## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| CHEMTECH ROYALTY ASSOCIATES, L.P., )<br>by DOW EUROPE, S.A., as Tax Matters Partner )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES OF AMERICA, )<br><br>Defendant. )<br> ) | Case No.: 05-944-RET-DLD<br><br>Case No.: 06-258-RET-DLD<br><br>Case No.: 07-405-RET-DLD |

## MEMORANDUM IN OPPOSITION
## TO MOTION TO COMPEL

Plaintiff, through undersigned counsel, opposes Defendant's Motion to Compel, filed

July 1, 2008, and respectfully submits this memorandum supporting its opposition

("Opposition"). For the reasons set forth below, Plaintiff's Privilege Logs meet or exceed the

standards set forth in the Federal Rules of Civil Procedure and applicable case law, and

Plaintiff's response to Interrogatory No. 16 reflects a reasonable inquiry under Federal Rule of

Civil Procedure 26(g). Accordingly, Defendant's Motion to Compel should be denied.

## BACKGROUND

### I.    Nature of the Case

This action is a petition for readjustment of partnership items of the Chemtech

Partnership[1] pursuant to section 6226 of the Internal Revenue Code of 1986, as amended (26

---

[1] Throughout this Opposition, "Chemtech Partnership" refers collectively to Chemtech Royalty Associates, L.P. ("Chemtech I") and Chemtech II, L.P. ("Chemtech II"). Chemtech I was formed in 1993; in 1998, Chemtech I was restructured and renamed Chemtech II.

U.S.C. § 6226). Congress enacted section 6226 as part of a set of comprehensive rules for the audit and litigation of partnership tax issues in the Tax Equity and Fiscal Responsibility Act of 1982, codified at 26 U.S.C. §§ 6221 et seq. (the "TEFRA rules"). Although the adjustment of partnership items has tax consequences for the partners in the Chemtech Partnership, their tax liability is not placed directly at issue in this TEFRA proceeding. At issue in this case is whether the IRS incorrectly adjusted certain partnership items, as defined by 26 U.S.C. § 6231(a)(3), of the Chemtech Partnership for the 1993 through 2003 taxable years.

## II.    Brief Factual Summary

Dow formed Chemtech I with five foreign banks in 1993 as a means of raising minority equity capital without adversely affecting its credit ratings or its balance sheet. Dow is a capital-intensive company for which ready access to capital is critical. Its business is cyclical in nature. Historically, Dow has followed a strategy of investing in new facilities during the "trough" years of the business cycle, when cash flow is low or even negative. In the early 1990s, Dow was undergoing a period of difficult business conditions and reduced earnings.

Dow's ability to raise capital at a reasonable cost depends upon Dow maintaining its credit ratings with ratings agencies. In order to minimize the risk of a credit downgrade, Dow decided to meet its funding requirements in part through Chemtech I. At the time Chemtech I was formed in 1993, the partnership vehicle enabled Dow to monetize valuable patent assets and to obtain $200 million in third-party capital that was treated for financial accounting purposes as minority equity on Dow's consolidated U.S. GAAP financial statements.

Dow subsidiaries contributed to the Chemtech Partnership patent assets valued at approximately $883 million and approximately $10 million in cash; the foreign banks contributed an aggregate of $200 million for limited partnership interests, which Dow was able

2

to access by way of loans from a partnership subsidiary. The Chemtech Partnership generated income primarily from royalties paid by Dow for the use of the patents. The foreign banks received a preferred return on their investments paid solely out of partnership profits and participated in profits and gains over and above the amount of the priority return. The foreign banks also would have participated in any losses in the partnership, and as limited partners, the entire amount of their contributed capital was subject to risk of loss.

In 1998, Dow exercised its option to purchase the partnership interests of the foreign banks due to changes in U.S. withholding tax laws that might have required Dow to indemnify the banks for U.S. withholding taxes. Following the purchase, Dow contributed its Plaquemine, Louisiana chemical plant to the partnership, Chemtech I distributed the patents and other assets to Dow partners, and the partnership's name was changed to Chemtech II, L.P. A U.S. subsidiary of Rabobank, RBDB, subsequently invested $200 million in the partnership. This investment enabled Dow to replace the $200 million in minority equity financing previously provided by the five foreign banks.

The government found objectionable certain tax consequences mandated by the Internal Revenue Code's partnership provisions that were favorable to Dow. Accordingly, it reallocated the partnership items of the Chemtech Partnership on multiple theories, including that the partnership was not valid for federal tax purposes.

## III.    Conduct Of Discovery

### A.    The Government's Quest For Privileged Documents

#### 1.    The Government's Focus On Privileged Tax Advice

Early in the litigation, Plaintiff made initial comprehensive document productions with respect to the 1993 through 1997 years of the Chemtech Partnership (documents produced on

October 13, 2006) and with respect to the 1998 through 2003 taxable years of the Chemtech

Partnership, following consolidation of those years (documents produced on June 12, 2007). The

government issued its First Request for Production of Documents, attached hereto as Exhibit A,

on May 11, 2007. Many of these broad ranging requests explicitly sought documents that the

government knew or should have known would be protected from discovery by applicable

privileges. See, e.g., United States' First Request for Production of Documents, Request Nos. 10

(seeking "[a]ll legal and tax opinions relating to the Chemtech transaction and/or to any entity's

participation in the Chemtech transaction"); 11 (seeking "[a]ll documents received from or given

to the law firm of King & Spalding related to the Chemtech transaction"); 13 (seeking "[a]ll

documents showing or analyzing the tax consequences of participating in the Chemtech

transaction for Dow or any other entity"); 14 (seeking "[a]ll communications and documents

between the internal tax department of Dow and any person in connection with the tax issues

related to the Chemtech transaction"); and 15 (seeking "[a]ll documents prepared by the internal

tax department of Dow in connection with the tax issues related to the Chemtech transaction").

The character of these requests made clear that, as has become common practice in tax

disputes, the government intended to launch a full-scale attack on Plaintiff's privileges. In

addition to requests targeted at outside counsel, requests for communications and tax analyses of

the Tax Department included documents authored or received by attorneys within the Tax

Department as part and parcel of their function of providing advice with respect to tax law and

associated legal issues. Dow's Tax Department was separate and distinct from the legal

department and reported directly to the CFO, a common practice for large companies. (Hahn

Dep. 155:17-20, 156:13-19, Apr. 10, 2008.)[2] Although the department included fifty or more

---

[2]  Excerpts from deposition testimony are indexed, alphabetically by witness, and are attached hereto as Exhibit B.

4

employees throughout the life of the Chemtech Partnership, only several were operating as attorneys in the Tax Department. (Brink Dep. 12:22-13:18, Apr. 3, 2008; Jones Dep. 19:16-20:22, May 16, 2008.) The Tax Department attorneys primarily were responsible for providing legal advice to the company, often in a tax planning role, and for working with outside counsel to provide Dow with legal advice relating to U.S. and foreign tax treatment. (Curry Dep. 43:12-44:8, 45:4-46:2, 48:19-49:5, June 5-6, 2008; Hahn Dep. 13:11-14:12, 24:12-25:19, 34:17-35:5, 109:10-110:7; Jones Dep. 81:13-82:4, 83:2-20.)

William Curry, currently Dow's Tax Director, testified that in performing legal duties for Dow in his former role as tax counsel he would evaluate transactions, noting "I reviewed code and regulations and considered the impact of a proposed transaction." (Curry Dep. 44:3-5.) Charles Hahn, a former Dow Tax Director, echoed this statement in describing his primary responsibilities: "[S]o as I said before, my responsibilities still were in the tax-planning area, primarily. I had some administrative duties as far as department administration and things like that, but primarily in the tax planning area." (Hahn Dep. 13:20-14:3.) Additionally, Craig Jones testified that he was "involved with the constant analysis of all of our transactions as to their probability of success" and that he "would always be on the look out for legal developments that would change the potential tax treatment of any Dow transaction." (Jones Dep. 81:13-82:4.) In sum, lawyers in Dow's Tax Department clearly acted as Dow's legal counsel with respect to the numerous tax issues a large company like Dow faced on a day-to-day basis. In some instances, certain attorneys also worked on the ongoing implementation of certain transactions to assure that Dow complied with the various legal requirements outlined in the corporate documents. (Curry Dep. 46:19-47:5, 49:6-19, 191:21-192:7, 227:12-228:9.) Plaintiff has produced documents relating to transaction administration that do not constitute legal advice.

Dow also relied on its outside counsel, King & Spalding ("K&S"), to provide tax advice.
Paul Brink, Dow's Tax Director during the implementation of Chemtech I, testified that he was
"the person who was responsible for providing . . . proper advice given to the company,"
specifically noting that at times, he would rely on outside counsel to assist him in answering tax
questions. (Brink Dep. 15:5-16:1.) With respect to the Chemtech Partnership transactions, K&S
served Dow in two capacities. First, K&S provided tax advice and evaluated the tax
consequences of the Chemtech Partnership transactions. Additionally, K&S provided general
corporate legal advice and drafted the relevant transaction documents. For the most part,
documents generated with respect to the former role are privileged and have been withheld or
redacted. Particularly in connection with the latter role, K&S often circulated non-privileged
documents to third-party deal participants, and Plaintiff has produced these documents.

As detailed above, Dow's Tax Department also employed various accountants and other
non-lawyer tax experts. In some cases, these employees prepared materials in anticipation of
litigation that are subject to work product protection. In addition, beginning in 1998, these
"federally authorized tax practitioners," including those who dealt frequently with IRS agents,
became eligible to provide privileged tax advice to Dow under 26 U.S.C. § 7525 subject to the
"same common law protections of confidentiality which apply to a communication between a
taxpayer and an attorney." Although not as prevalent as the advice Dow's in-house counsel
provided (Plaintiff only claims the § 7525 privilege over three documents), certain non-attorneys
in Dow's Tax Department also acted to provide Dow with advice related to tax issues facing the
company, specifically in connection with the Chemtech II transaction.

6

## 2.    Plaintiff's Good Faith Efforts To Preserve Privilege

As a result of the government's clear focus on privileged documents and its history in tax cases of taking a very broad view of subject matter waiver, it was particularly important for Plaintiff to exercise extreme care and diligence in its review to avoid the inadvertent production of documents that the government later would claim resulted in a subject matter waiver of applicable privileges. As a result, counsel for Plaintiff engaged in a careful review of all documents responsive to the government's broad-ranging requests to ensure that only non-privileged documents were produced. The process of undertaking a privilege review of documents in this case has been extremely time-consuming and resource-intensive. Each responsive document went through multiple levels of review before it was determined either that the document should be produced or withheld on the basis of one or more privileges.

Once it was determined that a document was to be withheld or redacted as privileged, a privilege log[3] entry was created containing information about the nature of the document, the privilege type and the basis for the claim of privilege, and the subject matter of the document. Thus, for each document, the Privilege Logs provide the following, to the extent available:

- date
- author
- addressee
- copyee
- document type (e.g., letter, memorandum, notes, opinion)
- privilege type (attorney-client, work product, tax practitioner privilege)
- privilege basis (describing the nature of the communication)
- subject matter

---

[3]    Two privilege logs exist in this matter, both dated April 2, 2008. The first is Plaintiff's Amended and Supplemented Privilege Log ("Privilege Log"), which contains all responsive documents Plaintiff currently withholds on privilege grounds. The second is Plaintiff's Amended and Supplemented Redacted Documents Privilege Log ("Redacted Log"), which contains all documents currently produced with any redaction. When discussed together, this Opposition refers to both of these documents as the "Privilege Logs."

The privilege basis field describes the nature of the communication. The sixteen distinct subject matter descriptions set forth the topic of communication at a general level. In addition, Plaintiff provided a list of all attorneys appearing as authors, addressees, or copyees, together with their affiliations (e.g., Dow, DESA, K&S, etc.) as an attachment to its Privilege Logs, attached hereto as Exhibit C. In short, the Privilege Logs provided as much information about each document as possible without revealing the privileged substance of the documents themselves.

Plaintiff expended significant additional resources attempting to resolve the current discovery dispute. First, Plaintiff re-reviewed each document on the Privilege Logs and determined upon further consideration that approximately eighty-six of the documents were not privileged. Plaintiff released these to the government and requested that the government identify specific documents or categories of documents remaining on the Privilege Logs that were of particular concern. See Letter from Hartman Blanchard to Deborah Morris (Feb. 29, 2008), attached hereto as Exhibit D. Despite two in-person meetings, the government never meaningfully explained to Plaintiff what documents it believed it needed. Instead, the government's assault on Plaintiff's privilege claims has remained undifferentiated with respect to the categories of documents it continues to seek.

Plaintiff also explained to the government multiple times that it was withholding many of the documents appearing on the Privilege Logs solely out of concern that the government would argue that production of the documents constituted a transaction-wide subject matter waiver. At Plaintiff's suggestion, the parties entered into an agreement that enabled Plaintiff to produce these documents without risking a subject matter waiver of any applicable privilege. Under the agreement, "the United States will not assert in any litigation that Plaintiff's production of [certain listed documents over which Plaintiff previously claimed privilege] constitutes a subject

8

matter waiver of the attorney-client privilege or the work product doctrine." See Agreement

Regarding Subject Matter Waiver of Attorney-Client Privilege or Work Product Doctrine With

Respect to Certain Documents (and First Amendment thereto) (collectively, the "Non-Waiver

Agreement"), attached hereto as Exhibit E. In order to implement the Non-Waiver Agreement,

Plaintiff again reviewed every document remaining on the Privilege Logs, generally producing

all documents other than communications to outside counsel and documents involving tax legal

analysis. This process has resulted in the production to the government of an additional 417

documents. Of 574 remaining documents on the Privilege Logs, the government is challenging

379 documents.[4] The government's continued challenge of external and in-house legal advice

relating to tax issues reinforces that the government is seeking to obtain legal advice relating to

the central issues in this litigation.

In all, Plaintiff's multiple reviews of its Privilege Logs and efforts to alleviate the

government's concerns resulted in the reduction of the total number of entries on Plaintiff's

Privilege Logs from 1,021 to 574 documents as of the date of this Opposition, a reduction in total

documents of over 43 percent. As of the date of this Opposition, Plaintiff has produced 11,014

documents.[5] By contrast, Plaintiff currently has withheld or produced in redacted form only 574

documents, or about 5 percent of all responsive documents. In substance, the documents

---

[4] Attached hereto as Exhibit F are revised versions of Plaintiff's Privilege Logs. Although the government does not specifically list the documents that it continues to challenge, Plaintiff has created new versions of its logs, attached as Exhibit F, that reflect only those documents that Plaintiff believes are still under challenge by the government. Pursuant to the criteria set forth in the Government's Memorandum at 7-8, these logs were created by: (1) removing all documents where "draft agreement" was the only subject matter listed; (2) removing all documents authored by K&S or any K&S attorney (this includes K&S attorneys not specifically listed in the government's memorandum of law) where "tax issues" was not listed as one of the subject matters; and (3) removing all documents authored by Dow employees provided solely to K&S attorneys where "tax issues" was not listed as one of the subject matters.

[5] Some of these documents are non-duplicative copies of the same document (e.g., a clean and marked up version of the same memorandum) and some documents contain attachments. Additionally, this total includes documents produced with redactions.

remaining on Plaintiff's Privilege Logs are those that clearly reflect privileged communications and analyses. Documents that reflect purely business advice or non-privileged tax return preparation have been produced.

The selectivity of the current privilege set is exemplified by the relative number of documents produced and withheld that were authored or received by Bill Curry. Although Mr. Curry's primary role was as a lawyer in Dow's Tax Department, as noted above, he also performed functions in the context of the Chemtech Partnership that were more in the nature of non-legal implementation and coordination. As a result, of all documents authored or received by Bill Curry, 1,672 have been produced and 244 have been withheld entirely. Thus, notwithstanding Mr. Curry's role as legal counsel, Plaintiff has withheld only 13 percent of communications to or from Mr. Curry, indicating the lengths to which Plaintiff has gone to produce documents wherever possible. Careful analysis of the legal versus non-legal functions performed by other attorneys in the Tax Department yielded similar results, with production of approximately 85 percent of documents authored or received by Charles Hahn and over 75 percent of documents authored or received by Craig Jones and Paul Brink.

## B.    Interrogatory No. 16

The government's Interrogatory No. 16 asked Plaintiff to "[d]escribe the method in which NPV and Risk Adjusted NPV of the Chemtech and Chemtech II projects were calculated (as referenced at CT 00073365), including in your answer a description of all risk factors that were taken into account in making those computations and a description of the weight accorded to each of those risk factors." See (Pl.'s Resp. to United States' Second Set of Interrogs., May 22, 2008), attached hereto as Exhibit G. In response to Interrogatory No. 16, Plaintiff stated, in pertinent part, as follows:

10

[T]he apparent author of the referenced document, Paul Janicki, is no longer employed at Dow. The government has deposed two of the recipients of the document (Geoffery Merszei and Charles Hahn, both of whom were examined specifically and extensively on its contents (see Merszei Tr. 102:8-118:3; Hahn Tr. 145:6-148:19)) and is scheduled to depose the third recipient of the document (Pedro Reinhard, identified by Mr. Merszei as the individual who would have made the ultimate decision, as CFO, what "risk factor" to use with respect to Chemtech II). Plaintiff currently does not have any basis for further elaborating on the "risk factors" taken into account in making the computations set forth in the referenced document.

See id. Following receipt of the response, the government complained (1) that it was not inquiring only about the referenced document; and (2) that the response did not indicate that Plaintiff had attempted to contact Mr. Janicki. See Letter from Deborah Morris to John Magee (June 23, 2008), attached hereto as Exhibit H.

Like other corporations, Dow is faced constantly with decisions as to which out of a large number of potential transactions it will enter into. To compare transactions with different rates of return, tenors, and cash flows over time, Dow looks to the net present value ("NPV") of a transaction. In all, the government deposed nine current or former Dow employees involved in the Chemtech Partnership who discussed the use of NPV analysis in connection with the transaction. NPV generally represents the cash-flow of a transaction discounted at some rate, typically the weighted average cost of capital, or "hurdle rate," for Dow, although other rates were used as warranted. See, e.g., (Falla Dep. 42:13-22; 85:15-86:1, May 8, 2008; Escudero Dep. 37:10-39:2, May 1, 2008.)

Consistent with Dow's general approach, Plaintiff produced to the government all responsive documents in its possession relating to the NPV of the Chemtech Partnership. Among the produced documents relating to the transaction NPV was the document that is the subject of Interrogatory No. 16, an April 7, 1998, e-mail from Paul Janicki, a former employee in Dow's Treasury Department, to Pedro Reinhard (then CFO at Dow), copying Geoffery Merszei

11

(then Treasurer at Dow) and Charles Hahn (then Tax Director at Dow), attached hereto as Exhibit I. This document refers to original forecasted and actual NPVs of the Chemtech Partnership through 1997 and estimated NPVs for Chemtech II. The e-mail also reflects calculations purporting to show "risk adjusted" NPVs based on percentage "risk factors." With respect to Chemtech I, Plaintiff also produced documents including Goldman Sachs transaction models projecting the NPV of the transaction to Dow under various different assumptions. With respect to Chemtech II, Plaintiff produced documents including various iterations of a spreadsheet comparing the NPV of the Chemtech Partnership to the NPV of a hypothetical "bond alternative," attached hereto as Exhibit J, and an e-mail authored by David Grzebinski, another former employee in Dow's Treasury Department, attached hereto as Exhibit K.

The government deposed all three recipients of the April 1998 Janicki e-mail. In fact, the government showed the e-mail in question to six different witnesses but chose not to depose the e-mail's author, Paul Janicki.[6] The government also showed the Grzebinski documents to several witnesses but chose not to depose Mr. Grzebinski. Additionally, although no deposed witness testified to having a specific recollection of the NPV process related to Chemtech II, five witnesses testified extensively concerning what risk factors Dow typically considers in NPV analyses of similar transactions.

At Geoffery Merszei's deposition, the government questioned Mr. Merszei about the NPV analysis underlying the Janicki e-mail, asking "what's the risk factor mean exactly?" (Merszei Dep. 105:1, Mar. 28, 2008.) Although not involved at the inception of Chemtech II (Merszei Dep. 103:11-12), Mr. Merszei provided detailed testimony on a "portfolio" of risk

---

[6] The witnesses examined on the email were William Curry (Dep. 353:18-358:2); Enrique Falla (Dep. 61:8-62:17); Chuck Hahn (Dep. 145:3-148:21); Craig Jones (Dep. 78:3-84:3); Geoffery Merszei (Dep. 102:7-118:3); and Pedro Reinhard (Dep. 283:3-301:15).

12

factors that are considered when calculating NPV, indicating that twenty different items could have been considered when determining the risk adjusted net present value. (Merszei Dep. 103:10.) Mr. Merszei went on to describe the types of risks typically factored into a financial investment similar to the one made in Chemtech II, discussing environmental risk, utilization risk, customer risk, product liability risk, investment risk, risk that the partners will act contrary to expectations, cross border issues, research and development issues, manufacturing issues, and tax risks. (Merszei Dep. 111:10-113:1; 115:3-117:7.) Finally, after this detailed discussion, Mr. Merszei noted that the CFO is the individual who makes the final decision concerning the risk adjustment to the net present value. (Merszei Dep. 117:8-118:3.)

Pedro Reinhard, CFO at the time that the parties entered into the Chemtech II transaction, testified that although he did not recall the specifics with respect to the risk adjusted NPV in relation to Chemtech II (Reinhard Dep. 287:6-25, May 30, 2008), "[r]isk factors, when they applied, are determined by the respective experts in a plant, in marketing, in research, wherever" (Reinhard Dep. 289:10-13), and speculated that the 51 percent "risk factor" set forth in the Janicki e-mail may have come from the tax group within Dow. (Reinhard Dep. 295:17-19.)

Charles Hahn, then Tax Director at Dow, also received the Janicki e-mail. When questioned about the document he indicated that "to the extent that there were figures that were needed that came out of the tax records, we would have provided that [to those performing the calculations]." (Hahn Dep. 147:22-148:2.) He also indicated that the Tax Department would not perform the NPV analysis because it "wouldn't have had all the figures to do it." (Hahn Dep. 147:16-18.)

Enrique Falla, former Dow CFO, testified that NPV calculations generally were performed for all "long-term investments" (Falla Dep. 45:15-16), and that some of the risks

13

taken into account include "foreign exchange risks . . . political risks . . . convertibility risks . . . [and] business risks." (Falla Dep. 44:21-45:2.) In all, Mr. Falla's testimony concerning NPV and its calculation spanned 12 pages. (Falla Dep. 42:9-54:5.)

Following receipt of the government's letter challenging the adequacy of Plaintiff's inquiry regarding Interrogatory No. 16, Craig Jones, Tax Director of DowAgrosciences and Tax Counsel for Dow, contacted Paul Janicki and David Grzebinski, former Dow Treasury Department employees who may have been involved in NPV calculations relating to the Chemtech Partnership. See Declaration of Craig Jones (July 24, 2008) ("Jones Decl."), at ¶ 2, attached hereto as Exhibit L. Mr. Janicki indicated that he no longer possessed any Dow documents. To date, Dow has received no further response from Mr. Janicki. See id. at ¶ 3. Mr. Grzebinski indicated that he no longer possessed any Dow documents. See id. at ¶ 4. Mr. Grzebinski also indicated that although he was involved in NPV calculations for Chemtech II, he does not recall the specifics of such calculations. See id. Generally, Mr. Grzebinski indicated that calculations involved comparing the cash flows of the transaction with the cash flows of a hypothetical 5-year bond issuance, discounting these flows at Dow's weighted average cost of capital, as well as adjusting the NPV using a percentage success factor obtained from Dow's Tax Department attorneys. See id.

## ARGUMENT

Plaintiff has worked extraordinarily hard to produce to the government as many documents as possible without risking subject matter waiver of its claims of privilege. Plaintiff's Privilege Logs meet and exceed the requirements of the Federal Rules of Civil Procedure for claiming the privilege and describing the nature of the documents withheld. Moreover, the government has failed to demonstrate any reason to believe that any documents or categories of

documents remaining on Plaintiff's Privilege Logs should be subject to heightened scrutiny.

Plaintiff's production of documents and the testimony of current and former employees of Dow regarding NPV analyses of the Chemtech Partnership have satisfied Plaintiff's duty of reasonable inquiry with respect to the government's Interrogatory No. 16. Moreover, Plaintiff has taken the voluntary step of contacting former employees who might have personal knowledge bearing on Interrogatory No. 16.

## I.     Plaintiff Appropriately Logged Responsive Documents Protected By Applicable Privileges.

Plaintiff has withheld the disputed documents from production principally under either or both of the attorney-client privilege and the attorney work product doctrine.[7] Courts long have respected the critical role of the attorney-client and work product privileges. The attorney-client privilege promotes "the broad public interests in the observance of law and the administration of justice" by encouraging the "full and frank communication between clients and their attorneys." Nguyen v. Excel Corp., 197 F.3d 200, 208 (5th Cir. 1999). Accordingly, the Fifth Circuit has recognized that "[a] corporate client has a privilege to refuse to disclose, and prevent its attorneys from disclosing, confidential communications between its representatives and its attorneys when the communications were made to obtain legal services." Id. at 206.

The privilege protects communications both to and from a corporation's attorney, where the purpose of the communication is to seek or render legal advice. See Upjohn Co. v. United States, 449 U.S. 383, 390 (1981) ("[T]he privilege exists to protect not only the giving of

---

[7]     The government makes much of Plaintiff's assertion of the tax practitioner privilege under 26 U.S.C. § 7525, but Plaintiff has asserted this privilege as to only three withheld documents. Additionally, the government has not challenged with particularity the elements of the privileges that it clams are not satisfied. In this Opposition, Plaintiff limits its response to issues specifically raised in the Government's Memorandum. Plaintiff reserves the right to supplement its Opposition in response to additional issues later raised by the government or the Court.

15

professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."); United States v. Ballard, 779 F.2d 287, 290 (5th Cir. 1986) (privilege protects the "lawyer's responses to [a client's] inquiries").

The work product doctrine prohibits discovery of materials prepared in anticipation of litigation. See Fed. R. Civ. P. 26(b)(3); Hickman v. Taylor, 329 U.S. 495 (1947). The doctrine advances the "strong public policy" of ensuring that a "lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." United States v. Nobles, 422 U.S. 225, 236-37 (1975) (citations omitted). As the Supreme Court has observed, without the work product doctrine, "much of what is now put down in writing would remain unwritten," and "the interests of clients and the cause of justice would be poorly served." Upjohn Co., 449 U.S. at 398. As a result, "opposing counsel may rarely, if ever, use discovery mechanisms to obtain the research, analysis of legal theories, mental impressions, and notes of an attorney acting on behalf of his client in anticipation of litigation." See LaSalle Bank N.A. v. Mobile Hotel Properties, LLC, No. 03-2225, 2004 WL 902169, *6 (E.D. La. Apr. 23, 2004). The doctrine protects work performed "by or for [a party] or its representative," and in that sense applies to the work of attorneys and non-attorneys alike. See Fed. R. Civ. P. 26(b)(3).

In the Fifth Circuit, a document is prepared in anticipation of litigation where "the primary motivating purpose behind the creation of the document was to aid in possible future litigation." United States v. Davis, 636 F.2d 1028, 1040 (5th Cir. 1981). Since the Fifth Circuit's decision in Davis, most other federal circuits have adopted a test derived from the Second Circuit's decision in United States v. Adlman, 134 F.3d 1194 (2nd Cir. 1998), which asks instead whether a document was prepared "because of" the prospect of litigation. The Fifth Circuit has not revisited its applicable test for work product since the widespread adoption of Adlman. Either

16

way, tax opinions obtained prior to the filing of a corporate tax return, and other work by tax

counsel to evaluate "the potential outcomes of litigation" with the IRS, were work product under

both standards. See Regions Financial v. United States, No. 2:06-00895, 2008 WL 2139008, *5

(N.D. Ala. May 8, 2008) ("[I]t is not necessary to determine which test applies here because the

result in this case is the same regardless of which test the court applies. Under both tests, the

critical issue is the purpose for which the documents were created."). Litigation need not be

imminent, or even certain to occur, for work product to apply. See Davis, 636 F.2d at 1040.

## A.     Plaintiff's Privilege Logs Amply Comply With The Federal Rules of Civil Procedure.

Rule 26(b)(5)(A) requires a party withholding information otherwise discoverable under

a claim of privilege to "expressly make the claim" and to "describe the nature of the documents,

communications, or tangible things . . . in a manner that, without revealing information itself

privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P.

26(b)(5)(A)(i)-(ii) (emphasis added). Although a "party must provide sufficient information to

enable other parties to evaluate the applicability of the claimed privilege or protection," the "rule

does not attempt to define for each case what information must be provided." Fed. R. Civ. P. 26

advisory committee's note. Consistent with the Federal Rules of Civil Procedure, the Middle

District of Louisiana has required privilege logs to contain only the date, author, recipient(s),

subject matter, purpose, and explanation of the claimed privilege. See Reine v. Honeywell Int'l,

Inc., No. 06-673, 2008 WL 1901398, *6 (M.D. La. Apr. 25, 2008) (requiring a log to contain the

date, the author, the recipient(s), general statement regarding the document, and the specific

basis for the privilege claim).

Plaintiff has provided more than adequate information on its Privilege Logs for the government to assess the claims made therein. The Privilege Logs contain descriptions of eight categories of information: date, author, addressee, copyee, document type, privilege type, privilege basis, and subject matter. See Exhibit F. In addition, Plaintiff provided a detailed list of the individuals appearing as authors, addressees, or copyees who are attorneys, together with their affiliations for each of their Privilege Logs. See Exhibit C.

The government complains specifically that "[t]he most glaring inadequacy of the privilege logs is the 'subject matter' category" because "the documents claimed as privileged are not described." Gov. Mem. at 11. However, the government does not suggest how more detailed descriptions would assist it in assessing the adequacy of Plaintiff's privilege claims. Rule 26 does not require parties to provide particularized descriptions detailing the minutiae distinguishing among documents falling within more generalized subject matters. To the contrary, the Advisory Committee specifically noted that "[d]etails concerning time, persons, general subject matter, etc., may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged, particularly if the items can be described by categories." Fed. R. Civ. P. 26 advisory committee's note; see also SEC v. Beacon Hill Asset Mgmt. LLC, 231 F.R.D. 134, 144 (S.D.N.Y. 2004) (finding "correspondence or e-mails seeking, transmitting or reflecting legal advice" sufficiently descriptive where court assumed nature of legal advice transmitted); In re Phenylpropanolamine Prods. Liab. Litig., No. 1407, 2002 U.S. Dist. LEXIS 26794, at *6-8 (W.D. Wash. Oct. 4, 2002) (accepting descriptions such as "'development, testing, labeling and marketing' of a Bayer product" notwithstanding that "defendants grouped a large portion of the documents into a fairly broad category"). As discussed, the government's requests targeting privileged documents has

resulted in precisely the voluminous privilege claims contemplated by the Advisory Committee in commenting that categorization of privilege claims is appropriate.

Plaintiff adequately has described the subject matters on its Privilege Logs. Each document was reviewed by attorneys who then would determine which of sixteen subject matters to assign each document. This process involved a careful document by document analysis. The government decries the subject matter "tax issues related to the Chemtech Partnership" as impermissibly vague. This complaint rings hollow, however, in light of the government's own discovery requests using the exact same subject matter terminology. See, e.g., Government Request for Production Nos. 14 (emphasis added) (seeking "[a]ll communications and documents between the internal tax department of Dow and any person in connection with the tax issues related to the Chemtech transaction"), and 15 (emphasis added) (seeking "[a]ll documents prepared by the internal tax department of Dow in connection with the tax issues related to the Chemtech transaction") (Exhibit A).

Moreover, Defendant does not demonstrate how a more detailed subject matter description would assist it in assessing Plaintiff's claims of privilege. Indeed, although an opponent may inquire into the "general nature" of the legal services provided to a corporation, specific details regarding the substance of any communications or the work performed by the attorney are subject to protection. See Nguyen, 197 F.3d at 206; see also Chaudhry v. Gallerizzo, 174 F.3d 394, 402-03 (4th Cir. 1999) (holding that privilege protects the identity of the federal statutes researched by the attorney); United States v. Amlani, 169 F.3d 1189, 1195 (9th Cir. 1999) (privilege protects "specific nature of the services provided, such as researching particular areas of law").

A party can waive privilege by providing too much of the substance of any communication, or by failing to object to an inquiry seeking privileged information. Nguyen, 197 F.3d at 206; see also Evergreen Trading, LLC v. United States, 80 Fed. Cl. 122, 137 (Fed. Cl. 2007) (noting that privilege can be waived by providing certain details regarding a communication on a privilege log). Thus, more detailed subject matters would come "perilously close to requiring disclosure of the substance of the privileged communication." Beacon Hill Asset Mgmt., 231 F.R.D. at 145; accord In re Grand Jury Subpoena, 274 F.3d 563, 576 (1st Cir. 2001) ("Privilege logs do not need to be precise to the point of pedantry."); Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 168 F.R.D. 641, 646 n.2 (D. Minn. 1996) (noting the "unavoidably cryptic nature of a description in a [p]rivilege [l]og"). Plaintiff's fear of waiver is not unfounded in light of the government's broad interpretation of the subject matter waiver, as demonstrated in the Government's Memorandum and discussed below (at section I.B.3.b).

**B.      None Of The Documents On Plaintiff's Privilege Logs Necessitate Heightened Scrutiny.**

The government makes a number of observations about the documents described in Plaintiff's Privilege Logs that it claims raise questions about the propriety of Plaintiff's privilege claims. As addressed below, none of these observations should result in increased scrutiny over any of the documents on Plaintiff's Privilege Logs.

**1.      A Document's Subject Matter Has No Bearing On The Validity Of Privilege Claims, And Documents With Unknown Authors Can Be Privileged.**

The government attempts to call into question Plaintiff's privilege claims over subject matters that "seem more business in nature than legal." Gov. Mem. at 12. This statement confuses and conflates privilege basis, which relates to the character of a communication, with

subject matter, which relates to the topic on which the legal advice is rendered or attorney work product is prepared. It is axiomatic that legal advice does not occur in a vacuum and that a corporation seeks legal advice with respect only to subjects relating to its business. So to state that the subject matter of a privileged communication is "business in nature" is a truism at best. See United States v. Chen, 99 F.3d 1495, 1501 (9th Cir. 1996) ("The government's phrase, 'involved in business decision-making,' obscures the issue. A client is entitled to hire a lawyer, and have his secrets kept, for legal advice regarding the client's business affairs."). However, the entries on Plaintiff's Privilege Logs do more than describe the subject matter of the communications at issue; they make specific claims that each communication seeks or reflects legal advice and/or was made in anticipation of litigation and indicates where the authors or recipients are attorneys. Plaintiff cannot divine why particular subject matter characteristics "seem more business in nature than legal" to the government, but any such nebulous distinction is simply irrelevant to the privileged character of a document.

The government correctly notes that a handful of the documents on Plaintiff's Privilege Logs (eleven out of 574 documents) do not list a specific author or recipient. In the corporate context, privilege regularly protects communications not involving attorneys or involving unknown authors where the communication relates to seeking or receiving legal advice. See Vallone v. CNA Fin. Corp., No. 98-7108, 2001 WL 1230663, at *1 (N.D. Ill. Oct. 15, 2001) (inferring that handwritten marginalia were from legal department and therefore privileged); Bogosian v. Gulf Oil Corp., No. 71-1137, 1983 WL 1855, at *2-3 (E.D. Pa. 1983) (sustaining claims of privilege over documents with unknown authors and recipients where facts and circumstances support inference that communication involved employees of the corporation); see also United States v. ChevronTexaco Corp., 241 F. Supp. 2d 1065, 1077 (N.D. Cal. 2002)

21

(denying the IRS's motion to compel discovery of certain non-attorney employee communications because they "reflect[ed] matters about which the client intend[ed] to seek legal advice"). In the case of each of the eleven documents in issue, Plaintiff is willing to provide limited additional information to demonstrate that the documents are reflective of legal advice. Attached hereto as Exhibit M. As Exhibit M demonstrates, it is clear that each of the documents at issue was sourced from Dow, and, although the author is unknown, the content of each document makes clear that the documents reflect communications with outside and in-house counsel for purposes of obtaining legal advice. For example, Privilege Log entry 966 is labeled "Notes from conference call with Bill Curry [in-house tax counsel] on 8/23/95," and the notes in question clearly reflect legal advice from Bill Curry relating to tax issues.

## 2. Documents Authored By In-House Counsel Relate To Privileged Legal Work.

Defendant further attacks Plaintiff's Privilege Logs on the grounds that Plaintiff's in-house attorneys performed predominantly non-privileged business functions. It is beyond dispute that privilege applies to the work of in-house counsel. See generally Upjohn Co., 449 U.S. 383 (1981) (applying privilege to work performed by general counsel's office); In re Sealed Case, 737 F.2d 94 (D.C. Cir. 1984) (status as in-house counsel alone "does not dilute the privilege"). In the case of corporate in-house counsel, the attorney must be functioning in "a professional legal capacity," as opposed to a business one, to qualify for the privilege. In re Sealed Case, 737 F.2d at 99. Because "legal and business issues are often inextricably intertwined . . . courts should resolve doubts in favor of the privilege." Robinson v. Tex. Auto Dealers Ass'n, 214 F.R.D. 432, 446 (E.D. Tex. 2003), rev'd on other grounds, 387 F.3d 416 (5th Cir. 2004).

At the outset, it is notable that three in-house attorneys predominate those entries on the Privilege Logs that do not involve direct external legal advice. Bill Curry, Craig Jones, or Eric Blackhurst authored well over half of the internally-generated documents that the government is seeking. As discussed above, during the time frame at issue in this case, Bill Curry and Craig Jones served the specific functions as "tax counsel" within the Tax Department. As distinguished from accountants and economists working in the Tax Department, the primary functions of Messrs. Curry and Jones was to provide legal advice. (Curry Dep. 47:2-5, 48:19-49:19; Jones Dep. 81:13-82:4, 83:2-4.) Eric Blackhurst was the primary transactional lawyer involved in the Chemtech Partnership, and his role almost exclusively involved providing legal advice on the partnership agreements and other transactional documents.

Notwithstanding that the primary roles of Dow in-house counsel were legal in nature, Plaintiff has carefully analyzed each document authored or received by in-house counsel to determine whether the document in fact relates to legal advice or business issues. This is particularly well-demonstrated by the relatively extensive production of documents authored or received by Bill Curry. As the government notes, notwithstanding Mr. Curry's primary function as tax counsel, in the context of the Chemtech Partnership, he was tasked as a junior executive with many implementation and compliance-related functions. Plaintiff did not withhold such documents, and accordingly produced 1,672 documents on which Mr. Curry was the author or recipient (approximately 87 percent of all such documents). Plaintiff's voluminous production of business-related documents authored or received by in-house attorneys like Mr. Curry belies the government's unfounded speculation that the withheld documents are somehow less likely to be privileged.

3.    **Documents Relating To Tax Issues Fall Squarely Within The Scope Of The Privileges Claimed.**

a.    **The Attorney-Client Privilege And Work Product Doctrine Apply With Equal Force In The Context of Tax Issues.**

Defendant claims that "documents categorized as 'tax issues' . . . are likely to fall outside the scope of privilege." Gov. Mem. at 14. If anything, the opposite is true. Multiple cases have determined that an in-house tax attorney's communications are privileged to the same degree as those of general in-house counsel. See, e.g., United States v. Textron Inc., 507 F. Supp. 2d 138, 147 (D.R.I. 2007) ("Here, since the tax accrual workpapers [at issue] essentially consist of nothing more than counsel's opinions that might be challenged . . . they are protected by the attorney-client privilege"); see also United States v. Rockwell, Int'l, 897 F.2d 1255, 1265 (3d Cir. 1990) (directing the District Court to make "specific factual findings as to the nature of the material" authored by in-house tax counsel to determine whether it contained legal advice). In fact, "the giving of tax advice and the preparation of tax returns . . . [is] prima facie subject to the attorney-client privilege." Colton v. United States, 306 F.2d 633, 637 (2d Cir. 1962). Other courts have acknowledged that tax planning serves the interests of the privilege by assuring that "more likely than not the tax law will be followed." Evergreen Trading, LLC v. United States, 80 Fed. Cl. 122, 131 (Fed. Cl. 2007). The presumption of privilege results because transactional tax analysis is:

> rooted virtually entirely in the law. The advisor must analyze the tax code, IRS rulings, decisions of the Tax Court, etc. Communications offering tax advice or discussing tax planning or the tax consequences of alternate business strategies are 'legal' communications . . . . We realize that corporations often enlist the services of nonlawyers (e.g., accountants, consulting firms) to advise them with respect to tax matters. This does not change the fact that the advice is rooted in the law and, when solicited from or given by a client's attorney it constitutes legal advice as contemplated by the attorney-client privilege.

United States v. Chevron Texaco Corp., 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002).

The foregoing authorities eminently make clear that courts treat the practice of legal tax work as privileged and use the same privilege criteria for tax-related documents as for documents relating to any other subject. The government's claim that "tax is largely a business-related subject," Gov. Mem. at 15, is neither meaningful nor suggestive that tax legal advice is subject to closer scrutiny. Nor is the government's citation to tax return preparation materials pertinent to Plaintiff's privilege assertions because Plaintiff is not claiming privilege over such documents.

### b.    Plaintiff Has Not Put Tax Advice At Issue In This Litigation.

As a fall-back, the government also argues that Plaintiff has put some or all of the privileged documents relating to tax "at issue," thereby waiving the privilege. The government speculates that it is "possible that any documents categorized as 'tax issues' could have a bearing on whether the Chemtech transactions are 'tax shelters' . . . which is an issue in this case." Gov. Mem. at 16. Additionally, the government contends that Plaintiff's invocation of the tax practitioner's privilege raises the tax shelter issue and waives the privilege with respect to that topic. The government's overbroad interpretation of the "at issue" doctrine is flawed.

The "at issue" doctrine operates to waive attorney-client privilege "when a litigant place[s] information protected by [the privilege] in issue through some affirmative act for his own benefit and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party." Conkling v. Turner, 883 F.2d 431, 431 (5th Cir. 1989) (citations and internal quotation marks omitted). A party does not place information at issue merely by denying allegations or asserting claims. For instance, a party does not place the advice of counsel at issue by asserting a good-faith defense in an anti-trust proceeding. In re Burlington Northern, Inc., 822 F.2d 518, 533 (5th Cir. 1987) ("This is not a case where a party has asserted a claim or defense that explicitly relies on the existence or absence of the very

communications for which he claims a privilege."); see also Nguyen, 197 F.3d at 205 (refusing

to find waiver based on assertion of good faith defense against allegation of violations of the Fair

Labor Standards Act); Ward v. Succession of Freeman, 854 F.2d 780, 789 (5th Cir. 1988) ("To

waive the attorney-client privilege by voluntarily injecting an issue in the case, a defendant must

do more than merely deny a plaintiff's allegations.") (citation omitted). Contrary to the position

taken by the government in its motion, privilege clearly is not waived when a party simply

denies the existence of a statutory precondition to imposition of a penalty. Rather, "at issue"

waiver is designed to prevent a party from using the privilege unfairly by "assert[ing] privilege

as both a sword and a shield." Greater Newburyport Clamshell Alliance v. Public Serv. Co., 838

F.2d 13, 17 (1st Cir. 1988) (internal quotation marks omitted).

Here, Plaintiff has not performed any affirmative act which could be construed as placing

protected information at issue. Plaintiff merely has denied an allegation that the transaction in

question was a tax shelter. See (Pl.'s Resp. to United States' Interrog. No. 6, May 31, 2007),

attached hereto as Exhibit N. Plaintiff has not and will not attempt to use affirmatively the

privileged legal advice it received in order to prove at trial that the Chemtech Partnership was not

a tax shelter. Nor does the receipt of tax advice in connection with the tax consequences of the

Chemtech Partnership bear at all on the tax shelter issue.[8]

Moreover, the cases on which the government relies are inapposite in the context of this

case. In Armstrong v. United States, the court applied the "at issue" waiver doctrine where the

proponent of the privilege sought to use affirmatively, but selectively, certain communications

---

[8] Legal advice obtained by Dow might be relevant to a partner-level "reasonable cause" defense to penalties if the Court ultimately finds penalties applicable in the present proceeding after an adverse judgment on the merits. As detailed in the Letter from Hartman Blanchard to Deborah Morris (Jan. 22, 2008), attached hereto as Exhibit O, the "reasonable cause" defense is a partner-level defense, not a partnership-level determination, that may be raised only in a separate, partner-level proceeding. See 26 U.S.C. § 6230(c)(4); Temp. Treas. Reg. § 301.6221-1T(c)-(d). Accordingly, Plaintiff cannot and will not raise that defense in the present proceeding.

with counsel to challenge a guilty plea. The court held that "where one attempts to attack a guilty plea in federal court upon the ground that it was not intelligently and knowingly entered and offers testimony during the litigation as to conversations with counsel regarding the entry of the guilty plea, he waives the right to claim the attorney-client privilege as to entire scope of that issue." Armstrong v. United States, 440 F.2d 658, 659 (5th Cir. 1971). Plaintiff has not performed an affirmative act that would result in the type of manifest unfairness that the government must demonstrate in order to avail itself of the "at issue" doctrine.[9] Because Plaintiff has not put any advice at issue, and because no manifest unfairness would result from upholding the privilege, no waiver has occurred.

### 4.    Documents Produced To The Government Pursuant To The Parties' Non-Waiver Agreement Are Irrelevant To The Privilege Claims On Plaintiff's Privilege Logs.

The government seeks to impugn Plaintiff's remaining privilege claims based on documents that Plaintiff produced to the government in good faith pursuant to the parties' Non-Waiver Agreement. These documents are not in dispute, nor do they bear any relevance to the privileged character of the items remaining on Plaintiff's Privilege Logs. As discussed, Plaintiff's initial privilege review necessarily was conservative given the government's obvious focus on obtaining privileged documents and given the government's historical predilection to claiming subject matter waiver with little or no foundation. See, e.g., In re G-I Holdings Inc.,

---

[9]    Furthermore, the government's claim that Plaintiff's assertion of the tax practitioner privilege (asserted only with respect to three documents on Plaintiff's Privilege Logs) waives any advice received on the tax shelter issue is without support. In the first place, the government fails to quote key language in the exception that it cites. Section 7525 does not apply to "written communications . . . in connection with the promotion of the direct or indirect participation of such corporation in any tax shelter (as defined in section 6662(d)(2)(C)(iii))." 26 U.S.C. § 7525(b) (emphasis added). The government has not alleged that any of the communications over which Plaintiff has asserted section 7525 reflect anything other than the "routine relationship between a tax practitioner and a client," which the tax shelter limitation was not intended to impact. See H.R. Rep. No. 105-599, at 269 (1998) (Conf. Rep.). In any event, the government's waiver argument must fail. Drawn to its logical conclusion, the argument would eviscerate the privilege entirely because to claim the privilege would be simultaneously to waive it.

27

218 F.R.D. 428 (D.N.J. 2003) (government argued that response to interrogatory regarding penalties created a transaction-wide subject matter waiver of privilege). As discussed above, the government's sweeping subject matter waiver argument in its Memorandum demonstrates that Plaintiff's caution has not been misplaced. Plaintiff is disheartened that the government has chosen to attempt to gain tactical traction from documents produced to it in good faith and for the purposes of resolving the parties' disputes. In any event, the documents are not indicative of those under challenge and accordingly are irrelevant.

## II.     Plaintiff Has Fulfilled Its Duty Of Reasonable Inquiry With Respect To Transaction NPV Analyses.

The government claims that Plaintiff's response to Interrogatory No. 16, seeking information about the "NPV" and "risk-adjusted NPV" of the Chemtech Partnership as set forth in the Janicki memorandum discussed above, *supra* Background § III.B, is deficient. Gov. Mem. at 19. Specifically, the government claims that Plaintiff has not made a reasonable inquiry required by Rule 26(g)(1), and that responding to interrogatories by means of deposition testimony is improper.

Rule 26(g)(1) requires a party to perform a reasonable inquiry with respect to each discovery request and response thereto. Courts apply an objective inquiry in determining whether a party has complied with the provisions of Rule 26(g)(1). Chapman & Cole v. Itel Container Int'l B.V., 116 F.R.D. 550, 556 (S.D. Tex. 1987). Plaintiff's inquiry clearly was reasonable under the circumstances. First, Plaintiff conducted exhaustive searches of Treasury Department files to locate documents relating to the Chemtech Partnership in connection with its initial disclosures and discovery responses. As a result of those searches, Plaintiff produced numerous documents containing NPV calculations. These documents included Goldman Sachs

models relating to Chemtech I and comparisons of the Chemtech II NPVs to a "bond alternative."

Second, as discussed above, numerous witnesses testified under oath on this topic. The deponents included current employees (Curry, Escudero, Merszei, and Jones), former employees (Brink, Hahn, and Reinhard), and third parties (Ackert and Globus (Goldman Sachs)). Based on this extensive testimony, the government has sufficient information to understand fully how Dow generally calculates risk with respect to its net present value analysis, and any further inquiries into this matter are both duplicative and unnecessary. Contrary to the government's claims that referencing deposition testimony is inappropriate, Gov. Mem. at 19, such references are sufficient as long as they include specific page and line references. See Shadow Lake Mgmt. v. Landmark Am. Ins. Co., No. 06-4357, 2007 WL 4354424, at *2 (E.D. La. Dec. 10, 2007) (ordering supplemental responses to interrogatories including "references to specific pages [of deposition testimony] where the answer is found"). In any event, Plaintiff is unaware of any current employees who could shed further light on the information sought in Interrogatory No. 16.

As the government is well aware from the documents produced and depositions taken, those former Dow employees most likely involved in preparing NPV analyses relating to the Chemtech Partnership are Paul Janicki and David Grzebinski. The government deposed several witnesses regarding the documents authored by Messrs. Janicki and Grzebinski. However, notwithstanding the government's apparent interest in this subject and Plaintiff's accommodation in permitting the government to take a total of 23 depositions, the government chose not to depose these individuals.

Although not required to do so, Plaintiff has sought the assistance of Messrs. Janicki and Grzebinski in responding to the government's inquiry. See Jones Decl. at ¶ 2, attached hereto as Exhibit L. Mr. Janicki indicated that he has no Dow documents in his possession. See id. at ¶ 3. Dow has followed up with Mr. Janicki to determine whether he recalls the manner in which the NPVs and risk adjusted NPVs were calculated. See id. Mr. Janicki's "out-of-office" e-mail reply indicates that he is out of the office until July 31, 2008. See id. Plaintiff has made similar inquiry of Mr. Grzebinski, and as discussed above, he has no Dow documents, but had limited recollection of general NPV calculations within Dow. See id. at ¶ 4. If either of these former employees provides additional information responsive to Interrogatory No. 16, Plaintiff will supplement its response accordingly.

WHEREFORE, Plaintiff respectfully requests that the government's motion be denied.

> PLAINTIFF
> CHEMTECH ROYALTY ASSOCIATES, L.P., by
> DOW EUROPE, S.A., as Tax Matters Partner

> *s/ David M Bienvenu, Jr.*

> David M. Bienvenu, Jr.
> TAYLOR, PORTER, BROOKS & PHILLIPS
> Post Office Box 2471
> Baton Rouge, LA 70821
> Telephone: (225) 387-3221
> Facsimile: (225) 346-8049

Dow Europe, S.A.
Bachtobelstrasse 3
CH-8819
Horgen, Switzerland

> John B. Magee
> Hartman E. Blanchard, Jr.
> MCKEE NELSON LLP
> 1919 M Street, N.W., Suite 200
> Washington, D.C. 20036
> Telephone: (202) 775-1880
> Facsimile: (202) 775-8586

## CERTIFICATE OF SERVICE

I certify that on July 24, 2008 a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

*s/ David M. Bienvenu, Jr.*

_____

David M. Bienvenu, Jr.

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| CHEMTECH ROYALTY ASSOCIATES, L.P.,<br>by DOW EUROPE, S.A., as Tax Matters Partner ) | |
| Plaintiff, | Case No.: 05-944-RET-DLD |
| v. | Case No.: 06-258-RET-DLD |
| UNITED STATES OF AMERICA, | Case No.: 07-405-RET-DLD |
| Defendant. | |

## **Proposed Order**

The Court having reviewed the government's Motion to Compel, Plaintiff's

Memorandum in Opposition thereto, and any further replies, and it appearing otherwise

proper, it is **ORDERED** that the government's Motion to Compel be, and hereby is,

**DENIED** in its entirety.


Signed in Baton Rouge, Louisiana, on _____, 2008


_____

Judge