# PLAINTIFF'S EXHIBIT

# B-1

| Deposition Excerpts | |
|---|---|
| **Deponent** | **Pages Included** |
| Brink, Paul | 1, 12-13, 15-16 |
| Curry, William | 1, 43-49, 191-192, 227-228, 353-358 |
| Escudero, Alfonso | 1, 37-39 |
| Falla, Enrique | 1, 42-54, 61-62, 85-86 |
| Hahn, Charles | 1, 13-14, 24-25, 34-35, 109-110, 145-148, 155-156 |
| Jones, Craig | 1, 19-20, 78-84 |
| Merszei, Geoffery | 1, 102-118 |
| Reinhard, Pedro | 1, 283-301 |

1

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2              MIDDLE DISTRICT OF LOUISIANA

 3                   CIVIL DIVISION

 4   - - - - - - - - - - - - - - - X

 5   CHEMTECH ROYALTY ASSOCIATES,   :

     L.P., by DOW EUROPE, S.A. as   :

 6   Tax Matters Partner,           :

 7           Plaintiff,             : Civil Action No.

 8             v.                   : 05-944-C-M3

 9   UNITED STATES OF AMERICA,      :

10           Defendant.             :

11   - - - - - - - - - - - - - - - X

12

13                         Washington, D.C.

14                         Thursday, April 3, 2008

15           Deposition of PAUL DAVID BRINK,

16   a witness herein, called for examination by

17   counsel for the Defendant at the law offices of

18   McKee Nelson, LLP, 1919 M Street, Northwest,

19   Suite 200, Washington, D.C., at 8:45 a.m., before

20   Marijane W. Simon, a Registered Diplomate

21   Reporter, Certified LiveNote Reporter, and Notary

22   Public in and for the District of Columbia.
```

12

1    CEO of a quite substantial reinsurance subsidiary

2    of Dow Chemical called Dorinco, D-o-r-i-n-c-o,

3    Reinsurance Company.  And I held those -- Those

4    are two positions.  They're kind of side-by side

5    jobs -- until July of 2001 when I retired.

6         **Q.    Were your jobs with Dorinco in Midland?**

7         A.    They were in Midland, yes.

8         **Q.    And what city and state do you currently**

9    **reside in?**

10        A.    I live in -- near Travers City,

11   Michigan.

12        **Q.    Going back to your time as director of**

13   **taxes at the Dow Chemical Company, what were your**

14   **roles in that position?**

15        A.    Oh, a couple of things, I guess.  I was

16   the principal tax advisor to the company on one

17   hand, and I was also in charge of a department.

18   It was all of the people in the department and

19   around the world that in a sense, worked for me,

20   so I had the administrative responsibility for the

21   operation of a department.

22        **Q.    And during your time there, how many**

```
                                                      13
 1    people were in the tax department?
 2         ·. A.    This is a rough guess, but I think about
 3    50 or so.  And then there were a number of people
 4    around the world who I think I had -- We used to
 5    call dotted-line responsibility.  I had sort of
 6    functional -- I'm not sure I can describe it quite
 7    right, but they weren't direct reports, but I had
 8    some oversight on their work.
 9         Q.    And these individuals in Midland, were
10    they attorneys, accountants --
11         A.    Both.
12         Q.    -- other professions?
13         A.    Both.  A few attorneys, more
14    accountants.  There was a lot of tax compliance
15    embedded in that and also the tax accounting work,
16    meaning the interface into the corporate
17    accounting ledgers.  That work was done there
18    also.
19         Q.    And -- Excuse me.  Was the tax
20    department responsible for interactions with your
21    outside auditors?
22         A.    Yes.
```

**PAUL DAVID BRINK**

15

1    a long time, but, certainly, any questions that

2    came up from transactions that the company was

3    considering, whether they were coming from the

4    finance department or from people doing mergers

5    and acquisitions, there were obviously a lot of

6    tax questions that arose in those contexts or

7    other business transactions, joint-venture

8    formations; and then, of course, the ERISA and the

9    whole pension and employee benefits.  And on a

10   range of subjects, I was the person who was

11   responsible for providing -- either from myself or

12   seeing that we had the proper advice given to the

13   company in these various areas.

14        Q.   So either you would answer the question

15   or delegate to someone in your department to

16   answer the questions?

17        A.   Or to outside counsel --

18        Q.   Okay.

19        A.   -- depending on how sophisticated -- how

20   complicated the issue was, and so forth.

21        Q.   And were you responsible for oversight

22   of outside counsel with respect to tax matters?

16

1        A.    I was.

2        Q.    During your time as tax director, were

3    there particular firms as who served as outside

4    counsel for Dow in tax matters?

5        A.    There were.

6        Q.    And who were they?

7        A.    Two come to mind, a firm called Miller &

8    Chevalier, and at the time, King & Spalding.  And

9    there may have been some others, particularly in

10   the state and local area; and, also, in ERISA we

11   may have also had some other people that we were

12   working with.

13       Q.    Okay.

14       A.    And also it wasn't -- There were times

15   we might have talked to the auditors, too, and

16   their tax people, although more often -- I suppose

17   more on the interface into the accounting books of

18   the company.

19       Q.    Was the tax department part of some

20   other department within Dow, or was it a

21   stand-alone department?

22       A.    It was a stand-alone department but part

1

1           IN THE UNITED STATES DISTRICT COURT FOR THE

2                  MIDDLE DISTRICT OF LOUISIANA

3

4    - - - - - - - - - - - - - - - x

5    CHEMTECH II, L.P.,              : Civil Action No.

6    BY IFCO, INC., as Tax          : 07-405-RET-DLD

7    Matters Partner,               : CONSOLIDATED WITH

8              Plaintiff,           : Civil Action No.:

9        Vs.                        : 05-944-RET-DLD; and

10   UNITED STATES OF AMERICA,      : Civil Action No.

11             Defendant.           : 06-258-RET-DLD

12   - - - - - - - - - - - - - - - x

13

14              Deposition of WILLIAM CURRY

15                   Washington, D.C.

16                Thursday, June 5, 2008

17                     9:06 a.m.

18                     Volume I

19

20   Job No.:  1-24899

21   Pages 1 - 312

22   Reported by:  TRISTAN-JOSEPH, RPR

**WILLIAM CURRY - Vol. 1**

Chemtech Royalty v. United States of America                              6/5/2008

43

1    the Dow Europe management.

2           Q.    Sure.   I assume that someone coordinates

3    the various tax departments around the world; is

4    that correct?

5           A.    Exactly.

6           Q.    And that would be done from Midland?

7           A.    Yes.

8           Q.    And that is current role?

9           A.    Yes.

10          Q.    Okay.   Okay.   We're here to talk about

11   the Chemtech and Chemtech II transactions.

12                When did you first become involved with

13   Chemtech or what would become of Chemtech?

14          A.    I believe in 1992.

15          Q.    And what was your role at that point?

16          A.    I was asked to evaluate some partnership

17   treatment of a proposed transaction.

18          Q.    And who asked you to do that?

19          A.    Chuck Hahn.

20          Q.    And when you say "partnership

21   treatment," do you mean tax treatment?

22          A.    Yes.

44

1          Q.    And did you perform some type of an

2     evaluation?

3          A.    Yeah.  Based on -- I reviewed code and

4     regulations and considered the impact of a proposed

5     transaction.

6          Q.    Okay.  And did you prepare some type of

7     memo or written report on the transaction?

8          A.    I don't recall how it was communicated.

9          Q.    Once you made this initial evaluation,

10    what did you do next?

11         A.    I don't recall precisely, but I'm sure I

12    discussed it with Chuck Hahn.

13         Q.    Okay.  And were you given any further

14    tasks to perform *the transaction?

15              MR. MAGEE:  In 1990 -- early 19 --

16    whatever, in 1992 --

17              MS. MORRIS:  In 1992 --

18              MR. MAGEE:  -- time frame?

19              MS. MORRIS:  -- yes.

20              THE WITNESS:  Yeah.  I think I may have

21    misspoken.  I think my involvement was early 1993.

22              So could you rephrase the question, I'm

45

```
 1    sorry?

 2    BY MS. MORRIS:

 3          Q.   Sure.

 4               Once you did this initial evaluation

 5    with Chuck Hahn, what was the next task you were

 6    asked to do?

 7               I'm not asking you to be perfectly in

 8    time, but your general recollection of what you did

 9    next.

10          A.   Well, I mean, I -- we then spent further

11    time evaluating the tax legal implications of the

12    transaction.

13          Q.   Did you work with anyone else at this

14    point on those evaluations?

15          A.   Well, I'm sure at one -- at some time,

16    typically, we would work with legal treasury

17    controllers and tax would be an evaluated potential

18    transaction.

19          Q.   Had you ever evaluated a partnership

20    treatment of a transaction before this?

21          A.   Yes.

22          Q.   Okay.  Was that a common task that you
```

46

1    did?

2        A.    Yes.

3        Q.    **Did you ever attend any meetings with**

4    **Goldman Sachs?**

5        A.    Not that I recall.

6        Q.    **Okay.**

7        A.    Let me -- let me back up.  I've clearly

8    attended meetings with Goldman Sachs present, yes.

9        Q.    **Do you have any recollection of those**

10   **meetings?**

11       A.    I don't have any specific recollection,

12   no.

13       Q.    **Do you recall what topics were**

14   **discussed?**

15       A.    I mean, clearly on this transaction, I

16   had been in meetings where there have been Goldman

17   Sachs' people present, but, no, I do not recall the

18   specifics.

19       Q.    **Other than evaluating the potential tax**

20   **treatment of the transaction, did you have any**

21   **other role in the formation of Chemtech?**

22              (Whereupon, McKee Nelson personnel

**WILLIAM CURRY - Vol. 1**

Chemtech Royalty v. United States of America                    6/5/2008

47

1    entered the proceedings.)

2         A.    In my role in the formation of Chemtech

3    was to evaluate the tax legal implications.  I was

4    also, once the decision was made to proceed,

5    involved in the implementation.

6         Q.    **Who made the final decision to proceed**

7    **with the Chemtech transaction?**

8         A.    I don't know for sure.

9         Q.    **Were you involved, at all, in**

10   **presentations to the Board of Directors or Finance**

11   **Committee regarding Chemtech?**

12        A.    No.

13        Q.    **Do you know if anyone at the tax**

14   **department was involved?**

15        A.    I do not know.

16        Q.    **Is the tax department ever involved in**

17   **those types of presentations to either the Finance**

18   **Committee or the Board of Directors?**

19              MR. MAGEE:  Objection to the form.

20              THE WITNESS:  I assume so, but I don't

21   know.

22

48

```
 1   BY MS. MORRIS:

 2        Q.   Okay.  Have you ever -- aside from the

 3   Chemtech transaction, have you ever made a

 4   presentation to the Finance Committee about a

 5   particular transaction?

 6        A.   The Finance Committee is no longer in

 7   existence --

 8        Q.   Okay.

 9        A.   -- and so, no, I have not.

10        Q.   Have you ever made a presentation to the

11   board?

12        A.   Yes.

13        Q.   Okay.  How often does that happen?

14        A.   Typically, once a year.

15        Q.   And what subject matters do you speak to

16   them about?

17        A.   Typically, about controls and general

18   tax department administrative issues.

19        Q.   Okay.  What was your role in the

20   implementation of Chemtech?

21        A.   I was involved in reviewing the legal

22   structure.  I was involved in aspects of the
```

49

1    license agreements.  I was involved in reviewing

2    and drafting the various agreements.  I had a -- I

3    had a role as helping to ensure that Dow was

4    meetings its obligations under the various

5    agreements.

6         Q.    And following implementation of the

7    daily involvement operations of the transaction?

8         A.    Yes.

9         Q.    And what was your role generally in the

10   operations?

11        A.    In -- prior to moving to Switzerland,

12   I -- my role, I suppose, was ensuring that Dow was

13   meeting its obligations under the terms of the

14   agreements.  After moving to Switzerland, it was

15   doing the same, reviewing the various partnership

16   agreements, license agreements, making sure we're

17   meeting our obligations.  I also once moved to --

18   once I moved to Switzerland, I also performed some

19   organizational work, as well.

20        Q.    Okay.  Let's go through some documents.

21              MR. MAGEE:  Volume I.

22              THE WITNESS:  Oh, gosh.

191

1              Was the tax effect or distribution

2    typically taken into account in analyzing whether

3    to distribute the patent?

4         A.    Certainly, not by Dow Europe S.A.

5         Q.    Was it a consideration by Dow?

6         A.    I don't know.  I wasn't a party to all

7    of the Dow negotiations and discussions that may

8    have -- may have been -- may have occurred.

9         Q.    Now when this letter was written, it's

10   date July 13, 1994.

11        A.    Mm-hmm.

12        Q.    You were still in Midland at that point.

13   Correct?

14        A.    Yes.  I left -- I'm sorry, I was

15   confusing the dates.

16        Q.    Mm-hmm.

17        A.    I left in -- you're right, I left in

18   '95.  So I was in Midland.

19              So, at that time, you may want to go and

20   restate your original question.

21        Q.    Okay.  What was your role while you were

22   in Midland as far as when portfolios were being

192

1        considered for distribution --

2              A.    I --

3              Q.    -- relative to that time?

4              A.    -- I -- I was the attorney in the tax

5        department, so I would have worked with Ed helping

6        him to understand what the obligate -- what Dow's

7        obligations were under the license agreements.

8              Q.    Okay.  Who at Dow would make the

9        decision whether or not to request the

10       distribution?

11             A.    Well, the business team, if there was a

12       business opportunity that could only be pursued by

13       having the patents distributed, the business team

14       would work with their -- within their organization

15       and discuss it within Dow until a decision was

16       made.

17             Q.    Were there ever situations where a

18       business team requested a distribution because the

19       particular business pursuit could only be pursued

20       by distributing out the portfolio?

21             A.    Not when I was in the U.S.  That may

22       have happened.  There were some distributions

**WILLIAM CURRY - Vol. 1**

227

1    A(2) there, it looks like?

2              Do you recall?

3         A.   I assume that's -- you know, I really

4    don't know.

5         Q.   Okay.  The math seems to work out that

6    way, but you don't recall?

7         A.   No.

8         Q.   Okay.

9              (Government Deposition Exhibit

10             No. 772 was marked for

11             Identification.)

12   BY MS. MORRIS:

13        Q.   I hand you 772.

14             (Witness reviews document.)

15        A.   Mm-hmm.

16        Q.   This is, I guess, a memo to file from

17   you?

18        A.   Yeah.

19        Q.   Do you know what the purpose of this

20   document was?

21        A.   Well, it's titled Steps on Patent

22   Distributions.  I assume that sort of relates to

228

1    it.

2         Q.    **Do you know why you wrote the memo?**

3         A.    In connection with the other previous

4    documents, I think it's just to go to I had spent

5    time to review one of the issues that presents the

6    general partner in the partnership on in terms of

7    distribution of patents.  And this is what this

8    memorializes, my review of the Partnership

9    Agreements, the license agreements, et cetera.

10        Q.    **Would this document have been used by**

11   **anyone else other than --**

12             MR. MAGEE:  Object to the form.

13             THE WITNESS:  I don't recall providing

14   it to specifically to anyone, but I would have -- I

15   wouldn't be surprised if I provided it to the legal

16   department and the patent department in Horgen.

17                         (Government Deposition Exhibit

18                         No. 773 was marked for

19                         Identification.)

20   BY MS. MORRIS:

21        Q.    **I'm going to hand you 773.**

22             **(Witness reviews document.)**

353

```
 1                    No. 838 was marked for

 2                    Identification.)

 3   BY MS. MORRIS:

 4        Q.   I'm going to hand you what I've marked

 5   as Exhibit No. 838.

 6             (Witness reviews document.)

 7        Q.   This is an e-mail from David Grzebinski

 8   to you and others, dated December 19, 1997, and the

 9   subject is Chemtech II - Asset.

10             Did you have any role in selecting the

11   asset for Chemtech II?

12        A.   No.

13        Q.   Do you know why you were included on

14   this e-mail?

15        A.   I really wasn't much involved in the

16   Chemtech II transactions, but it was probably a

17   courtesy.

18                    (Government Deposition Exhibit

19                    No. 839 was marked for

20                    Identification.)

21   BY MS. MORRIS:

22        Q.   What I'm marking is Exhibit 839.
```

354

```
 1        A.   Ah, yes.

 2             MR. WELSH:   My favorite.

 3             MR. MAGEE:   The old Janicki memo.

 4             (Laughter.)

 5             MR. WELSH:   My favorite.

 6             MR. MAGEE:   Your -- (laughing).

 7   BY MS. MORRIS:

 8        Q.   This is an e-mail from Paul Janicki.

 9             Do you know who Mr. Janicki is?

10        A.   Yeah, he was in the treasury department

11   in Midland.

12        Q.   Your name does not appear on this

13   e-mail.

14             (Laughter.)

15             MR. MAGEE:   But we're going to see

16   anyway.

17             MS. MORRIS:   Of course.

18             (Laughter.)

19   BY MS. MORRIS:

20        Q.   This is an e-mail addressed to you and

21   Pedro Reinhard.

22             And it states, "In response to your
```

355

1   inquiry, the following is the information you

2   requested regarding Chemtech:

3           "The original forecasted NPV of the

4   Project was $180 million.

5           "Risk Adjusted NPV (Risk Factor was

6   60 percent) 108 million; minus expenses, 10

7   million, for a total of $98 million."

8           Did you have any role in the calculation

9   of the original forecasted NPV?

10      A.   I'm not familiar with this document.

11      Q.   Okay.  I understand you're not familiar

12   with the document.

13           But do you recall being involved in

14   forecasting an NPV of the Chemtech Project?

15      A.   I don't recall.

16      Q.   Okay.  Is that something that you ever

17   did during the 1993 time period?

18           MR. MAGEE:  I'm sorry, ever did with

19   respect to Chemtech or . . . ?

20           MS. MORRIS:  With respect to Chemtech,

21   the beginning, the first Chemtech.

22           (Laughter.)

356

1                    THE WITNESS:   I would have been involved

2      with a group of people that evaluated the

3      feasibility of a transaction and would have

4      provided tax input accordingly.   I don't remember

5      coming up with NPV value of it.

6      BY MS. MORRIS:

7            Q.   So were you involved generally in coming

8      up with a risk factor?

9            A.   Well --

10                    MR. MAGEE:   Object to the form.

11                    THE WITNESS:   I don't know what the risk

12     factor, what all has signified that.   But,

13     certainly, on any transaction, we would assess tax

14     risks associated with it.

15     BY MS. MORRIS:

16           Q.   Okay.   And who did you typically provide

17     that information to?

18           A.   The business people involved and

19     certainly Chuck Hahn, who was my supervisor.

20           Q.   And do you know what they did with that

21     information?

22           A.   They used it to -- I don't specifically

357

```
 1    know, no.

 2         Q.    Okay.  And in your role today, as tax

 3    director, when you receive that type of

 4    information, what do you do with it?

 5         A.    It's used to help evaluate my input on

 6    the transaction.

 7         Q.    And then who do you give your input to?

 8         A.    Whoever the business purpose --

 9    businessperson is on leading the transaction.

10         Q.    And just to clarify, you don't recall

11    working on the Chemtech transaction, the risk --

12    strike that.

13              You don't recall assessing a tax risk to

14    the Chemtech transaction?

15              MR. MAGEE:  Objection to the form.

16              THE WITNESS:  I certainly provided input

17    on the tax risks associated with the deal.

18    BY MS. MORRIS:

19         Q.    Okay.  And did you have any involvement

20    with calculating the task risks of a Chemtech II

21    transaction?

22         A.    No.
```

358

```
 1        Q.   Okay, thank you.

 2        A.   Mm-hmm.

 3                  (Government Deposition Exhibit

 4                   No. 840 was marked for

 5                   Identification.)

 6   BY MS. MORRIS:

 7        Q.   I'm going to hand you what I've marked

 8   as Exhibit 840.

 9                  (Witness reviews document.)

10        Q.   This is a memo to you from Helen Siegal

11   at King & Spalding dated April 20, 1998, asking you

12   to please arrange to get twelve original signed

13   copies of the attached signature page for Diamond,

14   for the Partners' consent.

15             Do you recall doing this type of work

16   for Helen Siegal?

17        A.   I do not, but I don't even have -- know

18   that this is a complete document.

19        Q.   It's the document as it was provided to

20   us.  This actually seems to be missing at least

21   page 3 of the fax.

22        A.   I don't -- I don't recall doing that.
```

1

```
 1              UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF LOUISIANA
 3
 4    CHEMTECH ROYALTY ASSOCIATES, L.P.,
      by DOW EUROPE, S.A., as Tax Matters
 5    Partner,
 6                          Plaintiff,
                                        Civil Action Nos.:
 7         vs.                           05-944-RET-DLD
                                         06-258-RET-DLD
 8    UNITED STATES OF AMERICA,          07-405-RET-DLD
 9                          Defendant.
      _____/
10
11
12           DEPOSITION OF:  ALFONSO ESCUDERO
13              May 1, 2008, at 8:30 a.m.
14         DoubleTree Hotel, Bay City, Michigan
15
16    APPEARANCES:
17      For Plaintiff:      McKEE NELSON LLP
                            BY:  HARTMAN E. BLANCHARD, JR.
18
        For Defendant:      U.S. DEPARTMENT OF JUSTICE
19                          BY:   THOMAS F. KOELBL
                                  ROBERT L. WELSH
20
        ALSO PRESENT:       CAROL WRIGHT, IRS
21
22      Reported by:        DIANE KRAYNAK, RPR, CSR-2122
                            Certified Shorthand Reporter
23                          989-835-9171    Fax:  989-835-6064
24
25
```

                                                                    37

1                          (Recess taken.)

2                  MR. KOELBL:  Back on the record.

3    Q   **Mr. Escudero, I believe you mentioned before that one of the**

4        **variables considered was the discount rate.**

5    A   Um-hum.

6                  MR. BLANCHARD:  Considered generally in

7        transactions, I think.

8                  MR. KOELBL:  Okay.

9    Q   **What discount rate was applied in this transaction?**

10   A   I don't remember, to tell you the truth.  We normally apply

11       the so-called weighted average cost of capital, which is

12       typically the way we look at all the NPVs of all the

13       transactions in the company.

14   Q   **So how do you determine the discount rate to apply?**

15   A   How does it get calculated, you mean?

16   Q   **Yes.**

17   A   Well, there is a formula.  There is a formula that takes

18       different variables into account.

19            It's basically a formula that tries to -- first of all,

20       it calculates or you take into account the after-tax cost of

21       debt of the company, the after-tax -- which is, by

22       definition, cost of equity within the company, which is a

23       function of the risk premium that the investors in Dow's

24       stock require over the so-called risk-free rate, which is

25       the treasury rate, the U.S. treasury rate, and then it's a

Case 3:05-cv-00944-BAJ-EWD    Document 52-2    07/24/08    Page 28 of 62

38

1      weighted average of those two numbers, weighted by the

2      relative components of debt and equity in the balance sheet

3      of the company.

4          Now, one thing that is important to know is that -- one

5      thing is the -- the actual weighted average cost of capital

6      of the company has -- at any given point in time is a

7      function of all these variables that I mentioned.

8          Another thing is the -- what we call the hurdle rate,

9      if you like, which is the rate that approximates that

10     weighted average cost of capital but that is being used in

11     the company on an ongoing basis for this type of analysis,

12     funding transactions, M&A transactions, et cetera.

13         And the reason there's a slight difference between

14     those two numbers is because, for purposes of consistency

15     over time, you don't want -- the CFO of the company doesn't

16     want to be adjusting the hurdle rate up and down every

17     little bit depending on how the markets go, so unless there

18     is a significant change in the financial markets that are

19     sort of permanent and have made a significant change in the

20     external environment, in that case, yes, we would change the

21     hurdle rate, but it only happens maybe once every -- I mean,

22     as far as I remember, I think -- I think we have only had

23     two hurdle rates in the company so far in the last 15 or 20

24     years maybe, and they were only apart by 75 basis points.

25         We used to have 10.75, and I don't know in how many of

39

1       the last years, ten years perhaps, we've had it at 10

2       percent.

3            So that's pretty much how -- that's typically the

4       discount rate that we use.

5   Q   **I'd like to go back to the chart on Exhibit 521.  I'm hoping**

6       **you can just explain it to me a little bit.**

7            **The title on the left side says Value Added.**

8   A   Um-hum.

9   Q   **Value added to what?**

10           MR. BLANCHARD:  If you know the answer.

11  A   In this particular case I don't remember exactly what it

12      meant, to tell you the truth.  I don't know.  I don't know.

13      I would have to go into the details of the analysis and try

14      to dig it out.  Just by looking at this, I don't know

15      exactly what it means.

16  Q   **Then at the bottom it says Funds Raised.**

17  A   Yes.  That one, I think, is practically obvious.  It would

18      be the size of the -- I mean, the amount of money that the

19      investors would bring into the partnership, which would

20      ultimately be the amount raised by Dow in terms of

21      financing.

22  Q   **So where it says, on the bottom line, $200 million in funds**

23      **raised, --**

24  A   Right.

25  Q   **-- the value added looks like it's around 40 million?**

**MID-MICHIGAN REPORTING LLC  (989) 835-9171**

1

1         IN THE UNITED STATES DISTRICT COURT FOR THE

2              MIDDLE DISTRICT OF LOUISIANA

3

4     - - - - - - - - - - - - - - x

5     CHEMTECH II, L.P.,          : Civil Action No.

6     BY IFCO, INC., as Tax       : 07-405-RET-DLD

7     Matters Partner,            : CONSOLIDATED WITH

8          Vs.                    : Civil Action No.:

9              Plaintiff,         : 05-944-RET-DLD; and

10    UNITED STATES OF AMERICA,    : Civil Action No.

11             Defendant.         : 06-258-RET-DLD

12    - - - - - - - - - - - - - - x

13

14

15              Deposition of ENRIQUE FALLA

16                   Washington, D.C.

17                 Thursday, May 8, 2008

18                      8:43 a.m.

19

20    Job No.:  1-24897

21    Pages 1 - 125

22    Reported by:  TRISTAN-JOSEPH, RPR

**ENRIQUE FALLA**

42

1          Q.    The biggest component where --

2          A.    Yeah.

3          Q.    -- it says minority interest income?

4          A.    Yeah, yeah.  You had the minority -- I

5     think 19 percent.  I don't remember.

6                (Whereupon, Mr. Magee briefly confers

7     with Mr. Falla.)

8     BY MR. KOELBL:

9          Q.    Mr. Falla, are you familiar with net

10    present value calculations?

11         A.    Yes, sir.

12         Q.    Could you explain that concept to me?

13         A.    Yeah.  The next present value is really

14    the discounted cash flow.  So, in other words, if

15    you have a stream of income over a ten-year period,

16    you tend to discount that at a specified rate,

17    which usually is -- can be -- you know, people use

18    a ten-year treasury note, some people use a way of

19    cost of capital, so forth and so on.

20                And as you discount that stream of

21    income, the number, the discounted number, is your

22    net present value.

43

1    BY MR. KOELBL:

2          Q.    All right.

3          A.    That's the most easiest way to explain

4    it.

5          Q.    All right.  Were you involved in

6    calculating that present value for investments of

7    Dow?

8          A.    No, sir.

9          Q.    Okay.

10         A.    I have people that work for me that did

11   this in the economic evaluation --

12         Q.    Okay.

13         A.    -- section.

14         Q.    Do you know what factors are considered

15   in calculating it on that present value?

16         A.    Yes.

17         Q.    Okay.

18         A.    I mean, not the whole thing, in general.

19         Q.    In general?

20         A.    No, I -- yeah.

21         Q.    Okay.  Generally speaking, can you tell

22   me what factors are considered?

**ENRIQUE FALLA**

44

1          A.    Well, the factors is the stream of

2    income.  Really, you start with, you know, the

3    stream of income.  Usually you have a negative zero

4    here, which is your investment.  Then you have

5    subsequent years where you have positive, hopefully

6    positive cash flows.  And then at the end of the

7    year, you assign a terminal value, okay.

8               So that's your stream of cash flow.  And

9    then you discount this by a factor, because I

10   indicated people use different factors.  Depending

11   on the risk of the project, you use different

12   factors, and then you come with a number that is

13   equivalent of the value today of that stream of

14   income discounted by the specified rate.

15        **Q.    Okay.  And how do you determine the risk**

16   **of a project?**

17        A.    Well, this is done by the people that,

18   you know, are in the economic evaluation section,

19   but it's not the same as if you invest on known

20   product in the U.S. that an unknown product in

21   Ecuador, the risk in Ecuador is greater.  You have

22   foreign exchange risks, you have political risks,

45

1    you have convertibility risks, you have business

2    risks.

3             So based on that, okay, we establish

4    what is the hurdle range.  And if it is 1 or

5    2 percent above a hurdle rate, we're going to make

6    that investment because risk-award relationship,

7    you know, is not correct.

8             Now if it is in the U.S., you can be a

9    little more lenient, you know, because the risk

10   here is less than it is in, you know, some other

11   part of the world.

12       Q.   **Were net present value calculations made**

13   **for all investments of Dow's?**

14       A.   All investments, I would say not --

15   temporary investments, I would say no.  Long-term

16   investments, I will say they should have.  We did

17   it all, you know, but I can't tell you.  It might

18   be.  But, yeah, the policy is you have do an

19   economic evaluation.

20             Now there are transactions where net

21   present value may not as applicable.  I'll give you

22   an example, a research project, where it is

46

1     impossible to determine what is going to be the

2     outcome.  You know, you expect the return but, you

3     know -- you know, you're going to put money in

4     research and you hope something is going to come on

5     the other side of the pipeline, but you'll be

6     surprised how many times nothing comes out of it.

7              So we try not, for example, on research

8     projects, it's an exercise.  If you do, you're

9     speculating so much.

10        Q.    Mm-hmm.

11        A.    You know, a new drug, a new product.

12             Now you're talking about a plant, an

13    ethylene plant or a, you know, any plant.  Yes,

14    it's going to cost you 10 million bucks.  How much

15    product is going to be produced, at what price,

16    what profit, and then you discount the whole -- the

17    whole cash flow.

18             Those are automatic.  There's not a

19    single investment in plant equipment that doesn't

20    go through the present value, net present value

21    calculation, or internal rate of return, which is

22    more what we use.

47

1          Q.    Okay.

2          A.    Which is the other way around.  You get

3    to the rate of return.

4          Q.    Okay.

5          A.    Rather than that number in the net

6    present value.  We do it all.  But it's the

7    internal rate of return that we look at.  And if it

8    is 5 or 6 percent, you know, we're not going to do

9    if it 12.  Now it depends where it is, what is the

10   risk profile of the investment, and so forth.

11         Q.    Okay.  You said other people calculated

12   net present values.

13               You didn't do that, did you?

14         A.    No.  It was the -- again, the economic

15   evaluation group --

16         Q.    Okay.

17         A.    -- that goes through it, which is an

18   independent group.

19         Q.    Okay.

20         A.    So it's not self-serving, anybody, it's

21   using an independent, they do the calculation and

22   then they submit that.

48

1          Q.    They calculated the final net present

2    value --

3          A.    Yeah, an internal rate of return and so

4    forth and so on, yeah.

5          Q.    Okay.  And once you're -- once you were

6    provided with a net present value, what did you do

7    with it?

8          A.    Well, that was part of the approval

9    page --

10         Q.    Okay.

11         A.    -- which include many things.  It

12   included the assumptions, you know, for pricing,

13   volume, costs, you know, market conditions.  You

14   know it's a very lengthy, you know, it's a

15   presentation in general; particularly, in

16   production facilities.  And then that included net

17   present value, internal rate of return, and then

18   what we felt was the risk of the project.

19         Q.    This approval package, who was that

20   going to?

21         A.    That approval package goes -- if it is,

22   does not go to a finance committee, because it's a

49

1    capital or an investment.  Unless it is a financial

2    investment, it goes to the Finance Committee.  But

3    if it is a capital investment, it goes to the Board

4    in a form of a resolution.  These are financial

5    resolutions, but there are a lot of nonfinancial

6    resolutions, and they go to the Board.  And if it

7    is a huge project, you know, 300, $400 million,

8    there is presentation to the Board.

9         Q.   Okay.

10             (Whereupon, Mr. Welsh briefly confers

11   with Mr. Koelbl.)

12   BY MR. KOELBL:

13        Q.   Mr. Falla, you spoke a little earlier

14   about risk factors that were used in calculating

15   the net present value.

16        A.   Mm-hmm.

17        Q.   Is that the difference -- you mentioned

18   the difference between, say, a plant in the United

19   States and a plant in --

20        A.   Mm-hmm, India.

21        Q.   -- India, for example.

22             How do you quantify those risk?

**ENRIQUE FALLA**

50

1       A.    Well --

2       **Q.    -- factors?**

3       A.    -- we don't -- we don't quantify them.

4    Remember, what I did, I told you that we calculate

5    the internal rate of return --

6       Q.    Mm-hmm.

7       A.    -- which is the reverse.  Rather than

8    having that present value, we do both.

9       Q.    Mm-hmm.

10      A.    But let's say the -- for the sake of

11   argument, our weighted cost of capital is

12   14 percent, okay, which means that and equity,

13   okay, and you come with a project for India at 15

14   percent, that project is not going to be approved,

15   you know, it's very unlikely, because aside from

16   that, we do sensitivity analysis.

17           Let's say that the plant's start-up is

18   delayed a year.  How will this affect the project?

19   If the prices that we're estimating do not

20   materialize, they're lower, but the cost are

21   higher.

22           So we do a series of sensitivity

**ENRIQUE FALLA**

Chemtech Royalty v. United States of America                              5/8/2008

51

```
 1    analysis, wherein we have return a rate of return
 2    of this by let's say it's 20 percent, okay.  But
 3    there are sensitivities that could lower that to
 4    5 percent or it could be as high as, you know,
 5    25 percent.  Then we make a judgment, okay, this is
 6    what best -- not the best case -- this is the --
 7    the best case scenario.  And then from here, you
 8    can have a deviation, which is down to 5 percent,
 9    up to 25 percent.  And based on that, then you make
10    your judgement.  I mean, it's not something that I
11    make as the Board and say I got this.  People will
12    say, you know, this is not acceptable.  The risk
13    reward relationship is not acceptable to us, in
14    which case, either the project is sent for review,
15    or is denied by the Board and it is not approved.
16         Q.    How was tax factored into these
17    computation?
18         A.    Well, all of the analysis is done on an
19    after-tax basis.  You know that's unequivocally.
20    You have to look at it as an after-tax basis.  You
21    know, if you're going to build a plant in Ireland,
22    you get a hell of a tax incentive and you pay
```

52

1    10 percent taxes, in my days.  I don't know what it

2    is now.  So, you know, there's some advantages.  So

3    you look at everything on an after-tax basis.

4         **Q.    Is tax ever a risk factor?**

5         A.    Pardon me?

6         **Q.    Was tax ever a risk factor?**

7         A.    Tax, whenever we got incentives, see we

8    were not as a company tax credit company.  I don't

9    believe in that, because what the government gives,

10   the government takes.  And, to me, is a risk

11   factor, yes.  Because, you know, we -- and I can

12   give you a number of cases of projects where we

13   were given incentives, and by the time we completed

14   the thing, the incentive was repealed.  And Brazil

15   is one case in point.

16         So I try not to -- I say, yeah, it's

17   positive, but be careful because, you know, the

18   whole thing, the government gives, the government

19   takes, you know.  And it's not uncommon.  I tell

20   you in may countries, I'm not saying Europe or the

21   U.S., which are more serious, but you're talking

22   about, you know, third-world countries and well

53

1      China.

2               I'll give you an example of China.  Our

3      first visit there was in '85 and we were trying to

4      build a plant there, and they made promises, which,

5      of course, never materialized.  We never made any

6      money in our investment there at that plant.

7               So -- but that's reality, you know.

8      That's why we tend to ignore the incentive, the tax

9      incentives when we do the economic evaluation on

10     plants.  If it is in Europe, from a serious

11     European government, then you're take a different

12     view again, but there is risk whenever you get the

13     tax incentives.

14              And you're talking about staff taxes.

15     There's nothing you can do about it.  You know,

16     what can you do?  You got to assume the tax that is

17     valid at the present time, and say it's going to

18     be, you know, whatever it is, 30 percent or

19     35 percent, you know for the life of the project.

20              Now you know that tax law changes and

21     the taxes can go up or down.  But we just can't

22     calculate.  You know, now you start speculating me

ENRIQUE FALLA

Chemtech Royalty v. United States of America                     5/8/2008

54

1    on what is reasonable so.  But with any incentive

2    or anything that looks, you know, risky we tend to

3    discount heavily in our analysis.

4         Q.    Okay.

5                   (Government Deposition Exhibit

6                   No. 566 was marked for

7                   Identification.)

8    BY MR. KOELBL:

9         Q.    Mr. Falla, you've been handed

10   Exhibit 566.  Take a look at that for a minute.

11        A.    Yeah.  Sure and pay attention to the

12   date on it.

13              MR. MAGEE:  All right.  Wait for the

14   question.

15              THE WITNESS:  Well.

16              (Witness reviews document.)

17   BY MR. KOELBL:

18        Q.    Do you recognize Exhibit No. 566?

19        A.    No, not at all.

20        Q.    Okay.  The subject of this e-mail is

21   GAMBA Economics.

22              Do you know what "GAMBA" refers to?

61

1          Q.    Okay.

2          A.    But I don't know the specifics.  So I've

3    never see a graphic, a graph like this.

4          Q.    Okay.

5                (Whereupon, Mr. Welsh briefly confers

6    with Mr. Koelbl.)

7                (Discussion of the record.)

8                    (Government Deposition Exhibit

9                    No. 567 was marked for

10                   Identification.)

11   BY MR. KOELBL:

12         Q.    Okay.  Mr. Falla, I'm handing you

13   Exhibit 567.

14               Take a look at that and tell me if

15   you've seen that before.

16               (Witness reviews document.)

17         A.    No.

18         Q.    No.

19               Exhibit 567 seems to be an e-mail from

20   Paul Janicki, a subject of which is Chemtech

21   Valuations.

22               Within the context of Chemtech

62

1    Valuations, do you understand what the term

2    "original forecasted NPV" means, the second line of

3    the body of the e-mail?

4         A.   As of this, I know in general what it

5    means, but not on this specific.

6         Q.   Not in the context of Chemtech

7    Valuations?

8         A.   No, no, no.  This is 1998.  I'm -- he

9    was the director at the time.

10        Q.   Okay.  What does it mean in general?

11        A.   Well, really just what it says, you

12   know.  When you have a projection, you know, and

13   you say the NPV of this project is going to be 10,

14   that's the projected, you know, it's going to be

15   10.  And then, of course, it could be a deviation

16   from there but that's . . .

17        Q.   Okay.

18             (Whereupon, Mr. Welsh briefly confers

19   with Mr. Koelbl.)

20             MR. KOELBL:  All right.  We're going to

21   take a quick break and see if we have any more

22   questions for you.

Chemtech Royalty v. United States of America                                      5/8/2008

```
                                                                    85
 1    almost 7 percent.  That's higher.

 2         Q.   How much higher just in general if you

 3    recall --

 4         A.   Boy.

 5         Q.   -- at this time?

 6         A.   You're going to have to refresh --

 7         Q.   Okay.

 8         A.   -- my memory on --

 9         Q.   I'll find it.

10         A.   -- interest rates at the time, but not

11    significantly higher but higher.  I believe -- what

12    the hell was it?

13         Q.   That's alright.  We have a document.  I

14    just need to dig it out.

15              In the -- if you recall, in Dow's

16    calculation of its weighted average cost of

17    capital, what was roughly the rate for pure common

18    equity?

19              MR. WELSH:  For what year?

20              MR. MAGEE:  In the '92-'93 time frame.

21              THE WITNESS:  Well, you know, that

22    doesn't change a hell of a lot.  It is usually
```

86

1    between a 13 and I 14.5 percent that was, I

2    believe, around that.  I can't recall specifics.

3    As to that year, I just can't recall exactly, but

4    that's ballpark.

5             MR. MAGEE:  Mm-hmm.

6             THE WITNESS:  -- for corporate America

7    in general.  There are times it's lower, sometimes

8    it's higher, it's a function of the market, the

9    data of your stock.

10            (Whereupon, Mr. Magee briefly confers

11   with MacWilliams.)

12   BY MR. MAGEE:

13       Q.   Okay.  Let's look at Exhibit 4.  If turn

14   to page 11041.

15       A.   11041.

16       Q.   Yeah.  And these are quarterly average

17   On-Balance Sheet costs --

18       A.   Mm-hmm.

19       Q.   -- or debt in different currencies.  If

20   you look down at the bottom, the fourth from the

21   bottom is U.S. dollar.

22       A.   Right.

**CHARLES JOHN HAHN**

Chemtech Royalty v. United States of America                    4/10/2008

1

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2             MIDDLE DISTRICT OF LOUISIANA

 3                  CIVIL DIVISION

 4    - - - - - - - - - - - - - - X

      CHEMTECH ROYALTY ASSOCIATES,  :

 5    L.P., by DOW EUROPE, S.A. as   :

      Tax Matters Partner,           :

 6                                   :

               Plaintiff,            : Civil Action No.

 7                                   :

               v.                    : 05-944-C-M3

 8                                   :

      UNITED STATES OF AMERICA,      :

 9                                   :

               Defendant.            :

10    - - - - - - - - - - - - - - X

11

12

13                              Washington, D.C.

14                              Thursday, April 10, 2008

15            Deposition of CHARLES JOHN HAHN,

16    a witness herein, called for examination by

17    counsel for the Defendant at the law offices of

18    McKee Nelson, LLP, 1919 M Street, Northwest,

19    Suite 200, Washington, D.C., at 8:41 a.m., before

20    Marijane W. Simon, a Registered Diplomate

21    Reporter, Certified LiveNote Reporter, and Notary

22    Public in and for the District of Columbia.
```

13

1       A.    In 1992 and '93, I reported to Paul

2   Brink who was tax director.

3       **Q.    And who did he report to?**

4       A.    He reported to the CFO, and I believe at

5   the time it was Enrique Falla.  And then at some

6   point it changed to Pedro Reinhard, but I don't

7   know the exact year.

8       **Q.    Was that in '93 or was it --**

9       A.    I don't remember.  I think it was in

10  that time period, but I don't remember exactly.

11      **Q.    Okay.  What were your responsibilities**

12  **as tax director in 1992, 1993?**

13      A.    I --

14          MR. KOHLER:  Objection.  Precisely what

15  time period are we speaking about?

16          MR. WELSH:  1992, 1993.

17          THE WITNESS:  I was assistant tax

18  director at that time.

19          MR. WELSH:  Okay.

20          THE WITNESS:  Okay.  And so as I said

21  before, my responsibilities still were in the

22  tax-planning area, primarily.  I had some

14

1  administrative duties as far as department

2  administration and things like that, but primarily

3  in the tax planning area.

4       BY MR. WELSH:

5       Q.   So in terms of tax planning, did that

6  mean initiating projects, or was it --

7       A.   It could be initiating projects.  It

8  could be evaluating projects.  It's whatever was

9  basically needed.  I worked extensively in

10  intercompany pricing, making sure that all our

11  prices were arm's length and planning transactions

12  and then in the foreign-tax-credit area.

13       Q.   When did you first hear of the

14  off-balance-sheet financing project which became

15  known as IF?

16       A.   There was a meeting in Midland.  I

17  believe it was in 1992.  That was the first time I

18  was aware of it.  I had no knowledge prior to

19  that.

20       Q.   And as you recall that meeting, who was

21  present?

22       A.   I think there were representatives of

**CHARLES JOHN HAHN**

Chemtech Royalty v. United States of America                                    4/10/2008

24

```
 1    off-balance-sheet projects, not what was wrong

 2    with them -- I don't know that you finished

 3    answering what your -- what your recollection was

 4    of what those different projects were and -- if

 5    any -- and with who.

 6              THE WITNESS:  Again, there are so many

 7    projects that I wouldn't remember.  We dealt with

 8    most of the major banks and investment banks who

 9    were bringing things to us all the time.  They

10    were of all sorts of different types, and I don't

11    remember what my specific objections were to the

12    ones we did.  We gave our tax opinion on this

13    subject to the treasury department, and then they

14    decided what they wanted to do with it.

15              BY MR. WELSH:

16        Q.   Are you talking about the Chemtech

17    transaction now when you said, "We gave our tax

18    opinion"?

19        A.   Any entity.

20        Q.   Any entity.

21              You were always asked to give a tax

22    opinion on any suggested project?
```

Olender Reporting, Inc.              (888) 45-3376                    **WORLDWIDE**
Washington, D.C.                     **Baltimore, MD**                        **Florida**

25

1          A.    Our function was to look at the tax

2    aspects of it, and that's what we did.

3          Q.    **The overall tax aspects.  When you say**

4    **"tax aspects," do you mean for all of Dow**

5    **Chemical, or how did that work?  Enlighten me a**

6    **little bit as to what your purpose was.**

7                MR. KOHLER:  Can you give us a

8    timeframe?

9                MR. WELSH:   '92-'93.

10               THE WITNESS:  We would go ahead and, of

11   course, look at the legal aspects of it.

12   Obviously, we would also look at what other types

13   of tax effects there might be such as

14   foreign-tax-credit effects and things like that

15   that wouldn't be apparent to a non-tax-expert.

16               MR. WELSH:  Okay.

17               THE WITNESS:  And we would provide that

18   information to the people who were evaluating the

19   project.

20               BY MR. WELSH:

21         Q.    **Okay.  Without getting into the**

22   **substance of your legal opinions here, from all**

34

1    Gilfeather and Anita Jenkins, I think, 2006.

2          Bob Aukerman was a similar period of

3    time, probably '85 through the current, to the

4    best of my knowledge.

5          I don't remember precisely when Bill

6    Curry joined, but he was -- hadn't been there for

7    a real long time.

8          Wayne Jenner, sometime during this

9    period, got transferred to a subsidiary.  Hence, I

10   don't know if he was in the office at that time.

11   That was sometime in that time period.

12       Q.   Now, in '92, '93, were these people on

13   the same level of yours in terms of the

14   organizational structure, or were they below you?

15       A.   Ninety-two or ninety-three, I was

16   assistant tax director, so they reported to me.

17       Q.   Do you recall if Mr. Curry was there in

18   '92-'93?

19       A.   Yes, he was there.

20       Q.   So he reported to you at that time?

21       A.   Yes, he did.

22       Q.   And what was his function at that time?

35

1      A.   He was working on -- on partnership

2   issues and other legal issues.  I mean he was --

3   he was a tax attorney.  He gave legal opinions,

4   but that was his function.  He appeared in

5   protests and things like that.  I don't remember

6   at the time whether he did state and local

7   taxation.  I think he did some of that, but,

8   again, that's a long time ago, and we've

9   continuously -- had continuously shifted

10  responsibilities back and forth, so I don't

11  understand -- remember precisely.

12      Q.   **Do you recall if Mr. Curry was at the**

13  **meeting, the first meeting you described**

14  **concerning the Chemtech transaction, the beginning**

15  **of the Chemtech transaction?**

16      A.   I don't remember him being there.  I

17  want to -- if I can clarify my answer as to --

18  There's one other attorney that I forgot, an

19  attorney named Dave Bradey.

20      Q.   **Now, since you were superior to these**

21  **individuals who you describe, did they have**

22  **function areas, or how did you assign their**

109

1       A.     Not the specifics of the liquidation.   I

2    recall the issues with the banks on the

3    withholding, but that's the part that I recall.

4       Q.     **Okay.**

5       A.     And I knew that that was causing the

6    partners -- this transaction to unwind.

7       Q.     **The problems with withholding for the**

8    **partners?**

9       A.     Yes.

10      Q.     **Why was that issue causing the**

11   **partnership to unwind?**

12      A.     Because there had been a major change in

13   the tax law in the United States, and I had given

14   my -- our legal opinion to the treasury

15   department; to Pedro Reinhard, actually; on the

16   consequences of that; and the conclusion was, I

17   guess, by him, to pursue the liquidation of the

18   partnership.

19      Q.     **Did you recommend -- Did your**

20   **recommendation go that far, or was it just -- did**

21   **you just opine on the tax effects of the**

22   **regulation change?**

110

1        A.    My opinion -- I don't remember

2   specifically.  Normally, what I would do is simply

3   go ahead and opine on the facts of it.  And

4   then -- you know, there are many, many other

5   things other than the tax effects that go into

6   these conclusions.  And then he would decide

7   through whatever method they did.

8        Q.    **Did you meet with Mr. Reinhard on that**

9   **issue; that is, on the -- like, the tax effect and**

10  **whether or not it should or shouldn't cause Dow to**

11  **liquidate?**

12       A.    I don't, you know, specifically remember

13  a meeting, but it's likely I did.

14       Q.    **Did you meet with Mr. DemarT on the**

15  **liquidation issue?**

16       A.    I never met with Michel DemarT on this

17  issue.

18       Q.    **Do you recall talking to him about this**

19  **issue?**

20       A.    I don't recall talking to him about it.

21       Q.    **Do you remember any meetings on the**

22  **liquidation issue?**

**CHARLES JOHN HAHN**

145

    1              MR. KOHLER:  Work product and attorney/
    2     client, principally.
    3              (The Government marked
    4                  Exhibit 509.)
    5              BY MR. WELSH:
    6         Q.   **Okay, sir, I'll hand you what's marked**
    7     **as Exhibit 509.**
    8         A.   Okay.
    9         Q.   **Okay.  Sir, are you the "Charles Hahn"**
   10     **identified at the top of Exhibit 509 as people who**
   11     **received this email?**
   12         A.   Yes, I am.
   13         Q.   **Do you recall getting this email,**
   14     **specifically?**
   15         A.   I don't remember the specific email, no.
   16         Q.   **Do you doubt that you did in fact get**
   17     **it?**
   18         A.   No, I don't doubt that I got it.
   19         Q.   **The subject of this email is projections**
   20     **of the net present value of the projects; is that**
   21     **correct?**
   22         A.   That's what it appears to be, yes.

146

1     Q.    Did you have any input into the subject

2    matter of this email?

3        A.    I don't remember having any input

4    specifically myself.  The tax department would

5    have provided information, probably, to Paul

6    Janicki in doing the calculations.

7        Q.    Was Mr. Janicki the one in the company

8    who was required to perform net-present-value

9    computations for projects at this time?

10       A.    No, certainly not for all projects.  He

11    was in the treasury department, and he did -- he

12    had all sorts of duties.  I think he was just

13    asked to do it.

14       Q.    But he was the one as far as you know

15    who was asked to do the net-present-value

16    computations?

17       A.    I believe he was, yes.

18       Q.    That are reflected in Exhibit 509?

19       A.    I believe so.

20       Q.    Do you recognize the -- It's only

21    handwritten numbers here.  Well, there is actually

22    something that says "File" and then something

**CHARLES JOHN HAHN**

Chemtech Royalty v. United States of America                4/10/2008

147

1    below it.  Do you recognize that handwriting?

2          A.    I'm not certain.  It looks like it might

3    be Pedro Reinhard's handwriting, but I'm not a

4    hundred percent certain.

5          Q.    And the numbers below it, does that look

6    like that's also Pedro Reinhard's handwriting?

7          A.    I can't tell on that.

8          Q.    Do you know what he's computing out

9    here; that is, where he's adding the 69 million

10   and the 54 million?

11         A.    No, I don't know what he's computing

12   out.  I'd have to study it.

13         Q.    Did you ever have input into -- other

14   than just computing, giving them tax figures, any

15   input into net-present-value computations?

16         A.    We did not do this net-present-value

17   type of computation because we wouldn't have had

18   all the figures to do it.

19         Q.    Okay.  You just provided figures to

20   other people?

21         A.    We would have provided our opinion, and

22   if the -- to the extent that there were figures

148

1    that were needed that came out of the tax records,

2    we would have provided that, yes.

3         Q.   **So you just pulled figures out of tax**

4    **records for them?**

5         A.   I can't remember specifically what we

6    did with this project, but that's typically what

7    we would do if we had a tax number or it took

8    particular tax expertise to get to the number,

9    or -- or we had to give an opinion as to how the

10   tax treatment was of something, that's what we

11   would provide to them, and then they did the

12   analysis.

13        Q.   **Is Mr. Janicki in Midland now?**

14        A.   I don't think so, but I don't know for

15   sure.

16        Q.   **You don't -- You don't deal with him --**

17        A.   No.

18        Q.   **-- currently?**

19        A.   No.  I'm retired.

20        Q.   **Oh.  You're retired?**

21        A.   Yes.

22        Q.   **Oh, I'm sorry.  Where did we make you**

**CHARLES JOHN HAHN**

Chemtech Royalty v. United States of America                    4/10/2008

155

1              MR. KOHLER:  Work product.  And any

2    other applicable privilege.

3              MR. WELSH:  Okay.  Thank you very much,

4    Mr. Hahn.

5              (Discussion off the record.)

6              MR. KOHLER:  We'd like to actually go

7    back on the record and ask a few more questions

8    for clarification.

9        EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

10             BY MR. KOHLER:

11       Q.   Mr. Hahn, you understand that you are

12   still under oath?

13       A.   I do.

14       Q.   I will ask you a few questions in

15   clarification of your previous testimony.  The

16   first thing I'd like to ask you about is your

17   line-reporting responsibilities.  In your previous

18   testimony you told us that the tax reporting

19   department reported to the CFO; is that correct?

20       A.   That's correct.

21       Q.   Are you a member of any trade

22   associations that give you broad familiarity with

156

1    the practices of tax departments in the United

2    States?

3         A.    Not currently, but during my career as

4    tax director, I was very active in the NAM for the

5    International Tax Committee, fairly active in the

6    Chamber of Commerce, and most active in the

7    American Chemistry Council.

8         Q.    Would you say that those experiences

9    gave you broad familiarity with the practices and

10   the organizational structures of tax departments

11   in many different companies in the United States?

12        A.    Yes, I would.

13        Q.    How common is it for a tax department to

14   report to the CFO?

15        A.    For large companies, it is the most

16   common form that I know of; for smaller companies,

17   it might vary between CFO and controller's

18   department; very infrequently, the legal

19   department.

20        Q.    The second thing I'd like to ask you

21   about refers to your reference to the consolidated

22   Dow group.