# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| CHEMTECH ROYALTY ASSOCIATES, L.P., <br> by DOW EUROPE, S.A., as Tax Matters Partner <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Case No.: 05-944-RET-DLD <br><br> Case No.: 06-258-RET-DLD <br><br> Case No.: 07-405-RET-DLD |

## MEMORANDUM IN OPPOSITION
## TO MOTION TO COMPEL

Plaintiff, through undersigned counsel, opposes the government's Motion to Compel, filed December 16, 2009, relating to Plaintiff's claims of privilege. Plaintiff fully complied with this Court's March 30, 2009, Order (the "March 30 Order"), engaging in a diligent and resource-intensive revision of its privilege logs to provide the additional detail required by the Court. Of Plaintiff's total privilege claims over 1,079 documents, only 132 remain in dispute. The revisions made to each document's subject matter, purpose, and privilege basis amply enable this Court and the government to evaluate Plaintiff's claims of privilege with respect to each remaining document, and for the reasons set forth below, the government's motion should be denied. Alternatively, Plaintiff requests in camera review before any portion of the government's motion is granted.

## BACKGROUND

### I.    Nature of the Case

This action is a petition for readjustment of partnership items of the Chemtech Partnership[1] pursuant to section 6226 of the Internal Revenue Code of 1986, as amended (26 U.S.C. § 6226).  Congress enacted section 6226 as part of a set of comprehensive rules for the audit and litigation of partnership tax issues in the Tax Equity and Fiscal Responsibility Act of 1982, codified at 26 U.S.C. §§ 6221 *et seq.* (the "TEFRA rules").  Although the adjustment of partnership items has tax consequences for the partners in the Chemtech Partnership, their tax liability is not placed directly at issue in this TEFRA proceeding.  At issue in this case is whether the IRS incorrectly adjusted certain partnership items, as defined by 26 U.S.C. § 6231(a)(3), of the Chemtech Partnership for the 1993 through 2003 taxable years.

### II.    Brief Factual Summary

The Dow Chemical Company ("Dow") formed Chemtech I with five foreign banks in 1993 as a means of raising minority equity capital without adversely affecting its credit ratings or its balance sheet.  Dow is a capital-intensive company for which ready access to capital is critical.  Its business is cyclical in nature.  Historically, Dow has followed a strategy of investing in new facilities during the "trough" years of the business cycle, when cash flow is low or even negative.  In the early 1990s, Dow was undergoing a period of difficult business conditions and reduced earnings.

Dow's ability to raise capital at a reasonable cost depends upon Dow maintaining its credit ratings with ratings agencies.  In order to minimize the risk of a credit downgrade, Dow

---

[1] Throughout this Opposition, "Chemtech Partnership" refers collectively to Chemtech Royalty Associates, L.P. ("Chemtech I") and Chemtech II, L.P. ("Chemtech II").  Chemtech I was formed in 1993; in 1998, Chemtech I was restructured and renamed Chemtech II.

decided to meet its funding requirements in part through Chemtech I. At the time Chemtech I was formed in 1993, the partnership vehicle enabled Dow to monetize valuable patent assets and to obtain $200 million in third-party capital that was treated for financial accounting purposes as minority equity on Dow's consolidated U.S. GAAP financial statements.

Dow subsidiaries contributed to the Chemtech Partnership patent assets valued at approximately $883 million and approximately $10 million in cash; the foreign banks contributed an aggregate of $200 million for limited partnership interests, which Dow was able to access by way of loans from a partnership subsidiary. The Chemtech Partnership generated income primarily from royalties paid by Dow for the use of the patents. The foreign banks received a preferred return on their investments paid solely out of partnership profits and participated in profits and gains over and above the amount of the priority return. The foreign banks also would have participated in any losses in the partnership, and as limited partners, the entire amount of their contributed capital was subject to risk of loss.

In 1998, Dow exercised its option to purchase the partnership interests of the foreign banks due to changes in U.S. withholding tax laws that might have required Dow to indemnify the banks for U.S. withholding taxes. Following the purchase, Dow contributed its Plaquemine, Louisiana chemical plant to the partnership, Chemtech I distributed the patents and other assets to Dow partners, and the partnership's name was changed to Chemtech II. A U.S. subsidiary of Rabobank, RBDB, subsequently invested $200 million in the partnership. This investment enabled Dow to replace the $200 million in minority equity financing previously provided by the five foreign banks.

The government found objectionable certain tax consequences mandated by the Internal Revenue Code's partnership provisions that were favorable to Dow. Accordingly, it reallocated

the partnership items of the Chemtech Partnership on multiple theories, including that the partnership was not valid for federal tax purposes.

## III.    Plaintiff's Efforts to Resolve Privilege Disputes

At all stages of the current privilege dispute, Plaintiff has attempted in good faith to resolve the issues raised by the government without involving the Court.  These efforts, to which Plaintiff has devoted substantial resources, have been successful in significantly narrowing the scope of the dispute.  Nonetheless, the government largely has rebuffed Plaintiff's repeated requests to engage in meaningful discussion with respect to individual privilege log entries. Instead, the government has continued to assert conclusory arguments that are belied by Plaintiff's log descriptions and that exhibit a legally unsupported and excessively narrow view of the privilege.  The government has revealed a demonstrated interest in seeking documents related to Plaintiff's litigation strategy that are clearly privileged and before filing its motion largely failed to particularize its objections in a manner that might have allowed the parties to address and resolve each concern.

### A.    The Initial Dispute—The Government's Quest for Privileged Documents

#### 1.    The Government's Focus On Privileged Tax Advice

Early in the litigation, Plaintiff made initial comprehensive document productions with respect to the 1993 through 1997 years of the Chemtech Partnership (documents produced on October 13, 2006) and with respect to the 1998 through 2003 taxable years of the Chemtech Partnership, following consolidation of those years (documents produced on June 12, 2007).  In all, Plaintiff now has produced 11,148 documents comprised of 83,122 pages.  The government issued its First Request for Production of Documents, pertinent portions of which are attached hereto as Exhibit A, on May 11, 2007.  Many of these broad ranging requests explicitly sought documents that the government knew or should have known would be protected from discovery

by applicable privileges. *See, e.g.*, United States' First Request for Production of Documents, Request Nos. 10 (seeking "[a]ll legal and tax opinions relating to the Chemtech transaction and/or to any entity's participation in the Chemtech transaction"); 11 (seeking "[a]ll documents received from or given to the law firm of King & Spalding related to the Chemtech transaction"); 13 (seeking "[a]ll documents showing or analyzing the tax consequences of participating in the Chemtech transaction for Dow or any other entity"); 14 (seeking "[a]ll communications and documents between the internal tax department of Dow and any person in connection with the tax issues related to the Chemtech transaction"); and 15 (seeking "[a]ll documents prepared by the internal tax department of Dow in connection with the tax issues related to the Chemtech transaction").

The character of these requests made clear that, as has become common practice in tax disputes, the government intended to launch a full-scale attack on Plaintiff's privileges. In addition to requests targeted at Dow's outside counsel advice, requests for communications and tax analyses of Dow's Tax Department included documents authored or received by attorneys within the Tax Department as part and parcel of their function of providing advice with respect to tax law and associated legal issues. Dow's Tax Department was separate and distinct from the legal department and reported directly to the CFO, a common practice for large companies. (Hahn Dep. 155:17-20, 156:13-19, Apr. 10, 2008.)[2] Although the Tax Department included fifty or more employees throughout the life of the Chemtech Partnership, only several were operating as attorneys. (Brink Dep. 12:22-13:18, Apr. 3, 2008; Jones Dep. 19:16-20:22, May 16, 2008.) These attorneys primarily were responsible for providing legal advice to the company, often in a tax planning role, and for working with outside counsel to provide Dow with legal advice

---

[2] Excerpts from deposition testimony are indexed, alphabetically by witness, and are attached hereto as Exhibit B.

relating to U.S. and foreign tax treatment.  (Curry Dep. 43:12-44:8, 45:4-46:2, 48:19-49:5, June

5, 2008; Hahn Dep. 13:11-14:12, 24:12-25:19, 34:17-35:5, 109:10-110:7; Jones Dep. 81:13-82:4,

83:2-20; Brink Dep. 15:5-16:1.)

  William Curry, currently Dow's Tax Director, testified that in performing legal duties for

Dow in his former role as tax counsel he would evaluate transactions, noting "I reviewed code

and regulations and considered the impact of a proposed transaction."  (Curry Dep. 44:3-5.)

Charles Hahn, a former Dow Tax Director, echoed this statement in describing his primary

responsibilities:  "[S]o as I said before, my responsibilities still were in the tax-planning area,

primarily.  I had some administrative duties as far as department administration and things like

that, but primarily in the tax planning area."  (Hahn Dep. 13:20-14:3.)  Additionally, Craig Jones

testified that he was "involved with the constant analysis of all of our transactions as to their

probability of success" and that he "would always be on the look out for legal developments that

would change the potential tax treatment of any Dow transaction."  (Jones Dep. 81:13-82:4.)  In

sum, lawyers in Dow's Tax Department clearly acted as Dow's legal counsel with respect to the

numerous tax issues a large company like Dow faced on a day-to-day basis.  In some instances,

certain attorneys also worked on the ongoing implementation of certain transactions to assure

that Dow complied with the various legal requirements outlined in the corporate documents.

(Curry Dep. 46:19-47:5, 49:6-19, 191:21-192:7, 227:12-228:9.)  Plaintiff has produced

documents relating to transaction administration that do not constitute legal advice.

  Dow's Tax Department also employed various accountants and other non-lawyer tax

experts.  In some cases, these employees prepared materials in anticipation of litigation that are

subject to work product protection.  In addition, beginning in 1998, these "federally authorized

tax practitioners," including those who dealt frequently with IRS agents, became eligible to

provide privileged tax advice to Dow under 26 U.S.C. § 7525 subject to the "same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney." Although not as prevalent as the advice Dow's in-house counsel provided (Plaintiff only claims the § 7525 privilege over seven documents), certain non-attorneys in Dow's Tax Department also acted to provide Dow with advice related to tax issues facing the company, specifically in connection with the Chemtech II transaction.

### 2.    Plaintiff's Good Faith Efforts To Preserve Privilege

As a result of the government's clear focus on privileged documents and its history in tax cases of taking a very broad view of subject matter waiver, it was particularly important for Plaintiff to exercise extreme care and diligence in its review to avoid the inadvertent production of documents that the government later would claim resulted in a subject matter waiver of applicable privileges. Such a waiver would put a large number of Dow's documents at risk of discovery not just in the present case but also to discovery by third parties in other matters. *See In re G-I Holdings, Inc.*, 218 F.R.D. 428, 432 (D.N.J. 2003) ("Once a party waives the attorney-client privilege, it relinquishes the privilege for all purposes and circumstances thereafter.") As a result, counsel for Plaintiff engaged in a careful review of all documents responsive to the government's broad-ranging requests to ensure that only non-privileged documents were produced. The initial process of undertaking a privilege review of documents in this case was extremely time-consuming and resource-intensive.

Once it was determined that a document was to be withheld or redacted as privileged, a privilege log[3] entry was created containing information about the nature of the document, the

---

[3] Plaintiff provided the government with a privilege log identifying documents withheld in full on December 17, 2007, and a privilege log identifying documents produced in redacted form on February 1, 2008 (together, the "Initial Privilege Logs").

privilege type and the basis for the claim of privilege, and the subject matter of the document.

Thus, for each document, the Initial Privilege Logs provided the following, to the extent

available:

- date
- author
- addressee
- copyee
- document type (e.g., letter, memorandum, notes, opinion)
- privilege type (attorney-client, work product, tax practitioner privilege)
- privilege basis (describing the nature of the communication)
- subject matter

The privilege basis field described the nature of the communication. The 16 distinct

subject matter descriptions set forth the topic of communication at a general level. In addition,

Plaintiff provided a list of all attorneys appearing as authors, addressees, or copyees, together

with their affiliations (e.g., Dow, DESA, K&S, etc.) as an attachment to its Initial Privilege Logs.

Plaintiff expended significant additional resources attempting to resolve the initial

discovery dispute. First, Plaintiff re-reviewed each document on the Initial Privilege Logs and

determined upon further consideration to release 86 documents. Plaintiff released these to the

government and requested that the government identify specific documents or categories of

documents remaining on the Initial Privilege Logs that were of particular concern. *See* Letter

from Hartman Blanchard to Deborah Morris (Feb. 29, 2008), attached hereto as Exhibit C.

Despite two in-person meetings, the government never meaningfully explained to Plaintiff what

privilege claims were problematic. Instead, the government's assault on Plaintiff's privilege

claims remained undifferentiated with respect to the categories of documents it continued to

seek.

Plaintiff also explained to the government multiple times that it was withholding many of

the documents appearing on the Initial Privilege Logs solely out of concern that the government

would argue that production of the documents constituted a transaction-wide subject matter
waiver. At Plaintiff's suggestion, the parties entered into an agreement that enabled Plaintiff to
produce these documents without risking a subject matter waiver of any applicable privilege.
Under the agreement, "the United States will not assert in any litigation that Plaintiff's
production of [certain listed documents over which Plaintiff previously claimed privilege]
constitutes a subject matter waiver of the attorney-client privilege or the work product doctrine."
*See* Agreement Regarding Subject Matter Waiver of Attorney-Client Privilege or Work Product
Doctrine With Respect to Certain Documents (and amendments thereto) (collectively, the "Non-
Waiver Agreement"), attached hereto as Exhibit D. In order to implement the Non-Waiver
Agreement, Plaintiff again reviewed every document remaining on the Initial Privilege Logs,
generally producing all documents other than communications to outside counsel and documents
involving tax legal analysis. This process resulted in the production to the government of an
additional 380 documents. Plaintiff subsequently provided the government with two additional
privilege logs on April 2, 2008, identifying the remaining items over which it had maintained
claims of privilege in whole or in part. The first was Plaintiff's Amended and Supplemented
Privilege Log (the "April 2, 2008, Withheld Log"), which contained all responsive documents
Plaintiff withheld as of that date on privilege grounds. The second was Plaintiff's Amended and
Supplemented Redacted Documents Privilege Log (the "April 2, 2008, Redacted Log")
(collectively, the "April 2, 2008, Logs"), which contained all documents produced with any
redaction as of that date.

### B.    Plaintiff's Compliance with the March 30 Order

Despite Plaintiff's efforts to compromise and to discuss any particular concerns, the
government issued a blanket challenge to 379 claims of privilege listed on the April 2, 2008,
Logs, filing a motion to compel with this Court on July 1, 2008. On March 30, 2009, the Court

granted in part and denied in part that motion. The March 30 Order directed Plaintiff to provide additional detail in its privilege log entries and set forth a schedule for the parties to address any remaining disputes. As discussed below, Plaintiff complied fully with the Court's March 30 Order and undertook substantial additional efforts to address the government's complaints.

Following the issuance of the March 30 Order, attorneys for Plaintiff immediately conferred to discuss the implications of the Order and began to devise a protocol for compliance. Plaintiff determined that each document would be re-reviewed and each privilege log entry revised. First and foremost, Plaintiff focused on providing the additional detail required by the Court through individualized descriptions that would enable both the Court and the government to evaluate each claim of privilege with greater particularity. Specifically, Plaintiff revised the April 2, 2008, Logs to add or amend the following:[4]

- Authors and recipients. Plaintiff identified all authors and recipients to the extent reasonably possible. Additionally, Plaintiff provided a comprehensive list of the titles, affiliations, or roles of each author or recipient. At the government's request, Plaintiff also included this information together with the names on the face of the log for each entry.

- Beginning and ending Bates numbers. The withheld documents did not have preexisting Bates numbers because such numbers are assigned only after it has been determined that Plaintiff will produce a particular document. Plaintiff assigned Bates numbers to each withheld document with the prefix "CT-PRIV" to comply with the March 30 Order, and these Bates numbers now are reflected.

- Title/re line. Plaintiff added a column providing selected document summary information that may appear atop a document that could be construed as a document "title." Certain documents contained no title or reference line. These were marked as "N/A."

- Description/purpose. Plaintiff added a column that provides a detailed description of the nature of the document, its subject matter, and its purpose. This column includes, with respect to work product, a description of the specific, anticipated litigation.

---

[4] See Letter from Hartman Blanchard to Deborah Morris (Apr. 13, 2009), attached hereto as Exhibit E.

Three associate attorneys, under the supervision of two partners, reviewed all 379 challenged entries on the April 2, 2008, Logs multiple times.  On April 29, 2009, Plaintiff provided the government with withheld and redacted privilege logs revised as stated above to comply with the March 30 Order (together, the "April 29, 2009, Logs").[5]  As a result of the review and revisions, Plaintiff produced a log with substantially more detail than (1) the April 2, 2008, Logs, or (2) the government's own privilege log.[6]  For example, April 2, 2008, Withheld Log Entry No. 481 described a "[c]onfidential communication between client and lawyer for the purposes of facilitating the rendition of legal services or legal advice to the client" relating to "[t]he structure and/or operation of Chemtech; Tax issues related to the Chemtech partnership." It now reads "[f]ax from employee to in-house counsel attaching memorandum summarizing advice of in-house counsel relating to the application of technical tax rules to the partnership agreement, such as the maintenance of partnership capital accounts and the profits test."[7] Similarly, April 2, 2008, Withheld Log Entry No. 36 described a "[c]onfidential communication between client and lawyer for the purposes of facilitating the rendition of legal services or legal advice to the client" concerning "[t]ax issues related to the Chemtech partnership; [and the] basis, depreciation, fair market value and/or royalty rates of the Chemtech patent portfolios."  It now reads "[e]-mail from Dow employee to in-house tax counsel for the purpose of providing

---

[5] Based on its review and in efforts to narrow the current dispute, Plaintiff determined that it would produce in full or redacted form 102 additional documents from the April 2, 2008, Logs, pursuant to two amendments to the non-waiver agreement.  Together with the documents to which the government withdrew its challenges, the total number of documents on the April 29, 2009, Logs was 314.

[6] *See* Exhibit F (attaching the government's privilege log).  The government criticized Plaintiff's characterization of certain documents as "providing legal advice."  The government's objection loses force and credibility when one considers its own privilege log uses the phrase "to secure legal advice on the transactions at issue" approximately 135 times.

[7] Despite these efforts, the government maintains its objection over this entry.  (*See* Memorandum of Law in Support of Defendant's Motion to Compel ("Gov. Mem.") at 20-21.)  It is unclear why, after several requests to do so, the government is only now able to articulate its specific issues with regard to this log entry.

information related to the daily amortization of Essex contributed patents in order to determine the legal impact of GATT legislation with respect to these patents."

As it had done numerous times in the past, Plaintiff invited the government to articulate specific concerns regarding particular log entries. Given the heightened specificity of the new log entries, Plaintiff advised the government that the type of generic complaints that the government had made in the past were no longer appropriate. Rather, Plaintiff urged the government to work cooperatively to narrow the dispute before the Court. *See* Letter from Hartman Blanchard to Deborah Morris (Apr. 29, 2009), attached hereto as Exhibit G.

In response to Plaintiff's submission of the April 29, 2009, Logs, the government withdrew objections to 152 of the contested documents. *See* Letter from Deborah Morris to John Magee (May 14, 2009), attached hereto as Exhibit H. The government maintained its objection over 74 documents alleging that the entries did not adequately describe the purpose of the document. The government also maintained objections over numerous other documents on the basis that:

- The documents contained predominantly business, accounting, or tax return preparation advice;
- The documents were written "to file;" and
- The documents related to Plaintiff's tax reserve analysis.

Once again, counsel for Plaintiff re-reviewed each contested document to determine whether a more specific description would aid the government's privilege evaluation and to determine whether any documents could be released pursuant to an amendment to the non-waiver agreement.[8]

---

[8] In performing this review, Plaintiff determined that an additional 70 documents could be produced to the government in full pursuant to the non-waiver agreement, and 7 documents could be produced in redacted form, further narrowing the scope of the dispute.

Plaintiff responded to the government's objections on May 21, 2009. *See* Letter from Hartman Blanchard to Deborah Morris (May 21, 2009), attached hereto as Exhibit I. Plaintiff informed the government that it could not go beyond the extraordinary detail already provided in the absence of further specificity on the government's part without risking subject matter waiver of applicable privileges. Because the government, despite numerous requests, had failed to provide particularized concerns with regard to individual entries, Plaintiff could not determine the additional information sought or what aspects of the descriptions could be revised to assist the government in its evaluation of the privilege claims. The government never responded to Plaintiff's May 21, 2009, letter. On May 27, 2009, Plaintiff delivered to the government revised privilege logs identifying the remaining contested withheld (the "Final Log") and redacted (the "Final Redacted Log") documents (together, the "Final Logs").[9]

Plaintiff and the government subsequently met on several occasions to discuss numerous aspects of the litigation, including the government's concerns regarding the Final Logs. Each time, Plaintiff requested that the government raise specific concerns with respect to particular entries on the Final Logs in an attempt to narrow the discovery issues. The government either

---

[9] Plaintiff has attached new versions of the Final Logs as Exhibit J to this motion that reflect additional concessions made by the government in connection with the present motion to identify for the Court the Final Log Entries still in dispute. Plaintiff's accounting for the parties' privilege claims and compromises, itemized in more detailed fashion in Exhibit K, is summarized below:

| Privilege claims and compromises by the parties | Number of Documents Added or Subtracted from Logs | Running Total of Log Entry Numbers |
|---|---|---|
| Documents on Initial Logs and documents later added | 1,079 | 1,079 |
| Documents released by Plaintiff | (-570) | 509 |
| Government objections withdrawn | (-377) | 132 |

The government contends that it is only challenging 124 entries. (Gov. Mem. at 8.) However, when each challenged entry in the government's Motion to Compel is counted, the total is 132 challenged entries. Thus, Plaintiff has removed from the Final Logs only the 30 documents that the government explicitly concedes. (Gov. Mem. at 22 n.9.)

was unprepared to discuss the issue or failed to articulate specific concerns on any of these occasions. Instead, the government has chosen to provide specific complaints for the first time only now, in the present motion to compel.

## ARGUMENT

Plaintiff has complied with the March 30 Order, and the government's assertions to the contrary are without merit. Plaintiff's Final Logs provide all of the components necessary to sustain each asserted privilege claim. In addition to challenging the overall sufficiency of Plaintiff's Final Logs, the government argues that Plaintiff's Final Logs are deficient for the following reasons: (1) the Final Logs contain entries that do not specify the roles in-house counsel played and that combine a statement of the document's purpose with its subject matter; (2) certain documents were drafted "to file" or reflect an unknown author; (3) redacted documents show an overly broad view of privilege; and (4) documents relating to Plaintiff's tax reserve analysis are not privileged (or, in the case of one document, any privilege was waived). Each of the foregoing arguments, addressed in turn below, is meritless. The government's conclusory assumptions regarding the content and nature of each document are insufficient to defeat viable privilege claims asserted on an extraordinarily detailed privilege log. In any event, before granting the government's motion in any respect, Plaintiff requests that the Court review the documents at issue *in camera*.

I.    **Plaintiff's Final Logs Comply with the March 30 Order and Reflect Only Confidential, Privileged Communications**

The government continues to assert that the Final Logs are facially deficient for two main reasons. First, the government contends that the Final Logs do not adequately assert that communications involving in-house counsel are legal, rather than business, in nature. Second,

the government asserts that it was deficient to combine a document's subject matter description

with a description of its purpose.  As discussed below, these complaints are specious.

**A.      Plaintiff's Productions and Privilege Log Demonstrate Plaintiff's Careful**
**Application of Privilege Standards to Communications Involving In-House**
**Counsel**

The government continues to assert blanket, undifferentiated concerns that the documents

on Plaintiff's privilege logs are not privileged, primarily based on the involvement of in-house

counsel or the presence of corporate non-attorneys in the communications.  As indicated above,

it is clear that the applicable privileges apply "whether an attorney works at a law firm or works

as in-house counsel for a corporation." *Long v. Howmedica Osteonics Corp.*, No. 07-3005, 2007

U.S. Dist. LEIXS 93261, at *9 (E.D. La. Dec. 19, 2007); *Landry v. Ga. Gulf Corp.*, No. 97-1164-

B-M2, 2001 U.S. Dist. LEXIS 25223, at *8 (M.D. La. Feb. 26, 2001).  In drawing the sometimes

difficult distinction between business and legal communications in the corporate context,

Plaintiff has followed the general rule, claiming privilege only over communications that are

"predominantly legal, as opposed to business, in nature," *Itoba Ltd. v. LEP Group, PLC*, 930 F.

Supp. 36, 43 (D. Conn. 1996), or where legal and non-legal services are "inextricably

intertwined." *In re Vioxx Prods. Litig.*, 501 F. Supp. 2d 789, 798 (E.D. La. 2007).

At the outset, it is notable that three in-house attorneys predominate those entries on the

Final Logs that do not involve direct external legal advice.  Bill Curry, Craig Jones, or Eric

Blackhurst authored approximately half of the internally-generated documents that the

government is seeking.  As discussed above, during the time frame at issue in this case, Bill

Curry and Craig Jones served as "tax counsel" within the Tax Department.  As distinguished

from accountants and economists working in the Tax Department, the primary functions of

Messrs. Curry and Jones was to provide legal advice.  (Curry Dep. 47:2-5, 48:19-49:19; Jones

Dep. 81:13-82:4, 83:2-4.)  Eric Blackhurst was the primary transactional lawyer involved in the

Chemtech Partnership, and his role almost exclusively involved providing legal advice on the partnership agreements and other transactional documents.

Notwithstanding that the primary roles of Dow in-house counsel were legal in nature, Plaintiff has not asserted privilege over documents "merely because in-house counsel are included in the communications." (Gov. Mem. at 16.)  To the contrary, Plaintiff has analyzed carefully each document authored or received by in-house counsel to determine whether the document in fact relates to legal advice or business issues.  This is particularly well-demonstrated by the extensive production of documents authored or received by Bill Curry.  As the government notes, notwithstanding Mr. Curry's primary function as tax counsel, in the context of the Chemtech Partnership, he was tasked as a junior executive with many implementation and compliance-related functions.  Plaintiff did not withhold such documents and accordingly has produced 1,729 documents on which Mr. Curry was the author or recipient (approximately 92 percent of all such documents).  Plaintiff's voluminous production of business-related documents authored or received by in-house attorneys like Mr. Curry belies the government's unfounded speculation that the withheld documents are somehow less likely to be privileged.  Similarly, Plaintiff has claimed privilege over only 19 percent of documents authored or received by Craig Jones; 18 percent of documents authored or received by Paul Brink (former Tax Director); and 14 percent of documents authored or received by Charles Hahn.

Moreover, Plaintiff's Final Log descriptions confirm that Plaintiff did not claim privilege over non-legal business, tax return, or accounting communications.[10]  For example, the

---

[10] The government mischaracterizes the Court's March 30 Order as recognizing that "the attorney-client privilege as it relates to business advice of tax matters is narrower than might be claimed by many taxpayers." (Gov. Mem. at 5.)  The Court merely recited the uncontroversial proposition that "documents relating to the preparation of a tax (continues on next page)

government challenges Final Log Entry No. 142, which is described as an "[e]-mail from in-house counsel to employees for the purpose of summarizing legal analyses of (1) the impact of U.S. withholding tax regulations on the Chemtech partnership; and (2) outlining potential restructuring steps in light of the foregoing." The government contends without explanation that "the description suggests business planning," (Gov. Mem. at 17), notwithstanding that the protected content is described as a tax lawyer's "legal analyses" and the subject matter—"significant changes to U.S. tax law" and transactional "restructuring steps in light of the foregoing"—is precisely the type of subject matter on which legal advice routinely would be given.

The government further misleads the Court by citing to document *titles*, rather than *descriptions*, for the proposition that in-house lawyers were "merely acting in their capacities as smart corporate employees":

| Log Entry | Document Title (cited by government) | Document Description (omitted from government brief) |
|---|---|---|
| No. 658 | Steps to Restructure Chemtech | E-mail from in-house counsel for the purpose of forwarding in-house counsel outline of the principal steps necessary for restructuring the Chemtech partnership, including (1) identifying changes in U.S. withholding tax regulations and (2) providing interpretation of transaction agreements to effect an unwind. |
| No. 751 | Re: CRLP Profits and Income Adjustment for 1st Qtr | Confidential communication from in-house counsel to employees for the purpose of confirming the allocation of |

return are not privileged." (March 30 Order at 6.) However, it is undisputed that legal work related to tax planning and other aspects of tax compliance are privileged. *See e.g.*, *United States v. El Paso*, 682 F.2d 530, 539 (5th Cir. 1982) ("[W]e would be reluctant to hold that a lawyer's analysis of the soft spots in a tax return and his judgment on the outcome of the litigation on it are not legal advice."); *United States v. Chevron Texaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002) (stating that tax analyses of transactions are "rooted virtually entirely in the law"); *Colton v. United States*, 306 F.2d 633, 637 (2d Cir. 1962) (stating that "the giving of tax advice . . . is prima facie subject to the attorney-client privilege").

| | | |
|---|---|---|
| | | profits and taxable income of the Chemtech partnership. |
| No. 753 | Re: Second Installment of the Purchase Price | E-mail from employee to in-house counsel with information in order to provide legal advice regarding the process for complying with the transaction documents' requirements for making the second installment of the purchase price to Class A investors. |
| No. 790 | Chemtech Restructuring | Correspondence from in-house counsel to employee attaching email and memoranda from in-house counsel for the purpose of summarizing legal analysis of (1) the impact of potential U.S. withholding tax on the Chemtech investment agreements; (2) the purchase rights of DTPC under the Chemtech partnership agreement; and (3) potential restructuring steps in light of the foregoing. |

Once again, the descriptions omitted from the government's brief explicitly detail the nature of the legal advice.

The government also implies that certain communications with in-house counsel are not privileged as a result of their distribution to legal and non-legal personnel. (Gov. Mem. at 17 (citing *In re Vioxx*, 501 F. Supp. 2d at 805).) This contention misapplies *Vioxx*, which addressed situations where communications distributed to legal and non-legal personnel for simultaneous review by all parties were found to be predominantly business related. *See In re Vioxx*, 501 F. Supp. 2d at 805-06. Lawyers often are copied on the circulation of documents to provide legal advice regarding contracts, agreements, or other transactional documentation. The *Vioxx* court held that the primary purpose of the overall communication in these circumstances can be business as opposed to legal. *Id.* at 805. The court did not, as the government implies, hold that communications to both lawyers and non-lawyers are never privileged. Here, the document cited by the government (once again, Final Log Entry No. 142, discussed more fully above)

"summarized legal analyses," and its transmission from one in-house lawyer to three other in-house lawyers and two other corporate employees contradicts the government's characterization of the entry as showing a "wide distribution." The two non-lawyer employees were (1) Dow's corporate Treasurer, who was intimately involved in the Chemtech Partnership due to its financing benefits; and (2) an employee of the Chemtech Partnership's general partner.

In sum, the record reflects that Plaintiff was selective in its assertion of privilege over communications involving in-house counsel. Rather than support the government's position, the entries the government cites demonstrate the lengths to which Plaintiff has gone in order to provide individualized descriptions and indicate why the logged communications involving in-house counsel are privileged, rather than purely business, in nature. It is the government's conclusory allegations, and not Plaintiff's log entries, that are deficient. *See, e.g., Spannaus v. United States*, 942 F. Supp. 656, 658 n.1 (D.D.C. 1996) (noting that generalized objections to government's *Vaughn* index were insufficient to shift the burden of persuasion back to proponent of privilege).

## B.    Plaintiff Appropriately Integrated Into One Entry a Document's Subject Matter Description and Purpose

The government claims, for the first time in over six months since the Final Logs were submitted, that the combination of the document's purpose and description categories makes it impossible to "judge Chemtech's privilege claims." (Gov. Mem. at 20). The government makes this claim notwithstanding that the descriptions and purposes on the April 29, 2009, Logs were sufficiently clear for it to withdraw objections to a total of 182 of the entries. (Gov. Mem. at 22 n.9.) Indeed, every entry provides an explicit nexus to the document's legal purpose, as the entries cited by the government make clear.

For example, with respect to Final Log Entry No. 481, the government contends that it "cannot tell whether the communication relating to the partnership agreement is one primarily describing the operation of the agreement (which would not be privileged) or legal advice." *Id.* The contested entry describes a "[f]ax from in-house counsel attaching memorandum summarizing advice of in-house counsel *relating to the application of technical tax rules to the partnership agreement*, such as the maintenance of partnership capital accounts and the profits test" (emphasis added). It is unclear how the government could misconstrue the purpose of the document as anything other than to provide legal advice. Similarly, the government cites Final Log Entry No. 36, which describes an "[e]-mail from Dow employee to in-house counsel and employees for the purpose of providing information related to the daily amortization of Essex contributed patents *in order to determine the legal impact of GATT legislation with respect to these patents*" (emphasis added). The challenged entry explains with precision that the employee communication is made to assist in-house counsel with analysis of GATT legislation on patent amortization.

Finally, the government never articulates why an entry that describes both the subject matter and the purpose is somehow clearer than one that separates them.[11] To the contrary, the arbitrary separation of these related elements either would render the entries more difficult to interpret (because the purpose is more easily evaluated in the context of the subject matter) or duplicative (because the subject matter must be restated to clarify the purpose). The Court should reject the government's unwarranted attempt to impose an arbitrary technical requirement

---

[11] The Court's March 30 Order did not direct Plaintiff to provide a separate column for each category. Because a document's purpose and subject matter are necessarily intertwined, it would have been unwieldy and duplicative to include a separate category for each.

that the March 30 Order never contemplated and that would not improve the government's

ability to evaluate Plaintiff's privilege claims.

## II.   Documents Drafted "to File" or with an Unknown Author Reflect Privileged Communications and Are Appropriately Withheld

The government challenges the privilege claims of 31 entries that are addressed "to file,"

or that do not specify an author.  The government claims that attorney generated file memoranda

or notes are not privileged where they reflect uncommunicated thoughts.  However, attorney

generated legal analyses must be presumed to reflect an attorney's response to requests for legal

advice.  Accordingly, memoranda to file will be protected as privileged where "the notes reveal,

directly or indirectly, the substance of a confidential attorney-client communication,"  *In re*

*Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 407, 433 (N.D. Ill. 2006), or where they "record[] a

confidential attorney-client communication." *In re Rivastigmine Patent Litig.*, 237 F.R.D. 69, 83

(S.D.N.Y. 2006).  Courts have validated claims of privilege over documents addressed "to file"

that reflect otherwise privileged communications, noting that "[d]ocumentary evidence of

confidential communications is necessarily privileged as much as testimonial evidence." *Colton*

*v. United States*, 306 F.2d 633, 639 (2d Cir. 1962).  An attorney's notes to file also may be

protected when they are "used to formulate counsel's protected communications with their

client." *Note Funding Corp. v. Bobian Inv. Co., N.V.*, No. 93 Civ. 7427 (DAB), 1995 U.S. Dist.

LEXIS 16605, at *19 (S.D.N.Y. Nov. 9, 1995).

Plaintiff's claims of privilege over documents drafted "to file" are appropriate.  The

subject matter on the face of each withheld and redacted log entry drafted "to file" provides

sufficient detail to demonstrate that the communication is privileged.  Additionally, the log

entries with respect to these documents adequately describe why the privilege applies.  For

example, Final Log Entry No. 61, authored by Mr. Curry, is described as "[n]otes drafted by in-

house counsel for purposes of developing legal advice regarding interpretation of the GATT legislation and its impact on the Chemtech patents." Similarly, Final Log Entry No. 407, authored by Mr. Jones, is described as a "[m]emorandum drafted for the purpose of analyzing the tax consequences of alternative restructuring options of the Chemtech partnership in light of new withholding tax regulations. The memorandum identifies legal risks, and marginalia reflects advice received from outside counsel." Both of these entries clearly reflect in-house counsel's intention to provide legal advice to its client regarding a change in existing legislation. Final Log Entry No. 445 is authored by a corporate Treasury employee, but the description makes clear that his notes were "taken for the purpose of summarizing legal advice received from in-house counsel William Curry on the impact of new withholding tax regulations and the interpretation of partnership agreement requirements." Thus, the challenged entry demonstrates the nature of the advice received, the attorney who provided the advice, and the manner in which that advice was contemporaneously recorded.

The government also claims that documents with unknown authors cannot be privileged. This is not true where, as is the case with respect to documents that Plaintiff has withheld, the document's content makes clear that it reflects legal analysis. For example, Final Log Entry No. 966 describes a document that "contains notes for purposes of summarizing a conference call with in-house counsel William Curry; the notes reflect Mr. Curry's legal advice in which he analyzes the tax impact of a change in patent amortization, including a description of the issue and an analysis of a series of potential options." Plaintiff has identified the legal advisor and the privileged communication reflected in the notes to file, and the claim of privilege should be sustained. *See also* Final Redacted Log Entry No. 22 (privileged portion of document "reflects counsel's legal advice rendered for purposes of analyzing potential tax consequences of

negotiating a credit default swap"); Final Log Entry No. 1012 (indicating that analysis incorporates legal advice related to the hazards of litigation and counsel's evaluation of the potential outcomes of litigation). Each of these descriptions clearly reflects the nature of the legal advice provided and constitute protected communications.

Finally, it is clear that "[i]f the memoranda [to file] are prepared in anticipation of litigation, then they are protected by the work product privilege." *Glaxo, Inc. v. Novophram, Ltd.*, 148 F.R.D. 535, 541 (E.D.N.C. 1993). Plaintiff has clearly identified the anticipated litigation in log entries 1001-1003 and 1011. Accordingly, these memoranda are protected from disclosure.

**III.    The Challenged Redacted Documents Demonstrate Plaintiff's Precision in Excising Only Those Portions of a Document That Contain Privileged Information**

The government claims erroneously that the documents Plaintiff produced in redacted form demonstrate an overbroad approach to privilege. The diametric opposite is true: Plaintiff's targeted redactions show that Plaintiff was careful, selective, and precise in its privilege claims. The government's argument is based on the mistaken premise that legal advice cannot appear within a document otherwise dominated by non-legal content. *See In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d at 813 n.22 (noting that the attorney-client privilege "can focus on the communication as a whole or on segregable portions of communications if the proponent chooses to redact rather than make a universal claim."); *United States v. Chevron Corp.*, No. C 94-1885 (SBA), 1996 U.S. Dist. LEXIS 8646, at *5 (N.D. Cal. May 30, 1996) ("That the document as a whole addresses predominantly business matters does not negate the privilege as to the portion containing requests for legal advice.").

Plaintiff's precise redactions make clear that it narrowly construed the attorney-client and other applicable privileges. Final Redacted Log Entry No. 22 excises one sentence of an eight

page document; similarly, Final Redacted Log Entry No. 23 excises one sentence of a five page document. The redacted portion is clearly described as relating to Plaintiff's counsel's advice and analysis regarding the federal income tax consequences of negotiating a credit default swap. The government also challenges Final Redacted Log Entry Nos. 66-68, arguing it is "entirely unclear how . . . in-house counsels' perspective on Arthur D. Little's performance in valuing Chemtech's patents constitutes legal advice." (Gov. Mem. at 27). Because the validity of a valuation is a legal issue in many tax cases, it is not at all surprising that a valuation would be examined in light of prevailing legal requirements.

## IV.    The Court Should Not Order Production of Challenged Documents Reflecting Analysis of Dow's Tax Reserve

The government unsuccessfully attempted to obtain documents relating to Dow's tax reserve in connection with a motion to compel that the government filed in the U.S. District Court for the District of Columbia (the "D.C. litigation").[12] *See United States v. Deloitte & Touche USA LLP*, 623 F. Supp. 2d 39 (D.D.C. 2009). The D.C. litigation was precipitated by a broad ranging subpoena issue to Deloitte & Touche ("Deloitte"), Dow's auditor, to produce all documents relating to the Chemtech Partnership transaction.[13] Deloitte produced all but three documents, which it prepared or obtained in connection with its review of Dow's tax reserve and over which Dow asserted privilege. The District Court denied the government's motion to compel production of these documents, finding that the documents were privileged and that the

---

[12] The government appears bent on obtaining Chemtech-related tax reserve workpapers through short-circuiting the discovery process in this litigation and by testing as many different forums as it can. The government recently issued administrative summonses to Dow and Deloitte for Chemtech tax reserve related workpapers for Dow's 2004 through 2006 taxable years. *See* Exhibits L and M. Enforcement of the summons would occur in a Michigan district court, and appeal would lie in the Court of Appeals for the Sixth Circuit.

[13] The subpoena is attached hereto as Exhibit N.

disclosure of privileged communications to Deloitte did not waive the work product privilege.[14]

Three of the documents at issue in the present motion (Final Log Entry Nos. 167, 995, and 998)

are versions of a document that the government conceded in their appellate brief was "generated

by Dow's . . . in-house counsel for the purpose of providing Dow tax advice (not to evaluate

Dow's financial statements)." *See* Brief for the Appellant at 30-31 ("We have not challenged

Dow's claim (or the court's conclusion) that the [document] satisfied Rule 26(b)(3) when [it

was] originally generated.").[15]

A.    **Documents Relating to Plaintiff's Tax Reserve Analysis Are Irrelevant and
      Unduly Prejudicial**

The majority of the 33 documents relating to Dow's tax reserve are spreadsheets

analyzing tax reserves on Dow's financial statements for uncertain tax positions, including

Dow's positions relating to the Chemtech Partnership.  As the government is aware from the

D.C. litigation, setting the tax reserves is a process involving legal analyses and hazards of

litigation analyses of in-house counsel, outside counsel, and the company's auditor.  *See*

Declaration of William L. Curry ("Curry Decl."), attached hereto as Exhibit P.  Dow's tax

reserve analyses do not fall within the scope of appropriate discovery in this matter because they

are not "relevant to the subject matter of the action" or "reasonably calculated to lead to the

discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).   As indicated, these documents

simply reflect a privileged analysis of the hazards of litigation.  The Court ultimately must make

its own findings regarding the pertinent facts, none of which is made more or less probable by

attorney thoughts and impressions regarding the likelihood of success in litigation.  *See* Fed. R.

---

[14] *See id.* at 40-41.  The government appeal of the district court's decision currently is pending in the Court of Appeals for the District of Columbia Circuit.

[15] Pertinent pages of the brief are attached as Exhibit O.

Evid. 401.  Moreover, any potential relevance is far outweighed by the prejudice that Plaintiff

would suffer if the government is permitted to attempt to distract the Court with information

about Dow's litigating strategy and potential compromise positions.  *See* Fed. R. Evid. 403.  The

Court should not countenance such a diversion even if it finds that these documents are not

privileged.

**B.      Privileged Legal Advice Relating to Dow's Tax Reserve Analysis is Protected Work Product**

The Fifth Circuit employs a "primary purpose" test in determining whether a document

was prepared in anticipation of litigation and requires a finding that "the primary motivating

purpose behind the creation of the document was to aid in possible future litigation."  *United*

*States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. 1981).  However, litigation need not be imminent,

or even certain to occur for the privilege's protection to apply.  *Id.*  As affirmed by Dow's Tax

Director Bill Curry, Dow's management expected that the IRS would challenge the Chemtech

Partnership for numerous reasons, including (1) that the Chemtech Partnership transactions were

relatively large and involved significant tax benefits; (2) that the transactions arose in an

evolving and uncertain area of the tax law; and (3) that by the time Chemtech II was formed, the

IRS already had begun to dispute Dow's treatment of Chemtech I.  *See* Curry Decl. ¶¶ 8-10.

The government's citation to *United States v. El Paso*, 682 F.2d 530 (5th Cir. 1982), is

misguided.  The government should not be permitted to forum shop its discovery arguments and

should be bound by its decision to litigate the discoverability of tax reserve documents in the

District of Columbia.  In any event, *El Paso* was decided in 1982, over 27 years ago.  Since

1982, developments in disclosure related to corporate transparency (e.g., Sarbanes-Oxley) have

put an increasing strain on privilege.  Accounting firms now insist upon disclosure of all

confidential communications in order to ensure that they have not missed any important issues.

*See* AU 9326 - Auditing Interpretations of Section 326, ¶¶ .20-.22 ("If the client's support for the tax accrual . . . is based upon an opinion issued by an outside advisor with respect to a potentially material matter, the auditor should obtain access to the opinion, notwithstanding potential concerns regarding attorney-client or other forms of privilege."), attached hereto as Exhibit Q. Moreover, a substantial majority of Circuits have opted to apply the more flexible "because of" standard adopted by the Second Circuit in *United States v. Adlman*, 134 F.3d 1194 (2d Cir. 1998), which asks instead whether a document was prepared "because of" the prospect of litigation. *But see United States v. Textron, Inc.*, 577 F.3d 21, 29 (1st Cir. 2009) (holding that a determination of work product turns on whether a document is prepared for use in potential litigation). The Fifth Circuit has not reviewed its position on the applicable work product test since the widespread adoption of *Adlman*. In any event, at least one court recently held that the distinction was irrelevant in the context of reserve-related documents. *Regions Financial v. United States*, No. 2:06-CV-00895, 2008 U.S. Dist. LEXIS 41940, at *5 (N.D. Ala. May 8, 2008) (holding that accounting firm documents quoting or discussing company legal analyses in connection with tax reserves analysis are protected under either work product standard).[16]

## C.    Disclosure to Plaintiff's Independent Auditor Does Not Waive Privilege

As indicated above, the District Court in *Deloitte* held that the disclosure of Final Log Entry No. 995 to Deloitte did not waive work product protection.[17]  623 F. Supp. 2d at 41

---

[16] The reserve-related documents still contested are also protected by the attorney-client privilege and section 7525 tax practitioner's privilege for many of the same reasons they are protected by the work-product doctrine. *See El Paso*, 682 F.2d at 539 (stating that it "would be reluctant to hold that a lawyer's analysis of the soft spots in a tax return and his judgments on the outcome of litigation on it are not legal advice").

[17] Further, the disclosure of Final Log Entry No. 995 to Deloitte does not waive the attorney-client privilege because the disclosure of the document to Deloitte falls within the scope of the section 7525 Tax Practitioner's Privilege. Dow disclosed Final Log Entry No. 995 to Deloitte in order for Deloitte advise on the adequacy of Dow's tax contingency accounts, and in that respect Dow enjoyed an independent section 7525 privilege with Deloitte. Certain cases have held that disclosure to an outside auditor waives the attorney-client privilege. However, these cases are largely premised on the notion that no confidential accountant-client privilege existed when they were decided. In (continues on next page)

(holding that disclosure to an independent auditor did not waive work product protection because the disclosure "was not inconsistent with the maintenance of secrecy," the auditor was "not a potential adversary" to the company, "and no evidence suggests that it was unreasonable for [the company] to expect [the auditor] to maintain confidentiality").[18]  The government should not be permitted to relitigate the issue in this forum.[19]

## V.    Request for In Camera review

For the reasons stated above, Plaintiff urges the Court to deny the government's motion without further review.  However, to the extent that the Court is dissatisfied in any respect with Plaintiff's Final Logs, Plaintiff requests that the Court review the documents *in camera* before

---

*United States v. El Paso Co.*, the Fifth Circuit found the attorney-client privilege was waived upon disclosure to an auditor because "[n]o such [accountant-client] privilege exists under federal law . . . .  In the absence of a contrary rule established by law, we cannot view El Paso's discussions with its auditors as confidential." 682 F.2d 530, 541 (5th Cir. 1982); *see also, e.g., MIT*, 129 F.3d at 684-85; *In re Pfizer*, No. 90-1260, 1993 U.S. Dist. LEXIS 18215, at *22 (S.D.N.Y. Dec. 22, 1993).  The implication of these 1982 and 1993 decisions, which predate the 7525 privilege, is that the enactment the 7525 privilege supports the opposite result.

[18] *See also Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 237 F.R.D. 176, 183 (N.D. Ill. 2006); *In re JDS Uniphase Corp. Sec. Litig.*, No. 02-1486, 2006 U.S. Dist. LEXIS 76169, at *11 (N.D. Cal. Oct. 5, 2006); *Am. S.S. Owners Mut. Protection and Indem. Ass'n v. Alcoa S.S. Co.*, No. 04-Civ-4309, 2006 U.S. Dist. LEXIS 4265, at *10-12 (S.D.N.Y. Feb. 2, 2006); *Frank Betz Assocs., Inc. v. Jim Walter Homes, Inc.*, 226 F.R.D. 533, 535 (D.S.C. 2005); *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 229 F.R.D. 441, 445-48 (S.D.N.Y. 2004); *In re Honeywell Int'l, Inc. Sec. Litig.*, 230 F.R.D. 293, 300 (S.D.N.Y. 2003); *In re Raytheon Sec. Litig.*, 218 F.R.D. 354, 360 (D. Mass. 2003); *Gutter v. E.I. DuPont de Nemours & Co.*, No. 95-2152-CIV-GOLD, 1998 U.S. Dist. LEXIS 23207, at *13-14 (S.D. Fla. May 18, 1998).

[19] In any event, the government erroneously relies on one case that has been rejected in its own district and another case that was distinguished by another district court the last time the government made the argument.  *Medinol, Ltd. v. Boston Scientific Corp.*, 214 F.R.D. 113 (S.D.N.Y. 2002) was rejected by two separate decisions in the Second Circuit within six years of its publication.  *See Vacco v. Harrah's Operating Co.*, No. 1:07-CV-0663, 2008 U.S. Dist. LEXIS 88158, at *20 (N.D.N.Y. Oct. 29, 2008) ("*Medinol* . . . has been almost uniformly rejected as adopting too far restrictive of a view regarding the circumstances under which a waiver can occur."); *Am. S.S. Owners Mut. Protection and Indem. Ass'n v. Alcoa S.S. Co.*, No. 04-Civ-4309, 2006 U.S. Dist. LEXIS 4265 (S.D.N.Y. Feb. 2, 2006) (refusing to follow *Medinol* and stating that the holding was in direct opposition to the Second Circuit's holding in *Adlman*).

The government's reliance on *United States v. Mass. Inst. of Tech.*, 129 F.3d 681 (1st Cir. 1997) ("*MIT*"), is similarly misplaced.  Several courts have rejected application of *MIT* to situations involving disclosure to an independent auditor.  *See, e.g., Regions Fin. Corp.*, 2008 U.S. Dist. LEXIS 41940, at *27 (noting that "[t]he decisive factor" in *MIT* was that the auditor was "a branch of the Department of Defense"); *Merrill Lynch*, 229 F.R.D. at 446 ("The First Circuit found that the audit agency—which was responsible for preventing an overcharge for services—was a potential adversary because a review of MIT's billing statements could result in dispute or even litigation."); *Deloitte & Touche*, 623 F. Supp. 2d at 41 n.2 (stating that "the potential for adversity identified in *MIT* is absent").

ordering Plaintiff to produce any documents.  Presentation of documents for *in camera* review is a "practice both long-standing and routine in cases involving claims of privilege."  *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 386 (2d Cir. 2003). These submissions afford courts a method by which they can "confidentially review the evidence for which privilege is claimed and determine the propriety of the assertion of the privilege." *Zuckerbraun v. Gen. Dynamics Corp.*, 935 F.2d 544, 548 (2d Cir. 1991); *see also United States v. Cuthbertson*, 651 F.2d 189, 198 (3d Cir. 1981) (utilizing *in camera* review allows "the person opposing disclosure [to] obtain an impartial determination of whether the documents contain material that is producible under" a subpoena and allows for a disclosure determination "without causing the documents to lose their confidential status").  Given the relatively small number of Final Log Entries in dispute (132 total), the burden on the Court of reviewing a portion of these is within the scope of review that other courts have undertaken.  *See, e.g.*, *United States v. BDO Seidman, LLP*, 225 F. Supp. 2d 918 (N.D. Ill. 2002) (electing to conduct an *in camera* review of 267 contested documents).

WHEREFORE, Plaintiff respectfully requests that the government's motion be denied.

PLAINTIFF
CHEMTECH ROYALTY ASSOCIATES, L.P., by
DOW EUROPE, S.A., as Tax Matters Partner

s/David M. Bienvenu, Jr.
David M. Bienvenu, Jr. (LBN 20700)
TAYLOR, PORTER,  BROOKS & PHILLIPS
Post Office Box 2471
Baton Rouge, LA  70821
Telephone:  (225) 387-3221
Facsimile:  (225) 346-8049

John B. Magee
Hartman E. Blanchard, Jr.
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC  20006
Telephone:  (202) 373-6000
Facsimile:  (202) 373-6001

## CERTIFICATE OF SERVICE

I certify that on January 11, 2010 a copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.


s/ David M. Bienvenu, Jr.
David M. Bienvenu, Jr.

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| CHEMTECH ROYALTY ASSOCIATES, L.P., by DOW EUROPE, S.A., as Tax Matters Partner )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES OF AMERICA, )<br><br>Defendant. ) | Case No.: 05-944-RET-DLD<br><br>Case No.: 06-258-RET-DLD<br><br>Case No.: 07-405-RET-DLD |

## Proposed Order

Upon consideration of Defendant's Motion to Compel and Memorandum of Law in Support of Defendant's Motion to Compel, filed on December 16, 2009, and Plaintiff's Opposition to Defendant's Motion to Compel and Memorandum of Law in Support of Plaintiff's Opposition to Defendant's Motion, filed on January 11, 2010, it is hereby **ORDERED** that the Defendant's Motion to Compel is **DENIED** with respect to all claims.

Signed in Baton Rouge, Louisiana, on _____, 2010.


_____
Judge