# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| CHEMTECH ROYALTY ASSOCIATES, L.P., ) | |
| by DOW EUROPE, S.A., as Tax Matters Partner ) | |
| ) | |
| Plaintiff, ) | Case No.: 05-944-BAJ-DLD |
| ) | |
| v. ) | Case No.: 06-258-BAJ-DLD |
| ) | |
| UNITED STATES OF AMERICA, ) | Case No.: 07-405-BAJ-DLD |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

## <u>Plaintiff's Proposed Conclusions of Law and Findings of Fact</u>

David M. Bienvenu, Jr.
TAYLOR, PORTER, BROOKS & PHILLIPS
Post Office Box 2471
Baton Rouge, LA 70821
Telephone: (225) 387-3221
Facsimile: (225) 346-8049

John B. Magee
Hartman E. Blanchard, Jr.
James D. Bridgeman
Christopher P. Murphy
Robert A. Leonard
Royce L. Tidwell
BINGHAM MCCUTCHEN, LLP
2020 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 373-6000
Facsimile: (202) 373-6001

**March 31, 2011**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

**PROPOSED CONCLUSIONS OF LAW** ................................................................ 1

**PROPOSED FINDINGS OF FACT** ...................................................................... 3

**ULTIMATE FINDINGS OF FACT** ...................................................................... 3

**FINDINGS OF FACT** ........................................................................................... 5

**I.**      **OVERVIEW OF PROPOSED FINDINGS** ................................................. 5

**II.**    **DOW'S BUSINESS GENERALLY** ............................................................ 5

      A.    Importance of Cyclicality, Access to Capital, and the Credit Ratings in the Chemical Industry and to Dow ....................................................... 5

           1.    The Chemical Industry and Dow's Business Were Capital Intensive and Characterized by Cyclicality ............................... 5

           2.    Role of the Rating Agencies in Access to Capital .................... 6

      B.    Dow's Approach to Financing ............................................................. 8

**III.**   **THE DECISION TO ENTER INTO THE CHEMTECH I TRANSACTION** .......... 9

      A.    Business Conditions in the Early 1990s ............................................. 9

      B.    The Chemtech Concept ...................................................................... 10

           1.    Monetization of Patent Assets through Minority Equity Financing ........ 10

           2.    Enhancing the Value of Dow's Intellectual Property ............................. 11

      C.    Dow's Evaluation of the Proposed Chemtech Partnership ................. 11

      D.    Board Approval of Chemtech .............................................................. 12

**IV.**   **IMPLEMENTATION OF CHEMTECH I** ................................................. 12

      A.    Formation of Chemtech Royalty Associates ...................................... 12

      B.    Identification of Investors and Consummation of the Transaction ...... 13

**V.**    **KEY ELEMENTS OF THE CHEMTECH I PARTNERSHIP AGREEMENT** ... 15

      A.    Partnership Economics ....................................................................... 15

           1.    Maintenance of Capital Accounts ......................................... 16

           2.    Computation of Book Income ................................................. 16

           3.    Allocation of Book Profits and Losses and Distributions ....... 17

           4.    Partnership Cash Flow ........................................................... 18

           5.    Actual Economic Results to Class A Limited Partners ........... 18

      B.    Computation and Allocation of Partnership Taxable Income .............. 19

i

# TABLE OF CONTENTS
(continued)

Page

C. Other Features of Chemtech I Partnership ........................................... 20

   1. Subordination ............................................................ 20

   2. Voting Rights of Class A Limited Partners .............................. 20

   3. Other Rights of Class A Limited Partners ............................... 21

VI. **DOW'S U.S. GAAP ACCOUNTING FOR CHEMTECH** ........................ 21

VII. **OPERATION OF CHEMTECH: 1993-1998** ..................................... 23

VIII. **1998 PURCHASE OF THE CLASS A LIMITED PARTNER INTERESTS** .......... 24

IX. **BUSINESS CONDITIONS IN 1998—CONTINUED NEED FOR MINORITY EQUITY FINANCING** ................................................ 25

X. **THE RESTRUCTURING OF CHEMTECH** ...................................... 25

A. The Chemtech II Concept .......................................... 25

B. Board Approval of Chemtech II ................................... 26

C. The Chemtech Restructuring ...................................... 26

XI. **KEY ELEMENTS OF THE CHEMTECH II PARTNERSHIP AGREEMENT** ........................................................ 28

A. Partnership Economics ............................................ 28

   1. Maintenance of Capital Accounts ............................ 28

   2. Impact of Capital Accounts on Economic Entitlements ........ 28

   3. Computation of Book Income ................................ 28

   4. Allocation of Book Profits and Losses ....................... 29

   5. Actual Economic Results to Class A Limited Partner .......... 29

B. Computation and Allocation of Partnership Taxable Income ........... 30

C. Other Features of Chemtech I Partnership .......................... 30

   1. Subordination ............................................ 30

   2. Voting Rights of Class A Limited Partner ................... 31

   3. Other Rights of Class A Limited Partner .................... 31

XII. **OPERATION OF CHEMTECH II: 1998-2003** ............................. 32

## Proposed Conclusions of Law

1.  This Court has jurisdiction over these consolidated cases pursuant to I.R.C.[1] § 6226(a) and 28 U.S.C. § 1346(e).

2.  Plaintiff bears the burden of producing evidence, and of persuading the Court by a preponderance of the evidence, that the determinations made by the IRS in its Final Partnership Administrative Adjustments ("FPAAs") are erroneous.

3.  The investments made by Dow[2] and the Class A Limited Partners[3] in Chemtech I and Chemtech II each had economic substance and were not an economic "sham."

    a.  Dow had one or more valid, non-tax business purposes for entering into the Chemtech Partnership transactions.

    b.  The contributions of property and money to the Chemtech Partnership changed the economic interests of the partner investors.

4.  For federal income tax purposes, the Chemtech Partnership was properly classified as a partnership from April 30, 1993, through December 31, 2003.

5.  For federal income tax purposes, the Class A Limited Partners made equity investments in, and not loans to, Chemtech I and Chemtech II.

    a.  The test for whether an interest in an entity is debt or equity is the same for partnerships and corporations.

    b.  For federal income tax purposes, from August 3, 1993, through March 27, 1998, the Class A Limited Partners were partners in Chemtech I whether analyzed under *Commissioner v. Culbertson*, 337 U.S. 733 (1949), or I.R.C. § 704(e)(1).

---

[1] References to "I.R.C." are to the Internal Revenue code, as in effect during the tax years at issue.

[2] Throughout these Proposed Conclusions of Law and Findings of Fact ("Proposed Conclusions and Findings"), unless otherwise stated, all capitalized terms have the meanings set forth in the Joint Stipulations of Fact: 1993-2003, as filed by the parties in the Final Pretrial Order. "Dow" refers to The Dow Chemical Company and its affiliates that participated in the Chemtech Partnership. "Chemtech Partnership" refers to a Delaware limited partnership formed in 1993 as Chemtech Royalty Associates, L.P., which later was renamed Chemtech II, L.P. "Chemtech I" refers to transactions entered into by the Chemtech Partnership from its formation in 1993 up to its 1998 restructuring; "Chemtech II" refers to transactions engaged in by the Chemtech Partnership in connection with its restructuring in 1998 and thereafter, through and including 2003.

[3] Throughout these Proposed Conclusions and Findings, "Class A Limited Partners" refers to the third-party investors who purchased Class A Limited Partnership Interests in Chemtech I and Chemtech II, as appropriate.

c. For federal income tax purposes, from June 26, 1998, through December 31, 2003, the Class A Limited Partner was a partner in Chemtech II whether analyzed under *Commissioner v. Culbertson*, 337 U.S. 733 (1949), or I.R.C. § 704(e)(1).

6. The allocations of partnership book income and related taxable income to the Class A Limited Partners under the Chemtech I and Chemtech II Partnership Agreements complied with the requirements of I.R.C. § 704(b) and the regulations thereunder.

7. Under I.R.C. § 704(c), which is the exclusive statutory provision governing the allocation of taxable income attributable to differences between the tax basis and fair market value of property contributed to a partnership, the mandatory application of the "ceiling rule" contained in the Treasury Regulations applicable to Chemtech I does not permit the reallocation of taxable income from the Class A Limited Partners to the Dow partners.

8. Treasury Regulation § 1.701-2 does not apply to transactions entered into prior to May 1994. Therefore, the IRS may not apply it in the 1995-1998 taxable years to alter the tax consequences of the Chemtech I transactions that occurred in 1993, including the contributions of the Patent Assets, the investments by the Class A Limited Partners, and Chemtech I's license of the Patent Assets to Dow.

9. If Treasury Regulation § 1.701-2 is valid, it does not permit the government to reallocate income among the partners of the Chemtech Partnership from 1995 through 2003, or to deny the basis adjustments resulting from the Chemtech Partnership's 1998 election under I.R.C. § 754.

10. The Chemtech Partnership's distribution of the stock of Chemtech Portfolio, Inc. ("CPI") to Dow in 1998 did not result in I.R.C. § 731 gain because the CPI stock was not a marketable security.

11. The Court has jurisdiction to make partnership-level determinations of the applicability of penalties for the Chemtech Partnership's 1997 through 2003 tax years but does not have jurisdiction to make determinations with respect to any partner-level defenses to penalties.

12. The accuracy-related penalties of section 6662 do not apply to any understatement of tax resulting from the Chemtech transactions in 1997 through 2003.

a. The substantial understatement penalty under I.R.C. §§ 6662(b)(2) and (d) does not apply to the Chemtech Partnership's 1997 through 2003 tax years.

b. The penalty for "negligence or disregard of rules or regulations" under I.R.C. §§ 6662(b)(1) and (c) does not apply to the Chemtech Partnership's 1997 through 2003 tax years.

c. Neither the substantial valuation misstatement penalty under I.R.C. §§ 6662(b)(3) and (e) nor the gross valuation misstatement penalty under I.R.C. § 6662(h)(1) applies to the Chemtech Partnership's 1997 through 2003 tax years.

13.    For the 1993 through 2003 taxable years, the correct reporting of the Partnership items of the Chemtech Partnership is reflected in Exhibits A and B to the Parties' Joint Financial Stipulations:  1993-2003.

14.    The FPAA mailed by the IRS on April 15, 2005, with respect to the Chemtech Partnership's 1993-1994 tax years is invalid, and all of the adjustments set forth therein are erroneous.

15.    The FPAA mailed by the IRS on January 13, 2006, with respect to Chemtech Partnership's 1993-1997 tax years is invalid, and all of the adjustments set forth therein are erroneous.

16.    The FPAA mailed by the IRS on March 30, 2007, with respect to the Chemtech Partnership's 1998-2003 tax years is invalid, and all of the adjustments set forth therein are erroneous.

17.    The Partnership items of the Chemtech Partnership are readjusted as reflected in Exhibits A and B to the Parties' Joint Financial Stipulations:  1993-2003.


## Proposed Findings of Fact

### Ultimate Findings of Fact

1.    Dow had legitimate non-tax business purposes for entering into Chemtech I and Chemtech II.

   a.    Obtaining third-party financing that would not be treated as debt on its balance sheet for financial accounting purposes was important to Dow's business strategy.

   b.    The Chemtech Partnership enabled Dow to monetize assets, through the contribution of assets that had substantial economic value but low book values, and to obtain equity financing at favorable rates.

2.    Chemtech I and Chemtech II materially affected Dow's objective economic position.

   a.    The Chemtech Partnership strengthened Dow's balance sheet by providing it with $200 million of financing that it properly treated as minority equity for financial accounting purposes.

   b.    The Class A Limited Partners received limited partner interests in a partnership engaged in the ownership and management of income-producing assets.

   c.    Each partner's economic return from its investment in the Chemtech Partnership depended on the financial performance of the Partnership and the terms of the Partnership Agreement, which generally allocated profits, gains, and losses among the partners in accordance with their economic agreement.

3.     The investments the Class A Limited Partners made in the Chemtech I and Chemtech II transactions were in substance equity, not loans.

    a.    The attributes of the interests held by the Class A Limited Partners were typical of many limited partnership interests.

    b.    The interests held by the Class A Limited Partners were economically indistinguishable from many types of preferred stock and preferred partnership interests routinely recognized as equity.

4.     The partners in Chemtech I and Chemtech II intended to join together for the purpose of carrying on a business or financial operation or venture.

5.     Capital was a material income-producing factor in the Chemtech Partnership.

    a.    Chemtech I generally held patent assets and the stock of CPI, which held cash and core financial assets as defined in the agreement.

    b.    Chemtech II generally held chemical plant assets, stock of CPI, and stock of CPI II, which held permitted assets as defined in the Partnership Agreement.

6.     The allocations set forth in the Chemtech I and Chemtech II Partnership Agreements reflect the partners' economic interests in the Chemtech Partnership, and there is no alternative allocation of income and deductions that accurately reflects the bargained-for economics.

7.     It was not a principal purpose of the Chemtech II restructuring to reduce substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K.

8.     At the time of the distribution of CPI stock in June 1998, the stock of CPI had never been actively traded on an established securities market, and less than 20 percent of CPI's assets consisted of marketable securities.

9.     The principal purpose of the Chemtech Partnership was to obtain minority equity financing through the monetization of assets with high economic value but virtually zero book value.

10.    Avoidance or evasion of federal income tax was not the principal purpose of Chemtech I.

11.    Avoidance or evasion of federal income tax was not a significant purpose of Chemtech II.

12.    There was a reasonable basis for the tax return positions of Chemtech I and Chemtech II.

13.    There was substantial authority for the tax return positions of Chemtech I and Chemtech II.

**Findings of Fact**

## I.    OVERVIEW OF PROPOSED FINDINGS

1.    Dow is a multinational chemical company; its industry is capital intensive and cyclical, necessitating a high degree of financial flexibility and regular access to the capital markets at reasonable costs.

2.    Dow's maintenance of the high quality credit ratings, assigned by the major credit rating agencies, was critical to its ability to meet its financial needs.

3.    Because maintenance of Dow's credit rating depended in significant part on management of its balance sheet ratio of debt-to-total capital, Dow relied upon substantial amounts of "off-balance sheet" financing through leases and structured transactions to obtain funds that were not classified as debt on its balance sheet.

4.    The 1993 and 1998 Chemtech Partnership transactions provided Dow with $200 million of financing from limited partner investors that was treated as "minority equity" rather than debt on Dow's balance sheet at times when business conditions placed Dow's debt ratio under pressure.

5.    The use of the Chemtech Partnership structure also enabled Dow to monetize valuable economic assets (patents in 1993 and a chemical plant in 1998) that were carried at near zero on Dow's balance sheet by contributing the assets to the Partnership and attracting third-party limited partner investors.

## II.    DOW'S BUSINESS GENERALLY

6.    Dow is a leading science and technology company that provides innovative chemical, plastic, and agricultural products and services to many essential consumer markets.

7.    During the years at issue in this case, Dow served customers in a wide range of international markets that are vital to human progress, including food, transportation, health and medicine, personal and home care, and building and construction, among others.

### A.    Importance of Cyclicality, Access to Capital, and the Credit Ratings in the Chemical Industry and to Dow

#### 1.    The Chemical Industry and Dow's Business Were Capital Intensive and Characterized by Cyclicality

8.    The chemical industry is capital intensive and characterized by multi-year business cycles with pronounced peaks and troughs during which demand fluctuates substantially.

9.     As a result of the cyclical nature of the industry, Dow's earnings have been volatile.

         **2.     Role of the Rating Agencies in Access to Capital**

10.    Managing these industry dynamics required that Dow maintain its access to capital and maintain its financial flexibility, which allowed Dow to respond to fluctuating industry conditions.

11.    Access to the commercial paper market was especially important to Dow because by issuing commercial paper Dow could borrow at short-term rates lower than the rates payable on long-term debt, thereby obtaining financial flexibility to manage fluctuations in its operating cash flow.

12.    The commercial paper market is most liquid for companies that maintain at least an A-1/P-1 credit rating with Moody's because many purchasers of commercial paper have investment criteria that exclude commercial paper issued by companies with credit ratings lower than A-1/P-1.

13.    Dow's ability to raise capital at a reasonable cost depended, in significant part, on its credit rating.

14.    Three agencies rated Dow's credit during the 1990s:  Standard & Poor's, Moody's, and Duff & Phelps.

15.    Dow's senior debt was rated A by S&P, A-1 by Moody's, and A+ by Duff & Phelps.

16.    Typically, Dow's CFO and Treasurer managed Dow's relationship with the rating agencies.

17.    During the time frame at issue in this litigation, these individuals were Enrique Falla (CFO from 1988 to 1995), Pedro Reinhard (Treasurer from 1988 to 1995 and CFO from 1995 to 2005), and Geoffery Merszei (Treasurer from 1996 to 2001 and CFO from 2005 to 2010).

18.    All three Dow executives strived to cultivate excellent relationships with the agencies and would alert them when Dow was embarking on a major transaction or experiencing significant changes in its business.

19.    Dow was able to preserve its favorable ratings through difficult times because of the agencies' confidence in Dow's management; Dow's focus on maintaining its debt-to-total-capital ratio; and the agencies' understanding of Dow's business cycle.

20.    Dow met for annual and periodic reviews with each rating agency.

21.     Presentations to the agencies typically would outline Dow's current and future business outlook.

22.     The presentations focused most heavily on actual financial results for the prior and current years and expected financial results for the balance of the current year and the next year.

23.     Among the financial data presented were various financial ratios indicative of Dow's financial condition.

24.     Of these ratios, one of the most important to Dow and the rating agencies was the debt-to-total capital ratio.

25.     Dow was concerned about its debt ratios and wanted to avoid raising capital in a manner that would impair these ratios.

26.     Dow generally attempted to keep its debt ratios within specific ranges to avoid costly ratings downgrades (and resulting increased borrowing costs).

27.     Based on consultations with the rating agencies, Dow's stated debt-to-total-capital ratio target was 40 percent during the 1990s, and Dow's longstanding policy at that time had been to maintain that ratio at no higher than 40 percent.

28.     Dow established this percentage based on its understanding of what would be required to maintain its A rating by S&P and A-1 rating by Moody's.

29.     During the 1990s, maintenance of Dow's A/A-1 ratings was critical to Dow's overall financing strategy.

30.     A downgrade in Dow's rating would have resulted in increased borrowing costs, decreased financial flexibility, and, potentially, an inability to access the commercial paper market.

31.     A rating downgrade can result in increased borrowing costs in the hundreds of millions of dollars.

32.     For example, when Dow's credit ratings were downgraded on December 29, 2008, press accounts indicated that the downgrade could increase Dow's borrowing costs by more than $1 billion.

33.     Dow lost access to the commercial paper markets in 2009 and incurred substantial additional borrowing costs as a result.

**B.    Dow's Approach to Financing**

34.    Managing its debt-to-capital ratios required that Dow raise funds through means other than debt.

35.    In particular, Dow raised a significant percentage of its overall funding through so-called "off-balance sheet" transactions, which produced financing that was not treated as debt on its balance sheet.

36.    Dow's off-balance sheet financing included minority equity financing, which was not really off the balance sheet but was reflected on Dow's balance sheet in the mezzanine section between liabilities and equity.

37.    At the end of 1993, following the Chemtech I transaction, Dow had $5.9 billion in debt on its balance sheet and over $3 billion in off-balance sheet financing.

38.    Of the $3 billion in off-balance sheet financing that Dow had in place at the end of 1993, 41 percent consisted of minority equity financing.

39.    The Chemtech I Partnership made up $200 million of Dow's $1.2 billion in minority equity financing transactions.

40.    During the 1990s, based on Dow's experience with the rating agencies, it was Dow's understanding that the rating agencies viewed capital raised through minority equity financing differently from debt for purposes of testing the financial health of and rating the enterprise.

41.    Because these off-balance sheet transactions were not treated as debt on Dow's consolidated balance sheet, raising capital in this fashion enabled Dow to obtain funding without increasing its debt-to-total-capital ratio.

42.    Dow routinely received proposals for structured financing arrangements and would assess these proposals based on their impact on its overall financing strategy.

43.    Structured financing transactions had numerous advantages over stock issuances.

44.    The costs for structured financing transactions typically were much lower than those for issuing common stock.

45.    Issuing common stock had the added disadvantages of diluting earnings per share and potentially generating negative market reaction.

46.    Dow ordinarily raised funds for "general corporate purposes," but expected to earn a "hurdle rate" of approximately 10.75 percent on its investments.

47.    Dow typically evaluated both projects and financing opportunities on an after-tax basis.

8

## III.    THE DECISION TO ENTER INTO THE CHEMTECH I TRANSACTION

### A.    Business Conditions in the Early 1990s

48.    Dow's earnings peaked in the late 1980s.

49.    By the early 1990s, Dow was undergoing a period of difficult business conditions and "trough" earnings due to industry-wide and economy-wide conditions.

50.    The low earnings and resultant negative cash flows caused Dow's financial condition to deteriorate to levels not seen since the previous chemical industry trough in the mid-1980s.

51.    Dow's financial metrics reflected the trough conditions.

52.    Dow's net sales were down 4 percent between 1990 and 1992.

53.    Total Chemical and Performance Products were down 12 percent between 1990 and 1992 and down 16 percent between 1990 and 1993.

54.    Dow's debt-to-total capital ratio increased in 1990 through 1992, reaching 42.5 percent in 1992.

55.    Between 1990 and 1992, Dow's Cash Flow From Operations declined 38.74 percent, from $3.09 billion to $1.893 billion.

56.    After reporting net income of $1.384 billion in 1990, Dow reported a $500 million loss in 1992.

57.    Dow experienced significant profit margin compression as a result of decreasing prices and rising costs.

58.    In addition to the deteriorating fundamentals of the chemical industry in 1991, Dow had to contend with breast implant litigation at Dow Corning, a joint venture it owned with Corning, Inc.

59.    Dow management believed there was a risk that the breast implant litigation could result in a piercing of the corporate veil, resulting in potential liability exposure to Dow.

60.    In an attempt to minimize the potential impact of the breast implant litigation, Dow Corning was taking significant provisions for an eventual settlement of the litigation.

61.    These conditions impaired Dow's financial flexibility and raised concerns about Dow's ability to maintain its credit ratings.

62.    CFO Enrique Falla believed that Dow was skirting the edge of a ratings downgrade.

63. Mr. Falla pursued a three-prong strategy to mitigate the effects of the downturn: cutting costs to increase profitability; divesting nonstrategic assets; and increasing off-balance sheet financing.

64. Dow cut costs from 1992 through 1993 by reducing its workforce by nearly 6,000 employees, cutting its capital spending by approximately $500 million, improving utilization of plant equipment, and improving inventory turnover and account receivables turnover.

65. Dow divested itself of major nonstrategic assets during the 1992 through 1993 time period, including major energy and oil and gas assets.

66. Dow also increased its off-balance sheet financing in 1992 and 1993 in part to monetize certain assets on the balance sheet.

## B.    The Chemtech Concept

### 1.    Monetization of Patent Assets through Minority Equity Financing

67. Against the backdrop of a stressed credit status, Chemtech was part and parcel of Dow's strategy to maintain its financial flexibility and its access to capital.

68. The Chemtech transaction followed the course of a standard structured financing transaction at Dow.

69. Dow had a longstanding relationship with the investment bank Goldman Sachs, which was aware of industry conditions, Dow's business needs, and the role of structured finance in Dow's overall financing strategy.

70. Goldman Sachs first proposed the Chemtech transaction to Dow's Treasury department as a tax-efficient way to obtain minority equity financing at competitive rates.

71. Dow Treasurer Pedro Reinhard spearheaded the company's development and analysis of the proposal throughout most of 1992 and 1993.

72. The Goldman Sachs proposal contemplated that Dow entities would contribute patents with substantial economic value (but virtually zero book value) to a limited partnership.

73. The contribution of valuable patent assets would enable Dow to "monetize" those assets by obtaining cash from outside investors.

74. By licensing the patents at arm's-length rates from the partnership, Dow could continue to use the patents in its business.

75. The partnership would generate income primarily through licensing the assets back to Dow.

76.     Third-party investors would contribute cash to the partnership and participate as limited partners in exchange for a preferred return out of partnership profits and further upside equity potential.

77.     For financial accounting purposes, the third-party investment in the partnership would be treated as minority equity rather than debt on Dow's balance sheet.

78.     Dow could access the third-party cash through loans from a partnership subsidiary. Because the partnership would be consolidated with Dow for financial accounting purposes, these loans would be eliminated from Dow's consolidated financial statement.

79.     Showing additional asset value to stockholders through monetization would provide an additional benefit to Dow.

80.     Dow intended to use a minority equity transaction structure that the market would view favorably because the transaction would recognize the economic value of assets with a book value of virtually zero.

### 2.     Enhancing the Value of Dow's Intellectual Property

81.     In the late 1980s and early 1990s, a group within Dow known as "Intellectual Asset Management" was responsible for rationalizing and exploiting the untapped value of Dow's intellectual property.

82.     The Chemtech transaction was part and parcel of Dow's efforts to extract value from its intellectual property profile.

83.     During the course of selecting and valuing the patents ultimately contributed to the Chemtech Partnership, Dow developed, in conjunction with Arthur D. Little, cutting-edge valuation techniques that Dow continued to use for multiple purposes long after the Chemtech transaction.

### C.     Dow's Evaluation of the Proposed Chemtech Partnership

84.     Goldman made multiple presentations to Dow, including to Dow's CFO and Treasurer, detailing the benefits of the Chemtech transaction.

85.     The presentations focused on how Chemtech would permit Dow to further its off-balance sheet financing strategy while monetizing assets with minimal financial statement value.

86.     Goldman also created numerous financial models analyzing the transaction.

87.     The Goldman models calculated the Chemtech transaction's net present value ("NPV") to Dow by computing the anticipated net cash flows over the expected life of the partnership, then applying a discount rate to arrive at the present value of the transaction.

88.    Goldman's models showed that the NPV of the financing would be positive on both a pre-tax and after-tax basis.

89.    In reviewing the transaction internally, Reinhard enlisted patent, legal, and tax personnel to assist in evaluating the different aspects of the transaction.

90.    Although Goldman Sachs recommended that Dow use Goldman's counsel, Andrews & Kurth, for the transaction structuring, Reinhard engaged King & Spalding to undertake an independent legal review of the transaction.

**D.    Board Approval of Chemtech**

91.    Pedro Reinhard discussed the transaction with the Finance Committee of the Board of Directors, chaired by Falla; the Finance Committee then presented the transaction to the Dow Board, which approved the necessary resolutions to move forward with the Chemtech transaction in April 1993.

## IV.    IMPLEMENTATION OF CHEMTECH I

**A.    Formation of Chemtech Royalty Associates**

92.    With Goldman's assistance, during the early part of 1993 Dow developed deal terms that it expected would be attractive to potential investors.

93.    Goldman advised Dow that the Chemtech Partnership would be easier to market to potential investors if the basic partnership structure already were in place.

94.    As a result, Dow closed the initial transaction April 30, 1993, by forming the Chemtech Partnership, a limited partnership subject to the Delaware [Revised] Uniform Limited Partnership Act.  The Chemtech Partnership was formed with three partners, DESA as the General Partner, Ifco as a Class A Limited Partner, and DTPC as a Class B Limited Partner.

95.    The business of the Partnership was to be conducted by DESA outside the United States in Switzerland.

96.    DTPC and Ifco were newly formed entities incorporated in early April 1993. Both were incorporated in anticipation of the Chemtech Partnership transaction.

97.    On April 30, 1993, Dow contributed 68 patents and 100 shares of capital stock of a wholly owned subsidiary, CPI, to DTPC.  On the same date, Essex contributed five patents to DTPC.

98.    To capitalize the Chemtech Partnership, DESA and Ifco contributed cash, and DTPC contributed Patent Assets and its CPI stock.

99.    In selecting the patents to contribute to DTPC, Dow Treasury, patent, and intellectual asset management personnel worked in tandem to select high-value

and defensive patents that Dow currently was using in its business.  An independent appraiser, Arthur D. Little, valued the patents at approximately $867 million as of April 30, 1993.

100.  Following this initial capitalization of the Chemtech Partnership, the Partnership contributed most of Ifco's Original Capital Contribution to CPI, which loaned substantially all of its cash to a Dow affiliate.

101.  Pursuant to a Patent License Agreement entered into between Dow and the Chemtech Partnership, Dow was granted a non-exclusive license over the Patent Assets contributed to Chemtech.  The initial license period for each patent was not to exceed 80 percent of the patent's economic or statutory life.  Each patent was expected to have residual value at the end of its initial license term of at least 20 percent of its fair market value at the time of its contribution to the Chemtech Partnership.

102.  Pursuant to the Patent License Agreement, Dow agreed to pay an annual royalty on a quarterly basis for the right to use the Patent Assets; the annual royalty provided for a fixed minimum royalty plus a variable royalty tied to sales.

103.  The variable royalty provided potential upside for the Partnership and its partners.

**B.    Identification of Investors and Consummation of the Transaction**

104.  In late May 1993, Merszei, then Treasurer of DESA, Reinhard, seconded to and acting on behalf of Dow Europe, and representatives of Goldman Sachs met with various European financial institutions to discuss their possible investment in the Chemtech Partnership.

105.  The presentations to potential investors emphasized Dow's need for non-debt financing.

106.  European banks have a history of participating in equity-type financing and are comfortable with such form of investments.

107.  Merszei had dealt with European banks in a variety of contexts and was aware of their experience in making equity investments.

108.  As a result of the European meetings, a number of European financial institutions expressed an interest in becoming investors in the Chemtech Partnership.

109.  Rabo (Netherlands), Dresdner (Germany), and NatWest (U.K.) negotiated directly on their own behalf and as lead negotiators for other potential investors.

110.  For example, the investors conducted due diligence on the Original Patent Assets by hiring Peterson Consulting to review the ADL valuation work.

111.    A majority of the Class A Limited Partners that ultimately invested in the Chemtech Partnership treated their investments as equity for accounting purposes in their home country.

112.    Rabo's investment in Chemtech was reviewed by its Investment Committee, which only reviewed equity and equity-like investments.  For Dutch financial accounting there was no classification for partnership equity investments, so Rabobank categorized its partnership interest under "debts" with a special note recording that the interest was a "partnership interest."

113.    Dresdner considered the interest an equity interest in a partnership for U.S. and German tax purposes, as well as for financial accounting purposes and German bank regulatory purposes.  Its investment in Chemtech was reviewed and approved by the Dresdner Board, which reviewed and approved only equity investments.  Dresdner's investment in Chemtech was monitored by the "Generale Sekretariat Participations," which monitored only equity-type investments.

114.    Kredietbank N.V. evaluated its investment in Chemtech under new Belgian banking laws that allowed entities to take "shares" in commercial companies.

115.    BBL classified the investment as debt for its home country accounting and banking purposes.

116.    Prior to investing in the Chemtech Partnership, representatives for the five Class A Limited Partners met with the staff of the Federal Reserve Bank of New York to review their proposed investment in Chemtech.  The purpose of this meeting was to ensure that the Class A Limited Partners' limited partner participation in Chemtech I would not result in their being treated as engaging in a non-banking business in the United States as defined in Regulation K of the Bank Company Holding Act, which would have exposed the Class A Limited Partners to significant civil and even criminal penalties.

117.    If the Class A Limited Partners' investments in the Chemtech Partnership were debt, the Class A Limited Partners would have had no reason to meet with the Federal Reserve Bank of New York to review their proposed investment because non-U.S. banks can make a loan to a U.S. entity without violating any U.S. banking laws.

118.    The Class A Limited Partners later memorialized the meeting and the reasons they believed investing in the Chemtech Partnership did not constitute engaging in non-banking business in the United States in a letter sent on their behalf to the Federal Reserve Bank of New York.

119.    On August 3, 1993, the negotiation culminated in an agreement with five foreign investors to join in the Chemtech Partnership.

120.    The investors were Rabo, Dresdner, NatWest, BBL (Belgium), and KBC (Belgium).

121.    The foreign investors acquired limited partnership interests through a combination of capital contributions and purchases of Ifco's Class A interest occurring on August 3, 1993, and in October 25, 1993, the Second Closing and Subsequent Closing, respectively.

122.    The reason for the Subsequent Closing was the desire of BBL and Dresdner to await the Chemtech Partnership's Swiss registration, which occurred October 19, 1993.

123.    The Swiss Registration gave BBL and Dresdner comfort that their partnership interests would be limited liability interests that would not expose them to liabilities in excess of their invested capital.

124.    Due in large part to the staggered entry of the bank investors, each investor entered into an Investment Agreement on August 3, 1993.

125.    In connection with the admission of the new investors as partners, the capital accounts of DTPC, Ifco, and the General Partner were adjusted to reflect an allocation of all items of Partnership income, gain, loss, and deduction through August 3, 1993.

126.    The Patent Assets were revalued by Arthur D. Little at approximately $883 million as of August 3, 1993.

127.    This revaluation resulted in gains to the Partnership, which were included in the amounts allocated to DTPC, Ifco, and the General Partner as of August 3, 1993.

128.    This revaluation reflected an increase of approximately $42.6 million in the book value of the Patent Assets from April 30, 1993 to August 3, 1993—the period immediately prior to the entry of the investors.

## V.    KEY ELEMENTS OF THE CHEMTECH I PARTNERSHIP AGREEMENT

### A.    Partnership Economics

129.    Beginning on August 4, 1993, the Partnership Agreement provided for three classes of ownership interests:  (1) a General Partner Interest, held by DESA; (2) a Class B Limited Partner Interest, held by DTPC; and (3) Class A Limited Partner Interests, held by the third-party investors.

130.    Each party to the Partnership Agreement represented that it "intend[ed] to participate as a partner in a Delaware limited partnership for the purpose of making an economic profit from the transactions proposed to be entered into by the Partnership."

131.    The Partnership Agreement governed the partners' economic deal and provided for the allocation of book profits and losses to the partners.

132.   The Treasury Department has promulgated regulations under Internal Revenue Code § 704(b) that provide rules for maintaining Capital Accounts. These rules are designed to ensure that partners bear the economic effect of Partnership allocations and distributions.

133.   For purposes of maintaining the partners' Capital Accounts and allocating the results of Partnership operations among them, the Partnership maintained its books in the manner required by the Treasury Department's section 704(b) regulations ("704(b) Books").

### 1.    Maintenance of Capital Accounts

134.   The Chemtech Partnership established and maintained Capital Accounts for each partner.

135.   Thus, the Capital Accounts were scorecards that tracked each partner's economic stake in the Chemtech Partnership.

136.   Pursuant to these regulations, each partner received an initial Capital Account equal to the amount of cash and the fair market value of any property other than cash it contributed to the Partnership.

137.   During the operation of the Partnership, each partner's Capital Account was increased by the amount of book income allocated to it by the Partnership and decreased by the amount of any book losses allocated to it.

138.   A partner's Capital Account was reduced by the amount of cash and the value of any non-cash property distributed to it.

139.   Upon liquidation, each partner would receive the positive balance of its Capital Account, and any partner with a negative Capital Account was required to make a contribution to the Partnership to eliminate the deficit.

### 2.    Computation of Book Income

140.   The Partnership's book income from operations (generally referred to as "Profits" or "Losses" in the Partnership Agreement) was approximately equal to the difference between the patent royalties it received and its expenses.

141.   The Partnership's expenses included a management fee paid to the General Partner, miscellaneous administrative expenses, and the Class B Limited Partner's Guaranteed Payment.

142.   For purposes of computing book income, the Partnership's expenses included a deduction for amortization of the Patent Assets. As required by the section 704(b) regulations, the Patent Asset amortization expense was based on the Patent Assets' "book" value (i.e., the fair market value credited to the contributing partner's Capital Account).

143.   Because the Patent Asset amortization expense was taken into account in determining the book income allocated to the partners' Capital Accounts, and because the partners' economic entitlements were based on their Capital Account balances, each partner's economic interest in the Partnership was affected by its share of Patent Asset amortization expense, as determined for book purposes.

### 3.   Allocation of Book Profits and Losses and Distributions

144.   The Partnership Agreement generally allocated Profits as follows:

   a.   99 percent to the Class A Limited Partners and 1 percent to the General Partner until the Class A Limited Partners received an allocation of Profits equal to their Priority Return (generally 6.947 percent on invested capital);

   b.   thereafter, 98 percent to the Class B Limited Partner, 1 percent to the General Partner, and 1 percent to the Class A Limited Partners.

145.   The Partnership Agreement generally provided that Losses and Losses from Capital Transactions would be allocated as follows:

   a.   1 percent to the General Partner, 1 percent to the Class A Limited Partners, and 98 percent to the Class B Limited Partners until the Capital Account of the Class B Limited Partner was equal to zero;

   b.   thereafter, 1 percent to the General Partner and 99 percent to the Class A Limited Partners until the capital accounts of the Class A Limited Partners are equal to zero; and

   c.   thereafter, the balance, if any, 100 percent to the General Partner.

146.   Gains and Losses from Capital Transactions, including sales and distributions of Patent Assets, were not included in the computation of Profits and Losses and were separately allocated.

147.   Such gains included so-called "mark-to-market" gains calculated upon the occurrence of certain events, such as the distribution of Patent Assets from the Partnership.

148.   As required by the section 704(b) regulations, Gains and Losses from Capital Transactions were computed by reference to the book value of Partnership assets on the Partnership's 704(b) Books (i.e., their fair market value on the date of contribution, as reduced by book amortization expense).

149.   Gains from Capital Transactions were allocated 94 percent to the Class B Limited Partner, 5 percent to the General Partner, and 1 percent to the Class A Limited Partners.

150.   Although the Partnership made quarterly distributions of the Priority Return to the Class A Limited Partners, whether they would be entitled to retain the full amount of their Priority Return distributions depended on the Profits of the Partnership.

151.   If the cumulative allocations of Profits to the Class A Limited Partners were less than their cumulative distributions of Priority Return, the Class A Limited Partners' ending Capital Account balances would be less than their initial investment.

152.   Therefore, whether a Class A Limited Partner would recover its investment, or receive any return on its investment, depended on Chemtech's operating results.

153.   Conversely, the Class A Limited Partners' return on their investment could exceed their Priority Return, depending on the demand for products manufactured under the Patent License and book gains in Partnership assets.

   **4.   Partnership Cash Flow**

154.   Because a major component of Partnership expense was amortization of the Patent Assets, Chemtech I's cash flow exceeded its Profits.

155.   After paying expenses and distributing the Priority Return to the Class A Limited Partners, Chemtech I contributed most of the remaining cash flow to CPI on a quarterly basis.

156.   CPI was required to maintain approximately $50 million in Core Financial Assets issued by persons other than Dow or its affiliates.

157.   Much of the remaining excess cash contributed to CPI was loaned to DCIL, a Dow affiliate, for use in Dow's business.

   **5.   Actual Economic Results to Class A Limited Partners**

158.   The Class A Limited Partners were entitled to receive a quarterly distribution of a Priority Return of 6.947 percent of their invested capital.

159.   The Priority Return rate to the outside investors (6.947 percent) for the Chemtech transaction represented a very slight premium over conventional debt financing and was substantially cheaper to Dow than the cost of common equity embedded in Dow's weighted average cost of capital ("WACC") which at the time was approximately 10.75 percent.

160.   S&P reported that the average yield on preferred stock at the time that Chemtech I closed was 6.89 percent.

161.   Over the life of their investment in Chemtech I, the Class A Limited Partners received total distributions of Priority Return equal to $64,106,677.  At the

repurchase of their interests, the mark-to-market Capital Accounts of the Class A Limited Partners totaled $206,248,436.

162. The difference between the sum of the Priority Return distributions and ending mark-to-market Capital Accounts ($270,355,113) and their initial investment of $200 million is exactly equal to the sum of the cumulative net income allocated to them and mark-to-market gains and losses in connection with the purchase of their interests.

163. Therefore, the Class A Limited Partners received the economic benefit of each dollar of income allocated to them on the 704(b) Books.

**B.    Computation and Allocation of Partnership Taxable Income**

164. The computation of Chemtech I's taxable income from operations generally matched its computation of book income from operations under section 704(b), subject to one significant exception.

165. The principal difference between the computation of book income and taxable income resulted from amortization of the Patent Assets.

166. The section 704(b) regulations required that Chemtech I record the Patent Assets on its 704(b) Books at fair market value at the time of contribution; however, for purposes of computing its taxable income Chemtech I was required by I.R.C. § 723 to use Dow's historic tax basis.

167. The difference between these two values resulted in a difference between the amortization expense used to compute Chemtech I's book income under the section 704(b) regulations and the amount of amortization expense that Chemtech I could deduct in computing its taxable income.

168. As a result of this difference, Chemtech I's taxable income exceeded its section 704(b) income from 1993 through 1998.

169. Each allocation of Chemtech I's book income carried with it an allocation of a proportionate share of the corresponding items included in its taxable income.

170. This caused the taxable income of each partner, including the Class A Limited Partners, to exceed its book income from the Partnership.

171. The ceiling rule contained in the Treasury Regulations under section 704(c) prohibited the Partnership from reallocating this excess taxable income from the Class A Limited Partners to Dow.

### C.    Other Features of Chemtech I Partnership

#### 1.    Subordination

172.    As Class A Limited Partners, the investors were subject to a risk of loss of up to the amount of their combined $200 million Capital Accounts.

173.    Upon liquidation, the Class A Limited Partners were entitled to receive the positive balances, if any, in their Capital Accounts, pari passu with the rights of the Dow partners to receive their Capital Accounts.

174.    Thus, the Class A Limited Partners were residual claimants in the Chemtech Partnership.

175.    The Class A Limited Partners' right to receive their Capital Account balances was subordinate to the rights of creditors, including the General Partner (in its role as Partnership creditor) and the Class B Limited Partner (to the extent of its accrued Guaranteed Payment).

#### 2.    Voting Rights of Class A Limited Partners

176.    The General Partner was responsible for managing, controlling, and directing the business and affairs of Chemtech I.

177.    The Class A Limited Partners had voting rights consistent with rights typically accorded limited partners.

178.    The Class A Limited Partners did not participate in the active management of the Partnership business, but the restrictions on their participation were consistent with those generally imposed by the Delaware Revised Uniform Limited Partnership Act.

179.    The Class A Limited Partners did have important voting rights in the form of approval rights over various Partnership actions.

180.    Certain of the Class A Limited Partners' voting rights resembled equity owners' rights more than creditors' rights. The consent of each Class A Limited Partner is necessary to amend the Partnership Agreement, select a method of appraisal for Partnership assets, and for the Partnership to transfer assets in and out of the Partnership.

181.    As an example of these voting rights, during Chemtech I's 1994 taxable year DESA sought the Class A Limited Partners' consent to enter into a master lease involving assets other than the Patent Assets, as required under the Partnership Agreement. Ultimately, agreement between Dow and the Class A Limited Partners could not be reached, and the master lease was not executed.

3.    **Other Rights of Class A Limited Partners**

182.    The Class A Limited Partners could not force the Chemtech Partnership or Dow into bankruptcy for failure to distribute their Priority Return.

183.    Certain Optional Liquidation Events enabled the Class A Limited Partners to terminate their interests in the Partnership.  These rights were consistent with the rights of partners.

184.    In connection with their Partnership investments, the Class A Limited Partners sought and obtained a Limited Partner Guaranty.

185.    Under this Limited Partner Guaranty, Dow guaranteed the contractual performance of the Dow-related partners.

186.    Such guarantees were commonplace where a counterparty is contracting with a subsidiary that has fewer assets than its corporate parent.

187.    The Limited Partner Guaranty was not a guaranty of the financial performance of the Partnership or of the returns to the Class A Limited Partners.

188.    The Class A Limited Partners understood that the Limited Partner Guaranty did not guarantee the return of their investment.

189.    The Chemtech I structure was perpetual in nature with options for the investors or Dow to liquidate or purchase their investments.  The earliest contemplated date for liquidation or purchase listed in the August 1993 Amended and Restated Agreement of Limited Partnership was April 6, 2000.

## VI.    DOW'S U.S. GAAP ACCOUNTING FOR CHEMTECH

190.    Dow structured the Chemtech Partnership to ensure that it would meet its objective of providing financing that would be treated as minority equity in substance and not debt for U.S. GAAP purposes.

191.    U.S. Generally Accepted Accounting Principles ("GAAP") treated the infusion of funds from the Class A Limited Partners as minority equity and not debt on Dow's consolidated balance sheet.

192.    Under U.S. GAAP, Dow consolidated the Chemtech Partnership's financial results with its own, and carried over the book value of the contributed patents.

193.    The Class A Limited Partners' interest in the Chemtech Partnership was reported as "minority interest in subsidiary companies" on Dow's consolidated balance sheet.

194.    All of the Chemtech Partnership's transactions with Dow were eliminated in consolidation.

195. The Priority Return distribution was accounted for under U.S. GAAP as a "dividend declared to other stockholders."

196. Because CPI was also consolidated with Dow under U.S. GAAP, intercompany loans and interest accruals between CPI and Dow were eliminated in consolidation.

197. Dow's internal accountants concluded that the Class A Limited Partner Interests were characterized properly as minority interest equity under U.S. GAAP.

198. Dow's financial auditor, Deloitte & Touche LLP ("Deloitte") fully reviewed and analyzed the GAAP accounting for the classification of the Chemtech Partnership on Dow's financial statements, including the classification of the Class A Limited Partner Interests as minority equity.

199. Deloitte concluded that, under GAAP, the Class A Limited Partner Interests in Chemtech I acquired in 1993 were equity and that it was appropriate to report these interests on Dow's consolidated balance sheet as minority equity.

200. Deloitte concluded that, under GAAP, the Class A Limited Partner Interest in Chemtech II acquired by RBDC in 1998 was equity and that it was appropriate to report this interest on Dow's consolidated balance sheet as minority equity.

201. Each year, prior to Dow issuing its financial statements, Deloitte reaffirmed its conclusion that the Class A Limited Partner Interests in the Chemtech Partnership were properly classified by Dow as minority equity for each year from 1993 through 2003.

202. Dow's financial reporting of the Chemtech Partnership comported with its auditor's analyses.

203. Dow properly consolidated the Chemtech Partnership on its U.S. GAAP financial statements.

204. Dow properly eliminated intercompany borrowings and cash flows associated with the Chemtech Partnership, CPI, and CPI II.

205. Dow reported the Class A Limited Partner Interests as minority interest on its consolidated balance sheet for each year 1993 through 2003.

206. Dow reported payments to the Class A Limited Partners as dividends paid on minority equity on its consolidated income statement for each year from 1993 through 2003.

207. Dow's reporting of the Class A Limited Partner Interests in the Chemtech Partnership has never been challenged by any regulator.

## VII.    OPERATION OF CHEMTECH:  1993-1998

208.    The Chemtech Partnership operated with the original third-party Class A Limited Partners from August 1993 through February 1998 under the provisions of the Partnership Agreement.

209.    Consistent with the Partnership Agreement, the Chemtech Partnership issued quarterly and annual financial reports; Deloitte provided audited partnership financial statements to the Partnership; and the Partnership held annual meetings that the limited partners attended.

210.    The 704(b) Books were the operational financial statements for Chemtech I prepared in accordance with the Partnership Agreement and the 704(b) regulations.

211.    Dow paid the minimum royalty provided in the license agreement.

212.    Dow personnel calculated the relevant "QPM," or quantity of product manufactured, under the Patent License Agreement following the close of each fiscal year of the Partnership.

213.    Based upon these amounts, additional "variable royalties" in excess of the "minimum royalties" called for under the Patent License Agreement were paid to Chemtech I, increasing Profits in each year.

214.    Upon the expiration of the term of any patent license, Dow and the Chemtech Partnership would negotiate over relicensing of the patent portfolio at issue.

215.    Dow personnel from Intellectual Asset Management based the terms of the relicense offers on the same valuation methodology used by Arthur Little in valuing the Patent Assets.

216.    Chemtech I distributed patent portfolios on two occasions, eight patents in January 1997 and two patents in July 1997, to DTPC.

217.    Upon each distribution, the distributed patents were marked to market, using an ADL valuation that employed the same valuation approach used to value the portfolios in 1993.

218.    In January 1997, Patent Portfolios 14.2, 14.3, and 15.2 were marked to market. The mark-to-market values of these portfolios was $0, $179,200,000, and $0, respectively.  The net increase in the mark-to-market value of these Patent Portfolios resulted in an allocation of a net gain of $122.5 million, $1.23 million of which was allocated to the Class A Limited Partners.

219.    In July 1997, Patent Portfolio 20.1 was marked to market.  ADL concluded that the mark-to-market value of this patent portfolio was $35,056,000, resulting in a

net book gain of $1.56 million.  The Class A Limited Partners received a net allocation of this gain of $15,626.

## VIII.   1998 PURCHASE OF THE CLASS A LIMITED PARTNER INTERESTS

220.    On February 25, 1998, DTPC elected to exercise its option to purchase the Class A Limited Partner Interests in Chemtech I due to the potential that DTPC would be required to indemnify certain of the Class A Limited Partners for the cost of a withholding tax that new Treas. Reg. § 1.894-1T might impose on a portion of the royalty allocated to the investors.

221.    To compute the appropriate Purchase Price for the Class A Limited Partner Interests, the Patent Assets and stock of CPI held by the Partnership were marked to market and gains allocated to the Class A Limited Partners accordingly.

222.    As of February 25, 1998, the book basis of the Patent Assets was $362 million.

223.    ADL valued the Patent Assets at $444 million as of February 25, 1998.

224.    ADL's valuation resulted in a mark-to-market gain of $82 million with respect to the Patent Assets.

225.    As of February 25, 1998, the mark-to-market gain in the CPI stock totaled $84 million.

226.    The Class A Limited Partners were allocated 1 percent of the combined mark-to-market gain of $166 million on the Patent Assets and CPI stock, or $1.6 million.

227.    The Class A Limited Partners hired Peterson Consulting to review the valuation; and disputed the valuation on multiple grounds that were rejected by Dow.

228.    Ultimately, the Class A Limited Partners abandoned their remaining challenges to the ADL valuation.

229.    The Class A Limited Partners also received a Class A Guaranteed Payment, which compensated them for costs associated with termination of the investment before the earliest anticipated termination date of August 6, 2000.

230.    The Class A Guaranteed Payment was not intended to make up for any shortfall in the income of the Partnership, but simply reimbursed the Class A Limited Partners for swap and funding breakage costs incurred as a result of early termination of their investment, as well as reimbursing the additional anticipated margin (on a present value basis) on the Chemtech Priority Return through August 6, 2000.

231.    These types of breakage provisions are common in equity investments.

## IX.    BUSINESS CONDITIONS IN 1998—CONTINUED NEED FOR MINORITY EQUITY FINANCING

232.    When it became clear that the interests of the Class A Limited Partners would be purchased or liquidated, Dow began the process of determining how to replace the minority equity financing that otherwise would be lost.

233.    As a result of several factors, primarily another general cyclical downturn in the chemical industry, as well as an ongoing common stock repurchase program, Dow's need to carefully manage its debt ratio persisted in 1998.

234.    Therefore, Dow Treasurer Geoffery Merszei instructed his finance group to pursue financing opportunities that would provide the company with additional equity-type financing, for example, minority equity, or with off-balance sheet financing such as leasing transactions.

## X.    THE RESTRUCTURING OF CHEMTECH

### A.    The Chemtech II Concept

235.    Merszei designated Alfonso Escudero within Treasury to lead the restructuring of Chemtech.

236.    The goal of the restructuring was to continue to provide minority equity financing using the Chemtech Partnership.

237.    Escudero sought to identify assets with substantial economic value (but virtually zero book value) that could be contributed readily to the Chemtech Partnership and that would attract the capital of third-party investors.

238.    Ultimately, Escudero identified the LHC-3 Olefins and Aromatics Facility located in Plaquemine, Louisiana (the Plant Assets).

239.    As with the valuable Patent Assets, the Plant Assets had substantial economic value but near zero book value.

240.    Contributing the Plant Assets to the Chemtech Partnership would enable Dow to "monetize" the Plant Assets, while leasing them back from the Partnership for use in its business.

241.    The Partnership would generate income primarily through leasing the assets back to Dow.

242.    Dow would attract a third-party investor to the Partnership that would contribute cash and participate as a limited partner in exchange for a preferred return and further upside equity potential.

243.    Dow could access the third-party cash through loans from a Partnership subsidiary.

244.    For Dow's financial accounting purposes, intercompany payments would be eliminated in consolidation, and the third-party investment in the Partnership would be treated as minority equity and not debt on Dow's balance sheet.

245.    Showing additional asset value to investors through monetization was a benefit to Dow.

**B.      Board Approval of Chemtech II**

246.    Prior to the Chemtech restructuring, the Dow Board of Directors passed a resolution on April 9, 1998, that, among other things, authorized the transfer of the Plant Assets to DCDC.

247.    Passage of the resolution was supported by the "business support letter" signed by Escudero, dated March 27, 1998.

**C.      The Chemtech Restructuring**

248.    On March 27, 1998, Ifco purchased DESA's General Partner Interest and the Class A Limited Partner Interests, and, as of that date, the Class A Limited Partners ceased to be partners in the Chemtech Partnership.

249.    The name of the Partnership was changed to Chemtech II, and DCDC, a wholly owned Dow subsidiary, contributed the Plant Assets and 100 percent of the stock of CPI II in exchange for a Class B Limited Partner Interest.

250.    Chemtech II and Dow entered into a lease agreement with respect to the Plant Assets under which Dow agreed to lease the Plant Assets from Chemtech II for a period of 18 years, which was less than 80 percent of the Plant Assets' useful life.

251.    On June 12, 1998, Dow and CPI consolidated three pre-existing demand notes (these three demand notes earned interest at the commercial paper rate plus 0.125 percent) into one term note under which Dow agreed to pay on October 1, 2032, a principal amount of $781,600,000, which carried interest at a rate of 7.05 percent.

252.    Additionally, the Plant Assets were appraised by third-party consultant Appraisal Economics at a Fair Market Sales Value of $715,000,000 as of June 12, 1998.

253.    At the time of the appraisal, Dow had authorized an expansion of the Plant Assets that would allow for a 16 percent increase in production capacity at a capital cost to Dow of approximately $22 million.

254.    The completion date of the expansion was anticipated to be December 31, 1999.

255.   Appraisal Economics determined that the additional value to the Plant Assets from this expansion would be $118,000,000.

256.   Appraisal Economics determined the Fair Market Rental Value of the Plant Assets to be $66,132,000 per year over the term of the eighteen-year lease between Dow and Chemtech II.

257.   Following completion of the authorized expansion, the Fair Market Rental Value would increase by $11,319,000 to $77,451,000 over the term of the eighteen year lease.

258.   Effective June 25, 1998, Chemtech II redeemed DTPC's Partnership interest by distributing to DTPC the Patent Assets and approximately 67 percent of the CPI stock (as computed following a post-closing adjustment), and cash.

259.   Shares of CPI stock have never been traded on an established securities market.

260.   On June 25, 1998, more than 95 percent of the value of CPI's assets consisted of a promissory note.

261.   The promissory note held by CPI on June 25, 1998, was not traded on an established securities market.

262.   The promissory note held by CPI on June 25, 1998, did not give CPI the right to convert the note to cash.

263.   The Chemtech Partnership's tax basis in the assets distributed to DTPC in retirement of its interest exceeded DTPC's "outside" tax basis in its Partnership interest by approximately $381 million, resulting in a loss of $381 million of tax basis to the Partnership.

264.   Chemtech II made a timely election pursuant to I.R.C. § 754.  Because of the section 754 election, I.R.C. § 734 required the Partnership to increase its tax basis in its remaining assets by the $381 million of basis reduction suffered on the distribution to DTPC.

265.   Of the $381 million of basis adjustments made pursuant to I.R.C. § 734, approximately $363 million was allocated to the Plant Assets and approximately $18 million to the basis of the remaining CPI stock.

266.   On June 26, 1998, RBDC Inc. ("RBDC"), a Delaware corporation and U.S. affiliate of Rabo, was admitted to Chemtech II.

267.   Ifco, DCDC, and RBDC executed a Third Amended and Restated Agreement of Limited Partnership of Chemtech II ("Third Amended Partnership Agreement"), whereby RBDC entered the Partnership as the Class A Limited Partner, a portion of Ifco's Limited Partner interest was converted to a General Partner Interest, and DCDC's interest was converted to the Class B Limited Partner Interest.

268.    Finally, Ifco sold to RBDC the remainder of its Class A Limited Partner Interest for $200 million.

## XI.    KEY ELEMENTS OF THE CHEMTECH II PARTNERSHIP AGREEMENT

### A.    Partnership Economics

#### 1.    Maintenance of Capital Accounts

269.    The Partnership's maintenance of the Capital Accounts complied with the requirements of the Treasury Department regulations promulgated under I.R.C. § 704(b), which are designed to ensure that partners bear the economic effect of Partnership allocations and distributions.

270.    As with Chemtech I, each partner's economic investment was tracked by a Capital Account that reflected the partner's initial contribution at fair market value, increased by allocations of profits and gains and decreased by allocations of losses and deductions, including depreciation.

271.    Upon liquidation, each partner would receive the positive balance of its Capital Account, and any partner with a negative Capital Account was required to make a contribution to the Partnership to eliminate the deficit.

#### 2.    Impact of Capital Accounts on Economic Entitlements

272.    Although the Partnership made quarterly distributions of the Priority Return to RBDC, as the sole Class A Limited Partner, whether it would be entitled to retain the full amount of its Priority Return distributions depended on the Profits of the Partnership.

273.    If the cumulative allocations of book income to RBDC were less than its cumulative distributions of Priority Return, its ending Capital Account balance would be less than its initial $200 million investment.

274.    Therefore, whether RBDC would recover its investment, or receive any return on its investment, depended on Chemtech II's operating results.

#### 3.    Computation of Book Income

275.    Consistent with the 704(b) Books used for Chemtech I, for purposes of maintaining the partners' Capital Accounts and allocating the results of Partnership operations among them, Chemtech II computed its book income or loss in the manner required by the Treasury Department's section 704(b) regulations.

276.    The Partnership's total book income as determined under the section 704(b) regulations was approximately equal to the difference between the rental income it

28

received and its expenses, including its deduction for "book" depreciation of the Plant Assets.

277. As required by the section 704(b) regulations, Chemtech II's deduction for depreciation of the Plant Assets was based on their "book" value (i.e., the fair market value credited to the contributing partner's Capital Account).

### 4.    Allocation of Book Profits and Losses

278. Chemtech II specially allocated its deduction for depreciation of the Plant Assets 99 percent to the Class B Limited Partner and General Partner, and 1 percent to RBDC.

279. The special allocation of depreciation (as computed for 704(b) Book purposes) reduced each partner's Capital Account and thus affected its economic interest in the Chemtech II Partnership.

280. Partnership Profits, consisting of the remainder of its book operating income without regard to depreciation, were allocated first to RBDC until RBDC had received allocations of Profits equal to its cumulative Priority Return, which equaled 6.375 percent on its $200 million capital account balance.

281. The General Partner and Class B Limited Partner were allocated a cumulative Secondary Return equal to 8.375 percent of their Capital Accounts, but that allocation was to be made only to the extent of Profits available after reversal of prior allocations of losses (including depreciation).

282. Any remaining Profits were allocated 99 percent to the Class B Limited Partner and General Partner, and 1 percent to RBDC.

283. As with Chemtech I, RBDC would be allocated 1 percent of any remaining gains, including "mark-to-market" gains calculated upon the occurrence of certain events.

284. Additionally, after reversal of the residual profit and Secondary Return profit allocations, RBDC would bear 1 percent of losses until the Capital Accounts of the Class B Limited Partner and General Partner were reduced to zero; and 99 percent of losses thereafter until its own Capital Account was reduced to zero.

### 5.    Actual Economic Results to Class A Limited Partner

285. The Class A Limited Partner was entitled to receive a quarterly distribution of a Priority Return of 6.375 percent of its invested capital.

286. Through December 31, 2003, RBDC had received total profit allocations and distributions of the Priority Return equal to $68,134,085 and it had received cumulative allocations of book income (Profits, net of depreciation) equal to the amount of those distributions.

29

287.   As of December 31, 2003, RBDC's Capital Account Balance was $200,000,000, the amount of its original investment.

288.   Therefore, the allocations of book income to RBDC through the end of 2003 matched the economic profit it had earned on its investment.

**B.    Computation and Allocation of Partnership Taxable Income**

289.   The principal difference between Chemtech II's taxable income and its book income resulted from the difference between its section 704(b) book deduction for depreciation and its tax deduction for depreciation.

290.   Although the section 704(b) regulations required that Chemtech II record the Patent Assets on its initial balance sheet at fair market value at the time of contribution, for purposes of computing its taxable income Chemtech II was required to use DCDC's historic tax basis, as increased by the section 734(b) adjustment.

291.   The difference between these two values resulted in a difference between the depreciation expense used to compute Chemtech II's book income under the section 704(b) regulations and the tax deduction available to Chemtech II.

292.   The noncontributing partners, the Class A Limited Partner and the General Partner, each received an allocation of tax depreciation deduction that matched their allocation of book depreciation.

293.   Therefore, the entire tax burden resulting from the difference between book depreciation and tax depreciation was borne by the Class B Limited Partner, which had contributed the Plant Assets to Chemtech II.

294.   The amount of taxable income allocated to RBDC, the Class A Limited Partner, equaled the book income allocated to it.

295.   As a U.S. corporation, RBDC was subject to United States federal income tax on the taxable income allocated to it.

**C.    Other Features of Chemtech I Partnership**

**1.    Subordination**

296.   As the Class A Limited Partner, RBDC was subject to a risk of loss of up to the amount of its $200 million Capital Account.

297.   Upon liquidation, RBDC would receive the positive balance, if any, in its Capital Account, pari passu with the rights of the Dow partners to receive their Capital Accounts.

298.   Thus, RBDC was a residual claimant in Chemtech II.

299. RBDC's right to receive its Capital Account balance was subordinate to the rights of creditors, including the General Partner (in its role as Partnership creditor).

### 2. Voting Rights of Class A Limited Partner

300. The General Partner was responsible for managing, controlling, and directing the business and affairs of Chemtech II.

301. RBDC did not participate in the active management of the Partnership business, but the restrictions on their participation were consistent with those generally imposed by the Delaware Revised Uniform Limited Partnership Act.

302. RBDC had voting rights consistent with rights typically accorded limited partners.

### 3. Other Rights of Class A Limited Partner

303. RBDC could not force the Partnership into bankruptcy for failure to distribute its Priority Return.

304. RBDC had no ability to force bankruptcy of the Partnership (or of Dow).

305. Certain Optional Liquidation Events would enable RBDC to trigger a termination of their interests in the Partnership.  These rights were consistent with the rights of partners.

306. In connection with its Partnership investment, RBDC sought and obtained a Limited Partner Guaranty.

307. Under this Limited Partner Guaranty, Dow guaranteed the contractual performance of the Dow-related partners.

308. Such guarantees were commonplace where a counterparty is contracting with a subsidiary that has fewer assets than its corporate parent.

309. The Limited Partner Guaranty was *not* a guaranty of the financial performance of the Partnership or of RBDC's return.

310. The Chemtech II structure was envisioned to continue for up to 20 years with *options* for RBDC and Dow to terminate their relationship.

311. RBDC understood that the optional liquidation provisions were, in fact, optional and that the Partnership could continue for up to 20 years.

312. In fact, RBDC did not exercise the option to terminate its interest in Chemtech II upon the occurrence of the optional liquidation date 5 years into the investment.

313. On June 26, 2003, the Fourth Amended and Restated Agreement of Limited Partnership of Chemtech II was executed by and among Ifco, DCDC, and RBDC.

31

314. The agreement reflected an indefinite term and renegotiations of (i) the Priority Return to the Class A Limited Partner equal to returns of 4.207 percent per annum, and (ii) the Secondary Return to the General Partner and Class B Limited Partner equal to returns of 8.375 percent per annum.

315. The Chemtech Partnership continues in existence today, albeit without a third-party investor.

316. The Class A Limited Partners had no ability to force bankruptcy of the Partnership (or of Dow).

317. RBDC treated its Partnership interest as equity for financial reporting, tax, and all other purposes.

## XII. OPERATION OF CHEMTECH II:  1998-2003

318. Following entry of RBDC, the restructured Partnership operated in accordance with its agreements.

319. The Chemtech Partnership complied with obligations to its limited partners, issuing quarterly and annual reports and preparing unaudited partnership financial statements.

320. On September 1, 1999, the expansion of the chemical plant was completed, and the Partnership treated these Expansion Assets as part of the Plant Assets contributed by Dow.

321. Pursuant to the expansion, the rent due on the Chemical Plant increased beginning in October 1999.

322. In June 2003, following an appraisal of the Plant Assets and Expansion Assets by Appraisal Economics, Ifco, DCDC, and RBDC entered into a Fourth Amended and Restated Agreement of Limited Partnership of Chemtech II.

Respectfully submitted, this 31st day of March, 2011.

PLAINTIFF

CHEMTECH ROYALTY ASSOCIATES, L.P., by
DOW EUROPE, S.A., as Tax Matters Partner

/s/David M. Bienvenu, Jr.
David M. Bienvenu, Jr.
TAYLOR, PORTER, BROOKS & PHILLIPS
Post Office Box 2471
Baton Rouge, LA  70821
Telephone:  (225) 387-3221
Facsimile:  (225) 346-8049

John B. Magee
Hartman E. Blanchard, Jr.
James D. Bridgeman
Christopher P. Murphy
Robert A. Leonard
Royce L. Tidwell
BINGHAM MCCUTCHEN, LLP
2020 K Street, N.W.
Washington, D.C.  20006
Telephone:  (202) 373-6000
Facsimile:  (202) 373-6001

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on March 31, 2011, a copy of the foregoing was electronically filed with the

Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of

record by operation of the court's electronic filing system.


<u>/s/David M. Bienvenu, Jr.</u>
David M. Bienvenu, Jr.