IN THE UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| CHEMTECH ROYALTY ASSOCIATES, L.P., | ) |
| by DOW EUROPE, S.A., as Tax Matters Partner, | ) Case No.:  05-944-BAJ-DLD |
| | ) Judge Jackson |
| Plaintiff, | ) |
| | ) Case No.:  06-258-BAJ-DLD |
| | ) Judge Jackson |
| v. | ) |
| | ) Case No.:  07-CV-00405-BAJ-DLD |
| UNITED STATES OF AMERICA, | ) Judge Jackson |
| | ) |
| Defendant. | ) |
| | ) |

## UNITED STATES' PROPOSED FINDINGS OF FACTS
## AND CONCLUSIONS OF LAW

DONALD J. CAZAYOUX, JR.
  United States Attorney

JOHN A. DiCICCO
  Principal Deputy Assistant Attorney General

JOHN J. GAUPP, LBN 14976
  Assistant U.S. Attorney
  777 Florida Street, Suite 208
  Baton Rouge, Louisiana  70801
  Telephone:  (225) 389-0443

THOMAS J. SAWYER          (202) 514-8129
ROBERT L. WELSH           (202) 514-6068
THOMAS F. KOELBL          (202) 514-5891
PHILIP M. SCHREIBER       (202) 514-6069
  Trial Attorneys, Tax Division
  U.S. Department of Justice
  P.O. Box 14198
  Washington, DC  20044

# Table of Contents

**Introduction and Summary**

A.    Chemtech I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B.    Chemtech II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

C.    The tax benefits will be disallowed and penalties imposed

      1.    The intent of Congress. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      2.    The Chemtech transactions are disregarded under the economic
         substance doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      3.    The Chemtech partnership is disregarded for tax purposes;
         alternatively, banks are not true partners. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      4.    Under the Partnership Anti-Abuse Regulations, the Chemtech
         transactions should be disregarded. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      5.    Under Section 731, Dow should be taxed when Chemtech
         liquidated the partnership interest of a Dow subsidiary during the
         transition between Chemtech I and Chemtech II. . . . . . . . . . . . . . . . . . . . . . 12

      6.    Alternatively, if the Chemtech partnership and the Chemtech I and
         Chemtech II transactions are respected, the IRS may reallocate the
         tax items of Chemtech among the Dow and bank partners to
         properly reflect the economics of the partnership. . . . . . . . . . . . . . . . . . . . . 14

      7.    The IRS has appropriately imposed penalties on the abusive
         Chemtech transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Proposed Findings of Fact**

I     The Goldman Sachs' SLIPs tax shelter product

      A.    Goldman Sachs' development of SLIPs. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      B.    Goldman Sachs' marketing of SLIPs to the Dow Chemical
         Company. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Proposed Findings of Fact (cont'd)**

II      The preliminary stages of the SLIPs/Chemtech tax shelter

      A.      Dow's selection of patents to contribute to the SLIPs/Chemtech
           partnership. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      B.      The marketing of SLIPs/Chemtech to the foreign banks. . . . . . . . . . . . . . . . . . 30

III     Dow paid $12.6 million for the SLIPs/Chemtech tax shelter. . . . . . . . . . . . . . . . . . 38

IV      The formation and implementation of Chemtech/SLIPs. . . . . . . . . . . . . . . . . . . . . . 39

V       Chemtech I's circular flow of money versus the non-circular flow of tax
      consequences. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

VI      Winding up of Chemtech I

      A.      Change in tax law forces Dow to terminate Chemtech I two years
           early. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

      B.      Dow buy-out of foreign banks. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

      C.      Foreign banks dispute value of patents. . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

VII     Transition to Chemtech II

      A.      Dow plans to continue to use a partnership to obtain a deduction on
           property that had already been depreciated. . . . . . . . . . . . . . . . . . . . . . . . . . . 58

      B.      The note exchange. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

VIII    The Chemtech II transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

IX      The 754 election.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

X       Chemtech II's circular flow of money and the flow of tax benefits.. . . . . . . . . . . . . . . 68

XI      Debt / Equity factors

      A.      Characterization of interests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

      B.      Risk and returns of debt and equity claims. . . . . . . . . . . . . . . . . . . . . . . . . . 79

**Proposed Findings of Fact (cont'd)**

XII    Dow's lack of legitimate business benefits for contributions of the patents to the Chemtech partnership

    A.    It would have been unreasonable to expect that Chemtech would license the patents or otherwise obtain any additional funds other than Dow's royalty payments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

    B.    With respect to off-balance-sheet financing. . . . . . . . . . . . . . . . . . . . . . . . . . . 101

XIII    The litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

**Proposed Conclusions of Law**

I.    Intent of Congress: "What was done" in Chemtech I and Chemtech II was "not the thing" which Congress intended. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

II.    The Chemtech Transactions are disregarded under the economic substance doctrine

    A.    In general. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
    B.    *Gregory v. Helvering*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123
    C.    After *Gregory*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124
    D.    First prong: Economic substance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
    E.    Second prong: Business purpose.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

III.    Dow and the foreign banks did not join together to form a partnership for purposes of federal tax law

    A.    The partnership is not respected under Culbertson, or the sham partnership, doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

    B    Even if the partnership were to be respected, the foreign banks were not true partners.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

    C.    Alternatively, even if the partnership is not disregarded under *Culbertson*, in substance, the foreign banks' $200 million "investment" was truly a loan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

    D.    Section 704(e) is inapplicable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

**Proposed Conclusions of Law (cont'd)**

IV      Partnership (Subchapter K) Anti-Abuse Regulation

      A.      In general. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

      B.      The 754 basis step up should be disregarded under the Partnership
           Anti-Abuse Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

      C.      The broader Chemtech I and II Transactions should be disregarded. . . . . . . . . 162

V       Pursuant to Section 731, the distribution from Chemtech to Dow (through
      Diamond Tech) is taxable

      A.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

      B.      Section 731.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

      C.      The Dow note is a "marketable security". . . . . . . . . . . . . . . . . . . . . . . . . . 169

      D.      Alternatively, under Section 731's Anti-Abuse Rule, the 33-year
           term note should be considered a marketable security.. . . . . . . . . . . . . . . . . . 169

VI      Alternatively, if the Chemtech partnership and the Chemtech I and Chemtech II
      transactions are respected, the IRS may reallocate the tax items of Chemtech
      among the Dow and bank partners to properly reflect the economics of the
      partnership

      A.      In General.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

            (i)     Economic effect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173
            (ii)    Substantiality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

      B.      The allocations had no economic effect.. . . . . . . . . . . . . . . . . . . . . . . . . . . 175

      C.      The allocations were not substantial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

VII     Accuracy-related penalties under 26 U.S.C. § 6662 are appropriate

      A.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

      B.      The negligence penalty is appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

Proposed Conclusions of Law (cont'd)

    C.     The substantial understatement penalty is Appropriate. . . . . . . . . . . . . . . . . . 189

           a.     "Substantial authority". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190
           b.     Limitation on relief for tax shelter transactions. . . . . . . . . . . . . . . . . . . 192

    D.     Gross valuation misstatement penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

    E.     Defense to penalties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

## TABLE OF AUTHORITIES

**Cases:**

*ACM Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998). . . . . . . . . . . . . . . . 126
*Alamo Nat'l Bank v. Commissioner*, 95 F.2d 622 (5th Cir. 1938). . . . . . . . . . . . . . . . . 181
*Alexander v. Commissioner*, 194 F.2d 921 (5th Cir. 1952). . . . . . . . . . . . . . . . . . . . . . 138
*Allen v. Commissioner*, 925 F.2d 348 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . 183
*American Boat Co. v. United States*, 583 F. 3d 471 (7th Cir.2009). . . . . . . . . . . . . . . . 23
*American Elec. Power Co. v. United States*, 326 F.3d 737 (6th Cir. 2003). . . . . . . 123, 129
*ASA Investerings Partnership v. Commissioner*, 201 F.3d 505 (D.C. Cir.
      2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122, 135, 140, 155
*AWG Leasing Trust v. United States*, 592 F. Supp. 2d 953 (N.D. Ohio
      2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78, 129, 131, 132
*Bayou Verret Co. v. Commissioner*, 450 F.2d 850 (5th Cir. 1971). . . . . . . . . . . . . . . . 10
*BB&T Corp. v. United States*, 523 F.3d 461 (4th Cir. 2008). . . . . . . . . . . 75, 129, 131, 135
*Bemont Investments, LLC v. United States*, 2010 WL 3057437 (E.D. Tex.
      2010), *appeal pending*, 10-41132 (5th Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . . 194
*Blueberry Land Co. v. Commissioner*, 361 F.2d 93 (5th Cir. 1966). . . . . . . . . . . . . . . . 147
*Boca Investerings Partnership v. United States*, 167 F. Supp. 2d 298
      (D.D.C. 2001), *rev'd*, 314 F.3d 625 (D.C. Cir. 2003). . . . . . . . . . . . . . . . . . . . . 155
*Boca Investerings Partnership v. United States*, 314 F.3d 625 (D.C. Cir.). . . 122, 140, 155
*Carberry, Estate of v. Commissioner*, 933 F.2d 1124 (2d Cir. 1991). . . . . . . . . . . . . . 172
*Carroll v. United States*, 339 F.3d 61 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 181
*Casebeer v. Commissioner*, 909 F.2d 1360 (9th Cir.1990). . . . . . . . . . . . . . . . . . . . . . 133
*Castle Harbour*, see *TIFD III-E, Inc. v. United States*
*Chamberlain v. Commissioner*, 66 F. 3d 729 (5th Cir.1995). . . . . . . . . . . . . . . . . . . . . 23
*Coltec Indus., Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006). 8, 125, 132, 133, 134
*Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945). . . . . . . . . . . . . . . . . . . . . . 146
*Commissioner v. Culbertson*, 337 U.S. 733 (1949). . . . . . . . . . . . . . . . 10, 137, 138, 153

**Cases (cont'd):**

*Commissioner v. Meridian & Thirteenth R. Co.*, 132 F.2d 182 (7th Cir. 1942). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

*Commissioner v. Tower*, 327 U.S. 280 (1946). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

*Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001). . . . . . . . . . 126

*Davant v. Commissioner*, 366 F.2d 874 (5th Cir. 1966). . . . . . . . . . . . . . . . . . . 147, 148

*DeMartino v. Commissioner*, 862 F.2d 400 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . 123

*Dow Chemical Co. v. United States*, 435 F.3d 594 (6th Cir. 2006). . . . . . . . . 123, 125, 126

*Evans v. Commissioner*, 447 F.2d 547 (7th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . 155

*Felcyn v. United States*, 691 F. Supp. 205 (C.D. Cal. 1988). . . . . . . . . . . . . . . . . 129, 130

*Fidelity International Currency Advisor A Fund, LLC v. United States*, _
F.Supp.2d _, 2010 WL 4116469
(D. Mass. 2010). . . . . . . . . . . . . . . . . . . . . . 126, 127, 133, 137, 139, 158, 181, 190

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). . . . . . . . . . . . . . . . . . . . . 124, 125

*Gilbert v. Commissioner*, 248 F.2d 399 (2d Cir. 1957). . . . . . . . . . . . . . . . . 140, 141, 144

*Gilman v. Commissioner*, 933 F.2d 143 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . 127, 195

*Ginsburg v. Arnold*, 185 F.2d 913 (5th Cir. 1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

*Goldfine v. Commissioner*, 80 T.C. 843 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

*Goldman v. Commissioner*, 39 F.3d 402 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . 183

*Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966). . . . . . . . . . . . . . . . . . . . . . . 123

*Gregory v. Helvering*, 293 U.S. 465 (1935). . . . . 6, 115, 120, 121, 123, 124, 134, 146, 187

*Haberman Farms Inc. v. United States*, 305 F.2d 787 (8th Cir. 1962). . . . . . . . . . 121, 136

*Helvering v. Gregory*, 69 F.2d 809 (2d Cir. 1934), *aff'd*, 293 U.S. 465 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 120

*Hambuechen v. Commissioner*, 43 T.C. 90 (1964). . . . . . . . . . . . . . . . . . . . . . . . 140, 144

*Heasley v. Commissioner*, 902 F.2d 380 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . 193, 194

*Higgins v. Smith*, 308 U.S. 473 (1940). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125, 126

*Hines v. United States*, 912 F.2d 736 (4th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . 129

*Illes v. Commissioner*, 982 F.2d 163 (6th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . 24, 195

*IRS v. CM Holdings (In re CM Holdings, Inc.)*, 301 F.3d 96 (3d Cir. 2002). . . . . 115, 116

*IRS v. CM Holdings, Inc. (In re CM Holdings, Inc.)*, 254 B.R. 578 (D. Del. 2000), *aff'd*, 301 F.3d 96). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

*Jade Trading, LLC v. United States*, 80 Fed. Cl. 11 (2007), *reversed in part on other grounds*, 598 F.3d 1372 (2010). . . . . . . . . . . . . . . . . . . . . . 183, 184

*John Kelley Co. v. Commissioner*, 326 U.S. 521 (1946). . . . . . . . . . . . . . . . . . . . 148, 149

*Kahn, Estate of, v. Commissioner*, 499 F.2d 1186 (2d Cir. 1974). . . . . . . . . . . . . 138, 139

*Karme v. Commissioner*, 73 T.C. 1163 (1980), *aff'd*, 673 F.2d 1062 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

*Keller v. Commissioner*, 556 F.3d 1056, 1061 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . 195

*Killingsworth v. Commissioner*, 864 F.2d 1214 (5th Cir. 1989). . . . . . . . . . . . . . . . . . 124

Cases (cont'd):

*Klamath Strategic Inv. Fund, LLC v. United States*, 568 F.3d 537 (5th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 125, 126, 132, 184, 196

*Knetsch v. United States*, 364 U.S. 361 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . 123, 126

*Kornman & Assocs., Inc. v. United States*, 527 F.3d 443 (5th Cir. 2008). . . . . . . . . . . 134

*Kwiat v. Commissioner*, 64 T.C.M. (CCH) 327 (1992). . . . . . . . . . . . . . . . . . . . . . . . 132

*Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122 (D. Conn. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127, 134, 184, 190, 191, 196

*Luna v. Commissioner*, 42 T.C. 1067 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

*Marcello v. Commissioner*, 380 F.2d 499, 506 (5th Cir. 1967). . . . . . . . . . . . . . . . . . . 183

*Massengill v. Commissioner*, 876 F.2d 616 (8th Cir. 1989). . . . . . . . . . . . . . . . . . . . . 195

*Massey Motors, Inc. v. United States*, 364 U.S. 92 (1960). . . . . . . . . . . . . . . . . . . . . . 117

*Mayo Foundation for Medical Education and Research v. United States*, _ U.S. _, 131 S.Ct. 704 (Jan. 11, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

*Merino v. Commissioner*, 196 F.3d 147 (3d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . 195

*Merryman v. Commissioner*, 873 F.2d 879 (5th Cir. 1989). . . . . . . . . . . . 10, 129, 137, 141

*Neonatology Associates, P.A. v. Commissioner,* 299 F.3d 221 (3d Cir. 2002). . . . . . . . 183

*Nevada Partners Fund, LLC. v. United States*, 714 F.Supp.2d 598 (S.D. Miss. 2010), *appeal pending*, No. 10-60559 (5th Cir.). . . . . . . . . . . 126, 158, 194

*Newark Morning Ledger Co. v. United States*, 507 U.S. 546 (1993). . . . . . . . . . 117, 118

*Nicole Rose Corp. v. Commissioner*, 320 F.3d 282 (2d Cir. 2002). . . . . . . . . . . . 184, 189

*NPR Investments, LLC v. United States*, _ F. Supp.2d_, 2010 WL 3199621 (E.D. Tex. 2010), *appeal pending*, No. 10-41219 (5th Cir.). . . . . . . . . . . . . . . 194

*Ogden v. Comm'r*, 788 F.2d 252 (5th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

*Pasternak v. Commissioner*, 990 F.2d 893 (6th Cir. 1993). . . . . . . . . . . . . . . . . . . 24, 183

*Pflugradt v. United States*, 310 F.2d 412 (7th Cir. 1962). . . . . . . . . . . . . . . . . . . . . . . 155

*Plantation Patterns, Inc. v. Commissioner*, 462 F.2d 712 (5th Cir. 1972). . . . . . . 148, 149

*Reef Corp. v. Commissioner*, 368 F.2d 125 (5th Cir. 1966). . . . . . . . . . . . . . . . . . . . . 147

*Saba Partnership v. Commissioner*, 273 F.3d 1135 (D.C. Cir. 2001). . . . . . . . . . . . . . 140

*Sacks v. Commissioner*, 69 F.3d 982 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . 115

*Santa Monica Pictures, LLC v. Comm'r,* 89 T.C.M. (CCH) 1157, 2005 WL 1111792 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183, 184, 192, 196

*S&M Plumbing Co., Inc. v. Commissioner*, 55 T.C. 702 (1971). . . . . . . . . . . . . . 139, 140

*Schering-Plough (Merck & Co. ) v. United States*, 651 F.Supp.2d 219 (D.N.J. 8/28/09), *appeal pending*, No. 10-2775 (3d Cir.). . . . . . . . . . . . . . . . 146

*Southgate Master Fund, LLC v. United States*, 651 F.Supp.2d 596 (N.D. Tex. 8/18/09), *appeal pending*, No. 09-11166 (5th Cir.). . . . . . . . 10, 137, 139, 194

*Stobie Creek Investments, LLC v. United States,* 82 Fed. Cl. 636 (2008), *aff'd*, 608 F.3d 1366 (Fed. Cir. 2010). . . . . . . . . . . . . . . . . . . 183, 184, 191, 196

*TIFD III-E, Inc. v. United States (Castle Harbour I)*, 342 F.Supp.2d 94 (D. Conn. 2004), *rev'd*, 459 F.3d 220 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . 125

**Cases (cont'd):**

*TIFD III-E, Inc. v. United States (Castle Harbour II)*, 459 F.3d 220 (2d
    Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125, 137, 138, 141, 143, 144, 149
*TIFD III-E Inc. v. United States (Castle Harbour III)*, 660 F. Supp. 2d 367
    (D. Conn. 2009), *appeal pending*, No. 10-0070 (2d Cir.) (oral arg.
    May 16, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155, 191
*Todd v. Commissioner*, 862 F.2d 540 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . 193, 194
*Twenty-Mile Joint Venture PND, Ltd. v. Commissioner*, 200 F.3d 1268
    (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138, 139, 140
*United States v. General Geophysical Co.*, 296 F.2d 86 (5th Cir. 1961) . . . . . . . . 146, 147
*United States v. Ludey*, 274 U.S. 295 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
*Valero Energy Corp. v. United States*, 2008 WL 4104368 (N.D. Ill. 2008) . . . . . . . . . 130
*Virginia Historic Tax Credit Fund 2001 LP v. Commissioner*, _ F.3d _,
    2011 WL 1127056 (4th Cir. Mar. 29, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 142
*Weinert, Estate of, v. Commissioner*, 294 F.2d 750 (5th Cir. 1961) . . . . . . . . . . . . 8, 122
*Wells Fargo & Co. and Subsidiaries v. United States*, 91 Fed. Cl. 35
    (2010), *appeal pending*, No. 2010-5108 (argued Dec. 7, 2010) . . . . . . . . 130, 132
*Zfass v. Commissioner*, 118 F.3d 184 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 195
*Zirker v. Commissioner*, 87 T.C. 970 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

**Statutes:**

Internal Revenue Code (26 U.S.C.):
    Section 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171
    Section 704(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171
    Section 704(b) . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 163, 164, 171, 172, 176
    Section 704(e) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 152, 153, 154, 155
    Section 731 . . . . . . . . . . . . 12, 13, 61, 62, 133, 164, 165, 166, 167, 168, 169, 170
    Section 732 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160, 167
    Section 754 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 67, 159
    Section 6226 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182
    Section 6662 . . . . . . . . . . . . . . . . . . 15, 181, 182, 183, 184, 189, 190, 193, 194
    Section 6664 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

**Miscellaneous:**

Burke, Karen C. and McCouch, Grayson M.P., *Snookered Again:  Castle
    Harbour Revisited*, 128 Tax Notes 1143 (Sept. 13, 2010) . . . . . . . . . . . . . . . 156
Canellos, Peter C., *A Tax Practitioner's Perspective on Substance, Form
    and Business Purpose in Structuring Business Transactions and in
    Tax Shelters*, 54 SMU L. Rev. 47 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 130
H.R. Conf. Rep. 94-1515 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173
H.R. Rep. No. 82-586 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153, 154

**Miscellaneous (cont'd):**

H.R. Rep. No. 103-316 (1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

H.R. Rep. No. 111-443 (2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121, 122

Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (March
    30, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Treasury Decisions:

    T.D. 8588.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

    T.D. 8722.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51-52

Treasury Regulations (26 C.F.R.):

    Section 1.701-2. . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 156, 157, 158, 159, 162, 163

    Section 1.704-1(b). . . . . . . . . . . . . . . . . 14, 163, 172, 173, 174, 175, 176, 179, 180

    Section 1.704-1(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152, 154

    Section 1.731-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169, 170

    Section 301.6221-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182, 190, 196

    Section 1.6662-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

    Section 1.6662-3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183, 184, 191

    Section 1.6662-4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190, 191, 192

    Section 1.6662-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193, 195

Sheppard, Lee, News Analysis – Subchapter K's Attractive Nuisance, 126
    Tax Notes 131 (Jan. 11, 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

S. Rep. No. 82-781 (1951).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

S. Rep. No. 94-938 (1976).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

S. Rep. No. 97-494 (1982).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180, 181

Staff, Joint Committee on Taxation, *Study of Present-Law Penalty and
    Interest Provisions as Required by Section 3801 of the Internal
    Revenue Service Restructuring and Reform Act of 1998 (Including
    Provisions Relating to Corporate Tax Shelters)*, Vol. 1 (July 22,
    1999), http://www.jct.gov/publications (follow links to 1999
    documents and select JCS-3-99 Volume 1).. . . . . . . . . . . . 119, 120, 122, 188, 189

Willis, Arthur B. *et al.*, PARTNERSHIP TAXATION (6th ed. 2010):

    ¶ 10.02. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

    ¶ 10.04. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 174

***Introduction and Summary***

1.      The Dow Chemical Company engaged in two series of transactions designed to generate tax benefits that the United States contends are abusive tax shelters.  The two tax shelter transactions are referred to as Chemtech I, dealing with the tax years 1993 through 1997, and Chemtech II, dealing with the tax years 1998 through 2003.

2.      Chemtech I was promoted and marketed to large corporate taxpayers by Goldman Sachs under the trade name SLIPs, standing for "Special Limited Investment Partnerships," and it was implemented by Dow with the assistance of tax lawyers at the law firm of King & Spalding. The follow-on Chemtech II transaction was designed and implemented by the tax lawyers at King & Spalding.

3.      The Chemtech I and Chemtech II schemes are enormously complicated in their construction and operation, but the general concept behind the schemes is fairly straight-forward, and an outline of that general concept provides a foundation that may make the details in this opinion easier to understand.

4.      The Chemtech I tax shelter is generally known as a "lease-strip," named after an earlier generation of tax shelters that focused on leasing transactions.  At the core of a lease-strip shelter transaction is the separation of taxable income from tax deductions.  Taxable income is "stripped" away from a transaction and is allocated to a non-U.S. taxpayer (such as a foreign company that does not pay U.S. income taxes).  Once the taxable income is stripped away, the taxpayer is left with tax benefits, such as deductions, which may be used to reduce or eliminate the income tax that would otherwise be paid by that taxpayer on its other operations or other income.

United States' Proposed Findings/Conclusions - 1

### A.    *Chemtech I*

5.      SLIPs was a marketed tax shelter.  It was promoted by Goldman Sachs to large corporations such as Dow, Merck, Dun and Bradstreet, and International Paper.  At least one other investment bank marketed a similar lease strip transaction.  The first step in a SLIPs lease-strip was for the taxpayer and Goldman Sachs to identify a valuable group of assets that had zero or a very small tax basis.  The head of Goldman Sachs' Capital Market Group in New York, who developed SLIPs, described that **"the Holy Grail" of SLIPs was to "find equity that was tax deductible."**

6.      Dow ultimately decided to use intellectual property as its SLIPs asset, and it selected 73 patents.  Dow had created these patents, and, because Dow had already deducted the expenses incurred in their creation, they essentially had a zero tax basis.  Yet those 73 patents were worth approximately $800 million.

7.      Once Dow identified the low-basis assets to use in the SLIPs transaction, a complicated partnership arrangement was set into place that turned these zero-basis assets into a tax deduction.  Dow contributed the patents to the Chemtech partnership, located in Switzerland, and it leased them back.  Throughout the existence of the Chemtech I transaction, Dow continued to use the patents in the ordinary course of its business operations with no disruption to its business.

8.      Five foreign banks that did not pay U.S. income taxes joined Chemtech.  Those banks contributed a total of $200 million to the partnership and they became, or at least were labeled as, Dow's limited "partners" in Chemtech.

9.      During the operation of Chemtech I, which lasted for about five years, cash generally moved in a circle.  Dow paid "royalties" to Chemtech for the use of the patents. Chemtech contributed this royalty "income" to its subsidiary known as Chemtech Portfolio. And, to complete the circle, Chemtech Portfolio "loaned" that money back to a subsidiary of Dow.  Chemtech, of course, did pay a portion of that money to the foreign banks, but it was the equivalent of a 6.947 percent interest payment on a $200 million loan.

10.     Dow, on its U.S. income tax returns, deducted the roughly $650 million in "royalty" expenses that it had allegedly incurred.  But on its income tax returns, Dow did not report as income the funds that were returned to it by Chemtech in the form of loans.

11.     What happened to Chemtech's taxable income from its royalty income?  The great majority of it was "allocated" to the foreign banks.  But since the foreign banks were not U.S. taxpayers, they paid no income tax on that allocation.  Even though that income was *allocated* to the foreign banks for tax purposes, the foreign banks never actually *received* that money.  The foreign banks received a much smaller payment of cash, *i.e.*, a payment that was the equivalent of an interest payment.  In simple terms, Dow, with the assistance of Goldman Sachs, and through the use of a complicated partnership arrangement, manufactured artificial royalty expense deductions out of thin air.

**B.    *Chemtech II***

12.     The SLIPs tax shelter transaction (*Chemtech I*) was shut down in 1998, two years early due to a change in the tax laws, and the $200 million "investment" was returned to the foreign banks.  Then Dow's tax planners and attorneys implemented a similar scheme to create a second round of artificial tax benefits.

United States' Proposed Findings/Conclusions - 3

13.    The circular flow of cash in Chemtech I created a second opportunity for Dow to claim a tax advantage.  Because of Chemtech's large contributions of cash to its corporate subsidiary, Chemtech Portfolio, Chemtech had a large tax basis in that corporate stock. Chemtech II was designed to exploit that.

14.    Through a carefully planned series of events, Chemtech welcomed to the partnership a new Dow subsidiary (which contributed a portion of a low-basis Louisiana chemical plant), and the original Dow subsidiary (that had contributed the low-basis patents) departed.  Upon leaving the partnership, Chemtech distributed to that Dow subsidiary all of the remaining patents and two-thirds of its stock in Chemtech Portfolio.  Chemtech also welcomed back one of the foreign banks that had participated in Chemtech I (Rabobank), which contributed $200 million to the Chemtech II partnership.  Chemtech then made what is known as a "754 election," to make adjustments to the basis of the new assets held by Chemtech.

15.    Chemtech II differed from Chemtech I in that it did not rely on the "tax exempt" status of the foreign bank.  In Chemtech II, Rabobank used a domestic, U.S., subsidiary that was subject to U.S. income taxes.  Unlike the tax "play" in Chemtech I, which focused on the "tax exempt" status of foreign banks, the tax "play" in Chemtech II was the creation of artificial depreciation deductions arising from the 754 election.

16.    After the 754 election was made, Dow claimed that the basis of the Louisiana chemical plant increased by about $360 million.  That basis could be recovered by Dow in the form of a tax benefit--depreciation deductions.  Dow best described the effect of Chemtech II in an internal memo:  "In essence, the partnership was able to strip the basis from the CPI

United States' Proposed Findings/Conclusions - 4

[Chemtech Portfolio] stock that was distributed to [the Dow subsidiary known as] DTPC and apply it to the plant assets which were contributed."

17.    As in Chemtech I, Dow leased back the asset that it "contributed" to Chemtech. Dow's operation of that asset, the Plaquemine chemical plant, did not change.  And like Chemtech I, the cash flowed in a circle:  Dow made lease payments to Chemtech.  Chemtech, in turn, contributed that money into its new subsidiary (Chemtech Portfolio II).  And to complete the circle, those funds were then "loaned" back to a Dow subsidiary.

18.    Chemtech did pay a portion of those funds to Rabobank.  Again, those payments were essentially the equivalent of servicing a $200 million loan at 6.375 percent (until 2003), and 4.207 percent, thereafter.

19.    Chemtech II created significant tax benefits for Dow.  Dow claimed deductions for the payments it made to Chemtech to lease the chemical plant that had been contributed to the partnership.  Chemtech, in turn, allocated a portion of that "income" to Rabobank, and it allocated a larger portion to Dow.  This was different than the allocations made in Chemtech I, where the overwhelming majority of "income" was allocated to the tax-exempt foreign banks. That is, even though Dow claimed deductions for renting the chemical plant, it took back into income most of that money, because that income was allocated to Dow.  But the real tax benefits in Chemtech II were in the form of depreciation deductions.  Chemtech allocated 98 percent of the roughly $350 million depreciation deductions back to Dow.  Thus, by operation of Chemtech II, Dow created artificial depreciation deductions.

**C.    The Tax Benefits Will be Disallowed and Penalties Imposed**

**1.    The Intent of Congress**

20.    The Court accepted into evidence more than 1,000 exhibits.  It heard the testimony of lay and expert witnesses, and the arguments of counsel.  For the reasons summarized here, and explained in detail in the pages that follow, the Court upholds the IRS's disallowance of the tax benefits generated by Chemtech.  Moreover, it agrees that accuracy related penalties were appropriately imposed by the IRS, and it rejects all partnership-level defenses raised by Dow and Chemtech.

21.    The resolution of this case turns, in large part, on this Court's application of judicial doctrines that have been developed by the courts for more than three-quarters of a century.  While the judicial doctrines set forth a variety of different tests, those tests frequently overlap, and if a transaction violates one of those doctrines, it likely violates others as well.  That is because, at the heart of all of the judicial doctrines, is the Court's inquiry into the intent of Congress in allowing the tax benefit.  As the Supreme Court said in the landmark *Gregory v. Helvering* case more than 75 years ago, "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended."

22.    Two basic types of tax benefits are at issue in this case that were created, as Goldman Sachs would put it, when Dow converted an asset's equity into a tax deduction.   With respect to Chemtech I, the basic tax benefit is a deduction by Dow of royalty expenses paid for the use of its own patents.  With respect to Chemtech II, the basic tax benefit created by the transaction is a deduction for the depreciation of a chemical plant asset that had already, for the most part, been depreciated down to zero.

23.     This Court has no difficulty concluding that "what was done" in Chemtech I and Chemtech II was "not the thing which the statute" and Congress intended.

24.     With respect to the patents, before the Chemtech transaction, Dow owned them and used them in its operations.  While Dow certainly incurred costs when it developed the patents, there is no dispute that Dow had already recovered those costs: the patents had almost no tax basis.  The purpose of allowing a deduction for the payment of royalties for the use of a patent is to allow a taxpayer to recover the cost of acquiring that patent.  Congress did not intend for taxpayers to claim tax benefits simply because they are able to move cash in a circle after already recovering for tax purposes the cost of that asset.

25.     Likewise, in creating an allowance for depreciation, Congress intended to allow a taxpayer to recover the cost of an income producing asset.  With respect to the chemical plant at issue in Chemtech II, Dow had mostly recovered the cost of building and equipping the plant.  But Dow's carefully planned Chemtech II transaction was designed to allow it to increase the basis of the chemical plant in a manner that was completely unrelated to the cost of, or any economic investment in, the plant.  Congress did not intend for a taxpayer to recover the cost an asset several times over merely by engaging in a scheme that exploits a literal interpretation of a single provision of the Internal Revenue Code.  As Judge Learned Hand noted in his court of appeals opinion in *Gregory*, it is appropriate to deny tax benefits when the court witnesses "[t]he violence done the literal interpretation of the words" by such a clever scheme.  *Helvering v. Gregory*, 69 F.2d 809, 811 (2d Cir. 1934).

26.     In sum, since the tax benefits claimed by Dow were not what Congress intended, it is appropriate to apply the judicial doctrines that Courts have created in tax cases to curb abusive tax-avoidance schemes.

2.    ***The Chemtech Transactions are Disregarded Under The Economic Substance Doctrine***

27.     The Fifth Circuit has a long history of looking through the form of a transaction and taxing it according to its substance.  That principle "is no schoolboy's rule; it is the cornerstone of sound taxation . . . .  'Tax law deals in economic realities, not legal abstractions.'" *Estate of Weinert v. Commissioner*, 294 F.2d 750, 755 (5th Cir. 1961) (citation omitted).

28.     The courts and Congress recognize that it is nearly impossible to draft a tax statute that clever tax professionals cannot exploit and use in a manner not intended by the statute. Therefore, even if a transaction complies with "literal" tax rules, courts properly disregard the claimed tax benefits if the transaction runs afoul of any of several judicial doctrines, such as substance over form and economic substance.  *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1352 (Fed. Cir. 2006); *see Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 545-46 (5th Cir. 2009).

29.     The economic substance doctrine has two general tests that must be satisfied before a taxpayer can claim the benefit of a tax shelter transaction.  First, the transaction must have objective "economic substance."  That is, the transaction must have a reasonable expectation to make a profit, or, if profit is not the purpose of the transaction, that transaction must provide an economic advantage, or "appreciably affect" the economic position of the

taxpayer.  Second, the transaction must have a legitimate business purpose other than tax avoidance.

30.     In this case, the Chemtech I and Chemtech II transactions fail both prongs of the economic substance doctrine.  To begin, the transactions do not appreciably affect the economic position of Dow.  In substance, the partnerships are merely devices to disguise loans made by the banks to Dow.  Dow's transfer of patents to Chemtech in the Chemtech I transaction, and its transfer of a portion of a chemical plant in the Chemtech II transaction, did not materially affect the economic position of Dow.  It controlled and used the patents and chemical plant in the same manner it had done prior to engaging the Chemtech transactions.  To be sure, Dow paid the banks more money than would have been required for a straight loan, but in substance that was just an additional fee to compensate the banks for participating in a complex transaction designed to masquerade as an operating partnership.

31.     Moreover, Dow had no legitimate business purpose for engaging in the transactions other than obtaining hundreds of millions of dollars of tax benefits.  So it also fails the "business purpose" prong of the economic substance doctrine.  Like all of the modern tax shelters of the 1990s and beyond, the transaction was designed with a facade of a business purpose.  But that is all it was:  a facade.

32.     Alternatively, even if the Court were not to disregard the entirety of the Chemtech transactions, it would be constrained to disregard the subsidiary transaction where Dow caused three demand notes to be exchanged for a 33-year term promissory note.  Dow's internal documents demonstrate that the exchange of notes was done for no purpose other than to avoid the triggering of a tax.

### 3.    The Chemtech Partnership is Disregarded for Tax Purposes; Alternatively, Banks are Not True Partners

33.    The Supreme Court recognized more than 60 years ago that federal tax laws will not recognize the validity of a partnership unless "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949); *accord Bayou Verret Land Co. v. Commissioner*, 450 F.2d 850, 863 (5th Cir. 1971).  If a taxpayer's use of the partnership form does not satisfy the *Culbertson* standard, the partnership will be disregarded for tax purposes.

34.    Courts in the Fifth Circuit have followed *Culbertson* and denied tax benefits to tax shelter partnership arrangements that are nothing more than a sham designed to create tax benefits.  *Merryman v. Commissioner*, 873 F.2d 879 (5th Cir. 1989); *Southgate Master Fund, LLC v. United States*, 651 F. Supp. 2d 596 (N.D. Tex. 2009), *appeal pending*, No. 09-11166 (5th Cir.) (argued Dec. 6, 2010).

35.    Dow and the banks that participated in the Chemtech I and Chemtech II transactions had no intent to engage in any business involving the management of patents or of the chemical plant.  It was purely a tax-motivated financing arrangement dressed up as a partnership.  It was a sham partnership, and it will be disregarded.

36.    Alternatively, even if the Court were to respect the partnership itself as a separate entity for tax purposes, it would not treat the banks as true equity partners.

37.    As a second alternative, the Court would apply the substance-over-form doctrine and conclude that the banks' "investments" in the Chemtech partnership were, in form, loans.

38.     Finally, while the Court need not reach the partnership's argument that it should

be respected as a "family partnership" under I.R.C. § 704(e) because the entire partnership has

been disregarded, taxpayer's arguments to support such a classification are without merit.

**4.      *Under the Partnership Anti-Abuse Regulations, the Chemtech Transactions Should Be Disregarded***

39.     The Treasury issued a general partnership anti-abuse regulation that became

effective in 1994, and that anti-abuse regulation provides an alternative ground for disallowing

the Chemtech I benefits generated after 1994 and all of the Chemtech II benefits.

40.     Treasury Regulation § 1.701-2(a) recognizes that the partnership provisions of the

Internal Revenue Code (often referred to as subchapter K) are intended to permit taxpayers to

enter into flexible arrangements to accommodate business needs.  But the regulation notes that

such a partnership arrangement, to be respected, must have the following requirements: (1) the

partnership must be bona fide and each partnership transaction or series of related transactions

must be entered into for a substantial business purpose; (2) the form of each partnership

transaction must be respected under substance over form principles; and (3) the tax consequences

under subchapter K to each partner must accurately reflect the partners' economic agreement and

clearly reflect the partner's income.

41.     The partnership anti-abuse regulations allow the IRS to disregard the purported

partnership in whole or in part; determine that one or more of the purported partners of the

partnership should not be treated as a partner; reallocate the partnership's tax items such as

income and deductions; or otherwise adjust the claimed tax treatment of the transaction.

42.     The facts of the present case amply provide justification for the IRS's application of the anti-abuse regulation for transactions occurring after 1994.

43.     To begin, there is no question that the partners' aggregate federal tax liability is substantially less than it would have been without the use of the Chemtech partnership arrangement.  Indeed, even though Dow has emphasized in this case a "business purpose" that is merely a cover story, it has never denied (how could it?) the enormous tax benefits that the arrangement provided.

44.     In addition, the foreign banks were protected from any significant loss (or gain) in this case.  The banks were essentially guaranteed a fixed return by Dow, which retained the benefits and burdens of the ownership of the patent assets and the chemical plant.  While Dow sought to drink artificial tax benefits from the "Holy Grail" of Goldman Sachs' SLIPs arrangement, the IRS properly exercised its authority under the partnership anti-abuse regulations to deny them.

**5.      *Under Section 731, Dow Should Be Taxed When Chemtech Liquidated the Partnership Interest of a Dow Subsidiary During the Transition Between Chemtech I and Chemtech II***

45.     During the transition from Chemtech I to Chemtech II, Dow caused Chemtech to liquidate the partnership interest of Diamond Tech, the Dow subsidiary that had contributed the patents to Chemtech.  The liquidating distribution that was made to Diamond Tech was comprised of two assets:  The patents and 67 percent of the stock in Chemtech Portfolio, which was the partnership subsidiary that was used as the conduit for cash transfers from the partnership to Dow.  If the stock in Chemtech Portfolio is considered a "marketable security," then the Section 731 tax is triggered.

46.     In May 1998, shortly before the June liquidation of Diamond Tech's partnership interest, Dow recognized that Chemtech Portfolio would be considered a "marketable security" because Chemtech Portfolio itself was substantially comprised of marketable securities, including three Dow demand notes that were readily convertible to cash. Dow believed that the answer to this problem was simple. Since it was in control of Chemtech, Chemtech Portfolio, Diamond Tech, and Dow Chemical International, all it had to do was "[e]xchange these marketable securities for a deeply subordinated 33 year note."

47.     In June 1998, that is exactly what Dow did. It exchanged the three term notes for a single note with the face value of $781.6 million that was payable on October 1, 2032.

48.     Dow's ruse of substituting one note in the place of three others just prior to Diamond Tech's liquidation fails for a number of reasons. First, the exchange should be disregarded under either the economic substance doctrine or the general partnership anti-abuse regulation. Second, given that Dow and its subsidiaries are under common control and that Dow has demonstrated that, on its own whim, it can cause the note to be converted from a demand note to a term note, an "arrangement" is plainly in place that allows the note to be readily convertible to cash. Finally, the § 731 regulation has its own anti-abuse provision, and the IRS can properly disregard the note exchange pursuant to that rule. After all, Dow is not attempting to *defer* the § 731 tax, but avoid it altogether:  its internal memoranda emphasizes that Dow "expects that it will ultimately receive [the unremitted earnings from Chemtech Portfolio] tax-free. The receipt of earnings will not occur until a future date when the subsidiary has ceased operations, converted its net assets into cash and liquidated." Under any of these arguments, Dow's abusive scheme to avoid the § 731 tax must fail.

**6.    Alternatively, if the Chemtech Partnership and the Chemtech I and Chemtech II Transactions are Respected, the IRS May Reallocate the Tax Items of Chemtech Among the Dow and Bank Partners to Properly Reflect the Economics of the Partnership**

49.    Even if the Court were to determine that the Chemtech transaction had economic substance and was a valid partnership, the tax benefits of the transaction would still be disallowed because of Chemtech's disproportionate allocation of the partnership profits to the non-U.S.-tax paying foreign banks.  That allocation is wholly improper, and the IRS properly adjusted it because the allocation violates section 704(b) and its underlying regulations.

50.    Under § 704(b)(2) of the Internal Revenue Code, the partnership agreement will be controlling as to the allocation of a particular partnership item *only if* the allocation has what is called "substantial economic effect."  This is a two-pronged test, and in order for an allocation to be respected, it must (a) have an economic effect, and (b) be substantial.

51.    In order for an allocation to have economic effect, the allocation must be *consistent with the underlying economic arrangement of the partners*.  That is, if there is an economic benefit or economic burden that flows from an allocation, the partner to whom the allocation is made must receive that economic benefit or bear that economic burden.  The Chemtech partnership allocations fail to have economic effect because the foreign banks did not bear *any* economic burden from the allocation of high amounts of the taxable income.

52.    And in order for the economic effect of an allocation to be substantial, "it must affect the partners' dollar distributions from the partnership and may not benefit the after-tax results of some partner(s) unless it also hurts the after-tax results of another partner.  If some partner gains from the allocation, the government may not be the only loser."  Willis, PARTNERSHIP TAXATION ¶ 10.04[4][a]; *see* Treas. Reg. § 1.704-1(b)(2)(iii)(a).  Despite the

United States' Proposed Findings/Conclusions - 14

foreign banks contributing only 19 percent of the capital to Chemtech and the Dow entities

contributing 81 percent, the allocations of income for tax purposes were wildly uncorrelated.

Chemtech allowed Dow to shift the tax liability to a tax-exempt bank, making the government

the "only loser" in the Chemtech scheme.

7.     <em><strong>The IRS Has Appropriately Imposed Penalties on The Abusive Chemtech Transactions</strong></em>

53.     The Chemtech transactions are highly abusive and created hundreds of millions of

improper tax benefits.  The imposition of penalties is appropriate.

54.     First, the negligence penalty is appropriate if the taxpayer fails to make a

reasonable attempt to comply with the tax laws.  The oft quoted standard for negligence is that

penalties are appropriate when a scheme appears "too good to be true."  The "Holy Grail" of

Chemtech was to "find equity that was tax deductible."  Not surprisingly, Congress has not

enacted a "Holy Grail" statute that accomplishes such a feat.

55.     The evidence amply demonstrates that all parties involved in the development of

SLIPs were aware that, in order for it to work, SLIPs had to be supported by a valid business

purpose.  The Court is unpersuaded that Dow's claimed business purpose is valid.  Dow's aim

was to obtain tax benefits, and the business purpose was merely a facade.

56.     Second, the understatement penalty is also appropriate.  Dow's tax position was

without substantial authority, and Chemtech is a "tax shelter" for purposes of § 6662(d).

57.     Finally, for periods beginning in 1998, Dow is also liable for the higher 40 percent

gross valuation misstatement penalty.  In the Chemtech II transaction, Dow wrongly increased

the basis of its chemical plant by far more than 400 percent.

United States' Proposed Findings/Conclusions - 15

*Proposed Findings of Fact*

**I        *The Goldman Sachs' SLIPs Tax Shelter Product***

    **A.        *Goldman Sachs' Development of SLIPs***

58.        Goldman Sachs is a global investment banking firm headquartered in New York. David Ackert, a lawyer, worked for Goldman Sachs' Capital Market Group as its head of new product development.  (Ackert Dep. at 8.)  One of the products that Ackert had "an active role" in developing was called SLIPs, an acronym standing for Special Limited Investment Partnership.  (*Id*. at 10.)

59.        Ackert began working on SLIPs around 1991.  (Ackert Dep. at 8.)  In addition to Goldman Sachs, Ackert was aware that "Babcock and Brown was involved in a similar transaction and maybe others."  (Ackert Dep. at 14.)

60.        Ackert testified that, given the length of time since the transaction had occurred, he did not recall much about SLIPs.  But he did recall the tax benefits:  **The "Holy Grail" of SLIPs was to locate "equity that was tax deductible."**  (Ackert Dep. at 19.)

61.        Alexander Globus worked for Goldman Sachs, and in the fall of 1992 he joined Ackert on the SLIPs product.  (Globus Dep. at 9.)  Globus had degrees from Harvard (in physics), Stanford (masters, electrical engineering), and the University of Virginia (MBA).  At Stanford, his field of study was a type of mathematics called "controlled theory," that had practical aspects such as "guiding a rocket into space," "stabilizing an aircraft on autopilot" and "modeling cellular metabolism."  (*Id*. at 6-7.)

62.     Globus described that, when he went to work for Ackert, he was instructed to "meet with some lawyers from Andrews and Kurth" to hear about the tax law that "was the basis for the SLIPS transaction." (Globus Dep. at 11.)

63.     When asked to describe in general the SLIPs transaction, Globus, the man who studied guiding rockets into space, stabilizing an aircraft on autopilot, and modeling cellular metabolism, testified: "It's pretty complicated so it's hard for me to narrow it down into a few words. . . . I mean, it was described to me in a meeting that went over many, many hours . . . . So it's difficult to give a short answer to something that complex." (Globus Dep. at 12.)

64.     Globus's meeting at Andrews & Kurth "started out with a discussion I believe of off-balance-sheet financing and business purpose and a broad sweep of all the elements that had to be part of the transaction to make the transaction work." (Globus Dep. at 18.)   Andrews & Kurth "stress[ed] the importance of off-balance-sheet financing as business purpose." (*Id*. at 19.)

65.     Globus learned that "[i]n order for the overall transaction to work it was explained that while tax savings were fine, that other business purposes were important for the transaction to be complete.  And since I'm not a lawyer, I got the basic gist of what that meant." (Globus Dep. at 19.)  Globus was told that the purported business purpose of off-balance-sheet financing was "something of enormous value." (*Id*. at 20.)

66.     Globus noted that the lawyers at Andrews and Kurth were concerned that Treasury was going to issue regulations that might close the tax loophole being exploited by SLIPs, and "that we needed to put this transaction together because we sort of had permission until the final rights were issued to execute this transaction." (Globus Dep. at 19.)

67.    Because of the potential issuance of regulations, Globus noted that "there would have to be a tax opinion" within the Goldman Sachs' approval process, because the Department of Treasury would be "essentially saying, 'we understand this is a defect and if you do it after we issue the final reg[ulation]s we're not going to allow it to happen.'"  (Globus Dep. at 23.)

68.    After Globus first met with Andrews and Kurth to learn about SLIPs , he went back to his office, "worked for the next 24 hours and handed [Ackert] a model."  (Globus Dep. at 20.)  And then he refined it:  "It was a very complex model, just building in the model and making the model flexible and making the model capable of incorporating all of the different secondary and tertiary structural elements of the transaction."  (*Id*. at 21.)

69.    Goldman Sachs was well aware of the importance of creating a plausible business purpose for its tax shelter transactions, and indeed, between Goldman Sachs and Babcock & Brown, a rivalry of sorts had apparently developed.  As Globus explained, "our impression from what we knew about the [Babcock & Brown and Merrill Lynch] transactions was that they were sloppy."  When asked why those transactions were "sloppy," Globus explained (Globus Dep. at 25)[1]:

Q      Why do you say that [they were sloppy]?

---

[1]Goldman Sachs' attorney objected to the form of the deposition question.  That objection was without merit.  There was nothing improper about asking the witness to explain a previous answer.  While no other objection was raised, such as the witness's lack of detailed knowledge of Babcock & Brown's SLIPs transactions, the importance of this testimony is not the truth as to whether Goldman Sachs' SLIPs transactions generated a cleaner business purpose than Babcock & Brown's SLIPs transaction, but on Goldman Sachs' awareness of the importance of a non-tax business purpose.  Indeed, the awareness of all parties about the importance of creating a non-tax business purpose is one of the factors that this Court has considered in rejecting below Dow's claim that it had a legitimate purpose for implementing SLIPs.

A        Because they did not provide adequate weight to the importance of alternate
business purpose

Q        And where did you hear about these non-Goldman transactions from?

A        Grapevine.

**B.        *Goldman Sachs' Marketing of SLIPs to the Dow Chemical Company***

70.        Goldman Sachs would have looked to market SLIPs to financially sound

companies, because the primary requirement of a SLIPs client was that it be credit-worthy.

(Finard Rep. at 9.)  Indeed, the five Goldman Sachs clients that executed the SLIPs transactions

are household names:  Dow, Merck, Marion Merrell Dow, International Paper, and Dun and

Bradstreet.

71.        Ackert did "a majority of the marketing" for the Goldman Sachs' SLIPs products.

Ackert recalls selling the SLIPs transaction to Merck, International Paper, Dun & Bradstreet,

Marion and Merrell Dow, and Dow.  (*Id.* at 17; Globus Dep. at 24.)  SLIPs was pitched to other

corporations that did not do the transaction.  (Globus Dep. at 24.)

72.        As the promoter of a tax product, Goldman Sachs, as would be expected, created

presentations to explain the SLIPs product to potential customers.  (*See* Finard Rep. at 4.)

Goldman Sachs did create three slideshow-type packages for use in presentations to Dow in

1992, first on April 28, then June 9, and finally November 12.  (Joint Stip ¶ 13; Joint Exs. 8, 10,

and 13.)

73.        Ackert had worked with Dow prior to SLIPs, and he had previously met J. Pedro

Reinhard, the Vice President and Treasurer of Dow.  (Ackert Dep. at 10.)

74.     Dow had a relationship with Goldman Sachs prior to April 1992.  On April 22, 1992, Goldman Sachs sent a letter to Dow discussing Goldman's "proprietary information involving partnerships which offer a reasonable prospect of enabling . . . an entity to realize a pre-tax profit," but that would also allow the entity to "realize capital or ordinary deductions." (Joint Ex. 7.)  But before Goldman would disclose the transaction to Dow, it required Dow to sign a confidentiality agreement, which Dow did.  (*Id*. at bates 70680)

75.     The agreement allowed Dow to show the presentation materials to its internal personnel, but it could not "disclose the Product Information to any outside legal, tax or accounting advisors without our express written permission."  (*Id*. at bates 70679.)

76.     Goldman Sachs first presented the SLIPs transaction to Dow on April 28, 1992. (Joint Ex. 8.)  A few matters were immediately apparent from the presentation.  First, was the foreign nature of the program.  The general partner of the partnership was to be a foreign subsidiary of Dow that had "no U.S. office" and "no other U.S. activities."  (*Id*. at bates 11260.) The "Class A" investor in the partnership would be a Swiss entity.  (*Id*.)  (Indeed, the Swiss bank UBS played a role in Dow's SLIPs transaction, but ended up withdrawing as a prospective partner when it received advice that its participation may trigger unfavorable Swiss tax consequences (*see* Joint Exs. 75, 114.).)

77.     In addition, while Goldman Sachs appears to have kept mention of tax benefits to a minimum, since they knew that was not an acceptable business purpose if the transaction were to be respected, the presentation did emphasize that, if there were any adverse U.S. tax consequences for the foreign investor, Dow would be required to indemnify the foreign investor "for all U.S. taxes."  (Joint Ex. 8 at bates 11263.)

78.    On May 6, 1992, Goldman Sachs sent a letter to Pedro Reinhard, Dow's treasurer who was located in Midland, Michigan.  (Joint Stip. ¶ 14; Joint Ex. 9.)  Goldman Sachs outlined the fees that Dow could expect to pay for participating in SLIPs.  In its estimate, Goldman Sachs referred to two different sums, the first was the value of the partnership, and the second was the purported "investment" by a foreign bank. Those fees included:

- *Structuring fee*.  "Dow shall pay Goldman Sachs a structuring fee of 1% ($2.5 million) based on the fair market value of the partnership."  (Joint Ex. 9.)

| FMV of partnership | percentage fee | dollar fee |
|---|---|---|
| First $375 million | 1 % | $3,750,000 |
| From $375 to $500 million | 0.875% | $1,093,750 |
| Over $500 million | 0.750% | |

- *Preferred Equity Placement Fee*.  "Dow shall pay Goldman Sachs a placement fee of 5% ($2.5 million) on the Preferred Equity Investment" (*Id*.; note that Goldman Sachs was projecting a bank to participate in the amount of $50 million, but Dow's SLIPs transaction ultimately involved a total of $200 million by five different foreign banks.)

- *Documentation*.  Goldman Sachs "recommend[ed] that Dow use Andrews & Kurth, the principal firm that has worked with Goldman Sachs on the SLIPSs structure." (*Id*. at bates 11226).  Goldman predicted that the "documentation expenses" would be in the range of $250,000 "with an additional amount for the appropriate legal and tax opinions." (*Id*.)

- *Accounting and Appraisal Fees*.  To be handled by Dow.

79.    On June 9, 1992, Goldman Sachs made a second presentation of the Chemtech transaction.  (Joint Ex. 10.)  At that time, Goldman Sachs and Dow had not yet decided on what type of asset to contribute to the partnership.  Goldman Sachs' diagrams referred to the idea of Dow contributing equipment to the partnership: "Dow Parent forms Dow U.S. Subsidiary by contributing the Equipment in exchange for all of Dow U.S. Subsidiary's stock.  (The Equipment

will not be encumbered by any debt.)." (*Id*. at bates 11268.)  The examples at the end of the

presentation refer to three types of assets:  Aircraft, patents, and plant equipment.  (*Id*. at bates

11293, 11297, 11301.)

80.    Unlike the April presentation, Goldman Sachs' June 9 presentation described the

tax provision that was at the source of its tax product.  (Joint Ex. 10 at bates 11282-87.)  The

presentation also again included a description of the foreign nature of SLIPs, and added:  "The

partnership will not maintain a U.S. office, and will not engage in any trade or business activities

in the U.S."  (*Id*. at bates 11290.)

81.    At the June 9 meeting, Dow apparently expressed its interest in using patents in

the SLIPs transaction.  On June 22, 1992, Goldman provided a "term sheet" that had been used

by another Goldman client that had used "software and databases" in the SLIPs transaction.

(Joint Stip. ¶ 15; Joint Ex. 11.)  Ackert followed up with a July 8, 1992, letter enclosing a

memorandum prepared by the law firm of Wilson, Sonsini, Goodrich & Rosati about the

propriety of fixed rate royalties.  (Joint Ex. 12.)  Dow has been unable to locate this legal

memorandum.  (Joint Stip. ¶ 16.)

82.    On November 12, 1992, Goldman Sachs made a third presentation of SLIPs to

Dow.  (Joint Ex. 13.)  This presentation focused on patents, and unlike the previous

presentations, also focused on the documents that would be required to close the transaction.

(*Id*.)

83.    In December 1992, Dow obtained an opinion from Andrews and Kurth, the law

firm that worked with Goldman Sachs to design the SLIPs program, and the attorneys that had

first described the transaction, and the importance of emphasizing a business purpose, to

United States' Proposed Findings/Conclusions - 22

Alexander Globus.  The opinion letter addresses whether the partnership to be formed in the SLIPs transaction would be disregarded as a sham, whether the transaction itself would be disregarded as a sham under the various tax judicial doctrines that have been employed against abusive tax transactions, and whether the banks investment would be considered debt, and not equity.  (Joint Ex. 14.)  Whether Dow actually had an attorney-client relationship with Andrews & Kurth seems doubtful.  Dow paid $12.6 million to establish SLIPs, but Andrews & Kurth's fees were not among them.  (Joint Stip. ¶ 50.)

  84. On each issue, not surprisingly, the attorneys who helped design SLIPs opined that the partnership and the transactions should be respected, and that the interest of the banks would be more like equity than debt.  Dow in this case does not rely on the opinion of Andrews & Kurth.  The Court, in reaching its decision, would ordinarily give no deference to a legal opinion.  After all, deciding legal questions is the province of the courts.  But that is especially true in this situation, where the lawyers opining on the transaction were related to the promoter of this particular tax shelter.  *See, e.g.*, *Am. Boat Co., LLC v. United States,* 583 F.3d 471, 481 (7th Cir. 2009) (professional advice may not be objectively reasonable where the taxpayers knew or reasonably should have known that the professional had a conflict of interest); *Neonatology Associates, P.A. v. Comm'r,* 299 F.3d 221, 234 (3d Cir. 2002) ("[T]he reliance itself must be objectively reasonable in the sense that ... the professional himself does not suffer from a conflict of interest or lack of expertise that the taxpayer knew of or should have known about."); *Chamberlain v. Comm'r,* 66 F.3d 729, 732 (5th Cir. 1995) ("The reliance must be objectively reasonable; taxpayers may not rely on someone with an inherent conflict of interest, or someone with no knowledge concerning that matter upon which the advice is given." (footnotes omitted));

*Pasternak v. Comm'r*, 990 F. 2d at 903 ("[T]he purported experts were either the promoters themselves or agents of the promoters. Advice of such persons can hardly be described as that of 'independent professionals.' "); *Illes v. Commissioner*, 982 F.2d 163, 166 (6th Cir. 1992) (reasonable reliance precluded where accountant was "not a disinterested source" because he was a tax-shelter promoter.).

85.    Even though the promoter opinion is unimportant in terms of its conclusions, it is extremely revealing as to the mindset of Dow, indeed of all of the parties, as to its motives. In the summer and fall of 1992, and the winter of 1993, Dow was not focused on increasing its credit rating through the use of off-balance sheet financing. The documentation in this case focuses almost exclusively on the tax aspects.

86.    The Andrews and Kurth letter shows that several months before Dow executed the SLIPs transaction, Dow's concerns were in having the transaction and the partnership respected for tax purposes. Moreoever, on the copy of the opinion letter that Dow produced to the United States, and that has been admitted into evidence, Dow has made redactions, apparently of handwritten notes made by its in-house lawyers, under a claim of attorney-client privilege and/or work product. By redacting such material, it is impossible to ascertain whether Dow reasonably believed that the conclusions set forth in the opinion were accurate.

87.    Alexander Globus from Goldman Sachs ran "bazillions" of models during the development of Dow's SLIPs transaction. (Globus Dep. at 48.) The Globus model did not attempt to quantify any benefit to Dow of off-balance sheet financing.

88.    Tax savings were prominently displayed in Globus's SLIPs models, including those designed for Dow. For example, the eighteenth "run" of the Dow SLIPs model, made

around February 22, 1993, shows a heading on one page called "Sponsor Economics." (Joint Ex. 19 at bates 70472). Dow is the "Sponsor" of its SLIPs transaction. The SLIPs transaction was expected to last for seven years, and Globus's model showed that the net present value of seven years of tax benefits projected by Goldman Sachs was $128.04 million (Globus Dep. at 43-44):

> Q    So is that tax savings or do you know what that refers to?
>
> A    That would refer to tax savings.
>
> Q    And that's to Dow, correct?
>
> A    Yes.

89.    Indeed, not only did Goldman Sachs project the present value of Dow's tax savings, but, it projected benefits to Dow in terms of each share of stock that Dow had outstanding (Globus Dep. at 44):

> Q    And then at the bottom it has shares outstanding 273 million.
>
> A    Yes.
>
> Q    Do you know what shares those are referring to?
>
> A    I would assume the only thing would be relevant here would [be] the number of shares of Dow stock outstanding and whether this would contribute to their EPS.
>
> Q    And EPS is earnings per share?
>
> A    Correct.

90.    One of the Government's experts, Dr. Hubbard, has explained that Goldman Sachs' models nonetheless contain errors. (Hubbard Rebuttal Rep. at 46-47.)

91.    In the spring 1993, Goldman Sachs and Dow were also feeling "significant time pressure" to close their deal before Congress acted to shut down the tax loophole that Andrews

and Kurth had described to Globus several months earlier. (Joint Ex. 22.) "[B]oth Andrews & Kurth and King & Spalding believe there could be Congressional committee mark-ups affecting our transaction as early as mid-May." (*Id.*)

92.     Goldman Sachs had met with Dow in February and March. (Joint Ex. 22.) Goldman had already begun the process of locating European banks that might be interested in participating in Dow's SLIPs transaction. (*Id.*) At one meeting on a Thursday in March 1993, Dow proposed to Goldman Sachs some modifications in the SLIPs program that would have increased the risks placed on the foreign banks that would participate in SLIPs. This drew a spirited response from Goldman Sachs.

93.     Dow had begun to express some concern about the risks it was taking in making substantial guarantees to the foreign banks. (Joint Ex. 22.) In a memorandum dated March 12, Goldman Sachs advised Dow that "core modifications" suggested by Dow were unacceptable.

94.     In response to Dow's suggested "core modifications," Goldman Sachs bluntly reminded Dow that it was Dow that was receiving the tax benefits of SLIPs: "*[T]he financial institutions have been adamant that because they do not share in the tax benefits of the structure they will not accept any structural tax risk. This is not a pricing issue. No financing premium will justify the potential tax exposure.*" (*Id.*, emphasis added.)

95.     Moreover, Goldman Sachs also reminded Dow that SLIPs was a marketed tax transaction, and the foreign banks would not accept less favorable terms from Dow than they were getting from other U.S. taxpayers engaging in SLIPs: "This is further complicated because we have already approached this same limited investor base with a SLIPs transaction where the proposed changes are not present." (Joint Ex. 22.)

96.    Goldman Sachs cautioned Dow that it could not diminish the guarantees given to the foreign banks, because "[t]hey are investing in Dow/MMD, not a third party."  (Joint Ex. 22.) Nor would Goldman Sachs allow Dow to make the transaction even more complex: "the transaction already requires investors to accept an 'equity' instrument in an unfamiliar structure. We are already approaching the structural limits of the marketplace and we have significant doubts that the additional complexity raised by the proposed changes can be competently evaluated by investors."  (*Id*.)

97.    On March 15, 1993, Goldman Sachs sent another memorandum to Dow, King & Spalding, and Andrews & Kurth again discussing that Thursday meeting it had had with Dow. One of the points of focus was the 1 percent loss that might be passed on to the foreign bank. (Joint Ex. 23.)  Goldman Sachs noted that the foreign banks "will require significant protections vis-a-vis the 1% of losses allocated to its capital account."  Goldman Sachs noted two possible protections for the foreign banks.  Either a "stop loss" provision could be placed into the agreements to limit the amount of the foreign banks' potential loss, or provisions should allow the foreign banks to look to the partnership subsidiary (Chemtech Portfolio) "as effectively Dow/MMD credit quality."  (*Id.*)  The "stop loss" option was not followed, and two days later, Goldman Sachs circulated a description of the type of assets that must be held by the partnership subsidiary.  (Joint Stip. ¶ 18; Joint Ex. 24.)

98.    Goldman Sachs' March 15 memorandum again emphasized that Dow must provide "tax indemnity" to the foreign banks to protect them "fully from both Dow/MMD actions and structural flaws in the partnership arrangements.  We agree that in the event Dow/MMD opts to take out FORCO's interest upon a change in tax law, FORCO would be

entitled only to breakage costs and not to any 'make-whole' or other redemption premiums."

(Joint Ex. 23, emphasis original.)

99.     Dow's Board of Directors approved Dow's entry into SLIPs - Chemtech on April

8, 1993.  (Joint Stip. ¶ 23.)

## II      *The Preliminary Stages of the SLIPs/Chemtech Tax Shelter*

### A.     *Dow's Selection of Patents to Contribute to the SLIPs/Chemtech Partnership*

100.    In 1993 Dow had approximately 5,900 domestic patents and 17,700 foreign

patents.  (Stern Rep. at 8.)  In the chemical industry, many patents are held by organizations that

manufacture products for sale or for internal use.  (*Id*. at 8-9.)  Companies that hold patents may

manufacture their own goods, or license those patents to others who will manufacture the

products.  (*Id.* at 9.)  Some companies will do both, but then they usually maintain total control

over the patent portfolio in order to maximize its profitability.  (*Id*. at 9.)

101.    In the 1990s it was rare for a company to form a separate entity that would own a

part of its patent portfolio, but this has become more common in recent years.  (Stern Rep. at 10.)

102.    Dow selected 73 patents to contribute to Chemtech.  It began to identify patents in

early 1993, and the earliest list of patents we have been able to locate is from a list dated

March 25, 1993, which includes 100 patents (less than 2 percent of the total U.S. patents) in three

different Dow product areas.  (Stern Rep. at 11-12.)  At one point Dow added another category of

patents to the list, "defensive patents" that Dow did not practice but which increased the value of

those that Dow did use.  (*Id.* at 11.)  Dow noted, however, "that due to their small contribution to

the overall value of the transaction some Patent Portfolios may be eliminated to reduce appraisal

workload."  (*Id.* at 11) (internal citation omitted).

103.    It does not appear that Dow, when it selected the 73 patents, attempted to identify patents that would be most attractive to third parties.  Instead, these appear to be the criteria used (Stern Rep. at 12-13):

- •    Patent must relate to an active U.S manufacturing business

- •    Patent may be in use in one of the businesses

- •    If patent not in use, must be a defensive patent that adds value to those in use

- •    Patents with highest value seemed to be favored in order to reduce the total number

104.    In fact, if licensing to a third party seemed likely, those patents were eliminated from consideration.  As William Norris testified (Norris Dep. at 20):

Q    Do you know what other criteria there were for the selection of patents?

A    I don't know of any others.  I'm aware of some patents, one area that was excluded because it was considered by management and research to be premature for anything of this nature where the flexibility and freedom to deal with the patent and the properties, development, exploitation of the technology would be impacted - - was - - there was one major area like that.

105.    Seventy-one of the 73 patents had a zero tax basis.  (Joint Ex. 281.)  That is, part of Dow's operations include the employment of scientists, and Dow has generally developed its own patents, and already deducted most of the costs of developing those patents simply through claiming ordinary and necessary business expense deductions on its books and records.  Two of the patents (patent portfolio 18.9A and 18.11A) had a small basis, totaling about $54,000.  (Joint Stip. ¶ 25(o); Joint Ex. 281.)

106.    Dow valued the patents at $867 million following a particular methodology used by the professional appraising firm of Arthur D. Little & Co.  (Joint Stip. ¶ 25(l).)

107.    The appraisal assumed that the patents were valid and enforceable.  But that was a risk that would concern an "investor" in the SLIPs transaction.  Had the appraisal taken that risk into account, the $867 million figure would have been discounted to reflect that risk.  On August 4, Dow (through Diamond Tech) agreed that it would indemnify the partnership and its partners against any loss, damage, cost, or expense as a result of any patent being determined to be invalid or unenforceable.  (Joint Ex. 2K at bates 36467-69.)

###    B.    *The Marketing of SLIPs/Chemtech to the Foreign Banks*

108.    The foreign banks approached by Goldman Sachs about the Chemtech transaction would have analyzed it as a "structured financial transaction."  (Finard Rep. at 13.)  As Finard explained, a structured financial transaction is broadly defined as a "non-traditional transaction used in financing."  (*Id*.)  For a bank, the identifying feature of a structured financial transaction "is that it is heavily structured and/or has complex features that will require additional scrutiny because the transaction may represent risks not immediately apparent."  (*Id.* at 14.)

109.    Finard noted that structured transactions may have certain characteristics that highlight their elevated risks, such as (1) that they lack economic substance or a business purpose, (2) that they are designed for questionable accounting, regulatory, or tax objectives, or (3) that clients may disclose the transactions in a way that is misleading or inconsistent with the substance of the transaction.  (Finard Rep. at 14-15.)

110.    These increased risks frequently result in a higher level of management scrutiny or a more robust approval process.  (Finard Rep. at 15.)  But it is imperative that any bank considering entering into a structured transaction properly analyze its risks.  (*Id.* at 16.)

111.    Once the risks are understood, the bank considering a structured financial transaction will analyze the projected return of the project.  Higher returns are required to compensate for the increased risk of a structure finance transaction.  (Finard Rep. at 17.)

112.    On March 31, 1993, Sandi Hallmark of King & Spalding sent to Roberto DeMattia of DESA, Erick Blackhurst of Dow, and David Ackert of Goldman Sachs, a document titled "Transaction Overview and Summary of Partnership Terms and Conditions" to be shared with potential investors in Chemtech.  (Joint Ex. 32.)  It was standard industry practice to create this type of document to summarize the negotiated details of a transaction.  (Finard Rep. at 9-10.)

113.    In May 1993 Goldman Sachs presented the SLIPs transaction to foreign banks. (Joint Ex. 68.)  Although Ackert developed the Goldman Sachs' product and marketed it to U.S. taxpayers, he did not present SLIPs to the foreign banks.  He believes that the foreign bank presentations would have been conducted by Rich Katz or Steve Hickey.  (Ackert Dep. at 52.)

114.    The Goldman Sachs marketing materials to the foreign banks provided an overview of SLIPs.  In its overview, Goldman Sachs noted that "SLIPs provide a premium return with a credit enhancement" (Joint Ex. 68 at bates 1287 (heading slightly modified, in original simply says "overview")):

| Goldman Sachs' SLIPs Overview |
| --- |
| **The Investment**: |
| SLIPs are medium-term financial instruments that provide foreign investors the opportunity to receive a premium over the corporate bond yield of the U.S. Issuer. |

| **The Structure:** |
| --- |
| The Investor will hold a SLIP that entitles the Investor to a preferred return on a partnership that has as its major asset property subject to a triple net ("hell or high water") lease with a major U.S. Sponsor.  A foreign affiliate and a U.S. subsidiary of the U.S. corporation will be the other partners of the partnership. |

| **The Background:** |
| --- |
| The U.S. tax-exempt status of the foreign Investor and its participation in the partnership allow the U.S. Sponsor to achieve nondilutive minority interest financing and to obtain incremental tax benefits. |

115.     Goldman Sachs emphasized two primary points to the foreign banks.  First, that they would receive a "significant premium" over a corporate bond: (Joint Ex. 68 at bates 1289 (shading and spacing slightly modified)):

| **Return:** |
| --- |
| The return is preferred to all other claims on the partnership and provides a significant premium over the corporate bond yield of the U.S. Sponsor. |

116.     Second, Goldman Sachs emphasized the great protections that would be provided to the foreign banks, and noted that the credit risk has some similarity to the risk of investing in a corporate bond, except that the SLIPs credit risk is even safer.  The presentation noted that "SLIPs are over-collateralized by as much as 5 to 1" (Joint Ex. 68 at bates 1300), and provided

an example that "$20 capitalization by the investor is supported by the $80 capitalization by the Sponsor and Foreign Affiliate" (*Id*. at bates 1299) (Joint Ex. 68 at bates 1289 (shading and spacing slightly modified)):

| **Over-collateralization:** |
| --- |
| The Investor's investment is several times over-collateralized by the junior equity contributions of the other partners. |

| **Indemnification**: |
| --- |
| The U.S. Sponsor will give the Investor direct indemnification against general U.S. corporate, tax and withholding attributable to the SLIPs structure. |

| **Credit Exposure**: |
| --- |
| Although a SLIP is more secure than a corporate bond, the Investor has credit exposure to the U.S. Sponsor for performance under the lease, but the exposure is significantly over-collateralized by the underlying property. |

117.    Finally, Goldman Sachs highlighted the tax consequences of SLIPs.  In addition to noting up front that the U.S. taxpayer would receive "incremental tax benefits," it emphasized that the foreign banks would escape any U.S. tax: (Joint Ex. 68 at bates 1306 (shading and spacing slightly modified)):

| **U.S. Tax Consequences to the Investor:** |
|---|
| The activities of the Partnership will not constitute a United States trade or business and will not give rise to a permanent establishment in the United States. Accordingly all payments to the Investor attributable to Partnership's rental activities and all payments (including the termination payment) to the investor will be free of both U.S. income and withholding tax. |
| The Foreign Affiliate and the U.S. Sponsor will indemnify the Investor against U.S. taxes, including withholding taxes arising from the activities of the Partnership and the Investor through the end of the lease term and in respect of all payments that are not attributable to the Investor. The U.S. Sponsor will guarantee the indemnities and provide a similar indemnity that the Investor may enforce directly against the U.S. Sponsor. |
| The Investor should seek the advice of its own independent tax and accounting advisors before contemplating any investment. |

118.    Goldman Sachs and King & Spalding provided a "transaction summary" to the foreign banks, and, in footnote 2, they briefly describe how the tax benefits are generated. (Joint Ex. 32 at bates 20208.) The transaction summary noted that "[t]he Partnership's 'Profits' and 'Losses' may not be the same as its taxable income or loss." (*Id*.) Goldman Sachs explained that "[t]he principal difference is that, in determining taxable income or loss, depreciation is determined with reference to the Partnership's tax bases in its assets, whereas, in determining 'Profits' and 'Losses,' depreciation is determined with reference to the fair market value of the Partnership's assets at the date of contribution." (*Id*.)

119.    Once Dow implemented SLIPs, this difference between partnership profits and taxable income became apparent. The partnership agreement required Chemtech to keep its

books and records following U.S. GAAP (generally accepted accounting principles), but the

partnership allocations were based on Swiss GAAP.  Under U.S. GAAP, the partnership

accounted for patent amortization using the $50,000 basis, but under Swiss GAAP, the

partnership amortized the patents using the $800 million value determined by Arthur D. Little.

(Compare, *e.g.*, Joint Ex. 325 at bates 44925 (1995 Swiss GAAP financial statement showing

amortization expenses of $107 million, with Joint Ex. 343 at bates 9989 (Chemtech partnership

return claiming amortization deduction of only $4,449).).

    120.    Geoffrey Merszei, Dow's treasurer, acknowledged that the Dow's sales materials

referred to a "corporate bond," and that the SLIPs program implemented by Dow did indeed

provide greater security to a lender than would a corporate bond.  He testified as follows

(Merszei Dep. at 28-30):

Q    How would this special limited investment partnership have greater security than
a loan, which you've described a corporate bond as being?

A    Well, the higher security here is, I believe, referenced to the fact that the portfolio-
-the portfolio of the numerous patents and the value of that far exceeded the
underlying funds that were being distributed * * * * and so the security was closer
to the investor versus investing in a bond for The Dow Chemical Company.

    * * *

In the case of this transaction, the likelihood for this transaction to represent a
default would be perhaps less because you have a multiple, the total value of the
portfolio of the patents as a multiple of the amount of proceeds here.

Q    When you say amount of proceeds, you mean the amount that the banks –

A    Were investing. ...  Yes.  So the underlying value is much higher.

Q    So the patent portfolio – which is direct security in effect, is that what you're
saying, closer security?

A      Yes.

Q      Is a multiple of what the banks would be investing.

A      That's correct.

121.    On May 24, 1993, Pedro Reinhard led an "interesting presentation" to Hans Wolbert and Dr. Andres Leimbach of Dresdner bank.  In a letter dated June 14, 1993, Dresdner thanked Geoffrey Merszei "for the invitation to participate" in the Chemtech transaction and advised that Dresdner would "participate with an amount of US $50,000,000 (US Dollar Fifty Million)."  Dresdner further advised that "*it is envisioned that the funds will be contributed to the Limited Partnership partially as a (small) equity portion and as a (large) shareholder loan.*"  (Joint Ex. 89) (emphasis added).

122.    In addition to paying a higher yield to the foreign banks than would be paid on a corporate bond, and to providing them with greater security than a corporate bond, Dow also agreed to pay all of the out-of-pocket costs of the foreign banks that would participate.  Dow's Geoffrey Merszei admits that such reimbursements are typical when the benefits of a transaction flow in one general direction, and that, in the SLIPs transaction, those benefits flowed to Dow, so they paid the fees:  "Yeah, I mean, it depends on who the initiator of the project is, but at the end of the day, if the benefit flows to us, then we would – we would have to cover that.  And many of these type of costs are negotiated, of course, but the answer is yes."  (Merszei Dep. at 36.)

123.    Five foreign banks agreed to participate in Chemtech/SLIPs by contributing a total of $200 million (Joint Stip. ¶ 39, 48):

| Foreign Bank | Country of Origin | Total Amount |
|---|---|---|
| Bank Brussels Lambert (BBL) | Belgium | $25 million |
| Dresdner Bank AG | Germany | $50 million |
| Kredietbank, N.V. | Belgium | $50 million |
| National Westminster Bank Plc (Natwest) | United Kingdom | $35 million |
| Rabo Merchant Bank N.V. | The Netherlands | $40 million |

### III        *Dow Paid $12.6 Million for the SLIPs/Chemtech Tax Shelter*

124.    Dow incurred the following formation costs (Stip. Facts at ¶ 50):

| Formation Costs | | |
|---|---|---|
| Professional advisors | | |
|    Goldman Sachs | $  5,346,978 | |
|    King & Spaulding | $  1,558,696 | |
|    Arthur D. Little Co. | $     536,653 | |
|    Conyer, Dill & Pearman | $       67,248 | |
|    Price Waterhouse | $       81,873 | |
|    Howard Darby & Levin | $     261,105 | |
|    Deloitte & Touche | $       30,494 | |
|    Berlitz | $       37,564 | |
|    Potter Anderson | $       32,932 | |
|    Union Bank of Switzerland | $     722,462 | |
|    Lawyer Fees for Banks | $     263,038 | |
|    Travel Meals & Other | $     331,666 | |
|    Total | $  9,270,709 | |
| Foreign Banks | | |
|    Kredietbank N.V. | $     679,763 | |
|    National Westminster Bank PLC | $     692,000 | |
|    Rabo Merchant Bank N.V. | $     738,500 | |
|    Dresdner Bank AG | $     902,761 | |
|    Bank Brussels Lambert | $     365,938 | |
|    Total | $  3,378,962 | |
| Total Formation Costs | | $       12,649,671 |

125.    The formation costs did not include expenses that were to be later incurred, during the operation of Chemtech and its retirement of the foreign banks.  For example, Chemtech paid to Dow Europe an annual fee of $760,000 to operate the Chemtech partnership.  (Fin. Stip. Ex. D, D-2).

**IV    *The Formation and Implementation of Chemtech/SLIPs***

126.    Immediately prior to the Chemtech I transaction, these were the basic Dow entities that would participate (Joint Stip. ¶¶ 1-8):



127.    On April 30, 1993, Dow formed the Chemtech partnership.  At this point, it was entirely owned by Dow.



128.    Also on April 30, 1993, Dow agreed to lease back the patents, using the so-called "triple net leases" or "hell or high water" leases of the patents that had been described by Goldman Sachs.  (Joint Stip. ¶ 26; Joint Ex. 1Q, CT15687-15757.)

129.     The patents therefore flowed in a circle.  Dow contributed the patents to Diamond Technology.  Diamond Tech contributed the patents to Chemtech.  And Chemtech leased the patents back to Dow.

130.     Then the foreign banks entered the picture.  Arthur D. Little conducted a second appraisal of the patents and concluded that they had a fair market value of $883 million as of August 3, 1993.  (Joint Stip. ¶ 42; Joint Ex. 129.)

131.     Thereafter, the ownership structure was as follows (Stip. Facts ¶ 49 (percentages rounded)):

| Entity | Classification | Percentage ownership |
|---|---|---|
| Dow Europe S.A. | General Partner | 1 % |
| Foreign Banks | Class A Limited Partner | 18 % |
| Diamond Technology Partnership Co. | Class B Limited Partner | 81 % |
|  |  | 100.00 % |

132.    And the structure can be diagramed as follows:



**V        Chemtech I's Circular Flow of Money Versus the Non-Circular Flow of Tax
          Consequences**

133.    The economics of the Chemtech transaction are best explained by reviewing the

flow of money.  As shown in the diagrams that follow, that money essentially flowed in a circle,

from Dow, to Chemtech, back to Dow, except that the foreign banks were paid a fee that was

equivalent to an interest payment.

134.    But the tax consequences that Goldman Sachs and Dow intended to create from

that circular flow of cash did not move in such a neat circle.  Juxtaposed against the circular flow

of cash are diagrams of the flows of the tax consequences.  The diagrams show that, while Dow

claimed royalty expense deductions for the money that flowed *to* Chemtech, it did not take into

income the bulk of the money that flowed *from* Chemtech.

135.    Indeed, that is the hallmark of the so-called "Lease Strip" tax shelter.  The income

from, and deductions related to, circular flows of cash are separated.  Tax deductions, which are

tax benefits, are given to United States' taxpayers, while "taxable income," which is a tax

detriment, is allocated to tax-exempt entities.

136.    Dow paid royalty fees to Chemtech.  Chemtech paid the foreign banks a fixed fee

that was essentially the equivalent of a 7 percent interest payment on $200 million of debt.

Chemtech took the remaining cash and contributed it to its subsidiary corporation called

Chemtech Portfolio.  And then, to close the circle, Chemtech Portfolio loaned the money back to

the Dow corporate group.

137.    Dow readily admits that cash flows are an extremely important part of analyzing

any project.  As Geoffrey Merszei noted (Merszei Dep. at 114):  "[I]t always comes down to the

cash flows, right?"  Dow routinely evaluated projects based on their cash flows, and the net present value of those cash flows.  (Merszei Dep. at 104).  In Merszei's words:  "Looking at from the day the company invests to the day it terminates and gets back its funds, what would be the value of those funds over that period of time, the life of that investment.  That is a net present value calculation based on every project that we have in Dow."  (*Id.*)

138.    Chemtech I operated between 1993 and 1998.  The foreign banks were only "partners" during 1993 and 1998 for a small part of the year.  So the cash flows for 1994, 1995, 1996, and 1997 help best illustrate the economics of Chemtech I.  (*See generally* Joint Fin. Stip. at Ex. D.)

139.    Looking to the 1994 to 1997 cash flows, money flowed into Chemtech from one primary source:  Dow.  Dow made royalty payments as required under the lease agreement.  In general, after money flowed into Chemtech, several movements of cash took place.  First, a guaranteed payment was made to Dow (Diamond Technology).  Second, a $760,000 management fee was paid to Dow (Dow Europe).  Third, a priority return was made to the foreign banks.  Fourth, relatively small tax distributions were made to the Swiss tax authorities on behalf of Dow (Dow Europe and Diamond Technology) and the foreign banks.  Fifth, excess cash was contributed by Chemtech to its subsidiary, Chemtech Portfolio.  And sixth, loans were made from Chemtech Portfolio to Dow (Dow Chemical International).  (*See* Joint Fin. Stip. at Ex. D.)

140.    In addition to the cash received from Dow in the form of royalty payments, Chemtech and its subsidiary, Chemtech Portfolio also received interest and dividend income generated by its portfolio.  For example, on December 31, 1994, Chemtech and its subsidiary had

$60.1 million of current assets, made up predominately of marketable securities. (Joint Ex 326 at bates 5570.) These were the so called "permitted assets" that CPI was required to hold pursuant to the partnership agreement. CPI paid income taxes on that income, and the excess was available to be distributed back to Dow. That is why, in the diagrams that follow, more cash flowed back to Dow during the operating years than Dow paid to Chemtech.

141.    These major 1994 cash flows can be illustrated as follows:



142.    As illustrated above, the cash begins with Dow, circulates through the Chemtech entities, and is returned to Dow. But the flow of the tax benefits and burdens of the Chemtech transaction did not match this circular cash flow. Since Dow is the major partner in Chemtech, and since the bulk of the cash flows from Chemtech to Dow, one would expect the tax flows to be similar. That is, when Dow receives cash, that would be an item of income that it would

report on its tax return.  In that situation, for tax purposes, the circular flow of funds would, for

tax purposes, be a "wash" on Dow's tax return.  It would receive a deduction for payments made

to Chemtech, and report as income payments received from Chemtech.

143.    But Dow did not engage in the Chemtech transactions because of the *economic*

benefits of any cash flow.  It was the *tax* benefits that were the *raison d'être* for the transaction,

and indeed, the entire Chemtech structure.  Dow claimed a royalty expense deduction on its

corporate income tax returns.  But as shown in the tax flow illustration below, that cash was

returned to Dow without triggering any significant income tax.  That is, while Dow claimed the

$143 million royalty payment as a deduction, when that cash was recycled to Dow, it brought

with it only about $30 million in taxable income.  In other words, in 1994, the Chemtech

transaction created an *artificial* tax deduction of about $100 million.  The great bulk of

Chemtech's taxable income was allocated to the five foreign banks, which did not pay U.S.

income tax on that allocation, as is illustrated by this diagram:



144.    This cycle repeated in 1995 :





145.    And again in 1996:




146.    And again in 1997:





**VI    Winding Up of Chemtech I**

**A.    Change in Tax Law Forces Dow to Terminate Chemtech I Two Years Early**

147.    On July 2, 1997, the Treasury issued Treasury Decision 8722, which contained temporary regulations effective for amounts paid after January 1, 1998.  (Temp. Reg. § 1.894-1(d).)  Those regulations, in effect, shut down the Chemtech I tax shelter as of the effective date. (*See* Joint Stip. ¶ 69; Joint Ex. 513.)

148.    The new temporary regulation attacked certain manipulations done by taxpayers relating to so-called "hybrid entities," defined to be "an entity that is treated as fiscally transparent in either (but not both) the United States or the jurisdiction of residence of the person that seeks to claim treaty benefits."  Chemtech was a "hybrid entity" that claimed to be a partnership under U.S. law for the purposes of the U.S. partners, but which was not treated as a partnership under foreign law for the purposes of the foreign banks.  (*See* Joint Ex. 513.) Chemtech advising foreign banks that "[u]nder the new regulations, the withholding tax applies unless Chemtech is treated as a flow through entity in the country of residence of each Partner.")

149.    In the preamble to that temporary regulation, Treasury spoke to the "inappropriate and unintended results" whereby income was exempted from tax in both countries.  That result, noted the Treasury, is contrary to the intent of the tax treaties.  "[T]he agreement by the source country to cede part of all of its taxation rights to the treaty partner is predicated on a mutual understanding that the treaty partner is asserting tax jurisdiction over the income.  Stated simply, tax treaties contemplate that income relieved from taxation in the source country will be subject to tax in the treaty country.  This principle is central to the interpretation of treaty provisions in

determining the extent to which payments received by a hybrid entity are eligible for benefits under tax treaties." T.D. 8722.

150.    On December 22, 1997, Dow Europe S.A. wrote a letter to the foreign banks advising them of the change in United States' tax law, noting that the new regulations "may cause payments by Chemtech Royalty Associates, L.P. (Chemtech) to the Class A Limited Partners to be subject to a 30% withholding tax." (Joint Ex. 513.)

### B.    Dow Buy-out of Foreign Banks

151.    On February 25, 1998, Michel Denmare and Bill Curry called Rabo, BBL, KB, NatWest, and Dresdner and advised them that Diamond "had elected to purchase their interest in the partnership." (Joint Ex. 528; *see also* Joint Ex. 529 (formal written notice).)

152.    After his phone conversation, Denmare reported that "All five banks expressed regret that the transaction was early terminated, as they all reconfirmed how attractive the yield had been to them." (Joint Ex. 528.) He noted that, in particular, Kredietbank and Dresdner "expressed strong interest to be again invited if Dow was to consider a similar transaction (and I guess offering similar rich yields...) in the future." (*Id*.)

153.     Recall that the basic Chemtech I structure during the years 1994 through 1997 was as follows:



154.     On March 27, 1998, the foreign banks ceased to be "Class A" partners, and they received an initial interim payment.  (Joint Stip. ¶ 75.)

155.    The foreign banks received payments in three different installments, and they ultimately received $210.4 million, as follows (Joint Stip ¶ 78):

| Foreign Bank | Amount of Payment |
|---|---|
| Bank Brussels Lambert SA | $26,300,076 |
| Dresdner Bank AG | $52,602,390 |
| Kredietbank NV | $52,602,760 |
| Rabo Merchant Bank NV | $42,082,050 |
| National Westminster Bank Plc | $36,822,295 |
| Total | $210,409,571 |

156.    Dow brought its subsidiary, Ifco, back to buy out the interests of the foreign

banks.  As noted above, the banks received their funds over three installments, and not all on

March 27, but that is the date that their interest in Chemtech terminated:



157.    Ifco became the sole general partner of Chemtech (Joint Stip. ¶ 80), and the structure can be depicted as follows:



C.    *Foreign Banks Dispute Value of Patents*

158.    A portion of the payment to the foreign banks was based on an $82 million mark-to-market gain on the value of the patents.  The foreign banks were allocated 1 percent of that gain, or about $820,000 to be divided between the five of them.

159.    But the banks believed that the patents mark-to-market gain was greater than $82 million.  Between March and November 1998, the foreign banks negotiated with Dow over the value of the patents and of their mark-to-market gain.  (*See* Joint Stip. ¶ 77, 79.)  The foreign banks complained about the patent valuation, but Dow was unmoved by their protest.  In general, Dow took the position not that the foreign banks were incorrect about the patents' fair market value, but that the partnership agreement required them to use a specified methodology to determine the value for the purposes of the mark-to-market gain.  (*See generally* Joint Ex. 700.)  Dow noted in a memorandum that the banks' valuation position "could potentially result in an additional distribution in excess of $1 million," and Dow declined to pay anything additional.

(Joint Ex. 678; Joint Stip. ¶ 79.)  As noted in an internal Dow memo, the foreign banks appeared to be upset because "Dow has made so much money on this deal."  (Joint Ex. 678 at bates 4064.)

160.    Dow was plainly unhappy with the foreign banks' attempt to gain another $1 million from Chemtech.  Geoffery Merszei testified that he thought the foreign banks were being "too greedy" (Merszei Dep. at 125):  "I had to call them up and tell them they should not be too greedy and – that's it."

161.    While Dow relies on the facts of the banks $820,000 mark-to-market gain as an indication that the foreign banks had a real equity interest in the partnership, the Court observes that the facts surrounding this dispute over the patent value actually demonstrate just the opposite.

162.    Had Dow and the foreign banks been engaged in a true partnership where Dow had an 80 percent equity interest, and the foreign banks had a 20 percent equity interest, and if, during the operation of that joint venture between the foreign banks and Dow, the partnership assets had increased by $82 million, Dow, as the majority partner, ought to have been thrilled with its gain.  After all, Dow would be allocated 99 percent, *i.e.*, more than $81 million of that $82 million gain.

163.    Yet Dow's belief, as incredible as it sounds, was that it was *the banks* who were being greedy by arguing that the partnership assets had increased in value by an amount that might be closer to $182 million.  (*See* Joint Ex. 678 (Dow estimated foreign banks valuation would increase their 1 percent distribution by about $1 million, meaning that mark-to-market gain would have been closer to $182 million instead of the $82 million figure determined by

Arthur D. Little).)  If that were the case, then Dow's allocation of gain from the partnership would have been about $180 million.

164.    Dow's unhappiness with the banks can only be understood if the transaction is viewed in substance as something other than a joint venture between Dow and the foreign banks where each party had a real equity stake in the 73 patents.  Plainly Dow viewed the patents as its own, and when the banks attempted to obtain what they believed to be 1 percent of the real increase in the value of the patents, Dow cried foul.

## VII    Transition to Chemtech II

### A.    Dow Plans to Continue to Use a Partnership to Obtain a Deduction on Property That Had Already Been Depreciated

165.    Once Dow realized that it would have to close down the Chemtech I transaction, it began planning for Chemtech II.  In Chemtech II, Dow contributed a portion of a chemical plant located in Plaquemine, Louisiana.  (Joint Stip. ¶ 81-82.)  During the early stages of the project, to protect the confidentiality of the transaction, Dow named the transaction Project "Gamba."  Gamba is the Spanish word for shrimp, and "apparently Louisiana is famous for its shrimp." (Escudero Dep. at 32.)

166.    Dow's internal memoranda describe that the Chemtech II "structure is an off-shoot from the Chemtech I transaction and was designed by King & Spalding."  (Joint Ex. 710.) Dow paid King & Spalding $500,000.  (*Id*.)

167.    Like Chemtech I, tax benefits were at the heart of the transaction.  An internal Dow memorandum reveals that, "using Dow's cost of capital as a discount rate," the net present value of "this tax benefit is conservatively estimated at $100mm."  (Joint Ex. 710 at bates 83153 ("Critical Issues:  Tax Treatment").)

United States' Proposed Findings/Conclusions - 58

168.    In 1997, Dow "didn't feel any constraints to raise the money that was needed" for

Chemtech II. (Escudero Dep. at 18.) But it alleged that its "concern was what was going to

happen two, three, four years down the road when, according to the expectation, the combination

of industry and economic cycles would be in a situation where pricing probably wouldn't be

available and then perhaps the cash flow generation capacity of the company from an internal

business standpoint would be suffering." (Escudero Dep. at 18:13-21.)

169.    Typically, in a "funding-related" transaction, Dow would (Escudero Dep. at 20-

21),

> do an analysis of the transaction from a pure financial point of view,
> compare it to other sources of funding that were available or being
> considered at any point in time from the point of view of the tenor of the
> transaction, the amount, the type of investors or lenders that were
> associated with it, the geographic location of where those funds were
> going to be raised vis-a-vis where the funds were going to be needed, and
> the pricing components of that transaction from an interest expense point
> of view, from a fee standpoint."
>
> And then there would always be an analysis done, not by the treasury
> group or the funding group but by our colleagues in the tax and in the legal
> department, to analyze the tax and the legal considerations of whatever
> transaction was being proposed.
>
> And then at the end of the day, well, the analysis, the final conclusion
> would be reviewed, you know, with all the elements to it, with the
> treasurer and the CFO, and the decision would be made whether it was
> something to be pursued or not.

170.    When Dow would consider a financing transaction, it would "typically" engage in

a net present value calculation: "The plain vanilla ones where all you're doing is raising some

commercial paper, which is typically a 90-day maximum transaction, then there's no point in

doing an NPV analysis, okay? I'm talking about the ones that have some kind of structure around it, around them, then, yes, we would do an NPV analysis." (Escudero Dep. at 36.)

171.    As described above, Dow's file memorandum about the "1998 Chemtech restructuring" discusses a net present value computation, but that computation was for the "tax benefit," and not any benefit relating to off-balance sheet financing. (Joint Ex. 710.)

172.    Escudero was involved in the process of determining what assets were to be used in the Chemtech II transaction. While he does not specifically remember the process, "it had to be clear that the transaction wouldn't affect the normal day-to-day operations of the company from a manufacturing/engineering standpoint." (Escudero Dep. at 25.) Another factor was that the "financings were usually trying to take, not advantage, but were based sometimes on making use of the value – the economic value that some of those assets had that sometimes was in excess, way in excess of the accounting value, the book value." (Escudero Dep. at 27.)

173.    When Dow chose to use a Louisiana chemical plant, it sent an email to its manufacturing division to notify them of the plan, and to reassure them that their operations would not be hindered. On February 19, 1998, Escudero sent an email to Geoffery Merszei, which was then to be sent to Arnold Allenmang (vice president of manufacturing) notifying him that the Louisiana plant would be contributed to a partnership "that will remain under Dow's control," and that "[o]ur intention is not to affect in any manner the operation of these plants." (Joint Ex. 523.)

174.    As Escudero explained, "The whole purpose of this note was to, since we were going to do something with three manufacturing plants of the company, what we needed was the head of the manufacturing group to, first, know about it, and, second, understand that this was

United States' Proposed Findings/Conclusions - 60

not going to affect in any way the – his ability and his people's ability to run those plants and to continue doing their business the way they had always been doing it, okay?" (Escudero Dep. at 29-30.)

175.    Or put another way, "Dow's control is, yes, we're going to contribute those assets but it's not, by contributing the assets, that somebody else is owning those assets or having a say in how to run those assets." (Escudero Dep. at 30.)  As Merszei explained, "the key concern here is access to these facilities, and that's so that – we don't just, you know, allow anyone to have access to this site, which would require going through other – other facilities on the site, so we control access." (Merszei Dep. at 130.)

## B.    The Note Exchange

176.    During the transition from Chemtech I to Chemtech II, Dow planned to retire Diamond Tech as a partner and to distribute the patents back to Dow.  Dow also planned to distribute to Diamond Tech 67 percent of the Chemtech Portfolio stock held by Chemtech.

177.    Chemtech Portfolio was comprised entirely of cash, securities, and Dow demand notes.  For example, on February 25, 1998, Chemtech Portfolio had a value of $754,598,016. (Joint Exhibit 607 at 4.)  That was comprised of $51,555,925 in securities and $703,025,851 in inter-company Dow demand notes.  (*Id*. at 8.)

178.    The King & Spalding plan was to "use" the patents and Chemtech Portfolio stock "to take out DTPC's capital." (U.S. Ex. 15.)

179.    But a problem was discovered:  Dow became aware that the assets of Chemtech Portfolio would be considered "marketable securities," and that would trigger a tax pursuant to I.R.C. § 731.  Internal Dow handwritten notes made in May 1998 reveal Dow's plan to avoid the

§ 731 tax.  (U.S. Ex. 15.)  The handwritten notes described that Dow "can't have m[ar]k[e]table

securities when we distribute out the patents."  (*Id*.)  Thus, Dow knew that this could generate a

§ 731 tax.

180.    But Dow was not dissuaded.  Even though it recognized that the Chemtech

Portfolio assets were "Currently marketable"; it believed the solution to be simple:  "Exchange

these marketable securities for a deeply subordinated 33 year note."  (U.S. Ex. 15.)

181.    No business purpose whatsoever for exchanging the Dow demand notes for a 33-

year term note was suggested.  It was purely to avoid the § 731 tax.

182.    These May 1998 notes are corroborated by an internal Dow memorandum written

a few months later.  In a section of the memo entitled "Critical issues," Dow explained that "[t]he

key to the tax treatment is a 754 election which was made when the partnership assets were

distributed."  The 754 election was the mechanism by which Dow purported to receive its $380

million artificial boost to its chemical plant basis.  As Dow explained, "In essence, the

partnership was able to strip the basis from the CPI stock that was distributed to DTPC and apply

it to the plant assets which were contributed.  This allowed for a step up in basis on the plant

assets from $27mm to over $400mm."  (Joint Ex. 607 at bates 83153.)

183.    Dow characterized the "marketable security" matter as "the most important

aspect" of its Chemtech II tax shelter:  "The most important aspect of the 754 election was that

the assets in CPI be non-marketable.  Consequently, prior to the distribution we converted the

inter-company loan which CPI was making to TDCC to a deeply subordinated 34 year note."

(Joint Ex. 607 at bates 83153.)

184.    Again, in its formal internal memo, Dow stated no business purpose for the exchange.  But, immediately preceding that discussion, it emphasized the tax benefits of Chemtech II.  Dow noted that, with the boost of $380 million in artificial basis, Chemtech "will be able to depreciate this new basis on a 5 year MACRS schedule."  Dow emphasized that the Chemtech partnership agreement "allocated the depreciation to [Chemtech's] general partner IFCO.  IFCO is part of the Dow consolidated tax retrun and therefore Dow will receive the tax benefits."  (Joint Ex. 607 at bates 83153.)

185.    On June 12, 1998, pursuant to its plan, Dow exchanged the three demand notes for a single term note with a face value of $781.6 million payable on October 1, 2032.  (Joint Stip. at ¶ 83; Joint Ex. 3U.)

186.    In an email dated August 3, 1998, Dow discussed the term of the note to be used in Chemtech II.  Dave Grzebinski asked, "Can we make it indefinite or at least 10 years?  The financing will be in place for 5 years."  (Joint Ex. 705.)  Grzebinski noted that the Chemtech II financing "will be in place for 5 years," but after Chemtech II winds down, "CP2I [Chemtech Portfolio II] *will still need to have the loan in place until Chemtech III is set up.  The loan would then be converted to the same type of note that CPI [Chemtech Portfolio I] now has in place."*  (*Id*.) (emphasis added).

187.    Put another way, within days after the note exchange was made for the Chemtech I to Chemtech II transition, Dow was planning a similar note exchange to be made years later for what it anticipated might be the Chemtech III transaction.  Plainly there could be no business purpose anticipated for such an event except to obtain tax benefits.

## VIII    The Chemtech II Transaction

188.    Before June 12, 1998, Dow Chemical Delaware Corp. was a dormant wholly

owned Dow subsidiary.  (Joint Ex. 710 at bates 83151.)  The relevant umbrella under Dow

looked like this:



189.    The Dow Board of Directors resolved on April 9, 1998, that the Plaquemine

Louisiana plant assets could be contributed to Dow Chemical Delaware Corp.  (Joint Stip. ¶ 81);

(Joint Ex. 599.)

190.    On June 12, 1998, Dow contributed to Dow Chemical Delaware a Louisiana hydrocarbon plant and assets with a fair market value of $715 million and all outstanding stock in Chemtech Portfolio II, a Michigan corporation.  (Joint Stip ¶¶ 81; 85.)  Dow Chemical Delaware, in turn, contributed this property to Chemtech II.  (Joint Stip. ¶ 82.)  Dow agreed to lease back the chemical plant.  (Joint Stip. ¶¶ 82(d), 87.)

191.    At the time of the contribution, Dow had plans to expand the Louisiana chemical plant at a cost of approximately $22 million, and it was anticipated to be completed by the end of 1999.  Dow's appraiser concluded that the value of the $715 million plant, as expanded, would be increased by $118 million.  (Joint Stip. ¶ 86.)

192.    On June 25, 1998, Diamond Tech was retired from Chemtech.  It received 70 percent of the stock of Chemtech Portfolio, and all of the remaining patents.  (Joint Stip. ¶ 88.)

193.    One significant financial risk-management tool that was present in Chemtech II was a Credit Default Swap ("CDS").  In order to mitigate any risk whatsoever with its contribution to Chemtech II, Rabobank purchased $200 million of CDS, which fully hedged Dow's credit risk.  (See Joint Ex. 845 at bates 111.)  A CDS, in essence, is "similar to credit insurance."  If a loan holder wants to hedge or insure against a default or bankruptcy of the debtor, the creditor can entered to a CDS.  (Finard Rep. at 33-34.)  Here it is plain that Rabobank wanted to hedge its risk as against Dow, that Dow was the ultimate source of repayment and the real credit risk.  (Joint Ex. 824.)

194.    On June 26, RBDC, Inc., a U.S. affiliate of Rabo, was admitted to Chemtech.  Thereafter, the Chemtech II partners' capital accounts and percentage interests as reflected were as follows (Joint Stip ¶ 103):

United States' Proposed Findings/Conclusions - 65

| Partner | Capital Account | Percentage Interest |
|---|---|---|
| Ifco | $62,336,086 | 6.37 % |
| RBDC | $200,000,000 | 20.45% |
| Dow Chemical Delaware Corp. | $715,933,286 | 73.18 % |
| Total | $981,864,810 | 100 % |

195.    This is the basic structure of Chemtech II:



IX    *The 754 Election*

196.    Chemtech II made an election under I.R.C. § 754 when it filed its 1998 partnership tax return.  (Joint Stip. ¶¶ 89; 100.)

197.    Dow's formal internal memorandum explains that, for Chemtech II, "[t]he key to the tax treatment is a 754 election."  Because of the 754 election, "[i]n essence, the partnership was able to strip the basis from the CPI [Chemtech Portfolio] stock that was distributed to DTPC [Diamond Tech] and apply it to the plant assets which were contributed."  (Joint Ex. 710.)

198.    The Chemtech Portfolio stock had a large basis because of the contributions that Chemtech had made to Chemtech Portfolio, as part of the circular flow of cash that was described above.  (*See* Joint Ex. 710 at bates 83152.)

199.    The amount of basis that was "stripped" from the Chemtech Portfolio stock and "applied" to the remaining Chemtech assets was $381 million, and $363 million of that was used to increase Chemtech's basis in the chemical plant.  (Joint Ex. 710; Joint Stip. ¶ 100.)

200.    It is the § 754 election that essentially transferred Chemtech's inside basis in CPI to the chemical plant, which in turn provided Chemtech with artificially large depreciation deductions.  Recall in Chemtech I that the circular cash flows generally went from Dow to Chemtech to Chemtech Portfolio to Dow.  When Chemtech transferred its cash to Chemtech Portfolio, its basis in Chemtech Portfolio increased.  So when Chemtech I transitioned to Chemtech II, Chemtech's basis in that portion of the Chemtech Portfolio stock was roughly $450 million. (Joint Ex. 710; Joint Stip. ¶ 100.)

**X    *Chemtech II's Circular Flow of Money And the Flow of Tax Benfits***

201.    Like Chemtech I, the cash generally flowed in a circle, except for the interest-like payment to Rabo.  (Joint Fin. Stip., Ex. D, D-2.)  Since Rabo was only a partner for a portion of the 1998 tax year, 1999 is the first full year of cash flows.  In 1999, Dow made a $69 million payment to Chemtech II to rent the chemical plant, Chemtech II paid $12,750,000 to Rabo, and a $400,000 management fee to Ifco, Chemtech II dropped excess cash into Chemtech Portfolio II, which loaned $57.4 million to DCIL (bringing the total to the Dow entities to $57.5 million).  After 1999, the rental payments increased because of a higher rent due to the plant expansion:





202.    It was the tax benefits (illustrated in the chart below) that Dow sought, and in particular, the depreciation deduction.  The chemical plant had a pre-Chemtech II basis of roughly $18 million, and Dow could have claimed a portion of that each year in depreciation deduction.  But by implementing Chemtech II, Dow claimed a $69 million rental deduction for the chemical plant, and took back into income (through DCDC and Ifco) only about $55 million of that.  But more importantly, instead of a modest depreciation deduction, Dow was allocated nearly all of the extraordinarily large depreciation deductions generated by the chemical plant, as shown in the chart below.  Rabo, on the other hand received a taxable income distribution equal to its interest-like cash payment:

203.    This cycle repeated each year, although the ultimate tax benefit decreased each year because of declining depreciation deductions.

204.    So, the cash and tax flows in 2000:





205.    And the cash and tax flows in 2001:





206.    And the cash and tax flows in 2002:





207.    On June 26, 2003, the partners negotiated and executed a new Agreement of Limited Partnership ("ALP #4").  Although the partners all remained the same, the priority returns of the Class A limited partners was reduced to 4.207%.  (Joint Ex. 4B.)  Also on June 26, 2003, the Chemtech II partners agreed to a restructuring fee of $400,000, and an administration fee of $8,633 payable to Utrecht-America Financial Services Corp.  (Joint Ex. 4G.)

208.    Additional loans were also extended by CPI-II to DCIL on the same date.  DCIL issued demand notes totaling $225 million to CPI-II with a due date of June 30, 2008.  In this way, TDCC would continue using CPI-II as a vehicle through which surplus cash could be funneled back to Dow.

209.    The cash flows and tax flows in 2003 reflect a slightly lower payment to Rabo because of a restructured agreement that effectively represented a lower interest rate:





210.    As is apparent from the diagrams, a feature of both Chemtech I and Chemtech II

for Dow is annual circular flows of cash, and, likewise apparent is the fact that the tax benefits to

Dow have no rational relationship with the economic flow of funds.  Indeed, the tax benefits for

both can be said to be "artificial" precisely because they have no economic basis.

## XI    *Debt/Equity Factors*

### A.    *Characterization of Interests*

211.    An important part of this case involves the characterization of the foreign banks'

interests in Chemtech I.  The United States argues that the banks' interests are more akin to debt,

and, in fact, that the foreign banks were not true "partners" in Chemtech.  Chemtech, on the other

hand, argues that foreign banks were true equity partners in Chemtech.

212.    While the labels that the parties placed on their interests may provide insight, they

are not binding.  Courts in tax shelter cases sometimes refer to Abe Lincoln's famous riddle:

How many legs does a dog have if you call a tail a leg?  Answer:  Four.  Because calling a tail a

leg does not make it so.  (*BB&T Corp. v. United States*, 523 F.3d 461, 477 (4th Cir. 2008)).

213.    Here, Andrew & Kurth LLP wrote an opinion for Dow as part of Dow's purchase

of the SLIP tax shelter.  (Joint Ex. 14.)  Andrews & Kurth recognized the importance that, for tax

purposes, the foreign banks' interests be characterized as equity: "The anticipated tax

consequences of the Transaction would be substantially altered if the [Internal Revenue] Service

was successful in recharacterizing the [Class "A"] Preferred Interest as debt for tax purposes."

(*Id*. at bates 70443.)

214.    Indeed, the promoters recognized the importance of this truth, and noted that "all Partners . . . will covenant against taking any action that could be construed as inconsistent" with the proposition that the foreign banks were equity partners.  (*Id*. at bates 70459.)

215.    Despite that the partners covenanted to taking any action that could be construed as being inconsistent with the proposition that they were equity partners, the "condition" placed by Bank Brussels Lambert on its transfer of $25 million to Chemtech was that its bank commission, the Commission Bancaire, agree that the investment "be considered as loans and not equity."  (Joint Ex. 77.)  And that conclusion was reiterated by Goldman Sachs, which sent a copy of an Arthur Andersen opinion to BBL, noting on its fax cover sheet, that "[e]nclosed please find the opinion of Arthur Andersen that the SLIPs investment would be treated similarly to a loan for Belgian bank capital adequacy purposes."  (Joint Ex. 74 at bates 1277.)

216.    Likewise, before investors committed to the transaction, the form of the transaction was analyzed under German law.  Section 12 of the German Banking Act prevented German banks from owning certain assets, and there was the concern that a German bank's ownership of the Chemtech partnership might violate German law.  Price Waterhouse opined that a bank could invest in Chemtech and still comply with German law for two reasons.  First, under German substance over form principles, the bank's interest would actually be a loan, and second, in any event, the bank would hold less than 10 percent of partnership capital.  (US Ex. D7.)  Indeed, "One may well take the position that FORCO [the Foreign Company] does not have partner status for tax purposes."  (US Ex. D2.)  And, "We believe that the Income does not qualify as foreign source business income as FORCO - in our opinion - does not have partner status in the Partnership."  (*Id*.)

217.    While the parties frequently used the term "investors" to refer to the foreign

banks, that term was used in quotation marks, suggesting that this was an unusual enough term to

require a special indication.  For example, in an internal Dow memo from Michael Munro in the

Midland headquarters to Jane Gotee, who worked at Dow Europe S.A. in Switzerland, in July

1993 states:

- "Also enclosed is the previously executed original of the DCIL Demand Note in favor of Chemtech covering all relevant transfers.  Eric felt that this document was of most importance to the 'investors.'" (Joint Ex. 118.)

Another example, in a letter from Goldman Sachs to Dow, Goldman Sachs used of the word

"equity" in quotation marks when referring to the foreign banks' interest in Chemtech:

- "The transaction already requires Investors to accept an 'equity' instrument in an unfamiliar structure."  (Joint Ex. 22.)

218.    Bank Brussels Lambert also acknowledged that, internally, it viewed the

transaction as being debt-like (McGuire Dep. at14-15):

> Mr. Welsh:    So I take it then – and you can affirm if this is true or tell me that it is not true and then explain – that the Chemtech transaction ultimately was structured such that it was treated, for Belgian bank capital adequacy purposes, as a loan?
>
> A          For BBL we have treated it as a loan.

219.    And Mr. McGuire also testified (McGuire Dep. at 35):

> Q          Would you say that this, in your opinion, would you say that this is correct, in the sense that the Chemtech transaction provided the Bank greater security than regular loans which BBL made to Dow Chemical?
>
>              . . .
>
> A          Yes, we would.

220.    McGuire also testified (McGuire Dep. at 68-69):

A        As far as I am aware, the Bank chose to book the deal as a loan.

Q        For government purposes, how was the income which you received treated vis-a-vis the Belgian government?

. . .

A        Yes.  In respect of the Belgian government we treated it as interest income.

221.    In its internal documents, even Dow referred to the Chemtech transaction as "debt."  For example:

•    "Off Balance Sheet Debt Information"  (Joint Ex. 184), at several places noting that the obligation is "Fixed @ 6.947%" (*see also* Joint Ex. 699 at bates 68179; Joint Ex. 718 at 68194 (noting that Chemtech was 14 percent of Dow's off balance sheet ***debt*** in third quarter of 1998).

222.    Furthermore, with regard to the Chemtech II transaction, Rabobank (parent company of third party bank RBDC) stated during an internal review that "This is a 5-year ***loan*** to an SPV [Special Purpose Vehicle] (Chemtech) that holds fixed assets (a plant leased to Dow) and Dow demand notes."  (Joint. Ex. 856 at bates 8703.)

223.    The Court is persuaded that these characterizations accurately depict the foreign banks' interests in Chemtech as debt, not equity.  *AWG Leasing Trust v. United States*, 592 F. Supp. 2d 953, 983 (N.D. Ohio 2008) (noting that parties to a sale-leaseback of a waste-disposal facility in Germany structured the deal to avoid a transfer of the plant under German law as a factor showing no sale occurred); BB&T Corp. v. United States, 523 F.3d at 469 n. 10 (denying rent deduction for pulp factory purportedly leased from a Swedish cooperative that noted in

internal documents that "the transaction can be considered either based on its real meaning that is a financial transaction, or based on its formal content, that is two lease relationships.")

### B.    *Risk and Returns of Debt and Equity Claims*

224.    Equity claims represent the ownership interest in a business enterprise, and carry with them a residual claim on business profits, voting rights, and exhibit permanence as capital investments in the business.  (Hubbard Rep. 17.)

225.    By contrast pure debt involves an obligation by a borrower to repay a lender an amount by a date certain, and usually involve interest payments.  Debt's traits differ from equity in that debt provides for "a priority claim on operating profits, no voting rights, finite life, periodic payments that reduce risk, restrictive terms that protect the debt investors, and the right to force liquidation or reorganization."  (Hubbard Rep. 17.)

226.    The Chemtech transaction provided the foreign banks with vast and thorough risk-reduction mechanisms, which, as summarized here and detailed below in following sections, cause their interests to be more debt-like than equity-like.  These risk-reduction protections were given either by Dow, a Dow affiliate (which was, in turn, guaranteed by Dow itself), or by Chemtech itself – and all were in favor of foreign banks.

| Guarantee or Protection for Banks | Summary of Provision |
|---|---|
| 1. Supplemental Dow Indemnity | Dow agreed to indemnify the foreign banks against any liability arising from the operation of the partnership between the partnership's inception and the date of its registration |
| 2. Patent License Agreement | Required minimum-level payments by Dow to Chemtech for use of patents, virtually guaranteeing Chemtech's profits |

United States' Proposed Findings/Conclusions - 79

| 3. Spending Restrictions | Chemtech could spent no more than $1 million per year on expenses without the banks' approval |
|---|---|
| 4. Taking on of Debt | Chemtech could only take on additional debt with the approval from the majority of Class A and Class B interests |
| 5. Priority Return Guaranty | Chemtech was required to distribute to the foreign banks a fixed priority return of 6.947% per year on their contribution of $200 million |
| 6. Dow Limited Partner Guaranty | Dow guaranteed that its subsidiaries in Chemtech would perform their obligations per the Chemtech partnership documents |
| 7. Profits Requirement | Ensured that if "profits" did not meet 97.98 percent of the priority return, the foreign banks had the option of liquidating their interests in Chemtech |
| 8. Investment Restrictions on Chemtech Portfolio, Inc. | Highly restrictive investment provisions limited CPI's holdings to Dow Demand Notes, Dow Guaranteed Loans, or Aa / AA-rated instruments |
| 9. Patent and Chemical Plant Indemnification | Dow indemnified the banks from any liability for the patents in (Chemtech I) or the chemical plant in (Chemtech II) under so-called "hell or high-water" leases, which would have required paying royalties or rent even if the patents become invalid or the chemical plant become defunct and unproductive |
| 10. Over-Collateralization of Capital Interests | The banks' contributions of $200 million Chemtech I and II (separately) were over-collateralized. Chemtech I was required to maintain a ratio of assets to foreign bank capital of 3.5-to-1. In Chemtech II, the manufacturing plant had a fair market value of $715 million. |
| 11. Tax Indemnification | Dow agreed to indemnify the foreign banks from any adverse changes due to tax withholding changes, which eliminated the risk that a change in federal law would require taxes to be paid on the foreign banks' income. |
| 12. *Early Liquidation:* Margin-Make Whole | Compensated the foreign banks for the "shortfall of the expected return" if the transaction was terminated earlier than seven years. The amount due to be paid was the priority return rate. |

United States' Proposed Findings/Conclusions - 80

| 13.*Early Liquidation:* Swap Costs | Would have compensated banks if they engaged in third-party swaps that would have penalized them for terminating early. (None of the banks had losses from outstanding swap arrangements.) |
|---|---|
| 14. *Early Liquidation:* Funding-Breakage Costs | Compensated the banks for any costs of unwinding any borrowing they incurred at 90-day LIBOR, to be determined from the moment of the unwinding to the maturity of the borrowing at the end the 90-day quarter |
| 15. *Liquidation Provisions:* Items that Would Allow for Liquidation of the Foreign Banks' Interests | The following events, *inter alia*, would have allowed the foreign banks to liquidate their holdings in Chemtech I, thus effectively ending their participation in the scheme (and Dow's tax advantage):<br><br>1. if Chemtech failed to distribute at least 97.98 percent of the priority return;<br>2. if Dow failed to pay any royalty payments to Chemtech,<br>3. if partnership profits for the year were not equal to at least 97.98 percent of the priority return;<br>4. if there were any changes in the tax or legal structure that would have caused a reduction in the rate of return expected by the foreign banks;<br>5. if Dow declared bankruptcy or became insolvent; or, 6. if Chemtech failed to make certain scheduled retirement distributions.<br><br>Similar provisions existed in Chemtech II, protecting RBDC. |
| 16. *Liquidation Provisions:* Timeliness of Payments | If amounts were not distributed by the General Partner in a timely manner pursuant to a liquidation, Dow would compensate the banks for the delay at a rate of 200 basis points over LIBOR. |
| 17. *Liquidation Provisions:* Dow Liquidator Guaranty | Indemnified the foreign banks against claims that may arise against Chemtech in the course of its winding up |

| 18. *Liquidation Provisions:* Priority of Payments in Liquidation | Accrued and Unpaid payments were to be made to the foreign banks before any payments to the Dow entities were made (but after any non-General Partner debt was paid off, which would only occur if a majority of Class A and B interests approved it). In Chemtech II, distributions to RBDC were senior to any distributions from the partnership to Dow. |
|---|---|
| 19. Dow Liquidator Guaranty | Provided protection for claims against the foreign banks that may have arisen in the course of the winding up of Chemtech I |
| 20. Credit Default Swaps | In Chemtech II, Rabobank purchased $200 million of credit default swaps, which, provided it with 100% insurance on its $200 million investment in Chemtech II in the unlikely case of a Dow default or bankruptcy |

227.    **Dow's Guarantees of its Affiliates' Performance**.  Dow unconditionally guaranteed the "due and punctual" performance of its subsidiaries, including the General Partner, in Chemtech of "each of the covenants and obligations" required of them pursuant to the Chemtech transactional documents.  In the case of the General Partner, this obligation extended to its performance in its individual capacity *and* on behalf of Chemtech.  (Joint. Ex. 2M, § 1(a)); Hubbard Rep. at 27.)  RBDC also benefitted from this guaranty in Chemtech II.  (Joint. Ex. 3GG; Joint. Stip. ¶ 102.)

228.    **Revenue Guarantees by Dow**.  In sum, by guaranteeing a revenue stream for Chemtech, Dow essentially guaranteed that the foreign banks would receive their annual 6.947 percent priority return.   The primary source of cash flow for Chemtech I was royalty payments made by Dow to lease back the patents it had transferred to Chemtech.  Pursuant to the patent license agreement, Dow guaranteed that it would pay Chemtech a minimum amount of patent

royalties regardless of its actual use of the patents.  Joint Ex. 2O, § 3.2.  As set out in Exhibit B

to the Patent License Agreement, these minimum royalty payments were not conditional on

Dow's actual use of any of the patents in Chemtech.  *Id.*

229.    In addition, Dow agreed to make "variable" royalty payments when its use of the

patents exceeded the amount accounted for by the minimum royalty payments.  Joint Ex. 2O, §

3.3.  Thus, the patent license agreement, executed by Dow and Chemtech I, made the royalty

payments a direct credit obligation of Dow, and only if Dow declared bankruptcy would the

royalty payments not be made.  Joint Ex. 2L, § 4.2.

230.    In total, between 1993 and 1998, Dow paid $646 million in royalty payments to

Chemtech I for use of the patents.  The minimum royalty payments accounted for the vast

majority – over 99 percent – of the $646 million.  Thus, the minimum royalty payments Dow

made were sufficient to enable Chemtech to pay the foreign banks their priority return (which

totaled approximately $65 million between 1993 and 1998).  (Joint. Fin. Stip. Ex. D, D-2.)

231.    **Allocation of Chemtech Profits – Priority Return Guaranty**.  With

Chemtech's net income in place, Dow also guaranteed that Chemtech would make priority return

payments to the foreign banks, which was contracted to be distributed each quarter in cash.  As

noted above, Chemtech I was required to distribute to the foreign banks from its net income a

fixed priority return of 6.947 percent per year on their total contribution to Chemtech of $200

million.  (Joint Ex. 2L, § 4.2.)

232.    Thus, through the patent license agreement and the Dow limited partner

guarantee, Dow ensured that the foreign banks would receive their priority return.  Dow

guaranteed that it would make payments to Chemtech, and it guaranteed that its subsidiaries in

Chemtech would make payments to the foreign banks. (Joint Ex. 2M, § 1(a).) This guarantee ensured that the priority return would be paid to the foreign banks, and thus the priority return became another credit obligation of Dow in favor of the banks.

233.    If Chemtech did not have sufficient profits, or if it did not have assets available (both of which were extraordinarily unlikely), the foreign banks *theoretically* would not receive their full priority return. This, in form, is an equity-like factor. (Hubbard Rep. at 25.)

234.    The *substance* of the transaction, however, suggests a different conclusion. First, the priority return was cumulative. So if a payment was missed, the back payment to the banks would take priority over other distributions of profit.

235.    But the theoretical risk of loss vis-a-vis the banks was just that, merely theoretical. A profit was virtually guaranteed because of the various protections afforded the banks including (a) revenue guarantees by Dow, and (b) spending limits for Chemtech. Dr. Hubbard, in Exhibit 7 to his report, described that profits were essentially guaranteed, because, if Dow made the minimum royalty payments that it was required to make, and Chemtech spent all that it was allowed on administrative expenses, a sufficient profit would be made in all but four quarters over the first five years. And the shortfall in those four quarters was less than 1 percent. (Hubbard Rep. at Exhibit 7.)

236.    In fact, during its entire operation, Chemtech never came close to failing to achieve its required profit level. (*Id*. at Exhibit 8.)

237.    The risk to the banks of not receiving a priority return was equal to or less than the risk borne by a Dow debt holder. (Hubbard Rep. at 28; *id.* at 41-42 (quoting a Goldman Sachs promotional document: SLIPs offer a "higher yield and greater security than the equivalent

corporate bond of the U.S. corporation...").)

238.    With respect to risk, Arthur Andersen noted that "the economic effect" of the allocation of 98 percent of profits to the foreign banks was "that the bank will always get a return on its cash investment."  (Joint Ex. 74 at bates 1278.)

239.    The foreign banks also had the opportunity to share in residual profits.  Residual profits would be generated if Chemtech's net income per year exceeded approximately $14.03 million.  (Hubbard Rep. at 28.)

240.    While participation in profits is an equity-like characteristic, here that participation took a back seat to the guaranteed returns – a fixed interest rate payment distributed quarterly; thus this factor in substance is more debt-like.  First, the sharing of such profits was disproportionately low compared to the ownership percentage of the foreign banks, and the foreign banks did not expect sizable profit distributions.  (Hubbard Rep. at 28.)  Second, if a patent started to generate greater than expected profits, Dow had the ability to retire patent assets in order to prevent excess profits from "leaking" through to the foreign banks.  (Hubbard Rep. at 29.)

241.    Indeed, this actually occurred, with patent portfolio 14.3, which was producing higher profits than anticipated, thus causing the banks to receive additional income at the expense of Dow.  Handwritten notes produced by Dow ask: "14.3 - why are we distributing [this patent portfolio out from Chemtech]?  because it produces high profits (less leakage)."  (US Ex. D33.)  Thus, Dow had every incentive to minimize the potential for residual profits, and in fact, it did so.  (Finard Rep. at 24.)

242.    The additional monies the banks could receive from residual profits were not

meaningful compared to the guaranteed return.  (Hubbard Rep. at 28-29.)  In fact there was an

apparent conflict of interest that does not normally occur between true partners in equity.  While

all true partners in a classic equity arrangement want to maximize profits, here with Chemtech,

there was no real incentive for Dow to maximize residual profits because doing so simply would

move money from them to the foreign banks.  Indeed, under the Chemtech arrangement, Dow's

incentive, beyond paying for the guaranteed return, was to minimize profits, and thus avoid

"leakage" of the one percent kicker to the foreign banks.  This tension between Dow and its so-

called partners was later manifested when the foreign banks challenged the appraisal of the

remaining patents in connection with their withdrawal from Chemtech I.

     243.　　**Gain or Loss from Change in Partnership Asset Values.**  One feature of the

Chemtech arrangement was the foreign banks' eligibility to increase or decrease its return based

upon the fair market value of the partnership's assets at the end of Chemtech.  (Hubbard Rep. at

29.)

     244.　　Without question, this is, in form, an equity-like aspect of the arrangement.  But

the facts in this case demonstrate that the foreign banks focused more on their potential losses

from the transaction than on potential gains, perhaps due to Dow's ability to limit profits and

gains in asset value (by adding or removing certain patents) combined with the banks' low

participation rate in any such profits or gains.  (Finard Rep. at 23-28.)

     245.　　For example, Sipko Schat of Rabobank testified about his concern for the

potential downside (Schat Dep. at 44):

>     A.　　Liabilities for the limited partners, if there would be problems on the
>         patents, what would happen with the partnership and the limited partners;
>         legal liabilities and product liabilities.

Q.   And how did you resolve that issue, that is the product liabilities and patent liabilities.

A.   We discussed the insurance policies, we discussed the legal position on Swiss law as a limited partner.  And a lot of those discussions centered around that issue, what are the safeguards for the limited partner in case of disaster, because that was for us a really big issue.

246.   And as mentioned before, most telling was Goldman Sachs's rebuke of Dow's suggestion that the bank protections be diminished:  We must "convince banks of the immateriality of the 1% loss situation."  (Joint Ex. 23 at bates 70909.)  Since the foreign banks would be dealing with an unfamiliar structure, they would "increasingly look toward the contributed assets for comfort."  (Joint Ex. 22 at bates 11237.)

247.   Goldman Sachs acknowledged as much (Globus Dep. at 51-52):

Q    ...  What particular elements were the banks interested in as opposed to the patent minutia?

A    Anything that affected their return or the security of their investment.

Q    And what type of things would affect their return of security of investment?

A    The ratio of income to a partnership income to what they got paid, the value of the assets or the partnership relative to the principal, the standard stuff.

248.   As a result of the banks' skittishness, "the participants of the Chemtech transaction were afforded multiple safeguards similar to those found in debt contracts to protect the banks from losing any significant amount."  (Hubbard Rep. at 31.)  This took many forms, one of which was that CPI was required to hold a portfolio of "Core Financial Assets" and "Other Permitted Assets," which, because of their extremely low-risk nature, made it highly unlikely that "the partnership would suffer any losses due to investment imprudence.  This

unwillingness to accept a real possibility of downside risk is antithetical to the concept of an equity arrangement.  The focus on preventing losses rather than on the potential for gains is typical of a debt-like investment."  (Hubbard Rep. at 32.)

249.    These investment assets of CPI were restricted to Dow credit obligations and very low risk securities: (i) Dow Demand Notes (which were convertible to cash at the demand of Chemtech as long as Dow was viable); (ii) Dow Guaranteed Loans; and, (iii) Rated Securities of floating-rate instruments issued by entities rated at least "Aa" by Moody's or "AA" by S&P. (Hubbard Rep. at 36; Joint Exs. 58, 2L at bates 36486.)

250.    In an absolute worst-case scenario, in which the mark-to-market value of all of the patents, Dow Demand notes, other commercial bonds and government securities fell precipitously to zero, the foreign banks could theoretically have lost their investment in Chemtech.  In reality, however, this would only happen upon a catastrophic parade of horribles, including: (a) Dow's bankruptcy; (b) the complete loss of the patent values in Chemtech; (c) default by other highly rated companies; and (d) the total loss of risk-free government securities. As Dr. Hubbard pointed out, "This outcome is practically impossible."  (Hubbard Rep. at 34.)

251.    Moreover, the amount of money transferred to CPI increased dramatically over the life of the transaction, culminating in over $688 million by 1998.  (Joint Fin. Stip., Ex. D, D-2.)  Thus, as the value of Chemtech's patents decreased, the value of the Dow notes held by Chemtech increased, making the Chemtech transaction more and more like a direct debt obligation of Dow to the foreign banks.  (Finard Rep. at 31.)

252.    In sum, "Although the potential for additional returns is an equity-like feature on its face, the various risk mitigation steps, and disproportionately low participation in the potential

gains relative to ownership make these features more debt-like from an economic and financial perspective." (Hubbard Rep. at 34.)

253.    **Other Risks for the Banks Were Mitigated.**  A variety of other risks, noted below, were mitigated, thus further minimizing any potential downside for the foreign banks.

254.    **Risks Before Banks Joined the Partnership.**  The Supplemental Dow Indemnity indemnified the foreign banks against any liability arising from the operation of the partnership between the partnership's inception and the date of its registration.  (Joint Stip. ¶ 45; Joint Ex. 2N at bates 36689-94.)  This provided additional comfort to the foreign banks against any risks before they entered into Chemtech.

255.    **Patent and Chemical Plant Indemnification**.  Dow also indemnified the foreign banks from any liability from the patents or chemical plant.  As the May 1993 Goldman Sachs presentation phrased it:

> The investor will hold a SLIP that entitles the investor to a preferred return on a partnership that has a major asset property subject to a triple net ("hell or high water") lease with a major US sponsor.

(Joint. Ex. 69 at bates 1287-89.)  Under the so-called "triple net leases" or "hell or high water" leases, Dow was financially responsible for any costs associated with the patents or chemical plant.  (Sherman Dep. at 116-118 ("A triple net lease basically means they pay a lease payment come hell or high water.  It doesn't matter what happens.  The plant can burn to the ground and they're generally responsible for replacing the plant, but they have to continue to make that lease payment for the term of the lease.  It's come hell or high water.").)  Because Dow provided a performance guarantee for its subsidiary Diamond Tech, this indemnification was effectively a Dow obligation directly to the foreign banks.  In short, Diamond Tech indemnified Chemtech

against any losses resulting from a patent becoming invalid or unenforceable. (Joint Stip. ¶ 51; Joint Exs. 2K, 123 at bates 57724.)

256. **Risk of Early Termination**. The Chemtech transactional documents also contemplated compensating the foreign banks if Chemtech was liquidated before the foreign banks' seven year expected maturity date. This is because banks could theoretically lose part of their anticipated return due to third party arrangements. Thus, the parties added a Class A guaranteed Payment, "which included provisions for funding breakage costs, swap breakage costs, and 'margin make whole' payments. (Hubbard Rep. at 35.)

257. The margin make whole payments compensated the foreign banks for the "shortfall of the expected return" if the transaction was terminated earlier than seven years. (Schat Dep. at 114.) The amount due to be paid was the priority return rate. In fact upon the termination of Chemtech I, Dow paid the foreign banks over $4 million as part of this guarantee. (Joint Ex. 610.)

258. The swap breakage costs would have compensated the foreign banks under certain detailed circumstances regarding floating versus variable rates. (Schat Dep. 116-119.) For example, the priority return was a set, fixed rate of 6.947 percent. Banks, however, prefer to have access to "floating money and not fixed" and therefore, the banks contemplated swapping (*i.e.*, trading) their fixed rate income from Chemtech I for a floating rate. (*Id.*) These trades, if ended early, could have created a loss for the banks, depending on timing; accordingly, Dow agreed to compensate the banks for certain losses associated with these swaps. Although the banks did not engage in these swaps, they were free to do so and would have been protected against losses had they engaged in these secondary transactions with third parties. (*Id.*; *see also*

Joint Ex. 610 at bates 16667-71.)

259.    "Funding Breakage Costs" means, in the case of any foreign bank, any costs, as determined by the bank – a determination that was conclusive and binding in the absence of manifest error – of unwinding any incurred borrowing at 90-day LIBOR, to be determined from the moment of the unwinding to the maturity of the borrowing at the end the 90-day quarter. (Joint Ex. 2L at bates 36489.)  This provision was triggered for some of the foreign banks at the end of Chemtech I, requiring Dow to distribute an additional $8,900 to the foreign banks.  (Joint Ex. 610 at bates 16667-71.)

260.    Taken together these three provisions "mitigated the exposure of Class A interests to early termination by reimbursing resulting costs."  (Hubbard Rep. at 35.)

261.    Dow also guaranteed the liquidation payments that must be made by the general partner, and if there was a delay, the foreign banks would receive a bonus of two percent (200 basis points over LIBOR.)  (Hubbard Rep. at 35; Joint Ex. 2M.)  This guaranty also existed for the third-party bank in Chemtech II, RBDC.  (Joint. Ex. 3GG; Joint Stip. ¶ 102.)

262.    **Tax Indemnification**.  During the Chemtech negotiations, a Goldman Sachs employee stated that the foreign banks were "adamant that because they [did] not share in the tax benefits of the structure they [would] not accept any structural tax risk."  (Hubbard Rep. at 35; Joint Ex. 22.)

263.    Accordingly, Dow agreed to indemnify the foreign banks from any adverse changes due to tax withholding changes.  (Joint Ex. 2L at bates 36517, 36530.)  This eliminated another risk for the banks – that the IRS or a change in federal law would require taxes to be paid on the foreign banks' income.  (Hubbard Rep. at 35; Joint Ex. 22.)

264.    **Patent Restrictions**.  Not only did Chemtech Portfolio, Inc. have to hold certain sums in relatively risk-free securities, but Chemtech was forbidden to distribute patents away from the partnership without maintaining a 3.5-to-1 ratio of assets to Class A Interest capital (Joint Ex. 2L at bates 36523):

>    •    "5.3 <u>Restrictions on Authority of the General Partner</u>.  (a) Without the consent of all of the Limited Partners, the General Partner shall not have the authority to, and covenants and agrees that it shall not, (xiii) Cause or permit the distribution of any Permitted Asset in retirement of all or any portion of a Partner's Interest . . . unless immediately after any such distribution the aggregate Gross Asset Values of the Permitted Assets held by the Partnership shall be at least equal to three and one-half (3.5) times the aggregate Unrecovered Capital of the Class A Limited Partners."

265.    This also meant that the banks' interest in Chemtech I was over-collateralized. These types of guarantees are typically associated with debt instruments, not equity instruments. (Hubbard Rep. at 36 & Ex. 15.)  The same was true with regard to the Chemtech II asset, the manufacturing plant, which had a fair market value when contributed to Chemtech II of $715 million.  (Joint Fact ¶ 100.)  RBDC's contribution, however, to Chemtech II was only $200 million.  (*Id.* ¶ 101.)  Thus, its investment in Chemtech II was also over-collateralized.  (Joint Ex. 856 at bates 8703 ("our $200 mln exposure is covered almost 3x by the value of the assets in the SPV [Special Purpose Vehicle]" – Chemtech); Joint Ex. 845 at bates 113 ("The overall risk of loss in this transaction is extremely low.").)

266.    The conclusion that the risk and return characteristics of the foreign banks' interests were debt-like is reinforced by Goldman Sachs's "pitch" documents, which indicated the partnership investment offered "a higher yield and greater security than the equivalent corporate bond" of Dow.  (Hubbard Rep. at 36.)

267.    Furthermore, Patrick McGuire of Bank Brussels Lambert testified (McGuire Dep. at 34-35):

> Q     You said that you[r] bank did have loans, just financial loans, with Dow Chemical?
>
> A     Yes.
>
> Q     Would you say that this, in your opinion, would you say that this is correct, in the sense that the Chemtech transaction provided the Bank greater security than regular loans which BBL made to Dow Chemical?  * * *
>
> A     Yes, we would.

268.    **Liquidation Rights.**  While the foreign banks could not force a liquidation of Chemtech itself, they could liquidate their holdings in Chemtech for a variety of reasons, thus effectively ending their participation in the scheme (and Dow's tax advantage).  These reasons included (*inter alia*): (a) if Chemtech failed to distribute at least 97.98 percent of the priority return; (b) if Dow failed to pay any royalty payments to Chemtech (Joint. Ex. 2L at bates 36573); (c) if partnership profits for the year were not equal to at least 97.98 percent of the priority return (Hubbard Rep. at 26); (d) if there were any changes in the tax or legal structure that would have caused a reduction in the rate of return expected by the foreign banks; (e) if Dow declared bankruptcy or became insolvent; or, (f) if Chemtech failed to make certain scheduled retirement distributions (Joint. Ex. 2L at bates 36573).

269.    Any of these occurrences (along with many others listed) would have allowed the foreign banks to liquidate their holdings in Chemtech.  (*See* Joint Ex. 2L at bates 36571-76.)

270.    Similar provisions existed in Chemtech II, protecting RBDC's contribution.  (*See* Joint. Ex. 845 at bates 122 (noting that the following events would allow Dow or RBDC to

liquidate: "Failure of the general partner or Dow to remain in compliance and performance under the transaction documents, i.e. the partnership agreement, the lease agreement and the Dow guaranty; Failure of the partnership to distribute the preferred return on a quarterly basis; Bankruptcy either of the partnership, the general partner or Dow.").)

271.     Moreover, in the event of a shortfall in assets or cash, the General Partner agreed to subordinate its rights to the other creditors.  (Joint Ex. 2L at bates 36567.)

272.     Separately, the Dow Liquidator Guaranty (Joint Ex. 1R) ensured that, as long as the Chemtech General Partner was a Dow entity, the partnership and the General Partner would pay a fee to the entity responsible for liquidating Chemtech (if the Liquidator was not a Dow entity), and to pay all judgments and claims against the Liquidator.  (Joint Ex. 1R, § 1); (Joint Ex. 1O, § 12.9).  This provided protection for the foreign banks against claims that may have arisen in the course of the winding up of Chemtech I.

273.     **Credit Default Swap.**  One significant financial risk-management tool that was present in Chemtech II that was not present in Chemtech I (as the financial tool did not exist at the time) was a Credit Default Swap ("CDS").  Despite all of the protections listed above that provided RBDC with insurance, in order to further mitigate any risk associated with its contribution to Chemtech II, Rabobank purchased $200 million of CDS, which fully hedged Dow's credit risk.  (*See* Joint Ex. 845 at bates 111.)  A CDS, in essence, is "similar to credit insurance."  If a loan holder wants to hedge or insure against a default or bankruptcy of the debtor, the creditor can entered to a CDS.  (Finard Rep. at 33-34.)  A typical CDS "would be one in which the buyer (or the fixed rate payer) pays periodic payments to the seller (or floating rate payer) in exchange for the right to a payoff if there is a specified credit event – such as a default

or bankruptcy." (Finard Rep. at 34.) Here, in the unlikely case of a default by Dow, Rabobank could provide Dow Notes to its CDS counterpart and that counterpart would "in turn give cash to Rabo protecting Rabo from the credit risk associated with Dow in Chemtech II." (Finard Rep. at 34.)

274.    **Priority.** Another important characteristic of debt is priority over equity holders in bankruptcy or liquidation.

275.    Section 12.2 of the partnership agreement defines the foreign banks' Class A priority at the time that the partnership is liquidated. Distributions went according to the following order:

- First to creditors other than the General Partner in satisfaction of all of Chemtech's debts;

- Second, distributions for the foreign banks' guaranteed payments;

- Third, distributions for the Class B partners' guaranteed payments;

- Fourth, to pay Chemtech's debts to the General Partner; and,

- Fifth, the balance would be distributed to the partners in accordance with their positive Capital Accounts.

276.    Once again this characteristic of Section 12.2 appears – on its face – to be more equity-like than debt-like. (Hubbard Rep. at 39.) The partnership, however, was structured to virtually eliminate any risk that the foreign banks would not receive the full value of their capital accounts. (*Id.*) The same was true of Chemtech II, where distributions to RBDC were senior to any distributions from the partnership to Dow. (Joint Ex. 785 at bates 3590.)

277.    To ensure that Chemtech I did not have significant expenses, the partnership agreement dictated that Chemtech could pay no more than $1 million per year in aggregate costs

or expenses without approval from the foreign banks.  (Joint Ex. 2L at bates 36529.)  Roughly

three-fourths of this $1 million amount was the contractual management fee due to the General

Partner, leaving little money for other items.

278.    Additionally, to further ensure that Chemtech I could not incur liabilities, the

partnership could not issue any debt without approval from the majority of Class A and Class B

interests.  (*See* Joint Ex. 2L at bates 36526.)  The same protection existed with regard to

Chemtech II.  (*See* Joint Ex. 785 at bates 3593.)

279.    Dr. Hubbard examined Chemtech's ability to repay the foreign banks the amount

of their capital investment in the event of a hypothetical decline in partnership assets at the end of

each calendar year.  (Hubbard Rep. at 39 & Ex. 17.)  Exhibit 17 of Hubbard's report shows that

even if the patent assets became completely worthless, the foreign banks would still receive ***full

payment*** (minus 1 percent) of their capital interests, as long as the highly secure investments in

government bonds, cash equivalents, commercial paper, certificates of deposit, and Dow Demand

Notes sitting in Chemtech Portfolio did not also lose value.

280.    Dr. Hubbard concludes that the likelihood of the foreign banks being subordinate

to any creditors was *de minimis*.  And so long as Dow itself did not default, the foreign banks

would recoup most, if not all, of their initial capital contribution.  (Hubbard Rep. at 40.)  This

characteristic is more debt-like than equity-like.  (*Id*. at 41.)

281.    **Permanence.**  When Goldman Sachs pitched Chemtech to the foreign banks, it

described that the investment would have "an effective fixed maturity."  (Joint Ex. 68 at bates

1286.)

282.    The amended and restated partnership agreement set forth a number of "Optional

Liquidation Events."  The most prominent among these was a date certain: April 6, 2000, seven years after the partnership began.  (Joint Ex. 2L at bates 36573.)

283.    The restated partnership agreement also granted Dow the right to buy back the Class A interests from the foreign banks, through its optional retirement of the Class B Limited Partnership Interests.  (Hubbard Rep. at 41.)

284.    Goldman Sachs, the SLIPs promoter, described the limited life of the investment as having a "5 to 7 year term."  (Joint Ex. 68.)

285.    Apparently through representations by Dow, the foreign banks understood Chemtech to have a limited life.  Patrick McGuire of BBL testified (McGuire Dep. at 31-32):

> Q    * * *  [D]id you consider that the Chemtech transaction had a term, that is a time when it would mature?
>
> A    Yes.
>
> Q    What was that term?
>
> A    Seven years.
>
> Q    Is that in fact what – how the programme was finally developed and concluded, that is that it would have a term of 7 years?
>
> A    It was negotiated in a way that we would be able to get out after 7 years, yes.
>
> Q    Did you want that term or was that a term of years that was something which Dow wanted?
>
> A    It was something that Dow had asked for and that we felt comfortable with.

286.    Likewise, Rabobank testified that "[t]he expected initial term was 7 years...."  Rabo also testified that an extension period was possible if there was mutual consensus among

the participants.  (Schat Dep. at 112-13.)

287.    The term of the SLIPs program was, like a loan, intended to be of a fixed duration. The parties believed it to be in the nature of a 7-year program.  (*See* Joint Ex. 23; Merszei Dep. at 30-31 (stating that, in general, SLIPs are medium-term investments of between one and ten years, but that for Chemtech the anticipated duration was between five and seven years); US Ex. D7.)

288.    Further, even Dow's 10-K for 1993 disclosed the transaction and noted the seven year date:  "The partnerships will not terminate unless a termination or liquidation event occurs. One such event, which is within the control of outside investors, occurs in the year 2000 for Chemtech."  (Joint Ex. 255.)

289.    The same can be said for Chemtech II, which had an anticipated "maturity date" of June 30, 2008.  (Joint Ex. 856 ("CDS [Credit Default Swaps] in the amount of USD 200 mln with maturity of June 30, 2008 have been purchased to fully hedge Dow credit risk through maturity.").)

290.    Chemtech's limited life supports the conclusion that the foreign banks' interests were more debt-like.  (Hubbard Rep. at 42.)

291.    **Voting and Management Rights.**  Typically, debt instruments carry no right to vote and manage a business, while equity investments do.  (*Id*. at 43.)

292.    The restated partnership agreement provided that "The Limited Partners shall not have any right or power to take part in the management or control of the Partnership or its business and affairs or to act for or bind the Partnership in any way."  (Joint Ex. 2L at bates 36540.)

293.    But the restated partnership agreement also provided that the foreign banks would

be granted *limited* voting rights "only on those matters specifically reserved for their vote...." (*Id.* at bates 36541.)

294.    In practice, however, the banks did not become involved in the management of Chemtech.  Dresdner bank testified (Klier Dep. at 64):

> Q      If you recall, was the bank consulted prior to these assets being taken out of the partnership?
>
> A      I can't really remember that.
>
> Q      You cannot remember whether the bank was or was not consulted?
>
> A      No. No, I think we were not consulted.

295.    In part this was because the banks had no expertise in managing patents.  As Geoffrey Merszei noted when questions related to the patents arise, Chemtech would deal with Dow:  "The expertise for that is in the Dow Chemical Company."  (Merszei Dep. at 78.) Kreditbank NV testified that the bank was a "silent partner."  (Loeckx Dep. at 26.)

296.    Dow's outside counsel referred to the banks as "passive" investors, and she recalled at least one Chemtech meeting where no bank representative at all attended.  (Hallmark Dep. at 107, 127.)

297.    As Dr. Hubbard concluded, "while the banks were granted some management or voting rights, these were limited in scope and authority.  As a result, in the context of a debt versus equity classification analysis of the Class A Interests, this factor is not conclusive." (Hubbard Rep. at 44.)

**XII     Dow's Lack of Legitimate Business Benefits for Contributions of the Patents to the Chemtech Partnership**

   **A.     It Would Have Been Unreasonable To Expect that Chemtech Would License the Patents or Otherwise Obtain Any Additional Funds Other Than Dow's Royalty Payments**

298.    According to Chemtech's amended and restated partnership agreement, its purpose " is to acquire Permitted Assets and manage, protect and conserve the Permitted Assets and make such additional investments and engage in such additional activities as are specifically permitted under this Agreement."  (Joint Ex. 2L at bates 36477.)

299.    Dow owned the patents, and by entering into the licensing agreement with Chemtech, it was obligated to make royalty payments.  Chemtech had the right to license the technology contributed by Dow if it gave 90 days notice to Dow.  (Stern Rep. at 15; Joint Ex. 1Q at bates 15706.)

300.    As an investor in Chemtech, Dow could not expect to receive any additional revenue unless Chemtech licensed the patents to third parties.  (Stern Rep. at 15.)  But from an objective point of view, it is not reasonable that Dow would have expected to be able to lease the patents to third parties.  (*Id* at 17.)  by contributing the patents to Chemtech, Dow was actually making licensing *more* difficult.  (*Id*. at 16-17.)

301.    The patents included in Chemtech were those that Dow practiced, so it was highly unlikely from the outset that patents would have been licensed to third parties.  (Stern Rep. at 15; Joint Ex. 349 ("The patents subject to the License Agreement between [Chemtech and Dow] are an important package of technological assets on which Dow depends in many of its businesses and manufacturing processes.").)

302.    Moreover, with respect to most of the patents, Dow did not contribute all

technology that would have been necessary for third party licensees. Therefore, in order to license a patent, a third party would have had to have dealt not only with Chemtech, but with Dow. (Stern Rep. at 18.)

>   **B.    With Respect to Off-Balance-Sheet Financing**

303.    Corporate finance relates generally to the ways corporations raise capital from investors in order to pursue business opportunities. The fundamental questions a corporation must ask itself include (a) which investments should be made? and (b) how should those investments be paid for or financed? (Hubbard Rebuttal Rep. at 10.)

304.    The value of a firm is the present value of its expected future earnings. That value increases from higher earnings and/or lower costs of capital. Therefore if a project has a positive net present value, when taking into account the costs of financing, the value of that business should increase. (*Id*.)

305.    If a firm can borrow funds even at a very low cost, the value of the business does not increase unless some productive use for those funds can be found. Likewise, paying more than is necessary to borrow funds reduces the value of a business. (Hubbard Rebuttal Rep. at 10.) Thus it can be said that it is easier to find an investment strategy that has a positive net present value than it is to find a financing strategy that has a positive net present value. In fact, evaluating a financing strategy by itself almost always leads to a negative net present value due to the transaction costs. (*Id*. at 11.)

306.    Between 1990 and 1994, direct costs for debt financing averaged 2.2 percent of the proceeds, while direct costs associated with capital raised by initial public equity offerings averaged 11 percent. (Hubbard Rebuttal Rep. at 11.) A firm's optimal capital structure is

determined largely by the trade-off between the benefits and costs of debt financing.  (*Id*. at 12.)

307.    Firms typically first identify a specific profitable project, and then seek financing at the lowest possible cost.  There is no evidence in this case that Dow identified any specific project prior to the Chemtech transaction that reflected a business purpose other than the generation of large tax benefits.  (Hubbard Rebuttal Rep. at 16.)

308.    Dow did not have any particular project in mind, but instead declared that it wished to maintain a sense of "financial flexibility in difficult times."  (Hubbard Rebuttal Rep. at 16, referring to Esqudero Dep. at 12 and Falla Dep. at 71-74 and 83-84.)

309.    Dow's assistant controller, Carol Ashley, when asked what Dow did with the first $99 million loan that was made by Chemtech Portfolio to Dow, did not know of any specific use, but testified generally, "I think it was invested in the various financial needs of the company." (Ashley Dep. at 54.)

310.    Likewise, Gregory Heinlein of Dow's corporate treasury group did not know of any specific use of a $200 million "loan" from Chemtech Portfolio to Dow, noting, "[m]y recollection was it eventually came into the company and was used as a source of financing to either repay commercial paper or, you know, make the dividend payment or whatever, but I didn't track it right to the end."  (Heinlein Dep. at 68-69.)

311.    To the extent that Dow suggests that it was planning for an increase in capital expenditures, the objective facts do not support that.  If anything, Dow's overall need for capital was decreasing in 1992-1993.  (Hubbard Rebuttal Rep. at 18 and Ex. 4.)

312.    As part of the Chemtech scheme, Dow Chemical International Ltd. (DCIL) was authorized to borrow $1.1 billion, and it actually did "borrow" about $1 billion from Chemtech

Portfolio.  In 1993, Dow's total debt, whether considered on or off balance sheet, was about $10 billion.  (Joint Ex. 142 at bates 8066.)  Thus, DCIL's debt was the equivalent of 10 percent of Dow's reported debt.  Yet Geoffrey Merszei, who was as involved with the finances of Dow as any other individual, was barely aware of DCIL's existence.  When asked what it was, he responded (Merszei Dep. at 68):  "I believe, and I'm not certain, I believe it was a company that was primarily for export purposes to Latin America, but I'm not certain."

313.    Hubbard explained that Dow is a "cyclical equity" that follows a typical business cycle with peaks and troughs.  At the time that Dow was considering and implementing the Chemtech transaction, independent analysts favorably reported on Dow, noting that its "cash flow remains strong and the balance sheet is under control," that its "earnings [should be] increasing fairly steadily over the next several years," and that it "has a relatively moderate debt load" and "strong cash generation capability."  (All quoted phrases can be found in the italicized details in the paragraphs below.)

314.    The general economic conditions in the early 1990s were weak, and Dow suffered declining operating income between 1990 and 1992.  This trend began to reverse in 1993. (Hubbard Rebuttal Rep. at 20 and Ex. 2.)

315.    Even though a company is in the midst of the down point in a business cycle, credit rating agencies recognize that.  As Standard & Poor's acknowledges (Hubbard Rebuttal Rep. at 20, quoting Standard & Poors Debt Rating, S&P's Corporate Finance Criteria, 1992, at 63 and 67):  "[T]he level of risk over time is important, rather than at any specific point in time. Certainly, S&P looks at performance over the anticipated course of a full business cycle and not what is viewed as a peak or trough year."  And:  "Since ratings are designed to be valid over the

entire business cycle, ratios of a particular firm at any point in the cycle may not appear to be in line with its assigned debt ratings."

316.    Dow reported a $500 million loss in 1992, but it was largely the result of a one-time charge of $765 million due to changes in accounting principles.  Before that one-time charge was taken, Dow, in 1992, had positive earnings of over $276 million.  (Hubbard Rebuttal Rep. at 20.)

317.    Independent analysts did not adversely report on Dow during these periods; indeed, they remained optimistic on Dow's outlook (Hubbard Rebuttal Rep. at 21):

- "even in this environment Dow remains one of the industry's leaders, and that the stock deserves to be a core chemical holding for investors looking beyond the short term"  (Nomura Research Institute America, Inc., January 6, 1992)

- "Weak chemical industry fundamentals should produce similar [weak] results until 2H '92, although *cash flow remains strong and the balance sheet is under control*"  (Duff & Phelps Credit Rating Co., January 13, 1992)

- "we see a steady progression in profitability trends, with 1992 'climbing out' of the hole as the year unfolds ... and *earnings increasing fairly steadily over the next several years*"  (Donaldson, Lufkin & Jenrette, February 3, 1992)

- "we continue our strong purchase recommendation of this *cyclical equity* whose fortunes have already bottomed and have begun to recover."  (Donaldson, Lufkin & Jenrette, April 27, 1992)

- "Our rating reflects Dow's *strong cash generation capability*, excellent management, and dominant market positions in key product areas.  The company has made progress toward building sustainable earnings power and *has a relatively moderate debt load*."  (Duff & Phelps Credit Rating Co., November 3, 1992)

- "management thought that it was a good time to 'wipe the slate clean' through writeoffs – similar to the 1982 experience – rather than continuing to absorb charges as the efficiency moves are made over the next two years."  (Donaldson, Lufkin & Jenrette Sequrities, January 18, 1993)

- We recommend that clients purchase the shares of Dow Chemical. By virtue of the cyclical nature of the chemical business, Dow's earnings rise and fall in tandem with economic activity levels. The company has endured three years of declining earnings, culminating in 1992 with a reported loss of $1.83 per share. We expect 1993 to usher in the beginning of an earnings uptrend that will last for several years." (Argus Research Corporation, April 14, 1993.)

318.   Dr. Hubbard notes that in 1992 Dow had no obvious need for the cash and

working capital:

- One measure of a company's need for cash is its "quick ratio" of liquid assets to current liabilities. Between 1990 and 1994 the trend of Dow's quick ratio was stable. (Hubbard Rebuttal Rep. at 21-22 and Ex. 7.)

- Another measure of a company's need for cash is its "current ratio" of current assets to current liabilities, and again, Dow's current ratio between 1990 and 1994 was relatively flat. (Hubbard Rebuttal Rep. at 22 and Ex. 8.)

- Another measure of a company's need for cash is its working capital. Again, between 1990 and 1994 Dow's working capital was relatively stable, with an upward trend beginning in 1992. (Hubbard Rebuttal Rep. at 22 and Ex. 9.)

- Another measure of a company's need for cash is the ratio of Dow's cash and marketable securities to sales. The ratio shows increases from 1991 to 1992, and 1992 to 1993. (Hubbard Rebuttal Rep. at 22 and Ex. 10.)

- Another measure of a company's need for cash is the ratio of Dow's working capital to sales. The ratio show increases from 1991 to 1992, and 1992 to 1993. (Hubbard Rebuttal Rep. at 22 and Ex. 11.)

319.   An examination of Dow's internal documents therefore does not show any critical

need for cash at the time of the Chemtech transaction. (Hubbard Rebuttal Rep. at 22.) Dr.

Hubbard notes that, if raising $200 million was a priority for Dow, some documentation

somewhere would exist. (*Id*.)

320.   An analysis of Dow's financial statements and other evidence does not support the

conclusion that Dow had a compelling need for "financial flexibility" or "capital expenditures."

(*Id*.)

321.    Nor did Dow evaluate simpler, less costly, alternatives.  Any prudent business would have evaluated other sources of capital to ensure that the transaction was economically efficient, which means doing so at the lowest possible cost.  (*Id*. at 23.)

322.    Other forms of financing existed that would have allowed Dow to achieve off-balance sheet financing.  (Hubbard Rebuttal Rep. at 24.)  This alternative form is known as Trust Preferred Stock, known as TPS or MIPS.  (*Id*. at 24.)

323.    The transaction costs for Chemtech were roughly 6.3 percent of the amount issued (excluding any termination fees).  But the typical transaction costs for a MIPS transaction during this period was roughly 3.5 percent.  Moreover, preferred stock could have been issued, and issuance costs for such stock is roughly 3 percent of the proceeds.  (Hubbard Rebuttal Rep. at 24 and n.60.)

324.    Dr. Hubbard was also unable to find any internal evaluation of the costs of the Chemtech transactions versus the costs and benefits of debt.  For example, the Chemtech transaction was secured by Dow's patents.  The yield offered to foreign banks through Chemtech exceeded Dow's then-current unsecured borrowing rates.  Dow paid a premium of more than 0.8 percent, or roughly $8-11 million, based on this interest rate difference alone.  (Hubbard Rebuttal Rep. at 25 and Ex. 15.)

325.    Indeed, the lack of such an analysis is quite telling.  One of Dow's senior executives, Geoffrey Merszei, testified that such an analysis would ordinarily be made (Merszei Dep. at 135):  "[W]e're not going to do any off-balance-sheet financing for the sake of doing anything off balance sheet.  Off balance sheet is an additional benefit for the company, but we

certainly don't want to pay any – any premium because it's off balance sheet."

326.    Dr. Hubbard estimates that the effective before-tax excess "cost" of capital (that is, over typical Dow borrowing rates) to range from about ten to sixteen percent, compared to roughly five percent under MIPS.  MIPS was clearly the lower cost instrument, yet Dow didn't choose that.  Even Dow's expert, Dr. Erickson, agrees that MIPS would have offered similar accounting treatment.  (Erickson Rep. at 70.)

327.    The United States contends that Dow's desire for "off-balance-sheet" financing is mere window dressing that it used to implement its Chemtech tax-avoidance schemes.

328.    As evidence of this window dressing, consider Joint Exhibit 104, a letter agreement between Dow and its controlled affiliate, Dow Europe, dated June 30 1993:  "The formation and operation of Chemtech is expected to benefit not only Dow Europe S.A. but the Dow Chemical Company worldwide because of the transaction's off-balance-sheet financing features at an attractive rate."  But more than a decade later, once a Dow witness was sworn under oath to testify, the story had to be adjusted.  The transaction would provide no benefit at all to Dow Europe, a significant company with hundreds of employees that oversaw Dow's European operations.  As Mr. Merszei testified (Merszei Dep. at 44), when asked how Dow Europe could possibly benefit from the scheme:  "Well, whether you have – well, first of all, if it – if it benefits the Dow Chemical Company, it will benefit all of our affiliates indirectly around the world . . . .  And since it is benefitting Dow, the whole Dow family."

329.    In fact, assuming the form of the transaction were to be respected, Dow Europe, as a separate entity, was placing itself at risk by entering into the transaction.  When Dow Europe was describing the proposed transaction to the Swiss tax authorities, it described that it would

receive $760,000 each year to manage Chemtech, and that it would accept the "unlimited"

liability risk of the partnership. (Joint Ex. 122 at bates 66862.) Of course, Dow Europe was not

a completely separate entity, and Dow was the true entity accepting the risk.

330.    On July 25, 1993, Dow wrote to Dow Europe S.A. to describe the potential

liabilities under U.S. law that Dow Europe might incur in its capacity as general partner of

Chemtech. Dow outlined the potential risks, and concluded "that the likelihood of any liability

resulting from the Partnership's ownership of the Patent Assets is remote." (Joint Ex. 123 at

bates 57724.) Despite this remote possibility, Dow noted that "in the unlikely event that a

general partner might incur any liabilities associated with the ownership of the Patent Assets, the

Patent License Agreement requires that [Dow] indemnify the Partnership against a broad range of

liabilities, and such indemnification should cover any remote exposures that might be faced by

the Partnership or a general partner." (*Id.* at bates 57724-25.)

331.    Dow and its experts contend that there are significant economic benefits of "off-

balance" sheet financing. (*See* Erickson Rep. at 70-83.) For example, Dr. Erickson suggests that

"unwary" investors, including lenders, may "ignore off-balance sheet financing and set lower

interest rates for loans than the underlying risk levels warrant." (Erickson Rep. at 69.)

332.    The proponents of off-balance sheet financing essentially contend that investors

and credit rating agencies care as much about the labels placed on transactions (*i.e.*, whether it is

on the balance sheet or not), as they do about the substance of the transactions themselves.

(Hubbard Rebuttal Rep. at 28.)

333.    As Dr. Hubbard explained, there is substantial evidence that this perception is not

accurate. Markets operate in an efficient manner, and Dr. Erickson's analysis assumes that

investors are unable or unwilling to penetrate the company's accounting treatment. (*Id*.)

334.    Empirical evidence demonstrates that investors see through general off-balance-sheet accounting and hybrid securities and favor substance over form. (*Id*. at 33.)

335.    Likewise, Dr. Erickson suggests a benefit to Dow in that Dow's credit ratings would have been helped by off-balance sheet financing. But credit rating agencies are private organizations that analyze the likelihood of default and make their ratings of this risk public. (*Id*. at 35.)

336.    Credit rating agencies consider "the four Cs of credit – character, capacity, collateral, and covenants." (Hubbard Rebuttal Rep. at 35.) Financial ratios are just a part of what is considered.

- Character incorporate the ethical reputation and business qualifications of management, which is one of the most important factors. (*Id*. at 36.)

- Capacity is the ability of the company to repay its obligations, and is based in part on the company financial statements. (*Id*.)

- Collateral assesses the ability the generate cash flow and the ability to provide additional support if needed to service the debt. (*Id*.)

- Covenants, if relevant, minimize risk to creditors. (*Id*.)

337.    Dr. Hubbard points out that the S&P's 1992 Corporate Finance Criteria confirms that financial ratios are merely a part of the equation: "Ratios ... are not intended to be hurdles or prerequisites that should be achieved to attain a specific debt rating. While they provide insight into ratings in general, it is a mistake to oversimplify the entire thought process behind a specific rating by relying solely on these numbers. (*Id*.)

338.    In fact, the S&P encourages companies not to manage themselves based on

financial ratios:  "S&P does not encourage companies to manage themselves with an eye towards

a specific rating.  The more appropriate approach is to operate for the good of the business as

management sees it, and let the rating follow. . .  If opportunities are foregone merely to avoid

financial risk, the firm is making poor strategic decisions.  In fact, it may be sacrificing long-term

credit quality for the facade of low risk in the near term."  (*See* Hubbard Rebuttal Rep. at 37.)

339.    The evidence in this case points weighs strongly in favor of finding that Dow had

no business purpose for entering into Chemtech other than to obtain tax benefits.  To begin, as

Goldman Sachs' Alexander Globus learned on his first day working on the SLIPs transaction, tax

law was the basis for the SLIPS transaction.  (Globus Dep. at 11.)  But he also learned that the

transaction would not work without a business purpose, and while Globus concedes that he is not

a lawyer, "I got the basic gist of what that meant."  (Globus Dep. at 19.)  Indeed, Goldman Sachs

thought its SLIPs transaction was superior to Babcock & Brown and Merrill Lynch's "sloppy"

products because of Goldman Sachs' awareness of the importance of a business purpose when

putting the transaction together.  (Globus Dep. at 25.)

340.    Moreover, Dow had no apparent need for the $200 million.  Goldman Sachs

began marketing the SLIPs program *to* Dow in April 1992.  There is no indication that Dow was

seeking any financing, let alone financing in the $200 million range.  In May 1992, Goldman

Sachs' wrote a letter to Dow estimating what the SLIPs fees would be using a financing amount

of $50 million (and noting that $25 million was the minimum financing amount allowed).  (Joint

Ex. 9.)  Even a year later, it is apparent that Dow was fumbling its supposed business purpose of

"monetizing" its patents, and that it had no particular amount in mind; when Dow was meeting

with Arthur D. Little & Co. to value the patents, a memo asks, "Are we at a valuation near

$200MM, $400MM, 800MM, 1000MM?"  (Joint Ex. 50 at bates 28363-64.)

341.    Dow was not making strategic business decision with an eye based on its financial ratios or monetizing patents.  It was making a tax-avoidance decision, using  business purposes that were "window dressing," at best.

342.    Moreover, Dow was very clear in conceding that, whether its debt was "on" or "off" its balance sheet, full disclosure was made to the three major credit rating agencies it dealt with, Standard & Poor's, Moody's, and Duff and Phelps.

343.    As Merszei testified (Merszei Dep. at 161-2):

Q    But, again, also as to Moody's as you said with Standard & Poor's, you would in fact provide Moody's with the information concerning your off-balance-sheet debt, correct?

A    Yes.  Yes.

Q    So all your testimony as you outlined it concerning what you provided to Standard & Poor's also applies to Moody's?

A    Oh, to all of them.  We don't differentiate.

Q    So they would know in effect and could utilize for whatever purpose they wanted the information concerning your off-balance-sheet debt.

A    Yes.  Yes.

344.    It also bears noting that after the Chemtech transaction closed, Dow scheduled an operations meeting.  Since Chemtech's operations were not to involve the United States, the meeting was held in Toronto.  Goldman Sach's Alexander Globus attended the meeting.  (Joint Ex. 162.)  Globus was the mathematical expert who had modeled the transaction.  Ordinarily, this would not have been the type of meeting Globus would attend.  Globus, who testified that he had not at that time had a vacation in 14 months, was asked why he was asked to attend:

"Because the client wanted it.  I had handed off this transaction.  I was done, I was on vacation.
Steve Quinn called me down in Turks and Caicos and some guy ran as the scuba boat was
pulling away and said you have a phone call.  Steve Quin said A, B, C, D, and I said well, I guess
you're really asking me to get on a plane.  And that was the end of my vacation."  (Globus Dep.
at 67.)  Globus was to participate in one of the Toronto subgroup breakout sessions where
"financial optimization" was to be discussed.  (Joint Ex. 162.)  Globus had developed the model
showing, among other things, the net present value of the tax benefits of SLIPs.  He had not
quantified any value of off balance sheet financing.  There is no reasonable expectation for Mr.
Globus to have been called away from a vacation to address Dow's senior management on any
matter *other* than the "financial optimization" of tax savings.  Even if there were modeling of the
non-tax benefits of a tax-motivated transaction that has already closed, that does not add to its
legitimacy.

345.    It is true that Goldman Sachs and Dow appear to have taken great pains to
minimize the discussion of taxes, and one internal Dow documents suggests that that was
intentional.  On one agenda for a meeting to review the 1996 operations of Chemtech, the
typewritten agenda of the meeting did not include taxes.  Yet Merszei still scribbled a note on his
copy of the agenda:  "We can't talk about the tax impact on TDCC."  (Joint Ex. 406.)  At his
deposition, Merszei could not recall what he meant. (Merszei Dep. at 91.)

346.    During the course of pretrial disclosures and discovery, Dow produced
approximately 80,000 pages of documents to the United States.  As best as can be determined,
not one page of those documents attempted to evaluate the cash flow, or the net present value, of
the money Dow would save on its borrowing costs due to the use of the "off-balance-sheet"

financing in Chemtech.

347.   For example, consider Joint Exhibit 591, an internal Dow email from Paul Janicki to Pedro Reinhardt.  "The original forecasted NPV of the Project was $180MM," and taking into account risk factors and expenses, the projected value was $96 million.  But in April 1998, the "Actual NPV through the end of 1997 was $132MM."  Even though cash flows had already taken place, Dow still made an adjustment, using a "risk factor" of 60 percent, and concluded the actual value of the project, after expenses, was $69 million.  The only risk to the project *after* the transaction had already taken place was that the tax benefits would be disallowed.

## XIII   The Litigation

348.   On or about April 15, 2005, IRS agents hand delivered to Dow a document that defendant contends was a draft Notice of Final Partnership Administrative Adjustment ("FPAA") outlining adjustments that may be made to partnership items of Chemtech for the 1993 and 1994 taxable years.  The defendant contends that the document was not issued to the tax matters partner of the partnership as required by statute, nor was it issued by an IRS official with authority to issue an FPAA.  Plaintiff contends that the document was a valid FPAA for the 1993 and 1994 taxable years.

349.   On July 13, 2005, DESA, as Tax Matters Partner of Chemtech, timely petitioned the United States District Court for the Middle District of Louisiana for readjustment of its partnership items for the 1993 and 1994 taxable years.  The case was docketed as Case No. 05-944-C-M3.  The parties agree that: (i) if the document referred to in paragraph 135 is a valid FPAA, then this Court would have jurisdiction in Case No. 05-944-C-M3 to resolve the dispute over the 1993 and 1994 tax years, (ii) if the document is not a valid FPAA, then this Court would

have jurisdiction to resolve the dispute over the 1993 and 1994 tax years in Case No. 06-258-RET-CN, part of this consolidated action.  Since the parties agree that this Court has jurisdiction to resolve the 1993 and 1994 taxable years under one of these case numbers, there is no need to resolve the factual question of whether the April 15, 2005 document is a valid FPAA.

350.    On January 13, 2006, the IRS issued an FPAA to DESA in its capacity as Tax Matters Partner of Chemtech, adjusting certain partnership items for the 1993 through 1997 tax periods. On April 4, 2006, DESA, as Tax Matters Partner of Chemtech, timely petitioned the United States District Court for the Middle District of Louisiana for readjustment of its partnership items for the 1993 through 1997 taxable years.  The case was docketed as Case No. 06-258-RET-CN. On April 7, 2006, the cases were consolidated to enable the Court to address the tax dispute relating to all years in one proceeding.

351.    The United States filed an answer on June 5, 2006.  On December 4, 2006, DESA filed an amended complaint, and that same day the United States filed an amended answer and counterclaim.  Through the counterclaim, the United States seeks a 20% penalty for the 1997 tax year based on negligence and/or substantial understatement of income tax.

352.    On March 30, 2007, the IRS issued a FPAA to Ifco in its capacity as Tax Matters Partner of Chemtech II, adjusting certain partnership items of Chemtech II for the 1998 through 2003 taxable years.  On June 8, 2007, Ifco, as Tax Matters Partner of Chemtech II, timely petitioned the United States District Court for the Middle District of Louisiana for readjustment of its partnership items for the 1998 through 2003 taxable years.  The case was docketed as Case No. 3:07-cv-00405-RET-DLD.  On June 25, 2007, the parties moved to consolidate the cases relating to the 1993 through 2003 taxable years of the Chemtech Partnership.  On July 27, 2007,

the court ordered the cases consolidated.

353.    A bench trial was held from June 20, 2011 through June 24, 2011.

## Conclusions of Law

**I      Intent of Congress:  "What Was Done" in Chemtech I and Chemtech II Was "Not the Thing" Which Congress Intended**

354.    The Supreme Court explained in the landmark case *Gregory v. Helvering*, "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."  293 U.S. 465, 468 (1935).  But "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended."  *Id*.

355.    It is appropriate that the Court examine the Congress's intent in creating the tax benefits at issue in this case.

356.    Congress *can* enact a statute to favor non-economic transactions.  For example, Congress can offer tax benefits to promote the use of alternative energy.  That was the case in *Sacks v. Commissioner*, 69 F.3d 982 (9th Cir. 1995), which involved the question of whether depreciation deductions and investment credits were allowed on a transaction involving the sale and leaseback of solar energy equipment.  The Ninth Circuit reasoned that Congress had specifically encouraged investment in solar energy and thereby "skewed the neutrality of the tax system."  *Id*. at 991.

357.    But it is only when "Congress intends to encourage an activity, and to use taxpayers' desire to avoid taxes as a means to do it," that "a subjective motive of tax avoidance is permissible."  *IRS v. CM Holdings (In re CM Holdings, Inc.)*, 301 F.3d 96, 106 (3d Cir. 2002).

358.    Where instead, as here, there exists no Congressional intent to skew the tax

system, a transaction must have economic substance to be respected for tax purposes. This lack of Congressional intent in the context of perceived tax loopholes, rather than *Sacks*-like encouragement, was described aptly by the District Court in *CM Holdings*:

> The Court is unaware of any statute or legislative history indicating Congress has condoned, much less encouraged, policy loan interest deductions of the type and magnitude involved in Camelot's broad-based COLI VIII plan. To the contrary, Congress appears to be in a perpetual game of catch up with the innovative geniuses of the life insurance industry, constantly trying to plug up perceived holes in the tax code regarding the deductibility of policy loan interest, *e.g.*, § 264's general prohibition on deducting policy loan interest incurred as part of a plan to systematically borrow part or all of the increases in the policy values of the insurance, the $ 50,000 loan limit, and most recently the relevant provisions of HIPA. It *follows, the reasoning of Sacks does not apply here*.

*IRS v. CM Holdings, Inc.* (*In re CM Holdings, Inc.*), 254 B.R. 578, 624 (Bankr. D. Del. 2000) (emphasis added) (*affirmed CM Holdings,* 301 F.3d 96). To "engage in an activity solely for the purpose of avoiding taxes where that is not the statute's goal is to conduct an economic sham." *CM Holdings*, 301 F.3d 106.

359.    While Congress *can* intend to provide tax benefits for non-economic transactions, it did *not* do so for the non-economic transactions at issue in this case.

360.    In creating deductions for the depreciation or amortization of wasting assets, Congress intended to allow a taxpayer to recover the cost of an income-producing asset; it did not intend a taxpayer to manipulate the Tax Code to claim deductions for assets that have been already depreciated.

361.    But that is just what Dow did. Chemtech I and II were preplanned transactions designed and intended to generate artificial tax deductions from assets that could no longer provide depreciation or amortization deductions. Thus, for its fully-amortized patents, Dow

created artificial royalty deductions by transferring the patents to Chemtech I and "leasing" them

back.  Later, by transferring an almost-fully depreciated chemical plant to Chemtech II, Dow not

only created artificial deductions for payments to "rent" its own chemical plant, but also (through

a basis step-up) claimed an entire second set of depreciation deductions for that plant.

362.    Dow did this by design.  As an advisor at Goldman Sachs, which marketed and

sold to Dow the SLIPS transaction that became Chemtech I, explained, the "Holy Grail" of SLIPs

was to make equity into a tax deduction.  But this was plainly not intended by Congress.

363.    The depreciation deduction has been a part of the federal tax system "at least since

1909, when Congress recognized that a corporation should calculate its annual net income by

deducting from gross income 'all losses actually sustained within the year and not compensated

by insurance or otherwise, including a reasonable allowance for depreciation of property.'"

*Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 553 (1993) (quoting, Tariff of 1909,

§ 38 Second, 36 Stat. 11, 113.)  Depreciation deductions for intangible assets, including patents,

were permitted by the Revenue Act of 1918.  *Newark Morning Ledger*, 507 U.S. at 554-55.

364.    Depreciation deductions allow a taxpayer to recover the costs of acquiring an

asset.  *See*, *e.g.*, *Massey Motors, Inc. v. United States*, 364 U.S. 92, 107 (1960) ("We therefore

conclude that the Congress intended that the taxpayer should, under the allowance for

depreciation, recover only the cost of the asset less the estimated salvage, resale or second-hand

value.")  They "further the integrity of periodic income statements by making a meaningful

allocation of the cost entailed in the use (excluding maintenance expense) of the asset to the

periods to which it contributes."  *Id*. at 104.  Similarly, "[t]he end and purpose of [depreciation

accounting] is to approximate and reflect the financial consequences to the taxpayer of the subtle

effects of time and use on the value of his capital assets." *Id*.

365.    Thus, for physical assets, a depreciation deduction for a given year "represents the reduction, during the year, of the capital assets through wear and tear of the plant used" and the amount of the deduction "is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant in the business, the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost." *United States v. Ludey*, 274 U.S. 295, 300-01 (1927).

366.    Because an intangible asset does not "exhaust or waste away" like a physical asset, it may be depreciated only if it "has a value that wastes over an ascertainable period of time." *Newark Morning Ledger*, 507 U.S. at 566.  Therefore, amortization deductions are permissible for intangibles if the assets "can be valued" and have "a limited useful life." *Id*. Intangibles "such as patents and copyrights are depreciable over their 'legal lives.'" *Id*. at 556. "Whether or not an intangible asset, or a tangible asset, is depreciable depends upon the determination that the asset is actually exhausting, and that such exhaustion is susceptible of measurement." *Id*. (*citing* Rev. Rul. 68-483.)

367.    Through Chemtech, Dow, in essence, believed that it had found the "Holy Grail" whereby its assets could remain eternally youthful by regenerating deductions--ordinarily reserved for the recovery of the cost of an asset--based on the value of the asset *after* the cost of acquiring it had already been recovered.  It is not a reach for this Court to conclude that Congress had no such thing in mind.  The tax benefits sought by Dow in this case are "not the thing which Congress intended."

368.    Along with the notion that Congress did not intend the tax benefits claimed by

Dow in its Chemtech transaction, Congress has also expressed its frustration with large corporations that seek to engage in abusive tax shelters that exploit the tax laws in ways not intended.  The Tax Reform Act of 1986, along with other tax acts in the 1980s, shut down many abusive tax shelters of the 1980s, but the tax shelter problem was not eliminated.

369.   To the contrary, a new generation of tax shelters, generally those of the 1990s, followed.  As the Staff of the Joint Committee on Taxation noted in a 1999 report, "[t]he proliferation of corporate tax shelters is believed to be both widespread and significant."  *See* Staff, Joint Committee on Taxation, *Study of Present-Law Penalty and Interest Provisions as Required by Section 3801 of the Internal Revenue Service Restructuring and Reform Act of 1998 (Including Provisions Relating to Corporate Tax Shelters)*, Vol. 1 at 216 (July 22, 1999), http://www.jct.gov/publications (follow links to 1999 documents and select JCS-3-99 Volume 1) (hereafter Joint Committee 1999 Report).

370.   The Joint Committee quoted the Congressional testimony of the president of the Tax Executives Institute, who said that even the "TEI agrees that the situation cannot be ignored.  As tax executives, we see the challenge to the tax system every day."  Joint Committee 1999 Report at 217.  And the Chair of the ABA Tax Section stated that "[w]e have witnessed with growing alarm the aggressive use by large corporate taxpayers of tax 'products' that have little or no purpose other than reduction of Federal income taxes."  *Id*.  And the Report of the New York State Bar Association Tax Section stated that "[o]ur perception is that the number of widely-marketed, aggressive corporate tax shelter transactions has grown significantly in the last decade," and that "[i]n our view, corporate tax shelters (properly identified) represent a major problem for our system."  *Id*.  The Chair of the NYSBA Tax Section noted:  "The constant

promotion of these frequently artificial transactions breeds significant disrespect for the tax system, encouraging responsible corporate taxpayers to expect this type of activity to be the norm and to follow the lead of other taxpayers who have engaged in tax-advantaged transactions." *Id.* at 218.

371.    The Joint Committee noted that several factors contribute to this problem.  First is "the emerging view of the corporate tax department as a profit center and of the corporate income tax as a manageable cost." *Id.* at 221.  Second, the low cost of entering into a tax shelter, "as compared to the potential benefits from the tax savings, are insufficient to serve any meaningful deterrent function." *Id.*

372.    The Joint Committee also described a few characteristics of the modern corporate tax shelter.  First, "the reasonably expected pretax profit from the arrangement is insignificant when compared with the tax benefits that are expected to be derived." *Id.* at 220.  "Another common feature is the involvement of a tax-indifferent participant." *Id.*  The Joint Committee gave as an example that the "tax-indifferent participant is compensated to 'absorb' the undesirable tax consequences without suffering any adverse economic consequences from the arrangement." *Id.*  Third, the arrangements are such "that the expected tax benefits do not result in a corresponding loss for financial reporting purposes." *Id.* at 221.

373.    To be sure, as Judge Learned Hand famously noted, there is no "patriotic duty to increase one's taxes," *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir.1934), *aff'd*, 293 U.S. 465, but a taxpayer's right to reduce its taxes by legal means does not extend to abusive tax shelter transactions.

**II    The Chemtech I and Chemtech II Transactions Lack Economic Substance and, for Tax Purposes, Should Be Disregarded**

"[E]verything other than tax motivation fades under the glare of analysis."

Then-circuit judge Blackmun in *Haberman Farms, Inc. v. United States*, 305 F.2d 787, 793 (8th Cir. 1962)

**A.    In General**

The Internal Revenue Code provides detailed rules relating to the computation of a taxpayer's tax liability. *See* H.R. Rep. No. 111-443 at 291.[2] But the courts have long recognized that taxpayers may devise schemes that seemingly comply with the technical requirements of the Internal Revenue Code, but that are at odds with what the statute intended. *Gregory v. Helvering*, 293 U.S. 465 (1935). In those circumstances, courts deny the claimed tax benefits.

374.    The Supreme Court's landmark decision in *Gregory v. Helvering* emphasizes that the courts will look through the form of transactions that have been manufactured for tax purpose and examine their true substance.

375.    Several, sometimes overlapping, judicial doctrines have emerged from the many court decisions that followed *Gregory*. These judicial doctrines deny tax benefits to a taxpayer that has engaged in an abusive transactions designed to obtain tax benefits not intended by Congress. These judicial doctrines include "(1) the sham transaction doctrine, (2) the economic substance doctrine, (3) the business purpose doctrine, (4) the substance over form doctrine, and

---

[2] The Reconciliation Act of 2010 became law on March 30, 2010. Pub. L. No. 111-152, 124 Stat. 1029 (March 30, 2010). The act creates new Internal Revenue Code section 7701(o), entitled "Clarification of Economic Substance Doctrine." Section 7701(o) is prospective in application, and applies to transactions entered into after March 30, 2010. The present case involves transactions entered into between 1993 and 2003, well before the effective date of section 7701(o).

(5) the step transaction doctrine." *See* Staff, Joint Committee on Taxation, *Study of Present-Law Penalty and Interest Provisions as Required by Section 3801 of the Internal Revenue Service Restructuring and Reform Act of 1998 (Including Provisions Relating to Corporate Tax Shelters)*, Vol. 1 at 186 (July 22, 1999),  http://www.jct.gov/publications (follow links to 1999 documents and select JCS-3-99 Volume 1) (hereafter Joint Committee 1999 Report).

376.    The Fifth Circuit applies the judicial doctrines broadly, noting that "[t]he principle of looking through form to substance is no schoolboy's rule; it is the cornerstone of sound taxation . . . . 'Tax law deals in economic realities, not legal abstractions.'" *Estate of Weinert v. Commissioner*, 294 F.2d 750, 755 (5th Cir. 1961) (case involving whether a taxpayer had an economic interest in an oil or gas property) (internal citations omitted).

377.    Congress recognizes that, in the area of tax, their ability to draft tax statutes are no match for the cleverness of sophisticated tax lawyers and financial advisors.  Congress explained last year, when it prospectively clarified the economic substance doctrine, that "[a] strictly rule-based tax system cannot efficiently prescribe the appropriate outcome of every conceivable transaction that might be devised and is, as a result, incapable of preventing all unintended consequences."  H.R. Rep. No. 111-443 at 295.  The D.C. Circuit has explained that the tax system "gives a multitude of clever individuals in the private sector powerful incentives to game the system.  Even the smartest drafters of legislation and regulation cannot be expected to anticipate every device." *ASA Investerings Partnership v. Comm'r*, 201 F.3d 505, 513 (D.C. Cir. 2000); *Boca Investerings Partnership*, 314 F.3d at 631.  The judicial doctrines "reduce[] the incentive to engage in such essentially wasteful activity." *Id*.

378.    The economic substance doctrine has been used in any number of circumstances, and *Gregory* stands for the general proposition that "[t]he basic rule of law is that taxation is based upon substance, not form." *DeMartino v. Commissioner*, 862 F.2d 400, 406 (2d Cir. 1988); *see also Knetsch v. United States*, 364 U.S. 361, 366 (1960); *Goldstein v. Commissioner*, 364 F.2d 734, 741-42 (2d Cir. 1966).

379.    The economic substance doctrine looks through the form of the transaction to determine what, in substance, actually occurred. Courts therefore recognize that "even if a transaction is in 'formal compliance with Code provisions,' a deduction will be disallowed if the transaction is an economic sham." *Dow Chemical Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006) (quoting *Am. Elec. Power Co. v. United States*, 326 F.3d 737, 741 (6th Cir. 2003)).

## B.    *Gregory v. Helvering*

380.    In *Gregory v. Helvering*, the owner of a closely held corporation wanted the corporation to distribute to her a corporate asset (stock of a different corporation). Normally, such a distribution would take the form of a dividend, which would be a taxable event. The shareholder in *Gregory* wished to avoid this tax. In a prearranged transaction, the shareholder formed a new corporation, which then acquired the asset from the original closely-held corporation in a tax-free reorganization that complied with the literal terms of the applicable revenue act. The new corporation then liquidated, and the asset was distributed to the shareholder. The taxpayer acknowledged a tax motive in devising the transaction but contended that a tax motive was irrelevant because she complied with the letter of the revenue act. 293 U.S. 465 (1935).

381.    The Supreme Court in *Gregory* held that the purported reorganization lacked

economic substance because its real purpose was to obtain a tax benefit.  The Court focused on

the question *"whether what was done, apart from the tax motive, was the thing which the statute*

*intended."*  293 U.S. at 469 (emphasis added).  The Court posed the question:  what is found

when the substance of Gregory's transaction is examined?  It answered as follows (*id.*, emphasis

added):

> Simply an operation having no business or corporate purpose--a mere device
> which puts on the form of a corporate reorganization as a disguise for concealing
> its real character, and the sole object and accomplishment of which was the
> consummation of a preconceived plan, not to reorganize a business or any part of
> a business, but to transfer a parcel of corporate shares to the petitioner.

382.    The *Gregory* Court held that, although the transaction fell within the literal terms

of the reorganization statute, it was nothing more than "an elaborate and devious form of

conveyance masquerading as a corporate reorganization," and therefore it fell "outside the plain

intent of the statute."  *Id.* at 470.

### C.    After Gregory

383.    Since *Gregory*, courts have recognized "the eternal tension between form and

substance" in transactions designed for tax purposes.  *Killingsworth v. Commissioner*, 864 F.2d

1214, 1216 (5th Cir. 1989) (internal quotation omitted).   As the Fifth Circuit aptly put, "[s]ince

*Gregory* was decided, courts have consistently held that although a transaction may, on its face,

satisfy applicable Internal Revenue Code criteria, it will nevertheless remain unrecognized for

tax purposes if it is lacking in economic substance."  *Id.* at 1216.

384.    After *Gregory*, in *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978),

the Supreme Court recognized two general areas of inquiry to determine whether a transaction

should be respected for tax purposes: first, whether the taxpayer was motivated by any business

purpose other than obtaining tax benefits, and second, whether the transaction lacked economic substance. If a transaction fails either test, it is disregarded. *See, e.g.*, *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1355 (Fed. Cir. 2006); *Dow Chemical Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006).

385.    The Fifth Circuit has noted that the "economic substance doctrine allows courts to enforce the legislative purpose of the Code by preventing taxpayers from reaping tax benefits from transactions lacking in economic reality." *Klamath Strategic Investment Fund v. United States*, 568 F.3d 537, 543 (5th Cir. 2009) (citing *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1353-54 (Fed. Cir. 2006)). And transactions that "do not vary control or change the flow of economic benefits[ ] are to be dismissed from consideration." *Id.* (*citing Higgins v. Smith*, 308 U.S. 473, 476 (1940)).

386.    The Fifth Circuit in *Klamath*, referring to the Supreme Court's decision in *Frank Lyon*, applied a multi-factor test, "with factors including whether the transaction (1) has economic substance compelled by business or regulatory realities, (2) is imbued with tax-independent considerations, and (3) is not shaped totally by tax-avoidance features." *Klamath*, 568 F.3d at 544 (citing Frank Lyon, 435 U.S. at 583-84). An "absence of any one of them will render the transaction void for tax purposes." *Id.*[3]

---

[3] Dow has relied on the district court decision in *Castle Harbour I*, which rejected the Government's economic substance arguments. *TIFD III-E, Inc. v. United States*, 342 F. Supp. 2d 94 (D. Conn. 2004), *rev'd*, 459 F.3d 220 (2d Cir. 2006). Given the Second Circuit's reversal of the district court, and the fact that this Court's analysis of the particular facts in this case are not consistent with the findings made by the district court in *Castle Harbour I*, the Court declines to take the approach followed by the district court in that case.

**D.    First Prong:  Economic Substance**

387.    Courts examine "whether the transaction has any practical economic effects" other than generating a tax benefit, and they have "refused to recognize the tax consequences of transactions" that "did not appreciably affect [the taxpayer's] beneficial interest except to reduce his tax." *ACM Partnership v. Commissioner*, 157 F.3d 231, 248 (3d Cir. 1998) (internal quotations omitted); *Knetsch v. United States*, 364 U.S. 361, 366 (1960); *Dow Chemical*, 435 F.2d at 599 (key question to be decided is "whether the transaction has any practicable economic effects other than the creation of" tax benefits).

388.    As the Fifth Circuit noted recently in *Klamath*, "transactions which do not vary control or change the flow of economic benefits are to be dismissed from consideration."  568 F.3d at 543 (citing *Higgins v. Smith*, 308 U.S. 473, 476 (1940)).

389.    In making this analysis, *if* the purported purpose of a transaction is to make a profit, courts require that, objectively, there be a *reasonable* possibility of a profit that is substantial in relation to the tax benefits generated.  *Nevada Partners Fund, LLC v. United States*, 714 F. Supp. 2d 598, 632 (S.D. Miss. 2010) ("modest profits relative to substantial tax benefits are insufficient to imbue an otherwise dubious transaction with economic substance), *appeal pending*, No. 10-60559 (5th Cir.); *see also Compaq Computer Corp. v. Commissioner*, 277 F.3d 778, 782 (5th Cir. 2001.)  Many economic substance cases turn on the question whether the transaction had a reasonable possibility of profit, but a transaction may be designed to serve a business purpose other than making a profit.  *Fidelity*, 2010 WL 4116469 at *164.

390.    "In making its objective inquiry, the court should view the transaction from the standpoint of a 'prudent' or 'rational' business person-for example, by considering whether a

prudent or rational investor would engage in the transaction with a belief that profits could be earned." *Fidelity,* 2010 WL 4116469 at *164; *Gilman v. Commissioner,* 933 F.2d 143, 146-47 (2nd Cir.1991) (requiring the plaintiff to demonstrate that a prudent investor could have concluded that there was a realistic opportunity for a profit); *Long Term Capital Holdings v. United States,* 330 F. Supp. 2d 122, 172 (D. Conn. 2004).

391.    In the present case, Dow does not contend that it entered into the transaction to make a profit, but rather, to obtain benefits that would help its overall credit rating.  In the next section of this opinion, the Court rejects that purported business purpose.  But in this section, since Dow does not claim that it was motivated by profit, the Court will examine the practical economic effect of the Chemtech I and Chemtech II transactions:  Did Dow obtain an economic advantage from engaging in the transactions?

392.    When examining the economic effects of a transaction, it is well established that courts do not limit the application of economic substance to temporary or fleeting transactions.  Rather, the economic substance test is – and must remain – flexible in order to address the ever-changing tax schemes conceived by tax shelter promoters.  *Gilman v. Commissioner*, 933 F.2d 143, 147-48 (2d Cir. 1991).  In *Gilman*, for example, the transaction was not fleeting, but, like here, a lease-strip tax shelter that lasted a decade.

393.    In the present case Dow is unable to carry its burden that the Chemtech transactions had economic substance.

394.    Dow is in business to make a profit from its chemical manufacturing and related businesses, and its business is capital intensive.  As such, in order to fund its business projects, it needs access to financing.  As the government's expert noted, corporations face "fundamental

corporate finance questions":  First, what investments does a business have that require capital.

Second, how to raise it.  (Hubbard Rep. at 13; Hubbard Rebuttal Rep. at 10.)

395.    As described in some detail above, and in even more detail in Dr. Hubbard's

rebuttal report, the SLIPs transaction does not provide any economic advantage to Dow.  To the

contrary, the SLIPs transaction was an economic disadvantage.  If Dow were truly interested in

obtaining off balance sheet financing, it could have done so without engaging in such a

convoluted and expensive scheme.

396.    Also, as Dr. Hubbard noted, when its mistakes are corrected, the Goldman Sachs'

model developed by Alexander Globus, shows that "the NPV of Chemtech absent the tax

benefits was negative."  (Hubbard Rebuttal Rep. at 46-47.)

397.    Dow acknowledges that it routinely determines the net present value of its

transactions.  But the only net present value computations Dow made in this case related to the

tax savings, not to any quantifiable advantage it might obtain by its off-balance-sheet financing.

398.    Indeed, there is scant evidence that Dow even needed the $200 million that it

received in each Chemtech transaction.  As Dr. Hubbard noted, "firms typically first identify a

specific profitable project, and then seek financing at the lowest possible cost" (Hubbard

Rebuttal Rep. at 16), but  "I could find no mention of a specific capital project to be funded.  (*Id.*

at 17).  Thus Dow is unable to objectively quantify associated costs or benefits to establish that it

could have received any economic benefit.  (*Id.*)  Dr. Hubbard's own analysis was that "Dow had

no obvious need for cash."  (*Id.* at 21.)

399.    In addition, Dow chose the SLIPs transaction over less costly means of raising

off-balance-sheet financing, contrary to what a prudent business would have done, unless that

business was merely seeking tax benefits.  (*See, e.g.*, Hubbard Rebuttal Rep. at 23.)

400.    Not only did Dow make no attempt to quantify the benefits of off-balance-sheet

financing, but as Dr. Hubbard describes, from an objective point of view, Dow has failed to

provide any evidence of any value of off-balance-sheet accounting.  (*See*, e.g., Hubbard Rebuttal

Rep. at 34-42.)

401.    Perhaps the most telling aspect of the Chemtech transactions are the circular cash

flows.  Money simply flowed from Dow to the Chemtech group and then back to Dow.  Circular

flows of cash have long been indicators of tax shelter transactions that have been disregarded as

lacking substance.  *Merryman v. Commissioner*, 873 F.2d 879, 882 (5th Cir. 1989) ("Such a

circular flow of funds among related entities does not indicate a substantive economic transaction

for tax purposes."); *see also American Elec. Power Co., Inc. v. United States*, 326 F.3d 737, 743

(6th Cir. 2003 (internal quotes omitted) ("tax benefits generated by the circular policy-loan

interest deductions arose from thin air"); *BB&T Corp.,* 523 F.3d at 475 ("All that BB&T has

done is paid Sodra approximately $6 million dollars to sign documents. . ., arranged a circular

transfer of funds. . ., and invested approximately $12 million in government bonds."); *AWG

Leasing Trust v. United States*, 592 F. Supp. 2d 953, 983 (N.D. Ohio 2008) ("perfectly offsetting,

circular payments from and then back to the German banks strongly indicate that the AWG

transaction has little substantive business purpose other than generating tax benefits for the

Plaintiffs"); *Hines v. United States*, 912 F.2d 736, 741 (4th Cir. 1990) ("the lease and debt

payments between the three parties . . . were structured to be offsetting.  The circularity meant

that the transaction became self-sustaining after the payments at closing with virtually no further

financial input necessary from any of the parties."); *Felcyn v. United States*, 691 F.Supp. 205,

212 (C.D. Cal. 1988) (denying interest expense deduction because loan and alleged interest payments "were simply part of a circularization of funds"); *Valero Energy Corp. v. United States*, 2008 WL 4104368 at *14 (N.D. Ill. 2008) (tax shelter indicated when tax avoidance was "significant  purpose" when taxpayer "merely reclassified intercompany trade payables as intercompany loans—an objective that could have been accomplished by resolution and contract, or by transferring funds directly, rather than through the use of circular cash flows"); Peter C. Canellos, *A Tax Practitioner's Perspective on Substance, Form and Business Purpose in Structuring Business Transactions and in Tax Shelters*, 54 SMU L. Rev. 47, 58 (2001) (the "notion that a transitory subsidiary or a circular flow of cash may be disregarded ... is so well ingrained as to be taken for granted").

402.    Not all of the cash returned to Dow, but the payments to the foreign banks in substance, if not form, were mere interest payments equivalent to those needed to service a $200 million loan.

403.    Moreover, the lack of any economic benefit to the Chemtech leases is analogous to the lack of economic benefits bestowed o corporations that have engaged in LILO and SILO tax shelters.  In other words, casting aside the form of the Chemtech I and Chemtech II transactions, the substance of the deals are remarkably similar to LILO (lease-in lease out) and SILO (sale-in sale-out) tax shelters that the Court of Federal Claims found to be "offensive . . . on many levels," and "rotten to the core."  *Wells Fargo & Co. and Subsidiaries v. United States*, 91 Fed. Cl. 35, 39, 79 (2010).

404.    In a LILO, a US taxpayer claims rent deductions associated with its purported acquisition (from a non-US taxpayer) of a leasehold interest in property that is simultaneously

leased back to the owner.  In return, the property owner receives an accommodation fee for signing the lease but never relinquishes possession or control of the property.

405.    SILOs, which evolved after the IRS issued proposed regulations that effectively eliminated the ability to claim the accelerated rent deductions LILOs purported to offer, differ from LILOs only in that the US taxpayer purports to acquire (for tax purposes only) an ownership interest in the subject property and claims deductions for depreciation instead of rent.

406.    Both shelters require the use of funds provided by a third-party (usually a foreign bank) through a circular financing arrangement (commonly referred to as a "debt defeasance" or "debt loop") that 1) allows the parties to the lease agreements to satisfy their rental obligations without advancing any of their own funds, and 2) virtually eliminates any risk of repayment to the putative lender.

407.    Like LILOs and SILOs, the Chemtech I and Chemtech II transactions both involve the transfer--in form--of Dow's property to a separate entity that did not--in substance--affect Dow's use, possession, or control of its property.  In this respect, Dow's role is akin to the non-US taxpayers whose property served as the basis for the tax deductions that were ultimately disallowed in the LILO and SILO cases.

408.    But the rationale for denying the rent deductions claimed by US taxpayers in LILOs applies equally to denying the tax benefits generated by the circular flow of funds in Chemtech.  *See BB&T Corp. v. United States*, 523 F.3d 461, 475 (4th Cir. 2008) ("Because the funds BB&T provided as the Advance Head Lease Payment do not, in substance, constitute 'rental[ ] . . . payments required to be made as a condition to the continued use or possession' of the Equipment, BB&T is not entitled to a deduction under [IRC] § 162(a)(3)."); *see also AWG*

*Leasing Trust v. United States*, 592 F. Supp. 2d 953, 981-82 (N.D. Ohio 2008); *Wells Fargo & Co. and Subsidiaries v. United States*, 91 Fed. Cl. at 76, *quoting Kwiat v. Comm'r*, 64 T.C.M. (CCH) 327, 1992 WL 178603, at *8 (1992) ("[T]he issue is whether the 'transaction, as it stands at the time in question, sufficiently shifts the benefits and burdens of ownership such that the transaction should, for tax purposes, be treated as if it were a sale'.")

409.    In sum, the Chemtech I and Chemtech II transactions lack objective economic substance.

410.    In the alternative, even if the Court were to find that the Chemtech I and Chemtech II transactions had economic substance, the "note exchange" that took place in 1998 during the transition between Chemtech I and Chemtech II plainly lacked economic substance.

411.    Courts must define the "transaction" to be examined, and the transaction to examine is the one "that provided the tax benefits at issue." *Klamath*, 568 F.3d at 545.  The Court's primary holding is that the entire Chemtech scheme is the transaction to be analyzed for the purposes of economic substance, and that Chemtech schemes lacks economic substance.  But, with respect to the § 731 tax described below, the note exchange was the transaction that provided the tax benefits.  That transaction is Dow's exchange of three term notes for a single, deeply subordinated, note with a 33-year term.

412.    It bears noting that, during this transition period, the Chemtech partnership was entirely owned by Dow.  No foreign banks were involved.  A corporation's "arrangements with subsidiaries that do not affect the economic interest of independent third parties deserve particularly close scrutiny." *Coltec*, 454 F.3d at 1356-57.  Courts may consider subsidiary transactions as separate transactions for the purposes of the economic substance doctrine.

*Fidelity,* 2010 WL 4116469 at *121.

413.    During this transition period, Dow recognized that it could not structure the transition between Chemtech I and Chemtech II merely by directing Chemtech to distribute the patents back to Dow, by way of liquidating Diamond Technology's interest in Chemtech. As explained below in more detail, to do so would trigger a tax pursuant to I.R.C. § 731, because the Dow notes would be considered "marketable" securities.

414.    Therefore, on June 12, 1998, before distributing the patents, Dow simply converted the demand promissory notes to a single note in the amount of $781.6 million with a 33 year term payable on October 1, 2032. Given that Dow was both the borrower and the lender, it was economically meaningless, and, for tax purposes, it is without economic substance.

415.    It is plain that the note exchange had no economic impact whatsoever on Dow. The exchange is completely without economic substance, and it must be disregarded.

**E.    *Second Prong:  Business Purpose***

416.    A transaction can also be disregarded as an economic sham "if the taxpayer's sole subjective motivation is tax avoidance even if the transaction has economic substance." *Coltec,* 454 F.3d at 1355; *Fidelity*, 2010 WL 4116469 at *159; *Casebeer v. Comm'r,* 909 F.2d 1360, 1363-64 (9th Cir. 1990) ("whether the taxpayers have shown that they had a business purpose for engaging in the transaction other than tax avoidance").

417.    In determining the taxpayer's subjective purpose, the Court may consider, among other things, evidence of the experience and sophistication of the taxpayer. *See id.* at 1364. Where a taxpayer is sophisticated in economics and/or taxation, entering into a transaction with no reasonable prospect of profit is strong evidence of the taxpayer's true tax-avoidance

motivation. *See Long Term Capital Holdings,* 330 F. Supp. 2d at 186.

418.    The Federal Circuit has noted that "*Gregory v. Helvering* requires that a taxpayer carry an unusually heavy burden when he attempts to demonstrate that Congress intended to give favorable tax treatment to the kind of transaction that would never occur absent the motive of tax avoidance." *Coltec Industries Inc. v. United States*, 454  F.3d 1340, 1355-56 (Fed. Cir. 2006).

419.    In the present case, Dow claims a business purpose of obtaining "off balance sheet" financing.  But this claim is false.  Dow's sole quest in Chemtech was to seek Goldman Sachs' "Holy Grail" of turning equity into a tax deduction.  The Fifth Circuit is not fond of such quests:  When it rejected the notorious Son of BOSS tax shelter it commented that the shelter "attempt[s] to transform [a] wash transaction (for economic purposes) into a windfall (for tax purposes)" that reminded the Court "of an alchemist's attempt to transmute lead into gold." *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 456 (5th Cir. 2008).

420.    SLIPS was just one of many marketed tax shelters of the 1990s.  Some of those transactions, like the lease-strip SLIPS, SILO/LILO (Sale-In Lease-Out, and Lease-In Lease-Out), COLI (company owned life insurance), contingent liability shelters, were marketed to large corporations, while others, such as Son of BOSS, and DAD (distressed asset debt), and FOCus (*Nevada Partners*) were marketed to individuals.

421.    When considering a taxpayer's claimed business purpose for entering into a marketed tax product, the courts rightly examine very closely the taxpayer's claimed business purpose.  *See Coltec*, 454 F.3d at 1355-56.

422.    While taxpayers are entitled to structure their taxes in such a way as to reduce taxes, they may not structure a transaction "to such extreme lengths that the business purpose is

no more than a facade." *ASA Investerings Partnership v. Comm'r*, 201 F.3d 505 (D.C. Cir. 2000). Nor may a taxpayer claim tax benefits "by affixing labels to its transaction that do not accurately reflect their true nature." *BB&T Corp. v. United States*, 523 F.3d 461, 471 (4th Cir. 2008).

423.   As has been described in detail in the findings of fact, Dow's purpose in entering into the Chemtech I and Chemtech II transactions was to obtain tax benefits. Its claimed business purpose of "off-balance-sheet financing" was a smokescreen for its real, tax-motivated purpose. The promoter of Dow's SLIPs transacation, Goldman Sachs, as well as the attorneys at Andrews & Kurth that helped develop it, were well aware that the transaction would not work without a valid non-tax business reason, and the transaction was designed at the outset to provide the facade of such a purpose. But on close scrutiny, that business purpose falls away.

424.   In addition, with respect to the note exchange, it is plain that there was no business purpose to the exchange. The paper record is bare of any business reason for this conversion; tax reasons provide the only support. Dow's internal memoranda and notes describe that "[t]he most important aspect of the 754 election was that the assets in CPI [Chemtech Portfolio] be non-marketable. Consequently, prior to the distribution, we converted the inter-company loan which CPI was making to TDCC to a deeply subordinated 34 year note." (Joint Ex. 710 at bates 83153.)

425.   A different handwritten internal Dow memorandum dated in May of 1998 noted that this series of demand notes were "currently marketable," but "can't have marketable securities when we distribute out the patents. The patents and CPI stock will be used to take out DTPC's capital." So the notes indicate: "Exchange these marketable securities for a new deeply

subordinated 33 year note." (U.S. Ex. D15.)

426.    In case it was not obvious that obtaining the tax benefits turned on the timing of these events was not obvious, the handwritten notes emphasized: "We must do the exchange and contribution prior to retiring DTPC's interest." (*Id*.)

427.    Finally, particularly telling evidence that the note exchange was purely tax motivated was the August 3, 1998 email where Dow discussed making a similar note exchange at the conclusion of Chemtech II, when Dow would then prepare for Chemtech III (Joint Ex. 705): Chemtech Portfolio II "*will still need to have the loan in place until Chemtech III is set up. The loan would then be converted to the same type of note that CPI [Chemtech Portfolio I] now has in place.*" (*Id*.) (emphasis added). Dow had no purpose to make the 1998 note exchange except to avoid taxes.

428.    In conclusion, Dow's Chemtech transactions lack any economic substance, and, on scrutiny, they were entirely motivated by tax avoidance. As Justice Blackmun would say, "*everything other than tax motivation fades under the glare of analysis.*" *Haberman Farms Inc. v. United States*, 305 F.2d 787, 793 (8th Cir. 1962).

**III.    Dow and the Foreign Banks Did Not Join Together to Form a Partnership for the Purposes of the Internal Revenue Code**

> *"Men may put on the habiliments of a partnership whenever it advantages them to be treated as partners underneath, although in fact it may be a case of 'The King has no clothes on' to the sharp eyes of the law."*

> Justice Felix Frankfurter in *Commissioner v. Culbertson*, 337 U.S. 733, 752 (1949) (concurring)

**A.    The Partnership is Not Respected Under Culbertson, or the Sham Partnership, Doctrine**

429.    While the economic substance doctrine is invoked to disregard *transactions* without economic purpose, different judicial doctrines may be used to disregard or recharacterize *partnerships* where tax motivated transactions take place.  *Merryman v. Commissioner*, 873 F.2d 879, 881 (5th Cir. 1989); *Southgate Master Fund, LLC v. United States*, 651 F.Supp.2d 596, 657 (N.D. Tex. 8/18/09), *appeal pending*, No. 09-11166 (5th Cir.); *Fidelity International Currency Advisor A Fund, LLC v. United States*, _ F. Supp. 2d _, 2010 WL 4116469 at *139 and *165-66 (D. Mass. 2010); *see also TIFD III-E, Inc. v. United States*, 459 F.3d 220 (2d Cir. 2006) (case commonly referred to as *Castle Harbour II*).

430.    The *Culbertson*, or sham partnership, doctrine was established by the Supreme Court more than 60 years ago, when the Supreme Court set out the test for determining whether the partnership form will be respected for tax purposes.  *Comm'r v. Culbertson*, 337 U.S. 733, 742 (1949).  The *Culbertson* test "turns on the fair, objective characterization" of the facts and circumstances of the enterprise.  *Castle Harbour II*, 459 F.3d at 232.

431.    In ascertaining whether a partnership exists for tax purposes, the question is "whether, considering all of the facts--the agreement, the conduct of the parties in execution of

its provisions, their statements, the testimony of disinterested persons, the relationship of the

parties, their respective abilities and capital contributions, the actual control of income and the

purposes for which it is used, and any other facts throwing light on their true intent--the parties in

good faith and acting with a business purpose joined together in the present conduct of the

enterprise." *Culbertson*, 337 U.S. at 742. Although taxpayers have the right to reduce taxes by

any legal means, the existence of a tax avoidance motive gives some indication that there was no

bona fide intent to carry on business as a partnership." *Id*. at 744 n.13.

432.    Whether a partnership is respected for tax purposes is a matter of federal, not

local, law. *Comm'r v. Tower*, 327 U.S. 280, 287-288 (1946); *Estate of Kahn v. Comm'r*, 499

F.2d 1186, 1189 (2d Cir. 1974). That is, not only must a partnership be valid under state law,

"but also that it must be tested in the light of the economic realities underlying the federal income

tax law." *Alexander v. Comm'r*, 194 F.2d 921, 925 (5th Cir. 1952) (J. Rives, concurring) (also

noting, in the family partnership context, that "division of profits according to the partnership

agreement must not be patently unreasonable when compared with the actual contributions of

labor and capital of the family partners.")

433.    The *Culbertson* test "turns on the fair, objective characterization of the interest in

question upon consideration of all the circumstances." *Castle Harbour II*, 459 F.3d at 232; *see

also Estate of Kahn,* 499 F.2d 1186, 1189 (2d Cir.1974) (identifying factors a court might

consider); *Luna v. Comm'r*, 42 T.C. 1067, 1077-78 (1964) (same).

434.    It is the economic reality – and not the form in which the parties cast the

governing documents or the names by which they refer to the entity and one another – that

determines whether the participants in an enterprise are partners with each other. *Twenty-Mile*

*Joint Venture PND, Ltd. v. Comm'r*, 200 F.3d 1268, 1277 (10th Cir. 1999).

435.    The court must consider the totality of the circumstances in ascertaining whether a valid partnership has been formed.  *Estate of Kahn,* 499 F.2d at 1189; *S&M Plumbing Co., Inc. v. Comm'r*, 55 T.C. 702, 706 (1971).

436.    In *Southgate*, the district court in Texas had before it a partnership structure that was used to pass tax benefits that resulted from a so-called distressed debt tax shelter.  The district court believed that the underlying distressed debt transaction had economic substance, but it rejected the tax benefits based on *Culbertson*, *Merryman*, and the sham partnership doctrine. The court noted that the taxpayer claimed many "tax-independent considerations in forming Southgate," but despite these claimed reasons, shammed the partnership:  "Despite Plaintiff's attempts to imbue the partnership with legitimacy, the Court must conclude it was a sham. Although the Southgate transaction was not a sham per se, it is apparent to the Court that the underlying Martel/GNMA Repo structure was nothing more than a sham to gain tax benefits for Beal."  *Southgate*, 651 F. Supp. 2d at 658.

437.    In *Fidelity*, the district court had before it complex Son-of-BOSS tax shelters.  In addition to disregarding the transactions under the economic substance doctrine, the Court, following *Culbertson* and *Tower*, also disregarded two partnerships "created solely for the purpose of avoiding taxes," where the members "did not join together in good faith for the purpose of conducting a business activity through that entity."  2010 WL 4116469 at *139 and *165-66.

438.    Courts have held that, "[a]lthough no one factor by itself is determinative of the question, a significant factor is 'whether the funds were advanced with reasonable expectations

of repayment regardless of the success of the venture, or were placed at the risk of the business.'" *Hambuechen*, 43 T.C. at 99-100 (quoting *Gilbert v. Comm'r*, 248 F.2d 399, 406 (2d Cir. 1957).

439.    Moreover, it is the economic reality and not the form in which the parties cast the governing documents or the names by which they refer to the entity and one-another that is determinative in establishing whether a valid partnership has been formed. *Twenty-Mile Joint Venture*, 200 F.3d at 1277; *S&M Plumbing Co.,* 55 T.C. at 708-09.

440.    In addition, a partnership will be recognized for tax purposes only if there is a non-tax business purpose for forming the partnership. *Boca Investerings Partnership v. United States*, 314 F.3d 625, 632 (D.C. Cir.), *cert. denied*, 540 U.S. 826 (2003); *Saba Partnership v. Comm'r*, 273 F.3d 1135, 1141 (D.C. Cir. 2001). The intent to form a partnership can be inferred from the circumstances, including the contribution of money to the entity with the intent that it be repaid only if the venture succeeds. *See Gilbert*, 248 F.2d at 406; *Hambuechen*, 43 T.C. at 99-100.

441.    The fact that one partner is protected from the risks of the venture suggests that the partner's participation is formal rather than substantive. *ASA Investerings Partnership v. Comm'r*, 201 F.3d 505, 515 (D.C. Cir. 2000) (noting that partner whose risks are all insured at the expense of another partner "hardly fits within the traditional notion of a partnership"); *Saba Partnership*, 273 F.3d at 1141 (observing that a valid partnership is not formed where, among other things, one partner receives a guaranteed, specific return).

442.    The courts will decline to recognize an entity as a partnership where the partners' interest in potential gain is "dwarfed by its interest in the tax benefit." *ASA Investerings Partnership*, 201 F.3d at 513.

443.    In general, a "partnership is generally said to be created when persons join together their money, goods, labor, or skill, for the purpose of carrying on a trade, business, or profession, when there is a community of interest in the profits and losses." *Ginsburg v. Arnold*, 185 F.2d 913, 916 (5th Cir. 1950). The Second Circuit in *Castle Harbour II* "noted that Congress appears to have intended that 'the significant factor' in differentiating between the two be whether "the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business." *Castle Harbour II*, 459 F.3d at 232 (quoting *Gilbert*, 248 F.2d at 406).

444.    A circular flow of funds is also indicative of a sham partnership. The Fifth Circuit in *Merryman* noted: "Throughout Keeman's existence, money flowed back and forth but the economic positions of the parties were not altered. . . . Such a circular flow of funds among related entities does not indicate a substantive economic transaction for tax purposes. *Karme v. Commissioner*, 73 T.C. 1163, 1186-87 (1980), *aff'd*, 673 F.2d 1062 (9th Cir.1982); *Zirker v. Commissioner*, 87 T.C. 970, 976 (1986)." 873 F.2d at 882.

445.    The partnership structure in this case was, to be sure, more sophisticated than the structure in *Merryman*. That is to be expected, given that Goldman Sachs, the tax lawyers at King & Spalding, and the tax professionals at Dow went to such elaborate measures – and spent a whopping $12.6 million in doing so – to create that structure. Dow has also emphasized throughout the trial that it was careful about respecting the purported existence of the partnership, including keeping separate financial books and records, and conducting the partnership operations, as they were, out of a few offices of Dow Europe's Switzerland headquarters. That too was to be expected given that Dow paid nearly $1 million per year to keep those appearances.

United States' Proposed Findings/Conclusions - 141

But that was simply part of the formality that Dow knew must be followed. In the scheme of the enormous tax savings, Chemtech's $12.6 formation costs, the $760,000 annual fee, and other costs incurred by Dow were but a small fraction of the tax benefit.

446.    In addition, the Court has searched the record, but searched in vain, for credible evidence that the banks and Dow truly intended to join together in an entrepreneurial venture involving the patents. The transaction was structured from the outset, with insignificant variables, to produce a fixed stream of income that wholly originated with Dow. While the partnership agreement allowed the possibility that Dow's patents might be licensed to third parties, that too was just a facade. It would be unreasonable to conclude that third party licensing of the patents Dow was already using in its operations would occur.

447.    While the foreign banks in Chemtech I, and Rabo's domestic affiliate in Chemtech II, faced risks, these risks were far more like the risks faced by typical lenders than real equity holders. The Tax Court recently determined, in a partnership scheme that illicitly allocated tax credits, that the "investors" in the scheme had sufficient "entrepreneurial risk" in the partnership to allow the transfer of the tax credits. But the Fourth Circuit very recently reversed, and criticized the Tax Court's failure to analyze the true risks faced by the investors. Once those minimal risks were revealed, the Fourth Circuit dismissed the Tax Court's analysis and summed up the minimal risk faced by those investors: "*It is not the risk of the entrepreneur who puts money into a venture with the hope that it might grow in amount but with the knowledge that it may well shrink*." *Virginia Historic Tax Credit v. Comm'r*, _ F.3d _, 2011 WL 1127056 at *12 (4th Cir. Mar. 29, 2011.)

448.    The facts and circumstances of this case overwhelmingly lead to the conclusion

that the "risks" of the bank investors in the Chemtech schemes were "not the risk of the entrepreneur who puts money into a venture with the hop that it might grow in amount but with the knowledge that it may well shrink."  The banks were extremely concerned about any downside exposure, but they ultimately viewed their "investment" as being *safer* than an ordinary secured loan.   And as to any hopes that the venture might grow, they were illusory.  Not only did the partnership agreement allocate 99 percent of such "hopes" to Dow, and not the foreign banks, but as was demonstrated during the "partners" dispute over the mark-to-market gain in Chemtech I, when the banks attempted to collect on the possibility of their tiny 1 percent gain, Dow labeled them as "greedy" and pointed them to the definitions of the partnership agreement that required the use of a methodology that might not, and which the banks contended did not, lead to a true determination of the remaining patents' fair market value.

449.    Viewing the transactions in their totality, it is plain that the arrangement between Dow and the foreign banks was not a true partnership entered into for purposes of earning a profit and sharing the losses from the management of Dow's patents.

**B      Even if the Partnership Were To Be Respected, the Foreign Banks were Not True Partners**

450.    The Second Circuit noted that in applying the *Culbertson* test, "consideration whether an interest has the prevailing character of debt or equity can be helpful in analyzing whether, for tax purposes, the interest should be deemed a bona fide equity participation in a partnership." *Castle Harbour II*, 459 F.3d at 232.

451.    The recharacterization of a partnership, or a partner's interest in the partnership, "is not foreclosed merely because the taxpayer can point to the existence of some business

purpose or objective reality in addition to its tax-avoidance objective." *Id.*; *cf. Gilbert*, 248 F.2d at 406.

452.    The Tax Court has pointed out that "'the essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event.'" *Hambuechen*, 43 T.C. at 99 (quoting *Comm'r v. Meridian & Thirteenth R. Co.*, 132 F.2d 182, 186 (7th Cir. 1942).

453.    The Second Circuit had before it in *Castle Harbour II* the Babcock & Brown version of the SLIPs transaction.  As the Second Circuit noted, the tax rules behind the transaction involved "[a]n extraordinarily complex maze of partnership provisions." *Castle Harbour II*, 459 F.3d at 226.  The Second Circuit determined that the foreign banks "were not bona fide equity partners," but "were, for all intents and purposes, secured creditors." *Id.*

454.    As the Second Circuit noted, the *Culbertson* test can be applied to recharacterize the foreign banks' interests in the SLIPs partnership as something other than equity participation. *Id.* at 231-32.  "This test turns on the fair, objective characterization of the interest in question upon consideration of all of the circumstances." *Id.*

455.    The foreign banks in *Castle Harbour II* had "no meaningful risk of being paid anything less than the reimbursement of their investment at the Applicable Rate of return."  459 F.3d at 233.  The Second Circuit in *Castle Harbour II*  reversed the district court's finding to the contrary, noting that "the problem with [the district court's] determination is that it depended on the fictions projected by the partnership agreement, rather than on assessment of the practical realities."  459 F.3d at 234.  To determine whether the foreign banks had an upside or downside stake in the partnership, one must look to "realistic possibilities."

456.    Like General Electric, the taxpayer in *Castle Harbour*, Dow places too great of reliance on the labels that it has given the different aspects of the Chemtech transactions.  While such labels are sometimes helpful, in a transaction as closely orchestrated as this one we view such labels with a suspect eye.  In fact, the foreign banks were obligated to refrain from taking actions that might be construed as something other than equity participation.  But despite this covenant, for foreign capital adequacy purposes, those interests were likely viewed as debt.

457.    In addition, as noted previously, the foreign banks risks and returns were more like a debt interest than an equity interest.  The banks were essentially guaranteed a return on their "investment," and the actual operations of Chemtech support what was reasonably anticipated at the beginning of the deal:  The banks received their guaranteed return; the partnership never even came close to being in a position where that guaranteed return could not be made.  Indeed, during the initial "marketing" stage of Chemtech I, when Dow had proposed changes to reduce its potential exposure, Goldman Sachs balked at the suggestion, noting that we must "convince the banks of the immateriality of the 1% loss situation."  (Joint Ex. 23 at bates 70909.)

458.    While there was the possibility that the banks might receive a small "equity-like" distribution at the end of the arrangement, that possibility was not meaningful when compared to the guaranteed return.  And at all events, Dow took steps to deny the banks their de minimis equity-like return.

459.    Perhaps there was one real risk to the banks, and that was that the Internal Revenue Service would see through the Chemtech scheme and pursue the foreign banks for taxes.  Against that risk, the foreign banks were absolutely protected by Dow's indemnity

agreement.  The Court, in the findings set forth above, has catalogued many more factors that support the notion that, whatever interest the banks might be said to have had in the Chemtech schemes, it was certainly not an equity interest.  Therefore, while in Part A the Court has disregarded the entire partnership as a sham, in the alternative, it also concludes that, for tax purposes, the banks were not partners.

> **C.   Alternatively, Even If The Partnership is Not Disregarded Under Culberston, In Substance, the Foreign Banks' $200 Million "Investment" was Truly a Loan**

460.   As the Court has noted, it is a fundamental principle of tax law that the minimization of a tax liability may not be accomplished through form alone.  Where the form and substance of a transaction are in conflict, the substance is controlling.  *Gregory*, 293 U.S. at 469.  In the present case, as an alternative to determining that the partnership did not exist under *Culbertson*, the Court may also look at this transaction as being, in substance, a bank loan.

461.   A bank loan cannot be transformed for tax purposes into an equity investment merely by allowing the taxpayer to create a partnership structure in which the banks, in form only, invest.  To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.  *Comm'r v. Court Holding Co.*, 324 U.S. 331, 334 (1945).  *See Schering-Plough (Merck & Co.) v. United States*, 651 F. Supp. 2d 219, 244-263 (D.N.J. August 28, 2009), *appeal pending*, No. 10-2775 (3d Cir.) (arg. March 24, 2011) (applying substance over form doctrine to recharacterize inter-company sales as loans).

462.   In *United States v. General Geophysical Co.*, 296 F.2d 86, 87 (5th Cir. 1961), Judge Wisdom announced that "[t]he solution of hard tax cases requires something more than the

easy generalization that the substance rather than the form of a transaction is determinative of its tax effect, since in numerous situations the form by which a transaction is effected does influence or control its tax consequences.  This generalization does, however, reflect the truth that courts will, on occasion, look beyond the superficial formalities of a transaction to determine the proper tax treatment."

463.    Since *General Geophysical Co.*, the Fifth Circuit has repeatedly looked through the form of transactions.  The Fifth Circuit has emphasized that all steps of a transaction should be examined by the court, because "courts have never been shackled to mere paper subterfuges." *Davant v. Commissioner*, 366 F.2d 874, 880 (5th Cir. 1966).

464.    For example, on a number of times, it has determined that intermediaries inserted into a transaction for the purpose of altering tax consequences should be disregarded.  *See id.* at 874; *Blueberry Land Co. v. Commissioner*, 361 F.2d 93 (5th Cir. 1966); *Reef Corp. v. Commissioner*, 368 F.2d 125 (5th Cir. 1966).  In each of these cases, the Court analyzed whether the form of the transaction reflected its true substance, and whether the form effectuated – or thwarted – Congress's intent underlying the relevant tax provisions at issue.

465.    In *Davant*, the shareholders of one corporation (Warehouse) "contemplated" the "possibility" of selling its operating assets to another, related corporation (Water).  366 F.2d at 877-878.  Before an agreement had been reached, the shareholders were advised by their tax advisor that a direct sale of assets would produce gain taxable at the ordinary (rather than capital) rate.  *Id*. at 878.  To obtain the more favorable tax consequence, he advised them to pursue an "alternate course" involving an intermediary (the tax advisor's son) who was unrelated to the shareholders or their corporations.  *Id*.  Under the intermediary scheme, (i) the shareholders

would sell their Warehouse stock to the intermediary at a price that allowed him "to make a reasonable profit," and then (ii) the intermediary would sell "Warehouse's operating assets to Water and liquidate Warehouse without endangering the original stockholders' capital gain treatment." *Id*. To finance the scheme, the parties used the Warehouse stock as "collateral" for the intermediary's bank loan. *Id*. Agreeing with the Government, the Court held that the sale of Warehouse stock to the intermediary should be disregarded for tax purposes, and that the transaction should be recharacterized under the substance-over-form doctrine as a corporate reorganization whereby Warehouse transferred its assets to Water in exchange for Water's stock, because the "sole purpose" of including the intermediary was to alter the transaction's tax consequences. *Id*. at 880, 884. Even if the intermediary made a "reasonable profit," that did not give substance to his role in the transaction. *Id*. at 878. In recharacterizing the transaction as a corporate reorganization instead of a stock sale to an unrelated third party, the Court rejected the taxpayers' technical argument that such a recharacterization was improper because they did not actually receive any Water stock, explaining that "[t]o require the actual transfer of stock certificates where such a transfer would be a meaningless gesture" would thwart Congress's intent. *Id*. at 887.

466.    The facts of the present case require the Court to determine whether, in substance, the banks in the Chemtech I and Chemtech II transactions made loans. Whether a transaction involves debt or equity is a mixed question of fact and law. The Fifth Circuit has identified several non-exhaustive, non-exclusive, indicia to apply in a debt-equity analysis (albeit one involving a corporation, not a partnership). *Plantation Patterns, Inc. v. Comm'r*, 462 F.2d 712, 718-19 (5th Cir. 1972); *see also John Kelley Co. v. Comm'r*, 326 U.S. 521, 530 (1946) (various

factors can be considered to determine whether an investment is debt or equity, though not all are of equal weight and no single one is controlling).[4]

467.    The Fifth Circuit in *Plantation Patters* noted that their listed factors "was not intended to prevent the consideration of other factors which may be relevant in a particular case." 462 F.2d at 719 n.8.  In *Castle Harbour II*, the Second Circuit considered several factors commonly used in debt/equity analyses (none of which is determinative), some found in IRS Notice 94-47, and many of which overlap with the *Plantation Patterns* factors. The relevant factors identified in *Castle Harbour II* are:  1) whether the parties share in the upside potential of the partnership; 2) whether the issuer promised to pay a sum certain; 3) whether the transferor reasonably expected repayment; 4) whether the transferor's interest was subordinated to general creditors; 5) whether the transferor had the right to enforce payment of principal and interest; 6) whether the transferor had management rights; and 7) the labels used by the parties.

468.    For the most part, the Court has already analyzed these factors and concluded that the partnership was a sham, or alternatively, that the banks were not partners.  As a second alternative holding, this Court concludes that under the substance over form doctrine, the banks merely made loans to Dow, through an intermediary subsidiary.  Therefore, even without regard to *Culbertson*, the resulting cash flows from the Dow group to the banks should be treated as the

---

[4]  The non-exclusive factors set forth in *Plantation Patterns* include:  "(1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) thin or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of 'dividend' money; (11) the ability of the corporation to obtain loans from outside lending institutions."  462 F.2d at 718-19.

payment of interest, and all other tax consequences must be disregarded.

469.    The Court's conclusion is well supported by Dr. Hubbard's testimony and report. Dr. Hubbard noted that there are seemingly countless ways in which capital can be infused into a business, and financial instruments bear names such as "subordinated debt," "preferred stock," "common stock," and "limited partnership interests."  (Hubbard Rep. at 14.)  The names of these instruments are not so important.  "In practice, the substantive economic terms . . . are what matter to investors."  (*Id*.)

470.    Dr. Hubbard explained that a "fundamental tenet of modern finance theory is that, all else equal, investors require higher expected returns on investments that are riskier."  (*Id*.) Types of instruments vary in their "risk and return characteristics."  And these characteristics are most helpful to distinguish "debt" from "equity."  (*Id*.)

471.    Equity and debt investors generally face different types of risk.  Equity investors "may be concerned with market risk and idiosyncratic risk," while "debt investors may face, among other types of risk, default risk, and interest rate risk."  (*Id*.)  But in general, debt investors face less overall risk than equity investors.  (*Id*.)

472.    When a business is successful, equity investors fare best.  The business can pay its debt holders, and the equity investors split the profits.  (*Id*. at 15.)  But when a business is not successful, the holders of debt are paid first, and if necessary, can force the liquidation of the company in order to get paid.  (*Id*.)  In these circumstances, equity investors may lose their investment entirely.

473.    Dr. Hubbard provided an illustration of a firm that had $200 in debt.  Regardless of the firm's success, debt holders are never entitled to more than $200 in the firm's assets.  On

the other hand, equity holders are entitled to nothing until the debt obligation is satisfied, but

after that, the potential for return can be limitless (*Id*. at 15 and Ex. 6):



474.    The same principal holds true for the distribution of profits.  Debt holders are

entitled to interest payments before profits are distributed to the equity holders.  (*Id*. at 16 and

Ex. 6):



475.    The foreign banks did not, and could not, receive the benefit of Chemtech's

taxable income that had been allocated to them, nor did they have any realistic chance at the

distribution of profits above their guaranteed return.  Instead, the agreement between the parties

effectively guaranteed the foreign banks a fixed return on their "investment," and the 1 percent

equity "kicker" was simply insignificant.

476.    The foreign banks' investment was not, in substance, equity, but instead it was a loan.

477.    Under the substance over form doctrine, the banks so called equity contributions to the Chemtech I and Chemtech II partnerships are plainly not bona fide equity contributions, even if the partnership is not respected for tax purposes.

### D.    Section 704(e) is Inapplicable

478.    Dow contends that, in the event that the Court does not sham the entire partnership, but instead determines that the foreign banks are not equity partners, that the foreign banks should be still be recognized as partners under Section 704(e) of the Internal Revenue Code.  That section provides that certain "family partnerships" will be recognized for tax purposes.  That section provides:  "A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person."  26 U.S.C. § 704(e)(1).

479.    The Treasury regulations define "a capital interest in a partnership" as "an interest in the assets of the partnership, which is distributable to the owner of the capital interest upon his withdrawal from the partnership or upon liquidation of the partnership."  Treas. Reg. § 1.704-1(e)(1)(v).

480.    The regulations also set forth a list of nonexhaustive factors to be considered in determining whether a person is the real owner of a capital interest.  Treas. Reg. § 1.704-1(e)(2). The legislative history of I.R.C. § 704(e)(1) states that it was intended to "make clear the fundamental principle that, where there is a real transfer of ownership, a gift of a family

partnership interest is to be respected for tax purposes without regard to the motives which

actuated the transfer."  H. Rep. No. 82-586, at 33 (1951).

481.    As the House Report explains, "[m]any court decisions" since *Commissioner v.*

*Culbertson*, 337 U.S. 733 (1949), had invalidated transfers of family partnership interests where

there was no evidence of intent to benefit the partnership in some way.  *Id*. at 32-33.  Congress

sought to dispel the "confusion" by "harmoniz[ing] the rules governing interests in the so-called

family partnership with those generally applicable to other forms of property or business," *i.e.*, by

making "it clear that, however the owner of a partnership interest may have acquired such

interest, the income is taxable to the owner, if he is the real owner."  *Id*.  The House Report

further states that "[t]he amendment leaves the Commissioner and the courts free to inquire in

any case whether the donee or purchaser actually owns the interest in the partnership which the

transferor purports to have given or sold him," and that "[t]ransactions between persons in a

close family group, whether or not involving partnership interests, afford much opportunity for

deception and should be subject to close scrutiny." *Id*.  at 33.

482.    Thus, the House Report states, "[a]ll the facts and circumstances at the time of the

purported gift and during periods preceding and following it may be taken into consideration in

determining the bona fides or lack of bona fides of a purported gift or sale."  *Id*.; *see also* S. Rep.

No. 82-781, at 38-41 (1951).

483.    The Treasury regulations and legislative history make clear that I.R.C. § 704(e)(1)

is not intended to legitimize tax avoidance transactions.  The regulations state that a "donee or

purchaser of a capital interest in a partnership is not recognized as a partner under the principles

of section 704(e)(1) unless such interest is acquired in a bona fide transaction, not a mere sham

for tax avoidance or evasion purposes, and the donee is the real owner of such interest." Treas. Reg. § 1.704-1(e)(1)(iii); *see* H. Rep. No. 82-586, at 33 ("Cases will arise where the gift or sale is a mere sham."). In determining whether a transferee is the real owner, "all the facts and circumstances are taken into account." Treas. Reg. § 1.704-1(e)(1)(iii).

484.    The "reality" of ownership "is to be determined in the light of the transaction as a whole," and not based on "formal compliance" with "mechanical or formal tests." Treas. Reg. § 1.704-1(e)(2)(i) & (vi). Moreover, "[a] partnership may be recognized for income tax purposes as to some partners but not as to others." Treas. Reg. § 1.704-1(e)(1)(iii).

485.    The plain language of the statute makes clear that it applies to transfers of interests in existing partnerships, and not to the formation of partnerships. Thus, the subsection is entitled "Recognition of interest created by purchase or gift," and states that "[a] person shall be recognized as a partner . . . if he owns a capital interest in a partnership . . . whether or not such interest was derived by purchase or gift from any other person." I.R.C. § 704(e)(1).

486.    Moreover, the history and context of the provision establish that it was intended to address a situation where an interest in an existing partnership is transferred in a non-arm's length transaction. Thus, the legislative history and the Treasury regulations focus on determining whether a purported partner is the real owner and whether there was a bona fide transfer. *See* H.R. Rep. No. 82-586 at 33; Treas. Reg. § 1.704-1(e)(1)(iii), (e)(2).

487.    In the present case, in "reality," the banks do not have a true capital interest in the Chemtech partnership. Moreover, the Chemtech partnership was not pre-existing. As highlighted in Goldman Sachs' marketing materials, the Chemtech transaction had a number of steps. "Step 2" was Dow's contribution of the patents to Chemtech, and "Step 3" was the

infusion of $200 million by the foreign banks.  (Joint Ex. 68 at bates 1295-96.)  Step 2 would not have occurred but for Step 3.  Finally, Congress had made clear that it did not intend to allow § 704(e) to be used to for purposes of abuse.  Section 704(e) is simply inapplicable to this case.

488.     Dow relies heavily on the district court's decision in *TIFD III-E Inc. v. United States (Castle Harbour III)*, 660 F. Supp. 2d 367, 386-96 (D. Conn. 2009), *appeal pending*, No. 10-0070 (2d Cir.) (oral argument scheduled for May 16).  After the Second Circuit determined that the foreign banks in the SLIPs transaction had no equity interest in the partnership, the district court, on remand, seemingly contrary to the Second Circuit's opinion, determined that the foreign banks nonetheless had a capital interest.  The Second Circuit will hear oral arguments on the Government's appeal on May 16, 2011.

489.     The district court in *Castle Harbour III* relied on cases that involved the transfer of an interest in a valid, existing partnership to a person closely related to the transferor.  *See Evans v. Commissioner*, 447 F.2d 547 (7th Cir. 1973) (transfer of family partnership interest to partner's wholly-owned corporation); *Pflugradt v. United States*, 310 F.2d 412 (7th Cir. 1962) (transfer of limited partnership interests to minor children).  Because the present case does not involve the transfer of a partnership interest in a valid, existing partnership, I.R.C. § 704(e)(1) has no application.  Indeed, the only other court ever to use § 704(e) to recognize multi-million dollar transfers by large corporations in a similar situation was reversed on appeal.  *See Boca Investerings Partnership v. United States*, 167 F. Supp. 2d 298, 372 (D.D.C. 2001), *rev'd*, 314 F.3d 625 (D.C. Cir. 2003) (applied *Culbertson* in reversing finding of valid partnership); *see also ASA Investerings*, 201 F.3d 505 (applied *Culbertson* in ruling there was no valid partnership between AlliedSignal and Dutch bank).

490.    As one commentator aptly observed, "the idea that section 704(e) is an alternative to *Culbertson* came from the taxpayer's brief--the case law does not say this."  Lee Sheppard, News Analysis – Subchapter K's Attractive Nuisance, 126 Tax Notes 131, 135 (Jan. 11, 2010); *see also* Karen C. Burke and Grayson M.P. McCouch, *Snookered Again:  Castle Harbour Revisited*, 128 Tax Notes 1143 (Sept. 13, 2010), available in LEXIS, 2010 TNT 177-10 ("Despite the taxpayer's ingenious attempt to rehabilitate the banks as partners under section 704(e)(1), the family partnership rules do not provide a statutory shortcut to partnership status without regard to the general definition of a partnership.")

## IV    *Partnership (Subchapter K) Anti-Abuse Regulation*

### A.    *In General*

491.    The partnership provisions of the Internal Revenue Code are found in subchapter K, beginning at § 701.  A hallmark of the partnership tax provisions is that taxpayers be permitted "to conduct joint business . . . activities through a flexible economic arrangement" without triggering a tax at the partnership level.  Treas. Reg. § 1.701-2(a) (26 C.F.R.).  But Congress did not intend that the provisions of subchapter K be used for tax avoidance purposes. T.D. 8588 (preamble to regulation).

492.    As a complement to the common-law judicial doctrines, the Treasury Department in 1994 issued an "anti-abuse" rule for partnerships.  Treas. Reg. § 1.701-2 (26 C.F.R.).  In short, the regulation authorizes the IRS to disallow or recast partnership transactions that have tax consequences inconsistent with the intent of subchapter K.  T.D. 8588.

493.    Treasury noted in the preamble to the regulations that enhanced application of the judicial doctrines in partnership transactions "is particularly important in light of (i) the

flexibility of partnership arrangements, which can take myriad forms that are often of substantial

complexity, and (ii) the tax rules for partnerships, which are also often complex and, in many

cases, appear purely mechanical."  T.D. 8588.

494.    The regulation is "effective for all transactions involving a partnership that occur

on or after May 12, 1994."  § 1.701-2(g).

495.    "Implicit in the intent of subchapter K" are three general requirements.  First, that

the "partnership must be bona fide and each partnership transaction or series of related

transactions . . . must be entered into for a substantial business purpose."  Second, that the form

of each partnership be respected under substance over form principles.  And third, that the tax

consequences to each partner "accurately reflect the partners' economic agreement and clearly

reflect the partner's income."  Treas. Reg. § 1.701-2(a)(1) to (3).

496.    If a partnership violates any of these requirements, the IRS "can recast the

transaction . . . as appropriate to achieve tax results that are consistent with the intent of

subchapter K."  Treas. Reg. § 1.701-2(b).  In other words, the IRS may recast a transaction or

series of transactions "even though the transaction may fall within the literal words of a particular

statutory or regulatory provision" if necessary to achieve the tax results consistent with the intent

of Congress, "based on the particular facts and circumstances" presented in a particular situation.

T.D. 8588.

497.    The regulation allows several non-exclusive ways to cure the abuse, including (1)

disregarding the partnership in whole or in part, (2) determining that one or more purported

partners *not* be treated as a partner, (3) adjusting a method of accounting to clearly reflect the

partnership's or the partner's income, or (4) reallocating the partnership's items of income or

deduction.  Treas. Reg. § 1.701-2(b)(1) to (5).

498.    In order to determine whether to apply the anti-abuse regulation, the IRS looks to "all of the facts and circumstances, including a comparison of the purported business purpose for a transaction and the claimed tax benefits resulting from the transaction."  Treas. Reg. § 1.701-2(c).

499.    The factors to be considered include whether--(a) the present value of the partners' aggregate federal tax liability is substantially less than had the partners owned the partnership's assets and conducted the partnership's activities directly; (b) partners are admitted merely for the purpose of achieving the tax benefits and that they are protected from any risk of loss or have little or no participation in the profits from the partnership's activities other than a return that is in the nature of a payment for the use of capital; (c) partnership allocations are made in compliance with the literal requirements of § 704(b) but with results that are inconsistent with its purposes; and (d) the benefits and burdens of property contributed to the partnership are in substantial part retained by the contributing partner.  Treas. Reg. § 1.701-2(c)(1) to (7).

500.    Courts, in conjunction with other judicial doctrines, have applied the anti-abuse regulation to deny tax benefits from abusive tax shelter transactions.  *See Nevada Partners Fund LLC v. US*, 714 F. Supp. 2d 598 (S.D. Miss. 2010), *appeal docketed*, No. 10-60559 (5th Cir.); *Fidelity Int'l Currency Advisors Fund A v. United States*, _ F. Supp. 2d _, 2010 WL 4116469 (D. Mass. Oct. 19, 2010).

**B.** **The 754 Basis Step Up Should Be Disregarded Under the Partnership Anti-Abuse Rule**

501.    The tax benefits of the Chemtech II transaction were generated by the 754 basis step up.  As Dow wrote in its internal notes: "In essence, the partnership was able to strip the basis from the CPI stock that was distributed to DTPC and apply it to the plant assets which were contributed."  (Joint Ex. 710 at bates 83153.)

502.    The transition from Chemtech I to Chemtech II followed a carefully orchestrated series of steps. First, through Dow Chemical Delaware (DCDC), Dow contributed the low basis Louisiana chemical plant and a shell corporation to be used by the partnership as the conduit for excess cash.  Second, Dow retired Diamond Tech's partnership interest and distributed the patents. Third, Dow brought back one of the banks that had participated in Chemtech I, Rabo. Finally, on its 1998 partnership return, Chemtech made a § 754 election.

503.    It is the § 754 election that essentially transferred Chemtech's inside basis in CPI to its inside basis in the chemical plant, which in turn provided Chemtech with artificially large depreciation deductions that were then allocated to Dow.  Recall in Chemtech I that the circle of funds generally went from Dow to Chemtech to Chemtech Portfolio to Dow.  When Chemtech transferred its cash to Chemtech Portfolio, its basis in Chemtech Portfolio increased.  That basis step up was about $360 million.

504.    As noted in the regulation, "implicit in the intent of subchapter K" is the requirement that each partnership transaction, or series of transactions, "must be entered into for a substantial business purpose."  Treas. Reg. § 1.701-2(a)(1) to (3).

505.    The evidence presented in this case supports the conclusion that the series of

transaction leading up to the 754 election had no business purpose. Indeed, the entire Chemtech II structure was designed to exploit the 754 election.

506.    Diamond Tech departed the Chemtech partnership in 1998 and it had an outside basis in the partnership of about $80 million. (Joint Stip. ¶ 92.) It received in the distribution Chemtech Portfolio stock, in which Chemtech had a basis of $460 million. (Joint Stip. ¶ 91.) Chemtech's basis in the Chemtech Portfolio stock was so large because of the circular flows of cash that have been described throughout this opinion. That basis was created by the Dow promissory notes. When Chemtech received the CPI stock, it did not take Chemtech's $460 million basis in the stock. Instead, under I.R.C. § 732, Diamond Tech's basis in CPI would have been its outside basis in Chemtech (roughly $80 million), but it would not immediately pay a tax on that.

507.    But assume, for the sake of argument, that the following day Diamond Tech sold its CPI stock for $460 million. Diamond Tech's gain on that sale would have been $380 million. (proceeds of $460M less basis of $80 = gain of $380.) This explains why Chemtech had computed its § 754 basis adjustment to be $381 million. (Joint Stip. ¶ 97.) The tax code permits the partnership to make a basis adjustment *because* the departing partner will effectively pay any tax that is triggered by that basis.

508.    Dow's internal memorandum, however, explains that Dow will never allow that to happen. (Joint Ex. 710.) The memorandum explains that Diamond Tech's basis in the Chemtech Portfolio stock it received in the distribution was about $92 million, and that the book basis of the CPI stock was $485 million. (Joint Ex. 710 at bates 83152 (note that the figures contained in the parties' stipulations differ slightly from the figures used in this August 1998

memorandum, but those differences are not material to the point being made).)  The

memorandum explains that Dow will not have to account for these "unremitted earnings" of

more than $380 million "because TDCC expects that it will ultimately receive them tax-free."

(*Id*.)  Why would that be?  Because "[t]he receipt of earnings will not occur until a future date

when the subsidiary has ceased operations, converted its net assets into cash and liquidated."

(*Id*.)  How can that happen?  "This would be achieved by DTPC purchasing the minority interest

of CPI, therefore owning the requisite ownership to achieve a tax free liquidation under Section

332."  (*Id*.)

509.    In other words, the 754 election was made to take account of the $380 million

"increase" that would be taxed to Diamond Tech.  But as Dow's internal memorandum concedes,

the entire Chemtech II transaction was designed to prevent that from ever happening.

510.    As if that was not abusive enough, another 1998 Dow document, this one an

internal email, demonstrates that Dow intended to repeat this abuse in a transaction that it

expected to be called "Chemtech III."  (Joint Ex. 705.)

511.    In this August 1998 internal Dow email, Dow employees were discussing the

promissory notes to be given by Dow Chemical International--the Dow subsidiary that acted as

the conduit between Chemtech and Dow, through which the cash was to flow (Joint Exhibit

705):

> Corbett:          Dave, if there is no early demand for payoff of this DCIL note,
>                        when should it terminate?  Thanks.
>
> Grzebinski:     Can we make it indefinite or at least 10 years?  The financing will
>                        be in place for 5 years (Jun 26th anniversary).  However, after the
>                        financing has been paid off (the class-A LPs retired) CP2I will still
>                        need to have the loan in place until Chemtech III is set up.  The

loan would then be converted to the same type of note that CPI now has in place.

512.    At this time, Chemtech had not yet even made its 754 election to create the Chemtech II tax benefit, but it was already planning for Chemtech III.

513.    There is no legitimate dispute that the tax consequences to Dow as a result of the basis step up do not "accurately reflect the partners' economic agreement and clearly reflect the partner's income." Treas. Reg. § 1.701-2(a)(3). The $380 million basis step-up allocated to the Louisiana chemical plant was entirely artificial, created by the abuse of the "mechanical" application of the partnership rules, which is exactly what the anti-abuse rules were designed to stop. T.D. 8588.

### C.    *The Broader Chemtech I and II Transactions Should Be Disregarded*

514.    The Court has already described that the Chemtech partnership is a sham and should be disregarded under the judicial authorities described in *Culbertson*, *Merryman*, and *Saba*; or that the Chemtech I and Chemtech II transactions may be disregarded for lack of economic substance. But further authority for these remedies is provided in the general partnership anti-abuse regulations.

515.    In Chemtech I, five foreign banks participated as "partners," but they were partners in name only. They were well protected against any significant downside risk in their participation, and likewise, their upside potential was not significant. It is clear that only foreign, non-US taxpaying banks were ever considered for the Chemtech partnership precisely because they did not pay taxes. In other words, the first factor to be considered when applying the anti-abuse regulation--that the present value of the partners' aggregate federal tax liability is

substantially less than had the partners owned the partnership's assets and conducted the partnership's activities directly--weighs heavily in favor of applying the regulation.  Treas. Reg. § 1.701-2(c)

516.    Other factors in § 1.701-2(c) also weigh strongly in favor of applying the regulation.  The foreign banks were are well protected from any risk of loss, and their participation in "profits" of the business were illusory.  In addition, while the Court holds that the partnership allocations fail under the technical requirements of § 704(b), even if they did not, there is no question that to allow such allocations would be inconsistent with the purpose of § 704(b).  Finally, the benefits and burdens of owning the patents fell squarely on Dow.  The marketing materials provided to the foreign banks emphasized the "hell or high water" nature of Dow's obligations with respect to the patents.

517.    The anti-abuse regulation was not issued until 1994, and it is effective only for transactions entered into after May 12, 1994.  Dow suggests that the anti-abuse regulation is therefore not applicable to any portion of the Chemtech I transaction, because the partnership and lease agreements were signed before May 12, 1994.  But Dow construes the effective date of the regulation too narrowly.  Treasury Regulation § 1.701-2(b) is applicable if a partnership is formed *or availed of* in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate tax liability.  Chemtech was "availed of" with a principal purpose of reducing the partners' aggregate tax liability, and the "transaction" at issue in for the purposes of the anti-abuse regulation is the receipt by the partnership of the royalty payments and the allocation to the partners of such income.

518.    The regulation therefore applies to royalty payments and partnership allocations of

those payments made after 1994.  To allow Dow to avoid the anti-abuse rules merely because it had formed the partnership prior to the regulation's effective date would be to thwart the purpose of the regulation.

519.    With respect to Chemtech II, one of the foreign banks that had participated in Chemtech I, Rabo, continued on.  Like Chemtech I, the bank was a "partner" in name only.  Rabo was protected against any significant downside risk in its participation, and likewise, its upside potential was not significant.  Its participation in "profits" of the business were illusory--like Chemtech I, its participation was the equivalent of an interest payment.

520.    In addition, while the Court holds that the partnership allocations fail under the technical requirements of § 704(b), even if they did not, there is no question that to allow such allocations would be inconsistent with the purpose of § 704(b).

### V    *Pursuant to Section 731, The Distribution From Chemtech to Dow (Through Diamond Tech) Is Taxable*

#### A.    Introduction

521.    Chemtech I involved Dow's deduction for royalty payments made for the use of its own patents.  Chemtech II involved the depreciation of a Louisiana chemical plant using $360 million of artificial basis.  Both of these are, in and of themselves, abusive tax shelter transactions.  But even if the partnership and these transactions were to be respected as legitimate, a tax was still triggered in 1998 when Dow made the conversion from Chemtech I to Chemtech II.

522.    During the transition from Chemtech I to Chemtech II, Dow eliminated Diamond Tech as a partner, and it added Dow Chemical Delaware Co. (DCDC).  The Louisiana chemical

plant was contributed to Chemtech when Dow Chemical Delaware was added as a partner. And when Diamond Tech was retired from the partnership, Diamond Tech took the remaining patents with it, thus terminating Chemtech's nominal ownership of the patents.

523.    In return for surrendering its partnership interest, and in addition to taking the patents, Diamond Tech also received 67 percent of the Chemtech Portfolio stock held by Chemtech.

524.    Chemtech Portfolio was comprised entirely of cash, securities, and Dow demand notes. For example, on February 25, 1998 (the date that Dow advised the foreign banks that their interests were being terminated), Chemtech Portfolio had a value of $754,598,016. (Joint Exhibit 607.) That was comprised of $51,555,925 in securities and $703,025,851 in inter-company Dow demand notes. (*Id*. at bates 16618.) Thus, as explained below in detail, at that time, all of Chemtech Portfolio's assets were considered "marketable securities" for the purposes of § 731.

525.    Whether substantially all of Chemtech Portfolio's assets were considered "marketable securities" is important, because that would result in taxable income under § 731.

526.    Dow became keenly aware of this problem in May 1998, shortly before it caused Diamond Tech's interest to be terminated. Internal Dow handwritten notes dated May 20, 1998, reveal that the plan was to "use" the patents and Chemtech Portfolio stock "to take out DTPC's capital." (U.S. Ex. 15.)

527.    Dow immediately knew that this could generate a § 731 tax. As explained by Dow, this was because Chemtech Portfolio "Can't have marketable securities when we distribute out the patents." (*Id*.)

528.    But Dow was not dissuaded.  Even though it recognized that the Chemtech Portfolio assets were "Currently marketable"; it believed the solution to be simple:  "Exchange these marketable securities for a deeply subordinated 33 year note."  (*Id.*)

529.    No business purpose whatsoever for exchanging the Dow demand notes for a 33-year term note was suggested.  It was purely to avoid the § 731 tax.

530.    These May 1998 notes are corroborated by an internal Dow memorandum written a few months later.  In a section of the memo entitled "Critical issues," Dow explained that "The key to the tax treatment is a 754 election which was made when the partnership assets were distributed."  The 754 election was the mechanism by which Dow purported to receive its $380 million artificial basis boost, most of which would be allocated to its chemical plant.  As Dow explained, "In essence, the partnership was able to strip the basis from the CPI stock that was distributed to DTPC and apply it to the plant assets which were contributed.  This allowed for a step up in basis on the plant assets from $27mm to over $400mm."  (Joint Ex. 710 at bates 83153.)

531.    Dow characterized the "marketable security" matter as "the most important aspect" of its Chemtech II tax shelter:  "The most important aspect of the 754 election was that the assets in CPI be non-marketable.  Consequently, prior to the distribution we converted the inter-company loan which CPI was making to TDCC to a deeply subordinated 34 year note."  (Joint Ex. 710 at bates 83153.)

532.    Again, in its internal memo, Dow stated no business purpose for the exchange.  But, immediately preceding that discussion, it had no qualms about emphasizing the tax benefits of Chemtech II.  Dow noted that, with the boost of $380 million in artificial basis, Chemtech

"will be able to depreciate this new basis on a 5 year MACRS schedule." Dow emphasized that the Chemtech partnership agreement "allocated the depreciation to [Chemtech's] general partner IFCO. IFCO is part of the Dow consolidated tax retrun and therefore Dow will receive the tax benefits." (Joint Ex. 710 at 83153.)

533.    Indeed, in contrast to mentioning any business purpose, Dow quantified its tax purpose: "Using the cost of capital as a discount rate this tax benefit is conservatively estimated at $100mm." (*Id*.)

534.    On June 12, 1998, pursuant to its plan, that is exactly what Dow did. It exchanged three demand notes for a single term note with a face value of $781.6 million payable on October 1, 2032. (Joint Ex. 3U.)

535.    Then two weeks later, on June 25, 1998, Dow caused Diamond Tech to be retired from the partnership, and the patents and the stock were distributed.

### B.    *Section 731*

536.    The liquidation of a partner's interest in a partnership *may* be a taxable event. Section 731(a) requires that a partner recognize gain to the extent that it receives "money" in excess of its basis.

537.    For example, assume a partner has a basis of $100 in a partnership. That partnership liquidates, and the partner receives $20 cash and land worth $480. Under § 731(a), the partner would not recognize any gain, but, under § 732(b) take an $80 basis in the land. Putting that example to this case, Dow's intention was that "DTPC will take a tax basis in its

[67%][5] interest in the stock of CPI of $92M; however, the book basis of the stock of CPI will be $485M." (Joint Ex. 710.)

538.    For the purposes of § 731, the term "money" means more than just cash. It also includes "marketable securities." I.R.C. § 731(c)(1)(A)("the term 'money' includes marketable securities").

539.    The term "marketable securities," in turn, includes a broad range of items including "any financial instrument which, pursuant to its terms or any other arrangement, is readily convertible into, or exchangeable for, money or marketable securities." I.R.C. § 731(c)(2)(B)(ii).

540.    A demand loan, or even a promissory note with a very short term, by its very terms is considered to be a financial instrument that is readily convertible into cash.

541.    In the present case, Diamond Tech did not directly receive a Dow note from Chemtech. Instead, it received stock in Chemtech Portfolio, which itself was made up entirely of cash, securities, and Dow promissory notes. But for the purposes of § 731, receiving stock in an entity that itself is comprised of marketable securities is the same as directly receiving marketable securities. I.R.C. § 731(c)(2)(B)(v) (marketable securities include "interests in any entity if substantially all of the assets of such entity consist (directly or indirectly) of marketable securities, money, or both").

---

[5]The parties explained in their fact stipulation that DTPC initially was given 70 percent of the stock in Chemtech Portfolio. After discovering an accounting error, the distribution was corrected, and DTPC ultimately received 67 percent. The memorandum cited above used the 70 percent figure because that error had not yet been discovered. For the purposes of this litigation, that error is not material, and the United States has used the 67 percent figure throughout.

### C    The Dow note is a "marketable security"

542.    As explained previously, under principles of economic substance, the Court has disregarded the note exchange for federal tax purposes.  Therefore, at the time that Chemtech distributed Chemtech Portfolio stock to Diamond Tech, the Court considers CPI to be holding only securities and Dow demand notes.  Those are readily exchangeable for cash, and therefore, for purposes of § 731, they are "marketable securities."

543.    Moreover, even if the note was not disregarded under one of the judicial doctrines, the Court would still conclude that, under the facts of this case and the plain language of § 731(c)(2)(B)(ii), the 33-year term note is still a "marketable security."  Section 731(c)(2)(B)(ii) describes that the term "marketable securities" includes any financial instrument that, "pursuant to . . . any other arrangement, is readily convertible into, or exchangeable for, money."  Dow has complete control over Chemtech and Chemtech Portfolio.  On a moment's notice, just as it exchanged its three demand notes for the 33-year term note, it could likewise exchange its 33-year term note for a demand note.  Dow's internal notes and memoranda demonstrate that it is willing to make any arrangement that is necessary to suit its purposes.  In other words, there is no doubt that, if it was in Dow's interest to convert the note, it would immediately do so, because that is plainly the "arrangement" that the Dow parent has with its subsidiaries.

### D.    Alternatively, Under Section 731's Anti-Abuse Rule, The 33-Year Term Note Should Be Considered a Marketable Security

544.    The Section 731 regulations have an anti-abuse rule specific to § 741(c)'s provisions pertaining to marketable securities.  Treas. Reg. § 1.731-2(h).

545.    Treas. Reg. § 1.731-2(h) provides that "if a principal purpose of a transaction is to

achieve a tax result that is inconsistent with the purpose of section 731(c) and this section, the Commissioner can recast the transaction for Federal tax purposes as appropriate." Like the general anti-abuse regulations in § 1.701-2, this Court must determine the applicability of the § 731(c) anti-abuse rule "based on all the facts and circumstances." Treas. Reg. § 1.731-2(h).

546.     Section 731(c) was added to the Code in 1994, and it was designed to address an anomaly where a partner receiving cash in a liquidating distribution would be subject to a tax, but where a partner receiving something that was the equivalent of cash would not. H.R. Rep. No. 103-316 at 336 (Dec. 8, 1994). As noted in the House Report, "[t]his distinction in tax treatment between cash and marketable securities elevates form over substance, causes taxpayers to choose the form of transactions for tax reasons rather than economic reasons, and may not promote accurate income measurement. Rather, the present-law rule merely permits taxpayers to defer or avoid tax." *Id*.

547.     In this case, there is little doubt that, even if the Court were to respect the note exchange as having economic substance, and even if the Court were to construe § 731 in a manner that did not include Dow's promissory notes as within the scope of the type of financial instruments covered by § 731, the Court would still recast the Chemtech II transaction as requiring the payment of the § 731 tax.

548.     To demonstrate the plain abuse that occurred here, the Court returns to the simple example it had started with, that is, of a partner with a basis of $100 in a partnership. That partnership liquidated, and the partner received $20 cash and land worth $480. Under § 731(a), the partner would not recognize any gain, but take an $80 basis in the land. But the following year, if the partner sold that land for $480, he would recognize a $400 gain. Dow, on the other

hand, admits that it has no intention of ever paying a tax on value of Chemtech Portfolio that

exceeds Diamond Tech's adjusted basis in that stock after the distribution. As Dow noted in its

internal memorandum, "TDCC [Dow] expects that it will ultimately receive them [the unremitted

earnings from Chemtech Portfolio] tax-free. The receipt of earnings will not occur until a future

date when the subsidiary has ceased operations, converted its net assets into cash and liquidated."

(Joint Ex.710 at bates 83152.)

549.    Dow's internal notes make crystal clear the point that Dow's only purpose in

effecting the note exchange was to avoid tax. If the parties to the Chemtech transaction are truly

separate entities, as Dow would have the Court believe, then Diamond Tech should be taxed on

its exit from Chemtech.

**VI    *Alternatively, if the Chemtech Partnership and the Chemtech I and Chemtech
II Transactions are Respected, the IRS May Reallocate the Tax Items of
Chemtech Among the Dow and Bank Partners to Properly Reflect the
Economics of the Partnership***

### A.    *In General*

550.    A partnership is not a taxable entity; taxes are paid at the partner level.

Section 702(a) of the Code therefore requires each partner to report on its separate income tax

return its distributive share of the partnership's income, loss, gain, deduction, and credit.

551.    While the amount of a partner's distributive share generally is based on the

allocations contained in the partnership agreement, *see* I.R.C. § 704(a), section 704(b)(2)

provides that the partnership agreement will be controlling as to the allocation of a particular

partnership item *only* if the allocation has "substantial economic effect."

552.    If an allocation lacks substantial economic effect, then the partner's distributive

share "shall be determined in accordance with the partner's interest in the partnership

(determined by taking into account all facts and circumstances)." I.R.C. § 704(b); Treas. Reg. § 1.704-1(b)(1)(i).

553.    The substantial economic effect requirement prevents tax avoidance by analyzing whether an allocation's tax consequences are consistent with the allocation's economic consequences. *See* Arthur B. Willis *et al.*, PARTNERSHIP TAXATION, ¶ 10.02[1] (6th ed. 2010) ("The partner who receives the economic benefits of the operation, *i.e.*, income or gain, must be allocated the related tax burdens").

554.    Before 1976, I.R.C. § 704(b)(2) provided that partnership allocations would not be respected where "the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle." The predominant test for determining whether an allocation had a tax avoidance purpose was the substantial economic effect test set forth in then-existing Treasury regulations. *See Estate of Carberry v. Comm'r*, 933 F.2d 1124, 1128-29 (2d Cir. 1991); *Ogden v. Comm'r*, 788 F.2d 252, 260 (5th Cir. 1986).

555.    In 1976, Congress revised I.R.C. § 704(b)(2) to make the substantial economic effect test explicit and to expand its applicability. S. Rep. No. 94-938, at 98-101 (1976).

556.    Congress included the revision among a number of "tax shelter provisions," stating that "[t]he provisions relating to various deductions and exclusions in the case of partnerships are tightened so that the deductions or exclusions cannot be allocated among the various partners according to whomever can maximize the tax benefits unless such allocation also has substantial economic effect." S. Rep. No. 94-938, at 9. The provision "seek[s] to prevent the use of special allocations for tax avoidance purposes, while allowing their use for

bona fide business purposes." *Id.* at 100; *see* H.R. Conf. Rep. 94-1515, 21 at 422 (1976).

557.    To have substantial economic effect, partnership allocations must reflect the actual division of income or loss among the partners when viewed from the standpoint of economic (rather than tax) consequences. *Goldfine v. Comm'r*, 80 T.C. 843 (1983).  Treas. Reg. § 1.704-1(b)(2)(i) provides that the determination of whether an allocation of income, gain, loss, or deduction to a partner has "substantial economic effect" involves a two-part analysis that is made as of the end of the partnership taxable year to which the allocation relates.  *First*, the allocation must have "economic effect" within the meaning of § 1.704-1(b)(2)(ii), and *second*, the economic effect of the allocation must be "substantial" under § 1.704-1(b)(2)(iii).

### (i)    *Economic Effect*

558.    For a partnership's allocations to have economic effect, the partnership agreement generally must meet three mechanical requirements (the "safe-harbor" test).  *See* Treas. Reg. § 1.704-1(b)(2)(ii)(b).  The partnership agreement must provide:  (1) for the determination and maintenance of the partners' capital accounts in accordance with the rules of section 1.704-1(b)(2)(iv); (2) that upon the liquidation of the partnership (or any partner's interest in the partnership), liquidating distributions are required in all cases to be made in accordance with the positive capital account balances of the partners, as determined after making all capital account adjustments of the partnership taxable year during which such liquidation occurs; and, (3) if a partner has a deficit balance in its capital account following the liquidation of its interest in the partnership, the partner is unconditionally obligated to restore the amount of the deficit.  If a partnership satisfies each of these requirements, its allocations are typically treated as having economic effect for tax purposes.

559.    Even if a taxpayer meets the mechanical rules above, in order for an allocation to have economic effect, the allocation must be *consistent with the underlying economic arrangement of the partners*.  Treas. Reg. § 1.704-1(b)(2)(ii)(a).  In other words, if there is an economic benefit or economic burden that flows from an allocation, the partner to whom the allocation is made must receive that economic benefit or bear that economic burden.  Otherwise, the allocation does not have an economic effect.  *Id.*

### *(ii)    Substantiality*

560.    Moreover, under the second prong of the test, the economic effect of an allocation is *not* substantial if, at the time the allocation becomes part of the partnership agreement, (1) the after-tax economic consequences of at least one partner may, in present value terms, be enhanced as compared to such consequences if the allocation (or allocations) were not contained in the partnership agreement, and (2) there is a strong likelihood that the after-tax economic consequences of no partner will, in present value terms, be substantially diminished compared to such consequences if the allocation (or allocations) were not contained in the partnership agreement.  Treas. Reg. § 1.704-1(b)(2)(iii)(a).

561.    In other words, for the economic effect of an allocation to be substantial, "it must affect the partners' dollar distributions from the partnership and may not benefit the after-tax results of some partner(s) unless it also hurts the after-tax results of another partner.  If some partner gains from the allocation, the government may not be the only loser."  Willis, PARTNERSHIP TAXATION ¶ 10.04[4][a].

562.    The baseline for comparison in conducting this inquiry is the consequences that would result if the allocation "were not contained in the partnership agreement," *i.e.*, the

consequences that would result from an allocation that is based on the "partner's interest in the partnership" ("PIP").  Treas. Reg. § 1.704-1(b)(1)(i).

563.    A partner's interest in the partnership means "the manner in which the partners have agreed to share in the economic benefit or burden (if any)" relating to the income, gain, loss or other allocated item.  Treas. Reg. § 1.704-1(b)(3)(i).  The Court determines a PIP "by taking into account all facts and circumstances relating to the economic arrangement of the partners," including the following four factors:  (a) The partners' relative contributions to the partnership; (b) The interests of the partners in economic profits and losses (if different than that in taxable income or loss); (c) The interests of the partners in cash flow and other non-liquidating distributions; and, (d) The rights of the partners to distributions of capital upon liquidation. Treas. Reg. § 1.704-1(b)(3)(i) & (ii).

### B.    The Allocations Had No Economic Effect

564.    As applied to the current case, the Chemtech I partnership agreement allocated to the foreign banks the lion's share of the taxable income produced in Chemtech I.  And, as stated above, if there is an economic benefit or economic burden that corresponds to an allocation, the partner to whom the allocation is made must receive such economic benefit or bear such economic burden.  But because the foreign banks did not bear any economic burden from the allocation of high amounts of the taxable income, the allocation is not respected for purposes of I.R.C. section 704(b).

565.    The foreign banks contributed 19 percent of Chemtech I's capital and were guaranteed an annual rate of return of 6.947 percent.  Despite contributing only 19 percent of the capital, the foreign banks were allocated 94 percent of the royalty income in 1994; 91 percent in

1995; 85 percent in 1996; and, 64 percent in 1997.  (Joint Fin. Stip., Ex. B, pg. B-2.)

566.    Moreover, the Dow entities contributed 81 percent of the capital but were allocated only 6 percent of the royalty income in 1994; 9 percent in 1995; 15 percent in 1996; and, 36 percent in 1997.  (Joint Fin. Stip., Ex. B at B-2.)

567.    In sum, Chemtech allowed Dow to shift the tax liability for the royalty payment income stream to tax-exempt entities--foreign banks that did not pay U.S. taxes.  The deduction that Dow took for the royalty payments to Chemtech generated tax savings for Dow, and a circular flow of cash from the Chemtech subsidiary, CPI, to Dow entities prevented Dow from suffering any economic loss for making the royalty payments.  Therefore, the allocation of the majority of taxable income to the tax-indifferent foreign banks does not have economic effect, and will not be respected for tax purposes under section 704(b).

568.    With regard to the Chemtech II transaction, beginning in 1998, the § 704(b) abuse occurs with respect to the deductions allocated by the partnership.  Even though Rabo's capital contribution was approximately 20 percent, the partnership allocated only about 2 percent of the depreciation deductions. (*See* Joint Stip. ¶ 103; Joint Fin. Stip., Ex. B, at B-3.)

569.    Therefore, in both Chemtech I and Chemtech II, the allocations to the bank investors did not have economic effect; accordingly, the allocations to the partners will be readjusted according to the partners' interests in the partnerships, respectively.  *See* I.R.C. § 704(b); Treas. Reg. §1.704-1(b)(1)(i).

### C.    *The Allocations Were Not Substantial*

570.    Even if the allocations from Chemtech I had economic effect, the economic effect was not substantial because, from an after-tax perspective, no partner was in an economic

position that was worse than it would have been without the allocations (as compared to the PIP),

and the Dow entities were all in better economic situations than they would have been without

the allocations of taxable income to the tax-exempt foreign banks.

571.    Here, the application of the four factors in determining the partner's interest in the

partnership (PIP), can lead to only one conclusion:  the foreign banks had an interest in

Chemtech I that ranged from 1 percent to 19 percent; in no case would it exceed 19 percent.  As

this is the PIP and therefore the basis for comparison, it is apparent that the allocations of vastly

more income to the foreign banks need to be adjusted so that the foreign banks' receive, at most,

19 percent of the allocated income; the Dow entities consequently are allocated 81 percent of the

income, instead of between 6 and 36 percent as was inappropriately done by Chemtech.  (Joint

Fin. Stip., Ex. B at B-2.)

572.    As to the first factor, the partners' contributions to Chemtech is plain, as is the

conclusion: the foreign banks' (as a group) contribution of $200 million represented 19 percent

of the total value contributed to Chemtech; the Dow entities' contributions of patents and cash

represented an investment in Chemtech of the remaining 81 percent.  (*See* Joint Stip. ¶ 49; Joint

Fin. Stip., Ex. A at A-6.)

573.    The same is true for the partners' interests in the economic profits and losses:  the

foreign banks were entitled to only a 1 percent equity kicker and would only be subject to a 1

percent loss in the extraordinarily unlikely event that the Chemtech assets lost value.  (*See*

Hubbard Rep. at 12.)

574.    The third factor --interests in cash flows and distributions --tells a similar story:

the foreign banks were entitled to a 6.947 percent return on their $200 million contribution to

Chemtech. Over the life of Chemtech I, the total cash flows from the royalty payments Dow made to Chemtech totaled about $646 million. (Joint Fin. Stip., Ex. D at D-2.) Of that amount, the foreign banks received total guaranteed payments of approximately $65 million. (Joint Fin. Stip., Ex. A at A-10.) Therefore, the foreign banks' predetermined return of 6.947 percent represented approximately 10 percent of the total cash flows of Chemtech I. The remaining 90 percent went back to Dow-related entities either directly or in the form of inter-company loans. (Joint Fin. Stip., Ex. D at D-2.)

575.    The fourth factor of the partner's interest in the partnership (PIP) test -- distribution rights upon liquidation -- again highlights that the foreign banks' interests in the partnership were far outweighed by the amount of income allocated to them by the Chemtech transaction. The banks were entitled to an amount equal to their capital account balance, which in the case of the foreign banks would be their original contribution (of $200 million), plus any additional amounts that their capital accounts increased, and had not been compensated for. This was limited to 1 percent of any gains or losses in the value of Chemtech's underlying assets. (*See* Hubbard Rep. at 12 (citing CT00017664; CT00017667-68; and CT00017612-14).)

576.    As to the participants in Chemtech II, an analysis of these four factors directs the Court to the same conclusion. *First*, Rabo (RBDC), the non-Dow bank in Chemtech II, contributed just over 20 percent to the Chemtech II transaction; the Dow entities contributed nearly 80 percent. (Joint Stip. ¶ 103.) *Second*, like in Chemtech I, Rabo was entitled only to a 1 percent equity bump in the profits of Chemtech II (or subject to a 1 percent loss). *Third*, Rabo had an approximately 17 percent interest in the cash flows of Chemtech II. (Joint Fin. Stip., Ex. D at D-2 (sum of total priority return to Rabo from 1998-2003 divided by sum of total Dow

Lease Income received from 1998-2003).)  And, *fourth*, like in Chemtech I, the partners in Chemtech II would be entitled to an amount of their capital account balance upon the liquidation of Chemtech II, *i.e.*, their initial 20 percent contribution plus or minus 1 percent for any profits or losses.  (*See* Joint Ex. 3I at bates 56946.)

577.    In summary, these misallocations of taxable income to the foreign banks allowed Dow to escape U.S. taxation.  Thus, the allocations to the banks of additional income *above and beyond* their interest in the partnership did not diminish the banks' economic consequences: they were receiving the same dollar amount of monies regardless of the special allocations because they paid no tax on the income.  They were indifferent as to whether they were allocated $10 of taxable income or $10 million; their economic position didn't change one iota.  The Dow entities, however, received vast benefits from the allocation of the income to the foreign banks (in Chemtech I), or allocation of depreciation deductions to Dow (in Chemtech II) because the Dow entities would otherwise have been allocated substantially more income (in Chemtech I) or less depreciation (in Chemtech II) had the allocations been made in accordance with partner's interest in the partnership (PIP).  (Joint Fin. Stip., Ex B at B-2; Treas. Reg. § 1.704-1(b)(3)(i) & (ii).)

578.    This increase in allocated income to the Dow entities would raise Dow's tax liability above what was actually incurred with the Chemtech I allocations; thus, the Dow entities benefitted from the allocations.  Because the Dow entities benefitted from the allocation of income to the foreign banks and no other partner (including the banks) was worse off, the economic effect of the Chemtech I allocations was not "substantial."  As such, the Chemtech allocations of income are to be readjusted in accordance with the partner's interest in the

partnership.  Treas. Reg. §1.704-1(b)(1)(i).

579.     With regard to Chemtech II, the same logic applies:  even if the allocations from Chemtech II had economic effect (which they don't), the economic effect was not substantial because, from an after-tax perspective, no partner was in an economic position which was worse than it would have been in without the allocations, and the Dow entities were in a better economic situation than they would have been without the allocations of taxable income to Rabo. And since the income allocations made to Rabo were the same as the interest income it would have reported had it treated the distributions as interest income, Rabo was in no worse of a situation.  As such, the Chemtech allocations of income are to be readjusted in accordance with the partner's interest in the partnership.  Treas. Reg. §1.704-1(b)(1)(i).

580.     In the final analysis, the foreign banks' interests in the Chemtech I transaction ranged from 1 percent to 19 percent (the amount of their capital contribution).  With regard to Chemtech II, Rabo's (RBDC) interest ranged from 1 percent to approximately 20 percent as well. In both cases the banks' PIP is at most 20 percent; therefore, the allocation of massively larger amounts of taxable income to these entities (in Chemtech I) or deductions to Dow (in Chemtech II) clearly does not comport with section 704(b) or the underlying regulations and is readjusted according to the PIP.

## VII    *Accuracy-Related Penalties Are Appropriate Under 26 U.S.C. § 6662*

### A.    *Introduction*

581.     Accuracy-related penalties play a critical role in our self-assessing tax system. Congress designed those penalties for the specific purpose of providing a "downside risk" to tax avoidance schemes.  S. Rep. No. 97-494, at 272-273 (1982).  As the Senate Report explained,

without accuracy-related penalties, "taxpayers are not exposed to any downside risk in taking highly questionable positions on their tax returns since even resolution of the issue against the taxpayer will require only payment of the tax that should have been paid in the first instance with interest to reflect the cost of the 'borrowing.' . . . Thus, in the event that the questionable position is not detected, the taxpayer will have achieved an absolute reduction in tax without cost or risk." *Id*.

582.    This case highlights the need for penalties as a deterrent to taxpayers willing to enter into risky tax-shelter transactions.  Without penalties, there is little incentive for Dow and other major corporations to change their practices of entering into tax shelters, which exacerbates the $365 billion tax gap that plagues our nation.  *See Alamo Nat'l Bank v. Commissioner*, 95 F.2d 622, 623 (5th Cir. 1938) (IRS "in effect represents the interests of all other taxpayers who must bear what the particular taxpayer unjustly escapes").

583.    Section 6662 imposes a penalty equal to 20 percent of the portion of any underpayment of tax that is attributable to one or more of the following: (i) negligence; (ii) substantial understatement of income tax; and (iii) substantial valuation misstatement.  The valuation-misstatement penalty is increased to 40 percent in the case of a gross valuation misstatement. § 6662(h)(1).

584.    Prior to 1997, in partnership cases, tax penalties were generally determined on an individual partner level.  *See Carroll v. United States,* 339 F.3d 61, 68 (2d Cir. 2003); *Fidelity Intern. Currency Advisor A Fund, LLC, by Tax Matters Partner v. United States*, 2010 WL 4116469, *169 (D. Mass. 2010).  But in 1997 Congress changed the statute to require courts to determine *applicability* of penalties at the partnership level.  Therefore, beginning with the tax

year 1997, this Court has jurisdiction to determine "the applicability of any penalty ... which relates to an adjustment to a partnership item" and "all the legal and factual determinations that underlie the determination of any penalty."  26 U.S.C. § 6226(f); Treas. Reg. § 301.6221-1(c).

585.    The tax years in this case span for a decade beginning in 1993.  While the IRS has imposed penalties against Dow for the years 1993 to 1996, this Court does not have jurisdiction to decide them.  This Court's penalty jurisdiction begins in 1997, where the United States filed a counterclaim requesting the 20 percent accuracy-related penalty.  With respect to the "Chemtech II" tax years, 1998 through 2003, the IRS has imposed both the 20 and 40 percent penalties. (Joint Ex. 850 at 8.)

586.    Four penalties potentially apply with respect to the Chemtech II transaction under 26 U.S.C. § 6662.  (Joint Ex. 850 at 8.)  The four penalties are:

(1) a 20% penalty for negligence or disregard of rules or regulations (§ 6662(b)(1));

(2) a 20% penalty for a substantial understatement of income tax (§ 6662(b)(2));

(3) a 40% penalty for a gross valuation misstatement (§ 6662(b)(3) and (h)); and

(4) a 20% penalty for a substantial valuation misstatement (§ 6662(b)(3) and (e));

587.    Only two of these penalties, the negligence or disregard of rules penalty and the substantial understatement penalty, potentially apply with respect to the Chemtech I transaction, and these two penalties potentially apply only for the 1997 tax year.

588.    Section 6662 penalties are applied alternatively, not cumulatively.  There is no stacking of penalties, so the maximum penalty is either 20 percent or 40 percent of the underpayment of tax, even if an underpayment is attributable to more than one type of misconduct.  *See* Treas. Reg. § 1.6662-2(c).

**B.    *The Negligence Penalty is Appropriate***

589.    An understatement of tax is due to "negligence" if the taxpayer fails to make a reasonable attempt to comply with the tax laws.  I.R.C. § 6662(c).  Negligence is strongly indicated where the taxpayer claims a deduction that would seem to a reasonable and prudent person to be "too good to be true" under the circumstances.  Treas. Reg. § 1.6662-3(b)(1).  Return positions that have a reasonable basis, however, are not attributable to negligence.  *Id.*

590.    The negligence standard is an objective one, "requiring a finding of 'the lack of due care or the failure to do what a reasonable and prudent person would do under similar circumstances.'"  *Goldman v. Comm'r*, 39 F.3d 402, 407 (2d Cir. 1994) (*quoting Allen v. Comm'r*, 925 F.2d 348, 353 (9th Cir. 1991)); *accord Pasternak v. Comm'r*, 990 F.2d 893, 902 (6th Cir. 1993); *Marcello v. Comm'r*, 380 F.2d 499, 506 (5th Cir. 1967).

591.    Negligence is defined as "any failure to make a reasonable attempt to comply with the provisions of this title."  26 U.S.C. § 6662(c).  Negligence "includes any failure to . . . exercise ordinary and reasonable care in the preparation of a tax return . . . [and] is strongly indicated where . . . [a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances."  Treas. Reg. § 1.6662-3(b); *see Neonatology,* 299 F.3d at 234 (when "a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril"); *see also Stobie Creek Investments, LLC v. United States,* 82 Fed. Cl. 636, 713-14 (2008), *aff'd*, 608 F.3d 1366 (Fed. Cir. 2010); *Jade Trading, LLC v. United States,* 80 Fed. Cl. 11, 56 (2007), *reversed in part on other grounds,* 598 F.3d 1372 (Fed. Cir. 2010); *Santa Monica*

*Pictures, LLC v. Comm'r,* 89 T.C.M. (CCH) 1157, 2005 WL 1111792, at *99 (2005).

592.    "Disregard" includes "any careless, reckless, or intentional disregard." 26 U.S.C.

§ 6662(c).  Under the regulation,

> The term disregard includes any careless, reckless or intentional disregard of rules
> or regulations.  * * *  A disregard of rules or regulations is "careless" if the
> taxpayer does not exercise reasonable diligence to determine the correctness of a
> return position that is contrary to the rule or regulation.  A disregard is "reckless"
> if the taxpayer makes little or no effort to determine whether a rule or regulation
> exists, under circumstances which demonstrate a substantial deviation from the
> standard of conduct that a reasonable person would observe.

Treas. Reg. § 1.6662-3(b)(2).

593.    The Second Circuit upheld negligence penalties in the lease-stripping tax shelter

in *Nicole Rose Corp. v. Comm'r*, 320 F.3d 282, 285 (2d Cir. 2002):  "We agree that Rose's

scheme was sufficiently blatant that the participation of experts cannot convert its actions into a

'reasonable attempt to comply with the provisions' of the tax code."

594.    The applicability of the negligence penalty depends upon the conduct of the

partnership, their managing members, and the other parties.  *Jade Trading*, 80 Fed. Cl. at 55.

The *Jade* court, citing *Santa Monica Pictures*, relied on "the sophistication and conduct" of the

tax matters partner, a tax attorney who engineered the transaction found to be lacking in

economic substance."  *Id.  See also Stobie Creek*, 82 Fed. Cl. at 703 ("In such instances courts

look to the actions of the partnership through its managing partner."); Accord *Klamath Strategic

Inv. Fund, LLC v. United States*, 568 F.3d 537, 548 (5th Cir. 2009) (considering reasonable cause

and good faith defense at partnership level by looking to actions of managing member); *Long

Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 205-12 (D. Conn. 2004)

(considering partnership's reasonable cause and good faith defense at partnership level by

looking to actions of general partner).

595.    Therefore, in determining whether the negligence penalty is applicable, the Court is required to evaluate whether, with respect to the Chemtech transactions, Dow, which controlled Chemtech I and II, and the general partners and tax matters partners of both, exercised ordinary and reasonable care in the preparation of the partnership returns and that it made a reasonable attempt to comply with the provisions of the Code.

596.    As explained above, through the Chemtech I scheme, Dow claimed hundreds of millions of dollars of deductions for royalty payments made to use its own patents.  And through Chemtech II, Dow claimed depreciation deductions using $360 million of artificial basis for a chemical plant that had already been depreciated (as well as millions of dollars of deductions for payments made to "lease" its own chemical plant).  These hundreds of millions of dollars of artificial tax benefits plainly would seem "too good to be true" to a reasonable and prudent person, let alone to a highly sophisticated Fortune 100 company and its numerous inside and outside counsel and tax advisors.

597.    Dow was keenly aware that the tax benefits of Chemtech I and Chemtech II could be disregarded under the sham partnership doctrine (*Culbertson*), the sham transaction (economic substance) doctrine, and under principles of debt and equity.  Indeed, the lawyers at Andrews & Kurth, a law firm that helped developed SLIPs, wrote a 61 page memorandum describing these, and other problematic issues.  (Joint Ex. 14.)  Tellingly, on page 1 of the memorandum, Andrews & Kurth discusses **drug** patents, not patents related to chemicals.  The Andrews & Kurth memorandum appears to be a template opinion that unfortunately became common in the tax shelter industry.  The recitations of business objectives is contrived, and wholly consistent with

what Andrews & Kurth told Goldman Sachs's Alexander Globus--that a business purpose was

needed "in order for the transaction to work."  Globus did not need his degrees from Harvard,

Stanford, and Virginia to understand what he was being told.  "I got the basic gist," he noted.

(Globus Dep. at 19.)

598.    In addition, an internal Dow memorandum and notes discussing transition from

Chemtech I to Chemtech II--documents that had been withheld by Dow until they were ordered

produced after the close of discovery when the Court granted the United States' second motion to

compel--confirms Dow's tax motives behind Chemtech.  (Joint Ex. 710, U.S. Ex. 15.)  As

explained above, in May 1998, Dow recognized that if Chemtech Portfolio's assets were

considered "marketable securities" for the purposes of section 731, the transition from Chemtech

I to Chemtech II would trigger a tax under that statute.  Even though Dow recognized that

Chemtech Portolio's assets were in fact "currently marketable," it decided to "Exchange these

marketable securities for a deeply subordinated 33 year note."  No business purpose whatsoever

for exchanging the Dow demand notes for a 33-year term note was suggested.  It was purely to

avoid the section 731 tax.  Indeed, a few months later Dow characterized the "marketable

security" matter as "the most important aspect" of its Chemtech II tax shelter.  (Joint Ex. 710 at

bates 83153.)  Dow's memorandum also emphasized the value of the Chemtech I and Chemtech

II tax benefits to Dow.  (*Id*.)

599.    The Dow memorandum described how it came to be in Chemtech II that Rabo

was to be given an equity-like kicker:  "In order to get equity treatment, [Rabo] had to have both

equity upside and downside risk.  this was accomplished by having them participate in the FMV

mark-to-market on the partnership assets upon a liquidation.  **Craig Jones and  I [Mike Cone]**

**modeled this upside and downside**--please see the spreadsheet for details as to the level of exposure." (Joint Ex. 710 at bates 83153-54 (no spreadsheet was attached to the memo produced by Dow).) Dow's memorandum thus confirms that the mark-to-market gain was nothing but window dressing, or--as the Supreme Court might have described this aspect of the Chemtech II scheme if it were the one presented in *Gregory*--"*a disguise for concealing its real character*." 293 U.S. at 469.

600. After the Chemtech I deal closed, Dow wrote a letter thanking its tax lawyers at King & Spalding: "Your participation was critical to its successful completion. . . . This has been a complex, but worthwhile, transaction and a milestone of cooperation between our two organizations." (Joint Ex. 146.) King & Spalding also received accolades from Goldman Sachs, which plainly did not view its SLIPs transaction as one that was similar to ordinary business partnerships: "Enclosed is a deal momento in appreciation for all your hard work and effort that led to the successful completion of a ***complex and pioneering transaction***." (Joint Ex. 185) (emphasis added.) Dow may attempt to compare the Chemtech transactions to its other, legitimate, financing arrangements, but an objective view of the facts and circumstances, at the time Chemtech I closed, proves otherwise.

601. Dow was equally pleased when the Chemtech I transaction was wound up. Dow's Michel Demare, in an email to Geoff Merszei, Pedro Reinhard, and Chuck Hahn, proclaimed: "[T]his deal has been a great contributor to Dow's bottom line. Credit goes first to the negotiation team, but I think you will agree with me that a perfect implementation is, in this kind of transaction, the key to capture all the benefits identified when the transaction is started." (Joint Ex. 625.)

602.    Demare continued on his Chemtech reflection:  "I think time has come to give some credit to those who made it happen, and the first two names who come to my mind are bill Curry and Ed Valenzuela.  I have personally worked a lot with Bill from the European side, and all I can say is that he has put all his heart and energy in this transaction and has played in many regards the leading role in the implementation, the day-to-day management and later on in the liquidation of the transaction."  (Joint Ex. 625.)  Bill Curry, of course, was a Dow tax specialist.

603.    Dow, of course, took steps to make sure that it respected the transaction.  At the beginning of Chemtech, Dow sent a memorandum explaining that "[i]t is imperative that TDCC [Dow] respects the transfer of these patents to CRLP [Chemtech] and that CRLP not conduct business within the United States."  (Joint Ex. 179.)  This reminder was necessary because, in the course of its operations, Dow was continuing to use the patents just as it had before Chemtech.

604.    Likewise, Dow apparently took steps to keep its references to taxes to a minimum. For example, on his copy of the agenda for Chemtech's 1996 review meeting, Geoffrey Merszei wrote, "We can't talk about the tax impact on TDCC."  (Joint Ex. 402.)  Dow may contend that in the tens of thousands of pages of documents that it has produced to the United States, the government has only located handfuls of references to taxes.  This note may explain why that is, even though Merszei does not recall writing it.  When asked whether that meant he couldn't discuss the tax aspects of the Chemtech transaction, he responded "I don't -- I don't recall." (Merszei Dep. at 93.)

605.    The Staff of the Joint Committee in its 1999 report noted that one factor behind the tax shelter problem was "the emerging view of the corporate tax department as a profit center and of the corporate income tax as a manageable cost."  Staff, Joint Committee on Taxation,

*Study of Present-Law Penalty and Interest Provisions as Required by Section 3801 of the Internal Revenue Service Restructuring and Reform Act of 1998 (Including Provisions Relating to Corporate Tax Shelters)*, Vol. 1 at 221 (July 22, 1999). All indications in this case are that Dow is one such entity. For example, when Goldman Sachs projected the tax benefit of Chemtech, not only did it provide a net present value of that benefit, but it went further and noted that value *per outstanding share of Dow stock*. (Joint Ex. 19 at bates 70472; Globus Dep. at 44.)

606.    The Second Circuit in *Nicole Rose* noted that a taxpayer's experts cannot "convert its actions into a 'reasonable attempt to comply'" with the tax code when the tax shelter scheme is "sufficiently blatant." 320 F.3d at 285. The Chemtech scheme is sufficiently blatant.

607.    The Court returns to Mr. Demare's email that reflected on the benefits of the Chemtech transaction do Dow. Mr. Demare concluded in that email that he would "like to recommend a special award program ... to acknowledge the merits of this group which made it happen." (Joint Ex. 625.) The only "special award" that is merited in these circumstances is an award of penalties against Dow due to its negligence in implementing the Chemtech scheme.

608.    The Court concludes that the "negligence or disregard of rules or regulations" penalty of 26 U.S.C. § 6662(a) and (b)(1) therefore applies to the 1997 tax year for Chemtech I and the 1998 through 2003 tax years for Chemtech II.

C.    *The Substantial Understatement Penalty is Appropriate*

609.    A 20 percent substantial understatement penalty is imposed on a tax underpayment that is attributable to "[a]ny substantial understatement of income tax." I.R.C. § 6662(b)(2). An "understatement" of tax exists if the correct tax exceeds the reported tax.

I.R.C. § 6662(d)(2)(A).  For the tax periods in question an understatement is "substantial" if it exceeds the greater of $10,000 or 10 percent of the tax required to be shown on the return.  I.R.C. § 6662(d)(1).

610.    The calculations necessary to determine the amount of an understatement are conducted at the partner level.  Treas. Reg. § 301.6221-1(d); *see also Fidelity,* 2010 WL 4116469 at *172; *Long Term Capital Holdings,* 330 F. Supp. 2d at 200 n.100.  However, to the extent that the tax treatment at issue was claimed by the partnership certain factual determinations that may affect whether a reduction in any understatement is warranted for the reasons set forth in § 6662(d)(2)(B) can be conducted at the partnership level.

611.    Under § 6662(d)(2)(B), a reduction in the amount of an understatement of tax may be allowed if (1) the tax treatment claimed is based upon "substantial authority" or (2) if the taxpayer demonstrates a "reasonable basis" for the tax treatment claimed and "the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return."

612.    However, that relief is unavailable where the understatement is "attributable to a tax shelter."  26 U.S.C. § 6662(d)(2)(C).

### a.    *"Substantial Authority"*

613.    "Substantial authority" exists "only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment."  Treas. Reg. § 1.6662-4(d)(3)(i).  The types of authorities to be considered include the Internal Revenue Code, as well as other statutory provisions, Treasury regulations, revenue rulings and the like; case law; congressional intent; and other IRS memoranda, notices, and publications.

Treas. Reg. §  1.6662-4(d)(3)(iii).

614.    The substantial authority standard is "an objective standard, involving an analysis of the law and application of the law to relevant facts."  Treas. Reg. § 1.6662-4(d)(2).  The substantial authority standard is less stringent than the more likely than not standard (the standard that is met when there is a greater than 50-percent likelihood of the position being upheld), but more stringent than the reasonable basis standard as defined in § 1.6662-3(b)(3).  *See* Treas. Reg. § 1.6662-4(d)(2).

615.    The Court has already rejected Dow's contention that the Chemtech partnership and transactions should be respected.  Moreover, the Court now holds that there was not substantial authority for taking those positions.  The Court recognizes that the district court in *Castle Harbour III*, which involves Babcock & Brown's marketed version of the SLIPs transaction, rejected the imposition of penalties based on its interpretation of First Circuit precedent.  *Castle Harbour III*, 660 F. Supp. 2d at 396-400.  The United States has appealed that decision, and this Court must decide penalties based on Fifth Circuit and Supreme Court precedent.

616.    There is not substantial authority for tax treatment of partnership items where the transactions lack economic substance.  *Stobie Creek,* 82 Fed. Cl. at 706 n.64 (holding that where the "plaintiffs' transactions lack economic substance, or must be disregarded pursuant to the step transaction doctrine, plaintiffs cannot contend successfully that substantial authority supported the tax treatment claimed based on the form of their transactions rather than their substance"); *Long Term Capital Holdings,* 330 F. Supp. 2d at 204-05 (holding that, when underlying merits determination is that transaction lacks economic substance, taxpayer cannot cite authority, much

less substantial authority, to support claimed tax treatment); *Santa Monica Pictures,* 2005 WL 1111792 at *100-01 (finding no substantial authority when transactions had no economic substance beyond creation of tax benefits).

### b.    Limitation on Relief for Tax Shelter Transactions

617.    Even if a taxpayer has substantial authority, if the taxpayer has engaged in a tax shelter, it may not claim substantial authority unless the taxpayer "reasonably believed that the tax treatment was more likely than not the proper treatment."  Treas. Reg. § 1.6662-4(g)(i).

618.    Section §6662(d) was amended in 2004 to make the reduction provisions of I.R.C. § 6662(d)(2)(B) wholly inapplicable in the case of any item attributable to a tax shelter.  Pub. L. No. 108-357, § 812(d).  Treas. Reg. § 1.6662-4(g)(ii)(A) provides that the substantial authority exception generally is not available to corporate taxpayers engaged in tax shelter transactions. Treas. Reg. § 1.6662-4(g)(ii)(B) provides a special rule for transactions occurring prior to December 9, 1994, that allows corporations that in engage in tax shelter transactions to rely on the substantial authority exception.  The Chemtech SLIPs transaction at issue here occurred in 1993, so Dow can rely on the substantial authority exception for Chemtech I.  But for the transition between Chemtech I and Chemtech II, and for Chemtech II, Dow may not rely at all on substantial authority if these are considered tax shelters.

619.     During the Chemtech I years, a tax shelter was defined as a partnership, entity, plan, or arrangement "if the principal purpose of the entity, plan or arrangement, based on objective evidence, is to avoid or evade Federal income tax."  Treas. Reg. § 1.6662-4(g)(i)(A) (1997).  The principal purpose is tax avoidance or evasion "if that purpose exceeds any other purpose." *Id*.

620.    In the present case, there is little doubt that the principal purpose for engaging in the Chemtech transactions was tax avoidance or evasion.

### D.    *Gross Valuation Misstatement Penalty*

621.    A gross-valuation misstatement exists if the value or adjusted basis of property claimed on the return is 400% more than the amount determined to be the correct amount of such value or adjusted basis.  *See* 26 U.S.C. § 6662(a), (b)(3), (e)(2), (h)(1)-(2).

622.    Under 26 U.S.C. § 6662(e)(2), no valuation misstatement penalty may be imposed "unless the portion of the underpayment for the taxable year attributable to substantial valuation misstatements under chapter 1 exceeds $5,000."  The determination of whether the dollar limitation has been exceeded is applied at the taxpayer level, so that issue is not addressed in this proceeding.  *See* Treas. Reg. § 1.6662-5(h)(1).

623.    Here, the value or adjusted basis of property claimed on Chemtech's 1998 through 2003 tax returns is 400% more than the correct amount of such value or adjusted basis.  The appropriate basis for the chemical plant was approximately $37 million.  Dow claims that the Chemtech II transaction allowed Chemtech to step that basis by about $360 million - far more than 400 percent of its real basis.

624.    The "gross valuation misstatement" penalty of 26 U.S.C. § 6662(a), (b)(3), and (h) therefore applies as to the Chemtech II transaction.

625.    The Fifth Circuit, in *Todd v. Comm'r*, 862 F.2d 540, 541-42 (5th Cir. 1988), and *Heasley v. Comm'r*, 902 F.2d 380, 382-83 (5th Cir. 1990), held that a valuation misstatement penalty is not applicable where an entire transaction is disregarded under the economic-substance doctrine.  In *Todd*, the taxpayer was not entitled to claimed investment tax credits with respect to

refrigerated storage units because the units were not put in service during the years at issue. *Todd*, 862 F.2d 540. The Court of Appeals held that the resulting underpayments therefore were not attributable to any overvaluation that may have occurred. *Id*. In *Heasley*, the taxpayers did not dispute the disallowance of their advanced rental deductions and investment tax credits claimed with respect to leased energy savings units. 902 F.2d 380. They did dispute their liability for the overvaluation penalty. *Id*. Relying on *Todd*, the Fifth Circuit in *Heasley* announced the following rule:

> Whenever the I.R.S. totally disallows a deduction or credit, the I.R.S. may not penalize the taxpayer for a valuation overstatement included in that deduction or credit. In such a case, the underpayment is not attributable to a valuation overstatement. Instead, it is attributable to claiming an improper deduction or credit.

*Id*. at 383. However, the government has appealed four cases to the Fifth Circuit that challenge the application of *Heasley* to economic substance cases: *Southgate Master Fund, appeal pending*, No. 09-11166 (5th Cir.), *Bemont Investments, LLC v. United States,* 2010 WL 3057437 (E.D. Tex. 2010), *appeal pending*, 10-41132 (5th Cir.); *NPR Investments, LLC v. United States*,732 F. Supp. 2d 676 (E.D. Tex. 2010), *appeal pending*, No. 10-41219 (5th Cir.); and *Nevada Partners Fund, LLC. v. United States*,  714 F. Supp. 2d 598 (S.D. Miss. 2010), *appeal pending*, No. 10-60559 (5th Cir.).

626.    To begin, the *Heasley* rule should not apply because the effect of the IRS's rejection of the Chemtech scheme will not be to disallow *all* of Dow's basis in the chemical plant. The IRS is only disallowing the artificial portion of that basis that was created in Chemtech II. More importantly, the Court is constrained to defer to regulations promulgated subsequent to *Heasley*, which make clear that there is a gross valuation misstatement in the

circumstances of this case.  *See Mayo Foundation for Medical Education and Research v. United States*, _ U.S. _, 131 S.Ct. 704 (2011) (deferring to Treasury regulations promulgated to clarify ambiguous statute after courts of appeals, without the benefit of a regulation, had interpreted the statute differently).  Thus, Treas. Reg. § 1.6662-5(g) now provides, in pertinent part, that "[t]he value or adjusted basis claimed on a return of any property with a correct value or adjusted basis of zero is considered to be 400 percent or more of the correct amount.  There is a gross valuation misstatement with respect to such property, therefore, and the applicable penalty rate is 40 percent."

627.    To be sure, other Courts of Appeals disagree with the Fifth Circuit's approach.  *See Merino v. Commissioner*, 196 F.3d 147, 155, 157-159 (3d Cir. 1999); *Zfass v. Commissioner*, 118 F.3d 184, 190-91 (4th Cir. 1997); *Illes,* 982 F.2d at 167; *Gilman v. Commissioner*, 933 F.2d 143, 151 (2d Cir. 1991); *Massengill v. Commissioner*, 876 F.2d 616, 619-20 (8th Cir. 1989).[6]  This Court, of course, is bound to follow *Heasley* – if it applies.  But in the present case, since Chemtech's basis in the chemical plant will not be completely disallowed, *Heasley* is inapplicable.

628.    Therefore, for the Chemtech II tax years, the Court imposes the 40 percent overvaluation penalty.

**5.    Defense to Penalties**

629.    This Court will impose penalties unless the partnership raises a valid defense to its imposition.  One such defense is that a taxpayer may avoid penalties for any portion of an

---

[6]The Ninth Circuit, however, has followed the Fifth Circuit's lead.  *See Keller v. Commissioner*, 556 F.3d 1056, 1061 (9th Cir. 2009).

understatement if it shows that "there was a reasonable cause for such portion and that [he] acted in good faith[.]"  26 U.S.C. § 6664(c).  Only the partnership itself may raise that defense in a partnership-level proceeding; the "reasonable cause" of the individual partners must be asserted in partner-level proceedings.  Treas. Reg. § 301.6221-1(c).

630.    Whether a reasonable cause is a partner or partnership level defense depends on what actions a taxpayer claims provides reasonable cause.  The defense is a partnership defense when it is the actions of the partners in charge of managing the partnership.  *Klamath*, 568 F.3d at 548 (considering reasonable cause and good faith defense at partnership level by looking to actions of managing member); *Stobie Creek*, 608 F.3d at 1381-83; *Long Term Capital Holdings*, 330 F. Supp. 2d at 205-12 (considering partnership's reasonable cause and good faith defense at partnership level by looking to actions of general partner); *Santa Monica Pictures,* 2005 WL 1111792 at *100-12 (2005) (looking to actions of partnership through managing member in considering partnership's reasonable cause and good faith defense)).

631.    No reasonable cause defense has been raised in this proceeding.

Respectfully submitted this 31st Day of March, 2011.

UNITED STATES OF AMERICA, by

DONALD J. CAZAYOUX, JR.
UNITED STATES ATTORNEY

/s/ John J. Gaupp
John J. Gaupp
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Fax: (225) 389-0685
Local Counsel


Thomas J. Sawyer
Thomas F. Koelbl
Philip M. Schreiber
Robert L.Welsh
Trial Attorneys, Tax Division
U.S. Department of Justice
Post Office Box 14198
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 514-6068
Fax: (202) 514-9868

IN THE UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF LOUISIANA

CHEMTECH ROYALTY ASSOCIATES,      )
L.P., by DOW EUROPE, S.A. as Tax  )
Matters Partner,                  )
                                  )
            Plaintiff,            )
                                  )      Civil Action No. 05-944-C-M3
                                  )
      v.                          )       CONSOLIDATED WITH
                                  )
UNITED STATES OF AMERICA,         )      Civil Action No. 06-258-RET-CN
                                  )
            Defendant.            )

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing United States' Findings of Fact and Conclusions of Law was made on March 31, 2011, by electronic filing through the Court's EM/ECF system to counsel of record:

David M. Bienvenu, Jr., Esq.          John B. Magee
451 Florida Street, 8th Floor         Hartman E. Blanchard, Jr.
Taylor, Porter, Brooks & Phillips     Bingham McCutchen LLP
Baton Rouge, LA 70801                 2020 K Street, NW
                                      Washington, D.C.  20006-1806

                                      /s John Gaupp
                                      John J. Gaupp
                                      Assistant United States Attorney
                                      777 Florida Street, Suite 208
                                      Baton Rouge, Louisiana 70801
                                      Telephone: (225) 389-0443
                                      Fax: (225) 389-0685
                                      Local Counsel