# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| CHEMTECH ROYALTY ASSOCIATES, L.P., by DOW EUROPE, S.A., as Tax Matters Partner | ) ) ) ) | |
| Plaintiff, | ) ) | Case No.: 05-944-BAJ-DLD |
| v. | ) ) | Case No.: 06-258-BAJ-DLD |
| UNITED STATES OF AMERICA, | ) ) | Case No.: 07-405-BAJ-DLD |
| Defendant. | ) ) ) ) | |

## <u>PLAINTIFF'S PRE-TRIAL BRIEF</u>

David M. Bienvenu, Jr.
TAYLOR, PORTER, BROOKS & PHILLIPS
Post Office Box 2471
Baton Rouge, LA  70821
Telephone:  (225) 387-3221
Facsimile:  (225) 346-8049

John B. Magee
Hartman E. Blanchard, Jr.
James D. Bridgeman
Christopher P. Murphy
Robert A. Leonard
Royce L. Tidwell
BINGHAM MCCUTCHEN, LLP
2020 K Street, N.W.
Washington, D.C.  20006
Telephone:  (202) 373-6000
Facsimile:  (202) 373-6001

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF THE CASE ................................................................................. 1

    A.    Chemtech I:  1993-98 .......................................................................... 2

    B.    Chemtech II:  1998-2003 .................................................................... 4

    C.    Summary ............................................................................................. 4

II.   SUMMARY OF CHEMTECH TRANSACTIONS ....................................... 5

    A.    Dow's Business and Conditions in the Early 1990s ............................ 5

    B.    Development of the Chemtech Transaction .......................................... 11

        1.    Advantages of Chemtech ........................................................ 12

        2.    Tax Advantages of Chemtech Proposal .................................. 15

        3.    Board Approval of Chemtech .................................................. 16

        4.    Formation of Chemtech Royalty Associates ........................... 17

        5.    Identification of Third-Party Investors and Consummation of the Transaction ........................................................................ 21

        6.    Key Elements of the Chemtech Partnership Agreement Following Entry of the Class A Investors ................................ 25

        7.    Partnership Book Accounting .................................................. 28

    C.    Operation of Chemtech:  1993-1998 .................................................... 33

    D.    The 1998 Restructuring of Chemtech .................................................. 35

        1.    Purchase of Banks' Class A Interests ...................................... 35

        2.    Chemtech II ............................................................................. 37

        3.    Key Elements of the Chemtech Partnership Agreement Following Entry of RBDC .......................................................... 41

        4.    Tax Consequences of Chemtech II .......................................... 43

    E.    Accounting Treatment of Chemtech ..................................................... 44

### TABLE OF CONTENTS (cont.)

Page

ARGUMENT ................................................................................................. 45

I.     THE CHEMTECH TRANSACTIONS HAD ECONOMIC SUBSTANCE ............. 46

    A.     The Chemtech Transactions Had Objective Economic Substance ...................... 49

    B.     The Chemtech Transactions Had Substantial Non-Tax Business Purposes ........ 53

II.     THE CLASS A INVESTMENTS WERE EQUITY ................................................... 55

        1.     The Parties Intended the Banks' Interests to Be Equity, and the Formal Indicia of the Interests Demonstrate This Intent ........................ 58

        2.     The Interests Were Equity for Non-Tax Purposes .................................. 59

        3.     The Banks Were Subordinated to the Creditors of the Partnership ......... 61

        4.     The Banks Were Not Entitled to Repayment of a Sum Certain Amount ................................................................................. 62

        5.     The Class A Interests Were Substantially More Equity-Like Than Many Hybrid Instruments Classified as Equity for Tax Purposes ........... 63

III.     THE BANKS WERE PARTNERS IN CHEMTECH ................................................ 65

    A.     Chemtech was a Partnership ................................................................. 65

        1.     Moline Properties Requires Recognition of Chemtech as an Entity ........ 65

        2.     Because Chemtech Had Multiple Classes of Equity, the Existing Regulations Require That It Be Respected as a Business Entity ............. 66

    B.     The Banks Were Partners ....................................................................... 67

        1.     The Banks Were Partners under the Common-Law Test of Culbertson ............................................................................ 67

        2.     Section 704(e)(1) Requires Classification of the Banks as Partners ........ 71

           a.     The Class A Interests Were Capital Interests .............................. 72

           b.     The Banks Were the Real Owners of Their Interests ................. 72

           c.     Capital Was a Material Income-Producing Factor in Chemtech ................................................................................ 73

## TABLE OF CONTENTS (cont.)

Page

d. The Government's Arguments Are Incompatible with the Plain Text of the Statute, Its Legislative History, and the Consistent Line of Case Authority ............................................... 73

C. The Tax Benefits of the Partnership Form Are Irrelevant to Classification of the Banks As Partners ...................................................... 74

D. Conclusion .................................................... 76

IV. THE ALLOCATION OF CHEMTECH I'S INCOME COMPLIED WITH THE MANDATES OF SECTION 704 ........................................ 77

A. Sections 704(b) and 704(c) Govern the Allocation of Chemtech I's Income ...... 77

B. The Section 704(c) Ceiling Rule Applies to the Contributions of the Patent Assets to Chemtech I ........................................ 80

C. The Ceiling Rule Governs the Allocation of Taxable Income to the Class A Investors in Chemtech I ........................................ 83

D. The Allocation of Chemtech I's Profits Had Substantial Economic Effect ......... 86

1. The Allocation of Chemtech I's Income Had Economic Effect .............. 87

2. The Economic Effect of the Book Income Allocation Was "Substantial" ............................................... 89

3. The Government Cannot Posit an Alternative Allocation of Book Income That Reflects the Parties' Economic Deal .................................. 92

E. The History of the Ceiling Rule Refutes the Government's Position .................. 95

F. Conclusion ........................................................ 97

V. THE ALLOCATIONS OF CHEMTECH II'S INCOME HAD SUBSTANTIAL ECONOMIC EFFECT .................................................... 97

A. The Allocations of Chemtech II's Income Had Economic Effect ...................... 98

B. The Economic Effect of the Allocation of Chemtech II's Income Was Substantial .......................................................... 99

VI. DTPC DID NOT RECOGNIZE GAIN ON REDEMPTION OF ITS CHEMTECH INTEREST ........................................ 100

iii

**TABLE OF CONTENTS (cont.)**

Page

VII.  THE "PARTNERSHIP ANTI-ABUSE RULE" DOES NOT
      PERMIT THE IRS TO OVERRIDE THE STATUTORY
      MANDATES OF SUBCHAPTER K ........................................................... 103

      A.   The Partnership Anti-Abuse Rule Cannot Apply to Chemtech I ...................... 104

      B.   The Partnership Anti-Abuse Rule Does Not Permit the IRS to Override the
           Statutory Basis Adjustment Regime of Section 734 ........................................ 106

      C.   The Government's Interpretation of the Partnership Anti-Abuse Rule
           Would Render It Invalid ................................................................................. 110

VIII. THE GOVERNMENT'S PENALTY CLAIMS ARE UNFOUNDED ................... 112

IX.   CONCLUSION ......................................................................................... 114

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*ACM Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998) ..................................49

*Alexander v. Commissioner*, 190 F.2d 753 (5th Cir. 1951) ........................................68

*Alterman Foods, Inc. v. United States*, 505 F.2d 873 (5th Cir. 1974) ..........................59

*ASA Investerings Partnership v. Commissioner*, 201 F.3d 505 (D.C. Cir. 2000).........................75

*Boca Investerings Partnership v. United States*, 314 F.3d 625 (D.C. Cir. 2003).........................75

*Campbell County State Bank, Inc. v. Commissioner*, 37 T.C. 430, 441-42 (1961),
    *rev'd on other grounds*, 311 F.2d 374 (8th Cir. 1963), *acq.* 1966-2 C.B. 4. .........................66

*Carriage Square, Inc. v. Commissioner*, 69 T.C. 119 (1977)..................................71, 74

*Caruth Corporation v. United States*, 865 F.2d 644 (5th Cir. 1989)..............................46

*Chisholm v. Commissioner*, 79 F.2d 14 (2d Cir. 1935) ..........................................75

*Cirelli v. Commissioner*, 82 T.C. 335 (1984) ................................................74

*Commissioner v. J.N. Bray Co.,* 126 F.2d 612 (5th Cir. 1942).....................................59

*Commissioner v. Meridian & Thirteenth Realty Co.*, 132 F.2d 182 (7th Cir. 1942)..............57, 61

*Commissioner v. O.P.P. Holding Corp.*, 76 F.2d 11 (2d Cir. 1935)...............................58

*Commissioner v. Culbertson*, 337 U.S. 733 (1949) ............................67, 68, 69, 71, 74

*Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001)...........48, 49, 51, 52, 54

*Consolidated. Edison Co. v. United States*, 90 Fed. Cl. 228 (2009)..............................51

*Cottage Savings Association v. Commissioner,* 499 U.S. 554 (1991) ........................102

*Countryside Limited Partnership v. Commissioner,*
    95 T.C.M. (CCH) 1006 (2008) ..............................................101, 102, 110

*DeLaune v. United States*, 143 F.3d 995 (5th Cir. 1998)......................................97

*Deluxe Corp. v. United States*, 885 F.2d 848 (Fed. Cir. 1989)..................................111

*Dorsey v. United States*, 311 F.Supp. 625 (S.D. Fla. 1969) ....................................63

*Edward L. Stephenson Trust v. Commissioner*, 81 T.C. 283 (1983) ..........................110

## TABLE OF AUTHORITIES (cont.)

**Cases (cont.)**                                                                    **Page(s)**

*Eli Lily & Co. v. Commissioner*, 84 T.C. 996 (1985),
    *aff'd in part and rev'd in part*, 856 F.2d 855 (7th Cir. 1988)...................84

*Estate of Dorsey v. Commissioner*, 214 F.2d 294 (5th Cir. 1954)................68

*Estate of McLendon v. Commissiner*, 135 F.3d 1017 (5th Cir. 1998) ...........64

*Estate of Mixon v. United States*, 464 F.2d 394 (5th Cir. 1972)............56, 58

*Estate of Monroe v. Commissioner,* 24 F.3d 699 (5th Cir. 1997)................64

*Estate of Tobias v. Commissioner*, 81 T.C.M. (CCH) 1163 (2001) ...............94

*Evans v. Commissioner*, 54 T.C. 40 (1970) .............................................74

*Evans v. Commissioner*, 447 F.2d 547 (7th Cir. 1971).....................71, 73-74

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978),
    *rev'g* 536 F.2d 746 (8th Cir. 1976) ............................................. *passim*

*Friedlander Corp. v. Commissioner*, 216 F.2d 757 (5th Cir. 1954) ............75

*Ginsburg v. Arnold*, 185 F.2d 913 (5th Cir. 1950) ...................................68

*Gitlitz v. Commissioner*, 531 U.S. 206 (2001)........................................114

*Hambuechen v. Commissioner*, 43 T.C. 90 (1964)....................................55

*Helvering v. Credit Alliance Corp.*, 316 U.S. 107 (1942) .........................110

*Helvering v. Gregory*, 69 F.2d 809 (2d Cir. 1934),
    *aff'd*, 293 U.S. 465 (1935) ...................................................................46

*Historic Boardwalk Hall, LLC v. Commissioner*,
    No. 11273-07, 2011 WL 9078 (T.C. Jan. 3, 2011) ................................69

*Hunt v. Commissioner*, 59 T.C.M. (CCH) 635 (1990) ..............................69

*In re Delta Airlines, Inc.*, 608 F.3d 139 (2d Cir. 2010) ............................26

*Interhotel Co. v. Commissioner*, 81 T.C.M. (CCH) 1804 (2001).................94

*Jewel Tea Co. v. United States*, 90 F.2d 451 (2d Cir. 1937)........................55

*John Wanamaker Philadelphia v. Commissioner*, 139 F.2d 644 (3d Cir. 1943)...................57, 61

## TABLE OF AUTHORITIES (cont.)

**Cases (cont.)**                                                                      **Page(s)**

*Johnston v. Commissioner*, 69 T.C.M. (CCH) 2283 (1995) ........................................................72

*Karsch v. Commissioner*, 8 T.C. 1327 (1947) ........................................................................57

*Klamath Strategic Investment Fund v. United States*, 568 F.3d 537 (5th Cir. 2009) .............49, 52

*Koshland v. Helvering*, 298 U.S. 441 (1936).........................................................................110

*Kraft Foods Co. v. Commissioner*, 232 F.2d 118 (2d Cir. 1956).............................................59

*Lee Telephone Co. v. Commissioner*, 260 F.2d 114 (4th Cir. 1958) .....................................59-60

*Madorin v. Commissioner*, 84 T.C. 667 (1985)......................................................................71

*Marcus v. Commissioner*, 201 F.2d 850 (5th Cir. 1953) ........................................................68

*Merryman v. Commissioner*, 873 F.2d 879 (5th Cir. 1989)......................................................51

*Miele v. Commissioner*, 56 T.C. 556 (1971),
    *aff'd*, 474 F.2d 1338 (3d Cir. 1973) ...............................................................................60

*Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943).......................................65, 66, 76

*Morris v. Commissioner*, 13 T.C. 1020 (1949)......................................................................69

*Nalle v. Commissioner*, 997 F.2d 1134 (5th Cir. 1993).......................................................110-11

*Nassau Lens Co. v. Commissioner*, 308 F.2d 39 (2d Cir. 1962)..............................................59

*Neil v. Commissioner*, 269 F.2d 563 (5th Cir. 1959)..........................................................68-69

*P.M. Finance Corp. v. United States*, 302 F.2d 786 (3d Cir. 1962) ..........................................61

*Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206 (1998) .................................71

*Pflugradt v. United States*, 310 F.2d 412 (7th Cir. 1962)...................................................71, 74

*Poggetto v. United States*, 306 F.2d 76 (9th Cir. 1962).........................................................74

*Ragland Investment Co. v. Commissioner*, 52 T.C. 867 (1969),
    *aff'd*, 435 F.2d 118 (6th Cir. 1970)...........................................................................59, 60, 61

*Rite Aid Corp. v. United States*, 255 F.3d 1357 (Fed. Cir. 2001) ...............................................110

## TABLE OF AUTHORITIES (cont.)

**Cases (cont.)**                                                                                      **Page(s)**

*RLC Industries Co. v. Commissioner*, 58 F.3d 413 (9th Cir. 1995) .............................................111

*Saba Partnership v. Commissioner*, 273 F.3d 1135 (D.C. Cir. 2001) ..........................................75

*Scofield v. Davant*, 218 F.2d 486 (5th Cir. 1955) ......................................................................68

*Seabrook v. Commissioner*, 196 F.2d 322 (5th Cir. 1952) .........................................................68

*Shell Petroleum Inc. v. United States*,
   2008 WL 4714252, No. H-05-02016 (S.D. Tex. July 3, 2008) ...................... 50, 51-52, 53, 54

*Skarda v. Commissioner*, 250 F.2d 429 (10th Cir. 1957) ............................................................65

*Smith v. Commissioner*, 32 T.C. 1261 (1959), *acq.*, 1960-2 C.B. 7. ...........................................74

*Staked Plains Trust v. Commissioner*, 143 F.2d 421 (5th Cir. 1944) ..........................................63

*Strangi v. Commissioner*, 293 F.3d 279 (5th Cir. 2002)..............................................................50

*TIFD III-E, Inc.. v. United States*, 342 F. Supp. 2d 94 (D. Conn. 2004),
   *rev'd on other grounds*, 459 F.3d 220 (2d Cir. 2006)..................................................53, 54, 92

*TIFD III-E, Inc.. v. United States*, 459 F.3d 220 (2d Cir. 2006)............................................69, 70

*TIFD III-E, Inc.. v. United States*, 660 F. Supp. 2d 367 (D. Conn. 2009)....................................70

*Tomlinson v. 1661 Corp.*, 377 F.2d 291 (5th Cir. 1967)...............................................................61

*United States v. Adlman*, 134 F.3d 1194 (2d Cir. 1998).................................................................5

*United States v. Snyder Brothers Co.*, 367 F.2d 980 (5th Cir. 1966) ...............................56, 58, 61

*United States v. South Georgia Railway Co.,* 107 F.2d 3 (5th Cir. 1939).............56, 57, 58, 62, 63

*United Parcel Service of America, Inc. v. Commissioner*,
   254 F.3d 1014 (11th Cir. 2001) .....................................................................................49, 59

*Vecchio v. Commissioner*, 103 T.C. 170 (1994).........................................................................94

*Waterman Steamship Corp. v. Commissioner*, 430 F.2d 1185 (5th Cir. 1970) ......................58, 59

*West v. Commissioner*, 214 F.2d 300 (5th Cir. 1954).............................................................69, 76

*Yost v. Commissioner*, 190 F.2d 131 (5th Cir. 1951)....................................................................68

## TABLE OF AUTHORITIES (cont.)

**Internal Revenue Code of 1986 (26 U.S.C.) unless otherwise noted**                    **Page(s)**

§ 11................................................................................................................44

§ 332.....................................................................................................108, 109

§ 351(g)...........................................................................................................55

§ 701....................................................................................................15, 77, 78

§ 702.........................................................................................................77, 78

§ 702(a)...........................................................................................................15

§ 704(b)......................................................................................................*passim*

§ 704(c)......................................................................................................*passim*

§ 704(c) (1954) ..........................................................................................80-81

§ 704(e)(1) ...................................................................................71, 72, 73, 74, 76

§ 705......................................................................................................15, 84-85

§ 723..............................................................................................................79

§ 731..........................................................................................................15, 43

§ 731(a)...................................................................................................43, 100, 101

§ 731(a)(1) ................................................................................................100, 101

§ 731(c)..................................................................................................101, 102, 103

§ 731(c)(1) ....................................................................................................100

§ 731(c)(2)(A) .................................................................................................100

§ 731(c)(2)(B) .................................................................................................100

§ 732.......................................................................................................43, 106

§ 732(f)..........................................................................................................109

§ 734..............................................................................................44, 104, 107, 110

§ 734(b)..................................................................................106, 107, 108, 109, 112

## TABLE OF AUTHORITIES (cont.)

**Internal Revenue Code (cont.)**                                                **Page(s)**

§ 754 .................................................................................. 44, 104, 107, 108, 109

§ 761(a) .............................................................................................. 57, 65

§ 761(b) ................................................................................................... 67

§ 851 ....................................................................................................... 66

§ 856 ....................................................................................................... 66

§ 1504(a)(4) ............................................................................................ 55

§ 6221 ................................................................................................... 112

§ 6226(f) ............................................................................................... 112

§ 6230(c)(1)(C) ............................................................................... 112, 114

§ 6230(c)(2) .......................................................................................... 114

§ 6230(c)(3) .......................................................................................... 114

§ 6230(c)(4) .......................................................................................... 112

§ 6662(a) .......................................................................................... 112-13

§ 6662(b) .............................................................................................. 113

§ 6662(b)(1) ...................................................................................... 112-13

§ 6662(b)(2) ...................................................................................... 112-13

§ 6662(b)(3) .......................................................................................... 113

§ 6662(c) .............................................................................................. 113

§ 6662(d)(2)(B)(i) ................................................................................. 113

§ 6662(e) .............................................................................................. 113

§ 6662(h) .............................................................................................. 113

§ 7701(a)(1) ............................................................................................ 72

§ 7701(o)(4) ............................................................................................ 53

<u>**TABLE OF AUTHORITIES (cont.)**</u>

**Internal Revenue Code (cont.)**                                                    **Page(s)**

§ 7704(c) ......................................................................................................... 66

§ 7805(a) ........................................................................................................ 110

§ 7806(b) ......................................................................................................... 71


**Treasury Regulations**

§ 1.305-5(d), Ex. 5 ..................................................................................... 55-56

§ 1.701-2(a) .................................................................................................. 103

§ 1.701-2(d), Ex. (3) ............................................................................. 104, 105

§ 1.701-2(d), Ex. (5) ..................................................................................... 104

§ 1.701-2(d), Ex. (6) ............................................................................... 98, 104

§ 1.701-2(d), Ex. (8) ..................................................................................... 108

§ 1.701-2(d), Ex. (9) ..................................................................................... 108

§ 1.701-2(d), Ex. (10) ................................................................................... 108

§ 1.701-2(g) .................................................................................................. 104

§ 1.704-1(b)(1)(ii)(*a*) .................................................................................. 105

§ 1.704-1(b)(1)(vi) .......................................................................................... 86

§ 1.704-1(b)(1)(vii) ......................................................................................... 84

§ 1.704-1(b)(2) .......................................................................................... 87, 98

§ 1.704-1(b)(2)(ii)(*a*) ..................................................................................... 87

§ 1.704-1(b)(2)(ii)(*b*) ..................................................................................... 89

§ 1.704-1(b)(2)(ii)(*b*)(2) ............................................................................ 86-87

§ 1.704-1(b)(2)(ii)(*d*) ................................................................................ 87, 98

## TABLE OF AUTHORITIES (cont.)

**Treasury Regulations (cont.)**                                    **Page(s)**

§ 1.704-1(b)(2)(iii) .................................................................................... 86-87, 89

§ 1.704-1(b)(2)(iii)(*a*) (1993) ............................................................................ 90

§ 1.704-1(b)(2)(iii)(*b*) ................................................................................. 89-90

§ 1.704-1(b)(2)(iii)(*c*) ............................................................................ 89-90, 91

§ 1.704-1(b)(2)(iv) ........................................................................................ 86

§ 1.704-1(b)(2)(iv)(*b*) ............................................................................... 79, 88

§ 1.704-1(b)(2)(iv)(*b*)(*1*)-(*7*) ....................................................................... 92-93

§ 1.704-1(b)(2)(iv)(*b*)(2) .............................................................................. 79

§ 1.704-1(b)(2)(iv)(*d*)(*1*) ............................................................................. 79

§ 1.704-1(b)(2)(iv)(*d*)(*3*) ........................................................................... 29, 88

§ 1.704-1(b)(2)(iv)(*f*)(*3*) ............................................................................ 29, 88

§ 1.704-1(b)(2)(iv)(*g*)(*1*) ........................................................................ 79, 80, 88

§ 1.704-1(b)(3) ...................................................................................... 90, 92, 93

§ 1.704-1(b)(3)(i) ...................................................................................... 94-95

§ 1.704-1(b)(3)(ii)(*a*)-(*d*) .............................................................................. 92

§ 1.704-1(b)(5), Ex. (1) ........................................................................... 93, 98-99

§ 1.704-1(b)(5), Ex. (5) ...................................................................... 90-91, 92, 93, 94

§ 1.704-1(b)(5), Ex. (6) ................................................................................. 93

§ 1.704-1(b)(5), Ex. (7) .............................................................................. 93, 94

§ 1.704-1(b)(5), Ex. (9) ................................................................................. 91

## TABLE OF AUTHORITIES (cont.)

**Treasury Regulations (cont.)**                                      **Page(s)**

§ 1.704-1(b)(5), Ex. (14) .................................................................................88

§ 1.704-1(c)(2)(i) (1956) .................................................................79, 81, 84

§ 1.704-1(c)(2)(i) ............................................................................................

§ 1.704-1(e)(1) ..............................................................................................72

§ 1.704-1(e)(1)(iii) .........................................................................................72

§ 1.704-1(e)(1)(iv) .........................................................................................73

§ 1.704-1(e)(1)(v) ....................................................................................72, 73

§ 1.704-1(e)(2)(x) ..........................................................................................76

§ 1.704-2(e) ...................................................................................................98

§ 1.704-2(l)(1)(i) ..........................................................................................105

§ 1.704-3(a)(3)(i) ...........................................................................................97

§ 1.704-3(b)(2), Ex. 1(ii) ...............................................................................79

§ 1.704-3(c)(1) ...............................................................................................96

§ 1.731-2(c)(3) .......................................................................................100, 101

§ 1.731-2(h) .................................................................................................102

§ 1.1001-3(e)(2) ...........................................................................................102

§ 1.1001-3(e)(3) ...........................................................................................102

§ 1.1092(d)-1(a) ...........................................................................................100

§ 1.6662-3(b) ................................................................................................113

§ 1.6662-3(b)(3) ...........................................................................................113

§ 1.6662-4(d) ................................................................................................113

## TABLE OF AUTHORITIES (cont.)

**Treasury Regulations (cont.)**                                            **Page(s)**

§ 1.6662-4(d)(3)(i) ............................................................................................113

§ 1.6662-4(g)(1)(ii)(B ) ......................................................................................105

§ 25.2701-3(d), Ex. 3 .........................................................................................56

§ 301.6221-1(c) ...................................................................................................114

§ 301.6221-1(d) ...................................................................................................114

§ 301.7701-2(b)(1) (1993) ..................................................................................62

§ 301.7701-4(c)(1) ...............................................................................................66


**Legislative Materials**

Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1238,
    111 Stat. 788, 1026 (1997).........................................................................112

H.R. Rep. No. 82-586 (1951).............................................................................76

H.R. Rep. No. 83-1337 (1954)...........................................................................96

S. Rep. No. 82-781 (1951)..................................................................................76

S. Rep. No. 83-1622 (1954)................................................................................81

S. Rep. No. 98-169, vol. 1 (1984)......................................................................82


**I.R.S. Administrative Materials**

Notice 94-47, 1994-1 C.B. 357...........................................................................60

Notice 95-53, 1995-2 C.B. 334...........................................................................84

Notice 2008-55, 2008-27 I.R.B. 11.....................................................................63

Notice of Proposed Rulemaking, 57 Fed. Reg. 61,345 (Dec. 24, 1992).................82, 85

Private Letter Ruling 2011-12-003 (February 16, 2011).......................................64

## TABLE OF AUTHORITIES (cont.)

**I.R.S. Administrative Materials (cont.)**                                   **Page(s)**

Revenue Procedure 2003-84, 2003-2 C.B. 1159 ...................................................... 70-71

Revenue Ruling 78-142, 1978-1 C.B. 112.............................................................. 63-64

Revenue Ruling 90-27, 1990-1 C.B. 50..................................................................63

Revenue Ruling 94-28, 1994-1 C.B. 86 .................................................................64

T.A.M. 2004-18-008 (Apr. 30, 2004) ....................................................................60

T.A.M. 2005-12-020 (Mar. 25, 2005) ...................................................................60

T.A.M. 2006-50-017 (Aug. 18, 2006) ...................................................................67

T.D. 8080, 1986-1 C.B. 371..................................................................................66

T.D. 8500, 1994 C.B. 183.....................................................................................82

T.D. 8889, 2000-2 C.B. 124..................................................................................35

### Treatises

Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income,*
  *Estates and Gifts* (3d ed. 2003)................................................................. 81-82, 88

William S. McKee, William F. Nelson & Robert L. Whitmire, *Federal Taxation of*
  *Partnerships and Partners* (2d ed. 1990) ..............................................................78

### Miscellaneous

Daniel L. Simmons, *Built-in Gain and Built-in Loss Property on Formation of a*
  *Partnership: An Exploration of the Grand Elegance of Partnership Capital*
  *Accounts,* 9 Fla. Tax Rev. 599 (2009) .......................................................... 86-87

Ethan Yale, *Defining Partnership' For Federal Tax Purposes,*
  131 Tax Notes (TA) 589 (May 9, 2011) ...............................................................74

John P. Steines, Jr., *Partnership Allocations of Built-in Gain or Loss,*
  45 Tax L. Rev. 615 (1990).............................................................................78, 85

## TABLE OF AUTHORITIES (cont.)

**Miscellaneous (cont.)**                                                                  **Page(s)**

Karen Brettell, UPDATE 1-*S&P, Moody's Cut Dow Chemical on Scrapped Deal*,
    Reuters (Dec. 29, 2008, 10:56pm) ............................................................................7

Keith Johnson, *Dow Chemical Takes Hit as Kuwait Deal Derails,* Wall St. J., Dec. 30,
    2008, at B1 ...............................................................................................................7

Lawrence Lokken*, Partnership Allocations,* 41 Tax L. Rev. 547 (1986) .....................78

Sidney Davidson, Clyde P. Stickney, & Roman L. Weil, *Financial Accounting:*
    *An Introduction to Concepts, Methods and Uses* (The Dryden Press,
    5th ed. 1988).............................................................................................................10

Answer, *Rohm & Haas Co. v. The Dow Chemical Co. and Ramses*
    *Acquisition Corp.*, C.A. No. 4309-CC (Del. Ch. Feb 3, 2009).................................7

Annual Report, The Dow Chemical Company (2008) ....................................................7

## I.    SUMMARY OF THE CASE

The transactions at issue in this case resulted from Dow's long-standing financial management strategy that arose from the basic nature of its chemical business.  That business is capital intensive and subject to economic cycles based on product supply and demand.  In this environment, Dow developed a policy of financial flexibility that it implemented by maximizing its access to cash through as many sources as possible, while maintaining its favorable Standard & Poors A credit rating by keeping its debt at or below 40 percent of its total capital.  Chemtech fit Dow's overall financial strategy because it provided $200 million in cash from outside sources in a transaction that was classified as minority equity, rather than debt, on Dow's balance sheet.  Thus, the transactions enabled Dow to achieve significant non-tax business objectives and had non-tax economic substance and reality.

Dow achieved these objectives by forming a Delaware limited partnership and attracting limited partner investors.  The Government challenges the bona fides of the partnership solely because of its tax consequences, even though the tax consequences resulted directly from the requirements of Treasury regulations implementing a congressionally mandated policy.

The Government's principal legal argument is that these transactions should simply be ignored; however, these transactions had substantive economic consequences and material non-tax business purposes, and under Fifth Circuit case law they cannot be disregarded.  As an alternative, the Government tries to recharacterize the limited partner investors as lenders for tax purposes.  This fallback position is equally untenable:  the limited partner interests were equity and not debt.  These interests were economically indistinguishable from garden-variety preferred stock and analogous partnership interests that are routinely respected as equity for tax purposes.

The Government raises a variety of technical challenges to the tax results produced by the transactions.  Notably, the Government's technical arguments completely ignore its own regulations that prohibit the results it seeks to obtain here.

**A.    Chemtech I:  1993-98**

Dow formed the Chemtech Partnership[1] in 1993 as part of its strategy to maintain financial flexibility during a time of acute financial difficulty by obtaining external financing that would not be classified as debt.  The formation of the Partnership also enabled Dow to "monetize" an $883 million portfolio of patent assets by contributing those assets to the Partnership and using them to attract equity investments from limited partners.  By using the partnership form to monetize the partnership assets, Dow obtained financing that it could use to pay down debt or make needed business investments.  Perhaps most importantly, the limited partner investments were treated as "minority equity," rather than as debt, on Dow's balance sheet.  This financial accounting treatment provided a crucial benefit to Dow, which was concerned about maintaining its A credit rating.

As a partnership, Chemtech did not pay federal tax on its income; rather, its income and other tax items were allocated to its partners, which included subsidiaries of Dow (the "Dow partners") and foreign financial institutions (the "Class A Investors" or "Banks").  Because the Class A Investors were exempt from U.S. income tax on their shares of Chemtech's taxable

---

[1]    Throughout this brief, unless otherwise stated, all capitalized terms have the meanings set forth in the Joint Stipulations of Fact:  1993-2003, as filed by the parties in the Final Pretrial Order, Exhibit A.  "Dow" refers to The Dow Chemical Company and its affiliates that participated in the Chemtech Partnership.  "Chemtech Partnership" refers to a Delaware limited partnership formed in 1993 as Chemtech Royalty Associates, L.P., which later was renamed Chemtech II, L.P.  "Chemtech I" refers to transactions entered into by the Chemtech Partnership from its formation in 1993 up to its 1998 restructuring; "Chemtech II" refers to transactions engaged in by the Chemtech Partnership in connection with its restructuring in 1998 and thereafter, through and including 2003.

income, the Government is seeking to reallocate that income to one or more Dow partners.  To support its reallocation, the Government has concocted an array of theories.  First, it labels the formation of Chemtech a "sham" that should be ignored for tax purposes.  Alternatively, it claims that even if Chemtech was a partnership, the Class A Investors were not partners, or, if they were partners, that income allocated to them under the partnership tax rules should be reallocated to the Dow partners.

None of these arguments has any basis in law or in fact.  While the Government tries to dismiss the business purposes for the Chemtech transactions as "window dressing," the evidence will show that the transactions were motivated by substantial non-tax business purposes and had objective, non-tax economic effects for Dow and the Class A Investors.  The business purposes that the Government calls "window dressing" resulted from Dow's long-standing financial management practices.  Given these purposes, the Fifth-Circuit case law precludes treatment of the transaction as a "sham."

Likewise, the Government's effort to call the Class A Investors "lenders" rather than "partners" is unsupportable.  The Class A Interests had the essential elements of equity, such as participation in profits and voting rights, and lacked essential elements of debt, including priority in liquidation and the ability to force bankruptcy.  The Class A limited partnership interests were, in all material respects, indistinguishable from preferred stock and analogous partnership interests consistently recognized as equity by the courts and the IRS.

Finally, the Government tries to alter the tax results of the transactions by using the partnership tax rules to reallocate Chemtech I's income from the Class A Investors to the Dow partners.  A specific rule of the Internal Revenue Code, section 704(c), addresses this issue, and the "Ceiling Rule" mandated by the section 704(c) Regulations expressly supported the

Partnership's tax return reporting and prohibits the result the Government seeks. This may explain why it is not even mentioned in the Gov't PFOF.[2]

**B.      Chemtech II:  1998-2003**

In response to unanticipated changes in the law, Dow repurchased the Class A Investors' interests in 1998, but its need for minority equity financing continued.  To attract a new limited partner investor, Dow restructured Chemtech by contributing another high-value asset, a chemical plant, which the Partnership leased back to Dow.

Although the new investor was a U.S. corporation subject to federal income tax, the Government complains that it was allocated too much income.  In addition, the Government challenges the 1998 transactions that restructured Chemtech so that it could attract a new investor.  In particular, the Government seeks to recast a non-taxable distribution of patents and privately held stock into a taxable distribution of "marketable securities."  And it seeks to ignore adjustments that Chemtech made to the tax basis of its remaining assets, even though the Internal Revenue Code and its implementing regulations explicitly authorize such adjustments.

**C.      Summary**

In summary, the Partnership had real economic substance apart from tax savings, was formed for valid business purposes, and engaged in substantial and profitable business enterprises over a significant period of time.  Both Chemtech transactions had significant non-tax benefits and material economic effects for Dow.  To be sure, the Chemtech transactions produced tax benefits for Dow, which is why the Government finds these transactions objectionable.  That fact, however, is neither unusual nor legally relevant.  *See, e.g.*, *Frank Lyon Co. v. United States*, 435 U.S. 561, 580 (1978) ("The fact that favorable tax consequences were

---

[2]      All references to "Gov't PFOF" refer to United States' Proposed Findings of Facts and
        Conclusions of Law, filed March 31, 2011 (Docket Entry No. 89).

taken into account . . . on entering into the transaction is no reason for disallowing those consequences.  We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction.") (footnote omitted); *United States v. Adlman*, 134 F.3d 1194, 1204 (2d Cir. 1998) ("[The] desire to achieve a favorable tax result . . . is in no way incompatible with the existence of a legitimate non-tax business reason" for choosing a particular business structure.) (citation omitted).

## II.    SUMMARY OF CHEMTECH TRANSACTIONS

### A.    Dow's Business and Conditions in the Early 1990s

Dow is a leading science and technology company that provides innovative chemical, plastic, and agricultural products and services to many essential consumer markets.  (JX 5; JX 33.)[3]  In 2010, Dow had annual sales of $53.6 billion and employed approximately 50,000 people worldwide.  Dow serves customers in 160 countries and a wide range of markets that are vital to human progress, including food, transportation, health and medicine, personal and home care, and building and construction, among others.  Dow has 188 manufacturing sites in 35 countries and supplies more than 5,000 products.

The chemical industry is characterized by multi-year business cycles of peaks in earnings followed by troughs.  In the early 1990s, Dow's cycle was one of the most volatile in the industry.  (Merszei.)  Dow's earnings in the early 1990s followed this peak and trough pattern. (Reinhard Tr. 17:6-13; 17:19-24; Escudero Tr. 10:23-12:9; Heinlein Tr. 35:19-36:7.)[4]  In 1990, Dow reported earnings of almost $1.4 billion, an all-time high (JX 5 at CT00075702), but by the

---

[3]    All "JX" cites are to the Joint Exhibits, as filed by the parties in the Final Pretrial Order, Exhibit C.  All "PX" cites are to Plaintiff's Unagreed Exhibits, as filed by the parties in the Final Pretrial Order, Exhibit D.  All "PEX" and "DEX" cites are to the Expert Reports Stipulation, as filed by the parties in the Final Pretrial Order, Exhibit F.

[4]    All "Tr." cites are to designated deposition testimony.  Citations to Enrique Falla ("Falla"), Geoffrey Merszei ("Merszei"), Edward Valenzuela ("Valenzuela"), William Norris ("Norris") and Andrew Sherman ("Sherman"), refer to their anticipated trial testimony.

summer of 1991 its earnings were declining.  Between 1990 and 1992, Dow's net cash flow from operations declined by almost 39 percent, from $3.09 billion to $1.893 billion.  (JX 33 at CT00072597 (cash provided by operating activities).)  And in 1992, Dow recorded an annual loss of $500 million—the first annual loss in its history.  (JX 33 at CT00072591.)

Dow's financial problems resulted largely from deteriorating fundamentals in the chemical industry, including decreasing prices, rising costs, and declining sales.  (JX 33 at CT00072566.)  But Dow also faced some unique challenges.  It owned a 50 percent joint venture interest in Dow Corning, which was a defendant in over 4,000 product-liability litigation class-action cases involving breast implants it had manufactured.  Dow Corning was taking significant provisions for an eventual settlement, which were adversely affecting Dow's financial results. Dow was a named defendant in many of these lawsuits, and its management was concerned that Dow could be held financially responsible for liabilities of Dow Corning.  (JX 29 at CT00068811; JX 192 at CT00068538; JX 193 at CT00046428; JX 196 at CT00069021-24.)

In addition, Dow's debt-to-total-capital ratio exceeded 40 percent, which was the target ratio Dow and its credit rating agencies used for maintenance of  Dow's historical A credit rating.  A downgrade would have had a material adverse impact on Dow.  (*See* PEX 5, Erickson Supp. Rebuttal Rpt. at 10-14; *see also* Appendix II for an illustration of the computation of the debt-to-total-capital ratio and the differing impacts of debt and equity classification.)  Managing through the economic downturn would require that Dow maintain ready access to capital at a reasonable cost.  Preserving its strong credit rating[5] was essential to meeting that objective. (Falla; Escudero Tr. 16:18-18:8.)

---

[5]    In 1992, Dow had a credit rating of A (Standard & Poor's), A-1 (Moody's), and A+ (Duff & Phelps).  (JX 423 at CT00046333.)

6

Maintaining a strong credit rating was also important to Dow's day-to-day operations. The ability to issue commercial paper was critical to Dow's short-term cash management. Commercial paper enabled Dow to fund its day-to-day cash-flow needs at short-term rates that were much lower than the rates payable on long-term debt and thereby enhanced Dow's ability to maintain liquidity at a low cost.  (Heinlein Tr. 17:15-18:8.)  Many institutional purchasers of commercial paper have investment restrictions that prohibit them from buying commercial paper from companies with credit ratings lower than A1/P1.  (Falla.)  Thus, a downgrade in Dow's rating would have hurt its short-term rating and increased its borrowing costs, reduced its financial flexibility, and impaired if not eliminated its ability to issue commercial paper.

Subsequent developments bear this out.  In 2008, Dow suffered a significant ratings downgrade following the failure of a proposed joint venture with Kuwait's national petrochemical company, Petrochemical Industries Company.  *See* Answer ¶ 9, *Rohm & Haas Co. v. The Dow Chemical Co. and Ramses Acquisition Corp.*, C.A. No. 4309-CC (Del. Ch. Feb 3, 2009) (attached hereto as Exhibit A).  Dow shares fell $3.60 to $15.32, a 19 percent decrease, and the cost to insure Dow's debt jumped substantially.  *See* Keith Johnson, *Dow Chemical Takes Hit as Kuwait Deal Derails*, Wall St. J., Dec. 30, 2008, at B1;  Karen Brettell, UPDATE 1-*S&P, Moody's Cut Dow Chemical on Scrapped Deal*, Reuters (Dec. 29, 2008, 10:56pm), *available at* http://uk.reuters.com/assets/print?aid=UKN2932042920081229.  Dow's annual report for 2008 stated that "[i]f the Company's credit rating is further downgraded, it could have a negative impact on the Company's ability to access credit markets and could increase borrowing costs."  (Dow 2008 Annual Report at 10) (attached hereto as Exhibit B).  As the significant negative effects from Dow's 2008 downgrade demonstrate, Dow's credit rating and its relationship with the credit rating agencies were critical to its long-term health and success.

In the 1990s, Dow met for annual and periodic reviews with the rating agencies, making presentations that outlined its current and future business outlook and cash flows. (*See, e.g.*, JX 54; JX 55; JX 180; Falla; Merszei; Heinlein Tr. 20:1-21:1.) Among the financial data reviewed by the agencies were various financial ratios, including Dow's debt-to-total-capital ratio. (*See* JX 55 at CT00046491; Falla; Merszei; Heinlein Tr. 41:14-42:4.) Dow had a long-established policy of limiting its debt-to-total-capital ratio to no more than 40 percent.[6] Dow based this target on its understanding from the rating agencies of what would be necessary to preserve its A rating. Contemporaneous S&P documentation confirms this 40 percent target for companies, like Dow, with above average business risk profiles. (PEX 3, Erickson Rpt. at 64-65.)

The cyclical downturn in the early 1990s put severe pressure on Dow's balance sheet. (Reinhard Tr. 32:9-33:8.) In 1992 alone, Dow's balance sheet liabilities increased from $6.1 billion to $7.5 billion, and its debt-to-total-capital ratio increased from 41.3 percent in 1990 to 42.5 percent in 1992 (JX192 at CT00068546), exacerbating management's fears of a credit rating downgrade:



---

[6] This ratio was computed by dividing Dow's balance sheet debt by the sum of the debt and equity, including minority equity like that obtained through the Chemtech Partnership. (PEX 3, Erickson Rpt. at 65; JX 192 at CT00068545; *see* Appendix II.)

Dow's Chief Financial Officer, Enrique Falla, believed that Dow was skirting the edge of a ratings downgrade.  (*See also* Reinhard Tr. at 25:10-14 ("We were close to losing our rating.").)  In an attempt to avoid such a downgrade and guide Dow through this difficult financial environment, Mr. Falla devised a three-prong strategy to address Dow's financial problems and to ensure that the company had the financial capacity and flexibility to meets its needs.  First, he cut costs.  Between 1992 and the end of 1993, Dow reduced the number of employees by almost 10 percent, from approximately 61,400 to 55,400.  (JX 192 at CT00068502.)  In addition, Dow substantially reduced its capital spending from almost $2 billion in 1991 to $1.4 billion in 1993, a 27 percent reduction.  (JX 192 at CT00068520.)  Second, Dow embarked on a program of divesting nonstrategic assets.  (JX 192 at CT00068531.)

The third prong of Mr. Falla's strategy was to increase Dow's use of off-balance sheet financing.  Although Dow had reduced its capital budget, it continued to have substantial, on-going capital needs.  The decline in Dow's cash flow from operations required that it obtain financing to fund its capital budget.  For example, between 1990 and 1993 Dow's capital expenditures dropped by approximately $700 million, but its cash flow from operations declined by an even larger amount, $1 billion.  (JX 249 at CT00072667-68; PEX 2, Carron Supp. Rebuttal Rpt. at 6.)

Off-balance sheet financing would help Dow to meet these needs without increasing its balance-sheet liabilities or its debt-to-total-capital ratio.  Although the rating agencies were fully aware of Dow's off-balance sheet financing strategy, they never suggested that Dow should recompute its debt-to-total-capital ratio to treat off-balance sheet financings as debt, and Dow used those ratios in public disclosures regarding its finances.  (Falla; Merszei; Reinhard Tr. at

45:23-25; Globus Tr. at 30:7-12; PEX 3, Erickson Rpt. at 65-66 (S&P treats minority interest as equity, rather than debt in computing debt-to-capital ratios).)

Dow's use of off-balance sheet financing was consistent with standard commercial practice.  During the 1990s, U.S. corporations routinely used off-balance sheet financing structures to avoid putting additional debt on their balance sheets.  (Merszei; PEX 3, Erickson Rpt. at 68-69.)  Contemporaneous accounting literature recognized this practice, as reflected in the 1988 edition of a leading text:

> When debt is left off the balance sheet, ratios that have proved useful to analysts for many years (such as the debt-equity ratio) will appear more favorable to the borrower.  One motive may be to prevent an adverse debt-equity ratio from developing later.  The entity may foresee reaching the danger point in its debt-equity relations based on historical standards.  Future credit ratings might be lowered, and future borrowing costs might increase.[7]

Because off-balance sheet financing enabled Dow to raise capital without affecting its credit rating, these off-balance sheet financings were important and made up a significant portion of Dow's overall capital structure.  By the end of 1993, Dow had over $3 billion of off-balance sheet financing, including $1.1 billion from minority equity financing.  (JX 184.)  Dow's off-balance sheet financings were substantial when compared to its balance sheet debt of $5.9 billion and total balance sheet capitalization of $25.5 billion.  (JX 192 at CT00068526.)  Replacing Dow's $3 billion of off-balance sheet financing (or even its $1.1 billion of minority equity) with balance sheet debt would have had a dramatic, adverse effect on Dow's financial ratios.[8]

---

[7]  Sidney Davidson, Clyde P. Stickney, & Roman L. Weil, *Financial Accounting: An Introduction to Concepts, Methods and Uses* 472 (The Dryden Press, 5th ed. 1988) (attached hereto as Exhibit C).  (*See* PEX 2, Carron Supp. Rebuttal Rpt. at 16.)

[8]  Strictly speaking, minority equity financing is not "off-balance sheet," because it is reported on the face of the consolidated balance sheet.  However, because it is reported on the "mezzanine" section on the balance sheet, it is not treated as debt for financial accounting purposes and thus accomplishes most of the objectives of traditional off-balance sheet arrangements.

### B.    Development of the Chemtech Transaction

The Chemtech transaction was part and parcel of Dow's strategy of increasing its use of off-balance sheet financing.  (Reinhard Tr. 17:3-18:9, 25:2-22, 34:24-35:19; Hahn Tr. 43:10-19, 121:11-18.)  Goldman Sachs, Dow's primary investment bank and lead commercial paper underwriter, first proposed the Chemtech transaction to Dow.  Goldman had a long-standing relationship with Dow as its principal investment bank dating to the early 1950s (Reinhard Tr. 18:16-20.)  Consequently, Goldman was aware of industry conditions, the challenges confronting Dow, and the role of off-balance sheet financing in Dow's overall business strategy.  Pedro Reinhard, Dow's treasurer, stated that Goldman "knew based on the intimacy of the relationship what major issues Dow had in terms of its financing requirements."  (Reinhard Tr. at 18:5-8.)[9] David Ackert of Goldman confirmed that Dow needed off-balance sheet financing.  (Ackert Tr. at 20:12-19.)

Dow evaluated the transaction for over a year before its initial implementation. Goldman's initial presentation of the Chemtech concept to Dow occurred in April 1992, and Goldman made additional presentations in June and November.  (JX 8 at CT00011248 (structure would allow Dow to achieve financing classified "as minority interest, not debt, on Dow's balance sheet" and avoided "the issuance of new equity and associated dilution"); JX 10; JX 13.) Consistent with Mr. Falla's strategy, the transaction proposal called for Dow to contribute assets with substantial economic (but low book) value to a partnership.  The partnership then would license the assets back to Dow.  (Reinhard Tr. 25:23-26:6, 26:17-27:10, 27:15-28:7, 134:2-7.) Although Dow would no longer own the assets, and its ability to manage and use the assets was

---

[9]    Reinhard is unavailable to testify at trial.  He is retired from Dow and his board service was terminated in 2008 in a dispute with management.  In addition, he has another dispute with the company currently pending.

subject to new restrictions as a result of the assets' ownership by the partnership, the transaction would enable Dow to monetize[10] the contributed assets while continuing to use them in its business.  (JX 28; JX 38; JX 196 at CT00069073; Norris; Hahn Tr. 42:21-43:19, 44:3-45:12.)

Third-party investors would contribute cash to the partnership in exchange for limited partnership interests providing them with a priority or preferred return and further upside equity potential.  (JX 10 at CT00011275; Reinhard Tr. 212:15-25; Klier Tr. 119:24-120:10; Bonanni Tr. 69:5-16; Globus Tr. 52:23-53:15.)  Dow could access the investor funds through loans from a corporate subsidiary of the partnership.  (JX 8 at CT00011250, -53; JX 28.)  For Dow's financial accounting purposes, royalties paid to the partnership and borrowings from the structure would be eliminated in financial consolidation, and the third-party investment in the partnership would be treated as minority equity rather than debt on Dow's balance sheet.  (JX 10 at CT00011281; JX 13 at CT00011321; JX 196 at CT00069072-73; Reinhard Tr. 46:2-18.)  The elimination of Dow's intercompany transactions (*i.e.*, royalties paid to the Partnership, distributions from the Partnership to Dow affiliates, and funds borrowed from the Partnership subsidiary) results from the application of mechanical GAAP accounting rules.  (PEX 3, Erickson Rpt. at 33-37.)  The addition of minority equity on Dow's balance sheet would improve Dow's debt-to-total-capital ratio.  (PEX 3, Erickson Rpt. at 68.)

       1.    <u>Advantages of Chemtech</u>

Goldman's proposal was attractive to Dow for a variety of reasons.  First, the proposal offered Dow the opportunity to earn a profit on both a pre-tax and after-tax basis.  Dow does not raise new funds each time it embarks on a new investment.  Instead, Dow, like many large

---

[10]  Monetizing these assets enabled Dow to obtain cash and publicly demonstrate that it owned assets that were not currently listed on its balance sheet and that possessed significant value. (PEX 3, Erickson Rpt. at 5; Falla; Merszei.)

companies, follows a two-stage process, first determining its target rate of return (or "hurdle rate"), which approximates its weighted average cost of capital (Escudero Tr. 38:4-39:2), and then comparing the expected benefits of the proposed investment to the hurdle rate.  Dow also compares the cost of new sources of capital to its hurdle rate, and when less costly sources of capital are found, Dow uses them to expand its total capital or to replace more costly capital. (PEX 2, Carron Supp. Rebuttal Rpt. at 5; Falla; Merszei.)  The pre-tax cost of the financing (principally, the return that the preferred equity investors were expected to require) was about 7 percent, which was well below Dow's 10.75 percent hurdle rate.  (Escudero Tr. 37:14-39:2; JX 423 at CT00046332.)

Goldman's presentations also illustrated the pre-tax benefit Dow could expect to realize from the financing transaction.[11]  While Goldman's financial models were complex, they showed that the transaction had a positive expected net present value ("NPV") on a pre-tax basis, as well as significant tax savings to Dow.  (JX 18; JX 19; JX 70; JX 72; JX 151.)

Second, Goldman's proposal offered significant potential advantages over conventional forms of debt financing.  The outside investors would receive a preferred return at a rate in excess of the fixed rate payable on Dow's senior debt financing to reflect the increased risk of their equity investment over a typical Dow bond.  (Reinhard Tr. 150:2-152:13.)[12]  Because the Chemtech investors also would have some share in residual profits and asset appreciation, they could earn more than lenders; however, this potential cost was more than offset by the benefits

---

[11]  Goldman's financial models for the transaction discounted the cash flows at 12 percent to calculate the financing's net present value.  Although slightly higher than Dow's hurdle rate at the time, the 12 percent number incorporated the cost of capital plus risks.  (Reinhard Tr. 178:3-15.)

[12]  The Priority Return eventually negotiated with the Class A Investors closely approximated the contemporaneous average yield on preferred stock.  (PEX 3, Erickson Rpt. at 16-17; Merszei.)

Dow would receive from avoiding additional balance sheet indebtedness, a possible credit ratings downgrade, and a potential significant increase in overall funding costs for the entire company. (PEX 5, Erickson Supp. Rpt. at 10-14.) The Goldman proposal also provided advantages over the dilutive effects of issuing additional common stock. (*See* Escudero Tr. 76:18-77:4.)

Third, as noted above, the Chemtech transaction provided Dow with the opportunity to monetize its intellectual property assets. (JX 28; JX 38.) Because Dow had developed most of its patents internally and expensed the cost associated with their development, the patents had only a nominal value on Dow's GAAP books notwithstanding their substantial economic value. (Hahn Tr. 42:21-43:19.) In the late 1980s, Dow had begun searching for ways to exploit the untapped value in its intellectual property assets. Dow's Intellectual Asset Management group spearheaded this effort. (JX 230.) Chemtech was consistent with this objective because it enabled Dow to obtain $200 million in financing based on a group of assets that previously showed no value on its balance sheet.

The transaction costs of the Chemtech transaction were comparable to those of analogous transactions. The Government asserts that Chemtech's cost exceeded that of comparable "MIPS" transactions, which the Government apparently views as an acceptable alternative structure. (*See* Gov't PFOF ¶¶ 322-323.) But the Government relies on incomplete and outdated information. For example, the Government cites a $200 million issuance of MIPS by Enron in October 1993, which according to the Government's expert had total transaction costs of $6.6 million. In fact, an extensive study conducted by the Congressional Joint Committee on Taxation revealed that the total costs of that transaction exceeded $14 million. (PEX 5, Erickson Supp. Rebuttal Rpt. at 26-28.) In short, the Chemtech transaction raised the same amount of

funding, at a lower cost, than a contemporaneous minority equity transaction cited by the

Government and approved by IRS rulings.

        2.     <u>Tax Advantages of Chemtech Proposal</u>

Raising equity by monetizing specific assets effectively requires the creation of an entity

to which assets are contributed and in which investors invest.  Whatever the state law

characterization of such an equity-raising entity (corporation, trust, partnership, limited liability

company), for tax purposes the entity generally must be taxed as either a corporation or a

partnership.

Regardless of the form of entity utilized, it would not be entitled to any tax deduction for

amortizing the value of the Patent Assets, because those assets had virtually no tax basis, even

though Chemtech's economic income would be affected by amortizing the fair market value of

these assets over their useful lives.  As a result, Chemtech's taxable income would greatly

exceed its economic income.

If the Chemtech entity were a corporation, it would result in double taxation.  The

corporation would pay tax on its income, without a deduction for dividends to shareholders.  The

dividends distributed to preferred and other shareholders would be subject to a second level of

tax.

The Goldman proposal avoided this double tax.  Partnerships are not subject to a

separate, entity-level tax on their income.  Instead, partners are taxed directly on their shares of

partnership income, and distributions of income do not trigger a second level of tax.  *See* I.R.C.

§§ 701, 702(a), 705, 731.[13]

---

[13]   All references to "I.R.C." or "section" herein are to the Internal Revenue Code of 1986,
unless otherwise stated.

Under the tax rules in effect at the time—in particular, the Ceiling Rule mandated by the section 704(c) Regulations (but never mentioned in the Government's filings)—the excess taxable income generated by the Patent Assets, attributable to the difference between book amortization based on fair market value and tax amortization based on carryover basis, would be allocated among all the partners, including the Class A Investors, based on their shares of the Partnership's economic or "book" income. Because the Class A Investors' priority return entitled them to the larger share of the book income, they were allocated the bulk of this excess taxable income. Although they were not subject to U.S. tax on that income, the tax advantage the Government complains of was a timing difference. A U.S. investor would have been required to absorb and pay tax currently on its share of this excess taxable income, but it would receive an offsetting taxable loss on termination of its investment because excess taxable income would increase its basis in the partnership interest. By contrast, although the Class A Investors did not pay tax on the excess taxable income allocated to them, they also did not receive an offsetting taxable loss upon sale of their partnership interests. Furthermore, a non-U.S. investor from a country with a bilateral tax treaty with the U.S. generally would not be subject to U.S. tax on its share of royalty income earned by the Partnership, whereas dividends received as preferred stock issued by a corporate entity would be subject to U.S. tax.

3.     Board Approval of Chemtech

Dow enlisted patent, legal, and tax personnel to assist in evaluating the different aspects of the transaction. Although Goldman recommended that Dow use Goldman's counsel, Andrews & Kurth, for the transaction structuring, the company engaged King & Spalding to undertake an independent legal review of the transaction. (JX 9 at CT00011226; Hallmark Tr. 16:12-17:3, 160:7-10, 168:17-169:10.) Dow's Treasurer, Pedro Reinhard, discussed the transaction with the Finance Committee chaired by Enrique Falla; the Finance Committee then presented the

transaction to the Dow Board, which approved the necessary resolutions to move forward with the transaction in April 1993.[14]  (JSOF ¶ 22; JX 28; JX 38 at CT00046949 (presenting transaction to the Board of Directors as a way to "provide off-balance sheet financing at competitive rates" while allowing Dow "to recognize the financial value of certain United States patents with a low book value but a substantial economic value"); JX 40; Reinhard Tr. 220:3-221:25.)[15]

4.    Formation of Chemtech Royalty Associates

Following Board approval, Dow worked with Goldman to develop deal terms that would be attractive to potential investors.  Based on Goldman's advice that Chemtech would be easier to market to potential investors if the basic structure were in place, Dow formed the Partnership and established the patent license on April 30, 1993, without investors.  (JX 13 at CT00011311; JX 31; Ackert Tr. 45:16-46:4.)

To organize Chemtech, Dow first formed two special purpose entities, Diamond Technology Partnership Inc. ("DTPC"), and Ifco.  (JSOF ¶¶ 4-5; 23(a); 25(b).)  Dow contributed $100 million to DTPC in exchange for all of its stock, and DTPC contributed that amount to Ifco in exchange for all of its shares.  (JX 38; JSOF ¶ 25(e), (f).)

In addition, on April 30, 1993, Dow contributed 68 United States patents and all of the stock of Chemtech Portfolio, Inc. ("CPI") in exchange for additional stock of DTPC.  (JSOF ¶

---

[14]  The Government's insinuation that the transaction was hastily conceived and executed to exploit a "tax loophole" that was about to close (Gov't PFOF ¶¶ 66, 91) ignores the 16-month period between Goldman's first presentation in April 1992 and the transaction's closing in August 1993, a period that included intensive internal consideration of the proposal by Dow and extensive negotiations with prospective investors over the business terms of the deal.

[15]  All references to "JSOF" refer to the Joint Stipulations of Fact, attached as Exhibit A to the Final Pretrial Order, filed March 31, 2011 (Docket Entry No. 87).

25(i).)  On the same day, Essex contributed five United States patents to DTPC in exchange for approximately 12 percent of the stock of DTPC.  (JSOF ¶ 25(j), (k).)

Dow began the process of identifying and selecting patents ultimately contributed to Chemtech in early 1993.  Lead members of Dow's patent department set out to select a low number of high value patents that would be capable of attracting outside investors to the partnership.  Other operation centers at Dow were also involved in selecting the patents ultimately contributed to the partnership, including its research and business management divisions.  (Norris.)

Dow engaged Arthur D. Little ("ADL") to conduct a valuation of the 73 patents selected for contribution to the partnership.  (JSOF ¶ 60; JX 27.)  ADL depended upon Dow's "Technology Centers" (also known as "Tech Centers") to assist in determining the value of the patents.  (Valenzuela.)  Prior to Chemtech, these Tech Centers and Dow's Intellectual Asset Management department had begun to focus on better demonstrating the value of Dow's intellectual property.  Thus, these personnel were already familiar with methods by which Dow could extract and identify value from its intellectual property.

Upon receiving requests for information from ADL, Dow's Tech Centers would provide the information necessary to identify the patent's value to Dow.  Specifically, the Tech Centers addressed whether Dow would incur higher costs, lose market share, or sell products at a lower price if it no longer owned a particular patent.  (JX 49 at CT00020378.)  Not only would the Tech Centers address these issues, but they would also provide analysis as to why a certain result would occur and assign a specific value to that result.  (*See, e.g.*, JX 49 at CT00020384.)

ADL employed two variations of the discounted cash flow approach to value the Patent Assets:  the incremental cash flow approach (also known as the "contribution margin" method)

and the cost savings approach (also known as the "royalty savings" approach). Ultimately, ADL determined that the relief from royalty method was deficient. Dow reviewed this determination prior to issuance of the ADL valuation. (JX 73 at CT00019069; JX 76 at CT00020310.) On June 11, 1993, ADL issued a valuation report concluding that the fair market value of the Patent Assets as of April 30, 1993, was $866,996,000. (JSOF ¶ 62; JX 56 at CT00000557.) The Government has not contested the accuracy of this valuation or the appropriateness of the ADL methodology.[16]

Upon Chemtech's organization as a Delaware limited partnership (JSOF ¶ 25(l), (m)), Dow Europe, S.A. ("Dow Europe"), a preexisting foreign subsidiary of Dow, contributed approximately $10 million in cash in exchange for a General Partner interest in Chemtech. (JSOF ¶ 25(l).) In exchange for a Class B Limited Partner Interest, DTPC contributed the Patent Assets worth $867 million, and 100 percent of the stock of CPI, which was valued at zero. (JSOF ¶ 25(l).) Dow recognized that the contribution of the Patent Assets to the Partnership resulted in a change in legal ownership and took precautionary measures to ensure that the nature of that change was respected. (*See, e.g.*, JX 97; JX 179; P-6; Norris.)

Ifco contributed $100 million in exchange for a Class A Limited Partnership Interest. (JSOF ¶ 25(l).) The Partnership contributed most of Ifco's Original Capital Contribution to CPI, which loaned substantially all of its cash to an affiliate of Dow. Dow and Chemtech entered into a non-exclusive Patent License Agreement, pursuant to which Dow agreed to make quarterly royalty payments in exchange for the right to use the Patent Assets. (JX 1Q; JSOF ¶ 26.) The

---

[16]   Dow continued to use the valuation techniques developed by ADL in connection with the transaction long after the Chemtech I transaction. (JX 225; JX 230; Valenzuela.) For example, Dow has used these valuation techniques to analyze third-party patents and in connection with its transfer pricing. Other chemical and IP-intensive companies have emulated Dow's approach in managing their own patent assets.

royalty consisted of a fixed minimum royalty plus a variable royalty tied to production. (JX 1Q §§ 3.1-3.3, CT00015691-93.)

Minimum royalties were calculated as a function of the patent's individual fair market value and its economic life. The patent's fair market value was determined by Dow based on ADL's valuation of the patents as a whole. (Valenzuela.) ADL determined that Dow's allocation of value to individual patents was "reasonable and reflective of the underlying contribution of each patent to the fair market value of the Patent Assets as a whole." (JSOF ¶ 65.) These minimum royalty rates were set forth in Exhibit B to the Patent License Agreement. (JSOF ¶ 26; JX 1Q at Exhibit B, CT00015718-56.)

The variable royalty provided potential upside to the Partnership if the patent generated a certain volume of production. (Reinhard Tr. 212:15-25; Bonanni Tr. 69:5-16; Klier Tr. 119:24-120:10; Globus Tr. 53:4-54:8; Curry Tr. 195:19-196:12, 212:17-213:6.) Variable royalties were calculated as a function of production. Dow controller analysts provided quarterly reports containing production volumes, or quantity of product manufactured ("QPM"). QPM figures were then multiplied by the applicable unit royalty rate. The applicable unit royalty rate would be modified in "steps" as production volume increased, as detailed in Exhibit B to the Patent License Agreement. (*See, e.g.*, JX 1Q at CT00015744.) The product of these calculations equaled the "earned royalty" for a particular Patent Portfolio, which consisted of a group of related patents. (JX 1Q § 3.1, CT00015691.) Minimum royalties were then subtracted from earned royalties to determine the variable royalty payable on the Patent Portfolio. Chemtech would receive this difference, in addition to the minimum royalty payments. (JX 1Q at Exhibit C, CT00015757.) Earned royalties were calculated quarterly and annually. Dow, as licensee,

paid any remaining variable royalty for a year on or before the last business day of the first calendar quarter of the subsequent year.  (JX 156 at CT00016786.)[17]

Each Patent Portfolio was licensed for an initial term not to exceed 80 percent of the shortest economic or statutory life of any patent in the portfolio.  Each portfolio was expected to have residual value at the end of its initial license term of at least 20 percent of its fair market value at the time of its contribution to the Partnership.  (JX 150 at CT00079737; JX 173 at CT00079969; JX 331 at CT00009957; JX 398 at CT00079096.)  At the end of each license period, Dow had the option to extend the term of the license.  (JX 1Q § 4.2, CT00015696-97.)  Upon electing to relicense a particular Patent Portfolio, Dow would negotiate a new fair market value of the portfolio with Chemtech to determine the appropriate minimum and earned royalties payable on that Patent Portfolio during the terms of its relicense.  (JX 1Q § 4.2(b), CT00015697; JSOF ¶ 68.)  During Chemtech's operations, Dow and Chemtech often entered into arm's-length negotiations related to the relicensing of expiring Patent Portfolios.  (*See generally* JSOF ¶ 68; JSOF Appendix I & II.)

5. <u>Identification of Third-Party Investors and Consummation of the Transaction</u>

In late May 1993, Geoffery Merszei, Treasurer of Dow Europe and the person responsible for Dow's banking relationships in Europe, invited a number of banks to a presentation of the Chemtech limited partner investment opportunity.  (Merszei.)  Merszei, Reinhard, and representatives of Goldman Sachs met with various European banks to discuss their potential investment in Chemtech.  (JSOF ¶ 36.)  The presentations by Dow and Goldman emphasized Dow's need for non-debt financing. (JX 68 at ING/DOW00001287 (structure allows

---

[17]   The Government has not challenged the arm's-length terms of the minimum royalty and variable royalty payments.

Dow "to achieve nondilutive minority interest financing and obtain incremental tax benefits").)
Based on his experience, Merszei was aware that European banks historically had participated in
equity-type financing and were comfortable with non-debt investments.

Following these meetings, several European banks expressed an interest in becoming
investors in Chemtech.  (JX 65; JX 75; JX 77; JX 89.)  By mid-July 1993, Rabo Merchant Bank
N.V. ("Rabo") (Netherlands), Dresdner Bank AG ("Dresdner") (Germany), and National
Westminster plc ("NatWest") (U.K.) were participating directly in the negotiations on their own
behalf and as lead negotiators for other potential investors.  (JX 121; JX 128; JX 119.)  The
length and intensity of the negotiations resulted in large part from the investors' understanding of
the risks inherent in their equity investments.  (Reinhard Tr. 212:15-213:15, 224:25-225:20,
226:6-12; Bonanni Tr. 16:15-17:7, 23:6-12; Klier Tr. 119:4-23; Schat Tr. 96:10-97:10; Hahn Tr.
63:19-64:12.)

Deposition testimony confirms that the investors understood they were making equity
investments and generally treated their investments as equity.  Sipko Schat of Rabo testified that
Rabo accounted for its investment as a partnership interest that was transparent for Dutch tax
purposes.  (Schat Tr. 31:21-24.)  Schat testified that Rabo viewed its interest in Chemtech as
equity, noting that the transaction was approved by the "investment committee," which is
responsible for hybrid and equity investments but not debt.  (Schat Tr. 142:20-24, 143:10-16.)

According to Berthold Bonanni of Dresdner, "the banks put[] equity into the partnership,
and receive[d] returns on their equity."  (Bonanni Tr. 14:13-15.)  Stephan Klier, another
Dresdner deponent, testified that for German tax purposes "[t]his was an equity investment."
(Klier Tr. 119:2-3.)  Like Rabo, the approval process at Dresdner was handled by the Board,

which reviewed and approved equity investments but was not required to review and approve loans.  (Klier Tr. 30:3-17.)

The testimony of Frans Loeckx of Kredietbank, N.V. ("KBC") (Belgium) confirms that his bank viewed its investment as equity.  Mr. Loeckx worked in the Mergers and Acquisitions unit, which handled only equity investments.  (Loeckx Tr. 11:8-11.)

The only remaining Class A Investor that provided testimony, Bank Brussels Lambert ("BBL") (Belgium), testified that for certain Belgian purposes, including Belgian accounting and Belgian bank regulatory purposes, BBL treated the investment as a loan.  (McGuire Tr. 14:24-15:4, 68:19-20.)

Consequently, the predominant foreign treatment of the Class A Investors was equity treatment.  Further, foreign bank regulatory treatment of the investment varied widely and does not provide a reliable framework for classifying an investment as debt or equity.  (PEX 8, Schwartz Rebuttal Rpt. at 9-15.)

The Partnership Agreement reflects the clear intention and understanding of the parties that they were participating in a partnership as equity partners.  (JX 2L § 1.1, CT00036476; § 7.2(b), CT00036545.)  This expectation was confirmed externally in the context of U.S. banking regulations.  As part of the due diligence prior to the transaction, representatives of the Class A Investors and Dow conferred with staff of the Federal Reserve Bank in New York.  (JX 119.)  Regulation K of the Bank Holding Company Act in effect at the time of the transaction prohibited banks (both foreign and domestic) from engaging in nonbanking commercial activities in the United States.  (PEX 7, Schwartz Rpt. at 2-3.)  If the Class A Investors' interests were loans, Regulation K would have been irrelevant, because lending is "a fundamental banking activity" and thus permissible.  Because the Class A Investors viewed their investments as

equity, however, they wanted confirmation that their participation would not result in a violation of Regulation K, which could have subjected them to significant civil and even criminal penalties.  (JX119; Schat Tr. 71:21-78:8; PEX 7, Schwartz Rpt. at 2-3.)  The information the representatives submitted to the Federal Reserve contained an analysis of why the Banks' investments satisfied an exception to the general prohibition in Regulation K against engaging in nonbanking commercial activities in the United States.  The exception permits a foreign bank to invest in a U.S. company that does not engage in any business activity in the United States other than activities incidental to its international business.  (JX 119; PEX 7, Schwartz Rpt. at 2.)  Although Chemtech was a Delaware partnership, it intended to conduct its business entirely outside the United States, with its headquarters in Switzerland at the location of its general partner, Dow Europe.  (JX 2L § 1.4, CT00036477.)  The fact that the Banks went forward with the Chemtech transaction demonstrates that the Regulation K exception applied to their equity investment in the limited partnership.

The investors also conducted due diligence on the Patent Assets by hiring Peterson Consulting to review the ADL valuation work.  (JX 92; JX 116; JSOF ¶ 40; Schat Tr. 21:4-22:9, 47:25-48:10, 79:10-80:10; Loeckx Tr. 90:2-14.)

The negotiation and due diligence culminated in agreements with five European investors:  Rabo (JX 2F), Dresdner (JX 2C), NatWest (JX 2E), BBL (JX 2B), and KBC (JX 2D).  In connection with the Banks' entry into the Partnership, ADL conducted a second fair market valuation of the patents, using the same process it had employed during its initial valuation.  (JSOF ¶ 63.)  Memoranda again were distributed to Dow's Tech Centers requesting information regarding whether any material changes in a product's business, economic environment, or technological area had occurred since the prior valuation date of April 30, 1993.  (JX 98 at

CT00019242.)  The information requested was identical to that sought in the initial valuation.

While a majority of the responses indicated no change to the economic, business, or

technological outlook that would affect the value of the patent assets, four cases responded

positively.  (JX 115.)  On August 3, ADL issued its second valuation report concluding that the

fair market value of the Patent Assets was $883,200,000 as of August 4, 1993.  (JSOF ¶ 64; JX

129 at CT00001230.)  The Government has not contested this valuation or ADL's methodology.

Because the Partnership amortization between April and August 1993 had decreased the

Patent Assets' book value by $26.4 million, the book gain on the patents upon the fair market

valuation on August 3, 1993, was $42.6 million.  (Joint Fin. Stip. A-6 (LINE:  Plus: Revaluation

Gain Allocation Section 3.3(l)(vi) - Patents; COLUMN:  TOTAL).)[18]  This $42.6 million in book

gain was allocated to the Dow partners in accordance with the initial partnership agreement dated

April 30, 1993.  (*Id.*; JX 1O.)  This mark-to-market increase in value of the Patent Assets

demonstrated to the Class A Investors the potential upside of their investment in the Patent

Assets.

6.    Key Elements of the Chemtech Partnership Agreement Following Entry of
      the Class A Investors[19]

Structural elements of the Chemtech Partnership were ordinary and well within

conventional practices for limited partnerships.  The choice to utilize the limited partnership

form made sense in light of Dow's business objectives and the need to maintain structural

flexibility.  (PEX 6, Kleinberger Rebuttal Rpt. at 1.)  The allocation of rights and obligations

within the Chemtech structure was consistent with that commonly found in limited partnership

---

[18]    All references to "Joint Fin. Stip." refer to the Joint Financial Stipulations, attached as
        Exhibit B to the Final Pretrial Order, filed March 31, 2011 (Docket Entry No. 87).

[19]    A summary of all the key agreements for Chemtech I and Chemtech II are included in
        Appendix I.

arrangements.  Chemtech's allocation of economic returns, its governance structure, and its liquidity provisions comported with normative limited partnership structures.  The Priority Return with a one percent residual interest for the limited partners' contribution of 19 percent of capital was normal for investment partnerships of this type.  (PEX 6, Kleinberger Rebuttal Rpt. at 13-14.)

These aspects of limited partnership arrangements made Chemtech the perfect vehicle to implement Dow's financing strategy.  The flexibility offered by limited partnerships allowed Dow to craft a specialized channel to capital it needed during a time of significant industry distress.  (PEX 6, Kleinberger Rebuttal Rpt. at 17.)

Each of the Class A Investors entered into separate Investment Agreements.  The Investment Agreements contained certain indemnities, including an indemnity against liability for U.S. taxes that might result from Dow's management of the Partnership or from changes in U.S. tax law.  (*See, e.g.*, JX 2B § 7.2, CT00035794-95.)  Such tax indemnity agreements are common in commercial transactions.  Businesses routinely base investment decisions on their understanding of the applicable tax rules, and commercial transactions frequently include tax indemnity agreements allocating the risk of changes in expected tax treatment. (PEX 6, Kleinberger Rebuttal Rpt. at 23; Merszei.)  *See also In re Delta Air Lines, Inc.*, 608 F.3d 139 (2d Cir. 2010).

The Class A Investors acquired their partnership interests through a combination of capital contributions and purchases of Ifco's Class A interest.  Rabo, NatWest and KBC acquired their interests on August 4, 1993 (the "Second Closing").  (JSOF ¶ 41(a).)  BBL and Dresdner delayed acquisition of their interests until October 25, 1993 (the "Subsequent Closing") following Chemtech's Swiss registration.  (JSOF ¶¶ 41(a), 47.)  The Swiss registration gave BBL

and Dresdner comfort that their partnership interests would be limited interests and therefore that they would not be exposed to liability in excess of their invested capital.  (JX 158; JX 164; JX 165; JX 166; JX 172; McGuire Tr. 59:23-62:22, 84:12-19; Schat Tr. 91:13-94:19.)  The following chart depicts the partners' interests in partnership capital as of the First Closing, Second Closing, and Subsequent Closing (*see* JSOF ¶ 49):

| | First Closing | | Second Closing | | Subsequent Closing[20] | | |
|---|---|---|---|---|---|---|---|
| Partner | Capital Account on April 30, 1993 | Capital Percentage Ownership as of April 30, 1993 | Capital Account on August 4, 1993 | Capital Percentage Ownership as of August 4, 1993 | Distributions on October 25, 1993 | Capital Account on October 25, 1993 | Capital Percentage Ownership as of October 25, 1993 |
| DESA | $9,768,000 | 1% | $11,947,421 | 1.0655% | n/a | $11,946,926 | 1.0655% |
| DTPC | $866,996,000 | 88.7621% | $909,299,473 | 81.0972% | n/a | $909,299,472 | 81.1007% |
| Ifco | $100,000,000 | 10.2379% | $25,000,000 | 2.2297% | ($25,000,000) | ($6,129) | n/a |
| Krediet-bank | n/a | n/a | $100,000,000 | 8.9186% | ($50,000,000) | $49,975,485 | 4.4573% |
| NatWest | n/a | n/a | $35,000,000 | 3.1215% | n/a | $34,991,420 | 3.1208% |
| Rabo | n/a | n/a | $40,000,000 | 3.5675% | n/a | $39,990,194 | 3.5667% |
| Dresdner | n/a | n/a | n/a | n/a | n/a | $50,000,000 | 4.4595% |
| BBL | n/a | n/a | n/a | n/a | n/a | $25,000,000 | 2.2297% |
| Total for all Class A Investors | n/a | n/a | $200,000,000 | 15.6076% | n/a | $199,957,099 | 17.8324% |

_____

[20]  In August 1994, the Class A Investors' percentage interests in the partnership were realigned to reflect their true percent ownership based on their initial contribution amounts.  After this realignment, the relative percentage of the $200 million in Class A Interests was (JSOF ¶ 48):

| | |
|---|---|
| Kredietbank | 25.0% |
| NatWest | 17.5% |
| Rabo | 20.0% |
| Dresdner | 25.0% |
| BBL | 12.5% |
| **TOTAL** | **100%** |

Beginning on August 4, 1993, the Partnership had three classes of ownership interests. DESA was the sole General Partner; DTPC was the Class B Limited Partner; and the Banks were Class A Limited Partners. (JX 2L § 2.6, CT00036509.) Each partner represented that it "intend[ed] to participate as a partner in a Delaware limited partnership for the purpose of making an economic profit from the transactions proposed to be entered into by the Partnership." (JX 2L § 1.1, CT00036476; § 7.2(b), CT00036545.)



### 7.    Partnership Book Accounting

The Partnership Agreement tracked each partner's economic interest in Chemtech through a Capital Account that reflected the economics of the transaction. (PEX 3, Erickson Rpt. at 51.) Because the Capital Accounts tracked the economic interests of the partners, the starting point for each partner's Capital Account was the fair market value of property or the amount of cash it had contributed. Allocations of income and gains from capital transactions increased a partner's Capital Account, while allocations of losses and distributions of cash or property decreased a partner's Capital Account. Upon liquidation of its interest, the partner would be

entitled to the balance in its Capital Account.  The Capital Accounts thus ensured that each partner would bear the economic effect of allocations and distributions provided for in the Partnership Agreement.  (JX 2L § 2, CT00036502-10.)  The Partnership maintained Capital Accounts in accordance with the Treasury Regulations under section 704.  (PEX 3, Erickson Rpt. at 60.)

| | |
|---|---|
| **+** | **Cash and Fair Market Value of Property Contributed** |
| **+** | **Profit and Mark-to-Market Gains** |
| **−** | **(Losses and Mark-to-Market Losses)** |
| **−** | **(Fair Market Value of Property or Cash Distributed)** |
| **=** | **Ending Partner Capital Account** |

The Partnership computed Profits or Losses on an annual basis.  Chemtech's Profits or Losses were approximately equal to the difference between the royalty revenue it received from Dow (for use of the patents) and its expenses, which included patent amortization, a management fee paid to the General Partner, miscellaneous administrative expenses, and the Class B Limited Partner's Guaranteed Payment.  The Class B Guaranteed Payment was an annual payment equal to 2.279 percent of the lesser of the Class B Limited Partner's average Unrecovered Capital or the Class B Limited Partner's Original Capital Contribution.  (JX 2L § 1.10, CT00036485; JX 202 at CT00032180.)

The amortization of the book value of the Patent Assets was a non-cash deduction based on their fair market value at their contribution to the Partnership in April 1993, as increased by the mark-to-market valuation in August 1993.  The Treasury Regulations governing the maintenance of the Partnership's Capital Accounts required the deduction of this book amortization expense to ensure that this economic cost was reflected in the partners' capital accounts.  *See* Treas. Reg. §§ 1.704-1(b)(2)(iv)(*d*)(*3*), (*f*)(*3*).  Because this book amortization was

a non-cash expense, Chemtech I's net cashflow always exceeded its book or economic profits, generally by the amount of book amortization. Chemtech contributed most of its excess cash to CPI, which was required to maintain approximately $50 million in Core Financial Assets. CPI loaned most of its remaining cash to DCIL, a Dow affiliate, for use in the Dow group's business. (*See, e.g.*, JX 419 at CT00016352.)

The Partnership Agreement allocated Profits 99 percent to the Class A Limited Partners and 1 percent to the General Partner until the Class A Limited Partners had received profit allocations equal to their Priority Return (generally 6.947 percent on invested capital). Thereafter, Profits were allocated 98 percent to the Class B Limited Partner, 1 percent to the General Partner, and 1 percent to the Class A Limited Partners. (*See generally* JX 2L § 3.1, CT00036510-11.) Gains from Capital Transactions generally were allocated 94 percent to the Class B Limited Partner, 5 percent to the General Partner, and 1 percent to the Class A Limited Partners. (*See generally* JX 2L § 3.3(l), CT00036515-17.)[21] Such gains included so-called "mark-to-market" gains calculated upon the occurrence of certain events, such as a distribution of any Patent Assets by the Partnership to a Dow partner.

The Chemtech Partnership Agreement provided for a similar tiered allocation of Losses and Capital Losses: (1) 1 percent to the General Partner, 1 percent to the Class A Limited Partners, and 98 percent to the Class B Limited Partners until the Capital Account of the Class B Limited Partner had been reduced to zero; (2) 1 percent to the General Partner and 99 percent to the Class A Limited Partners until the Capital Accounts of the Class A Limited Partners had been reduced to zero; and (3) the balance, if any, 100 percent to the General Partner. (*See generally* JX 2L § 3.2, CT00036511-12, 17.)

---

[21]    Additional allocation tiers that would have made up for cumulative Priority Return shortfalls and would have reversed cumulative losses are summarized in Appendix I.

Although the Partnership Agreement required quarterly distributions of the Class A Investors' Priority Return, their economic return ultimately depended on the Profits and Losses allocated to them under the Partnership Agreement. The Priority Return distributions reduced the Class A Investors' Capital Account balances. (*See, e.g.*, JX 183 (demonstrating fluctuations in capital accounts for the 1993 tax year).) If the distributions to the Class A Investors exceeded the Profits allocated to them for the year, the Class A Investors would suffer a net decrease in their Capital Accounts, which would reduce the amount distributable to them on liquidation of their interests. Thus, the Class A Investors could have earned more or less than the Priority Return (and, in fact, they ultimately earned more). (Reinhard Tr. 212:15-25; Schat Tr. 50:12-23, 114:17-24; Bonanni Tr. 29:14-30:1.)

The Class A Investors' claim against the Partnership was limited to their Capital Account balances. They had no contractual right to the return of the original investment or to any return on that investment. The investors could not force Dow into bankruptcy for failure to receive a distribution of their Priority Return. (Schat Tr. 16:24-21:3; PEX 4, Erickson Rebuttal Rpt. at 22; PEX 1, Carron Rebuttal Rpt. at 16-17; DEX 4, Hubbard Rpt. at 37.) The Chemtech structure was perpetual in nature with options for the Class A Investors or Dow to liquidate or purchase their investments. (JX 2L § 14, CT00036571-76 (describing optional liquidation events).) The Banks understood that the liquidation provisions were optional and that the Partnership could continue indefinitely. (Schat Tr. 112:19-113:9.)

In connection with their partnership investments, the Class A Investors sought and obtained a Limited Partner Guaranty. (JX 2M; Schat Tr. 124:3-14; McGuire Tr. 80:6-25.) Under this Limited Partner Guaranty, Dow guaranteed the contractual performance of its affiliates. Performance guarantees by a corporate parent are commonplace where a counterparty

is contracting with a subsidiary that may have more finite assets than its corporate parent.  The performance guaranty was not a guaranty of the Partnership's financial results, nor did it assure the Class A Investors of any payments or the return of their investment.  The Class A Investors' financial performance depended entirely on the economic performance of the Partnership.  (PEX 6, Kleinberger Rebuttal Rpt. at 20-21.)

The Class A Investors' upside from their one percent share of residual profits and gains was limited only by the demand for products manufactured under the Patent License.  This demand was outside the control of Dow and was somewhat unpredictable.  As noted above, the value of the Patent Assets increased by approximately $42.6 million from April 30, 1993, to August 3, 1993—the period immediately prior to the entry of the investors.

Upon liquidation, the Class A Investors were entitled to a return of their Capital Accounts *pari passu* with all other partners, and only after satisfaction of all creditors.  As residual claimants, they would receive their Capital Accounts only after all creditors had been paid fully. In fact, their claims were junior to the claims of the General Partner (in its role as partnership creditor) and the Class B Limited Partner (in respect of any accrued but unpaid Class B Guaranteed Payment).  (JX 2L § 12.2, CT00036565-67.)

Upon an early termination of their investments, the Investors could receive a Class A Guaranteed Payment.  (JX 2L § 12.2(b), CT00036566.)  As financial institutions, the Class A Investors had locked in their funding for the minimum expected term of their investment.  The Class A Guaranteed Payment was designed to compensate them for costs associated with terminating their investment before the earliest anticipated termination date of August 6, 2000. The Class A Guaranteed Payment would reimburse the Class A Investors for swap and funding breakage costs incurred from the early termination, as well as for the additional anticipated

margin (on a present value basis) they had expected to earn through August 6, 2000.  (*See* JSOF ¶ 73(c).)  These types of breakage provisions are common in callable preferred and similar equity investments.  (Klier Tr. 121:20-122:5.)

The General Partner was responsible for managing, controlling, and directing the business and affairs of Chemtech I.  (JX 2L § 5.1, CT00026522.)  The Class A Investors had voting rights consistent with those typically accorded limited partners.  (PEX 6, Kleinberger Rebuttal Rpt. at 18.)  They did not participate in the day-to-day management of the Partnership's business but had critical voting rights in the form of approval rights over various partnership actions, including any merger or acquisition.  (JX 2L § 5.3, CT00036523-30; Schat Tr. 48:14-51:23, 52:8-56:17.)

### C.    Operation of Chemtech:  1993-1998

The Chemtech Partnership operated with the original Class A Investors until February 1998.  During this time, Chemtech complied with all obligations to its limited partners.  (Curry Tr. 86:7-14.)  Among other things, the Partnership issued quarterly and annual financial reports; Deloitte provided audited financial statements to the Partnership; and the Partnership held annual meetings that the limited partners attended.  (*See, e.g.*, JSOF ¶¶ 54-57; JX 197; JX 202; JX 205; JX 209.)

Dow personnel calculated the relevant QPM under the Patent License Agreement quarterly and following the close of each fiscal year in order to calculate the variable royalties payable to Dow under the Patent License Agreement.  Variable royalty payments from Dow to Chemtech resulted in increased profit allocations to the Class A Investors beyond their Priority Return.  (JX 156 at CT00016785-87; JX 264 at CT00002190.)  During 1994, Dow (without prompting) learned it had been omitting from its QPM data related to imports.  Dow resolved this contractual ambiguity in favor of Chemtech (and thus, the Class A Investors), resulting in an

33

increase to the variable royalties payable by Dow.  (JX 223 at CT00019839; Valenzuela.)

Between 1993 and 1997, Dow paid Chemtech over $2.5 million in variable royalties under the

Patent License Agreement.  (JX 455.)

Upon expiration of particular Patent Portfolio licenses, Dow would decide whether it

wanted to relicense the expiring Patent Portfolio license.  If so, Dow would negotiate with the

Partnership over the terms of the new license.  Dow personnel based the terms of Dow's

relicense offers on the same methodology that ADL had used to value the Patent Assets.  (*See*

JSOF ¶ 68, Appendices I & II; JX 233; JX 286.)  Because minimum royalties were calculated

based on each patent's fair market value, it was possible for Chemtech to receive smaller or

greater minimum royalty payments upon relicensing.  (*See, e.g.*, JX 370 ("Dow is proposing new

royalty rates that are substantially higher than the original rates"); JSOF ¶ 68, Appendices I &

II.)

Chemtech also made distributions of Patent Portfolios at Dow's request.  Chemtech made

two distributions in 1997.  In January 1997, Chemtech distributed three Patent Portfolios to

DTPC.  The Partnership marked to market the distributed portfolios, using an ADL valuation that

employed the same methodology used to value the original contributions.  The valuation resulted

in a net book gain of $122.5 million (reflecting a gain of $166 million in one portfolio and $43

million of losses in the other two).  The net gain was allocated to the partners' Capital Accounts,

with Class A Investors receiving an allocation of $1.23 million.  (*See* JSOF ¶ 58; JX 386.)  This

allocation was in addition to the Class A Investors' Priority Return, and thus increased their

overall return for participating in the Partnership.

In July 1997, Chemtech distributed another Patent Portfolio to DTPC. The mark-to-market of the portfolio resulted in a net book gain of $1.56 million, of which 1 percent was allocated to the Class A Investors. (*See* JSOF ¶ 59; JX 456.)[22]

Chemtech prepared its financial statements consistent with the requirements of section 704(b) book accounting and Swiss GAAP (consistent with the partnership book accounting principles set forth above) and in accordance with U.S. GAAP for purposes of Dow's consolidated financial statements. (PEX 3, Erickson Rpt. at 42, 48-60.)

D.   **The 1998 Restructuring of Chemtech**

1.   Purchase of Banks' Class A Interests

In July 1997, the Treasury Department issued new regulations regarding the taxation of foreign persons deriving U.S.-source income through partnerships.[23] These new regulations created the possibility that, beginning in 1998, some of the Investors would have owed U.S. tax on their shares of Chemtech's royalty income. Rather than incur the risk of having to indemnify those Investors for these U.S. tax payments, DTPC chose to exercise its option to purchase all the Investors' interests in Chemtech. (*See* JSOF ¶¶ 69-70.) On February 25, 1998, DTPC gave notice of its exercise of this option. (JX 529.)

The purchase price for the Class A Interests equaled the Banks' capital accounts, as adjusted to reflect their allocable share of any mark-to-market gain or loss in the Patent Assets

---

[22]   The Government's claim that Dow forced distributions of high-producing Patent Portfolios to prevent "leakage" of future cash flow to the Class A Investors (*see* Gov't. PFOF ¶¶ 239-40) is erroneous. The Class A Investors recognized the mark-to-market gains on the distribution of these portfolios, which, according to the methodology used to value the portfolios, includes consideration of future royalty streams.

[23]   The new regulations were highly controversial, because for the first time they based a foreign investor's eligibility for treaty benefits for income received through a U.S. partnership on the treatment of the partnership under foreign tax law rather than on its U.S. tax classification. *See* T.D. 8889, 2000-2 C.B. 124 (describing comments on proposed regulations).

and CPI stock.  (*See* JSOF ¶¶ 71-73; *see also* JX 2L § 3.6(b), CT00036518-19, § 8.2(e),

CT00036548, § 10.8(b)(i), CT00036559, § 14.3(d)(i), CT00036578-79.)[24]  ADL initially valued

the remaining Patent Assets at $362 million.  (JSOF ¶ 77; JX 700.)  After discovering an error in

the application of its valuation methodology, ADL revalued the Patent Assets.  The corrected

valuation of $444 million resulted in book gains of $82 million, increasing the Partnership's total

mark-to-market gains to $166 million (the CPI stock had book gain of approximately $84

million), of which 1 percent, or $1.6 million, was allocated to the Class A Investors.  (*See* JSOF

¶¶ 74, 77.)

 Following DTPC's exercise of its option to purchase the Class A Investors' interests, the

Banks hired Peterson Consulting to review the ADL valuation.  (JX 548; JX 555; JX 567;

Loeckx Tr. 90:2-14; Schat Tr. 121:7-18; 136:2-137:13; Curry Tr. 348:22-349:6.)  Based on

Peterson's advice, the investors disputed the ADL valuation on multiple grounds in an effort to

achieve a higher valuation for the Patent Assets, which would have resulted in additional gains

for the investors.  (*See* JX 548; JX 555; JX 557; JX 559; JX 571; JX 573; JX 588; JX 604; JX

606; JX 617; JX 618; JX 619; JX 625; JX 628-29; JX 659; JX 673-74; JX 676; JX 677; JX 678;

JX 680; JX 684; JX 686; JX 690; JX 696; JX 700; JX 704; JX 720-21; Schat Tr. 121:7-18;

McGuire Tr. 133:8-134:10.)

 Dow rejected Peterson's positions, largely because of their inconsistency with the

methodology established and agreed upon in the Partnership Agreement.  (JX 648.)  Adherence

to a consistent method of valuation is necessary to ensure that fluctuations in investors' returns

reflect changes in actual value rather than changes in methodology.  (PEX 1, Carron Rebuttal

---

[24] The mark-to-market adjustment was determined by calculating the difference between the current fair market value of partnership assets and their book value and determining the portion of any resulting gain or loss that would be allocable to the Banks under the Partnership Agreement.

Rpt. at 14; PEX 6, Kleinberger Rebuttal Rpt. at 10 n.11; Valenzuela.) The Class A Investors challenged Dow's rejection of Peterson's claims, invoking the fiduciary duties DESA owed to the Class A Investors in its capacity as General Partner of Chemtech. (*See* JX 673.) DESA satisfied its fiduciary obligations by providing a more robust explanation for its rejection of Peterson's observations. (JX 700.) Ultimately, after months of discussion, the Class A Investors abandoned their remaining challenges. (*See* JSOF ¶ 79; JX 725.)[25]

### 2. Chemtech II

Having concluded that it would need to purchase the Class A Investors' interests, Dow began exploring how to replace the $200 million of minority equity that Chemtech I had provided. (Jones Tr. 142:18-22.) Dow Treasurer Geoffery Merszei had overall responsibility for Dow's off-balance sheet and minority equity financing, and was assisted by Alfonso Escudero of the Treasury group. (JX 523; Merszei.) According to Escudero, it was important for Dow to diversify its funding sources and to issue instruments "that would be treated or classified for accounting purposes as equity type financing as opposed to straight financial debt." (Escudero Tr. 16:24-17:2; JX 729.) Escudero testified that the debt-to-total-capital ratio continued to be important for rating agency analyses during this timeframe, and minority equity financing transactions helped Dow manage this important ratio. (Escudero Tr. 13:11-14:1, 17:3-18:8.) As in 1993, Dow's goal was to keep this critical ratio below 40 percent. (Merszei.) The continuation of the off-balance sheet financing strategy was key to Merszei's financial

---

[25] According to the Government, Dow "ought to have been thrilled" to pay the Banks a higher price, since it would mean that Dow's own investment had increased in value. (Gov't PFOF ¶ 162.) That assertion is preposterous. Dow was buying the Banks' interests, and like any rational buyer, Dow had no economic incentive to pay the Banks more than their interests were worth. There certainly is no basis for the Government's assumption that increasing in the price paid to the Banks would have enabled Dow to realize a commensurate return from its preexisting investment. In any event, the Government has not challenged the accuracy of the final valuation or the appropriateness of ADL's valuation methodology.

management of Dow during the time of the Chemtech II transaction, which was only one of several types of off-balance sheet and equity-type financings that Dow entered into in this timeframe.  (Merszei; Escudero Tr. 80:7-11; JX 729.)

The goal of the restructuring was the same as with Chemtech I:  monetize existing assets with substantial economic value but a low book value by using them to attract third-party preferred equity investment to "provide off-balance sheet financing at competitive rates through sale of limited partnership interests."  (JX 566; JX 574.)  Escudero testified that one benefit related to this type of financing was "making use of the value—the economic value that some of those assets had that sometimes was in excess, way in excess of the accounting value, the book value."  (Escudero Tr. 27:1-6.)  Because the remaining Patent Assets that had been monetized in Chemtech I were five years older, it was necessary for Dow to identify other assets that might support an equity investment.  Ultimately, Escudero identified the LHC-3 Olefins and Aromatics Facility located in Plaquemine, Louisiana (the "Plant Assets") as an asset that Dow could monetize to raise minority equity.  (JX 512; JX 523; JX 574; JX 581; JX 591.)  Like the Patent Assets, the Plant Assets had substantial economic value but little or no book value.  (JX 512.)  Thus, contributing the Plant Assets to Chemtech and leasing them back would enable Dow to use the assets to obtain financing while continuing to use them in its business.  (JX 539; JX 574; JX 537.)  When analyzing the Chemtech II transaction, Dow, as was typical for structured finance transactions, performed an NPV analysis.  It concluded the transaction would have a positive pre-tax and post-tax net present value and that it compared favorably to other alternatives.  (JX 591; JX 709; Escudero Tr. 20:11-17 ("Typically when a [funding-related] transaction was proposed to us or presented, . . . we would do an analysis of the transaction from a pure financial

point of view, compare it to other sources of funding that were available or being considered at any point in time . . . ."); *id.* at 36:13-22.)

Dow retained Appraisal Economics to value the Plant Assets. Appraisal Economics valued the Plant Assets at $715,000,000 as of June 12, 1998. (JSOF ¶ 85.) At the time of the appraisal, Dow had authorized an expansion of the Plant Assets that would increase production capacity by 16 percent, at a capital cost of approximately $22 million. Appraisal Economics determined that this expansion, which Dow expected to complete by December 31, 1999, would increase the value of the Plant Assets by $118,000,000. (*See* JSOF ¶ 86.) The Government does not challenge the accuracy of either of these valuations.

Appraisal Economics determined the fair market rental of the Plant Assets for an 18-year lease to be $66,132,000 per annum. Completion of the authorized expansion would increase the fair market rental to $77,451,000 per annum over the remainder of the 18-year lease. (*See* JSOF ¶ 87.)

On March 27, 1998, Ifco purchased DESA's General Partner interest and the Class A Investors' Limited Partner interests, and, as of that date, the Investors ceased to be partners in Chemtech. (*See* JSOF ¶ 75.) The Partnership changed its name to Chemtech II. (*See* JSOF ¶ 82(a).) DCDC, a wholly-owned Dow subsidiary, contributed the Plant Assets and 100 percent of the stock of CPI II in exchange for a Class B Limited Partner interest. (JSOF ¶ 82(b)-(c).) Chemtech II and Dow entered into a lease agreement under which Dow leased the Plant Assets from Chemtech II for a period of 18 years. (JSOF ¶ 82(d).)

CPI's assets included three demand promissory notes issued by DCIL, which paid interest at the 90-Day Dealer Commercial Paper Rate plus 0.125 percent. (*See* JSOF ¶¶ 28, 30-31.) On June 12, 1998, DCIL and CPI consolidated these notes into a single term note, payable

October 1, 2032, which had a principal amount of $781,600,000 and paid interest at a fixed rate of 7.05 percent.  (*See* JSOF ¶ 83.)

Effective June 25, 1998, Chemtech II distributed the Patent Assets, CPI stock, and cash, with a total value equal to DTPC's Capital Account balance, to DTPC in complete redemption of its partnership interest.  (*See* JSOF ¶ 88.)

On June 26, 1998, Ifco sold most of its Class A Interest to RBDC Inc. ("RBDC"), a Delaware corporation and U.S. affiliate of Rabo.  Ifco, DCDC, and RBDC executed a Third Amended and Restated Agreement of Limited Partnership of Chemtech II ("Third Amended Partnership Agreement"), admitting RBDC as the Class A Limited Partner, converting the rest of Ifco's Class A Interest to a General Partner interest, and converting DCDC's interest to the Class B Limited Partner interest.  (*See* JSOF ¶ 101.)



3.    Key Elements of the Chemtech Partnership Agreement Following Entry of RBDC

Although the allocation provisions of the Third Amended Partnership Agreement differed somewhat from those of the Chemtech I structure, the Class A Investor participation in the Partnership was similar.  Whereas amortization of the Patent Assets in Chemtech I had been computed on a "straight-line" basis, the Internal Revenue Code provided for accelerated depreciation on the Plant Assets in Chemtech II.  As a result, the Partnership's book and tax depreciation exceeded its rental income in the early years of the lease term, generating book and tax losses.  Because, as in Chemtech I, RBDC's Class A Interest was to be economically equivalent to preferred stock, it was not intended to bear a significant share of the first risk of loss.  Therefore, the parties agreed to specially allocate 99 percent of the depreciation to the Dow partners and only 1 percent to RBDC.  (JX 3DD § 3.03(e), CT00057265-66.)  Depreciation was excluded from the computation of Profits, which were allocated first to RBDC to the extent of its Priority Return from Profits (6.375 percent on its initial $200 million Capital Account balance).  (JX 3DD § 3.01, CT00057262-63.)  After allocations to reverse prior allocations of Losses and depreciation, the Partnership Agreement allocated remaining Profits to the General Partner and Class B Limited Partner to the extent necessary to provide them with a cumulative Secondary Return of 8.375 percent on their Capital Accounts.  (JX 3DD § 3.01(f), CT00057263.)  Any residual Profits were allocated 99 percent to the Dow partners and 1 percent to RBDC.  (JX 3DD § 3.01(g), CT00057264.)

RBDC was entitled to 1 percent of any gains, including "mark-to-market" gains calculated upon the occurrence of certain events.  Additionally, RBDC would bear 1 percent of all Losses until the Capital Account of the Class B Limited Partner was reduced to zero; and 100 percent of Losses thereafter until its own Capital Account was reduced to zero.  (JX 3DD § 3.02,

41

CT00057264.)  Thus, RBDC was subject to a risk of loss of up to the amount of its $200 million investment.

RBDC's return depended upon the success of the Partnership; RBDC could have earned more or less than the Priority Return, depending on whether the Profits allocated to it were sufficient to cover the distributions of Priority Return.

The governance structure of Chemtech II was similar to that of Chemtech I.  The general partner's control of day-to-day management was restricted by certain narrowly tailored voting rights afforded RBDC that were designed to preserve the nature of its investment.

Upon liquidation of the Partnership, RBDC was entitled to its Capital Account balance, if any, and its rights were subordinate to those of creditors (including the General Partner in its role as partnership creditor) and were *pari passu* with those of all other partners.  (JX 3DD § 12.02, CT00057292-93.)  As in Chemtech I, RBDC sought and obtained a guaranty of performance by the General Partner and DCDC of the terms and conditions of the partnership agreement.  (JX 3GG.)  This guaranty did not entitle it to receive more than its Capital Account balance and did not assure it of the return of its investment.

The parties anticipated that the Chemtech II structure could continue for up to 20 years, with options for RBDC or Dow to liquidate or purchase RBDC's interest.  (JX 3DD § 12.01, CT00057291-92, § 14.01, CT00057297-98.)  In fact, when RBDC's initial option became exercisable five years into the investment, the Partners amended the partnership agreement to provide for (i) indefinite term (JX 4B § 14.02, CT00065588-89), and (ii) a reduction in RBDC's Priority Return to 4.207 percent per annum (JSOF ¶ 118(a); JX 4B § 1.10, CT00065555). Ultimately, RBDC remained a partner for 10 years.  In June 2008, Ifco exercised its option to

acquire RBDC's Class A Interest. Chemtech continues in existence today, albeit without a third-party investor. (JSOF ¶ 134.)

RBDC treated its Class A Interest as equity for financial reporting, tax, and all other purposes. (Sherman.)

4.    Tax Consequences of Chemtech II.

In connection with the restructuring of Chemtech, the Partnership distributed the remaining Patent Assets, approximately 67 percent of the CPI stock, and cash to DTPC in complete redemption of its interest. (JSOF ¶¶ 88, 106, 109.) Under the general rules of partnership taxation, a partner does not recognize tax when it receives a distribution of property from a partnership. I.R.C. § 731(a). However, a partner's tax basis in any property distributed by the partnership cannot exceed its basis in its partnership interest. *See* I.R.C. § 732. This ensures that, when a partner receives a property distribution in liquidation of its interest, any gain or loss in the partnership investment will be deferred until the partner disposes of the distributed property.

These rules applied to Chemtech's distribution to DTPC. Under section 731, DTPC did not recognize gain or loss on the distribution in liquidation of its Chemtech interest, but under section 732 it took a basis in the distributed assets equal to its basis in its Chemtech interest. These rules resulted in a $381 million reduction in the basis of the distributed assets, from $462,963,591 (Chemtech's basis in the assets prior to the distribution (JSOF ¶ 91)) to $81,518,346 (DTPC's tax basis in its partnership interest (JSOF ¶ 92)).

A partnership's distribution of high basis assets to a partner with a lower basis in its partnership interest can cause a tax detriment to the remaining partners from a loss of asset basis inside the partnership. In this instance, the basis loss was $381 million. As permitted by the Code, Chemtech elected to eliminate this disparity by electing to increase its tax basis in its

43

remaining assets by the $381 million of basis lost on the redemption distribution.  *See* I.R.C. §§ 734, 754.  Under the regulations governing the allocation of that basis increase among the remaining assets of the Partnership, $363 million was applied to the Plant Assets, thereby increasing the potential depreciation deductions available to Chemtech.  (JSOF ¶¶ 89-100.)

Upon admission of RBDC to the Partnership, the parties agreed to specially allocate 99 percent of Chemtech's book depreciation deductions to the Dow partners.  As a U.S. corporation, RBDC was subject to U.S. federal income tax on the entire amount of income it received from Chemtech.  *See* I.R.C. § 11.

### E.     Accounting Treatment of Chemtech

The central purpose of the Chemtech transactions was to provide Dow with financing that would qualify as minority equity, rather than debt, under U.S. generally accepted accounting principles ("GAAP").  Dow structured the Class A Interests to meet this objective.

Under GAAP, Chemtech I's financial results were included in Dow's consolidated financial statements.  Dow reported the Class A Interests as "minority interests in subsidiary companies" on its consolidated balance sheet.  (JX 192 at CT00068526, 42 (Note R); JX 196 at CT00069073-75 (Note R).)  Because the Chemtech partnership was consolidated with Dow, all intercompany transactions (royalties and loans) were eliminated in consolidation and only the Class A Investors' Priority Return appeared on Dow's consolidated income statement as minority dividends.  Dow's royalty expense and Chemtech's corresponding royalty income were eliminated in consolidation.  (JX 255 at CT00069168.)

Dow's financial auditor, Deloitte & Touche LLP ("Deloitte") reviewed and analyzed all aspects of the Chemtech transactions and determined that the Class A Interests were appropriately classified as minority equity.  (PX 2.)  Deloitte also concluded that the Class A Interests were most analogous to preferred stock, which is equity under GAAP.  (*Id.*; PEX 4,

44

Erickson Rebuttal Rpt. at 23-24.)  Deloitte reaffirmed this conclusion every year from 1993

through 1998.  (JX 196; JX 255; JX 324; JX 422; JX 572; JX 736.)  Professor Erickson reviewed

Deloitte's analysis and agreed with its conclusion that the Class A Interests were properly

classified as minority equity on Dow's consolidated balance sheet and that the limited

partnership interests are closely analogous to preferred stock.  (PEX 3, Erickson Rpt. at 7-8, 42.)

This treatment continued following the 1998 restructuring and the admission of RBDC to

the Partnership in 1998.  Dow included Chemtech II in its consolidated financial statements and

reported RBDC's interest as a minority equity interest in a subsidiary.  Deloitte reviewed and

approved Dow's characterization of the investment under GAAP every year through 2008, when

Dow repurchased RBDC's interest.


## ARGUMENT

The Government of necessity resorts to soft judicial doctrines like "sham" and "economic

substance" because the plain language of the Code and its implementing regulations mandate the

tax treatment that the Government seeks to negate.  These rules were not "loopholes"—they

were intended to and known to produce the very tax consequences the Government now finds

objectionable.[26]

The stipulated record and testimony presented at trial will demonstrate that the formation

and operation of Chemtech had economic substance; that Dow had substantial non-tax business

purposes for engaging in the transactions; and that the substance of the transactions is consistent

with their form.  Ultimately, the Government's complaint is that Dow obtained more favorable

tax results than it might have achieved under some alternative, hypothetical transaction more to

---

[26]  The Government's fixation on "loopholes" is ironic, because the Gov't PFOF purportedly
covers the issues in this litigation without ever identifying the "loophole."

the Government's liking.  But the IRS does not have the right to second-guess business decisions or to impose taxes based on what taxpayers might have done.

## I.     THE CHEMTECH TRANSACTIONS HAD ECONOMIC SUBSTANCE

Taxpayers have the right to minimize their taxes through careful planning.  In the words of Learned Hand, "[a]ny one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury."  *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934), *aff'd*, 293 U.S. 465 (1935) ("The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted" (quoting affirming opinion, 293 U.S. at 469).).  In the words of the Fifth Circuit, "a well-effectuated desire to take advantage of tax rules is not itself a ground for tax liability."  *Caruth Corp. v. United States*, 865 F.2d 644, 648 (5th Cir. 1989).

While acknowledging that taxpayers may plan their affairs to minimize or avoid taxes, the courts have established certain limitations.  The most important of these is the economic substance or "sham transaction" doctrine, which permits a transaction to be ignored for tax purposes when it has no non-tax purpose or effect.  The Government seeks to invoke the sham transaction doctrine here by alleging that the Chemtech transactions served no business purpose and had no objective non-tax economic effects.  The Government's assertions mischaracterize the facts and distort the relevant law.

The leading Supreme Court decision governing the sham transaction doctrine is *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), *rev'g* 536 F.2d 746 (8th Cir. 1976).  *Lyon* involved a sale-leaseback transaction in which a bank sold a building to the taxpayer, who in turn leased the building back to the bank.  The transaction enabled the bank to achieve off-balance sheet treatment for the building and the related debt necessary to finance its construction.  As lessee, the bank was responsible for all maintenance and other expenses and was obligated to pay

rent regardless of the condition of the building.  Because the scheduled rent would exactly equal

the taxpayer's debt service obligations, over the first 25 years of the lease, the taxpayer could

neither make nor lose a dime unless the bank defaulted on its rent.  *Id.* at 566-67.  Over the first

11 years, however, the taxpayer expected to derive substantial tax benefits from depreciation

deductions on the building and interest deductions on the mortgage.  *Id.* at 568, 580 n.15.  Once

the tax benefits had been exhausted, the bank would have the right to buy back the building from

the taxpayer for a fixed purchase price.  If the bank exercised its purchase option, the taxpayer

would receive the return of its initial cash investment plus interest but would not share any

appreciation in the value of the building.  *Id.* at 567.  The taxpayer's expected tax benefits

($1,500,000) vastly exceeded its cash investment ($500,000) and objectively dominated any non-

tax benefits it was likely to receive from the transaction.  *Id.* at 571.

  As in this case, the Government sought to deny the expected tax benefits by

characterizing the transaction as a sham.  *Lyon*, 435 U.S. at 573.  The Eighth Circuit Court of

Appeals agreed with the IRS, concluding that "[t]he only economic advantages inuring to

taxpayer during [the first twenty-five years] are tax shelter benefits."  *Lyon,* 536 F.2d at 753.

The Supreme Court reversed.

  According to the Court, the taxpayer's personal liability on the acquisition financing and

the impact of the transaction on the taxpayer's financial position (including the taxpayer's

diminished ability to incur more debt) demonstrated that the transaction was not a sham.  *Lyon,*

435 U.S. at 577, 581.  Furthermore, the favorable off-balance sheet accounting treatment that the

bank obtained "gave the transaction a meaningful character consonant with the form it was

given."  *Id.* at 577.  The Supreme Court based its decision on the following standard:

> [W]here . . . there is a genuine multiple-party transaction with economic
> substance which is compelled or encouraged by business or regulatory realities, is
> imbued with tax-independent considerations, and is not shaped solely by tax-
> avoidance features that have meaningless labels attached, the Government should
> honor the allocation of rights and duties effectuated by the parties.

*Id.* at 583-84.

In *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001), the Fifth

Circuit applied *Lyon* to sustain the tax benefits resulting from a tax-motivated transaction.  In

*Compaq*, the taxpayer invested in a tax shelter product designed to shelter capital gains and to

transfer foreign tax credits from non-U.S. taxpayers to U.S. taxpayers.  Compaq purchased

American Depository Receipts ("ADRs"), which represented shares of stock in foreign

corporations, from a foreign entity that was exempt from U.S. taxes and had no use for U.S.

foreign tax credits.  The price paid for the ADRs reflected the right to a declared but unpaid

dividend.  Compaq immediately resold the ADRs back to the entity from which it had bought

them, but the settlement date was arranged so that closing occurred after the record date for the

dividends had passed.  The transaction generated two tax benefits for Compaq:  foreign tax

credits on the dividends, which it used to offset its U.S. taxes, and a capital loss from resale of

the shares ex-dividend, which it used to offset gains from an unrelated transaction.

The IRS challenged these tax benefits, alleging that the transaction lacked business

purpose and economic substance.  The Fifth Circuit rejected the IRS's argument.  The court

determined that Compaq had obtained legitimate non-tax economic benefits from the transaction.

Because the dividends Compaq received exceeded the capital loss incurred on the resale of the

ADRs, the transactions produced a real economic gain, thereby demonstrating that the

transaction had economic substance.  *Compaq,* 277 F.3d at 786.  Although the transaction had

been structured to limit Compaq's economic risk, the limitations on risk were entirely consistent

with the presence of economic substance.  *Id*. at 787 ("The absence of risk that can legitimately

be eliminated does not make a transaction a sham [], but in this case risk was present.") (internal citation omitted.)

The Fifth Circuit acknowledged that tax considerations played an important role in Compaq's decision to effect the transaction but held that the transaction satisfied the business purpose requirement because Compaq's participation had not been motivated *solely* by tax considerations. *Compaq,* 277 F.3d at 786-787. Compaq's desire to obtain a tax benefit from the transaction was immaterial:

> [T]he availability of a capital gain against which to offset the capital losses from the ADR transaction was a necessary precondition to the profitability of the transaction on an after-tax basis. A sensible taxpayer would have engaged in such a transaction only if it had a capital gain against which to offset the capital losses that the taxpayer knew would result from the transaction. All this is unremarkable and is no evidence that Compaq had an impermissible motive.

*Id.* at 786 n.8.[27]

### A.    The Chemtech Transactions Had Objective Economic Substance

A transaction has objective economic substance if it objectively affects the taxpayer's non-tax business interests, either by creating a reasonable possibility of profit or by altering the taxpayer's legal relations. *See*, *e.g.*, *Compaq*, 277 F.3d at 786; *UPS of America, Inc. v. Comm'r*, 254 F.3d 1014, 1018 (11th Cir. 2001) ("The kind of 'economic effects' required to entitle a transaction to respect in taxation include the creation of genuine obligations enforceable by an unrelated party."); *ACM P'ship v. Comm'r*, 157 F.3d 231, 248 n.31 (3d Cir. 1998) (tax-motivated transaction satisfies standard if it affects "the taxpayer's net economic position, legal relations, or non-tax business interests").

---

[27]    More recently, in *Klamath Strategic Investment Fund v. United States*, 568 F.3d 537 (5th Cir. 2009), the Fifth Circuit applied the *Lyon* standard in affirming a District Court's disallowance of the tax benefits from a transaction. The court rejected the taxpayer's argument that it had the potential for a pre-tax economic profit from the transaction, citing evidence that the transaction was structured so that the conditions necessary to achieve the pre-tax profit would not occur.

In *Strangi v. Commissioner*, 293 F.3d 279, 282 (5th Cir. 2002), the Fifth Circuit held that an individual's transfer of property to a family limited partnership shortly before his death had objective economic substance, because the transfer "changed the legal relationships between decedent and his heirs and creditors" and because "purchasers of decedent's assets would not disregard the partnership." Similarly, in *Shell Petroleum Inc. v. United States*, 2008 WL 4714252, No. H-05-02016 (S.D. Tex. July 3, 2008), the District Court found that a taxpayer's contribution of assets to a controlled subsidiary had objective economic substance, even though the taxpayer owned 100 percent of the voting common stock of the subsidiary and thus retained complete operational control over the contributed assets.

The facts of this case are much more compelling than those of the cases discussed above. First, Dow obtained $200 million of minority equity financing from unrelated parties. Because the expected return to the Class A Limited Partners was well below Dow's weighted average cost of capital and the hurdle rate it expected to earn from its business investments, Dow could reasonably expect to generate a profit by using the proceeds to pay down other, more costly financings or to make investments in its business.

Second, the Chemtech transactions altered the parties' legal and economic relations and created material economic risks for all parties. The Government repeatedly emphasizes Dow's continued use of the assets contributed to Chemtech and the triple net lease with a "hell or high water" rental obligation that limited the Banks' risk of loss. (*See, e.g.,* Gov't PFOF ¶¶ 114, 128, 226, 255, 516.) The Government made the same argument in *Lyon*: the bank continued to use the building it had sold to the taxpayer, the triple net lease obligated the bank to cover all expenses, and the bank had a "hell or high water" obligation to pay rent regardless of the building's condition. *See Lyon,* 536 F.2d at 749-50. Despite these limitations on risk, the

50

Supreme Court sustained the taxpayer's investment in the building as having economic substance consistent with its form.  The Banks' return from their investment in Chemtech was more variable than the Frank Lyon Company's return from its equity investment in the bank building.

Likewise, the Government's "circular cash flow" allegations miss the mark.  The Government alleges that all of the rents and royalties paid to Chemtech came back to Dow. (Gov't PFOF ¶ 401.)  It completely ignores the cash invested by the Banks and RBDC and the cash distributions they received.  Those cash flows—which were essential to the business purpose of the transactions—were not "circular."  By the Government's logic, the sale-leaseback transaction in *Lyon* was "circular," because the taxpayer bought the building from the bank, leased it back to the bank, and used every dollar of rent received from the bank to service the debt incurred to purchase the building.  The cash flows in the Chemtech transaction had much more economic impact on the parties than the cash flows received and paid by the taxpayer in *Lyon.*  Labeling a transaction "circular" does not deprive it of economic substance.  *See Consol. Edison Co. v. United States*, 90 Fed. Cl. 228, 339 (2009).[28]

In *Compaq*, the taxpayer resold the ADRs after little more than an hour; in contrast, the Banks' investments in Chemtech I lasted for almost five years, and RBDC's Chemtech II investment lasted ten years.  Unlike the family limited partnership sustained in *Strangi*, the Chemtech transactions resulted in substantial cash investments from unrelated third parties, thereby creating new legal relationships between Dow, Chemtech, and the Banks.  And unlike *Shell*, where the taxpayer contributed assets to a corporate subsidiary over which it retained sole

---

[28]    The Government's reliance on *Merryman v. Commissioner*, 873 F.2d 879 (5th Cir. 1989), is misplaced.  The partnership at issue in that case consisted entirely of related parties, and the court specifically found that the cash transfers did not affect the parties' economic positions. *Id.* at 882.  The presence of the Banks and the demonstrable benefits Dow received from the Banks' cash investments render *Merryman* inapposite.

voting control, the Banks negotiated for an extensive set of restrictions and consent rights, consistent with their status as limited partners, that limited the control exercisable by Dow over Chemtech.

The Government relies on the Fifth Circuit's decision in *Klamath v. United States*, 568 F.3d 537 (5th Cir. 2009), but that case is easily distinguished. *Klamath* involved individuals who formed a partnership to make foreign currency trades structured to generate a non-economic taxable loss. The investments did not serve any business purpose for the individuals, who were attorneys seeking to shelter income from large contingent fee awards. And while the taxpayers asserted that their investments had the potential to generate a pre-tax profit, the trial court found, as a fact, that the transaction was structured so that the circumstances necessary to produce the pre-tax profit would never occur. *Klamath*, 568 F.3d at 545 ("The loan transactions could never have been profitable because the funding amount could not actually be used for investments, and the high-risk investments for which the funding amount might have provided security were never intended to occur."). There is not even a superficial resemblance between *Klamath* and the facts of this case.

Chemtech created real risks for Dow and the Banks,[29] and for 15 years it provided Dow with $200 million of minority equity capital that Dow employed in its business activities. These consequences had undeniable economic reality, separate and apart from any tax consequences.

---

[29] Although the use of preferred equity limited the Banks' risk, the fact remains that they shared in the first dollar of any losses incurred by Chemtech I. By any standard, their downside risk materially exceeded that of the taxpayers in *Lyon* and *Compaq*. In *Lyon*, for the initial 25 years of the lease the taxpayer's net pre-tax cash flow would be zero; extension of the lease would ensure the return of its capital plus a 6 percent fixed return. 435 U.S. at 566-67. In *Compaq*, the taxpayer's immediate resale of the ADRs meant that it was exposed to market risk in the underlying stock for little more than an hour. 277 F.3d at 780.

### B.    The Chemtech Transactions Had Substantial Non-Tax Business Purposes

As the Supreme Court stated in *Lyon*, a transaction with economic substance will be respected if it is "compelled *or* encouraged" by business realities, has "tax-independent considerations," and "is not shaped *solely* by tax-avoidance features with meaningless labels attached."  435 U.S. at 583-84 (emphasis added).  The Chemtech transactions easily exceed this standard.

The principal purpose of the Chemtech transactions was to raise capital without creating balance sheet debt.  In *Lyon*, the Supreme Court recognized this as a valid business purpose that supported recognition of the transaction, even though it was not the taxpayer's purpose, but the objective of an unrelated party (the bank that was leasing the building from the taxpayer).  *Lyon*, 435 U.S. at 578-79.  Other courts have recognized that raising minority equity capital is a valid business purpose.  *See Shell*, 2008 WL 2714252, at *34; *TIFD III-E, Inc. v. United States*, 342 F. Supp. 2d 94, 111 (D. Conn. 2004), *rev'd on other grounds*, 459 F.3d 220 (2d Cir. 2006).  More recently, when Congress enacted legislation in 2010 to codify the economic substance doctrine, it specifically acknowledged that achieving a financial accounting benefit may constitute a "substantial" business purpose as long as the accounting benefit is not derived from a reduction in tax.  I.R.C. § 7701(o)(4).  While section 7701(o) does not apply to either Chemtech transaction, it should remove any doubt as to the validity of the non-tax business purposes for these transactions.

The Government's expert claims that the cost of the Chemtech transaction outweighed the quantifiable non-tax financial benefits to Dow.  (DEX 5, Hubbard Rebuttal Rpt. at 43.)  This insinuation distorts the facts, because it unilaterally dismisses the financial accounting and rating agency benefits Dow derived from raising minority equity financing as "window dressing" and ignores any benefits Dow received from using the proceeds to pay down debt or make new

investments.  The Government's own expert concedes that excluding such benefits will cause *every* financing transaction to have a negative value. (DEX 5, Hubbard Rebuttal Rpt. at 46-48.)[30] Thus, his critique is meaningless.

Also irrelevant is the Government's complaint that the Chemtech transactions were structured to obtain certain tax results.  In *Compaq*, the Fifth Circuit sustained transaction even though it understood that the taxpayer had "sought *primarily* to get otherwise unavailable tax benefits."  277 F.3d at 786 (emphasis added); *see also Lyon*, 435 U.S. at 580 ("The fact that favorable tax consequences were taken into account by [the taxpayer] on entering into the transaction is no reason for disallowing those consequences.  We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction.") (footnote omitted).  The *Compaq* court specifically rejected the IRS's argument that the participation of a tax-exempt foreign counterparty was relevant to whether the taxpayer had a business purpose, comparing the transaction to an investment in tax-exempt bonds, the benefits of which depend on the tax attributes of the investor.  277 F.3d at 786 n.8.

In short, the Supreme Court's decision in *Lyon* and the subsequent Fifth Circuit case law makes clear that taxpayers may engage in a transaction to minimize taxes, as long as the transaction "is not shaped solely by tax-avoidance features with meaningless labels attached." 435 U.S. at 584.  The features of the Chemtech transaction that produced favorable tax results— namely, the formation of a partnership and the issuance of preferred equity interests—were

---

[30]  Not only does the Government's assertion distort the facts, but it mischaracterizes the controlling law.  In *Lyon*, the *only* economic benefits the taxpayer expected to realize over the first 25 years were the tax benefits.  In *Compaq*, the taxpayer's pre-tax profit ($1.9 million) was substantially less than the $20 million in tax losses it recognized.  In *Shell* and *TIFD III-E*, the District Courts determined that obtaining minority equity financing met the business purpose requirement without quantifying those non-tax benefits or weighing them against any tax benefits received, and the Government did not appeal those holdings in either case.

directly related to the non-tax business benefits Dow sought to obtain.  The Chemtech transactions had material non-tax business motivations, and the form of the transactions cannot be dismissed or ignored as "meaningless labels."

## II.    THE CLASS A INVESTMENTS WERE EQUITY

The Government claims, as one of its alternative positions, that the Banks and RBDC made loans rather than equity investments.  Not only were the Class A Interests equity, but they were more equity-like than many debt-like hybrid interests routinely characterized as equity by the IRS and the courts.  Although most of these cases involve investments in corporations rather than partnerships, the same principles apply in distinguishing between capital contributions and loans to limited partnerships.  *See Hambuechen v. Comm'r*, 43 T.C. 90 (1964).

According to the Government's expert, the Class A Interests were "more akin" to pure debt than to common stock equity.  (Gov't PFOF ¶¶ 224-225; DEX 4, Hubbard Rpt. at 16-17.) The polar paradigm employed by the Government makes no comparison to preferred stock. Since the early days of the income tax, however, the courts have recognized that preferred stock is equity for tax purposes, even though it usually has most of the attributes of debt.  In an early case, Judge Learned Hand observed that common stockholders generally share all profits and manage the business and that it would have been "entirely logical" to treat preferred shares as debt for tax purposes.  Nevertheless, Judge Hand concluded that the tax law "has always distinguished between creditors and preferred shareholders."  *Jewel Tea Co. v. United States*, 90 F.2d 451, 452 (2d Cir. 1937).

Indeed, numerous provisions of the Internal Revenue Code and regulations recognize that preferred stock is equity even when it is highly debt-like, does not vote, and does not participate in corporate earnings or growth to any significant extent.  *See*, *e.g.*, I.R.C. §§ 351(g), 1504(a)(4). The regulations under section 305, which apply only to corporate equity, contain an example

describing a highly debt-like preferred stock that pays fixed rate dividends, is mandatorily redeemable at a fixed price after ten years, and is issued by a corporation that "is likely to have the legal and financial capacity . . . to redeem."  Treas. Reg. § 1.305-5(d), Ex. 5.  Regulations under section 2701, which applies to transfers of equity interests, contain an example describing nonvoting preferred stock that carries a cumulative eight percent dividend and gives its holder the right to put the stock to the issuer for its par value.  Treas. Reg. § 25.2701-3(d), Ex. 3.  These provisions of the statute and regulations presume that preferred interests are equity for tax purposes even when they are "more akin to debt" than to common equity.

Not surprisingly, when the Government is arguing *for* equity treatment, it does not compare hybrid instruments to common equity, but to preferred stock.  Thus, in *United States v. Snyder Brothers Co.,* the Government prevailed in reclassifying debentures as equity, based on the argument that the debentures "created rights in the holders that do not significantly vary from those of preferred stockholders."  367 F.2d 980, 983 (5th Cir. 1966).

While the courts have developed a variety of multi-factor tests to distinguish between debt and common equity,[31] they typically have relied on a few specific factors to distinguish between preferred stock and debt.  In *United States v. South Georgia Railway Co.,* 107 F.2d 3 (5th Cir. 1939), the Fifth Circuit addressed the tax classification of debt-like preferred stock.  The certificate holders were entitled to cumulative, fixed dividend payments (denominated as "interest") that were payable semi-annually irrespective of the corporation's profitability.  The certificate holders were entitled to receive the full amount of these accrued payments before any payment could be paid to the common shareholders.  Upon failure by the corporation to make these payments, the preferred certificate holders could force it into receivership.  On liquidation,

---

[31]    *See*, *e.g.*, *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972) (identifying 13 factors).

the certificate holders had priority over common stockholders. They did not participate in residual profits and had no voting rights. Despite these debt-like characteristics, the Fifth Circuit held that the preferred stock was equity, relying on (1) the form of the instrument, (2) the absence of an enforceable right to receive a sum certain at a fixed maturity date, (3) the absence of creditor rights for the collection of unpaid dividends, and (4) the taxpayer's intent to substitute "stock liabilities for liabilities existing as debt." 107 F.2d at 5-6. The Class A Investors satisfy these equity criteria.

Other circuits have recognized nonparticipating preferred stock as equity for tax purposes. In *John Wanamaker Philadelphia v. Commissioner*, 139 F.2d 644 (3d Cir. 1943), the Third Circuit held preferred stock to be equity for tax purposes even though it carried a fixed, cumulative return and did not participate in either residual profits or management. The Seventh Circuit has characterized as equity preferred stock that had a definite maturity date and other debt-like features, including debt-like covenants designed to ensure payment of the preferred return. *Comm'r v. Meridian & Thirteenth Realty Co.*, 132 F.2d 182 (7th Cir. 1942).[32]

As these cases show, courts seeking to distinguish between preferred equity and conventional debt rely on certain crucial factors: the intent of the parties and form of the transaction; treatment of the instrument for non-tax purposes; priority in liquidation; and any contingency on the obligation to repay and the source of payments. Application of these factors

---

[32]  The Government erroneously contends that Chemtech's "limited life" supports characterization of the Banks as lenders. (*See, e.g.,* Gov't PFOF ¶¶ 285, 288, 290.) Chemtech was organized to have perpetual existence with *optional* liquidation rights. (PEX 6, Kleinberger Rebuttal Rpt. at 19.) In any event, the expected life of an *entity* is irrelevant to whether the investors hold equity or debt. Numerous partnerships and joint ventures are organized for a specified term. *See, e.g.,* I.R.C. § 761(a)(3) (permitting, but not requiring, partnerships organized "for a short period" to elect out of the partnership tax rules); *Karsch v. Comm'r*, 8 T.C. 1327 (1947) (three-year partnership).

to the Class A Interests demonstrates that they possessed the essential attributes of equity and were more equity-like than conventional nonvoting, nonparticipating preferred stock.

       1.    <u>The Parties Intended the Banks' Interests to Be Equity, and the Formal Indicia of the Interests Demonstrate This Intent</u>

The form of an instrument is an objective manifestation of the parties' intent to create a particular relationship, and, when unambiguous, is a significant factor in determining its classification for tax purposes. *Snyder Bros. Co.*, 367 F.2d at 982-83; *see also Estate of Mixon*, 464 F.2d at 403; *Comm'r v. O.P.P. Holding Corp.*, 76 F.2d 11, 13 (2d Cir. 1935) (Although preferred stock and debt "contain substantially similar provisions . . . only in the case of certificates designated as bonds were the holders intended to be creditors of the corporation."). In *South Georgia Railway*, the Fifth Circuit (at the IRS's urging) relied heavily on the form of the instrument in classifying it as equity. 107 F.2d at 5.

The form of the Class A Interests demonstrates the parties' intent that the Class A Interest would be equity. The Partnership was formed under Delaware's limited partnership law. Each partner represented "that it intends to participate as a partner in a Delaware limited partnership for the purpose of making an economic profit from the transactions proposed to be entered into by the Partnership," and the Partnership Agreement provides the Class A Interests with rights consistent with those typically accorded limited partner equity investments under state law. (*See* JX 2L § 7.2(b), CT00036545; *see also* JX 3DD § 7.02(f), CT00057277; PEX 1, Carron Rebuttal Rpt. at 7-10; PEX 6, Kleinberger Rebuttal Rpt. at 8.)

The Government's "substance over form" mantra misses the point. In the debt/equity context, form affects the parties' substantive legal rights. *See*, *e.g*., *Waterman S.S. Corp. v. Comm'r*, 430 F.2d 1185, 1192 (5th Cir. 1970). The form of the Class A Interests gave the Banks rights typical of limited partners (such as voting rights) while denying them other rights inherent

in creditor status (such as the right to a sum certain, priority in liquidation, or the right to force

bankruptcy for nonpayment).  (Kleinberger Rebuttal Rpt. at 18-21.)  As the Fifth Circuit has

observed, "the solution of hard tax cases requires something more than the easy generalization

that the substance rather than the form of a transaction is determinative of its tax effect. . . .  [I]n

numerous situations the form by which a transaction is effected does influence or control its tax

consequences."[33]

Not only did the equity form have substantive consequences, but the use of the form was

essential to achieving the dominant business purpose.  Under such circumstances, *Lyon* requires

that the Government "honor the allocation of rights and duties effectuated by the parties."  435

U.S. at 562.[34]

### 2. The Interests Were Equity for Non-Tax Purposes

Courts also often have placed significance on whether the parties intended an instrument

to be treated as equity for financial accounting, regulatory, or other non-tax purposes.  *See*, *e.g.*,

*Alterman Foods, Inc. v. United States*, 505 F.2d 873, 879 (5th Cir. 1974); *Lee Tel. Co. v.*

---

[33]   *Waterman*, 430 F.2d at 1192.  In the limited circumstances in which the Fifth Circuit has
recast nominal equity as debt, the facts have indicated the intention to create a debtor-creditor
relationship.  *See Comm'r v. J.N. Bray Co.,* 126 F.2d 612, 612-13 (5th Cir. 1942)
(characterizing as debt "debenture preferred stock" that provided for semi-annual payments
of "interest" without approval of the board of directors, a fixed maturity date, and creditors'
rights to sue for nonpayment).

[34]   Although Dow had substantial business purposes for seeking equity financing, it is important
to note that taxpayers are not required to prove a "tax-independent" reason for choosing
between debt and equity financing.  *See*, *e.g.*, *UPS*, 254 F.3d at 1019 (observing that taxes
are often the only reason for choosing between debt and equity); *Ragland Inv. Co. v.
Comm'r*, 52 T.C. 867, 880 (1969), *aff'd*, 435 F.2d 118 (6th Cir. 1970) (rejecting IRS effort to
reclassify preferred stock as debt, even though taxpayer's *sole* purpose for using preferred
stock was to obtain a tax benefit); *Nassau Lens Co. v. Comm'r*, 308 F.2d 39, 44-45 (2d Cir.
1962) (rejecting IRS argument that taxpayer had to establish a non-tax business purpose to
justify its classification of an instrument as debt rather than equity); *Kraft Foods Co. v.
Comm'r*, 232 F.2d 118, 128 (2d Cir. 1956) (rejecting IRS effort to reclassify debt as equity,
even though the taxpayer's *sole* purpose for issuing debt was to obtain a tax advantage).

*Comm'r*, 260 F.2d 114, 115-16 (4th Cir. 1958) (concluding that preferred stock issued to decrease the ratio of the company's debt to its net worth was equity); *Miele v. Comm'r*, 56 T.C. 556, 566 (1971), *aff'd*, 474 F.2d 1338 (3d Cir. 1973); *Ragland*, 52 T.C. at 876.  The IRS agrees that such treatment is significant, especially when a taxpayer seeks to create an instrument that is equity for accounting purposes and debt for tax purposes.  *See* Notice 94-47, 1994-1 C.B. 357.[35]

The Banks' interests in Chemtech were consistently treated as equity on the financial statements of Chemtech.  Dow's consolidated financial statements reported the Banks' interests as minority equity in a consolidated subsidiary entity.  Indeed, achieving this financial accounting treatment was critical to Dow's business objectives.  Expert testimony will confirm that Dow and its auditor, Deloitte, properly accounted for the Banks' partnership interests as minority equity under U.S. GAAP.  (PX 2; PEX 3, Erickson Rpt. at 4-8.)

The Government claims that some Banks classified their Chemtech interests as debt under foreign law.  (*See* Gov't PFOF ¶¶ 218-220.)  To the extent such treatment is relevant,[36] the evidence favors equity characterization.  Most of the Banks treated their investments in Chemtech I as equity for non-U.S. tax purposes, and the lone Class A Investor in Chemtech II treated the investment as equity for regulatory, financial, and tax reporting.  (Sherman.)  No meaningful inferences may be drawn from *foreign* bank regulatory treatment of the Banks' interests.  (PEX 8, Schwartz Rebuttal Rpt. at 15.)

---

[35]  In Notice 94-47, the IRS responded to taxpayers' efforts to create tax-deductible preferred equity, stating that equity treatment for GAAP or rating agency purposes *supports* treating the instrument as equity for tax purposes.  The Government's proposed findings repeatedly use the "tax-deductible equity" mantra; not surprisingly, the Government neglects to mention that, under the IRS's published position, the factor *supports* treating the Banks' interests as equity.  (Gov't PFOF ¶¶ 5, 54, 60.)

[36]  In other cases, the IRS has stated that classification of an instrument under foreign law is irrelevant to its U.S. tax characterization.  *See, e.g.*, T.A.M. 2005-12-020 (Mar. 25, 2005); T.A.M. 2004-18-008 (Apr. 30, 2004).

Finally, the evidence will demonstrate that the Banks viewed their investments in Chemtech as equity for U.S. bank regulatory purposes. Because the Banks were making equity investments, they were concerned over the potential application of Regulation K to a non-lending business. Therefore, they contacted the Federal Reserve Board to confirm that their equity interests would not cause them to be engaged in a U.S. non-banking business. (*See* JX 119.) These inquiries would have been unnecessary had the Class A Interests been loans for U.S. banking law purposes. (PEX 7, Schwartz Rpt. at 2-3.)

3.    The Banks Were Subordinated to the Creditors of the Partnership

A crucial distinction between preferred stock and debt is the subordination of the stockholder to creditors. Some courts have characterized the right to share with general creditors in the event of dissolution or liquidation as the "most significant characteristic of the creditor-debtor relationship." *P.M. Fin. Corp. v. United States*, 302 F.2d 786, 789-90 (3d Cir. 1962); *see also John Wanamaker Phila.*, 139 F.2d at 647; *Meridian & Thirteenth Realty Co.*, 132 F.2d at 186-87; *Ragland*, 52 T.C. at 877. The fact that an investor's rights are subordinate to all indebtedness, including debt to be incurred in the future, "weighs heavily toward an equity participation and against the existence of a bona-fide debtor-creditor relationship." *Tomlinson v. 1661 Corp.*, 377 F.2d 291, 298 (5th Cir. 1967); *see also United States v. Snyder Bros. Co.*, 367 F.2d 980, 984 (5th Cir. 1966).

Upon liquidation of Chemtech, all creditors' claims, whether arising out of contract or tort, would be paid *prior* to any distribution to the Class A Interests. (PEX 1, Carron Rebuttal Rpt. at 17-18.) The Banks' right to receive their Capital Accounts was *pari passu* with the rights of the Dow partners to receive their Capital Accounts. The Class A Interests were subordinated to all creditors, *including* the General Partner (in its status as creditor), and they were

subordinated to the rights of the Class B Limited Partner to receive its accrued guaranteed payment.  (*See* JX 2L § 12.2, CT00036565; JX 3DD § 12.02, CT00057292.)

> 4.    The Banks Were Not Entitled to Repayment of a Sum Certain Amount

The essential feature of debt is an unconditional, legally enforceable right to the return of a sum certain.  The Fifth Circuit has characterized "the existence of a fixed maturity for the principal sum with the right to force payment of the sum" as "the most significant, if not essential feature of a debtor and creditor as opposed to a stockholder relationship."  *South Ga. Ry.*, 107 F.2d at 5.

The Banks did not have the right to be repaid their original capital investments.  Upon liquidation, the Banks' rights would be limited to their Capital Account balances, which were dependent upon the financial performance of the Patent Assets.  Whether the Class A Interests' Capital Accounts would be sufficient to return their aggregate $200 million investment to them depended on the Profits and Losses of the Partnership.  Any decrease in the mark-to-market value of the Partnership's assets could cause the Banks' Capital Account balances to be less than their $200 million investment.  Unlike creditors, they would have had no right to sue the Partnership, Dow, or any of the Dow partners for the shortfall.

Upon certain events, the Banks had the right to declare an Optional Liquidating Event.  But the right to initiate a liquidation of an entity is an *equity* right.[37]  And even if the Banks exercised their rights, their entitlement was limited to their Capital Account balances.  They did not have an enforceable right to a sum certain.

---

[37]    Under the entity classification regulations in effect in 1993, the ability of a member to trigger dissolution of an entity by withdrawing was a factor used to distinguish a partnership from a corporation.  Treas. Reg. § 301.7701-2(b)(1) (1993) (continuity of life) (attached hereto as Exhibit D).

5.    The Class A Interests Were Substantially More Equity-Like Than Many
Hybrid Instruments Classified as Equity for Tax Purposes

Fifth Circuit case law and IRS rulings eliminate any doubt that the Class A Interests were

equity for tax purposes.  In *South Georgia Railway*, the preferred shareholders were entitled to a

7 percent return regardless of the success or failure of the business; had no interest in residual

profits beyond their stated 7 percent return; could force the corporation into receivership for

failure to pay the accrued preferred dividends; and had no voting rights.  *South Ga. Ry.*, 107 F.2d

4 n.1.  The Fifth Circuit held the interests to be equity for tax purposes.[38]

The Class A Interests were substantially more equity-like than the preferred stock

addressed in *South Georgia Railway.*  The Class A Interests participated in the *first* tier of net

losses.  (*See* JX 2L § 3.2(b), CT00036512; JX 3DD § 3.02(c), CT00057264.)  The Class A

Interests participated in Chemtech's residual profits and in the appreciation of its assets.  (*See* JX

2L § 3.1(f), CT00036511, § 3.3(l)(vi), CT00036516; JX 3DD § 3.01(g), CT00057264, § 3.01(a),

(c), CT00057263.)  The Class A Interests did not have creditors' rights.  As limited partners, the

Class A Interests had voting rights that substantially limited the actions the general partner could

take without their approval.  (*See* JX 2L § 5.3, CT00036523, § 9.2(a)-(b), CT00036550; JX3DD

§ 5.03, CT00057269, § 9.02(a) and (b), CT00057283.)

The Government's debt-equity position in this case is also inconsistent with numerous

published rulings recognizing that debt-like hybrid instruments are equity, even when they are

"an investment alternative to commercial paper or other short-term debt."  Revenue Ruling 90-

27, 1990-1 C.B. 50; *see also* Notice 2008-55, 2008-27 I.R.B. 11, 11-12 § 2.2.  Revenue Ruling

---

[38]    *South Georgia Railway* is hardly unique in the Fifth Circuit.  *See Staked Plains Trust v.
Comm'r*, 143 F.2d 421 (5th Cir. 1944) (preferred stock was equity even though holders were
entitled to a guaranteed return of a sum certain amount); *Dorsey v. United States*, 311 F.
Supp. 625 (S.D. Fla. 1969) (preferred stock was equity even though it provided for a fixed
return regardless of profits and had a mandatory redemption date).

78-142, 1978-1 C.B. 112, held that mandatorily redeemable preferred stock was equity, even though it had extensive covenants that ensured the issuer would have sufficient net current assets to redeem the preferred stock on schedule. Similarly, Revenue Ruling 94-28, 1994-1 C.B. 86, characterizes as equity a class of preferred stock that is "protected from the risk of loss otherwise inherent in the ownership of an equity interest" and does not qualify as "stock" for corporate law purposes. These rulings are directly relevant here: the Fifth Circuit has made it clear that "the Commissioner will be held to his published rulings." *Estate of McLendon v. Comm'r*, 135 F.3d 1017, 1024 (5th Cir. 1998).

The IRS continues to issue administrative rulings that refute the Government's ad hoc litigation position in this case. Recently the IRS issued a private letter ruling recognizing, as equity, preferred interests issued by a money market mutual fund that had the following attributes: (i) a cumulative dividend based on prevailing interest rates; (ii) no participation in residual profits; (iii) a liquidation preference equal to the purchase price plus accrued but unpaid dividends; (iv) a right for the holder to resell the shares every seven days and receive its full liquidation preference, including accrued but unpaid dividends; (v) a requirement that the issuing corporation maintain net assets equal to 200 percent of the liquidation preference; and (vi) a requirement that the issuing corporation immediately redeem the shares whenever its assets fall below the 200 percent minimum asset coverage requirement. Priv. Ltr. Rul. 2011-20-003 (Feb. 16, 2011) (attached hereto as Exhibit E).[39] By any standard, the Class A Interests are substantially more equity-like than the debt-like preferred stock that this recent IRS ruling respects as equity.

---

[39] Although private letter rulings are not binding authority, they may be "properly cited as evidence of how the Commissioner [of the IRS] has interpreted the law in the past." *Estate of Monroe v. Comm'r,* 124 F.3d 699, 710 (5th Cir. 1997).

## III.    THE BANKS WERE PARTNERS IN CHEMTECH

The tax consequences at issue here result from the characterization of the Class A Investors' interests as partnership interests.  As explained below, because the Class A Investors held equity, it necessarily follows that (1) Chemtech was a partnership, and (2) the Banks were partners in Chemtech.

### A.    Chemtech was a Partnership

Section 761(a) defines the term "partnership" to include "a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not . . . a corporation or a trust or estate."  Chemtech was not a corporation, trust, or estate.  Moreover, it easily meets the judicial and regulatory standards for recognition as an "unincorporated organization" through which a "business, financial operation, or venture" was conducted.

1.    Moline Properties Requires Recognition of Chemtech as an Entity

The Supreme Court's decision in *Moline Properties, Inc. v. Commissioner* established the standard for determining whether an entity has sufficient substance to be recognized for federal tax purposes:

> Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity *or* is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.

319 U.S. 436, 438-39 (1943) (emphasis added) (citations and footnotes omitted).  *Moline Properties* establishes a disjunctive test:  the entity is recognized for tax purposes if it is created for a business purpose *or* if it actually carries on a real business activity.  *See Skarda v. Comm'r*, 250 F.2d 429, 433-34 (10th Cir. 1957).  *Moline Properties* applies to entities that, if recognized,

65

will be classified as partnerships.  *See, e.g.*, *Campbell Cnty. State Bank, Inc. v. Comm'r*, 37 T.C.

430, 441-42 (1961), *rev'd on other grounds*, 311 F.2d 374 (8th Cir. 1963), *acq.* 1966-2 C.B. 4.

The same analysis that demonstrates that the Chemtech transactions had economic

substance also compels the conclusion that the Chemtech partnership satisfies the *Moline*

*Properties* standard.  There were non-tax business purposes for the formation of Chemtech—in

particular, enabling Dow to raise equity financing.  Chemtech's continuous ownership of

hundreds of millions of dollars in income-producing assets easily satisfies the minimal level of

business activity required to satisfy *Moline Properties*.[40]

> 2.    Because Chemtech Had Multiple Classes of Equity, the Existing
>        Regulations Require That It Be Respected as a Business Entity

In the mid-1980s, promoters began marketing transactions that offered investors multiple

classes of equity interests (such as preferred and common) in a fixed pool of assets.  The

promoters took the position that the arrangements were "trusts" rather than partnerships or

corporations for tax purposes.  The Treasury Department objected, asserting that the multiple

classes of interests enabled participants to achieve diverse investment objectives and justified

treating the arrangements as either partnerships or corporations in order to assure that income

would be properly taxed.  Therefore, it amended the entity classification regulations to require

that virtually all such multiple-class ownership arrangements be taxed as either corporations or

partnerships.  *See* Treas. Reg. § 301.7701-4(c)(1); T.D. 8080, 1986-1 C.B. 371.

The IRS has relied on these regulations to *require* taxpayers to treat multiple class

arrangements as partnerships, even when the classes represent investments in highly secure,

---

[40]    While Chemtech's income took the form of royalties and rents, numerous provisions of the
Internal Revenue Code recognize, as separate entities, corporations and partnerships formed
to generate passive income.  *See, e.g.*, I.R.C. §§ 851 (mutual funds), 856 (REITs), 7704(c)
(publicly traded partnerships deriving at least 90 percent of their income from passive
sources).

debt-like assets.  *See* T.A.M. 2006-50-017 (Aug. 18, 2006).  The IRS's treatment of such arrangements as partnerships is irreconcilable with the Government's litigating position in this case.  The 1986 regulations and the IRS's consistent interpretation of those regulations should eliminate any doubt as to whether Chemtech was a partnership.  Chemtech was unincorporated and had three separate classes of equity interests, which enabled its members to achieve diverse investment objectives.  Therefore, the entity classification regulations require that it be treated as a partnership.

> **B.      The Banks Were Partners**

Section 761(b) defines the term "partner" as "a member of a partnership."  As limited partners under Delaware law, the Banks satisfy this statutory definition.  Two separate lines of authority confirm this conclusion:  a subjective common-law standard and an objective statutory standard.

> 1.      The Banks Were Partners under the Common-Law Test of *Culbertson*

The common-law standard for determining partner status emanates from *Commissioner v. Culbertson*, 337 U.S. 733 (1949), the last of three Supreme Court decisions addressing the "family partnership" tax shelter.  The idea of the family partnership was simple:  transfer a profitable business to a partnership and give or sell interests in the partnership to relatives or close associates, thereby spreading the income among multiple lower-rate taxpayers and cutting the effective rate of tax on the partnership's income by up to 70 percent.  Although some of these partnerships served valid non-tax purposes (such as bringing a child into the business), many were purely tax motivated.

In *Culbertson* the family partnership included a father and four sons.  The Tax Court held that the sons were not partners, but the Fifth Circuit reversed.  In affirming the Fifth Circuit, the Supreme Court defined the question as "whether, considering all the facts . . . the parties in good

67

faith and acting with a business purpose intended to join together in the present conduct of the enterprise." 337 U.S. at 742. The Court based its reasoning on two disparate lines of analysis: (1) a subjective test derived from the non-tax common law of partnerships, and (2) the assignment-of-income doctrine, a tax-law concept that requires that income from capital be taxed to its owner. *See* 337 U.S. at 739-40.

The Fifth Circuit has made it clear that *Culbertson* does not permit the IRS or the courts to "substitute their ideas for what the partners ought, in creating the partnership, to have provided." *Marcus v. Comm'r*, 201 F.2d 850, 853 (5th Cir. 1953); *see also Scofield v. Davant*, 218 F.2d 486, 489 (5th Cir. 1955) ("Where fair and reasonable minds may differ as to whether the thing furnished was of sufficient substantial value to justify the admission of any partner, the court may not substitute its judgment for that of the contracting parties."). A partnership transaction will be upheld if it creates "real change" in the economic relations of the partners. *Seabrook v. Comm'r*, 196 F.2d 322, 327 (5th Cir. 1952). Consistent with the assignment-of-income principles underlying *Culbertson*, the Fifth Circuit has repeatedly rejected efforts by the IRS and the Tax Court to disregard a partner's status when the facts show the partner is the true owner of the interest. *See, e.g., Neil v. Comm'r*, 269 F.2d 563, 568-69 (5th Cir. 1959); *Estate of Dorsey v. Comm'r*, 214 F.2d 294, 300 (5th Cir. 1954); *Alexander v. Comm'r*, 190 F.2d 753, 755-56 (5th Cir. 1951); *Yost v. Comm'r*, 190 F.2d 131, 134 (5th Cir. 1951); *Ginsburg v. Arnold*, 185 F.2d 913, 915-16 (5th Cir. 1950).

The Banks were partners under *Culbertson*. Each "act[ed] with a business purpose" in investing in Chemtech. 337 U.S. at 742. They negotiated at arm's length to enter into a comprehensive partnership agreement; each contributed a substantial portion of the capital of the entity; and they held themselves out as partners. Because their ultimate return depended on the

68

results of partnership operations, they "had a share not only in the fruits but also in the tree on which it grew." *Neil*, 269 F.2d at 573.  They held and exercised certain management and voting rights consistent with their status as limited partners.  (*See* JX 2L § 5.3, CT00036523; JX3DD § 5.03, CT00057269.)[41]  The Banks vigorously pursued their gain participation rights upon exit from Chemtech I, disputing the valuation of the Patents Assets and calling on DESA to fulfill its fiduciary duty as General Partner.  (JX 673.)

The Government will contend that the Banks did not sufficiently participate in Profits and Losses to qualify as partners, but it is well settled that holders of preferred equity interests may qualify as partners under *Culbertson*.  In fact, in *Morris v. Commissioner*, 13 T.C. 1020, 1023-24 (1949), decided shortly after *Culbertson*, the Tax Court held that the owner of a preferred equity interest in a brokerage partnership was a partner under *Culbertson*, even though she provided no services to the partnership, did not participate in management, bore no losses, and received a fixed 6 percent return on her investment, plus a small interest in residual profits.  More recently, the Tax Court upheld the partner status of an investor whose interest was limited to a three percent preferred return.  *Historic Boardwalk Hall, LLC v. Comm'r*, No. 11273-07, 2011 WL 9078, at *20 (T.C. Jan. 3, 2011); *see also Hunt v. Comm'r*, 59 T.C.M. (CCH) 635, 641 (1990) (investor respected as partner even though other partners guaranteed the return of 98 percent of its capital contributions and a minimum return based on prevailing interest rates).

The Government relies heavily on the Second Circuit's opinion in *TIFD III-E, Inc.*, 459 F.3d at 240-41, for the proposition that an equity interest may be too debt-like to qualify as a partnership interest under *Culbertson*.  Notably, however, the Second Circuit did not reverse the

---

[41]  The Fifth Circuit previously has held that limited partners prohibited from participating in management and operations are nevertheless partners under *Culbertson*.  *See West v. Comm'r*, 214 F.2d 300, 304 (5th Cir. 1954) (failure of trust to exercise management rights had no legal significance due to nature of interest as partnership under Louisiana law).

trial court's holding that the partnership had economic substance and that that the disputed partnership interests were equity, and it remanded the case for a determination as to whether the holders of those interests were partners under section 704(e). *TIFD III-E, Inc.,* 459 F.3d at 241 n.19.[42]  Importantly, the Second Circuit based its *Culbertson* decision on its interpretation of certain features that are not present in Chemtech, including:  (a) "Exhibit E" payments that made the partnership self-liquidating over time, and  (b) hypothetical "Investment Accounts" that could cause the partners to receive liquidating distributions in excess of their capital account balances, leading the court to conclude that the investors were "guaranteed repayment of their initial investment at an agreed rate of return."  459 F.3d at 241.  As demonstrated above, the Class A Investors were not guaranteed the return of their capital investment or a specified return on that capital.  The Second Circuit's decision is inapplicable here.

Indeed, when administering the tax system the IRS itself applies a different standard for determining partner status than the one employed by the Second Circuit in *TIFD III-E.*  The IRS has issued published guidance making it clear that an equity investor will be treated as a partner for tax purposes even if its interest is "the economic equivalent of a variable-rate tax-exempt bond."  Rev. Proc. 2003-84, 2003-2 C.B. 1159, § 2.  Specifically, the IRS ruled that a partnership existed based on the presence of two classes of equity:  "interests that are entitled to a preferred variable return on its capital . . . and interests that are entitled to *all* of the remaining income of the partnership."  *Id.* (emphasis added).  Not only did the IRS hold that such arrangements *could* qualify as partnerships:  it *required* them to file partnership tax returns, reasoning that "if one class of partners has a right to partnership income that is superior to the right of another class of

---

[42]    On remand, the trial judge found that the requirements of section 704(e)(1) for partnership status were satisfied.  *TIFD III-E, Inc. v. United States*, 660 F. Supp. 2d 367, 395 (D. Conn. 2009).

partners, then the net partnership income or loss allocated to the partners with inferior rights to partnership income can be determined only by computing the net income or loss of the partnership and then by reducing that net income by income allocable to partners with superior rights to partnership income." *Id.* Revenue Procedure 2003-84 is completely consistent with the regulations that require classification of multiple-class investment arrangements as business entities. And it belies the Government's claims that the Class A Interests, which had substantially more residual participation than the preferred interests described in Revenue Procedure 2003-84, were not bona fide partnership equity.

> 2.     Section 704(e)(1) Requires Classification of the Banks as Partners

Section 704(e)(1) provides:

> A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

I.R.C. § 704(e)(1). Congress enacted the predecessor to current section 704(e)(1) in 1951 for the express purpose of providing an objective standard that would serve as an alternative to *Culbertson*'s intent-based standard.[43] As the Seventh Circuit has explained:

> The test is no longer whether the parties acted in good faith with a business purpose in joining together to conduct the partnership business. This was the test set forth in [*Culbertson*] . . . , which was decided before present § 704(e)(1) was a part of the Code.

*Pflugradt v. United States*, 310 F.2d 412, 415 (7th Cir. 1962) (citation omitted).

---

[43] Although section 704(e) appears under the caption "Family Partnerships," that caption is irrelevant to its scope. *See* I.R.C. § 7806(b); *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (section heading cannot limit plain meaning of statutory text). Courts uniformly have recognized that section 704(e)(1) applies beyond the family partnership context. *See, e.g.*, *Evans v. Comm'r*, 447 F.2d 547, 550 (7th Cir. 1971); *Madorin v. Comm'r*, 84 T.C. 667, 679 (1985); *Carriage Square, Inc. v. Comm'r*, 69 T.C. 119, 126 n.4 (1977). The IRS has long since conceded the issue. *See* 1978-2 C.B. 1 (acquiescing in Tax Court's decision in *Evans*).

The plain language of section 704(e)(1) requires recognition of the Banks as partners. As corporations, the Banks were "persons." I.R.C. § 7701(a)(1). They owned capital interests. They were the real owners of those interests. And capital was the *only* material income-producing factor in Chemtech. *See* Treas. Reg. § 1.704-1(e)(1).

a.     *The Class A Interests Were Capital Interests*

The regulations under section 704(e)(1) define the term "capital interest" as "an interest in the assets of the partnership, which is distributable to the owner of the capital interest upon his withdrawal from the partnership or upon liquidation of the partnership." Treas. Reg. § 1.704-1(e)(1)(v); *Johnston v. Comm'r*, 69 T.C.M. (CCH) 2283, 2286 n.5 (1995) (describing a capital interest as one which "includes the right to share in the capital of a partnership upon liquidation").

Upon withdrawal from or liquidation of Chemtech, the Banks were entitled to receive distributions based on the positive balance, if any, in their Capital Accounts. (*See* JX 2L § 12.2, CT00036565; JX 3DD § 12.02, CT00057292.) Therefore, the Class A Interests were capital interests.

b.     *The Banks Were the Real Owners of Their Interests*

To be respected as a partner under section 704(e)(1), the owner of a capital interest must be the "real owner" and must have "dominion and control of" the interest. Treas. Reg. § 1.704-1(e)(1)(iii). The Banks possessed and exercised full dominion and control over their capital interests in Chemtech. They conducted extensive negotiations with Dow over the terms of their interests. They had the right to liquidate or sell their interests, subject to limited restrictions. They participated in annual member meetings, and received quarterly and annual certifications and partnership financial statements. They engaged in negotiations over various transactions that could affect Chemtech's business. They received regular distributions of their share of

partnership income, which under the regulations constitutes "substantial evidence" of the reality

of their ownership.  Treas. Reg. § 1.704-1(e)(2)(v).  As the dispute relating to the 1998 purchase

of the initial Banks' interests demonstrates, the Banks vigorously enforced their rights under the

Partnership Agreement.  They were the real owners of their interests for all tax purposes,

including section 704(e)(1).

        c.      *Capital Was a Material Income-Producing Factor in Chemtech*

Capital is considered a material income-producing factor "if a substantial portion of the

gross income of the business is attributable to the employment of capital in the business

conducted by the partnership."  Treas. Reg. § 1.704-1(e)(1)(iv).  Chemtech's income consisted

entirely of income from its ownership of assets, either royalties earned from the Patent Assets

(Chemtech I), or rent from the Plant Assets (Chemtech II).  Chemtech generated no material fees,

commissions, or other personal services income.  Capital was a material income-producing

factor—indeed, the *only* material income-producing factor—in Chemtech.

        d.      *The Government's Arguments Are Incompatible with the Plain*
                  *Text of the Statute, Its Legislative History, and the Consistent Line*
                  *of Case Authority*

The Government seeks to avoid the import of the unambiguous statutory text by

conjuring up a hodge-podge of irrelevant and unsustainable assertions.  Its principal technical

argument is that section 704(e)(1) applies only to transfers of interests in preexisting partnerships

between related parties.  (*See* Gov't PFOF ¶¶ 485-87.)  The plain language of the statute refutes

the Government's "interpretation," as the Seventh Circuit determined almost 40 years ago:

> We cannot agree that in making family partnerships subject to general partnership
> principles, Congress intended to limit § 704(e)(1) to family partnerships derived
> by gift rather than purchase.

*Evans v. Comm'r*, 447 F.2d 547, 550 (7th Cir. 1971), *acq.* 1978-1 C.B. 7.  As the Seventh Circuit

observed, the history of the statute compels this conclusion:  section 704(e)(1) "derives

unchanged from § 3797(a)(2) of the 1939 Code which is a *general definition applicable to all partnerships*." *Id*. (emphasis added).[44]

Despite *Evans*, the Government represents there is no case law support for applying section 704(e)(1) as an alternative to *Culbertson*. (*See* Gov't PFOF ¶ 156.) In fact, as the Government surely must know, the Seventh Circuit's decisions in *Pflugradt* and *Evans*, as well as decisions of the Tax Court and the Ninth Circuit, all recognize section 704(e)(1) as an alternative to *Culbertson*. *See Poggetto v. United States*, 306 F.2d 76, 79 (9th Cir. 1962); *Cirelli v. Comm'r*, 82 T.C. 335, 348 (1984); *Carriage Square, Inc.*, 69 T.C. at 128; *Smith v. Comm'r*, 32 T.C. 1261 (1959), *acq*., 1960-2 C.B. 7. The Government cites no judicial authority to support its contorted interpretation of section 704(e)(1) because none exists. *See* Ethan Yale, *Defining 'Partnership' For Federal Tax Purposes*, 131 Tax Notes (TA) 589 (May 9, 2011) (referring to Government's litigating positions on section 704(e)(1) as "misguided" (quotation at 589), "nonsensical" (quotation at 595), and "unsupportable" and "folly" (quotations at 599)).

### C.    The Tax Benefits of the Partnership Form Are Irrelevant to Classification of the Banks As Partners

The Government objects to treating the Banks as partners because of the tax consequences that result. It is well settled, however, that taxpayers may form a partnership for

---

[44]    In an apparent effort to limit the damage wrought by *Evans* on its position, the Government calls it a "family partnership" case. (*See* Gov't PFOF ¶ 489.) That characterization is simply not true. In *Evans*, the IRS argued that section 704(e)(1) could not apply because the partnership was *not* a family partnership. In holding that section 704(e)(1) applied, the Tax Court specifically found that the case "*does not involve a 'family partnership*.'" *Evans v. Comm'r*, 54 T.C. 40, 51 (1970), *aff'd*, 447 F.2d 547, 550 (7th Cir. 1971), *acq.* 1978-1 C.B. 7 (emphasis added). On appeal, the Seventh Circuit decisively rejected the IRS's effort to limit section 704(e)(1) to family partnerships. Had the partnership at issue been a "family partnership," it would have been unnecessary for the Seventh Circuit to consider whether the statute applies to non-family arrangements. The opinions of the Tax Court and Seventh Circuit demonstrate that both courts (and the litigants) recognized that the case did not involve a family partnership.

the principal purpose of minimizing their tax liability, as long as the partnership meets the statutory standard of section 761.  In the words of the Fifth Circuit:  "[I]f a taxpayer actually carries on business in the chosen form, the tax collector may not deprive him of the incidental tax benefits flowing therefrom."  *Friedlander Corp. v. Comm'r*, 216 F.2d 757, 758 (5th Cir. 1954); *see Chisholm v. Comm'r*, 79 F.2d 14 (2d Cir. 1935) (motive irrelevant where partnership had objective economic reality and substance).  The existing Treasury Regulations acknowledge this principle.  *See* Treas. Reg. § 1.701-2(d), Ex. 4(i) (formation of new partnership *solely* to defer taxable gain determined to be consistent with the intent of subchapter K).  As a matter of law, the Government's tax-motive assertions are irrelevant to whether Chemtech was a partnership.

Some recent cases have refused to recognize tax-motivated partnership transactions where the entity lacked any discernable non-tax business purpose.  In *ASA Investerings Partnership v. Commissioner*, 201 F.3d 505, 512 (D.C. Cir. 2000), the District of Columbia Circuit held that a putative partnership would be disregarded for federal income tax purposes, based on "the absence of a nontax business purpose."  *See also Boca Investerings P'ship v. United States*, 314 F.3d 625, 632 (D.C. Cir. 2003); *Saba P'ship v. Comm'r*, 273 F.3d 1135, 1141 (D.C. Cir. 2001).  The D.C. Circuit found no evidence of *any* non-tax business purpose for the larger transactions in any of those three cases, much less for the formation of the partnership to implement the transactions.  *See*, *e.g.*, *Boca*, 314 F.3d at 632 ("[T]he record would not support a finding that the partnership form served any non-tax business purpose."); *Saba*, 273 F.3d at 1141; *ASA*, 201 F.3d at 513-16.  The sole purpose of these partnership transactions, which were substantially identical transactions developed by Merrill Lynch, was to generate a non-economic taxable loss.  Thus, the overall transactions lacked economic substance, and the purported

partnerships failed to satisfy the basic requirements for recognition as a separate entity under *Moline Properties*. These cases bear no resemblance to Chemtech.

The facts demonstrate that Dow had non-tax business purposes for seeking investments structured to qualify as minority equity, rather than debt, on its consolidated financial statements. Like any prudent business, Dow structured those investments in a way that would achieve its non-tax purposes while minimizing its overall tax cost. But this tax planning is entirely legitimate and permissible. As the legislative history to section 704(e)(1) makes clear, if the ownership of a partnership interest is real, "*it does not matter what motivated the transfer*." H.R. Rep. No. 82-586, at 32 (1951) (emphasis added) (attached hereto as Exhibit F); S. Rep. No. 82-781, at 39 (1951) (emphasis added) (attached hereto as Exhibit G). The section 704(e)(1) Regulations confirm that objective reality is dispositive. *See* Treas. Reg. § 1.704-1(e)(2)(x) ("If the reality of the transfer of interest is satisfactorily established, the motives for the transaction are generally immaterial.").

### D.      Conclusion

In an early case involving a dispute over recognition of a partner, the Fifth Circuit chastised the Tax Court and IRS for relying on conclusory allegations and labels rather than factual analysis. *See West v. Comm'r*, 214 F.2d 300, 302 (5th Cir. 1954). The Government is trying to reprise that strategy here. There is no principled distinction between the Class A Interests and preferred equity routinely respected as equity by the IRS, yet the Government argues for a different result in this case merely because it dislikes the tax results. The courts and the IRS itself have repeatedly affirmed the right of taxpayers to form partnerships and corporations to implement business transactions, even when the sole animating purpose for forming the new entity was to avoid a tax liability that otherwise would have resulted.

76

Chemtech falls easily within this established precedent.  Its formation was necessary to achieve Dow's substantial non-tax business objectives of raising capital and achieving minority equity treatment.

## IV.    THE ALLOCATION OF CHEMTECH I'S INCOME COMPLIED WITH THE MANDATES OF SECTION 704

Partnerships are not subject to federal income tax; instead, each partner is taxed on its allocable share of the partnership's income, gains, deductions and losses.  I.R.C. §§ 701, 702. Because the fair market value of the Patent Assets was much higher than their tax basis, the Partnership's book basis for amortization substantially exceeded its basis for computing tax depreciation.  This difference caused Chemtech's taxable income to exceed its book or economic income.  Because of their Priority Return, the Class A Investors were allocated more than 90 percent of the Partnership's book income, which under the regulations allocated to them more than 90 percent of its taxable income.  The Government objects to the allocation of this excess taxable income to the Class A Investors and seeks to reallocate this income to the Dow partners. But the Government's reallocations violate its own regulation adopted under Code section 704(c), which governs when excess taxable income from contributed property may be reallocated to the contributing partner.  The regulations under section 704(c) contained a specific rule, known as the Ceiling Rule, which expressly prohibits the reallocation the Government urges here.

### A.    Sections 704(b) and 704(c) Govern the Allocation of Chemtech I's Income

As explained above, partnerships are not subject to federal income tax; instead, each partner is taxed on its share of the partnership's income, gains, deductions and losses.  I.R.C.

§§ 701, 702.  The allocation of a partnership's income among its partners is governed by two

Code provisions:  section 704(b) and section 704(c).[45]

Section 704(b) applies to a partnership's economic or "book" income and requires that

this income be allocated among the partners based on their economic agreement.  Allocations of

book income under section 704(b) adjust the partners' capital accounts and thus affect their

economic stake in the partnership.  Section 704(b) does not directly allocate taxable income, but

allocations of taxable income items follows the allocations of the related book items.

Section 704(c) applies when a partner contributes property that has a built-in gain or loss

(i.e., a tax basis that differs from its fair market value).  In general terms, section 704(c) requires

that tax items attributable to built-in gain or loss be allocated solely to the partner who

contributed the built-in gain or loss assets, thereby preventing the contribution from shifting the

tax consequences of the built-in gain or loss to the other partners.  The Ceiling Rule limits the

amount of tax items attributable to built-in gain that can be allocated to the contributing partner.

Section 704(c) does not apply to allocations of book income and has no impact on the partners'

capital accounts or their economic interests in the partnership.

Section 704(c) is best understood by comparing the consequences of a purchase of

property by a partnership to a contribution of property.  When a partnership buys property, it

enters the property on its books at cost and uses this "book value" to compute its future section

704(b) gain or loss from the property.  If the property is depreciable, the partnership determines

its section 704(b) book income by computing depreciation based on the book value of the

---

[45]   The following sources explain the interaction between section 704(b) and the section 704(c)
rules in effect at the time of the Chemtech I transaction:  John P. Steines, Jr., *Partnership
Allocations of Built-in Gain or Loss*, 45 Tax L. Rev. 615 (1990);  Lawrence Lokken,
*Partnership Allocations*, 41 Tax. L. Rev. 547 (1986); William S. McKee, William F. Nelson
& Robert L. Whitmire, *Federal Taxation of Partnerships and Partners* § 10.02[2][c][iii] (2d
ed. 1990) (attached hereto as Exhibit H).

property.  Because the property's tax basis equals its cost, the partnership's book and tax depreciation deductions are identical.

When a partner contributes property to a partnership, the partner's capital account is credited with the fair market value of the contributed property.  Treas. Reg. § 1.704-1(b)(2)(iv)(*b*).  This value becomes the partnership's initial book value, which is thereafter used to compute the partnership's book income, including its book amortization or depreciation.  Treas. Reg. § 1.704-1(b)(2)(iv)(*g*)(*1*).  For tax purposes, however, the partnership inherits the contributing partner's tax basis in the property.  *See* I.R.C. § 723.  The difference between initial book value and tax basis will create disparities between the partnership's book income (which ignores the built-in gain or loss) and its taxable income (which reflects the built-in gain or loss).  Section 704(b) governs the allocation of book income; section 704(c) governs the allocation of the gap between book and taxable income.

The following example illustrates the relationship between sections 704(b) and (c).[46]  A and B form an equal partnership.  A contributes depreciable property with a tax basis of $400, a value of $1,000, and a built-in gain of $600.  B contributes cash of $1,000.  Pursuant to the section 704(b) Regulations, the partnership's initial books show $2,000 of assets and $2,000 of capital, but the partnership's tax basis in its assets is only $1,400, creating a book/tax disparity of $600.  Treas. Reg. §§ 1.704-1(b)(2)(iv)(*b*)(*2*), (*d*)(*1*).  Because the contributed property is depreciable on a straight-line basis over 10 years, the section 704(b) Regulations require the partnership to take a $100 book depreciation deduction each year in computing its book

---

[46]  This example is derived from an example in the section 704(c) Regulations issued in 1956, which apply to the Chemtech I transaction.  *See* Treas. Reg. § 1.704-1(c)(2)(i), Ex. 1 (1956) (attached hereto as Exhibit I).  The example survives, in modified form, as Example 1(ii) of Treas. Reg. § 1.704-3(b)(2).

income,[47] but the tax depreciation of the contributed property is only $40. The initial $600

book/tax disparity will cause the partnership's taxable income to exceed its book income by $60

per year over the 10-year life of the asset. This excess taxable income is not attributable to the

partnership's economic results and has no impact on any partner's economic interest in the

partnership. It is attributable entirely to the built-in gain in the property at the time of its

contribution by A. Thus, section 704(b) governs the allocation of the partnership's $100 annual

book depreciation deduction. Section 704(c) provides the rules to allocate the $40 of available

tax depreciation to account for the $60 difference between book and tax depreciation.

The contribution of the Patent Assets to Chemtech I created a book/tax difference

between the initial book value of the Patent Assets ($867 million) and their tax basis ($53,345).

(JSOF ¶¶ 25(o), 62.) The taxable income that the Government seeks to reallocate was

attributable *entirely* to built-in gain in the contributed Patent Assets. Section 704(c)—not section

704(b)—governs allocations of this taxable income. Inexplicably, the Government's proposed

findings never mention section 704(c) or the Ceiling Rule established by the legislative history of

section 704(c) and the section 704(c) Regulations that apply to the Chemtech I transaction.

### B.    The Section 704(c) Ceiling Rule Applies to the Contributions of the Patent Assets to Chemtech I

When Congress first codified the existing partnership tax rules in 1954, it gave extensive

consideration to the allocation of tax items attributable to built-in gain and built-in loss property

to partnerships. Section 704(c)(2) permitted, but did not require, partnerships to allocate built-in

---

[47]    Treas. Reg. § 1.704-1(b)(2)(iv)(*g*)(*1*) (requiring maintenance of partners' capital accounts based on allocations of depreciation "as computed for book purposes").

gain or loss items to the contributing partner.[48]  But the legislative history limited the partners'

ability to allocate taxable items to the partner who had contributed the built-in gain or loss asset:

> In any case, however, the total gain, loss, or depreciation allocated to the [contributing] partners *may not differ* from the amount of gain or loss realized by the partnership, or the depreciation or depletion allowable to it.

S. Rep. No. 83-1622, at 381 (1954).  This rule is generally referred to as the "Ceiling Rule,"

because it caps the amount that may be specially allocated under section 704(c).

The Senate Committee Report for the 1954 Code includes the example (described in the

preceding section) that illustrates the application of the Ceiling Rule to depreciable property.

Again, A and B form an equal partnership.  A contributes property with a value of $1,000 and a

tax basis of $400; B contributes $1,000 cash.  The property contributed by A depreciates at an

annual rate of 10 percent.  The Committee Report states:

> Since B, who contributed $1,000 in cash, has, in effect, purchased an undivided half interest in the property for $500, and since the property depreciates at an annual rate of 10 percent, B should be entitled to a deduction of $50 per year.  But since the partnership is allowed only $40 per year (10 percent of $400), no more than this amount may be allocated to B.

S. Rep. No. 83-1622, at 381 (1954).  Because the partnership is prohibited from allocating more

than $40 of tax depreciation to B, the inevitable result is to overstate B's taxable income by $10

(the difference between the $40 of depreciation that B actually receives and the $50 of book

depreciation that B should have received).

The regulations promulgated in 1956 implemented the Ceiling Rule.  Treas. Reg.

§ 1.704-1(c)(2) (1956) (attached hereto as Exhibit I).  The 1956 Regulations make clear that the

partnership cannot create additional tax depreciation to bridge the gap and cannot reallocate

---

[48]  Under section 704(c)(1) of the 1954 Code, the general rule required that all tax items attributable to built-in gain or loss items be allocated in the same manner as the associated book items, even though the result was to shift the tax burden attributable to the built-in gain (or tax benefit, in the case of a built-in loss) to noncontributing partners.

other items of taxable income or deduction to compensate B for the shortfall.  *See* Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 87.3.2 (3d ed. 2003) ("The ceiling rule, however, bars this approach.") (attached hereto as Exhibit J).  These regulations include an example confirming that when a contribution of built-in gain property triggers the Ceiling Rule, the taxable income of the *non*contributing partner will exceed its share of the partnership's book income.  These regulations apply to the Chemtech I transaction, and the example describes the result in Chemtech I, where the taxable income allocated to the Class A Investors exceeded their book income because their share of tax depreciation was capped by the Ceiling Rule.

In 1984, Congress amended section 704(c) by requiring that all partnerships allocate tax items attributable to built-in gain or loss in contributed property to the contributing partner.  Essentially, the 1984 legislation made the elective provision (section 704(c)(2)) into the general rule, but did not disturb the Ceiling Rule.  The legislative history to the 1984 amendments suggested that "it *may* be appropriate" for the Treasury to modify the Ceiling Rule, but made clear that any regulatory changes should be prospective.  S. Rep. No. 98-169, vol. 1, at 215 n.2 (1984) (emphasis added).  After lengthy consideration, the Treasury Department issued proposed regulations in 1992.  57 Fed. Reg. 61,345 (Dec. 24, 1992).  Consistent with the 1984 legislative history, Treasury stated that the new rules would apply only to contributions of property made after the promulgation of final regulations.  The proposed regulations were highly controversial, and it took another year for the Treasury to issue final regulations.  The final regulations, effective December 21, 1993, differed substantially from the proposed regulations issued the prior year, reflecting the complexity of the issues associated with built-in gains and losses.  T.D. 8500, 1994 C.B. 183.  It is undisputed that the 1993 regulations do not apply to Chemtech I.

**C.    The Ceiling Rule Governs the Allocation of Taxable Income to the Class A Investors in Chemtech I**

As explained above, the Partnership's initial book value in the Patent Assets was $867 million, but its initial tax basis in the Patent Assets was only $53,345.  (JSOF ¶¶ 25(o), 62.)  This created a difference between the Partnership's book income and its taxable income—a difference that is governed by section 704(c) and the Ceiling Rule.

A review of the allocation of Chemtech I's book income and taxable income for 1994, its first full year of operation, shows the impact of section 704(c) and the Ceiling Rule.  Chemtech I had $14,795,535 of book income (designated "Profits" in the Partnership Agreement), but $122,407,828 of taxable income.  (*See* Joint Fin. Stip. A-4, B-2.)  The Class A Investors' Priority Return accounted for well over 90 percent of the Partnership's book income, and therefore they received a commensurate share of the Partnership's book income and of its taxable income:

|  | Partnership Book Income | Class A Partners' Share (93.958%) | Partnership Taxable Income | Class A Partners' Share of Taxable Items |
|---|---|---|---|---|
| Royalties | $   143,259,731 | $ 134,604,193 | $  143,259,731 | $   134,604,193 |
| Amortization | (107,617,137) | (101,115,071) | (4,844) | (4,844) |
| Guaranteed Payments | (19,958,423) | (18,752,565) | (19,958,423) | (18,752,565) |
| Fees & Expenses | (891,054) | (837,217) | (891,054) | (837,217) |
| Other Income | 2,418 | 2,271 | 2,418 | 2,271 |
|  | $     14,795,535 | $   13,901,611 | $  122,407,828 | $  115,011,838 |

As this chart illustrates, the allocation of book income to the Class A Partners carried with it a pro rata share of each item included in the computation of the Partnership's "bottom line" book income (including royalties and book amortization).  Since the Class A Partners were allocated 93.958 percent of the Partnership's bottom-line book income, they were also allocated

93.958 percent of each item of income and deduction included in the Partnership's bottom-line book income. *See* Treas. Reg. § 1.704-1(b)(1)(vii).[49] Each item of book income allocated to the Class A Partners carried with it the correlative taxable item. Thus, for example, the Class A Partners' share of taxable royalties was equal to their share of book royalties ($134,604,193).

Because of the built-in gain in the contributed Patent Assets, there was a substantial difference between the Partnership's book amortization deduction ($107,617,137) and its tax deduction for amortization ($4,844). Section 704(c) required that the Partnership allocate the first $101,115,071 in tax amortization deductions to the Class A Partners, but the Ceiling Rule limited the section 704(c) allocation to the Partnership's total tax deduction for amortization ($4,844). The Ceiling Rule prohibited Chemtech I from creating additional tax amortization to allocate to the Class A Partners or from reallocating other taxable income (such as royalties) from the Class A Partners to Dow. *See* Treas. Reg. § 1.704-1(c)(2) (1956) (last sentence). Therefore, the total taxable income allocated to the Class A Partners exceeded the book income allocated to them.

The same allocation of taxable income would have resulted had the Class A Partners been U.S. taxpayers. Although a U.S. taxpayer would have paid tax on the income allocated to it by reason of the Ceiling Rule, under section 705, the additional taxable income would have

---

[49]    The Government repeatedly mischaracterizes the Chemtech I transaction as a "lease strip." (*See* Gov't PFOF ¶¶ 4-5, 135, 392, 593.) According to the IRS, a lease strip is a transaction that separates the income from renting property from the related deductions such as depreciation and maintenance. *See* Notice 95-53, 1995-2 C.B. 334. As the 1994 chart above illustrates, no such separation occurred in Chemtech I: the royalties from licensing the Patent Assets and all related expenses were allocated together as part of the Partnership's bottom-line income. The Government's fixation on the costs incurred by Dow in prior years to develop the patents is irrelevant to whether the contribution of those assets to Chemtech is respected. *See Eli Lily & Co. v. Comm'r*, 84 T.C. 996, 1125 (1985), *aff'd in part and rev'd in part*, 856 F.2d 855 (7th Cir. 1988) (rejecting effort by IRS to attribute income earned by subsidiary from ownership of patents to the parent company that had contributed the patents to the subsidiary).

increased its tax basis in its partnership interest.  Upon a sale or liquidation of its interest, a U.S.

taxpayer would have recognized a taxable loss exactly offsetting the excess taxable income

previously allocated to it under the Ceiling Rule.  Thus, had the Class A Investors been U.S.

taxpayers, the excess taxable income shifted to them by the Ceiling Rule would have been

reversed by a taxable loss on the sale of the Class A Interests in 1998.

The consequences of the Ceiling Rule were well understood by Congress, practitioners

and the IRS.  As one contemporaneous article noted, "the ceiling rule is a pervasive obstacle to

satisfying the objectives of § 704(c), often causing it to fall far short of its mark."  Steines, *supra*

note 45, at 647.[50]  When it issued proposed regulations in 1992, the IRS acknowledged the very

consequences of the Chemtech I transaction:

> The traditional method retains the "ceiling rule."  The ceiling rule provides that
> the total amortization . . . depreciation . . . allocated to the partners cannot exceed
> the amount of the partnerhship's amortization . . . [or] depreciation . . . .  Thus,
> under the traditional method there may be insufficient partnership tax deductions
> to allow noncontributing partners to be allocated tax deductions equal to their
> share of book deductions.  This consequence of the ceiling rule may prevent
> elimination of the entire effect of the disparity between the fair market value and
> adjusted basis in the partnership for the contributing partner and may create a
> disparity for the noncontributing partners.  *The proposed regulations retain the
> traditional method despite this potential for distortion . . . .*

Notice of Proposed Rulemaking, 57 Fed. Reg. 61,345-46 (Dec. 24, 1992) (emphasis added).

While the Government repeatedly complains that the Class A Partners' shares of taxable

income exceeded their shares of book or economic income, that was the inevitable—and

intended—consequence of the Ceiling Rule.  Without citing or discussing the Ceiling Rule or the

1956 Regulations that dictate the tax results of the Chemtech I transaction, the Government turns

instead to the section 704(b) Regulations, alleging that the substantial economic effect test

---

[50]   In referring to the pervasive impact of the Ceiling Rule, the same commentator stated that "it
is not extreme to think that the ceiling is hit in over half of the contributions to and purchases
of interests in partnerships."  *Id.*

requires the reallocation of royalty income from the Banks to Dow to "cure" the alleged

distortion. This effort fails for two reasons. First, it violates the purposes and limits of the

section 704(b) regulations, which deal exclusively with book or economic income. Second, the

Government's proposed cure looks uncannily like the "curative allocation" regime adopted in the

1993 section 704(c) regulations, even though the 1993 Regulations cannot apply to the Chemtech

I transaction and, even if they did apply, would have no effect on the allocation of Chemtech's

704(b) income. Treas. Reg. §§ 1.704-1(b)(1)(vi), -1(b)(2)(iv).

### D.    The Allocation of Chemtech I's Profits Had Substantial Economic Effect

As explained above, the Ceiling Rule prohibits the IRS from using section 704(c) to

reallocate taxable income from the Class A Investors to the Dow partners. Therefore, the only

way to reduce the Banks' share of taxable income is to reduce the amount of book income

allocated to them under section 704(b). A reduction in the book income allocated to the Class A

Partners would result in a proportionate reduction in the excess taxable income allocated to them.

In general, allocations of book items contained in the partnership agreement must be

respected under section 704(b) if they have "substantial economic effect." If an allocation lacks

substantial economic effect, the book item is allocated according to the "partner's interest in the

partnership" or "PIIP" standard. While the section 704(b) Regulations are intricate, they reflect a

fundamental principle. A partnership's items of book income must be allocated so that, if the

partnership sold its assets for cash equal to their current book value and liquidated, each partner

would receive an amount equal to the sum of its contributions to the partnership and the

cumulative allocations of book income it has received, reduced by prior distributions and

cumulative allocations of book loss. In other words, partners must be allocated book income

equal to their economic profit (or loss) as reflected in their capital accounts. *See* Treas. Reg.

§§ 1.704-1(b)(2)(ii)(*b*)(*2*), -1(b)(3)(ii); *see also* Daniel L. Simmons, *Built-in Gain and Built-in Loss Property on Formation of a Partnership: An Exploration of the Grand Elegance of Partnership Capital Accounts*, 9 Fla. Tax Rev. 599, 605 (2009) ("Properly maintained capital accounts designate the interest of each partner in the assets of a partnership at any point in time."). The regulations under section 704(b) create a two-part test for determining whether an allocation has substantial economic effect: (1) the allocation must have "economic effect," and (2) that economic effect must be "substantial." Treas. Reg. § 1.704-1(b)(2).

       1.     <u>The Allocation of Chemtech I's Income Had Economic Effect</u>

The economic effect standard requires that, if an item of partnership income has a corresponding economic benefit, the partner who receives the allocation must also receive that economic benefit. Conversely, a partnership deduction or loss must be allocated to the partner or partners who bear the corresponding economic burden. Treas. Reg. § 1.704-1(b)(2)(ii)(*a*). The regulations include a three-part economic effect test and an alternate test for economic effect. The Chemtech partnership agreement satisfied the alternate test: (i) it required the maintenance of capital accounts; (ii) liquidating distributions were required to be made in accordance with the partners' capital accounts; and (iii) the general partner was required to restore any deficit in its capital account upon liquidation of its interest (commonly referred to as a deficit restoration obligation or "DRO") and each limited partner was subject to a "qualified income offset." *Compare* Treas. Reg. § 1.704-1(b)(2)(ii)(*d*), *with* JX 2L § 1.10, CT00036482 ("capital account"); § 12.2(e), CT00036566-67 (DRO); § 3.3(a), CT00036512 (qualified income offset.)

The section 704(b) Regulations contain elaborate requirements for the maintenance of capital accounts, including the computation of "book income" and allocation of that book income to the partners' capital accounts. *See* Treas. Reg. § 1.704-1(b)(2). As explained above, the only difference between Chemtech I's book income and its taxable income was the difference

between book amortization and tax amortization.  As required by the section 704(b) Regulations, Chemtech recorded the Patent Assets on its books at their fair market value on the contribution date.  Treas. Reg. §§ 1.704-1(b)(2)(iv)(*b*), -1(b)(2)(iv)(*g*)(*1*).  It then used this "book value" to compute its book amortization, consistent with the mandatory rules under section 704(b).  Treas. Reg. §§ 1.704-1(b)(2)(iv)(*d*)(*3*), (*f*)(*3*).  The section 704(b) Regulations require that partnerships use book depreciation and amortization to maintain capital accounts because, in the words of a leading treatise, "only allocations of book depreciation have economic effect.  The difference between tax and book depreciation is a tax item that has no economic significance apart from taxes."  Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 87.3.2 (3d ed. 2003); *see* Treas. Reg. § 1.704-1(b)(5), Ex. (14).

In asserting that the allocation of Chemtech's income lacked economic effect, the Government states that "the banks are allocated a majority of the taxable income, but they did not receive any economic benefit that corresponds to that allocation."  (Def.'s Resp. to Pl.'s Interrog. #17) (attached hereto as Exhibit K).[51]  The Government's position is wrong, both legally and economically.  As explained above, the difference between the taxable income and the economic income allocated to the Class A Investors is attributable entirely to the built-in gain in the Patent Assets.  The regulations could not be clearer that *any* allocation of this built-in taxable gain "cannot have economic effect since it cannot be properly reflected in the partners' book capital accounts."  Treas. Reg. § 1.704-1(b)(5), Ex. (14).  The Government fumbles the analysis because it applies the right standard (economic effect) to the wrong income (built-in gain governed by section 704(c)).

---

[51]  In its PFOF, the Government makes a different complaint:  that the banks "did not bear any economic burden [sic] from the allocation of high amounts of the taxable income."  (Gov't PFOF ¶ 564.)

When that standard is applied to the right income (section 704(b) book income), it immediately becomes clear that the allocations to the Class A Investors had economic effect. Every dollar of royalty income allocated to the Banks was reflected in a credit to their Capital Accounts and resulted in a commensurate economic benefit to them. The Banks also bore the detriment of the book amortization allocated to them. While the book amortization was not matched by tax deductions for amortization, the section 704(b) Regulations *require* that the book/tax difference in amortization be ignored in applying the economic effect test.

Those regulations expressly state that an allocation "*will* have economic effect" if the partnership agreement satisfies the three-part capital account test throughout the term of the partnership. Treas. Reg. § 1.704-1(b)(2)(ii)(*b*) (emphasis added). The Partnership Agreement's compliance with all three elements of this test is dispositive of the economic effect issue. Because the Government's argument cannot be sustained without invalidating its own section 704(b) Regulations, it is incorrect as a matter of law.

2.     <u>The Economic Effect of the Book Income Allocation Was "Substantial"</u>

An allocation that has "economic effect" may be disregarded if the economic effect of the allocation is not "substantial." Treas. Reg. § 1.704-1(b)(2)(iii). The economic effect of an allocation is substantial "if there is a reasonable *possibility* that the allocation . . . will affect substantially the dollar amounts to be received by the partners from the partnership, independent of tax consequences." *Id*. (emphasis added). Thus, substantiality is an *objective* standard—it does not permit the IRS to disregard an allocation merely because it dislikes the tax result.

The economic effect of an allocation is not substantial if it reduces the partners' aggregate tax liabilities without materially altering their expected pre-tax economic results. The section 704(b) Regulations contain three specific rules that govern such cases. Two of these rules are irrelevant here: allocations with "shifting tax consequences" (Treas. Reg. § 1.704-

89

1(b)(2)(iii)(*b*)) and "transitory allocations" (Treas. Reg. § 1.704-1(b)(2)(iii)(*c*)).  The

Government seeks to apply the third rule, the "overall-tax-effect test":

> [T]he economic effect of an allocation (or allocations) is not substantial if, at the time the allocation becomes part of the partnership agreement, (1) the after-tax economic consequences of at least one partner may, in present value terms, be enhanced compared to such consequences if the allocation (or allocations) were not contained in the partnership agreement, and (2) there is a strong likelihood that the after-tax economic consequences of no partner will, in present value terms, be substantially diminished compared to such consequences if the allocation (or allocations) were not contained in the partnership agreement.

Treas. Reg. § 1.704-1(b)(2)(iii)(*a*) (1993) (attached hereto as Exhibit L).  (Gov't PFOF ¶ 560.)

The overall-tax-effect test requires a comparison between the likely after-tax

consequences of the tested allocation and the likely after-tax consequences of a baseline

allocation, specifically, how the item would have been shared if the tested allocation were not

contained in the partnership agreement.  The parties agree that the appropriate baseline is PIIP,

which the regulations define as "the manner in which the partners have agreed to share the

economic benefit or burden (if any) corresponding to the income, gain, loss, deduction, or credit

(or item thereof) that is allocated."  Treas. Reg. § 1.704-1(b)(3).  Thus, the baseline used to apply

the overall-tax-effect test must reflect the parties' economic bargain.

Example (5) of the section 704(b) Regulations illustrates the application of the overall-

tax-effect test.  Treas. Reg. § 1.704-1(b)(5), Ex. (5).  Example (5) involves a two-member

partnership.  Partner I, is in a high tax bracket and J is in a low tax bracket.  They contribute

equal amounts and generally share profits and losses equally.  At formation, a "strong

likelihood" exists that the partnership will receive between $450 and $550 annually in taxable

investment income and a comparable amount in tax-exempt investment income.  I and J allocate

80 percent of the tax-exempt income to I, while J receives 20 percent of the tax-exempt income

and 100 percent of the taxable income.  The example assumes that, absent tax considerations, I

90

and J would have agreed to share the taxable and tax-exempt income 50/50.  When compared to this 50/50 baseline, the special allocations are likely to enhance I's after-tax position, and there is a substantial likelihood that J's after-tax return will not be substantially diminished.[52]  Therefore, the economic effect of the special allocations is not substantial.

Example (5) demonstrates that the baseline used to apply the overall-tax-effect test must reflect the parties' economic deal.  It uses a 50/50 baseline that reduces J's share of dividends and taxable interest but increases J's share of tax-exempt interest so that J's overall share of the partnership's expected book income remains the same.  In contrast to Example (5), Chemtech I did not specially allocate different classes of income among its partners; indeed, unlike Example (5), there is only one category of income that can be taken into account in applying the overall-tax-effect test:  Profits.[53]  Thus the allocation of profits, which included the Priority Return allocation to the Class A Investors was in fact the only available baseline.  Since it is mathematically impossible to construct an alternative baseline, Chemtech I's allocation of Profits necessarily satisfies the overall-tax-effect test.[54]

---

[52]  The example's premise is that I is better off trading 50 percent of the taxable income for 30 percent of the tax-exempt income.

[53]  The Partnership Agreement contained a separate allocation for Gains from Capital Transactions, but the regulations require that these potential gains be ignored in applying the overall-tax-effect test.  Treas. Reg. § 1.704-1(b)(2)(iii)(c) (final three sentences) (the "value equals basis" rule).

[54]  The section 704(b) Regulations contain one other example that illustrates the overall-tax-effect test.  Treas. Reg. § 1.704-1(b)(5), Ex. (9).  Example (9) applies the overall-tax-effect test to strike down disproportionately high allocations of income to a partner that has a net operating loss (NOL).  The quid pro quo for the disproportionately high allocation of income to the NOL partner is a delay in the distribution of the income for many years, which substantially reduces the present value of the allocated income to the NOL partner.  Since Chemtech regularly distributed the income allocated to the Class A Investors, Example (9) is irrelevant.

This conclusion is completely consistent with the purpose of the overall-tax-effect test as revealed by Example (5).  As another court aptly noted in rejecting a similar argument, the Government is trying to use the overall-tax-effect rule not to challenge "the *manner* in which the [investors] were allocated their interest in the partnership (something the overall tax effect rule might cover), but [] the fact that the [investors] were allocated such a huge interest in the first place."  *See TIFD III-E, Inc. v. United States*, 342 F. Supp. 2d 94, 121 (D. Conn. 2004), *rev'd on other grounds*, 459 F.3d 220 (2d Cir. 2006).[55]

The economic effect of Chemtech I's allocations was economically realistic and substantial, and those allocations had substantial economic effect.

> 3.     The Government Cannot Posit an Alternative Allocation of Book Income
>          That Reflects the Parties' Economic Deal

Even if the Government could show that the allocation of Chemtech I's book income lacked substantial economic effect, those allocations must be respected if they are consistent with PIIP.  I.R.C. § 704(b).  The determination of PIIP is based on all facts and circumstances.  I.R.C. § 704(b); Treas. Reg. § 1.704-1(b)(3).  The regulations identify four nonexclusive factors relevant in determining PIIP:  contributions, income allocations, nonliquidating distributions, and liquidating distributions.  Notably, these factors correspond to the adjustments that the economic effect test requires be made to maintain partners' capital accounts.  *Compare* Treas. Reg. § 1.704-1(b)(3)(ii)(*a*)-(*d*) (PIIP factors), *with* Treas. Reg. § 1.704-1(b)(2)(iv)(*b*)(*1*)-(*7*) (capital

---

[55] Moreover, the Government bases its substantiality argument on allocations of *taxable* income, rather than on allocations of book income as computed under the section 704(b) Regulations.  (*See* Gov't PFOF ¶ 577.)  As explained above, however, allocations of taxable income attributable to built-in gain or loss *never* have economic effect.  Applying the substantiality test to an item that never has economic effect is nonsensical, yet that is what the Government tries to do in this case.

account adjustments).  The regulations mandate that any reallocation under PIIP must reflect the partners' economic entitlements.  Treas. Reg. § 1.704-1(b)(3) (first sentence).

Example (5) of Treasury Regulation § 1.704-1(b)(5) illustrates the reallocation of income under PIIP.  In Year 1, the partnership receives $450 of tax-exempt income and $550 of taxable income.  The agreement allocates $360 (80 percent of the tax-exempt income) to I and $640 (20 percent of the tax-exempt and 100 percent of the taxable income) to J.  These allocations lack substantiality, but they have economic effect, because they are credited to the partners' capital accounts and thus affect, dollar-for-dollar, the amounts I and J would receive if the partnership liquidated at the end of Year 1.  Although Example (5) uses a 50/50 baseline to apply the overall-tax-effect test, when it applies PIIP to the actual results in Year 1 it does not reallocate the items 50/50.  Instead, it respects the actual credits to the partners' capital accounts (36 percent to I, 64 percent to J); however, it changes the composition of the book items allocated to each partner to include a proportionate share of the taxable and tax-exempt income.  Thus, I's $360 share of book income is adjusted to include 36 percent of both taxable and tax-exempt income, and J's $640 allocation is adjusted to include 64 percent of each category.  In other words, regardless of the projected sharing implied by the overall-tax-effect test baseline, the reallocation of actual book income must reflect how the partners actually share that income, as reflected in their capital accounts.

Example (5) is not unique.  Other examples in the section 704(b) Regulations also demonstrate that the reallocation of an item under PIIP must be made in a manner that, had it been contained in the original agreement, would have satisfied the economic effect test.  *See* Treas. Reg. § 1.704-1(b)(5) Exs. (1)(iv), (6) (last two sentences), (7)(i) (last two sentences),

(7)(ii) (last two sentences).  Where, as here, the tested allocation has economic effect, any

reallocation under PIIP cannot alter the partners' capital account balances.[56]

In the context of Chemtech I, Example (5) means that the allocation of Profits to the

Class A Investors (their Priority Return and their one percent residual interest), in fact reflects

PIIP, notwithstanding that the Class A Investors contributed 19 percent of the capital.  An

analysis of the Partnership's 1994 book income demonstrates why the allocations in the

Partnership Agreement satisfy the PIIP standard and why the Government's PIIP argument is

economically nonsensical.  The Class A Partners received actual cash distributions of over $13.9

million during 1994, yet their Capital Account balances (the amount they would receive on

liquidation of their interests) at the end of 1994 were virtually unchanged from the beginning of

the year.  The cash distributions could not have represented a return of their invested capital and

must have represented an economic interest in income earned during the year.

| | |
|---|---|
| Class A Partners' 12/31/94 Capital Accounts | $200,004,746 |
| Class A Partners' 1/1/94 Capital Accounts | (200,008,547) |
| Net Change in Capital Accounts | (3,801) |
| 1994 Distributions to Class A Partners | 13,905,412 |
| Economic Benefit From 1994 Income | $13,901,611 |

(See Joint Fin. Stip. A-6.)  Since the Class A Partners received the economic benefit of

$13,901,611 of income, the PIIP standard requires that they be allocated a like amount of book

---

[56]  Likewise, the Tax Court applies PIIP based on the partners' economic entitlements.  See
Vecchio v. Comm'r, 103 T.C. 170, 194-95 (1994) (allocating entire gain to one partner to
eliminate that partner's negative capital account and satisfy that partner's liquidation
preference); Estate of Tobias v. Comm'r, 81 T.C.M. (CCH) 1163, 1170 (2001) (allocating
100 percent of the partnership's income for the year to the partner who received "economic
benefit" of the income); Interhotel Co. v. Comm'r, 81 T.C.M. (CCH) 1804 (2001) (PIIP
requires analysis of actual economic impact of  allocations).  These cases confirm that the
PIIP standard requires that book income be allocated consistent with the economic sharing of
that income.

income.  Treas. Reg. § 1.704-1(b)(3)(i) (references to PIIP "signify the manner in which the partners have agreed to share the economic benefit . . . corresponding to the income . . . that is allocated").

While the Government pays lip service to the PIIP standard, it conjures up a result that ignores the economic inquiry that the regulations require.  Under the Government's litigation version of PIIP, the Class A Partners' share of Chemtech I's book income cannot exceed 19 percent.  (Gov't PFOF ¶ 571.)  In 1994, the Government's PIIP theory would limit the Class A Partners' share of book income to no more than $2,811,152, which is $11 million less than the $13.9 million in economic benefit they actually received.

### E.    The History of the Ceiling Rule Refutes the Government's Position.

According to the Government, the tax results produced by Chemtech I were "not the thing" which the statute intended.  (Gov't PFOF ¶¶ 354ff.)  Only by ignoring section 704(c) and its legislative history could the Government have made such a glib assertion.

The legislative history of the Internal Revenue Code of 1954 demonstrates that Congress understood that the Ceiling Rule could result in the overstatement of the taxable income of noncontributing partners such as the Banks.  Given the history of litigation over family partnerships, Congress was well aware of the potential use of partnerships to shift income from high-bracket taxpayers to low-bracket taxpayers, particularly in an era when the difference between the lowest marginal rate and the highest marginal rate reached 70 percentage points.  Nevertheless, Congress imposed the rule in the interest of simplicity and because it knew that when noncontributing partners disposed of their interests, the effects of the Ceiling Rule would

be reversed through a corresponding benefit.  H.R. Rep. No. 83-1337, at A223-24 (1954).[57]  The 1954 legislative history included an example that described the impact of the Ceiling Rule on a contribution of depreciable property with built-in gain.  The 1984 legislative history suggested that the Treasury revisit the Ceiling Rule, but stated that any change to the rule should be prospective.

Based on this history, it is indisputable that Congress intended section 704(c) to be the *exclusive* provision to govern the allocation of tax items attributable to book/tax differences in contributed property and that Congress intended the Ceiling Rule to limit the scope of section 704(c).  Yet the Government's section 704(b) arguments read section 704(c) out of the Code, while importing into section 704(b) a solution directly out of the section 704(c) regulations that post-date the transaction in question.  The logical conclusion of the Government's arguments is that section 704(c) is deadwood and the Treasury Department's nine-year effort to revise the Ceiling Rule was a waste of time.

The 1993 Regulations that amended the Ceiling Rule demonstrate the flaws in the Government's allocation arguments here.  Had the amended regulations applied to Chemtech I, they would have permitted the IRS to mandate "curative" allocations of taxable royalty income to the Dow partners, thereby reducing the Class A Partners' taxable income by an amount equal to the shortfall in tax depreciation.  *See* Treas. Reg. § 1.704-3(c)(1).  The Government's proposed section 704(b) reallocation here would achieve the same effect as curative allocations created under the 1993 Regulations.  But the 1993 amendments changed the section 704(c) Regulations—*not* the section 704(b) Regulations.  The section 704(b) Regulations continue to

---

[57]    In the example, the $10 of taxable income shifted to B under the ceiling rule increases its tax basis in the partnership interest.  When B sells its interest, the additional tax basis will generate a taxable loss (or reduced taxable gain, depending on the circumstances).

require that partnerships use the book value of contributed property in applying section 704(b). *See* Treas. Reg. § 1.704-3(a)(3)(i). Thus, even today, the section 704(b) Regulations prohibit the tax result that the Government seeks here, which is to impose noneconomic reallocations of section 704(b) income in order to mitigate the effects of the Ceiling Rule.

F.    **Conclusion**

The difference between the book value and tax basis of the Patent Assets caused Chemtech I's taxable income to exceed its book income. The allocation of this excess taxable income is the exclusive province of section 704(c), but the Ceiling Rule established by the Government's mandatory section 704(c) Regulations prohibits the reallocation that the Government seeks here. The Government's effort to ignore the Ceiling Rule causes it to make section 704(b) arguments that violate basic concepts and fundamental requirements of its own section 704(b) Regulations.

In *DeLaune v. United States*, 143 F.3d 995, 1005 (5th Cir. 1998), the Fifth Circuit rejected the Government's effort to "escape" the effect of a binding regulation, adding that "we are a little perturbed that [it] would even try." Once again, the Government is trying to escape a binding regulation. The difference between this case and *DeLaune* is that the Government will not even acknowledge that it is trying to disavow the Ceiling Rule.

**V.    THE ALLOCATIONS OF CHEMTECH II'S INCOME HAD SUBSTANTIAL ECONOMIC EFFECT**

Unlike Chemtech I, Chemtech II's operating income and deductions were not included in a single bottom-line allocation. Instead, the Chemtech II Partnership Agreement provided for a special allocation of depreciation, and then provided for a bottom-line allocation of "Profits" that consisted of all remaining items of operating income and deductions. (*See* JX 3DD § 3.03(e), CT00057265; § 3.01, CT00057262-63.) As in Chemtech I, the book value of the Plant Assets

exceeded their tax basis, creating a difference between Chemtech II's book depreciation

deduction and its tax deduction for depreciation.  Pursuant to section 704(c)(1), the tax deduction

was allocated first to RBDC and Ifco (the noncontributing partners), with the result that DCDC

(the Dow partner that had contributed the Plant Assets to the Partnership) had taxable income

greater than its share of Chemtech II's book or economic income.  The Ceiling Rule did not

apply, because the Plant Assets had sufficient tax depreciation deductions to match the book

depreciation allocable to RBDC and Ifco.

### A.    The Allocations of Chemtech II's Income Had Economic Effect

As with Chemtech I, the Chemtech II Partnership Agreement satisfied the alternate test

for establishing "economic effect."  *See supra* Part IV(D)(1); Treas. Reg. § 1.704-1(b)(2)(ii)(*d*);

JX 3DD.  Moreover, the allocation of book income to RBDC exactly matched the net taxable

income allocated to it each year, and the total book income allocated to RBDC equaled its total

economic profit from its investment in Chemtech II.  (*Compare* Joint Fin. Stip. A-8, *with* Joint

Fin. Stip. B-4.)  Based on these facts, it should be beyond dispute that the allocations had

economic effect.

Not to be dissuaded, however, the Government alleges that the allocations lack economic

effect because RBDC contributed 20 percent of the capital but received only 2 percent of the

total depreciation deductions.  (Gov't PFOF ¶¶ 568-569.)  This argument dissolves upon its first

encounter with the regulations:  "Section 704(b), § 1.704-1(b)(2), and § 1.704-2(e) allow

partnership items of income, gain, loss, deduction, and credit to be allocated validly to the

partners separate from the partners' respective ownership of the capital to which the allocations

relate."  Treas. Reg. § 1.701-2(d), Ex. (6)(iii); *see also* Treas. Reg. § 1.704-1(b)(5), Ex. (1)(iii)

(respecting arrangement in which depreciation is allocated entirely to one partner while all

remaining items are allocated 50/50). Once again, the Government's legal argument is irreconcilable with the unambiguous provisions of its own regulations.

**B.  The Economic Effect of the Allocation of Chemtech II's Income Was Substantial**

The Government also maintains that the economic effect of the Chemtech II allocations was not substantial because "from an after-tax perspective, no partner was in an economic position which was worse than it would have been in without the allocations." (Gov't PFOF ¶ 579.)  A simple math exercise proves why this assertion is wrong.  Like the Dow members, RBDC was a U.S. corporation subject to federal income tax at a maximum rate of 35 percent. The allocation of a dollar of book income to RBDC increased its after-tax income by 65 cents; however, that same allocation *reduced* the after-tax income of the Dow entities by 65 cents.  As long as tax rates remained below 100 percent, each dollar of taxable income allocated to RBDC would leave the Dow partners worse off, and each dollar of taxable income allocated to a Dow partner would reduce RBDC's after-tax results.

The Government tries to finesse its math problem by suggesting that the "baseline" used to apply the overall-tax-effect test to Chemtech II is one in which RBDC is a lender rather than a partner. (Gov't PFOF ¶ 579.)  That proposition is absurd.  Section 704(b) is an issue only because RBDC is a partner, so a baseline that assumes it is not a partner is nonsensical.  It is also inconsistent with the Government's statement that PIIP is the proper baseline in Chemtech I.  (*Id.* ¶ 570.)  The Government's application of its idiosyncratic baseline is even more bizarre, because it reaches the simultaneous conclusions that (1) the Dow entities are better off because RBDC is getting *more* income than under the baseline, and (2) RBDC is receiving the *identical* amount of income.  (*Id.* ¶ 579.)

## VI.    DTPC DID NOT RECOGNIZE GAIN ON REDEMPTION OF ITS CHEMTECH INTEREST

In connection with the restructuring for the Chemtech II transaction, the Partnership redeemed DTPC's interest for a combination of the remaining Patent Assets and shares of CPI, its wholly owned corporate subsidiary.  DTPC did not recognize taxable gain on this distribution.  *See* I.R.C. § 731(a)(1) (providing that gain on liquidating distributions "shall not be recognized . . . except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution").  The Government, however, asserts that the CPI shares were "marketable securities" that should be treated as "money" for purposes of section 731(a).  *See* I.R.C. § 731(c)(1).  Section 731(c)(2)(A) defines the term "marketable securities" to include any financial instrument that, as of the date of distribution by the partnership, is actively traded on an established securities market.  I.R.C. § 731(c)(2)(A); Treas. Reg. § 1.1092(d)-1(a).  Since the Partnership owned 100 percent of CPI immediately prior to the distribution, the CPI shares were not marketable securities under the general definition.

Under section 731(c)(2)(B)(v), shares of CPI could only be treated as marketable securities, in whole or in part, if 90 percent or more of its assets at the time of distribution consisted of marketable securities.  Treas. Reg. § 1.731-2(c)(3).  At the time of the distribution, the principal amount of the Dow Note was $781 million.  (JSOF ¶ 83.)  The Dow Note represented over 97 percent of the total assets of CPI.[58]  The Dow Note was not publicly traded, and as a 34-year note it was not readily convertible into cash.

The Government contends that CPI shares were marketable securities because, *before* the distribution, CPI had owned demand notes that were, by their terms, convertible into money.

---

[58]    The value of the 70 percent interest in CPI distributed to DTPC was $559 million (JSOF ¶ 88), indicating a total CPI value of $800 million.  The $781 million Dow Note represented 97.6 percent of CPI's total assets.

Although CPI did not own these notes at the time of the distribution, the Government argues that CPI's exchange of the demand notes for the Dow Note should be ignored for purposes of section 731(c).

The Government is incorrect. Whether an interest in an entity is a marketable security for purposes of section 731(c) depends on whether "the assets of the entity . . . *at the time of the distribution* of an interest in the entity consist . . . of marketable securities, money, or both." Treas. Reg. § 1.731-2(c)(3)(i), (ii) (quotation at -2(c)(3)(i)) (emphasis added). Whether the entity held marketable securities in the past, or acquires them in the future, is irrelevant. The section 731(c) Regulations require that the determination be made at the moment the distribution occurs.

This is not a loophole. Section 731(c) does nothing more than treat marketable securities as cash for purposes of section 731(a), which taxes partnership distributions to the extent the "money distributed" exceeds the partner's basis in its partnership interest. I.R.C. § 731(a)(1). Under this general rule, taxation depends on whether the partner *actually* received money; whether the partnership held money at some point prior to the distribution is irrelevant. The same principle applies here: at the time of the distribution CPI held no marketable securities, and therefore its shares were not marketable securities.

For example, in *Countryside Limited Partnership v. Commissioner*, 95 T.C.M. (CCH) 1006 (2008), the Tax Court held that promissory notes distributed by a partnership to two of its partners were not marketable securities for purposes of section 731(c). The partnership had bought the notes for cash in anticipation of the distribution, and it easily could have retained the cash instead of purchasing nonmarketable securities. Consistent with the statute and regulations,

however, the Tax Court based its section 731(c) analysis solely on the attributes of the distributed notes.

The section 731(c) Regulations include an "anti-abuse rule" designed to apply to transactions structured to achieve results that are inconsistent with the purpose of section 731(c). *See* Treas. Reg. § 1.731-2(h).  In all three examples that illustrate this rule, the partnership actually held marketable securities at the time of the distribution and engaged in a transaction designed to shift the economic benefits of the marketable securities to a partner without making an actual distribution to that partner.  Since Chemtech owned no marketable securities, it could not have shifted the economic benefits of marketable securities to *any* partner.  Thus, the CPI distribution does not come within any of the three examples.  As the Tax Court observed in *Countryside*, when the regulation was finalized, the Treasury Department stated that no additional examples were needed to illustrate the scope of the section 731(c) anti-abuse rule.  95 T.C.M. (CCH) at 1022 (citing T.D. 8707, 1997-1 C.B. 128, 130.)  Therefore, the section 731(c) anti-abuse rule does not apply.

The Government's other arguments are similarly unavailing.  The Government seeks to disregard CPI's acquisition of the Dow Note as a tax-motivated exchange lacking in economic substance.  (Gov't PFOF ¶ 542.)  The Supreme Court has held that an exchange of one debt instrument for another is to be recognized for tax purposes, even when the evidence establishes that the *sole* purpose of the exchange is to recognize a tax benefit, as long as the instruments have material differences.  *Cottage Savings Ass'n v. Comm'r,* 499 U.S. 554 (1991).  In comparison to the demand notes, the Dow Note provides for a 34-year term and a higher, fixed interest rate, either of which is sufficient to trigger a "significant modification" requiring recognition of the exchange for tax purposes.  *See* Treas. Reg. § 1.1001-3(e)(2), (3).

The Government's final argument is that Dow's control over CPI is an "arrangement" that makes the Dow Note "readily convertible into, or exchangeable for, money." (Gov't PFOF ¶ 543.) The Government's theory expands section 731(c) beyond recognition: taken at face value, it means that virtually any asset could be treated as a marketable security, as long as the owner of the asset has an affiliate or family member who would be able to purchase the asset for cash, even if, as in this case, that owner (CPI) cannot require the affiliate to do so.

Under section 731(c), the only relevant fact is whether the assets held by CPI at the time of the distribution included any "marketable securities." The answer is "no." Because the CPI shares were not marketable securities, the distribution by Chemtech was not taxable under section 731.

## VII. THE "PARTNERSHIP ANTI-ABUSE RULE" DOES NOT PERMIT THE IRS TO OVERRIDE THE STATUTORY MANDATES OF SUBCHAPTER K

The Government seeks to bootstrap its litigating positions by invoking the "partnership anti-abuse rule," which was adopted after the Chemtech I transactions on a prospective basis. This regulation purports to give the IRS the authority to override the application of the normal partnership tax rules for transactions inconsistent with the intent of subchapter K. According to the regulation, three requirements are "[i]mplicit in the intent of subchapter K":

> (1) the partnership must be bona fide and each partnership transaction or series of related transactions . . . must be entered into for a substantial business purpose;

> (2) the form of each partnership transaction must be respected under substance over form principles; and

> (3) the tax consequences to each partner of the partnership's transactions "must accurately reflect the partners' economic agreement and clearly reflect the partner's income," unless the failure to reflect income was "clearly contemplated" by the drafters of the relevant operative provisions and accepted as the price of achieving administrative convenience or other policy objectives.

Treas. Reg. § 1.701-2(a).

The Government seeks to invoke the partnership anti-abuse rule to achieve two results: (1) to override the rules of section 704(b) and (c) and the regulations thereunder in order to reallocate income from the Banks to one or more Dow partners; and (2) to eliminate the mechanical adjustments made by Chemtech II to the basis of its assets pursuant to sections 734 and 754.

### A.      The Partnership Anti-Abuse Rule Cannot Apply to Chemtech I

By its terms, the partnership anti-abuse rule applies to "transactions involving a partnership that occur on or after May 12, 1994." Treas. Reg. § 1.701-2(g). The last investment in Chemtech I, the Subsequent Closing, occurred in October 1993. Therefore, the section 701 regulation cannot apply to allocations of Chemtech I's income.

As with its section 704(b) arguments, which seek to circumvent the effective date of the section 704(c) Regulations published in December 1993, the Government tries to circumvent the effective date of the partnership anti-abuse rule. It does so by claiming that the relevant "transaction" is not the formation of the Partnership or the investments by the Banks, but the Partnership's ongoing receipt of income and the allocation of that income to the partners pursuant to the terms of the August 1993 transaction documents. (*See* Gov't PFOF ¶ 517.)

The Government's claim rests on an untenable interpretation that would give an explicitly prospective regulation retroactive effect. The partnership anti-abuse rule contains numerous examples illustrating its application when a partnership is formed for the purpose of generating favorable treatment of future partnership income. *See* Treas. Reg. § 1.701-2(d), Exs. (3) (achieving favorable look-through treatment for partnership income under foreign tax credit rules), (5) (special allocations of dividend income), (6) (special allocations of depreciation). In each example, the tax benefits will arise each time the partnership receives income subject to the favorable tax treatment. Yet the regulation does not characterize each receipt of income as a

separate "transaction." Instead, in each case the example refers to the "decision to organize and conduct business" through a partnership, and holds that the IRS "cannot invoke [the rule] to recast the *transaction*." *Id.* at Exs. (3)(ii), (5)(ii), (6)(iii) (emphasis added). The wording of these examples makes no sense if, as the Government posits here, each receipt of royalty income is a separate transaction for purposes of the partnership anti-abuse rule.[59]

Had the Treasury intended to apply the partnership anti-abuse rule to income received by a partnership after 1994, it would have been easy to say so. All it had to say was that the regulation would apply to all taxable years beginning after the date of promulgation. *See*, *e.g.*, Treas. Reg. §§ 1.704-1(b)(1)(ii)(a) (allocation regulations effective for taxable years beginning after specified date), -2(l)(1)(i) (same). Instead, it limited the regulation to future transactions. The reason is obvious: the Treasury Department did not intend the regulation to apply to prior transactions, even when those transactions affect income reported in post-effective date years.

The Government protests that failing to apply the regulation "merely because" the partnership was formed prior to the effective date "would be to thwart the purpose of the regulation." (Gov't PFOF ¶ 518.) But the purpose of the partnership anti-abuse rule was to deter *future* transactions, not change the rules governing old transactions. By the Government's logic, any prospective effective date provision "thwarts" the purpose of the new rules by grandfathering prior transactions.

The Government's tactic is particularly objectionable here. The tax benefit at issue in Chemtech I results directly from the Ceiling Rule, which was imposed by the 1954 legislative history and implemented by the 1956 Treasury Regulations. Consistent with a Congressional

---

[59]   Other provisions of the regulations support this distinction. For example, the section 6662 Regulations provide a special rule for "items of a corporation arising in connection with transactions occurring prior to December 9, 1994," in recognition that each item of income or deduction does not trigger a separate "transaction." *See* Treas. Reg. § 1.6662-4(g)(1)(ii)(B).

directive, the 1993 amendments to the Ceiling Rule apply prospectively to future *contributions* of property, not to future allocations of income on property contributed before the effective date. The Government's effort to apply the partnership anti-abuse rule to the Chemtech I transaction is a thinly disguised effort to circumvent the Congressionally mandated effective date of the existing section 704(c) Regulations.

### B.    The Partnership Anti-Abuse Rule Does Not Permit the IRS to Override the Statutory Basis Adjustment Regime of Section 734

As explained above, partnerships are pass-through entities.  Consistent with this treatment, the partnership tax rules generally seek to provide parity between a partnership's "inside basis" in its assets and the partners' aggregate "outside bases" in their partnership interests.  One such rule is section 732, which provides that a partner who receives a liquidating distribution of property takes a basis in the distributed property equal to her basis in the partnership interest surrendered.  For example, assume that a partnership owns Blackacre, which has a basis and value of $900, and that it distributes Blackacre to A in liquidation of A's partnership interest.  If A had a $500 tax basis in the partnership interest, A's basis in Blackacre will be limited to $500, and A will recognize her $400 gain in her partnership interest when she sells Blackacre.  While this result imposes the appropriate tax on A, it results in the "loss" of $400 of basis to the partnership and thus can create a disparity between the partnership's inside basis in its remaining assets and the remaining partners' outside bases in their partnership interests.  In such a case, section 734 permits a partnership to restore this parity by increasing the basis of its remaining assets by an amount equal to the reduction in the basis of the distributed assets.  *See* I.R.C. § 734(b)(1)(B).

In 1998, the Partnership redeemed DTPC's partnership interest by distributing some cash, the remaining Patent Assets, and 67 percent of the shares of CPI.  (JSOF ¶¶ 88, 106, 109.)  The

Partnership's total tax basis in the distributed assets was $462,963,591.  (JSOF ¶ 91.)  Section 732 limited DTPC's tax basis in the distributed assets to its "outside basis" in its partnership interest, or $81,518,346.  (JSOF ¶¶ 92-94.)  Therefore, the distribution triggered a reduction of over $381 million in the distributed assets.

The Government acknowledges that the Partnership made a timely election under section 754.  (JSOF ¶ 89.)  And the Government does not challenge the Partnership's application of the regulations governing the allocation of the section 734(b) adjustments among its remaining assets, including the chemical plant.  (JSOF ¶¶ 98-100; Joint Fin. Stip. signature page at (ii).)  Nevertheless, the Government asserts that the partnership anti-abuse rule permits the IRS to override the express commands of sections 734 and 754.  (*See* Gov't PFOF ¶ 513.)  Even if the anti-abuse rule is valid in some circumstances, it cannot be validly applied to override the explicit requirements of these statutory provisions.

The Government alleges that the section 734(b) adjustments distort the Partnership's income.  (Gov't PFOF ¶¶ 501-13.)  Even a cursory review of the partnership anti-abuse rule reveals the flaw in the Government's argument.  The partnership anti-abuse rule includes an example that demonstrates that distortions in income occur when section 734(b) adjustments are *not* made:

> In general, the [section 734(b)] adjustments that would be made if an election under section 754 were in effect are *necessary* to minimize distortions between the partners' bases in their partnership interests and the partnership's basis in its assets following, for example, a distribution to a partner. . . . Congress clearly recognized that *if the section 754 election were not made, basis distortions may result*.

Treas. Reg. § 1.701-2(d), Ex. (9)(iii) (emphasis added).[60]  The Government's litigating position turns Example (9) on its head.  And it demonstrates that, in the hands of the Government, the partnership anti-abuse rule is little more than a Rorschach test that enables the IRS to adopt whatever interpretation of the "intent of Subchapter K" happens to suit its litigating position in a given case.[61]

The Government tries to justify its position by asserting that DTPC can avoid recognizing taxable gain on the distributed CPI shares by purchasing additional shares of CPI so that it can liquidate CPI tax-free under section 332.  (Gov't PFOF ¶ 508.)  According to the Government, the possibility that DTPC will avoid recognizing the gain in the distributed CPI shares is inconsistent with the "intent" of subchapter K and thus permits the IRS to overrule the explicit requirements of section 734(b).

That argument is a non sequitur.  As Example (9) recognizes, section 734(b) adjustments are designed to provide parity between the partnership's basis in its *remaining* assets and the outside bases of the *remaining* partners in their partnership interests.  Whether the partner receiving the distribution ever recognizes a taxable gain or loss in the distributed asset is irrelevant.  For example, if a partnership makes a liquidating distribution of an asset with a basis of $1,000 and a value of $500 to a partner who has a $500 basis in his partnership interest, the partner will hold an asset with no built-in gain or loss.  However, that distribution will result in a

---

[60]  Like Example (9), the only other example in the partnership anti-abuse rule that discusses section 754 elections concludes that the *failure* to make the election permits the partners to duplicate a loss and thus distorts income.  *See* Treas. Reg. § 1.701-2(d), Ex. (8)

[61]  Even if a tax result does not "clearly reflect income," under the partnership anti-abuse rule it will be sustained if it is "clearly contemplated" by the applicable statutory and regulation provisions.  Since section 754 is purely elective, Congress surely knew that taxpayers would only make the election when beneficial to their interests.  And the partnership anti-abuse rule expressly states that taxpayers' use of in-kind partnership distributions to shift basis from nondepreciable property to depreciable property is "clearly contemplated" by subchapter K.  Treas. Reg. § 1.701-2(d), Ex. (10).

$500 reduction in the basis of the distributed asset, and if the partnership has a section 754 election in effect it will receive a positive section 734(b) adjustment to its remaining assets. Conversely, if the partnership distributes an asset with a basis of $500 and a value of $500 to a partner with a basis of $1,000 in her partnership interest, the partner will take a $1,000 basis in the asset; if the partnership has a section 754 election in effect, it will be required to *reduce* its basis in its remaining assets by $500, regardless of whether the partner ever obtains a tax benefit from the $1,000 basis in the distributed asset. In short, whether the partner ever disposes of the distributed property is irrelevant to whether the partnership is entitled (or required) to make section 734(b) adjustments to the basis of its remaining assets.

Section 732(f), which Congress enacted in 1999, makes this point abundantly clear. Section 732(f) applies to a distribution of corporate stock to a corporate partner that is able to liquidate the distributed subsidiary under section 332. When section 732(f) applies, it requires the distributed subsidiary (in this case, CPI) to reduce its basis in its assets, thus ensuring that the corporate partner receiving the distribution (DTPC) cannot avoid the detriment of the basis reduction by liquidating the subsidiary tax-free under section 332. Thus, section 732(f) directly addresses the issue raised by the Government here. Had section 732(f) applied to the distribution of CPI, it would have required CPI to reduce its tax basis in its non-cash assets (principally, the Dow Note) by $381 million. I.R.C. § 732(f)(1). But it would have left Chemtech II's section 734(b) adjustments intact. The legislative solution enacted by Congress demonstrates that the issue raised by the Government is irrelevant to the application of sections 734(b) and 754.

In sum, the tax consequences of the 1998 distribution to DTPC satisfy all the requirements of the sham transaction doctrine and the substance-over-form doctrine. The adjustments to the basis of the Partnership's remaining assets resulted directly from the

application of the elective rules of section 734.  The partnership anti-abuse rule cannot validly be applied to a transaction that had economic substance and that satisfied all applicable statutory requirements.  *See Countryside L.P. v. Comm'r,* 95 T.C.M. at 1021-22.

### C.    The Government's Interpretation of the Partnership Anti-Abuse Rule Would Render It Invalid

The preceding discussion of the partnership anti-abuse rule demonstrates why, according to its own terms, that regulation does not apply to Chemtech I or the 1998 distribution to DTPC. Any interpretation of the regulation that would produce the results the Government seeks here would make the anti-abuse regulation invalid.

An administrative agency can act only within the bounds of authority delegated to it by Congress.  In the case of the partnership anti-abuse rule, that authority must derive from I.R.C. § 7805(a), which authorizes promulgation of regulations for "enforcement" of the Code.  This authority does not permit the Treasury Department to usurp the authority of Congress by adding restrictions to a statute which are not there, particularly when (as with Subchapter K) a thorough set of highly articulated statutory rules already exists.  *See Edward L. Stephenson Trust v. Comm'r*, 81 T.C. 283, 288, 289 (1983) (quoting *Estate of Boeshore v. Comm'r*, 78 T.C. 523, 527 (1982)) (holding a similar anti-abuse regulation invalid because it imposed a subjective standard on issues Congress had addressed through "clear and precise" objective rules); *see also Rite Aid Corp. v. United States*, 255 F.3d 1357, 1359 (Fed. Cir. 2001); *Koshland v. Helvering*, 298 U.S. 441, 447 (1936) (Where "the provisions of the act are unambiguous, and its directions specific, there is no power to amend it by regulation."); *Helvering v. Credit Alliance Corp.*, 316 U.S. 107, 113 (1942) (rejecting a regulation that "not only was contradictory of the plain terms of the [statute] but attempted to add a supplementary legislative provision, which could only have been enacted by Congress"); *Nalle v. Comm'r*, 997 F.2d 1134, 1139 (5th Cir. 1993) ("In the absence

of any ambiguity, our analysis must be confined to the plain language of the statute."); *Deluxe Corp. v. United States*, 885 F.2d 848, 853 (Fed. Cir. 1989) ("A regulation serves to implement the law, not change it.").

Moreover, the Treasury Department does not have the authority to promulgate a regulation that usurps the judiciary's authority to interpret the law. As the Ninth Circuit held in *RLC Industries Co. v. Comm'r*, 58 F.3d 413, 416 (9th Cir. 1995) (quoting *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 154-55 (1991)), "'making authoritative findings of fact and . . . applying the Secretary's standards to those facts in making a decision' are 'adjudicatory powers typically exercised by a *court* in the agency-review context.'" In *RLC Industries*, the Ninth Circuit held invalid a legislative Treasury regulation that purportedly gave the IRS "overriding power" to decide the reasonableness of a taxpayer's depletion allowance. *Id.* at 419. The regulation at issue provided that for "good and substantial reasons satisfactory to the district director, or as required by the district director on audit," the IRS could readjust a taxpayer's timber or land accounts. *Id.* at 414. As is the case with the partnership anti-abuse rule, the regulation in *RLC Industries* purported to provide the Service with this authority regardless of whether the accounts otherwise comported with the Code. *Id.* In holding the regulation invalid, the Ninth Circuit stated that the regulation:

> Eviscerate[d] the fundamental distinction that is deeply embedded in administrative law between quasi-legislative and quasi-judicial power. Rulemaking, the quasi-legislative power, is intended to add substance to the Acts of Congress, to complete absent but necessary details. . . . Adjudication, the quasi-judicial power, is intended to provide for the enforcement of agency . . . regulations on a case-by-case basis.

*Id.* at 417 (citations and internal quotation marks omitted).

The same basic situation exists here. The Government's position in this case construes the partnership anti-abuse rule to give the IRS the power to determine whether it will comply

with the Code and Regulations, based on its unilateral interpretation of whether a transaction comports with the "intent" of the statute and produces results that were "contemplated" by the drafters. Here, that would mean construing the rule to give the IRS the power to override the effective date of the 1993 amendments to the section 704(c) Regulations, thereby ignoring a Congressional directive that any change to the Ceiling Rule would be prospective. And it means permitting the IRS to override the explicit statutory rules that authorize partnerships to make basis adjustments under section 734(b), based on an ad hoc criterion that does not appear in any relevant authority and that is inconsistent with a later statute enacted to deal with the specific issue raised by the Government.

The IRS does not have the power to make such decisions, and any regulation that purports to give it such authority cannot be valid.[62]

## VIII.   THE GOVERNMENT'S PENALTY CLAIMS ARE UNFOUNDED

Initially, the TEFRA rules did not authorize courts to consider any penalty-related issues at the partnership level. In 1997, Congress amended the TEFRA provisions to provide for partnership-level determination of certain penalty-related issues. *See* Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1238(a), (b)(1), 111 Stat. 788, 1026 (1997) (codified at I.R.C. §§ 6221, 6226(f)). These amendments do not apply to the Partnership's pre-1997 tax years; thus, this Court's jurisdiction on penalty issues is limited to 1997 and later years. Even after 1997, the Code and Regulations provide partners with the right to assert partner-level defenses in separate, partner-level proceedings. I.R.C. § 6230(c)(1)(C), (c)(4).

The FPAA issued by the IRS for 1997 and the subsequent tax years asserts that accuracy-related penalties apply to the underpayment of tax that results from the FPAA adjustments. *See*

---

[62]   Notably, no court has applied the partnership anti-abuse rule to alter the tax consequences of a transaction that possessed economic substance and business purpose.

I.R.C. §§ 6662(a), (b)(1), (b)(2).  The accuracy-related penalties asserted by the Government include penalties based on a "substantial understatement" of tax and negligence.  With respect to Chemtech II, the Government also asserts that penalties for a substantial or gross valuation misstatement apply.  *See* I.R.C. § 6662(b)(3), (e), (h).  For the reasons described above, the FPAA adjustments have no basis in law or fact.  Accordingly, no underpayment of tax arises from those adjustments and thus the accuracy-related penalties.

Even in the unlikely event that the Court were to sustain some aspect of the FPAA adjustments, the accuracy-related penalties would not apply.  The substantial understatement penalty would not apply because substantial authority existed for the positions taken on Chemtech's tax returns.  *See* I.R.C. § 6662(d)(2)(B)(i); Treas. Reg. § 1.6662-4(d), -4(d)(3)(i).

For the same reason, the negligence penalty would not apply.  The regulations state that a "return position that has a reasonable basis as defined in paragraph (b)(3) of this section is not attributable to negligence."  Treas. Reg. § 1.6662-3(b).  For this purpose, "reasonable basis" is an objective standard that is less stringent than "substantial authority" but "significantly higher than not frivolous or not patently improper."  Treas. Reg. § 1.6662-3(b)(3).  A return position that is "reasonably based on one or more of the authorities set forth in [the substantial authority regulations will] . . . generally satisfy the reasonable basis standard."  Treas. Reg. § 1.6662-3(b)(3).

The Government's assertion of negligence in this case is ironic, to say the least.  The negligence penalty applies to any "disregard of rules or regulations."  I.R.C. §§ 6662(b), (c).  As demonstrated throughout this brief, the Government's litigating positions in this case repeatedly disregard, and frequently fail to discuss, unambiguous provisions of the Code and Regulations.  Indeed, had the Class A Investors in Chemtech I been U.S. taxpayers, and had they (like the

Government here) ignored the Ceiling Rule in determining their taxable income from their investments in Chemtech I, the IRS could have imposed a negligence penalty on them.

Finally, there is no basis for imposition of a valuation misstatement penalty to the Chemtech II transaction. As the Government itself appears to acknowledge, its position is inconsistent with controlling Fifth Circuit authority. (*See* Gov't PFOF ¶ 625.)

Chemtech's partners have additional defenses to penalties that cannot be raised in this partnership proceeding.[63]

The Government's penalty arguments boil down to the assertions that Dow took taxes into account in structuring the Chemtech transactions and that the results were "too good to be true." (Gov't PFOF ¶¶ 54, 589, 591, 596.)  Neither of these is a substantive legal standard, much less a basis for imposing a penalty. As explained above, the Fifth Circuit and other courts have consistently held that taxpayers are entitled to rely on the tax laws in structuring transactions. Moreover, in numerous cases the courts have made it clear that the taxpayer may, in fact, be entitled to a result that the IRS claims is "too good to be true." *See, e.g., Gitlitz v. Comm'r*, 531 U.S. 206, 220 (2001) (rejecting IRS argument that the taxpayer's position would result in a "double windfall," stating that "[b]ecause the Code's plain text permits the taxpayers to receive these benefits, we need not address this policy concern") (footnote omitted).

## IX.    CONCLUSION

Although Dow understood and expected that the Ceiling Rule would provide a tax benefit on the contribution of the Patent Assets, the formation of Chemtech I responded to real business needs and furthered the non-tax business objectives of Dow and its affiliated partners. The

---

[63]  Partner-level defenses to penalties (i.e., defenses that are unique to an individual partner) are not part of the partnership proceeding and can be raised only in a refund suit brought after the court finds in favor of the IRS in the partnership proceeding. I.R.C. §§ 6230(c)(1)(C), (c)(2), (c)(3); Treas. Reg. § 301.6221-1(c), (d).

evidence produced at trial will establish that the Class A Interests in Chemtech had substantive economic effects and were motivated by material non-tax business purposes. Therefore, the Supreme Court's decision in *Lyon* and subsequent Fifth Circuit precedent require that the transactions be respected for federal income tax purposes.

The Government's alternative argument, that the Class A Investors were creditors rather than partners, is inconsistent with Fifth Circuit precedent distinguishing between debt and preferred equity. This argument is also inconsistent with the IRS's longstanding practice of recognizing, as bona fide equity, nonparticipating preferred interests issued by corporations and partnerships.

The Government's section 704(b) argument is nothing more than an attempt to amend the Ceiling Rule retroactively by applying the December 1993 Regulations retroactively, in violation of the explicitly prospective effective date. The Ceiling Rule resulted from deliberate policy choices made by Congress in 1954 and by the Treasury Department in 1956. The legislative and executive branches understood and contemplated the very tax consequences that the Government now seeks to avoid.

Likewise, the Government's various challenges to the Chemtech II transaction rely on unsupported factual assertions and legal interpretations that are irreconcilable with relevant provisions of the Code and regulations.

[signature on next page]

PLAINTIFF

CHEMTECH ROYALTY ASSOCIATES, L.P., by
DOW EUROPE, S.A., as Tax Matters Partner

/s/David M. Bienvenu, Jr.
David M. Bienvenu, Jr.
TAYLOR, PORTER, BROOKS & PHILLIPS
Post Office Box 2471
Baton Rouge, LA  70821
Telephone:  (225) 387-3221
Facsimile:  (225) 346-8049

John B. Magee
Hartman E. Blanchard, Jr.
James D. Bridgeman
Christopher P. Murphy
Royce L. Tidwell
Robert A. Leonard
BINGHAM MCCUTCHEN, LLP
2020 K Street, N.W.
Washington, D.C.  20006
Telephone:  (202) 373-6000
Facsimile:  (202) 373-6001

**CERTIFICATE OF SERVICE**


I certify that on May 27, 2011, a copy of the foregoing was electronically filed with the

Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of

record by operation of the Court's electronic filing system.


/s/David M. Bienvenu, Jr._____

David M. Bienvenu, Jr.

# APPENDIX I

## Summary - Chemtech I 1993 Agreements

## 1.    Investment Agreements (JX 2B; JX 2C; JX 2D; JX 2E; JX 2F)

Chemtech, Dow Europe, DTPC, and Ifco executed an Investment Agreement with each of the Class A Investors.  The Investment Agreements, each of which is substantially similar, govern investments of the Class A Investors in Chemtech.  The key provisions of the Investment Agreements are described below:

Acquisition of Class A Interests

The Class A Investors acquired their limited partnership interests by acquiring Ifco's limited partnership interest and making additional Capital Contributions to Chemtech.  (JX 2B §§ 2.1, 2.2, 2.3, 2.5, 2.6, CT00035773-74.)   The investments were staggered, with KBC, NatWest, and Rabo investing at the first Closing, and BBL and Dresdner investing at the Subsequent Closing.

Each Class A Investor's Capital Account was credited with the amount of its Capital Contribution and its pro rata share of Ifco's Capital Account.  (JX 2B §§ 2.3, 2.6, CT00035774.)

Liability of Class A Investors

Dow Europe, DTPC, and Ifco (the "Original Dow Partners") represented that the Class A Investors would not become general Partners in Chemtech or become liable for the obligations of the Partnership by virtue of their becoming limited Partners.  If, however, the Class A Investors participated in the control of the business of the Partnership beyond the rights afforded to them in the Amended Partnership Agreement (JX 2L), the Class A Investors could become liable for such obligations.  (JX 2B § 3.1.2(b), CT00035777.)

Indemnities

DTPC provided indemnities for the Class A Investors, including for liability arising from:

(i)     untrue statements in the relevant documents,
(ii)    breach of Dow or its affiliates' representations or warranties,
(iii)   failure of Dow or its affiliates to perform in conformance with the relevant agreements,
(iv)    negligence by Dow or its affiliates,
(v)     claims relating to the Partnership assets,
(vi)    violations of law by Dow Europe in its capacity as general Partner,
(vii)   Class A Investor participation in control of the business of the Partnership, provided that such participation would not constitute participation in control of the Partnership under the Delaware Revised Uniform Limited Partnership Act. (JX 2B § 7.1, CT00035793-94.)

DTPC also indemnified the Class A Investors for Covered Taxes (including U.S. taxes) to the extent the Class A Investor complied with certain provisions, including conducting certain activities relating to the investment in Chemtech outside the United States.  (JX 2B § 7.2, CT00035794-810.)

## 2.    Chemtech Partnership Agreement (JX 2L)

The Amended and Restated Agreement of Limited Partnership of Chemtech Royalty Associates, L.P. governed the operation of the Chemtech Partnership.  (JX 2L.)

Computation of Partnership Profit / Loss

Partnership Profits or Losses were calculated in the same manner as Partnership taxable income, except that non-cash expenses related to asset amortization / depreciation were calculated using the book value of the assets rather than the tax basis.  (JX 2L § 1.10, CT00036497-98.)  Profit or Loss does not include gain or loss from capital transactions, because as discussed below, such gain or loss is specially allocated.

Allocation of Partnership Profit / Loss

Allocations of Profit increase a Partner's Capital Account.[1]  Profits were generally allocated first 99 percent to the Class A Investors and 1 percent to Dow Europe until the Class A Investors received their Priority Return, which was generally equal to 6.947 percent of the Class A Investors' Original Capital Contribution, including the portion of each Class A Investors' Capital Account that it acquired from Ifco.  (JX 2L § 3.1, CT00036510-11.)  Thereafter, profits were allocated 98 percent to DTPC, 1 percent to Dow Europe, and 1 percent to the Class A Investors.

Allocations of Loss reduced a Partner's Capital Account.  Losses were allocated in a similar manner as profits:  first, to all Partners in proportion to their share of previous profit allocations; second, 98 percent to DTPC, 1 percent to Dow Europe and 1 percent to the Class A Investors until DTPC's Capital Account was reduced to zero; third, 99 percent to the Class A Investors and 1 percent to Dow Europe until the Class A Investors' Capital Accounts were reduced to zero; and, the remainder to Dow Europe.  (JX 2L § 3.2, CT00036511-12.)

Allocation of Gains / Losses from Capital Transactions

Gains and losses from capital transactions (e.g., gains and losses resulting from marking the patent assets to market) were specially allocated.[2]  (JX 2L § 3.3(l), CT00036515.)  Allocations of

---

[1]    For purposes of clarity, we have omitted certain loss recovery allocation provisions in the Chemtech I agreement.

[2]    *Id.*

gain increased a Partner's Capital Account. Generally, gain from capital transactions was allocated 94 percent to DTPC, 5 percent to Dow Europe, and 1 percent to the Class A Investors. (JX 2L § 3.3(l)(vi), CT00036516-17.)

Allocations of loss from capital transactions reduced a Partner's Capital Account. Losses from capital transactions were allocated: first, to all Partners in proportion to their respective shares of previous Profit and gain allocations; second, 98 percent to DTPC, 1 percent to Dow Europe and 1 percent to the Class A Investors until DTPC's Capital Account was reduced to zero; third, 99 percent to the Class A Investors and 1 percent to Dow Europe until the Class A Investors' Capital Accounts were reduced to zero; and the remainder to Dow Europe. (JX 2L § 3.3(m), CT00036517.)

<u>Guaranteed Payments</u>

DTPC, Dow Europe, and the Class A Investors received guaranteed payments under the Partnership Agreement. (JX 2L § 4.1, CT00036520.) DTPC's guaranteed payment was equal to 2.279 percent of its Capital Account, calculated on an annual basis. (JX 2L § 1.10, CT00036485 (definition of Class B Limited Partner's Guaranteed Payment).) Dow Europe's guaranteed payment was equal to 1 percent of DTPC's guaranteed payment. DTPC and Dow Europe's guaranteed payments were paid quarterly. These guaranteed payments were treated as expenses of the Partnership in computing Partnership Profit, and therefore the Capital Accounts for DTPC and Dow Europe were not reduced by the guaranteed payments they received.

The Class A Investors were entitled to the Class A Guaranteed Payment upon termination of their investment in Chemtech prior to August 6, 2000. (JX 2L § 12.7, CT00036569.) This payment was designed to compensate the Class A Investors for swap and funding breakage costs, to the extent the investors incurred such costs, as well as for margin (on an expected value basis) that they expected to earn through August 6, 2000.

<u>Cash Distributions</u>

Distributions reduced a Partner's Capital Account by the fair market value of the property distributed. The Partnership Agreement required quarterly and annual cash distributions. (JX 2L § 4.2, CT00036521-22.) The Class A Investors received quarterly distributions in the amount of the Priority Return. Dow Europe received a quarterly distribution in the amount of the Secondary Return (which was generally equal to 1/99[th] of the priority return).

<u>Voting Rights</u>

The Class A Investors had limited voting rights commensurate with their status as limited Partners. These voting rights provided the Class A Investors with the ability to prohibit the Partnership from taking actions inconsistent with the Class A Investors' investment objectives. For example, the Class A Investors' consent was required prior to any additional Capital Contributions. (JX 2L § 2.3(a), CT00036505.) Similarly, the Class A Investors' consent was required prior to any distributions not provided for by the Partnership Agreement. (JX 2L § 4.4, CT00000036522.) The Class A Investors also had consent rights regarding a variety of activities

managed by the general Partner, Dow Europe, including consent prior to the Partnership merging or consolidating with or into any other entity. (*See* JX 2L § 5.3, CT00036523, § 5.3(a)(xvi), CT00036525.)

Meetings

The Partnership Agreement required that Dow Europe call regular, annual meetings of the Partners for purposes of reviewing the activities of the Partnership during the prior year. (JX 2L § 9.2(b), CT00036550.) The Class A Investors were included in these annual meetings.

Optional Liquidation Events

The Partnership Agreement provided for several Optional Liquidation Events upon which either the Dow Partners or Class A Investors could terminate their investment in Chemtech. (JX 2L § 14.1, CT00036571-76.) For example, if the Partnership failed to earn Profits of at least 98 percent of the Class A Investors' Priority Return, or if the Partnership failed to hold at least $50 million in Core Financial Assets, the Class A Investors could elect to terminate their interest. The Class A Investors could also terminate their interest if Dow or its affiliates failed to perform as required under the relevant agreements, or at any time after April 6, 2000.

Dow Purchase Option

DTPC had the option of purchasing the Class A Investors' interests at any time after August 4, 2000. If the Class A Investors opted to terminate their interests, DTPC could choose to purchase the interest rather than liquidate the Partnership. (JX 2L § 14.3, CT00036577-81.) If DTPC exercised its purchase option, it would purchase the Class A Investors' interest for an amount equal to the Class A Investors' capital accounts plus certain Class A Investor expenses. (JX 2L § 14.3(d)(i), CT00036578-79.)

Liquidation

Upon liquidation, the assets of the Partnership would be distributed first to third-party creditors, second to related party creditors (i.e., Partner liabilities), and finally, *pari passu*, to the Partners in proportion to their positive Capital Account balances. (JX 2L § 12.2, CT00036565-67.)

## 3.    Patent License Agreement (JX 2O)

Under the Patent License Agreement, Chemtech granted Dow the non-exclusive right to make use and sell products under certain patents in the United States. (JX 2O.)

Dow was obligated to make royalty payments equal to the greater of Earned Royalties or Minimum Royalties. (JX 2O § 3.3, CT00036703.) Earned Royalties were based upon the Quantity of Product Manufactured ("QPM") under each Patent Portfolio. (JX 2O § 3.1, CT00036701-02.)

A Patent Portfolio consisted of multiple patents, which were typically used together as part of an integrated manufacturing process. Each Patent Portfolio was assigned its own royalty rate, and its own license termination date. (JX 2O at Exhibit B, CT00036728-66.)

Dow had the option of extending the license with respect to any Patent Portfolio. (JX 2O § 4.2(a), CT00036706-07.) If Dow exercised its option, the Patent Portfolio Royalty Rate would be adjusted to the then current fair market value. (JX 2O § 4.2(b), CT00036707.) Generally, if a patent was found to be invalid, Dow was no longer obligated to pay royalties with respect to the invalid patent. (JX 2O § 3.5(a), CT00036703-04.)

Dow indemnified Chemtech and its Partners for any losses suffered by reason of Dow's use or exercise of rights under the Patents. (JX 2O § 8.1, CT00036713.)

## 4.      Dow Limited Partner Guaranty (JX 2M)

Dow executed a Limited Partner Guaranty in favor of the Class A Investors. (JX 2M.) Under the Guaranty, Dow guaranteed the performance by each of the Dow affiliates of its respective obligations under the relevant agreements. (JX 2M § 1(a), CT00036656.) Dow also agreed that if the Partnership liquidated or DTPC agreed to purchase the Class A Investors' interests, and the Class A Investors were not paid the balance of their Capital Accounts within the timeframe provided by the Partnership agreement, that it would pay interest in a stipulated amount for the delay. (JX 2M § 1(b), CT00036656-57.)

Dow did not guaranty the return of the Class A Investors' initial investment in Chemtech or the financial performance of the Partnership.

## 5.      Dow Liquidator Guaranty (JX 2P)

Dow guaranteed the payment of fees to a Liquidator of the Partnership, in the event such Liquidator was not Chemtech's general Partner. (JX 2P § 1, CT00036778-79.) Dow also indemnified the Liquidator for liability arising from its actions as Liquidator, provided such actions were not grossly negligent, fraudulent, or willful misconduct. (JX 2P § 2, CT00036779-80; JX 2L § 12.9(c), CT00036570.)

## 6.      Supplemental Dow Indemnity (JX 2N)

Dow indemnified each of the Class A Investors for liability arising during the period prior to registration of the Class A Investors as limited Partners in Chemtech in the Zurich Commercial

Register.  (JX 2N § 1, CT00036690.)  Registration in the Zurich Commercial Register was completed on October 19, 1993. (JSOF ¶ 46.)


## Summary - Chemtech II 1998 Agreements


## 1.    Purchase Agreement (JX 3EE)

Ifco and RBDC executed a Purchase Agreement by which Ifco sold its limited partnership interest in Chemtech II to RBDC.  (JX 3EE.)  The agreement provided that RBDC would pay $200 million in exchange for Ifco's limited Partner interest, and that Ifco would withdraw from Chemtech as a limited Partner (but remain as the general Partner).


## 2.    Chemtech II Partnership Agreement (JX 3DD)

The Third Amended and Restated Agreement of Limited Partnership of Chemtech II, L.P. governed the operation of the Chemtech II Partnership.  (JX 3DD.)

Computation of Partnership Profit / Loss

Partnership Profit or Losses were calculated in the same manner as taxable income, with certain exceptions, including that book depreciation would not be taken into account.  (JX 3DD § 1.10, CT00057257.)  As discussed below, book depreciation was excluded from the calculation of Profit or Losses because it was specially allocated.

Allocation of Partnership Profit / Loss

Special allocations of certain Partnership items were made prior to the general allocations of Profit and Loss.  (JX 3DD § 3.01, CT00057262-64.)  Book depreciation, which reduced Partner capital accounts, was allocated 99 percent to Ifco and DCDC in proportion to the capital account of each Partner, and 1 percent to the Class A Investor until the capital accounts of Ifco and DCDC were reduced to zero.  (JX 3DD § 3.03(e), CT00057265-66.)

Allocations of Profit increased Partner capital accounts.[3]  Profits were first allocated 100 percent to the Class A Investor until it received an amount equal to its Priority Return.  (JX 3DD § 3.01(a), CT00057263.)  Second, Profit was allocated 100 percent to the Class A Investor until it received an amount equal to the depreciation it was specially allocated.  (JX 3DD § 3.01(c), CT00057263.)  Third, Profit was allocated to Ifco and DCDC until each was allocated an amount equal to the depreciation it was specially allocated.  (JX 3DD § 3.01(d), CT00057263.)  Fourth,

---

[3]    For purposes of clarity, we have omitted certain loss recovery allocation provisions contained within the Chemtech II Partnership agreement.

Profit was allocated to Ifco and DCDC until each received its Secondary Return, which was equal to approximately 8.375 percent of each Partner's capital account. (JX 3DD § 3.01(f), CT00057263.)  Finally, the remainder of the Profit was allocated 99 percent to Ifco and DCDC, and 1 percent to the Class A Investor (the "residual Profit" allocation). (JX 3DD § 3.01(g), CT00057264.)

Allocations of Loss reduced a Partner's Capital Account.  Losses were allocated:  first, to all Partners in proportion to their allocations of residual Profit; second, to Ifco and DCDC in proportion to their allocations of Secondary Return; third, 99 percent to Ifco and DCDC in proportion to their Capital Account balances and 1 percent to the Class A Investor until Ifco and DCDC's Capital Accounts were reduced to zero; fourth, to the Class A Investor until its Capital Account was reduced to zero; and, the remainder to Ifco.  (JX 3DD § 3.02, CT00057264.)

<u>Cash Distributions</u>

Quarterly cash distributions to the Class A Investor were required in an amount equal to its cumulative Priority Return.  (JX 3DD § 4.01, CT00057268.)

<u>Voting Rights</u>

The Class A Investor had limited voting rights commensurate with its status as limited Partner.  These voting rights provided the Class A Investor with the ability to prohibit the Partnership from taking actions inconsistent with the Class A Investor's investment objectives.  For example, the Class A Investor's consent was required prior to the Partnership investing in assets other than Permitted Assets.   (JX 3DD § 5.03(g), CT00057270.)

<u>Notice / Liquidation Events</u>

The Partnership agreement provided for several Notice Events upon which the Class A Investor could terminate its investment in Chemtech II.  (JX 3DD § 14.01, CT00057297-98.)  Generally, if Dow or its affiliates failed to perform as required under the agreements, the Class A Investor could choose to issue a Liquidation Notice, which would either cause the liquidation of the Partnership or allow the Dow Partners to purchase the Class A Investor's interest.  The occurrence of March 8, 2003 was such a Notice Event.  When this Notice Event occurred, Dow and the Class A Investor renegotiated certain terms of the agreement, but did not liquidate the Partnership.

<u>Dow Purchase Option</u>

The Dow Partners had the option of purchasing the Class A Investor's interest at any time after June 26, 2003.  If the Dow Partners exercised the purchase option, it would purchase the Class A Investors' interest for an amount equal to the Class A Investors' capital accounts plus certain Class A Investor expenses.  (JX 3DD § 14.03, CT00057298-99.)  The Dow Partners also had the option of purchasing the Class A Investor's interest upon receipt of a Liquidation Notice.

7

Liquidation

Upon liquidation, the assets of the Partnership would be distributed first to third-party creditors, second to related party creditors (i.e., Partner liabilities), and finally, *pari passu*, to the Partners in proportion to their positive Capital Account balances.  (JX 3DD § 12.02, CT00057292-93.)

## 3.  Chemtech Lease Agreement (JX 3T)

Under the Chemtech Lease Agreement, Chemtech II leased the Plant Assets, consisting of the Light Hydrocarbon 3 Facility and Benzene Plant near Plaquemine, Louisiana, to Dow.  (JX 3T § 2.01, CT00057137.)  The term of the lease was for a period of 18 years, commencing on June 12, 1998.  (JX 3T § 3.01, CT00057137.)  Dow was obligated to make quarterly Rent payments totaling $77,451,000 annually.[4]  (JX 3T § 3.03, CT00057138.)  The lease was a "net lease" under which Dow was obligated to make Rent payments in all events unless the Plant Assets suffered an Event of Loss, in which case Dow was obligated to pay the Stipulated Loss Value.  (JX 3T § 3.07, CT00057138-39, § 10.01, CT00057157-58.)  Dow was also obligated to insure the Plant Assets and pay certain taxes relating to the Plant Assets.  (JX 3T § 8.13, CT00057151-54, § 9.01, CT00057156.)

Dow indemnified Chemtech II and its Partners against claims, among others, arising out of the operation of the Plant Assets, negligent acts or omissions by Dow employees in connection with the operating of the Plant Assets, and Environmental Liabilities arising after commencement of the lease.  (JX 3T § 8.12, CT00057150-51, § 8.14, CT00057155, § 8.15, CT00057155-56.)

## 4.  Dow Guaranty (JX 3GG)

Dow executed a Guaranty in favor of the Class A Investor.  (JX 3GG.)  Under the Guaranty, Dow guaranteed the performance by each of the Dow affiliates of its respective obligations under the relevant agreements.  (JX 3GG § 2(a), CT00057333.)  Dow also agreed that if the Partnership liquidated or if a Dow Partner agreed to purchase the Class A Investor's interest, and the Class A Investor was not paid the balance of its Capital Account within the timeframe provided by the Partnership agreement, that Dow would pay interest in a stipulated amount for the delay.  (JX 3GG § 2(b)(ii), CT00057333-34.)

Dow did not guaranty the Class A Investor's initial investment in Chemtech II or the financial performance of the Partnership.

---

[4]  The initial rent was $66,132,000 annually, but was increased in 2001 to reflect the addition of certain plant improvements.

**APPENDIX II**

**Computation of Debt-To-Total-Capital Ratio and Differing
Impacts of Debt and Equity Classification**

| Scenario | Balance Sheet | | | | | Total Capital (Debt + Equity) | Debt-to-Total Capital Ratio Calculation | Debt-to-Total Capital Ratio |
|---|---|---|---|---|---|---|---|---|
| | Assets | = | Debt | + | Equity | | | |
| **Baseline** | $100 | = | $40 | + | $60 | $100 | $\dfrac{\$40}{\$100}$ | 40.0% |
| **Scenario 1 – Issue $10 of Debt** | $110 | = | $50 | + | $60 | $110 | $\dfrac{\$50}{\$110}$ | 45.5% |
| **Scenario 2 – Raise $10 of Minority Equity** | $110 | = | $40 | + | $70 | $110 | $\dfrac{\$40}{\$110}$ | 36.4% |