# **PLAINTIFF'S PRE-TRIAL BRIEF**

# **EXHIBIT A**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| ──────────────────────────── ) | |
| ROHM AND HAAS COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 4309-CC |
| ) | |
| THE DOW CHEMICAL COMPANY ) | |
| and RAMSES ACQUISITION CORP., ) | |
| ) | |
| Defendants. ) | |
| ──────────────────────────── ) | |

<u>**ANSWER OF DEFENDANTS**</u>
<u>**THE DOW CHEMICAL COMPANY AND RAMSES ACQUISITION CORP.**</u>

 Anxious to deliver a blunt message to Dow, Rohm and Haas's Complaint effectively

delivers the same "tough luck" language to the thousands of people who today *are* Rohm and

Haas, an integral group of stakeholders with a vested interest in the success of a newly merged

enterprise, which in turn completely depends upon them.  As well, Rohm and Haas turns a blind

eye to the very difficult issue that the Court now confronts—whether the forced integration of

tens of thousands of jobs and the judicial creation of a new entity is equitable considering *all* of

the relevant legal interests.  Contrary to the Complaint's suggestion, the interests of Rohm and

Haas shareholders who control the company today but have no contractual rights whatsoever to

consummation of the merger—and no stake in its future prospects—are not dispositive.

 This is a case with strongly competing interests that have to be weighed.  There are no

black and white hats or simple answers, only intimidating and evolving uncertainties that must

be thoroughly understood before any irreversible action is taken.  Nor can this case be fit into the

neat platitudes of "buyer's remorse" or "the market has changed."  While the collapse of the

financial markets is important to the case, it is only one part of the problem.  And even as late as

early December 2008, when any buyer would have had some regret, Dow still stood behind its commitment, as it would like to do even today. The problems that are the immediate cause of this controversy were yet to come in December and have yet to be resolved today.

While Rohm and Haas's counsel may casually dismiss these problems by stating that "What will happen in the future to the bridge financing, it is you know, frankly, not Rohm and Haas's problem. We bargained for a closing," (Jan. 27, 2009 Court Hrg. Tr. at 11), the reality is starkly different for the approximately 15,000 employees of Rohm and Haas, as well as the more than 40,000 Dow employees being joined at the hip with them in the merged enterprises, and their associated communities, customers and suppliers. For those employees in Philadelphia, Pennsylvania, Midland, Michigan and the hundreds of other communities in which Dow, Rohm and Haas and their many customers and suppliers do business, the viability of the merged entities and their prospects for creating value are vital. The interests of **all** who make up Dow and Rohm and Haas, and not just the narrow interests of some, must be balanced carefully before the drastic remedy of specific performance is ordered.

Dow has charted a path forward, urged Rohm and Haas (the **company**) to walk with it down that path, and is prepared to work in like fashion with the Court as well, so that this case enhances rather than impedes progress toward a business solution. Forcing a merger under the present circumstances will cause irreparable harm to both Dow and Rohm and Haas. Prudence dictates that the welfare of all legitimate stakeholders be considered and that a fair and workable solution be found.

### FACTS COMMON TO DOW'S ANSWERS TO PLAINTIFF'S ALLEGATIONS AND TO DOW'S ADDITIONAL DEFENSES

The response in Paragraphs 1 through 49 immediately below provide factual predicates generally applicable throughout Dow's answers to the allegations of Plaintiff's Complaint and

also applicable to Dow's additional defenses.  These responses are stated once here to avoid repetition, and are incorporated by reference in Dow's answers to individual Paragraphs 1 through 50 of the Complaint and in Dow's additional defenses.

## I.  THE AGREED MERGER CONTEMPLATED A TRANSFORMATIVE INTEGRATION OF TWO FINANCIALLY STRONG AND COMPLEMENTARY COMPANIES

1.      Far from being either a passive investment or the acquisition of a much smaller company, the transaction at issue was to be a dramatic evolution for both Dow and Rohm and Haas.  The merger was designed to implement the central goal of a strategy that had been years in the making.  By 2005, it had become clear to Dow that shifting the company toward specialty chemical markets would reduce its exposure to cyclical forces and provide the best platform for long-term earnings growth.  To that end, Dow management developed a new business strategy for the entire company, consisting of two main components:  (a) finding strategic partners to co-invest in Dow's existing basic chemical businesses, and (b) expanding Dow's presence in specialty chemical markets, both through internal growth and through acquisitions.  The two-prong strategy was and is intended to transform Dow into what its CEO Andrew Liveris described to analysts on December 8, 2008 as a "leaner, higher growth, market centered" portfolio of businesses.

2.      As it embarked on this strategy, Dow brought to the table both a specialty chemicals and plastics business and a commodity or "basic" chemicals and plastics business, combined in a financially strong corporation.  Last year, about 48% of Dow's revenues came from basic chemicals and plastics such as chlorine, polyethylene (whose end uses include packaging), polypropylene (used, e.g., in carpeting and clothing), and polystyrene (used, e.g., in "Styrofoam" brand insulation).  About 45% of Dow's revenues came from specialty chemicals and plastics, including materials such as polycarbonate (used, e.g., in eyeglasses, computers),

specialty polymers and materials used in paper coatings, electronics and water purification, and ethanolamines (used, e.g., in lubricants and flat panel LCDs).  The remaining 7% consisted of agricultural products such as herbicides.

3.      For 2007, Dow and its consolidated subsidiaries had net sales of $53.5 billion, and pretax profits of $4.2 billion.  Dow operates 150 manufacturing sites in 35 countries and employs more than 40,000 people.  As of mid-2008, Dow revenues for 2008 were projected to be around $58 billion.  As of mid-2008, Dow's debt was stable and highly-rated.  Dow's debt had strong, investment-grade ratings of A3 from Moody's and A- from Standard & Poor's.  In addition, Dow regularly issued commercial paper in the range of $1 to $2 billion, with a strong A2/P2 rating to support Dow's critical daily cash funding needs.  The commercial paper was backstopped by a $3 billion committed revolving credit facility.  In the first half of 2008, Dow's share price ranged from $33.01 to $43.43, corresponding to a market capitalization of approximately $30 to $40 billion.  On July 7, 2008, the date of the Rohm and Haas offer, Dow opened at $34.31 per share and its market capitalization was $31.7 billion.  Rohm and Haas's opening market capitalization that day was $8.9 billion, about 28% of Dow's.

4.      Dow's relationships with customers and suppliers are vast.  Dow has more than 16,500 customers in the United States and 50,000 total customers in at least 167 countries worldwide.  Dow has approximately 20,000 active suppliers in at least 112 countries.  Many of these relationships are longstanding and deep-rooted in communities throughout the United States and the world.

5.      Rohm and Haas was an ideal strategic candidate for merging with Dow to form a new and powerful force in specialty materials and specialty chemicals and to enhance the balance with Dow's basic chemicals and plastics business.  From its headquarters in

4

Philadelphia, Rohm and Haas operated a worldwide specialty materials business with $8.9 billion of revenues and $2.5 billion of gross profits for 2007. As of June 2008, revenues for 2008 were estimated to be increasing to $9.7 billion. Rohm and Haas employed more than 15,700 employees at 131 manufacturing or R&D sites in 27 countries. Rohm and Haas's specialty materials and specialty chemicals business lines included: coatings, electronic materials used in semiconductors and computers, specialty adhesives, polymers and coatings used in packaging and building materials, primary raw materials used as intermediates for paints/coatings and packaging/building materials, performance materials such as ion-exchange resins and powder coatings used in paper, water and food processing, and personal care products.

6. It was to be a merger made in heaven and for one very important reason— "synergy"—that is easy to articulate but hugely difficult to execute successfully in practice. What's required is the seamless combination of two very large and complex organizations into a community of people who work as one and who will then build on their complementary strengths and resources to achieve a level of cooperation and performance that, if achieved, will produce huge new value.

7. The merger would create the world's largest specialty materials and specialty chemicals company. After the merger (and consummation of the K-Dow joint venture, discussed below) Dow's new Rohm and Haas Advanced Materials division (the "Rohm and Haas Division") would contribute 59% of total revenues (up from 45% in the old Dow), Dow's vulnerability to cyclicality would be reduced, margins would be increased, and earnings growth would be stabilized. The potential synergies were substantial and were key to the deal. Assuming that Dow and Rohm and Haas employees succeeded in integrating the companies, Dow expected the merger to create about $800 million per year in operational and cost synergies.

These included $400 million in efficiencies expected to be achieved by integrating operations (corporate overhead, R&D and sales office consolidations); $150 million of expected synergies from combining technologies; and $250 million in increased purchasing leverage. The net present value of the growth synergies expected to be realized by combining the two companies was an estimated $1.3 to $1.9 billion. All told, under conditions as they existed in mid-2008, the present value of anticipated cost and growth synergies (net of integration costs) was estimated to exceed $5 billion. Assuming a successful integration, it would be a company whose whole would exceed the sum of its parts.

        8.      The talent and experience of the people of Rohm and Haas—at all levels of the company—were at the heart of the plan to realize those synergies. The headquarters of the new Rohm and Haas Division would remain in Philadelphia. Rohm and Haas and its leadership would become the primary vehicle for Dow's downstream specialty materials and specialty chemicals strategy and its implementation. About $5 billion (annual revenues) of Dow's specialty businesses would be contributed to the Rohm and Haas business unit, where the integrated businesses were expected to benefit from Rohm and Haas's experience and skill. Senior Rohm and Haas executives and managers were assigned key roles in Dow or the new Rohm and Haas Division, including the CEO of the Rohm and Haas Division. To make sure they would stay, substantial "stay bonuses" for key managers were approved by Rohm and Haas in late 2008, to be paid by Dow six months after consummation of the merger, as an incentive for those managers to remain and help effect the integration. Dow has announced plans to realign and integrate Rohm and Haas businesses and product lines—including Acrylic Monomers, Primary Materials and Plastic Additives—among four Business Divisions of the merged entity: Hydrocarbons and Basic Plastics, Basic Chemicals, Performance Products, and Health

Agriculture and Infrastructure.  Dow has also announced plans to align business leaders from old Dow and Rohm and Haas into the various business groups of the new Rohm and Haas division.

9.      On July 7, 2008, Dow made a $76 per share all-cash offer for Rohm and Haas. After intensive negotiations and an increase in the share price to $78, Rohm and Haas accepted the offer on July 10, 2008.  Total cash consideration to be paid to Rohm and Haas shareholders by Dow upon closing was $15.3 billion (plus approximately $375 million in payments to holders of Rohm and Haas stock options), and Dow would also assume $3.2 billion of Rohm and Haas debt.  Again, the fundamental rationale for doing this transaction—which came at a 74% premium over Rohm and Haas's market price versus the July 9, 2008 market closing price—was the tremendous synergies that would be obtained in the merged entities.  It was precisely for this reason that Andrew Liveris, Dow's CEO, characterized Rohm and Haas as rare "beachfront property" and a rare "jewel" the likes of which does not come on the market often.

10.      Financing for the planned merger was threefold.  The first component was the long-planned first prong of Dow's transformative strategy:  finding partners to co-invest in its basic plastics business.  By the time of the offer to buy Rohm and Haas, a partner had been found and this key transaction was far advanced.  After discussions during 2007 with many interested co-investors, in December 2007 Dow signed a detailed Memorandum of Understanding with Kuwait's national petrochemical company, Petrochemical Industries Company ("PIC"), in anticipation of consummating the joint venture, called K-Dow Petrochemicals, by the third quarter of 2008, which was expected to result in approximately $9 billion of cash proceeds to Dow.

11.      Dow had two additional sources of financing.  Dow secured $4 billion in equity commitments, $3 billion of which came from Berkshire Hathaway Inc., representing a vote of

confidence from one of the investment community's most esteemed judges of long-term value, Warren Buffett. The remaining $1 billion came from the Kuwait Investment Authority ("KIA"), another demonstration of commitment of the State of Kuwait to its ongoing and extensive partnership with Dow. Finally, Dow secured a $13 billion short-term bridge loan from a consortium of 19 banks. The bridge loan was not designed to be the primary funding vehicle for the Rohm and Haas acquisition. Rather, the bulk of the bridge loan was put in place as a short-term backstop in the event that the Rohm and Haas closing occurred before the K-Dow joint venture closed. The term of the bridge loan is 12 months from closing or until April 14, 2010 (whichever comes first), and only a fraction of the loan was expected to be owed for anything close to that duration. With these multiple layers of financing, Dow fully expected that the merged entities would thrive and retain a strong investment-grade credit rating and thereby retain financial flexibility, even under conservative estimates.

12.    While negotiation of the Rohm and Haas deal and its financing took place against a backdrop of unsettled credit markets, the problems seemed to be limited to mortgage-backed securities, the adverse effects of which to that point had been concentrated in a handful of banks and mortgage lenders and did not appear widespread or worldwide. At a number of major financial institutions—including Wells Fargo, JPMorgan Chase, Goldman Sachs, Citigroup, and Bank of America—second quarter 2008 earnings actually beat expectations. And the prevailing outlook was cautiously optimistic. As recently as May 16, 2008, Treasury Secretary Henry Paulson had commented: "In my judgment, we are closer to the end of the market turmoil than the beginning." In short, the coming catastrophe of frozen financial markets and the historic economic plunge in general conditions and even steeper plunge in the chemical business were not risks that could remotely be anticipated in the middle of 2008.

II. **BOTH HISTORY AND THE CONTRACT DOCUMENTS MAKE CLEAR THAT (1) NO ONE ANTICIPATED THE EVENTS BOTH COMPANIES FACE NOW, AND (2) THE SHAREHOLDERS WHO ARE THE TRUE DRIVERS OF THIS LITIGATION HAVE NO CONTRACTUAL RIGHT TO CONSUMMATION OF THE AGREEMENT**

13.    The Complaint quotes at length the provisions of the Merger Agreement that provided Rohm and Haas great legal certainty that the merger would be consummated and, correspondingly, imposed many limitations on Dow's ability not to close.  But those very provisions and the robust auction which led to them completely belie any notion that the parties contemplated the rapid devolution of the financial system in the fall of 2008, much less the stunning and unique problems that beset Dow later on.  While Rohm and Haas may argue now for the *legal* proposition that the Merger Agreement contemplated and allocated the risks that have subsequently emerged, as a matter of historical *fact* there was no contemplation or allocation of the severe and historic collapses that have taken place.

14.    The Complaint's recitation of the Merger Agreement terms also is carefully selective in making a very important omission.  The Complaint fails even to mention that those for whom this litigation is brought have no legal right to assert against Dow.  That right was specifically negotiated by Dow and Rohm and Haas and was bargained away.  Rohm and Haas prepared the initial draft of the Merger Agreement, in which it proposed an exception to the prohibition on third-party beneficiaries that would allow "the Company [*i.e.*, Rohm and Haas], on behalf of the holders of equity interests in the Company, to pursue damages in the event of any breach of this Agreement."  Dow rejected this proposed amendment and insisted on an unqualified prohibition of third-party beneficiaries, with no exception for Rohm and Haas's shareholders or for Rohm and Haas to pursue damages for injury to equity interests.  In the next draft, Rohm and Haas proposed the carve-out yet again; in its counter-draft, Dow rejected it again.  Rohm and Haas finally acquiesced, agreeing that the Merger Agreement would not confer

9

any rights on its shareholders, as memorialized in the final version of Section 8.10 of the Merger

Agreement:

> Section 8.10  Entire Agreement: Third-Party Beneficiaries.  This Agreement
> (including the exhibits and schedules hereto) and the confidentiality Agreement
> constitute the entire agreement, and supersede all other prior agreements and
> understandings, both written and oral, between the parties, or any of them, with
> respect to the subject matter hereof and thereof is not intended to and shall not
> confer upon any person other than the parties hereto any rights or remedies
> hereunder except for the provisions of Section 5.9 hereof.  Nothing contained in
> this Agreement shall be deemed to amend any Company Benefit Plan or to confer
> on any employee the right to enforce the covenants included in Section 5.5.

As a consequence, Rohm and Haas cannot assert any shareholder rights or claims based on

damage to equity interests.

## III.    AS THE MARKETS COLLAPSED IN THE LATTER HALF OF 2008, DOW FINALIZED THE FINANCING FOR THE MERGER AND STOOD BY THE DEAL

15.    After the merger agreement was signed, a cascading sequence of market failures

of historic proportions took place, and conditions worsened throughout the end of 2008.  Among

other events, (a) the U.S. Federal Reserve Bank announced $85 billion in emergency lending to

AIG; (b) a money market fund managed by Reserve Management Corporation "broke the buck"

as its net asset value fell below $1 per share; (c) the U.S. Treasury was forced to insure money

market funds to prevent a run on the funds; (d) the U.S. regulators seized the assets of

Washington Mutual, the sixth-largest domestic bank; (e) one of the nation's oldest and largest

investment banks, Bear Stearns, was allowed to fail; (f) markets for auction securities, various

derivatives instruments, bonds, commercial paper, money-market funds and even LIBOR inter-

bank lending froze, and have only partly unfrozen since; (g) Congress and the President enacted

a massive bailout plan; (h) the federal government rescued Citigroup, one of the three lead banks

on Dow's bridge loan; (i) Merrill Lynch, another of the three lead banks on the bridge loan, was

absorbed by Bank of America, whose own widely reported struggles continue to worsen; and (j)

Standard & Poor's downgraded the credit ratings of eleven of the world's largest banks, signaling that the global financial crisis would be deeper and last much longer than expected.

16.    Today, the shriveled market capitalizations of the major banks illustrate the severity of what has happened. The aggregate market capitalization of the 19 banks participating in Dow's bridge loan dropped over 50% from July 7, 2008 ($1.19 trillion) to January 30, 2009 ($586 billion). One of the lead lenders, Merrill Lynch, no longer exists as a standalone company. The lead story in last Friday's *Wall Street Journal* showed Citigroup trading for 20% of its book value and Bank of America (which absorbed Merrill Lynch) trading at 33% of book.

17.    Yet Dow continued down the path toward consummation. On September 8, 2008, Dow signed a definitive credit agreement providing for the bridge loan. On October 27, 2008, it signed definitive investment agreements with Berkshire Hathaway and the Kuwait Investment Authority for the $4 billion of convertible preferred stock.

18.    Dow took rapid steps to position and structure the businesses for the upcoming integration. To proactively mitigate potential antitrust issues associated with the merger, on September 10, 2008, Dow announced it had engaged a financial advisor and in the fall commenced discussions with potential buyers of its Clear Lake, Texas acrylic acid and esters and UCAR Emulsion Systems specialty latex businesses in North America, which operated in similar markets to certain Rohm and Haas businesses.

19.    On November 24, 2008, the Supreme Petroleum Council of Kuwait ("SPC") approved the proposed K-Dow joint venture and immediately thereafter, on November 28, 2008, the K-Dow Petrochemicals joint venture agreement with PIC was executed. On December 15, 2008, K-Dow executed a $3.7 billion two-year credit agreement to finance K-Dow, and more than 1,000 Dow employees were prepared for the K-Dow start-up. Dow expected that, at or

shortly after the K-Dow closing on the agreed date of January 2, 2009, Dow would receive $9 billion of funds provided from the K-Dow transaction.

20.    By December 18, 2008, Dow had identified over 100 business leaders from Dow and Rohm and Haas to fill positions at the new Rohm and Haas Division, and had developed a detailed plan to integrate the marketing, communications, finance, human resources, legal, manufacturing, engineering, research and development, and shared services functions of the new division.  Organizational charts of each of these eight functions were filled in—in detail—with roughly half of the leaders coming from Rohm and Haas and half from Dow.  Despite the deteriorating economic and financial climate, Dow was focused on closing the transaction, on time and as planned.

21.    Throughout December, Dow incurred significant legal, appraisal-related, and accounting expenses in pursuit of the deal.  The total amount of these fees exceeds $50 million.  This amount is in addition to the more than $165 million in banking fees Dow has committed to pay to secure initial financing.

22.    Dow was not blind to the implications for the merger of the deteriorating market.  But the decision to proceed was not changed.  On December 8, 2008, Dow CEO Andrew Liveris declared publicly that the deal was "on track."  This was more than just talk.  At the same time that Dow was publicly expressing its commitment to the deal, implementation planning was actively underway, with over 1,000 Dow employees engaged in the task.  Thousands of implementation tasks were carried out or set forth in highly detailed, complex implementation plans to be executed postmerger.  Dow employees who were slated to move to Philadelphia made school and housing arrangements for their families.

## IV.    FOR DOW, ROHM AND HAAS, AND THE MERGER, THE WORLD CHANGED BEGINNING DECEMBER 28

23.    Over a period of mere days and weeks, a confluence of dramatic and unforeseeable shocks—to Dow, to the chemical industry as a whole, and to financial markets—upset all reasonable expectations and cast a dark shadow of uncertainty over the viability of the Rohm and Haas acquisition.

24.    First, on December 28, a press report in Kuwait and a phone call placed to Dow by PIC's parent reported that the K-Dow deal was in danger of collapse because Kuwait's Supreme Petroleum Council ("SPC") had rescinded its approval of the deal (notwithstanding that the Council's approval via a formal and binding resolution had been provided prior to the execution of the joint venture agreement on November 28, 2008). On New Year's Eve, Dow received written notification from PIC that PIC would refuse to close on January 2, 2009, due to the SPC's reversal—and PIC indeed did not close on that day. Dow is pursuing the legal remedies at its disposal, but the prospects for consummating the K-Dow transaction, and for Dow to gain access to the $9 billion cash the deal was intended to provide, remain profoundly uncertain.

25.    On December 29, the first business day after news of the K-Dow collapse surfaced, Moody's and S&P downgraded Dow's credit rating. S&P cut Dow's rating two levels, from A- to BBB. Moody's cut Dow's rating one level, from A3 to Baa1, the third-lowest investment grade. Moody's commented that the failed K-Dow deal "substantially increases the likelihood that Dow's credit profile will be weakened in any reasonable scenario." Furthermore, both rating agencies put Dow on a credit watch with negative outlook.

26.    As this was happening, economic conditions in the chemical industry deteriorated rapidly and dramatically, and have continued downward over the last several weeks. According

to a January 25, 2009, research report by Rohm and Haas's financial advisor for the transaction,

Goldman Sachs,

> Over the past several weeks, we have seen a series of profit warnings and bearish
> macroeconomic data points amplified by somber earnings outlook commentaries
> across the chemical industry.  In our view, this underscores ***dramatic,
> unprecedented global demand destruction*** across various key chemical end
> markets such as auto, construction, consumer, electronics, and industrial.
> Continued customer inventory destocking and production cutbacks along with
> prolonged holiday shutdowns have extended into January, suggesting further
> volume deterioration in 1H2009 with poor demand visibility broadly
> acknowledged.  (emphasis added)

A January 26, 2009, *Wall Street Journal* article noted that "[t]he global economic slowdown has

dried up demand for chemicals in virtually every market . . . ."  Jonathan Tyler, director of the

chemical-industry practice at investment bank Houlihan Lokey, characterized conditions in the

chemicals industry as "more than a perfect storm."

       27.     In response, each of the major players in the industry has dramatically decreased

production and cut jobs:

- In November 2008, BASF—the largest chemicals company in the world—closed 80
  plants and reduced production at 100 more.  Twenty thousand employees will be
  affected.  BASF explained that the "economic situation at the end of October" was
  "difficult," that "customer demand in key markets . . . declined significantly" in
  November.  On January 19, 2009, BASF again announced that its global business
  "declined significantly" in December 2008, including that its capacity utilization rate "is
  currently less than 75%."  BASF indicated that it saw "no signs of a turnaround" in
  January.

- In December 2008, DuPont issued a warning about its earning and in January reported a
  $629 million loss for the fourth quarter of 2008, compared to a $545 million profit in
  2007, and announced that it would cut 2,500 jobs.

- LyondellBasell, the third-largest chemicals company in the United States, filed for
  bankruptcy on January 6, 2009.

- In January 2009, Huntsman cut 1,175 full-time workers and another 490 contractors, or
  9 percent of its workforce, despite having received a $1 billion breakup fee from Hexion.

28.     Rohm and Haas and Dow both suffered body blows.  From June 2008 through January 2009, Rohm and Haas cut over 1,800 jobs.  For Dow's part, between October and December 2008, sales fell almost 30 percent, from $15.4 billion to $10.9 billion.  Dow's utilization rate suffered an extraordinary drop in December, from 71.6 percent to 44.4 percent—the lowest rate on record.  Dow's gross margins for the fourth quarter of 2008 declined by over $1 billion from the same period in the prior year, on a decline of over $3 billion in net sales.  In all, Dow suffered a net loss in the fourth quarter of $1.6 billion, as compared to a net profit of $470 million in the same period of 2007.  The drop-off in Dow's earnings has been severe, rapid, and unpredictable, to the point that internal forecasts of fourth quarter earnings made December 10, 2008 had overestimated Dow's actual earnings for the quarter (reported publicly today) by 92 cents per share.

29.     On January 30, 2009, Rohm and Haas's market capitalization of $10.8 billion exceeded Dow's market capitalization of $10.7 billion, a huge change from July 7, 2008 when Dow's market capitalization was more than three-and-one-half times larger than Rohm and Haas.  Indeed, the cost of the transaction itself now exceeds Dow's current market capitalization by about $5 billion.

30.     The outlook for 2009 is bleak.  Dow's January daily sales are tracking below December's.  Since July 10, 2008, consensus estimates of Rohm and Haas's 2009 earnings have fallen 31%.  And the global and chemical industry downturns show few signs of abating.

## V.    WITHIN THESE SAME 30 DAYS, DOW HAS RESPONDED IMMEDIATELY ON ALL FRONTS TO KEEP THE FOUNDATIONS FOR THIS DEAL FROM CRUMBLING

31.     Dow's response to the dual shocks of the K-Dow collapse and the severe and accelerating economic downturn has been swift and comprehensive.  Economic and business

management principles demand that in times of such uncertainty, firms should focus on cutting

costs and retaining cash, and Dow has done so.

32.     First, on December 8, 2008, Dow announced that that it would take the painful

steps of laying off 5,000 Dow employees (11% of Dow's total employees), cutting 6,000

contractors, temporarily halting production at 180 plants and permanently closing 20 plants

worldwide.  Dow has since accelerated its restructuring efforts, extended production cuts and

delayed calling back contract employees.

33.     Second, after receipt of PIC's December 31, 2008 communication, Dow sought to

rescue the K-Dow deal, while at the same time reaching out to alternative buyers.  In the three

weeks since PIC's withdrawal, Dow's management has been in contact with more than 15

potential partners.  A dedicated task force is working to identify and qualify the short list of

likely buyers so that expedited work and negotiations can begin soon.  There is genuine interest

in these assets, and substantial value to be realized if the investment is made without a fire sale.

Correspondingly, if Dow has to sell the assets in a fire sale, a significant part of their value will

be destroyed.  The extensive due diligence performed for K-Dow makes possible consummating

an alternative transaction on an expedited basis.

34.     Third, at the same time Dow began an analysis of other divestitures it could

potentially make to generate cash.  Although neither Dow's nor Rohm and Haas's strategic plans

called for the sale of these assets at this time because of their complementary fit with the

anticipated Rohm and Haas Division, Dow is considering sales not only of Dow's existing

businesses but also business units of the potential merged entity.

35.     Fourth, Dow dramatically reduced its spending.  In 2008, Dow's capital spending

amounted to $2.3 billion.  As of early December 2008, Dow's capital plan for 2009 had a

16

$1.65 billion target (plus about $200 million for K-Dow).  In mid-December, Dow slashed its

2009 capital program to $1.1 billion, requiring significant and dramatic changes in expectations

across every business and function.

36.     Fifth, Dow initiated an intensive dialogue with the credit rating agencies, working

night and day to understand their concerns and develop a plan to address them.  The agencies

have expressed grave worry over the chemical industry cycle; the strain now placed on Dow's

capital structure in the absence of the expected proceeds of K-Dow; and the company's ability,

should it proceed with the Rohm and Haas acquisition, to refinance the $13 billion bridge loan at

the expiration of its term in 12 months (or in April 2010, whichever is sooner) or avoid its

immediate repayment due to the failure of Dow to meet the required leverage covenant.  The

rating agencies have made clear that Dow's current, investment-grade credit rating will not

remain if the Rohm and Haas acquisition takes place and the bulk of the bridge loan is drawn

down, unless plans are put in place for significant changes, such as raising additional capital by

accessing the capital markets, or disposing of assets (both of which have great potential for value

destruction in this climate).  Maintaining a Moody's rating above Baa3 and a rating with S&P

above BBB- is critical to Dow's ability to maintain financing and run its business.

37.     Sixth, Dow is also seeking a one-year extension of a significant portion of the

bridge loan, a requirement that the rating agencies have made clear is critical to maintaining an

investment-grade rating.  The company is actively negotiating with the lending group toward that

end, but in doing so has been forced to re-open the previously agreed terms.  Those negotiations

are colored by the stress placed on Dow's balance sheet when $9 billion in cash from the K-Dow

deal failed to materialize, and by the unsurprising fact that, in these challenging times,

convincing 19 financial institutions to extend a significant portion of the $13 billion in credit is no simple task.

## VI.   DOW'S DEALINGS WITH ROHM AND HAAS AND ITS POSITION IN THIS CASE HAVE BEEN PRECISELY FRAMED TO SERVE THE INTERESTS OF BOTH COMPANIES IN FINDING A VIABLE PATH TO MERGER

38.     The Complaint misses the essence of Dow's approach to the problems both Dow and Rohm and Haas face.  Dow's approach to this transaction is totally grounded in necessity.  It is necessary first of all to get control of the basic building blocks of any future course by stabilizing credit ratings, obtaining workable financing and maintaining liquidity.  Turning then to future action, the first order of business is to account and plan for uncertainties affecting Dow's market, Rohm and Haas's business, and the market for the merged entities.  The overwhelming problem here is uncertainty.  And it is unknown when and how those uncertainties will be resolved.

39.     Under current conditions and the existing terms of the bridge loan, forced closure and consummation of the merger would threaten the viability of the new enterprise.  This alone justified Dow's decision not to consummate the merger in January.  But even a successful renegotiation of the bridge loan would only open the door to even more complex forecasts and decisions.  Future conditions and events are difficult to predict, particularly since the terms on which Dow might be able to extend the term of the bridge loan are not currently known but could involve financial and other covenants that could seriously affect Dow's finances and operations and drastically limit Dow's alternatives in the future.  All forecasts and decisions must be constrained by reasonable worst-case forecasts until the range of uncertainty is reduced.

40.     And so, in the days preceding the filing of the Complaint on January 26, as Dow and Rohm and Haas engaged in principal-to-principal discussions about the merger, Dow most certainly did not abrogate the merger agreement, did not walk away from the deal, and did not

18

say that the merger never could be consummated.  Rather, Dow urged that both sides take more

time to understand the facts and await important developments that would inform their thinking

about the transaction.  While Dow recognized that Rohm and Haas would be under pressure to

file suit and accepted that litigation might be necessary, Dow urged that a dialogue between the

companies begin and continue as the litigation proceeded.

     41.     On January 25, 2009, Dow's CEO Andrew Liveris sent a message to Rohm and

Haas's CEO Raj Gupta, suggesting that the parties work together toward a mutually beneficial

solution:

> Raj-
>
> Thank you again for meeting with Chuck and me yesterday.  Following up on
> these discussions we have thought again about how to go forward and suggest the
> following path.
>
> First, due to concerns and uncertainty about the potential success of the combined
> organizations, we confirm that Dow does not intend to close the acquisition on or
> by Tuesday pursuant to the existing terms.  Yesterday we explained at length the
> basis for our concerns and I will not restate them here.
>
> Even with the reality of these concerns and uncertainties, we believe that we will
> be able to determine our ability to close the transaction by June 30, 2009.
>
> While we are pursuing our efforts to remove the uncertainties, we suggest that we
> set up a structured process between Dow and Rohm and Haas principals to
> consider potential solutions.  During this time we would be ready to discuss
> possible modifications to the terms of the existing merger agreement that would
> facilitate an earlier closing of the transaction.
>
> Also, we are receptive to your suggestion that Rohm and Haas initiate the process
> of divesting Morton Salt and possible other Rohm and Haas actions that might be
> helpful.
>
> Consequently, in the short term we suggest that we issue a joint press release
> along the following lines with the bracketed language at your option:
>
>> Dow has informed Rohm and Haas that Dow does not intend to
>> close the pending acquisition of Rohm and Haas on or before
>> Tuesday, January 27, 2009.  Dow and Rohm and Haas remain in

continuing discussions about the closing [and each party is
separately assessing its options].

Separately, if Rohm and Haas chooses to initiate litigation, we believe that it is
important that this litigation not get in the way of our respective efforts to solve
the situation.  In that circumstance, we would also suggest that we jointly issue a
press release indicating that we continue to have discussions.

We would welcome any suggestions that you would have that would facilitate the
closing of the transaction in the near term, including possible modifications to the
terms of the existing merger agreement.

I would be glad to discuss this with you further today.

Sincerely,

Andrew

42.    This continues to be Dow's position now that litigation has commenced.  *Any*
forced merger at *any* time is an extreme, external intervention in a business process that can
actually work only if it makes sense internally.  It must be driven by the desires and goals of the
people who go to work every day rather than by artificially (and hastily) imposed mandates.
These basic human facts are all the more dominant where, as here, the merger depends upon the
creation of new value through synergies.

43.    But this case finds Rohm and Haas, presumably acting for its current shareholders
and in total disregard of its other constituencies, asking that the same extreme intervention occur
immediately, precisely when the uncertainty is greatest, when the combined companies would be
most vulnerable, and when any newly-created entity would be the most hobbled by leverage
under current financial conditions and terms.  That result can only serve the interest of one
constituency of one side to the transaction—the old shareholders of Rohm and Haas.  The result
is directly contrary to the interests of Rohm and Haas as a business, of Dow, of the merged
entities, of the tens of thousands current Rohm and Haas and Dow employees, and of the
associated communities, suppliers and customers.  Every principle of prudence exercised in

20

consideration of all of the interests, not just the Rohm and Haas shareholders, counsels for waiting until more is known.

44.     And the informed marketplace has made the same judgment.  On January 28, a senior vice-president at Moody's commented:  "[I]t is fiscally prudent for Dow to delay the merger with Rohm and Haas until they have delineated the specific sources for the refinancing of the $13 billion bridge loan."

45.     The rating agencies have made clear that taking on approximately $10 billion of unanticipated debt, with no clear prospect of refinancing before its maturity on or before April 14, 2010, could lead to an immediate downgrade of Dow's credit rating to Baa3 or lower by Moody's or BBB- or lower by S&P.  S&P, which (as noted above) immediately downgraded Dow after news of the K-Dow collapse and now rates Dow at the second-lowest investment grade, has already warned that its "CreditWatch with negative implications on Dow indicates that we could lower the ratings again following completion of the Rohm and Haas transaction." Moody's outlook is as bad, if not worse.  On December 31, 2008, Moody's cautioned that due to the cancellation of the K-Dow transaction, it was "likely that Dow's credit profile would be weaker than previously anticipated and its ratings could fall below the Baa2 level if Dow completes the R&H acquisition."  And on January 28, 2009, Moody's warned:  "We would need to receive a very detailed refinancing plan that entails very little execution risk in order to maintain an investment-grade rating."

46.     The downgrade signaled by both rating agencies would, in turn, imperil the billions of dollars of debt.  The bridge loan agreement contains a covenant, triggered if Dow falls to Baa3 or lower (Moody's) or BBB- or lower (S&P), requiring maintenance of a debt-to-EBITDA ratio of 4.25 or less (on a trailing 12-month basis) for the pro forma merged company.

If the merger were consummated now, with significantly greater debt than originally anticipated, and with earnings withering, the ratio would exceed this limit within a short period of time under current bridge loan terms.  There is **no cure** for such a default.  Upon the lenders' demand, Dow could be liable to repay the entire outstanding balance, an obligation it could not fulfill. Furthermore, a default on the bridge loan would result in a cross-default of billions of dollars of other Dow debt, the potential unavailability of funds under Dow's $3 billion revolving credit facility, and impairment of Dow's ability to raise working capital by issuing commercial paper, and could further trigger a "put" by lenders of more than approximately $1.1 billion of the $3.2 billion of Rohm and Haas debt to be assumed by Dow at closing if Rohm and Haas dropped below investment grade.  A further adverse consequence of a lowering of Dow's debt rating to below investment grade would be the loss of Dow's ability to self-insure for environmental remediation programs and the need to purchase performance bonds or letters of credit.

47.    In addition, in order to be able to drawdown on the bridge loan, Dow would be required to establish that it satisfies an incurrence covenant included in the bridge loan credit agreement that requires Dow's ratio of consolidated indebtedness to consolidated capitalization to not exceed 0.65:1.00.  If Dow initially satisfies this requirement, but subsequently falls out of compliance, Dow would be prohibited from incurring any additional indebtedness absent a waiver from the banks.  This same covenant also appears in Dow's $3 billion revolving credit facility, which would also become unavailable if Dow is no longer in compliance with this incurrence covenant.  This lack of flexibility could substantially jeopardize the financial sustainability of the merged entities.

48.    Suppliers, customers, and employees of both organizations are inevitably affected by and will respond to these ominous facts.  Their response to these circumstances may further

compound and accelerate the problems, impairing the merged enterprises' ability to do business effectively and making the prospect of worsening conditions a self-fulfilling prophecy.

49.     At bottom, these unforeseen and unforeseeable events have—for the time being— eradicated the essential purpose of this transaction:  creating a viable merged organization, one that will combine tens of thousands of employees who must work together to create the synergies that made this acquisition make sense.  Forcing them together in an over-leveraged, hobbled deal would do no equity to Dow, to Rohm and Haas, or to their employees, communities, customers and suppliers.

*       *       *

The Dow Chemical Company ("Dow") hereby sets forth its Answer to the Complaint of Rohm and Haas Company ("Rohm and Haas").  In this section, use of the term "Dow" is also deemed to include Ramses Acquisition Corp.  All statements of which Dow does not have personal knowledge are upon information and belief.

## NATURE OF THE ACTION

1.     This suit is brought by Rohm and Haas to force Dow to honor its obligations under a July 10, 2008, agreement to acquire Rohm and Haas for $78 in cash per share of Rohm and Haas common stock (plus a "ticking fee" commencing on January 10, 2009) (the "Merger"). Even though all conditions to Dow's obligation to close the Merger have now been satisfied, Dow has refused to close in an intentional breach of the parties' agreement.  Rohm and Haas is entitled, therefore, to an order of specific performance directing Dow to proceed to consummate the Merger without delay.

**ANSWER**     Dow admits that Plaintiff Rohm and Haas has brought this lawsuit in an attempt to force Dow to acquire Rohm and Haas for $78 in cash per share of Rohm and Haas common stock (plus a "ticking fee" commencing on January 10, 2009), despite the unacceptable risk of irreparable harm to both companies that such a transaction would entail under prevailing circumstances, but denies that Plaintiff is entitled to such relief.  Insofar as Paragraph 1 of the Complaint purports to characterize the Merger Agreement, Dow respectfully refers the Court to

23

the Merger Agreement for its full and complete terms.  Dow denies that all conditions to Dow's

obligation to close the Merger have been satisfied and denies that Dow has breached the

agreement, intentionally or otherwise.  A confluence of dramatic and unforeseeable shocks—to

Dow, to the chemical industry as a whole, and to the banks and financial markets—has made it

impossible to consummate Dow's planned acquisition of Rohm and Haas at once without

jeopardizing the very existence of both companies.  More specifically, Dow avers that its

acquisition of Rohm and Haas could lead to a downgrade of Dow's credit rating and,

consequently, could result in the default on multiple billions of dollars of acquisition debt which

in turn could cause cross-defaults on billions of dollars of other Dow debt, impair the company's

ability to issue commercial paper, and set off a whole host of other unforeseeable consequences.

Dow denies that it is obliged to subject itself and Rohm and Haas to an untenably over-leveraged

position by completing the Merger at this time, and further denies that Rohm and Haas is entitled

to an equitable order of specific performance.


        2.      The Agreement and Plan of Merger between Dow and Rohm and Haas  (the
"Merger Agreement") (Exhibit A hereto) expressly provides that the closing date for the Merger
"shall be no later than the second business day" after the satisfaction of the conditions to closing.
Merger Agreement § 1.2.  Notwithstanding Dow's surreptitious, wrongful and deliberate efforts
to delay receipt of antitrust clearance of the Merger, on Friday, January 23, 2009, the FTC
cleared the Merger to close, satisfying the last outstanding condition.  Dow never asserted prior
to January 23 that any other condition remained to be satisfied and, in particular, never claimed
that Rohm and Haas had suffered a "Material Adverse Effect" in its business.  The Merger
Agreement therefore unambiguously required Dow to close the Merger no later than Tuesday,
January 27, 2009.

**<u>ANSWER</u>**      Insofar as Paragraph 2 of the Complaint purports to characterize the Merger

Agreement, Dow respectfully refers the Court to the Merger Agreement for its full and complete

terms.  Dow admits that the quoted language appears in Section 1.2 of the Merger Agreement,

but denies the implication in Paragraph 2 of the Complaint that Section 1.2 forbids closing the

Merger later than two business days after the satisfaction of the conditions to closing.  In fact, Section 1.2 expressly provides for closing on an alternative date should the parties deem it advisable to delay, for instance to avoid consummating the Merger if the consequence would be to jeopardize the viability of both organizations.

Dow denies that it engaged in any wrongful efforts to delay receipt of antitrust clearance of the Merger.  To the contrary, Dow has worked intensely to secure antitrust clearances from the FTC, the European Commission and a number of other antitrust agencies.  On January 23, 2009, the FTC provisionally accepted the divestitures that Dow offered and has placed the provisionally accepted decision and order governing the divestitures on the public record for a 30-day comment period (as required by rules promulgated under the FTC Act).  After the 30-day period, the FTC has the right to accept the decision and order as final; to refer it back to the FTC staff for modification or renegotiation; to pursue litigation against Dow and Rohm and Haas to block the transaction outright or to seek to unwind it if the transaction has already closed or to seek additional divestitures.  Because the FTC retains the right to reject the consent agreement and seek to unwind the transaction, the FTC's final antitrust clearance is not achieved until after the public comment period and final acceptance of the consent decree, which has not yet occurred.

Dow denies that all conditions in the Merger Agreement for closing had been satisfied as of January 23, 2009.  A confluence of dramatic and unforeseeable shocks—to Dow, to the chemical industry as a whole, and to financial markets—has made it impossible to immediately consummate Dow's planned acquisition of Rohm and Haas without jeopardizing the very existence of both companies.  Dow denies that it is obliged to subject itself and Rohm and Haas

to an untenably over-leveraged position by completing the Merger no later than Tuesday, January 27, 2009.  Furthermore, final FTC approval had not yet been obtained.

Dow denies the remaining allegations in Paragraph 2.


3.      Despite the plain language of the Merger Agreement, on January 25, 2009, Dow's Chairman and CEO, Andrew Liveris, wrote to Rohm and Haas's Chairman and CEO, Raj Gupta, stating that "due to concerns and uncertainty about the potential success of the combined organizations, we confirm that Dow does not intend to close the acquisition on or by Tuesday [January 27]."  Mr. Liveris refused to commit to closing at a future date, stating only that "we believe that we will be able to determine our ability to close the transaction by June 30, 2009."

**ANSWER**      Insofar as Paragraph 3 of the Complaint purports to characterize the "plain language" of the Merger Agreement or correspondence among the parties, Dow respectfully refers the Court to the Merger Agreement and correspondence for their full and complete terms.

Dow admits that on January 25, 2009, Dow's Chairman and CEO, Andrew Liveris, wrote a message to Rohm and Haas's Chairman and CEO, Raj Gupta, and that the quoted language appears in that letter.  However, Dow denies that Plaintiff has fully and completely quoted the correspondence and denies Plaintiff's characterization of the message.  The message is reproduced in full in Paragraph 41 of Dow's statement of Common Facts, and is very different in overall tone and content from the Complaint's selective snippets.  Contrary to the implication that Paragraph 3 seeks to create, the message recites that Dow had "explained at length the basis for [its] concerns in the meeting"; that Mr. Liveris and Mr. Gupta discussed a structured process between the companies' principals to solve the problem facing both organizations; and that Rohm and Haas recognized the potential divestiture of some of its assets could be necessary. Dow admits that Mr. Liveris discussed with Mr. Gupta the fact that, given current market conditions and the failure of the K-Dow joint venture to close, closing the Merger now would be impracticable and would subject both Dow and Rohm and Haas to unacceptable risks of

irreparable harm, including losing their investment-grade credit ratings, and defaulting on

billions of dollars under their debt agreements.


       4.     Dow's refusal to proceed to close is driven by the Kuwait government's decision in late December 2008 to terminate a planned joint venture — known as K-Dow Petrochemicals ("K-Dow") — between Dow and a Kuwaiti company.  The failure of the K-Dow venture does not provide Dow with a basis for refusing to close.  Dow's obligations under the Merger Agreement are not in any way conditioned on consummation of the K-Dow joint venture.  In fact, Dow's obligation to complete the Merger is not conditioned on financing of any kind.  To the contrary, Dow covenanted that it "shall take all action necessary to ensure that as of the Closing Date, [Dow] will obtain the Financing." Merger Agreement § 5.l(b)(i).  Dow's refusal to close, therefore, is without any legal justification.  And Dow does have in place committed financing that is two billion dollars in excess of the total purchase price for Rohm and Haas.

**<u>ANSWER</u>**     Dow admits that the Kuwaiti government's stunning and unanticipated reversal of

its prior approval of the K-Dow transaction severely impacted the prospects of the planned

Merger, but Dow denies that its inability to close the Merger at this time is driven exclusively by

the Kuwaiti government's decision and further denies that it lacks a legal basis or justification

for declining to close at this time.  The failure of the K-Dow transaction is one of a confluence of

events that has rendered closing the Merger impracticable, would frustrate the essential purpose

of the Merger itself, and would cause an unacceptable risk of irreparable harm to the parties to

the Merger.  The sudden unavailability of approximately $9 billion in cash would force Dow to

draw down a comparable amount on a short term bridge loan under conditions that would

quickly place it in default.

      Insofar as Paragraph 4 of the Complaint purports to characterize the Merger Agreement,

Dow respectfully refers the Court to the Merger Agreement for its full and complete terms.  Dow

admits that the quoted language appears in Section 5.1 of the Merger Agreement, but denies that

Plaintiff fully and completely quotes the Merger Agreement and denies Plaintiff's

characterization of the agreement.  Dow denies that the failure of the K-Dow venture does not

provide Dow with a basis for declining to close at this time, insofar as the failure of the K-Dow

deal is among the many dramatic and unforeseeable shocks—to Dow, to the chemical industry as

a whole, and to financial markets—that has rendered closing the Merger impracticable and an

unacceptable risk to the combined companies.

Dow admits that it undertook to secure financing for its planned acquisition of Rohm and

Haas.  Dow admits that it has secured equity commitments of $4 billion to finance its planned

acquisition of Rohm and Haas.  Dow further admits that it has secured commitments from a

consortium of 19 banks to finance up to $13 billion of Dow's planned acquisition of Rohm and

Haas through a short-term bridge loan, but Dow denies the implication that it could fully draw

upon this commitment without being subject to an imminent default and denies the remaining

allegations of Paragraph 4.


5.      Dow agreed in Section 8.5(a) of the Merger Agreement that "irreparable damage
would occur in the event that any of the provisions of this Agreement were not performed in
accordance with their specific terms or were otherwise breached," that the parties would not have
any adequate remedy at law in the event of such a breach and that Rohm and Haas would be
entitled "to enforce specifically the terms and provisions of this Agreement" in the event of a
breach.  Rohm and Haas therefore is entitled to: (a) an order of specific performance requiring
Dow to perform its obligations under the Merger Agreement and close the Merger immediately
and (b) an injunction preventing Dow from breaching its obligations under the Merger
Agreement.

**<u>ANSWER</u>**      Insofar as Paragraph 5 of the Complaint purports to characterize the Merger

Agreement, Dow respectfully refers the Court to the Merger Agreement for its full and complete

terms.  Dow admits that the quoted language appears in Section 8.5 of the Merger Agreement but

denies that Plaintiff fully and completely quotes the agreement and denies Plaintiff's

characterization of the agreement.  Dow denies that under the facts and circumstances of this

case Rohm and Haas is entitled to an order of specific performance or an injunction and denies

the remaining allegations of Paragraph 5.

28

**PARTIES**

6.      Plaintiff Rohm and Haas is a leading global specialty materials company.  In 2007, Rohm and Haas reported sales of $8.9 billion on a portfolio of global businesses including electronic materials, specialty materials and salt.  Rohm and Haas is incorporated under the laws of Delaware.  Its principal executive offices are in Philadelphia, Pennsylvania.

**ANSWER**      Dow admits the allegations in Paragraph 6 of the Complaint.

7.      Defendant The Dow Chemical Company is a diversified chemical company engaged in the manufacture and sale of chemicals, plastic materials, and agricultural and other specialized products and services.  In 2007, it had annual sales of $53.5 billion and employed approximately 45,900 people worldwide.  The Dow Chemical Company is incorporated under the laws of Delaware.  Its principal executive offices are in Midland, Michigan.

**ANSWER**      Dow admits the allegations in Paragraph 7 of the Complaint.

8.      Defendant Ramses Acquisition Corp. is a Delaware corporation, wholly owned by The Dow Chemical Company, which was formed solely for the purpose of facilitating the acquisition of Rohm and Haas.

**ANSWER**      Dow admits the allegations in Paragraph 8 of the Complaint.

**JURISDICTION**

9.      This Court has subject matter jurisdiction: under *6 Del. C. § 2708(b);* which grants the courts of Delaware jurisdiction over actions on contracts, such as the Merger Agreement here, in which the parties have specified that Delaware law governs; under 8 *Del. C. 11 l(a)(6)*, which grants the Court of Chancery jurisdiction over "[a]ny civil action to interpret, apply, enforce or determine the validity of the provisions of. . . [a]ny agreement . . . of merger" governed by the merger provisions of the DGCL, as is the Merger Agreement; and under 10 *Del. C. 5 341*, which gives the Court of Chancery jurisdiction "to hear and determine all matters and causes in equity."

**ANSWER**      Dow admits the allegations in Paragraph 9 of the Complaint.

10.      Personal jurisdiction is proper in this Court because all of the parties are Delaware corporations and also because Rohm and Haas and Dow agreed in Section 8.5(a) of the Merger Agreement that the Delaware courts would have exclusive jurisdiction over any dispute with

29

respect to the Merger Agreement.  A confidentiality agreement entered into by the parties likewise provided for a Delaware forum.

**ANSWER**      Dow admits the allegations in Paragraph 10 of the Complaint.


## FACTUAL ALLEGATIONS

11.    Rohm and Haas and Dow executed the Merger Agreement on July 10, 2008, at the conclusion of a bidding contest that pitted Dow against one of its rivals in the chemical industry, which had offered to acquire Rohm and Haas for $75 a share.  By July 2008, the credit markets were already in turmoil and the risk that the U.S. and world economies could be entering a deep and prolonged recession was widely acknowledged.  Dow nonetheless agreed to pay a very substantial premium for Rohm and Haas because it recognized that the acquisition of Rohm and Haas presented a once in a lifetime opportunity to transform Dow into the world's premier specialty chemical company.  In the words of Dow's Chairman and CEO, Andrew Liveris, Rohm and Haas "is a jewel. . . . There aren't many jewels out there, this is one of them."

**ANSWER**      Dow admits that Rohm and Haas and Dow executed the Merger Agreement on

July 10, 2008.  Based on information and belief, Dow admits that Rohm and Haas has stated in

its proxy statement sent to Rohm and Haas shareholders seeking approval of the Merger that

another bidder offered to acquire Rohm and Haas at $75 a share.  Dow admits that by July 2008

there were problems in the credit markets, and that the risk that the U.S. and world economies

could be entering a recession was acknowledged by some observers.  Dow denies that anything

like the full magnitude of the credit crisis was apparent as of July 2008, or that the severity of the

coming U.S. and worldwide economic downturns was apparent.

Dow admits that it agreed to pay a premium for Rohm and Haas and that the acquisition

of Rohm and Haas is part of Dow's transformative strategy, according to which Dow is shifting

toward specialty chemical markets to reduce the company's exposure to cyclical forces and

provide the best platform for long-term earnings growth.  As of July 2008, Dow anticipated that

the K-Dow transaction would be a major component of its efforts to reduce Dow's investment in

basic chemicals and plastics assets, and would provide approximately $9 billion in cash to

finance the Rohm and Haas transaction.  Dow admits that its Chairman and CEO, Andrew

Liveris, has used the quoted language, but denies that Plaintiff fully or completely quotes Mr.

Liveris's statements and denies the remaining allegations of Paragraph 11.


       12.     Because the economic environment was challenging and because a number of
would-be acquirers had recently sought to renege on their commitments, Rohm and Haas
stressed throughout the negotiations that certainty that the Merger would close was fundamental
to its decision whether to accept Dow's bid.  Indeed, in Dow's July 7, 2008, bid letter to Rohm
and Haas, Mr. Liveris wrote, "I have taken to heart, am respectful of and keenly share the critical
importance of speed to signing and certainty of close desired by Rohm and Haas' Board." In
order to effectuate this intent, the Merger Agreement requires closing not later than two business
days after the conditions set forth in Article VI thereof are satisfied:

> SECTION 1.2  Closing.  The closing of the Merger (the "Closing")
> shall take place at the offices of Wachtell, Lipton, Rosen & Katz,
> 51 West 52nd Street, New York, New York at 10:00 a.m., local
> time, on a date to be specified by the parties (the ''Closing Date'')
> which shall be **no later than the second business day after the
> satisfaction or waiver (to the extent permitted by applicable
> Law (as defined in Section 3.7(a)) of the conditions set forth in
> ARTICLE VI** (other than those conditions that by their nature are
> to be satisfied by action at the Closing, but subject to the
> satisfaction or written waiver of such conditions), or at such other
> place, date and time as the Company and Parent may agree in
> writing.  (Emphasis added).

**<u>ANSWER</u>**     Dow admits that in the course of the Merger negotiations Rohm and Haas on

occasion expressed a desire for certainty of closing, but denies that this was the sole

consideration in Rohm and Haas's decision to go forward with the Merger and further denies the

implication that such a desire is in any way unusual among potential acquisition targets.  Dow

admits that on July 7, 2008, Mr. Liveris wrote a letter to Mr. Gupta, and that the letter contains

the quoted language, but denies that Plaintiff has fully and completely quoted the letter and

denies Plaintiff's characterization of the letter.

       Insofar as Paragraph 12 of the Complaint purports to characterize the Merger Agreement,

Dow respectfully refers the Court to the Merger Agreement for its full and complete terms.  Dow

admits that the quoted language appears in Section 1.2 of the Merger Agreement, but denies

Plaintiff's characterization of the agreement and specifically denies the implication in Paragraph

12 of the Complaint that Section 1.2 forbids closing the Merger later than two business days after

the satisfaction of the conditions to closing.  In fact, Section 1.2 expressly provides for closing

on an alternative date should the parties deem it advisable to delay, for instance to avoid

consummating the Merger if the consequence would be to jeopardize the viability of both

organizations.  And Section 7.1(b) provides for closing as late as October 10, 2009 under certain

circumstances.  Dow denies the remaining allegations of Paragraph 12.


13.    Article VI of the Merger Agreement sets forth certain conditions to the
obligations of the parties to effect the Merger, including approval of the Merger by Rohm and
Haas stockholders, the absence of an injunction by a court or other tribunal of competent
jurisdiction prohibiting the consummation of the Merger, and FTC clearance and European
Commission approval of the Merger.  Regarding FTC clearance, Section 6.l(c)(i) of the Merger
Agreement provides that, before Dow's obligation to close is triggered, "[a]ny applicable waiting
period under the HSR Act shall have expired or been earlier terminated." All of the conditions to
Dow's obligation to close the Merger set forth in Article VI have now been satisfied.

**ANSWER**      Dow admits that Article VI of the Merger Agreement sets forth certain conditions

to the obligations of the parties to effect the Merger and admits that Section 6.1(c)(i) contains the

quoted language, but denies that Plaintiff has fully and completely quoted the agreement and

denies the implication that Section 6.1(c)(i) is the only provision regarding FTC clearance.

Insofar as Paragraph 13 of the Complaint purports to characterize the Merger Agreement, Dow

respectfully refers the Court to the Merger Agreement for its full and complete terms.  Dow

denies that it is obligated to close the Merger under the present circumstances.

Dow denies that FTC final clearance has yet been effected and states that on Friday,

January 23, 2009, the FTC provisionally accepted the agreement, but the 30-day comment period

has not run and final acceptance of the consent decree has not occurred, as described in Dow's

Answer to Paragraph 2 above, which is incorporated by reference.

Dow denies the remaining allegations of Paragraph 13.


14.     In furtherance of the parties' intent that the Merger would close promptly, Dow covenanted to use its "reasonable best efforts" to consummate the Merger "as promptly as practicable." Merger Agreement § 5.6.  Dow also specifically covenanted that it "shall not . . . take any action . . . that is reasonably likely to . . . materially delay the satisfaction of the conditions to the Merger set forth in Section 6.1 of this Agreement or the consummation of the transactions contemplated hereby." Merger Agreement § 5.l(b)(ii).

**ANSWER**      Dow admits that the quoted language appears in the Merger Agreement, but

denies that Plaintiff has fully and completely quoted the cited provisions of the agreement.

Insofar as Paragraph 14 of the Complaint purports to characterize the Merger Agreement, Dow

respectfully refers the Court to the Merger Agreement for its full and complete terms.  Dow

denies Plaintiff's characterization of the quoted provisions and denies the remaining allegations

of Paragraph 14.


15.     Dow also demonstrated its commitment to a certain closing by agreeing to an unusually restrictive definition of "Company Material Adverse Effect," which, among other things, explicitly excludes adverse effects (i) "generally affecting the specialty chemical industry or the segments thereof in which [Rohm and Haas] and its Subsidiaries operate" or (ii) "generally affecting the economy or the financial, debt, credit or securities markets, in the United States or elsewhere." (The carve-out extends even to adverse effects that disproportionately affect Rohm and Haas.).  Merger Agreement § 3.1.  In agreeing to this MAE definition, Dow affirmatively assumed the risk that the economy and credit markets would further deteriorate during the period between signing and closing.

**ANSWER**      Dow admits that the quoted language appears in Section 3.1 of the Merger

Agreement, but denies that Plaintiff has fully and completely quoted that provision.  Insofar as

Paragraph 15 of the Complaint purports to characterize the Merger Agreement, Dow respectfully

refers the Court to the Merger Agreement for its full and complete terms.  Dow denies that it

committed to a "certain closing," especially insofar as such a closing would place the merged

entities at great risk and jeopardize the viability of the two organizations.  Dow denies that, in

agreeing to a particular definition of "Company Material Adverse Effect," Dow affirmatively

assumed the risk that the economy and credit markets would deteriorate so drastically during the

period between signing and closing as to frustrate the essential purpose of the Merger and to

make the Merger impossible or impracticable or to impose undue hardship.  Dow denies the

remaining allegations of Paragraph 15.


16.     Section 2.1(a) of the Merger Agreement provides that Dow must pay "Additional Per Share Consideration" in the event that the Merger does not close by January 10, 2009 for a period of up to six months.  The additional consideration (*i.e.*, the "ticking fee") amounts to approximately $3.3 million a day, minus any dividend that Rohm and Haas pays to its stockholders between January 10, 2009 and the earlier of July 10, 2009 or the closing date. Section 2.1(a) is not a liquidated damages provision and does not give Dow the option to delay the closing so long as it pays the "ticking fee." The ticking fee is payable if the Merger closes.  If the Merger does not close, Dow will not pay the ticking fee.

**ANSWER**     Dow admits that the quoted language appears in Section 2.1(a) of the Merger

Agreement, but denies that Plaintiff has fully and completely quoted the agreement and denies

Plaintiff's characterization of the agreement.  Insofar as Paragraph 16 of the Complaint purports

to characterize the Merger Agreement, Dow respectfully refers the Court to the Merger

Agreement for its full and complete terms.  Insofar as Paragraph 16 asserts legal conclusions

concerning the effect of the contract language, no response thereto is required.  Dow denies the

remaining allegations of Paragraph 16.


17.     The parties further memorialized their commitment to closing the Merger by explicitly agreeing that a failure to perform any of the terms of the Merger Agreement would constitute irreparable harm without any adequate remedy at law, and that the parties are entitled to injunctive relief to prevent breaches of the Merger Agreement, and to specific performance. As set forth in Section 8.5(a) of the Merger Agreement:

> The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that the parties would not have any adequate remedy at law. It is accordingly agreed that **the parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement**. . . . The foregoing is in addition to any other remedy to which any party is entitled at law, in equity or otherwise. (Merger Agreement § 8.5(a) (emphasis added)).

**ANSWER**    Dow admits that the quoted language appears in the Merger Agreement but denies that Plaintiff has fully or completely quoted the cited provisions and denies Plaintiffs' characterizations, including Plaintiff's implication that Dow was legally required to immediately close even if to do so would be impracticable, frustrate the purpose of the Merger and lead to an unacceptable risk of irreparable harm to both companies. Insofar as Paragraph 17 of the Complaint purports to characterize the Merger Agreement, Dow respectfully refers the Court to the Merger Agreement for its full and complete terms. Dow denies that Section 8.5 of the Merger Agreement entitles Rohm and Haas to injunctive relief or specific performance where, as is the case here, such an extraordinary equitable remedy would cause an unacceptable risk of irreparable harm to both companies. Dow denies the remaining allegations of Paragraph 17.

18.    In order to provide Rohm and Haas the assurance that it demanded, Dow agreed that there would be no financing condition in the Merger Agreement. Accordingly, Dow covenanted, with no reasonable best efforts qualification, that it "shall take all action necessary to ensure that as of the Closing Date, [Dow] will obtain the Financing." Merger Agreement § 5.l(b)(i). Further, Dow expressly represented that it would have the funds necessary to close. As provided in the Merger Agreement:

> SECTION 4.6  Available Funds.  [Dow] will have available to it at the Closing all of the funds required to be provided by [Dow] for the consummation of the transactions contemplated hereby and for the satisfaction of all of [Dow's] obligations under this Agreement, including the payment of the Merger Consideration and the Option and Stock-Based Consideration, and the funding of any required

financings or repayments of indebtedness (collectively, the "Financing").

Dow's covenant to obtain financing for the Merger is a binding and unqualified contractual obligation. It is not subject to Dow's convenience or preference, and the Merger Agreement does not state that the financing obtained must be on terms agreeable to Dow.

**ANSWER**      Dow admits that the quoted language appears in the Merger Agreement, but

denies Plaintiff's characterization of that language. Insofar as Paragraph 18 of the Complaint

purports to characterize the Merger Agreement, Dow respectfully refers the Court to the Merger

Agreement for its full and complete terms. Insofar as Paragraph 18 contains legal conclusions

concerning the effect of the contract language, no response thereto is required. Dow denies the

remaining allegations of Paragraph 18.

19.    In connection with representing that it would have the financing necessary to close the Merger and covenanting to obtain it by the closing date, Dow entered into a debt commitment letter with Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Merrill Lynch Capital Corp., Morgan Stanley Senior Funding, Inc. and Morgan Stanley Bank. On September 8, 2008, as contemplated by the debt commitment letter, Dow entered into a definitive term loan agreement with the lenders. Under the agreement, the lenders committed to lend Dow $13 billion to finance the bulk of the Merger consideration. The agreement set interest rate and other terms before the dramatic credit market dislocations later that month. Dow thus was able to "lock in" debt financing for the Merger on favorable terms.

**ANSWER**      Dow admits that it entered into a debt commitment letter with Citigroup Global

Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Merrill Lynch Capital Corp., Morgan

Stanley Senior Funding, Inc. and Morgan Stanley Bank. Insofar as Paragraph 19 of the

Complaint purports to characterize that commitment letter, Dow respectfully refers the Court to

the commitment letter for its full and complete terms.

Dow admits that on September 8, 2008 Dow entered into a term bridge loan agreement

with a consortium of 19 banks, but denies Plaintiff's characterization of the agreement and

denies that it provided sufficient financing for the Merger. Insofar as Paragraph 19 of the

Complaint purports to characterize the term loan agreement, Dow respectfully refers the Court to the agreement for its full and complete terms.  Dow admits that under the term loan agreement the lenders committed to lend Dow up to $13 billion—for one year from closing or until April 14, 2010, whichever comes first—in connection with the Merger.

Dow admits that the debt agreement was executed on September 8, 2008.  Dow further admits that the agreement set interest rate and other terms before the dramatic credit market dislocations later that month.  Dow denies that it was able to "lock in" debt financing for the Merger on "favorable" terms.  As described above, Dow would be placed at risk of having its credit rating downgraded to BBB- (by S&P) or Baa3 (by Moody's) or lower, which would put Dow in peril of defaulting on the financial covenants if it is forced to draw upon its short-term bridge loan to finance the Merger.  Obtaining a waiver of such a default would require Dow to attempt to renegotiate the terms of the debt agreement with no assurance that a renegotiation would succeed in procuring a waiver of the default.  Any terms of the agreement that Plaintiff characterizes as "favorable" in the current market—*e.g.*, pricing terms—would undoubtedly be sacrificed.

Dow denies the remaining allegations of Paragraph 19.

20.    Dow also obtained equity commitment letters from Berkshire Hathaway Inc. and the Kuwait Investment Authority ("KIA"), under which Berkshire Hathaway and KIA agreed to acquire 3,000,000 and 1,000,000 shares, respectively, of cumulative convertible perpetual preferred stock of Dow at a price of $1,000 per share, for aggregate consideration of $4 billion. Under the definitive investment agreements with Berkshire Hathaway and KIA signed October 27, 2008, each preferred share may be converted to 24.2010 shares of common stock, subject to certain conditions.  This conversion rate — amounting to approximately $41.32 per share of Dow common stock — has become very favorable to Dow in light of subsequent declines in Dow's stock price.

**<u>ANSWER</u>**    Dow admits that it obtained equity commitment letters from Berkshire Hathaway and KIA under which Berkshire Hathaway and KIA agreed to acquire 3,000,000 and 1,000,000

shares, respectively, of cumulative convertible perpetual preferred stock of Dow at a price of $1,000 per share, for aggregate consideration of $4 billion.  Insofar as Paragraph 20 of the Complaint purports to characterize those equity commitment letters, Dow respectfully refers the Court to the equity commitment letters for their full and complete terms.

Dow admits that it signed investment agreements with Berkshire Hathaway and KIA on October 27, 2008 under which each preferred share may be converted to 24.2010 shares of common stock subject to certain conditions.  Insofar as Paragraph 20 of the Complaint purports to characterize those agreements, Dow respectfully refers the Court to the agreements for their full and complete terms.

Dow admits that its stock price and market capitalization have declined dramatically— over 40%—since October 27, 2008, and that these declines may make conversion of the convertible perpetual preferred stock less attractive to the respective investors.  At the same time, the more than 60% decline in Dow's market capitalization since the signing of the Merger Agreement in July 2008 has contributed to the significantly increased ratio of debt Dow would incur in consummating the Merger to its equity and cannot be characterized as "favorable to Dow."

Dow denies the remaining allegations of Paragraph 20.


21.     Together, these debt and preferred equity financing commitments total $17 billion — $2 billion more than the total transaction price of approximately $15 billion.

**ANSWER**     Dow admits that the total amount of these commitments is $17 billion, that they are subject to several significant conditions that Plaintiff omits, and that a forced Merger would require Dow to draw upon a large portion of those commitments.  Dow denies that the total transaction price was approximately $15 billion, since it included $15.3 billion of cash payments

to shareholders and approximately another $375 million in payments to holders of Rohm and

Haas stock options and restricted stock; moreover, Dow would assume $3.2 billion of Rohm and

Haas debt in the Merger, raising the overall cost to more than $18.8 billion.  Further, the bulk of

the bridge loan would be reduced by the receipt of approximately $9 billion of K-Dow proceeds,

pursuant to Section 2.12 of the bridge loan credit agreement, which provides for mandatory and

automatic prepayment of the bridge loan in an amount equal to the net cash proceeds from the K-

Dow closing.

The bridge loan agreement contains a covenant that is triggered if Dow falls to Baa3 or

lower (Moody's) or BBB- or lower (S&P), requiring the maintenance of a debt-to-annual

EBITDA ratio of 4.25 or below for the pro forma merged companies.  If the Merger were

consummated now, with significantly greater debt than originally anticipated, and with earnings

suffering, the ratio would exceed this limit within a few months.  There is no cure for such a

default and no assurance that the banks would waive the default.  Dow would be liable to repay

the entire outstanding balance on the banks' demand, an obligation it could not fulfill as well as

billions of dollars of other Dow debt that would be accelerated.  Thus, a large draw upon the

bridge loan would put the combined companies at an unacceptable risk of irreparable harm,

including a credit rating downgrade and the potential default of billions of dollars on their debt

agreements.

22.    These financing sources were in addition to anticipated cash proceeds from the
formation of K-Dow, a planned joint venture between Dow and Petrochemical Industries
Company ("PIC") of the State of Kuwait, a wholly owned subsidiary of Kuwait Petroleum
Corporation ("KPC").    At the time Dow announced its entry into a memorandum of
understanding regarding K-Dow in December 2007, Dow expected to receive $9.5 billion in cash
proceeds from the joint venture, which was expected to close by the end of 2008.  But as stated
in Dow's press release announcing the K-Dow memorandum of understanding, K-Dow "was

subject to the completion of definitive agreements, customary conditions and regulatory approvals."

**ANSWER**      Dow admits that it signed a memorandum of understanding regarding the K-Dow transaction in December 2007 and that Dow expected to receive approximately $9.5 billion when the transaction closed as originally anticipated in the third quarter of 2008.  Insofar as Paragraph 22 of the Complaint purports to characterize the memorandum of understanding, Dow respectfully refers the Court to the memorandum for its full and complete terms.  Dow admits that K-Dow was a planned joint venture between Dow and Petrochemical Industries Company ("PIC") of the State of Kuwait, a wholly owned subsidiary of Kuwait Petroleum Corporation ("KPC"), and admits that the K-Dow transaction was subject to the completion, among other things, of definitive agreements, customary conditions, and regulatory approvals.  Dow and PIC signed a definitive K-Dow agreement on November 28, 2008.  As of December 2008, all conditions to closing the K-Dow deal, including the required regulatory approvals, were satisfied, and closing was agreed to take place on January 2, 2009.  However, December 28 brought a stunning turn of events, as Dow was advised that the Kuwaiti Supreme Petroleum Council had unilaterally reversed its prior approval of the K-Dow joint venture and shortly thereafter learned that PIC was refusing to close the deal.

Dow admits that as of December 1, 2008, it expected the K-Dow joint venture to provide Dow $9 billion in cash to help finance its acquisition of Rohm and Haas.  Without this cash, forcing consummation of the Merger would require an enormous draw upon Dow's short-term bridge loan, leading to the events and consequences detailed in Paragraph 21 above.

Dow denies the remaining allegations in Paragraph 22.


23.      Thus, at the time Dow signed the Merger Agreement with Rohm and Haas, Dow did not have a binding contract with PIC.  Comments by Mr. Liveris and Dow's CFO, Geoffery

Merszei, during the July 10, 2008, press conference announcing the Merger make clear that Dow knew that it could not count on funds from K-Dow being available to finance the Merger:

> [Analyst]: In the sane vein, I'm wondering— it looks like that you are very confident now on getting the Kuwait deal done, and it sounds like you are counting on — in fact, counting on that money to do this deal.
>
> ANDREW LIVERIS: Well, I'll get Geoffery to chime in.  But look, **no, we are not counting on it.  We can do this deal without the Kuwait money, and we will stay at investment grade**. . . .
>
> GEOFFERY MERSZEI: No, I mean, I would just have to reiterate what Andrew said.  I mean, I think it's a very key point here.  **This deal is certainly not contingent on the closing of our Kuwait joint venture**. (emphasis added)

**ANSWER**        Dow admits that the K-Dow agreement with PIC was signed after the Merger Agreement.  Dow admits that Mr. Liveris and Dow's CFO Geoffery Merszei made the quoted comments during a July 10, 2008 press conference announcing the Merger, but denies that Plaintiff has fully and completely quoted the comments and denies Plaintiff's characterization of those comments.  Dow admits that, given market conditions as of July 10, 2008, it was expected that Dow could consummate the Merger for the short term in the absence of its first receiving $9 billion in cash upon closing the K-Dow joint venture.  This expectation was based on prevailing market conditions at that time, and on Dow's then-current financial projections, which did not include the unforeseeable and unprecedented credit crisis and deep recession, or the prospect that drawing upon the bridge loan commitment would cause the loss of Dow's investment-grade credit rating, an ensuing violation of Dow's loan covenants, and run a risk of default on billions of dollars of debt.

Dow denies the remaining allegations in Paragraph 23.

24.     Both Dow and Rohm and Haas thus understood at all times that Dow's obligations under the Merger Agreement were not in any way conditioned on completion of the K-Dow joint venture, and that these funds were not required to consummate the Merger. This understanding is reflected in the Merger Agreement which, among other things, contains no financing contingency. In Dow's July 7, 2008 bid letter to Rohm and Haas, Mr. Liveris admitted as much: "We intend to finance the Merger with our available cash balances and a fully committed financing facility. Accordingly, the Merger Agreement is not subject to any financing contingency."

**ANSWER**     Dow denies that it ever reached an understanding with Rohm and Haas that funds

from the K-Dow joint venture were not required to consummate the Merger and specifically

denies that any such understanding is reflected in the Merger Agreement. Insofar as Paragraph

24 purports to characterize the Merger Agreement, Dow respectfully refers the Court to the

Merger Agreement for its full and complete terms. Dow admits that, given reasonable

expectations concerning future market conditions as of July 10, 2008, it expected that it could

consummate the Merger even in the absence of its receiving approximately $9 billion in cash

upon closing the K-Dow joint venture. This expectation was based on prevailing market

conditions at that point in time, and on Dow's then-current projections, which did not include the

unforeseeable eventuality of a draw upon the bridge loan commitment risking Dow's investment-

grade credit rating and incurring the risk of an imminent default on billions of dollars of debt.

Dow lacks sufficient information to assess Rohm and Haas's allegation regarding what it

understood at the time, and thus denies Plaintiff's allegations regarding same.

Dow admits that on July 7, 2008 Mr. Liveris transmitted a letter to Mr. Gupta. Insofar as

Paragraph 24 purports to characterize that letter, Dow respectfully refers the Court to the letter

Agreement for its full and complete terms.

Dow denies the remaining allegations in Paragraph 24.


25.     During the fall of 2008, the U.S. and global economies suffered significant shocks. Nonetheless, throughout this period, Dow continued to emphasize its ability to close the

Merger despite the economic environment.  For example, on October 23, 2008, Mr. Liveris appeared on the program "Morning Call" on Bloomberg TV.  After a discussion that focused on the challenging economic climate, Mr. Liveris was asked about the Merger.  Mr. Liveris responded:

> **We'll close early next year.  We feel very good about it.**  [A] lot of work we've done already on due diligence tells us that we'll make sure that the synergies are bankable**.**  In fact, the numbers look very good. . .  Uh, and **that deal will close early next year** (Emphasis added).

**ANSWER**    Dow admits that the U.S. and global economies suffered significant shocks during the fall of 2008.  Indeed, as The Economist put it on October 30, 2008:  "The economies of the rich world seem to have fallen off a cliff."  In response to the rapidly-accelerating crisis, Dow took decisive action, reducing headcount by 5,000 employees, eliminating 6,000 contractor positions, and temporarily halting production at 180 plants and closing 20.

Dow admits that, in spite of these dramatic events, it nevertheless remained committed to the Merger in October 2008, and indeed through December 2008.  Dow admits that on October 23, 2008, Mr. Liveris appeared on Bloomberg TV's "Morning Call" and made the quoted comments, but denies that Plaintiff has fully and completely quoted those comments and denies Plaintiff's characterization of the comments.  With all conditions to closing the K-Dow joint venture satisfied, Dow had no reason to doubt that it would soon be receiving $9 billion in cash on or around January 2, 2009, which could then be used to close promptly its acquisition of Rohm and Haas.  Only after the Kuwaiti entities unexpectedly reversed their approval of the K-Dow transaction in late December 2008 and failed to close, in combination with the contemporaneous and subsequent severe deterioration of the credit markets and industry-wide financial performance, was the viability of the Merger and Dow's ability to close threatened.

Dow denies the remaining allegations of Paragraph 25.

26.    In a December 1 analyst call, Mr. Liveris once again asserted that Dow would close the Merger, despite prevailing economic conditions:

> I've got to tell you, after over 700 meetings with Rohm and Haas in a legal structure context, integration, planning, clean team environment, **we are thrilled at the quality of their leadership, thrilled at the quality of their growth programs and actually their decisiveness in taking out costs of their own, which they had announced prior to this economic meltdown.**
>
> ... We will proceed and implement the deal. **We are very confident that we will emerge with strong financials as a consequence of the acquisition** and in particular achieve the goal that we've been talking about for several years here. I didn't ask for these economic conditions. No one else did. But at Dow, we don't just sit in back rooms and say, oh, woe is me. We actually get moving and implement better, faster, stronger to deliver the economic goals that we promise. (Emphasis added).

And, during a December 8, 2008 webcast, Mr. Liveris again reassured that Dow was "on track to close the Rohm and Haas acquisition," that Dow "remain[ed] committed to closing the deal," and that Dow had "plenty of financing resources available" to do so.

**ANSWER**    Dow admits that on December 1, 2008, Mr. Liveris made the quoted comments on an analyst call, and that on December 8, 2008, Mr. Liveris made the quoted comments during a webcast, but denies that Plaintiff has fully and completely quoted Mr. Liveris's comments and denies Plaintiff's characterization of those comments.

With all conditions to closing the K-Dow joint venture satisfied, Dow had no reason to doubt that it would soon be receiving $9 billion in cash on and shortly after January 2, 2009, which could then be used to promptly close its acquisition of Rohm and Haas. Only when the Kuwaiti entities unexpectedly purported to reverse their approval of the K-Dow transaction in late December 2008 and failed to close, in combination with the contemporaneous and subsequent severe deterioration of the credit markets and industry-wide financial situation, was the viability of the Merger and Dow's ability to close threatened.

Dow denies the remaining allegations of Paragraph 26.

44

27.    Following execution of the Merger Agreement, Dow and Rohm and Haas jointly undertook to obtain antitrust clearance for the Merger from both the FTC and the European Commission.

**ANSWER**    Dow admits the allegations in Paragraph 27 of the Complaint.

28.    In connection with seeking FTC clearance, Dow and Rohm and Haas made filings under the Hart-Scott-Rodino ("HSR") Act on July 30, 2008, starting a 30-day initial waiting period.  On August 29, 2008, at the end of the initial 30-day waiting period, the FTC issued a formal Request for Additional Information and Documentary Materials, colloquially known as a "Second Request," to Dow and Rohm and Haas.  The Second Request sought additional documents and information from both parties regarding potential antitrust issues.  Issuance of the Second Request extended the applicable HSR waiting period until 30 days after both parties certified substantial compliance with the Second Request.

**ANSWER**    Dow admits the allegations in Paragraph 28 of the Complaint.

29.    Dow and Rohm and Haas both certified substantial compliance with the Second Request on October 7, 2008.  This triggered the second 30-day waiting period under the HSR Act, which expired on November 6.  Dow had previously entered into a timing agreement with the FTC Staff that gave the Staff additional time beyond the HSR Act's 30-day waiting period to review the transaction.  As subsequently modified, the timing agreement provided that Dow would have to provide the FTC with 30-days' notice of its intent to close.  As required by the Merger Agreement, Dow obtained Rohm and Haas's consent before entering into these timing agreements with the FTC.  Dow gave the FTC notice of its intention to close on December 5, 2008.

**ANSWER**    Dow admits that both Dow and Rohm and Haas certified substantial compliance with the Second Request on October 7, 2008, triggering the second 30-day waiting period under the HSR Act.  Dow also admits that it had entered into a timing agreement with the FTC Staff that gave the Staff additional time beyond the HSR Act's 30-day waiting period to review the transaction, and that as subsequently modified, the timing agreement provided that Dow would provide the FTC with 30-days notice of its intent to close.  Dow admits that Rohm and Haas consented to entering these timing agreements with the FTC.  Dow denies that the Merger

45

Agreement required Rohm and Haas consent to timing agreements with the FTC.  Section 5.6(c)

of the Merger Agreement entitles Dow to direct the antitrust defense of the transaction.  Dow

admits that on December 5, 2008, it provided 30-days notice of its intent to close the acquisition

of Rohm and Haas and committed to the FTC not to close the transaction prior to January 5,

2009.  Dow subsequently committed to the FTC not to close the transaction prior to January 26,

2009.

Dow denies the remaining allegations in Paragraph 29 of the Complaint.


30.     By late December 2008, the only remaining conditions to Dow's obligation to
close were antitrust approvals by the FTC and the European Commission.  It was anticipated that
the FTC would vote to clear the Merger before January 5, 2009, and the European Commission
would approve the Merger on Thursday, January 8, 2009.  As a result, all indications were that
the Merger would close no later than two business days thereafter, i.e., by Monday, January 12.

**<u>ANSWER</u>**     Dow denies that by late December 2008, the only remaining conditions to Dow's

obligation to close were antitrust approvals by the FTC and the European Commission.  Dow had

no legal obligation to close on a deal that was impracticable at the time, would frustrate the

purpose of the Merger and would result in an unacceptable risk of irreparable harm to the parties.

Insofar as Paragraph 30 of the Complaint purports to characterize the Merger Agreement, Dow

respectfully refers the Court to the Merger Agreement for its full and complete terms.  Dow

admits that by late December 2008, it anticipated that the European Commission would approve

the Merger on Thursday, January 8, 2009, and that the FTC would provisionally accept the

agreement containing consent order, the order to hold separate and maintain assets, and the

proposed decision and order by Monday, January 5, 2009.  Dow denies that these events would

have required closing no later than Monday, January 12.

Dow denies the remaining allegations of Paragraph 30.

31.     On December 28, 2008, KPC and PIC informed Dow that the Kuwait Supreme Petroleum Council had reversed its prior approval of the K-Dow joint venture.  The collapse of K-Dow prompted Dow to attempt to postpone its obligations to close the Merger by delaying antitrust clearance, a knowing and intentional breach of Dow's covenants in Sections 5.l(b)(ii); 5.6(a) and 5.6(b) of the Merger Agreement.

**ANSWER**     Dow admits that on December 28, 2008, KPC orally informed Dow that the

Kuwait Supreme Petroleum Council had reversed its prior approval of the K-Dow joint venture.

Dow further admits that on New Year's Eve, Dow received official word of the shocking turn of

events, via a letter from PIC stating that Kuwait's Supreme Petroleum Council had rescinded its

approval, and "as a result it is no longer possible for Closing to take place on 2 January 2009."

Dow admits that it had discussions with the FTC but denies that they were improper and

denies that they constituted a breach of the Merger Agreement, much less a "knowing and

intentional breach."  To the contrary, Dow's actions were authorized by and consistent with

Dow's role and right under the Merger Agreement to direct the antitrust defense of the

transaction and to communicate with the FTC on procedural matters.  Specifically, Section 5.6(c)

of the Merger Agreement provides that Dow "shall be entitled to direct the antitrust defense of

the transaction contemplated by this Agreement in any investigation or litigation by, or

negotiations with, any Governmental Entity or any other Person relating to the Merger or

regulatory filings under applicable Regulatory Law, including any communications with any

Governmental Entity relating to any contemplated or proposed Divestiture Action."  The Merger

Agreement further provides that Rohm and Haas will cooperate with Dow in such defense.

Under the Merger Agreement, Dow has the right to decide whether and when to offer

concessions to gain FTC approval and is entitled to direct the defense so as to limit the

divestitures required or to litigate with the FTC to avoid divestitures all together, so long as

closing may occur on or before October 10, 2009.  The Merger Agreement protects Rohm and

Haas by providing that if the closing has not occurred by January 10, 2009, Dow shall pay a "ticking fee" until July 10, 2009 if the transaction has not closed by such date.

In an effort to obtain early approval of the transaction, Dow offered the FTC extensive divestitures early in the process.  After the K-Dow transaction failed to close, however, Dow's financial position had changed dramatically and unpredictably.  Dow therefore requested that the FTC postpone provisional acceptance of the Consent Decree so as to allow Dow an opportunity to consider the implications of the divestitures proposed for the Rohm and Haas transactions and for the combined companies' financial condition, in light of the dramatically changed situation, and to consider whether the changed circumstances required Dow to renegotiate with the FTC the asset package to be included in the divestiture.  Andrew Liveris, Dow's CEO, visited with three of the FTC Commissioners personally during the week of January 5 to explain the situation and its implications for the Rohm and Haas transaction and possible divestitures.  The meetings with the FTC Commissioners were procedural because they related to Dow's timing request, and in any event Dow did not yet know enough to make substantive proposals concerning the divestiture, as it had not yet had the opportunity to assess fully the impact of the K-Dow events. The FTC offered to modify the consent decree so as to impose requirements only upon the closing of the Rohm and Haas transaction.  These modifications were implemented and Dow agreed not to close the transaction before January 26, 2009.  The FTC provisionally accepted the proposed consent agreement on January 23, 2009, as further described in Dow's Answer to Paragraph 2 above, which is incorporated by reference.

32.    Dow first approached the FTC on December 31, without notice to Rohm and Haas, and volunteered that it would not consummate the Merger until January 9.  Thereafter, Mr. Liveris, Dow's Chairman and CEO engaged in improper *ex parte* contacts, personally visiting three FTC Commissioners to lobby for a delay in FTC clearance, again without notice to Rohm and Haas.  As a result of these improper actions, Dow was able to delay the receipt of antitrust clearance from January 5 to January 23.  Dow's repeated efforts to delay FTC clearance

through *ex parte* contacts with the FTC constituted flagrant and intentional violations of Sections 5.l(b)(ii), 5.6(a), 5.6(b), 5.6(c)(iii), 5.6(c)(iv) and 5.6(c)(v) of the Merger Agreement.

**ANSWER**     Dow admits that it had discussions with the FTC that were authorized by and

consistent with Dow's role and right under the Merger Agreement to direct the antitrust defense,

as described in Dow's Answer to Paragraph 31 above which is incorporated by reference.

Dow denies the remaining allegations of Paragraph 32.


33.     On January 6, 2009, at the very same time that Dow was acting to delay antitrust clearance, Mr. Liveris suggested in remarks to *The Wall Street Journal* that the closing of the Merger might be "several months" away.  Mr. Liveris further claimed that "there is no deadline on the Rohm & Haas deal" and suggested that Dow is free to delay the Merger indefinitely so long as it pays a "ticking fee" under the Merger Agreement beginning on January 10, 2009. Mr. Liveris is wrong: the ticking fee provision does not give Dow an option to delay the Merger's closing at will as long as Dow pays the fee.  Moreover, the ticking fee is payable only if Dow honors its contractual obligation to close the Merger—which Dow refuses to do.

**ANSWER**     Dow admits that Mr. Liveris made comments to the *Wall Street Journal*

indicating that, due to factors including current market conditions and the collapse of the K-Dow

joint venture, successful consummation of the Merger might be several months away.  Dow

admits that the quoted language appears in a January 6, 2009, *Wall Street Journal* article, but

denies that Plaintiff fully and completely quotes the comments in that article.

Insofar as Paragraph 33 of the Complaint purports to characterize the Merger Agreement,

Dow respectfully refers the Court to the Merger Agreement for its full and complete terms.  Dow

denies that it has refused to honor any contractual obligations under the Merger Agreement and

denies the remaining allegations of Paragraph 33, including Plaintiff's suggestion that Dow's

discussions with the FTC were improper or a breach of the Merger Agreement.


34.     When Rohm and Haas learned that Dow had surreptitiously procured the delay of FTC clearance, Rohm and Haas demanded that Dow commit that it would not seek any further delay.  Mr. Liveris and Rohm and Haas's Chairman and CEO, Raj Gupta, met on January 19 in

Philadelphia to discuss the matter. After committing that Dow would not take further steps to delay FTC clearance, Mr. Liveris requested that Dow be given until June 30, 2009, to close the Merger. Mr. Liveris refused, however, to commit that at the end of that time Dow would close. Mr. Liveris did not claim that Dow had any legal basis for refusing to close, asserting only that it would be financially advantageous to Dow if it had more time to restructure its business and balance sheet prior to closing the Merger. Mr. Gupta replied that Dow's request for such an extension of the time to close was unacceptable to Rohm and Haas.

**ANSWER**      Dow denies that it "surreptitiously procured" a delay of FTC clearance. All of

Dow's communications with the FTC were authorized under the Merger Agreement and were

disclosed to Rohm and Haas.

Dow admits that Mr. Liveris and Mr. Gupta met on January 19 in Philadelphia to discuss

the Merger. Dow admits that Mr. Liveris requested that, in light of unforeseeable and

unprecedented market conditions severely affecting both Dow and Rohm and Haas and the

collapse of the K-Dow joint venture and their impact on success of the merged entities, any

closing of the Merger be delayed until June 30, 2009. Dow admits that Mr. Gupta asked Mr.

Liveris if Dow could commit to closing by June 30, 2009, and admits that Mr. Liveris informed

Mr. Gupta that Dow could not so commit at this time because of the untenable risks that doing so

would impose on both organizations.

Dow denies the implication that Mr. Liveris's discussion with Mr. Gupta suggests that

Dow did not have any legal justification for not agreeing to close the Merger by June 30, 2009.

Dow further denies that Mr. Liveris's request was based on the notion that this would be

"financially advantageous to Dow." Rather, the request was premised upon the fact that, given

the stunning recent developments, including current market conditions and the failure to close

the K-Dow joint venture, closing the Merger now would be impracticable, would frustrate the

purpose of the Merger, and would subject both Dow and Rohm and Haas to unacceptable risks of

irreparable harm, including losing their investment-grade credit ratings and defaulting on billions

of dollars under their debt agreements. Dow admits that, despite the manifest risk that

50

immediately closing the Merger would pose to both companies, Mr. Gupta did not agree to an extension of the time to close the Merger and instead demanded that Dow close the transaction within two days of receipt of "FTC clearance."

Dow denies the remaining allegations of Paragraph 34.

35.    A similar request for additional time was made at a subsequent meeting between Mr. Charles Kalil, Dow's General Counsel, and Mr. Robert Lonergan, Rohm and Haas's General Counsel on January 20.  Once again, Dow refused to commit that it would close the Merger if it was given more time.  And once again, Dow did not claim that it had any legal justification for refusing to close.  Mr. Lonergan reiterated that such request for additional time was not acceptable to Rohm and Haas.

**ANSWER**    Dow admits that Mr. Kalil and Mr. Lonergan met on January 20 and that, for the same reasons Dow's CEO had discussed with Rohm and Haas's CEO the preceding day, Dow could not commit to close the Merger because of the untenable risks that doing so would impose on both organizations.

Dow denies the implication that Mr. Kalil's discussion with Mr. Lonergan suggests that Dow did not have any legal justification for not agreeing to close the Merger.  Dow's position was premised upon the fact that, given the stunning and unforeseeable developments, including current market conditions and the failure of the K-Dow joint venture, closing the Merger now would be impracticable, would frustrate the purpose of the Merger, and would subject both Dow and Rohm and Haas to unacceptable risks of irreparable harm, including losing their investment-grade credit ratings and defaulting on billions of dollars under their debt agreements.  Dow admits that, despite the manifest risk that immediately closing the Merger would pose to both companies, Mr. Lonergan did not agree to an extension of the time to close the Merger and instead demanded that Dow close the transaction within two days of receipt of FTC clearance.

Dow denies the remaining allegations of Paragraph 35.

51

36.    The FTC granted final antitrust clearance for the Merger on Friday, January 23, 2009. Under Section 1.2 of the Merger Agreement, this triggered a closing date of no later than Tuesday, January 27, 2009.

**ANSWER**    Dow denies that the FTC granted final antitrust clearance for the Merger on Friday, January 23, 2009. On January 23, 2009, in settlement of the FTC's charges that Dow's acquisition of Rohm and Haas would be anticompetitive and would violate federal law, the FTC provisionally accepted the agreement as described in Dow's Answer to Paragraphs 2 and 31 above, which are incorporated by reference.

Insofar as Paragraph 36 of the Complaint purports to characterize the Merger Agreement, Dow respectfully refers the Court to the Merger Agreement for its full and complete terms. Dow denies that, under the present circumstances, the FTC's action triggered a closing date of no later than Tuesday, January 27, 2009, and denies the implication in Paragraph 36 of the Complaint that Section 1.2 forbids closing the Merger later than two business days after such provisional acceptance or the satisfaction of the other conditions to closing. In fact, Section 1.2 provides for closing on an alternative date should the parties deem it advisable, for instance to postpone consummating the Merger if the consequence would be to jeopardize the viability of both organizations. And Section 7.1(b) provides for closing as late as October 10, 2009 under certain circumstances.

Dow denies the remaining allegations of Paragraph 36.

37.    The FTC's January 23 press release announcing clearance of the Merger makes clear that its action would permit the transaction to close. As stated in the press release, "Under the proposed consent order **allowing the transaction to proceed**, Dow will sell a range of assets . . . ." (Emphasis added.)

**ANSWER**    Dow admits that the FTC issued a press release on January 23, 2009, which contains the quoted language, but denies that Plaintiff has quoted the press release fully or completely.  Dow denies the implication that the FTC's press release contemplated or required the transaction to close or to close by any particular date.  The statement by the FTC only speaks to the transaction from its perspective and does not, and could not possibly, speak to the satisfaction of the remaining conditions to closing.  Dow denies the remaining allegations of Paragraph 37.

38.    On January 24, Messrs. Liveris and Kalil of Dow met with Messrs. Gupta and Lonergan of Rohm and Haas.  Once again, Dow did not claim that it had any justification under the Merger Agreement for refusing or refusing to commit to a closing date.  Instead, Dow claimed that it was economically disadvantageous for Dow to close on schedule.

**ANSWER**    Dow admits that on January 24, Messrs. Liveris and Kalil of Dow met with Messrs. Gupta and Lonergan of Rohm and Haas.  Dow denies Plaintiff's assertion that Dow did not provide any justification for delaying the closing of the Merger, and denies that Dow merely claimed it was "economically disadvantageous for Dow to close."  Rather, Dow informed Rohm and Haas frankly and with candor that, given the stunning recent developments including current market conditions and the K-Dow joint venture's failure to close, closing the Merger now would be impracticable and would subject both Dow and Rohm and Haas to unacceptable risks of irreparable harm, including losing their investment-grade credit ratings and defaulting on billions of dollars under their debt agreements.

39.    On January 25, Mr. Liveris wrote to Mr. Gupta, stating that "due to concerns and uncertainty about the potential success of the combined organizations, we confirm that Dow does not intend to close the acquisition on or by Tuesday [January 27] pursuant to the existing terms." Mr. Liveris refused to commit to closing at a future date, stating only that "we believe that we will be able to determine our ability to close the transaction by June 30, 2009."  Mr. Liveris did not claim that there was any legal basis for Dow's refusal to close.

53

**ANSWER**    Dow admits that on January 25, 2009, Mr. Liveris wrote a message to Mr. Gupta, and that the quoted language appears in that letter.  However, Dow denies that Plaintiff has fully and completely quoted the correspondence and denies Plaintiff's characterization of the message. The message is reproduced in full in Paragraph 41 of Dow's statement of facts, and is very different in overall tone and content from the Complaint's selective snippets.  Dow admits that, under the present circumstances, its planned acquisition of Rohm and Haas is plagued by concerns and uncertainty about the potential success of the combined organizations.

Dow denies the implication that Mr. Kalil's discussion with Mr. Lonergan suggests that Dow did not have any legal justification for not agreeing to close the Merger.  The January 25 message recites that Dow had "explained at length the basis for [its] concerns in the meeting"; that Mr. Liveris and Mr. Gupta discussed a structured process between the companies' principals to solve the problem facing both organizations; and that Rohm and Haas recognized the potential divestiture of some of its assets could be necessary.  Those concerns revolved around the fact that, given the stunning recent developments, closing the Merger now would be impracticable, would frustrate the purpose of the Merger and would subject both Dow and Rohm and Haas to unacceptable risks of irreparable harm, including potentially losing their investment-grade credit ratings and defaulting on billions of dollars under their debt agreements.

Dow denies the remaining allegations of Paragraph 39.

40.    Dow's failure to honor its contractual commitment to close the Merger on schedule is subjecting the business and affairs of Rohm and Haas to intolerable uncertainty, affecting not only Rohm and Haas and its stockholders, but also employees, customers, suppliers and other persons or entities doing business with Rohm and Haas.  The longer that this uncertainty about the Merger continues, the more likely it is that Rohm and Haas's business will suffer — for example, by losing employees, customers and suppliers.  Moreover, as noted above, Dow agreed in Section 8.5(a) of the Merger Agreement that irreparable damage would occur in the event that Dow failed to perform its obligations thereunder.

**ANSWER**      Insofar as Paragraph 40 purports to characterize the Merger Agreement, Dow respectfully refers the Court to the Merger Agreement for its full and complete terms.  Dow denies that it has failed to honor any contractual commitments under the Merger Agreement.

Dow denies that it has subjected the business and affairs of Rohm and Haas to intolerable uncertainty or that it has caused Rohm and Haas's business to suffer, and denies that Dow has caused Rohm and Haas  "irreparable damage."  To the contrary, Rohm and Haas's business would be much worse off, and indeed irreparably harmed, if the parties were to close the Merger at the present time.  Consummation of the Merger under current circumstances is not in the interest of Dow, Rohm and Haas, the more than 40,000 current Dow employees, the more than 15,000 current Rohm and Haas employees, both companies' current and future customers, both companies' current and future suppliers, and the communities of Midland, Michigan, and Philadelphia, Pennsylvania, as well as the hundreds of other communities in which Dow, Rohm and Haas, and their customers and suppliers do business.  Dow, Rohm and Haas, and the employees of both companies would suffer greatly should the transaction be forced to close now.

Dow denies the remaining allegations of Paragraph 40.


**CAUSE OF ACTION**
**(Specific Performance)**

41.      Rohm and Haas repeats and realleges the allegations of paragraphs 1 through 40 as if fully set forth herein.

**ANSWER**      Dow repeats and realleges its answers to the allegations of Paragraphs 1 through 40 of the Complaint as if fully set forth herein.


42.      Rohm and Haas and Dow entered into the Merger Agreement, a binding contractual agreement for valuable consideration.

**ANSWER**      Dow admits that Rohm and Haas and Dow entered into the Merger Agreement, a

contractual agreement for valuable consideration, but denies that the Agreement is binding under

current conditions, due to impracticability, failure of essential purpose and other factors cited

throughout this answer.

43.      Rohm and Haas is not in violation of any provision of the Merger Agreement. Rohm and Haas has performed and is prepared to continue to perform all of its obligations under that contract.

**ANSWER**      Dow lacks knowledge or information sufficient to form a belief as to the

allegations of Paragraph 43 of the Complaint that Rohm and Haas is prepared to perform all of

its obligations under the Merger Agreement, and therefore denies them.  Dow denies the

remaining allegations of Paragraph 43 of the Complaint.

44.      All of the conditions to closing the Merger were satisfied as of January 23, 2009. Under Section 1.2 of the Merger Agreement, this triggered a mandatory closing date of no later than January 27, 2009.

**ANSWER**      Dow denies that all of the conditions to closing the Merger were satisfied as of

January 23, 2009 because, among other things, to do so would be impractical, would frustrate the

purpose of the Merger Agreement, and would be accompanied by an unacceptable risk of

irreparable injury to the parties.  Dow denies that Section 1.2 of the Merger Agreement required

a mandatory closing date of no later than January 27, 2009, and denies the implication in

Paragraph 44 of the Complaint that Section 1.2 forbids closing the Merger later than two

business days after the satisfaction of the conditions to closing.  In fact, Section 1.2 expressly

provides for closing on an alternative date should the parties deem it advisable to delay, for

instance to avoid consummating the Merger if the consequence would be to jeopardize the

viability of both organizations.

45.     Dow has unequivocally stated that it will not close the transaction on January 27, 2009.

**ANSWER**     Dow admits that it stated that the Merger could not be closed on January 27, 2009

because to do so would be impracticable, would frustrate the purpose of the Merger Agreement,

and would be accompanied by an unacceptable risk of irreparable harm to the parties.

46.     Dow's conduct violates Sections 1.2, 5.l(b) and 5.6 of the Merger Agreement, is without justification and is a knowing and intentional breach of the Merger Agreement.

**ANSWER**     Dow denies the allegations of Paragraph 46.

47.     Rohm and Haas has no adequate remedy at law.  A damages award, while enormous, would be imprecise, while an award of specific performance might entirely or in large part eliminate the need for a determination of damages.

**ANSWER**     Dow denies the allegations of Paragraph 47.

48.     Rohm and Haas has a contractual right to enforce specifically the terms and conditions of the Merger Agreement, as expressly provided in Section 8.5(a) thereof.

**ANSWER**     Insofar as Paragraph 48 of the Complaint purports to characterize the Merger

Agreement, Dow respectfully refers the Court to the Merger Agreement for its full and complete

terms.  Dow denies that Rohm and Haas is entitled to an equitable order of specific performance

under present circumstances and therefore denies the allegations of Paragraph 48.

49.     Dow specifically covenanted in Section 5.l(b)(i) of the Merger Agreement to "take all action necessary to ensure that as of the Closing Date, [Dow] will obtain the Financing."  And, in fact, Dow has the ability to consummate the Merger.  Dow has $13 billion in debt financing and an additional $4 billion of preferred equity financing committed to fund the Merger, more than adequate funds to pay the bargained-for aggregate consideration of approximately $15 billion.

**ANSWER**      Dow admits that the quoted language appears in Section 5.1(b)(i) of the Merger Agreement, but denies that Plaintiff has quoted Section 5.1 fully and completely.  Insofar as Paragraph 49 of the Complaint purports to characterize the Merger Agreement, Dow respectfully refers the Court to the Merger Agreement for its full and complete terms.  Dow admits that it undertook to secure financing for the Merger, but denies that it can responsibly consummate the Merger at the present time, if it can consummate the Merger at all.  Dow admits that it has entered into a bridge loan, the terms of which provide up to $13 billion in short-term debt financing under certain circumstances, and has entered into agreements for an additional $4 billion in preferred equity financing committed to fund the Merger, but denies the implication that the financing Dow has obtained makes the Merger practicable given the current circumstances and terms of that financing and further denies that these funds can be drawn down without subjecting Dow and Rohm and Haas to unacceptable risks of irreparable harm.  In light of the risk of irreparable harm that would befall Dow and Rohm and Haas upon closing the Merger given the current circumstances and terms of Dow's financing, Dow denies that it has the current ability to consummate the Merger because closing the Merger is impracticable, would frustrate the purpose of the Merger and would subject both Dow and Rohm and Haas to unacceptable risks of irreparable harm, including potentially losing their investment-grade credit ratings and defaulting on billions of dollars under their debt agreements.

Dow denies the remaining allegations of Paragraph 49.


50.      By reason of the foregoing, Rohm and Haas is entitled to a decree of specific performance requiring Dow to close the Merger Agreement immediately.

**ANSWER**      Dow denies that Rohm and Haas is entitled to a decree of specific performance requiring Dow to close the Merger Agreement immediately.

58

## ADDITIONAL DEFENSES

Without assuming any burden of proof that it would not otherwise bear, Dow asserts the following additional defenses (and incorporates by reference general Paragraphs 1 through 49 on pages 3 through 23 above):

## FIRST DEFENSE — FRUSTRATION OF PURPOSE

The sudden, historic, unforeseen and unforeseeable events of the past 45 days—rapid acceleration of the economic and financial downturn, unprecedented falloff in Dow's earnings and demand in December and January, deteriorating condition of the 19-bank consortium on the bridge loan, dramatic change in Dow's ability to comply with the debt-to-EBITDA covenant under the not-yet-drawn bridge loan, severe downgrade of Dow's credit rating and pronouncement of the rating agencies that Dow will be lowered below investment grade if the Merger is consummated under current conditions, and the collapse of the K-Dow transaction— have negated a basic assumption of the Merger Agreement and frustrated the purpose of the transaction.  Forcing the Merger to close now would jeopardize the viability of the merged entities.

## SECOND DEFENSE — COMMERCIAL IMPRACTICABILITY

The sudden, historic, unforeseen and unforeseeable events of the past 45 days—rapid acceleration of the economic and financial downturn, unprecedented falloff in Dow's earnings and demand since December, deteriorating condition of the 19-bank consortium on the bridge loan, dramatic change in Dow's ability to comply with the debt-to-EBITDA covenant under the not-yet-drawn bridge loan, severe downgrade of Dow's credit rating and pronouncement of the

rating agencies that Dow will be lowered below investment grade if the Merger is consummated under current conditions, and the collapse of the K-Dow transaction—have negated a basic assumption of the Merger Agreement and rendered consummation of the Merger commercially impracticable.

### THIRD DEFENSE — IMPOSSIBILITY OF PERFORMANCE

The sudden, historic, unforeseen and unforeseeable events of the past 45 days—rapid acceleration of the economic and financial downturn, unprecedented falloff in Dow's earnings and demand since December, deteriorating condition of the 19-bank consortium on the bridge loan, dramatic change in Dow's ability to comply with the debt-to-EBITDA covenant under the not-yet-drawn bridge loan, severe downgrade in Dow's credit rating and pronouncement of the rating agencies that Dow will be lowered below investment grade if the Merger is consummated under current conditions, and the collapse of the K-Dow transaction—have negated a basic assumption of the Merger Agreement and made it impossible for Dow to acquire Rohm and Haas without jeopardizing the viability of the merged entities.

### FOURTH DEFENSE — UNDUE HARDSHIP

An order of specific performance forcing the consummation of the Merger would cause undue hardship to Dow, Dow's shareholders (who would be indirect Rohm and Haas shareholders after the Merger), Rohm and Haas itself, the employees of both companies, and the general public.

### FIFTH DEFENSE — ADEQUACY OF LEGAL REMEDY

Rohm and Haas has adequate remedies at law for any breach of the Merger Agreement.

## SIXTH DEFENSE — FAILURE TO STATE A CLAIM

The Complaint fails to state a claim upon which relief can be granted.


In addition to the enumerated defenses identified above, Dow reserves the right to raise any additional defenses that may become available or appropriate.

61

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____

Martin P. Tully (#465)
Kenneth J. Nachbar (#2067)
J.R. Biondi (#4987)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
   *Attorneys for Defendants*

OF COUNSEL:

David M. Bernick, P.C.
Michael P. Foradas, P.C.
John Donley
Nader R. Boulos
Douglas G. Smith
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL  60601
(312) 861-2000

Charles J. Kalil
Duncan A. Stuart
THE DOW CHEMICAL COMPANY
2030 Dow Center
Midland, MI 48674
(989) 636-1000

Dated:  February 3, 2009