## <u>PLAINTIFF'S PRE-TRIAL BRIEF</u>

# EXHIBIT J

Checkpoint Contents
  Federal Library
    Federal Editorial Materials
      WG&L Federal Treatises
        Individual and General Federal Taxation
          Bittker & Lokken: Federal Taxation of Income, Estates, and Gifts
            Part 12 Business Entities and Their Owners
              Chapter 87: Partnership Allocations
                ¶87.3. Items Related to Contributed Property

# ¶ 87.3 Items Related to Contributed Property

## ¶ 87.3.1 Generally

According to § 704(c)(1)(A),

> income, gain, loss, and deduction with respect to property contributed to the partnership
> by a partner shall be shared among partners so as to take account of the variation
> between the basis of the property to the partnership and its fair market value at the time
> of contribution. [1]

In the simplest cases, this is done by allocating gain or loss on a sale of contributed property to the
contributing partner to the extent of appreciation or depreciation in the property's value up to the time
of contribution and applying the profit and loss sharing provisions of the partnership agreement only to
gain or loss accruing after the contribution. For example, if partner *A* 's contribution on the formation of
the *AB* partnership is Blackacre, which is then worth $1,000 and has a basis to *A* of $800, and the
partnership subsequently sells Blackacre for $1,100, the partnership has gain of $300 (the amount
realized of $1,100, less *A* 's basis of $800). Of the $300, $200 is allocated to *A* under § 704(c) and
$100 is allocated under the partnership agreement. According to the regulations, the "purpose of
section 704(c) is to prevent the shifting of tax consequences among partners with respect to
precontribution gain or loss." [2]

Although a partnership takes a contributing partner's basis for contributed property, [3] the property is
recorded in the partnership books at fair market value. [4] The variation between basis and fair market
value referred to in § 704(c)(1)(A) thus equals the difference between partnership basis and the book
entry made for the property. The regulations use the term "section 704(c) property" to refer to
contributed property whose book value differs from the contributing partner's basis for it. [5] If the book
value exceeds the partner's basis, the excess is "built-in gain"; an excess of the basis over the book
value is "built-in loss." [6] Built-in gain or loss is reduced by any subsequent reduction in the difference
between the partnership's book value and basis for the property. For example, depreciation is
computed separately for book and tax purposes, and the depreciation adjustments to the book value
and basis have the effect of reducing the book-basis differential (to zero when the property is fully
depreciated).

Rather than prescribing a single method for complying with the mandate of § 704(c), the regulations
require that allocations relating to the contributed property be made "using a reasonable method that
is consistent with the purposes of section 704(c)." [7] The regulations describe three methods "that are
generally reasonable"—a traditional method, [8] a traditional method with curative allocations, [9] and a
remedial allocation method [10] —but they allow use of other reasonable methods "in appropriate
circumstances." [11] A partnership can usually select any one of these methods for complying with § 704
(c). However, no allocation method, including one of those described in the regulations, is acceptable if
a contribution and allocation are made "with a view to shifting the tax consequences of built-in gain or

loss among the partners in a manner that substantially reduces the present value of the partners' aggregate tax liability." [12]

Section 704(c)(1) usually applies "property-by-property." [13] Although different methods may be used for different items of contributed property, the partnership and the partners must "consistently apply a single reasonable method for each item of contributed property," and "the overall method or combination of methods [must be] reasonable [given] the facts and circumstances" and must be "consistent with the purpose of section 704(c)." [14] The regulations warn that it may not be reasonable to use one method for appreciated property and another method for depreciated property.

In addition to the three methods, the ensuing discussion includes descriptions of several supporting rules and exceptions, including

>    1. A de minimis rule allowing a partnership to disregard § 704(c) with respect to all property contributed by a partner during a partnership taxable year or to apply § 704(c) only on selling the property, even if it is depreciable, if built-in gains and losses are small in relation to the adjusted basis of contributed property. [15]

>    2. A requirement that a contributing partner recognize built-in gain or loss if the partnership distributes contributed property to partner other than the contributing partner within seven years after the contribution. [16]

>    3. A requirement to use the "principles" of § 704(c) in accounting for book-basis differences arising from a restatement of the partnership assets at fair market value on the admission of a new partner or when the interest of an existing partner is increased, decreased, or liquidated. [17]

>    4. Complex rules on the allocation of depreciation recapture gain on a partnership's disposition of contributed property. [18]

## ¶ 87.3.2 Traditional Method

Under the traditional method, noncontributing partners normally receive tax allocations of partnership gain, loss, or deduction from contributed property equal to their allocations of the corresponding book items, and the difference between tax and book items is allocated to or absorbed by the contributing partner. [19] However, the traditional method is limited by a ceiling rule, which restricts tax allocations to a sharing of the partnership's gain, loss, or deduction, as determined for tax purposes, even if this causes tax allocations to noncontributing partners to differ from their shares of book items. The ceiling rule causes distortions that may persist until the partnership liquidates. [20] The distortions can usually be eliminated by using the traditional method with curative allocations. [21] Moreover, if utilized for the purpose of exploiting ceiling-rule distortions, the traditional method is disallowed by an antiabuse rule. [22]

>    1. *Gains and losses on sales.*   Normally, when a partnership sells or exchanges contributed property, tax gain or loss equal to the book gain or loss is allocated under the partnership agreement, and built-in gain or loss is allocated to the contributing partner. [23] Assume *X* contributes Blackacre in exchange for a one-half interest in the *XY* partnership, and *Y* contributes cash of $100. Blackacre is worth $100, but *X*'s basis for it, which becomes the partnership's basis, is $60. The partnership must record the value of Blackacre on its books at $100 and give *X* an opening capital account of $100. If the partnership later sells Blackacre for $120, it recognizes gain for tax purposes of $60, which consists of built-in gain of $40 (the $100 value when contributed less the adjusted basis of $60), and book gain of $20 (the selling price of $120 less the book value of $100). Each partner is allocated tax gain equal to her share of the book gain ($10 to each partner), and this allocation is reflected by increasing each partner's capital account

by $10. The built-in gain of $40 is allocated to the contributing partner, *X*, and this allocation is not reflected in the capital accounts. In total, *X* has $50 of tax gain, and the tax allocation to *Y* equals the book allocation of $10 of gain.

The concept underlying this procedure is as follows: The partners liquidation entitlements are determined by the capital accounts. *X*'s capital contribution was reflected in the books by crediting her capital account with $100, the fair market value of the property, thereby establishing her entitlement to a return of the full value of the contribution. Allocation of the $40 of gain that accrued before *X*'s contribution is thus a tax matter only, not an issue relating to the partners' economic arrangement. Since the gain accrued to *X*, not *Y*, the fundamental policy of § 704—to bar shifts of tax items from partner to partner that lack economic substance apart from taxes—requires that this portion of the gain be taxed to *X* alone.

The ceiling rule deviates from this concept. Assume the partnership sells Blackacre for $70, recognizing tax gain of $10 (the amount realized less the adjusted basis of $60) and book loss of $30 (the selling price less the book value of $100). Under the concept described in the preceding paragraph, (1) each partner has tax loss equal to her $15 share of the book loss and (2) *X* also has tax gain of $40—the difference between the tax item (a gain of $10) and the book item (a loss of $30)—leaving her with net tax gain of $25 ($40 less $15). Under this approach, the capital accounts would be reduced by the partners' shares of the book loss, $15 each, and tax basis would be fully reconciled with the partnership books. However, the ceiling rule precludes this result by demanding that the tax allocation consist of nothing more or less than a division of the tax item recognized by the partnership. [24] If that item is a gain, the partners' distributive shares must consist only of gain, and no partner can be allocated loss; if the tax item is loss, only loss can be allocated. In the example, the tax gain of $10 is a portion of the built-in gain and is therefore allocated to *X* alone. *X* is taxed on less than all of the gain that accrued to the property before it was contributed, and *Y* is allowed no deduction for any portion of the loss sustained by the partnership. The $40 discrepancy between the tax and book accounts arising from *X*'s contribution is not fully eliminated, even though the contributed property is now gone.

This book-basis discrepancy usually does not disappear until the partnership liquidates. [25] Assume the *XY* partnership has no transactions other than the sale of Blackacre, and the partnership liquidates immediately after this sale by distributing its remaining property (cash of $100 received from *Y* and $70 received on selling Blackacre). After the sale, each partner's capital account is $85 ($100 contributed less $15 of book loss on the sale), and the liquidating distributions of $85 to each partner reduce the capital accounts to zero. However, the adjusted basis of *X*'s partnership interest is $70 (*X*'s adjusted basis for Blackacre ($60) plus $10 of gain on the sale), and the adjusted basis of *Y*'s partnership interest is $100 (the amount of her contribution). On the liquidating distributions, *X* therefore has capital gain of $15 under § 731(a) ($85 received less adjusted basis of $70), and *Y* has capital loss of $15 ($85 received less adjusted basis of $100). [26] The gain and loss consist of the economic gain and loss on Blackacre that the ceiling rule blocked the partners from recognizing at the time of sale.

2.  *Cost recovery deductions.*   If a partnership is allowed depreciation, depletion, or amortization with respect to § 704(c) property, noncontributing partners are usually allocated cost recovery for tax purposes equal to their shares of the book item, and any difference between the book and tax items is absorbed by or allocated to the contributing partner. [27] Assume *X*'s contribution to the equal partnership of *X* and *Y* is depreciable five-year property that *X* had acquired at a cost of $1,000 and is worth $720 when *X* contributes it to the partnership at the beginning of the third year of its recovery period. *X* took depreciation of $200 and $320 for the two years she used the property in her business, and her adjusted basis is $480 when it is contributed to the partnership. For tax purposes, the partnership is entitled to depreciation over the succeeding four years of $192, $115.2, $115.2, and $57.6 (the amounts that would have been allowed to *X* if she had retained the property). [28] The partnership must record the property on its books at $720 (the fair market value at the time of contribution) and credit *X*'s capital account with $720 for the contribution. Book depreciation, which must bear the same relationship

to the property's book value as tax depreciation bears to its adjusted tax basis, [29] is $288 ($720 times $192/$480), $172.8, $172.8, and $86.4 for the remaining four years of the property's depreciation recovery period. The allocation of depreciation is as follows:

| Y | | Total | | X | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Year | Tax | Book | Tax | Book | Tax |
| Book | | | | | | |
| | 1 | $192.00 | $288.00 | $48.00 | $288.00 | $48.00 |
| $288.00 | | | | | | |
| | 2 | 115.20 | 172.80 | 28.80 | 86.40 | 86.40 |
| 86.40 | | | | | | |
| | 3 | 115.20 | 172.80 | 28.80 | 86.40 | 86.40 |
| 86.40 | | | | | | |
| | 4 | 57.60 | 86.40 | 14.40 | 43.20 | 43.20 |
| 43.20 | | | | | | |

Only the allocation of book depreciation is reflected in the capital accounts. Because the capital accounts record the partners' economic interests, only allocations of book depreciation have economic effect. The difference between tax and book depreciation is a tax item that has no economic significance apart from taxes. Because the difference arises from the spread between the property's basis and its value at the time of contribution, it is thrust on the contributing partner, X. If it was not, X would be assigned some of the tax benefit of basis that comes from Y's contribution. For example, if Y contributes cash of $720 and the partnership invests the cash in depreciable property, the partnership will have tax depreciation in the aggregate of $1,200 ($480 on the property contributed by X and $720 on the property purchased with Y's contribution). If the $240 shortfall resulting from X's low basis was not allocated exclusively to X, each partner would get depreciation of $600 (one half of $1,200), and X would effectively have the benefit of $120 of depreciable basis created by Y's contribution. The fundamental idea underlying § 704 is that such a transfer of tax benefits should not be allowed if it does not have economic significance apart from taxes.

Built-in gain declines annually by any amount by which book depreciation exceeds tax depreciation, and built-in loss is reduced by an excess of tax depreciation over book depreciation. [30] In the example, built-in gain is originally $240 (the property's value when contributed ($720), less X's adjusted basis ($480)). At the end of year 1, it is $144 ($240 less the excess of book depreciation for year 1 ($288) over the tax depreciation for the year ($192)). If the partnership sells the property at the beginning of year 2 for its book value of $432 ($720 less $288 of book depreciation), the tax gain on the sale is $144—$432 less the adjusted tax basis of $288 (X's adjusted basis of $480 less $192 of tax depreciation for year 1), and all of it is allocated to X because it equals the built-in gain.

The ceiling rule also applies to depreciation. [31] Under the traditional method, the tax allocation of depreciation can consist only of a sharing of the partnership's depreciation deduction. When the rule applies, tax depreciation is allocated exclusively to noncontributing partners, but this allocation falls short of the partners' share of the book depreciation. For example, if the depreciable property contributed by X is worth $1,200, rather than $720, the allocations are as follows:

| Y | | Total | | X | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Year | Tax | Book | Tax | Book | Tax |
| Book | | | | | | |
| | 1 | $192.00 | $480.00 | 0 | $240.00 | $192.00 |

```
$240.00
        2            115.20    288.00        0      144.00     115.20
144.00
        3            115.20    288.00        0      144.00     115.20
144.00
        4             57.60    144.40        0       72.00      57.60
72.00
```

The general policy of requiring *X* to absorb the entire difference between book and tax depreciation could be followed by giving *Y* a tax depreciation equal to her share of the book allowance, and requiring *X* to recognize gross income (negative depreciation) equal to the excess of *Y*'s share of book depreciation over the tax depreciation deduction ($48, $28.8, $28.8, and $14.4 for years 1 through 4). The ceiling rule, however, bars this approach.

# ¶ 87.3.3 Traditional Method With Curative Allocations

A partnership using the traditional method may make "reasonable curative allocations" of unrelated partnership income or deductions to "correct distortions created by the ceiling rule." [32] A curative allocation is an allocation of a tax item that differs from the allocation of the corresponding book item, with the purpose and effect of causing all tax allocations to noncontributing partners to be equal to the allocations of book items. Curative allocations may not exceed the difference between tax and book allocations relating to contributed property. [33] "[T]he purpose of curative allocations is to equalize the overall allocations of economic and tax items to noncontributing partners." [34]

Assume the equal partnership of *X* and *Y* is created by *X*'s contribution of depreciable property, which is worth $10,000 and has a basis of $4,000, and *Y*'s contribution of $10,000 in cash, which the partnership expends in purchasing inventory. The depreciable property is depreciated on a straight line basis over 10 years after the contribution ($1,000 annually for book purposes and $400 annually for tax purposes), and the partnership's gross income for its first year consists of $700 from inventory sales. [35] If the partnership adopts the traditional method without curative allocations, the tax depreciation of $400 is allocated to *Y* alone because it is less than *Y*'s share of the book depreciation ($500), and the results for the first year are reflected in the capital accounts as follows:

```
                                Total                X
        Y
                       ----------------    ----------------
-----------------
        Transaction     Tax     Book     Tax     Book
Tax      Book
        Contributions  $14,000  $20,000  $4,000  $10,000    $10,000
$10,000
        Sales income      700      700     350      350        350
350
        Depreciation     (400)  (1,000)    -0-      (500)
 (400)    (500)
                        -------  -------  ------  -------    -------
-------
        Year-end       $14,300  $19,700  $4,350  $ 9,850    $ 9,950  $
9,850
```

As a result of the ceiling rule, the book-basis discrepancy, which initially is reflected only in the capital account of *X*, who contributed § 704(c) property, would be extended to *Y*, who contributed only cash.

The effects of the ceiling rule can be neutralized by a curative allocation of $100 of *Y*'s share of the sales income to *X* for tax, but not book, purposes. [36] If this is done, the capital account adjustments are as follows:

| Transaction | Total Tax | Total Book | X Tax | X Book | Y Tax | Y Book |
|---|---|---|---|---|---|---|
| Contributions | $14,000 | $20,000 | $4,000 | $10,000 | $10,000 | $10,000 |
| Sales income | 700 | 700 | 450 | 350 | 250 | 350 |
| Depreciation | (400) | (1,000) | -0- | (500) | (400) | (500) |
| Year-end | $14,300 | $19,700 | $4,350 | $ 9,850 | $ 9,950 | $ 9,850 |

The curative allocation, which equalizes *Y*'s tax and book accounts, has the same effect as an elimination of the ceiling rule. Without the ceiling rule, *Y* would be allocated $500 of tax depreciation, and *X* would be allocated negative tax depreciation (gross income) of $100.

Generally, the item or items allocated by a curative allocation "must be expected to have substantially the same effect on each partner's tax liability as the tax item limited by the ceiling rule." [37] For example, a curative allocation made to correct the effects of the ceiling rule on an allocation of depreciation must be expected to have the same effect as an allocation of income from the property. Furthermore, if the ceiling rule applies to depreciation within a particular statutory grouping for purposes of the credit limitation rules of § 904(d), the curative allocation must usually be of income within the same grouping. [38]

However, an allocation of gain on a disposition of property may be curative of depreciation allocations with respect to the property, even if the gain and depreciation are not of the same character (e.g., capital gain and ordinary deduction), but this allocation must be "properly provided for" by the partnership agreement in effect when the property is contributed. [39] For example, a partnership agreement may provide that in the event the ceiling rule applies to depreciation with respect to contributed property, no curative allocations will be made as depreciation is claimed. However, a curative allocation of gain on sale of the property will be made to offset to the extent possible all distortions caused by the ceiling rule in allocating depreciation on the property.

Generally, an allocation to cure a distortion caused by the ceiling rule must be made for the taxable year in which the rule creates the distortion. [40] For example, distortion resulting from the rule's application to depreciation for a particular year may usually be cured only by an allocation made for that year. However, for the year in which § 704(c) property is sold, a curative allocation may be made to correct the effects of the rule for that and all prior years (e.g., on depreciation allocations). Also, curative allocations may be made after the year of the ceiling rule's application if the "allocations are made over a reasonable period of time, such as over the property's economic life, and are provided for under the partnership agreement in effect for the year of contribution." [41]

A partnership using the traditional method may make curative allocations for some items, such as depreciation, but not other items pertaining to the same property, and it may make curative allocations with respect to some, but not all, contributed property. [42] However, it must be "consistent in its application of curative allocations with respect to each item of...property from year to year." [43] For example, it may not make curative allocations for depreciation from particular property in some years but not others. Moreover, if a contribution and curative allocations are made "with a view to" shifting tax items to minimize the aggregate tax burdens of the partners, the allocations may be disallowed by an antiabuse rule. [44]

# ¶ 87.3.4 Remedial Allocation Method

The remedial allocation method is similar to the traditional method with curative allocations. [45] A remedial allocation, like a curative allocation, is made to eliminate a distorting effect of the ceiling rule. Additionally, a remedial allocation, like a curative allocation, is only made for tax purposes and is not reflected in partnership books. However, while curative allocations can be made for some items and skipped for others, a partnership adopting the remedial allocation method must make a remedial allocation for each taxable year for which book allocations to noncontributing partners differ from these partners' shares of a tax item. More fundamentally, while a curative allocation is of income or gain from other transactions or property, a remedial allocation is simply an adjusting entry—income, gain, loss, or deduction to the contributing partner and an equal offsetting item to the noncontributing partners—not a reallocation of actual income or deduction. "Remedial items are notional tax items created by the partnership solely for tax purposes...." [46] Remedial allocations do not affect book capital accounts or the partnership's taxable income or adjusted basis for partnership property. They do, however, "have the same effect as actual tax items on a partner's tax liability and on the partner's adjusted tax basis in the partnership interest." In many situations, this artificial canceling out of effects of the ceiling rule reaches the same results as an elimination of the rule. However, computations of book depreciation are altered under the remedial method in a way that usually delays remedial allocations.

For a sale of § 704(c) property, the remedial method is applied by allocating gain or loss on the sale by the traditional method (including the ceiling rule) and eliminating any resulting tax-book discrepancy for noncontributing partners with a remedial allocations equal to the discrepancy. [47] Assume the *XY* partnership is organized by *X*'s contribution of Blackacre, which is worth $1,000 and has a basis to *X* of $400, and *Y*'s contribution of $1,000 in cash; sometime later, before the partnership has any other transactions, Blackacre is sold for $900. [48] On the sale, the partnership has a tax gain of $500 (amount realized of $900 less basis of $400) and a book loss of $100 ($900 less the book value of $1,000). Because of the ceiling rule, *Y* cannot be allocated tax loss matching her $50 share of the book loss. If the partnership has adopted the remedial method, this tax-book difference is eliminated as follows:

|  | *Total* | | *X* | | | *Y* | |
| --- | --- | --- | --- | --- | --- | --- | --- |
|  | --------------- | | --------------- | | | --------------- | |
|  | *Tax* | *Book* | *Tax* | *Book* | | *Tax* | *Book* |
| Contributions | $1,400 | $2,000 | $400 | $1,000 | $1,000 | $1,000 | $1,000 |
| Sale | 500 | (100) | 500 | (50) | (50) | | |
| Remedial Allocation |  |  | 50 |  |  | (50) | |
|  | ------ | ------ | ---- | ------ | ------ | ------ | |
|  | $1,900 | $1,900 | $950 | $ 950 | $ 950 | $ 950 | |

Because the ceiling rule applies to loss on sale of Blackacre, the remedial allocation of $50 to *X* is hypothetical tax gain on the sale of Blackacre, and the $50 remedial deduction allocation to *Y* is hypothetical tax loss on the sale. If Blackacre was a capital asset to the partnership, the remedial allocation is of capital gain and loss.

The procedure is somewhat more complicated for depreciation of § 704(c) property whose value exceeds adjusted basis sufficiently to invoke the ceiling rule. Under the remedial method, a partnership's book depreciation is the sum of

   1. Tax depreciation, which usually equals the depreciation that would have been allowed to the contributing partner if the property had not been contributed to the partnership, and

2. Depreciation of the excess of the book value over the basis, computed as though the partnership had purchased the property at the time of its contribution. [49]

The latter increment may be computed by any method the partnership could have used if the partnership had actually purchased the property. [50] If noncontributing partners' shares of book depreciation exceed tax depreciation, an annual remedial allocation equal to this excess (income to the contributing partner and deduction to the noncontributing partners) is made to prevent tax-book differences from arising for the noncontributing partners. Depreciation of the excess of the book value over the basis usually continues after tax depreciation is completed, and for this period, the annual remedial allocation equals the book depreciation allocated to noncontributing partners.

Assume the equal partnership of *X* and *Y* is organized by *X*'s contribution of depreciable property worth $1,000 (with a basis of $400) and *Y*'s contribution of $1,000 in cash. [51] The property contributed by *X* is 10-year property and is depreciated on a straight line basis; four years remain in its recovery period at the time of contribution. The partnership agreement requires the remedial method to be used with straight line depreciation of the excess of the book value over the basis. Tax depreciation is $100 annually (one fourth of the adjusted basis of $400). The $600 excess of the book value over the basis is recovered by ten annual allowances of $60 each. For each of the first four years, the book depreciation is $160 (sum of $100 and $60). If the partnership's gross income for each relevant year equals allowable deductions (other than depreciation), capital account adjustments for the first year are as follows:

|               | Total |        | X     |        |       |
|               | Tax   | Book   | Tax   | Book   |       |
| Transaction   |       |        |       |        | Tax   Book |
| Contributions | $1,400 | $2,000 | $400  | $1,000 | $1,000  $1,000 |
| Depreciation  | (100) | (160)  | (20)  | (80)   | (80)  (80) |
|               | ------ | ------ | ---- | ------ | ------  ------ |
| Year-end      | $1,300 | $1,840 | $380 | $ 920 | $ 920  $ 920 |

(Y appears as a column header to the left of Total; Tax/Book appear under each grouping)

Although the property is fully depreciated for tax purposes at the end of the partnership's fourth year, book depreciation of $60 annually continues for years 5 through 10. The results for year 5 appear in the capital accounts as follows:

|               | Total |        | X     |        |       |
|               | Tax   | Book   | Tax   | Book   | Tax   Book |
| End of year 4 | $1,000 | $1,360 | $320 | $680  | $680  $680 |
| Depreciation  |       | (60)   |      | (30)  | (30) |
|               | ------ | ------ | ---- | ---- | ----  ---- |
| End of year 5 | $1,000 | $1,300 | $320 | $650 | $680  $650 |

However, a remedial allocation is required to eliminate the book-tax discrepancy for *Y* arising from the depreciation allocation, as follows:

|  | Total | | X | | Y | |
| --- | --- | --- | --- | --- | --- | --- |
|  | Tax | Book | Tax | Book | Tax | Book |
| End of year 4 | $1,000 | $1,360 | $320 | $680 | $680 | $680 |
| Depreciation |  | (60) |  | (30) |  | (30) |
| Remedial Allocation |  |  | 30 |  |  | (30) |
| End of year 5 | $1,000 | $1,300 | $350 | $650 | $650 | $650 |

After these adjustments are the repeated for years 6 through 10, the tax and book accounts will be equalized at $500 for each partner, and all tax-book differences will have disappeared.

The remedially allocated income and deduction "have the same tax attributes as the tax item limited by the ceiling rule." [52] For example, the income to the contributing partner must have the same character (ordinary or capital) as the limited item, must be from the same source (U.S. or foreign) and must be subject to the same limitations (e.g., § 469). When the ceiling rule applies on a sale of property, a remedial allocation to a contributing partner is of hypothetical gain on sale of the property, and the matching remedial allocation to the noncontributing partner is hypothetical loss on the sale. If actual gain or loss on the sale is capital, the remedial allocations are "subject to all the rules normally applicable to capital gains and capital losses, as if the amounts had actually been realized by the partnership." [53] When the rule applies to depreciation, the offsetting income to the contributing partner is hypothetical income from the depreciable property.

The remedial allocation method is elective with taxpayers. [54] If a partnership uses another method that the IRS finds unreasonable, the IRS will not correct the unreasonableness by imposing the remedial allocation method or "any other method involving the creation of notional tax items." [55]

## ¶ 87.3.5 Antiabuse Rule

A particular method for complying with § 704(c) is not reasonable and therefore may not be used if the contribution of property or the event that results in reverse § 704(c) allocations and "the corresponding allocation of tax items…are made with a view to shifting the tax consequences of built-in gain or loss among the partners in a manner that substantially reduces the present value of the partners' aggregate tax liability." [56] The Treasury, in 2010, amended the regulations to require that the effects of allocations on indirect partners, as well as direct partners, must be considered in applying the antiabuse rule. [56.1]

1. *Generally.* This antiabuse rule is most likely to apply when the traditional method is limited by the ceiling rule. Assume the equal partnership of *X* and *Y* is organized with *X* 's contribution of depreciable property (value $1,000 and adjusted basis of $100) and *Y*'s contribution of $1,000 in cash; *Y* has a large net operating loss that will likely expire without being fully utilized. [57] The partnership's first year is the last year of the recovery period for the property contributed by *X*; for this year, the partnership has book depreciation of $1,000, which is allocated equally to *X* and *Y* , and tax depreciation of $100, which (as § 704(c) requires) is allocated to *Y*. After this year, the built-in gain (originally, $900) is zero because the property's book value and adjusted basis are both zero. If the partnership sells the property for $1,000 at the beginning of its second year, gain on the sale is allocated under the partnership agreement, $500 to each partner; § 704(c) does not apply because there is no built-in gain. Economically, the partnership, and hence *Y* , have no gain or loss from the property because the selling price ($1,000) equals the property's

value when contributed, and *X* has $900 of gain (one half of partnership assets of $2,000 immediately after the sale, less *X*'s unrecovered cost for the contributed property ($100)). If the ceiling rule did not apply, the tax results would roughly match the economic results; *Y* would be allocated $500 of depreciation deduction for year 1 and $500 of gain for year 2, and *X* would be allocated negative depreciation (gross income) of $400 for year 1 and gain of $500 for year 2. However, because of the ceiling rule, the net results for *Y* are income of $400 ($100 of depreciation for year 1 and $500 of gain for year 2) and for *X* are gain of $500 (no depreciation for year 1 and gain of $500 for year 2), and $400 of gross income is shifted from *X* to *Y*, who pays no tax on it because her net operating loss, which would otherwise expire unused, is deducted against it. If the partners arranged the contribution of the property and adopted the traditional method "with a view to" accomplishing this shift, the traditional method is not reasonable and may not be used. The alternative required by the antiabuse rule is a curative allocation of $400 of *Y*'s share of the gain on sale of the property to *X* for tax, but not book, purposes. [58]

In other situations, a curative allocation may create, rather than remedy, an abuse. Assume *X*, rather than *Y*, has an expiring NOL carryover, and instead of selling the property contributed by *X*, the partnership has gross income of $800 during year 1 on sales of inventory acquired with *Y*'s cash contribution. [59] If the partnership uses the traditional method without curative allocations, the results, as reflected in the capital accounts, are as follows:

|  | | Total | | X | | | |
| Y | | | | | | | |
| ----------------- | | --------------- | | --------------- | | | |
| Transaction | Tax | Book | Tax | Book | | | |
| Tax | Book | | | | | | |
| Contributions | $1,100 | $2,000 | $100 | $1,000 | $1,000 | | |
| $1,000 | | | | | | | |
| Sales income | 800 | 800 | 400 | 400 | 400 | | |
| 400 | | | | | | | |
| Depreciation | (100) | (1,000) | -0- | (500) | | | |
| (100) | (500) | | | | | | |
| | ------ | ------ | ---- | ------ | ------ | | |
| ------ | | | | | | | |
| Year-end | $1,800 | $1,800 | $500 | $ 900 | $1,300 | $ | |
| 900 | | | | | | | |

In contrast, a curative allocation would shift all of *Y*'s share of the sales income to *X* for tax, but not book, purposes, as follows:

|  | | Total | | X | | | |
| Y | | | | | | | |
| ----------------- | | --------------- | | --------------- | | | |
| Transaction | Tax | Book | Tax | Book | | | |
| Tax | Book | | | | | | |
| Contributions | $1,100 | $2,000 | $100 | $1,000 | $1,000 | | |
| $1,000 | | | | | | | |
| Sales income | 800 | 800 | 800 | 400 | | | |
| -0- | 400 | | | | | | |
| Depreciation | (100 | (1,000) | -0- | (500) | | | |
| (100) | (500) | | | | | | |
| | ------ | ------ | ---- | ------ | ------ | | |
| ------ | | | | | | | |
| Year-end | $1,800 | $1,800 | $900 | $ 900 | $ 900 | $ | |
| 900 | | | | | | | |

The curative allocation increases *X*'s share of partnership taxable income for the year by $400, but *X* 's

tax is not increased because the NOL, which would otherwise expire unused, is deducted against it. According to the regulations, if the depreciable property was contributed to the partnership and the partnership adopted the curative allocation "with a view" to shifting income to *X*, the curative allocation is not reasonable and therefore is not permitted. This conclusion is appropriate only because the income allocated by the curative allocation derives from the partnership's investment of *Y*'s contribution. To the extent the curative allocation can be made with income generated by the contributed property, it should not be considered unreasonable, because the income would have been *X*'s if the partnership had not been organized. [60]

2. *Indirect partners.* For purposes of the antiabuse rule, as amended in 2010, a partnership's "partners shall include both direct and indirect partners." [60.1] The term "indirect partner" includes any "direct or indirect owner of a partnership, S corporation, or controlled foreign corporation … , or direct or indirect beneficiary of a trust or estate, that is a partner in the partnership." [60.2] For example, if the *ABC* partnership is a partner of the *XYZ* partnership, a partner of *ABC* is treated as a partner of *XYZ* for purposes of applying the antiabuse rule to *XYZ*. Similarly, if *S* Corp., an S corporation, is a partner of *XYZ*, each shareholder of *S* Corp. is treated as a partner of *XYZ* for this purpose, and if a trust is a partner of *XYZ* , all beneficiaries of the trust are indirect partners of *XYZ* .

The term "indirect partner" also includes a "consolidated group of which the partner in the partnership is a member." [60.3] For example, if *DelCo*, a Delaware corporation, and several of its subsidiary corporations comprise a consolidated group and one of the subsidiaries is a partner of the *XYZ* partnership, the consolidated group is considered a partner of the partnership for purposes of the antiabuse rule.

A shareholder of a CFC is an indirect partner of a partnership of which the CFC is a partner "only with respect to allocations of items of income, gain, loss, or deduction that" (1) "enter into" the computation of a U.S. shareholder's inclusion under § 951(a) of income of the CFC, (2) "enter into any person's income attributable to" a U.S. shareholder's § 951(a) inclusion, or (3) would enter into any such computations "if such items were allocated to" the CFC. [60.4] Assume the *XYZ* partnership has income that if allocated to a CFC, would be subpart F income, and *ForCo*, a foreign corporation wholly owned by *DelCo*, a Delaware corporation, is a partner of *XYZ* . [60.5] *DelCo* is a U.S. shareholder of *ForCo* , and *ForCo* is a CFC. Section 951(a) thus requires *DelCo* to recognize *ForCo*'s subpart F income as gross income of *DelCo* for U.S. tax purposes. *DelCo* is considered an indirect partner of *XYZ* for purposes of determining *DelCo*'s § 951(a) inclusion. This rule applies with respect to both a CFC's direct shareholders and to indirect shareholders "through tiers of entities." In the example, that is, the analysis would be the same if *ForCo* were a second or lower tier foreign subsidiary of *DelCo*.

# ¶ 87.3.6 Distributions

A partnership's distribution of property contributed by one partner to another may trigger a requirement for the contributing partner to recognize built-in gain. Specifically, if property contributed in exchange for a partnership interest is distributed to a partner other than the contributing partner within seven years after the contribution, the contributing partner must recognize the built-in gain or loss that would have been recognized if the partnership had then sold the property at its fair market value. [61] This constructive gain or loss has the same character as gain or loss the partnership would have recognized on selling the property to the distributee. [62] Both the basis of the contributing partner's partnership interest and the property's adjusted basis are increased by the gain or decreased by the loss. [63] This rule was enacted in 1989 because Congress believed that without it, partnerships could, by distributing property contributed by one partner to another partner, "circumvent the rule requiring pre-contribution gain on contributed property to be allocated to the contributing partner." [64] The rule does not apply if contributed property is distributed to the partner who made the contribution. [65]

Assume *X* contributes Blackacre to the *XY* partnership when its value is $100 and *X*'s adjusted basis for it is $60. Subsequently, when Blackacre is worth $120, the partnership distributes it to *Y*. [66] If the distribution occurs within seven years after *X*'s contribution, *X* must, at the time of the distribution, recognize gain of $40 (the $100 value at the time of contribution less *X*'s basis of $60) because the partnership's sale of Blackacre for its fair market value of $120 would have triggered recognition of this amount of built-in gain. If Blackacre is a capital asset in the hands of both the partnership and *Y*, the gain is capital gain. *X*'s basis for her partnership interest is increased by the $40 gain. Immediately before the distribution, the partnership's basis for Blackacre is increased to $100 (the sum of the $60 basis before distribution plus $40 of gain recognized by *X* on the distribution), and this becomes *Y*'s basis for Blackacre if *Y* succeeds to the partnership's basis. [67]

The analysis is more complex if the partnership has adopted the remedial allocation method and the ceiling rule would then apply to a sale of the contributed property. For example, if Blackacre is worth $70 when distributed to *Y*, the distribution would, under the traditional method, cause *X* to recognize gain of $10 (a fair market value of $70 less an adjusted basis of $60). However, on an actual sale of the property, the partnership would have had a book loss of $30 (the selling price of $70 less the book value of $100). If the partnership had used the remedial method, *Y* would be allowed a tax loss of $15 for her share of the book income, and *X* would have been imputed an additional $15 of tax gain. Since the distribution rule requires *X* to recognize gain or loss as though "the property had been sold at its fair market value at the time of the distribution," the regulations require *X* to recognize the notional $15 of gain (in addition to the $10 of built-in gain) if the *XY* partnership has adopted the remedial allocation method. [68] The regulations make no reference to *Y*, but since the statutory rule refers only to the contributing partner, *Y* is apparently not allowed the notional tax loss that would have arisen under the remedial method on an actual sale.

The regulations do not indicate how the case would be handled if the partnership had previously used the traditional method with curative allocations with respect to the same property. "A partnership must be consistent in its application of curative allocations with respect to each item of section 704(c) property from year to year." [69] For example, if the distributed property is depreciable and the partnership had, in prior years, used curative allocations to correct ceiling-rule distortions resulting from allocations of depreciation, arguably, the partnership must also make a curative allocation on the distribution to *Y* because, given its use of the curative method for the distributed property in earlier years, it would have had to make a curative allocation on a sale of the property.

An antiabuse rule requires the recognition rule to "be applied in a manner consistent with [its] purpose. ..." [70] If "a principal purpose of a transaction is to achieve a tax result...inconsistent with" this purpose, the IRS may "recast the transaction as appropriate to achieve tax results that are consistent with the purpose...." For example, if partners amend their agreement within the seven-year period to shift to a noncontributing partner "substantially all the economic risks and benefits" with respect to contributed property and distribute the property to that partner immediately after the period ends, the amendment to the partnership agreement may be treated as a distribution of the property. [71] Also, if a partnership is organized for the purpose of making a nontaxable disposition of contributed property to an acquirer to be identified later, the seven-year period may be tolled until the acquirer is admitted to the partnership. [72]

There are, however, several exceptions to the distribution rule.

    1.  *Distribution of like kind property.*   Recognition of built-in gain or loss on a distribution of contributed property to a noncontributing partner may be avoided or reduced if the contributing partner receives distribution of like-kind property. Specifically, if

        a. Contributed property is distributed to a noncontributing partner,

        b. The contributing partner receives a distribution of other property not later than the earlier of 180 days after the distribution to the noncontributing partner or the due date of

the contributing partner's return for the year (determined with extensions), and

c. The assets contributed and received by the contributing partner are of like kind within the meaning of § 1031,

then, the built-in gain or loss that the contributing partner would otherwise have recognized is reduced by built-in gain or loss inherent in the like-kind property (the difference between the property's fair market value and the contributing partner's basis for it immediately after the distribution). [73] This rule is meant to allow nonrecognition for a transaction that would have been a like kind exchange had it occurred outside the partnership. [74]

Assume the *XY* partnership was organized by *X*'s contribution of Blackacre (with a value of $2,000 and an adjusted basis of $1,000), and *Y*'s contribution of $4,000 in cash; the partnership immediately purchases Whiteacre for $800. [75] Several years later, when Blackacre and Whiteacre are worth $2,000 and $1,000, respectively, the partnership makes nonliquidating distributions of Blackacre to *Y* and Whiteacre to *X*. The distribution of Blackacre (contributed by *X*) to *Y* would normally cause *X* to recognize built-in gain of $1,000 (the $2,000 value as of dates of contribution and distribution, less *X*'s basis for Blackacre of $1,000). However, because *X* receives like-kind property (Whiteacre), the recognized built-in gain is reduced by the gain built into Whiteacre immediately after *X* receives it ($1,000 less *X*'s basis of $800). *X* must therefore recognize built-in gain of $800 ($1,000 less $200).

2. *Constructive partnership termination.* A partnership is deemed terminated if more than 50 percent of the interests in partnership capital and profits are sold or exchanged during a period of 12 months or less. The terminated partnership is deemed to transfer all of its assets to a new partnership in exchange for interests in the new partnership that it immediately distributes to its partners. [76] The deemed distributions in connection with a deemed termination do not trigger recognition of built-in gain by the contributing partners. [77] Instead, all of the § 704(c) characteristics of the terminated partnership and its partners and assets carries over to the new partnership.

3. *Transfer to another partnership.* A partnership's transfer of all of its assets and liabilities to another partnership in exchange for interests in the transferee partnership does not cause contributing partners to recognize built-in gain if the transferor partnership distributes the interests in the transferee partnership to its partners in complete liquidation. [78] The transferee partnership steps into the shoes of the transferor partnership for purposes of § 704(c). An example of such a transfer is an assets-over merger, which is effected by one partnership (the merging partnership) transferring its assets to another partnership (the continuing partnership) in exchange for an interest in the surviving partnership, which the merging partnership then distributes to its partners in complete liquidation. [78.1]

The IRS issued a ruling in 2004 explaining the application of the rules on distributions and contributed property following an assets-over merger, but it subsequently decided that the ruling was not consistent with existing regulations and promised to issue new regulations "implementing the principles" of the ruling. [78.2] In the ruling's hypothetical case, partnership *AB* was organized by *A*'s contribution of Asset 1, which was worth $300 when contributed and for which *A* had an adjusted basis of $200, and *B*'s contribution of $300 in cash, while partnership *CD* was organized by *C*'s contribution of Asset 2, which was worth $200 and had an adjusted basis to *C* of $100, and *D*'s contribution of $200 in cash. [78.3] After these partnerships had existed for two years, *AB* and *CD* merge by an assets-over transaction in which *AB* was the continuing partnership. At the time of the merger, *AB*'s assets are Asset 1, then worth $900, and $300 in cash, and *CD*'s assets are Asset 2, then worth $600, and $200 in cash. After the merger, *A* and *B* each own 30 percent of the capital and profits interests in *AB*, and *C* and *D* each have 20 percent interests. The partnership agreements require a revaluation of partnership property upon

the entry of a new partner. [78.4] Six years later, when *AB* has the same assets as immediately after the merger and Assets 1 and 2 have the same values as at the time of the merger, *AB* distributes Asset 2 to *A* in liquidation of her partnership interest.

Under § 704(c)(1)(B), if a partnership distributes contributed property to a partner other than the contributing partner within seven years after the contribution, the contributing partner recognizes gain or loss equal to the unrealized appreciation or depreciation in the property at the time of contribution (or, if less, the partnership gain or loss that would have been recognized on a sale or exchange of the property immediately before the distribution). Under § 737(a), a partner receiving a distribution recognizes gain equal to the partner's "net precontribution gain" or, if less, the excess of the fair market value of the distributed property over the adjusted basis of the partner's interest immediately before the distribution. [78.5] A partner's net precontribution gain is the net gain that he or she would have recognized under § 704(c)(1)(B) if all property contributed by the partner during the preceding seven years had been distributed to another partner immediately before the distribution. [78.6]

An assets-over merger does not restart the running of the seven-year period for purposes of either of these rules. [78.7] However, according to the 2004 ruling, new § 704(c) gain may arise from the contribution of assets of one partnership to another in an assets-over merger. [78.8]

In the merger of *AB* and *CD*, *CD* contributes cash and Asset 2 to *AB* in exchange for an interest in *AB* and distributes this interest in liquidation to *C* and *D*. Asset 2 then has $500 of built-in gain (fair market value of $600, less adjusted basis of $100), of which $100 is § 704(c) gain attributable to *C*'s contribution of Asset 2 to *CD* (fair market value on contribution of $200, less adjusted basis of $100) and $400 is additional § 704(c) gain arising from the merger. On receiving interests in *AB*, *C* and *D* each succeed to one half of *CD*'s $400 of § 704(c) gain in Asset 2. [78.9] Thus, after the merger, *C* has § 704(c) gain of $300 (sum of $100 and $200), and *D* has $200.

Since *AB* distributes Asset 2 to *A* more than seven years after *C* contributes the asset to *CD*, the distribution does not, under § 704(c)(1)(B), trigger recognition of *C* 's $100 of § 704(c) gain arising from that contribution. However, because the distribution occurs within seven years after *CD*'s contribution of Asset 2 to *AB*, § 704(c)(1)(B) does apply to the $400 of § 704(c) gain that arose from that contribution. *C* and *D*, who as transferees of *CD*'s interest in *AB* each succeeded to one-half of this § 704(c) gain, each have $200 of gain on the distribution of Asset 2 to *A*.

*A* recognizes no gain under § 737 as a result of the distribution. Under its partnership agreement, *AB* revalues its property on the entry of *CD* as a new partner. Asset 1's fair market value is then $900, and its adjusted basis is $200. Of the $700 of built-in gain in Asset 1, $100 is § 704(c) gain that arose from *A* 's contribution of Asset 1 (fair market value on contribution of $300, less adjusted basis of $200), and $600 arises from the book-up of Asset 1 and is shared equally by *A* and *B* ($300 each). Because *AB* distributes Asset 2 to *A* more than seven years after *A* contributed the asset to *AB*, *A* had no net precontribution gain for purposes of § 737(b) at the time of the distribution. The $600 of reverse § 704(c) gain in Asset 1, resulting from booking-up *AB*'s property at the time of the merger, is not net precontribution gain.

4.   *Partnership incorporation.*   An incorporation of a partnership does not cause contributing partners to recognize built-in gain or loss if the partnership liquidates in connection with the incorporation and the incorporation is accomplished other than by the partnership distributing its assets to its partners and the partners transferring the assets to the corporation. [79] For example, recognition of built-in gain or loss is not triggered by a partnership's transfer of all of its assets and liabilities to a corporation in exchange for stock, which the partnership distributes in liquidation to its partners. [80]

5.   *Liquidating distributions.*   A contributing partner is not required to recognize built-in gain on

a distribution of contributed property to a noncontributing partner if

   a. The distribution is in liquidation of the partnership,

   b. In the liquidation, the contributing partner receives only an interest in the property that he or she contributed to the partnership, and

   c. The built-in gain or loss with respect to the interest received by the contributing partner is, immediately after the liquidation, not less than the built-in gain or loss that the contributing partner would have recognized if the partnership had sold the contributed property immediately before liquidating. [81]

Assume the *XY* partnership was organized with *X*'s contribution of Blackacre (with a value and basis of $2,000) and *Y*'s contribution of Whiteacre (with a value $2,000 and a basis of $1,000). Three years later, when Blackacre is worth $2,000 and Whiteacre is worth $4,000, the partnership liquidates, distributing Blackacre and an undivided 25 percent interest in Whiteacre to *X* and an undivided 75 percent interest in Whiteacre to *Y*. [82] The partnership's distribution to *X* of an interest in Whiteacre (contributed by *Y*) does not cause *Y* to recognize a built-in gain, because

   a. The distribution is in liquidation,

   b. The liquidating distribution to *Y* consists only of an interest in the property contributed by *Y* (Whiteacre), and

   c. A built-in gain with respect to *Y*'s interest in Whiteacre immediately after the liquidation (with a value of $3,000, less an adjusted basis of $1,000) [83] is not less than the built-in gain that *Y* would have recognized on the partnership's sale of Whiteacre immediately before the liquidation (the contribution value of $2,000, less an adjusted basis of $1,000).

# ¶ 87.3.7 Partnership Revaluations

When a partnership admits a new partner or when the interest of an existing partner is increased, decreased, or liquidated, it may restate all partnership assets in its books at current value. [84] Although § 704(c) only applies to built-in gains and losses inherent in property contributed to a partnership by a partner, [85] a partnership must, following a restatement of partnership assets, use the "principles" of § 704(c) in making allocations reflecting the resulting differences between the book value and the adjusted basis. [86] The regulations refer to these allocations as "reverse" § 704(c) allocations because the book-basis divergences resulting from a restatement pertain to property held before the revaluation, rather than contributed property.

Reverse § 704(c) allocations must be made by "a reasonable method that is consistent with the purposes of section 704(b) and (c)." [87] Such allocations need not be made by the same method as § 704(c) allocations pertaining to contributed property, even if built-in gains or losses from contributed property exist when the books are restated. Also, if a partnership restates its books more than once, a latter restatement need not be accounted for by the method used for an earlier restatement.

Generally, reverse allocations, like § 704(c) allocations, must be made property by property. [88] However, a "securities partnership" is allowed to lump together all gains and losses from "qualified financial assets." [89] "Securities partnership" may be either a "management company" (a partnership registered as a management company with the SEC under the Investment Company Act of 1940) or an "investment company," which is a partnership whose qualified financial assets represent at least 90 percent of the fair market value of all assets at the time of each capital account restatement and that expects, as of the end of the first year it uses an aggregate approach, to make such restatements at

least annually. [90] The term "qualified financial assets" generally includes only "actively traded" personal property (including publicly traded stocks and bonds). [91] However, a partnership owning an interest in a securities partnership is deemed to own a ratable portion of all qualified financial assets owned by the securities partnership. Also, the qualified financial assets of a management company include all corporate stock, debt instruments, interest rate, currency, and equity swaps, options, futures contracts, and other derivative financial instruments, whether or not actively traded.

A securities partnership may aggregate qualified financial assets "using any reasonable approach that is consistent with the purpose of section 704(c)." [92] The regulations describe two approaches that are "generally reasonable"—a "partial netting approach" and a "full netting approach." [93] A "partnership must apply the same aggregate approach to all of its qualified financial assets for all taxable years" that it qualifies as a securities partnership. [94] Also, regardless of how it aggregates, the partnership must "separately account" for built-in gain or loss from contributed property.

## ¶ 87.3.8 Miscellaneous Rules

1.   *Aggregation*.   Section 704(c)(1) usually applies "property-by-property." [95] Built-in gain or loss is computed and recognized separately for each item, not by aggregating all items contributed by a partner. However, a partnership may aggregate all property in each of the following categories contributed by one partner during one taxable year of the partnership: (1) depreciable personal property in the same general asset account, (2) personal property with zero bases, and (3) inventory other than securities and inventory accounted for by a specific identification method. [96] The IRS may designate other types of property that may be aggregated in applying § 704(c), by either published guidance or letter ruling. It has exercised this power to allow a partnership organized as a Qualified Master-Feeder Structure to aggregate contributed property in making § 704(c) and reverse § 704(c) allocations. [97]

1a.   *Benefit of built-in loss confined to contributing partner*.   If the adjusted basis of contributed property exceeds the property's fair market value when the contribution is made, the difference (built-in loss) may "be taken into account only in determining the amount of the items allocated to the contributing partner," and the property's basis in the hands of the partnership otherwise equals its fair market value at the time of contribution. [98] Thus, if a contributing partner transfers her partnership interest or the interest is liquidated, the partnership's adjusted basis for contributed built-in loss property is based on the property's fair market value when contributed, and "the built-in loss is eliminated." [98.1] Congress added this rule in 2004 because it found that the partnership rules had allowed "inappropriate transfer of losses among partners," thus facilitating "tax-shelter transactions." [98.2]

2.   *Transfers of partnership interests*.   Apart from the rule described in the preceding paragraph, the transferee of a partnership interest steps into the transferor's shoes in the application of § 704(c). [98.3] For example, if *X* contributed Blackacre (value $1,000 and adjusted basis of $800) to the *XY* partnership on its organization and later, when the partnership still owns Blackacre, *X* sells her partnership interest to *Z* in an arm's length transaction, the $200 of built-in gain, which would have been allocated to *X* under § 704(c) if the partnership had sold Blackacre for $1,000 or more while *X* was a partner, will instead be allocated to *Z* if such a sale occurs. In contrast, if *X*'s adjusted basis for Blackacre was $1,200, the built-in loss of $200 is allocated to *X* if the partnership sells the property while *X* is a partner, but if the partnership still holds the property when *X* sells her interest to *Z*, Blackacre's adjusted basis is thereafter $1,000 for all purposes, and there is no possibility of *Z* or any other partner deducting the built-in loss.

3.   *Nonrecognition exchanges of § 704(c) property*.   If a partnership exchanges § 704(c) property in a transaction in which gain or loss is not recognized, substituted basis property received in the exchange is thereafter treated as § 704(c) property with the same amount of built-in gain or loss as the property exchanged. [99] For example, if *X* contributes Blackacre to the

*XY* partnership for a partnership interest and the partnership later exchanges Blackacre for Whiteacre in a like-kind exchange qualifying under § 1031(a),[100] Whiteacre is § 704(c) property. If gain is recognized in part (e.g., because boot is received in the exchange), recognized gain is allocated to the contributing partner to the extent of built-in gain and built-in gain with respect to substituted basis property is correspondingly reduced.

4.   *Accounts receivable and payable.*   If a partner contributes accounts receivable of a business for which the partner used the cash method of accounting, § 704(c) applies to income recognized on the partnership's collection of the receivables. For example, if *X* 's contribution to the *XY* partnership includes accounts receivable of her cash-method law practice, the receivables are entered on the partnership's books at the fair market value, even though *X* 's and the partnership's basis for them is zero, and *X* has built-in gain equal to the receivables' value when contributed. On collection, partnership gross income equal to the built-in gain (or if less, the amount collected) is allocated to *X.* Any excess of the amount collected over the fair market value figure shown in the books is book gain, which is allocated among the partners under the partnership agreement.

If a partnership assumes accounts payable or other accrued but unpaid obligations of a cash method partner, the partnership's deduction for a subsequent payment of the obligations is allocated under "rules similar to" § 704(c)(1).[101] For example, if the *XY* partnership also assumes accounts payable of *X* 's law practice, the assumed liabilities are entered on the partnership's books at the fair market value (presumably, the face amount), and the credit to *X*'s capital account for her contribution is the excess of the fair market value of the property she contributes over the assumed payables. The partnership is allowed a deduction for its payment of each account, which is allocated to *X* alone, and no entry is made in the capital accounts to reflect the payment.

5.   *Depreciation recapture.*   Gain on a sale of depreciable personal property is ordinary income to the extent of depreciation previously taken on the property, including, in the case of property contributed to a partnership, depreciation allowed or allowable to the contributing partner before the contribution.[102] A partner's distributive share of partnership depreciation recapture is the lesser of the partner's share of partnership gain on disposition of the depreciable property or the partner's share of depreciation previously taken with respect to the property,[103] except that if the sum of the partners' shares of depreciation exceed the partnership's recapture gain, that gain is allocated among the partners in proportion to their shares of depreciation.[104] A contributing partner's share of depreciation on contributed property generally includes all depreciation allowed or allowable to the partner on the property for periods preceding the contribution.[105]

However, if a partnership's depreciation on contributed property was allocated by the traditional method with curative allocations, the contributing partner's share of depreciation on the property (including precontribution depreciation) is reduced (but not below zero) by curative allocations of ordinary income to the partner or curative allocations of deduction to noncontributing partners, to the extent the curative allocations are made to correct a ceiling rule distortion occurring in the allocation of depreciation on the property.[106] Conversely, noncontributing partners' shares of depreciation are increased by the amounts of the reductions of the depreciation share of the contributing partner. Similarly, if a partnership uses the remedial allocation method, a contributing partner's share of depreciation is reduced (but not below zero) by remedial allocations of income to the partner made to offset ceiling rule effects on allocations of depreciation on the contributed property, and noncontributing partner's shares of depreciation are increased by the same amounts.[107] These adjustments are also made when a partnership has recapture gain on disposing of property whose book value was restated in a revaluation of partnership assets.[108]

Assume the *XY* partnership is organized with *X*'s contribution of a depreciable widget (with a value of $2,800 and an adjusted basis of $800) and *Y*'s cash contribution of $2,800. The widget

is a five-year property, and *X* took $200 of depreciation (computed on a straight line basis) before transferring it to the partnership at the beginning of the second year in the property's recovery period. *Y*'s cash contribution is immediately invested in a depreciable gidget, which is seven-year property and is depreciated on a straight line basis.

If *XY* uses the traditional method, it is, for each of its first four years, allowed tax depreciation with respect to the widget of $200 (one fourth of $800), allocable solely to *Y* (the noncontributing partner), and book depreciation of $700 (one fourth of $2,800), allocable equally to *X* and *Y*. [109] If the partnership sells the widget at the beginning of its sixth year for $1,000, the partnership has gain of $1,000 (the amount realized less a basis of zero), all of which is ordinary income under the recapture rule because depreciation on the property ($200 by *X* and $800 by the partnership) was also $1,000. The partners' shares of the depreciation are $200 for *X* and $800 for *Y*, and they must be allocated partnership recapture gain in these amounts.

If *XY* uses the traditional method with curative allocations, the allocations of depreciation on the widget would be as described in the preceding paragraph. Assume, however, that the partnership chooses to make curative allocations to *Y* of portions of *X*'s share of depreciation of the gidget. [110] The annual depreciation of the gidget is $400 (one seventh of $2,800) for both book and tax purposes, and it is normally allocated equally to *X* and *Y*. However, the curative allocation gives *Y* $150 of *X*'s share for each of the first four years, resulting in the following annual allocations:

|  | Y Tax | Y Book | Total Tax | Total Book | X Tax | X Book |
|---|---|---|---|---|---|---|
| Widget | $200 | $350 | $200 | $ 700 | -0- | $350 |
| Gidget | 350 | 200 | 400 | 400 | 50 | 200 |
| Total | $550 | $550 | $600 | $1,100 | $50 | $550 |

The curative allocation ($150 annually) reduces *X*'s share of the depreciation on the widget from $200 (precontribution depreciation) to $50 after the first year and then to zero after the second year. *Y*'s share of this depreciation is $350 annually (the sum of the $200 actual depreciation plus the $150 curative allocation). Thus, if the partnership sells the widget at the beginning of year 6 for $1,000, all of the partnership's recapture gain ($1,000) is allocated to *Y*.

If *XY* uses the remedial allocation method, the excess of the widget's contribution value ($2,800) over its adjusted basis ($800) is depreciated for book purposes over five years (the period that would apply if the partnership had purchased the widget when it was contributed). The book depreciation would then be $600 ($200 of tax depreciation plus one fifth of $2,000 ($400)) for each of the first four years and $400 for the fifth year. [111] The allocations for each of the first four years are as follows:

|  | Y Tax | Y Book | Total Tax | Total Book | X Tax | X Book |
|---|---|---|---|---|---|---|
| Widget | $200 | $300 | $200 | $ 600 | -0- | $300 |
| Curative allocaton |  | 100 |  |  |  | (100) |

|             |       |         |       |       |       |
|-------------|-------|---------|-------|-------|-------|
| Gidget      | 400   | 400     | 200   | 200   | 200   |
| 200         |       |         |       |       |       |
|             | ----  | ------  | ----  | ----  | ----  |
| ----        |       |         |       |       |       |
| Total       | $600  | $1,000  | $100  | $500  | $500  |
| $500        |       |         |       |       |       |

The curative allocations reduce *X*'s share of depreciation on the widget ($200 of precontributon depreciation) and increase *Y*'s share. Thus, as in the curative allocations case, *X* 's depreciation share is zero for the third and subsequent years, and if *XY* sells the widget at the beginning of year 6 for $1,000, all of the partnership's recapture gain ($1,000) would be allocated to *Y*.

6.  *De minimis rule.*  A partnership may disregard § 704(c) with respect to all property contributed by a partner during a partnership taxable year or apply § 704(c) only on selling the property, even if it is depreciable, if there is only a "small disparity" between the property's fair market value and the contributing partner's basis for it. [112] A disparity is small only if (1) the fair market value of all property contributed by the partner during the year is not more than 115 percent or less than 85 percent of the partner's adjusted basis for it and (2) the total disparity for the property does not exceed $20,000. [113]

---

[1]

  See generally 1 McKee, Nelson & Whitmire, Federal Taxation of Partnerships and Partners ¶ 10.04 (Warren, Gorham & Lamont, 3d ed. 1997); Cuff, Section 704(c)(1)(A) Regulations, 72 Taxes 444 (1994); Monroe, Saving Subchapter K: Substance, Shattered Ceilings, and the Problem of Contributed Property, 74 Brook. L. Rev. 1381 (2009); Simmons, Built-In Gain and Built-In Loss Property on Formation of a Partnership: An Exploration of the Grand Elegance of Partnership Capital Accounts, 9 Fla. Tax Rev. 599 (2009). See also Cunningham & Cunningham, Simplifying Subchapter K: The Deferred Sale Method, 51 SMU L. Rev. 1 (1997); Gergen, Potential Tax Traps in Liquidating a Family Limited Partnership, 101 Tax Notes 1431 (Dec. 22, 2003); Lynn, Unrecognized Built-In Gain When a Contributing Partner Dies, 126 Tax Notes 81 (Jan. 4, 2009).

The IRS has requested comments on the application of § 704(c) to multiple layers of built-in gains and losses resulting from tiered structures, mergers, and divisions. Notice 2009-70, 2009-34 IRB 255. See Jackel, A Response to Notice 2009-70, 124 Tax Notes 1133 (Sept. 14, 2009).

Section 704(c) only applies if a partner's transfer of property to a partnership is treated as a contribution subject to the nonrecognition rule of § 721 and not if, for example, the contribution is recast under § 707(a)(2) as a sale. Reg. § 1.704-3(a)(5). See supra ¶ 86.2.1 for § 721 and infra ¶ 88.2.3 for § 707(a)(2).

The present § 704(c) was enacted in 1984 and applies to contributions made after March 1984. Regulations under the provision, issued by TD 8500, 1994-1 CB 183, apply to property contributed after December 20, 1993. Reg. § 1.704-3(f).

[2]

  Reg. § 1.704-3(a)(1).

[3]

  IRC § 723, discussed supra ¶ 86.2.1.

[4]

Reg. § 1.704-1(b)(2)(iv), discussed supra ¶ 87.2.2 text accompanying notes 20–24. See Reg. § 1.704-3(a)(3)(i) (even if partnership does not comply with capital account rules generally, it must use "a book capital account based on the same principles" for contributed property "(i.e., a book capital account that reflects the fair market value of the property at the time of contribution and that is subsequently adjusted for cost recovery and other events that affect the basis of the property)").

5

Reg. § 1.704-3(a)(3)(i). "Accounts payable and other accrued but unpaid items contributed by a partner using the cash receipts and disbursements method of accounting" are § 704(c) property. Reg. § 1.704-3(a)(4). Also, "§ 1.752-7 liabilities" are § 704(c) property, and to the extent that built-in loss associated with such a liability exceeds the cost of satisfying the liability, the excess creates a "ceiling rule" limitation. Reg. § 1.704-3(a)(12). See Reg. § 1.704-3(k) (Reg. § 1.704-3(a)(12) applies to Reg. § 1.752-7 liability transfers after June 23, 2003). For Reg. § 1.752-7 liabilities and Reg. § 1.752-7 liability transfers, see infra ¶ 87.6.7.

6

Reg. § 1.704-3(a)(3)(ii).

7

Reg. § 1.704-3(a)(1).

8

Reg. § 1.704-3(b), discussed infra ¶ 87.3.2.

9

Reg. § 1.704-3(c), discussed infra ¶ 87.3.3.

10

Reg. § 1.704-3(d), described infra ¶ 87.3.4.

11

Reg. § 1.704-3(a)(1).

12

Reg. § 1.704-3(a)(10), discussed infra ¶ 87.3.5 . Also, if a partnership using a traditional method (with or without curative allocations) contributes § 704(c) property to another (lower-tier) partnership, the contributing (upper-tier) partnership must allocate its distributive share of the lower-tier partnership's income and deductions "in a manner that takes into account the contributing partner's remaining built-in gain or loss." Reg. § 1.704-3(e)(9).

13

Reg. § 1.704-3(a)(2), discussed infra ¶ 87.3.8 text accompanying notes 95–97 .

14

Case 3:05-cv-00944-BAJ-EWD     Document 107-11     05/27/11   Page 22 of 33

Reg. § 1.704-3(a)(2).

[15]

See infra ¶ 87.3.8 text accompanying notes 112–113.

[16]

See infra ¶ 87.3.6.

[17]

Reg. § 1.704-3(a)(6), discussed infra ¶ 87.3.7.

[18]

See infra ¶ 87.3.8 text accompanying notes 102–111.

[19]

The method is called the "traditional" method because it is prescribed by the regulations under a pre-1984 elective version of § 704(c). PS-164-84, 1993-1 CB 857, 858.

[20]

A partner's capital account, plus his or her share of partnership liabilities, normally equals the adjusted basis of the partner's partnership interest. When contributed property is worth more or less than a contributing partner's adjusted basis for it, the adjusted basis of the contributing partner's interest equals the capital account, plus the partner's liability share, plus or minus the built-in gain or loss. Apart from the ceiling rule, the built-in gain or loss disappears as the contributed property is disposed of or depreciated. However, when the ceiling rule applies, the contributing partner's capital account and the adjusted basis never fully reconcile, and a disposition of the contributed property or depreciation of the property causes this discrepancy to spread to the noncontributing partners.

[21]

Reg. § 1.704-3(c), discussed infra ¶ 87.3.3.

[22]

Reg. § 1.704-3(a)(10), discussed infra ¶ 87.3.5 .

[23]

Reg. § 1.704-3(b)(1) (if § 704(c) property is disposed of in part, proportionate part of built-in gain or loss must be allocated to contributing partner).

[24]

Reg. § 1.704-3(b)(1). See Reg. § 1.704-3(b)(2) Ex. 1(iii).

[25]

See Reg. § 1.704-3(b)(2) Ex. 1(iv).

26

For § 731(a), see infra ¶ 88.1.1.

27

Reg. § 1.704-3(b)(1).

28

For the depreciation computation, see supra ¶ 23.3.4.

29

Reg. § 1.704-1(b)(2)(iv)(g)(*3*). If the property's adjusted basis is zero, the partnership may select any "reasonable method" for computing book depreciation.

30

Reg. § 1.704-3(a)(3)(ii).

31

Reg. § 1.704-3(b)(1). See Reg. § 1.704-3(b)(2) Ex. 1(ii).

32

Reg. § 1.704-3(c)(1).

33

Reg. § 1.704-3(c)(3)(i) (curative allocation is "not reasonable to the extent it exceeds the amount necessary to offset the effect of the ceiling rule").

34

PS-164-84, 1993-1 CB 857, 859.

35

Reg. § 1.704-3(c)(4) Ex. 1.

36

An allocation to *X* of more than $100 of *Y*'s share of the sales income is not acceptable, because it is larger than necessary to offset the effect of the ceiling rule. Reg. § 1.704-3(c)(4) Ex. 1(iii).

37

Reg. § 1.704-3(c)(3)(iii)(A). The expected effect of a curative allocation is judged when the partner agrees to contribute the § 704(c) property, except that if "the partnership agreement is not sufficiently

specific as to the precise manner in which [the curative] allocations are to be made," the expectation is tested when the allocation is made.

38

For § 904(d), see supra ¶ 72.7.

39

Reg. § 1.704-3(c)(3)(iii)(B).

40

Reg. § 1.704-3(c)(3)(i).

41

Reg. § 1.704-3(c)(3)(ii).

42

Reg. § 1.704-3(c)(1).

43

Reg. § 1.704-3(c)(2).

44

Reg. § 1.704-3(a)(10), discussed infra ¶ 87.3.5.

45

See Marich, Hortenstine & Penick, The Remedial Allocation Method: A Viable Cure for the Ceiling Rule, 65 Tax Notes 1267 (Dec. 5, 1994).

46

Reg. § 1.704-3(d)(4)(ii).

47

Reg. § 1.704-3(d)(1).

48

See Reg. § 1.704-3(d)(7) Ex. 2.

49

Reg. § 1.704-3(d)(2). For the tax depreciation allowance, see § 168(i)(7), discussed supra ¶ 23.3.7 text accompanying notes 107–109.

50

For sales of nondepreciable property, the remedial method simply cancels out the effects of the ceiling rule and raises the question, "Why doesn't the IRS simply allow taxpayers to disregard the ceiling rule, instead of applying, and immediately neutralizing, it?" However, disregarding the ceiling rule for depreciation would allow noncontributing partners to recover their investments in the property over the remainder of the contributing partner's recovery period, a result the Treasury found inappropriate. In the example, *Y* effectively purchases one half of the property contributed by *X*, and the Treasury concluded that *Y*'s investment in the property should therefore be recovered as though the partnership had purchased the property at the time of contribution.

51

See Reg. § 1.704-3(d)(5) Ex. 1.

52

Reg. § 1.704-3(d)(3).

53

TD 8500, 1994-1 CB 183, 185.

54

See Reg. § 1.704-3(d)(5)(i) (absent additional published guidance from IRS, "the remedial allocation method…is the only reasonable section 704(c) method permitting the creation of notional tax items").

55

Reg. § 1.704-3(d)(5)(ii).

56

Reg. § 1.704-3(a)(10)(i). For reverse § 704(c) allocations, see infra ¶ 87.3.7.

56.1

Reg. § 1.704-3(a)(10)(i), discussed infra text accompanying notes 60.1–61.5. The Treasury issued the amendments by TD 9485, 75 Fed. Reg. 32,659 (June 9, 2010); for the proposed regulations, see REG-100798-06, 73 Fed. Reg. 28,765 (May 19, 2008).

As so amended, Reg. § 1.704-3(a)(10) applies for taxable years beginning after June 9, 2010. "No inference should be drawn from this effective date with respect to prior law." TD 9485, supra, at 32,660.

57

Reg. § 1.704-3(b)(2) Ex. 2.

58

See Reg. § 1.704-3(d)(5)(ii) (in applying antiabuse rule, IRS will not impose either remedial allocation method or "any other method involving the creation of notional tax items").

---

59

Reg. § 1.704-3(c)(4) Ex. 3.

60

In the regulations, the revenues generated by the depreciable property are said to "exactly equal [the partnership's] operating expenses" and are disregarded in analyzing the example. This approach is not appropriate. The operating expenses relate to income from inventory sales as well as revenues from the depreciable property. The partnership thus had net income before depreciation from the depreciable property, and it should be allowed to make a curative allocation of *Y*'s share of this income to *X*.

60.1

Reg. § 1.704-3(a)(10)(i).

60.2

Reg. § 1.704-3(a)(10)(ii). For S corporations, see infra ¶ 98.1; for controlled foreign corporations (CFCs), see supra ¶ 69.1.

60.3

Reg. § 1.704-3(a)(10)(ii). For the term "consolidated group," see infra ¶ 97.2.

60.4

Reg. § 1.704-3(a)(10)(ii). For the term "U.S. shareholder," see supra ¶ 69.2; for inclusions under § 951(a), see supra ¶ 69.12.

60.5

For subpart F income, see supra ¶ 69.10 .

61

IRC § 704(c)(1)(B); Reg. § 1.704-4(a)(1). See Reg. § 1.704-4(a)(2) (rule only applies if distribution is "to a partner acting in the capacity of a partner within the meaning of section 731," discussed infra ¶ 88.1.1), Reg. § 1.704-4(c)(1) (rule inapplicable to distribution of property contributed before October 4, 1989). For the regulations, which apply to distributions after January 8, 1995 (Reg. § 1.704-4(g)), see TD 8642, 1996-1 CB 126; Cuff, Final Regs. Explain Rules Governing Partnership Contributions and Distributions, 13 J. Partnership Tax'n 219 (1996); Zachary & Weingold, The Final Regulations Under Sections 704(c)(1)(B) and 737, 23 J. Real Est. Tax'n 290 (1996).

The date of contribution is the first day of the seven-year period. Reg. § 1.704-4(a)(4)(i). Termination of the partnership under § 708(b)(1)(B), which applies if more than 50 percent of the interests in partnership capital and profits are sold or exchanged over a period of 12 months or less, does not restart the seven-year clock. Reg. § 1.704-4(a)(4)(ii). For § 708(b)(1)(B), see infra ¶ 88.5. The tainted period was five years for distributions before June 9, 1997. Pub. L. No. 105-34, § 1063, 111 Stat. 788 (1997).

The IRS accepts a partnership's valuation of distributed property for this purpose if the valuation "is

reasonably agreed to among the partners in an arm's-length negotiation and the partners have sufficiently adverse interests." Reg. § 1.704-4(a)(3).

---

62

See IRC § 707(b)(2) (gain on partnership's sale of property to controlling partner is ordinary if property is not capital asset in partner's hands), discussed infra ¶ 88.2.4; Reg. § 1.704-4(b)(2) Ex. (built-in gain taxed on distribution of nondepreciable real property to noncontributing partner is ordinary income if distributee uses property in trade or business).

---

63

Reg. § 1.704-4(e)(1) (basis adjustment taken into account in determining tax consequences of contemporaneous distribution to contributing partner), Reg. § 1.704-4(e)(2) (adjustment to partnership basis for property occurs immediately before distribution), Reg. § 1.704-4(e)(3) (adjustment to property basis not elective).

---

64

HR Rep. No. 247, 101st Cong., 1st Sess. 1356 (1989).

---

65

See Reg. § 1.704-4(c)(6) (rule also inapplicable to distribution of undivided interest not exceeding undivided interest contributed by distributee partner).

---

66

See Reg. § 1.704-4(a)(5) Ex. 1. If the contributed property is depreciable, the arithmetic is more complicated, but the applicable concepts are the same. See Reg. § 1.704-4(a)(5) Ex. 2.

---

67

See IRC § 732, discussed infra ¶ 88.1.1.

---

68

Reg. § 1.704-4(a)(5) Ex. 3.

---

69

Reg. § 1.704-3(c)(2).

---

70

Reg. § 1.704-4(f)(1).

---

71

Reg. § 1.704-4(f)(2) Ex. 1.

---

72

Reg. § 1.704-4(f)(2) Ex. 2.

73

IRC § 704(c)(2); Reg. § 1.704-4(d)(3). For the like kind concept under § 1031, see supra ¶ 44.2.2; for a partner's basis for distributed property, see § 732, discussed infra ¶ 88.1.1.

74

HR Rep. No. 386, 101st Cong., 1st Sess. 623–624 (Conf. Rep. 1989).

75

See Reg. § 1.704-4(d)(4) Ex.

76

IRC § 708(b)(1)(B), discussed infra ¶ 88.5.

77

Reg. § 1.704-4(c)(3).

78

Reg. § 1.704-4(c)(4).

78.1

See infra ¶ 89.4.

78.2

Rev. Rul. 2004-43, 2004-18 IRB 842, revoked by Rev. Rul. 2005-10, 2005-7 IRB 492. The Treasury has proposed such regulations. REG-143397-05, 72 Fed. Reg. 46,932 (Aug. 22, 2007). The new regulations will apply to distributions after January 19, 2005. Notice 2005-15, 2005-7 IRB 527. See Kalinka, Proposed Regulations Would Provide Guidance, But Add Complexity for Making Code Sec. 704 (c) Allocations After an Assets-Over Partnership Merger, 86 Taxes 11 (Jan. 2008); Lipton, Proposed Regulations on Built-In Gain and Mergers: The Service Refuses to Budge, 107 J. Tax'n 324 (2007).

78.3

Assets 1 and 2 are nondepreciable capital assets. Under the partnership agreements, the partners' capital accounts are maintained in accordance with the § 704(b) regulations, distributions in liquidation must be in accordance with positive capital account balances, and a partner with a capital account deficit must restore the deficit on liquidation. *AB* would not be an investment company (within the meaning of § 351) if it were incorporated, and neither partnership holds unrealized receivables or inventory within the meaning of those terms under § 751.

78.4

Neither partnership has a § 754 election in effect.

78.5

For this purpose, money included in the distribution is disregarded, and the adjusted basis of the partner's interest is reduced by any distributed money. See supra ¶ 88.1.3.

---

78.6

---

IRC § 737(b).

---

78.7

---

Reg. §§ 1.704-4(c)(4), 1.737-2(b)(3).

---

78.8

---

Rev. Rul. 2004-43, 2004-18 IRB 842, revoked by Rev. Rul. 2005-10, 2005-7 IRB 492.

---

78.9

---

Reg. § 1.704-3(a)(7).

---

79

---

Reg. § 1.704-4(c)(5).

---

80

---

For whether the partnership recognizes gain or loss on exchanging its assets for stock of the corporation, see § 351, discussed infra ¶ 91.1.

---

81

---

Reg. § 1.704-4(c)(2).

---

82

---

See Reg. § 1.704-4(c)(7) Ex.

---

83

---

*X*'s adjusted basis for her 75 percent interest in Whiteacre equals the adjusted basis of her partnership interest immediately before the liquidation. IRC § 732(b), discussed infra ¶ 88.1.1.

---

84

---

Reg. § 1.704-1(b)(2)(iv)(f)(5), discussed supra ¶ 87.2.3 text accompanying notes 72–82.

---

85

---

Reg. § 1.704-3(a)(3).

---

86

---

Reg. § 1.704-3(a)(6)(i). See generally Abrams, Partnership Book-Ups, 127 Tax Notes 435 (Apr. 26, 2010); Land, Revaluations Revisited: Partnership Allocations and the Demise of the Ceiling Rule, 54

Tax Law. 241 (2001).

87

Reg. § 1.704-3(a)(6)(i).

88

Reg. § 1.704-3(a)(2), discussed infra ¶ 87.3.8 text accompanying notes 95–97.

89

Reg. § 1.704-3(e)(3)(i). See Rev. Proc. 2007-59, 2007-40 IRB 745 (granting partnerships automatic consent to adopt these procedures as accounting method). See also NY State Bar Ass'n Tax Section, Report on Aggregation Issues Facing Securities Partnerships Under Subchapter K (Sept. 29, 2010), available at http://www.nysba.org/taxreports; Levere, A Proposal for Applying Section 704(c) to Securities Partnerships, 59 Tax Notes 249 (Apr. 12, 1993).

90

Reg. § 1.704-3(e)(3)(iii).

91

Reg. § 1.704-3(e)(3)(ii). For the term "actively traded," see Reg. § 1.1092(d)-1, discussed supra ¶ 57.6.2 text accompanying notes 9–28.

92

Reg. § 1.704-3(e)(3)(i).

93

See Reg. § 1.704-3(e)(3)(iv) (description of partial netting approach), Reg. § 1.704-3(e)(3)(ix) Ex. 1 (illustration of partial netting approach), Reg. § 1.704-3(e)(3)(v) (description of full netting approach), Reg. § 1.704-3(e)(3)(ix) Ex. 2 (illustration of full netting approach).

94

Reg. § 1.704-3(e)(3)(i).

95

Reg. § 1.704-3(a)(2). For an exception to this rule for reverse allocations by securities partnerships, see Reg. § 1.704-3(e)(3), discussed supra ¶ 87.3.7 text accompanying notes 89–94.

96

Reg. § 1.704-3(e)(2).

97

Rev. Proc. 2001-36, 2001-1 CB 1326.

In a typical Master-Feeder Structure, two or more Feeder Funds or one or more Feeder Funds and an investment advisor, principal underwriter, or manager contribute their assets, consisting primarily of cash or financial investments, to a single Master Portfolio in exchange for beneficial interests in the Master Portfolio....[E]ach Feeder Fund and the Master Portfolio is registered with the Securities and Exchange Commission under the Investment Company Act of 1940...The shares of these Feeder Funds are typically publicly offered and widely held by individuals, corporations, and institutional investors. Generally, each Feeder Fund is an open-end mutual fund, which continuously offers to sell new shares or redeem existing shares for a price equal to the net asset value of their proportionate interest in the portfolio.

Id. § 2.07. A Master-Feeder Structure is qualified only if, among other things, noncash contributions from a Feeder Fund consist only of a diversified portfolio of stocks and securities, not more than 25 percent of which consists of stocks and securities of one issuer and not more than 50 percent of which consists of stocks and securities of five or fewer issuers. Id. § 4.02. A Qualified Master-Feeder Structure may "aggregate built-in gains and losses from contributed securities for purposes of making § 704(c) allocations and reverse § 704(c) allocations." Id. § 3.01.

The IRS considers requests for rulings allowing other securities partnerships to use similar procedures "where the burden of making § 704(c) allocations is great and the likelihood of character and timing distortions is minimal." Id. § 3.02.

---

98

IRC § 704(c)(1)(C). See Jones, It's the Ceiling Rule, Stupid! 107 Tax Notes 1579 (June 20, 2005). This rule applies with respect to property contributed after October 22, 2004. Pub. L. No. 108-357, § 833, 118 Stat. 1418 (2004).

Congress intended that this rule should not "limit the ability of master-feeder structures to apply an aggregate method for making allocations under section 704(c) to the extent the aggregate method is permitted" by Rev. Proc. 2001-36, 2001-1 CB 1326. HR Rep. No. 755, 108th Cong., 2d Sess. 627 & n.549 (Conf. Rep. 2004).

---

98.1

HR Rep. No. 755, 108th Cong., 2d Sess. 623 (Conf. Rep. 2004).

---

98.2

HR Rep. No. 548, 108th Cong., 2d Sess. 283 (2004).

---

98.3

Reg. § 1.704-3(a)(7). For transfers after June 23, 2003, this rule does not apply to a person acquiring a partnership interest from a Reg. § 1.752-7 liability partner in a transaction to which Reg. § 1.752-7 (e)(1) applies. See infra ¶ 87.6.7.

---

99

Reg. § 1.704-3(a)(8)(i). See IRC § 7701(a)(42) (substituted basis property includes "exchanged basis property," which is property having a basis determined in whole or in part by reference to other property that taxpayer held at any time).

---

100

For § 1031(a), see supra ¶ 44.2.

101

IRC § 704(c)(3); Reg. § 1.704-3(a)(4) (cash method payables "treated as section 704(c) property for purposes of applying" § 704(c)). See Reg. § 1.704-1(b)(2)(iv)(g)(2).

102

IRC § 1245(a)(1) (basic recapture rule), § 1245(b)(3) (inclusion of depreciation taken by prior owner if taxpayer succeeded to prior owner's basis for property under, among other provisions, § 721). See IRC § 1250(a) (similar rule for real property depreciated by accelerated method).

103

Reg. § 1.1245-1(e)(2)(i).

104

Reg. § 1.1245-1(e)(2)(ii)(C)(4).

105

Reg. §§ 1.704-3(a)(11), 1.1245-1(e)(2)(ii)(C)(1).

106

Reg. § 1.1245-1(e)(2)(ii)(C)(2).

107

Reg. § 1.1245-1(e)(2)(ii)(C)(3).

108

Reg. § 1.1245-1(e)(2)(ii)(C)(5). For asset revaluations, see supra ¶ 87.3.7.

109

Reg. § 1.1245-1(e)(2)(iii) Ex. 3(ii).

110

Reg. § 1.1245-1(e)(2)(iii) Ex. 3(iii).

111

Reg. § 1.1245-1(e)(2)(iii) Ex. 3(iv).

112

Reg. § 1.704-3(e)(1).

Case 3:05-cv-00944-BAJ-EWD    Document 107-11    05/27/11   Page 33 of 33

113

  Total disparity is computed by adding built-in gains and losses together, treating both gains and losses as positive numbers. PS-164-84, 1993-1 CB 857, 860.

END OF DOCUMENT -

© 2011 Thomson Reuters/RIA. All rights reserved.