## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

CHEMTECH ROYALTY ASSOCIATES, L.P., by DOW EUROPE, S.A., as Tax Matters Partner

CIVIL ACTION

NO. 05-944-BAJ-DLD

**VERSUS**

UNITED STATES OF AMERICA

NO. 06-258-BAJ-DLD

NO. 07-405-BAJ-DLD

## MEMORANDUM RULING

This matter came before the Court for a bench trial on June 20-24, 2011. Closing arguments were held June 27, 2011. The Dow Chemical Company ("Dow") engaged in two series of transactions that the United States contends are abusive tax shelters. The two transactions are referred to as Chemtech I, dealing with tax years 1993–97, and Chemtech II, dealing with tax years 1998–2003. Chemtech I was promoted and marketed to large corporate taxpayers by Goldman Sachs under the trade name SLIPs, standing for "Special Limited Investment Partnerships," and was implemented by Dow with the assistance of tax lawyers at the law firm of King & Spalding. Chemtech II was designed and implemented by the tax lawyers at King & Spalding. Both arrangements are enormously complicated in their construction and operation. At issue in this case is whether the IRS incorrectly adjusted certain partnership items, as defined by 26 U.S.C. § 6231(a)(3), of Chemtech for the 1993 through 2003 tax years. In addition, the United States seeks penalties for 1997–2003 tax years.

1

Two basic types of tax benefits are at issue in this case that were created when Dow converted an asset's equity into a tax deduction. In Chemtech I, the basic tax benefit is a deduction by Dow of royalty expenses paid for the use of its own patents. In Chemtech II, the benefit created is a deduction for the depreciation of a chemical plant asset that had already, for the most part, been depreciated down to zero.

The resolution of this case turns, in large part, on this Court's application of judicial doctrines that have been developed by the courts for more than three-quarters of a century. For the reasons which follow, the Court finds that the Chemtech transactions should be disregarded for tax purposes because: a) the transactions fail both tests under the economic substance doctrine; b) the partnership was a sham and had no legitimate business purpose; and c) even if this Court were to respect the partnership as a separate entity for tax purposes, it would not treat the banks as true equity partners. Finally, the Court finds that a 20% penalty applies for substantial understatement and negligence.

## FINDINGS OF FACT

### A. SLIPs Tax Shelter Product

Goldman Sachs ("Goldman") is a global investment banking firm headquartered in New York City. One of the products that Goldman developed in the early 1990s was called Special Limited Investment Partnerships, or "SLIPs." SLIPs was a complex marketed tax transaction, the ultimate goal of which was to

2

locate "equity that was tax deductible."[1] Goldman employees worked closely with the law firm of Andrews & Kurth in the development of SLIPs. Lawyers from Andrews & Kurth advised Goldman that, under the tax law in force at the time, business purposes other than tax savings were important for the completion of the transaction. In particular, lawyers stressed that the business purpose of off-balance sheet financing ("OBSF") was essential.[2]

Goldman sold SLIPs to various well-known clients other than Dow, including Merck and International Paper. In 1992, Goldman began marketing SLIPs to Dow in a series of slideshow presentations. Prior to the presentations, Goldman and Dow reached a confidentiality agreement, prohibiting Dow from disclosing information about SLIPs to "any outside legal, tax or accounting advisors without [Goldman's] permission."[3]

The first presentation took place in April 1992. During that presentation, Goldman described a partnership made up of a foreign subsidiary of Dow along with a foreign investor. Goldman kept the mention of tax benefits to a minimum, but emphasized that if there were any adverse U.S. tax consequences for foreign investors, Dow would indemnify them. In June 1992, Goldman offered another presentation to Dow, in which it described the tax provision at the source of SLIPs.

---

[1] Deposition of David Ackert, p. 14. This goal was referred to as the "Holy Grail" in reference to its perceived unattainable nature.

[2] OBSF is "the structuring of debt, financial instruments, business transactions, guarantees, sale of assets, and other financial activities such that these items are not included on the balance sheet of the firm." Elwin Ray Rogers and Grant Lindstrom, *Ethical Implications of Off-Balance-Sheet Financing*, BUS. & PROF. ETHICS J., vol. 15, no. 2, 19–32 (1996).

[3] Joint Exhibit 7, at Bates 70679.

Also during the meeting, Dow first expressed its interest in using patents as the assets to contribute to the partnership. In November of that year, Goldman made a third presentation to Dow which focused on patents. In December, Dow obtained an opinion letter from Andrews & Kurth addressing whether the potential partnership formed by the SLIPs transaction would be disregarded as a sham, whether the transaction itself would be disregarded as a sham under various judicial doctrines employed against abusive tax transactions, and whether an investment by foreign banks would be considered debt, and not equity.[4] Dow's focus on tax issues from the outset, and concern for its validity in that regard, reflects its primary motive for entering into the SLIPs transaction.

In 1993, Goldman began the process of identifying European banks that might be interested in participating in the SLIPs transaction with Dow. Dow had become concerned about the guarantees it had to make to the foreign banks as part of the transaction (indemnifying them for any potential tax exposure), and wanted to make various "core modifications."[5] In response, Goldman reminded Dow that it was the only party receiving the tax benefits of the transaction, and that "[B]ecause [the financial institutions] do not share in the tax benefits of the structure they will not accept any structural tax risk. ... No financing premium will justify the potential tax exposure."[6] Goldman further advised Dow not to make the transaction any more complicated, stating, "We are already approaching the structural limits of

---

[4] Dow does not rely on the opinion of Andrews & Kurth in this case, and the Court does not take it into consideration in this opinion.
[5] Joint Exhibit 22.
[6] Joint Exhibit 22.

4

the marketplace and we have significant doubts that the additional complexity raised by the proposed changes can be competently evaluated by investors."[7]

In a March 1993 memorandum to Dow, Goldman reiterated that Dow must indemnify the foreign banks for any tax liability in order to protect the banks "fully from both Dow/[Marion Merrell Dow] actions and structural flaws in the partnership agreements."[8] On April 8, 1993, Dow's Board of Directors approved Dow's entry into a SLIPs transaction, establishing a partnership, "Chemtech I," with its principal place of business in Horgen, Switzerland.

## B. Chemtech I

### a. Formation of Chemtech I

SLIPs was a marketed tax shelter product. This particular type of tax shelter is known as a "lease-strip," meaning that taxable income is "stripped away" from a transaction and is allocated to a non-US taxpayer.  Once the taxable income is stripped away, the U.S. taxpayer is left with tax benefits which may be used to reduce or eliminate the income tax that would otherwise be paid by the taxpayer for other business or income.

#### i. Contribution of assets to the partnership

The first step in the transaction was for Dow to identify a valuable group of assets with a tax basis at or near zero. Dow decided to use intellectual property,

---

[7] Joint Exhibit 22.
[8] Joint Exhibit 23. (emphasis removed)

specifically 73 patents, as its SLIPs asset. Dow created the patents and, having already deducted the expenses it incurred in creating the product, the patents had effectively a zero tax basis. The Court finds persuasive the opinion of United States' expert witness Kenneth Stern. In his report, Stern stated that the criteria Dow used in selecting these patents was not which patents would be most attractive to third parties, but instead patents that, among other things: had the highest value (in order to reduce the total number of patents); related to an active U.S. manufacturing business; may be in use in one of the businesses; or if not in use, then must be a "defensive patent."[9] Seventy-one of the 73 patents had a zero tax basis. The remaining two had a total tax basis of approximately $54,000. In total, the patents were valued at $867 million in an appraisal by a professional appraising firm, Arthur D. Little & Co.

Dow owned the patents, and by entering into the licensing agreement with Chemtech, it was obligated to make royalty payments. Chemtech then had the right to license the technology contributed by Dow provided it gave 90 days notice to Dow. Therefore, as an investor in Chemtech, Dow could not expect to receive any additional revenue unless Chemtech licensed the patents to third parties. Two factors combined to make licensing of the patents unlikely: 1) the patents included in Chemtech were those that Dow practiced; and 2) with respect to most of the patents, Dow did not contribute all technology that would have been necessary for

---

[9] Stern defined a "defensive patent" as one Dow did not use in practice, but increased the value of the patents Dow did in fact use.

third party licensees. A third party would have therefore needed to deal with both Chemtech and Dow in order to license a patent.

Sharon Oriel, an employee involved in the management of patents for Dow, acknowledged that Chemtech I did not change in the manner in which Dow used its patents, and that placing the patents into the Chemtech partnership did not increase the value of those patents to Dow.[10]

### ii. Addition of general and limited partners to Chemtech

The second step in the transaction was to select the parties to the Chemtech limited partnership. Chemtech was a Dow partnership with general and limited partners. The general partner was Dow Europe, S.A. ("DESA"), a Dow subsidiary based in Switzerland. DESA transferred roughly $10 million cash to Chemtech as a contribution to its capital. As a general partner, DESA acted as the managing partner of Chemtech and ultimately owned roughly 1% of Chemtech.

Diamond Technology Partnership Company, ("DTPC"), a Dow subsidiary incorporated in Delaware with its principle place of business in Hamilton, Bermuda, as a Class A limited partner in Chemtech. DTPC transferred U.S. patents (valued at $866,996,000), to Chemtech as a contribution to its capital. Ultimately, DTPC owned roughly 88% of Chemtech.

DESA and DTPC also created Chemtech Portfolio, Inc., ("CPI"), a subsidiary of Chemtech incorporated in Texas with its principle place of business in Midland,

---

[10] Trial Transcript vol. 4, at 27.

Michigan. In addition to the Patent Assets contributed to Chemtech by DTPC, DTPC also contributed 100% of its CPI stock into Chemtech's capital.

Subsequently, Essex Specialty Products, Inc., ("Essex"), a Dow subsidiary, became involved in Chemtech when it acquired roughly 5% of the common stock of DTPC in exchange for up to $1,000 and the assignment of five U.S. patents to DTPC. In other words, DTPC owned approximately 88% of Chemtech, and Essex owned about 5% of DTPC.

Ifco, Inc., ("Ifco"), another subsidiary of DTPC incorporated in Delaware with its principle place of business in Hamilton, Bermuda, was designated as a Class B limited partner of Chemtech. Ifco acquired a limited partnership interest by contributing $100 million to its capital.

On April 30, 1993, Dow contributed 68 patents and 100 shares of CPI stock to DTPC in exchange for 776 shares of DTPC. Additionally, Essex contributed 5 patents to DTPC in exchange for 113 shares of DTPC.

Also on April 30, DTPC and Chemtech executed a Contribution Agreement whereby DTPC contributed those combined 73 patents and 100 shares of capital stock of CPI to Chemtech in exchange for a Class B Limited Partner interest in Chemtech. The contributed patents had a tax basis of $53,345; the CPI stock had a tax basis of $2,481,532. Additionally, an Agreement of Limited Partnership of Chemtech Royalty Associates, L.P., (the "Partnership Agreement"), was executed among DESA, (the General Partner), and DTPC and Ifco, (the Limited Partners).

8

In summary, at this stage in its formation, the three partners of Chemtech included DESA, DTPC, and Ifco. DESA, as general partner, contributed $10 million to Chemtech's capital and owned about 1% of the partnership. DTPC, as a limited partner, contributed Patent Assets, (valued at $866,996,000), and 100% of its stock in CPI to Chemtech's capital, and owned roughly 88% of the partnership. Ifco, the other limited partner, contributed $100 million to Chemtech's capital and owned about 10% of the partnership.

In addition, on April 30, 1993, Dow agreed to lease back the patents from Chemtech using the "triple net leases" described by Goldman.[11] This created a "circular flow" of the patents: Dow contributed the patents to DTPC, who contributed the patents to Chemtech, who leased back the patents to Dow. At this point, the foreign investors entered the picture.

### iii. Entrance of Foreign Investors

In May 1993, Goldman approached various foreign banks about their potential investment in the Chemtech partnership. The foreign banks analyzed the transaction as a "structured financial transaction," which is a non-traditional transaction used in financing that is "heavily structured and/or has complex features that will require additional scrutiny because the transaction may represent risks not immediately apparent."[12] In its presentations, Goldman emphasized three

---

[11] Such a lease makes the lessee (Dow) responsible for all of the costs relating to the assets (patents) being leased in addition to the rent fee.
[12] Report of Joel Finard, United States' expert on capital markets and structured transactions, at pp. 13–14.

primary points: 1) they would receive a significant premium over a corporate bond; 2) they would have great protections provided to them with a credit risk less than that of investing in a corporate bond; and 3) the tax consequences of SLIPs, noting specifically that the U.S. Taxpayer (Dow, in this instance) would receive incremental tax benefits and the foreign banks would escape any U.S. tax liability.[13]

Eventually, five foreign banks agreed to participate in Chemtech I by contributing a total of $200 million:

| Bank | Amount invested |
|------|-----------------|
| • Bank of Brussels Lambert | $25 million |
| • Dresdner Bank A.G. | $50 million |
| • Kredietbank, N.V. | $50 million |
| • National Westminster Bank Plc | $35 million |
| • Rabo Merchant Bank | $40 million |

At this point, the ownership structure of Chemtech was as follows:

| Entity | Classification | Ownership % |
|--------|----------------|-------------|
| • DESA | General Partner | 1% |
| • Foreign Banks | Class A Limited Partner | 18% |
| • DTPC | Class B Limited Partner | 81% |

---

[13] The presentation materials stated the following:

> The activities of the Partnership will not constitute a United States trade or business and will not give rise to a permanent establishment in the United States. Accordingly all payments … to the investor will be free of both U.S. income and withholding tax.
>
> The Foreign Affiliate and the U.S. Sponsor will indemnify the Investor against U.S. taxes, including withholding taxes arising from the activities of the Partnership and the Investor through the end of the lease term and in respect of all payments that are not attributable to the Investor. The U.S. Sponsor will guarantee the indemnities and provide a similar indemnity that the Investor may enforce directly against the U.S. Sponsor.

Joint Exhibit 68, at Bates 1306.

Dow incurred formation costs totaling just over $12.6 million, not including expenses incurred later during the operation of Chemtech and the retiring of the foreign banks.

### b.  Operation of Chemtech I

In order to fully understand the economics of Chemtech I, an analysis of the flow of money and the resulting tax consequences is required. Conceptually, the money flowed in a circle, akin to the circular flow of patents discussed above,[14] from Dow to Chemtech back to Dow, except the foreign banks were paid a fee equivalent to an interest payment. The tax consequences, on the other hand, do not move in such a way. While Dow claimed royalty expense deductions for the money flowing *to* Chemtech, it did not take into account the income of the bulk of the money flowing *from* Chemtech. That is the hallmark of a "lease strip" tax-shelter such as SLIPS: the income from, and deductions related to, circular flows of cash are separated. Tax deductions are given to United States' taxpayers, while taxable income is allocated to tax-exempt entities, i.e. foreign investors.

Dow paid royalty fees to Chemtech for the use of the patents it had previously assigned. Chemtech then paid the foreign banks a fixed fee the equivalent of an approximate 7% interest payment on $200 million of investments.[15] The Chemtech partnership then took the remaining cash and contributed it to its

---

[14] *See infra*, at 7.
[15] The parties dispute whether this investment was debt or equity. That issue will be addressed in the conclusions of law, *infra*.

11

subsidiary corporation, Chemtech Portfolio ("CPI"). CPI then loaned the money back to the Dow corporate group.

Chemtech I operated between 1993 and 1998. The foreign banks were invested in the partnership during 1993 and 1998 for only a small part of the year. Therefore, the cash flows from 1994–97 best illustrate the economics of Chemtech I. During that time money flowed into Chemtech from a primary source, Dow, which made royalty payments as required in the lease agreement. After the money was paid to Chemtech, several transfers of cash occurred. First, a guaranteed payment was made to DTPC. Second, a $760,000 management fee was made to DESA (a European Dow subsidiary). Third, a priority return was made to the foreign banks. Fourth, relatively small tax distributions were made to the Swiss tax authorities on behalf of Dow (DESA and DTPC) and the foreign banks. Next, Chemtech contributed excess cash to its subsidiary CPI. Finally, loans were made from CPI to Dow (Dow Chemical International).[16]

The 1994 cash flows break down as follows:

1. Dow Chemical Company[17] royalty payment to Chemtech for $143.3 million;
2. Chemtech interest-like payment to the five foreign banks for $13.9 million;
3. Chemtech, through CPI, loan back to Dow for $136.9 million.

---

[16] Joint Financial Stipulations, Exhibit D. In addition to the cash received from Dow, Chemtech and its subsidiary, CPI, also received interest and dividend income generated by its portfolio, which included mostly marketable securities. Joint Exhibit 326, at Bates 5570. CPI paid taxes on this income, and the excess was distributed back to Dow, resulting in more cash flowing back to Dow during the operating years than Dow paid to Chemtech.

[17] Including subsidiaries Dow Chemical International, Ltd. (DCIL), Dow Europe, S.A. (DESA), and Diamond Technology Partnership Corporation (DTPC).

The movement of cash begins with Dow, circulates through Chemtech entities, and returns back to Dow. One would expect the tax consequences to follow the cash, so that Dow would receive a deduction for payments made to Chemtech, and report payments received from Chemtech as income. In other words, the transaction would be a "wash" on Dow's tax return. But that's not what happened.

Indeed, Dow claimed a royalty expense deduction on its corporate income tax returns. But, as shown below, that cash was returned to Dow without triggering any significant income tax. In 1994 the major tax flows of Chemtech I were as follows:

1.  The Dow Chemical Company deducted $143.3 million in royalty expenses for payments made to the Chemtech partnership in exchange for use of the patents;
2.  Chemtech had a taxable income of $122.4 million, allocating $115 million of that income to the five foreign banks and $28.1 million of the income back to Dow.

Therefore, in 1994, Dow paid $143.3 million to Chemtech in royalty expenses, $136.9 million of which was eventually returned to Dow. However, only $28.1 million of income was allocated back to Dow for tax purposes. Likewise, the five foreign banks were paid $13.9 million in "interest like payments," but were allocated $115 million in income for tax purposes.

Similar flows of cash and tax consequences continued in the following years.

1995 Chemtech I

Cash Flows:

1.  Dow paid $142.8 million in royalties to Chemtech;

2. Chemtech paid $13.9 million in "interest-like" payments to the five foreign banks;
3. Chemtech loaned $150.2 million back to Dow.

Tax Flows:

1. Dow claimed a $142.8 million deduction for royalty payments to Chemtech;
2. Chemtech reported $122.4 million in taxable income, allocating $111.5 million to the five foreign banks and $31.2 million to Dow.

1996 Chemtech I

Cash Flows:

1. Dow paid $142.1 million to Chemtech;
2. Chemtech paid $13.9 million to the five foreign banks, and loaned $146.1 million back to Dow.

Tax Flows:

1. Dow claimed a $142.1 million deduction for royalty payments to Chemtech;
2. Chemtech reported $121.3 million in taxable income, allocating $103.4 million to the five foreign banks and $38.6 million to Dow.

1997 Chemtech I

Cash Flows:

1. Dow paid $97.9 million to Chemtech;
2. Chemtech paid $13.9 million to the five foreign banks, and loaned $110.2 million back to Dow.

Tax Flows:

1. Dow claimed a $97.9 deduction for royalty payments to Chemtech;
2. Chemtech reported a taxable income of $81.4 million, allocating $52.6 million to the five foreign banks and $45 million back to Dow.[18]

## c. End of Chemtech I

---

[18] The numbers each year do not zero-out. This is a result of additional income of CPI, Chemtech's subsidiary. For an explanation, see note 12, *infra*.

### i. Change in Tax Regulations

Changes in U.S. tax law forced Dow to terminate Chemtech I at the end of 1997. Temporary regulations issued by the U.S. Treasury, effective as of Jan. 1, 1998,[19] attacked tax manipulations relating to "hybrid entities," which were defined as "an entity that is treated as fiscally transparent in either the United States or the jurisdiction of residence of the person that seeks to claim treaty benefits."[20] Chemtech fit this description as it claimed to be a partnership under U.S. law for purposes of the domestic partners, but it was not treated as a partnership under foreign law for the purposes of the foreign banks.[21]

In the preamble to its temporary regulation, the U.S. Department of the Treasury noted that the result of a tax exemption in both countries (U.S. and the jurisdiction of residence) was both "inappropriate" and "unintended."[22] Furthermore, the Treasury noted, the result is contrary to the intent of the tax treaties between the countries, which "[C]ontemplate that income relieved from taxation in the source country will be subject to tax in the treaty country."[23]

In December 1997, DESA informed the foreign banks of the change in United States tax law, noting that the new regulations may cause the payments to the foreign banks as "Class A Limited Partners" to be subject to a 30% withholding tax.

---

[19] Treasury Decision 8722, Temp. Reg. § 1.894–1(d).
[20] Joint Exhibit 513.
[21] Joint Exhibit 513. In this exhibit, Chemtech advised the foreign banks that "[u]nder the new regulations, the withholding tax applies unless Chemtech is treated as a flow through entity in the country of residence of each Partner."
[22] Treasury Decision 8722.
[23] Treasury Decision 8722.

### ii. Exit of Foreign Banks

In February 1998, Dow representatives informed the five foreign banks that Dow, through DTPC, had "elected to purchase their interest in the [Chemtech I] partnership."[24] On March 27, 1998, the five foreign banks ceased to be "Class A partners" and received payments in three different installments, totaling $210.4 million.[25] Dow brought its subsidiary, Ifco, back into the transaction to buy out the interests of the foreign banks.[26] At this time, Ifco became the sole general partner of Chemtech, owning just over 18%; DTPC was the limited partner, owning just over 81%. The payouts were as follows:

| Bank | Amount of Payment |
| --- | --- |
| Bank Brussels Lambert, S.A. | $26,300,076 |
| Dresdner Bank, A.G. | $52,602,390 |
| Kredietbank, N.V. | $52,602,760 |
| Rabo Merchant Bank, N.V. | $42,082,050 |
| National Westminster Bank, P.L.C. | $36,822,295 |
| Total | $210,409,571 |

---

[24] Joint Exhibit 528. The banks "expressed regret" at the termination of the transaction, and two in particular, Kredietbank and Dresdner, expressed an interest in being invited again if Dow ever entered into a similar transaction.

[25] Not all funds were received on March 27, but that was the termination date of the banks' interest in Chemtech I.

[26] Ifco was a limited partner in Chemtech I prior to the involvement of the foreign banks, at which time it exited the partnership.

A portion of this payment was based on an $82 million market-to-market gain in the value of the patents assigned to Chemtech. The foreign banks were allocated 1% of that gain to be divided among then.

A dispute soon arose over the amount of value the patents had gained—the banks believed it to be greater than $82 million. However, their complaints regarding the patent valuation met deaf ears, as Dow pointed out that the partnership agreement required a specific methodology for determining the market-to-market gain. The banks' position could have required an additional $1 million distribution, and Dow refused to pay anything additional. An internal Dow memo noted that the foreign banks appeared to be upset because "Dow has made so much money on this deal."[27] Furthermore, a high-ranking Dow officer testified that the banks were being "too greedy" in their attempts to gain more in distribution of the increased value.

The Court notes that, if Chemtech were a true joint venture, all parties would be pleased with high gains in mark-to-market valuation of the patents. However, that does not appear to be the case. The foreign banks had a collective 1% interest in the increased value of the patent assets. Therefore, if they believed they could be due up to an additional $1 million dollars, their valuation had the potential to be $100 million greater than Dow's—roughly $180 million. Dow's valuation showed a $82 million gain. Dow was due 99% of any market-to-market value gain. Therefore, a $100 million increase in calculation would have allocated an additional $99

_____

[27] Joint Exhibit 678, at Bates 4064.

million to Dow (along with the additional $1 million to the banks); yet Dow dismissed the banks' objection and held to their original valuation.

Given Dow's assertion that Chemtech was a true partnership and joint venture, its unwavering position on the valuation of market-to-market gains in the patents eludes this Court's understanding. The only way the Court can understand Dow's position is if Chemtech were, in fact, something other than a true partnership where each party had a real ownership stake in the patents. Dow appeared to view the patents as its own property, and preferred the banks to come away with as little value in that property as possible.

## C. Chemtech II

### a. Transition to Chemtech II

Dow began planning for Chemtech II once it realized it would have to terminate the Chemtech I transaction. While Chemtech I featured patent assets, in Chemtech II Dow contributed a portion of a chemical plant in Plaquemines, Louisiana. Internal memoranda from Dow describe the structure of Chemtech II as "an offshoot from the Chemtech I transaction and was designed by King & Spalding."[28] Similar to Chemtech I, tax benefits were a key component of the transaction. According to internal memoranda, Dow calculated the net present value of the tax benefit at a "conservative" $100 million.[29] Unlike Chemtech I, Dow

---

[28] Joint Exhibit 710. The law firm of King & Spalding was also involved in the structuring of the Chemtech I transaction.
[29] Joint Exhibit 710, at Bates 83153. For funding transactions, Dow would typically analyze the financial aspects of the transaction, then consider tax and legal consequences, and finally make a

did not have an immediate fundraising need for Chemtech II in 1997. Rather, it was concerned with the upcoming years and potential downturn in both the industry and economic cycles.

In determining the assets to contribute to the new Chemtech partnership, Dow sought to ensure the transaction wouldn't affect day-to-day operations of the company, and that the assets had value in excess of their book value. When Dow chose the Louisiana chemical plant as the asset to be contributed to the partnership, internal communications between its corporate officers sent in February 1998 revealed that the plant would "remain under Dow's control," and that Dow intended "not to affect in any manner the operation of these [plant assets]."[30]

During the transition from Chemtech I to Chemtech II, Dow planned to retire DTPC as a partner. DTPC contributed the patent assets to Chemtech, and Dow sought to regain control of those patents. In addition, Dow planned to distribute to DTPC 67% of the Chemtech Portfolio ("CPI") stock held by the Chemtech partnership.  CPI was comprised entirely of cash, securities, and Dow demand notes valued at over $750 million as of February 1998. The sum was split into just over

---

decision based on those factors. Net present value calculations were typically done in structured financing transactions.

[30] Joint Exhibit 523.

$50 million in securities and just over $700 million in inter-company Dow demand notes. The plan was to use the patents and CPI stock "to take out DTPC's capital."[31]

However, a problem arose. Dow learned that the CPI assets would be considered "marketable securities," triggering a tax pursuant to Internal Revenue Code § 731. Dow's plan to avoid this tax was to exchange those securities for a "deeply subordinated 33-year note."[32] Internal Dow memoranda support these facts. In one memo, Dow explained that "[t]he key to the tax treatment [of the exchange] is a 754 election which was made when the partnership assets were distributed."[33] The 754 election allowed Dow to receive a $380 million boost to the basis of its chemical plant, enabling Dow "to strip the basis from the CPI stock that was distributed to DTPC and apply it to the plant assets which were contributed. This allowed for an increase in the tax basis of the plant assets from $27 million to over $400 million."[34] Dow believed the marketable security matter to be the most important part of the Chemtech II transaction.[35]

In its internal memo, Dow described no business purpose for the securities-for-note exchange, but emphasized the tax benefits of Chemtech II. In particular, Dow noted that the $380 million boost to the basis of the Louisiana chemical plant enabled it to depreciate the basis on a five-year schedule. The Chemtech partnership agreement allocated this depreciation to IFCO, the general partner of

---

[31] United States Exhibit 15.
[32] *Id.*
[33] Joint Exhibit 607
[34] *Id.* at Bates 83153.
[35] An internal memorandum states, "The most important aspect of the 754 election was that the assets in CPI be non-marketable."*Id.*

20

Chemtech. IFCO, a Dow subsidiary, is part of the Dow consolidated tax return "and therefore Dow will receive the tax benefits."[36]  On June 12, 1998, Dow exchanged the three demand notes for a single term note with a face value of $781.6 million

Just over one month later, in August 1998, Dow was looking ahead to a planned Chemtech III transaction. Dow emails show employees discussing the terms of the notes used in Chemtech II, seeking to ensure they would still be in place "until Chemtech III is set up," so that the loan could be "converted to the same type of note that CPI [had] in place."[37] This communication reveals, among other things, Dow's plan to initiate a third version of the Chemtech tax shelter without any discernible business purpose in place. That is, any purpose other than using the transaction as a tax shelter.

### b.  Formation of Chemtech II

On April 9, 1998, the Dow board of directors resolved that the Plaquemine Louisiana plant assets would be contributed to Dow Chemical Delaware Corp. ("DCDC").[38]  On June 12, 1998, Dow contributed to DCDC the Louisiana hydrocarbon plant and asset, valued at $715 million, and all outstanding stock in CPI II, a Michigan corporation. DCDC then contributed this property to Chemtech II, and Dow agreed to lease back the chemical plant. At the time of contribution, Dow had plans to expand the plant by the end of 1999. An appraiser determined

---

[36] Id.

[37] Joint Exhibit 705.

[38] DCDC was, until that time, a dormant wholly owned subsidiary of Dow.

that the value of the plant would be increased by $118 million, compared to the $22 million cost of improvement.

On June 25, 2008, DTPC was retired from Chemtech in exchange for 70% of the stock of CPI and all of the remaining patents.

On June 26, 1998, RBDC, Inc., a United States affiliate of Rabobank,[39] was admitted to Chemtech after Rabobank purchased $200 million of Credit Default Swaps from Dow.[40] The Credit Default Swaps show that Rabobank wanted to protect itself in its dealings with Dow, and that Dow was the ultimate source of repayment and the real credit risk in the transaction.[41] There were three partners to Chemtech II: IFCO (Dow subsidiary), DCDC (Dow subsidiary), and RBCD, which held the following interests:

| Partner | Capital Investment | % Interest |
|---------|-------------------|------------|
| IFCO | $62,336,086 | 6.37% |
| RBDC | $200,000,000 | 20.45% |
| DCDC | $715,933,286 | 73.18% |
| Total | $981,864,810 | 100% |

The Chemtech partnership also owned both CPI, and CPI II, and all of their assets.

### c. The § 754 Election

---

[39] Rabobank was one of the five foreign banks invested in Chemtech I.
[40] A Credit Default Swap guarantees the purchaser protection in case the seller defaults or goes into bankruptcy.
[41] Joint Exhibit 824.

When it filed its 1998 partnership tax return, Chemtech II made an election under section 754 of the Internal Revenue Code ("§ 754"). The § 754 election was a key to the tax treatment of Chemtech II, and enabled the partnership to "strip the basis from the CPI stock that was distributed to DTPC and apply it to the plant assets which were contributed."[42] Dow stripped $381 million of basis from the CPI stock and applied it to the remaining Chemtech, $363 million of which was used to increase Chemtech's basis in the chemical plant.

The § 754 election essentially transferred Chemtech's inside basis in CPI to the Louisiana chemical plant, which in turn provided Chemtech with artificially large depreciation deductions. In Chemtech I, the cash generally flowed from Dow to Chemtech to CPI back to Dow. When Chemtech transferred its cash to CPI, its basis in CPI increased. When Chemtech I transitioned to Chemtech II, Chemtech's basis in that portion of the CPI stock was roughly $450 million. This is the amount of basis transferred to the plant through the § 754 election.

### d. Operation of Chemtech II

Like Chemtech I, the cash in Chemtech II generally flowed in a circle, except for the interest-like payment to RBDC (the only non-Dow partner). The first full year of cash flows in Chemtech II was 1999. In that year, the following cash flows occurred:

1999 Cash Flows

---

[42] Joint Exhibit 710. The CPI stock had a large basis as a result of the contributions that Chemtech made to CPI, described above.

1. Dow made a $69 million payment to Chemtech II to rent the chemical plant;[43]
2. Chemtech II paid $12.75 million to RBDC, a $400,000 management fee to IFCO, and placed excess cash into CPI II;
3. CPI II loaned $57.4 million back to Dow Chemical International ("DCIL")

Tax benefits were at the center of the Chemtech II transaction, particularly the deduction for the depreciation of the chemical plant. The plan had a pre-transaction basis of approximately $18 million, a portion of which Dow could have claimed each year in depreciation deduction. Chemtech II allowed Dow to claim a $69 million rental deduction for the chemical plant, while taking back income (through DCDC and IFCO) of about $55 million of that cash. More importantly, Dow was allocated nearly all of the large depreciation deductions generated by the chemical plant, while RBDC received a taxable income distribution equal to its interest-like cash payment:

1999 Tax Flows

Chemtech II total numbers reported:
| Income: | $69 million |
| Depreciation: | $115 million |
| Taxable Income: | ($46 million) |

DCDC tax report:
| Income: | $49 million |
| Depreciation: | $93 million |
| Taxable Income: | ($44 million) |

IFCO tax report:
| Income: | $4 million |
| Depreciation: | $20 million |
| Taxable Income: | ($15 million) |

---

[43] After 1999, rental payments increased because plant expansion required a higher rental value.

24

RBDC tax report:
      Income:                  $15 million
      Depreciation:          $2 million
      Taxable Income:      $12.75 million

This cycle repeated each year, although the tax benefit decreased each year because of declining depreciation deductions.

<u>2000 Chemtech II Cash and Tax Flows</u>

2000 Cash Flows:

1. Dow made a $77.5 million rental payment to Chemtech to rent the plant;
2. Chemtech made a $12.75 million interest-like payment to RBDC, and loaned $69.3 million back to Dow through its subsidiaries.

2000 Tax flows

Chemtech II total numbers reported:
      Income:                  $77.5 million
      Depreciation:          $66.2 million
      Taxable Income:      $10 million

DCDC tax report:
      Income:                  $58.2 million
      Depreciation:          $55.7 million
      Taxable Income:      $2.5 million

IFCO tax report:
      Income:                  $4.7 million
      Depreciation:          $9.1 million
      Taxable Income:      ($4.4 million)

RBDC tax report:
      Income:                  $14.1 million
      Depreciation:          $1.4 million
      Taxable Income:      $12.75 million

<u>2001 Chemtech II Cash and Tax Flows</u>

2001 Cash flows:

1. Dow paid $77.5 million to Chemtech in rental payments;

2. Chemtech paid $12.75 million in interest-like payments to RBDC, and loaned $69.6 million back to Dow through its subsidiaries.

2001 Tax flows:

Chemtech II total numbers reported:
| | |
|---|---|
| Income: | $77.5 million |
| Depreciation: | $42.7 million |
| Taxable Income: | $34.3 million |

DCDC tax report:
| | |
|---|---|
| Income: | $58.7 million |
| Depreciation: | $35.8 million |
| Taxable Income: | $22.9 million |

IFCO tax report:
| | |
|---|---|
| Income: | $4.6 million |
| Depreciation: | $6 million |
| Taxable Income: | ($1.3 million) |

RBDC tax report:
| | |
|---|---|
| Income: | $13.7 million |
| Depreciation: | $0.9 million |
| Taxable Income: | $12.75 million |

## 2002 Chemtech II Cash and Tax Flows

2002 Cash flows:

1. Dow paid $77.5 million to Chemtech in rental payments;
2. Chemtech paid $12.75 million in interest-like payments to RBDC, and loaned $67.8 million back to Dow through its subsidiaries.

2002 Tax flows:

Chemtech II total numbers reported:
| | |
|---|---|
| Income: | $77.5 million |
| Depreciation: | $39.2 million |
| Taxable Income: | $37.8 million |

DCDC tax report:
| | |
|---|---|
| Income: | $58.9 million |
| Depreciation: | $32.8 million |
| Taxable Income: | $26.1 million |

IFCO tax report:

Income:             $4.6 million
Depreciation:       $5.6 million
Taxable Income:     ($1 million)

RBDC tax report:
Income:             $13.6 million
Depreciation:       $0.8 million
Taxable Income:     $12.75 million

## 2003 Chemtech II Cash and Tax Flows

The cash and tax flows from 2003 show a slightly lower payment to RBDC because of a restructured agreement that effectively represented a lower interest rate.

2003 Cash flows:

1. Dow paid $77.5 million to Chemtech in rental payments;
2. Chemtech paid $10.6 million in interest-like payments to RBDC, and loaned $69.3 million back to Dow through its subsidiaries.

2003 Tax flows:

Chemtech II total numbers reported:
Income:             $77.5 million
Depreciation:       $21.9 million
Taxable Income:     $54.7 million

DCDC tax report:
Income:             $60.9 million
Depreciation:       $18.3 million
Taxable Income:     $42.6 million

IFCO tax report:
Income:             $4.7 million
Depreciation:       $3.2 million
Taxable Income:     $1.5 million

RBDC tax report:
Income:             $11.1 million
Depreciation:       $0.5 million

Taxable Income:          $10.58 million

The numbers above show that both Chemtech I and Chemtech II featured annual circular flows of cash, and the tax benefits to Dow did not have a rational relationship with the flow of funds.

## D. Class A Partners' Interest in Chemtech

### a. Characterization of the Interests

Aside from the parties' dispute regarding the reasons Dow entered into the Chemtech transactions designed by Goldman Sachs, the parties also disagree on whether the interest of the foreign banks as "Class A Investors" was an interest in equity or debt. However, the parties stipulate that the arrangement is neither pure equity nor pure debt, but a sort of hybrid. As Dr. Glen Hubbard, a government economic expert, explained, one should think of two poles: one of pure debt, and one of pure equity.[44] "...In the world we live in in finance, there are thousands of securities in between those two poles."[45] Dow disagrees with this "polar approach," but the Court finds the testimony of Dr. Hubbard credible, and adopts his approach to the distinction between debt and equity in this case.

Equity claims represent the ownership interest in a business enterprise, and carry with them a residual claim on business profits, voting rights, and are more permanent as capital investments in a business. Debt, by contract, involves an obligation by a borrower to repay a lender an amount by a certain date, typically

---

[44] Trial Transcript vol. 5, at 13.
[45] *Id.* at 14.

28

accompanied by interest payments. Debt differs from equity in that debt provides for "a priority claim on operating profits, no voting rights, finite life, periodic payments that reduce risk, restrictive terms that protect the debt investors, and the right to force liquidation or reorganization."[46]

Dow asserts the interests were preferred equity, which would require this Court, assuming both a legitimate business purpose *other than* tax motivations and economic substance to the transactions, to recognize that the foreign banks were partners for tax purposes. The government asserts the interests "fall[], *overwhelmingly*, on the debt side of the spectrum."[47] The consequences of such a finding are crucial. It would provide this Court with an alternative ground upon which to disregard the Chemtech transactions, ignoring for this purpose the motivations behind the transactions or whether they had any economic substance. Therefore, this characterization represents an important part of this case.

During the early development of the SLIPs transactions, Dow knew how important it would be to classify the foreign banks' interest as equity. Andrews & Kurth[48] wrote an opinion letter for Dow, explaining that "[t]he anticipated tax consequences of the [SLIPs] [t]ransaction would be substantially altered if the [Internal Revenue] Service was successful in recharacterizing the [Class "A"]

---

[46] Report of Dr. Glen Hubbard, at 17.
[47] United States' Post Trial Brief, at 19. (emphasis added)
[48] Andrews & Kurth was involved in the SLIPs transaction at the very beginning, meeting with employees from Goldman Sachs to ensure the product would be declared legitimate under then-existing law.

Preferred Interest as debt for tax purposes."[49] The promoters of the SLIPs transaction agreed, and noted that all Partners would be required to enter into a covenant against taking any action that could be seen as inconsistent with the idea that the foreign banks were equity partners.

Despite this covenant, Bank Brussels Lambert ("BBL") placed a condition on its $25 million transfer to Chemtech that its bank commission, the Commission Bancaire, agree that the investment "be considered as loans and not equity."[50] BBL also internally viewed the transaction as a loan.[51] The transaction was also analyzed under German banking law before investors committed. That analysis, performed by Price Waterhouse, revealed that, under German substance over form principles, the bank's interest would be a loan. Stated plainly, "... FORCO [The Foreign Investor] does not have partner status for tax purposes."[52] Rabobank (parent company of RBDC) stated that their participation in the Chemtech II transaction was a "5-year loan to an SPV [Special Purpose Vehicle] that holds fixed assets (the Louisiana chemical plant) and Dow demand notes."[53]

During trial, Merle Erickson,[54] Dow's expert witness in accounting, testified that the Class A interests in this case were most comparable to preferred stock instruments commonly characterized as equity.[55] Professor Erickson was concerned

---

[49] Joint Exhibit 14, at Bates 70443.
[50] Joint Exhibit 77.
[51] Deposition of Patrick Mcguire, at 14–15.
[52] United States Exhibit D2.
[53] Joint Exhibit 856, at Bates 8703.
[54] Erickson is a professor at the University of Chicago.
[55] Trial Transcript vol. 3, at 166–92.

with whether, under generally accepted accounting principles ("GAAP"), the investments in this case would be considered debt or equity. Dow's auditor, Deloitte & Touche, also classified the Class A interests as equity based on their similarity to preferred stock. Joel Finard, an expert witness for the United States in capital markets and structured transactions, confirmed during the trial that Deloitte bases its characterization of instruments on their underlying substance, not just the label given to them by the parties involved.

The parties' characterization of the interests alone, while persuasive and significant, does not lead this Court to find the Class A interests were debt rather than equity, or vice versa. A look at several important factors that distinguish the two types of interests is required, and both parties provided expert testimony on the various factors.

### b. Debt/Equity Factors

As stated earlier, the Court finds persuasive and credible the testimony of Dr. Glen Hubbard, an expert on economics for the United States. Dr. Hubbard advocated a "polar" approach when determining whether the Class A interests were equity or debt. Following this approach, this Court notes that the interests at issue were neither pure debt nor equity, but somewhere in the middle; a "hybrid," so to speak. The parties have identified a number of factors helpful in determining whether the Class A interests were equity or debt.

### i. Risk and Return of Debt and Equity Claims

31

Risk and return is the primary factor when distinguishing between debt and equity interests.[56] The Chemtech transaction provided the foreign banks with numerous and thorough mechanisms that reduced their risks. These protections were given either by Dow, a Dow subsidiary, or Chemtech itself. They included:

| Guaranty or Protection for Bank | Summary of Provision |
|---|---|
| Patent License Agreement | Required minimum payments from Dow to Chemtech for use of patents, guaranteeing Chemtech's profits. |
| Spending Restrictions | Chemtech could spend no more than $1 million per year on expenses without the approval of the foreign banks. |
| Priority Return Guaranty | Chemtech was required to distribute to the foreign banks a fixed priority return of 6.947% per year on their $200 million contribution. |
| Profits Requirement | Ensured that if "profits" did not meet 97.98% of priority return, the foreign banks had the option of liquidating their interests in Chemtech. |
| Patent and Chemical Plant Indemnification | Dow indemnified the banks from any liability for the patents (Chemtech I) or the chemical plant (Chemtech II). This meant royalties would still be paid if patents became invalid or plant became defunct. |
| Tax Indemnification | Dow agreed to indemnify the foreign banks from any adverse changes due to tax withholding changes, eliminating the risk that United States federal law would require income taxes be paid on the foreign banks' income. |
| Early Liquidation Provisions | Various provisions compensated the foreign banks for different costs or shortfalls on returns if the Chemtech I |

---

[56] Courts have noted that "Congress appears to have intended that the 'significant factor' in differentiating between the two [debt and equity] be whether 'the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of business." *Castle Harbour II*, 459 F.3d at 232 (2d. Cir. 2009) (quoting *Gilbert v. Comm'r*, 248 F.2d 399 (2d Cir. 1957).

| | |
|---|---|
| | transaction was terminated earlier than planned, or if the foreign banks engaged in third party swaps. |
| Liquidation provisions | Allowed the foreign banks to liquidate their holdings in Chemtech I (and Chemtech II for RBDC) if any of the number of other requirements were not met (i.e., royalty payments, profit goals, distributions of priority returns).<br><br>Provided the foreign banks with preference in payment ahead of Dow entities if liquidation occurred.<br><br>Provided protection for claims against the foreign banks that may have arisen in winding up of Chemtech I |
| Credit Default Swaps | In Chemtech II, RBDC purchased its interest in the form of $200 million of CDS, which provided 100% insurance on its investment in case Dow defaulted or went bankrupt. |

A closer inspection of several of these safeguards shows just how insulated the banks were from the risks of the open market. The Chemtech partnership was guaranteed to receive the royalty payments from Dow each year, and the banks were guaranteed their priority return on those payments. Between 1993 and 1998, Dow paid $646 million in royalties to Chemtech I. Minimum royalty payments made up over 99% of that total number. The minimum royalties were therefore sufficient for Chemtech to pay the foreign banks their priority return, totaling roughly $65 million during that time.

### ii.  The Priority Return Guaranty

If Chemtech did not have sufficient profits or assets available, the foreign banks would not receive their full priority return. This is an equity-like factor, but was extremely unlikely to happen, and therefore difficult to classify it as an actual risk to the foreign banks. Profits were virtually guaranteed in the transaction as a result of (1) the revenue guarantees by Dow, and (2) the spending limits for Chemtech. During its entire operation, Chemtech never came close to failing to achieve its required profit level. The risk to the foreign banks of not receiving a priority return was equal to or less than that borne by a Dow debt holder. When it marketed SLIPs, Goldman averred that the product offered "a higher yield and greater security than the equivalent bond of the U.S. corporation... ."

The foreign banks also had the opportunity to share in residual profits, which would be generated if Chemtech's net income per year exceeded approximately $14.03 million. This is also a characteristic of equity—participation in profits but it is clear in this case that such participation was secondary to the fixed payments the foreign banks received. If a patent began to generate greater than expected profits, Dow was able to retire the patent assets in order to prevent excess profits from "leaking" through to the foreign banks. Evidence produced by Dow shows that such a circumstance occurred with patent portfolio 14.3, which was removed from Chemtech "because it produces high profits (less leakage)."[57]

### iii.  Patent and Chemical Plant Indemnification

---

[57] United States Exhibit D33.

Dow indemnified the foreign banks from any liability from the patents or chemical plant through a triple net "hell or high water" lease. Under these leases, Dow was responsible for any costs associated with the patents or chemical plant. Andrew Sherman, who held many offices within Rabobank and was eventually named General Counsel, said of the lease involved in Chemtech II (which was similar to that involved in Chemtech I), "[It] basically means they pay a lease payment come hell or high water. It doesn't matter what happens. The plant can burn to the ground and they're generally responsible for replacing the plant, but they have to continue to make that lease payment for the term of the lease."[58] Therefore, Dow (through DTPC and DCDC) essentially indemnified Chemtech against any losses resulting from a patent becoming invalid, or the chemical plant going defunct or becoming unproductive.

### iv. Tax Indemnification

During the early Chemtech negotiations, a Goldman employee stated that the foreign banks were "adamant that because they [did] not share in the tax benefits of the structure they [would] not accept any structural tax risk."[59] Dow therefore agreed to indemnify the foreign banks from any adverse changes due to tax withholding changes, eliminating another risk for the banks.

### v. Voting and Management Rights

---

[58] Deposition of Andrew Sherman, at 116–18.
[59] Joint Exhibit 22; Report of Dr. Glen Hubbard, at 35.

35

This is a particularly significant point of contention between the parties, as Dow contends the foreign banks' interest was equity because, among other reasons, they were granted limited voting rights in the partnership agreement. However, a closer look at the voting rights scheme reveals a different substantive scenario.

The foreign banks, as "limited partners", did not have any right to manage or control the Chemtech partnership or affect its business or affairs in any way. The foreign banks were also granted limited voting rights "on those matters specifically reserved for their vote...."[60] In reality, however, the banks were not involved in the management of Chemtech. Dow's outside counsel referred to the banks as "passive" investors, and recalled a Chemtech meeting where no bank representatives attended at all. The Court agrees with Dr. Glen Hubbard's assessment that, because the banks clearly had rights in theory but not as clearly in practice, this factor is inconclusive.

## E. Dow's Purpose for Forming the Chemtech Partnership

Dow asserts its primary reason for entering into SLIPs was maintenance of a high quality credit rating, enabling it to raise capital at a reasonable or low cost. The chemical industry is characterized by multi-year business cycles with peaks and valleys during which demand fluctuates substantially. According to Dow, managing these industry dynamics required that Dow maintain access to capital and financial flexibility. Dow's ability to raise capital depended, in significant part, on its credit rating.

---

[60] Joint Exhibit 2L, at Bates 36541.

This rating depended heavily on Dow's debt-to-total capital ratio. To maintain a ratio that would result in a high credit rating, Dow claims it relied upon substantial amounts of "off-balance sheet financing" ("OBSF") to obtain funds that were not classified as debt on its balance sheet. Dow asserts the 1993 and 1998 Chemtech transactions provided it with $200 million of financing from limited partner investors. This financing was treated as "minority equity" rather than debt on Dow's balance sheet at times when business conditions placed Dow's debt ratio under pressure. Chemtech also enabled Dow to monetize economic assets—patents in 1993, a chemical plant in 1998—that were carried at near zero on Dow's balance sheet by contributing the assets to the Chemtech partnership and attracting third-party limited investors.

In summary, Dow asserts it participated in the Chemtech transactions because a) it needed the ability to raise low cost capital during tough economic conditions; b) a high rating from the credit rating agencies was essential to access such capital; c) a primary factor used by the agencies was the debt-to-total capital ratio; and d) OBSF was an effective tool for raising money without increasing debt. This Court's findings differ dramatically from Dow's assertions.

Corporate finance relates generally to the ways corporations raise capital from investors in order to pursue business opportunities. A corporation must decide, time and again, which investments it must make, and how to pay for, or finance, those investments. Typically, a corporation will first identify a specific profitable project, and then seek financing at the lowest possible cost. No evidence was

37

presented in this case showing that Dow identified any specific project prior to the Chemtech transaction that reflected a purpose other than the generation of large tax benefits.

Instead, Dow declared that it wished to generally maintain a sense of "financial stability in difficult times," and its employees were not able to think of a specific use of any funds coming from Chemtech Portfolio to Dow.[61] In addition, high-ranking Dow officials weren't able to recall the role of Dow Chemical International, Ltd. ("DCIL"), even though it purportedly "borrowed" roughly $1 billion from CPI, or about 10% of Dow's total debt in 1993.

Dow claims the weak economic conditions at the time of the formation of Chemtech I forced it to look to OBSF to maintain its credit rating. However, rating agencies recognize the turning of the business cycle, as shown in an especially telling statement from Standard & Poor's Corporate Finance Criteria: "[T]he level of risk over time is important, rather than at any specific point in time. Certainly, S&P looks at performance over the anticipated course of a full business cycle and not what is viewed as a peak or trough year. ... Since ratings are designed to be valid over the entire business cycle, [debt-to-total capital] ratios of a particular firm at any point in the cycle may not appear to be in line with its assigned debt rating."[62]

---

[61] As for the first loan from Chemtech to Dow, totaling $99 million, an assistant controller at Dow testified that she thought it was invested in the various financial needs of the company.

[62] Rebuttal Report of Dr. Glen Hubbard, at 20 (quoting Standard & Poor's Debt Rating, S&P's corporate Finance Criteria, 1992, at 63, 67).

No documentation exists showing Dow had any critical need for cash at the time of the Chemtech transaction, and an analysis of Dow's financial statements and other evidence, as shown in Dr. Hubbard's Rebuttal Report and in multiple exhibits, does not support the conclusion that Dow had a need for financial flexibility or capital expenditures.

No evidence shows that Dow evaluated less costly alternative to the Chemtech transaction when, in fact, other forms of financing existed that would have allowed Dow to achieve OBSF. Trust Preferred Stock is one such alternative to SLIPs, and the transaction costs for this alternative at the time of Chemtech I was roughly 3.5%, compared to 6.3% in Chemtech (excluding any termination fees).

According to Dow and its experts, there are significant economic benefits of OBSF. For example, unwary investors may ignore OBSF and set lower interest rates for loans than those warranted by the underlying risk levels.[63] Dow relies on maintenance of its debt-to-total capital ratio as the primary factor for entering into OBSF. Labeling the funds from the foreign banks as equity rather than debt helped achieve this goal. Essentially, supporters of OBSF contend that investors and credit rating agencies care as much about the labels placed on transactions as they do about the substance of the transactions themselves. However, as Dr. Hubbard explained, empirical evidence shows that investors favor substance over form. Ratios were only a part of the equation and, according to S&P's Corporate Finance

---

[63] Report of Merle Erickson, at 70–83.

Criteria at the time of Chemtech I, "[I]t is a mistake to oversimplify the entire thought process behind a specific rating by relying solely on these numbers."[64]

In addition, the asset management side of the Chemtech transactions did not result in any profits for Dow. Dow continued to use the patents in the same manner as it had prior to Chemtech I. It did not license any single patent contributed to Chemtech to a third party. Moreover, placement of the patents into the partnership did not increase their value to Dow. Dow employees claim to have generated a growth in Dow's licensing income from $25 to $100 million in the 1990s, but Chemtech had nothing to do with that growth.

Dow's professed business purpose is a false wall in the maze of the Chemtech transactions. Upon closer inspection, the path does not end at OBSF or credit ratings, but continues to the heart of the case: tax benefits. The evidence in this case leads this Court to find that Dow had no business purpose for entering into the Chemtech transactions other than to obtain tax benefits. Tax law was the basis for the SLIPs transaction from the beginning. Moreover, Dow had no apparent need for the $200 million investment as it was Goldman Sachs who marketed the SLIPs product to Dow in 1992. As much as a year into organizing the transaction with Goldman, Dow had no particular amount in mind for the value of the patents it planned to "monetize," but was throwing around figures between $200 million and $1 billion. The fact that Goldman and Dow had little discussion of taxes appears to be a product of design rather than function, as at least one high-ranking Dow officer

---

[64] Hubbard Rebuttal Report, at 35 (quoting S&P 1992 Corporate Finance Criteria).

reminded himself prior to a meeting that, "We can't talk about the tax impact on [The Dow Chemical Company]." Finally, in at least one of its calculations of the net present value of the Chemtech transactions, Dow considered risk factors after the transaction had taken place. The only risk to the project after the transaction occurred was that the tax benefits would be disallowed.

## F. The Litigation

On April 15, 2005, IRS agents delivered to Dow a document that Defendant, the United States, contends was a draft Notice of Final Partnership Administrative Adjustment ("FPAA"). This document outlined adjustments that may be made to partnership items of Chemtech for the 1993 and 1994 taxable years. Defendant contends the document was not issued to the tax matters partner ("TMP") of the partnership as required by statute, nor was it issued by an IRS official with authority to issue an FPAA. Plaintiff contends the document was a valid FPAA for the 1993 and 1994 taxable years.

On July 13, 2005, DESA, as TMP of Chemtech, timely petitioned this Court for readjustment of its partnership items for the 1993 and 1994 taxable years. The case was docketed as No. 05-944-C-M3. The parties agree that: (i) if the document referred to in the previous paragraph is a valid FPAA, then this Court would have jurisdiction in case No. 05-944 to resolve the dispute over the 1993 and 1994 tax years; (ii) if the document is not a valid FPAA, then this Court would have jurisdiction to resolve the dispute over the 1993 and 1994 tax years in Case No. 06-

41

248-RET-CN, part of this consolidated action. Since the parties agree that this Court has jurisdiction to resolve the 1993 and 1994 taxable years under one of these case numbers, there is no need to resolve the factual question of whether the April 15, 2005 document is a valid FPAA.

On January 13, 2006, the IRS issued an FPAA to DESA in its capacity as TMP of Chemtech, adjusting certain partnership items for the 1993–97 tax periods. On April 4, 2006, DESA, as TMP of Chemtech, timely petitioned this Court for readjustment of its partnership items for the 1993–97 tax years. This case was docketed as 06-258-RET-CN. On April 7, 2006, the cases were consolidated to enable the Court to address the tax dispute relating to all years in one proceeding.

The United States filed an answer on June 5, 2006. On December 4, 2006, DESA filed an amended complaint, and that same day the United States filed an amended answer and counterclaim. In its counterclaim, the United States seeks a 20% penalty for the 1997 tax year based on negligence and/or substantial understatement of income tax.

On March 30, 2007, the IRS issued a FPAA to Ifco in its capacity as TMP of Chemtech II, adjusting certain partnership items of Chemtech II for the 1998–2003 taxable years. On June 8, 2007, Ifco timely petitioned this Court for readjustment of its partnership items for those years. The case was docketed as 07-405-RET-DLD. On June 25, 2007, the parties moved to consolidate the cases relating to the 1993–

2003 taxable years of the Chemtech Partnership. On July 27, 2007, this Court ordered the cases consolidated.

## CONCLUSIONS OF LAW

Under 26 U.S.C. § 6226(e)(1), a partner filing a petition for readjustment of partnership items is required to deposit with the Secretary of the Treasury the amount by which the tax liability of the partner would be increased if the treatment of partnership items on the partner's return were made consistent with the treatment of the items on the partnership return, as adjusted by the FPAA. In this case, DESA is not required to make a deposit because it would not have an increased tax liability if the FPAA were correct. Furthermore, DESA's status as a controlled foreign corporation does not make it a "pass-thru partner" within the meaning of 26 U.S.C. § 6231(a)(9). As a result, neither Dow nor DESA is required to deposit the amount by which the tax liability of Dow could potentially be increased. Therefore, this Court properly has jurisdiction over this matter pursuant to the Tax Equity and Fiscal Responsibility Act ("TEFRA"), 26 U.S.C. § 6226, and 28 U.S.C. § 1348(e).

In this case, as any tax case, the Court must "distinguish the mere avoidance of taxes from legally circumscribed tax evasion."[65] Every individual has the right to avoid a tax by remaining outside the reach of the law that imposes it. "Over and over again courts have said that there is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. Everybody does so, rich or poor; and all

---

[65] *Trans-Serve, Inc. v. United States*, 2006 WL 2588008, *6 (W.D. La. 2006).

do right, for nobody owes any public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions. To demand more in the name of morals is mere cant."[66] The Supreme Court shares this view, and has held that taxpayers undoubtedly have the right to decrease the amount of the taxes they owe within the limits of the law.[67] The question that must be answered is "whether what was done, apart from the tax motive, was the thing which the statute intended."[68] When entering into a transaction, a subjective motive of tax avoidance is permissible if "Congress intends to encourage an activity, and to use taxpayers' desire to avoid taxes as a means to do it."[69] But when no legitimate business activity accompanies the goal of tax avoidance, a transaction or other business engagement may be disregarded for tax purposes.

Whether the Chemtech transactions carried on a legitimate business activity is a central issue in this case. Dow claims the IRS, in readjusting certain partnership items, has incorrectly characterized the Chemtech transactions as "shams." According to Dow, the transactions have legitimate business purpose, chief among them the maintenance of Dow's credit rating and access to low-cost capital for the development of future products. The United States asserts there was no purpose other than tax avoidance, and contends the nature of the transactions require this Court to reject Dow's claimed tax benefits under two judicial doctrines, economic substance and sham partnership, as well as debt and equity principles. In

---

[66] *Commissioner v. Newman*, 159 F.2d 848, 850–51 (2d Cir. 1947) (L. Hand, J. dissenting), *cert. denied*, 331 U.S. 859 (1947).
[67] *Gregory v. Helvering*, 293 U.S. 465 (1935).
[68] *Id.* at 468.
[69] *In re CM Holdings, Inc.*, 301 F.3d 96, 106 (3d Cir. 2002).

44

addition, the United States asks the Court to affirm its imposition of penalties against Dow for substantial understatement of taxes, negligence, and a valuation misstatement.

## A. The Economic Substance Doctrine

The United States first asks this Court to reject Dow's claimed tax benefits based on the economic substance doctrine. This doctrine is one of several judicial doctrines to emerge since the Supreme Court's decision in *Gregory v. Helvering*.[70] The Fifth Circuit applies these doctrines broadly, noting that "[t]he principle of looking through form to substance . . . is the cornerstone of sound taxation . . . ."[71] And that "'Tax law deals in economic realities, not legal abstractions.'"[72] Congress recognizes that its ability to draft tax statutes does not compare to the skill of sophisticated tax lawyers and financial advisors. It has stated that "[a] strictly rule-based tax system cannot efficiently prescribe the appropriate outcome of every conceivable transaction that might be devised and is, as a result, incapable of preventing all unintended consequences."[73] "Even the smartest drafters of legislation and regulation cannot be expected to anticipate every device."[74] Judicial doctrines such as the economic substance doctrine "reduce[] the incentive to engage in such essentially wasteful activity."[75]

---

[70] 293 U.S. 465 (1935).
[71] *Estate of Weinert v. Comm'r*, 294 F.2d 750, 755 (5th Cir. 1961).
[72] *Id.* (quoting *Comm'r v. Southwest Exploration Co.*, 350 U.S. 308, 315 (1956)).
[73] H.R. Rep. No. 111-443, at 295.
[74] *ASA Investerings Partnership v. Comm'r*, 201 F.3d 505, 513 (D.C. Cir. 2000).
[75] *Id.*

The economic substance doctrine allows courts to enforce the legislative purpose of the Internal Revenue Code by prohibiting "the taxpayer to reap tax benefits from a transaction that lacks economic reality."[76] Therefore, transactions with no economic effect other than creating income tax deductions will not be recognized for tax purposes.[77] In other words, after *Gregory*, courts will look through the form of transactions manufactured for tax purposes and examine their true substance. Even if a transaction complies formally with provisions of the Internal Revenue Code, "a deduction will be disallowed if the transaction is an economic sham."[78]

The Supreme Court has held that "[w]here . . . there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties."[79] The conjunctive phrasing of the above factors is important: the absence of any one of them renders the transaction void for tax purposes.[80]

---

[76] *Southgate Master Fund, LLC, ex rel. Montgomery Capital Advisors, LLC v. United* States, 659 F.3d 466, 479 (5th Cir. 2011) (quoting *Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006)).

[77] *Boynton v. Comm'r*, 649 F.2d 1168 (5th Cir. 1981).

[78] *Am. Elec. Power Co. v. United States*, 326 F.3d 737, 741 (6th Cir. 2003).

[79] *Frank Lyon Co. v. United States*, 435 U.S. 561, 583–84 (1978).

[80] *Klamath Strategic Investment Fund ex rel St. Croix Ventures v. United States*, 568 F.3d 537, 544 (5th Cir. 2009).

46

In *Klamath*, the Fifth Circuit derived from *Frank Lyon* a three-part test for determining whether a transaction has sufficient economic substance to be respected for tax purposes; it asks whether the transaction "(1) has economic substance compelled by business or regulatory realities, (2) is imbued with tax-independent considerations, and (3) is not shaped totally by tax avoidance features.[81] Thus, in the Fifth Circuit, a taxpayer must establish that: a) the transaction had a reasonable possibility of profit (the "objective" economic substance test), *and* b) that the taxpayer was motivated to enter into the transaction for a legitimate non-tax business purpose (the "subjective" test").[82]

### a. The Objective Prong: Economic Substance

When courts apply the economic substance doctrine, the proper focus is on the particular transaction that gives rise to the tax benefit, not collateral transactions that do not produce tax benefits.[83] Therefore, "transactions which do not vary, control, or change the flow of economic benefits are to be dismissed from consideration."[84] "Yet, in applying these principles, a court must view the transactions 'as a whole, and each step, from the commencement . . . to the consummation . . . is relevant.'"[85] A lack of economic substance is sufficient to

---

[81] *Id.*

[82] *Southgate Master Fund, LLC ex rel Montgomery Capital Advisers, LLC v. United States*, 651 F. Supp. 2d 596, 654 (N.D. Texas 2009), *aff'd*, 659 F.3d 466 (5th Cir. 2011).

[83] *Klamath*, 568 F.3d at 545.

[84] *Id.* at 543 (citing *Higgins v. Smith*, 308 U.S. 473, 476 (1940)).

[85] *Southgate*, 651 F. Supp. 2d at 654 (quoting *Weller v. Comm'r*, 270 F.2d 294, 297 (3d cir. 1959)).

invalidate the transaction regardless of whether the taxpayer has motives other than tax avoidance.[86]

The tax benefits in the instant case were created by exploiting the partnership provisions of § 704 of the Internal Revenue Code. The Court therefore will focus on those transactions that pertain to the creation and use of the Chemtech "partnership." The transfer of assets to the partnership (the patents in Chemtech I and the chemical plant in Chemtech II) did not result in any economic advantage to Dow.

The SLIPs transaction did not change Dow's financial position. There was no increase in the value of the patents contributed, and not one patent was licensed to a third party. This means no income was generated by forming the Chemtech partnership. Furthermore, the circular flow of money, as described in great detail above, convinces the Court that none of the cash flows had any economic substance whatsoever.

Although the Court will address the alleged purpose of off-balance-sheet financing in the second prong of its economic substance analysis, it is necessary to determine whether any economic advantages were gained, or value obtained, from the financing. Both Dr. Hubbard and Dow's economic expert, Andrew Carron, agree that "[t]he net present value of financing transactions is at most zero."[87] The only

---

[86] *Coltec Industries v. United States,* 454 F.3d at 1355 (Fed. Cir. 2006). *See also United Parcel Serv. Of Am., Inc. v. Comm'r,* 254 F.3d 1014, 1018 (11th Cir. 2001); *ACM Partnership v. Comm'r,* 157 F.3d 231, 247 (3d Cir. 1998); *James v. Comm'r,* 899 F.2d 905, 908–09 (10th Cir. 1990)).
[87] Trial Transcript vol. 5, at 17, 151.

48

net present value computations Dow made in this case related to the tax savings, not to any quantifiable advantage it might obtain by its off-balance-sheet financing. As for the off-balance-sheet aspect of the financing, the Court agrees with Dr. Hubbard that Dow did not prove it had any appreciable affect or value to Dow.[88]

In addition, the note exchange that occurred in 1998 during the transition from Chemtech I to Chemtech II lacked economic substance. The particular transaction to be analyzed is Dow's exchange of three term notes for a single, deeply subordinated note with a term of 33 years. At the time of the exchange, no foreign banks were involved in Chemtech. A corporation's dealings "with subsidiaries that do not affect the interest of independent third parties deserve particularly close scrutiny."[89]

During this period, Dow recognized it could not structure the transition between Chemtech I and Chemtech II merely by directing Chemtech to distribute the patents back to Dow, via a liquidation of DTPC's interest in Chemtech. To do so would trigger a tax pursuant to section 731 of the Internal Revenue Code because the Dow notes would be considered "marketable" securities. In order to avoid this tax, Dow converted the demand notes into a single note for $781.6 million with a 33-year term payable in October 2032. Because Dow was both borrower and lender to the note, the transaction is without economic substance and must be disregarded for tax purposes.

---

[88] *See id.* at 15; Defendant's Exhibit 5, at 34–43.
[89] *Coltec*, 454 F.3d at 1356–57.

The objective economic substance inquiry boils down to "whether the transaction affected the taxpayer's financial position in any way."[90] The Court concludes that the Chemtech transactions had no such effect and therefore do not satisfy the objective prong of the economic substance doctrine.

### a. The Subjective Prong: Business Purpose

The last two *Klamath* factors inquire whether the transaction was "motivated solely by tax avoidance considerations or was imbued with some genuine business purpose."[91] *Frank Lyon* requires a transaction not be "shaped solely by tax-avoidance features that have meaningless labels attached."[92] As a result, a transaction can be disregarded as an economic sham "if the taxpayer's sole subjective motivation is tax avoidance even if the transaction has economic substance."[93]

Certainly taxpayers are not prohibited from considering tax consequences in their business dealings.[94] However, a taxpayer may not structure a transaction "to such extreme lengths that the business purpose is no more than a façade."[95] "*Gregory v. Helvering* requires that a taxpayer carry an unusually heavy burden when [it] attempts to demonstrate that Congress intended to give favorable tax treatment to the kind of transaction that would never occur absent the motive of tax

---

[90] *In re CM Holdings, Inc.*, 301 F.3d 96, 103 (3d Cir. 2002).
[91] *Southgate*, 659 F.3d at 481.
[92] 435 U.S. at 584.
[93] *Coltec*, 454 F.3d at 1355.
[94] *See Frank Lyon*, 435 U.S. at 580 ("The fact that favorable tax consequences were taken into account . . . on entering into the transaction is no reason for disallowing those consequences. We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction.")
[95] *ASA Investerings*, 201 F.3d at 513.

avoidance."[96] In determining a taxpayer's subjective purpose, a court may consider, among other things, evidence of the experience and sophistication of the taxpayer.[97]

If the purported purpose of a transaction is to make a profit, courts require that there be a reasonable possibility of a profit that is substantial in relation to the tax benefits generated.[98] In this case, Dow does not contend that it entered into the transaction to make a profit, but rather to obtain benefits that would sustain its credit rating. Specifically, Dow claims a business purpose of obtaining "off balance sheet" financing ("OBSF") through the use of SLIPs in Chemtech I, and a King & Spalding designed partnership in Chemtech II. SLIPs was a marketed tax shelter presented to Dow by Goldman Sachs, a factor that the Court properly takes into account when analyzing Dow's claimed business purpose.[99]

Dow's business is capital intensive, and it requires access to financing in order to fund its business projects. Dow asserts it was interested in obtaining OBSF as a method of maintaining its debt-to-total capital ratio, which in turn would preserve its high credit rating. However, as described in the findings of fact, Dow's purpose in entering into the Chemtech transactions was to obtain tax benefits. "Everything other than tax motivation fades under the glare of analysis."[100]

---

[96] *Coltec*, 454 F.3d at 1355–56.
[97] *See id.* at 1364.
[98] *Nevada Partners Fund, LLC ex rel Sapphire II, Inc. v. United States*, 714 F. Supp. 2d 598, 632 (S.D. Miss. 2010).
[99] *See In re CM Holdings*, 301 F.3d at 107.
[100] *Haberman Farms Inc. v. United States*, 305 F.2d 787, 793 (8th Cir. 1962).

There were cheaper and less complex alternatives to SLIPs that could achieve the goal of obtaining OBSF. A prudent business owner would not have chosen SLIPs in such a situation unless his business was seeking only the tax benefits derived from a transaction.

Two Dow executives testified at trial that the purpose of SLIPs was for Dow to obtain the accounting advantages of OBSF. However, these two executives, Enrique Falla and Geoffrey Merszei, were not closely involved with Dow's decision to enter into SLIPs. Falla was Dow's Chief Financial Officer during Chemtech I. He never met with Goldman about SLIPs and never saw the partnership agreement.[101] Although Falla did bring the transaction to Dow's Board of Directors, he only spent a half hour studying the transaction.[102]

Merszei was treasurer of DESA during the time Dow was considering entering into SLIPs. Goldman developed SLIPs with the intention of using foreign banks as "partners" in order to take advantage of their tax exempt status. Merszei was pushed, but eventually acknowledged that if Dow had entered into SLIPs in order to obtain the advantages of OBSF, it could have accomplished the same goal with a domestic bank.[103] Yet, no domestic banks were approached. Moreover, Merszei was unaware of the role of CPI in the cash flow cycle of Chemtech I. If Merszei was closely involved in Chemtech I, he would have known CPI's role in recycling cash back to Dow.

---

[101] Trial Transcript vol. 1, at 224, 242.
[102] *Id.* at 251–54.
[103] Trial Transcript vol. 2, at 45–47.

The note exchange executed by Dow in the transition from Chemtech I to Chemtech II also did not have a business purpose. Unlike the SLIPs transaction, Dow does not assert a legitimate business purpose for this exchange. As described in detail above, the note exchange was a key step in enabling Dow to increase the tax basis of the chemical plant by roughly $380 million. The Court has not identified any other purpose for the exchange.

The Court concludes there was no legitimate business purpose other than tax avoidance behind the Chemtech transactions. Therefore, the transactions fail both the objective and subjective prongs of the economic substance analysis, and are an economic sham.

## B. The Sham Partnership Doctrine

### a. The Legal Standard

The Government also contends that Chemtech, in both its first and second manifestations, was a "sham" partnership and should be disregarded. While the economic substance doctrine focuses upon the substance and purpose of *transactions*, the sham partnership doctrine is used to disregard *partnerships* where tax motivated transactions occur. Under the sham partnership doctrine, also known as the *Culbertson* doctrine, a partnership should be respected only if "the partners really and truly intended to join together for the purpose of carrying on the business

and sharing in the profits and losses or both."[104] The test "turns on the fair, objective characterization" of the facts and circumstances of the enterprise.[105]

In determining whether a partnership exists for tax purposes, the question set forth in *Culbertson* is, "[W]hether, considering all of the facts . . . the parties in good faith and acting with a business purpose joined together in the present conduct of the enterprise."[106] This determination is made in light of all relevant facts and circumstances, including "the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent."[107]

That a transaction has tax benefits "does not automatically mean it is a sham so long as it is imbued with tax-independent considerations."[108] However, if a partnership's underlying business activities have economic substance, that fact "does not, standing alone, immunize the partnership from judicial scrutiny."[109] "The parties' selection of the partnership form must have been driven by a genuine business purpose."[110] In other words, "the issue ... is not whether [the business operations of Chemtech I and Chemtech II] had economic substance, but whether

---

[104] *Comm'r v. Culbertson*, 337 U.S. 733, 741 (1949).
[105] *TIFD III-E, Inc. v. United States (Castle Harbor II)*, 459 F.3d 220, 232 (2d Cir. 2006).
[106] *Culbertson*, 337 U.S. at 742.
[107] *Id.*
[108] *Merryman v. Comm'r*, 873 F.2d 879, 881 (5th Cir. 1989) (citing *Halladay v. Comm'r*, 649 F.2d 1176, 1179 (5th Cir. 1981)).
[109] *Southgate*, 659 F.3d at 484 (citing *Castle Harbour II*, 459 F.3d at 231).
[110] *Id.*

the formation of the partnership had such substance."[111] "If there was not a legitimate [business] reason to operate as a partnership, then the partnership will not be respected for tax purposes even if it engaged in transactions that had economic substance."[112]

Dow argues that Chemtech must be recognized as a separate entity for tax purposes under the either/or test announced in *Moline Properties v. Comm'r*.[113] Under that test, a partnership must be respected for tax purposes if it was formed for a business purpose *or* actually carried on a business activity.[114] However, as the court recognized in *Southgate*, the *Moline Properties* test conflicts with the Fifth Circuit's holding in *Merryman*.[115] Moreover, like the plaintiff in *Southgate*, Dow misreads *Moline Properties*. The *Moline Properties* test is not a two-pronged inquiry, but a unitary test under which "the existence of a formal business activity is a given but the inquiry turns on the existence of a nontax business motive."[116]

### b. Chemtech I and Chemtech II were sham partnerships

The facts and circumstances of this case make it plain that Dow's SLIPs transaction (Chemtech I) and the later King & Spalding shelter transaction (Chemtech II) created sham partnerships. Dow and the foreign banks did not "in

---

[111] *Merryman*, 873 F.2d at 881.
[112] *Southgate*, 659 F.3d at 484.
[113] 319 U.S. 436 (1943).
[114] *Id.*
[115] 659 F.3d at 484 n.64.
[116] *ASA Investerings*, 201 F.3d at 512 (citing *Knetsch v. United States*, 364 U.S. 361, 364–66 (1960)).

good faith and acting with a business purpose," join together in the present conduct of an enterprise.

Chemtech's partnership tax returns report that its business purpose was "patent management."[117] As a chemical industry expert for the United States explained, this was common in the chemical industry. Parties would enter into such an agreement in order to maximize the profitability of the patents. But, when Dow selected the patents for SLIPs, it made no attempt to identify patents that would be attractive to a third party seeking a license in exchange for royalty payments. Instead, as discussed above in the Court's findings of fact, Dow selected patents that would: a) allow it to continue using the patents as if no transfer had occurred, b) would aid it meeting its goal of contributing close to $1 billion worth of patents to Chemtech, and c) would otherwise conform to its tax strategy.

It is obvious to this Court that Dow never had an intention to derive any additional revenue by transferring the patents to Chemtech. It would be unreasonable to conclude that third parties would license patents from Chemtech which Dow was already using in its operations. Indeed, at trial, Dow abandoned the idea that the Chemtech partnership was designed to manage patents or maximize the revenues of the patents by licensing them to third parties.

A circular flow of funds, similar to what occurred in this case, is also indicative of a sham partnership. The Fifth Circuit in *Merryman* noted "Throughout [the partnership's] existence, money flowed back and forth but the economic

---

[117] Joint Exhibits 213, 265, 343, 446, 632.

positions of the parties were not altered. . . . Such a circular flow of funds among related entities does not indicate a substantive economic transaction for tax purposes."[118] This case, like *Merryman*, involves a circular flow of funds among related entities—Dow and its subsidiaries. As described in detail above, Dow would make a payment, royalty or rental, to Chemtech, and would then receive a loan in return from CPI for a substantial portion of the original payment. The cash flowed out, and flowed back in to Dow.

The allocation of risks and losses in Chemtech is another factor which leads this Court to conclude there was no true partnership. A partner whose risks are all insured at the expense of another partner "hardly fits within the traditional notion of a partnership."[119] A valid partnership is not formed where, among other things, one partner receives a guaranteed, specific return.[120]

While the foreign banks in Chemtech I, and RBDC in Chemtech II, faced some risks, they were not like the risks of a true partner or entrepreneur, who "puts money into a venture with the hope that it might grow in amount but with the knowledge that it may well shrink."[121] The banks were extremely concerned about any downside exposure, but, in the end, they viewed their investment as safer than an ordinary secured loan. Any hope that the venture with Dow might grow was illusory: the partnership agreement allocated 99% of any growth to Dow. In addition, when the foreign banks and Dow disputed the mark-to-market gain of the

---

[118] *Merryman*, 873 F.2d at 882.
[119] *ASA Investerings*, 201 F.3d at 515.
[120] *Saba Partnership v. Comm'r*, 273 F.3d 1135, 1141 (D.C. Cir. 2001).
[121] *Virginia Historic Tax Credit v. Comm'r*, 639 F.3d 129, 145–46 (4th Cir. 2011).

value of the patents in Chemtech I, Dow called the foreign banks "greedy" when they attempted to collect on the possibility of their 1% gain. Dow then directed the banks' attention to definitions in the partnership agreement that required the use of a methodology that, in the banks' opinion, did not lead to a true determination of the remaining patents' fair market value.

It is clear to this Court that, viewing the Chemtech transactions in their totality, the agreements between Dow and the foreign banks did not form true partnerships because they lacked a true "business purpose" as required by *Culbertson*.

## C. The foreign banks were not true partners

In Part B, the Court disregarded the entire Chemtech partnerships as shams. In this section, the Court also concludes that the foreign banks also were not partners for tax purposes. As discussed at length in the findings of fact, the foreign banks' interests were in the nature of debt, not equity.

In applying the *Culbertson* test, the Second Circuit noted, "consideration [of] whether an interest has the prevailing character of debt or equity can be helpful in analyzing whether, for tax purposes, the interest should be deemed a bona fide equity participation in a partnership."[122] "It is often said that the essential difference between a creditor and a stockholder is that the latter intends to make an

---

[122] *Castle Harbour II*, 459 F.3d at 232.

investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event."[123]

In *Castle Harbour II*, the Second Circuit had before it a different version of the SLIPs transaction created by Babcock & Brown, a global investment firm based in Australia that has since gone into liquidation. The foreign banks in *Castle Harbour II* had "no meaningful risk of being paid anything less than the reimbursement of their investment at the Applicable Rate of return."[124] So too here. Indeed, this is not the only similarity the banks in the instant case share with those in *Castle Harbour II*: "(1) They were promised the reimbursement, on a previously agreed schedule, of their initial investment at an agreed annual rate of return; (2) their repayment was secured by [a] guaranty; (3) they were fully protected against risk of loss, except as to a tiny amount in highly unlikely circumstances . . ."[125]

The banks were essentially guaranteed a return on their investment, and the actual operations of Chemtech support what was reasonably anticipated at the beginning of the deal: The banks received their guaranteed return, and the partnership never came close to being unable to make that return. For their contribution to Chemtech, the banks were guaranteed a return just under 7% each year. Goldman and Dow worked together to ensure the banks' risk of loss would be de minimis. Early in the development of Chemtech, Dow proposed changes to the SLIPs transaction to reduce its potential exposure. Goldman balked at this

---

[123] *Comm'r v. Meridian & Thirteen R. Co.*, 132 F.2d 182, 186 (7th Cir. 1942).
[124] 459 F.3d at 233.
[125] *Id.* at 229.

suggestion, noting that the banks must be convinced of "the immateriality of the [possibility] of the 1% loss []."[126]

Insofar as any "equity-like" distribution, or the possibility thereof, such a distribution was not meaningful when compared to the guaranteed return on the investment. And, as previously discussed, Dow took steps to deny the banks their equity-like return, although it was only 1% of any growth in value. Dow retained the remaining 99%.

The only risk to the banks that posed any real threat was the I.R.S., which could see through the Chemtech scheme and pursue the foreign banks for taxes. However, the foreign banks were protected against this risk because Dow provided the banks with an indemnity agreement should such a situation occur. In the findings of fact above, the Court has laid out many more factors that support the conclusion that the banks' interest in the Chemtech schemes was not an equity interest. The foreign banks, therefore, were not partners in Chemtech for tax purposes.

## D. The Court Declines to Reach Other Arguments

The United States submitted several other arguments in support of the FPAA. The Court declines to address those arguments as the theories discussed in this ruling are sufficient to disregard the Chemtech transactions and partnerships for tax purposes.

---

[126] Joint Exhibit 23, at Bates 70909.

## E. Penalties

Congress designed accuracy-related penalties in order to provide a "downside risk" to tax avoidance schemes.[127] Without accuracy-related penalties

> [T]axpayers are not exposed to any downside risk in taking highly questionable positions on their tax returns since even resolution of the issues against the taxpayer will require only payment of the tax that should have been paid in the first instance with interest to reflect the cost of the 'borrowing.' . . . Thus, in the event that the questionable position is not detected, the taxpayer will have achieved an absolute reduction in tax without cost or risk.[128]

The tax years in this case span a decade from 1993–2003. Although the IRS imposed penalties against Dow for the 1993–96 tax years, this Court does not have jurisdiction to decide them. The Court only has jurisdiction over penalties beginning in 1997 with Chemtech I, where the United States filed a counterclaim seeking an accuracy-related penalty. This jurisdiction extends to the tax years involving Chemtech II, 1998–2003.

Section 6662 of the Internal Revenue Code imposes a penalty equal to 20% of the portion of any underpayment of tax attributable to one or more of the following: (i) negligence; (ii) substantial understatement of income tax; and (iii) substantial valuation misstatement.[129] The valuation-misstatement penalty is increased to 40% in the case of a gross valuation misstatement.[130] The Internal Revenue Service determined that each of the above penalties applies to the Chemtech transactions.

---

[127] S. Rep. No. 97-494, at 272–73 (1982).
[128] *Id.*
[129] 26 U.S.C. § 6662(b)(1–3), (h).
[130] *Id.* § 6662(h)(1).

For Chemtech II, the IRS determined that all penalties applied. For Chemtech I, the IRS determined that only two of the penalties, the 20% negligence penalty and the 20% substantial understatement penalty, applied. Penalties under section 6662 are applied alternatively, not cumulatively. They are not stacked, so the maximum penalty is either 20% or 40% of the underpayment of tax, even if an underpayment is attributable to more than one type of misconduct.[131]

The issue of penalties is governed by TEFRA, 26 U.S.C. §§ 6221–33. Under TEFRA, "the tax treatment of any partnership item (and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item) shall be determined at the partnership level."[132] The scope of judicial review is set forth as follows:

> A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of [FPAA] relates; the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.[133]

The above provision "clearly grants the district court jurisdiction to determine the applicability of any penalty relating to an adjustment of a partnership item."[134]

### a. The Negligence Penalty is Appropriate

---

[131] Treas. Reg. § 1.6662(c).
[132] 26 U.S.C. § 6221.
[133] *Id.* § 6226(f).
[134] *Klamath*, 568 F.3d at 547.

An understatement of tax is due to "negligence" if the taxpayer fails to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, to exercise ordinary and reasonable care in the preparation of a tax return, to keep adequate books and records, or to substantiate items properly.[135] Negligence is strongly indicated if a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction or credit which would seem "too good to be true" to a reasonable and prudent person.[136]

However, positions in a tax return that have a reasonable basis are not attributable to negligence.[137] "Reasonable basis" is a significantly higher standard than "not frivolous" or "not patently improper;" it cannot be a merely arguable or merely colorable claim.[138] "Reasonable basis" requires reliance on legal authorities and not on opinions rendered by tax professionals.[139]

The applicability of the negligence penalty depends upon the conduct of the partnership, their managing members, and the other parties.[140] Therefore, in determining whether the negligence penalty is applicable, the Court must evaluate whether, with respect to the Chemtech transactions, Dow, which controlled Chemtech I and II, and the general partners and tax matters partners of both,

---

[135] 26 U.S.C. 6662(c).

[136] Treas. Reg. § 1.6662–3(b)(1)(ii). *See Neonatology Associates, P.A. v. Comm'r*, 299 F.3d 221, 234 (3d Cir. 2002) ("When . . . a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril.")

[137] Treas. Reg. § 1.6662–3(b)(1)(ii).

[138] *Id.* § 1.6662–3(b)(3).

[139] *Id.* § 1.6662–4(d)(2).

[140] *Jade Trading, LLC v. United States*, 80 Fed. Cl. 11, 55 (Fed. Cl. 2007), *aff'd in part, vacated in part, rev'd in part on other grounds, Jade Trading LLC ex rel Ervin v. United States*, 598 F.3d 1372 (Fed. Cir. 2010); *accord Klamath*, 568 F.3d 537, 548 (considering reasonable cause and good faith defense at partnership level by looking to actions of managing members).

exercised ordinary and reasonable care in the preparation of the partnership returns and that it made a reasonable attempt to comply with the provisions of the Code.

As discussed earlier, through the Chemtech I scheme, Dow claimed hundreds of millions of dollars of deductions for royalty payments made to use its own patents. Through Chemtech II, Dow claimed depreciation deductions using $360 million of artificial basis for a chemical plant that had already been depreciated (in addition to millions of dollars of deductions for payment made to "lease" its own chemical plant). These artificial tax benefits would seem "too good to be true" to a reasonable and prudent person, let alone to a highly sophisticated Fortune 100 company and its numerous lawyers and tax professionals.

Dow was aware that the tax benefits of Chemtech I and II could be disregarded under various judicial doctrines and principles of debt and equity. Andrews & Kurth, the law firm that helped develop SLIPs, wrote a lengthy memorandum describing these and other issues at the outset of the transactions.[141] The constant refrain of business objectives is contrived, and wholly consistent with what Andrews & Kurth told Goldman Employees who developed SLIPs—that a business purpose was needed in order for the transaction to work.

Additionally, an internal Dow memorandum and notes discussing the transition from Chemtech I to Chemtech II confirms Dow's tax motive behind

---

[141] Joint Exhibit 14.

64

Chemtech.[142] As explained earlier, in May 1998, Dow recognized that if CPI's assets were considered "marketable securities" for the purposes of section 731, the transition from Chemtech I to Chemtech II would trigger a tax under that statute. Even though Dow knew that CPI's assets were in fact "currently marketable," it decided to "[e]xchange these marketable securities for a deeply subordinated 33-year note." No business purpose whatsoever for exchanging the Dow demand notes for a 33-year term note was asserted. It was only to avoid the tax under § 731. Notably, a few months later Dow characterized the "marketable security" matter as "the most important aspect" of its Chemtech II tax shelter.[143]

The Dow memorandum also described the process in Chemtech II that led to Rabo being given an equity-like aspect to its agreement to participate in the transaction: "In order to get equity treatment, [Rabo] had to have both equity upside and downside risk. This was accomplished by having them participate in the FMV mark-to-market on the partnership assets upon a liquidation."[144] This all but confirms that the mark-to-market gain was nothing but window dressing, or "a disguise for concealing [the transaction's] real character."[145]

In a 1999 report, the Staff of the Joint Committee on Taxation noted several factors behind the tax shelter problem:

> . . . [T]he emerging view of the corporate tax department as a profit center and of the corporate income tax as a manageable cost has

---

[142] Joint Exhibit 710; United States Exhibit 15.
[143] Joint Exhibit 710, at Bates 83153.
[144] Joint Exhibit 710, at Bates 83153–54.
[145] *Gregory*, 293 U.S. at 469.

increased the pressure to use tax shelter products to decrease a corporation's effective tax rate. Additionally, the relative costs of entering into tax shelter transactions (including the risk that the transaction will be detected upon audit, challenged by the IRS, and ultimately result in a deficiency), as compared to the potential benefits from the tax savings, are insufficient to serve any meaningful deterrent function.[146]

The facts of the present case indicate that Dow viewed its tax department as a profit center. When Goldman projected the tax benefit of Chemtech, it provided both an overall net present value of the benefit and also a net present value per outstanding share of Dow stock.[147]

The Court concludes that the "negligence or disregard of rules or regulations" penalty of 26 U.S.C. § 6662(a) and (b)(1) therefore applies to Chemtech I for the 1997 tax year, and to Chemtech II for the 1998–2003 tax years.

### b. The Substantial Understatement Penalty is Appropriate

A 20% penalty for substantial understatement is imposed on a tax underpayment attributable to "[a]ny substantial understatement of income tax."[148] For the tax periods at issue in this case, an understatement is "substantial" if the

---

[146] Staff, Joint Committee on Taxation, *Study of Present-Law Penalty and Interest Provisions as Required by Section 3801 of the Internal Revenue Service Restructuring and Reform Act of 1998 (Including Provisions Relating to Corporate Tax Shelters)*, Vol. I at 221 (July 22, 1999). Also in this report, the Staff of the Joint committee identifies several common characteristics of corporate tax shelters. These characteristics include: (a) an insignificant pretax profit in comparison to tax benefits; (b) the involvement of a tax-indifferent participant to "absorb" the undesirable tax consequences without suffering any adverse economic consequences from the arrangement (i.e., tax income materially in excess of economic income); and (c) the use of guarantees, tax indemnities, or similar arrangements designed to recompense the corporate participant in the event that it is not entitled to all or any portion of the anticipated tax benefits. *Id.* at 220–21. Each of these characteristics is present in the Chemtech transactions.

[147] Joint Exhibit 19, at Bates 70472.

[148] 26 U.S.C. § 6662(b)(2).

amount of understatement exceeds the greater of $10,000 or 10% of the tax required to be shown on the return.[149]

The calculations necessary to determine the amount of an understatement are conducted at the partner level.[150] However, to the extent the tax treatment at issue was claimed by the partnership, certain factual determinations that may affect whether a reduction in any understatement is warranted for the reasons set forth in 26 U.S.C. § 6662(d)(2)(B) can be conducted at the partnership level. Under that section, a reduction in the amount of an understatement of tax may be allowed if (1) the tax treatment claimed is based upon "substantial authority" or (2) if the taxpayer demonstrates a "reasonable basis" for the tax treatment claimed and "the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return." However, that relief is unavailable where the understatement is "attributable to a tax shelter."[151]

i.     "Substantial Authority"

For substantial authority to exist, "the weight of the authorities supporting the treatment [must be] substantial in relation to the weight of authorities supporting contrary treatment."[152] The substantial authority standard is "an objective standard, involving an analysis of the law and application of the law to the

---

[149] *Id.* § 6662(d)(1).
[150] Treas. Reg. § 301.6221–1(d).
[151] 26 U.S.C. § 6662(d)(2)(C).
[152] Treas. Reg. § 1.6662–4(d)(3)(i).

relevant facts."[153] The substantial authority standard is less stringent than the more likely than not standard (the standard that is met when there is a greater than 50% likelihood of the position being upheld), but more stringent than the reasonable basis standard as defined in § 1.6662-3(b)(3).[154]

The types of authorities to be considered include the Internal Revenue Code, as well as other statutory provisions, Treasury regulations, revenue filings and the like; case law; congressional intent; and other IRS memoranda, notices, and publications.[155] Opinions rendered by tax professionals are not considered authority.[156]

The Court finds there was not substantial authority for the positions taken by Dow in the Chemtech transactions. The Court has already held the Chemtech transactions lack any underlying economic substance, and were entered into solely for the purpose of creating tax benefits. As such, the facts of this case fall in line with cases from other circuits and courts where a finding of no substantial authority accompanied a finding of lack of economic substance.[157]

## ii.    Limitation of Relief for Tax Shelter Transactions

Even if a taxpayer has substantial authority, if the taxpayer has engaged in a tax shelter, it may not claim substantial authority unless the taxpayer "reasonably

---

[153] *Id.* § 1.6662–4(d)(2).
[154] *Id.*
[155] *Id.* § 1.6662–4(d)(3)(iii).
[156] *Id.*
[157] *See Castle Harbour III*, 666 F.3d 836, 848–50 (2d Cir. 2012); *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 204–05 (D. Conn. 2004); *Santa Monica Pictures, LLC v. Comm'r*, T.C. Memo 2005-104, 2005 WL 1111792, at *100–01.

believed that the tax treatment was more likely than not the proper treatment."[158] Section 6662(d) of the Internal Revenue Code was amended in 2004 to make the reduction provisions of § 6662(d)(2)(B) wholly inapplicable in the case of any item attributable to a tax shelter.[159] Treasury Regulation § 1.6662–4(g)(ii)(B) provides a special rule for transactions occurring prior to December 9, 1994 that allows corporations that engage in tax shelter transactions to rely on the substantial authority exception. The Chemtech SLIPs transaction at issue here occurred in 1993, so Dow is entitled to rely on the substantial authority exception for Chemtech I. For the transition between Chemtech I and Chemtech II, and for Chemtech II, Dow is not entitled to rely at all on substantial authority if the arrangements are considered tax shelters.

During the Chemtech I years, a tax shelter was defined as a partnership, entity, plan, or arrangement "if the principal purpose of the entity, plan or arrangement, based on objective evidence, is to avoid or evade Federal income tax."[160] The principal purpose is tax avoidance or evasion "if that purpose exceeds any other purpose."[161] The Court has already determined the principal purpose of the Chemtech transactions was tax avoidance. Therefore, they are tax shelters within the meaning of the Treasury Regulations, and Dow is not entitled to rely on the substantial authority exception for the applicable periods.

### c.  The Gross Valuation Misstatement Penalty is not Appropriate

---

[158] Treas. Reg. § 1.6662–4(g)(i).
[159] Pub. L. No. 108-357, § 812(d).
[160] Treas. Reg. § 1.6662–4(g)(i)(A) (1997).
[161] *Id.*

Section 6662 of the Internal Revenue code imposes a penalty equal to 20% of the portion of any underpayment of tax attributable to a substantial valuation misstatement.[162] This penalty increases to 40% in the case of a gross valuation misstatement.[163] The Government seeks to apply the 40% penalty to the Chemtech II transaction.

A gross-valuation misstatement exists if the value or adjusted basis of property claimed on the return is 400% more than the amount determined to be the correct amount of such value or adjusted basis.[164] No valuation misstatement penalty may be imposed "unless the portion of the underpayment for the taxable year *attributable to* substantial valuation misstatements under chapter 1 exceeds $5,000."[165]

The Fifth Circuit, in *Todd v. Comm'r*[166] and *Heasley v. Comm'r*,[167] held that a valuation misstatement penalty is not applicable where an entire transaction is disregarded under the economic substance doctrine.[168] In other words, these penalties are not applicable if the IRS's disallowance of tax benefits is not "attributable to" a valuation misstatement.[169] In *Todd*, the Fifth Circuit held that because deductions and credits were disallowed for a reason totally unrelated to any

---

[162] 26 U.S.C. § 6662(b)(3).
[163] *Id.* § 6662(h)(1).
[164] *See* 26 U.S.C. § 6662(a), (b)(3), (e)(2), (h)(1–2).
[165] *Id.* § 6662(e)(2). (emphasis added)
[166] 862 F.2d 540 (5th cir. 1988).
[167] 902 F.2d 380 (5th Cir. 1990).
[168] *See Todd*, 862 F.2d at 541–42; *Heasley*, 902 F.2d at 382–83.
[169] *Southgate*, 651 F. Supp. 2d. at 664, *aff'd*, 659 F.3d 466 (5th Cir. 2011) (quoting *Klamath* 472 F. Supp. 2d at 899–900, *aff'd in part*, 568 F.3d at 553 (holding that a disallowance was not "attributable to" a valuation misstatement when the IRS disallowed a transaction as lacking economic substance)).

valuation overstatement, the resulting underpayment could not be "attributable to a valuation overstatement" and misstatement penalties therefore should not apply.[170] In *Heasley*, the taxpayers did not dispute the disallowance of their advanced rental deductions and investment tax credits claimed with respect to leased energy savings units, but did dispute their liability for the overvaluation penalty.[171] Relying on its holding in *Todd*, the Fifth Circuit in *Heasley* announced the following rule:

> Whenever the IRS totally disallows a deduction or credit, the IRS may not penalize the taxpayer for a valuation overstatement included in that deduction or credit. In such a case, the underpayment is not *attributable to* a valuation overstatement. Instead, it is attributable to claiming an improper deduction or credit.[172]

The Fifth Circuit has reaffirmed the *Todd/Heasley* reasoning several times.[173]

The Government contends that the *Heasley* rule does not apply in the instant case for two reasons. First, the Government argues that because the IRS's rejection of the Chemtech II scheme will not disallow *all* of Dow's basis in the chemical plant, but only the "artificial portion" of the basis, the *Heasley* rule does not apply. However, this distinction has no merit. While the FPAA would not disallow all of Dow's basis in the chemical plant, it would disallow the entirety of the basis created by the Chemtech II transaction via the 754 election discussed earlier. Therefore, the

---

[170] *Todd*, 862 F.2d at 542.
[171] 902 F.2d at 380.
[172] *Id.* at 383. (emphasis added)
[173] *See, e.g., Weiner v. United States*, 389 F.3d 152 (5th Cir. 2004); *Bemont Investments, LLC ex rel Tax Matters Partner v. United States*, 679 F.3d 339 (5th Cir. 2012).

*Heasley* rule does apply in this case, and the gross valuation misstatement penalty is not appropriate.

Second, the Government argues that the *Heasley* rule does not apply because of regulations promulgated subsequent to *Heasley* to which the Court is required to defer. Specifically, the Government asserts that Treasury Regulation § 1.6662–5(g) mandates a finding that, when basis is reduced to zero, the deemed valuation misstatement is automatically considered a gross valuation misstatement. The Court is not persuaded by this argument, just as the Fifth Circuit was not when it said, "[T]he regulation does not purport to negate the holdings in the [*Todd/Heasley* line of cases]—that the valuation misstatement penalty does not apply when the IRS completely disallows a deduction on other grounds. It only helps determine whether a valuation misstatement is a gross misstatement."[174] In other words, the regulation does not change the character of the grounds for disallowance, but only helps clarify the degree of a particular ground: a valuation misstatement.

In sum, the Court determines that a 20% penalty for negligence and substantial understatement is appropriate in the instant case. Neither the 20% nor the 40% penalty for valuation misstatement is appropriate. The penalties are not cumulative, so a total penalty of 20% is appropriate.

### d. Defense to Penalties

---

[174] *Bemont*, 679 F.3d at 348 n.5.

The Court will impose penalties unless the partnership raises a valid defense to its imposition. One such defense is that a taxpayer may avoid penalties for any portion of an understatement if it shows that "there was a reasonable cause for such portion and that [he] acted in good faith[.]"[175] Only the partnership itself may raise that defense in a partnership-level proceeding; the "reasonable cause of the individual partners must be asserted in partner-level proceedings.[176] Whether a reasonable cause is a partner- or partnership-level defense depends on what actions a taxpayer claims provides reasonable cause. The defense is a partnership defense when it is the actions of the partners in charge of managing the partnership.[177]  No reasonable cause defense has been raised in this proceeding.

---

[175] 26 U.S.C. § 6664(c).

[176] Treas. Reg. § 301.6221–1(c).

[177] *Klamath*, 568 F.3d at 548.

73

## CONCLUSION

For the foregoing reasons, the Court finds that the Chemtech transactions and partnerships should be disregarded for tax purposes. The Court also finds that the foreign banks were not partners in Chemtech for tax purposes. Finally, the Court finds that a 20% penalty applies in this case for the tax years over which this court has jurisdiction. The parties are directed to confer and submit, within 15 days, a proposed form of judgment (agreed if possible) consistent with this opinion.


Baton Rouge, Louisiana, February 26, 2013.

BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA