# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CHEMTECH ROYALTY** | : | **NO: 05-944-BAJ-DLD** |
| **ASSOCIATES, L.P.** | : | **NO: 06-258-BAJ-DLD** |
| | : | **NO: 07-405-BAJ-DLD** |
| **VERSUS** | : | |
| | : | **JUNE 21, 2011** |
| **UNITED STATES OF AMERICA** | : | |
| | : | **9:00 A.M.** |

---

### TRIAL TRANSCRIPT ---- VOLUME 2
### OF THE ABOVE PROCEEDINGS HELD
### BEFORE THE HONORABLE BRIAN A. JACKSON
### UNITED STATES DISTRICT JUDGE

==============================================================

## A P P E A R A N C E S :

**FOR THE PLAINTIFF, CHEMTECH ROYALTY ASSOCIATES, L.P.:**

     JOHN B. MAGEE, ESQ.
     CHRISTOPER P. MURPHY, ESQ.
     HARTMAN E. BLANCHARD, ESQ.
     ROYCE L. TIDWELL, ESQ.
     ROBERT A. LEONARD, ESQ.
     WASHINGTON, D.C. 20006-1806

**FOR THE DEFENDANT, UNITED STATES OF AMERICA :**
     THOMAS J. SAWYER, E SQ.
     ROBERT L. WELSH, ESQ.
     THOMAS F. KOELBL, ESQ.
     PHILIP M. SCHREIBER, ESQ.
     WASHINGTON, D.C. 20044

### REPORTED BY: CLARE SMITH-NEELY, CCR

---

### BATON ROUGE, LA 70801

I N D E X

VOLUME 1  —  CHEMTECH TRIAL 6-21-11

| ATTORNEY: | WITNESS: | | PAGE: |
|-----------|----------|--|-------|
| JOHN MAGEE | GOEFFREY MERSZEI | DIRECT | 04 |
| ROBERT WELSH | GOEFFREY MERSZEI | CROSS | 37 |
| JOHN MAGEE | GOEFFREY MERSZEI | REDIRECT | 128 |
| ROBERT WELSH | GOEFFREY MERSZEI | RECROSS | 141 |
| CHRIS MURPHY | WILLIAM NORRIS | DIRECT | 145 |
| THOMAS SAWYER | WILLIAM NORRIS | CROSS | 189 |
| CHRIS MURPHY | WILLIAM NORRIS | RE-DIRECT | 211 |
| HARTMAN BLANCHARD | ED VALENZUELA | DIRECT | 213 |
| ROBERT WELSH | ED VALENZUELA | CROSS | 255 |
| ROYCE TIDWELL | ANDREW SHERMAN | DIRECT | 270 |

1

2      BY THE CLERK:

3           THE HONORABLE UNITED STATES DISTRICT COURT,

4      THE MIDDLE DISTRICT OF LOUISIANA IS NOW IN

5      SESSION.  ORDER AND SILENCE ARE NOW COMMANDED.

6      GOD SAVE THE UNITED STATES AND THIS HONORABLE

7      COURT.  THE HONORABLE BRIAN A. JACKSON

8      PRESIDING.

9      BY THE COURT:

10          GOOD MORNING, EVERYONE.  PLEASE BE SEATED.

11     BY MR. MAGEE:

12          GOOD MORNING, YOUR HONOR.

13     BY MR. SAWYER:

14          GOOD MORNING.

15     BY THE COURT:

16          OKAY.  ARE WE ALL READY TO RESUME THIS

17     MORNING?

18     BY MR. MAGEE:

19          JOHN MAGEE FOR THE PLAINTIFF, YOUR HONOR.

20     READY TO RESUME WITH THE DIRECT EXAMINATION OF

21     GEOFFREY MERSZEI.

22     BY THE COURT:

23          GOOD MORNING, MR. MERSZEI.

24     BY THE WITNESS:

25          GOOD MORNING.

1          BY THE COURT:

2              LET'S PROCEED.

3                  DIRECT EXAMINATION

4    BY MR. MAGEE:

5    Q.  GOOD MORNING, MR. MERSZEI.

6    A.  GOOD MORNING.

7    Q.  YESTERDAY WE HEARD A GOOD DEAL ABOUT DOW EUROPE SA,--

8    A.  YES, SIR.

9    Q.  -- WHICH WAS THE GENERAL PARTNER OF THE CHEMTECH

10       TRANSACTION.  AND YOU WERE THE TREASURER OF DOW

11       EUROPE SA, DURING THE PERIOD WHEN CHEMTECH WAS FIRST

12       FORMED.

13           I'D LIKE TO ASK YOU TO JUST DESCRIBE DOW EUROPE

14       SA WITHOUT REGARD TO CHEMTECH.  WHAT WAS GOING ON IN

15       HORGEN, SWITZERLAND IN THAT COMPANY WITH RESPECT TO

16       DOW'S OPERATIONS?

17   A.  RIGHT.  WELL, HORGEN AND DOW EUROPE SA, THE -- THE

18       HEADQUARTERS FOR DOW EUROPE MIDDLE EAST AND AFRICA

19       HAS BEEN IN EXISTENCE FOR OVER 50 YEARS.  IN FACT, WE

20       CELEBRATED OUR 50-YEAR ANNIVERSARY IN OCTOBER, LAST

21       YEAR.  IT IS THE MANAGEMENT HEADQUARTERS FOR BUSINESS

22       IN EUROPE, AFRICA AND THE MIDDLE EAST.  TODAY WE HAVE

23       ABOUT 1,000 PEOPLE IN DOW EUROPE SA.  AT THAT TIME I

24       WOULD IMAGINE THAT THE NUMBER OF PEOPLE WAS PROBABLY

25       ABOUT HALF AND HALF, FIVE OR SIX HUNDRED PEOPLE.

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 5 of 318

1    THESE ARE MOSTLY MANAGEMENT-LEVEL PEOPLE, BUSINESS

2    LEADERS, FUNCTIONAL LEADERS.  SO, YOU KNOW, LIKE

3    MYSELF AS TREASURER, HEAD OF LEGAL, HEAD OF HR, HUMAN

4    RELATIONS AND ALL OF THE OTHER FUNCTIONS, PROVIDING

5    LEADERSHIP TO THE VARIOUS COUNTRIES WHERE WE ALSO HAD

6    DOW PEOPLE, BUT THEY WERE REPORTING INTO THE

7    MANAGEMENT STRUCTURE THAT WE HAD IN DOW EUROPE SA.

8  Q.    THANK YOU.

9        BY MR. MAGEE:

10        MAY I APPROACH THE WITNESS, YOUR HONOR?  I

11    HAVE AN EXHIBIT THAT'S NOT IN THE NOTEBOOK.

12        BY THE COURT:

13        YOU MAY.

14  BY MR. MAGEE:

15  Q.    MR. MERSZEI, I'VE HANDED YOU "JOINT EXHIBIT 402."

16    CAN YOU IDENTIFY THIS DOCUMENT?

17  A.    YES, I CAN.  EXCUSE ME.

18  Q.    PLEASE TELL US WHAT IT IS.

19  A.    THIS IS A -- A DOCUMENT WRITTEN BY MR. DEMARE AND,

20    WHICH IS A PRECURSOR TO A MEETING THAT WAS GOING TO

21    BE HELD IN CANADA ABOUT A MONTH FOLLOWING THIS --

22    THIS NOTE.  AND THE HANDWRITING ON THE BACK IS

23    OBVIOUSLY MINE.

24  Q.    ALL RIGHT.  LET ME -- LET ME JUST ASK A QUESTION.

25    YOUR -- YOUR ADDRESS -- AN ADDRESSEE ON THIS MEMO,

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 6 of 318

1    YES?

2  A.   YES.

3  Q.   ALL RIGHT.  AND THIS WAS A MEETING ABOUT THE CHEMTECH

4       ROYALTY ASSOCIATE, LP, THE LIMITED PARTNERSHIP THAT

5       WE'VE BEEN DISCUSSING HERE; IS THAT RIGHT?

6  A.   THAT'S CORRECT.

7  Q.   ALL RIGHT.  AND WHO WAS EXPECTED TO ATTEND THIS

8       MEETING?

9  A.   THE -- THE -- THE INVESTORS.  AND THEN, OF COURSE,

10      THE OUTSIDE PEOPLE, THE CLASS A INVESTORS, AS WELL AS

11      ALL THE PEOPLE ADDRESSED ON THE TOP.

12 Q.   ALL RIGHT.  SO LET'S TURN THE EXHIBIT TO THE BATES

13      ENDING 21702.  EXCUSE ME.  YOU'VE IDENTIFIED THIS

14      HANDWRITING AS YOURS.  I WANT TO ASK YOU A QUESTION

15      ABOUT THE FIRST HYPHENATED PHRASE OR SENTENCE.  CAN

16      YOU READ THAT TO US?

17 A.   YES.  FIRST TIME I CAN READ IT.  I MUST SAY IT'S VERY

18      EMBARRASSING.  MY HANDWRITING LOOKS AWFUL.

19          "WE CAN'T TALK ABOUT THE TAX IMPACT ON TDCC, THE

20      DOW CHEMICAL COMPANY."

21 Q.   DO YOU RECALL WHAT YOU MEANT OR INTENDED TO MEAN WHEN

22      YOU WROTE THAT DOWN?

23 A.   I -- YOU KNOW, THIS -- I MEAN, THIS GOES BACK 14 --

24      14 YEARS AGO.  SO -- AND THE -- AND WHEN I -- WHEN I

25      READ THIS, I PUT IT IN THE CONTEXT OF THE PURPOSE OF

1          THIS -- OF THIS NOTE HERE, THE WAY I -- I NORMALLY

2     OPERATE IS THAT WHEN SOMETHING APPEARS TO, YOU KNOW,

3     CONCERN ME, THEN I WOULD SCRIBBLE SOMETHING JUST FOR

4     MY OWN PURPOSE TO REMEMBER THAT.  AND MY REACTION --

5     I WOULD PROBABLY REACT THE SAME WAY RIGHT NOW IF I

6     WOULD BE IN THAT POSITION.  IS THAT THERE ARE SO MANY

7     PEOPLE THAT ARE PLANNING ON ATTENDING THAT MEETING,

8     INCLUDING, OF COURSE, MOST IMPORTANTLY OUTSIDE

9     PEOPLE.  IN OTHER WORDS, INVESTORS THAT WERE NOT PART

10    OF DOW.

11          AND SO MY REACTION WAS, WELL, WE SHOULD -- WE

12    DEFINITELY SHOULD NOT BE TALKING ABOUT A -- A TAX

13    MATTER THAT IMPACTS THE DOW CHEMICAL COMPANY IN FRONT

14    OF EXTERNAL AUDIENCES.  I WAS -- THAT'S -- THAT WOULD

15    BE MY REACTION HERE.

16 Q.  ALL RIGHT.  WAS IT TYPICAL FOR YOU TO KEEP DOW'S

17    INTERNAL TAX MATTERS CONFIDENTIAL WITHIN DOW?

18 A.  OH, MOST DEFINITELY.

19 Q.  ALL RIGHT.  I WANT TO MOVE NOW TO CHEMTECH II, THE RE

20    -- THE REFUNDING OF -- OF THE PARTNERSHIP AFTER THE

21    CLASS A -- THE FIVE BANKS, FOREIGN BANKS, WERE BOUGHT

22    OUT, WHICH WE DISCUSSED YESTERDAY.

23          I WANT TO TURN TO "EXHIBIT 574," WHICH IS DATED

24    MARCH 27, 1998, AFTER THE EXIT OF THE ORIGINAL CLASS

25    A INVESTORS.  IT'S TITLED SPECIAL LIMITED PARTNERSHIP

1        ASSET FINANCING.  AND IT APPEARS TO BE ADDRESSED TO

2        YOU AT THE TOP; IS THAT CORRECT?

3   A.   THAT'S CORRECT.

4   Q.   AND IT'S BEING SUBMITTED BY MR. ESCUDERO, THE

5        DIRECTOR OF CORPORATE FINANCE.

6   A.   YES.

7   Q.   WHAT WAS HIS RESPONSIBILITY AT THE TIME?

8   A.   MR. ESCUDERO WAS IN CHARGE OF FUNDING, SHORT TERM AS

9        WELL AS LONG-TERM FUNDING.  HE HAD COMMERCIAL PAPER,

10       DIRECT BANK RELATION, FINANCING, BOND MARKETS,

11       MINORITY-INTEREST TYPE FINANCING.  ANY -- ANY TYPE OF

12       FUNDING NOW.

13  Q.   IF WE LOOK AT THE FIRST PARAGRAPH OF THIS EXHIBIT, IT

14       REFERS TO A RESOLUTION FOR CONSIDERATION BY THE DOW

15       BOARD OF DIRECTORS AUTHORIZING A CONTRIBUTION OF

16       CERTAIN LOUISIANA HYDROCARBON ASSETS TO CHEMTECH

17       ROYAL ASSOCIATES, LP, AND EXISTING MAJORITY-OWNED

18       DOWN PARTNERSHIP TO PROVIDE OFF-BALANCE SHEET

19       FINANCING AT COMPETITIVE RATES THROUGH SALE OF

20       LIMITED PARTNERSHIP INTERESTS TO U.S. INVESTORS IN

21       THE PARTNERSHIP.  THE STRUCTURE WILL ALLOW THE

22       COMPANY TO RECOGNIZE THE FINANCIAL VALUE OF CERTAIN

23       UNITED STATES ASSETS WITH A BOOK VALUE -- WITH A LOW

24       BOOK VALUE, BUT A SUBSTANTIAL ECONOMIC VALUE.

25            I'D LIKE TO FOCUS FIRST ON THE PHRASE, "TO

1       PROVIDE OFF-BALANCE SHEET FINANCING AT COMPETITIVE

2       RATES."

3           CAN YOU TELL US IN THE CONTEXT OF THIS PROPOSED

4       RESOLUTION WHAT WAS GOING ON?

5   A.  YES, CERTAINLY.  DURING -- DURING THIS PERIOD, AS WAS

6       THE CASE IN -- IN THE EARLIER YEARS, WE WERE

7       CONSTANTLY LOOKING FOR OFF-BALANCE SHEET FINANCING TO

8       COMPLIMENT OUR ON-BALANCE SHEET FINANCING DEBT -- ON-

9       BALANCE SHEET DEBT.  AND THIS STRUCTURE REPRESENTED

10      AN OPPORTUNITY FOR US, SIMILAR TO -- TO THE PRIOR

11      MINORITY EQUITY FINANCING TO DO THE SAME, BY

12      CONTRIBUTING ASSETS THAT HAD A VERY LOW BOOK VALUE.

13      AND REALIZING A -- A HIGHER ECONOMIC VALUE BY THE

14      STRUCTURE BRINGING IN CASH TO THE COMPANY WITHOUT

15      NEGATIVELY IMPACTING THE DEBT-TO-TOTAL CAPITAL.

16  Q.  OKAY.  WHEN IT REFERS TO OFF-BALANCE SHEET HERE,

17      WE'RE REFERRING TO MINORITY EQUITY TYPE OFF-BALANCE

18      SHEET OR ARE WE REFERRING TO OPERATING-LEASE TYPE

19      TRANSACTIONS?

20  A.  NO.  MINORITY EQUITY.

21  Q.  ALL RIGHT.  WHAT WAS THE -- WHAT WAS YOUR POSITION AT

22      THE TIME?  WHAT WAS YOUR RESPONSIBILITY WITH RESPECT

23      TO THIS PROPOSED RESOLUTION?

24  A.  AS -- AS TREASURER OF THE COMPANY, I WAS ALSO EX

25      OFFICIO MEMBER OF THE FINANCE COMMITTEE AND -- AND

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 10 of 318

1      SECRETARY OF THE FINANCE COMMITTEE.  AND SO ALL --

2      ALL RESOLUTIONS OR ANY -- ANY TRANSACTION THAT WAS

3      GOING TO BE REVIEWED BY THE FINANCE COMMITTEE AND

4      ULTIMATELY PRESENTED TO THE BOARD WOULD BE ADDRESSED

5      TO ME.

6  Q.  ALL RIGHT.

7  A.  I WOULD COMPILE IT AND I WOULD REVIEW IT WITH THE

8      FINANCE COMMITTEE.  AND EACH TRANSACTION WOULD

9      ACTUALLY BE DESCRIBED, SOMETIMES WITH -- WITH SLIDES,

10     SOMETIMES I WOULD JUST, YOU KNOW, VERBALLY DESCRIBE

11     IT.  AND ALL TRANSACTIONS WOULD BE SUPPORTED BY A

12     BUSINESS SUPPORT LETTER, AS WELL AS A RESOLUTION.

13  Q.  AND IS THIS A BUSINESS SUPPORT LETTER OR IS THAT A

14      DIFFERENT KIND OF DOCUMENT?

15  A.  NO.  THIS IS A -- THIS IS A -- THIS IS FOR PURPOSES

16      OF BUSINESS SUPPORT LETTER.

17  Q.  OKAY.  AND WHAT WAS THE BUSINESS -- WHAT WAS THE

18      PURPOSE OF THE BUSINESS SUPPORT LETTER SUPPORTING THE

19      RESOLUTION?

20  A.  IT WOULD -- IT WOULD DESCRIBE -- IT WOULD DESCRIBE

21      WHY WE WOULD BE ENGAGED IN THIS TRANSACTION, WHAT THE

22      PURPOSE, WHAT THE OBJECTIVE IS.  AND THEN WE WOULD

23      SUBSEQUENTLY TALK MORE ABOUT IT DURING THE -- DURING

24      THE FINANCE COMMITTEE.

25  Q.  WERE LETTERS LIKE THIS COMMON OR RESOLUTIONS THAT

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 11 of 318

1          WERE GOING TO BE PRESENTED TO THE FINANCE COMMITTEE

2          AND THE BOARD?

3    A.    VERY COMMON.  THERE WAS -- WE NEVER DISCUSSED ANY

4          TRANSACTION THAT DIDN'T HAVE A BUSINESS SUPPORT

5          LETTER.

6    Q.    AND IF WE TURN OVER TO BATES 57704, DOES -- DOES THIS

7          DESCRIBE THE RESOLUTION?  THIS IS THE RESOLUTION; IS

8          THAT CORRECT?

9    A.    THIS IS THE RESOLUTION THAT WAS PART OF THE PACKAGE

10         WITH THE BUSINESS SUPPORT LETTER.  AND WHICH

11         ULTIMATELY WAS PART OF THE PACKAGE THAT WAS APPROVED

12         BY THE BOARD OF THE DOW CHEMICAL COMPANY.

13   Q.    ALL RIGHT.  WERE THERE ANY SIGNIFICANT CHANGES IN

14         DOW'S FINANCIAL PHILOSOPHY AND THE FOCUS ON FINANCIAL

15         FLEXIBILITY BETWEEN 1993, WHEN YOU WERE IN HORGEN,

16         AND 1998 WHEN YOU CAME BACK TO THE DOW CHEMICAL

17         COMPANY?

18   A.    NO.  THE STRATEGY WAS -- WAS -- THE SAME.

19         INTERNALLY, IN TERMS OF OUR PRIORITIZING FLEXIBILITY,

20         PROVIDING LIQUIDITY, HAVING IT AVAILABLE AT ALL

21         TIMES.  THE -- IF I RECALL CORRECTLY, THE -- THE

22         EXTERNAL ENVIRONMENT WAS -- WAS -- WAS A LITTLE

23         DIFFERENT.  ONCE AGAIN, IN THE EARLY '90'S YOU HAD --

24         YOU HAD THE TROUGH AND THEN -- AND THEN IN THE LATE

25         '90'S WE WERE MOVING AGAIN INTO A TROUGH.  WE WEREN'T

1    YET INTO THE TROUGH.  BUT THE INDICATIONS WERE WELL,

2    I THINK SOME '98 WAS -- WAS A CHALLENGING YEAR AND

3    '99 WAS GOING TO BE AN EVEN MORE CHALLENGING YEAR.

4        IT'S RELATIVELY EASY FOR US TO FORECAST THE

5    INDUSTRY CYCLE, OF COURSE, NOT THE ECONOMIC CYCLE.

6        AND SO DURING THAT TIME WE AGAIN HAD A LOT OF

7    EMPHASIS ON -- ON NEEDING TO FUND OURSELVES, NOT JUST

8    BECAUSE OF THE DIFFICULT ECONOMIC ENVIRONMENT.  BUT

9    WE WERE ALSO IN A GROWTH MODE.  AND THE GROWTH MODE

10   INVESTING PRIMARILY OVERSEAS, BECAUSE THAT'S WHERE

11   THE GROWTH WAS -- WAS MORE EVIDENT FOR US.  AND AT

12   THE SAME TIME, IT WASN'T A SECRET.  THIS WAS PUBLICLY

13   KNOWN, THAT DOW WAS ALSO IN THE LOOK-OUT FOR SOME

14   FOCUSED ACQUISITIONS TO HELP TRANSFORM OUR COMPANY

15   INTO A -- INTO A MORE SPECIALIZED CHEMICAL COMPANY

16   WITH LESS VOLATILITY IN EARNINGS.  BECAUSE OUR

17   EARNINGS WERE SO VOLATILE AND DIFFICULT TO MANAGE IT.

18       AND SO A COMBINATION OF A DIFFICULT ECONOMIC

19   ENVIRONMENT WITH PREDICTIONS THAT IT WAS GOING TO BE

20   EVEN MORE DIFFICULT.  AND AT THE SAME TIME

21   EXPECTATIONS BY THE SHAREHOLDER TO GROW WITH

22   POTENTIAL ACQUISITIONS OF, YOU KNOW, AGAIN, RE-

23   EMPHASIZE THE NEED FOR -- FOR FUNDING.

24 Q.  ALL RIGHT.  LET'S TURN TO THE NEXT TAB IN YOUR

25   NOTEBOOK, "JOINT EXHIBIT 597," DATED APRIL 15, 1998.

1       AND IT'S TITLED FINANCE COMMITTEE MINUTES.  AND IT'S

2       SIGNED BY YOU.

3           AS SECRETARY OF THE FINANCE COMMITTEE DID YOU

4       TYPICALLY PREPARE AND TRANSMIT MINUTES AFTER THE

5       FINANCE COMMITTEE MEETINGS?

6    A.  YES, I DID.

7    Q.  OKAY.  WAS GOLDMAN SACHS INVOLVED IN ANY WAY IN -- IN

8       THE FUND -- IN THE FUNDING REPLACEMENT OF THE 200

9       MILLION IN -- IN WHAT WE CALL CHEMTECH II?

10   A.  NO.  NO, THEY WERE NOT.

11   Q.  IF WE LOOK AT THE -- AT THE ACTUAL MINUTES, BATES

12      ENDING 23334, THERE AT THE BOTTOM, FINANCIAL

13      RESOLUTIONS, WITH YOUR NAME.  DOES THAT MEAN YOU WERE

14      -- WELL, DOES -- IT SAYS YOU PRESENTED 14, RIGHT?

15   A.  CORRECT.  I PRESENTED ALL OF THEM.

16   Q.  AND IF WE LOOK AT NUMBER SEVEN, IT LISTS THE LHC2 AND

17      LHC3 ASSET FINANCING PROJECT THAT WAS THE SUBJECT OF

18      THE RESOLUTION?

19   A.  YES.  IT WAS -- IT WAS PRESENTED.  NUMBER -- NUMBER

20      SEVEN.

21   Q.  ALL RIGHT.  AND THAT'S THE CONTRIBUTION OF THE ASSETS

22      FOR -- FOR WHAT WE WOULD CALL CHEMTECH II, THE

23      PLAQUEMINE PLANT?

24   A.  THAT'S CORRECT.

25   Q.  AND DID YOU, IN FACT, PRESENT THE RESOLUTION?

1  A.   YES.

2  Q.   ALL RIGHT.  AND THE BUSINESS PURPOSE AS REFLECTED IN

3       THE BUSINESS SUPPORT LETTER?

4  A.   YES.

5  Q.   AND YOU'VE DESCRIBED THE CONDITIONS AND THE NEED FOR

6       CASH.  WAS THIS A -- A FINANCING FOR GENERAL

7       CORPORATE PURPOSES OR FOR SPECIFIC PROJECT FINANCING?

8  A.   NO.  IT WAS, AGAIN, IN -- IN LINE WITH PREVIOUS

9       PRACTICE FOR GENERAL BUSINESS PURPOSES.  NOW, THERE'S

10      A, YOU KNOW, AN OBVIOUS LINKAGE WITH THE -- WITH THE

11      PRIME -- PRIOR CHEMTECH I.  BECAUSE WE WANTED TO

12      MINIMIZE THE IMPACT ON OUR ON-BALANCE SHEET DEBT.

13      AND SO BY ENGAGING IN -- IN THIS -- IN THIS

14      FINANCING, WE WERE ABLE TO DIRECTLY OFFSET THE

15      CHEMTECH I, AND THEREBY AVOID A NEGATIVE IMPACT ON

16      OUR ON-BALANCE SHEET DEBT.

17 Q.   ALL RIGHT.  YESTERDAY YOU REFERRED TO THE POOLING OF

18      FUNDS RECEIVED FOR GENERAL PURPOSE FINANCING --

19 A.   RIGHT.

20 Q.   -- AND THE DEPLOYMENT OF THOSE FUNDS AT OR ABOVE THE

21      HURDLE RATE.  I THINK YOU MENTIONED UP TO THREE

22      PERCENT OF THOSE OR SOMETHING?

23 A.   THAT'S CORRECT.

24 Q.   IS THERE ANYTHING DIFFERENT HERE OR IS THAT THE SAME

25      KIND OF ECONOMIC --

1   A.   NO, IT'S THE SAME.

2   Q.   -- VALUE?

3   A.   THE -- THE EXPECTATION -- AGAIN, WE -- IN FACT, WITH

4        ALL THESE TRANSACTIONS, WHETHER IT WAS THIS

5        TRANSACTION OR ANY OTHER, YOU KNOW, FUNDING -- FUNDED

6        TRANSACTION, THE EXPECTATION FOR ANY TYPE OF FUNDING

7        IS -- IS, FIRST OF ALL, AT A MINIMUM TO MEET -- THE

8        RATE WAS STILL A WHACK OF, I BELIEVE, 10.75, PLUS

9        THAT THREE PERCENT SPREAD.

10  Q.   WOULD YOU PLEASE TURN TO THE NEXT EXHIBIT IN YOUR

11       NOTEBOOK, "JOINT EXHIBIT 729"?  THIS IS A NOTE,

12       NOVEMBER 16, 1998, SIGNED BY YOU AND ADDRESSED TO MR.

13       ESCUDERO.  YOU DESCRIBED HIS RESPONSIBILITY A FEW

14       MINUTES AGO AS BEING RESPONSIBLE FOR FUNDING.

15            CAN YOU TELL US WHAT THE PURPOSE OF THIS LETTER

16       WAS?

17  A.   THE PURPOSE OF THIS LETTER WAS TO EMPHASIZE HOW

18       CRITICAL IT WAS FOR US TO FIND WAYS TO, AGAIN,

19       MINIMIZE OUR FINANCIAL EXPENSES AND TO FIND WAYS TO

20       GET FUNDS FOR DOW.  BUT AT THE SAME TIME, NOT

21       IMPACTING OUR DEBT-TO-TOTAL CAPITAL.

22  Q.   NOW, WAS THIS A -- A ONE-OFF COMMUNICATION OR WAS

23       THIS THE TYPE OF COMMUNICATION YOU MADE ON A REGULAR

24       BASIS?

25  A.   I MADE IT ON A REGULAR BASIS.  MY PREDECESSORS MADE

1        IT ON A REGULAR BASIS.  AND THIS WAS VERY, VERY

2        COMMON.

3   Q.   THE SECOND PARAGRAPH REFERS TO THE CYCLICAL DOWNTURN.

4        IS THAT WHAT YOU WERE REFERENCING IN YOUR TESTIMONY A

5        FEW MOMENTS AGO?

6   A.   YES, SIR.

7   Q.   ALL RIGHT.  AND THE THIRD PARAGRAPH REFERS TO

8        LOWERING DOW'S DEBT TO CAPITALIZATION RATIO TO

9        MAINTAIN FINANCIAL FLEXIBILITY TO PURSUE BUSINESS

10       OPPORTUNITIES.

11          IS THAT -- THAT'S CONSISTENT WITH -- IS THAT

12       CONSISTENT WITH YOUR TESTIMONY A FEW MINUTES AGO

13       ABOUT A NEEDS HERE?

14  A.   YES, SIR.

15          BY MR. WELSH:

16             OBJECTION, YOUR HONOR.  I DON'T THINK WE

17          NEED HIM TO REANALYZE HIS TESTIMONY, RE-

18          EMPHASIZING IT FOR NO PURPOSE OTHER THAN TO RE-

19          EMPHASIZE IT.

20          BY THE COURT:

21             I UNDERSTAND, MR. WELSH.  HE'S ALREADY

22          RESPONDED.  SO YOUR OBJECTION IS NOTED.

23          BY MR. WELSH:

24             THANK YOU, JUDGE.

25  BY MR. MAGEE:

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 17 of 318

1   Q.   WOULD YOU PLEASE TURN TO THE NEXT EXHIBIT,

2        "PLAINTIFF'S DEMONSTRATIVE NUMBER NINE," WHICH SETS

3        FORTH DOW'S DEBT TO TOTAL CAPITAL RATIO OF THE PERIOD

4        1990 TO 1998.  AND FOOTNOTES FROM "PLAINTIFF'S

5        EXHIBIT 12," THE 40 PERCENT DEBT-TO-TOTAL CAPITAL

6        GUIDELINE THAT WE FOCUSED ON HERE PREVIOUSLY.

7             CAN YOU JUST RELATE TO US THE CONTEXT OF THE

8        REFINANCING IN 1998 TO THE CONTEXT OF THIS GRAPH AND

9        WHAT IT SHOWS?

10  A.   WELL, THIS GRAPH -- EXCUSE ME.  THIS GRAPH SHOWS THE

11       TREND LINE OF OUR -- OF OUR DEBT OF OUR ON-BALANCE

12       SHEET DEBT.  AND IT PRETTY MUCH ALSO REFLECTS THE

13       ECONOMIC ENVIRONMENT THAT WE WERE UNDER.  BECAUSE IN

14       THE EARLY '90'S, AGAIN, IT WAS A VERY DIFFICULT

15       ENVIRONMENT FOR US.  AS A CONSEQUENCE, OUR -- OUR

16       DEBT INCREASED.  IT IMPROVED IN THE MIDDLE '90'S.

17       AND THEN TOWARDS THE END OF THE '90'S, AGAIN, BECAUSE

18       OF CHALLENGES THAT I JUST RESPONDED TO EARLIER THAT I

19       NOTED, OUR DEBT LEVEL AGAIN GOT UP TO THE LEVEL OF

20       40.  AND, IN FACT, ABOVE 40, WHICH WAS CLEARLY

21       SOMETHING THAT WE DID NOT WANT TO HAVE OCCUR.  IT DID

22       OCCUR.  AND THERE WAS A LOT OF PRESSURE TO GET THAT

23       DEBT-TO-TOTAL CAPITAL DOWN BELOW 40.

24            AND IF I MAY ADD, YOU KNOW, THIS IS LIKE 13

25       YEARS AGO, WE HAVE EXACTLY THE SAME SITUATION TODAY

1          WHERE, IN FACT, WE HAVE A DEBT-TO-TOTAL CAPITAL OF

2          JUST SLIGHTLY ABOVE 40, 41.  AND I'M NO LONGER THE

3          CFO.  BUT EVEN THE CEO PUBLICLY IS STATING THAT WE

4          HAVE A -- A DRIVE AND AN OBJECTIVE OF GETTING THAT

5          DEBT LEVEL DOWN BELOW 40.

6  Q.    ALL RIGHT.  WE'RE GOING TO DISCUSS THE 40 PERCENT A

7          LITTLE BIT MORE IN DETAIL.

8               BUT I'D LIKE TO FIRST MOVE -- EXCUSE ME, TO

9          "JOINT EXHIBIT 737," WHICH IS DOW'S 1998 ANNUAL

10         REPORT.  THAT'S THE END OF THE YEAR AFTER THE

11         CONSUMMATION OF THE FUNDING REPLACEMENT IN CHEMTECH.

12              CAN YOU TURN, PLEASE, TO BATES ENDING 68788?  IN

13         PARTICULAR, THIS IS NOTE K TO THE FINANCIAL

14         STATEMENTS.  AND IT REFERS TO, IN THE FIRST

15         PARAGRAPH, TO THE CHEMTECH FORMATION IN 1993.  AND

16         THEN THE PURCHASE OF THE LIMITED PARTNERSHIP

17         INTERESTS AND SO FORTH.

18              CAN YOU JUST LOOK THROUGH NOTE K HERE?  AND THEN

19         I HAVE A COUPLE OF QUESTIONS FOR YOU.

20  A.    ALL RIGHT.

21  Q.    ALL RIGHT.  LOOKING AT THE FIRST TWO PARA -- FIRST

22         TWO FULL PARAGRAPHS.  DOES THAT ACCURATELY DESCRIBE

23         THE CONVERSION FROM THE ORIGINAL BANK INVESTORS IN

24         CHEMTECH TO THE SINGLE INVESTOR WITH 200 MILLION IN

25         REPLENISH FUNDS?

1    A.   YES, IT DOES.

2    Q.   OKAY.  THE THIRD PARAGRAPH REFERS TO CHEMTECH II AS A

3         SEPARATE AND DISTINCT LEGAL ENTITY FROM THE COMPANY,

4         DOW, AND ITS AFFILIATES.

5              AND THEN IN THE -- AT THE END OF THIS PARAGRAPH

6         REFERS TO THE GENERAL PARTNER DIRECTING THE BUSINESS

7         ACTIVITY AND HAS FIDUCIARY RESPONSIBILITY OF THE

8         PARTNERSHIP AND OTHER MEMBERS.

9              THAT -- WE DISCUSSED THAT ISSUE IN THE CONTEXT

10        OF MR. WOLBERT'S ASSERTIONS FOR DRESNER AND THE CLASS

11        A INVESTORS IN CHEMTECH I.  IS THIS THE SAME TYPE OF

12        FIDUCIARY DUTY THAT WAS DISCUSSED THERE?

13   A.   YES, SIR.

14            BY MR. WELSH:

15                YOUR HONOR, I ---

16            BY THE COURT:

17                DON'T ANSWER THE QUESTION.  WAIT.  JUST --

18            JUST DON'T ANSWER.  WE HAVE AN OBJECTION.

19            BY MR. WELSH:

20                YOUR HONOR, I OBJECT.  I DON'T MIND SOME

21            LEADING, AND I REALIZE IT MAY SHORTEN THE TRIAL

22            TO SOME EXTENT.  BUT MR. MAGEE IS TESTIFYING FOR

23            HIM IN TERMS OF REMINDING HIM ABOUT THINGS.  IF

24            HE WANTS TO ASK HIM A DIRECT QUESTION, THAT

25            WOULD BE PREFERABLE FROM OUR POINT OF VIEW.

1    BY MR. MAGEE:

2         I CAN DO SO.

3    BY THE COURT:

4         YOU MAY.

5    BY MR. MAGEE:

6    Q.   DO YOU RECALL THAT YOUR TESTIMONY YESTERDAY REGARDING

7         YOUR DISCUSSIONS WITH MR. WOLBERT ON THE VALUATION

8         ISSUE?

9    A.   YES, I DO.

10   Q.   DO YOU RECALL WHETHER OR NOT MR. WOLBERT EVER RAISED

11        THE FIDUCIARY RESPONSIBILITY OF THE DOW CHEMICAL

12        COMPANY AND THE GENERAL PARTNER OR THE PARTNERSHIP IN

13        PARTICULAR?

14   A.   WELL, IN GENERALLY, I DO.  IT WAS UNDERSTOOD THAT WE

15        HAD THE FIDUCIARY DUTIES.  AND I RESPONDED THAT, YES,

16        WE  -- WE ACKNOWLEDGED THAT AND WE ADHERED BY IT.

17   Q.   ARE THE FIDUCIARY DUTIES REFERENCED IN NOTE K TO YOUR

18        1998 ANNUAL STATEMENT SIMILAR TO OR DIFFERENT FROM

19        THE FIDUCIARY DUTIES THAT YOU JUST TALKED ABOUT IN

20        CONTEXT OF THE VALUATION DISPUTE?

21   A.   THEY ARE SIMILAR.

22   Q.   DID YOU EVER HAVE FIDUCIARY DUTY RESPONSIBILITY TO

23        CREDITORS FOR THE ISSUANCE OF PLAIN DEBT?

24   A.   NO.

25   Q.   LET'S TURN TO PAGE, BATES ENDING 68762, PLEASE.

1        THAT'S GOING BACK A LITTLE BIT IN THE DOCUMENT.

2    `        IN THE MIDDLE LEFT THERE'S A TITLE OF

3        "RESULTS OF OPERATIONS."  CAN YOU JUST BRIEFLY TAKE A

4        LOOK AT THAT AND THEN TELL US HOW IT RELATES TO WHAT

5        YOU'VE ALREADY DESCRIBED AS AMBITIONS IN 1998?

6    A.   WELL, IT -- IT DESCRIBES THE -- THE EXTERNAL

7        ENVIRONMENT BEING VERY -- VERY CHALLENGING.  IN '98

8        -- DURING 1998 THE TOP LINE OF SALES REVENUE WERE

9        DOWN EIGHT PERCENT FROM THE PRIOR YEAR, FROM 1997.

10       THE -- THERE WAS ALSO A REFERENCE TO THE NEED

11       FOR RESTRUCTURING OUR PERFORMANCE -- OUR -- OUR

12       BUSINESSES, OUR PORTFOLIO.  THIS WAS -- THIS IS

13       ACTUALLY REFERRING TO WHAT I SAID EARLIER, THAT WE

14       WERE TRYING TO CHANGE OUR PORTFOLIO TO GO MORE

15       DOWNSTREAM, SO THAT WE WOULD BE LESS SUSCEPTIBLE TO

16       THE -- TO THE INDUSTRIAL VOLATILITY, THE INDUSTRY

17       CYCLE.

18       AND IT ALSO MAKES REFERENCE HERE IN THE BOTTOM,

19       THE BOTTOM PARAGRAPH HERE, FIRST SENTENCE, 1998, IT

20       WAS A CHALLENGING YEAR AND WE EXPECTED TO CONTINUE IN

21       1999.

22   Q.   ALL RIGHT.  WOULD YOU PLEASE TURN TO BATES 68777?

23       THIS IS THE CONSOLIDATED BALANCE SHEET, THE RIGHT-

24       HAND SIDE OF THE BALANCE SHEET, LIABILITIES AND

25       STOCKHOLDER EQUITY AND SO ON.  IN THE MIDDLE OF THE

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 22 of 318

1        PAGE THERE'S AN ITEM LABELED MINORITY INTEREST IN

2        SUBSIDIARY COMPANIES.  WAS -- WAS THE CHEMTECH

3        PARTNERSHIP INCLUDED HERE IN YOUR CONSOLIDATED

4        BALANCE SHEET?

5   A.   YES, IT WAS.  IT'S PART OF THE 1998, 532.

6   Q.   ALL RIGHT.  IS THAT DISTINCT IN THE BALANCE SHEET

7        FROM THE DEBT LISTED ABOVE?

8   A.   IT IS.  WE HAVE THE -- THE DEBT ABOVE THERE, THE

9        LONG-TERM DEBT.  THERE ARE FOUR BILLION 051, AND THAT

10       DOES NOT INCLUDE THE MINORITY INTEREST.

11  Q.   ALL RIGHT.  WILL YOU PLEASE TURN TO 68779?  IF WE

12       LOOK UNDER OPERATING ACTIVITIES UNDER THE TOPIC

13       ADJUSTMENTS TO RECONCILE NET INCOME OR NET CASH FLOW

14       PROVIDED BY OPERATING ACTIVITIES, THE ONE, TWO,

15       THREE, FOUR -- FIFTH ITEM DOWN IS MINORITY INTEREST

16       SHARE IN INCOME.  CAN YOU TELL US WHAT THAT'S

17       INTENDED TO DISPLAY?

18  A.   THIS INCLUDES THE INCOME -- THIS INCLUDES THE INCOME

19       OF CHEMTECH II TO -- TO THE SHAREHOLDERS.

20  Q.   AND WHY DO YOU CARVE OUT FROM THE OPERATING STATEMENT

21       OF YOUR INCOME MINORITY -- THE SHARE ATTRIBUTABLE TO

22       THE MINORITY INTERESTS?

23  A.   BECAUSE IT'S NOT TO THE COMMON SHAREHOLDERS.

24  Q.   OF DOW?

25  A.   OF DOW.

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 23 of 318

1   Q.   ALL RIGHT.  LET'S TURN TO THE RATING AGENCIES AND THE

2        TOPIC OF THE DEBT-TO-TOTAL CAPITAL RATIO IN THE

3        COMPANY'S TARGET OF 40.

4             WHAT WAS YOUR UNDERSTANDING OF THE SOURCE OF

5        THAT -- THAT TARGET?

6   A.   MY UNDERSTANDING IS THAT -- THIS GOES BACK MANY, MANY

7        YEARS AGO AND EMANATES FROM DISCUSSIONS WITH THE

8        RATING AGENCIES.  THAT 40 PERCENT REALLY RELATES TO A

9        RATING OF A SINGLE A.  SO HISTORICALLY, MOST

10       CORPORATIONS THAT HAD A SINGLE A RATING WERE ABLE TO

11       MAINTAIN A DEBT-TO-TOTAL CAPITAL BELOW 40, IN THE

12       30'S.  MID 30'S UP TO 40.

13            COMPANIES THAT HAD A DEBT-TO-TOTAL CAPITAL ABOVE

14       40 RARELY HAVE A RATING OF SINGLE A.  AND THAT SINGLE

15       A RATING WAS THE IDEAL -- DEEMED TO BE THE IDEAL

16       RATING FOR A COMPANY LIKE OURSELVES WHO WAS

17       CONSTANTLY -- BECAUSE WE WERE CAPITAL INTENSIVE AND

18       ALWAYS IN NEED OF CAPITAL, A COMPANY THAT CONSTANTLY

19       IN THE MARKET RAISING CAPITAL.  AND A SINGLE A RATING

20       WAS REQUIRED TO RAISE FUNDS DURING DIFFICULT

21       FINANCIAL TIMES, BOTH AS A COMPANY, AS WELL AS

22       EXTERNALLY.  AND IT ALSO WAS DEEMED TO BE THE BEST

23       RATING TO ATTRACT LOWER RATES.

24   Q.   WHAT IMPACT DOES THE SINGLE A RATING HAVE ON YOUR

25       COMMERCIAL PAPER RATING OF A1/P1?

1  A.   THAT WAS A -- A PREREQUISITE FOR OUR A1/P1 RATING.

2       SO WHEN WE ISSUED COMMERCIAL PAPER, THE A1/P1,

3       ALTHOUGH IT'S A SHORT-TERM RATING, IT VERY MUCH IS

4       LINKED TO OUR LONG-TERM RATING, OF A SINGLE A.  AND

5       THAT ALLOWED US TO NOT JUST ISSUE COMMERCIAL PAPER,

6       BUT TO ALSO ISSUE COMMERCIAL PAPER WITH A SLIGHTLY

7       LONGER DURATIONS.  INSTEAD OF ONLY 30 DAYS, WE WERE

8       ABLE TO PLACE PAPER -- CORPORATE COMMERCIAL PAPER --

9       CORPORATE HIGH HOLD USE UP TO 180 DAYS AND, IN FACT,

10      EVEN -- EVEN SLIGHTLY LONGER THAN THAT.  MOSTLY UNDER

11      ONE YEAR.

12  Q.  DURING YOUR TENURE AS TREASURER OF DOW FROM 1996 TO

13      2001, HOW FREQUENT WAS YOUR PERSONAL INTERACTION WITH

14      THE RATING AGENCIES THAT RATED DOW, PARTICULARLY

15      STANDARD AND POOR'S AND MOODY'S?

16  A.  YES.  WE HAD A -- WE HAD A FORMAL REVIEW ONCE A YEAR,

17      NORMALLY OCCURRED AROUND THE TIME OF OUR ANNUAL

18      MEETING, WHICH ALWAYS TOOK PLACE IN MAY.  SO IT WAS

19      EITHER JUST BEFORE -- YOU KNOW, BEFORE OR AFTER THE

20      ANNUAL MEETING, AFTER THE -- THE YEAR-END FINANCIALS

21      WERE -- WERE PUBLISHED.

22          IN ADDITION TO THAT, WHENEVER WE HAD AN

23      ACQUISITION OR WE HAD A MATERIAL TRANSACTION, WE

24      WOULD EITHER TALK TO THEM ON THE PHONE OR MEET THEM

25      IN PERSON TO DESCRIBE THE TRANSACTIONS.

1  Q.   OKAY.  AND WHAT WAS YOUR RESPONSIBILITY AT THESE

2       MEETINGS?  WHAT KIND OF THINGS DID YOU PERSONALLY

3       DISCUSS WITH THE AGENCY PERSONNEL?

4  A.   YES.  I WAS THE -- FIRST I WAS THE FACILITATOR OF

5       THESE MEETINGS.  SO I CALLED UP THE RATING AGENCIES

6       AND -- AND ARRANGED FOR THESE MEETINGS.  THESE WERE

7       NORMALLY ABOUT FOUR-OR-FIVE-HOUR TYPE MEETINGS OF

8       VERY IN-DEPTH TYPE OF DISCUSSIONS.  AND HELPED PUT

9       THE AGENDA TOGETHER FOR THE -- FOR THE MEETING.

10 Q.   ALL RIGHT.  AT THESE MEETINGS DID YOU DISCUSS OPENLY

11      WITH THE AGENCIES THE LEVEL OF YOUR ACTUAL DEBT ON

12      YOUR BALANCE SHEET?

13 A.   OH, YES.  WE -- WE DISCUSSED THE -- THE CAPITAL

14      STRUCTURE OF THE COMPANY.  WE DISCUSSED THE

15      FINANCIALS LOOKING BACK, AS WELL AS GOING FORWARD.

16      DISCUSSED THE CASH FLOWS, DISCUSSED THE VARIOUS

17      COMPONENTS OF OUR DEBT, AND THE REST OF THE CAPITAL

18      STRUCTURE INCLUSIVE OF MINORITY EQUITY.

19 Q.   DID YOU DISCUSS THE OFF-BALANCE SHEET FINANCING IN

20      GENERAL AND OPERATING LEASES AND OTHER THINGS OTHER

21      THAN MINORITY EQUITY AS WELL?

22 A.   YES.  THERE WAS QUITE AN EXTENSIVE DISCUSSION ON ALL

23      -- ALL ASPECTS OF OUR -- OF OUR CAPITAL STRUCTURE,

24      INCLUDING SALE LEASEBACK, OPERATING LEASES, ET

25      CETERA.

1   Q.   ALL RIGHT.  DID YOU DESCRIBE THE TRANSACTIONS LIKE

2        THE CHEMTECH TRANSACTION THE WAY IT'S DESCRIBED IN

3        NOTE K OF YOUR ANNUAL REPORT?

4   A.   YES, WE DID.

5   Q.   ALL RIGHT.  DID YOU DISCLOSE THE MANNER IN WHICH YOU

6        HAD COMPUTED THE DEBT-TO-TOTAL CAPITAL RATIO BY

7        PUTTING MINORITY EQUITY IN THE DENOMINATOR ONLY?

8   A.   YES.  YES, WE DID.  AND THE -- THE DATA THAT WE

9        SHARED WITH THE RATING AGENCIES MAKE -- YOU KNOW,

10       MAKE THAT -- MAKE THAT VERY CLEAR.

11  Q.   LET'S TURN TO THE NEXT TAB, "EXHIBIT -- JOINT EXHIBIT

12       423," PLEASE.  DOW CHEMICAL COMPANY'S STANDARD AND

13       POOR'S PAPER DATED MARCH 25, 1997.  IF WE TURN TO THE

14       SECOND PAGE, BATES ENDING 46317.

15            YOU'RE LISTED AS A PRESENTER FOR CASH-FLOW

16       ANALYSIS AND -- AND FORECASTS.  WOULD YOU JUST

17       DESCRIBE BRIEFLY HOW THAT RELATES TO THE DESCRIPTION

18       YOU JUST GAVE US AND YOUR RESPONSIBILITIES?

19  A.   YES.  WELL, I MEAN, OUR -- THAT COVERES THE

20       FINANCIALS, THE CAPITAL STRUCTURE, THE CASH FLOW THAT

21       WAS -- IN THIS MEETING IT WAS 1997, MARCH 25.  SO

22       THAT MEANS WE WERE DISCUSSING THE FINANCIALS AND THE

23       CASH FLOW THAT OCCURRED DURING THE PRIOR YEAR.  AND

24       THEN ALSO A FORECAST, WHAT IT WAS GOING TO LOOK LIKE

25       GOING -- GOING FORWARD.

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 27 of 318

1   Q.   IF YOU WOULD TURN TO BATES NUMBER 46329, PLEASE.

2        THIS IS TITLED "TOTAL CAPITAL."  YOU JUST MENTIONED

3        DISCUSSING THE CAPITAL STRUCTURE.  HOW DOES THAT

4        RELATE TO WHAT IS DISPLAYED HERE ON THE THREE ITEMS

5        FOR TOTAL CAPITAL?

6   A.   WELL, FOR 1996.  SO, YOU KNOW, WE LOOKED AT THE

7        ACTUAL YEAR THAT WAS JUST COMPLETED.  AND SO YOU HAVE

8        A TOTAL CAPITAL OF 15.5 BILLION.  WITH THE THREE

9        COMPONENTS, EQUITY OF 7.9 BILLION, MINORITY INTEREST

10       OF TWO BILLION, INCLUSIVE OF CHEMTECH.  AND THEN

11       GROSS DEBT OF 5.4.  SO A TOTAL CAPITAL IS 15.5.  THEN

12       YOU TAKE YOUR GROSS DEBT OF 5.4 AS A PERCENTAGE OF

13       THE 15.5, AND YOU GET YOUR DEBT-TO-TOTAL CAPITAL OF

14       35 PERCENT.

15  Q.   THAT'S THE RATIO THAT WE'VE BEEN TALKING ABOUT HERE?

16  A.   YES.

17  Q.   THAT 40 PERCENT TARGET?

18  A.   YES.

19  Q.   YOU PRESENTED THIS KIND OF INFORMATION TO THE

20       AGENCIES ON A REGULAR BASIS?

21  A.   EVERY YEAR.

22  Q.   ALL RIGHT.  DID YOU HAVE CONTACT WITH THE AGENCIES

23       OTHER THAN AT THE ANNUAL MEETINGS?  TELEPHONE OR

24       OTHERWISE?

25  A.   OH, YES, YES.

1   Q.   DID YOU MEET AND TALK?

2   A.   YES, YES.  WHENEVER -- YOU KNOW, LIKE I SAID.

3        WHENEVER WE HAD A -- YOU KNOW, A MAJOR TRANSACTION,

4        WE WOULD -- WE WOULD CALL THEM UP.  THIS WAS NOT A

5        REQUIREMENT, I MAY ADD.  WE -- PART OF OUR -- PART OF

6        OUR PHILOSOPHY WITH THE RATING AGENCIES WAS TO BE

7        VERY TRANSPARENT, VERY OPEN.  THEY REALLY APPRECIATED

8        IT.  AND THEIR CONSENT TO -- TO, YOU KNOW,

9        CONFIDENTIALITY.

10        SO WE WERE ABLE TO TALK TO THEM THE DAY BEFORE

11       THE ANNOUNCEMENT ABOUT TRANSACTIONS, TO MAKE SURE

12       THAT -- THAT THEY KNEW WHAT THE CONSEQUENCES OF THESE

13       TRANSACTIONS WERE GOING TO BE ON OUR BALANCE SHEET.

14        SO, AGAIN, VERY OPEN, VERY TRANSPARENT.

15   Q.   DID THE RATING AGENCIES EVER CRITICIZE OR SUGGEST

16       THAT YOU COMPUTE IN A DIFFERENT WAY YOUR DEBT-TO-

17       TOTAL CAPITAL RATIO?

18   A.   NO, THEY DID NOT.  AND IT'S CLEAR THAT THEY DID NOT

19       BECAUSE THE -- THE RATIOS AND THE WAY I DESCRIBED IT

20       HERE IS CONSISTENT YEAR OVER YEAR.

21        SO IF THE RATING AGENCIES WOULD HAVE OBJECTED,

22       THEY -- YOU KNOW, WE WOULD HAVE HAD TO, OBVIOUSLY, DO

23       SOMETHING DIFFERENT.

24   Q.   DID YOU USE THE SAME RATIO COMPUTED -- COMPUTATION

25       METHODOLOGY IN DISCLOSURES OF YOUR RATIO TO THE

1        PUBLIC?

2   A.   YES.  YES.

3   Q.   ALL RIGHT.  DID YOU -- WHAT -- WHAT ABOUT TO YOUR

4        DEBT HOLDERS?  DID YOU EVER DESCRIBE THAT RATIO TO

5        THEM OR HAVE DISCUSSIONS WITH THEM ABOUT IT?

6   A.   YES.  AS -- AS -- AS TREASURER, I REGULARLY

7        PARTICIPATED IN -- IN ANALYSTS CONVENTIONS WHERE BANK

8        ANALYSTS, SECURITY ANALYSTS THAT WERE -- THAT WERE

9        BOND ANALYSTS CLOSE TO EQUITY ANALYSTS.  SO THE BOND

10       HAD -- THE BOND HOLDERS WERE VERY MUCH INTERESTED IN

11       THE CAPITAL STRUCTURE OF THE COMPANY.  AND I

12       REGULARLY PRESENTED SOME VERY, VERY SIMILAR -- VERY

13       SIMILAR TYPE OF A PICTURE TO WHAT YOU SEE HERE, TO

14       THE RATING AGENCIES.

15           SO, ONCE AGAIN, VERY TRANSPARENT, EXTERNALLY.

16  Q.   WERE YOU ATTEMPTING TO FOOL THE RATING AGENCIES OR

17       THE INVESTING PUBLIC ABOUT THE SUBSTANCE OF THE

18       CHEMTECH TRANSACTIONS WHEN YOU DISCLOSED CHEMTECH II

19       IN NOTE K OF THE ANNUAL REPORT OR DISCLOSED YOUR

20       DEBT-TO-TOTAL CAPITAL RATIO IN YOUR PUBLIC FILINGS?

21  A.   CERTAINLY NOT.  YOU KNOW, I DON'T THINK WE COULD HAVE

22       BEEN ANY MORE TRANSPARENT WHEN IT -- WHEN IT CAME TO

23       CHEMTECH II, CHEMTECH I, OR ANY OF THE OTHER

24       FINANCIAL TRANSACTIONS THAT DOW HAS EVER PUT ON THE

25       BOOKS.  WE'RE VERY PROUD OF -- OF OUR TRANSPARENCY.

1    FIRST POINT.

2         SECOND POINT IS THAT WE CLEARLY FOLLOWED U.S.

3    GAAP ACCOUNTING, YOU KNOW, EVERY YEAR.  WE GOT

4    AUDITED FINANCIALS BY OUR -- BY OUR AUDITORS.  AND,

5    LIKE I SAID, EVERY YEAR WE WERE MEETING WITH THE

6    RATING AGENCIES.  AND IF -- IF WE WOULD HAVE DONE

7    ANYTHING WRONG, WE CERTAINLY WOULD HAVE BEEN ADVISED

8    AND -- AND WE WOULD HAVE, YOU KNOW, RESPONDED

9    ACCORDINGLY.

10         SO -- IN FACT, JUST THE OPPOSITE.  YOU KNOW,

11    LIKE I SAID, WE WERE ALWAYS VERY TRANSPARENT.

12  Q.  WHEN YOU WENT TO ALCAN IN 2001 AS THE CFO, DID ALCAN

13    HAVE ANY OFF-BALANCE SHEET FINANCING TRANSACTIONS ON

14    ITS BALANCE SHEET THAT IT EXCLUDE -- THAT IT PUT IN

15    THE DENOMINATOR -- THE DENOMINATOR OF ITS DEBT-TO-

16    TOTAL CAPITAL RATIO?

17         BY THE COURT:

18              DON'T ANSWER.

19         BY MR. WELSH:

20              OBJECTION, YOUR HONOR.  THIS IS A SUBJECT

21         -- I OBJECT TO THIS, YOUR HONOR, AS -- IT'S

22         IRRELEVANT BECAUSE HE CAN'T -- PLUS, IT DOESN'T

23         ALLOW US THE OPPORTUNITY TO BE ABLE TO ANALYZE

24         THE -- THE ALLEGATIONS WHICH HAVE BEEN MADE BY

25         MERSZEI.

1      BY THE COURT:

2           THE OBJECTION IS SUSTAINED.  I THINK WE'VE

3      HAD ENOUGH.  I UNDERSTAND WHERE YOU'RE GOING,

4      MR. MAGEE.  OTHER COMPANIES APPARENTLY USE OFF-

5      SHEET FINANCING, AS WELL.  AND I THINK THAT'S --

6      THAT'S CERTAINLY BEEN ESTABLISHED.

7      BY MR. MAGEE:

8           BUT YESTERDAY WHEN YOU SUSTAINED THE

9      OBJECTION ABOUT REPORTING IN A PROFESSIONAL

10      ORGANIZATION, YOU ALLOWED ME TO INQUIRE ABOUT

11      PERSONAL KNOWLEDGE.  THIS IS -- HE'S THE CFO OF

12      THAT COMPANY.

13      BY THE COURT:

14           WELL, I -- I -- AGAIN, FOR OUR PURPOSES

15      HERE FOR CHEMTECH, I DON'T THINK IT'S NECESSARY

16      OR RELEVANT.  AND, AGAIN, I THINK THE EVIDENCE

17      IS ALREADY ESTABLISHED THAT THIS IS A FINANCING

18      ARRANGEMENT THAT MANY COMPANIES USE.

19   BY MR. MAGEE:

20   Q.   I WANT TO TAKE YOU BACK TO YOUR DOW CFO EXPERIENCE

21      WHEN YOU CAME BACK TO DOW IN 2005 YOU WERE THE CFO

22      UNTIL 2010.  WAS DOW EVER DOWNGRADED FROM A SINGLE A

23      RATING DURING YOUR TENURE AS THE CFO?

24   A.   UNFORTUNATELY, YES.

25   Q.   AND WHEN DID THAT OCCUR?

Case 3:05-cv-00944-BAJ-EWD    Document 166    08/29/13    Page 32 of 318

1  A.   THAT OCCURRED -- THAT OCCURRED IN, THE FIRST TIME IT

2       OCCURRED IN DECEMBER OF -- DECEMBER OF '08, LATE

3       DECEMBER OF '08.

4  Q.   AND WHAT WAS THAT DOWNGRADE IN?

5  A.   WHAT WAS IT OR WHY?

6  Q.   WHAT HAPPENED TO THE A, THE SINGLE A?

7  A.   OH.  WELL, OUR -- OUR -- OUR RATING DROPPED FROM A TO

8       A MINUS.  AND IT WAS A RESULT OF -- IT DROPPED -- I

9       CAN'T REMEMBER NOW.  WAS IT A MINUS TO TRIPLE B OR A

10      TO A MINUS.  IT DROPPED.  AND IT DROPPED AS A RESULT

11      OF -- THIS WAS JUST AT THE -- DURING THE FINANCIAL

12      CRISES.  AND THEN WE HAD A COMMITMENT BY THE KUWAITIS

13      TO ACQUIRE A 50 PERCENT OF OUR PLASTICS, OUR

14      POLYETHYLENE BUSINESS.  AND THEY DID NOT LIVE UP TO

15      THEIR OBLIGATION AND INFORMED US.  AND THERE WAS OVER

16      SEVEN BILLION DOLLARS OF MONEY THAT DID NOT FLOW.

17      AND AS A RESULT OF THAT, WE WERE DOWNGRADED.

18 Q.   HOW DID THAT AFFECT DOW'S FINANCIAL FLEXIBILITY AND

19      YOUR PHILOSOPHY, YOUR FINANCIAL STRATEGY PHILOSOPHY?

20 A.   IT IMMEDIATELY AFFECTED -- WELL, IT DIDN'T -- IT

21      DIDN'T AFFECT THE PHILOSOPHY.  IT AFFECTED THE -- OUR

22      -- OUR ABILITY TO -- TO TAP THE MARKET.  THE

23      ENVIRONMENT AT THAT TIME, WHENEVER YOU DO HAVE A DROP

24      IN -- IN A RATING, IN FACT, WHETHER IT'S FROM A-MINUS

25      TO TRIPLE B OR FROM A-MINUS, THE FACT THAT IT DROPS

1          IMPLIES THAT THE CREDIT WORTHINESS OF THE COMPANY HAD

2          CHANGED.  AND IT HAS ALL SORTS OF CONSEQUENCES.

3              WE -- THE SPREADS THAT WE WERE GETTING FROM THE

4          BANKS -- IN OTHER WORDS, THE COST OF MONEY FOR DOW

5          INCREASED.  CUSTOMERS WERE GETTING NERVOUS BECAUSE OF

6          THE CHANGED RATING.  WE HADN'T HAD A CHANGE IN THE

7          RATING FOR MANY, MANY YEARS.  AND THEY WERE CONCERNED

8          THAT PERHAPS WE WOULDN'T BE A CONSISTENT SUPPLIER.

9              TALKING ABOUT SUPPLIERS, WE HAD ONE MAJOR

10         SUPPLIER.  AND I BELIEVE I CAN MENTION THE NAME HERE.

11    Q.   YES.

12    A.   IT WAS PETROLEUM BP, A SUPPLIER THAT SUPPLIES US WITH

13         NAPHTHA, IN OTHER WORDS, OIL.  THIS WAS THE SUPPLIER

14         WITH A VOLUME OF CLOSE TO A BILLION DOLLARS A YEAR.

15         AND WE HAD ON THE AVERAGE PAYMENT TERMS ABOUT 45

16         DAYS.  SO WE WERE ALLOWED TO PAY THEM IN 45 DAYS

17         AFTER RECEIVING THE NAPHTHA.  AND THEY PUT US ON CASH

18         IN ADVANCE, WHICH, OF COURSE, HAD A VERY DETRIMENTAL

19         IMPACT ON OUR WORKING CAPITAL REQUIREMENTS.  THE ONLY

20         WAY I WAS ABLE TO ADDRESS THAT, IN FACT, WAS TO

21         PERSONALLY CALL THE CFO OF BRITISH PETROLEUM TO TELL

22         HIM THAT THINGS ARE ACTUALLY NOT AS BAD AS THEY

23         APPEAR TO BE.  AND I HAVE TO EXPLAIN TO THE CFO, BP,

24         CIRCUMSTANCES WHY OUR RATING DROPPED.

25             AND SO THE -- SO IT HAS AN IMPACT IN COST.  IT

```
 1        HAD AN IMPACT IN AVAILABILITY OF FUNDING.  AND IT

 2        ALSO HAS A -- AN IMPACT ON THE -- ON THE REPUTATION

 3        OF THE COMPANY.

 4   Q.   WHAT DO YOU MEAN BY THAT?

 5   A.   WELL, WE HAD -- WE HAD -- WE HAVE AND WE'RE VERY

 6        PROUD OF THAT, A PRETTY SOPHISTICATED RECRUITING

 7        PROGRAM WHERE WE GO AND RECRUIT PEOPLE, YOU KNOW,

 8        POTENTIAL EMPLOYEES FROM SOME OF THE BEST

 9        UNIVERSITIES IN THE COUNTRY.  AND WE ACTUALLY HAD --

10        I PERSONALLY KNOW OF -- OF A FEW THAT WERE CALLING ME

11        UP AND ASKING ME WHETHER DOW IS OKAY AND WONDERING

12        WHETHER -- WHETHER THEY SHOULD COME TO DOW.

13             SO IT -- IT'S PART OF -- IT'S MUCH LARGER THAN,

14        IN FACT, JUST THE COST OF FINANCING.  IT'S -- IT'S

15        REPUTATION AND BRANDING.

16   Q.   WERE THERE ANY IMPACTS ON YOUR BANK FACILITIES?

17   A.   IT ALSO HAD IMPACT ON -- ON BANK FACILITIES, OF

18        COURSE.  MANY OF THE BANKS -- WE HAD BANK LINES,

19        WHICH WERE NON-COMMITTED.  SO, IN OTHER WORDS, WE

20        DIDN'T PAY FOR THEM.  AND THEY, OF COURSE, WERE

21        WITHDRAWN IMMEDIATELY.  AND THEN WE HAD -- WE HAD A

22        BRITISH FINANCING IN PLACE.  THIS WAS A 13 BILLION

23        DOLLAR BRIDGE FINANCING FOR THE ACQUISITION OF ROMAN

24        HAAS, WHICH HAD AN ESCALATION CLAUSE, WHICH WAS

25        RELATED TO THE RATING.
```

1            SO AS THE RATING DROPPED, THE COST ABOVE A

2       REFERENCE PRICE INCREASED.  SO THE OVERALL COSTS OF

3       THAT BRIDGE FINANCING INCREASED SUBSTANTIALLY BECAUSE

4       OF THE LOWER -- LOWER RATING.

5  Q.   HOW MUCH WAS THAT BRIDGE FINANCING?

6  A.   THE BRIDGE FINANCING ---

7  Q.   THE AMOUNT?

8  A.   THE AMOUNT WAS -- IT WAS 13 BILLION DOLLARS.  AND,

9       YOU KNOW, THE AVERAGE -- THE ADDITIONAL COST WAS, YOU

10      KNOW, ONE, ONE AND A HALF PERCENT.  IN FACT, IT

11      INCREASED EVEN MORE LATER.  SO, YOU KNOW, ONE PERCENT

12      OF 13 BILLION IS 130 MILLION DOLLARS.  SO, YOU KNOW,

13      WE'RE TALKING A MATERIAL IMPACT.

14  Q.  RIGHT.  YOU -- YOU'VE BEEN DISCUSSING THE DECEMBER

15      DOWNGRADE.  WERE THERE FURTHER -- ANY FURTHER

16      DOWNGRADES IN THE SPRING OF -- OF 2009?

17  A.  YES.  THERE WAS A -- I -- I GOT A LITTLE CONFUSED

18      ABOUT THE A, A-MINUS OR -- BECAUSE WE ULTIMATELY --

19      IN -- I THINK IT WAS THE END OF MARCH, THE FIRST OF

20      APRIL, WE ONCE AGAIN HAD A DOWNGRADE TO TRIPLE B-

21      MINUS.

22  Q.  WHAT YEAR WAS THAT?

23  A.  THAT -- THAT WAS -- THAT WAS 2009.

24  Q.  SPRING?

25  A.  SPRING.  SPRING OF 2009.  SO THE FIRST DOWNGRADE WAS

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 36 of 318

1    LATE DECEMBER OF 2008.  WELL, I WAS CFO.

2         AND THEN THE SECOND DOWNGRADE TO TRIPLE B MINUS

3    WAS END OF MARCH OR FIRST OF APRIL, AROUND THAT TIME,

4    TO TRIPLE B MINUS.  TRIPLE B MINUS IS THE LOWEST

5    LEVEL BEFORE YOU GET TO JUNK CATEGORY.

6  Q.  JUNK BOND?

7  A.  JUNK-BOND CATEGORY, WHICH EXCLUDES YOU -- YOU KNOW,

8    PRECLUDES YOU FROM ISSUING COMMERCIAL PAPER, ET

9    CETERA.

10        AND SO THESE WERE -- WERE QUITE DRAMATIC TIMES

11   FOR US.

12  Q.  THANK YOU, MR. MERSZEI.  I HAVE NO FURTHER QUESTIONS

13   AT THIS TIME.

14  A.  THANK YOU.

15        BY THE COURT:

16            THANK YOU, MR. MAGEE.

17            MR. WELSH?

18        BY MR. WELSH:

19            YOUR HONOR, IF WE COULD, GIVEN THE NATURE

20        OF THE TESTIMONY I'D LIKE TO HAVE A COUPLE OF

21        MINUTES TO SPEAK WITH MY COLLEAGUES.  COULD WE

22        HAVE A BREAK FOR 15 MINUTES AT THIS TIME?

23        BY THE COURT:

24            I WAS PREPARED TO GO TO ABOUT TEN.  BUT IF

25        -- IF YOU NEED MORE TIME, I'LL GIVE YOU.  WE'LL

1          TAKE OUR MORNING BREAK A LITTLE EARLY THIS

2          MORNING.  WE WILL RESUME IN 15 MINUTES.  COURT

3          IS IN RECESS.

4          BY MR. WELSH:

5              THANK YOU VERY MUCH.

6          BY LAW CLERK:

7              ALL RISE.

8          (THEREFORE, AT THIS TIME, A BRIEF RECESS WAS

9          HELD.)

10         BY THE COURT:

11             BE SEATED.  OKAY.  MR. WELSH, ARE YOU

12         PREPARED TO CONDUCT CROSS-EXAMINATION AT THIS

13         TIME?

14         BY MR. WELSH:

15             THANK YOU, YOUR HONOR.

16         BY THE COURT:

17             PLEASE PROCEED.

18         BY MR. WELSH:

19             THANK YOU.

20               CROSS-EXAMINATION

21  BY MR. WELSH:

22  Q.   GOOD MORNING, MR. MERSZEI.

23  A.   GOOD MORNING.

24  Q.   MR. MERSZEI, I'D LIKE TO START OUT WITH THE -- SOME

25       QUESTIONS THAT MR. MAGEE ASKED YOU AND -- AND PERHAPS

1        EXPAND ON THEM A LITTLE BIT SO THAT I CAN UNDERSTAND

2        SOME OF YOUR TESTIMONY.

3            AT A NUMBER OF TIMES DURING HIS EXAMINATION OF

4        YOU, YOU DISCUSSED THE VOLATILITY OF THE ECONOMIC

5        CYCLE AND THE NATURE OF THE CHEMICAL BUSINESS.

6            IS THIS SOMETHING THAT HAD GONE ON FOR A GREAT

7        NUMBER OF YEARS IN THE CHEMICAL BUSINESS?

8    A.   YES.  THIS IS NOTHING NEW.  THIS GOES BACK -- I

9        JOINED DOW 34 YEARS AGO.  AND IT WAS THE CASE 34

10       YEARS AGO.  AND, IN FACT, WE -- WE STILL HAVE IT AS

11       IT'S REALLY DRIVEN BY THE SUPPLY OF THE RAW

12       MATERIALS.

13           AND WHAT HAPPENS IS THAT DURING GOOD TIMES

14       COMPANIES HAVE SHORT MEMORIES.  AND SO DURING GOOD

15       TIMES THEY TAKE THE EARNINGS THAT ARE GENERATED AND

16       THEY BUILD NEW FACILITIES AROUND THE WORLD.  AND IT'S

17       NOT JUST DOW.  BUT IT'S COMPETITION HERE IN THE

18       UNITED STATES, AS WELL AS ELSEWHERE.  TODAY IT'S

19       CHINA, YOU KNOW, BRAZIL, GERMANY, ET CETERA.

20           SO WHAT HAPPENS, DURING GOOD TIMES THEY INVEST.

21       IT TAKES ABOUT THREE OR FOUR YEARS TO BUILD A LARGE

22       PETROCHEMICAL SITE.  AND THEN, OF COURSE, YOU HAVE

23       THIS NEW SUPPLY COMING ON STREAM.  AND THIS NEW

24       SUPPLY CAUSES THE MARGINS TO -- TO DROP QUITE

25       DRAMATICALLY.  AND THAT'S WHAT WE REFER TO AS THE --

```
 1        AS THE CYCLE IN THE CHEMICAL INDUSTRY.  SO IT'S

 2        SUPPLY -- IT'S SUPPLY DRIVEN.

 3            UNLIKE THE ECONOMIC CYCLE, WHERE YOU -- WHERE

 4        PEOPLE JUST DON'T HAVE THE DESIRE OR THE MONEY TO GO

 5        AND SPEND.  SO YOU HAVE LESS DEMAND.  THAT'S THE

 6        ECONOMIC CYCLE.

 7   Q.   SO -- SO THE CHEMICAL INDUSTRY CYCLE IS NOT TIED TO

 8        THE GENERAL OVERALL ECONOMY CYCLE?

 9   A.   WELL, IT CAN BE.  THE -- WE CALL IT THE DOUBLE WHAMMY

10        IN OUR BUSINESS.  AND -- AND IT'S HAPPENED BEFORE

11        WHERE YOU HAVE BOTH THE CHEMICAL CYCLE AND THE

12        ECONOMIC CYCLE BOTH OCCUR AT THE SAME TIME.  THAT, IN

13        FACT, HAPPENED IN -- IN 2001.  AND AT THAT POINT IN

14        TIME -- ACTUALLY I WAS LEAVING DOW.  I LEFT DOW IN

15        2001.  SO I MISSED THAT PART, 2001, 2002.  BUT IN

16        THOSE YEARS, DOW, IN FACT, JUST BROKE EVEN.  THAT'S

17        WHAT HAPPENS WHEN BOTH THE -- THE DEMAND SIDE AND THE

18        SUPPLY SIDE CROSS.

19   Q.   BUT HISTORICALLY HAS THE -- THE ECONOMIC CYCLE TIED

20        TO THE CHEMICAL INDUSTRY, THEIR -- THEIR ECONOMIC

21        CYCLE BEEN A PREDICTABLE CYCLE?

22   A.   NO.  I DON'T THINK ECONOMIC CYCLES ARE -- ARE THAT

23        PREDICTABLE.  I DON'T THINK THE -- I DON'T THINK

24        ECONOMISTS HAVE HAD SUCH A GREAT RECORD IN

25        FORECASTING, YOU KNOW, TRENDS.
```

 1  Q.   WELL, WHEN YOU SAY IT'S CYCLICAL, THEN DO YOU MEAN --

 2       WHAT -- WHAT DO YOU MEAN?

 3  A.   WELL, HISTORICALLY THE -- THE -- THE INDUSTRY CYCLE

 4       IS CYCLICAL.

 5  Q.   THAT'S WHAT I MEAN.

 6  A.   THE INDUSTRY CYCLE IS CYCLICAL.   AND HISTORICALLY

 7       IT'S BEEN ANYWHERE FROM -- IT'S NOT EXACT SCIENCE,

 8       MR. WELSH.  BUT IT'S -- IT'S ROUGHLY EVERY -- EVERY

 9       FIVE TO SEVEN YEARS.

10            SO DURING GOOD TIMES, THE GOOD TIMES LAST ABOUT

11       TWO YEARS, HISTORICALLY.  BY THAT I MEAN THE PEAK

12       EARNINGS OF CHEMICAL COMPANIES.  AND THIS IS NOT

13       UNIQUE TO DOW.  THIS IS, YOU KNOW, INDUSTRYWIDE.

14            AND AS I SAID, WHEN THE COMPANIES EARN A LOT OF

15       MONEY, THEN THEIR INCLINATION IS TO INVEST.  SO THEY

16       TAKE THAT MONEY, THEY INVEST.  IT TAKES THREE OR FOUR

17       YEARS TO BUILD THESE LARGE PLANTS, AND THEN YOU HAVE

18       AN OVER SUPPLY FOR TWO OR THREE YEARS.  AND THAT'S

19       REFERRED TO AS THE -- AS -- AS THE TROUGH IN THE

20       CYCLE, BECAUSE OF THE OVER -- OVER SUPPLY.  THE

21       SUPPLY JUST EXCEEDS THAT OF THE NATURAL DEMANDS.  THE

22       DEMAND MAY GO UP THREE OR FOUR PERCENT EVERY YEAR.

23       THE SUPPLY -- SUDDENLY THERE'S A MAJOR ADDITION OF

24       SUPPLY OR OF RAW MATERIALS, THAT'S WHEN YOU -- WHEN

25       YOU HAVE THESE TROUGHS.

1           AND SO HISTORICALLY IT'S BEEN EVERY FIVE TO

2      SEVEN YEARS.

3  Q.  AND WHEN YOU SAY HISTORICALLY, OVER WHAT PERIOD OF

4      TIME?

5  A.  OH, OVER THE LAST 30 YEARS.

6  Q.  AND I TAKE IT EVERYONE KNOWS ABOUT THIS, THE RATING

7      AGENCIES, EVERYBODY ELSE, THE LENDERS?  EVERYONE

8      UNDERSTANDS THAT THIS CYCLE IS -- IS THE PREDICTABLE

9      CYCLE IN THE CHEMISTRY -- IN THE CHEMICAL INDUSTRY?

10 A.  IT'S -- IT'S WELL KNOWN.  THE RATING AGENCIES -- I

11     MAY ADD, MANY OF THE FOLKS, THE ANALYSTS AND THE

12     RATING AGENCIES THAT WOULD, FOR INSTANCE, HANDLE

13     COMPANIES SUCH AS DOW IN THE CHEMICAL INDUSTRY, MANY

14     OF THEM HAVE ACTUALLY DEGREES IN CHEMISTRY.  AND SOME

15     OF THEM, IN FACT, HAVE WORKED IN A CHEMICAL INDUSTRY.

16     AND THE SAME APPLIES TO THE BANKERS.  MANY OF THE

17     BANKERS THAT, IN FACT, ARE WHAT WE CALL RELATIONSHIP

18     MANAGERS, MANY OF THEM HAVE DEGREES IN CHEMISTRY OR

19     AT ONE TIME OR ANOTHER WORKED FOR A CHEMICAL COMPANY.

20     SO THEY UNDERSTAND THE INDUSTRY VERY WELL.

21 Q.  SO THEY -- THEY AREN'T SURPRISED BY THIS CYCLICAL

22     NATURE OF HOW THINGS WORK IN THE CHEMICAL INDUSTRY IN

23     TERMS OF THE FIVE-TO-SEVEN-YEAR CYCLE?

24 A.  THEY'RE NOT -- THEY'RE NOT SURPRISED.  BUT, LIKE I

25     SAID, IT'S NOT AN EXACT SCIENCE.  SO THE CYCLE IS

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 42 of 318

1    SOMETIMES FIVE YEARS, SOMETIMES SEVEN YEARS.  BUT

2    THEY UNDERSTAND THE VOLATILITY.  THEY UNDERSTAND THAT

3    THE INDUSTRY CYCLE IS SUPPLY DRIVEN AND THE ECONOMIC

4    CYCLE IS DEMAND DRIVEN.

5  Q.  AND SO THEY UNDERSTAND THAT WHEN THEY'RE IN A TROUGH,

6    THEY KNOW WHY THAT HAPPENED AND THEY REALIZED THAT --

7    THAT THEY'RE GOING -- THAT THINGS ARE GOING TO GET

8    BETTER; THAT THEY'RE GOING TO COME OUT OF THAT

9    TROUGH?

10 A.  WELL, SOME COMPANIES HAVE NOT GOTTEN BETTER.  SOME

11    COMPANIES HAVE NOT GOTTEN BETTER.  IF YOU LOOK AT THE

12    -- AT THE PROFILE OF THE CHEMICAL INDUSTRY, THERE ARE

13    NOT MANY U.S. CHEMICAL COMPANIES OPERATING TODAY

14    VERSUS MAYBE 30 YEARS AGO.

15    SO MANY CHEMICAL COMPANIES HAVE GONE BANKRUPT.

16    MANY CHEMICAL COMPANIES HAVE BEEN ACQUIRED OVER THE

17    LAST 20 OR 30 YEARS.  SO THE -- THE INDUSTRY PROFILE

18    HAS CHANGED DRAMATICALLY.

19    SO IT'S -- IT'S NOT AS SIMPLE AS SAYING THAT

20    WHILE THERE'S A CYCLE AND YOU'RE NOT DOING WELL NOW,

21    BUT YOU'RE GOING TO DO WELL LATER ON.  THE ONES THAT

22    HAVE BEEN WELL MANAGED DO GET OUT OF THE TROUGH AND

23    GO THROUGH THE NEXT CYCLE.

24 Q.  WELL, FOR DOW CHEMICAL, THOUGH, IT'S BEEN A

25    PREDICTABLE CYCLE, THE FIVE-TO-SEVEN-YEAR CYCLE,

Case 3:05-cv-00944-BAJ-EWD    Document 166    08/29/13    Page 43 of 318

1    CORRECT?

2  A.   RELATIVELY PREDICTABLE.

3  Q.   AND FOR THOSE COMPANIES THAT WENT UNDER, I TAKE IT

4       DOW PICKED UP THEIR, OR PART OF THEIR MARKET.  AND

5       THEN THE BIGGER COMPANIES GOT BIGGER AND SOME OF THE

6       OTHER ONES JUST GOT WEEDED OUT, CORRECT?

7  A.   THAT'S CORRECT.

8  Q.   OKAY.  NOW, SIR, YOU DISCUSSED IN YOUR TESTIMONY

9       YESTERDAY WITH -- WITH MR. MAGEE WHAT YOU DESCRIBED

10      AS MONETIZING THE PATENTS.  DO YOU RECALL THAT

11      TESTIMONY?

12 A.   YES, I DO.

13 Q.   AND YOU WERE TALKING ABOUT THE FACT THAT YOU'VE

14      MONETIZED THEM BY -- WELL, MAYBE I'LL LET YOU REFRESH

15      OUR RECOLLECTION ABOUT THAT.  WHAT DID YOU MEAN WHEN

16      YOU WERE TALKING MONETIZING THE PATENTS?

17 A.   BY THAT I MEANT TAKING A -- AN ASSET THAT -- THAT HAS

18      ECONOMIC VALUE BUT IT'S NOT REFLECTED ON THE BOOKS OF

19      THE COMPANY.  AND THE VALUATION IS BASED ON A MARK-

20      TO-MARKET BASIS, AND RECOGNIZING THAT VALUE AND

21      GETTING CASH FOR IT IN RETURN.

22 Q.   WHEN YOU WERE -- WHEN YOU SAID MARK-TO-MARKET, YOU

23      WERE TALKING ABOUT MARKING IT UP FROM THE BOOK VALUE

24      TO THE FAIR MARKET VALUE; IS THAT CORRECT?

25 A.   NO.  IT'S -- MARK-TO-MARKET MEANING WHAT IS THE FAIR

1       VALUE OF -- OF AN ASSET AT -- AT THAT TIME.  WHAT IS

2       THE ECONOMIC VALUE OF THAT ASSET.  AND THERE'S --

3       THERE'S A METHODOLOGY THAT I DON'T HAVE -- I DON'T

4       KNOW THE DETAILS OF IT.  BUT WE RELIED ON OUTSIDE

5       CONSULTING FOR THAT, FOR ADL IN THIS CASE, ARTHUR D.

6       LITTLE, AND THEY HAD METHODOLOGY BASED ON VARIOUS

7       ASSUMPTIONS.  ESSENTIALLY BASED ON THE CASH FLOW

8       ASSUMPTIONS GOING FORWARD AND THIS GOING BACK.  AND

9       THEN, OF COURSE, TAKING INTO ACCOUNT THE EXTERNAL

10      ENVIRONMENT, ET CETERA.  AND THAT'S HOW YOU END UP

11      GETTING A -- A FAIR MARKET VALUE AT THAT POINT IN

12      TIME.

13  Q.  NO.  I -- I UNDERSTAND, SIR.  PERHAPS I ASKED THE

14      WRONG QUESTION.

15          WHAT I MEANT WAS, WHEN YOU MARK-TO-MARKET, YOU

16      HAVE TO -- YOU HAVE TO HAVE A STARTING POINT.  THAT

17      IS, I MEAN I KNOW YOUR -- WHAT YOU'RE TALKING ABOUT

18      IS WHAT THE VALUATION OF THE PATENTS AND GETTING

19      THEIR PRESENT VALUE.

20  A.  RIGHT.

21  Q.  BUT I'M TALKING ABOUT YOU MARKED IT TO MARKET FROM

22      SOME EARLIER NUMBER, CORRECT?  THAT IS, YOU -- YOU

23      JUST BROUGHT IT UP TO CURRENT DAY'S PRICE; IS THAT

24      RIGHT?

25  A.  CURRENT ---

1    Q.    IS THAT ALL YOU MEANT BY THAT?

2    A.    CURRENT DAY VALUE.

3    Q.    OKAY.  YOU -- YOU WEREN'T COMPARING IT TO THE VALUE

4          ON THE BOOKS OF DOW, WHICH WAS A TINY FRACTION OF ITS

5          FAIR MARKET VALUE, CORRECT?

6    A.    NO.

7    Q.    OKAY.  NOW, SIR, WHEN YOU WERE TALKING ABOUT DOING

8          THAT, YOU WERE TALKING ABOUT GOING TO THE BANKS AND

9          GETTING MONEY FOR -- BASED ON THE FAIR MARKET VALUE

10         OF THE PATENTS, CORRECT?

11   A.    THAT'S CORRECT.

12   Q.    ALL RIGHT.  AND YOU WENT -- YOU DISCUSSED GOING TO

13         THE EUROPEAN BANKS TO GET THAT -- THAT MONEY; IS THAT

14         RIGHT?

15   A.    YES.

16   Q.    COULD YOU HAVE GOTTEN THAT SAME MONEY OR WOULD IT

17         HAVE BEEN POSSIBLE TO GO AND BORROW MONEY ON THE

18         VALUE OF THE PATENTS FROM U.S. BANKS?

19   A.    I -- YOU KNOW, I WAS -- I WAS THE TREASURER FOR DOW

20         EUROPE.  AND I FOCUSED ON INVESTORS IN -- IN EUROPE.

21         AND WHEN MR. REINHARD CALLED, THAT'S WHEN I FOUND

22         ABOUT IT.  HE AT ONE TIME WAS ALSO TREASURER FOR DOW

23         EUROPE.  AND SO HE ALSO WAS AWARE OF EUROPEAN

24         INVESTORS HAVING HAD A LOT OF EXPERIENCE IN INVESTING

25         IN EQUITY-TYPE INSTRUMENTS AND COMPANIES.  AND SO IT

```
1        WAS ONLY NATURAL FOR -- FOR US TO FIND EUROPEAN

2        INVESTORS.  AND THE -- AND -- AND THE PARTNERSHIP WAS

3        OPERATING IN THE -- IN EUROPE.  AND SO IT WAS ONLY

4        NATURAL TO GET EUROPEAN INVESTORS.

5   Q.   I DON'T THINK THAT WAS EXACTLY MY QUESTION, THOUGH,

6        SIR.

7             MY QUESTION WAS: COULD YOU HAVE GONE TO U.S.

8        BANKS AND BORROWED AGAINST THE VALUE OF THE PATENTS

9        IF YOU HAD WANTED TO?  IS THERE ANY REASON YOU COULD

10       NOT HAVE?

11  A.   I -- I CAN'T ANSWER THAT.  I WAS IN EUROPE AT THE

12       TIME AND -- AND I WAS NOT INVOLVED IN THE ORIGINAL

13       INCEPTION OF IT.

14  Q.   WELL, TAKING IT OUT OF THE CHEMTECH CONTEXT THEN, YOU

15       HAD 880 MILLION DOLLARS WORTH OF PATENTS, CORRECT?

16  A.   APPROXIMATELY THAT AMOUNT.

17  Q.   AND COULD YOU OR COULD YOU NOT, BASED ON YOUR

18       EXTENSIVE KNOWLEDGE IN THE TREASURY DEPARTMENT AND AS

19       CFO OF DOW IN THE UNITED STATES AND ELSEWHERE, COULD

20       YOU HAVE NOT GONE TO THE -- TO THE MARKET IN THE

21       UNITED STATES AND -- AND BORROWED MONEY BASED ON THE

22       VALUE OF THOSE PATENTS?

23  A.   IT WAS A STRUCTURE THAT I BELIEVE PROHIBITED US FROM

24       -- FROM USING, AT THAT TIME, U.S. INVESTORS.  AND SO

25       BECAUSE OF THAT WE WERE LOOKING TO EUROPE.
```

1  Q.   SIR, MY QUESTION WAS NOT IN THE STRUCTURE OF

2       CHEMTECH.

3            MY QUESTION WAS, COULD YOU HAVE NOT GONE TO

4       BANKS WITH THE VALUE OF THE PATENTS AND BORROWED

5       MONEY AGAINST THE VALUE OF THE PATENTS?

6  A.   I DON'T KNOW.

7  Q.   YOU DON'T KNOW BECAUSE YOU DIDN'T TRY OR YOU DON'T

8       KNOW BECAUSE YOU DON'T KNOW WHETHER BANKS WOULD LEND

9       MONEY BASED ON THE VALUE OF THE PATENTS?

10 A.   I -- BECAUSE -- I JUST DON'T KNOW.  I DID NOT -- I --

11      I NEVER SPOKE TO A -- TO AN AMERICAN INSTITUTION OR

12      AN AMERICAN INVESTOR ABOUT THAT.

13 Q.   NO.  THAT'S NOT MY QUESTION.  MY QUESTION IS MORE OF

14      A HYPOTHETICAL.

15           COULD YOU HAVE GONE TO U.S. BANKS AND BORROWED

16      AGAINST THE VALUE OF AN ASSET, SUCH AS ALMOST A

17      BILLION DOLLARS WORTH OF PATENTS?

18 A.   WELL, PERHAPS -- PERHAPS WE COULD HAVE.  I DON'T

19      KNOW.

20 Q.   THANK YOU.  AND, SIR, MR. MAGEE ASKED YOU SOME

21      QUESTIONS CONCERNING THE CHEMTECH DOW GOLDMAN SACHS

22      PRESENTATION.  I THINK IT'S IN YOUR BINDER THAT MR.

23      MAGEE PROVIDED.  "JOINT EXHIBIT 68."  DO YOU HAVE

24      THAT IN FRONT OF YOU?

25 A.   YES.  I SEE IT ON THE SCREEN.

1    Q.    OKAY.  I'LL GIVE YOU A MINUTE.

2    A.    WHICH ONE IS IT?

3    Q.    I THINK IT'S THE FIRST ONE IN YOUR BINDER, "JOINT

4          EXHIBIT 68 -- "JF 68."

5    A.    YOU'RE RIGHT.  YES, I HAVE IT.

6    Q.    AND I BELIEVE YOU SAID IN YOUR TESTIMONY FOR MR.

7          MAGEE THAT YOU ATTENDED THAT PRESENTATION?

8    A.    YES.

9    Q.    DID ANY PRECEDE THAT PRESENTATION?  DID YOU MEET WITH

10         MR. REINHARD PRIOR TO THAT PRESENTATION OR ANYBODY

11         ELSE FROM DOW?  CAN YOU GIVE ME A LITTLE BACKGROUND

12         LEADING UP TO THIS PRESENTATION?

13   A.    WELL, I DON'T -- I DON'T REMEMBER THE -- YOU KNOW,

14         THE DETAILS.  WHAT I CAN REMEMBER IS THAT, YOU KNOW,

15         MR. REINHARD, LIKE I SAID A MINUTE AGO, CALLED ME UP

16         AND INTRODUCED ME TO THE -- TO THE CONCEPT OF

17         INTELLECTUAL PROPERTY FINANCING.  AND THEN FOLLOWING

18         THAT DISCUSSION, AND I DON'T EVEN REMEMBER, YOU KNOW,

19         HOW MUCH TIME WENT BY, HE THEN -- YOU KNOW, WE HAD

20         SEVERAL DISCUSSIONS WHERE HE ASKED ME TO FACILITATE A

21         MEETING WITH GOLDMAN AND PROSPECTIVE INVESTORS.  AND

22         THAT -- THAT'S WHAT I DID.  I DON'T RECALL ANY OTHER

23         SPECIFIC DISCUSSIONS.  I'M SURE I PROBABLY HAD A FEW

24         PHONE CALLS BUT I -- YOU KNOW, I DON'T REMEMBER.

25   Q.    WELL, I THINK YESTERDAY YOU SAID THAT YOU -- YOU --

1      YOU CONTACTED THE BANKS ---

2   A.  WELL, I CONTACTED THE BANKS.  YES.  THAT'S CORRECT.

3   Q.  AND YOU DESCRIBED YOUR -- YOUR LONG WORKING

4      RELATIONSHIP WITH THE DIFFERENT BANKS, THE DRESNER --

5   A.  YES.

6   Q.  -- DBL?

7   A.  YES.

8   Q.  NETWEST.

9   A.  YES.  THAT'S CORRECT.  I -- I SAID YESTERDAY -- TO

10      REAFFIRM THAT.  I -- I CALLED THEM UP.  I MEAN, THE

11      AGREEMENT WAS WITH MR. REINHARD THAT I WOULD CALL UP

12      THOSE BANKERS WHO I THOUGHT WOULD -- WOULD HAVE AN

13      INTEREST IN PARTICIPATING IN SUCH AN INVESTMENT.

14   Q.  DO YOU RECALL WHERE THIS MEETING TOOK PLACE?

15   A.  I -- I BELIEVE IN ZURICH, BUT I'M NOT SURE.

16   Q.  NOW, MR. MAGEE WENT THROUGH SOME PARTS OF THIS "JOINT

17      EXHIBIT 68" WITH YOU.  AND IF YOU WOULD, I'D LIKE YOU

18      TO TURN TO THE -- THE SECOND PAGE OF THE SPECIAL

19      LIMITED INVESTING PARTNERSHIP UNIT, SLIPS

20      PRESENTATION, MAY, 1993.

21      THE SECOND PAGE IS BATES NUMBER 1284.  DO YOU

22      SEE THAT?

23   A.  HOLD ON.  YES.  YES.

24   Q.  AND THAT -- THAT'S DIRECTED TO MARION MERRELL DOW,

25      ACTUALLY.  AND THEN THE NEXT PAGE, WHICH IS 1285, IS

1      DIRECTED TO DOW CHEMICAL.  WHY WAS THIS -- IF YOU

2      KNOW, WHY WAS THIS A JOINT PRESENTATION?

3  A.   WELL, I HAD NO -- I HAD NO DIRECT INVOLVEMENT WITH

4      MARION MERRELL DOW.  BUT MARION MERRELL DOW WAS A --

5      WAS A TOTALLY SEPARATE LEGAL ENTITY.  AND -- BUT DOW

6      HAD A -- AN INTEREST IN MARION MERRELL DOW FROM A --

7      FROM A CORPORATE STANDPOINT.

8          AND SO THE OPPORTUNITY WAS NOT JUST TO RECOGNIZE

9      THE FAIR MARKET VALUE FOR PATENTS THAT WAS IN THE --

10     IN THE DOW BUSINESS, BUT AS WELL IN THE PORTFOLIO OF

11     MARION MERRELL DOW.  AND SO THERE WAS A FEELING THAT

12     THERE MAY BE AN OPPORTUNITY ALSO FOR MARION MERRELL

13     DOW TO -- TO MONETIZE SOME OF THE PATENTS THAT THEY

14     HAD IN THEIR -- IN THEIR BUSINESS PORTFOLIO.

15 Q.   DID -- DO YOU RECALL WHO ATTENDED THE MEETING FROM

16     MARION MERRELL DOW?

17 A.   I -- I'M NOT CERTAIN.  BUT I THINK IT WAS -- I THINK

18     THE TREASURER FOR MARION MERRELL DOW, AND I THINK IT

19     WAS BOB LAFERTY, BUT I'M NOT SURE.

20 Q.   NOW, SIR, WHY DON'T YOU TURN TO BATES NUMBER PAGE

21     1286.

22 A.   ALL RIGHT.

23 Q.   AND THE -- THE SECOND BLOCK THERE, IT SAYS, "THE

24     PROGRAM."  I WONDER IF YOU COULD JUST READ THROUGH

25     THAT.  YOU DON'T NEED TO READ IT OUT LOUD.  BUT JUST

1    READ THROUGH THAT AND TELL ME IF THAT ACCURATELY

2    REFLECTS YOUR UNDERSTANDING OF THE CHEMTECH

3    TRANSACTION.

4  A.  ALL RIGHT.  FROM A -- I -- I'M NOT 100 PERCENT SURE

5    ABOUT THAT.  THIS WAS A -- THIS WAS THE FIRST TIME

6    THE -- THIS TOPIC WAS -- WAS PRESENTED TO A VERY HIGH

7    LEVEL.  AND SO I AM, FROM A TECHNICAL STANDPOINT, NOT

8    IN A POSITION TO SAY WHETHER THAT 100 PERCENT IS WHAT

9    WE ENDED UP WITH.

10  Q.  ARE THERE PARTS OF IT THAT YOU'RE NOT SURE ABOUT IN

11    TERMS OF WHAT YOU FINALLY ENDED UP WITH?  IF THERE

12    ARE, JUST TELL ME WHAT THOSE ARE.

13  A.  I'M NOT SURE.  I THINK THE -- THE FACT THAT FIXED

14    MATURITY, I'M NOT SURE ABOUT THAT.  I -- I'M NOT

15    GOING TO COMMENT ON IT, BECAUSE I AM JUST NOT A

16    TECHNICAL EXPERT ON IT.

17  Q.  OKAY.  WELL, WHAT -- WHAT PART -- WELL, YOU ATTENDED

18    THE MEETING AND -- AND YOU KNEW HOW CHEMTECH WORKED

19    OUT AFTER THE MEETING, CORRECT?

20  A.  I -- I ATTENDED THE MEETING AS A FACILITATOR FOR THE

21    STRUCTURE.  I DID NOT LEAD ANY DISCUSSIONS.  I DID

22    NOT PRESENT THE DETAILS OF THE STRUCTURE.

23  Q.  I UNDERSTAND.  AND WHAT WAS YOUR POSITION IN CHEMTECH

24    AFTER IT WAS IMPLEMENTED AGAIN?

25  A.  AFTER IT WAS IMPLEMENTED I WAS THE TREASURER OF

1    CHEMTECH, AS WELL AS TREASURER FOR -- FOR DOW EUROPE.

2    AND IT WAS -- THE PRIMARY ROLE THERE WAS TO MAKE SURE

3    THAT, FROM AN ACCOUNTING STANDPOINT, FROM

4    ADMINISTRATIVE STANDPOINT, IT WAS MANAGED ACCORDING

5    TO THE AGREEMENT.  AND I WAS ALSO RESPONSIBLE FOR

6    MAKING SURE THAT ACCESS FUNDS ARE PROPERLY INVESTED

7    AND THAT THE LOANS AND THAT LOANS TO VARIOUS DOW

8    SUBSIDIARIES WOULD BE PROPERLY, ALSO DISTRIBUTED

9    EFFECTIVE.

10        SO THIS WAS A -- THIS WAS A TREASURY ROLE, CASH

11    MANAGEMENT ROLE, AND NOT A -- NOT AN ACCOUNTING,

12    TECHNICAL KIND OF A ROLE.

13  Q.  OKAY.  DID YOU ATTEND ALL THE PARTNERSHIP MEETINGS?

14  A.  I DID NOT ATTEND ALL OF THE PARTNERSHIP MEETINGS.  I

15    ATTENDED SOME OF THEM, BUT NOT ALL OF THEM.

16  Q.  I THINK MR. MAGEE DIRECTED YOUR ATTENTION TO A COUPLE

17    OF THE PARTNERSHIP MEETING AGENDAS, WHERE ---

18  A.  RIGHT.

19  Q.  AND YOU WERE THE HEAD OF CHEMTECH, CORRECT?

20  A.  I WAS A HEAD -- THE HEAD -- I WAS THE TREASURER OF

21    CHEMTECH.

22  Q.  SO YOU UNDERSTOOD THE CHEMTECH -- I'M SURE AS THE

23    TREASURER OF CHEMTECH, YOU UNDERSTOOD THE STRUCTURE

24    AND -- AND HOW CHEMTECH WORKED, CORRECT?

25  A.  THE GENERAL STRUCTURE.

1  Q.   SO ---

2  A.   AND -- AND THE GENERAL STRUCTURE AND HOW THE MONEY

3       FLOWED.

4  Q.   WHEN YOU SAID THE GENERAL STRUCTURE AND HOW THE MONEY

5       FLOWED, THEN WHAT DO YOU MEAN BY THE GENERAL

6       STRUCTURE?

7  A.   WELL, THE CONCEPT OF CONTRIBUTING THE -- THE PATENTS

8       TO THE PARTNERSHIP.  AND THEN HAVING THE MONEY FLOW

9       AS -- AS LOANS BACK TO DOW.

10 Q.   AND HOW -- HOW -- AGAIN, HOW DID THE MONEY FLOW AS

11      LOANS BACK TO DOW?

12 A.   THROUGH -- THROUGH INTERMEDIARY COMPANIES.

13 Q.   WHAT WAS THAT INTERMEDIARY COMPANY?

14 A.   IT WAS PRIMARILY -- I BELIEVE IT WAS PRIMARILY ONE --

15      CHEMTECH I WAS PRIMARILY DCIL.  AND -- A DOW ENTITY.

16      WE HAVE LITERALLY HUNDREDS OF DOW LEGAL ENTITIES.

17 Q.   SO DID THE MONEY GO STRAIGHT FROM CHEMTECH

18      PARTNERSHIP TO DCIL OR WAS THERE ANOTHER INTERMEDIARY

19      COMPANY IN-BETWEEN?

20 A.   I DON'T EXACTLY REMEMBER THAT.  I THINK IT WENT

21      DIRECTLY, BUT I'M NOT SURE.

22 Q.   OKAY.  SO THEN TELL ME HOW -- HOW THAT WAS

23      FACILITATED, IF THAT WAS ONE OF YOUR -- APPARENTLY

24      YOUR PRIMARY ROLE IN THE CHEMTECH DEAL.  HOW DID THE

25      MONEY FLOW FROM THE CHEMTECH PARTNERSHIP TO DCIL?

1  A.   WE HAD -- LOOK.  WE HAD -- WE HAD CASH MANAGERS.  WE

2       HAD CASH MANAGERS INVOLVED IN THIS.  WE HAD

3       ACCOUNTANTS DO IT.  AND I DID NOT DIRECTLY GET

4       INVOLVED IN THAT.

5  Q.   WELL, THEN, WHAT EXACTLY WHAT WAS YOUR JOB AS

6       TREASURER IF YOU DIDN'T HANDLE THE CASH FLOWS AND YOU

7       AREN'T SURE OF ALL OF THE SPECIFICS OF THE STRUCTURE,

8       THEN CHEMTECH DIDN'T REALLY DO ANYTHING OTHER THAN

9       INVEST THE MONEY, CORRECT?

10 A.   I WAS RESPONSIBLE TO MAKE SURE THAT PEOPLE -- I MEAN,

11      YOU KNOW, NO DIFFERENT FROM BEING TREASURER OF DOW.

12      I HAVE CASH MANAGERS FOR THAT.  AND I HAVE

13      ACCOUNTANTS FOR THAT DOING THESE THINGS.  AND I MADE

14      SURE THAT -- THAT WE HAVE THE RIGHT PEOPLE EXECUTING

15      THE VARIOUS -- THE VARIOUS TRANSACTIONS.

16 Q.   AND THE VARIOUS TRANSACTIONS WERE JUST LOANING THE

17      MONEY BACK TO DOW, CORRECT?

18 A.   AND -- AND INVESTING SOME FUNDS.

19 Q.   OKAY.  WHAT -- WHAT DID THEY INVEST IN?

20 A.   THEY INVESTED IN -- IN VARIOUS INSTRUMENTS, MONEY

21      MARKETS, ET CETERA.

22 Q.   WHAT -- WHAT KIND OF VARIOUS INSTRUMENTS?  COULD YOU

23      GIVE ME THE RANGE OF THOSE INSTRUMENTS?

24 A.   I -- I DIDN'T -- I DIDN'T PERSONALLY DO IT SO I CAN'T

25      TELL YOU.

1  Q.  DID YOU SEE THE REPORTS OF WHAT THEY INVESTED IN?

2  A.  I -- I WOULD HAVE -- I WOULD HAVE SEEN THE REPORTS,

3      BUT I DON'T -- YOU KNOW, I -- I DON'T REMEMBER.  I

4      MAY HAVE SEEN -- SINCE THEN I MAY HAVE SEEN, YOU

5      KNOW, THOUSANDS AND THOUSANDS OF INVESTMENT REPORTS

6      FROM VARIOUS LEGAL ENTITIES.  SO I CANNOT RECALL.

7  Q.  DO YOU RECALL WHETHER THESE WERE ALL JUST TRIPLE A

8      BONDS AND U.S. SECURITIES, TREASURY BILLS, THAT SORT

9      OF -- TREASURY NOTES, THAT SORT OF THING?

10 A.  YES.  WE -- I DON'T REMEMBER.  AGAIN, WE HAVE A VERY

11     STRICT AND ALWAYS HAD A VERY STRICT RULES IN TERMS OF

12     -- IN TERMS OF THESE INVESTMENTS.  THESE INVESTMENTS

13     WERE NORMALLY LIMITED TO COMPANIES OR INSTRUMENTS

14     THAT HAD AT LEAST AS GOOD OF A RATING AS OUR OWN.

15     THAT WAS THE -- THAT WAS THE BASIC PRINCIPAL.

16 Q.  THE BASIC PRINCIPAL.  WAS THAT A REQUIREMENT THAT

17     THESE INVESTMENTS BE MADE IN -- IN ASSETS THAT HAD A

18     VALUE OR A -- A RATING AT LEAST AS HIGH AS DOW?

19 A.  YES.

20 Q.  DO YOU KNOW WHY THAT WAS?  WHY THEY WERE REQUIRED TO

21     BE OF VALUE AS HIGH AS DOW'S?

22 A.  WELL, TO MINIMIZE THE RISK.

23 Q.  TO MINIMIZE THE RISK TO WHO?

24 A.  WELL, FOR THE INVESTOR.

25 Q.  DID YOU EVER HEAR OF A COMPANY CALLED CPI, CHEMTECH

1    PORTFOLIO, INCORPORATED?

2  A.   I RECALL THE NAME.

3  Q.   DO YOU RECALL WHAT IT DID?

4  A.   NO.

5  Q.   DO YOU RECALL EVER DEALING WITH CHEMTECH PORTFOLIO,

6    INC.?

7  A.   I RECALL THE NAME.  I DON'T -- I DON'T RECALL IN WHAT

8    CONTEXT.

9  Q.   DO YOU RECALL WHERE IT WAS LOCATED?

10  A.   NO.  MOST LIKELY -- NO, I DON'T KNOW.

11  Q.   AND, SIR, I BELIEVE THAT IF YOU COULD TURN OVER TO

12    BATES NUMBER 1289.  THERE'S A -- WHAT I WOULD CALL A

13    BOARD PLANK, BUT IT LOOKS MORE LIKE AN ARROW.  FIVE-

14    TO-SEVEN-YEAR TERM; DO YOU SEE THAT?

15  A.   YES.

16  Q.   DO YOU RECALL THE CHEMTECH -- CHEMTECH TRANSACTION

17    BEING SET UP AS A FIVE-TO-SEVEN-YEAR TERM INVESTMENT?

18  A.   WELL, THE ANSWER IS NO.  I ANSWERED YOU EARLIER I

19    WASN'T SURE ABOUT THE -- ABOUT THE TENURE.  SO THE

20    ANSWER IS NO.  BUT I SEE IT HERE.

21  Q.   BUT DO YOU RECALL BEING ASKED THAT QUESTION EARLIER

22    WHEN I TOOK YOUR DEPOSITION IN MIDLAND ON MARCH 28TH,

23    2008?

24  A.   YOU ASKED ME A FEW HUNDRED, MAYBE A THOUSAND

25    QUESTIONS DURING THAT DAY.  I DON'T RECALL YOU ASKING

```
 1        ME THAT SPECIFIC QUESTION.  I'M SORRY.
 2   Q.   I'M SURE YOU COULDN'T REMEMBER THEM ALL.  I AGREE.
 3            WELL, IN FACT, SIR, I DID ASK YOU THAT QUESTION.
 4        I'D LIKE TO READ IT TO YOU.  IT'S ON PAGE 31 OF YOUR
 5        DEPOSITION.  AND YOU'LL SEE THAT ON THE SCREEN.
 6            BY THE COURT:
 7                CAN YOU READ THAT, SIR?  WHY DON'T WE
 8                ENLARGE IT, IF WE CAN.
 9   BY MR. WELSH:
10   Q.   DO YOU SEE THAT, SIR?
11   A.   YES, I SEE IT.
12   Q.   OKAY.  AND YOU SEE HOW I ASKED YOU A QUESTION.  "DO
13        YOU RECALL FOR THIS TRANSACTION WHAT THE TERM WAS TO
14        BE?"  AND YOU ANSWERED, "I DON'T RECALL.  I THINK IT
15        WAS AROUND FIVE-TO-SEVEN YEARS."
16            IS THAT YOUR BEST RECOLLECTION TODAY?
17   A.   YES.
18   Q.   THANK YOU.  NOW, IN FACT, SIR, I'D LIKE YOU TO TURN
19        TO WHAT'S IN YOUR BINDER FROM MR. MAGEE, WHICH IS
20        "JOINT EXHIBIT 280."  DO YOU HAVE THAT IN FRONT OF
21        YOU, SIR?
22   A.   YES, I DO.
23   Q.   OKAY.  THERE YOU DESCRIBE THAT AS BEING A 1995 ANNUAL
24        MEETING.  IS THAT TRUE?  THE AGENDA FOR IT.  IT'S THE
25        SECOND PAGE, BATES NUMBER 9736.
```

1   A.   YES.

2   Q.   AND YOU WERE THERE WITH THE GENERAL PARTNER, WHICH

3        WAS DOW EUROPE, CORRECT?

4   A.   YES.

5   Q.   AND WHO WAS W. BAUR?

6   A.   W. BAUR WAS -- DURING THAT TIME HE HAD VARIOUS --

7        VARIOUS ROLES.  I CAN'T -- HE WAS VERY MUCH A PART OF

8        THIS -- OF THE ADMINISTRATIVE PART OF -- OF CHEMTECH.

9        EXACTLY WHAT ROLE?  I THINK HE WAS PRIMARILY THE CASH

10       MANAGER.  BUT I -- I CAN'T REMEMBER THE EXACT ROLE.

11  Q.   MR. -- MR. LEUTENEGGER?

12  A.   MR. LEUTENEGGER IS A -- HE'S AN ACCOUNTANT TODAY.

13       EXACTLY MY -- MY GUESS IS THAT HE WAS ALSO INVOLVED

14       AS A -- AS AN ACCOUNTANT.

15  Q.   AND MR. CURRY?

16  A.   MR. CURRY WAS OUR LOCAL TAX MANAGER, ALL LOCATED IN

17       -- IN HORGEN.

18  Q.   OKAY.  AND THEN THE REST OF THE REPRESENTATIVES OF

19       THE VARIOUS BANKS, CORRECT?

20  A.   RIGHT.

21  Q.   DO YOU RECALL -- AND I KNOW THIS WASN'T THE ONLY

22       MEETING YOU -- YOU SAID YOU ATTENDED --

23  A.   SOME.

24  Q.   -- MOST OF THE MEETINGS?

25  A.   YES.  SOME OF THEM, NOT ALL OF THEM.

1  Q.   BUT THE VAST BULK OF THEM, CORRECT?

2  A.   MOST OF THEM.

3  Q.   AND WHAT EXACTLY DID YOU RECALL, GENERALLY SPEAKING

4       NOW, WHAT EXACTLY DID THE BANKS DO IN TERMS OF

5       PARTICIPATION AT THESE MEETINGS?

6  A.   THE BANKS WERE THERE TO PRIMARILY -- PRIMARILY LISTEN

7       TO MAKE SURE THAT THEIR INVESTMENTS WERE BEING

8       PROPERLY MANAGED.  ASKED A LOT OF QUESTIONS.

9  Q.   CAN YOU TELL ME, GENERALLY SPEAKING, AND MAYBE WE CAN

10      LIMIT IT DOWN.  BUT GENERALLY SPEAKING WHAT WERE

11      THEIR QUESTIONS CONCERNING?

12 A.   IT WAS SO LONG AGO.  I -- I -- I MEAN, CERTAINLY THEY

13      WERE -- I MEAN, PART OF MY ROLE IS REPRESENTING ALSO

14      DOW -- DOW EUROPE, PER SE, WAS DESCRIBING THE -- THE

15      BUSINESS ENVIRONMENT, WHICH, OF COURSE, HAD A

16      RELEVANCE TO SOME OF THE PATENTS THERE.  SO THEY WERE

17      VERY INTERESTED IN THAT.

18           THEN THEY WERE INTERESTED IN -- IN THE

19      ADMINISTRATIVE PART OF IT, MAKING SURE THAT -- FROM

20      THE ADMINISTRATION, FROM AN ACCOUNTING STANDPOINT

21      THINGS WERE BEING DONE THE RIGHT WAY.

22           BUT I DON'T -- I DON'T RECALL THE SPECIFICS.

23 Q.   WELL, YOU SAID A FEW MINUTES AGO THAT WHAT CHEMTECH

24      DID, WHICH WAS IN HORGEN AND WHERE DRESNER WAS, DOW

25      EUROPE, WAS TO INVEST THE MONEY.  AND THE MONEY WAS

1      REQUIRED TO BE INVESTED IN A HIGH LEVEL OF FINANCIAL

2      INSTRUMENTS, CORRECT?

3   A.  THAT'S CORRECT.

4   Q.  SO THERE REALLY WASN'T MUCH FOR THEM TO ASK ABOUT THE

5      INVESTMENTS, OTHER THAN TO MAKE SURE THEY WERE -- AND

6      THEY COULD SEE WHAT -- THAT THEY WERE BEING KEPT IN

7      THESE HIGH LEVEL ASSETS, CORRECT?

8   A.  LIKE I SAID, I -- I DON'T RECALL THE SPECIFICS OF THE

9      QUESTIONS.

10  Q.  THE SPECIFICS OF WHAT?

11  A.  OF THE QUESTIONS THAT THEY WERE ASKING.

12  Q.  OH.  NO.  I WAS ASKING ABOUT -- MY QUESTION WASN'T

13      THAT AGAIN.  IT WAS WHETHER OR NOT, AS YOU SAID A

14      MINUTE AGO, THE ASSETS OF CHEMTECH WERE INVESTED --

15      THEY WERE REQUIRED TO BE INVESTED IN HIGH LEVEL

16      ASSETS, CORRECT?

17  A.  HIGH QUALITY.

18  Q.  HIGH QUALITY.  SO THERE REALLY WASN'T MUCH FOR THEM

19      TO ASK ABOUT THE INVESTMENTS THEN, WAS THERE?

20          BY THE COURT:

21              IF YOU RECALL.

22  BY THE WITNESS:

23  A.  I DON'T RECALL.

24  BY MR. WELSH:

25  Q.  NOW, SIR, YOU DESCRIBED CHEMTECH AS BEING THERE IN

1          HORGEN, SWITZERLAND, CORRECT?

2    A.    CORRECT.

3    Q.    ALONG WITH DOW EUROPE?

4    A.    RIGHT.

5    Q.    DID CHEMTECH ITSELF HAVE ANY EMPLOYEES?

6    A.    IT HAD -- I DON'T REMEMBER THE -- THE EXACT -- EXACT

7          WAY IT WAS MANAGED.  IT HAD -- WHETHER IT WAS THROUGH

8          ADMINISTRATIVE SERVICES, YOU KNOW, THROUGH A SERVICE

9          AGREEMENT.  BUT IT HAD -- IT HAD QUITE A FEW PEOPLE

10         THAT WERE WORKING ON BEHALF OF CHEMTECH.  AND THERE

11         WERE OFFICES THERE THAT WERE DEDICATED TO CHEMTECH.

12   Q.    DID YOU EVER SEE THE OFFICES?

13   A.    DID I EVER SEE THEM?

14   Q.    YES.

15   A.    YES.

16   Q.    AND DID CHEMTECH PAY SALARIES TO THESE PEOPLE?

17   A.    THEY WERE -- YES.  THEY WERE -- BUT, AGAIN, HOW IT

18         WAS DONE, I DON'T KNOW.  BUT -- BUT OBVIOUSLY, YOU

19         KNOW, WE DIDN'T PROVIDE SERVICES FOR FREE.

20   Q.    WHEN YOU SAY, "WE DIDN'T PROVIDE SERVICES FOR FREE,"

21         WHAT DO YOU MEAN?

22   A.    THE EMPLOYEES LIKE MR. BAUER WAS -- WAS WORKING FOR

23         DOW -- DOW EUROPE.  AND ANY -- ANY SERVICES THAT HE

24         PROVIDED WOULD BE PAID FOR.

25   Q.    BY DOW EUROPE OR BY CHEMTECH?

1    A.    NO.   ULTIMATELY IT WAS -- IT WAS SOME -- SOME FORM OF

2          -- OF REIMBURSEMENT.   I DON'T KNOW HOW THAT WAS DONE.

3    Q.    DO YOU MEAN BY DOW -- BETWEEN DOW EUROPE AND

4          CHEMTECH?

5    A.    YES.

6    Q.    SO ALL THESE PEOPLE WERE -- WERE DOW EUROPE

7          EMPLOYEES?   ALL THE CHEMTECH PEOPLE WERE DOW EUROPE

8          EMPLOYEES WERE SOMEHOW LOANED TO --

9    A.    YES.   BUT I DON'T KNOW HOW.

10   Q.    -- CHEMTECH?

11   A.    I DON'T KNOW HOW THAT WAS DONE.

12   Q.    DO YOU RECALL HOW MANY PEOPLE THERE WERE THAT WERE

13         LOANED OR OTHERWISE DEALT WITH BY DOW EUROPE AND --

14         AND LOANED TO CHEMTECH?

15   A.    IT WAS A RELATIVELY SMALL AMOUNT, BUT I DON'T

16         REMEMBER HOW MANY.

17   Q.    WERE THEIR OFFICES IN WITH THE DOW EUROPE OFFICES?

18   A.    THEY WERE IN THE SAME -- SAME COMPLEX.   WE HAVE THREE

19         BUILDINGS IN HORGEN.   AND THEY WERE IN, YOU KNOW, ONE

20         OF THOSE BUILDINGS.

21   Q.    SIR, MR. MAGEE WENT OVER WITH YOU A -- A DOCUMENT

22         WHICH HE PROVIDED.   I DON'T THINK IT'S IN YOUR

23         BINDER.   HE GAVE IT TO YOU TODAY AND TO US.   IT'S

24         "JOINT EXHIBIT 402."   DO YOU SEE THAT?   IT'S A LOOSE

25         PIECE OF PAPER.

1   A.   YES, SIR.

2   Q.   AND IT'S A -- A MEMO -- EXCUSE ME.  WHAT YOU

3        DESCRIBED AS A PRECURSOR TO A MEETING IN CANADA; IS

4        THAT CORRECT?

5   A.   THAT'S CORRECT.

6   Q.   AND WHAT WAS THE MEETING IN CANADA TO BE?  IS IT

7        WHAT'S DESCRIBED IN THAT FIRST PARAGRAPH, UNDER "RE:

8        CHEMTECH ROYALTY ASSOCIATES"?

9   A.   IT WAS A -- IT WAS A MEETING, I BELIEVE, TO REVIEW

10       THE RESULTS OF THE PRIOR YEAR.

11  Q.   AND IT'S A LISTING OF THE PEOPLE OF WHO, I TAKE IT,

12       WOULD THEN ALSO HAVE APPEARED AT THE MEETING IN

13       CANADA?

14  A.   YES.  I DON'T -- I DON'T KNOW WHETHER EVERYONE --

15       WHETHER EVERY ONE OF THOSE PEOPLE ATTENDED.  BUT

16       THOSE ARE PEOPLE THAT WERE INVITED TO ATTEND.

17  Q.   AND THEN MR. MAGEE DIRECTED YOUR ATTENTION TO YOUR

18       HANDWRITTEN NOTE ON THE BACK OF THAT, WHICH READS,

19       "WE CAN'T TALK ABOUT THE TAX IMPACT ON TDCC."

20  A.   THAT'S CORRECT.

21  Q.   AND YOU SAID -- YOU GAVE HIM AN EXPLANATION FOR WHY

22       YOU BELIEVE YOU WROTE THAT ON THERE.

23  A.   YES.  AND MY EXPLANATION IS BASED ON THE SAME

24       REACTION I WOULD HAVE TODAY.  IF I WERE -- IF I WERE

25       GIVEN THIS KIND OF A DOCUMENT TODAY.  BECAUSE, AGAIN,

1    IT'S BEEN 14 YEARS.  SO I CAN'T -- I CAN'T REMEMBER

2    THESE DETAILS.  BUT IF I WOULD SEE A -- A LIST OF

3    THAT MANY PEOPLE ALONG WITH -- WITH THE INVESTORS,

4    THEN MY REACTION WOULD BE -- AND THERE WERE QUITE A

5    FEW PEOPLE THAT -- THAT REPRESENT TAXES AND -- AND

6    TREASURY, ET CETERA.  THEN MY REACTION WAS MY OWN

7    NOTES TO -- TO MYSELF AS, YOU KNOW, LET'S MAKE SURE

8    THAT WE DON'T SHARE TOO MUCH DOW INFORMATION WITH AN

9    EXTERNAL PARTY.

10   Q.   AND WHO WERE THE EXTERNAL PARTIES THAT YOU WERE

11        WORRIED ABOUT SHARING THIS INFORMATION WITH?

12   A.   WITH INVESTORS THAT WERE GOING TO ATTEND OUR MEETING.

13        NOW, THIS LETTER DID NOT ADDRESS THOSE INVESTORS.

14        THIS WAS A MEMO TO DOW INTERNAL PEOPLE.

15   Q.   WELL, THIS -- THIS MEMO, "JOINT EXHIBIT 402" IN THAT

16        FIRST PARAGRAPH SAID THAT IT WAS TO BE A REVIEW

17        MEETING OF CHEMTECH ROYALTY ASSOCIATES, RIGHT?

18   A.   YES.

19   Q.   SO WHO WERE THE OUTSIDE INVESTORS?

20   A.   YOU KNOW, I -- I -- I HAD ASSUMED HERE AND, YOU KNOW,

21        THAT'S WHY I WOULD RATHER SAY I DON'T REMEMBER.  I

22        SHOULDN'T BE ASSUMING HERE.  I'VE ASSUMED THAT THIS

23        WAS GOING TO BE A MEETING WITH -- WITH -- WITH

24        OUTSIDE INVESTORS.  SO I -- I -- I CAN'T -- I CAN'T

25        REMEMBER.

1        BUT IRRESPECTIVE OF THAT, WHETHER AN OUTSIDE

2    INVESTORS OR NOT, WITH THAT MANY PEOPLE IN A -- IN A

3    MEETING, MY REACTION WOULD -- WOULD BE THE SAME,

4    WHICH WOULD BE, YOU KNOW, LET'S NOT TALK ABOUT --

5    ABOUT -- ABOUT TAX ISSUES.  IT'S -- YOU KNOW, IN DOW,

6    FOR INSTANCE, I -- I MYSELF AS TREASURER VERY RARELY

7    GOT INVOLVED IN ANY TAX ISSUES.  IT'S THE TAX

8    DEPARTMENT THAT DOES THAT.  AND THE TAX DEPARTMENT

9    REPORTS TO THE -- TO THE CFO.  AND IN MY TREASURER

10   CAPACITY I HARDLY EVER GOT INVOLVED IN -- IN -- IN

11   ANY TAX ISSUES.

12   SO THAT WAS MY REACTION.

13       NOW, I THOUGHT WHEN I MADE THE -- WHEN I GAVE

14   THAT RESPONSE EARLIER, I HAD ASSUMED THAT THIS WAS A

15   MEETING WITH THE -- WITH THE OUTSIDE SHAREHOLDERS.

16   BUT PERHAPS THAT'S NOT -- THAT'S NOT THE CASE.

17 Q.  NOW, IT DOESN'T APPEAR SO, DOES IT?  AND, IN FACT, IF

18   YOU LOOK ON HERE AND YOU LOOK AT THE -- THE TO LINE,

19   IT'S TO BILL CURRY OF TAX.  IT'S TO CHUCK HAHN OF

20   TAX.  IT'S TO GREG JONES OF TAX.  IT'S TO ED

21   VALENZUELA OF TAX.  IT APPEARS THAT THIS IS A MEETING

22   AND IT'S STATES IT IS TO BE A MEETING IN TORONTO OF

23   THE CHEMTECH ROYALTY ASSOCIATES.  IT'S NOT ABOUT

24   OUTSIDE INVESTORS, CORRECT?

25 A.  WELL, I -- I HAVE TO RE-READ IT, SORRY.

1   Q.   THAT'S ALL RIGHT.  ALL RIGHT, SIR.   TELL ME ---

2              BY THE COURT:

3                  WELL, LET HIM -- LET HIM READ IT IF HE

4            WANTS TO READ IT AND ANSWER YOUR QUESTION.

5            BY MR. WELSH:

6                  YES, YOUR HONOR.

7   BY THE WITNESS:

8   A.   IT IS MOST LIKELY AN INTERNAL MEETING, BUT I'M NOT

9        CERTAIN.

10  BY MR. WELSH:

11  Q.   OKAY.  WELL, THEN MAYBE THIS WILL HELP YOU OUT.

12       UNDER NUMBER FIVE, ONE OF THE ITEM AGENDAS IS THE

13       LAST BULLET POINT UNDER FIVE.  IT'S PLANNING --

14       PLANNING FOR THE ANNUAL PARTNER MEETING.  SO

15       APPARENTLY THIS DIDN'T INVOLVE THE -- THE CLASS A

16       PARTNERS, CORRECT?

17  A.   YES.  IT -- IT APPEARS THAT WAY.

18  Q.   SO IT WAS ALL INTERNAL DOW PEOPLE THEN, WASN'T IT?

19  A.   YOU KNOW, THERE WERE SO MANY MEETINGS THAT THIS

20       APPEARS THAT -- THAT THERE WERE NO OUTSIDE PARTNERS

21       INVOLVED.

22          NOW, AT THE MEETING ITSELF LATER ON WHETHER

23       THERE WERE PARTNERS INVOLVED, I DON'T KNOW.  BUT IF I

24       READ THIS -- AT LEAST CERTAINLY PART OF THAT MEETING

25       WAS EXCLUSIVELY INTERNAL.

Case 3:05-cv-00944-BAJ-EWD    Document 166    08/29/13    Page 67 of 318

1    Q.    SIR, DO YOU REMEMBER BEING ASKED ABOUT THIS

2          PARTICULAR DOCUMENT DURING YOUR DEPOSITION, WHICH I

3          TOOK OF YOU IN MIDLAND ON MARCH 28TH, 2008?

4    A.    NO.  LIKE I SAID, YOU ASKED ME SO MANY QUESTIONS, I

5          CAN'T RECALL EACH ONE.

6    Q.    WELL, PERHAPS THIS WILL REFRESH YOUR -- EXCUSE ME --

7          RECOLLECTION.  IF WE COULD TURN TO YOUR DEPOSITION

8          PAGE 93, LINE 14.  DO YOU SEE THAT, SIR?

9    A.    I -- I DON'T THINK ---

10   Q.    WHERE YOU WERE TALKING ABOUT THIS DOCUMENT, LINE 14,

11         "I'M EMBARRASSED TO ADMIT IT"?

12             BY THE COURT:

13                 WAIT.  IT'S NOT ON THE ---

14             BY MR. WELSH:

15                 IT'S NOT?  OH, I'M SORRY.  I'M SORRY,

16             JUDGE.

17             BY THE COURT:

18                 NOT -- NOT QUITE YET.  THERE WE GO.

19             BY MR. WELSH:

20                 I'M SORRY.

21             BY THE COURT:

22                 AND WHY DON'T WE GO ON AND ENLARGE IT AT

23             THE RELEVANT PORTION?  THERE WE GO.  THANK YOU.

24   BY THE WITNESS:

25   A.    "I'M EMBARRASSED TO ADMIT IT, BUT THAT'S MY AWFUL

1        HANDWRITING."  THAT'S WHAT I SAID EARLIER TODAY.

2    BY MR. WELSH:

3    Q.   YES, SIR.

4    A.   YOUR QUESTION, PLEASE, AGAIN?

5    Q.   OH.  IF YOU WOULD READ THROUGH YOUR -- YOUR TESTIMONY

6         THERE AND TELL ME WHETHER -- YOU CAN READ DOWN TO THE

7         FIRST.

8    A.   OKAY.

9             BY THE COURT:

10                SCROLL DOWN.

11   BY MR. WELSH:

12   Q.   LINE FOUR.  WELL, ACTUALLY LINE FIVE OF THE PAGE 94.

13   A.   OKAY.

14             BY THE COURT:

15                WELL -- WELL, LET'S MAKE SURE WE GET IT ON

16         THE SCREEN HERE.

17   BY MR. WELSH:

18   Q.   OR YOU CAN TAKE IT IN PIECES IF WE CAN'T GET IT ALL

19         UP ON THE SCREEN.

20   A.   IT'S OKAY.  JUST LEAVE IT NOW.  DO YOU WANT ME TO

21         READ IT ALOUD?

22   Q.   WELL, JUST READ IT OVER AND FIRST, JUST TELL ME IF

23         THAT'S YOUR BEST RECOLLECTION OF WHAT YOU SAID AT THE

24         TIME.

25   A.   WELL -- THANK YOU.  WELL, WHAT I'VE READ HERE SO FAR

1        IS MORE OR LESS THE SAME ANSWER TO WHAT I'VE BEEN

2        GIVING YOU NOW, WHICH IS I DON'T RECALL.

3   Q.   YOU JUST DON'T RECALL?

4   A.   I JUST DON'T RECALL.

5   Q.   AND HOW MANY MEETINGS, SIR, DO YOU ATTEND WITH DOW

6        PEOPLE OR DID YOU ATTEND -- I'M SORRY -- LET'S GO

7        BACK TO THIS TIME PERIOD 1997, IN THE COURSE OF A

8        YEAR?

9   A.   HOW MANY MEETINGS?

10  Q.   APPROXIMATELY.

11  A.   IN GENERAL?

12  Q.   GENERAL MEETINGS, YES.

13  A.   IT'S A DOW DISEASE.  TOO MANY MEETINGS.  IN ONE YEAR?

14       PROBABLY -- I'M EMBARRASSED TO ADMIT IT.  BUT

15       PROBABLY THOUSANDS.

16  Q.   THOUSANDS OF MEETINGS.  AND I THINK WHEN YOU WERE

17       TALKING TO MR. MAGEE YOU SAID THAT GENERALLY SPEAKING

18       IT'S A TENET OF DOW THAT YOU KEEP CONFIDENTIAL

19       COMMUNICATIONS AND CONFIDENTIAL INFORMATION

20       CONFIDENTIAL, CORRECT?

21  A.   YES.  QUITE NORMAL.

22  Q.   AND EVERYONE AT DOW KNOWS THAT YOU'RE SUPPOSED TO

23       KEEP CONFIDENTIAL INFORMATION CONFIDENTIAL, CORRECT?

24  A.   THEY'RE SUPPOSED TO.

25  Q.   AND THAT'S NOT SOMETHING THAT THEY NEED TO BE

1      REMINDED OF, IS IT?

2  A.   I DISAGREE WITH THAT.  I THINK WE ALWAYS HAVE TO

3      REMIND PEOPLE.  WHEN YOU HAVE A LARGE ORGANIZATION

4      LIKE DOW, 50,000 PEOPLE.  WHEN IT COMES TO CERTAIN

5      THINGS LIKE CONFIDENTIALITY, SAFETY, ET CETERA, YOU

6      HAVE TO BE REMINDED CONTINUOUSLY.

7  Q.   AND DO YOU REMIND THEM?

8  A.   I DO.

9  Q.   SO YOU DON'T NEED TO REMIND YOURSELF, DO YOU?

10 A.   SUBCONSCIOUSLY I ALWAYS DO.

11 Q.   SUBCONSCIOUSLY.  OKAY.  BUT YOU DON'T NEED TO WRITE

12     YOURSELF A NOTE THAT YOU NEED TO NOT DISCUSS

13     CONFIDENTIAL INFORMATION, BECAUSE YOU KNOW THAT?

14 A.   I -- I DISAGREE WITH THAT.

15 Q.   WHY?

16 A.   I THINK -- I THINK THERE'S A NATURAL INCLINATION TO

17     WRITE THESE THINGS DOWN.

18 Q.   OKAY.  NOW, SIR, IF YOU'D TURN YOUR ATTENTION TO WHAT

19     WAS IN MR. MAGEE'S BINDER, "JOINT EXHIBIT 574."

20 A.   YES, SIR.

21 Q.   DO YOU HAVE THAT IN FRONT OF YOU, SIR?

22 A.   YES, I DO.

23 Q.   ALL RIGHT.  NOW, SIR, I BELIEVE THAT YOU -- YOU

24     DESCRIBED THIS, THAT IS, THERE ARE TWO PAGES TO THIS

25     DOCUMENT, I BELIEVE -- NO, THREE PAGES.  I'M SORRY.

1        THE FIRST DOCUMENT, WHICH IS BATES NUMBER 57703, YOU

2        DESCRIBED, I THINK, AS A BUSINESS SUPPORT LETTER?

3   A.   YES.

4   Q.   AND, AGAIN, VERY BRIEFLY, COULD YOU TELL ME WHAT --

5        WHAT THAT -- THE POINT OF THAT DOCUMENT IS?

6   A.   THE POINT OF THE DOCUMENT IS TO DESCRIBE THE -- THE

7        TRANSACTION.  AND WHY WE HAVE THIS TRANSACTION.  I

8        MEAN, THAT APPLIES TO ALL BUSINESS SUPPORT LETTERS,

9        NOT JUST TO THIS ONE.

10           SO YOU DESCRIBE WHAT IS IT THAT YOU'RE ASKING

11       APPROVAL FOR, AND WHY ARE YOU RECOMMENDING IT TO THE

12       FINANCE COMMITTEE AND ULTIMATELY TO THE BOARD TO

13       APPROVE.

14  Q.   AND THEN ALONG WITH THAT GOES WHAT YOU DESCRIBED, I

15       THINK, TO MR. MAGEE, BATES NUMBER PAGE 57704, AND I

16       DON'T KNOW WHY IT GOES TO 57706, AS THE RESOLUTION

17       PART; IS THAT CORRECT?

18  A.   YES.  YOU ALWAYS HAVE A -- THE RESOLUTION IS FOR

19       PURPOSES OF A BOARD APPROVAL.

20  Q.   AND YOU DESCRIBED TO HIM AFTER YOU MENTIONED THESE

21       TWO PARTS AS BEING PART OF THE PACKAGE.  WHAT ELSE

22       WOULD HAVE GONE ALONG WITH THIS?  WHAT ELSE WAS PART

23       OF THE PACKAGE?

24  A.   PART OF THE PACKAGE?

25  Q.   THAT'S WHAT YOU SAID.  I DIDN'T UNDERSTAND IT.

1   A.   WELL, I -- I PERHAPS WAS REFERRING TO THE -- THE

2        PACKAGE BEING QUITE A FEW.  I MEAN, WE HAVE -- WE

3        REGULARLY HAD, YOU KNOW, HALF A DOZEN TO A DOZEN, IN

4        SOME CASES, YOU KNOW, AS MANY AS 14 OR 15 DIFFERENT

5        TRANSACTIONS.  AND SO I THINK I WAS REFERRING TO THAT

6        IN TERMS OF THE PACKAGE.

7            BUT IF YOU'RE TALKING SPECIFIC TO A PACKAGE, I'M

8        TALKING ABOUT A -- A BUSINESS SUPPORT LETTER, AS WELL

9        AS THE RESOLUTION.

10  Q.   AND THAT'S GENERALLY ALL THAT'S IN THE PACKAGE IS THE

11       ONE PARTICULAR TRANSACTION?

12  A.   YES.  YOU SOMETIMES -- YOU SOMETIMES HAVE ONLY THAT.

13       SOMETIMES YOU HAVE -- YOU SUPPORT THAT WITH A -- WITH

14       A PRESENTATION OR -- OR YOU JUST ARTICULATE IT.  IT'S

15       A COMBINATION.  AGAIN, DEPENDING ON EACH -- EACH

16       TRANSACTION.  IF IT REQUIRED IT, THEN THE FINANCE

17       COMMITTEE WOULD ACTUALLY ASK FOR A PRESENTATION.

18  Q.   AND DO YOU RECALL PRESENTATIONS BEING ASKED FOR AND

19       MADE IN THE CHEMTECH?

20  A.   NO, I DON'T.

21  Q.   ALL RIGHT, SIR.

22  A.   I DON'T RECALL.

23  Q.   OH, YOU DON'T RECALL WHETHER IT WAS OR WAS NOT?

24  A.   THAT'S CORRECT.

25  Q.   ALL RIGHT.  THEN MR. MAGEE NEXT DIRECTED YOUR

1        ATTENTION TO THE NEXT DOCUMENT IN YOUR BOOK, WHICH IS

2        JX597.

3   A.   YES, SIR.

4   Q.   AND YOU SAID THESE ARE THE MINUTES OF THE FINANCE

5        COMMITTEE, OF THE BOARD?

6   A.   YES.

7   Q.   AND THIS IS WHERE THE RESOLUTION PACKAGE WAS

8        PRESENTED; IS THAT CORRECT?

9   A.   YES.  THIS IS -- THIS IS THE MINUTES OF THE

10       PRESENTATION, WHICH INCLUDED THE BUSINESS SUPPORT

11       LETTER ON CHEMTECH II.

12  Q.   ALL RIGHT.  COULD YOU TELL ME WHAT -- WHAT DOES --

13       WHAT -- WHAT IS ENTAILED IN PRESENTING THIS

14       RESOLUTION TO THE FINANCE COMMITTEE?  WHAT -- WHAT

15       HAPPENS?  IS THERE DISCUSSION?  HOW DOES IT -- HOW

16       DOES IT TAKE PLACE?

17  A.   IT DEPENDS ON -- ON THE -- ON THE NUMBER OF

18       TRANSACTIONS.  SO I GO BACK TO "EXHIBIT 574," THE

19       BUSINESS SUPPORT LETTER.  SO, AGAIN, I DON'T RECALL

20       WHETHER THERE WAS A REQUEST BY -- IN THIS CASE IT

21       WOULD BE THE CFO.  I WOULD SIT DOWN AS -- AS

22       TREASURER -- IN 1998 I WAS THE TREASURER OF DOW.  SO

23       I WOULD SIT DOWN WITH THE CFO, AT THAT TIME IT WAS

24       PEDRO REINHARD.  AND I WOULD GO OVER THE VARIOUS

25       TRANSACTIONS WITH HIM IN TERMS OF WHAT WE WOULD

1    REVIEW WITH THE FINANCE COMMITTEE.  AND  THEN EITHER

2    -- EITHER HE WOULD ASK FOR -- IF HE FELT IT WAS

3    REQUIRED, HE WOULD ASK FOR AN ADDITIONAL PRESENTATION

4    BY ONE OF THE SUBJECT MATTER EXPERTS TO -- TO PRESENT

5    ONE OF THESE TRANSACTIONS.  ESCUDERO, FOR INSTANCE,

6    HAD A CORPORATE FINANCE.

7         I -- I CAN'T RECALL -- I DON'T -- I DON'T

8    REMEMBER ANY SPECIFIC PRESENTATIONS SUPPORTING THIS

9    TRANSACTION.  BUT WHAT I WOULD DO IS I WOULD PRETTY

10   MUCH SUMMARIZE WHAT IS STATED HERE IN THE BUSINESS

11   SUPPORT LETTER, "EXHIBIT 574."  AND THEN AS I WOULD,

12   BY THE WAY, ALL THE OTHERS.  SO IN THE MINUTES YOU

13   SAW THAT THEY WERE -- THERE WERE 14 -- I BELIEVE

14   THERE WERE 14 -- 14 RESOLUTIONS.  AND I WOULD, LIKE I

15   SAID, SUMMARIZE THEM.  AND THEN OPEN IT UP FOR Q AND

16   A.

17 Q.  AND YOU SAID YOU DON'T REMEMBER WHAT THE Q AND A WAS

18   IN TERMS OF THE CHEMTECH TRANSACTION?

19 A.  NO.  I -- I MEAN, I'M -- I'M PRETTY SURE THAT, YOU

20   KNOW, IT WAS -- IT WAS PRETTY CLEAR THAT IT WAS -- IT

21   WAS OFF-BALANCE SHEET FINANCING AND IT WAS, YOU KNOW,

22   EQUITY TYPE OF -- OF FINANCING.  AND THAT'S -- THAT'S

23   -- THAT'S PRETTY MUCH IT.

24        AND, YOU KNOW, YOU HAVE -- YOU HAVE PEOPLE ON

25   THE FINANCE COMMITTEE THAT -- YOU HAVE MR. FALLA,

1        WHO, OF COURSE, IS -- IS A SUBJECT -- FINANCE SUBJECT

2        MATTER EXPERT.  AND HE WAS ON THE -- HE WAS STILL ON

3        THE -- ON THE OTHER COMMITTEE AS A BOARD MEMBER.  AND

4        YOU HAVE THE COMPTROLLER THERE AND YOU HAD OTHER

5        BOARD MEMBERS THERE.

6   Q.   DID YOU THINK THEY CONSIDERED THIS A -- AND YOU

7        CONSIDER THIS TO BE A PRETTY MUCH RUN-OF-THE-MILL

8        EQUITY FINANCING TRANSACTION?

9   A.   RUN OF THE MILL?  IT WAS A -- IT WAS AN ATTRACTIVE

10       EQUITY FINANCING.  AND IT CERTAINLY WAS INTERESTING,

11       BECAUSE IT WAS AN ASSET THAT HAD VERY LITTLE VALUE TO

12       OUR BOOKS.  AND WE WERE ABLE TO GET A FAIR MARKET --

13       ECONOMIC FAIR MARKET VALUE OUT OF IT.  AND I THINK

14       THAT THAT WAS VERY ATTRACTIVE.  AND SO THERE WAS

15       OBVIOUSLY SUPPORT.  OTHERWISE, IT WOULD NOT HAVE BEEN

16       RECOMMENDED.

17            ULTIMATELY, THESE PEOPLE HERE HAVE TO AGREE

18       WHETHER OR NOT IT SHOULD GO ON FOR THE BOARD FOR

19       FINAL APPROVAL.  AND THEY SUPPORTED IT.  ONCE IN A

20       WHILE WE HAD -- WE HAD TRANSACTIONS WITH BUSINESS

21       SUPPORT LETTERS THAT WERE ACTUALLY NOT APPROVED BY

22       THE FINANCE COMMITTEE, AND THEY WERE WITHDRAWN.

23  Q.   OKAY, SIR.  I WONDER IF YOU WOULD DIRECT YOUR

24       ATTENTION TO -- I THINK THE NEXT MAYBE TWO DOCUMENTS

25       UP IN MR. MAGEE'S BOOK, "PLAINTIFF'S DEMONSTRATIVE

1        NUMBER 9." IT'S A BLUE GRAPH. IT SAYS, DOWS DEBT-

2        TO-TOTAL CAPITALIZATION RATIO.

3   A.   YES, SIR.

4   Q.   DO YOU SEE THAT, SIR?

5   A.   YES.

6   Q.   ALL RIGHT. NOW, YOU HAD A LOT OF CONVERSATION WITH

7        MR. MAGEE CONCERNING THE 40 PERCENT WHACK OR HURDLE

8        RATE. I'M SORRY, THE DEBT-TO-CAPITALIZATION RATIO?

9   A.   YES.

10  Q.   AND YOU SHOW THAT HERE ON THE GRAPH. AND YOU SHOW --

11       YOU'VE GOT A LINE SHOWING THE MAXIMUM 40 PERCENT,

12       CORRECT? AND ACTUALLY DOW WENT OVER THAT LINE FOR

13       FIVE OF THE YEARS, CORRECT? BETWEEN '90 AND '98?

14  A.   THAT'S CORRECT.

15  Q.   NOW, SIR, DID -- DID DOW EVER EXPERIENCE A DOWN GRADE

16       DURING THE PERIOD 1990 THROUGH 1998?

17  A.   NO. I DON'T -- LET ME THINK. I DON'T THINK SO. I

18       BELIEVE NO. AND MAY I EXPAND ON THAT?

19            BY THE COURT:

20              SURE. GO AHEAD.

21  BY THE WITNESS:

22  A.   THAT'S THE BENEFIT OF HAVING TRANSPARENCY WITH THE

23       RATING AGENCIES. AGAIN, THIS IS NOT ALL, YOU KNOW,

24       AN EXACT SCIENCE. SO WE SAT WITH THE RATING

25       AGENCIES. AND I CAN ASSURE YOU THAT WHENEVER THE --

1        WHENEVER THE DEBT-TO-TOTAL CAPITAL WAS CLOSE TO 40,

2        THE FREQUENCY OF MEETINGS WITH THE RATING AGENCIES

3        INCREASED IN ORDER TO PROVIDE THEM WITH COMFORT THAT

4        WE'RE DOING SOMETHING ABOUT THIS RATIO, BEING

5        DILIGENT ABOUT -- ABOUT GETTING THAT -- THAT RATIO

6        DOWN BELOW -- BELOW 40.

7            AND THE FACT THAT WE WERE AS TRANSPARENT AND

8        OPEN WITH THE RATING AGENCIES, WITHOUT A DOUBT

9        CONTRIBUTED TO THE FACT THAT WE WERE NOT DOWNGRADED

10       WHEN WE -- WHEN WE HIT THAT 40.  I THINK THAT -- THAT

11       HAD A BIG -- BIG REASON WHY WE WERE ABLE TO HOLD ON

12       TO OUR RATING.

13    BY MR. WELSH:

14    Q.   SO -- AND TELL ME IF I'M WRONG.  SO -- WHAT YOU'RE

15       TELLING ME THAT -- THAT BECAUSE YOU HAD THIS -- THIS

16       RELATIONSHIP AND THIS ABILITY TO WORK WITH THE RATING

17       AGENCIES AND YOU WERE SO TRANSPARENT, YOU TOLD THEM

18       EVERYTHING ABOUT WHAT WAS HAPPENING IN THE COMPANY

19       BECAUSE IT WAS CONFIDENTIAL BETWEEN YOU AND THE

20       RATING AGENCIES.  BUT, THEY DIDN'T CONSIDER THIS,

21       APPARENTLY, THIS 40 PERCENT DEBT-TO-CAPITALIZATION

22       RATIO TO BE SOME SORT OF RED LINE WHERE YOU CROSS IT

23       AND IT'S GOING TO CAUSE YOU FINANCIAL PROBLEMS IN

24       TERMS OF YOUR RATING AND YOUR ABILITY TO ACCESS THE

25       CAPITAL MARKETS, CORRECT?

1  A.    THEY, OF COURSE, WERE VERY CONCERNED ABOUT IT.  AND

2        THAT'S WHY WE MET WITH THEM EXTRA TIMES.  BUT WE WERE

3        ABLE TO DEMONSTRATE TO THEM THAT, BASED ON OUR

4        FORECAST FOR THE FOLLOWING YEAR -- REMEMBER WHEN I

5        WAS ASKED ABOUT -- ABOUT THE -- THE -- WHAT I WAS

6        REVIEWING WITH THE RATING AGENCIES, WE DID NOT ONLY

7        REVIEW PAST, BUT WE TALKED ABOUT FORWARD ACTIVITIES

8        OF THE CASH FLOW WITH OUR FORECASTS, AND HOW WERE WE

9        PLANNING ON ADDRESSING A POTENTIAL SHORTFALL.  AND

10       THAT'S WHAT, YOU KNOW, ENDED UP HELPING US RETAIN

11       THAT RATING.

12            AND AS YOU CAN SEE, WE DIDN'T -- I MEAN, YOU

13       KNOW, 40 IS A -- IS A REFERENCE POINT.  AND WE DIDN'T

14       GO TOO FAR ABOVE THAT -- ABOVE THAT 40.

15            AND SO I THINK -- AGAIN, 40 -- 40 IS A REFERENCE

16       POINT.  AND I THINK IF WE WOULD HAVE HAD -- WE ONLY

17       HAD -- WE ONLY HAD '90, '91, AND '92, WHICH WAS

18       DURING THE YEARS OF A -- OF A TROUGH -- AND I THINK

19       -- AN INDUSTRY TROUGH.  AND AS WELL I BELIEVE THE

20       ECONOMY -- I CAN'T REMEMBER.  I DIDN'T WRITE ANY

21       DETAILS DOW BUT, I THINK THE ECONOMY WAS ALSO PRETTY

22       WEAK, THE GLOBAL ECONOMY BECAUSE WE'RE A GLOBAL

23       COMPANY.  SO AS A CONSEQUENCE IT INCREASED A LITTLE

24       BIT HERE.

25            BUT ALL THE OTHER YEARS ACTUALLY, YOU KNOW, THE

1    TREND WAS -- WAS PRETTY MUCH DOWN EXCEPT FOR, AGAIN,

2    IN 1997 WE WERE UP.  BUT THEN AGAIN WE WERE ABLE TO

3    BRING IT DOWN A LITTLE BIT.

4         SO I THINK THE HIGHEST WE EXPERIENCED HERE WAS,

5    IT LOOKS LIKE, AROUND 43 PERCENT.

6         SO WE WERE -- YOU KNOW, WE WERE AT THE EDGE.

7    AND BECAUSE OF THE FACT THAT WE WERE AT THE EDGE

8    ALWAYS WITH THE RATING AGENCIES, YOU KNOW, WE HAD

9    THIS -- THIS -- THIS HIGH DEGREE OF SENSITIVITY IN

10   TERMS OF GETTING -- GETTING OFF-BALANCE SHEET

11   FINANCING.  IT IS A DIRECT RELATIONSHIP BETWEEN OUR

12   OFF-BALANCE SHEET FINANCING AND -- AND THIS CHART.

13   AND IT WASN'T JUST OFF-BALANCE SHEET FINANCINGS IN

14   TERMS OF EQUITY FINANCING AND LEASES, SALE OF LEASE

15   BACK-UP ASSETS.  IT WAS ALSO -- THERE WAS LOTS OF

16   WRITTEN COMMUNICATION WITHIN THE ORGANIZATION IN

17   TERMS OF SELLING -- SELLING LAND, ACTUALLY PROPERTY,

18   LAND, THAT WE OWNED.  YOU KNOW, DISCOUNTING OF

19   RECEIVABLES WITHOUT RECOURSE, ET CETERA, ET CETERA.

20   IN ORDER TO BE ABLE TO MAINTAIN THE LEVEL THAT WAS,

21   YOU KNOW, AROUND -- AROUND 40.

22 Q.  I UNDERSTAND.  SO -- SO IN FACT IT WAS A GREAT NUMBER

23   OF THINGS THAT THESE RATING AGENCIES WOULD

24   CONSIDERED?

25 A.  YES.

1    Q.   THAT YOU COULD GO TO THEM AND EXPLAIN TO THEM THAT

2         THIS -- THIS 40 PERCENT NUMBER, AS I SEE THE MAJORITY

3         OF THE YEARS BETWEEN '90 AND '98 YOU WENT OVER IT.

4         BUT THEY CAME TO UNDERSTAND THAT THAT WAS JUST A

5         GUIDELINE NUMBER.  IT WASN'T ANYTHING WHICH

6         APPARENTLY WOULD CAUSE THEM TO DOWNGRADE YOU?

7    A.   NO.  I DON'T THINK IT WAS A GUIDELINE, MR. WELSH.

8         BECAUSE, YOU KNOW, YOU DON'T HAVE -- IN THE TYPE OF

9         VOLATILE ECONOMIC ENVIRONMENT THAT WE EXPERIENCED

10        BETWEEN 1990 AND 1998, BEING ABLE TO MAINTAIN IT AT

11        THIS LEVEL IS -- IS -- IS NOT JUST A GUIDELINE.  I

12        MEAN, THIS IS SOMETHING THAT WAS  -- IT WAS A -- IT

13        WAS  A CONSCIENTIOUS EFFORT TO KEEP IT AROUND 40

14        PERCENT, AS -- AS LOW AS WE CAN.

15             SO THAT -- THAT'S MORE THAN A GUIDELINE.

16   Q.   THAT WAS SOMETHING THAT YOU COULD OBVIOUSLY GO OVER

17        WITHOUT GETTING A DOWN GRADE?

18   A.   NO.  IT WASN'T OBVIOUS.  DEFINITELY NOT.

19   Q.   NO.  I MEAN, FROM THIS GRAPH IT'S OBVIOUS, BECAUSE

20        YOU DIDN'T GET A DOWN GRADE DURING 1990 TO 1998?

21   A.   BECAUSE EVERY TIME WE MET THEM, WE DEMONSTRATED TO

22        THEM THAT WE'RE GOING TO GET IT DOWN.

23   Q.   THROUGH ALL THESE OTHER MECHANISMS?

24   A.   THROUGH ALL THESE OTHER MECHANISMS.

25   Q.   OKAY, SIR.  I WONDER IF YOU WOULD TURN YOUR ATTENTION

1       TO ANOTHER PAGE IN MR. MAGEE'S BOOK, "JOINT EXHIBIT

2       423."

3   A.  YES, SIR.

4   Q.  YOU HAVE THAT?

5   A.  YES.

6   Q.  OKAY.  AND THAT'S YOUR MEETING WITH STANDARD AND

7       POOR'S, MARCH 25TH, 1997?

8   A.  YES.

9   Q.  OKAY.  IF YOU'D TURN TO THE SECOND PAGE OF THAT,

10      WHICH IS BATES NUMBER 46317.

11  A.  YES.

12  Q.  IT APPEARS THAT YOU AND MR. REINHARD AND A MR. T.S.

13      LEBEAUX ATTENDED THE MEETING FOR DOW; IS THAT

14      CORRECT?

15  A.  YES.

16  Q.  OKAY.  WELL, WE KNOW WHO MR. REINHARD IS.  WHO IS MR.

17      LEBEAUX?

18  A.  IT'S MS. LEBEAUX.

19  Q.  OH, I'M SORRY.

20  A.  IT'S -- NO, NO.  YOU WOULDN'T KNOW.  IT'S -- IT'S

21      TERI LEBEAUX.  AND SHE WAS IN CHARGE OF INVESTOR

22      RELATIONS.  SHE WAS TITLE OF DIRECTOR OF INVESTOR

23      RELATIONS.

24  Q.  OKAY.  AND WHAT -- YOU -- YOU TALKED ABOUT WHAT YOU

25      DID WITH MR. MAGEE; THAT IS, CASH FLOW ANALYST AND

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 82 of 318

```
 1        FORECAST.  WHAT DID MR. REINHARD TALK ABOUT IN TERMS

 2        OF THE 1998 OUTLOOK?

 3   A.   HE, AGAIN, TALKED -- HE PROBABLY SPENT MOST OF HIS

 4        TIME EXPLAINING DEMAND SUPPLY OF THE BUSINESSES, THE

 5        -- THE CYCLE, WHICH IS NOT THAT OBVIOUS.  IT WAS, YOU

 6        KNOW, -- SO HE EXPLAINED THAT.  THE INDUSTRY CYCLE,

 7        ECONOMIC CYCLE.  THE MORE -- LEANING MORE TOWARD THE

 8        STRATEGY OF THE COMPANY, WHY ARE WE CONSIDERING

 9        POTENTIAL INVESTMENTS?  WELL, BECAUSE WE WANTED TO

10        TRANSFORM OUR PORTFOLIO SO THAT WE WOULDN'T HAVE THE

11        VOLATILITY IN THE EARNINGS THAT WE HAD BEEN

12        EXPERIENCING BECAUSE OF OUR EXPOSURE TO FEED STOCK

13        AND ENERGY, ET CETERA.  THOSE ARE THE TYPE OF THINGS

14        THAT -- THAT HE WOULD BE FOCUSING ON.

15   Q.   NOW, YOU SAID YOU WERE -- AT THESE MEETINGS YOU COULD

16        BE COMPLETELY OPEN AND CANDID, CORRECT?

17   A.   YES.

18   Q.   AND YOU DESCRIBED YOUR TRANSACTIONS WITH THOSE RATING

19        AGENCIES AS VERY TRANSPARENT, CORRECT?

20   A.   YES.

21   Q.   DO YOU RECALL -- THIS WAS AT THE TIME WHEN YOU WERE

22        LEADING INTO CHEMTECH II, CORRECT?

23   A.   '97?  YES.

24   Q.   DO YOU RECALL DISCUSSING THE CHEMTECH II TRANSACTION

25        WITH THE RATING AGENCY?
```

1   A.   I -- YOU KNOW, WE -- WE DISCUSSED ALL TRANSACTIONS.

2        DO I REMEMBER NOW SPECIFICALLY ON THAT DAY THAT WE

3        DISCUSSED TRANSACTION?  NO.

4           I DO KNOW, THOUGH, THAT THEY WERE VERY MUCH AWARE

5        OF CHEMTECH I AND CHEMTECH II.  I DON'T KNOW AT WHAT

6        POINT WE DISCUSSED IT.  THEY WERE VERY FAMILIAR WITH

7        IT, AS THEY WERE WITH ANOTHER TRANSACTION THAT WE

8        HAD, WHICH WAS THE DOW GRANTS TRANSACTION.

9           AND SO NOT ONLY DID THEY ASK QUESTIONS ABOUT THE

10       ON-BALANCE SHEET FINANCING, BUT THEY WERE, NEEDLESS

11       TO SAY, ALSO VERY INTERESTED IN THE -- IN THE OFF-

12       BALANCE SHEET FINANCING.  AND WHETHER IT WAS THE --

13       THE EQUITY FINANCING OR THE DIFFERENT FORMS OF -- OF

14       LEASES.

15  Q.   AND DEBT FINANCING?

16  A.   AND DEBT FINANCING.

17  Q.   THEY WERE -- AND YOU WERE TRANSPARENT AS TO ALL

18       EQUITY FINANCING THAT HORGEN AND OTHERWISE SALE

19       LEASEBACK CHEMTECH TYPE -- TYPE TRANSACTIONS?

20  A.   YES.

21  Q.   AND ALL DEBT FINANCING?

22  A.   YES.

23  Q.   AND I TAKE IT YOU ALSO WENT INTO THE MARKET AND

24       BORROWED MONEY; THAT IS, FROM BANKS AND OTHER

25       INSTITUTIONS?

1   A.   YES.  MOSTLY ISSUANCE OF BONDS, LONG-TERM -- LONG-

2        TERM DEBT, AS WELL AS COMMERCIAL PAPER, SHORT-TERM

3        DEBT.

4   Q.   AND WHEN YOU WENT TO BORROW THAT MONEY, WERE THOSE

5        ORGANIZATIONS ALSO INTERESTED IN YOUR ENTIRE BALANCE

6        SHEET OFF -- OFF-BALANCE SHEET AND ON-BALANCE SHEET

7        FINANCING?

8   A.   YES.  WELL, I MEAN, THEY ARE OBVIOUSLY INTERESTED IN

9        THE -- IN THE -- CALL IT THE -- THE CREDIT WORTHINESS

10       OF -- OF DOW.  AND SO THEY WERE -- SO THEY USED

11       PUBLIC INFORMATION VIA THE ANNUAL REPORT, THE -- THE

12       FILINGS WITH THE SEC, AS WELL AS MEETINGS.  MANY OF

13       THE BOND HOLDERS ATTENDED MEETINGS WITH THE SECURITY

14       ANALYSTS WITH THE -- WITH -- WITH EQUITY INVESTORS.

15       AND THEN THE RATING AGENCIES THEMSELVES ALSO

16       PUBLISHED REPORTS FOLLOWING THE REVIEWS THAT WE HAD

17       WITH THE -- WITH THE RATING AGENCIES, THEY USUALLY

18       FOLLOWED UP WITHIN, I DON'T KNOW, A WEEK OR TWO,

19       SOMETIMES THREE WEEKS.  THEY HAD THEIR OWN -- OWN

20       REPORT WHERE THEY, YOU KNOW, REAFFIRMED THE RATING

21       AND -- AND WHY, ET CETERA.

22   Q.  SO YOU -- AND I TAKE IT THAT YOU'RE AS TRANSPARENT

23       WITH THE -- WITH THE DEBT WITH THE LENDERS AS YOU

24       WERE WITH THE EQUITY INVESTORS, CORRECT?

25   A.   THE -- WE DID NOT GO INTO -- TO THE SAME DEGREE IN

1        DETAILS WITH -- WITH EVERYONE.  IT ALL -- I MEAN,

2        THERE WERE -- THERE WAS VERY LITTLE -- LITTLE

3        QUESTIONS IN THOSE DAYS IN TERMS OF WHAT TYPE OF, YOU

4        KNOW, OFF-BALANCE SHEET FINANCINGS.  THEY WOULD ASK

5        US, WELL, YOU KNOW, DO YOU HAVE OFF-BALANCE SHEET

6        FINANCING?  AND WE WOULD SAY, YES.

7             SOMETIMES THEY WOULD ASK, YOU KNOW, HOW MUCH?

8        AND WE WOULD SAY -- WE WOULD TELL THEM HOW MUCH.

9             BUT THAT WAS -- THAT'S -- THAT'S PRETTY MUCH IT.

10  Q.   BUT IF THEY WERE INTERESTED, YOU WOULD HAVE ANSWERED?

11       YOU WOULD HAVE -- YOU WOULD HAVE BEEN COMPLETELY

12       TRANSPARENT WITH THEM, TOO?

13  A.   YES.

14  Q.   TO THE EXTENT THEY WERE INTERESTED, CORRECT?

15  A.   YES.  THAT'S RIGHT.  THAT'S --

16  Q.   THERE WOULDN'T HAVE BEEN ---

17  A.   -- THAT HAS ALWAYS BEEN OUR -- OUR PHILOSOPHY.

18  Q.   THERE WOULD BE NO DIFFERENCE IN TERMS OF IF THEY

19       ASKED, YOU WOULD TELL THEM?  YOU WOULD BE AS

20       TRANSPARENT WITH BOTH THE DEBT HOLDERS AS THE EQUITY

21       HOLDERS, CORRECT?

22  A.   YES.

23  Q.   NOW, SIR, YOU DISCUSSED WITH MR. MAGEE THE PROBLEM OF

24       THE -- THE LARGE PROBLEM, APPARENTLY, IN 2008 OF THE

25       -- THE DOWNGRADE THAT YOU RECEIVED AS A RESULT OF THE

1        -- THE KUWAITS PULLING OUT OF THE DEAL THAT YOU

2        DESCRIBED?

3    A.  (NO RESPONSE)

4    Q.  AND YOU SAID THAT AS A RESULT OF THAT DEAL YOU WERE

5        DOWNGRADED CORRECT?

6    A.  AS A RESULT OF A CONTRACTUAL OBLIGATION NOT HAVING

7        MATERIALIZED, WE WERE DOWN GRADED.

8    Q.  AND I TAKE IT THAT THERE WAS AN ANNOUNCEMENT MADE IN

9        THE MARKET AS TO THIS DEAL FALLING THROUGH, AND

10       THAT'S WHAT CAUSED THE DOWNGRADING, CORRECT?

11   A.  THAT'S CORRECT.

12   Q.  DO YOU RECALL HOW LONG AFTER THE ANNOUNCEMENT WAS

13       MADE IN THE MARKET THAT THE DOWNGRADE OCCURRED?

14   A.  YES, I DO.  BECAUSE I HAD LIVED THROUGH IT.  AND IT

15       WAS A LITTLE MORE RECENT THAN SOME OF THE OTHER

16       QUESTIONS THAT YOU WERE ASKING ME EARLIER.

17            SO IT HAPPENED, I BELIEVE, IN -- IN THE MIDDLE

18       EAST THEY WORK. SO THEIR SATURDAYS IS LIKE, YOU KNOW,

19       IS LIKE OUR -- OR THEIR SUNDAYS IS LIKE OUR MONDAY.

20       AND SO I LEARNED ABOUT THE -- THE KUWAITS NOT LIVING

21       UP TO THEIR OBLIGATION ON THE WEEKEND.

22            SO ON THE MONDAY MORNING, IT MUST -- IT MUST

23       HAVE BEEN THE LAST MONDAY IN DECEMBER.  I DON'T

24       REMEMBER THE EXACT DATE, WE ACTUALLY CALLED UP -- I

25       ACTUALLY CALLED UP, AS THE CFO, ALONG WITH OUR

1      TREASURER.  WE CALLED UP ALL THE RATING AGENCIES,

2      AGAIN IN THE SPIRIT OF NOT WAITING FOR THEM TO COME

3      TO US, BUT WE GOING TO THEM.  AND WE ADVISED THEM OF

4      THE FACT THAT THE KUWAITS DECIDED, FOR NO APPARENT

5      REASON, NOT TO LIVE UP TO THEIR OBLIGATION.

6           AND THE CONSEQUENCE OF THAT WAS THAT WE WERE NOT

7      GOING TO GET OVER SEVEN BILLION DOLLARS.  AND THE

8      RATING AGENCIES KNEW, OF COURSE, THAT WE ALSO HAD OR

9      WERE GOING TO HAVE AN OBLIGATION TO PAY FOR ROHM AND

10     HAAS.

11          AND SO THEY LOOKED AT THEIR -- THEY -- THEY --

12     THEY LOOKED AT OUR CURRENT BALANCE SHEET, WHICH WAS

13     FINE.  WHICH HAD A DEBT TO CAPITAL BELOW 40 PERCENT.

14     AND THEY JUST ADDED SOME NUMBERS TOGETHER AND THEY

15     CONCLUDED THAT WE WOULD ULTIMATELY END UP WITH A

16     DEBT-TO-TOTAL CAPITAL THAT FAR EXCEEDED THAT 40

17     PERCENT, IN FACT, IN THE HIGH 40'S.  AND AS A

18     CONSEQUENCE THEY WITHIN -- I THINK WITHIN ABOUT FOUR

19     HOURS OF THAT PHONE CALL THEY DOWN GRADED US.

20  Q.  SO WITHIN FOUR HOURS OF THE ANNOUNCEMENT, THEY DOWN-

21      GRADED YOU?

22  A.  YES.

23  Q.  NOW, SIR, WE'VE HEARD AN AWFUL LOT IN THIS CASE ABOUT

24      A MR. PEDRO REINHARD.  COULD YOU DESCRIBE YOUR

25      RELATIONSHIP WITH HIM, HISTORICALLY?  NOT -- I'M NOT

```
1        ASKING YOU FOR YOUR PERSONAL RELATIONSHIP WITH HIM.
2    A.  I DIDN'T HAVE MUCH OF A PERSONAL RELATIONSHIP WITH
3        MR. REINHARD.
4    Q.  OKAY.
5    A.  MR. REINHARD WAS OR HAD BEEN MY -- MY SUPERVISOR IN
6        -- YOU KNOW, IN VARIOUS ROLES.  SO WHEN -- WHEN I WAS
7        TREASURER FOR DOW IN GERMANY, HE WAS TREASURER FOR
8        DOW EUROPE.  AND WHEN I WAS TREASURER OF THE COMPANY,
9        HE WAS THE CFO.  SO WORKWISE, I KNEW HIM FOR AN
10       EXTENSIVE PERIOD.
11   Q.  SO YOU WERE ---
12   A.  WAS THAT -- WAS THAT YOUR QUESTION?
13   Q.  YES.  YES, IT IS, SIR.  YOU WERE HIS SUBORDINATE THEN
14       IN -- IN BOTH --
15   A.  YES.
16   Q.  -- SWITZERLAND AND IN THE UNITED STATES IN MIDLAND?
17   A.  YES.  ACTUALLY, THERE WAS ANOTHER TIME.  WHEN I WAS
18       TREASURER IN ASIA PACIFIC, HE WAS ALSO A TREASURER OF
19       THE COMPANY.  SO I -- I WORKED FOR HIM THREE TIMES.
20   Q.  WERE YOU BOTH IN ASIA THEN OR ---
21   A.  NO.  I WAS -- I WAS TREASURER FOR ASIA PACIFIC.  AND
22       HE WAS THE TREASURER FOR DOW.
23   Q.  SO HE WAS IN MIDLAND AND YOU WERE --
24   A.  HE WAS IN MIDLAND.
25   Q.  -- AND YOU WERE IN -- YOU WERE IN HORGEN?
```

1    A.   HE WAS -- LET ME START ALL OVER AGAIN.  I WAS

2         TREASURER IN GERMANY.  AND HE WAS THE TREASURER FOR

3         DOW IN EUROPE.  WHEN I MOVED TO MIDLAND, HE WAS --

4         WHEN I MOVED TO MIDLAND, HE WAS FOR A FEW MONTHS MY

5         SUPERVISOR.  BECAUSE HE -- DURING THE COURSE OF MY

6         TWO YEARS IN MIDLAND AS FOREIGN EXCHANGE MANAGER

7         DURING THE -- DURING THE LAST FEW MONTHS HE BECAME

8         THE TREASURER.  SO I REPORTED TO HIM BRIEFLY THEN.

9         HE THEN SUBSEQUENTLY MOVED ME TO -- TO HONG KONG AS

10        TREASURER FOR ASIA PACIFIC.  AND I HAD A REPORTING

11        LINE TO PEDRO REINHARD AS TREASURER.  AND HE WAS IN

12        MIDLAND, MICHIGAN.  AND THEN I MOVED, OR HE MOVED ME,

13        THE ORGANIZATION MOVED ME, IT'S NOT JUST HIM, TO

14        MANAGEMENT.  THAT IS, THEY MOVED ME TO EUROPE AS

15        TREASURER FOR EUROPE, AND HE WAS THE TREASURER FOR

16        THE COMPANY.  AND THEN WHEN HE BECAME CFO, I BECAME

17        TREASURER OF THE COMPANY.  SO QUITE A FEW YEARS.

18   Q.   OKAY, SIR.  IN 19 -- IN 2007 YOU WERE THE CFO OF DOW;

19        IS THAT CORRECT?

20   A.   THAT'S CORRECT.

21   Q.   SO IT TAKE IT YOU WELL REMEMBER THE PROBLEM WITH MR.

22        REINHARD IN 2007?

23   A.   PROBLEM WITH MR. REINHARD IN 2007?

24             BY THE COURT:

25                APPARENTLY HE DOESN'T REMEMBER.  SO WHY

1           DON'T YOU --

2   BY MR. WELSH:

3   Q.   WELL, MAYBE I BETTER REFRESH YOUR RECOLLECTION, --

4           BY THE COURT:

5               -- REFRESH HIS RECOLLECTION.

6   BY MR. WELSH:

7   Q.   -- SIR.

8           BY MR. WELSH:

9               MAY I APPROACH THE WITNESS --

10          BY THE COURT:

11              YES.

12          BY MR. WELSH:

13              -- AND THE BENCH, YOUR HONOR?

14          BY THE COURT:

15              YOU MAY.

16          BY MR. WELSH:

17              OKAY.

18  BY THE WITNESS:

19  A.   ALL RIGHT.  GO AHEAD.

20  BY MR. WELSH:

21  Q.   ALL RIGHT.  DO YOU REMEMBER THE SUBJECT MATTER OF

22       THIS ANNOUNCEMENT BY THE DOW CHEMICAL COMPANY ON

23       APRIL 12TH, 2007?

24  A.   YES.  YES, I DO.

25  Q.   AND IT MENTIONS THE UNAUTHORIZED -- PEDRO REINHARD

1          AND APPARENTLY ANOTHER GENTLEMAN AND THEIR

2          UNAUTHORIZED DISCUSSIONS WITH THIRD PARTIES ABOUT THE

3          POTENTIAL ACQUISITION OF THE COMPANY.  COULD YOU TELL

4          ME WHAT THAT'S TALKING ABOUT?

5              BY THE COURT:

6                  DON'T ANSWER THE QUESTION JUST YET.

7              BY MR. MAGEE:

8                  JUST FOR CLARIFICATION, YOUR HONOR, I DON'T

9              SEE THE 2007 ANYWHERE ON THE EXHIBIT. SO I --

10             PERHAPS MR. WELSH COULD HELP ME OUT.  I SEE A

11             PRINTOUT DATE OF 2011.  AND IT MAY WELL BE 2007.

12             I'M JUST -- FOR THE BENEFIT OF ME AND THE

13             WITNESS, IT -- CLARIFY THE YEAR OR ESTABLISH IT.

14             BY MR. WELSH:

15                 I'LL TRY TO DO THAT, YOUR HONOR.

16             BY THE COURT:

17                 VERY WELL.

18     BY MR. WELSH:

19     Q.   IT WAS, IN FACT, 2007, WASN'T IT, MR. MERSZEI?

20             BY THE COURT:

21                 IF YOU KNOW.

22     BY THE WITNESS:

23     A.   I BELIEVE SO.  I THINK THAT'S AROUND THE TIME.

24     BY MR. WELSH:

25     Q.   ALL RIGHT.  SO, NOW, COULD YOU TELL ME WHAT IS

1        DESCRIBED IN THIS DOW CHEMICAL COMPANY ANNOUNCEMENT

2        CONCERNING THE UNAUTHORIZED DISCUSSIONS WITH THIRD --

3        POTENTIAL THIRD PARTIES ABOUT THE POTENTIAL

4        ACQUISITION OF THE COMPANY?

5   A.   I KNOW AS MUCH AS YOU DO, JUST NOW WHAT YOU JUST

6        SAID.  THAT'S THE WAY I WOULD RESPOND.  THAT'S --

7        THAT'S HOW I KNOW.  THAT'S -- THAT'S WHAT I KNOW.  I

8        -- YOU KNOW, I WAS NOT AN INSIDER TO THIS.  THERE WAS

9        ALLEGATION THAT HE HAD INFORMATION AND WAS SHARING

10       THAT WITH EXTERNAL PARTY FOR THE POTENTIAL

11       ACQUISITION OF DOW.  AND THAT'S -- THAT'S WHY HE WAS

12       TERMINATED.

13  Q.   AND DO YOU RECALL WHO HE WAS TRYING TO SHARE THE

14       INFORMATION WITH?

15  A.   NO, I DON'T.

16  Q.   DO YOU REMEMBER THE OTHER PARTIES WHO WERE INVOLVED

17       IN AN ATTEMPT -- POTENTIAL ATTEMPT TO ACQUIRE DOW

18       CHEMICAL?

19  A.   THEY WERE -- THERE WERE SOME ALLEGATIONS WITH -- WITH

20       SOME FINANCIAL INSTITUTIONS.  BUT I DON'T KNOW

21       WHETHER THAT IS CORRECT OR NOT.

22  Q.   DO YOU KNOW WHETHER DOW CHEMICAL -- YOU WERE CFO AT

23       THE TIME, CORRECT?

24  A.   THAT'S RIGHT.

25  Q.   AND -- AND IMMEDIATELY PRECEDING YOU AS CFO WAS PEDRO

1    REINHARD, CORRECT?

2  A.   RIGHT.

3  Q.   SO I TAKE IT THIS WAS A FAIRLY BIG EVENT FOR THE

4       MANAGEMENT OF DOW CHEMICAL TO FIRE PEDRO REINHARD,

5       WASN'T IT?

6  A.   CERTAINLY.  HE WAS A BOARD MEMBER AT THE TIME.

7  Q.   SO IT TAKE IT THERE WERE TREMENDOUS DISCUSSIONS.

8       WERE YOU IN ON THE -- THE MEETING WHEN IT WAS DECIDED

9       THAT PEDRO REINHARD WOULD BE FIRED FROM DOW CHEMICAL?

10 A.   NO, I WAS NOT.

11 Q.   WHO WAS INVOLVED AND WHO MADE THAT DECISION, IF YOU

12      KNOW?

13 A.   THERE -- WELL, THERE WERE SOME -- I BELIEVE IT WAS

14      THE -- THE CEO, ANDREW LIVERIS, AND THE -- AND THE

15      LEAD DIRECTOR, MR. STERN, FROM -- FROM THE BOARD.

16      BUT I WAS NOT -- I WAS NOT IN THE -- I MEAN, I -- I

17      LEARNED ABOUT IT, OF COURSE.  BUT I WAS NOT PARTY TO

18      THAT DECISION.

19 Q.   I TAKE IT THERE WAS QUITE A BIT OF GOSSIP AROUND THE

20      HEADQUARTERS.  YOU WERE AT THE HEADQUARTERS AT THAT

21      TIME, WEREN'T YOU?

22 A.   YES.  THE CORRECT WORD IS GOSSIP.

23 Q.   DISCUSSIONS?  WELL, ACTUALLY, HE WAS FIRED, WASN'T

24      HE?

25 A.   HE WAS FIRED.

1    Q.    AND APPARENTLY DOW --

2    A.    HE WAS TERMINATED.

3    Q.    -- AND DOW MADE A NEWS RELEASE OF THAT FACT?

4    A.    YES.

5    Q.    AND DOW CHEMICAL SUED PEDRO REINHARD, DIDN'T IT?

6    A.    I'M NOT EVEN SURE ABOUT THAT.

7    Q.    YOU WEREN'T IN ANY WAY INVOLVED IN THAT SUIT?

8    A.    I WAS NOT INVOLVED IN THAT.  I PURPOSEFULLY KEPT

9          MYSELF OUT OF THAT DISCUSSION.

10   Q.    DID YOU EVER SEE THE COMPLAINT, IF ONE WAS FILED?

11   A.    NO.  I MEAN, WAS AWARE OF IT, BUT I WASN'T -- I MEAN,

12         I ACTUALLY DON'T -- DON'T RECALL SEEING THE

13         COMPLAINT.  IT MAY HAVE BEEN SHOWN AT THE -- AT THE

14         BOARD LEVEL.  BUT I'M ---

15   Q.    WELL, PERHAPS I CAN -- I CAN HAND YOU ONE AND PERHAPS

16         THAT WILL REFRESH YOUR RECOLLECTION --

17   A.    YES.

18   Q.    -- AS TO WHETHER OR NOT YOU SAW IT.

19               BY MR. WELSH:

20                  MAY I APPROACH THE WITNESS, YOUR HONOR?

21               BY THE COURT:

22                  YOU MAY.

23   BY MR. WELSH:

24   Q.    AND LOOK THROUGH THAT FOR JUST A MINUTE, MR. MERSZEI.

25   A.    YES, SIR.

1  Q.  ALL RIGHT.  NOW, MR. MERSZEI, MY QUESTION TO YOU IS,

2      IS THIS -- AFTER HAVING LOOKED THROUGH IT, REFRESH

3      YOUR RECOLLECTION AS TO WHETHER OR NOT YOU SAW THIS

4      COMPLAINT EVER BEFORE?

5  A.  I DON'T -- I DON'T RECALL ACTUALLY HAVING IT LIKE

6      THIS EVER IN MY HANDS.  OKAY?  IT MAY HAVE BEEN -- IT

7      MAY HAVE BEEN CIRCULATED AT THE BOARD LEVEL.  AND I

8      MAY HAVE SKIMMED THROUGH IT.  BUT THAT -- THAT COULD

9      BE THE CASE, SINCE AT THAT TIME I WAS A MEMBER OF THE

10     BOARD AT DOW.

11 Q.  OKAY, SIR.  LET ME DIRECT YOUR ATTENTION TO THE NINTH

12     PAGE OF THIS DOCUMENT, PARAGRAPH 33.  WHICH SAYS, "ON

13     APRIL 8, 2007, IN THE SUNDAY EXPRESS TRUMPETED A BUY-

14     -OUT OF DOW, QUOTE, COULD BE DAYS AWAY AS A

15     CONSORTIUM OF MIDDLE EASTERN INVESTORS AND AMERICAN

16     BUY-OUT FIRMS PUTS THE FINISHING TOUCHES ON APPROACH

17     FOR U.S. GIANT DOW CHEMICAL."

18         DO YOU REMEMBER THE SUBSTANCE OF WHAT'S ALLEGED

19     THERE?

20 A.  WELL, THERE WERE -- THERE WERE ACTUALLY A COUPLE OF

21     NEWS ARTICLES FROM THE U.K. THAT CAME OUT.  IN FACT,

22     I THINK THAT'S HOW THE U.S. PRESS FOUND OUT ABOUT IT,

23     THROUGH SOME U.K. PAPERS.  IT WAS A SUNDAY EXPRESS,

24     AND I THINK IT WAS ANOTHER PAPER.  AND ULTIMATELY A

25     -- A BANK BASED IN -- IN LONDON WAS SOMEHOW CONNECTED

1      WITH -- WITH THIS CASE.

2   Q.   SIR, DO YOU REMEMBER HOW THIS -- THIS LAWSUIT WAS

3        RESOLVED ULTIMATELY?

4   A.   I KNOW IT WAS SOME FORM OF SETTLEMENT.  I DID NOT

5        ATTEND THAT BOARD MEETING.

6   Q.   ARE YOU AWARE OF THE SETTLEMENT?

7   A.   I'M NOT -- NOT THE DETAILS.  AND I WAS -- AND I DID

8        NOT ATTEND THAT PARTICULAR BOARD -- BOARD MEETING.  I

9        DID NOT PHYSICALLY ATTEND THAT BOARD MEETING.

10  Q.   ALL RIGHT, SIR.  PERHAPS I CAN REFRESH YOUR

11       RECOLLECTION.

12            BY MR. WELSH:

13              IF I MAY APPROACH THE WITNESS, YOUR HONOR.

14            BY THE COURT:

15              YOU MAY.

16  BY MR. WELSH:

17  Q.   ALL RIGHT, SIR.  WHAT I'VE HANDED YOU IS A NEWS

18       RELEASE BY THE DOW CHEMICAL COMPANY, MIDLAND,

19       MICHIGAN, JUNE 2ND, 2008.

20  A.   YES, SIR.

21  Q.   DO YOU RECALL EVER SEEING THIS NEWS RELEASE BEFORE?

22  A.   YES.  I BELIEVE I DID SEE THIS ONE.

23  Q.   WERE YOU INVOLVED IN DRAFTING IT?

24  A.   NO, I WAS NOT.

25  Q.   DID WHOEVER DRAFTED IT HAVE ANY CONTACT WITH YOU IN

1       PREPARING THIS NEWS RELEASE?

2   A.  NO.

3   Q.  ALL RIGHT.  IT STATES A COUPLE OF LINES DOWN, BETWEEN

4       AFTER MIDLAND, MICHIGAN, JUNE 2ND, 2008, LITIGATION

5       BETWEEN THEM HAS BEEN SETTLED TO THEIR MUTUAL -- TO

6       THE MUTUAL SATISFACTION OF THE PARTIES.

7           DO YOU KNOW HOW, BASED ON THE -- THE TWO

8       PARTIES, HOW THE RESOLUTION OF THE LITIGATION WORKED

9       OUT?

10  A.  NO.  AND I -- I, IN FACT, FELT VERY UNCOMFORTABLE,

11      HAVING WORKED FOR PEDRO REINHARD FOR SO MANY YEARS

12      AND THEN ULTIMATELY BECOMING CFO AND REPLACING HIM.

13      I JUST WAS NOT INVOLVED IN THESE -- IN THESE

14      DISCUSSIONS.

15          SO I WAS NOT AT ALL INVOLVED.  AND I WAS NOT

16      ASKED FOR MY OPINION IN TERMS OF THE SETTLEMENT.

17  Q.  THIS NEWS RELEASE REFERS BACK TO -- A COUPLE OF MORE

18      LINES DOWN.  IT SAYS, "MR. REINHARD AND MR. KREINBERG

19      DO NOT DISPUTE DOW'S APRIL 12TH, 2007 PRESS RELEASE,"

20      WHICH IS THE DOCUMENT THAT YOU LOOKED AT A MINUTE

21      AGO.  DO YOU SEE THAT?

22          BY THE COURT:

23              WELL, WAIT.  THAT -- THERE IS -- IS THERE

24          AN OBJECTION?

25          BY MR. MAGEE:

1          YES.  THE OBJECTION IS, YOUR HONOR, THIS

2     DOCUMENT IS NOT IN EVIDENCE, PURPORTEDLY BEING

3     USED FOR REFRESHMENT AND WE'RE READING THE

4     DOCUMENT INTO THE RECORD WITHOUT SUBMITTING IT

5     AS EVIDENCE.  I'M NOT PARTICULARLY CONCERNED

6     ABOUT THE DOCUMENT.  BUT I THINK IT'S

7     INAPPROPRIATE.  WE'VE GONE WAY BEYOND

8     REFRESHMENT, PARTICULARLY GIVEN WHAT MR. MERSZEI

9     SAID ABOUT HIS INVOLVEMENT IN THE DECISION.

10    BY THE COURT:

11         WHERE ARE WE GOING WITH THIS?

12    BY MR. WELSH:

13         YOUR HONOR, PEDRO REINHARD IS -- WE SAID IN

14    THE OPENING, IS THE ELEPHANT -- I BELIEVE HE'S

15    THE SHADOW IN THE ROOM.  AND I THINK THAT GIVEN

16    THAT SO MUCH OF HIS TESTIMONY IS GOING TO BE

17    SUBMITTED TO THIS COURT, TO YOUR HONOR, AND BY

18    -- BY WAY OF NOT ONLY HIS DEPOSITION TESTIMONY,

19    BUT HIS VIDEO TESTIMONY, WHICH HAS BEEN PLAYED

20    BY US.  THE WITNESSES FOR DOW CHEMICAL HAVE

21    REFERRED OVER AND OVER TO MR. REINHARD AS BEING

22    THE PROJENATOR OF THE CHEMTECH TRANSACTION.

23         SO I THINK THAT MR. REINHARD'S VERACITY,

24    MR. REINHARD'S POSITION IN THE COMPANY, MR.

25    REINHARD'S GENERAL RELATIONS TO THESE MATTERS IS

1        -- IS OF RELEVANCE TO THE CASE AND OF INTEREST

2        TO THE COURT.

3        BY THE COURT:

4            I HAVE NO DOUBT ABOUT THAT.  I GUESS WHAT

5        YOUR OPPONENT TAKES ISSUE WITH IS WHETHER THIS

6        WITNESS IS CAPABLE OF TESTIFYING ABOUT THE FACTS

7        OF THIS -- THIS PRESS RELEASE, GIVEN THAT HE'S

8        TESTIFIED THAT HE PURPOSEFULLY ATTEMPTED TO

9        DISTANCE HIMSELF FROM IT.

10           MR. MAGEE, WOULD YOU LIKE TO BE HEARD ON

11       THAT, SIR?

12       BY MR. MAGEE:

13           I DON'T THINK I NEED TO BE HEARD, YOUR

14       HONOR.  YOU HAVE JUST ---

15       BY THE COURT:

16           THANK YOU.  SO -- SO THAT -- THAT'S I GUESS

17       THE POINT OF ALL OF THIS.  I MEAN, AGAIN, I'LL

18       GIVE YOU A LITTLE BIT OF LATITUDE.  BUT I THINK

19       IT'S CLEAR FROM HIS TESTIMONY THAT, GIVEN THAT

20       HE WASN'T ALTOGETHER COMFORTABLE WITH THIS

21       INCIDENT, HE SPECIFIED THAT HE HAD NO ACTIVE

22       INVOLVEMENT IN THE PRESS RELEASE OR ANY OF THE

23       -- THE DECISIONS OF THE BOARDS IN -- IN

24       INITIATING THE LAWSUIT; IS THAT CORRECT?

25       BY THE WITNESS:

1          THAT'S CORRECT.

2     BY MR. WELSH:

3          WELL, IN THAT CASE, YOUR HONOR, IF MR.

4     MAGEE WOULD LIKE ME TO PUT -- TO MARK THESE AS

5     EXHIBITS IN THE CASE, I WOULD BE HAPPY TO DO

6     THAT.

7     BY THE COURT:

8          WHY DON'T WE DO THAT?  SO WHAT -- WHAT'S

9     THE LAST EXHIBIT?

10    BY MR. WELSH:

11         I GUESS WE'LL MAKE THEM DEFENDANT'S

12    EXHIBITS, YOUR HONOR?

13    BY THE COURT:

14         YES.

15    BY MR. WELSH:

16         ALL RIGHT.  "D65."

17    BY THE COURT:

18         "D65?"

19    BY MR. WELSH:

20         THE FIRST ONE OF THESE, WHICH WILL BE THE

21    -- THE APRIL 12TH, 2007 DOW CHEMICAL COMPANY NEWS

22    RELEASE WILL BE THE FIRST ONE.

23    BY THE COURT:

24         SO THAT WILL BE -- THAT -- THAT ONE IS --

25    BY MR. WELSH:

1              THAT ONE WILL BE --

2        BY THE COURT:

3              -- "D65," CORRECT?

4        BY MR. WELSH:

5              -- "65."

6        BY THE COURT:

7              ALL RIGHT.  SO WE'RE TALKING ABOUT THE --

8        THE DOCUMENT WITH THE HEADING PR NEWS WIRE?

9        BY MR. WELSH:

10             YES, YOUR HONOR.

11       BY THE COURT:

12             AND THE NEXT DOCUMENT, THAT IS THE PRESS

13       RELEASE OR MEDIA RELEASE OF JUNE 2ND, 2008?

14       BY MR. WELSH:

15             I THINK -- I THINK THE NEXT ONE MAY HAVE

16       BEEN THE COMPLAINT, YOUR HONOR.

17       BY THE COURT:

18             COMPLAINT?  THAT'S RIGHT.  SO THAT WILL BE

19       "D66," CORRECT?

20       BY MR. WELSH:

21             YES, YOUR HONOR.

22       BY THE COURT:

23             AND THEN FINALLY THE DOW PRESS RELEASE WILL

24       BE "D67," CORRECT?

25       BY MR. WELSH:

1          YES, YOUR HONOR.  AND, YOUR HONOR, I'VE HAD

2      -- IF YOU'LL GIVE ME A LITTLE LEEWAY SO THAT WE

3      CAN MORE DEVELOP THIS -- THIS POINT QUICKLY,

4      WITHOUT GOING THROUGH QUESTIONS.  I DO HAVE AN

5      ARTICLE WHICH I'D LIKE HIM TO REVIEW AND TELL ME

6      WHETHER THE SUBSTANCE OF THE ARTICLE IS CORRECT

7      ABOUT THE -- THE TRANSACTION.  THIS IS AN

8      ARTICLE FROM THE NEW YORK TIMES DATED JUNE 3RD,

9      2008.  IT INVOLVES BOTH THE -- THE SUBJECT

10     MATTER OF MR. REINHARD'S ACTIONS, VIS A VIS AN

11     ATTEMPTED TAKE-OVER OF DOW, AND THE SETTLEMENT.

12     BY THE COURT:

13          WELL, THAT'S FINE.  IT -- IT MAY BE

14     CUMULATIVE, BUT LET'S JUST TAKE A LOOK AND SEE.

15     BY MR. WELSH:

16          THANK YOU, YOUR HONOR.

17          AND IF YOU'D LIKE, YOUR HONOR, I CAN MARK

18     THIS IN ADVANCE AS "DEFENDANT'S NUMBER" --

19     BY THE COURT:

20          "68."

21     BY MR. WELSH:

22          -- "68."

23     BY MR. MAGEE:

24          YOUR HONOR, --

25     BY THE COURT:

1            YES, MR. MAGEE.

2        BY MR. MAGEE:

3            -- NONE OF THESE ARE ADMITTED INTO

4        EVIDENCE.  THE PURPOSE -- I TAKE IT THE PURPOSE

5        OF THIS IS TO ASK THE WITNESS WHETHER THIS

6        REFRESHES HIS RECOLLECTION ABOUT ANY OF THE

7        DETAILS OF THIS DISPUTE AND SETTLEMENT.

8        BY THE COURT:

9            I THINK THAT'S RIGHT.  IS THAT RIGHT?

10       BY MR. WELSH:

11           YES, YOUR HONOR.

12       BY MR. MAGEE:

13           THE QUESTION SHOULD BE RESTRICTED TO THAT.

14       BY THE COURT:

15           THANK YOU.

16       BY MR. MAGEE:

17           THANK YOU.

18       BY THE COURT:

19           WHY DON'T YOU TAKE A MOMENT AND READ THAT

20       EXHIBIT.

21       BY THE WITNESS:

22           THANK YOU.  I APPRECIATE IT.

23  BY THE WITNESS:

24  A.   MR. WELSH, I'VE READ IT.

25  BY MR. WELSH:

1   Q.   OKAY, SIR.

2          BY THE COURT:

3              ONE MOMENT.   PROCEED.

4          BY MR. WELSH:

5              THANK YOU, YOUR HONOR.

6   BY MR. WELSH:

7   Q.   ALL RIGHT, MR. MERSZEI.   NOW THAT YOU'VE REVIEWED THE

8        ARTICLE, SECRET LIFE OF THE DEAL, DOES THAT REFRESH

9        YOUR RECOLLECTION AS TO THE FACTS OF THE -- OF THE

10       TRANSACTION BETWEEN MR. REINHARD, KKR AND THE

11       SULTANATE OF OMAN?

12  A.   YOU KNOW, I -- I RECALL THIS -- ACTUALLY I -- I

13       ACTUALLY RECALL HAVING READ THIS ARTICLE.   AND SINCE

14       I WASN'T PRIVY TO ALL OF THE FACTS, BUT GENERALLY

15       SPEAKING IT REFLECTS AT LEAST SOME OF THE

16       ALLEGATIONS.

17  Q.   AND I THINK SEVERAL PARAGRAPHS DOWN IT SAYS, "AS DOW

18       CHEMICAL TELLS THE STORY, WE ASK YOU AT THIS POINT IS

19       THIS VERSION MORE CREDIBLE."   THEN IT GOES ON TO

20       DESCRIBE THE 50 BILLION ATTEMPTED LBO OF DOW.

21          BY THE COURT:

22              IS THERE -- IS THERE A QUESTION THERE?

23          BY MR. WELSH:

24              I'M SORRY, YOUR HONOR.

25  BY MR. WELSH:

1  Q.   WELL, THE QUESTION IS, IS -- IS THAT -- IS THE WAY

2       THAT THEY SET IT OUT YOUR UNDERSTANDING OF WHAT

3       HAPPENED?

4            BY THE COURT:

5                 DON'T ANSWER THE QUESTION JUST YET.

6            BY MR. MAGEE:

7                 YOUR HONOR, TO FOLLOW WHAT WE'VE BEEN

8            SAYING, I THINK THAT'S AN ABUSE OF THE

9            REFRESHMENT PROCESS TO KEEP READING ELEMENTS OF

10           THE ARTICLE INTO THE RECORD.  THE DOCUMENT IS

11           NOT IN THE RECORD.  IT'S BEEN USED FOR

12           REFRESHMENT.  HE DOESN'T HAVE ANY BASIS FOR

13           COMMENTING ON THAT.  AND IT'S INAPPROPRIATE TO

14           QUOTE IT INTO THE RECORD.

15           BY THE COURT:

16                WELL, HE -- HE'S -- HE'S READ THE -- THE

17           ARTICLE.  HE'S REFRESHED NOW, I GUESS, HIS

18           RECOLLECTION, MR. WELSH.  WHY DON'T YOU JUST GO

19           ON AND ASK HIM GENERALLY ABOUT THE -- THE

20           INCIDENT, TRANSACTION, THE EVENT WITHOUT

21           SPECIFICALLY SEEKING TO VERIFY THE ACCURACY OF

22           THIS NEWSPAPER ARTICLE.

23           BY MR. WELSH:

24                THANK YOU, YOUR HONOR.  I'LL DO THAT.

25  BY MR. WELSH:

```
 1   Q.   ALL RIGHT, SIR.  DO YOU RECALL THAT THE PLOTTERS OF
 2        THE TAKEOVER OF DOW WERE, AMONG OTHERS, PEDRO
 3        REINHARD, THE SULTANATE OF OMAN, AND KKR AND J.P.
 4        MORGAN?
 5   A.   YES.  I RECALL HAVING READ THAT.
 6   Q.   AND DO YOU RECALL THAT BEING THE POSITION OF DOW
 7        CHEMICAL, VIS A VIS PEDRO REINHARD AT THE TIME, THAT
 8        THOSE WERE THE PLOTTERS AGAINST DOW IN TERMS OF AN
 9        LBO?
10   A.   I DON'T BELIEVE -- I DON'T -- I MEAN, IT WAS CLEAR
11        THAT THE PLOTTERS WERE -- WERE MR. KREINBERG AND MR.
12        REINHARD.  IN TERMS OF THE SULTAN OF -- OF OMAN, I --
13        I CANNOT COMMENT ON THAT.  I DON'T KNOW WHETHER IT
14        WAS -- THERE WAS ALLEGATIONS ABOUT THAT.  BUT I DON'T
15        RECALL THAT -- THAT -- THAT WAS -- THAT THAT, IN
16        FACT, HAPPENED.
17   Q.   ALL RIGHT.  THANK YOU VERY MUCH, MR. MERSZEI.
18             ALL RIGHT, SIR.  I'D LIKE TO TURN YOUR ATTENTION
19        ---
20             BY MR. WELSH:
21                 YOUR HONOR, IF I MAY?
22             BY THE COURT:
23                 AND JUST TO BE CLEAR.  THAT -- THAT LAST
24             "EXHIBIT 68" IS NOT BEING OFFERED FOR
25             INTRODUCTION -- FOR ADMISSION INTO EVIDENCE?  IT
```

1        WAS SOLELY USED TO HELP HIM REFRESH HIS

2        RECOLLECTION, CORRECT?

3        BY MR. WELSH:

4            WELL, YOUR HONOR, GIVEN -- GIVEN THE -- THE

5        NATURE OF PEDRO REINHARD TO -- TO THIS CASE, I

6        WILL OFFER ALL OF THE LAST FOUR EXHIBITS INTO

7        EVIDENCE.

8        BY MR. MAGEE:

9            I OBJECT, YOUR HONOR.  THEY'RE CLEARLY

10       HEARSAY.  THE NEWSPAPER ARTICLE IS IN THE

11       TESTIMONY FROM THE STAND REFLECTS ALLEGATIONS OF

12       THE PARTY.  IT DOESN'T REFLECT THE TRUTH.  AND

13       IT'S DOUBLE HEARSAY.

14       BY THE COURT:

15           I -- I THIN THAT THE -- THE TESTIMONY OF

16       THE WITNESS IS SUFFICIENT.  I THINK YOU CREATED

17       SUFFICIENT RECORD OF THE TESTIMONY OF THE

18       WITNESS THAT YOU HAVE THAT -- THAT THERE WAS

19       SOME PLOTTERS THAT YOU -- AND HE DESCRIBED THEM,

20       AGAINST DOW.  SO I WILL SUSTAIN THE OBJECTION

21       AND WILL NOT ADMIT THESE DOCUMENTS INTO THE

22       RECORD.

23       BY MR. WELSH:

24           YOUR HONOR, IF I MAY BE HEARD JUST ONE

25       SECOND ON THAT?

1    BY THE COURT:

2        YOU MAY.

3    BY MR. WELSH:

4        COULD I JUST OFFER THE TWO DOW CHEMICAL

5    NEWS RELEASES AS STATEMENTS OF DOW CHEMICAL?

6    BY THE COURT:

7        WAIT.  THE TWO OR --

8    BY MR. WELSH:

9        YES.

10   BY THE COURT:

11       -- IT'S ALL ONE?

12   BY MR. WELSH:

13       NO.  THERE'S -- THERE'S TWO.  THE FIRST ONE

14   IS THE AP WIRE.

15   BY THE COURT:

16       WELL, LET'S JUST SAY THIS.  LET'S -- LET'S

17   TAKE THEM ONE AT A TIME.  ONE "D8" THE LAST ONE,

18   "D68," AGAIN, THAT WILL NOT BE ADMITTED.  OKAY.

19       "D67," THAT IS A DOW DOCUMENT, CORRECT?

20   BY MR. WELSH:

21       THERE WERE TWO ---

22   BY THE COURT:

23       IT'S A DOW PUBLIC DOCUMENT?

24   BY MR. WELSH:

25       IT IS A DOW PUBLIC DOCUMENT, YOUR HONOR.

1   BY THE COURT:

2         WELL, I'M INCLINED TO ADMIT THIS, MR.

3   MAGEE.  IT'S A DOCUMENT THAT THE WITNESS HAS

4   TESTIFIED ABOUT SOME OF THE FACTS HERE.  SO I --

5   I'LL GO ON AND -- AND ADMIT THAT DOCUMENT INTO

6   THE

7   RECORD.

8         AND -- AND WHAT'S THE OTHER ONE NOW?

9   BY MR. WELSH:

10        YOUR HONOR, THERE -- THERE WERE ONLY TWO --

11   OTHER THAN THE COMPLAINT, ONLY TWO DOW

12   DOCUMENTS.  ONE WAS -- IT HAS THE DOW -- IT'S ON

13   THE DOW LETTERHEAD.  IT HAS THE DOW DIAMOND.

14   BY THE COURT:

15        YES.  THAT'S --

16   BY MR. WELSH:

17        IT'S "67."

18   BY THE COURT:

19        -- THAT'S "D67."  YES.  I'LL ADMIT "67."

20   BUT I DON'T SEE WHERE THAT "D65" IS A DOW

21   DOCUMENT.  IT SEEMS LIKE IT'S AKIN TO THE NEW

22   YORK TIMES ARTICLE.  IT'S A NEWS ACCOUNT OF A

23   WIRE STORY ISSUED OR A PRESS RELEASE ISSUED BY

24   DOW.

25   BY MR. WELSH:

1       YOUR HONOR, THAT -- THAT'S CORRECT.  THAT

2   WAS A PRESS RELEASE ISSUED BY DOW.  I COULDN'T

3   GET, GIVEN ITS AGE, THE OFFICIAL DOW DOCUMENT.

4   ALL I COULD GET WAS THE HISTORICAL PR NEWS WIRE

5   PRINTOUT OF IT.

6   BY THE COURT:

7       OKAY.

8   BY MR. WELSH:

9       BUT IT -- IT SHOWS IT AS BEING A -- A DOW

10  CHEMICAL RELEASE.  IT SAYS IN THE FIRST LINE THE

11  DOW CHEMICAL COMPANY AND THE NYSC NAME OF DOW.

12  AND IT SAYS DOWN AT THE BOTTOM, SOURCE, THE DOW

13  CHEMICAL COMPANY.

14  BY THE COURT:

15      SO YOUR -- IS YOUR POINT THAT ---

16  BY MR. WELSH:

17      MY POINT IS I -- I JUST COULDN'T GET THE

18  OFFICIAL DOW DOCUMENT.  ALL I COULD GET WAS A

19  HISTORICAL PR NEWS WIRE REPRINT OF IT.

20  BY THE COURT:

21      MR. MAGEE?

22  BY MR. MAGEE:

23      YES.  YES, YOUR HONOR.  I'M NOT SURE WHAT

24  THE PROBLEM IS WITH THE AGE, SINCE THE DOCUMENT

25  YOU ADMITTED AS "D67" POST DATES WHAT IS THE

1   PURPORTED PRESS RELEASE FROM DOW.

2        BUT I THINK IT'S OBJECTIONABLE.  WE DON'T

3   KNOW THE ACCURACY OF THIS WIRE ADAPTATION.  WE

4   DON'T KNOW WHAT'S IN HERE, WHETHER IT WAS ALL

5   DOW OR PART OF DOW OR AN INTERPRETATION OF WHAT

6   DOW SAID.  BECAUSE IT ISN'T A DOW STATEMENT.

7   AND I OBJECT STRENUOUSLY TO ITS ---

8   BY THE COURT:

9        WELL, IT'S A CLOSE CALL, MR. WELSH.  BUT

10   BECAUSE IT ISN'T -- AGAIN, I DON'T KNOW IF -- I

11   THINK MR. MAGEE HAS A VALID POINT.  I'M NOT SURE

12   IF IT'S BEEN ALTERED IN ANY WAY.

13        AGAIN, I THINK THE SUBSTANCE OF IT IS -- IS

14   PRETTY MUCH REFERRED TO IN "D67."

15   BY MR. WELSH:

16        YOUR HONOR, IF I MAY.  THE POINT IN "D67"

17   IS IT REFERS TO AND INCORPORATES THIS NEWS

18   RELEASE THAT -- THE LATER DOCUMENT.  IT REFERS

19   TO THE APRIL 12TH, 2007 NEWS RELEASE AS WHAT MR.

20   REINHARD ADMITS TO.  AND BECAUSE OF THAT, THEY

21   DO TIE TOGETHER.  THAT'S THE REASON ---

22   BY THE COURT:

23        NO, I -- I UNDERSTAND THAT.  BUT, AGAIN,

24   I'M -- I'M GOING TO DENY ADMISSION OF THIS -- OF

25   THIS DOCUMENT FOR THAT REASON.

1              AGAIN, I THINK THAT YOU -- THE WITNESS'

2       TESTIMONY COUPLED WITH "D67" IS -- IS CERTAINLY

3       -- PROVIDES ENOUGH INFORMATION ON -- ON -- ON

4       THOSE FACTS AND THOSE EVENTS.

5       BY MR. WELSH:

6              OKAY.  THANK YOU, YOUR HONOR.

7       BY THE COURT:

8              AND ACTUALLY "66" REFERENCES IT.  IT BEARS

9       DIRECTLY ON -- ON "66" AS WELL.  SO, AGAIN, TO

10      THE EXTENT THAT -- MR. MAGEE I'M GOING TO GO ON

11      AND REVERSE COURSE HERE TO THE EXTENT THAT "D67"

12      REFERENCES THE FACT THE -- THE LAWSUIT THAT IS

13      "D66."  I'LL GO ON AND ALLOW "66" IN AS WELL AS

14      "67."

15             SO THOSE TWO DOCUMENTS WILL -- WILL BE

16      ADMITTED.

17             AND I REALIZE -- AND I WILL STATE FOR THE

18      RECORD, THESE ARE MERELY ALLEGATIONS OF DOW THAT

19      -- THAT I -- I UNDERSTAND THAT AND I WILL

20      CERTAINLY KEEP THAT IN MIND WHEN -- WHEN

21      CONSIDERING THE ISSUES.

22      BY MR. MAGEE:

23             WE'D LIKE TO -- IN LIGHT OF THAT, YOUR

24      HONOR, WE'D LIKE TO PRESENT TO THE COURT FOR

25      ADMISSION INTO EVIDENCE, WHICH WE'LL DO

1     TOMORROW, IS THE COMPLAINT FILED BY MR. REINHARD

2     AGAINST DOW.

3     BY THE COURT:

4          UH HUH.

5     BY MR. MAGEE:

6          BREACH OF DUTIES TO MR. REINHARD AS ---

7     BY MR. WELSH:

8          WE HAVE NO OBJECTION.

9     BY THE COURT:

10         I THINK THAT'S FAIR.  I'LL -- I'LL BE HAPPY

11    TO ACCEPT THAT.

12    BY MR. MAGEE:

13         WE'LL SUBMIT THAT, AND ALONG WITH "66."

14    BY THE COURT:

15         VERY WELL.

16    BY MR. WELSH:

17         AND IN FACT, YOUR HONOR, WE -- WE DON'T

18    HAVE TO WAIT UNTIL TOMORROW.  I THINK WE HAVE

19    COPIES OF THAT.

20    BY THE COURT:

21         BUT DO YOU HAVE ---

22    BY MR. MAGEE:

23         EXCUSE ME.

24    BY THE COURT:

25         GO AHEAD.

1          BY MR. MAGEE:

2               WHAT I WANT TO ADMIT IS DOW'S ANSWER TO --

3          OR WHAT I WANT IS MR. REINHARD'S COMPLAINT, I

4          GUESS.  DO YOU HAVE MR. REINHARD'S COMPLAINT?

5          BY MR. WELSH:

6               I THINK -- I THINK WE -- NO.  PERHAPS --

7          I'M SORRY.

8          BY THE COURT:

9               OKAY.  SO WE'LL ---

10         BY MR. MAGEE:

11              WE HAVE DOW'S COMPLAINT.  WE'LL INTRODUCE

12         MR. REINHARD'S COMPLAINT TOMORROW.

13         BY THE COURT:

14              VERY WELL.

15         BY MR. MAGEE:

16              THANK YOU.

17         BY MR. WELSH:

18              MAY I APPROACH THE WITNESS, YOUR HONOR?

19         BY THE COURT:

20              YOU MAY.

21    BY MR. WELSH:

22    Q.   ALL RIGHT, SIR.  I'D LIKE TO DIRECT YOUR ATTENTION TO

23         THE BINDER THAT YOU HAVE IN FRONT OF YOU, "JX89."

24         BY MR. MAGEE:

25              I'M SORRY, YOUR HONOR.  WHAT IS THE

1        REFERENCE?

2        BY MR. WELSH:

3            "JX89."

4        BY THE COURT:

5            WHAT IS IT?

6        BY MR. WELSH:

7            IT'S "JOINT EXHIBIT NUMBER 89."

8        BY MR. MAGEE:

9            IT'S IN THE BACK.  YES, I CAN FIND IT NOW.

10        THANK YOU.

11    BY MR. WELSH:

12    Q.    AND IT SAYS IT'S A LETTER TO YOU FROM MR. WOLBERT

13          AND MR. LEIMBACH. DO YOU RECOGNIZE IT?

14    A.    I DON'T RECALL THIS LETTER.  I MEAN, I SEE IT AND I

15          SEE THAT IT'S ADDRESSED TO ME.  BUT I -- I DON'T

16          RECALL THIS LETTER.

17    Q.    IT REFERS IN ITS FIRST LINE AFTER THE DEAR MR.

18          MERSZEI, REFERRING TO THE INTERESTING PRESENTATION

19          LED BY MR. PEDRO REINHARD, WHICH WE HAD IN FRANKFURT

20          ON MAY 24TH, 1993.  IS THAT THE GOLDMAN SACHS

21          PRESENTATION WHICH YOU SAID THAT YOU ATTENDED? THAT'S

22          JX68"?

23    A.    I ---

24    Q.    WHICH TOOK PLACE IN MAY?

25    A.    YOU KNOW, I DON'T -- I DON'T RECALL, BECAUSE I -- I

1    HAD THOUGHT THAT, YOU KNOW, I MENTIONED TO YOU

2    EARLIER THAT I THOUGHT THE MEETING -- I COULDN'T

3    REMEMBER EXACTLY WHERE THE MEETING TOOK PLACE.  I

4    THOUGHT IT WAS IN ZURICH.  AND HERE IT'S REFERRING TO

5    FRANKFORT.

6         SO I -- I -- I DON'T -- I DON'T RECALL.

7         BY THE COURT:

8              WAIT, LET ---  MR. MAGEE?

9         BY MR. MAGEE:

10             WELL, I'M NOT SURE WHETHER I'M PHRASING

11         THIS AS AN OBJECTION OR NOT, YOUR HONOR. THE

12         POSITION OF THE DEFENDANT WAS THAT WE WERE GOING

13         TO HAVE 50 PERCENT OF MR. MERSZEI'S DEPOSITION

14         IN DESIGNATION INTO EVIDENCE SO THAT WE COULD

15         SHORTEN THE CROSS-EXAMINATION.  AND IN THE

16         DESIGNATIONS THERE ARE A SIGNIFICANT -- ALL OF

17         HIS TESTIMONY ABOUT THIS EXHIBIT IS IN THE

18         DEPOSITION DESIGNATIONS THAT HAVE BEEN SUBMITTED

19         INTO EVIDENCE.

20             SO I HOPE WE'RE NOT GOING TO HAVE A PATTERN

21         -- I DON'T PARTICULARLY CARE.  BUT IF WE'RE

22         GOING TO HAVE A PATTERN HERE IN LIGHT OF THE

23         CALENDAR OF THE PROCEEDINGS, I'M GOING TO

24         OBJECT.

25         BY THE COURT:

1          MR. WELSH?

2     BY MR. WELSH:

3          YES, YOUR HONOR.  WELL, AS -- AS WE'VE SEEN

4     FROM SOME OTHER EXHIBITS, MR. MERSZEI'S

5     RECOLLECTION MAY BE SOMEWHAT DIFFERENT TODAY

6     THAN IT WAS AT THE TIME OF THE DEPOSITION. AND

7     SO THERE ARE -- THERE ARE MINOR POINTS THAT I

8     WANT TO EXPLORE WITH THE WITNESS TO MAKE SURE

9     THAT I CAN CONFIRM OR MODIFY WHAT HE SAID IN HIS

10    DEPOSITION.

11         I'M NOT GOING TO GO THROUGH THE VAST BULK

12    OF THE EXHIBITS.  THERE ARE A GREAT NUMBER OF

13    EXHIBITS USED IN MR. MERSZEI'S DEPOSITION.  IN

14    FACT, ALL THE WAY FROM "DEPOSITION EXHIBIT 412"

15    TO "DEPOSITION EXHIBIT 472."  THAT'S 60

16    EXHIBITS.  I THINK I HAVE MAYBE SEVEN OR EIGHT.

17    BY THE COURT:

18         OKAY.  MR. MAGEE?

19    BY MR. MAGEE:

20         WELL, I -- I'M LOOKING AT THE DESIGNATION

21    LIST, YOUR HONOR.  AND PROBABLY OVER -- OVER 30

22    OF THOSE EXHIBITS WERE DESIGNATED.

23    BY THE COURT:

24         SO YOU ---

25    BY MR. MAGEE:

1          ALONG WITH THE DESIGNATION AND ALL THE

2       TESTIMONY ASSOCIATED WITH THEM. IT'S HARD TO

3       KNOW WHAT'S COMING, BUT I'M -- I'M GOING TO

4       OBJECT TO THE EXTENT THAT IT'S ALREADY

5       DESIGNATED, THAT DEPOSITION TESTIMONY.

6       BY THE COURT:

7            BUT -- BUT YOU -- YOU SAY YOU WANT TO GO

8       THROUGH SEVEN OR EIGHT OF THESE EXHIBITS?

9       BY MR. WELSH:

10           I WANT TO GO THROUGH A HANDFUL OF THEM,

11      YOUR HONOR.  THAT'S -- THAT'S IT.

12      BY THE COURT:

13           OKAY.

14      BY MR. WELSH:

15           CERTAINLY NOT THE 30 THAT WE'VE DESIGNATED,

16      NO.

17      BY THE COURT:

18           OKAY.  WELL, THAT'S -- I'LL GIVE YOU SOME

19      LATITUDE.  SO WHY DON'T WE -- WHY DON'T WE

20      PROCEED?

21      BY MR. WELSH:

22           THANK YOU, YOUR HONOR.

23  BY MR. WELSH:

24  Q.   OKAY, MR. MERSZEI.

25  A.   YES.

1   Q.   YOU SAID YOU -- YOU CAN'T SAY FOR SURE WHETHER OR NOT

2        IT WAS THE SAME PRESENTATION MEETING?

3   A.   THAT'S CORRECT.

4   Q.   WAS THERE MORE THAN ONE PRESENTATION MEETING, AS BEST

5        YOU RECALL, BETWEEN YOURSELF, MR. REINHARD AND

6        DRESNER CONCERNING THE CHEMTECH TRANSACTION?

7   A,   I BELIEVE THERE WERE -- AND, AGAIN, I'M -- I'M -- I

8        CAN'T RECALL EXACTLY.  BUT BESIDES THE -- THAT LARGE

9        PRESENTATION THAT I FACILITATED, WHERE THE INVESTORS

10       INITIALLY CAME TO LISTEN TO THE OPPORTUNITY FOR THIS

11       INVESTMENT OPPORTUNITY, THERE WERE SOME OTHER

12       MEETINGS THAT WERE MORE ON A ONE-TO-ONE BASIS.  BUT I

13       DON'T RECALL, YOU KNOW.  I MEAN, MANY TIMES THAT WE

14       MET WITH THE BANKERS. WE ALSO TALKED TO THEM ABOUT

15       SOME OTHER TRANSACTIONS.  OKAY?  SO I -- I JUST DON'T

16       RECALL THE SPECIFICS HERE.  AND I DON'T RECALL THIS

17       SPECIFIC PRESENTATION WHERE -- WHERE THEY -- WHERE

18       MR. REINHARD APPARENTLY LED THE DISCUSSION.

19  Q.   WELL, THIS CONCERNS THE CHEMTECH TRANSACTION,

20       CORRECT?

21  A.   YES.  I SEE THAT.

22  Q.   OKAY.  AND IF YOU CAN LOOK AT THE FIRST PARAGRAPH OF

23       THIS LETTER -- I'M SORRY.  THE FIRST PARAGRAPH BELOW

24       THE 50 MILLION DOLLARS, U.S.  IT SAYS, "AS ALREADY

25       DISCUSSED DURING OUR INITIAL MEETING," DO YOU SEE

1      THAT?

2

3   A.   YES.  I SEE IT.

4   Q.   IT SAYS, "IT IS ENVISIONED THAT THE FUNDS WILL BE

5        CONTRIBUTED TO THE LIMITED PARTNERSHIP PARTIALLY AS A

6        SMALL EQUITY PORTION AND AS A LARGE SHAREHOLDER

7        LOAN."

8            DO YOU KNOW WHAT MR. WOLBERT AND MR. LEIMBACH

9        ARE REFERRING TO THERE?

10  A.   NO.

11  Q.   DO YOU HAVE ANY IDEA WHAT THEY'RE TALKING ABOUT IN

12       TERMS OF A LARGE SHAREHOLDER LOAN?

13  A.   I DON'T RECALL.

14  Q.   OKAY.  SIR, I'D LIKE TO TURN YOUR ATTENTION TO THE

15       NEXT -- ONE OF THE NEXT EXHIBITS IN YOUR BINDER,

16       "JOINT EXHIBIT 144."  DO YOU HAVE THAT IN FRONT OF

17       YOU, SIR?

18  A.   YES.

19  Q.   ALL RIGHT.  IT'S A LETTER THAT YOU WROTE TO MR. HEINZ

20       HESS AND DR. PETER BERGER?

21  A.   RIGHT.

22  Q.   THE UNION BANK OF SWITZERLAND, UBS, CORRECT?

23  A.   CORRECT.

24  Q.   AND IT ADDRESSES, IN THE FIRST PARAGRAPH, THE

25       SUCCESSFUL CLOSING OF THE SLIPS TRANSACTION IN EARLY

1       AUGUST, WHICH IS THE CHEMTECH I TRANSACTION, CORRECT?

2  A.   YES.

3  Q.   AND IT SAYS THAT, "BOTH DOW AND UBS SPENT A

4       CONSIDERABLE AMOUNT OF TIME AND ENERGY GUIDING THIS

5       TRANSACTION TO COMPLETION.  WE REGRET THE TAX

6       CONSIDERATIONS OUTSIDE OUR CONTROL PREVENTED US FROM

7       PARTICIPATING IN THE FINANCING."

8            DO YOU KNOW WHAT UBS IS REFERRING TO THERE IN

9       TERMS OF THE TAX CONSIDERATIONS THAT PREVENTED THEM

10       FROM PARTICIPATING IN CHEMTECH I?

11  A.   NO.  I -- IT -- IT MAY HAVE BEEN THAT THE ISSUE WITH

12       THE TAX JURISDICTION IN THE -- YOU KNOW, IN THE -- IN

13       THE U.S. THAT THEY WERE UNCOMFORTABLE WITH.  OTHER

14       THAN THAT I -- I -- THAT WAS PROBABLY IT.

15  Q.   YOU SAID THE TAX WHAT IN THE U.S.?  I'M SORRY.

16  A.   REMEMBER, WE WERE TALKING YESTERDAY ABOUT THIS IS A

17       -- A U.S. DELAWARE COMPANY THAT WAS OPERATING IN

18       SWITZERLAND.  AND THEY FELT UNCOMFORTABLE WITH ANY

19       POTENTIAL TAX LIABILITY COMING OUT OF THE U.S.  I

20       THINK THAT MAY HAVE BEEN IT.

21  Q.   OKAY.  OKAY, SIR.  I'D LIKE TO TURN YOUR ATTENTION

22       NOW TO "JOINT EXHIBIT NUMBER 528."  DO YOU HAVE THAT

23       EXHIBIT IN FRONT OF YOU, SIR?

24  A.   YES, I DO.

25  Q.   THIS IS A -- APPARENTLY A PRINTOUT OF AN E-MAIL, IT

1      APPEARS, ON YOUR LETTERHEAD FROM MR. DEMARE?

2  A.  RIGHT.

3  Q.  CONCERNING THE -- THE EARLY TERMINATION OF THE BANKS

4      FROM THE CHEMTECH I PARTNERSHIP, CORRECT?

5  A.  RIGHT.

6  Q.  AND THE LAST LINE ABOVE THE BEST REGARDS, MICHEL

7      DEMARE.  IT SAYS, IN PARENTHESES.  "AND I GUESS

8      OFFERING SIMILAR -- SIMILAR RICH YIELDS."

9          DO YOU KNOW WHAT HE'S TALKING ABOUT THERE?

10  A.  WELL, THEY -- THEIR EXPERIENCE WITH CHEMTECH I WAS --

11      WAS -- WAS GOOD.  THEY WERE VERY PLEASED WITH IT.

12      AND THEY -- YOU KNOW, AGAIN, CONSISTENT WITH THE

13      NATURE OF EUROPEAN BANKS WHERE THEY -- THEY -- THEY

14      LIKE THESE TYPE OF INVESTMENTS.  AND THEY WERE HOPING

15      THAT, EVEN THOUGH WE TERMINATED CHEMTECH I, THEY HAD

16      HOPED THAT THEY WOULD HAVE SOME FUTURE OPPORTUNITIES

17      WITH A SIMILAR TYPE OF TRANSACTION.  THAT'S -- THAT'S

18      -- THAT'S WHAT I'M -- THAT'S WHAT I WOULD DEDUCT FROM

19      READING THAT PARAGRAPH.

20  Q.  AND I THINK WHEN YOU WERE TALKING TO MR. MAGEE, I

21      THINK YESTERDAY, ABOUT THE TERMINATION OF THE BANKS,

22      YOU SAID THAT YOU ACTUALLY HAD TO -- TO TALK TO SOME

23      OF THE BANKS ABOUT THEIR -- THEIR UNHAPPY ATTITUDE

24      TOWARD THE -- THE TERMINATION OF CHEMTECH I EARLY?

25  A.  THAT'S CORRECT.

```
 1   Q.   IS THAT -- THAT CORRECT?

 2   A.   YES.  YES.

 3   Q.   AND DID YOU FIND THE POSITION OF THE BANKS TO BE

 4        UNREASONABLE IN THAT REGARD?

 5   A.   YOU KNOW, IN MY EXPERIENCE, MY 34 YEARS OF EXPERIENCE

 6        WITH THE BANKS, THE BANKS WILL TRY TO SQUEEZE AS MUCH

 7        OUT OF YOU AS THEY CAN.  AND THIS WAS A TRANSACTION

 8        THAT WAS ATTRACTIVE TO THEM.  THEY DID NOT EXPECT US

 9        AT THAT POINT IN TIME TO TERMINATE IT.  AND SO THEY

10        TRIED TO GET AS MUCH UPSIDE AS POSSIBLE, WHICH WASN'T

11        A SURPRISE TO ME WITH THE BANKS.  THAT'S HOW THE

12        BANKS, YOU KNOW, OPERATE.

13            AND SO NOT ONLY WAS IT ATTRACTIVE TO THEM, BUT

14        THEY -- YOU KNOW, THEY WANTED A LITTLE MORE.  THEY

15        WERE -- THEY WERE -- THEY WERE GREEDY.  AND WE FELT

16        IT WAS UN -- IT WAS FRANKLY UNFAIR, BECAUSE IT WAS

17        NOT CONSISTENT WITH THE ORIGINAL AGREEMENT.  AND

18        THEREFORE, YOU KNOW, MY DISCUSSIONS WITH -- YOU KNOW,

19        WITH THE BANKS.  AND SO I BELIEVE THAT'S HOW THIS ALL

20        TRANSPIRED.

21   Q.   DID YOU -- DID YOU TELL THEM THAT THEY -- THEY

22        SHOULDN'T BE SO GREEDY?

23   A.   MOST DEFINITELY.  NOT JUST NOT SO GREEDY, BUT THAT

24        THEY SHOULD BE FAIR AND THEY SHOULD STICK TO THE

25        ORIGINAL AGREEMENT AND THE UNDERSTANDING OF THE
```

1  AGREEMENT.

2 Q. OKAY, SIR.  MAYBE YOU CAN HELP ME OUT HERE.  WHAT --

3  IN WHAT WAY WEREN'T THEY STICKING TO THE ORIGINAL

4  AGREEMENT?

5 A. WELL, THEY WANTED -- THEY WANTED TO -- TO CHALLENGE

6  THE FAIR MARKET VALUE OF -- OF THE -- OF THE -- OF

7  THOSE ASSETS.  AND WE USED -- WE HAD AGREED TO A

8  METHOLOGY BY ADL.  AND THEY WANTED -- THEY WERE

9  HOPING THAT WITH THE NEW -- NEW KIND OF METHODOLOGY,

10  WITH THE NEW -- WITH DIFFERENT TYPE OF ASSUMPTIONS

11  THAT PERHAPS THE VALUE OF THOSE ASSETS, YOU KNOW,

12  WOULD BE -- WOULD BE GREATER.

13 Q. WAS THERE ANYTHING ELSE THAT YOU CONSIDERED THEM TO

14  BE TOO GREEDY ABOUT?

15 A. SPECIFIC TO THIS TRANSACTION?

16 Q. SPECIFIC TO CHEMTECH I, YES.

17 A. TO CHEMTECH.  NO.  I MEAN, THERE WERE ALWAYS

18  CHALLENGING -- YOU KNOW, THERE ARE CHALLENGING, YOU

19  KNOW, MAKING SURE THAT -- THAT THE INVESTMENTS WERE

20  -- WERE THE BEST TYPE OF INVESTMENTS WITH THE HIGHEST

21  YIELD, ET CETERA.

22   SO, YOU KNOW, VERY TYPICAL TYPE OF A -- A

23  REACTION BY AN INVESTOR WHO WANTS TO OPTIMIZE HIS

24  RETURN.

25 Q. ALL RIGHT, SIR.  WHY DON'T YOU TURN YOUR ATTENTION TO

1              "JOINT EXHIBIT 444."  DO YOU HAVE THAT, SIR?

2    A.   YES, SIR.

3    Q.   ALL RIGHT.  THIS IS ADDRESSED TO YOU?

4    A.   I HAVE IT.  YES.  IT TOOK ME A WHILE TO FIND IT, SIR.

5    Q.   OKAY.  ALL RIGHT.  THIS IS A DUFF AND PHELPS CREDIT

6         RATING REPORT TO YOU FROM DUFF AND PHELPS, CORRECT?

7    A.   YES.

8    Q.   DATED MAY 7TH, 1997.

9    A.   RIGHT.

10   Q.   DID YOU DEAL WITH DUFF AND PHELPS PERSONALLY?

11   A.   YES, I DID.

12   Q.   DID YOU HAVE MEETINGS WITH DUFF AND PHELPS?

13   A.   YES, PERSONALLY.

14   Q.   WHERE IS DUFF AND PHELPS LOCATED?

15   A.   THEY WERE LOCATED IN -- THEY'RE LOCATED IN CHICAGO.

16        NOW, WE TEND TO HAVE MEETINGS WITH THEM NOT JUST IN

17        CHICAGO, SOMETIMES IN MIDLAND.  IN FACT, SOMETIMES IN

18        NEW YORK.  BUT MOST OF THE TIME I MET WITH THEM IN --

19        IN CHICAGO.

20   Q.   AND THEY'RE A LARGE RATING AGENCY?

21   A.   THEY ARE -- THEY PROBABLY WOULDN'T AGREE WITH ME.

22        BUT THEY ARE A SECOND-TIER RATING AGENCY.  S&P AND

23        MOODY'S BEING THE -- THE ONES THAT -- THAT GET MOST

24        OF THE RECOGNITION.

25   Q.   THEY'RE -- THEY'RE THIRD AFTER S&P AND MOODY'S?

1   A.   THIRD.

2   Q.   I MEAN, IN YOUR ESTIMATION, MAYBE NOT IN THEIRS?

3   A.   MOST -- MOST CORPORATIONS WOULD AGREE WITH THAT.

4        MOST -- MOST LARGE CORPORATIONS COMPARABLE TO DOW

5        WOULD AGREE WITH THAT.

6   Q.   THEY'RE NUMBER THREE?

7   A.   THEY'RE NUMBER THREE.  THEY'RE NUMBER THREE OUT OF

8        THREE OR FOUR.

9   Q.   ALL RIGHT, SIR.  WHY DON'T YOU TURN OVER TO BATES

10       NUMBER PAGE 71911.

11  A.   YES, SIR.

12  Q.   AND IF YOU GO DOWN THERE MOST OF THE WAY DOWN THE

13       PAGE THERE'S A HEADING.  IT SAYS, CAPITALIZATION.

14  A.   YES.  I SEE IT.

15  Q.   AND UNDER THAT IT SHOWS SHORT-TERM DEBT, SENIOR LONG-

16       TERM DEBT, SUBORDINATED LT, WHICH I TAKE IT MEANS

17       LONG TERM, CORRECT?

18  A.   CORRECT.

19  Q.   DEBT, TOTAL DEBT, AND THEN BELOW THAT THERE'S ANOTHER

20       HEADING THAT SAYS OFF-BALANCE SHEET DEBT.  AND THEN

21       THERE'S A LINE THAT ADDS IT ALL TOGETHER AS TOTAL

22       ADJUSTED DEBT; IS THAT CORRECT?

23  A.   THAT'S CORRECT.

24  Q.   IT SAYS -- SHOWS RIGHT ON THIS REPORT THE -- ALL THE

25       DEBT; THAT IS, BOTH ON -- ON-BALANCE SHEET AND OFF-

1     BALANCE SHEET, CORRECT?

2  A.  LET'S SEE.  YES, I BELIEVE SO.

3  Q.  ALL RIGHT, SIR.  I'D LIKE YOU TO TURN YOUR ATTENTION

4     NOW TO "JOINT EXHIBIT 385."  DO YOU RECOGNIZE THE

5     HANDWRITING ON THIS DOCUMENT?

6  A.  YES.  THAT'S MY AWFUL HANDWRITING.

7  Q.  ALL RIGHT.  I WONDER IF YOU COULD READ -- THERE'S

8     ONLY FOUR POINTS TO THIS DOCUMENT.  I WONDER IF YOU

9     COULD READ THOSE FOR US, PLEASE.

10 A.  OKAY.  ONE, MEET WITH THE BUSINESS TO UNDERSTAND

11     PATENT STRATEGY, PATENT PETROLEUM NUMBER 2021.

12     BRACKETS, TIMING FIRST QUARTER 97.

13 Q.  I'M SORRY.  WHAT WAS THAT LAST PART?

14 A.  LOOKS LIKE TIMING FIRST QUARTER.

15 Q.  OKAY.

16 A.  97.

17 Q.  AND THAT'S NUMBER ONE?

18 A.  AND NUMBER TWO IS 14.3.  WHY ARE WE DISTRIBUTING?

19     BECAUSE IT PRODUCES HIGH PROFITS.

20 Q.  AND THEN IN PARENTHESES?

21 A.  LESS LEAKAGE.

22 Q.  OKAY.  AND THEN BELOW THAT?

23 A.  14.3, LINKED WITH 14.7.  BUT IF YOU DISTRIBUTE 14.3,

24     YOU DON'T HAVE TO DISTRIBUTE 14.7.

25 Q.  OKAY.  NUMBER THREE?

1    A.   ADL REPORT DUE ON DECEMBER 20 ON VALUATION. DOW

2         EUROPE SA.  MICHEL AND BILL.

3    Q.   WHO ARE MICHEL AND BILL, IF YOU KNOW?

4    A.   COULD HAVE BEEN MR. DEMARE, MICHEL DEMARE, AND BILL.

5         WE HAD SEVERAL BILLS.  AND IT COULD HAVE BEEN BILL

6         CURRY.  I'M NOT SURE.

7    Q.   AND NUMBER FOUR?

8    A.   14.3.  BILL TO TALK TO ED.  CAN WE DEFEND 14.7 TO BE

9         -- I DON'T KNOW, DELINKED.

10   Q.   ALL RIGHT.  OKAY.  IS THAT -- IS THE BILL AND ED IN

11        NUMBER FOUR BILL CURRY AND ED VALENZUELA?

12   A.   I'M NOT SURE ABOUT BILL.  ED, I BELIEVE, IS ED

13        VALENZUELA.

14   Q.   ALL RIGHT.  THEN UP IN NUMBER TWO IN PARENTHESES YOU

15        HAVE THE WORDS, "LESS LEAKAGE."  WHAT WERE YOU

16        REFERRING TO THERE?

17   A.   I DON'T UNDERSTAND IT, ACTUALLY.  BECAUSE I DON'T SEE

18        HOW THERE COULD BE LEAKAGE, BECAUSE ANY -- ANY -- ANY

19        FAIR MARKET VALUATION -- HIGH FAIR MARKET EVALUATION

20        WOULD BE -- WOULD BE SHARED BY EVERYONE.  SO I DON'T

21        -- I DON'T KNOW.

22   Q.   YOU DON'T KNOW WHY YOU WOULD WRITE THAT THERE?

23   A.   I DON'T KNOW WHY I WROTE THAT.  I DON'T KNOW IF -- IF

24        -- IT -- IN THE CONTEXT OF -- OF CHEMTECH, I DON'T

25        UNDERSTAND THAT.  I DON'T UNDERSTAND WHY I WOULD HAVE

1        WRITTEN THAT, BECAUSE HOW CAN THERE BE LEAKAGE?

2   Q.   AND YOU DID WRITE IT, THOUGH?

3   A.   NO, I -- I WROTE IT.  I DON'T DISPUTE THAT.

4   Q.   LET ME ASK YOU ONE -- ONE OTHER THING, SIR.  DO YOU

5        RECALL WHETHER YOU EVER GAVE ANY OF THE RATING

6        AGENCIES THE LIMITED PARTNERSHIP AGREEMENT IN

7        CHEMTECH I?

8   A.   OH, BOY.  I DON'T REMEMBER.

9   Q.   YOU DON'T REMEMBER WHETHER YOU DID OR NOT?

10  A.   I DON'T REMEMBER WHETHER WE DID OR NOT.  I DID NOT.

11  Q.   OKAY.  YOU DID NOT?

12  A.   I KNOW THAT I DID NOT.

13           BY MR. WELSH:

14               IF I COULD HAVE JUST A COUPLE OF MINUTES,

15           YOUR HONOR.

16           BY THE COURT:

17               SURE.

18           BY MR. WELSH:

19               THANK YOU, YOUR HONOR.

20  BY MR. WELSH:

21  Q.   I HAVE NO FURTHER QUESTIONS, MR. MERSZEI.  THANK YOU

22       VERY MUCH.

23           BY THE COURT:

24               THANK YOU, MR. WELSH.

25               MR. MAGEE, DO WE HAVE EXTENSIVE RE-DIRECT

1   OR HOW LONG DO YOU THINK YOU NEED TO SPEND?

2   BY MR. WELSH:

3         I -- I THINK I CAN FINISH THIS BEFORE

4   LUNCH.

5   BY THE COURT:

6         THAT -- THAT WOULD ---

7   BY MR. WELSH:

8         MUSIC TO YOUR EARS?

9   BY THE COURT:

10        ABSOLUTELY.

11              RE-DIRECT EXAMINATION

12  BY MR. MAGEE:

13  Q.  LET'S START WITH "JOINT EXHIBIT 444," THE DUFF AND

14      PHELPS REPORT IN THE WHITE NOTEBOOK.

15  A.  OKAY.

16  Q.  AND TURN TO PAGE 71911.  I WANT TO FOCUS ON THE OFF-

17      BALANCE SHEET AND THE AMOUNT OF DEBT THAT'S IN THE

18      TOTAL ADJUSTED DEBT COLUMN.

19  A.  OKAY.

20  Q.  ALL RIGHT.  WILL YOU LOOK AT 1993, PLEASE?  THE OFF-

21      BALANCE SHEET DEBT ADJUSTMENT IS ONE BILLION 820?

22  A.  YES.  I SEE THAT.

23  Q.  OKAY.  AND THE RECORD REFLECTS THAT AT THAT POINT IN

24      TIME THE TOTAL OFF-BALANCE SHEET FINANCING DEBT THAT

25      DOW HAD WAS 3.1 BILLION.

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 131 of 318

1   A.   I RECALL THAT.

2   Q.   ALL RIGHT.  SO IF IT'S TRUE, ISN'T IT, THAT -- THAT

3        THIS ADJUSTMENT DOESN'T REFLECT ALL OF YOUR OFF-

4        BALANCE SHEET FINANCING AT THE TIME?

5   A.   YES.  LET ME JUST REFLECT ON THAT.

6            BY THE COURT:

7                WHY DON'T WE HAVE THAT ON THE -- THE

8        MONITOR?

9            BY MR. MAGEE:

10               ONE -- ONE MINUTE, YOUR HONOR.

11           BY THE COURT:

12               OKAY.  THERE WE GO.

13           BY MR. MAGEE:

14               I'LL GET IT UP.

15  BY MR. MAGEE:

16  Q.   YES.  SEE, IT'S THE ONE -- THE 1820 IS WHAT I'M

17       FOCUSING ON IN THE 1993 COLUMN.

18  A.   1993, 1820.

19  Q.   YES.  THE RECORD REFLECTS THAT DOW ---

20  A.   OFF-BALANCE SHEET.

21  Q.   YES.

22  A.   AND WE AT THE TIME HAD A -- A TOTAL OFF-BALANCE SHEET

23       FINANCING OF AROUND THREE BILLION.  AND I BELIEVE

24       THAT DIFFERENCE -- THAT DIFFERENCE -- TO RECONCILE

25       THAT WITH THREE BILLION WOULD BE -- WOULD BE MOST

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 132 of 318

1    LIKELY DOW BRANDS, MINORITY INTERESTS OF ROUGHLY

2    AROUND 900 MILLION.

3         AND THEN WE HAVE CHEMTECH AND THAT'S 200 --

4    THAT'S 1.1.  SO WE ADD 1.8 PLUS 1.1, IT'S 2.9.

5         AND THEN THERE WAS ANOTHER RELATIVELY SMALL, I

6    BELIEVE, MINORITY INTEREST TRANSACTION.  SO ---

7  Q.  CARTEREN WAS LISTED AT 180.  WOULD THAT MAKE THE

8    DIFFERENCE?

9  A.  YES.  I -- THAT WOULD THEN ADD UP TO PRETTY CLOSE TO

10    THAT THREE OR 3.1, WHATEVER THE EXACT AMOUNT IS.

11         SO THIS IS -- THAT'S THE WAY I WOULD RECONCILE

12    IT.

13  Q.  SO THE ADJUSTMENT DOES NOT REFLECT THE TOTAL AMOUNT

14    OF YOUR OFF-BALANCE SHEET.  IN FACT, IT EXCLUDES THE

15    MINORITY EQUITY ON THAT RECONCILIATION?

16  A.  YES.  I DIDN'T THINK WHEN I -- WHEN I ANSWERED IT

17    EARLIER, IF I DID.  I JUST -- I JUST AGREED THAT THAT

18    AMOUNT IS OFF-BALANCE SHEET.  I DIDN'T -- I DID NOT

19    -- THE MINORITY INTEREST IS OFF-BALANCE SHEET.  BUT

20    HERE THEY ARE REFERRING TO OTHER FORMS OF OFF-BALANCE

21    SHEET, WHICH ARE -- WHICH ARE CLEARLY, YOU KNOW, THE

22    LEASES, OPERATING LEASES, THE -- THE SALE AND

23    LEASEBACK OF BUILDINGS FOR MORE TRADITIONAL TYPE OF

24    BALANCE-SHEET FINANCING.

25  Q.  OKAY.  LET'S LOOK IN THE BLACK BINDER, PLEASE, TOWARD

1    THE END EXHIBIT -- "JOINT EXHIBIT 423," WHICH IS THE

2    MARCH 25, 1997 STANDARD AND POOR'S REPORT.

3        IN HIS QUESTION TO YOU, MR. WELSH ASSERTED THAT

4    AT THIS TIME IT WAS LEADING INTO CHEMTECH II, AND

5    ASKING QUESTIONS ABOUT WHETHER YOU DISCUSSED CHEMTECH

6    II.

7        I WANT TO CLARIFY THE RECORD FIRST, THAT THE

8    STIPULATIONS INDICATE THAT THE FIRST NOTICE OF ANY

9    CHANGE IN THE LAW REGARDING THE WITHHOLDING TAX RULES

10   THAT RESULTED IN THE WITHDRAWAL OF THE CLASS A'S CAME

11   IN DECEMBER, 1997.  SO IT POST DATES THIS QUITE

12   SUBSTANTIALLY.

13       AND AS WE DID IN YOUR DIRECT EXAMINATION, THE

14   NOTICE OF -- OF TERMINATION IS DATED IN FEBRUARY.  IN

15   FACT, WE LOOK AT THIS EXHIBIT ONE TIME.  "JOINT

16   EXHIBIT 529" THAT WE DISCUSSED IS FEBRUARY 25, 1998,

17   THE FIRST TIME THAT THE CLASS A PARTNERS WERE

18   NOTIFIED ABOUT THIS.

19       SO WHEN WE LOOK AT "423," WAS THERE ANY REASON

20   TO BELIEVE THAT CHEMTECH II WAS ON THE AGENDA AT ALL?

21  A.  NOT THIS -- THAT SPECIFIC REVIEW, I -- I DON'T

22   RECALL.  BECAUSE WE HAD SO MANY MEETINGS WITH THE

23   RATINGS AGENCIES.  AND WE -- YOU KNOW, ONCE IN A

24   WHILE, YOU KNOW, THEY ASKED FOR MORE DETAILS.  OTHER

25   TIMES, BECAUSE THEY WERE FAMILIAR WITH -- WITH THE

1    TRANSACTIONS, YOU KNOW, WE DIDN'T SPECIFICALLY GO,

2    YOU KNOW, GO INTO THEM.  WE DIDN'T -- WE DIDN'T

3    REPEAT THE SAME THING EVERY YEAR.  SO I DON'T RECALL.

4  Q.  BUT MY POINT WAS THE RECORD REFLECTS THAT THERE WAS

5    NOTHING ABOUT WITHDRAWAL OF THE FIRST CHEMTECH I

6    UNTIL 19 -- LATE '97 OR EARLY '98.  AND THIS -- MARCH

7    OF '97.

8  A.  RIGHT.

9       BY MR. WELSH:

10          OBJECTION, YOUR HONOR.

11       BY THE COURT:

12          DON'T ANSWER.  OBJECTION.

13       BY MR. WELSH:

14          OBJECTION, YOUR HONOR.  FOR ONE THING,

15       MR. MAGEE IS TESTIFYING.

16          NUMBER TWO, HE'S ALREADY BEEN ASKED AND

17       ANSWERED THAT QUESTION.

18       BY THE COURT:

19          RIGHT.  WELL, I -- I WILL -- I WILL SUSTAIN

20       THE OBJECTION TO THE EXTENT THAT IT WASN'T

21       ALTOGETHER CLEAR TO ME THAT IT WAS A QUESTION,

22       AS WELL.

23  BY MR. MAGEE:

24  Q.  WELL, WE'LL TAKE IT BY THE NUMBERS, MR. MERSZEI.

25       WILL YOU PLEASE TURN TO "JOINT EXHIBIT 529."  THE

1       FIRST ADOPTION NOTICE FOR THE PARTNERS ON FEBRUARY

2       25, 1998, 11 MONTHS AFTER THE DOCUMENT WE WERE

3       DISCUSSING.  ALL RIGHT?  DO YOU RECALL LOOKING AT

4       THIS EXHIBIT?

5            BY THE COURT:

6                 DON'T ANSWER THE QUESTION.

7            BY MR. WELSH:

8                 OBJECTION, YOUR HONOR.  AGAIN, HE'S -- HE'S

9            ASKED THE QUESTION AS TO WHETHER OR NOT HE

10           REMEMBERS WHAT HAPPENED AT THE MEETING.  AND MR.

11           MERSZEI HAS ALREADY TESTIFIED THAT HE DOESN'T.

12           BY THE COURT:

13                OKAY.  WELL, I'LL GIVE YOU A LITTLE BIT OF

14           LATITUDE, MR. MAGEE.  YOU CAN ASK A COUPLE OF

15           FOLLOW-UP QUESTIONS IF YOU WISH TO JOG HIS

16           MEMORY.  BUT ---

17           BY MR MAGEE:

18                I'M TRYING TO JOG HIS MEMORY ABOUT THE TIME

19           FRAME, YOUR HONOR.  THAT'S ALL.

20    BY MR. MAGEE:

21    Q.   LOOKING AT THIS AS 11 MONTHS AFTER THE MEETING, THE

22         RATING AGENCY MEETING YOU WERE TALKING ABOUT, IS

23         THERE ANY REASON TO BELIEVE THAT CHEMTECH II, THE

24         REPLACEMENT TRANSACTOIN, WOULD HAVE BEEN THE SUBJECT

25         OF A MARCH, 1997, MEETING, 11 MONTHS PRIOR TO THIS

1          FIRST NOTIFICATION?

2    A.    NO.

3    Q.    THANK YOU.  LET'S LOOK AT "JOINT EXHIBIT 280."  THIS

4          IS THE MINUTES OF THE ANNUAL MEETING THAT MR. WELSH

5          REVIEWED WITH YOU.

6    A.    YES.

7    Q.    AND HE PARTICULARLY EMPHASIZED THAT MR. CURRY WAS IN

8          THE TAX DEPARTMENT IN HORGEN AT THE TIME IN DOW

9          EUROPE SA; IS THAT RIGHT?

10   A.    YES.

11   Q.    OKAY.  I WANT TO LOOK AT THE ACTUAL MINUTES

12         THEMSELVES INSTEAD OF JUST THE ATTENDEES.

13             IF YOU'LL LOOK AT 9737, PLEASE.  THE THIRD

14         PARAGRAPH.  MR. CURRY REVIEWED THE MINUTES OF THE

15         CHEMTECH ROYALTY ASSOCIATION LP PARTNER MEETING.  DO

16         YOU SEE THAT?

17   A.    YES.

18   Q.    AND THEN WE HAD -- WELL, LET'S FINISH WITH MR. CURRY.

19         WE TURN OVER TO 9738.  THERE ARE TWO ENTRIES FOR MR.

20         CURRY.  HE INFORMED THE PARTNERS THAT THE INITIAL

21         LICENSE TERM FOR -- FOR PORTFOLIO 2.1 HAD EXPIRED AND

22         IT WAS GOING TO BE RELICENSED.  AND HE INFORMED THE

23         CLASS A PARTNERS THAT THE GENERAL PARTNER WILL

24         REQUEST CONFIRMATION OF THE STATEMENT ON THE

25         INVESTMENT AGREEMENT.

1        IS THERE ANYTHING IN THESE MINUTES OR ANY

2        RECOLLECTION YOU HAVE OF THE MEETING THAT INDICATES

3        THAT MR. CURRY TALKED AT ALL ABOUT ANY TAX TOPICS?

4  A.   I -- I CAN'T RECALL.  SORRY.

5  Q.   YOU HAD AN EXCHANGE ON THIS EXHIBIT ABOUT WHAT THE

6        LIMITED PARTNERS WERE INTERESTED IN AND WHETHER THEY

7        WERE JUST PASSIVE BYSTANDERS ABOUT THE INFORMATION

8        THAT WAS CONVEYED.

9        IF YOU'LL LOOK AT THE THIRD PARAGRAPH FROM THE

10       BOTTOM.  IT SAYS ON 9737.  IT SAYS, "THE HIGHLIGHTS

11       OF THE PARTNERSHIP FINANCIAL RESULTS IN 1994 INCLUDED

12       RECEIVING $899,000.00 OF NET VARIABLE ROYALTIES, IN

13       ADDITION TO THE SCHEDULED MINIMUM ROYALTIES."

14       DO YOU RECALL WHETHER THE PARTNERS WERE

15       INTERESTED IN THAT EXCESS INCOME?

16 A.    YES.

17 Q.    AND THE BOTTOM PARAGRAPH SAYS, "THE PARTNERS -- THE

18       PARTNERS REVIEWED AND DISCUSSED THE STATUS OF THEIR

19       CAPITAL ACCOUNTS.  AND AFTER DISCUSSION, THE CLASS A

20       LIMITED PARTNERS ACCEPTED THE CAPITAL ACCOUNT."

21       SO ARE THESE MINUTES ACCURATE IN CONVEYING THAT

22       THERE WAS A DISCUSSION ABOUT THE CAPITAL ACCOUNTS

23       WITH THE LIMITED PARTNERS?

24 A.    LIKE I SAID, I DON'T -- I DON'T RECALL THE DETAIL.

25       BUT ALL THE SUBJECT MATTERS, AND MR. LEUTENEGGER

1    BEING A -- A CERTIFIED PUBLIC ACCOUNTANT CERTAINLY

2    WAS -- WAS, YOU KNOW, ASSURED ALL -- ALL THE -- ALL

3    THE PARTICIPANTS, ALL THE SHAREHOLDERS THAT -- THAT

4    WHATEVER IS BEING REFLECTED IS TRULY CORRECT.

5         SO I -- FROM THAT I DEDUCT THE ANSWER IS YES.

6  Q.  EARLY IN HIS CROSS-EXAMINATION WHEN YOU WERE

7    DISCUSSING THE TOPIC OF MONETIZATION, MR. WELSH ASKED

8    YOU IF YOU COULD HAVE USED THE PATENTS, THE 883

9    MILLION DOLLARS WORTH OF PATENTS, TO BORROW FROM A

10   BANK IN THE U.S., HYPOTHETICALLY.  AND YOU SAID YOU

11   -- I THINK YOU SAID YOU DIDN'T -- DIDN'T KNOW.  YOU

12   WERE FOCUSED ON EUROPE.

13        BUT LET ME ASK, HOW WOULD YOUR DEBT-TO-TOTAL

14   CAPITAL RATIO HAVE BEEN AFFECTED IF YOU HAD BORROWED

15   200, SECURITIZED OR OTHERWISE, WITH REFERENCE TO THE

16   PATENTS AS OPPOSED TO DOING A NET MINORITY EQUITY

17   TRANSACTION?

18        BY THE COURT:

19             DON'T ANSWER THE QUESTION YET.

20        BY MR. WELSH:

21             YOUR HONOR, I OBJECT.  I THINK MR. MAGEE IS

22             INCORRECTLY CHARACTERIZING.  I THINK HE'S SAID

23             THAT THEY COULD, OF COURSE, HAVE BORROWED

24             AGAINST THE ALMOST 900 MILLION DOLLARS IN

25             ASSETS.

```
 1              BUT AS HE CORRECTLY SAID, THEY -- THEY DID
 2          NOT DO THAT.  AND I DON'T DISPUTE THAT THEY
 3          DIDN'T DO THAT.  THE QUESTION WAS WHETHER THEY
 4          COULD HAVE, AND HE ANSWERED THAT THEY -- THEY
 5          COULD.
 6          BY THE COURT:
 7              WELL, I UNDERSTAND THAT, MR. WELSH.  BUT IT
 8          IS RE-DIRECT.  AND IT WAS AN ISSUE THAT CAME UP
 9          IN CROSS-EXAMINATION.  SO I'LL PERMIT THE
10          QUESTION.
11  BY MR. MAGEE:
12  Q.  FIRST OF ALL, LET'S JUST CLARIFY WHAT YOU SAID.  DO
13      YOU RECALL WHAT YOU SAID IN THIS CONTEXT?
14  A.  I -- THE -- THOSE ASSETS WERE ON THE BOOKS FOR MORE
15      OR LESS NOTHING, ZERO.  SO THE -- IT -- IT WOULD HAVE
16      BEEN VERY DIFFICULT TO BORROW AGAINST THOSE, BECAUSE
17      THEY WERE NOT REFLECTED ON THE BOOKS.
18  Q.  AND HOW WOULD A DEBT BORROWING, EVEN IF YOU WERE ABLE
19      TO USE THOSE ASSETS FOR A DEBT BORROWING, HOW WOULD
20      THAT HAVE AFFECTED YOUR DEBT-TO-TOTAL CAPITAL RATIO
21      IN 1993 WHEN YOU WERE TRYING TO REDUCE IT?
22  A.  WELL, IT CERTAINLY WOULD HAVE INCREASED THE -- THE
23      DEBT PORTION.  AND, THEREBY, INCREASE THE DEBT-TO-
24      TOTAL CAPITAL.
25  Q.  THANK YOU.  I HAVE NO FURTHER QUESTIONS.
```

1       BY THE COURT:

2              VERY WELL.  MR. WELSH?

3       BY MR. WELSH:

4              JUST ONE SECOND, YOUR HONOR.  I WANT TO ASK

5       CO-COUNSEL A QUESTION.

6              I JUST HAVE ONE QUESTION, IF I MAY, YOUR

7       HONOR.

8       BY THE COURT:

9              ONE QUESTION?

10      BY MR. WELSH:

11             I THINK -- I'VE SAID THAT A MILLION TIMES

12      AND IT TURNS OUT TO BE MORE.  BUT I'M GOING TO

13      TRY THIS TIME TO KEEP IT TO JUST ONE QUESTION,

14      IF I MAY, YOUR HONOR.

15      BY THE COURT:

16             ONE QUESTION COMPLETELY RELATED TO THE RE-

17      DIRECT?

18      BY MR. WELSH:

19             I PROMISE.  I PROMISE.

20      BY THE COURT:

21             OKAY.

22      BY MR. WELSH:

23             NOTHING TO DO WITH ANYTHING ELSE.

24      BY THE COURT:

25             ALL RIGHT.

```
 1              BY MR. WELSH:
 2                   IN FACT, IT HAS TO DO WITH HIS LAST
 3              QUESTION.
 4                        RE-CROSS-EXAMINATION
 5    BY MR. WELSH:
 6    Q.   WHERE HE ASKED YOU THAT -- I THINK YOU MENTIONED THE
 7         FACT THAT THE PATENTS HAD ZERO BASIS ON THE BOOKS
 8         MIGHT AFFECT THEIR ABILITY TO BE BORROWED AGAINST.
 9              WHAT DOES A LENDER LOOK AT, WHAT'S ON THE BOOKS
10         OR WHAT THE FAIR MARKET VALUE OF THE ASSET THAT IS
11         PUTTING -- IS PUT UP AS COLLATERAL FOR A LOAN IS?
12              BY THE COURT:
13                   IF YOU KNOW.
14    BY THE WITNESS:
15    A.   I DON'T RECALL EVER HAVING BORROWED IN THIS COUNTRY
16         WITH ASSETS THAT WERE NOT ON THE BOOKS BEING
17         COLLATERALIZED.
18              IN OTHER WORDS, YOU HAD PHYSICAL ASSETS THAT
19         WERE ON THE BOOKS FOR A CERTAIN AMOUNT OF DOLLARS.
20         AND THEY WOULD BE PLEDGED AGAINST SOME BORROWING.
21              BY MR. WELSH:
22                   SO THESE ARE ONLY FOLLOW-UPS, YOUR HONOR.
23              BY THE COURT:
24                   OKAY.
25    BY MR. WELSH:
```

1   Q.   SO IF THERE IS A BUILDING THAT YOU DEPRECIATED DOWN

2        TO VERY LITTLE BUT IT'S SITTING ON A PIECE OF NEW

3        YORK CITY REAL ESTATE THAT'S WORTH HUNDREDS OF

4        MILLIONS OF DOLLARS BUT IT'S BEING CARRIED ON THE

5        BOOK VALUE OF, I DON'T KNOW, IT'S BEEN SITTING THERE

6        FOR 40 YEARS, BUT YOU CAN'T BORROW MONEY AGAINST THAT

7        JUST BECAUSE THE BOOK VALUE IS LOW?

8   A.   NO.  THAT IS CORRECT.  WELL, ACTUALLY, YOU NKOW,

9        DEPENDING ON WHEN.  BECAUSE YOU CANNOT -- IT IS VERY

10       DIFFICULT -- IN FACT, I THINK FROM YOUR -- I'M NOT A

11       CPA.  BUT YOU CAN -- YOU CAN -- YOU CAN PLEDGE SALE

12       AND LEASEBACK THESE -- THESE ASSETS WHEN THEY ARE --

13       WHEN THEY'RE NEW ASSETS, NOT WHEN THEY'RE OLD ASSETS.

14       NOW, THESE ARE THE -- THE RULES TODAY.

15            IN TERMS OF -- IN TERMS OF ASSETS, PHYSICAL

16       ASSET, LIKE A -- LIKE A BUILDING, YOU ARE CORRECT.

17       THOSE WERE -- WERE -- I MEAN, IT WAS OBVIOUS THEY HAD

18       ECONOMIC VALUE AND YOU COULD PLEDGE THOSE.

19            IN TERMS OF THE PATENTS, I AM JUST NOT THAT

20       FAMILIAR BECAUSE I HAVEN'T WORKED IN THE U.S. LONG

21       ENOUGH TO KNOW WHETHER -- WHETHER YOU COULD DO THAT.

22   Q.   WELL, WHAT LENDERS CARE ABOUT IS -- IS THE REAL VALUE

23       OF AN ASSET, NOT WHAT ITS BOOK VALUE IS, CORRECT?

24   A.   THAT'S CORRECT.  BUT I HAVE NEVER, NEVER EXPERIENCED

25       ANY PLEDGE OF PATENTS FOR BANK BORROWINGS.

1   Q.    NO FURTHER QUESTIONS.

2              BY MR. WELSH:

3                   THANK YOU, YOUR HONOR.

4   BY MR. WELSH:

5   Q.    THANK YOU, MR. MERSZEI:

6              BY THE COURT:

7                   THANK YOU.

8              BY MR. MAGEE:

9                   NO QUESTIONS, YOUR HONOR.

10             BY THE COURT:

11                  OKAY.  IT'S ALMOST NOON.  I'D LIKE TO

12             CONFINE THE LUNCH BREAK TODAY TO ONE HOUR, IF

13             BOTH SIDES THINK THAT THEY CAN -- THEY CAN

14             ACCOMPLISH THAT, HAVE A GOOD LUNCH AND BE BACK

15             BY ONE O'CLOCK.  WHY DON'T WE PLAN TO DO IT.

16                  SO, AGAIN, WE'LL TAKE A RECESS RIGHT NOW

17             AND WE'LL RECONVENE AT ONE O'CLOCK, UNLESS ---

18             BY MR. MAGEE:

19                  WOULD THE COURT EXCUSE MR. MERSZEI, PLEASE?

20             BY THE COURT:

21                  YES.

22             BY MR. MAGEE:

23                  SO HE CAN FLY BACK TO MIDLAND.

24             BY THE COURT:

25                  WELL, WE'D LOVE FOR YOU TO STAY HERE IN

1        THIS -- YOU KNOW, THIS ENTIRE TRIAL.  BUT YOU

2        ARE EXCUSED.  THANK YOU FOR COMING IN TODAY.

3        BY THE WITNESS:

4             THANK YOU, YOUR HONOR.

5        BY THE COURT:

6             COURT IS IN RECESS.

7        (THEREFORE, AT THIS TIME, THE COURT IS IN RECESS

8        FOR LUNCH.)

9        (THEREFORE, AT THIS TIME, THE PROCEEDINGS WERE

10       RESUMED)

11       BY THE COURT:

12            BE SEATED.  OKAY, MR. MAGEE, PLEASE CALL

13       YOUR NEXT WITNESS.

14       BY MR. MAGEE:

15            PLAINTIFF CALLS, AT THIS TIME, YOUR HONOR,

16       WILLIAM NORRIS AND HE WILL BE EXAMINED BY

17       CHRISTOPHER MURPHY.

18       BY THE COURT:

19            VERY WELL.

20

21

22

23

24

25

1

2  THE WITNESS, WILLIAM R. NORRIS, AFTER HAVING FIRST BEEN

3  DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING

4  BUT THE TRUTH, TESTIFIED AS FOLLOWS:

5                    EXAMINATION

6          BY MR. MURPHY:

7              GOOD AFTERNOON, YOUR HONOR.  I'M

8          CHRISTOPHER MURPHY FOR THE PLAINTIFF.

9          BY THE COURT:

10             GOOD AFTERNOON, MR. MURPHY.  YOU MAY

11         PROCEED.

12         BY MR. MURPHY:

13             THANK YOU VERY MUCH.

14  BY MR. MURPHY:

15  Q.   MR. NORRIS, DO YOU HAVE A COPY OF THIS BLACK BINDER

16       WITH SOME EXHIBITS IN FRONT OF YOU THERE?

17  A.   I DO.

18  Q.   OKAY.  EXCELLENT.  HOW ARE YOU DOING THIS AFTERNOON?

19  A.   FINE, FINE.  THANK YOU.

20  Q.   SO TODAY I'M GOING TO BE ASKING YOU ABOUT YOUR

21       INVOLVEMENT IN THE CHEMTECH PARTNERSHIP WHICH

22       OCCURRED IN 1993.  CAN YOU TELL ME WHAT POSITION YOU

23       HELD AT DOW IN 1993?

24  A.   IN 1993 I WAS THE ASSOCIATE PATENT COUNSEL.

25  Q.   AND AT THAT TIME WHO DID YOU REPORT TO?

1  A.   I REPORTED TO RICHARD WATERMAN, WHO WAS THE PATENT

2       COUNSEL FOR DOW CHEMICAL.

3  Q.   AND THE PATENT COUNSEL, WHAT DEPARTMENT IS THAT

4       LOCATED IN, IN THE SCHEME OF THE PATENT?

5  A.   IT'S IN HE PATENT DEPARTMENT, PART OF THE PATENT

6       DEPARTMENT, WHICH IS A SUB ASPECT, IF YOU WILL, OF

7       THE LEGAL DEPARTMENT.

8  Q.   OKAY.  GREAT.  LET'S STEP BACK A SECOND AND DISCUSS

9       YOUR BACKGROUND.  LET'S START WITH COLLEGE.  WHERE

10      DID YOU GO TO COLLEGE AND WHEN DID YOU GRADUATE FROM

11      COLLEGE?

12 A.   I WENT TO UNIVERSITY OF MICHIGAN. I GRADUATED FIRST

13      WITH A BACHELOR OF SCIENCE IN CHEMICAL ENGINEERING IN

14      1954.  AFTER AN INTERIM PERIOD IN THE MILITARY, I

15      FINISHED LAW SCHOOL IN 1959 AND SUBSEQUENT TO THAT

16      PASSED THE MICHIGAN STATE AND PATENT OFFICE BAR

17      EXAMINATIONS.

18 Q.   OKAY.  GREAT.  NOW LET'S MOVE ON TO YOUR EMPLOYMENT.

19      WHERE WERE YOU EMPLOYED DIRECTLY OUT OF LAW SCHOOL IN

20      1959?

21 A.   I WAS EMPLOYED BY THE DOW CHEMICAL COMPANY DIRECTLY

22      OUT OF LAW SCHOOL.

23 Q.   AND IN WHAT DEPARTMENT DID YOU GO TO WORK FOR AT DOW

24      IN 1959?

25 A.   THE PATENT DEPARTMENT.

1  Q.   THROUGHOUT THE COURSE OF YOUR PROFESSIONAL CAREER,

2       DID YOU WORK FOR ANY COMPANY OTHER THAN DOW?

3  A.   ONLY DOW.

4  Q.   OKAY.  SO NOW AT A HIGH LEVEL, I'D JUST LIKE TO ASK,

5       THROUGHOUT THAT LONG CAREER AT DOW, WHAT WERE YOUR

6       RESPONSIBILITIES AT DOW?

7  A.   WELL, INITIALLY FOR APPROXIMATELY THE FIRST 10 YEARS,

8       I WAS EITHER IN THE PATENT PROFESSION, DOMESTIC

9       PATENT PROFESSION, AND I HAD SOME TRAINING EXPERIENCE

10      IN TRADEMARKS AND LARGELY HAD PRETTY MUCH DOMESTIC

11      EXPERIENCE THERE.  IN ABOUT 10 YEARS, OR ABOUT 1970

12      ROUGHLY, I WAS MOVED INTO A MANAGERIAL ROLE OVER A

13      GROUP THAT WAS RESPONSIBLE FOR THE FOREIGN FUNDING OF

14      DOW CHEMICAL'S PATENT.  AND I, ALMOST AT THE SAME

15      TIME, I UNDERTOOK HE ARRANGING OF INTERCOMPANY

16      LICENSING TO THE DOW CHEMICAL SUBSIDIARIES OVERSEAS,

17      AND I ALSO AT THE SAME TIME I WAS APPOINTED TO THE

18      COMPANY'S ANTITRUST COMMITTEE.  AND THERE WAS ANOTHER

19      THREAD OF RESPONSIBILITY THAT ULTIMATELY GREW INTO A

20      SMALL GROUP WHICH RELATED TO THE REGULATORY

21      COMPLIANCE OF THE DEPARTMENT OF COMMERCE REGULATIONS.

22 Q.   OKAY.  GREAT.  THAT SOUNDS LIKE A GOOD SUMMARY.  WHEN

23      DID YOU RETIRE FROM THE DOW CHEMICAL COMPANY?

24 A.   APRIL 1996

25 Q.   SO JUST TO CONFIRM, YOU ONLY WORKED FOR DOW FROM TO

1      1959 TO 1996?

2  A.   THAT'S CORRECT.

3  Q.   OKAY.  GREAT.  LET'S MOVE FORWARD A LITTLE BIT TO THE

4       SUBJECT OF THIS CASE, WHICH YOU KNOW WE ARE HERE TO

5       TALK ABOUT, CHEMTECH.  WHAT WAS YOUR EARLIEST

6       INVOLVEMENT THE PROJECT THAT ULTIMATELY BECAME

7       CHEMTECH?

8  A.   I WAS INVITED TO A MEETING WITH THE DOW CHEMICAL CFO,

9       PEDRO REINHARD, AND THAT WAS MY FIRST CONTACT WITH

10      THIS INITIATIVE.

11 Q.   AND WHAT AT THIS MEETING DID MR. REINHARD ASK YOU TO

12      DO?

13 A.   HE ASKED ME FOR -- HE WANTED TO KNOW THE VALUE OF THE

14      UNITED STATES PATENTS OWNED BY DOW CHEMICAL COVERING

15      HIS MANUFACTURING OPERATIONS IN THE UNITED STATES.

16 Q.   AND HE WANTED TO KNOW THE VALUE, YOU SAID.  WERE YOU

17      ABLE TO PROVIDE MR. REINHARD WITH A VALUE AT THAT

18      TIME?

19 A.   NO, I COULD NOT.

20 Q.   SO THEN WHY COULDN'T YOU DO THAT AT THE MEETING?

21 A.   IT'S SOMETHING THAT NEVER -- I GUESS THE QUESTION

22      HADN'T BEEN ASKED BEFORE.  WE DIDN'T HAVE THE DATA

23      READILY AVAILABLE AND, OF COURSE, SUBSEQUENTLY

24      INITIATIVES WERE STARTED TO GET THE DATA, BUT AT THAT

25      POINT WE DID NOT HAVE THE DATA.

1   Q.   SO IF YOU DIDN'T HAVE THE DATA, WHY DO YOU THINK THAT

2        YOU WERE INVITED TO THIS EARLY MEETING BY MR.

3        REINHARD?

4   A.   WELL, I THINK MY INVOLVEMENT WITH THE INTERCOMPANY

5        LICENSING PROGRAM, LICENSING THE TECHNOLOGY TO ITS

6        SUBSIDIARIES AROUND THE WORLD.  AND PRETTY MUCH THAT

7        EXPERIENCE PROBABLY NOMINATED ME FOR THAT

8        OPPORTUNITY.

9   Q.   OKAY.  GREAT.  SO YOU SAID THAT THERE WASN'T A VALUE

10       OF THE PATENT.  SO PRIOR TO CHEMTECH, WAS THERE ANY

11       WAY THAT DOW ASSIGNED VALUE TO ITS U.S. PATENTS?

12  A.   NOT ROUTINELY.

13  Q.   WAS THERE -- SO THERE WAS NO SYSTEMIC APPROACH OR

14       ANYTHING LIKE THAT TO ASSIGNING THE VALUE?

15  A.   NO, NOT SYSTEMATIC.  THAT'S CORRECT.

16  Q.   WAS THERE ANY WAY AT ALL AT A TIME PRIOR TO CHEMTECH

17       WHEN DOW FOUND A REASON OR A NEED TO VALUE ITS U.S.

18       PATENTS.

19  A.   OH, YES, THAT WOULD HAPPEN ON AN OCCASIONAL BASIS,

20       PARTICULARLY, FOR EXAMPLE, AN INFRINGEMENT ACTION, A

21       SUCCESSFUL ONE, THERE WOULD BE A DAMAGE PHASE IN THAT

22       LITIGATION AND, OF COURSE, IT WOULD BECOME IMPORTANT

23       TO ESTABLISH THE VALUE OF THE PATENT, THE TECHNOLOGY

24       FOR THAT PURPOSE WOULD BE ONE EXAMPLE.

25  Q.   OKAY. GREAT. WELL, LET'S TALK ABOUT CHEMTECH.  DID

1        CHEMTECH ULTIMATELY CHANGE THE WAY THAT DOW ASSIGNED

2        VALUE TO ITS U.S. PATENTS?

3   A.   YES, IT DID PROFOUNDLY, I THINK.  IT LED TO AN

4        ENTIRELY IMPROVED AND SYSTEMATIC APPROACH TO VALUING

5        ON A PRELIMINARY BASIS AT LEAST, THE PATENTS THAT

6        WERE BEING FILED.

7   Q.   WAS THERE ANY COMPANY THAT HELPED DOW DEVELOP THIS,

8        AS YOU CALL, SYSTEMATIC ---

9   A.   YES, VERY PROMINENTLY AND IMPORTANTLY IT WAS ARTHUR

10       D. LITTLE, WHO YOU RETAINED AT THAT TIME.

11  Q.   OKAY.  LET'S TURN BACK JUST TO EARLY 1993, KIND OF

12       AROUND THE TIME OF THIS FIRST MEETING.  DID YOU PLAY

13       AN ACTIVE ROLE IN ACTUALLY CHOOSING THE PATENTS THAT

14       WERE ULTIMATELY CONTRIBUTED TO THE CHEMTECH

15       STRUCTURE?

16  A.   NO, NOT SPECIFICALLY.  I WAS TANGENTLY INVOLVED

17       PERHAPS IN ESTABLISHING BROAD METRICS FOR INCLUSION

18       OF PATENTS.  FOR EXAMPLE, WE WOULD NOT WANT TO

19       INCLUDE A PATENT WHICH HAD AN ACTIVE ISSUE WITH A

20       THIRD PARTY AT THAT POINT.  BUT -- AND WE MIGHT HAVE

21       ESTABLISHED SOME CRITERIA LIKE THAT.

22  Q.   SO WHAT DEPARTMENTS THEN OR WHAT PEOPLE WERE MORE

23       INVOLVED IN THE SELECTION PROCESS?

24  A.   WELL, THOSE IMMEDIATELY CONCERNED HAVING THE BEST

25       CONNECTIONS WITH THE BUSINESSES AND THE TECHNOLOGY

1    CENTER OR WITH THE BUSINESSES AND MANUFACTURING

2    THROUGH THE TECHNOLOGY CENTER. WE HAD TECHNOLOGY

3    CENTERS AND INVENTIONS OR AT THE TIME I THINK THEY

4    WERE TITLED INTELLECTUAL PROPERTY -- OR INTELLECTUAL

5    ASSET MANAGERS. THAT WAS IT.

6    Q.   SO YOU MENTIONED TECH CENTERS AND INTELLECTUAL ASSET

7    MANAGEMENT OR INVENTIONS MANAGEMENT. WHO DID YOU

8    WORK WITH IN INVENTIONS MANAGEMENT DURING THIS

9    PROCESS?

10   A    SHARON ORIEL WAS DEFINITELY INVOLVED AND PHIL BARNETT

11   AND SOMETIME, CASUALLY PERHAPS, ED VALENZUELA.

12   Q.   OKAY. GREAT. SO YOU SAID YOU HAD SOME TANGENTIAL

13   SELECTION OR, EXCUSE ME, SOME TANGENTIAL INVOLVEMENT

14   IN THE SELECTION PROCESS. DID YOU PLAY A MORE ACTIVE

15   ROLE IN ANY OTHER ASPECTS OF SETTING UP THE CHEMTECH

16   TRANSACTION?

17   A.   YES. THE ANSWER IS YES, I DID PLAY A MORE ACTIVE

18   ROLE IN TWO INSTANCES. ONE WAS THE CONSULTING

19   AGREEMENT, A SECRECY AGREEMENT REQUIRED TO BRING

20   ARTHUR D. LITTLE ON BOARD. AND SUBSEQUENTLY I WAS

21   DIRECTLY INVOLVED IN DRAFTING AND APPROVING IT. I

22   GUESS I EXECUTED THE LICENSE AGREEMENT, A PARTNERSHIP

23   TO DOW.

24   Q.   A PATENT ---

25   A.   YES.

1   Q.   AND YOU MENTIONED FIRST THE SECRECY OR

2        CONFIDENTIALITY AGREEMENT WITH ARTHUR D. LITTLE. WHY

3        WAS SUCH AN AGREEMENT NECESSARY?

4   A.   FIRST TO APPRAISE THE VALUE OF THE PATENTS, THEY

5        NEEDED VERY SENSITIVE EFFICIENCY PRODUCTION

6        TECHNOLOGY.  EXTREMELY IMPORTANT, IF YOU WILL, TRADE

7        SECRETS WERE TO BE EXCHANGED OR MADE AVAILABLE FOR

8        THOSE APPRAISALS.

9   Q.   SO YOU WORKED ON THAT CONSULT -- OR, EXCUSE ME, THAT

10       CONFIDENTIALITY SECRECY AGREEMENT.  DID YOU AVE DAY-

11       TO-DAY COMMUNICATIONS WITH ARTHUR D. LITTLE. IN

12       ESTABLISHING THE VALUE?

13  A.   NOT DAY-TO-DAY.  MAYBE ONCE OR TWICE IN THE COURSE OF

14       THE WHOLE PROJECT I MET WITH HIM TO SEE IF THERE WERE

15       ANY ISSUES OR THINGS WE NEEDED TO IRON OUT.

16  Q.   WHO, IF YOU KNOW, AT DOW WAS MORE INVOLVED IN THOSE

17       DAY-TO-DAY COMMUNICATIONS RELATED TO ESTABLISHING THE

18       PATENT VALUE WITH ADL?

19  A.   WELL, YOUR QUALIFICATION -- DO I -- I KNOW THE

20       CATEGORY BUT JUST SPECIFICALLY WHAT THEY WERE DOING,

21       I DIDN'T KNOW.  THE PEOPLE INVOLVED WERE THE

22       INTELLECTUAL PROPERTY MANAGEMENT PEOPLE.  THEY WERE

23       THE NAMED CONDUIT PROBABLY FROM THE TECH CENTER.  THE

24       TECH CENTER IS REALLY A COMMITTEE OF BUSINESS AND

25       TECHNICAL AND PRODUCTION, COUNTING ALL SORTS OF --

1      IT'S REALLY A MINOR BUSINESS COMMITTEE.  THAT

2      COMMITTEE OR THAT -- FROM THAT SOURCE, THE INVENTIONS

3      MANAGEMENT PEOPLE WERE MAKING THE INFORMATION

4      AVAILABLE TO ARTHUR D. LITTLE.  THEY NEEDED IT FOR

5      THE APPRAISAL.

6  Q.   DO YOU SEE -- YOU MENTIONED THE INVENTIONS MANAGEMENT

7      ACTED AS A KIND OF A CONDUIT BETWEEN THE TECH CENTERS

8      WHO HAD THE INFO AND ADL; IS THAT RIGHT?

9  A.   THAT'S RIGHT.  AND I DON'T WANT TO CONFUSE THE POINT

10     HERE.  I'VE BEEN SWITCHING BETWEEN INVENTIONS

11     MANAGEMENT AND INTELLECTUAL PROPERTY MANAGERS.  THE

12     LATTER TITLE IS JUST A MORE UPDATED TITLE OF THE

13     INVENTIONS MANAGEMENT.  SO IT'S THE SAME GROUP.

14  Q.  OKAY.  GREAT.  WELL, THANK YOU.  NOW YOU ALSO

15     MENTIONED A PATENT LICENSE AGREEMENT AND THAT YOU

16     WERE INVOLVED IN THAT.

17  A.   YES.

18  Q.  LET'S START BY TAKING A LOOK IN YOUR BINDER AT THIS

19     FIRST DOCUMENT.  IT'S GOING TO BE JOINT EXHIBIT 2O, 2

20     CAPITAL O.  IF YOU FLIP TO THE SECOND PAGE OF THIS

21     DOCUMENT.  THIS STATES THAT THIS IS A PATENT LICENSE

22     AGREEMENT.  IT'S DATED APRIL 30, 1993 AND IT'S

23     BETWEEN CHEMTECH, WHO IS REFERRED TO AS THE LICENSOR,

24     AND DOW, WHO IS REFERRED TO AS THE LICENSEE.  DO YOU

25     RECOGNIZE THIS DOCUMENT?

1  A.   YES, I DO.

2  Q.   I'M GOING TO ASK YOU TO FLIP WAY AHEAD NOW TO BATES

3       CT 00036768.  NOW, THIS IS AN AMENDMENT.  IT'S CALLED

4       FIRST AMENDMENT TO THE PATENT LICENSE AGREEMENT AND

5       IT'S DATED AUGUST 4, 1993.  I'LL WAIT UNTIL YOU GET

6       THERE.

7  A.   YES. THERE.

8  Q.   SO, AS I SAID, DATED AUGUST 4, 1993.  DO YOU KNOW WHY

9       THE PATENT LICENSE AGREEMENT WAS AMENDED ON THAT DAY?

10  A.   YES.  I AM AWARE OF A REASON FOR THE AMENDMENT.  I

11       WASN'T DIRECTLY INVOLVED IN THE AMENDMENT.  OF

12       COURSE, I WAS INFORMED ABOUT ITS EXISTENCE AND AS IT

13       AFFECTED THE AGREEMENT, BASIC LICENSE AGREEMENT.  BUT

14       IT WAS, I THINK, WAS THE PROSPECT -- IT WAS ENTERED

15       INTO ON THE PROSPECT OF PARTNERSHIPS COMING INTO THE

16       CHEMTECH PARTNERSHIP.

17  Q.   I THINK YOU SAID PARTNERSHIPS COMING INTO THE

18       PARTNERSHIPS.

19  A.   I'M SORRY, PARTNERS COMING INTO THE PARTNERSHIPS.

20  Q.   BUT YOU SAID YOU DIDN'T HAVE TOO MUCH INVOLVEMENT

21       WITH THIS AMENDMENT?

22  A.   I DIDN'T HAVE ANY -- I ONLY BECAME AWARE OF THE

23       AMENDMENT SUBSEQUENT TO IT'S EXECUTION, BUT I WAS

24       AWARE OF IT AFTER I SAW THAT THAT'S WHAT TRIGGERED

25       IT.

1   Q.   LET'S FLIP BACK TO THAT SECOND PAGE OF THE AGREEMENT,

2        WHICH IS BATES 36697, THAT WE WERE LOOKING AT BEFORE.

3        HOW WERE YOU INVOLVED IN CREATING THIS AGREEMENT?

4   A.   WELL, INITIALLY -- INITIALLY I PREPARED A FIRST

5        DRAFT, IF YOU WILL, OF THE LICENSE AGREEMENT,

6        ANTICIPATING SUCCESS OF THE PARTNERSHIP.  DOW WAS

7        GOING TO NEED A LICENSE UNDER THE PATENTS THAT WERE

8        CONTRIBUTED TO THE PARTNERSHIP.

9   Q.   SO YOU DID A FIRST DRAFT?

10  A.   FIRST DRAFT.

11  Q.   HAS THIS DRAFT HAD ANY CHANGES SINCE THAT FIRST

12       DRAFT, IF YOU RECALL?

13  A.   YES, SIGNIFICANT.  THERE WERE QUITE A FEW CHANGES.

14       SUBSEQUENTLY, AFTER RECEIVING THE FINAL DRAFT, I

15       REVIEWED IT QUITE IN DETAIL.  I RECALL HAVING

16       SUGGESTED SOME MINOR AMENDMENTS, BUT OTHERWISE, IT'S

17       PRETTY MUCH ON THAT SECOND REVIEW AS IT WAS PROPOSED

18       AND EXECUTED BY MYSELF LATER.

19  Q.   RIGHT.  WERE YOU INVOLVED IN ALL OF THE AMENDMENTS

20       FROM THE FIRST AMENDMENT TO THIS FINAL AGREEMENT?

21  A.   NO.

22  Q.   WELL, WHO WAS INVOLVED IN THAT SUBSEQUENT DRAFTING?

23  A.   WELL, WE HAD OUTSIDE COUNSEL.  WE HAD OUTSIDE COUNSEL

24       WORKING WITH US.  A NUMBER OF LAWYERS WERE INVOLVED

25       IN THIS PROJECT AND I DON'T RECALL THE NAMES OF THE

1      PARTICULAR COUNSEL THAT WORKED ON THIS.  BUT WE HAD

2      OUTSIDE COUNSEL ASSISTANCE IN THIS MATTER.

3  Q.  AND YOU MENTIONED, I THINK, THAT YOU HAD EXECUTED

4      THIS AGREEMENT AT BATES PAGE 36722.  IF YOU JUST FLIP

5      THERE, IS THAT YOUR SIGNATURE AT THE BOTTOM OF THE

6      PAGE?

7  A.  YES, IT IS.

8  Q.  NOW WE ARE GOING TO GET INTO THE DETAIL OF THIS

9      AGREEMENT IN A MOMENT, BUT BEFORE WE DO THAT, CAN YOU

10     TELL ME WHY A PATENT LICENSE AGREEMENT WAS EVEN

11     NECESSARY FOR THIS TRANSACTION?

12 A.  WELL, AS A PARTNERSHIP IS FORMED, THE PATENT IS

13     PROTECTING THE TECHNOLOGY USED BY DOW, AND ITS

14     PROCESSES IN THE UNITED STATES WERE CONTRIBUTED TO

15     THAT PARTNERSHIP.  SO DOW WAS OPERATING, IF YOU WILL,

16     WITHOUT INTANGIBLES AND IT NEEDED TO DO SO LEGALLY.

17 Q.  SO THIS -- YOU SAID THE PATENTS WERE CONTRIBUTED.

18     DID THIS AGREEMENT SET THE TERMS OF SOME LICENSE BACK

19     TO DOW?

20 A.  IT DOES.  IT ESTABLISHES THE LICENSE TERMS UNDER

21     WHICH DOW UTILIZES THE PATENTED TECHNOLOGY IN THE

22     UNITED STATES.

23 Q.  NOW LET'S FLIP AHEAD AGAIN TO EXHIBIT A, WHICH IS AT

24     BATES PAGE 36723.  AND IT'S LISTED AS EXHIBIT A,

25     PATENT PORTFOLIOS.

1  A.   OKAY.  THANK YOU.

2  Q.   ARE YOU THERE?

3  A.   I AM.

4  Q.   OKAY.  GREAT.  NOW, THIS AS I SAID IS LISTED AS

5       EXHIBIT A, PATENT PORTFOLIOS, AND IT HAS FOUR BASIC

6       COLUMNS ON THIS PAGE.  LET'S WALK THROUGH THE

7       COLUMNS.  CAN YOU TELL ME WHAT THIS FIRST BIG COLUMN

8       REPRESENTS?

9  A.   THE FIRST COLUMN IS -- REPRESENTS A BREAKDOWN OF THE

10      PORTFOLIO BY BUSINESSES ON WHICH WE LOOKED ON TO THE

11      -- THE CHEMICALS -- FOR EXAMPLE, CHEMICALS AND

12      PERFORMANCE PRODUCT WOULD BE A MAJOR PRODUCT HEADING.

13      AND THEN UNDER THAT WERE GROUPS OF PRODUCTS FOR WHICH

14      THERE WOULD BE ACCOUNTING RECORDS, IF YOU WILL, AND

15      ALL KINDS OF RECORDS FOR VALUING THAT, PATENTS IN

16      THAT PORTFOLIO.

17 Q.   NOW LETS LOOK AT THE NUMBERS 2.1 A AND 2.1 B, FOR

18      EXAMPLE, WHICH ARE UNDER CHLOR ALKALI BONDED ASBESTOS

19      DIAPHRAGM?  WHAT DO 2.1 A AND 2.1 B REPRESENT HERE?

20      IN THE SAME COLUMN.

21 A.   SAME COLUMN. OH, THE FIRST ENTRY THERE.  YEAH, A-1.

22      THAT REPRESENTS A DESCRIPTION OF THE PRODUCT, THE

23      PHYSICAL PRODUCT MANUFACTURED UTILIZING THE

24      TECHNOLOGY THAT IS INDEXED BY THE 2.1 A AND B.

25 Q.   AND NOW LET'S GO RIGHT THERE AT THAT SAME PLACE BUT

1      OVER TO THE SECOND COLUMN WHERE THERE'S A U.S. PATENT

2      NUMBER AND FOR 2.1 IT SAYS 4,093,533.  WHAT DOES THAT

3      NUMBER REPRESENT?

4   A.  THAT IS THE PATENT NUMBER ASSIGNED TO -- THE NUMBER

5      ASSIGNED BY THE U.S. PATENT OFFICE TO THAT PARTICULAR

6      PATENT.

7   Q   WHAT ABOUT THE NEXT COLUMN RIGHT OVER TO THE RIGHT

8      WHERE IT SAYS EXP DATE AND FOR 2.1 A IT IS 6695?

9      WHAT DOES THAT REPRESENT?

10  A.  THAT WOULD BE THE EXPIRATION DATE OF THE PATENT

11      ESTABLISHED BY LAW.

12  Q.  AND THEN THERE'S A FOURTH COLUMN WHICH SAYS TYPE AND

13      IT'S BROKEN DOWN INTO THREE SUB COLUMNS: PROD, P-R-O-

14      D; PROC, P-R-O-C; AND APPL.  CAN WE START WITH PROD

15      AND TELL ME WHAT THAT ONE MEANS?

16  A.  PROD, YEAH, IS CONTRACTION OF THE PRODUCT AND PRODUCT

17      REFERS TO THE -- IF THERE'S AN X IN THAT COLUMN, THE

18      PARTICULAR PATENT WOULD COVER THE PHYSICAL PRODUCT

19      MANUFACTURED WITH THAT PATENT.

20  Q.  AND THEN THE NEXT ONE.

21  A.  PROCESS WOULD BE THE PROCESS BY WHICH THAT PHYSICAL

22      PRODUCT WAS MADE IN THE CONFINES OF THE PLANT.  AND

23      APPLICATION, IF THERE'S AN X IN THAT COLUMN, THE

24      PATENT WOULD BE APPLICABLE TO A CUSTOMER FOR THAT

25      PHYSICAL PRODUCT. THE PATENT RIGHTS WOULD BE

1   EXERCISED BY THE CUSTOMER.

2   Q.   NOW, THERE'S FIVE PAGES TO THIS EXHIBIT A.

3        ULTIMATELY OVERALL, WHAT PATENTS THAT ARE LISTED HERE

4        -- WHAT IS THIS LIST OF PATENTS, I SHOULD SAY?

5   A.   WELL, THESE -- THE ENTIRE LISTING IS THE PORTFOLIO

6        THAT WAS CONTRIBUTED TO THE CHEMTECH PARTNERSHIP.

7   Q.   OKAY.  GREAT. THANK YOU.  NOW LET'S GO TO THE VERY

8        NEXT EXHIBIT, EXHIBIT B, WHICH STARTS ON BATES PAGE

9        36728.  NOW, THE TOP OF THIS PAGE -- WE'VE GOT TO

10       FLIP THE BINDER HERE, BUT THE TOP OF THIS PAGE SAYS

11       "EXHIBIT B" AND IT SAYS "A, BUSINESS GROUP, CHEMICALS

12       AND PERFORMANCE PRODUCTS."  THEN IT SAYS, "SUB-

13       BUSINESS GROUP, CHEMICALS AND METALS, PORTFOLIO

14       GROUP, BONDED ASBESTOS DIAPHRAGM," THE INDEX NUMBER

15       AND THEN IT LISTS AGAIN 2.1 A AND 2.1 B.  CAN YOU

16       TELL ME HOW EXHIBIT B THAT WE'RE LOOKING AT HERE

17       RELATES TO EXHIBIT A THAT WE WERE JUST LOOKING AT?

18  A.   WELL, EXHIBIT A LISTS THE PORTFOLIOS, AND EXHIBIT B

19       LISTS THEIR ESTABLISHED -- DEFINES THEIR ROYALTIES

20       PAYABLE WITH RESPECT TO THT PORTFOLIO.  SO WHEN YOU

21       WHEN YOU LOOK AT THE HEADINGS, THEY ARE THE SAME

22       HEADINGS THAT YOU SEE IN EXHIBIT A FOLLOWED BY

23       INFORMATION ON HOW THE ROYALTIES ARE TO BE

24       CALCULATED.

25  Q.   WELL, LETS LOOK AT THAT INFORMATION REALLY QUICKLY

1      HERE.  LET'S LOOK AT THE FIRST COLUMN WHICH READS

2      PATENT -- EXCUSE ME, IT READS "PORTFOLIO LICENSE"

3      TERMINATION DATE AND THEN IT HAS A DATE OF JANUARY 3,

4      1995.  WHAT DOES THE PORTFOLIO LICENSE TERMINATION

5      DATE REPRESENT?

6   A.  THAT REPRESENTS THE TERMINATION OF THE LICENSE UNDER

7      THE PATENTS.

8   Q.  SO WHAT HAPPENS WHEN A PORTFOLIO EXPIRES?

9   A.  IF DOW WISHES TO EXTEND THE LICENSE FOR THE REMAINING

10      LIFE OF THE PATENTS, IT WILL ENTER INTO A NEGOTIATION

11      WITH THE PARTNERSHIP.

12   Q.  AND SUBSEQUENT TO THAT NEGOTIATION, WHAT WILL ---

13   A.  THERE WILL BE AN EXTENSION OF A LICENSE AGREEMENT ON

14      NEW TERMS.

15   Q.  NOW LET'S STAY ON THIS PAGE BUT JUMP OVER TO THE

16      SECOND TO LAST COLUMN AND THAT READS, "MINIMUM

17      ROYALTIES" AND THEN IT SAYS "U.S. DOLLARS" AND THEN

18      IT HAS AN AMOUNT, $2,002,000.  WHAT DOES THIS COLUMN

19      REPRESENT?

20   A.  THAT IS THE MINIMUM ROYALTIES PAYABLE UNDER THT

21      PARTICULAR PORTFOLIO REGARDLESS OF WHETHER THE PATENT

22      RIGHTS ARE EXERCISED OR WHATEVER THE MINIMUM

23      ROYALTIES THAT ARE PAYABLE IN ORDER TO KEEP THE

24      LICENSE ALIVE FOR THAT PERIOD.

25   Q.  PERFECT.  NOW LET'S LOOK AT THE SECOND COLUMN, WHICH

1    IS SORT OF A MULTIPLE COLUMN COLUMN.  IT READS

2    "PORTFOLIO ROYALTY RATE" AND THEN IT HAS "VOLUMES PER

3    POUND TIMES DOLLARS, UNIT RATE PER POUND."  WHAT DOES

4    THIS COLUMN HERE REPRESENT?

5  A.  THEY REPRESENT THE DATA NECESSARY TO CALCULATE THE

6    VARIABLE ROYALTY, IN OTHER WORDS, ROYALTY ASSOCIATED

7    WITH A PARTICULAR UNITS OF PRODUCTION.

8  Q.  SO IF THERE IS MORE PRODUCT MANUFACTURED, HOW DOES

9    THAT AFFECT THE RATE THAT'S LISTED IN THIS COLUMN?

10 A.  WELL, YOU CAN SEE THE RATE DECLINES STEPWISE TO THREE

11    LEVELS HERE AND -- BUT ASSUMING THAT WE'RE IN ONE

12    LEVEL OR ANOTHER, THE VARIABLE ROYALTY IS CALCULATED.

13    I'M NOT QUITE SURE IF I UNDERSTAND ENTIRELY THE

14    QUESTION HERE.

15 Q.  THAT'S OKAY.  IS THERE -- DOES THIS RELATE AT ALL TO

16    A DEFINITION THAT WE CAN FLIP BACK TO CALLED THE

17    EARNED ROYALTY?

18 A.  EARNED ROYALTIES, THAT'S CORRECT.  THAT'S THE EARNED

19    ROYALTIES EARNED IN ASSOCIATION OR IN RELATION TO

20    PRODUCTION.

21 Q.  AND SO THE MORE PRODUCTION, HOW DOES THAT AFFECT THE

22    EARNED ROYALTY?

23        BY THE COURT:

24            I'M SORRY, I DIDN'T HEAR.  MR. NORRIS, YOU

25        PROBABLY NEED TO LET MR. MURPHY COMPLETE HIS

1              SENTENCE, HIS QUESTION TO YOU BECAUSE A COUPLE

2              OF TIMES WE'VE HAD BOTH OF YOU SPEAKING AT THE

3              SAME TIME AND IT'S VERY DIFFICULT FOR MY COURT

4              REPORTER TO GET IT DOWN.  SO WHY DON'T YOU JUST

5              REPEAT IT BECAUSE I'M NOT SURE I GOT THE ANSWER.

6          I KNOW YOU RESPONDED, BUT I DIDN'T HEAR YOUR

7          RESPONSE.

8          BY MR. MURPHY:

9              ABSOLUTELY.  I APOLOGIZE, YOUR HONOR.

10         BY THE COURT:

11              THAT'S QUITE ALL RIGHT.

12  BY MR. MURPHY:

13  Q.   THE MORE PRODUCT THAT IS PRODUCED, HOW DOES THAT

14       AFFECT THE EARNED ROYALTY?

15  A.   INCREASES THROUGH EARNED ROYALTY.

16  Q.   LET'S GO BACK TO PAGE THREE OF THE AGREEMENT, WHICH

17       IS AT BATES 36999.  THERE'S A DEFINITION ON THIS

18       PAGE, DEFINITION 1.24, CALLED NET VARIABLE ROYALTIES.

19       PLEASE REVIEW THIS PARAGRAPH AND THEN LET ME KNOW

20       WHAT IS THE NET VARIABLE ROYALTY IN THIS AGREEMENT?

21  A.   NET VARIABLE ROYALTIES, FOLLOWING THE WORDING OF THE

22       PARAGRAPH, ARE THE EXCESS OF THE EARNED ROYALTIES

23       WITH RESPECT TO A PARTICULAR PORTFOLIO FOR ANY FISCAL

24       YEAR OVER AND ABOVE THE MINIMUM ROYALTIES THAT WOULD

25       HAVE BEEN PAYABLE.

1   Q.   NOW, THIS NEXT QUESTION MIGHT SEEM SIMPLISTIC, BUT

2        THEN WHEN IS THE NET VARIABLE ROYALTY ACTUALLY PAID,

3        IN WHAT CIRCUMSTANCE?

4   A.   THE NET ROYALTY IS PAID ONLY WHEN THE PRODUCTION

5        EXCEEDS THE MINIMAL LEVEL.

6   Q.   AND THEN WHAT IF THE EARNED ROYALTY IS LESS THAN THE

7        MINIMUM ROYALTY?  WHAT HAPPENS WITH THE NET VARIABLE

8        ROYALTY THEN?

9   A.   THERE IS NO NET VARIABLE ROYALTY IN THAT INSTANCE.

10  Q.   NOW, IS IT COMMON TO CONSIDER MINIMUM ROYALTIES WHEN

11       YOU'VE ENTERED INTO A LICENSE AGREEMENT?

12  A.   YES.  IT'S A COMMON CONSIDERATION IN MOST LICENSING

13       OR MANY LICENSING PROGRAMS.  NOT ALL OF THEM, BUT

14       MANY.

15  Q.   AND HOW OFTEN, DURING THE COURSE OF YOUR CAREER, WERE

16       YOU INVOLVED IN DRAFTING OR NEGOTIATING LICENSE

17       AGREEMENTS?

18  A.   A LOT.  EXTENSIVELY OVER MY ENTIRE CAREER I WAS

19       EITHER DRAFTING LICENSES FOR THE UNITED STATES

20       DOMESTICALLY OR FOREIGN LICENSES.  I HAD MANY

21       OPPORTUNITIES AND OCCASIONS TO DO THAT IN ALL KINDS

22       OF ARRANGEMENTS.

23  Q.   NOW LET'S MOVE ON FROM THIS EXHIBIT.  I WANT TO PULL

24       UP EXHIBIT P6.  THIS IS A LETTER DATED JULY 27, 1993

25       AND IT'S UNDER YOUR SIGNATURE TO A NUMBER OF

1      DIFFERENT PEOPLE ALL LISTED IN THE PATENT OFFICE

2      REGARDING WHAT'S CALLED THE IFCO PROJECT FOREIGN

3      INVESTMENT IN 73 DOW U.S. PATENTS.  DID YOU WRITE

4      THIS LETTER?

5   A.   YES, I DID.

6          BY THE COURT:

7              WAIT JUST A MINUTE.  IS THERE AN OBJECTION,

8          MR. SAWYER?

9          BY MR. SAWYER:

10             YES, YOUR HONOR.  P6, MY UNDERSTANDING, IS

11         ONE OF THE DISPUTED EXHIBITS IN THIS CASE AND IS

12         NOT IN EVIDENCE AT THIS TIME.  AND THE BASIS OF

13         THE UNITED STATES' OBJECTION TO THIS EXHIBIT IS

14         THAT IT'S NOT COMPLETE.  THE DOCUMENT THAT WAS

15         PROVIDED TO US HAD THREE ADDITIONAL PAGES THAT

16         HAD BEEN REDACTED IN THEIR ENTIRETY.  THE P6

17         THAT'S SHOWN IN THE NOTEBOOK RIGHT HERE, MY

18         UNDERSTANDING, HAS THREE ADDITIONAL PAGES TO IT

19         THAT HAVE BEEN REDACTED.  OUR OBJECTION IS THAT

20         UNDER ATTORNEY-CLIENT PRIVILEGE GROUNDS -- OUR

21         OBJECTION IS THAT THIS MATERIAL WAS WITHHELD

22         FROM US DURING DISCOVERY EVEN THOUGH WE DID NOT

23         FILE A MOTION -- I DON'T BELIEVE THIS WAS PART

24         OF OUR MOTION TO COMPEL BUT WE BELIEVE IT'S

25         INAPPROPRIATE TO INTRODUCE ONLY A PART OF AN

1       EXHIBIT AND REDACT THE REST OF THE EXHIBIT AND

2       WE'D ASK THAT THE COURT REVIEW IN-CAMERA THE

3       ENTIRE DOCUMENT TO DETERMINE WHETHER THE

4       REDACTED PORTION IS ACTUALLY PRIVILEGED

5       MATERIAL.

6       BY THE COURT:

7            MR. MURPHY?

8       BY MR. MURPHY:

9            I HAVE A COUPLE RESPONSES TO THAT.  FIRST,

10      THE EXHIBIT HE'S TALKING ABOUT IS MENTIONED HERE

11      AT THE END OF THE LETTER, THE COVER LETTER, AND

12      I'M NOT REALLY LISTING THIS DOCUMENT OR GOING TO

13      ASK HIM ABOUT THIS DOCUMENT FOR THAT PURPOSE AT

14      ALL.  SO I COULD LAY SOME FOUNDATION IF YOU'D

15      LIKE AND WE CAN GO FROM THERE.  ALTERNATIVELY,

16      AS MR. SAWYER POINTED OUT, THERE WAS NO MOTION

17      TO COMPEL ON THIS.  IN FACT, WHEN THE GOVERNMENT

18      FILED ITS MOTION TO COMPEL, IT RELEASED THIS

19      DOCUMENT.  WE HAD IT LISTED ON A REDACTED

20      PRIVILEGE LOG AND I HAVE ALL THESE MATERIAL WITH

21      ME IF THE COURT WOULD LIKE TO REVIEW THEM.  BUT

22      WHAT ULTIMATELY OCCURRED IS THE GOVERNMENT

23      WAIVED ITS OBJECTION TO PRIVILEGE OVER THESE

24      LAST THREE PAGES.

25      BY THE COURT:

1          MR. SAWYER?

2     BY MR. SAWYER:

3          YOUR HONOR, THERE'S A DIFFERENCE BETWEEN

4     WITHHOLDING A DOCUMENT IN DISCOVERY AND DECIDING

5     TO GO TO MOTION TO COMPEL AND THEY'RE

6     INTRODUCING THAT DOCUMENT IN COURT.  IF YOU ARE

7     GOING TO INTRODUCE THAT DOCUMENT IN COURT, I CAN

8     CLAIM A PRIVILEGE FOR THREE OF THE PAGES OF THE

9     DOCUMENT.  WE HAVEN'T WAIVED IT IF WE HAVEN'T

10    FILED A MOTION TO COMPEL DURING THE DISCOVERY

11    PHASE.  I MEAN, THERE WERE HUNDREDS OF DOCUMENTS

12    WE DIDN'T FILE MOTIONS TO COMPEL OVER.

13    BY THE COURT:

14         WELL, FIRST LET ME UNDERSTAND, MR. MURPHY,

15    THE REASON THAT YOU ARE RAISING THIS SO THAT YOU

16    -- WHAT PART OR PORTION OF THIS DOCUMENT DO YOU

17    WISH TO QUESTION THE WITNESS ABOUT?

18    BY MR. MURPHY:

19         RIGHT.  IN FACT, ALL I REALLY WISH TO

20    QUESTION HIM ABOUT IS THE FIRST TWO PARAGRAPHS.

21    ONE WHICH TALKS ABOUT A REMINDER OF THE

22    OWNERSHIP OF THE PATENTS HAS BEEN TRANSFERRED,

23    AND THEN THIS THIRD PARTY LICENSING PARAGRAPH.

24    BY MR. SAWYER:

25         MAY I RESPOND?

1    BY THE COURT:

2         THE THIRD PARTY, THE SECOND PARAGRAPH?

3    BY MR. MURPHY:

4         I'M SORRY, YOUR HONOR.  YES, THE FIRST FULL

5    PARAGRAPH AND THE SECOND FULL PARAGRAPH.

6    BY THE COURT:

7         MR. SAWYER?

8    BY MR. SAWYER:

9         I HAVE NO OBJECTION TO HIM BEING ALLOWED TO

10   CONTINUE THE EXAMINATION. MY REQUEST WOULD BE

11   THAT AFTER THE -- AT SOME POINT THE COURT REVIEW

12   THOSE THREE PAGES BECAUSE I DON'T KNOW IF ---

13   BY THE COURT:

14        YOU DON'T KNOW WHAT THOSE DOCUMENTS ARE?

15   BY MR. SAWYER:

16        AND I HAVE NO IDEA IF THOSE ARE MATTERS

17   THAT WOULD RELATE TO MY ABILITY TO CROSS EXAMINE

18   HIM OR IF THEY WERE APPROPRIATELY WITHHELD IN

19   THE FIRST PLACE ON ATTORNEY-CLIENT PRIVILEGE

20   PURPOSES.

21   BY THE COURT:

22        WELL, IT SEEMS WE HAVE TWO CHOICES HERE,

23   MR. MURPHY.  I CAN GO ON AND REVIEW THOSE

24   DOCUMENTS IN-CAMERA WITH THE POSSIBILITY OF

25   ORDERING DISCLOSURE OF THOSE DOCUMENTS TO THE

1     GOVERNMENT OR YOU CAN SIMPLY WITHDRAW YOUR

2     ATTEMPTS TO ADMIT, TO INTRODUCE THESE DOCUMENTS

3     AND SIMPLY QUESTION THE WITNESS ABOUT THOSE

4     FACTS WITHOUT THE USE OF THE DOCUMENT.  THAT

5     WOULD SIMPLIFY MATTERS GREATLY, BUT AGAIN IF YOU

6     WANT TO USE THE DOCUMENT, YOU WANT -- IF YOU

7     WISH TO INTRODUCE THE DOCUMENT, OF COURSE, I'LL

8     HAVE TO CONSIDER MR. SAWYER'S REQUEST.

9     BY MR. MURPHY:

10        COULD I MAKE ONE MORE COMMENT BEFORE YOU GO

11    FORWARD TO THE FINALIZATION, YOUR HONOR?

12    BY THE COURT:

13        YOU MAY.

14    BY MR. MURPHY:

15        THE REASON THIS THREE PAGES WERE HELD WAS

16    BECAUSE IT WAS A DRAFT OF SOMETHING AND THE

17    ULTIMATE FINAL DRAFT WAS PRODUCED AND JUST FOR

18    THE RECORD THAT IS JOINT EXHIBIT 123.  AND WE

19    WITHHELD ALL SORT OF THOSE DRAFT MATERIALS AND

20    THAT'S WHAT THE GOVERNMENT WAIVED ITS OBJECTION

21    OVER.  I DON'T KNOW IF ME LETTING THE DEFENDANT

22    KNOW THAT IT'S JOINT EXHIBIT 123 IN ITS FINAL

23    FORM MAY HELP SIMPLIFY MATTERS.

24    BY THE COURT:

25        MR. SAWYER, IF IT'S ALREADY -- IF THE FINAL

1    DOCUMENT IS ALREADY IN ---

2    BY MR. SAWYER:

3         THIS IS THE FIRST TIME I'M HEARING IT, BUT

4    I'M HAPPY TO TAKE A LOOK AT JOINT EXHIBIT 123

5    RIGHT NOW.

6    BY THE COURT:

7         WHY DON'T YOU TAKE A MOMENT AND LET'S TAKE

8    A LOOK AT IT.

9    (OFF RECORD DISCUSSION)

10   BY MR. SAWYER:

11        EXHIBIT 123 IS AN IMPORTANT DOCUMENT IN THE

12   CASE.  WE WOULD LIKE -- IF WE'VE BEEN PROVIDED

13   THE FINAL COPY OF A LETTER WRITTEN BY THE

14   TREASURER OF DOW AND THERE'S A DRAFT COPY OF

15   THAT LETTER THAT'S IMPORTANT TO THIS CASE, I

16   DON'T UNDERSTAND WHAT THE ATTORNEY-CLIENT

17   PRIVILEGE COULD POSSIBLY BE.  I ASK THE COURT TO

18   REVIEW THE DOCUMENT IN-CAMERA TO DETERMINE

19   WHETHER IT'S IN FACT ---

20   BY THE COURT:

21        WELL, WHO MADE THE DOCUMENT?  ARE YOU

22   TELLING ME IT WAS THE TREASURER WHO WROTE THE

23   DOCUMENT AND NOT A LAWYER?

24   BY MR. MURPHY:

25        MAY I RESPOND, YOUR HONOR?

1        BY THE COURT:

2            YES.

3        BY MR. MURPHY:

4            IT WAS ULTIMATELY SIGNED BY THE TREASURER,

5        YES, BUT THERE ARE THE FACTS THAT PROVE THAT

6        INPUT FROM LAWYERS WENT INTO DRAFTING THE FINAL

7        DOCUMENT, AND THAT'S WHY WE WITHHELD IT AS

8        PRIVILEGED, UNDER ATTORNEY-CLIENT PRIVILEGE.

9        BY THE COURT:

10           BUT IF THE DRAFT WAS WRITTEN BY THE

11       TREASURER, I STILL DON'T UNDERSTAND WHY IT'S AN

12       ATTORNEY-CLIENT PRIVILEGE HERE, IF AGAIN THE

13       AUTHOR OF THE DOCUMENT WAS NOT A LAWYER.  I

14       MEAN, IT MIGHT HAVE BEEN A TREASURER WHO

15       RECEIVED INPUT LAWYERS.  IT HAPPENS EVERY DAY IN

16       AMERICA.  AND I WON'T EVEN GET INTO THE

17       DISCUSSION OF WHETHER THOSE LAWYERS WERE ACTING

18       AS BUSINESS PERSONS RATHER THAN LAWYERS AT THE

19       TIME, BUT IF IN FACT THE DRAFT WAS WRITTEN BY

20       THE TREASURER, I STILL FAIL TO SEE HOW THE

21       ATTORNEY-CLIENT PRIVILEGE IS INVOKED HERE.

22       BY MR. MURPHY:

23           THE DRAFT IS ULTIMATELY SIGNED BY THE

24       TREASURER BUT THERE ARE INPUT FROM LAWYERS THAT

25       WENT INTO THE DRAFTING.  IN FACT, MR. NORRIS, A

1        LAWYER, ATTACHED THIS DRAFT MEMORANDUM LISTING

2        POTENTIAL LIABILITIES, AS IT SAYS, TO THIS

3        MEMORANDUM THAT HE SENT AROUND.  AND THAT IS THE

4        REASON WE CLAIMED ATTORNEY-CLIENT PRIVILEGE OVER

5        THE DOCUMENT, YOUR HONOR.

6        BY THE COURT:

7            BUT AGAIN, I STILL ASK THE QUESTION, WHO

8        DRAFTED THE DRAFT?  WAS IT THE TREASURER WHO

9        DRAFTED THE DRAFT AFTER HAVING RECEIVING INPUT

10       FROM THE LAWYERS OR -- HELP ME OUT HERE.

11       BY MR. MURPHY:

12           WELL, IT'S A LITTLE BIT OLD, BUT OUR BEST

13       UNDERSTANDING WAS THAT IT WAS A COMBINED PROCESS

14       IN WHICH THE LAWYERS ASSISTED THE TREASURER IN

15       WRITING THE DRAFT AND PROVIDED INPUT INTO

16       WRITING THAT DRAFT.  SO THERE WAS PARTS OF IT

17       THAT WERE WRITTEN BY LAWYERS, PARTS OF IT THAT

18       WERE WRITTEN WITH THE TREASURER'S ASSISTANCE.

19       BY THE COURT:

20           WAS ANYONE ELSE INVOLVED IN THE DRAFTING

21       OF THE DOCUMENT, ANYONE OTHER THAN THE LAWYERS

22       AND THE TREASURER?

23       BY MR. MURPHY:

24           NOT TO THE BEST OF MY KNOWLEDGE, YOUR

25       HONOR.

1        BY THE COURT:

2            DO YOU HAVE A COPY?  DO YOU HAVE THE DRAFT

3        DOCUMENT?

4        BY MR. MURPHY:

5            YES, I DO. I HAVE THE FULL DOCUMENT WITH

6        THE THREE PAGES THAT WERE REDACTED IN UNREDACTED

7        FORM.

8        BY THE COURT:

9            WHY DON'T YOU LET ME TAKE A LOOK AT THAT.

10       WE'LL HAVE TO TAKE A SHORT BREAK WHILE I REVIEW

11       THE DOCUMENT.

12       BY MR. MURPHY:

13           YOUR HONOR, SHOULD I MARK THIS AT ALL OR

14       SHOULD I JUST ---

15       BY THE COURT:

16           YOU MAY, YES. PLEASE ---

17       BY MR. MURPHY:

18           I'LL MARK IT AS P13, IS OUR NEXT.

19       BY THE COURT:

20           VERY WELL.  SO P13 IS THE DRAFT; IS THAT

21       CORRECT?

22       BY MR. MURPHY:

23           THAT'S CORRECT, YOUR HONOR, THE LAST THREE

24       PAGES ARE THE DRAFT.

25       BY THE COURT:

1          WHERE'S THE FINAL?  WHAT EXHIBIT IS THE

2     FINAL DRAFT?

3     BY MR. MURPHY:

4          IT'S JOINT EXHIBIT 123 AND I CAN EITHER GET

5     THAT ON THE SCREEN FOR YOU OR I CAN GIVE YOU A

6     HARD COPY.

7     BY THE COURT:

8          I'D LIKE A HARD COPY.  IS IT IN MR. NORRIS'

9     EXHIBIT BINDER?  APPARENTLY NOT.

10    BY MR. MURPHY:

11         NO, IT'S NOT, YOUR HONOR.

12    BY THE COURT:

13         SO THIS IS THE FINAL DRAFT, JOINT EXHIBIT

14    123, CORRECT?

15    BY MR. MURPHY:

16         YES. FOR THE RECORD, JOINT EXHIBIT 123 IS

17    THE FINAL DRAFT OF THE REDACTED THREE PAGES THAT

18    ARE ATTACHED TO P6.

19    BY THE COURT:

20         THE REDACTED THREE PAGES, VERY WELL.  WE'LL

21    TAKE A SHORT BREAK.  I'LL RETIRE TO CHAMBERS FOR

22    JUST A FEW MINUTES AND REVIEW THE DOCUMENT.  MR.

23    NORRIS, LET ME JUST REMIND YOU, SIR, YOU ARE

24    STILL UNDER THE SEQUESTRATION ORDER, SIR, SO

25    PLEASE DO NOT DISCUSS YOUR TESTIMONY WITH ANY

1      OTHER WITNESSES, OKAY?  VERY WELL.  COURT IS IN

2      RECESS.

3          (THEREFORE, AT THIS TIME, THE COURT IS IN A

4          BRIEF RECESS.)

5      BY THE COURT:

6          THIS IS WHERE WE ARE.  MR. MURPHY, LET ME

7      JUST TELL YOU, I CERTAINLY RESPECT THE ATTORNEY-

8      CLIENT PRIVILEGE AND I BELIEVE EVERYTHING OUGHT

9      TO BE DONE TO PROTECT THE ATTORNEY-CLIENT

10     PRIVILEGE.  THERE'S NO QUESTION ABOUT THAT. BUT

11     THE DILEMMA HERE THAT I'M FACED WITH IS WHETHER

12     TO ALLOW YOU TO CONTINUE TO QUESTION THIS

13     WITNESS ABOUT A DRAFT DOCUMENT, EVEN THOUGH IT'S

14     ONLY A PORTION OF THE DRAFT DOCUMENT THAT YOU

15     ARE INTERESTED IN INTRODUCING, IT SEEMS TO ME

16     IT'S GOING TO HAVE TO BE ALL OR NOTHING HERE.

17     NOW, I DON'T KNOW IF THERE ARE FACTS THAT YOU

18     WANT TO PROBE OF THIS WITNESS WHO -- FACTS THAT

19     ARE REFLECTED IN JOINT EXHIBIT 123, IN OTHER

20     WORDS, IF YOU CAN CONFINE YOUR QUESTIONS TO THE

21     CONTENTS OF 123 OR NOT.  HOWEVER, I WILL SAY

22     THAT IF YOU WISH TO GO INTO THE CONTENTS OF P13,

23     IT IS A DRAFT OR PART OF THE DOCUMENT IS A

24     DRAFT, IT SEEMS TO ME I'M GOING TO HAVE TO ALLOW

25     THE GOVERNMENT AN OPPORTUNITY TO REVIEW THE

1        DRAFT IF YOU'RE GOING TO QUESTION THIS WITNESS

2        ABOUT ANYTHING THAT'S A PART OF P13.  SO I GUESS

3        WHAT I'M SUGGESTING IS, IT'S YOUR CALL.  AGAIN,

4        I WILL LET YOU QUESTION THE WITNESS ABOUT,

5        PERHAPS FACTS THAT MAY BE DESCRIBED IN P13

6        WITHOUT ACTUALLY ADMITTING P13 INTO THE RECORD.

7        BUT I MOST CERTAINLY CAN'T CONSIDER, OF COURSE,

8        THE CONTENTS OF THAT DRAFT DOCUMENT WITHOUT

9        ALLOWING THE GOVERNMENT ACCESS TO IT.  SO IT'S

10       YOUR CALL.

11   BY MR. MURPHY:

12        WELL, I MEAN, I'M COMFORTABLE WITH SHOWING

13       THEM THE DRAFT AND RELEASING THAT PRIVILEGE AS

14       LONG AS WE'RE CLEAR THAT THERE'S NO BROADER

15       WAIVER THAT RESULTS FROM DOING THAT.

16   BY THE COURT:

17        YOU UNDERSTAND THAT, MR. SAWYER?

18       NOW, WHEN YOU SAY BROADER WAIVER, LET'S MAKE

19       SURE WE UNDERSTAND OUR TERMS NOW.

20   BY MR. MURPHY:

21        CERTAINLY.

22   BY THE COURT:

23        WELL, I'LL LET YOU DEFINE THE TERM.  YOU

24       OBVIOUSLY HAVE SOME CONCERNS THAT THE GOVERNMENT

25       MAY RELY ON AND USE P13 FOR SOME OTHER REASON?

1      BY MR. MURPHY:

2          THE ONLY OTHER REASON I WOULD WANT TO MAKE

3      SURE THAT, YOU KNOW, WE HAVE QUITE A FEW DRAFT

4      DOCUMENTS THAT WERE WITHHELD AS PRIVILEGED AND

5      THE PRIVILEGE WAS EITHER NOT CHALLENGED BY THE

6      GOVERNMENT OR WAS UPHELD BY AN IN-CAMERA REVIEW

7      BY MAGISTRATE DOLBY.

8      BY THE COURT:

9          I UNDERSTAND.

10     BY MR. MURPHY:

11         SO IF I TURN THIS ONE OVER, I JUST WANT TO

12     MAKE SURE THIS IS THE ONLY ONE THAT RESULTS IN

13     ANY PRIVILEGE BEING TURNED OVER.

14     BY THE COURT:

15         THAT'S FAIR ENOUGH.  THAT'S A REASONABLE

16     POSITION TO TAKE.  MR. SAWYER, SURELY YOU

17     WOULDN'T CHALLENGE THE OTHER DOCUMENTS OVER-

18     WHICH THE PLAINTIFFS HAVE CLAIMED PRIVILEGE,

19     CORRECT?

20     BY MR. SAWYER:

21         WELL, WE'RE CERTAINLY NOT GOING TO SAY THAT

22     MERELY BECAUSE A DOCUMENT WAS WITHHELD FROM

23     DISCOVERY UNDER ANY PRIVILEGE CLAIMS THAT WE

24     WOULDN'T MAKE A SIMILAR CHALLENGE IF THERE ARE

25     OTHER DOCUMENTS THEY INTEND TO USE IN COURT.  MY

1           UNDERSTANDING OF WHAT HE'S SAYING IS THAT HE'S

2           NOT INTENDING TO WAIVE THE ATTORNEY-CLIENT

3           PRIVILEGE FOR ANYTHING BUT THIS ONE.

4           BY THE COURT:

5               THAT CERTAINLY IS MY UNDERSTANDING AS WELL

6           AND I WOULDN'T EXPECT HIM TO, FRANKLY.

7           BY MR. MURPHY:

8               YEAH, THAT'S A CORRECT UNDERSTANDING. I

9           THINK WE'RE ALL ON THE SAME PAGE, YOUR HONOR.

10          BY THE COURT:

11              THAT'S FINE.  SO THAT BEING THE CASE, I

12          DON'T KNOW IF YOU HAVE A COPY OF P13 TO PRESENT

13          TO THE GOVERNMENT, BUT IF YOU'D LIKE A COPY TO

14          PRESENT TO ME, THAT'S ---

15          BY MR. MURPHY:

16              YOU CAN HOLD ONTO THAT.  I HAVE A COUPLE

17          EXTRAS.

18          BY THE COURT:

19              VERY WELL.

20   BY MR. MURPHY:

21   Q.   ALL RIGHT.  NOW LET ME JUST GET BACK TO THE

22        EXAMINATION NOW.  SO WE ARE ON DOCUMENT P6, WHICH IS

23        AN UNREDACTED FORM P13.  IF YOU CAN JUST LOOK AT THE

24        VERY FIRST PAGE OF THIS LETTER, WHICH IS A LETTER

25        DATED JULY 27, 1993.  IT'S UNDER YOUR SIGNATURE, MR.

1       NORRIS, AND IT'S TO A NUMBER OF DIFFERENT PEOPLE IN

2       THE PATENT OFFICE REGARDING THE IFCO PROJECT FOREIGN

3       INVESTMENT IN 73 DOW PATENTS.  DID YOU WRITE THIS

4       LETTER?

5    A.  I DID.

6    Q.  AND WHAT ROLE DO THE FIRST SEVEN PEOPLE LISTED ON

7       THIS LETTER, STARTING WITH R.G. BROOKENS, HOLD AT

8       DOW?

9    A.  THEY ARE ALL EITHER PATENT -- SECTION MANAGERS IN THE

10      PATENT DEPARTMENT OR REGIONAL SECTION MANAGERS.

11      THEY'RE ALL IN THE PATENT DEPARTMENT.  THAT'S THE

12      ADDRESSEES, YES.

13   Q.  AND WHO WOULD THESE FOLKS IN THE PATENT DEPARTMENT,

14      WHAT OTHER BUSINESS LINES WOULD THEY DEAL WITH?

15   A.  THEY DEAL WITH -- THEY HAVE ASSIGNED -- EACH OF THEM

16      WAS RESPONSIBLE FOR A PARTICULAR TECHNOLOGY AREA OR

17      TYPE OF TECHNOLOGY AND THEY WOULD ENCOUNTER ANY

18      ISSUES RELATING TO PATENTS, ANY OF THEIR CLIENTS,

19      WHETHER THEY BE BUSINESS, PRODUCTION, RESEARCH,

20      WHATEVER.  IF THERE'S A QUESTION REGARDING A PATENT,

21      IT WAS UNDERSTOOD THAT THOSE PERSONS WOULD TAKE THEIR

22      QUESTIONS TO THE PATENT -- THEIR RELATED OR ASSIGNED

23      PATENT REPRESENTATIVE.

24   Q.  OKAY.  GREAT.  NOW LET'S MOVE INTO THE LETTER, THE

25      FIRST PARAGRAPH OF THE LETTER WHICH READS, THE

```
1         SUBJECT PROJECT STILL ON TRACK AND EXPECTED TO CLOSE
2         SOMETIME THIS MONTH.  THIS IS JUST A REMINDER THAT
3         THE OWNERSHIP OF THE PATENTS LISTED IN EXHIBIT A HAS
4         BEEN TRANSFERRED TO A FOREIGN PARTNERSHIP AND TDCC
5         HAS BECOME A LICENSEE UNDER THESE PATENTS.
6         WHY DID YOU SEND THESE MANAGERS A LETTER INFORMING
7         THEM THAT OWNERSHIP OF THE PATENTS HAD BEEN
8         TRANSFERRED?
9  A.     WELL, FIRST OF ALL, THESE MANAGERS ARE SOMEWHAT
10        GEOGRAPHICALLY DISPERSED, SO THE COMMUNICATION FORM
11        OF A LETTER SEEMED FEASIBLE AND OF COURSE THEY NEEDED
12        TO KNOW THAT WITH REGARD TO THE PARTICULAR PATENTS
13        THAT ARE LISTED THEY WOULD BE HANDLED IF A QUESTION
14        AROSE FROM ONE OF THEIR CLIENTS IN A DIFFERENT
15        MANNER.
16 Q.     NOW, THE NEXT PARAGRAPH DISCUSSES ANY THIRD PARTY
17        LICENSING OF A PATENT IN THIS PORTFOLIO, AND IT SAYS,
18        "WE'LL HAVE TO HENCEFORTH BE UNDER THE AUSPICES OF
19        THE PARTNERSHIP."  DO YOU RECALL WHY YOU WANTED TO
20        LET THESE PARTICULAR MANAGERS KNOW OF THIS DIFFERENCE
21        IN THIRD PARTY LICENSING?
22 A.     WELL, THIS WOULD BE THE MOST LIKELY TYPE OF QUESTION
23        THAT COULD ARISE FOR THESE MANAGERS THAT SOMEONE --
24        AND EACH OF THEM, YOU KNOW, THEY MAY BE RESPONSIBLE
25        FOR FIVE OR SIX ATTORNEYS.  SO WE'RE LOOKING AT 50 OR
```

1       60 ATTORNEYS SPREAD ACROSS THE COUNTRY.  AND THEY

2       MIGHT ENCOUNTER A LICENSING REQUEST AND PROCESS IT

3       AND IT WAS IMPORTANT THAT WE INTERCEPT THAT AND GET

4       IT IN TO THE RIGHT CHANNELS.

5   Q.  LET'S TURN TO THE NEXT EXHIBIT, WHICH IS IN YOUR

6       BINDER JOINT EXHIBIT 179.  THIS IS A MEMO DATED

7       NOVEMBER 29, 1993.  IT IS UNDER YOUR NAME THERE, W.R.

8       NORRIS, AT THE BOTTOM.  AND IT IS ADDRESSED TO IRV

9       SNYDER WITH A CC TO BILL KNEE REGARDING CHEMTECH

10      ROYALTY ASSOCIATES, LP.  ARE YOU FAMILIAR WITH THIS

11      MEMO?

12  A.  YES, I AM.

13  Q.  BEFORE WE LOOK AT IT, WHO ARE IRV SNYDER AND BILL

14      KNEE?

15  A.  IRV SNYDER WAS A MAJOR RESEARCH MANAGER AT DOW.  MOST

16      OF THE LABORATORY DIRECTORS HAD REPORTED TO HIM AT

17      THE TIME.  AND BILL KNEE WAS THE MANAGER, OVERALL

18      MANAGER, OF THE TECHNOLOGY CENTERS.  THE MANAGERS OF

19      THOSE TECHNOLOGY CENTERS WOULD HAVE REPORTED TO BILL

20      KNEE.

21  Q.  IF I COULD DIRECT YOUR ATTENTION TO THE SECOND

22      PARAGRAPH OF THE LETTER WHICH STATES, IT IS

23      IMPERATIVE THAT TDCC RESPECTS THE TRANSFER OF THESE

24      PATENTS TO CRLP AND THAT CRLP NOT CONDUCT BUSINESS

25      WITHIN THE UNITED STATES.  TO HELP ENSURE THESE

1     RESULTS, IT IS IMPERATIVE THAT THE FOLLOWING

2     PRACTICES BE OBSERVED.

3     FIRST, WHY WERE YOU SENDING THIS TO IRV AND BILL IN

4     NOVEMBER OF 1993, WHICH WAS AFTER THE CHEMTECH

5     TRANSACTION CLOSED?

6  A.  WELL, IT -- AFTER IT CLOSED, OF COURSE, IT BECAME AN

7     ACTIVE PARTNERSHIP AND THE POSSIBILITY OF A RESEARCH

8     MANAGER OR SOMEONE IN THE DISPERSED AUTHORITIES WOULD

9     UNDERTAKE TO DEAL WITH ONE OF ITS PATENT PORTFOLIOS

10    AND SO THAT'S WHY, FOR EXAMPLE, I USE THE WORD

11    IMPERATIVE TO EMPHASIZE THE POINT.

12  Q.  AND ONE OF THE THINGS YOU MENTIONED IN THE LETTER WAS

13    NOT CONDUCT BUSINESS IN THE UNITED STATES.  WHY WAS

14    IT IMPORTANT NOT TO CONDUCT BUSINESS IN THE UNITED

15    STATES?

16  A.  WELL, THE PARTNERSHIP WAS A FOREIGN PARTNERSHIP AND

17    FOR A NUMBER OF REASONS IT NEEDS TO -- WANTED TO STAY

18    OUT OF THE JURISDICTION OF U.S. LAW, LONGARM STATUTES

19    FOR EACH LICENSING ACTIVITIES, FOR EXAMPLE.

20  Q.  NOW LET'S LOOK AT THE SUB-POINTS ONE, TWO AND THREE

21    IN THE LETTER.  NUMBER ONE SAYS, "EXCEPT FOR

22    AUTHORITY SPECIFICALLY GRANTED TO TDCC UNDER ITS

23    LICENSE, ALL DECISIONS RELATING TO LICENSING THIRD

24    PARTIES, JOINT VENTURE AND/OR THE SALE OF THESE

25    PATENTS MUST BE MADE BY DESA AS MANAGING PARTNER OF

1     CRLP."

2          WHY WAS IT IMPERATIVE THAT THE DECISIONS BE MADE

3     BY DESA, DOW EUROPE?

4  A.  DOW EUROPE WAS THE MANAGING PARTNER OF THE

5     PARTNERSHIP AND IT WOULD FALL IN THEIR AREA OF

6     BUSINESS RESPONSIBILITY TO MAKE THOSE DECISIONS.  AND

7     I GUESS THIS IS INFORMATION THAT MIGHT CLARIFY ANYONE

8     WONDERING WHY ARE WE RESTRICTING COMMUNICATIONS.

9     THEY WOULD KNOW WHY.

10  Q.  AND NUMBER TWO WE ALREADY SPOKE ABOUT, WHICH WAS

11     DOING BUSINESS IN THE UNITED STATES. SO LET'S LOOK AT

12     NUMBER THREE, WHICH STATES, ALL TRANSACTIONS BETWEEN

13     CRLP AND TDCC AS LICENSEE MUST BE AT ARM'S LENGTH.

14     WHY WAS IT IMPERATIVE THAT THAT PRACTICE BE OBSERVED?

15  A.  THAT WAS AGAIN TO LET THEM KNOW THAT EVEN THOUGH DESA

16     IS A SUBSIDIARY, IT HAS A RESPONSIBILITY TO, FOR

17     EXAMPLE, ITS INVESTORS, MINORITY INTERESTS, FIDUCIARY

18     RESPONSIBILITY TO THOSE INVESTORS AND I GUESS I WAS

19     JUST FLAGGING THAT POINT.

20  Q.  WELL, LET'S STEP BACK REAL QUICKLY TO BEFORE THE

21     BANKS ACTUALLY JOINED THE PARTNERSHIP IN AUGUST 93.

22     DID YOU HAVE ANY INTERACTION WITH THE BANKS OR THE

23     BANKS' REPRESENTATIVES PRIOR TO THEIR JOINING THE

24     PARTNERSHIP?

25  A.  FROM MY RECOLLECTION, I RECALL ONE SUCH OCCASION.

1   Q.   WELL, LET'S TAKE A LOOK AT THE NEXT EXHIBIT, WHICH IS

2        JOINT EXHIBIT 102, AND THIS COVER PAGE IS JUST AN

3        AGREEMENT FORM.  BUT LET'S LOOK TO THE SECOND PAGE

4        WHICH IS AT BATES NUMBER CT00045857.  THIS IS A

5        CONFIDENTIALITY AGREEMENT BETWEEN CMS, PETERSON AND

6        DOW AND IT'S DATED JUNE 29, 1993.  CAN YOU FIRST LOOK

7        AT THE THIRD PAGE OF THIS EXHIBIT, WHICH IS 45858 AND

8        THIS SHOWS THE AGREEMENT WAS SIGNED BY YOU ON BEHALF

9        OF DOW AND THEN ALSO COUNTERSIGNED BY CMS AND

10       PETERSON.  ARE YOU FAMILIAR WITH THIS AGREEMENT?

11  A.   YES, I AM.

12  Q.   AND DID YOU DRAFT THIS AGREEMENT?

13  A.   YES, I DID.

14  Q.   WHY WOULD YOU HAVE TO ENTER INTO AN AGREEMENT LIKE

15       THIS WITH CMS AND PETERSON?

16  A.   WELL, THE INVESTORS, OF COURSE, WERE INTERESTED IN

17       DOING DUE DILIGENCE WITH RESPECT TO CHECKING

18       INFORMATION RELIED ON BY ADL AND ESTABLISHING THE

19       BOUNDARIES.

20           BY MR. SAWYER:

21              OBJECTION, YOUR HONOR.  HE INDICATED WHAT

22           OTHER PARTIES ARE INTERESTED IN AND THAT'S

23           EITHER BEYOND HIS KNOWLEDGE OR SOMETHING THAT WE

24           NEED FOUNDATION FOR.

25           BY THE COURT:

1              WELL, MR. MURPHY, IF YOU WANT TO LAY A

2         FOUNDATION, I THINK THE WITNESS CAN TESTIFY

3         ABOUT -- WELL, WHY DON'T YOU LAY A FOUNDATION.

4         BY MR. MURPHY:

5              YEAH, REALLY WHAT I'M GETTING TO -- OR WHY

6         DON'T I ASK A NEW QUESTION HERE.

7         BY THE COURT:

8              THAT'S FINE.

9    BY MR. MURPHY:

10   Q.   LET'S DO THIS, MR. NORRIS, SO WHY WAS IT IMPORTANT

11        FOR DOW TO HAVE OTHER PARTIES ENGAGED IN A

12        CONFIDENTIALITY AGREEMENT LIKE THIS?

13   A.   DOW'S INTEREST, HONESTLY I THINK THAT WAS TO PROTECT

14        THE CONFIDENTIAL -- VERY SENSITIVE CONFIDENTIAL

15        ECONOMIC AND TECHNICAL INFORMATION FROM THIRD -- YOU

16        KNOW, IN THE HANDS OF A THIRD PARTY.

17   Q.   NOW, AWHILE AGO IN YOUR TESTIMONY YOU ALSO MENTIONED

18        A SECRECY AGREEMENT WITH ADL.  WAS THIS THE SAME TYPE

19        OF AGREEMENT THAT WAS ENTERED INTO WITH ADL?

20   A.   THEY WERE ESSENTIALLY PARALLEL IN THEIR TERMS, YES.

21   Q.   OKAY, GREAT. LET'S MOVE FORWARD NOW TO AFTER THE

22        TRANSACTION CLOSED AGAIN.  BACK TO JOINT EXHIBIT 234

23        IS THE NEXT DOCUMENT IN YOUR BINDER.  THIS IS A

24        LETTER FROM YOU TO DOW EUROPE LISTED AS THE GENERAL

25        PARTNER OF CHEMTECH REGARDING PORTFOLIO 2.1 LICENSE

1    EXTENSION PER ARTICLE 4.2.  YOU CAN JUST TAKE A LOOK

2    AT THIS DOCUMENT, THE FIRST PARAGRAPH.  DO YOU RECALL

3    WHY YOU SENT THIS LETTER TO CHEMTECH?

4  A.  YES.  I SENT IT AS THE LICENSE AGREEMENT REQUIRES A

5    NOTIFICATION ON THE PART -- BY THE LICENSEE OF ITS

6    INTEREST AND INTENTION TO EXTEND THE LICENSE FOR THE

7    REMAINING LIFE OF THE PORTFOLIO, 2.1.

8  Q.  NOW LET'S LOOK AT THE SECOND PARAGRAPH WHICH STATES,

9    "STUDIES ARE PRESENTLY IN PROGRESS TO ESTABLISH THE

10    FAIR MARKET ROYALTY FOR MAKING AN OFFER TO EXTEND THE

11    SOLE LICENSE FOR THE REMAINING LICENSE OF THIS

12    PORTFOLIO."  WHY DID YOU INCLUDE THAT PARAGRAPH IN

13    THIS NOTICE LETTER?

14  A.  WELL, WHEN THE LETTER WAS WRITTEN, WE WERE JUST

15    ESTABLISHING THE NOTICE REQUIREMENT.  WORK CONTACTS

16    -- A NUMBER OF PEOPLE HAD TO BE CONSULTED TO SEE WHAT

17    THEIR, YOU KNOW,  CURRENT CIRCUMSTANCES WERE FOR THE

18    BUSINESS, WHAT WOULD BE A FAIR MARKET ROYALTY AT THE

19    TIME, WERE WISHING TO EXTEND THE LICENSE.  SO STUDIES

20    WERE UNDERWAY; PEOPLE WERE BEING CONTACTED.

21    TECHNOLOGY CENTER AND INVENTIONS-MANAGEMENT PEOPLE

22    WERE BEING INVOLVED.

23  Q.  LET'S LOOK AT THE NEXT DOCUMENT, JOINT EXHIBIT 238.

24    NOW THIS IS AN EMAIL.  IT'S FROM MIKE GLENN TO YOU

25    ALONG WITH SOME OTHER FOLKS, INCLUDING ED VALENZUELA

1      AND BILL CURRY.  IT'S DATED NOVEMBER 23, 1994 AND

2      IT'S REGARDING CHEMTECH PATENT PORTFOLIO 2.1.  FIRST,

3      WHO IS MIKE GLENN WHO SENT THIS EMAIL?

4   A.  MIKE GLENN WAS -- IS A QUALIFIED PATENT ATTORNEY AT

5      THE TIME TO DOW EUROPE AND WAS PROVIDING PATENT LEGAL

6      SERVICES TO THE PARTNERSHIP.

7   Q.  WHAT SORT OF SERVICES ARE INCLUDED IN THAT PATENT

8      LEGAL SERVICE FOR THE PARTNERSHIP YOU JUST DESCRIBED?

9   A.  WELL, OF COURSE, IN THIS IMMEDIATE INSTANCE, HE --

10     THE LAPSE OF TIME, I WOULD SAY FROM OCTOBER 28 WHEN

11     MY NOTICE WAS SENT TO NOVEMBER, ALMOST -- WHAT IS

12     THAT?  ABOUT A MONTH?  HE'S REPORTING ON WHAT HE'S

13     INITIATED IN THE PARTNERSHIP AND I THINK HE'S A VERY

14     CAPABLE, CONSCIENTIOUS ATTORNEY AND I'M SURE HE WAS

15     CONTACTING THE -- PROBABLY CONTACTING THE MINORITY

16     INTERESTS UNDER HIS FIDUCIARY DUTIES TO THEM.

17  Q.  NOW LET'S LOOK IN PARTICULAR AT THE CONTENTS OF THIS

18     LETTER.  THE FIRST PARAGRAPH IT STATES -- EXCUSE ME,

19     THIS EMAIL STATES, "IN PREPARATION FOR OUR DISCUSSION

20     OF THE FAIR MARKET VALUE OF THIS PORTFOLIO, I HAVE

21     MADE SOME INQUIRIES CONCERNING THE PROJECTED ECONOMIC

22     CONDITIONS FOR THIS BUSINESS DURING THE NEXT 18

23     MONTHS.  I HAVE A FEW QUESTIONS AND POINTS FOR YOU TO

24     CONSIDER."

25          REMEMBERING THAT WE JUST LOOKED AT THE

1       RELICENSING NOTICE, WHAT WAS YOUR UNDERSTANDING OF

2       WHY YOU WERE SENT THIS EMAIL?

3   A.  MY UNDERSTANDING WAS THAT HE'S PREPARING -- I THINK

4       AS I MIGHT HAVE MENTIONED, THAT HE IS PREPARING HIS

5       INVESTORS POSSIBLY FOR THIS -- HE'S PROVIDING THEM

6       NOTICE AND OF COURSE JUSTIFICATION FOR THE NOTICE AND

7       WHAT NEEDED TO BE DONE AND GIVE THEM AN OPPORTUNITY,

8       IF YOU WILL, FOR THEIR INPUT.  SO HE WAS GATHERING

9       THE INFORMATION THAT WOULD FACILITATE A MUTUAL

10      ARRANGEMENT, AN AGREEMENT, ON THE ROYALTIES.  ABSENT

11      FINDING THAT, THAT WOULD BE AN ARBITRATION NEEDED.

12  Q.  AND SO THIS BACK AND FORTH WHERE YOU SEND A NOTICE

13      AND THEN MR. GLENN SENDS SOMETHING BACK, WAS THAT

14      COMMON IN THE RELICENSING OF PORTFOLIOS INVOLVING

15      CHEMTECH?

16  A.  YEAH.  WELL, OF COURSE, THIS WAS THE FIRST INSTANCE.

17      YES, THAT'S WHAT WAS EXPECTED.

18  Q.  LET'S LOOK AT THE NEXT AGREEMENT OR, EXCUSE ME, THE

19      NEXT DOCUMENT HERE, WHICH IS JOINT EXHIBIT 246.  THIS

20      IS A LETTER.  IT'S DATED NOVEMBER 22 -- EXCUSE ME,

21      IT'S DATED DECEMBER 22, 1994 AND IS ULTIMATELY

22      FINALIZED BY CHEMTECH, SIGNED BY MR. MERSZEI ON

23      JANUARY 5, 1995 RELATED TO PORTFOLIO 2.1.  DO YOU

24      KNOW WHAT THIS LETTER AGREEMENT REPRESENTS?

25  A.  YES.  THAT WAS THE FINAL AGREEMENT BETWEEN THE

1      PARTNERSHIP AND DOW REGARDING THE EXTENSION OF

2      PORTFOLIO 2.1, AN EXTENSION OF THAT LICENSE FOR THE

3      REMAINING LIFE.

4  Q.  THIS DOCUMENT THAT WE ARE LOOKING AT NOW IS DATED, AS

5      I SAID, AND FINALLY SIGNED JANUARY 5, 1995. BUT THE

6      FIRST DOCUMENT THAT WE LOOKED AT IN THIS SEQUENCE,

7      WHICH WAS THE RELICENSING OFFER FROM DOW, WAS DATED

8      OCTOBER 28TH.  SO THERE WAS OVER TWO MONTHS IN-BETWEEN

9      THE FIRST OFFER AND THE FINALIZED AGREEMENT.  DO YOU

10     KNOW WHY IT TOOK SO LONG TO REACH AN AGREEMENT ON THE

11     RELICENSING?

12 A.  WELL, QUITE A FEW PEOPLE, BUSY PEOPLE, HAD TO BE

13     CONTACTED TO GET THEIR INPUTS ON, SHOULD WE SAY, THE

14     BUSINESS CONDITIONS AT THE TIME WE WERE SEEKING TO

15     RELICENSE PORTFOLIO.

16 Q.  OKAY.  GREAT.  I HAVE NO FURTHER QUESTIONS FOR YOU AT

17     THIS TIME, MR. NORRIS.

18          BY THE COURT:

19              THANK YOU, MR. MURPHY.

20          BY MR. SAWYER:

21              MAY I MAKE ONE HOUSEKEEPING MATTER?  P6 IS

22          NOT ADMITTED, BUT P13 IS?  IS THAT HOW THIS WILL

23          WORK?

24          BY THE COURT:

25              P6?

1          BY MR. SAWYER:

2               P6 WAS THE INCOMPLETE DOCUMENT AND YOU --

3          IT WAS IN COMPLETE FORM AND YOU WENT BACK INTO

4          CHAMBERS AND I BELIEVE IT'S COMING IN COMPLETE

5          FORM.

6          BY THE COURT:

7               P13 IS THE DRAFT DOCUMENT.  THE JOINT

8          EXHIBIT 123 WAS THE FINAL LETTER.

9          BY MR. MURPHY:

10              YES, YOUR HONOR.  P6 WAS THE DOCUMENT

11         WITHOUT THE REDACTED DRAFT ATTACHED.  P13 IS THE

12         COMPLETE THING WITH THE DRAFT ATTACHED.  SO I

13         AGREE WITH MR. SAWYER, WE SHOULD PROBABLY NOT

14         HAVE P6 INTO EVIDENCE AND WE SHOULD HAVE P13.

15         BY THE COURT:

16              AGREED.  MR. SAWYER?

17                   CROSS EXAMINATION

18    BY MR. SAWYER:

19    Q.   GOOD AFTERNOON, MR. NORRIS.  AS A TENNESSEE GRADUATE,

20         I'M NOT GOING TO TALK FOOTBALL SMACK WITH ANYONE HERE

21         TODAY.  MR. NORRIS, AT THE BEGINNING OF YOUR DIRECT

22         EXAMINATION, YOU SPOKE ABOUT YOUR FIRST MEETING WITH

23         MR. REINHARD AND THAT WAS BEFORE YOU HAD REALLY HEARD

24         OF THE CHEMTECH PROGRAM.  HE JUST CALLED YOU IN SORT

25         OF OUT OF THE BLUE; IS THAT RIGHT?

1   A.   THAT'S EXACTLY RIGHT.

2   Q.   AND MR. REINHARD WAS TREASURER, LATER BECAME CFO?

3   A.   YES.

4   Q.   NOW, THERE WAS ANOTHER MAN AT THE MEETING WITH MR.

5        REINHARD, WASN'T THERE?

6   A.   YES, THERE WAS.

7   Q.   AND THAT WAS PAUL BRINK?

8   A.   THAT'S CORRECT.

9   Q.   AND MR. BRINK IS THE TAX DIRECTOR; IS THAT TRUE?

10  A.   AT THE TIME, I THINK SO.

11  Q.   WAS THERE ANYONE ELSE AT THAT MEETING BESIDES AND MR.

12       BRINK AND REINHARD?

13  A.   NO, IT WAS JUST THE THREE OF US, AS I RECALL.

14  Q.   AND YOU INDICATED YOU REPORTED DIRECTLY TO THE PATENT

15       COUNSEL AT DOW?

16  A.   YES, YES, I THINK SO.  THERE WAS A PERIOD IN THERE IN

17       WHICH WE GOT CORPORATE LEGAL EQUAL ORGANIZATION.  I

18       WAS PART OF THAT, BUT I THINK THAT DISSOLVED AND I

19       WAS -- YOUR STATEMENT IS CORRECT.

20  Q.   AND MY POINT IS THAT YOU DIDN'T REPORT TO EITHER MR.

21       BRINK OR TO MR REINHARD?

22  A.   THAT'S CORRECT.

23  Q.   FIRST, WITH RESPECT TO DOW'S MANUFACTURING

24       ACTIVITIES, AFTER THE CHEMTECH PLAN WAS PUT INTO

25       PLACE, DID DOW'S MANUFACTURING ACTIVITIES CHANGE IN

```
1         ANY WAY?
2    A.   I DON'T THINK THE MANUFACTURING WAS AFFECTED.
3    Q.   IN FACT, I THINK YOU INDICATED IN YOUR DEPOSITION AND
4         OTHER DOCUMENT EVIDENCE IS THAT DOW'S NORTH AMERICAN
5         -- AS FAR AS CHEMTECH WAS CONCERNED, IT WAS
6         TRANSPARENT TO DOW'S NORTH AMERICAN ACTIVITIES, IN
7         OTHER WORDS, THAT THEY -- DOW'S NORTH AMERICAN
8         MANUFACTURING ACTIVITIES PROCEEDED ON AS IF CHEMTECH
9         DID NOT EXIST.
10   A.   IF MANUFACTURING ACTIVITIES MEANS SOMETHING THAT GOES
11        ON IN A PLANT WHERE YOU PRODUCE A PHYSICAL PRODUCT.
12        IF IT GETS TO BE A BROADER ACTIVITY, A BROADER -- I
13        MEAN A BROADER IDEA ABOUT MANAGEMENT OF THAT PLANT, I
14        GUESS I WOULD BE HESITANT TO AGREE WITH THE POINT.
15   Q.   RIGHT. AND I JUST WANTED TO STICK WITH THE FIRST HALF
16        OF WHAT YOU SAID, EXCLUSIVELY THE MANUFACTURING.
17        NOW I THINK JUST AS OBVIOUS POINT, BUT I DON'T THINK
18        IT'S BEEN MADE DURING THE TRIAL YET IS THAT CHEMTECH
19        ITSELF DID NOT MANUFACTURE ANY PRODUCTS, CORRECT?
20   A.   THAT'S CORRECT.
21   Q.   AND WHAT WAS YOUR UNDERSTANDING OF WHAT CHEMTECH'S
22        BUSINESS WAS?
23   A.   I REALLY DIDN'T HAVE MUCH ACCESS TO THE ORGANIZATION
24        AND CONSTITUTION ORGANIZATION, IF YOU WILL, OF
25        CHEMTECH AND SO I REALLY CAN'T ANSWER THAT QUESTION.
```

1    Q.   I'D LIKE TO SHOW YOU JOINT EXHIBIT 97.

2              BY MR. SAWYER:

3                  MAY I APPROACH?

4              BY THE COURT:

5                  YOU MAY.

6   BY MR. SAWYER:

7    Q.   I'M NOT SURE IF THAT ONE IS IN YOUR BLACK BOOK OR

8         NOT.  IN THE SECOND PARAGRAPH OF JOINT EXHIBIT 97,

9         THE LETTER -- WELL, FIRST OF ALL, THE LETTER IS

10        WRITTEN BY A PHIL BARNETT OR SIGNED BY PHIL BARNETT

11        AND SHARON ORIEL.  I BELIEVE YOU'VE DESCRIBED WHO

12        THOSE PEOPLE WERE, BUT COULD YOU JUST REPEAT WHO THEY

13        WERE?

14   A.   YES. THEY WERE -- THESE SIGNATORIES WERE MEMBERS OF

15        THE INTELLECTUAL ASSET -- INTELLECTUAL PROPERTY --

16        INTELLECTUAL ASSET MANAGEMENT GROUP.

17   Q.   DO YOU RECALL, DID YOU DRAFT THIS LETTER FOR THEM?

18   A.   NO.

19   Q.   AND THE SECOND PARAGRAPH BEGINS, THE ARRANGEMENT IS

20        EXTREMELY COMPLEX.  DO YOU AGREE THAT THE CHEMTECH

21        ARRANGEMENT WAS EXTREMELY COMPLEX?

22              BY THE COURT:

23                  DON'T ANSWER THE QUESTION YET.  IS THERE AN

24              OBJECTION?

25              BY MR. MURPHY:

1          YOUR HONOR, I MEAN, HE'S NOT AN ADDRESSEE

2       ON THIS DOCUMENT.  HE DIDN'T SEND THE DOCUMENT.

3       SO I DON'T KNOW ---

4       BY MR. SAWYER:

5          HE'S MENTIONED ---

6       BY MR. MURPHY:

7          I DON'T KNOW WHERE THE FOUNDATION IS TO ASK

8       HIM QUESTIONS ABOUT THIS DOCUMENT THAT HE HASN'T

9       EVEN SAID THAT HE RECOGNIZES.

10      BY MR. SAWYER:

11         IF I MAY RESPOND.  THE LAST SENTENCE OF THE

12      SECOND PARAGRAPH DISCUSSES KEY PEOPLE TO BE

13      CONTACTED, INCLUDING BILL NORRIS.

14      BY THE COURT:

15         I'LL OVERRULE THE OBJECTION.  I'LL ALLOW

16      HIM TO BE QUESTIONED ON THE DOCUMENT SINCE HE'S

17      REFERENCED IT.

18  BY MR. SAWYER:

19  Q.   THE QUESTION, MR. NORRIS, IS DO YOU AGREE THAT THE

20      CHEMTECH ARRANGEMENT WAS EXTREMELY COMPLEX?

21  A.   I WORKED WITH A LOT OF COMPLEX ARRANGEMENTS.  I THINK

22      IT KIND OF FIT -- TAKE OUT EXTREMELY.  I'D SAY

23      COMPLEX, YES.  EXTREMELY?  I DIDN'T THINK SO.

24  Q.   THE THIRD SENTENCE IN THAT PARAGRAPH WE JUST

25      MENTIONED, THOUGH, THE TRANSACTION IS DESIGNED TO BE

1      TRANSPARENT TO THE NORTH AMERICAN BUSINESSES.  WAS

2      THERE SOME DISTINCTION MADE BETWEEN THE NORTH

3      AMERICAN BUSINESSES AND ALL OF DOW'S BUSINESSES?

4  A.  I REALLY -- I DON'T THINK I'M QUALIFIED TO ANSWER

5      BECAUSE IT'S A BUSINESS ORGANIZATION CONCEPT AND

6      THAT'S SOMETHING THAT I DIDN'T PERHAPS FOLLOW THAT

7      CLOSELY.  I WORKED -- THEY WERE ALL MY CLIENTS, SO I

8      DIDN'T PAY THAT MUCH ATTENTION TO ONE OR THE OTHER

9      TITLE.

10 Q.  THE CHEMTECH -- THE PATENTS INVOLVED IN THE CHEMTECH

11     PATENTS WERE JUST U.S. BASED PATENTS?

12 A.  THAT'S CORRECT.

13 Q.  AND IS IT FREQUENT FOR DOW TO HAVE PATENTS OVER THE

14     SAME TECHNOLOGY IN MANY DIFFERENT COUNTRIES?

15 A.  YES.

16 Q.  AND SO IF ---

17 A.  IF I UNDERSTAND THE QUESTION, YOU'RE ASKING DO WE

18     HAVE A PATENT PROTECTED -- ARE THE COUNTERPART

19     PATENTS FILED IN FOREIGN COUNTRIES FOR THESE THAT

20     WERE IN THIS PORTFOLIO, THE ANSWER I'M SAYING IS YES.

21 Q.  SO THE PATENTS THAT WENT TO CHEMTECH WERE JUST THE

22     U.S. PATENTS?

23 A.  CORRECT.

24 Q.  AND DOW MAY STILL BE USING THE SAME PATENT BUT NOT A

25     U.S. PATENT AND THE SAME TECHNOLOGY IN OTHER

1    COUNTRIES?

2  A.   IT WOULD BE A DIFFERENT PATENT OF THAT COUNTRY BUT IT

3       COULD BE -- IT COULD HAVE BEEN.  I DON'T KNOW HOW

4       OFTEN THAT WAS THE CASE, BUT IT COULD HAVE BEEN.

5  Q.   TO YOUR KNOWLEDGE, DID CHEMTECH EVER LEASE OUT ANY

6       PATENT OTHER THAN TO DOW?

7  A.   NO.  BUT LET ME POINT TO THE POINT THAT I DON'T KNOW

8       BECAUSE MY RETIREMENT -- I RETIRED IN 1996 AND

9       CHEMTECH WAS JUST GETTING STARTED REALLY AT THAT

10      POINT.  SO I DON'T HAVE THAT INFORMATION.

11 Q.   DURING YOUR TIME ON THE CHEMTECH PROJECT, DID YOU

12      EVER HAVE ANY INDICATION FROM ONE OF THE FOREIGN

13      BANKS INVOLVED IN CHEMTECH THAT THEY WANTED TO BEGIN

14      LEASING THOSE PATENTS TO A THIRD PARTY?

15 A.   NO.  THAT NEVER CAME TO MY ATTENTION.

16 Q.   IN THE BLACK BINDER THAT MR. MURPHY PROVIDED FOR YOU,

17      THE FIRST TAB IS JOINT EXHIBIT 20 AND I BELIEVE --

18      FIRST OF ALL, THE PATENT LICENSE AGREEMENT MADE ON

19      APRIL 30TH WAS SIGNED IN HAMILTON, BERMUDA; IS THAT

20      CORRECT?

21 A.   CORRECT.

22 Q.   AND AGAIN, I BELIEVE MR. MURPHY ASKED YOU, BUT WHY

23      WAS CHEMTECH SO KEEN ON NOT HAVING ANY TIES TO THE

24      UNITED STATES?  WHAT IS YOUR UNDERSTANDING OF THAT?

25 A.   WELL, MY UNDERSTANDING OF THAT IS THAT CHEMTECH WAS A

1    FOREIGN CORPORATION.  IT HAD FOREIGN -- YOU KNOW,

2    COMPANIES OR BANKS THAT HAS INVESTORS AND IT DIDN'T

3    WANT TO SUBJECT ANY OF THESE PARTNERS AND ITSELF, OF

4    COURSE, TO THE LONGARM POSSIBLY, STATUTES OF THE

5    UNITED STATES OR JURISDICTION OF THE COURTS IN THE

6    UNITED STATES.

7  Q.  BUT DIRECTING YOUR ATTENTION TO THE SAME FIRST

8    PARAGRAPH OF JOINT EXHIBIT 20, THE PATENT LICENSE

9    AGREEMENT, IT SAID IT WAS EXECUTED IN HAMILTON,

10    BERMUDA.  RIGHT AFTER THAT IT SAYS BETWEEN CHEMTECH

11    ROYALTY ASSOCIATES, A LIMITED PARTNERSHIP ORGANIZED

12    UNDER THE LAWS OF THE STATE OF DELAWARE HAVING ITS

13    PRINCIPAL PLACE OF BUSINESS IN HORGEN, SWITZERLAND.

14    SO THIS WAS NOT A FOREIGN PARTNERSHIP, WAS IT?  IT

15    WAS A PARTNERSHIP FORMED UNDER THE LAWS OF THE UNITED

16    STATES.

17  A.  I THINK WE'RE IN AN AREA WHERE I'M NOT REALLY

18    QUALIFIED TO GIVE AN ANSWER TO THAT QUESTION OTHER

19    THAN WHAT YOU CAN READ. IT WAS A DELAWARE CORPORATION

20    OPERATING EXCLUSIVELY IN SWITZERLAND.

21  Q.  NOW, AT SOME TIME DURING YOUR INVOLVEMENT WITH THE

22    CHEMTECH PROJECT, YOU WERE TOLD THAT IT WAS NOT --

23    THAT CHEMTECH COULD NOT HAVE ANY TIES TO THE UNITED

24    STATES, WEREN'T YOU?  I MEAN, HOW DID THAT ---

25  A.  RIGHT.  I THINK IN ESSENCE THAT'S CORRECT.  WHAT WAS

1        THE LAST QUESTION?

2   Q.   THAT'S MY QUESTION.  YOU WERE TOLD THAT CHEMTECH --

3   A.   OH, TOLD?

4   Q.   -- COULD NOT HAVE TIES TO THE UNITED STATES?

5   A.   PRETTY MUCH -- I DON'T KNOW THAT I WAS TOLD.  I MEAN,

6        IT WAS A CORPORATION, A FOREIGN CORPORATION TO

7        OPERATE IN SWITZERLAND AND I DON'T THINK THEY TOLD

8        ME.  IT WAS JUST OBVIOUS IT WAS A SWISS CORPORATION

9        OPERATION.

10  Q.   ARE YOU AWARE IF THIS PARTNERSHIP EVER FILED U.S. TAX

11       RETURNS?

12  A.   OH, I'M NOT -- I HAVE NO INFORMATION ON THAT.

13  Q.   YOU MENTIONED THAT ONE REASON THAT CHEMTECH WAS NOT

14       TO HAVE TIES TO THE UNITED STATES, YOU SAID SOMETHING

15       ABOUT REACH OF A LONGARM STATUTE.  I'M NOT SURE I

16       UNDERSTAND THAT REFERENCE.  COULD YOU EXPLAIN THAT,

17       PLEASE?

18  A.   WELL, MY RECOLLECTION -- WE'RE GOING BACK 20 YEARS

19       AND I'VE BEEN OUT OF THE LEGAL PRACTICE FOR ALL THAT

20       LENGTH OF TIME, SO MY RECOLLECTION OF THE LONGARM

21       STATUTE LICENSING, FROM MY EXPERIENCE IN THE

22       LICENSING FIELD, IF YOU'RE LICENSING TECHNOLOGY IN

23       THE UNITED STATES, YOU CAN BE REACHED THROUGH THE

24       LONGARM STATUTE.  THAT'S DOING BUSINESS ENOUGH FOR --

25       TO GIVE COURT JURISDICTION FOR WHATEVER REASON.

1       COULD BE LIABILITY. IT COULD BE OTHER ISSUES IN THE

2       RELATIONSHIP.

3    Q.   DID ANYONE EVER TELL YOU THAT THE REASON CHEMTECH

4       COULD NOT HAVE TIES TO THE UNITED STATES WAS FOR

5       UNITED STATES TAX PURPOSES?

6    A.   NO.  NO.  I DIDN'T KNOW THAT.

7    Q.   DID YOU HAVE ANY INDICATION THAT CHEMTECH WAS A TAX

8       TRANSACTION GIVEN THAT YOUR INITIAL MEETING ON THE

9       PROJECT INVOLVED THE DIRECTOR OF TAXES FOR DOW

10       CHEMICAL COMPANY?

11   A.   THE ANSWER IS NO.

12   Q.   I'M SORRY, I WAS JUST PASSED A NOTE THAT I HAVE BEEN

13       REFERRING TO A DOCUMENT AS DOCUMENT 20 AND IT'S

14       DOCUMENT 2O, JUST SO THE RECORD IS CLEAR.

15   A.   OKAY.  I'M REFERRING TO THAT TOO, SO I'M SORRY.

16   Q.   ARE YOU AWARE OF WHETHER CHEMTECH HAD ANY EMPLOYEES?

17   A.   NO, I'M NOT.

18   Q.   DID YOU EVER DEAL WITH ANY EMPLOYEES THAT PURPORTED

19       TO BE EMPLOYEES OF CHEMTECH?

20   A.   NO, I'M NOT AWARE OF ANY EMPLOYEES.  I KNOW, YOU

21       KNOW, I WORKED WITH AND SAW SOME DOCUMENTS SIGNED ON

22       BEHALF OF CHEMTECH WERE PERSONS I KNEW, BUT I DIDN'T

23       KNOW IF THEY WERE EMPLOYED BY CHEMTECH OR NOT.  I

24       REALLY WAS -- THE PARTNERSHIP OPERATIONS WERE PRETTY

25       MUCH BEHIND THE SCREEN AS FAR AS I WAS CONCERNED.

1  Q.   WITH RESPECT TO THE PATENT RATES THAT YOU'VE

2       DISCUSSED ON YOUR DIRECT EXAMINATION, DO YOU RECALL

3       OFFHAND THE DIFFERENCE BETWEEN OR THE MEANING OF THE

4       TERM, ADJUSTED MINIMUM ROYALTY?

5  A.   YES.  I THINK, HAVING LOOKED AT THE DOCUMENT, MY

6       RECOLLECTIONS ARE REFRESHED ON THAT A LITTLE BIT.  I

7       THINK I UNDERSTAND THAT.

8  Q.   CAN YOU EXPLAIN -- DID IT HAVE SOMETHING TO DO WITH

9       THE FACT THAT IF CHEMTECH WERE TO LEASE A PATENT TO A

10      THIRD PARTY, WHAT WOULD HAPPEN TO THE PATENT RATE?

11 A.   THAT'S MY UNDERSTANDING.

12 Q.   AND SO PATENT RATE WOULD ACTUALLY DECREASE SOMETIMES

13      25 PERCENT, BUT IN THAT NEIGHBORHOOD?

14 A.   YEAH.  I MEAN A SOLE LICENSE IS WORTH MORE THAN ONE

15      OF SEVERAL.  AND YOU USE THE TERM LEASE AND I USE THE

16      TERM LICENSE.  I THINK WE'RE ON THE SAME PLANE.

17 Q.   YES.  I'D LIKE TO ---

18          BY MR. SAWYER:

19              COULD I APPROACH THE WITNESS?

20          BY THE COURT:

21              YOU MAY.

22 BY MR. SAWYER:

23 Q.   IT'S JOINT EXHIBIT 210.  I DON'T KNOW, MR. NORRIS, IF

24      YOU'VE SEEN THIS EXHIBIT RECENTLY.  DO YOU NEED TO

25      READ IT TO FAMILIARIZE YOURSELF?  IT INVOLVES

1        SOMETHING CALLED A PATENT LICENSE WITH KELLOGG.

2   A.   YES.  I HAVEN'T SEEN IT RECENTLY, BUT I SEE I WAS THE

3        ADDRESSEE OF THE COMMUNICATION, SO I DID ONCE.

4   Q.   WITH RESPECT TO -- WOULD YOU LIKE TO -- WELL, FIRST

5        OF ALL, THE INITIAL EMAIL THAT I DO NOT BELIEVE YOU

6        WERE A PARTY TO; YOU WERE A PARTY ON THE REPLY.  BUT

7        IT INDICATED THAT THE DOW WOULD LIKE TO INTRODUCE

8        CHEMTECH TO A POTENTIAL DOW LICENSEE THAT WOULD ALSO

9        LIKE TO TALK TO CHEMTECH ABOUT TAKING A LICENSE UNDER

10       SOME CHEMTECH PATENTS.  THE POTENTIAL LICENSEE IS MW

11       KELLOGG COMPANY.  AND MY UNDERSTANDING, JUST TO

12       SUMMARIZE THE EMAIL, IS THAT DOW WAS INTERESTED IN

13       LEASING OR LICENSING A FOREIGN PATENT AND THAT BY

14       CIRCUMSTANCES THE PERSON WHO WOULD BE USING THE

15       FOREIGN PATENT MAY IMPORT SOME OF THAT PRODUCT INTO

16       THE UNITED STATES, WHICH WOULD POTENTIALLY INFRINGE

17       ON THE PATENT INVOLVED IN THE CHEMTECH PARTNERSHIP.

18       I DON'T KNOW IF THAT IS A REASONABLE SUMMARY OF THAT

19       EMAIL.

20  A.   IT SOUNDS REASONABLE TO ME.

21            BY THE COURT:

22               THAT'S YOUR RECOLLECTION OF THE CONTENTS OF

23            THE EMAIL, MR. NORRIS?

24            BY THE WITNESS:

25               I'M SORRY?

```
 1          BY THE COURT:
 2                IS THAT YOUR RECOLLECTION OF THE CONTENTS
 3          OF THE EMAIL?
 4          BY THE WITNESS:
 5                WELL, A REFRESHED RECOLLECTION LOOKING AT
 6          THE EMAIL NOW.
 7   BY THE WITNESS:
 8   A.   LOOKING AT THE EMAIL, MY RECOLLECTIONS OF IT ARE
 9        SOMEWHAT REFRESHED.  I CAN UNDERSTAND WHAT'S INVOLVED
10        HERE.  THE PARTICULAR MATTER, I'M HAVING TROUBLE
11        RECALLING.  I DO RECALL KELLOGG AND SOME OTHER
12        CONNECTIONS WITH DOW BUT -- NOT WITH THE PARTNERSHIP
13        BUT WITH DOW U.S.  KELLOGG, I THINK, IS AN
14        ENGINEERING COMPANY AND THEY WANTED SOME TECHNOLOGY
15        AND THEY WANTED TO BUILD TECHNOLOGY WITHOUT ANY
16        PATENT ENCUMBRANCES.  I THINK THAT'S WHAT MAY HAVE
17        LED TO THIS COMMUNICATION.  BUT WHAT HAPPENED BEYOND
18        THIS, I CAN'T RECALL.
19   BY MR. SAWYER:
20   Q.   AND THE EMAIL AT THE TOP IS WRITTEN FROM SOMEONE
21        NAMED M. GLENN.  DO YOU KNOW WHO THAT IS?
22   A.   YES, MIKE.  THAT'S MIKE GLENN.  HE WAS THE CHEMTECH
23        PATENT ATTORNEY AND OPERATING FOR DOW EUROPE AS WELL
24        AS THE PARTNERSHIP.
25   Q.   AND WHO WAS CHARLES MAURER.
```

1   A.   CHARLES MAURER WAS A U.S. PATENT ATTORNEY IN DOW'S

2        PATENT DEPARTMENT IN MICHIGAN.

3   Q.   AND SO HE WAS THE ONE WHO WROTE THE INITIAL EMAIL

4        STARTING AT THE BOTTOM, TURNING ONTO THE -- THE

5        SIGNATURE ON THE SECOND PAGE OF THAT DOCUMENT, OR AT

6        LEAST THE TYPEWRITTEN SIGNATURE IS CHARLES MAURER.

7   A.   OKAY.  I NEVER SAW HIS COMMUNICATION BEFORE.  I MEAN,

8        OBVIOUSLY THE ONE FROM MIKE WAS COPIED TO ME FOR

9        INFORMATION PURPOSES, BUT HIS COMMUNICATION TO GLENN

10       WAS NOT COPIED TO ME.

11  Q.   THE SECOND PARAGRAPH OF THAT EMAIL SAYS, "IT APPEARS

12       LIKELY THAT ANY LICENSE WILL REQUIRE APPROVAL FROM

13       ALL THE PARTNERS.  THIS COULD BE AVOIDED IF THE

14       LICENSEE QUALIFIES AS A PERMITTED THIRD PARTY

15       LICENSEE UNDER PARAGRAPH 1.29i."  FIRST OF ALL, WHEN

16       IT SAYS REQUIRED APPROVAL FROM ALL THE PARTNERS,

17       WOULD THAT BE ALL OF THE PARTNERS OF CHEMTECH?

18  A.   YOU'RE ASKING ME TO GET INTO CHARLIE MAURER'S MIND,

19       ABOUT, YOU KNOW, HIS ANALYSIS, WHAT IT WAS,  AND

20       PREMISES AND WHAT HE WAS TRYING TO DO.  AND I HAVE NO

21       RECOLLECTION OTHER THAN THIS, ONCE YOU'VE REFRESHED

22       MY RECOLLECTION, HAVING RECEIVED THIS COMMUNICATION

23       AND WHAT WAS TRANSPIRING.

24  Q.   I MAY HAVE CONFUSED YOU BY REFERRING TO THE SECOND

25       EMAIL THAT WAS WRITTEN BY MR. MAURER.  BUT THE TOP

1    EMAIL WAS WRITTEN BY MR. GLENN AND HE BEGINS BY

2    SAYING, "I DISCUSSED THE KELLOGG SITUATION BRIEFLY

3    WITH BILL NORRIS," AND THEN HE GOES ON TO REPLY TO

4    MR. MAURER.  THE THIRD PARAGRAPH OF THAT EMAIL SAYS,

5    "IF APPROVAL FROM THE PARTNERS IS REQUIRED FOR A

6    LICENSE, YOU NEED TO CONSIDER THE FOLLOWING POINTS.

7    SOME LIMITED PARTNERS GAIN LITTLE FROM THE GRANT OF

8    AN ADDITIONAL LICENSE.  THEY WILL BE DISINCLINED TO

9    ACCEPT ANY RISK AND LIKELY WILL NOT APPROVE TERMS

10    WHICH STRAY VERY FAR FROM THOSE IN THE LICENSE

11    GRANTED TO DOW.  I'M WILLING TO DISCUSS WITH YOU AND

12    KELLOGG ANY PROPOSALS, BUT YOU SHOULD KEEP IN MIND

13    THAT MORE THAN THE GENERAL PARTNERS' APPROVAL WILL

14    LIKELY BE REQUIRED FOR A LICENSE."  AND WHEN IT

15    REFERS TO GENERAL PARTNER, DOW EUROPE IS THE GENERAL

16    PARTNER OF CHEMTECH; IS THAT CORRECT?

17  A.   I THINK ALL OF THAT IS CORRECT, YES.

18  Q.   AND SO WHEN THEY REFER TO ALL OF THE PARTNERS, THEY

19    PROBABLY -- THEY MEAN THE FOREIGN BANKS WHO ARE ALSO

20    ---

21  A.   THE BANKS IN THE PARTNERSHIP, CORRECT.

22       BY THE COURT:

23         WAIT, WAIT.  IS THERE AN OBJECTION?

24       BY MR. MURPHY;

25         WELL, I MEAN, HE ALREADY TESTIFIED THAT

1        HE'S NOT CERTAIN ABOUT WHAT ALL THE PARTNERS

2        MEANS AND THAT HE CAN'T BE INSIDE MR. MAURER'S

3        HEAD, AND THEN I THINK THAT MR. SAWYER JUST

4        TRIED TO RECLASSIFY HIS TESTIMONY IN A WAY THAT

5        WAS NOT CONSISTENT WITH WHAT HE PREVIOUSLY

6        STATED.

7        BY THE COURT:

8            MR. SAWYER?

9        BY MR. SAWYER:

10           THE EMAIL IS FROM MICHAEL GLENN AND HE

11       BEGINS HIS EMAIL SAYING, "I'VE DISCUSSED THE

12       KELLOGG SITUATION WITH BILL NORRIS.  MR. NORRIS

13       WAS A PATENT COUNSEL DEALING WITH THE CHEMTECH

14       TRANSACTION.  SO IT SEEMS THAT MR. GLENN WAS

15       RESPONDING TO MR. MAURER'S REQUEST AFTER HAVING

16       CONSULTED WITH MR. NORRIS.

17       BY THE COURT:

18           I'LL ALLOW YOU SOME LATITUDE HERE, BUT,

19       AGAIN, IF THE WITNESS RECALLS. IF HE DOESN'T

20       RECALL, HE'LL SIMPLY TELL US THAT HE DOESN'T

21       RECALL.  BUT YOU CAN ASK HIM ABOUT THE

22       CIRCUMSTANCES OR THE DISCUSSIONS THAT ARE

23       DESCRIBED HERE IN THE EMAIL.

24  BY MR. SAWYER:

25  Q.   DO YOU RECALL EVER DISCUSSING WITH MR. GLENN OR

1        ANYONE ELSE THAT A FOREIGN BANK PARTNER IN CHEMTECH

2        WOULD BE DISINCLINED TO ACCEPT ANY RISK BY ALLOWING

3        THE PATENT TO BE RELICENSED?

4   A.   NO, I DIDN'T DISCUSS THAT.  NO.

5   Q.   YOU DON'T RECALL?

6   A.   A BRIEF DISCUSSION, WHATEVER IT MIGHT HAVE BEEN,

7        DOESN'T COME TO MIND, WHATEVER THAT WAS.  AND IT

8        CERTAINLY WASN'T -- HE WASN'T RECEIVING DIRECTIONS

9        FROM ME HOW TO RESPOND.  THAT ANALYSIS, I CONTRIBUTE

10       TO MR. GLENN SOLELY FOR THE PARTNERSHIP.

11  Q.   THANK YOU.  DID DOW FREQUENTLY LICENSE OUT ITS

12       TECHNOLOGY?

13  A.   NO, NOT -- WELL, THERE'S TWO PARTS THERE.  THE

14       TECHNOLOGY PRACTICED WITHIN THE CONFINES OF THIS, MY

15       ANSWER WOULD BE NO.  IT WAS VERY INFREQUENT THAT

16       PRODUCTION TECHNOLOGY WAS LICENSED TO THIRD PARTIES.

17       APPLICATION TECHNOLOGY, ON THE OTHER HAND, WOULD BE

18       ROUTINE.  THAT'S TECHNOLOGY EXERCISED OR UTILIZED BY

19       A CUSTOMER OF DOW FOR A PARTICULAR PRODUCT.  THAT

20       WOULD BE OBVIOUSLY MADE AVAILABLE TO ANY CUSTOMER.

21  Q.   IF I WERE TO TELL YOU THAT AROUND 1993, DOW'S

22       APPROXIMATE GROSS REVENUES WERE ABOUT 18 BILLION

23       DOLLARS, WOULD THAT SOUND -- IS THAT ABOUT YOUR

24       UNDERSTANDING OF THE ---

25  A.   I'M REALLY NOT QUALIFIED, I'M SORRY, TO RECALL,

1     NUMBER ONE, AND NUMBER TWO, IF I EVEN KNEW AT THE

2     TIME.  SORRY.

3  Q.  DO YOUR RECALL HOW MANY ACTIVE U.S. PATENTS DOW WOULD

4     HAVE HAD?  AND AGAIN NOT AN EXACT NUMBER BY ANY

5     MEANS, BUT APPROXIMATELY HOW MANY ACTIVE U.S. PATENTS

6     DOW WOULD'VE HAD IN 1993?

7  A.  NO, I REALLY DON'T THINK I CAN MAKE A FAIR GUESS AT

8     THAT.

9          BY MR. SAWYER:

10           YOUR HONOR, MAY I APPROACH THE WITNESS?  I

11         HAVE -- THIS WAS ONE OF THE FALLA EXHIBITS,

12         JOINT EXHIBIT 196.  IT'S A 10K FOR 1993.

13         BY MR. MURPHY:

14           DO YOU HAVE A COPY FOR ME?

15         BY MR. SAWYER:

16           I HAVE YOUR COPY THAT YOU GAVE ME.

17         BY MR. MURPHY:

18           LET ME SEE IF I CAN FIND IT.

19         BY MR. SAWYER:

20           IT'S ONLY ONE PAGE OF THE DOCUMENT.  WE CAN

21         PROBABLY PULL IT UP ON THE SCREEN.

22         BY MR. MURPHY:

23           I HAVE A COPY.

24  BY MR. SAWYER:

25  Q.  MR. NORRIS, I'VE HANDED YOU JOINT EXHIBIT 196 AND I

```
 1        BELIEVE RIGHT ABOVE THE PAGE BREAK WHERE IT SAYS PAGE

 2        7 IT INDICATES THAT DOW HAD 5,900 ACTIVE U.S. PATENTS

 3        AND 17,700 ACTIVE FOREIGN PATENTS; IS THAT CORRECT?

 4   A.   IN WHAT YEAR?

 5   Q.   THIS IS JOINT EXHIBIT 196, WHICH IS A 1993 10K FILED

 6        WITH THE ---

 7   A.   10K, OKAY, YES.  I PROBABLY CONTRIBUTED TO THAT

 8        INFORMATION AT THE TIME. BUT YES, I WOULD AGREE WITH

 9        THAT.  I GUESS IT'S A 10K.  I'D BELIEVE THAT.

10   Q.   AND THE CHEMTECH PROJECT INVOLVED 73 PATENTS; IS THAT

11        YOUR UNDERSTANDING?

12   A.   YES.

13   Q.   SO THE CHEMTECH PROJECT INVOLVED A TINY FRACTION OF

14        DOW'S ACTIVE U.S. PATENTS?

15   A.   YES.  THAT'S WHAT THE NUMBERS SAY.

16   Q.   THANK YOU.  I'M DONE WITH EXHIBIT 196.  DID YOU

17        ATTEND ANY OF THE CHEMTECH MEETINGS WITHIN DOW?  I

18        THINK THEY WERE SOMETIMES CALLED CHEMTECH REVIEW

19        MEETINGS.  DO YOU RECALL ATTENDING MEETINGS OF

20        CHEMTECH WHILE YOU WERE EMPLOYED AT DOW?

21   A.   I CAN THINK OF ONE.  AGAIN, I RETIRED IN 1996. AS

22        CHEMTECH WAS GETTING UP AND RUNNING, I MIGHT HAVE

23        ATTENDED ONE.  I REMEMBER THERE WAS ONE MEETING IN

24        TORONTO WHERE I PROBABLY WAS THERE.  BUT AGAIN IN A

25        ROLE OF, YOU KNOW, NOT HAVING AN ACTIVE ROLE IN THE
```

1    FORMATION OF CHEMTECH ANYMORE.  CHEMTECH EXISTED, WAS

2    OPERATING ON ITS OWN AND WAS THERE AS A RESOURCE, IF

3    I RECALL IT.

4  Q.  AND WAS THERE POSSIBLY ALSO A MEETING IN BERMUDA THAT

5    YOU MIGHT ALSO HAVE ATTENDED FOR CHEMTECH?

6  A.  AFTER ITS FORMATION?

7  Q.  YES.

8  A.  NO.  I DON'T RECALL THAT.  I WOULDN'T HAVE GONE TO

9    THAT.

10 Q.  DO YOU RECALL A LEGISLATION OCCURRING DURING THE

11   OPERATION OF CHEMTECH CALLED GATT?  I THINK IT WAS

12   GENERAL AGREEMENT ON TRADE AND I'M NOT SURE WHAT

13   THE OTHER ---

14 A.  YES, I'M FAMILIAR.  THAT WAS -- I REMEMBER THE TERM

15   AND -- YES.

16 Q.  AND GATT HAD AN IMPACT ON CHEMTECH BECAUSE IT

17   EXTENDED THE LIVES OF CERTAIN PATENTS; IS THAT

18   CORRECT?

19 A.  YES.  I THINK IT DID.

20 Q.  WHEN LEGISLATION IS PASSED THAT EXTENDS THE LIFE OF A

21   PATENT, THAT INCREASES THE VALUE OF THAT PATENT,

22   DOESN'T IT?

23 A.  WELL, AT THAT TIME?  POSSIBLY.  OR POSSIBLY THERE'S

24   NO CHANGE OR PERHAPS THERE'S A DECREASE.  I MEAN, IT

25   WOULD DEPEND IN MY MIND ON THE ECONOMIC CIRCUMSTANCES

1      AT THE TIME THE LAW TOOK EFFECT. SO IF THE PATENT

2      WERE IN THE PORTFOLIO PRIOR TO THE LEGISLATION

3      CHANGING THE LIFE OF THE PATENT, YOU WOULD HAVE TO

4      EXAMINE THAT QUESTION AT THAT TIME I GUESS.  NOW, IF

5      IT'S LICENSE, IT WOULDN'T MODIFY THE LICENSE FOR THE

6      EXISTING LICENSE BUT IT MIGHT MODIFY IT FOR THE

7      RENEWAL OR EXTENSION.

8           BY MR. SAWYER:

9                I HAVE, I THINK, JUST ONE MORE EXHIBIT, IF

10           I MAY APPROACH THE WITNESS.

11           BY THE COURT:

12                YOU MAY.

13  BY MR. SAWYER:

14  Q.   MR. NORRIS, I'VE HANDED YOU EXHIBIT 43.  HAVE YOU

15       EVER SEEN EXHIBIT 43 BEFORE?

16  A.   WELL, I DON'T IMMEDIATELY RECOGNIZE IT.

17  Q.   DO YOU RECALL ---

18  A.   NO, I DON'T ---  IF MY NAME IS ON IT, I DON'T KNOW --

19       LET'S SEE.  WAS I -- I DOUBT IT.  I DON'T SEE MY NAME

20       ON IT AND WHY WOULD THIS COMMUNICATION HAVE BEEN SENT

21       TO ME, I'M NOT SURE.

22  Q.   DO YOU RECALL DURING THE VALUATION PROCESS IN THE

23       PREPARATION FOR THE CHEMTECH TRANSACTION THAT THERE

24       WERE REASONS THAT DOW HAD TO ACT QUICKLY TO OBTAIN

25       INFORMATION IN ORDER TO IMPLEMENT THE CHEMTECH PLAN?

1  A.   NO. NO, I REALLY WASN'T THAT INVOLVED, IF YOU WILL.

2       I PREPARED THE PARTS THAT I'VE MENTIONED TODAY, BUT

3       WHAT MOTIVATED AND HOW THE THING CAME TO BE, I REALLY

4       HAVE NO BACKGROUND -- I WOULDN'T SAY NO BACKGROUND

5       BUT VERY LITTLE BACKGROUND INFORMATION.

6  Q.   I WANT TO THANK YOU VERY MUCH FOR YOUR TIME.

7  A.   THANK YOU.

8            BY THE COURT:

9                 MR. MURPHY, ANY REDIRECT?

10           BY MR. MURPHY:

11                YOUR HONOR, CAN I JUST HAVE ONE QUICK

12           SECOND TO CONSULT WITH MY COUNSEL HERE?

13           BY THE COURT:

14                YOU MAY.

15           BY MR. MURPHY:

16                THANK YOU, YOUR HONOR.  I JUST HAVE TWO

17           QUICK THINGS.  ONE IS A LITTLE RECORD

18           CLARIFICATION POINT.

19           BY THE COURT:

20                VERY WELL.

21           BY MR. MURPHY:

22                I THINK WHEN I STARTED TO EXAMINE MR.

23           NORRIS ABOUT THE DOCUMENT WHERE WE HAD THE

24           PRIVILEGE DISPUTE AND I MAY HAVE REFERRED TO IT

25           AS P6 A COUPLE TIMES, BUT OF COURSE P13 IS THE

1    DOCUMENT THAT'S IN EVIDENCE.  AND I JUST WANT TO

2    MAKE SURE THE RECORD IS CLEAR.

3    BY THE COURT:

4         WE'LL MAKE SURE THE RECORD IS CLEAR ON THAT

5    POINT.  IT'S ACTUALLY BEEN P13 THAT'S BEEN

6    ADMITTED AND NOT P6.

7    BY MR. MURPHY:

8         THANK YOU VERY MUCH, YOUR HONOR, AND I DO

9    HAVE ONE QUESTION.

10              RE-DIRECT EXAMINATION

11   BY MR. MURPHY:

12   Q.   MR. NORRIS?

13   A.   YES.

14   Q.   IF YOU CAN JUST REALLY QUICKLY FLIP TO JX 238 WHICH

15   IS IN THE BINDER I GAVE YOU.  IT'S THE THIRD DOCUMENT

16   FROM THE BACK, JOINT EXHIBIT 238.  IT'S AN EMAIL FROM

17   MIKE GLENN TO YOU AND OTHERS.

18   A.   OH, YES, I GOT IT.

19   Q.   YOU'VE GOT IT THERE?

20   A.   I HAVE IT NOW.

21   Q.   NOW, DURING YOUR CROSS EXAMINATION, MR. SAWYER ASKED

22   YOU IF YOU KNEW WHETHER OR NOT CHEMTECH HAD ANY

23   EMPLOYEES.  DO YOU REMEMBER THAT QUESTION?

24   A.   YES, I DO.

25   Q.   CAN I JUST FOCUSED YOUR ATTENTION DOWN AT THE BOTTOM

1           OF THIS EMAIL WHERE IT SAYS MICHAEL L. GLENN ON

2           BEHALF OF CHEMTECH ROYALTY ASSOCIATES, LP?  IS IT

3           CONSISTENT WITH YOUR RECOLLECTION THAT MR. GLENN WAS

4           OPERATING AT TIMES ON BEHALF OF CHEMTECH?

5    A.    YES, HE WOULD BE.

6                BY MR. MURPHY:

7                     I HAVE NO FURTHER QUESTION, YOUR HONOR.

8                BY THE COURT:

9                     THANK YOU, MR. MURPHY.  MR. NORRIS, THERE'S

10          NO FURTHER QUESTIONS FOR YOU TODAY.  YOU ARE

11          EXCUSED.  THANK YOU FOR COMING IN AND GOOD LUCK

12          TO THE BIG BLUE THE NEXT YEAR.

13               BY THE WITNESS:

14                    I'LL BE THERE.

15                    (THEREFORE, AT THIS TIME, THE WITNESS WAS

16                    EXCUSED AND A RECESS WAS HAD.)

17                BY THE COURT:

18                     BE SEATED.  OKAY.  MR. MAGEE?

19               BY MR. MAGEE:

20                    WE'RE READY, YOUR HONOR.  OUR NEXT WITNESS

21          IS EDWARD VALENZUELA, AND HE'S GOING TO BE

22          EXAMINED BY MR. HARTMAN BLANCHARD.

23               BY THE COURT:

24                    MR. BLANCHARD, PLEASE CALL YOUR WITNESS.

25               BY MR. BLANCHARD:

1              AFTERNOON, YOUR HONOR.  HARDY BLANCHARD ON

2          BEHALF OF PLANTIFF.  WE CALL MR. EDWARD

3          VALENZUELA.

4                  DIRECT EXAMINATION

5   THE WITNESS, EDWARD VALENZUELA, AFTER HAVING FIRST BEEN

6   DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING

7   BUT THE TRUTH, TESTIFIED AS FOLLOWS:

8          BY THE CLERK:

9              STATE AND SPELL YOUR NAME FOR THE RECORD.

10          BY THE WITNESS:

11              EDWARD VALENZUELA , E-D-D-W-A-R-D   V-A-L-

12          E-N-Z-U-E-L-A.

13          BY THE COURT:

14              YOU MAY PROCEED.

15   BY MR. BLANCHARD:

16   Q.   GOOD AFTERNOON, MR. VALENZUELA.

17   A.   GOOD AFTERNOON.

18   Q.   WE'RE GOING TO TALK IN A MINUTE ABOUT YOUR

19          INVOLVEMENT, PARTICULARLY WITH RESPECT TO THE PATENTS

20          THAT WERE CONTRIBUTED TO THE CHEMTECH PARTNERSHIP.  I

21          UNDERSTAND THAT YOUR WORK IN THAT CONNECTION WAS AS

22          AN ECONOMIC PLANNER; IS THAT RIGHT?

23   A.   THAT'S RIGHT.

24   Q.   I'D LIKE TO START OFF BY GETTING YOU TO TELL ME WHAT

25          FIELDS YOU HOLD EDUCATIONAL DEGREES IN.

1  A.   I HAVE A BACHELOR'S IN CHEMISTRY FROM THE UNIVERSITY

2       OF CALIFORNIA AT BERKLEY AND M.S. AND PH.D. IN

3       PHYSICAL CHEMISTRY FROM WISCONSIN, MADISON, AND THEN

4       M.B.A. IN FINANCE FROM CENTRAL MICHIGAN.

5  Q.   WHAT WAS YOUR FIRST POSITION AT DOW?

6  A.   I WORKED IN A THERMODYNAMICS LAB AS A PHYSICAL

7       CHEMIST FOR SIX YEARS.

8  Q.   STARTING IN WHAT YEAR?

9  A.   '75 THROUGH '81.

10  Q.   I UNDERSTAND THAT FOR MOST OF THE REST OF YOUR

11       CAREER, FROM APPROXIMATELY 1981 UNTIL THE TIME YOU

12       RETIRED IN 2007 YOU WERE AN ECONOMIC PLANNER.  COULD

13       YOU EXPLAIN THE ROLE OF AN ECONOMIC PLANNER AT DOW?

14  A.   AN ECONOMIC PLANNER WITHIN DOW IS LIKE A FINANCIAL

15       ANALYST.  THEY'RE USUALLY CHEMISTS OR CHEM ENGINEERS,

16       AND THEY BRING KNOWLEDGE OF THE CHEMICAL INDUSTRY,

17       ALONG WITH COMPUTER SKILLS, MATHEMATICAL SKILLS AND

18       ANALYTIC SKILLS AND DO WHAT A FINANCIAL ANALYST WOULD

19       DO FOR THE BUSINESSES WITHIN THE COMPANY.

20  Q.   AND WHAT BUSINESSES DID YOU WORK WITH AT DOW; WOULD

21       YOU JUST RUN ME BRIEFLY THROUGH THAT CHRONOLOGY?

22  A.   WELL, FROM '81 ON FOR ABOUT FOUR YEARS, I WORKED IN

23       THE EXECUTIVE DEPARTMENT IN THE INORGANICS BUSINESS,

24       LATER ON IN THE POLYURETHANE BUSINESS FROM MAYBE '84,

25       '85 TO '91, AND THEN IN THE TAX DEPARTMENT FROM 1991.

1    Q.   AND THAT'S THROUGH ABOUT 2007?

2    A.   2007; THAT'S RIGHT.

3    Q.   YOU RETIRED AFTER 2007?

4    A.   CORRECT.

5    Q.   I WANT TO TURN NOW TO YOUR INVOLVEMENT IN THE

6         CHEMTECH TRANSACTION.  WHAT WAS YOUR UNDERSTANDING OF

7         THE NATURE OF THE TRANSACTION WHEN YOU FIRST LEARNED

8         OF IT IN 1993?

9    A.   IT WAS AN INTANGIBLE FINANCING TRANSACTION.

10   Q.   CAN YOU EXPLAIN A LITTLE BIT MORE WHAT THAT MEANT TO

11        YOU?

12   A.   WELL, EVERY TEN YEARS OR SO THE CHEMICAL INDUSTRY

13        GOES THROUGH THESE BOOM-AND-BUST CYCLES, AND IN THE

14        EARLY '90'S THE COMPANY, DOW CHEMICAL, WAS IN NEED OF

15        FUNDS, AND THIS WAS ONE WAY TO OBTAIN FUNDS.

16   Q.   YOU MENTIONED YOU WERE IN THE TAX DEPARTMENT AT THIS

17        TIME IN 1993.  WHY WAS THE TAX DEPARTMENT INVOLVED?

18   A.   IN MOST OF THE TREASURY TRANSACTIONS THERE WAS A TAX

19        ASPECT, SO THERE WAS ALWAYS SOMEBODY FROM THE TAX

20        DEPARTMENT INVOLVED.

21   Q.   WE'LL GET INTO THE SPECIFICS AS WE GO THROUGH YOUR

22        DIRECT EXAMINATION TODAY, BUT CAN YOU TELL US AT A

23        GENERAL LEVEL WHAT YOUR ROLE WAS WITH RESPECT TO THE

24        CHEMTECH PARTNERSHIP?

25   A.   GENERALLY, I HAD TWO ROLES, DEPENDING ON WHERE IN THE

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 216 of 318

```
1        TRANSACTION TIMEWISE.  AT THE BEGINNING I DID A LOT

2        WITH THE VALUATION OF THE PATENTS AND THEN LATER ON

3        WITH THE OPERATIONAL ASPECTS OF COMPUTING OF THE

4        ROYALTY PAYMENTS.

5   Q.   DID YOU HAVE ANY INVOLVEMENT IN RE-LICENSING

6        ACTIVITIES?

7   A.   YES.  THE INITIAL VALUATION WORK WAS TO ESTABLISH THE

8        INITIAL VALUES OF THE PATENTS, AND THEN LATER ON AS

9        LICENSES EXPIRED, WE'D HAVE TO REVALUE IN THE RE-

10       LICENSING.

11  Q.   OKAY.  I'D LIKE TO START WITH THE PROCESS OF VALUING

12       THE PATENTS, THE PATENTS THAT WERE ULTIMATELY

13       CONTRIBUTED TO CHEMTECH.  YOU HAVE A BINDER NEXT TO

14       YOU, IF YOU COULD REFER TO THAT.  THIS IS ALSO GOING

15       TO COME UP ON THE SCREEN IN FRONT OF YOU, SO WHATEVER

16       IS EASIER FOR YOU, MR. VALENZUELA, WOULD BE FINE.

17       I'D LIKE TO TURN TO EXHIBIT JX-16.  THIS IS A MEMO

18       FROM YOU TO BILL NORRIS DATED FEBRUARY 8TH, 1993.  ARE

19       YOU FAMILIAR WITH THIS MEMO?

20  A.   YES.

21  Q.   WHO IS BILL NORRIS?

22  A.   BILL NORRIS WAS A PATENT ATTORNEY IN THE PATENT

23       DEPARTMENT.  HE WAS OUR LICENSING AND ROYALTY GURU.

24  Q.   THE FIRST PARAGRAPH IN JOINT EXHIBIT 16 STATES,

25       "ATTACHED TO THE TWO PAGE SPREAD SHEET SHOWING A
```

1    PORTFOLIO OF PATENTS, WHICH INCLUDES PATENTS BOTH

2    FROM PLASTICS AND CHEMICALS AND PERFORMANCE PRODUCTS.

3    THE DISCOUNTED NET PRESENT VALUE OF THE ROYALTIES

4    GLEANED FROM THESE PATENTS IS $515 MILLION."  DID THE

5    VALUATION YOU'RE DESCRIBING IN THIS MEMO RELATE TO

6    CHEMTECH?

7  A.  YES.

8  Q.  DID YOU PERFORM VALUATION WORK EARLIER THAN

9    APPROXIMATELY FEBRUARY OF 1993 WITH RESPECT TO THE

10    CHEMTECH PARTNERSHIP?

11  A.  I DID VALUATION WORK BUT NOT WITH RESPECT TO

12    CHEMTECH.

13  Q.  OKAY.  IN OTHER CONTEXTS YOU WERE FAMILIAR WITH

14    VALUATIONS?

15  A.  YES.

16  Q.  DO YOU KNOW -- EXCUSE ME -- DO YOU KNOW WHO SELECTED

17    THE PATENTS REFERRED TO IN THIS MEMO?

18  A.  IT WOULD HAVE BEEN BILL NORRIS AND OTHER PEOPLE IN

19    THE PATENT AND INTELLECTUAL ASSET GROUPS.

20  Q.  ARE YOU AWARE OF WHAT CRITERIA MR. NORRIS OR

21    PERSONNEL FROM INTELLECTUAL ASSET MANAGEMENT USED TO

22    SELECT THE PATENTS?

23  A.  NO.

24  Q.  WE TURN TO THE LIST BEGINNING ON THE SECOND PAGE OF

25    JOINT EXHIBIT 16, BATES ENDING IN 20452.  DOES THIS

1       LIST REFLECT THE PATENTS ULTIMATELY CONTRIBUTED TO

2       THE CHEMTECH PARTNERSHIP?

3   A.  I THINK AT THIS STAGE, THE FINAL LIST OF PATENTS THAT

4       WERE GOING TO BE CONTRIBUTED WAS INFLUX, AND SO THERE

5       WERE PATENTS COMING IN AND OUT OF THE LIST.  BUT THIS

6       PROBABLY REPRESENTS MOST OF WHAT WAS EVENTUALLY

7       CONTRIBUTED.

8   Q.  CAN YOU PLEASE EXPLAIN AT A GENERAL LEVEL THE

9       VALUATION METHODOLOGY DESCRIBED IN THIS MEMO?

10  A.  THIS IS WHAT'S CALLED A ROYALTY-SAVINGS KIND OF

11      APPROACH.  AND BASICALLY WHAT YOU DO FOR EACH PRODUCT

12      LINE OR EACH TECHNOLOGY, YOU ESTIMATE THE SALES FOR

13      THE PRODUCT LINE OUT, YOU KNOW, TEN, 15 YEARS, AND

14      THEN YOU ESTABLISH A REASONABLE ROYALTY RATE

15      ASSOCIATED WITH THE PATENTS OR THE TECHNOLOGY --

16      LET'S SAY 3 PERCENT OF THE SALES, FOR EXAMPLE, AS A

17      TYPICAL ROYALTY.  AND YOU JUST APPLY THAT AGAINST THE

18      SALES.  SO THAT GIVES YOU A ROYALTY SCREEN OVER TIME.

19      AND YOU JUST DISCOUNT THAT BACK TO THE PRESENT USING

20      NORMAL DISCOUNT AND CASH FLOW TECHNIQUES TO GET IT AT

21      PRESENT VALUE.  AND THAT REPRESENTS THE NET PRESENT

22      VALUE OF THE ROYALTY STREAM.

23  Q.  ALL RIGHT.  LET'S MOVE TO JOINT EXHIBIT 17.  THIS IS

24      A FEBRUARY 15TH, 1993, MEMORANDUM FROM YOU TO BILL

25      NORRIS.  ARE YOU FAMILIAR WITH THIS MEMO?

1   A.   YES.

2   Q.   THE "RE" LINE IS "FAIR MARKET VALUE OF PATENT

3        PORTFOLIO ROYALTY STREAM INTANGIBLE SECURITIZATION

4        PROJECT."  WHAT DOES INTANGIBLE SECURITIZATION

5        PROJECT REFER TO?

6   A.   THAT'S THE INTANGIBLE FINANCING -- THE CHEMTECH

7        PROJECT.

8   Q.   THE SECOND SENTENCE OF THE FIRST PARAGRAPH OF THIS

9        EXHIBIT, JOINT EXHIBIT 17, STATES THAT, "THE

10       DISCOUNTED NET PRESENT VALUE (AT 12 PERCENT) OF THE

11       ROYALTY STREAM FROM THESE PATENTS IS CURRENTLY AT

12       $814 MILLION FOR THE 62 PATENT GROUPS."  DO YOU KNOW

13       WHETHER THIS VALUATION RELATES TO THE SAME SET OF

14       PATENTS ADDRESSED IN THE FEBRUARY 8TH, 1993,

15       MEMORANDUM THAT WE JUST LOOKED AT?

16  A.   IT'S PROBABLY A SIMILAR GROUP.  AS I MENTIONED, THE

17       FINAL LIST WAS INFLUX AT THIS TIME, SO THERE WAS

18       STUFF GOING IN AND OUT.  BUT IN GENERAL, IT'S

19       PROBABLY A SIMILAR LIST.

20  Q.   AND WHAT DOES THE 12 PERCENT REFER TO?

21  A.   THAT'S THE DISCOUNT RATE THAT'S USED TO DISCOUNT

22       THOSE FUTURE CASH FLOWS BACK TO THE PRESENT.

23  Q.   WHY DID YOU CHOOSE THAT DISCOUNT RATE OF 12 PERCENT

24       FOR THIS PURPOSE?

25  A.   TWELVE (12) PERCENT PROBABLY REPRESENTED AT THIS TIME

1          THE WEIGHTED AVERAGE COST OF CAPITAL FOR DOW

2          CHEMICAL.

3    Q.    COULD YOU BRIEFLY DESCRIBE WHAT THAT MEANS -- THE

4          WEIGHTED AVERAGE COST OF CAPITAL?

5    A.    IN VALUATION THEORY, THE WEIGHTED AVERAGE COST OF

6          CAPITAL IS WHAT YOU USE FOR A COMPANY WHEN YOU'RE

7          VALUING A COMPANY OR FOR A BUSINESS WHEN YOU'RE

8          VALUING A BUSINESS.  AND WHAT IT IS IS THERE'S TWO

9          COMPONENTS; THERE'S AN EQUITY COMPONENT AND A DEBT

10         COMPONENT.  SO YOU USE THE COST OF EQUITY AND THE

11         COST OF DEBT, WEIGHTED AT THE SPECIFIC RATIOS THAT

12         DEBT AND EQUITY ARE WITHIN THE CORPORATE STRUCTURE.

13         SO WITH DOW, IT MIGHT HAVE BEEN 60/40 PR 70/30.

14         LET'S SAY 70 PERCENT EQUITY AND 30 PERCENT DEBT.  A

15         TYPICAL COST OF EQUITY WOULD BE, LET'S SAY, 15 TO 18

16         PERCENT, WHEREAS A TYPICAL COST OF DEBT MIGHT BE SIX-

17         TO-EIGHT PERCENT.  AND SO YOU AVERAGE THOSE BASED ON

18         THE WEIGHTS OF THE CAPITAL STRUCTURE AND YOU COME OUT

19         WITH SOMETHING LIKE THE 12 PERCENT THAT WE WERE

20         UTILIZING HERE.

21   Q.    ALL RIGHT.  AT THIS TIME IN FEBRUARY OF 1993, WERE

22         THERE ANY EXTERNAL CONSULTANTS INVOLVED IN THE

23         VALUATION PROCESS WITH RESPECT TO THE CHEMTECH

24         PATENTS?

25   A.    AT THE -- AT THE TIME THAT WE WERE DOING THESE MEMOS,

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 221 of 318

1       IT WAS STRICTLY INTERNAL.  BUT LATER ON, I THINK AT

2       THE END OF FEBRUARY THEY HIRED ARTHUR D. LITTLE AS

3       AN INDEPENDENT CONSULTANT TO DO THEIR OWN VALUATION.

4    Q. LET'S FOCUS ON ARTHUR D. LITTLE FOR A MOMENT.  I'LL

5       JUST USE ADL FOR SHORTHAND.  HAD YOU OR OTHERS AT DOW

6       WORKED WITH ADL BEFORE YOU ENGAGED THEM ON THE

7       CHEMTECH TRANSACTION?

8    A. I HADN'T, BUT THE PATENT DEPARTMENT HAD WORKED WITH

9       ARTHUR D. LITTLE BEFORE.

10   Q. DO YOU KNOW WHY ADL WAS SELECTED TO VALUE THE PATENTS

11      CONTRIBUTED TO CHEMTECH?

12   A. ARTHUR D. LITTLE HAS EXTENSIVE CHEMICAL PRACTICE, SO

13      THEY HAD A LOT OF PEOPLE FROM THE CHEMICAL INDUSTRY

14      WORKING FOR THEM IN -- IN THEIR CHEMICAL PRACTICE

15      THAT HAD KNOWLEDGE OF PROCESSES AND TECHNOLOGY AND

16      ALL THAT.  AND SEPARATELY, THEY HAD A VALUATION GROUP

17      THAT DID VALUATIONS.  AND SO I THINK COMBINED THEY

18      HAD GOOD EXPERTISE.

19   Q. WHAT ROLE DID YOU PLAY IN ASSISTING ADL DURING THE

20      VALUATION PROCESS?

21   A. I WAS THE LIAISON, I GUESS, BETWEEN THE DOW CHEMICAL

22      COMPANY AND ARTHUR D. LITTLE.  SO WHEN THEY HAD

23      QUESTIONS ABOUT BUSINESSES, ABOUT PROFITS, FORECASTS,

24      WHATEVER, IT WAS KIND OF MY JOB TO SET UP MEETINGS

25      WITH PEOPLE IN THE DOW CHEMICAL COMPANY THAT COULD

1        ANSWER THOSE QUESTIONS.

2   Q.   YOU MENTIONED SETTING UP MEETINGS WITH PEOPLE IN THE

3        DOW CHEMICAL COMPANY.  CAN YOU JUST DESCRIBE WHAT THE

4        DIFFERENT FUNCTIONS WERE WITHIN DOW WHO WERE INVOLVED

5        IN ASSISTING ADL?

6   A.   WHAT WE HAD WERE USUALLY THE PATENT ATTORNEY RELATED

7        TO THE PARTICULAR BUSINESS, THE INTELLECTUAL ASSET

8        MANAGER FROM THE PARTICULAR BUSINESS, MAYBE A

9        RESEARCHER WHO WAS FAMILIAR WITH THE TECHNOLOGY,

10       SOMEBODY FROM MANUFACTURING, YOU KNOW, WHO KNEW WHAT

11       TECHNOLOGY WAS USED IN MANUFACTURING PLANTS, USUALLY

12       A TECH CENTER PERSON, AND THEN SOMEBODY FROM THE

13       COMMERCIAL SIDE -- A MARKETING KIND OF PERSON, AND

14       MAYBE THE ECONOMIC PLANNER FOR THE BUSINESS ITSELF.

15       SO BETWEEN SIX AND EIGHT DIFFERENT PEOPLE FROM DOW

16       MEETING WITH MAYBE THREE DIFFERENT PEOPLE FROM ARTHUR

17       D. LITTLE.

18  Q.   ALL RIGHT.  YOU MENTIONED THE MANUFACTURING TECH

19       CENTERS.  CAN YOU EXPLAIN WHAT THE TECH CENTERS WERE?

20  A.   DOW HAS THESE MANUFACTURING TECHNOLOGY CENTERS FOR

21       EACH SEPARATE VALUE CENTER OR MANUFACTURING PROCESS.

22       AND IT'S THEIR JOB TO UNDERSTAND THE LATEST

23       TECHNOLOGY AND DOW'S TECHNOLOGY FOR PRODUCING THE

24       PARTICULAR PRODUCT INVOLVED.  AND WHAT THEY DID WAS

25       ACT AS A FLEXION POINT FOR TECHNOLOGY AND THEN AS A

1       DISSEMINATION POINT TO DISSEMINATE.  SO WE MIGHT HAVE

2       SIX DIFFERENT PLANTS AROUND THE WORLD PRODUCING

3       POLYETHYLENE, AND THEY WOULD HAVE REALTIME ACCESS TO

4       PLANT INFORMATION.  AND WHEN THEY WOULD MAKE AN

5       IMPROVEMENT IN ONE PLANT, IF IT TURNED OUT TO BE A

6       GOOD IMPROVEMENT, THEN THEY WOULD DISSEMINATE THAT TO

7       THE OTHER FIVE PLANTS AROUND THE WORLD, SO THAT ALL

8       OF THE PLANTS WERE AT THE SAME HIGH LEVEL OF

9       TECHNOLOGY.

10  Q.  YOU MENTIONED INTELLECTUAL ASSET MANAGEMENT.  CAN YOU

11      DESCRIBE THE ROLE OF THAT FUNCTION AT DOW?

12  A.  THESE TECH CENTERS THAT I TALKED ABOUT JUST NOW WERE

13      MANUFACTURING FUNCTION.  AND SEPARATELY, AND WITHIN

14      THE RESEARCH FUNCTION, USUALLY CHEMISTS ACTED AS

15      INTELLECTUAL ASSET MANAGERS FOR THE SAME BUSINESS.

16      AND IT WAS THEIR JOB TO UNDERSTAND DOW'S PORTFOLIO OF

17      PATENTS RELATED TO THE TECHNOLOGY, AND ALSO SOME IDEA

18      OF THE COMPETITORS PATENT POSITION AND WHERE

19      RESEARCH, YOU KNOW, SHOULD BE FOCUSED TO FILL IN GAPS

20      OR TO KEEP US ON THE LEADING EDGE.

21  Q.  WERE THERE PARTICULAR MANAGERS WITHIN INTELLECTUAL

22      ASSET MANAGEMENT THAT WERE RESPONSIBLE FOR THE

23      CHEMTECH PARTNERSHIP?

24  A.  WITHIN INTELLECTUAL ASSET MANAGERS FUNCTION AT THIS

25      TIME, I THINK GORDON PATRIKIS WAS THE LEADER, AND

```
 1         THEN UNDER HIM WERE SHARON ORIEL AND PHIL BARNETT
 2         THAT HAD -- ONE OF THEM HAD THE CHEMICALS AND ONE OF
 3         THEM HAD THE PLASTICS, AND THEN UNDERNEATH THEM WOULD
 4         BE INTELLECTUAL ASSET MANAGERS FOR ALL THE DIFFERENT
 5         BUSINESSES.
 6    Q.   YOU MENTIONED MARKETING PERSONNEL AND ECONOMIC
 7         PLANNERS WITHIN THE BUSINESSES.  WHAT ROLE DID THESE
 8         INDIVIDUALS PLAY IN THE VALUATION PROCESS, IF ANY?
 9    A.   WELL, THE MARKETING MANAGER WOULD HAVE AN IDEA OF,
10         YOU KNOW, WHAT CUSTOMERS WERE LOOKING FOR, WHAT
11         VOLUME KIND OF INCREASES OR FORECAST, THE MARKET
12         SHARE AND PRICING, YOU KNOW, GOING FORWARD.  AND THEN
13         THE ECONOMIC PLANNER WOULD PROBABLY HAVE FORECASTS
14         FOR THE BUSINESS THAT WENT OUT, YOU KNOW, TEN -- TEN
15         YEARS OR SO.
16    Q.   I'D LIKE TO TURN, PLEASE, TO JOINT EXHIBIT 49.  THIS
17         IS AN APRIL 18$^{TH}$, 1993, MEMO FROM YOU TO PHIL BARNETT,
18         BILL NORRIS, SHARON ORIEL, AND CAROL SOLANO.  ARE YOU
19         FAMILIAR WITH THIS DOCUMENT?
20    A.   YES.
21    Q.   WE'VE ALREADY MENTIONED PHIL BARNETT, BILL NORRIS,
22         AND SHARON ORIEL.  WHO IS CAROL SOLANO?
23    A.   CAROL SOLANO WAS A PARALEGAL WORKING FOR BILL NORRIS
24         WITHIN THE PATENT DEPARTMENT.
25    Q.   OKAY.  THE "RE" LINE OF THE LETTER REFERS TO "TECH
```

1      CENTER VALUATION ON QUANTIFYING BENEFITS OF THE

2      ORIGINAL PATENT LIST."  WHAT DOES THE ORIGINAL PATENT

3      LIST REFER TO?

4  A.  THE LIST OF PATENTS THAT WAS CONTRIBUTED TO CHEMTECH.

5  Q.  LET'S TURN TO THE SECOND AND THIRD PAGES OF JOINT

6      EXHIBIT 49, BATES ENDING 20378 AND 79.  THIS IS ONE

7      OF THE ATTACHMENTS TO YOUR APRIL 18TH, 1993, MEMO.

8      IT'S AN APRIL 14TH, 1993, MEMO FROM YOU TO TECHNOLOGY

9      CENTER MANAGERS.  ARE YOU FAMILIAR WITH THIS MEMO?

10 A.  YES.

11 Q.  THE FIRST PARAGRAPH STATES, "DOW IS UNDERTAKING A

12     FINANCING PROJECT IN WHICH WE ARE COLLATERALIZING

13     INTANGIBLE ASSETS, PATENTS.  THAT IS, WE ARE

14     CONTRIBUTING TECHNOLOGY, PATENTS, AS OUR EQUITY

15     CONTRIBUTION TO A PARTNERSHIP."  THIS IS REFERRING TO

16     CHEMTECH?

17 A.  YES.

18 Q.  THIS APRIL 14TH MEMO LAYS OUT A NUMBER OF QUESTIONS TO

19     BE ANSWERED BY THE TECH CENTERS.  CAN YOU DESCRIBE

20     GENERALLY THE PURPOSE FOR SEEKING THIS INFORMATION?

21 A.  AT THIS TIME, ARTHUR D. LITTLE HAD DONE A LOT OF WORK

22     IN VALUING THE PATENTS, AND THEY HAD FURTHER

23     QUESTIONS WHICH ARE KIND OF SUMMARIZED HERE.  AND THE

24     IDEA WAS TO HELP THEM TO ESTABLISH TECH FACTORS OR

25     CONTRIBUTION MARGINS OF THE TECHNOLOGY CONTRIBUTIONS

```
 1        TO THE BUSINESS.

 2   Q.   OKAY.  I'M GOING TO -- WE'RE GOING TO COME BACK AND

 3        DISCUSS A LITTLE BIT LATER THE DETAILS OF THAT -- OF

 4        THE CONTRIBUTION MARGINS, THE TECH FACTORS.  BUT FOR

 5        NOW I'M GOING TO FOCUS ON THIS MEMO.  AND I JUST WANT

 6        TO LOOK -- I SEE THAT THE MEMO IS TITLED "RUSH TO

 7        DESK."  IT SEEMS TO SOLICIT A RESPONSE WITHIN ONE

 8        DAY.  AND THEN IN ADDITION, IF YOU LOOK DOWN TO THE

 9        BOTTOM OF BATES PAGE 20379, THERE'S A HANDWRITTEN

10        NOTE THAT I BELIEVE STATES, "THERE ARE SOME

11        EXTERNALLY IMPOSED TIME FRAMES THAT REQUIRE US TO

12        ASSEMBLE THE DATA THIS WEEK."  WHY WERE YOU IMPOSING

13        SUCH A TIGHT DEADLINE?

14             BY THE COURT:

15                  WAIT.  DON'T ANSWER THE QUESTION.

16             BY MR. WELSH:

17                  OBJECTION, YOUR HONOR.  I DON'T THINK HE'S

18             IDENTIFIED WHO WROTE THAT.

19             BY THE COURT:

20                  WELL, WHY DON'T WE LAY A FOUNDATION, MR.

21             BLANCHARD.

22             BY MR. BLANCHARD:

23                  SURE.

24   BY MR. BLANCHARD:

25   Q.   LOOKING TO THAT HANDWRITING, MR. VALENZUELA, ARE YOU
```

1       AWARE -- YOU SEE THAT THERE'S A SIGNATURE -- NOT

2       PERHAPS THE MOST LEGIBLE SIGNATURE AT THE BOTTOM OF

3       THE HANDWRITING.  ARE YOU AWARE WHO WROTE THIS --

4   A.  YES.

5   Q.  -- HANDWRITTEN NOTE?  WHO WAS IT?

6   A.  BILL KNEE.

7   Q.  AND WHO WAS BILL KNEE?

8   A.  BILL KNEE WAS THE MANAGER OF ALL THE TECHNOLOGY

9       CENTERS.

10  Q.  OKAY.

11  A.  HE WAS THE ONE THAT CO-SIGNED THIS LETTER, ALONG WITH

12      ME AND PAUL BRINK.

13          BY MR. BLANCHARD:

14              AND REALLY, I JUST HAVE A MORE GENERAL

15          QUESTION, YOUR HONOR, IF I MAY.  IT'S JUST WHY

16          WAS THE TIGHT FRAME -- WHY WAS THERE A TIGHT

17          TIME FRAME HERE?

18  BY THE WITNESS:

19  A.  I THINK WE HAD ESTABLISHED APRIL 30TH AS THE DEADLINE

20      TO COME UP WITH A VALUATION FOR THESE PATENTS.

21      ARTHUR D. LITTLE HAD BEEN WORKING SINCE THE END OF

22      FEBRUARY, SO THEY WERE GIVEN, YOU KNOW, MARCH AND

23      APRIL TO COME UP WITH A VALUATION.

24  BY MR. BLANCHARD:

25  Q.  OKAY.  TURNING BACK NOW TO YOUR APRIL 18TH MEMO -- THE

1    APRIL 18TH, 1993, MEMO THAT'S THE COVER MEMO THAT WE

2    LOOKED AT A MINUTE, BATES ENDING 20377.  AND THE VERY

3    LAST SENTENCE INDICATES THAT, "ALSO ATTACHED ARE

4    COPIES OF THE TECH CENTER ANSWERS I HAVE RECEIVED TO

5    DATE."  IS THAT REFERRING TO THE ANSWERS TO THE RUSH-

6    TO-DESK MEMO THAT WE JUST LOOKED AT?

7  A.  YES.

8  Q.  I WANT TO TAKE A LOOK AT JUST ONE OF THESE RESPONSES,

9    JUST BY WAY OF EXAMPLE, SO THAT YOU CAN DESCRIBE WHAT

10   THE PURPOSE OF IT -- OF THESE COMMUNICATIONS WERE.

11   LET'S PULL UP BATES 20387.  THIS IS ATTACHED TO YOUR

12   APRIL 18TH, 1993, MEMO.  IT'S A MEMO TO YOU FROM AN

13   EMPLOYEE WITHIN THE HIGH PRESSURE POLYETHYLENE

14   TECHNOLOGY CENTER.  CAN YOU JUST BRIEFLY EXPLAIN THE

15   SIGNIFICANCE OF THIS DOCUMENT?

16 A.  THIS IS IN ANSWER TO SOME OF THE QUESTIONS THAT WE

17   HAD ASKED.  WHAT DOES THE PATENT CONTRIBUTE TO THE

18   BUSINESS?  AND IT LOOKS LIKE THIS PARTICULAR ONE IS A

19   COST SAVINGS OF THIS TWO CENTS A POUND DOWN -- DOWN

20   IN 3-A.  AND IT PROVIDES MORE INFORMATION THAT ARTHUR

21   D. LITTLE WOULD USE IN THEIR CONTRIBUTION MARGIN

22   METHODOLOGY.

23 Q.  LET'S TURN TO JOINT EXHIBIT 76.  THIS IS A JUNE 4TH,

24   1993, MEMO FROM YOU TO BILL CURRY, ENTITLED

25   "COMPARISONS OF ADL ROYALTY SAVINGS APPROACH WITH ADL

1    CONTRIBUTION MARGIN APPROACH." ARE YOU FAMILIAR WITH

2    THIS DOCUMENT?

3  A.  YES.

4  Q.  THE FIRST SENTENCE OF YOUR MEMO INDICATES THAT, "ADL

5    USED TWO APPROACHES TO THE VALUATION OF THE

6    TECHNOLOGY DESCRIBED IN OUR PATENTS." WHAT I WANT TO

7    DO NOW IS JUMP DOWN A COUPLE OF SENTENCES AND DISCUSS

8    THE SECOND METHODOLOGY FIRST. "METHOD 2 WAS TO USE

9    INDUSTRY GUIDELINES ON COMPARABLE TECHNOLOGIES TO

10    ESTIMATE THE APPROPRIATE ROYALTY, EITHER BASED ON

11    SALES DOLLARS OR PRODUCTION VOLUME. THIS METHOD WAS

12    REFERRED TO AS THE ROYALTY SAVINGS APPROACH." HOW

13    DID ADL'S ROYALTY SAVINGS APPROACH COMPARE GENERALLY

14    WITH THE METHODOLOGY DESCRIBED IN THE FEBRUARY 1993

15    MEMORANDA WE LOOKED AT EARLIER TODAY?

16  A.  IT'S BASICALLY THE SAME METHOD. THEY WOULD HAVE JUST

17    USED THEIR ESTIMATE OF WHAT AN INDUSTRY STANDARD

18    ROYALTY WAS, WHEREAS WE WOULD HAVE USED OUR, YOU

19    KNOW, DOW'S ESTIMATE OF THE INDUSTRY STANDARD

20    ROYALTY. BUT THE SALES METHOD AND THE MULTIPLICATION

21    AND THE DISCOUNTED CASH FLOW IS ALL -- ALL THE SAME.

22  Q.  ALL RIGHT. AND LOOKING BACK TO THE FIRST PARAGRAPH

23    OF JOINT EXHIBIT 76, BEGINNING WITH THE SECOND

24    SENTENCE YOU STATE THAT, "METHOD 1 WAS TO ATTRIBUTE

25    SOME PORTION OF THE PROFITS OF A PARTICULAR BUSINESS

1    TO THE INTANGIBLES IN QUESTION.  THIS WAS REFERRED TO

2    AS THE CONTRIBUTION MARGIN APPROACH." CAN YOU

3    EXPLAIN HOW THE CONTRIBUTION MARGIN APPROACH DIFFERED

4    FROM THE ROYALTY SAVINGS APPROACH?

5  A.  IN THE ROYALTY SAVINGS APPROACH YOU BASICALLY HAVE

6    THE SALES FORECAST AND THEN THIS ESTIMATED ROYALTY

7    THAT YOU MULTIPLY AGAINST THE SALES TO GET A ROYALTY

8    CASH FLOW PER YEAR THAT YOU DISCOUNT BACK.  IN THE

9    CONTRIBUTION MARGIN APPROACH, YOU HAVE A MUCH MORE

10    DETAILED INCOME STATEMENT FOR THE BUSINESS.  SO

11    YOU'VE GOT SALES, OF COURSE, AND VOLUME, AND THEN

12    YOU'VE ALSO GOT COST OF SALES, SELL IN GENERAL, AND

13    ADMIN EXPENSES, LEADING YOU TO AN OPERATING MARGIN.

14    AND THEN YOU'VE GOT BELOW-THE-LINE EXPENSES THAT GET

15    YOU TO A PROFIT BEFORE TAX.  THEN YOU'VE GOT A TAX

16    LINE THAT GETS YOU THE PROFIT AFTER TAX.  AND THEN IF

17    THERE'S ANY CASH-FLOW ITEMS LIKE CAPITAL EXPENDITURES

18    THAT NEEDED TO BE ADDED OR SUBTRACTED FROM THAT

19    PROFIT AFTER TAX, YOU EVENTUALLY WIND UP WITH THIS

20    CASH FLOW AFTER TAX THAT THEN GETS DISCOUNTED BACK TO

21    THE PRESENT.  SO THAT GIVES YOU A VALUE FOR THE

22    BUSINESS.  AND NOW YOU HAVE TO DECIDE HOW MUCH OF

23    THAT VALUE CAN BE ATTRIBUTED TO THE TECHNOLOGY THAT

24    THE PATENTS REPRESENT WITHIN THAT BUSINESS.  THAT'S

25    BASICALLY THE CONTRIBUTION MARGIN APPROACH.

1    Q.    AND HOW WAS THAT CONTRIBUTION FACTOR ESTABLISHED;

2          THAT IS TO SAY, HOW WAS IT DETERMINED WHAT PORTION OF

3          THE BUSINESS WAS ATTRIBUTABLE TO THE VALUE OF THE

4          PATENT?

5    A.    BASED ON ATTRIBUTES OF THE TECHNOLOGY, KIND OF IN

6          ANSWER TO THE QUESTIONS FROM SOME OF THOSE PREVIOUS

7          MEMOS.  YOU KNOW, JUST THE -- DO THE PATENTS OR THE

8          TECHNOLOGY CONTRIBUTE TO VOLUME, CONTRIBUTE TO PRICE,

9          CONTRIBUTE TO COSTS.  YOU KNOW, WHERE -- WHERE IS THE

10         VALUE OF THE TECHNOLOGY IMPACT TO BUSINESS.  AND

11         THAT'S KIND OF HOW ARTHUR D. LITTLE WOULD DETERMINE

12         THEIR FRACTION.

13   Q.    TURNING TO THE SECOND PAGE OF JOINT EXHIBIT 76, BATES

14         ENDING 20310, SECOND TO LAST PARAGRAPH, LAST

15         SENTENCE, YOU STATE THAT, "ADL IS CORRECT IN MY

16         OPINION IN STATING THAT THE INDUSTRY GUIDELINES IS

17         THE WEAKER APPROACH TO VALUING SOME OF THESE SPECIAL

18         SITUATIONS."  WHAT WAS YOUR UNDERSTANDING OF ADL'S

19         REASONING FOR PREFERRING THE CONTRIBUTION MARGIN

20         APPROACH?

21   A.    WELL, THERE'S TWO REASONS.  ONE IS THAT THE

22         CONTRIBUTION MARGIN APPROACH IS MUCH MORE DETAILED IN

23         TERMS OF THE WAY THAT YOU LOOK AT THE BUSINESS AND

24         THE WAY YOU LOOK AT THE TECHNOLOGY.  AND THE OTHER IS

25         THAT IN THE ROYALTY SAVINGS APPROACH YOU'RE TAKING

1    KIND OF AN AVERAGE ROYALTY RATE FOR THE TECHNOLOGY.

2    SO IT DOESN'T TAKE INTO ACCOUNT KIND OF UNIQUE,

3    ABOVE-AVERAGE SITUATIONS OR UNIQUE, BELOW-AVERAGE

4    SITUATIONS.  YOU'RE KIND OF LOOKING AT INDUSTRY

5    STANDARD AVERAGE-SORT OF RATES.

6  Q.  AND WHAT WOULD BE AN EXAMPLE OF A UNIQUE OR UNUSUAL

7    AND VALUABLE TECHNOLOGY?

8  A.  ON THE LIST ON THE FOLLOWING PAGE ---

9  Q.  LET'S ALL BE SURE WE'RE ON THE SAME PAGE.  SO THE

10   BATES NUMBER THERE?

11 A.  20311.  THE ESSEX GROUP OF PATENTS WOULD HAVE BEEN

12   UNIQUE.

13 Q.  OKAY.  AND LET'S JUST BE SURE WE SEE WHAT YOU'RE

14   LOOKING AT HERE.  IT'S A LITTLE BIT OF A DIFFICULT

15   SPREADSHEET TO READ HERE.  BUT IT LOOKS LIKE -- ARE

16   YOU LOOKING TO THE UNIT NUMBER 18?

17 A.  RIGHT.  THE -- THE FOURTH COLUMN, UNIT NUMBER 18,

18   ESSEX.  THAT GROUP OF PATENTS IS WORTH $107 MILLION

19   IN THAT FIRST CONTRIBUTION MARGIN DOW COLUMN.  AND

20   THE ESSEX PACKAGE WERE ONE OF THOSE UNIQUE ---

21 Q.  AND AGAIN, THE IMPORT OF THAT, MY UNDERSTANDING IS

22   THAT AN INDUSTRY ROYALTY RATE WOULD UNDERSTATE THE

23   VALUE OF THAT PATENT?

24 A.  RIGHT.  WHAT ESSEX HAD WAS A PROCESS AND A BUNCH OF

25   PATENTS THAT COVERED THE PROCESS FOR ADHERING WINDOWS

1    -- WINDSHIELDS ON CARS.  AND WHAT THEY CAME UP WITH

2    WAS A POLYURETHANE ADHESIVE SYSTEM AND ON THE

3    MANUFACTURING LINE.  YOU COULD JUST TAKE A CAULKING

4    GUN FILLED WITH THIS AND YOU RAN A BEAD AROUND THE

5    METAL PART OF THE -- WHERE THE WINDSHIELD GOES, AND

6    THEN YOU JUST SLAP THE WINDSHIELD ON BY HAND.  AND

7    THAT ADHESIVE NOT ONLY GLUED THE WINDSHIELD, BUT IT

8    PROVIDED A WEATHER STRIPPING AT THE SAME TIME.  AND

9    IT KIND OF REVOLUTIONIZED THE WAY THAT THE AUTOMOTIVE

10   COMPANIES PUT THE WINDSHIELDS ON CARS.  SO IT WAS

11   UNIQUE; IT WAS SPECIALIZED.  THEY HAD A BIG MARKET

12   SHARE.  AND SO IT WAS AN ABOVE-AVERAGE KIND OF A

13   ROYALTY -- HIGHLY VALUABLE TECHNOLOGY.

14 Q.  LET'S TURN BRIEFLY BACK TO THE FIRST PAGE OF JOINT

15   EXHIBIT 76, AT BATES 20309.  THERE'S A REFERENCE HERE

16   TO DEFENSIVE TECHNOLOGIES.  WHAT'S A DEFENSIVE

17   TECHNOLOGY?

18 A.  DEFENSIVE TECHNOLOGY ARE PATENTS -- IS WHERE YOU HAVE

19   A GROUP OF PATENTS BUT YOU'RE NOT PRACTICING THEM.

20   YOU JUST HAVE THEM SO THAT -- TO PREVENT OTHER PEOPLE

21   FROM PRACTICING IN A GIVEN AREA.  I THINK NOWADAYS

22   IT'S UTILIZED IN THE SEMICONDUCTOR INDUSTRY QUITE A

23   BIT.

24 Q.  AND WHAT'S AN EXAMPLE OF A COST-SAVING TECHNOLOGY I

25   SEE REFERRED TO HERE?

1  A.   ONE THAT REDUCES THE COSTS.  SO SOME OF THESE WOULD

2       EFFECT VOLUME OR EFFECT THE PRICE OR THE MARKETS THAT

3       YOU COULD GET INTO.  BUT THE COST SAVING ONE JUST

4       REDUCES THE COST TO PRODUCE A PRODUCT.

5  Q.   OKAY.  LET'S TURN TO JOINT EXHIBIT 56.  IT'S A

6       RELATIVELY LENGTHY DOCUMENT, IF YOU COULD JUST PAGE

7       THROUGH IT AND LET ME KNOW IF YOU ARE FAMILIAR WITH

8       IT.

9  A.   YES.

10 Q.   AND WHAT IS THIS DOCUMENT?

11 A.   THIS WAS THE FINAL DOCUMENT THAT SUPPORTED ARTHUR D.

12      LITTLE'S VALUATION AS OF APRIL 30TH.

13 Q.   DO YOU KNOW WHAT METHODOLOGY ADL USED -- ADL

14      ULTIMATELY APPLIED IN VALUING ASSETS FOR THIS REPORT?

15 A.   THE CONTRIBUTION MARGIN APPROACH.

16 Q.   SO THAT TAKES CARE OF THE INITIAL VALUATION OF THE

17      PATENTS CONTRIBUTED TO CHEMTECH AS OF APRIL 30TH,

18      1993.  I WANT TO TURN NOW TO THE FOLLOW-UP VALUATION

19      THAT OCCURRED AS OF AUGUST 1993, AND I'M GOING TO

20      SHOW YOU EXHIBIT JX-98.  IF YOU'D LIKE TO TURN TO

21      BATES 19242, THE SECOND PAGE OF THAT EXHIBIT.  AND

22      THIS IS A JUNE 24TH, 1993 MEMO FROM YOU TO A LIST OF

23      DISTRIBUTEES THAT ARE ON THE FIRST -- LISTED ON THE

24      FIRST PAGE OF THE EXHIBIT.  ARE YOU FAMILIAR WITH

25      THIS DOCUMENT?

1   A.   YES.

2   Q.   THE "RE" LINE REFERS TO, "UPDATE OF APRIL 30TH, 1993,

3        ARTHUR D. LITTLE APPRAISAL."  WHAT'S YOUR

4        UNDERSTANDING OF WHY AN UPDATED APPRAISAL WAS BEING

5        PERFORMED?

6   A.   I THINK AT THIS TIME THE OUTSIDE INVESTORS WERE

7        COMING IN, SO THE PATENTS HAD TO BE VALUED AS OF THE

8        DATE THAT THE OTHER PARTNERS CAME IN.

9   Q.   WHAT, THEN, WAS THE PURPOSE OF THIS JUNE 24TH, 1993,

10       MEMO?

11  A.   TO DETERMINE WHAT HAD CHANGED BETWEEN APRIL 30TH AND

12       WHATEVER THIS NEXT VALUATION DATE WAS GOING TO BE

13       WITH RESPECT TO EITHER ECONOMIC CONDITIONS OR TO THE

14       INDIVIDUAL TECHNOLOGIES AND BUSINESSES THAT WERE

15       BEING VALUED.

16  Q.   ALL RIGHT.  LET'S REFER TO JOINT EXHIBIT 115.  THIS

17       IS A JULY 13TH, 1993 MEMO FROM YOU TO BILL CURRY, BILL

18       NORRIS, PHIL BARNETT, AND SHARON ORIEL.  ARE YOU

19       FAMILIAR WITH THIS DOCUMENT?

20  A.   YES.

21  Q.   WHAT WAS THE PURPOSE OF THIS DOCUMENT?

22  A.   WHAT THIS DOES IS SUMMARIZE ANSWERS TO THE QUESTIONS

23       THAT WE'D ASKED ABOUT WHAT'S CHANGED BETWEEN THE

24       APRIL 30TH VALUATION AND WHENEVER THIS WAS DONE,

25       EITHER LATE JUNE OR EARLY JULY.

1   Q.   AND TO WHAT EXTENT WERE THERE CHANGES THAT MIGHT

2        EFFECT THE VALUATION?

3   A.   IT LOOKS LIKE THIS SPECIFIES THAT THERE WERE CHANGES

4        PRIMARILY IN FOUR CASES, AND THEN IN THE OTHER CASES,

5        THERE WEREN'T SIGNIFICANT CHANGES.

6   Q.   LET'S TURN TO JOINT EXHIBIT 129.  JUST TAKE A MINUTE

7        TO LOOK THROUGH THAT AND LET ME KNOW IF YOU'RE

8        FAMILIAR WITH THAT DOCUMENT.

9   A.   YES.

10  Q.   AND WHAT IS THE DOCUMENT?

11  A.   THIS IS, AGAIN, ARTHUR D. LITTLE'S VALUATION, BUT AS

12       OF THE SECOND DATE.

13  Q.   ARE YOU FAMILIAR WITH THE METHODOLOGY THAT ADL USED

14       IN THIS VALUATION?

15  A.   YES.

16  Q.   WHAT METHODOLOGY DID THEY USE?

17  A.   THE SAME CONTRIBUTION MARGIN METHOD THAT WAS USED IN

18       THE APRIL 30TH ONE.

19  Q.   MR. VALENZUELA, IT'S A STIPULATED FACT IN THE CASE

20       THAT THE VALUE OF THE PATENTS INCREASED FROM THE

21       INITIAL VALUATION, RESULTING IN A MARK-TO-MARKET GAIN

22       OF $42 MILLION, APPROXIMATELY, FROM THE FIRST

23       VALUATION TO THE SECOND VALUATION.  DO YOU KNOW WHAT

24       CAUSED THIS INCREASE IN VALUE?

25  A.   NOT SPECIFICALLY, BUT WHATEVER HAD OCCURRED BETWEEN

1      APRIL 30TH AND THE SECOND DATE, AND PLUS THOSE FOUR

2      PORTFOLIOS THAT HAD CHANGES, YOU KNOW, PROBABLY

3      RESULTED IN THE CHANGE IN THE VALUE.  AND I GUESS IN

4      THIS CASE IT WAS HIGHER.

5  Q.  PLEASE TURN TO JOINT EXHIBIT 230.  AND AGAIN, JUST

6      TAKE A MINUTE TO FLIP THROUGH THE DOCUMENT AND LET ME

7      KNOW IF YOU ARE FAMILIAR WITH IT.

8  A.  YES.

9  Q.  WHAT'S YOUR UNDERSTANDING OF THE PURPOSE OF THE

10      DOCUMENT?

11  A.  THIS DOCUMENT WAS USED BY DOW'S INTELLECTUAL ASSET

12      GROUP TO DOCUMENT THE PROCESS OF CONTRIBUTION MARGIN.

13      AT THIS POINT, THEY CALLED IT THE TECH FACTOR METHOD,

14      BUT THAT WHOLE APPROACH TO DETERMINING THE VALUE OF

15      THE INTANGIBLES.

16  Q.  LET'S LOOK AT BATES ENDING 19020.  THE FOURTH

17      PARAGRAPH STATES THAT, "THE TECHNOLOGY FACTOR METHOD

18      IS OUTLINED IN MORE DETAIL BECAUSE IT IS THE BELIEF

19      OF THE INTELLECTUAL ASSET MANAGEMENT FUNCTION THAT

20      THIS TOOL MAY BE POTENTIALLY USEFUL IN A NUMBER OF

21      VALUATION CASES."  ARE YOU AWARE WHETHER DOW USED THE

22      METHODOLOGY FOR VALUATION PURPOSES BEYOND THE

23      CHEMTECH PARTNERSHIP CONTEXT?

24  A.  YES.  BASICALLY IT WAS USED FROM THEN ON AS A

25      VALUATION PROCESS, BOTH WITHIN DOW AND OUTSIDE DOW.

```
 1        I THINK SAM CURRY AND THE INTELLECTUAL ASSET GROUP
 2        TAUGHT CLASSES IN THE METHODOLOGY AND THEY DEVELOPED
 3        A COMPUTER PROGRAM AND SOLD IT TO VARIOUS PEOPLE,
 4        INCLUDING NASA.
 5   Q.   ALL RIGHT.  I'D LIKE TO TURN NOW, MR. VALENZUELA, TO
 6        SOME OF YOUR FUNCTIONS IN THE OPERATION -- THE
 7        ONGOING OPERATION OF THE CHEMTECH PARTNERSHIP.  AND I
 8        BELIEVE YOU MENTIONED AT THE OUTSET THAT YOU HAD A
 9        ROLE IN COMPUTING ROYALTIES UNDER THE PATENT LICENSE
10        AGREEMENT; IS THAT CORRECT?
11   A.   YES.
12   Q.   WHAT TYPES OF ROYALTIES DID THE LICENSE PROVIDE FOR,
13        IF YOU KNOW?
14   A.   EACH LICENSE HAD A MINIMUM ROYALTY AND THEN AN EARNED
15        ROYALTY.  AND THE EARNED ROYALTY, TO THE EXTENT IT
16        WAS GREATER THAN THE MINIMUM ROYALTIES WAS JUST
17        CALLED THE VARIABLE ROYALTY.
18   Q.   AND HOW WAS THE EARNED ROYALTY COMPUTED, JUST
19        GENERALLY?  WE'RE GOING TO GET INTO SPECIFICS, BUT
20        HOW DID THE EARNED ROYALTY DIFFER FROM THE MINIMUM
21        ROYALTY?
22   A.   THE ROYALTIES WERE UNIT ROYALTIES, BASED ON POUNDS.
23        AND SO IF THE POUNDS PRODUCED -- ACTUAL POUNDS TIMES
24        THE ROYALTY RATES.  IF THE NUMBER WAS GREATER THAN
25        THE MINIMUM ROYALTY, THEN YOU'D HAVE AN EARNED
```

1    ROYALTY THAT WAS GREATER.

2  Q.  ALL RIGHT.  AND WHEN YOU MADE REFERENCE TO POUNDS

3    PRODUCED, DOES THAT REFER TO A VOLUME BASED ROYALTY

4    THAT'S KNOWN AS QUANTITY OF PRODUCT MANUFACTURED, OR

5    QPM?

6  A.  YES.

7  Q.  ALL RIGHT.  I'D LIKE TO START WITH MINIMUM ROYALTIES.

8    HOW ARE THOSE DETERMINED?

9  A.  WHAT IS VALUED FOR EACH PATENT GROUP WAS THE NET

10    PRESENT VALUE, OR DISCOUNTED CASH FLOW OF THE

11    TECHNOLOGY CONTRIBUTION OF THE BUSINESS OVER A

12    SPECIFIC PATENT'S LIFE.  SO LET'S SAY THERE WERE 15

13    YEARS OF PATENT LIFE, SO YOU HAD THIS NPP THAT

14    REPRESENTED 15 YEARS.  AND WHAT YOU WOULD THEN DO IS

15    TAKE THAT NET PRESENT VALUE -- FIRST YOU'D ESTABLISH

16    A LICENSE AND THE LICENSE GENERALLY WENT FOR 80

17    PERCENT OF THAT PATENT LIFE.  SO NOW YOU'VE GOT,

18    LET'S SAY, A 12 OR 13 YEAR LICENSE.  AND NOW YOU

19    AMORTIZE THAT AT SOME INTEREST RATE THAT'S APPLICABLE

20    OVER THE 12 YEARS TO GET AN ANNUAL ROYALTY.  WHICH,

21    IF YOU MULTIPLY THE ANNUAL MINIMUM ROYALTIES TIMES

22    THE INTEREST RATE, TIMES THE YEARS, THEN YOU WOULD

23    GET BACK THE NET PRESENT VALUE OF THAT PERIOD OF

24    TIME.  SO THAT'S HOW THE ANNUAL MINIMUM ROYALTIES

25    WERE ESTABLISHED.

1    Q.    ALL RIGHT.  AND WE DISCUSSED THAT EARNED ROYALTIES

2          WERE VOLUME ROYALTIES TIED TO THE QUANTITY OF PRODUCT

3          MANUFACTURED.  IF WE COULD TURN BRIEFLY TO JOINT

4          EXHIBIT 2-O.  IT MAY APPEAR AS JOINT EXHIBIT 20, BUT

5          IT'S ACTUALLY 2-O.  AND THIS IS THE PATENT LICENSE

6          AGREEMENT.  I WANT TO LOOK AT ONE OF THE APPENDICES

7          WITHIN THIS AGREEMENT, WHICH ACTUALLY BEGINS ON BATES

8          ENDING 36728.  LET ME KNOW WHEN YOU'RE THERE, AND

9          HOPEFULLY IT'LL POP UP ON YOUR SCREEN AS WELL.

10   A.    OKAY.

11   Q.    AND LET ME ASK YOU FIRST: DID YOU USE THESE

12         APPENDICES IN CONNECTION WITH YOUR WORK IN COMPUTING

13         ROYALTIES UNDER THE PATENT LICENSE?

14   A.    YES, THESE WERE THE OFFICIAL DOCUMENTS THAT HAD --

15         THIS VOLUME STEPS ON THE LEFT AND THEN THE UNIT

16         VOLUME ROYALTY THAT WENT WITH THE VOLUME STEPS.

17   Q.    OKAY.  I'D LIKE TO FOCUS ON THE EARNED ROYALTY AND

18         THIS COMPUTATION OF WHAT YOU REFERRED TO AS THE

19         VOLUME STEPS.  SO IF YOU COULD LOOK -- AND WE SEE

20         HERE THAT THERE IS A PORTFOLIO GROUP LISTED, BONDED

21         ASBESTOS DIAPHRAGM, IF I'M READING IT CORRECTLY.  AND

22         THEN FURTHER DOWN THAT COLUMN IS A HEADER FOR

23         PORTFOLIO ROYALTY RATE.  AND THERE'S A FORMULA --

24         WHAT LOOKS LIKE A VOLUME FORMULA BELOW THAT HEADER.

25         COULD YOU WALK US THROUGH THE FORMULA AND EXPLAIN HOW

1   THAT WORKS?

2   A.   YES, WHAT WE TALKED ABOUT WAS THE ANNUAL MINIMUM

3        ROYALTY, AND THE MINIMUM ROYALTY IS WHAT YOU GET JUST

4        BY MULTIPLYING THAT FIRST LINE -- THE 6.8 BILLION

5        POUNDS TIMES THE $.0003 CENTS PER POUND OR DOLLARS

6        PER POUND.  NOW, IF THE ACTUAL VOLUMES PRODUCED WERE

7        LESS THAN 6.8 BILLION POUNDS, THEN THAT 0003 RATE

8        APPLIED.  BUT IF THE VOLUMES WERE GREATER THAN 6.8

9        AND LESS THAN 7.1, THEN A DIFFERENT -- A LOWER

10       ROYALTY RATE APPLIED.  AND THEN IF THE VOLUME WAS

11       GREATER THAN 7.1, A DIFFERENT ROYALTY RATE APPLIED.

12       AND SO DEPENDING ON ACTUAL VOLUME, THEN YOU'D

13       MULTIPLY THOSE NUMBERS TOGETHER -- THE VOLUME TIMES

14       THE DIFFERENT ROYALTY RATES TO CALCULATE THE EARNED

15       ROYALTY FOR A SPECIFIC PERIOD, BASED ON ACTUAL QPM

16       VOLUMES.

17   Q.   NOW, IN TERMS OF THE ACTUAL QPM VOLUMES, YOU

18       MENTIONED THAT YOU WERE INVOLVED IN THE PROCESS OF

19       COMPUTING THOSE.  COULD YOU PLEASE DESCRIBE WHAT YOUR

20       ROLE WAS AND WHAT THAT PROCESS ENTAILED?

21   A.   THERE WERE MAYBE 20 OR MORE DIFFERENT BUSINESSES THAT

22       HAD THESE DIFFERENT ROYALTIES ASSOCIATED WITH THEM.

23       AND SO WITHIN THE DOW CHEMICAL COMPANY THERE WERE 20-

24       SOMETHING INDIVIDUALS WHO AT THE END OF THE QUARTER

25       WOULD DETERMINE THE ACTUAL QPM VOLUMES.  AND THEY

1        WOULD -- FOR THEIR PARTICULAR BUSINESS.  AND THEY

2        WOULD SEND THOSE TO THE NORTH AMERICAN ROYALTY

3        ACCOUNTANT, WHO WOULD THEN LOOK THEM OVER AND SEND

4        THEM TO ME.  AND THEN I WOULD DO THE COMPUTATIONS OF

5        CALCULATING THESE EARNED ROYALTIES FOR THE DIFFERENT

6        GROUPS, AND THEN I WOULD SEND THOSE ON TO THE DOW

7        CONTROLLER TO MAKE THE ACTUAL ROYALTY PAYMENT.

8   Q.   TO WHAT EXTENT, IF ANY, WERE THE QPM NUMBERS VERIFIED

9        BY A THIRD PARTY?

10  A.   WELL, AS I MENTIONED, THE NORTH AMERICAN ROYALTY

11       ACCOUNTANT WOULD LOOK THEM OVER, I WOULD LOOK THEM

12       OVER, AND THEN INTERNAL AUDITING AND DELOITTE AND

13       TOUCHE WOULD EVENTUALLY -- WHO WAS DOW'S OUTSIDE

14       AUDITOR,  WOULD EVENTUALLY LOOK OVER THE QPM'S AND

15       VERIFY THEM.

16  Q.   LET'S TURN TO JOINT EXHIBIT 223.  THIS IS A

17       MEMORANDUM FROM YOU TO BILL CURRY, BILL NORRIS, AND

18       OTHERS, DATED AUGUST 1ST, 1994.  ARE YOU FAMILIAR WITH

19       THIS MEMO?

20  A.   YES.

21  Q.   THE FIRST SENTENCE STATE, "THE ABOVE GROUP HAS BEEN

22       LOOKING INTO THE QUESTION OF IMPORTS IN REGARDS TO

23       QPM VOLUMES."  CAN YOU EXPLAIN WHAT THE QUESTION OF

24       IMPORTS HERE REFERS TO?

25  A.   WHAT DOW HAD LICENSED WAS THE U.S. RIGHTS TO PRODUCE,

1      USING THE TECHNOLOGY.  AND SO WHAT OUR QPM WAS WAS

2      THE VOLUMES PRODUCED IN U.S. BASED PLANTS THAT

3      UTILIZED THE TECHNOLOGY.  BUT YOU ALSO NEED TO COUNT

4      IF THE TECHNOLOGY IS USED OUTSIDE THE U.S. TO PRODUCE

5      THE SAME PRODUCT, BUT THEN THAT IS IMPORTED INTO THE

6      U.S. AND THEN SOLD.  SO YOU'VE GOT TO INCLUDE THIS

7      EXTRA IMPORTS IN YOUR QPM CALCULATION.

8   Q.  ALL RIGHT.  I'M LOOKING TO THE LAST PARAGRAPH,

9      BEGINNING ON BATES ENDING 19839, CARRYING OVER ONTO

10      19840.  YOUR MEMO INDICATES THAT AN ADDITIONAL

11      VARIABLE ROYALTY PAYMENT MUST BE MADE FOR 1993 ON

12      THIS BASIS.  TO WHAT EXTENT, IF AT ALL, DID YOU

13      CONTINUE TO PERFORM ANALYSES OF IMPORTS IN SUBSEQUENT

14      YEARS?

15   A.  OH, WE -- WE DID THAT FOR ALL FUTURE YEARS.  IT WAS

16      JUST A PART OF THE REGULAR CALCULATION FROM THEN ON.

17   Q.  ALL RIGHT.  I'D LIKE TO ASK YOU NOW ABOUT YOUR

18      INVOLVEMENT IN THE PATENT RE-LICENSING PROCESS.  AND

19      THE LICENSE AGREEMENT -- I THINK WE'VE DISCUSSED --

20      PROVIDED DIFFERENT LICENSE EXPIRATION DATES FOR EACH

21      PATENT PORTFOLIO.  WHAT WAS YOUR UNDERSTANDING OF HOW

22      THE PORTFOLIO EXPIRATION TERMS RELATED TO THE

23      REMAINING PATENT LIVES?

24   A.  WOULD YOU REPEAT THAT AGAIN?

25   Q.  THE AGREEMENT PROVIDED FOR EXPIRATION TERMS FOR EACH

1           PORTFOLIO.  AND I WAS JUST ASKING HOW THAT EXPIRATION

2           TERM RELATED TO THE REMAINING LIFE OF THE PATENT, IF

3           YOU KNOW.

4     A.   THE ORIGINAL FIRST GROUP OF LICENSES WERE FOR 80

5           PERCENT OF THE PATENT LIFE.  AND SO IF THERE WAS A

6           RE-LICENSE, THEN IT WAS FOR THAT LAST 20 PERCENT,

7           REMAINDER OF THE PATENT LIFE.

8     Q.   ALL RIGHT.  AND UPON EXPIRATION OF THE LICENSE TERM,

9           WHAT WOULD HAPPEN, THEN, IF DOW WANTED TO CONTINUE TO

10          USE THE PATENTED TECHNOLOGY?

11    A.   THEY WOULD HAVE TO RE-LICENSE THE TECHNOLOGY, AND

12          THERE WOULD BE A RE-VALUATION AND REDETERMINATION OF

13          THE ROYALTY RATES.

14    Q.   ALL RIGHT. TURN TO, PLEASE, TO JOINT EXHIBIT 282.

15          NOW, IF YOU COULD TURN TO THE SECOND PAGE OF THAT

16          EXHIBIT, BATES ENDING 2388.  THIS IS A MEMO FROM YOU

17          TO THE CHEMTECH FILE, DATED AUGUST 25TH, 1995, TITLED,

18          "METHODOLOGY FOR RE-LICENSING CHEMTECH'S PORTFOLIOS."

19          I WANT TO GET INTO A FEW OF THE SPECIFICS, BUT WHAT,

20          GENERALLY, WAS THE PURPOSE OF THIS MEMO?

21    A.   TO KIND OF DOCUMENT THE PROCESS THAT WE WENT THROUGH

22          EVERY TIME A PORTFOLIO CAME UP FOR RE-LICENSING.  SO

23          WHENEVER A LICENSE EXPIRED, THEN YOU HAD TO DETERMINE

24          WHETHER WE WERE GOING TO RE-LICENSE OR NOT.  YOU GO

25          THROUGH THESE STEPS, AND THESE WERE THE PEOPLE

1 ⎮⎮      INVOLVED.

2 ⎮⎮ Q.   ALL RIGHT.  AND STEP 2 INDICATES "COMMISSION

3 ⎮⎮      EVALUATION STUDY."  WHY WAS THAT NECESSARY?

4 ⎮⎮ A.   WELL, ANYTIME YOU DID A RE-LICENSING, YOU HAD TO

5 ⎮⎮      VALUE THE PATENTS OR THE TECHNOLOGY AT THAT POINT IN

6 ⎮⎮      TIME.  SO YOU HAD TO TAKE INTO ACCOUNT WHATEVER HAD

7 ⎮⎮      CHANGED AND WHATEVER, YOU KNOW, THE NEW FORECASTS FOR

8 ⎮⎮      THE FUTURE WERE.

9 ⎮⎮ Q.   ALL RIGHT.  AND JUST BY WAY OF REVIEW, CAN YOU JUST

10 ⎮⎮      EXPLAIN HOW THE VALUATION WAS USED TO ESTABLISH

11 ⎮⎮      MINIMUM ROYALTIES FOR THIS RE-LICENSE PERIOD?

12 ⎮⎮ A.   AGAIN, ONCE YOU HAD THE VALUE FOR THE PATENT GROUP,

13 ⎮⎮      WHICH MIGHT BE OVER FIVE YEARS OR SOMETHING, WE HAD

14 ⎮⎮      TO DETERMINE AN INTEREST RATE THAT WAS APPLICABLE

15 ⎮⎮      WHICH THE TREASURY DEPARTMENT WOULD VIEW FOR THAT

16 ⎮⎮      FIVE-YEAR PERIOD AND AMORTIZE THE NET PRESENT VALUE

17 ⎮⎮      SO THAT YOU GOT THESE ANNUAL ROYALTIES.  AND THEN

18 ⎮⎮      YOU'D TAKE THE ANNUAL ROYALTY AND DIVIDE THAT BY THE

19 ⎮⎮      FORECAST VOLUME TO GET A UNIT ROYALTY RATE.  THAT

20 ⎮⎮      WOULD BE THE FIRST STEP ROYALTY IN THOSE TIERED

21 ⎮⎮      STEPS.

22 ⎮⎮ Q.   AND HOW WERE THE REMAINDER OF THE TIERED STEPS

23 ⎮⎮      ESTABLISHED?

24 ⎮⎮ A.   BASICALLY, THE SECOND STEP IS HALF OF THE FIRST AND

25 ⎮⎮      THE THIRD STEP IS HALF OF THE SECOND.

```
 1   Q.   HOW MIGHT CHANGES IN FAIR MARKET VALUE OF A PATENT
 2        EFFECT PROPOSED ROYALTY RATES?
 3   A.   WELL, IF THE VALUE WENT UP, THE ROYALTY RATE WOULD GO
 4        UP AND IF THE VALUE WENT DOWN, THE ROYALTY RATE WOULD
 5        GO DOWN.
 6   Q.   WHAT ARE SOME OF THE FACTORS THAT MIGHT IMPACT FAIR
 7        MARKET VALUE?
 8   A.   WELL, IF THE BUSINESS WAS DOING GOOD, THEN IT WOULD
 9        HAVE A HIGHER VALUE, OR IF THE BUSINESS WASN'T DOING
10        AS WELL.
11   Q.   LET'S TURN TO JOINT EXHIBIT 299.  THIS IS A
12        MEMORANDUM DATED OCTOBER 9TH, 1995, FROM YOU TO BILL
13        NORRIS, GREG HEINLEIN, AND BILL CURRY.  ARE YOU
14        FAMILIAR WITH THIS DOCUMENT?
15   A.   YES.
16   Q.   WHO IS GREG HEINLEIN?
17   A.   GREG HEINLEIN WAS THE TREASURY ANALYST.
18   Q.   ALL RIGHT.  AND THE "RE" LINE IS, "CALCULATION OF THE
19        INCREASE IN VALUE OF PATENTS DUE TO GATT LIFE
20        EXTENSIONS."  AND I BELIEVE GATT STANDS FOR GENERAL
21        AGREEMENT ON TARRIFFS AND TRADE.  THAT COULD BE
22        SOMEWHAT OFF.  BUT ARE YOU AWARE OF WHAT GATT WAS,
23        GENERALLY?
24   A.   YES.  WHAT GATT WAS, YES.
25   Q.   AND WHAT WAS IT; WHAT WAS YOUR UNDERSTANDING OF WHAT
```

1        IT WAS?

2    A.   GATT WAS A GLOBAL KIND OF A PATENT AGREEMENT FROM THE

3         SIGNATORIES TO IT, WHICH HAD A DIFFERENT LIFE THAN

4         THE U.S. LIFE.  IN THE U.S. WE HAD 17-YEAR PATENT

5         LIFE, AND GATT HAD LIKE 21-YEAR PATENT LIFE.  SO WHEN

6         THE U.S. BECAME A SIGNATORY TO THIS GATT AGREEMENT,

7         THEN THAT MEANT THAT OUR LIVES WOULD NOW CHANGE FROM

8         17 TO 21.  SO IT DEPENDED ON KIND OF A HISTORY OF THE

9         PATENT OR SOME DETAILS RELATED TO THE PATENT AS TO

10        WHETHER IT AUTOMATICALLY JUMPED FROM 17 TO 21 YEARS,

11        OR WHETHER IT DIDN'T.  SO WE HAD TO GO THROUGH -- THE

12        PATENT DEPARTMENT HAD TO GO THROUGH EACH PATENT AND

13        DETERMINE WHETHER IT'S LIFE WAS EXTENDED AND WHAT THE

14        NEW LIFE WAS, BASED ON ---

15   Q.   ALL RIGHT.  AND HOW WOULD AN EXTENDED LIFE EFFECT THE

16        FAIR MARKET VALUE OF A PARTICULAR PATENT?

17   A.   BECAUSE IT WAS GOING TO BE OVER A LONGER PERIOD OF

18        TIME, THEN THE VALUE WOULD GO UP.

19   Q.   TO WHAT EXTENT, IF AT ALL, WOULD ANY INCREASE IN

20        PATENT LIVES RESULTING FROM GATT BE REFLECTED IN RE-

21        LICENSING DISCUSSIONS?

22   A.   WELL, IT WAS AUTOMATICALLY -- WHEN YOU DID THE

23        RE-VALUATION, NOW YOU HAVE THIS LONGER LIFE, SO THE

24        VALUE WOULD GO UP.

25   Q.   OKAY.  I'D LIKE TO MOVE NOW BRIEFLY TO YOUR VALUATION

Case 3:05-cv-00944-BAJ-EWD   Document 166   08/29/13   Page 248 of 318

1    ROLE IN CONNECTION WITH PATENT DISTRIBUTIONS.  IT'S

2    STIPULATED THAT CHEMTECH MADE TWO DISTRIBUTIONS OF

3    PATENT PORTFOLIOS IN 1997, AND THE FINAL DISTRIBUTION

4    OF ALL REMAINING PATENTS WITHIN CHEMTECH IN 1998.

5    WHAT WAS YOUR ROLE WITH RESPECT TO THESE

6    DISTRIBUTIONS?

7  A.  ARTHUR D. LITTLE WAS CALLED IN TO DO THE VALUATIONS

8    OF THE DISTRIBUTIONS, AND MY ROLE WAS THE SAME AS IT

9    HAD BEEN AT THE BEGINNING, KIND OF ACTING AS THE

10    LIAISON BETWEEN ARTHUR D. LITTLE AND DOW.

11  Q.  ARE YOU FAMILIAR WITH THE METHOD USED TO VALUE PATENT

12    PORTFOLIOS IN THESE THREE VALUATIONS?

13  A.  IT WAS THE SAME CONTRIBUTION MARGIN METHOD.

14  Q.  I WANT TO ASK YOU BRIEFLY ABOUT THE RESULT OF ONE OF

15    THE 1997 DISTRIBUTIONS.  LET'S TURN TO JOINT EXHIBIT

16    386.  IT'S A LETTER DATED DECEMBER 20TH, 1996, FROM

17    MICHEL DEMARE TO CHEMTECH PARTNERS.  FIRST SENTENCE

18    OF THE LETTER INDICATES THAT, "THIS IS TO MAKE YOU

19    AWARE THAT DOW EUROPE AS GENERAL PARTNER OF CHEMTECH

20    ROYALTY ASSOCIATES HAS ELECTED TO DISTRIBUTE THREE

21    PATENT PORTFOLIOS TO DIAMOND TECHNOLOGY PARTNERSHIP

22    IN RETIREMENT OF A PORTION OF DTPC PARTNER'S

23    INTEREST, PURSUANT TO SECTION 10.8 OF THE PARTNERSHIP

24    AGREEMENT."  DO YOU KNOW WHY THE GENERAL PARTNER

25    ELECTED TO DISTRIBUTE THESE PATENTS?

1    A.    NO, I WASN'T INVOLVED IN THOSE KIND OF DECISIONS.

2    Q.    LET'S TURN TO THE SECOND PAGE OF THIS LETTER, BATES

3          ENDING 21707, AND THERE'S A TABLE, WHICH WE'RE GOING

4          TO ENLARGE A LITTLE BIT HERE, INDICATING THAT THREE

5          PORTFOLIOS WERE DISTRIBUTED AND THAT TWO OF THE

6          PORTFOLIOS, THE FIRST AND THE THIRD, 14.2 AND 15.2,

7          HAD BEEN APPRAISED AT A ZERO VALUE, RESULTING IN

8          MARK-TO-MARKET LOSSES OF $41 MILLION, OR

9          APPROXIMATELY $42 MILLION, APPROXIMATELY $1.6, $1.5

10         MILLION, RESPECTIVELY.  I'M LOOKING TO 14.3.  THAT

11         PORTFOLIO HAD BEEN APPRAISED AT $179.2 MILLION,

12         RESULTING IN A MARK-TO-MARKET GAIN OF $166 MILLION.

13         AND THEN NETTING THOSE OUT, A NET GAIN OF $122.5

14         MILLION.  ARE YOU AWARE OF WHAT COULD HAVE CAUSED THE

15         CHANGES IN VALUATIONS OF MAGNITUDES LIKE THESE?

16   A.    WELL, WHATEVER ARTHUR D. LITTLE FOUND UPON THE -- THE

17         '98 VALUATIONS, EITHER THE TECHNOLOGY UTILIZATION WAS

18         CHANGED WITHIN DOW, OR SOME OF THE FACTS, YOU KNOW,

19         COULD HAVE CHANGED BETWEEN 1993 AND 1998.

20   Q.    AND WHEN YOU REFER TO FACTS, YOU'RE REFERRING TO

21         BUSINESS CONDITIONS?

22   A.    RIGHT, BUSINESS CONDITIONS AND HOW THE TECHNOLOGY WAS

23         UTILIZED WITHIN THE BUSINESS.

24   Q.    ALL RIGHT.  I WANT TO ASK YOU NOW FINALLY ABOUT THE

25         FINAL MARK-TO-MARKET VALUATION IN CONNECTION WITH THE

1       EXIT OF THE CLASS A LIMITED PARTNERS IN 1998.  WERE

2       YOU INVOLVED IN VALUATIONS RELATING TO THAT

3       DISTRIBUTION, AS WELL?

4   A.   YES.

5   Q.   ARE YOU AWARE OF A DISPUTE WITH THE CHEMTECH

6       INVESTORS OVER THAT VALUATION?

7   A.   THE FINAL VALUE, YES.

8   Q.   CAN YOU DESCRIBE WHAT PRECIPITATED THAT DISPUTE?

9   A.   THE OUTSIDE INVESTORS HIRED THEIR OWN VALUATION

10      CONSULTANT TO LOOK AT ARTHUR D. LITTLE'S VALUATION

11      AND DETERMINE IF THEY AGREED WITH ARTHUR D. LITTLE'S

12      METHODOLOGY OR -- OR WITH THE FACTS OF THE VALUATION.

13  Q.   AND WAS THAT CONSULTANT, PETERSON CONSULTING?

14  A.   THAT'S CORRECT.

15  Q.   I'D LIKE TO SHOW YOU JOINT EXHIBIT 691.  AND IF YOU

16      WOULD TURN TO THE SECOND PAGE, BATES ENDING 70658,

17      THIS IS A MEMORANDUM DATED JUNE 29TH, 1998, FROM YOU

18      TO BILL CURRY AND MICHEL DEMARE, ENTITLED, "ISSUES

19      RAISED BY PETERSON CONSULTING."  ARE YOU FAMILIAR

20      WITH THIS DOCUMENT?

21  A.   YES.

22  Q.   WHO IS MICHEL DEMARE?

23  A.   MICHEL DEMARE WAS THE TREASURER FOR DOW EUROPE.

24  Q.   WHAT WAS THE PURPOSE OF THIS MEMO?

25  A.   PETERSON HAD BEEN IN CONTACT WITH ARTHUR D. LITTLE,

1      YOU KNOW, BY PHONE AND WITH US, DOW, OVER PHONE AND I

2      THINK WE MIGHT HAVE EVEN HAD SOME MEETINGS.  BUT THEY

3      HAD RAISED A BUNCH OF ISSUES OVER THAT TIME FRAME.

4      AND I THINK WHAT THIS DOCUMENT DOES IS KIND OF

5      SUMMARIZE WHAT WE THOUGHT WERE THE SUBSTANTIVE ISSUES

6      THAT THEY HAD RAISED AND OUR FEELING AS TO WHETHER IT

7      WAS A VALID ISSUE OR NOT.

8   Q.  ALL RIGHT.  THE FIRST PARAGRAPH MAKES REFERENCE TO AN

9      INITIAL ADL VALUATION REPORT AS OF FEBRUARY 25TH,

10      1998, CONCLUDING THAT THE FAIR MARKET VALUE OF THE

11      PATENTS WAS $362.2 MILLION.  THE MEMO GOES ON TO

12      EXPLAIN AS FOLLOWS, BEGINNING WITH THE THIRD

13      SENTENCE, "ON MONDAY, APRIL 27TH, 1998, IN A REVIEW

14      UPON HIS RETURN FROM A WEEK AWAY, BILL EDWARDS OF ADL

15      DISCOVERED THAT A PORTION OF THE AMORTIZATION SHIELD

16      MARKUP HAD NOT BEEN APPLIED CORRECTLY.  WHEN THIS

17      PORTION OF THE AMORTIZATION SHIELD WAS CORRECTLY

18      APPLIED BY ADL TO THE CONTRACT PERIOD VALUE, THE FAIR

19      MARKET VALUE OF THE PATENT ASSETS INCREASED BY SOME

20      $80 MILLION, TO ALMOST $440 MILLION."  CAN YOU

21      EXPLAIN TO US WHAT AN AMORTIZATION SHIELD MARKUP IS?

22   A.  WELL, WHAT WE'RE TALKING ABOUT IN THE VALUATIONS IS

23      AFTER-TAX CASH FLOWS THAT ARE DISCOUNTED BACK TO THE

24      PRESENT.  SO ANY AFTER-TAX KIND OF ITEMS THAT EFFECT

25      AFTER-TAX CASH FLOW GET TAKEN INTO ACCOUNT.  AND IN

1    THIS CASE, THE TECHNOLOGY WAS NOT ZERO BASIS.  IT HAD

2    SOME BASIS THAT COULD BE AMORTIZED.  AND SO THAT

3    AMORTIZATION AND DEPRECIATION WOULD WIND UP SAVING

4    TAX.  AND SO THE AMORTIZATION SHIELD AND THE TAX

5    SAVINGS COULD BE TAKEN INTO ACCOUNT EITHER DIRECTLY

6    WITHIN A BIG SPREADSHEET AS A LINE ITEM OR IT CAN BE

7    INCLUDED AS -- AT THE END OF THE VALUATION AS A KIND

8    OF A GROSSUP FACTOR.  AND I THINK THAT'S WHAT ARTHUR

9    D. LITTLE DID WAS USE A GROSSUP FACTOR AT THE END AS

10   A -- AS A WAY TO GET FROM -- TO INCLUDE THE

11   AMORTIZATION SHIELD AND IT'S IMPACT ON THE VALUE.

12 Q.  ALL RIGHT.  AND THIS CORRECTION INVOLVING THE

13   AMORTIZATION SHIELD MARKUP REFERRED TO, DID DOW

14   DISPUTE THAT?

15 A.  OH, NO, NO.  IT WAS AN ERROR, I GUESS, ON ARTHUR D.

16   LITTLE'S PART.  SO CORRECTING THE ERROR, YOU KNOW, WE

17   DIDN'T.

18 Q.  ALL RIGHT.  NOW I WANT TO JUST BRIEFLY DISCUSS SOME

19   ISSUES RAISED BY PETERSON AND DOW'S RESPONSES.  WE'LL

20   START WITH ITEM 1, DIFFERENT DISCOUNT RATES.  CAN YOU

21   SUMMARIZE THE ISSUE RAISED THERE AND DOW'S RESPONSE?

22 A.  ARTHUR D. LITTLE AND WE, WOULD USE THE WEIGHTED

23   AVERAGE COST OF CAPITAL AS THE DISCOUNT RATE, AND

24   PETERSON THOUGHT THAT YOU SHOULD USE A DEBT RATE

25   INSTEAD, WHICH WOULD BE A MUCH LOWER NUMBER, YOU

```
 1    KNOW, LIKE SIX-TO-EIGHT PERCENT RATHER THAN THE TEN
 2    TO 12 WEIGHTED AVERAGE COST OF CAPITAL.  AND THAT
 3    WOULD RESULT IN A BIG INCREASE IN VALUE BY USING THE
 4    LOWER DISCOUNT RATE, YOU KNOW, A 30-TO-40 PERCENT
 5    INCREASE IN VALUE.  WE THOUGHT THAT THAT WAS A
 6    SIGNIFICANT CHANGE IN METHODOLOGY. THAT YOU SHOULD BE
 7    CONSISTENT IN THE WAY THAT YOU VALUE THE THINGS AT
 8    THE BEGINNING AND THE WAY YOU VALUE THINGS AT THE
 9    END.  THAT WAS INCONSISTENT AND WAS NOT A VALID
10    METHODOLOGICAL.
11 Q. TURNING NOW TO THE SECOND COMPLAINT, REGARDING
12    SELLER'S TAX GROSSUP.  WHAT WAS THAT COMPLAINT AND
13    WHAT WAS DOW'S RESPONSE?
14 A. WELL, THIS ONE IS A LITTLE MORE ESOTERIC, BUT BOTH OF
15    THESE WE CONSIDERED TO BE CHANGES IN METHODOLOGY FROM
16    THE INITIAL VALUATION TO THE FINAL VALUATION.  SO WE
17    CONSIDERED THIS NUMBER TWO BASICALLY THE SAME AS
18    NUMBER ONE, THAT IT IS A SIGNIFICANT CHANGE IN
19    METHODOLOGY THAT WOULD CAUSE AN INCREASE IN THE VALUE
20    -- A KIND OF WINDFALL PROFITS TO SOMEBODY.
21 Q. AND THEN, FINALLY, WHAT WAS THE COMPLAINT LISTED ITEM
22    -- LISTED UNDER ITEM 3, BATES ENDING 70659,
23    INDIVIDUAL RATHER THAN TOTAL VALUATIONS?
24 A. WELL, AGAIN, THIS -- WE CONSIDERED THAT IT WAS A
25    CHANGE IN METHODOLOGY AND WOULD, AGAIN, RESULT IN A
```

1    MUCH HIGHER VALUE -- THAT IT WASN'T CONSISTENT WITH

2    WHAT HAD BEEN DONE INITIALLY AND THAT YOU OUGHT TO BE

3    CONSISTENT IN METHODOLOGY AT THE END.

4  Q.  LOOKING AT BATES PAGE ENDING 70660, IT LOOKS LIKE THE

5    FINAL TWO ISSUES YOU NOTE WERE DISCUSSED AND

6    RESOLVED.  DO YOU KNOW HOW THE FIRST THREE ISSUES

7    WERE RESOLVED?

8  A.  THESE LAST TWO THAT YOU'RE TALKING ABOUT RESULTED IN

9    INCREASES OF, YOU KNOW, $4 TO $7 MILLION DOLLARS TO

10   THE PORTFOLIOS.  BUT THE FIRST THREE, WE CONSIDERED

11   TO BE CHANGES IN METHODOLOGY THAT WEREN'T APPLICABLE.

12   AND SO WE DIDN'T AGREE THAT THEY SHOULD BE APPLIED.

13  Q.  MR. VALENZUELA, AFTER THE PATENTS WERE DISTRIBUTED

14   OUT OF CHEMTECH IN 1998, WHAT FURTHER INVOLVEMENT DID

15   YOU HAVE WITH RESPECT TO THE PATENTS?

16  A.  WE CONTINUED TO DO THE QUARTERLY QPM'S AND EARNED

17   ROYALTIES AND DETERMINE PAYMENTS UP UNTIL THE END OF

18   2001 WHEN I THINK ALL OF DOW'S PATENTS WERE

19   CONTRIBUTED TO AN INTANGIBLE HOLDING COMPANY.

20  Q.  SO DOW CONTINUED TO LICENSE THE PATENTS, BUT THEY

21   WERE OWNED BY A DIFFERENT ENTITY?

22  A.  THAT'S CORRECT.

23       BY MR. BLANCHARD:

24           THANK YOU VERY MUCH, MR. VALENZUELA.

25           YOUR HONOR, I HAVE NO FURTHER QUESTIONS AT

```
1              THIS TIME.
2              BY THE COURT:
3                   THANK YOU.  MR. WELSH?
4              BY MR. WELSH:
5                   THANK YOU, YOUR HONOR.
6                        CROSS EXAMINATION
7    BY MR. WELSH:
8    Q.   GOOD AFTERNOON, MR. VALENZUELA.
9    A.   GOOD AFTERNOON.
10   Q.   I JUST HAVE A FEW QUESTIONS FOR YOU.  MR. VALENZUELA,
11        DO YOU KNOW WHY OR DO YOU HAVE ANY INDICATION AS TO
12        WHY THESE PARTICULAR PATENTS WERE PICKED FOR THE
13        INCLUSION INTO THE CHEMTECH PARTNERSHIP?
14   A.   NOT -- NOT SPECIFICALLY.  WITH EACH PATENT, THE
15        PATENT DEPARTMENT -- BILL NORRIS AND THE INTELLECTUAL
16        ASSETS GROUP, CHOSE THE PATENTS.
17   Q.   DID YOU GET ANY INDICATION AS TO WHY THEY MAY HAVE
18        CHOSEN THOSE PATENTS?
19   A.   NO.
20   Q.   DO YOU REMEMBER BEING ASKED ABOUT THAT WHEN YOUR
21        DEPOSITION WAS TAKEN A FEW YEARS AGO?
22   A.   WHAT I SAID WAS THEY WOULD HAVE PICKED THE FEWEST
23        PATENTS THAT HAD THE HIGHEST VALUE.
24   Q.   SO THAT WAS THE REASON THAT THE PATENTS WERE CHOSEN,
25        AS BEST YOU KNOW?
```

1   A.   WELL, THAT'S MY -- MY OPINION.

2   Q.   THE FEWEST NUMBER WITH THE HIGHEST VALUE?

3   A.   YES.

4   Q.   WHY WOULD THEY HAVE WANTED TO DO THAT, AS FAR AS YOU

5        KNOW -- THAT IS, PICK THE FEWEST NUMBER WITH THE

6        HIGHEST VALUE; WHY WOULD THAT MATTER?

7   A.   WELL, YOU'D HAVE TO DO THIS VALUATION AND LICENSING

8        OF ALL THE -- I THINK THE MORE YOU HAD, THE BIGGER

9        THE JOB.

10  Q.   SO THEY JUST WANTED TO GET CERTAIN VALUE OF PATENTS;

11       THAT IS, THEY JUST WANTED TO REACH A CERTAIN NUMBER;

12       IS THAT IT?

13  A.   I COULDN'T SAY.

14  Q.   AND, SIR, MR. BLANCHARD ASKED YOU TO TURN TO JX-17 IN

15       HIS EXHIBIT BOOK, AND I BELIEVE HE ASKED YOU SOME

16       QUESTIONS ABOUT THE DISCOUNT RATE WHICH WAS TO BE

17       APPLIED, AND YOU SAID IT WAS 12 PERCENT?

18  A.   RIGHT.

19  Q.   NOW, OVER ON PAGE BATES NUMBER 47192, THERE ARE

20       LISTED THERE A NUMBER OF DIFFERENT DISCOUNT RATES.

21       DO YOU KNOW WHY A SERIES OF DISCOUNT RATES WERE

22       LISTED THERE?

23  A.   JUST TO SHOW WHAT EFFECT THE DISCOUNT RATE HAD ON THE

24       VALUE.

25  Q.   BUT IF YOU'RE GOING TO USE THE 12 PERCENT, WHY WOULD

1       YOU LIST THESE DIFFERENT RATES?

2  A.   WELL, 12 PERCENT WAS DOW'S WEIGHTED AVERAGE COST OF

3       CAPITAL AT THE TIME, AND SO THAT'S WHAT WE WOULD HAVE

4       USED.  BUT IF WE WERE GOING TO HIRE ARTHUR D. LITTLE,

5       THEN THEY WOULD DETERMINE THE APPROPRIATE DISCOUNT

6       RATE, RATHER THAN US.

7  Q.   SO THESE MAY HAVE BEEN THE RATE THAT WOULD HAVE BEEN

8       APPLIED BY ADL -- THESE DIFFERENT DISCOUNT RATES?

9  A.   WELL, THEY -- THEY WOULD HAVE CHOSEN SOMETHING THAT

10      WOULD HAVE -- COULD HAVE BEEN DIFFERENT THAN 12 AND

11      WE DIDN'T KNOW, YOU KNOW, WHAT IT WOULD WIND UP AS.

12 Q.   NOW, SIR, MR. BLANCHARD ALSO DIRECTED YOUR ATTENTION

13      TO JOINT EXHIBIT 4, I'M SORRY, 49.  DO YOU HAVE THAT

14      IN FRONT OF YOU?

15 A.   YES.

16 Q.   AND THE SECOND PAGE OF THAT EXHIBIT, WHICH IS BATES

17      NUMBER 20378, IS CAPTIONED "RUSH TO DESK."  AND HE

18      ASKED YOU ABOUT THE ONE DAY TIME WHICH WAS TO BE

19      ALLOWED TO YOU TO GET CERTAIN INFORMATION TOGETHER?

20 A.   UH-HUH.

21 Q.   AND YOU SAID, I BELIEVE, THAT THE REASON THAT YOU

22      NEEDED TO GET IT SO QUICKLY WAS THAT THERE WAS AN

23      APRIL 30TH CLOSING DATE; CORRECT?

24 A.   I DON T KNOW ABOUT CLOSING DATE, BUT DEADLINE.

25 Q.   WHERE DID THAT DEADLINE DATE, THAT IS THE APRIL 30TH

Case 3:05-cv-00944-BAJ-EWD    Document 166    08/29/13    Page 258 of 318

```
 1        DATE, COME FROM AS FAR AS YOU KNOW?

 2   A.   FROM SOMEBODY ELSE, I DON'T KNOW WHO.

 3   Q.   DO YOU KNOW WHY --

 4   A.   NO.

 5   Q.   -- THERE WAS AN APRIL 30TH CLOSING DATE?

 6   A.   NO.

 7   Q.   DID ANYBODY EVER TALK TO YOU ABOUT THAT OR GIVE YOU

 8        ANY INPUT --

 9   A.   NO.

10   Q.   -- OR INSIGHT AS TO WHY THAT WAS?

11   A.   NO.

12   Q.   SO YOU DON'T HAVE ANY IDEA WHY THE DATE OF APRIL 30TH

13        WAS SIGNIFICANT?

14   A.   NO.

15   Q.   ALL RIGHT, SIR.  I'D LIKE YOU TO TURN TO JOINT

16        EXHIBIT 223.  I THINK IN CONNECTION WITH THIS EXHIBIT

17        MR. BLANCHARD ASKED YOU A FEW QUESTIONS ABOUT THE 80

18        PERCENT OF THE VALUE OF THE LIFE OF THE PATENT BEING

19        THE AMOUNT THAT YOU USED TO COMPUTE THE VALUE; IS

20        THAT CORRECT, OR DID I GET THAT WRONG?

21   A.   THIS IS ON QPM FROM IMPORTS.

22   Q.   OH, I'M SORRY; I'M SORRY.  PERHAPS IT WASN'T IN

23        CONNECTION WITH THAT WHATSOEVER.  MR. BLANCHARD ASKED

24        YOU SOME QUESTIONS ABOUT THE 80 PERCENT LIFE OF

25        PATENTS -- THAT IS, THE VALUE OF THE PATENT IS
```

1      COMPUTED ON -- BASED ON 80 PERCENT OF THE LIFE OF THE

2      PATENT; IS THAT CORRECT?

3  A.  THE -- THE ORIGINAL LICENSE WAS FOR 80 PERCENT OF THE

4      PATENT LIFE.

5  Q.  OKAY.  SO THE PATENT -- THE LICENSE WAS ONLY FOR 80

6      PERCENT OF THE REMAINING LIFE OF THE PATENT; CORRECT?

7  A.  CORRECT.

8  Q.  DO YOU KNOW WHY THAT 80 PERCENT NUMBER WAS CHOSEN --

9      THAT IS, WHY IT WAS ONLY FOR 80 PERCENT OF THE LIFE?

10 A.  NO.

11 Q.  AND I THINK ONE OF THE LAST THINGS MR. BLANCHARD

12     ASKED YOU WAS AFTER THE PATENTS WERE DISTRIBUTED OUT

13     OF THE PARTNERSHIP, YOU CONTINUED TO COMPUTE

14     ROYALTIES AND QPM'S FOR SOME PERIOD OF TIME?

15 A.  THAT'S CORRECT.

16 Q.  UP UNTIL WHEN?

17 A.  UNTIL SOMETIME IN 2001 OR 2002 WHEN THIS INTANGIBLE

18     HOLDING COMPANY CAME INTO EXISTENCE, AND THEN ALL

19     PATENTS WERE CONTRIBUTED.

20 Q.  WHAT WAS THE INTANGIBLES HOLDING COMPANY; WHAT WAS

21     THAT ENTITY?

22 A.  YOU MEAN AN ACTUAL LEGAL NAME?

23 Q.  WELL, WHO OWNED IT, WHAT DID IT DO; WHAT WAS IT?

24 A.  IT -- IT COLLECTED ALL OF DOW'S PATENTS.  SO ALL OF

25     DOW'S PATENTS WERE CONTRIBUTED TO THIS INTANGIBLE

1      HOLDING COMPANY.

2   Q.   AND WAS THIS A SUBSIDIARY OF DOW?

3   A.   YES.

4   Q.   AND, SIR, WHEN YOU VALUED THESE PATENTS AND PUT THEM

5        INTO CHEMTECH PARTNERSHIP, YOU PUT IN ONLY THE

6        PATENTS THEMSELVES; CORRECT?  THE TECHNOLOGY WHICH

7        ACCOMPANIED THE PATENTS WAS NOT PUT INTO THE

8        PARTNERSHIP; IS THAT CORRECT?

9   A.   WELL, I'M -- I'M NOT SURE EXACTLY ON THE DISTINCTION.

10       WHAT I WAS CALLING IT WAS THE PATENTS, AND I DON'T

11       KNOW ABOUT THE DIFFERENCE BETWEEN PATENTS AND

12       TECHNOLOGY.

13  Q.   DO YOU UNDERSTAND THE DIFFERENCE BETWEEN THE PATENTS

14       AND THE TECHNOLOGY WHICH ACCOMPANIES THE PATENTS?

15  A.   NO.

16  Q.   DO YOU KNOW WHEN THEY VALUED THE PATENTS IF THEY

17       VALUED ONLY THE PATENTS THEMSELVES AND NOT THE

18       TECHNOLOGY RELATED TO THE PATENT; DO YOU UNDERSTAND

19       THAT?

20           BY THE COURT:

21               DON'T ANSWER THE QUESTION.  IS THERE AN

22           OBJECTION?

23           BY MR. BLANCHARD:

24               YOUR HONOR, I JUST -- HE JUST ASKED THE

25           WITNESS A QUESTION.  I BELIEVE THERE'S A LACK OF

1          FOUNDATION.  MR. VALENZUELA DOESN'T SEEM TO

2          UNDERSTAND WHAT MR. WELSH IS REFERRING TO WITH

3          THIS PATENTS VERSUS TECHNOLOGY DISTINCTION.

4          BY THE COURT:

5               YES.  I MEAN, WHY DON'T YOU LAY A

6          FOUNDATION HERE?

7          BY MR. WELSH:

8               OKAY.

9          BY THE COURT:

10              I THINK THE WITNESS DESERVES TO UNDERSTAND

11         THE CONTEXT IN WHICH YOU ASK IT.

12         BY MR. WELSH:

13              CERTAINLY, YOUR HONOR.

14         BY THE COURT:

15              AND I NEED TO KNOW THE CONTEXT, AS WELL, SO

16         WHY DON'T YOU ---

17         BY MR. WELSH:

18              I UNDERSTAND.  I WAS JUST TRYING TO SHORTEN

19         THINGS.  THIS IS SOMETHING WHICH WE DISCUSSED IN

20         HIS DEPOSITION.

21   BY MR. WELSH:

22   Q.   MR. VALENZUELA, DO YOU UNDERSTAND THE DIFFERENCE

23        BETWEEN THE PATENT ITSELF AND THE TECHNOLOGY WHICH IS

24        HELPFUL IN PRACTICING THE PATENT?

25   A.   NOT -- NOT EXACTLY, NO.

1   Q.   WELL, MAYBE I COULD REFRESH YOUR RECOLLECTION THEN,

2        SIR, AND IF YOU COULD -- WE COULD TURN TO YOUR

3        DEPOSITION, WHICH WAS DATED JANUARY 24TH, 2008, PAGE

4        27.  START READING AT LINE 7, DOWN TO LINE 17 ON PAGE

5        27.  DOES THAT REFRESH YOUR RECOLLECTION?

6   A.   UH-HUH.

7   Q.   CAN YOU TELL ME WHAT YOU MEANT IN YOUR EXPLANATION ON

8        PAGE 27 OF YOUR DEPOSITION?

9   A.   I BELIEVE I WAS ANSWERING THE QUESTION OF WHETHER THE

10       PATENTS WERE SEPARATED FROM -- FROM RELATED

11       TECHNOLOGY.

12  Q.   AND DID YOU UNDERSTAND THAT THEY WERE?

13  A.   YES.

14  Q.   AND ONLY THE PATENT ITSELF WAS INCLUDED INTO THE

15       CHEMTECH PARTNERSHIP; CORRECT?

16  A.   CORRECT.

17            BY MR. WELSH:

18                MAY I APPROACH THE WITNESS, YOUR HONOR?

19            BY THE COURT:

20                YOU MAY.

21            BY MR. WELSH:

22                THANK YOU.

23  BY MR. WELSH:

24  Q.   MR. VALENZUELA, I'D LIKE TO TURN YOUR ATTENTION TO

25       JOINT EXHIBIT 50.  TAKE A MINUTE TO LOOK THROUGH THAT

1    DOCUMENT.  ALL RIGHT, SIR.  HAVE YOU HAD A CHANCE TO

2    REVIEW THAT DOCUMENT?

3  A.  YES.

4  Q.  AND IT SAYS THAT IT'S TENTATIVE TOPICS FOR MONDAY ADL

5    MEETING; IS THAT ARTHUR DANIEL LITTLE?

6  A.  ARTHUR D. LITTLE.

7  Q.  ARTHUR D. LITTLE.  AND OVER ON THE SECOND PAGE OF

8    THAT DOCUMENT THERE'S HANDWRITING.  IS THAT YOUR

9    HANDWRITING?

10  A.  YES.

11  Q.  CAN YOU READ THAT FOR ME?

12  A.  "PAUL SAYS YOU CAN DISCUSS ABSTRACT METHODOLOGY WITH

13    THE OTHER GUYS, BUT NOT SPECIFICS OF THE DEAL.  DOW

14    NEEDS TO BE AT ANY DISCUSSIONS INVOLVING THE SPECIFIC

15    TRANSACTION."

16  Q.  OKAY.  NOW, WAS THE DEAL THE CHEMTECH DEAL?

17  A.  YES.

18  Q.  AND WHEN IT SAYS SPECIFIC METHODOLOGY -- WHAT'S THAT

19    FIRST PART?

20  A.  ABSTRACT METHODOLOGY.

21  Q.  WITH THE OTHER GUYS -- THE OTHER GUYS ARE THE ADL

22    PEOPLE?

23  A.  I BELIEVE SO.

24  Q.  WHY WERE YOU INSTRUCTED BY PAUL -- AND FIRST OF ALL,

25    LET ME ASK YOU A BACKGROUND QUESTION: WHO IS PAUL?

1    A.    THIS IS PAUL BRINK.

2    Q.    AND WHERE DID PAUL BRINK WORK?

3    A.    HE WAS THE HEAD OF THE TAX DEPARTMENT.

4    Q.    AND HE INSTRUCTED YOU TO NOT DISCUSS THE SPECIFICS OF

5          THE CHEMTECH DEAL WITH THE ADL PEOPLE?

6    A.    THAT'S CORRECT.

7    Q.    DO YOU KNOW WHY?

8    A.    BECAUSE HE WANTED THEIR VALUATION ---

9          BY THE COURT:

10              DON'T ANSWER THE QUESTION JUST YET.  IS

11          THERE AN OBJECTION?

12          BY MR. BLANCHARD:

13              LACK -- LACK OF FOUNDATION.  HE WANTS THE

14          -- IT SOUNDED LIKE THE WITNESS WAS GOING TO

15          ANSWER MORE THAN JUST THE QUESTION ASKED. HE

16          SAID, "DO YOU KNOW WHY MR. BRINK ---"  AND I

17          JUST WANTED TO.

18          BY THE COURT:

19              OKAY.  VERY WELL.

20              WHY DON'T YOU REPEAT THE QUESTION AND

21          NARROW IT SO THAT IT DOESN'T INVOKE HEARSAY.

22    BY MR. WELSH:

23    Q.    DO YOU HAVE ANY IDEA WHY MR. BRINK INSTRUCTED YOU NOT

24          TO DISCUSS THE SPECIFICS OF THE CHEMTECH DEAL WITH

25          THE ADL PEOPLE?

1  A.   YES.

2  Q.   CAN YOU TELL ME WHY?

3  A.   HE DIDN'T WANT THEM -- HE WANTED THE VALUATION TO BE

4       INDEPENDENT, NOT RELATED TO THE SPECIFIC TRANSACTION.

5  Q.   AND IF YOU KNOW, WHY WOULD REVEALING THE CHEMTECH

6       TRANSACTION EFFECT OR POSSIBLY EFFECT THE VALUATION?

7  A.   I DON'T KNOW.

8  Q.   IS THAT WHAT YOU JUST EXPLAINED, THAT HE DIDN'T WANT

9       THE VALUATION TO BE EFFECTED BY THE CHEMTECH

10      TRANSACTION INFORMATION; IS THAT WHAT MR. BRINK TOLD

11      YOU?

12 A.   YES.

13 Q.   DID HE EXPLAIN, OR WAS THAT HIS WHOLE STATEMENT?

14 A.   AS I RECALL, IT WAS ALONG THOSE GENERAL LINES.

15           BY MR. WELSH:

16               MAY I APPROACH THE WITNESS, YOUR HONOR?

17           BY THE COURT:

18               YOU MAY.

19 BY MR. WELSH:

20 Q.   ALL RIGHT, SIR.  WHY DON'T YOU TAKE A LOOK THROUGH

21      JOINT EXHIBIT 220?  HAVE YOU HAD A CHANCE TO REVIEW

22      THAT, SIR?

23 A.   YES.

24 Q.   ARE YOU THE AUTHOR OF THIS DOCUMENT?

25 A.   YES.

1   Q.   AND CAN YOU TELL ME WHAT THIS DOCUMENT, IN GENERAL,

2        IS TALKING ABOUT?

3   A.   I'M DOING A SERIES OF CALCULATIONS TO SHOW, I GUESS,

4        WHAT HAPPENS IF YOU DO SOMETHING.

5   Q.   IS DOING THAT -- IS THE SOMETHING YOU'RE TALKING

6        ABOUT DOING DISTRIBUTING OUT A BISPHENOL PORTFOLIO?

7   A.   RIGHT.

8   Q.   AND WHAT WERE YOU COMPUTING, IN TERMS OF CONCERNS

9        ABOUT DISTRIBUTING OUT THAT PORTFOLIO?

10  A.   IT HAD SOMETHING TO DO WITH THE CHANGES TO THE

11       DEPRECIATION AND INCOME.

12  Q.   DEPRECIATION AND INCOME OF WHO?

13  A.   IT LOOKS LIKE THE PARTNERSHIP.

14  Q.   DO YOU KNOW WHY YOU WERE ASKED TO PREPARE THIS

15       DOCUMENT?

16  A.   NO.

17  Q.   AND DID THE REQUEST COME FROM MR. BILL CURRY?

18  A.   YES.

19  Q.   WHERE DID MR. BILL CURRY WORK?

20  A.   HE WAS IN THE TAX DEPARTMENT.

21  Q.   AND IN THE FIRST FULL PARAGRAPH AFTER THE

22       INTRODUCTORY PART ABOUT IN THE ASSET MODEL, IT STARTS

23       WITH, "I THEN COPIED THE OVERLAY PORTION OF THE ASSET

24       MODEL."  DO YOU SEE THAT, SIR?

25  A.   YES.

1  Q.   THE THIRD SENTENCE BEGINS, "NET EFFECT OF INCREASED

2       INCOME AND REDUCED DEDUCTIONS IS ABOUT $6.9 MILLION

3       NPD OVER THE LIFE OF THE AGREEMENT FROM 4-30-93."

4       WHAT'S THAT DIRECTED TO?

5  A.   I -- I DON'T KNOW AT THIS POINT.

6  Q.   THE NEXT HEADING WITH AN UNDERLINE IS "ROUGH

7       ANALYSIS."  DO YOU SEE THAT, SIR?

8  A.   UH-HUH.

9  Q.   IT SAYS, "TAKING OUT THESE TWO PATENTS SHOULD REDUCE

10      THE ANNUAL RENTALS BY VARIOUS AMOUNTS."  ANNUAL

11      RENTALS TO WHO?

12 A.   EITHER -- EITHER DOW OR THE PARTNERSHIP.

13 Q.   DO YOU RECALL HAVING ANY DISCUSSIONS WITH MR. CURRY

14      ABOUT THIS ISSUE -- THE DISTRIBUTION OF THESE

15      BISPHENOL PATENTS?

16 A.   NO.

17           BY MR. WELSH:

18               IF I COULD HAVE JUST ONE SECOND, YOUR

19           HONOR.

20           BY THE COURT:

21               YOU MAY.

22           BY MR. WELSH:

23               THANK YOU VERY MUCH, MR. VALENZUELA.  I

24           HAVE NO FURTHER QUESTIONS.

25               THANK YOU, YOUR HONOR.

```
 1          BY THE COURT:
 2               THANK YOU.
 3               ANY REDIRECT, MR. BLANCHARD?
 4          BY MR. BLANCHARD:
 5               NO, SIR, YOUR HONOR.
 6          BY THE COURT:
 7               VERY WELL.
 8               MR. VALENZUELA, THANK YOU FOR COMING IN
 9          TODAY, SIR.  YOU ARE EXCUSED.
10               ALL RIGHT, GENTLEMEN.  IT'S NOW 4:30.  I
11          THINK IT'S TIME FOR ANOTHER 15 MINUTE BREAK.
12          WE'LL RESUME AT 4:45.  AND AS WE DID YESTERDAY,
13          WE'LL GO TILL ABOUT SIX O'CLOCK TONIGHT.  OKAY?
14          BY MR. WELSH:
15               THANK YOU.
16          BY THE COURT:
17               COURT IS IN RECESS.
18               (THEREFORE, AT THIS TIME, THE COURT IS IN
19               RECESS.)
20               (THEREFORE, AT THIS TIME, THE PROCEEDINGS
21               ARE RESUMED.)
22          BY THE COURT:
23               BE SEATED EVERYONE.
24               OKAY.  MR. MAGEE, YOU MAY CALL YOUR NEXT
25          WITNESS.
```

1        BY MR. MAGEE:

2              YOUR HONOR, OUR NEXT WITNESS IS GOING TO BE

3        ANDREW SHERMAN, AND HE WILL BE PRESENTED BY

4        ROYCE TIDWELL.

5        BY THE COURT:

6              VERY WELL.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2    THE WITNESS, ANDREW SHERMAN, AFTER HAVING FIRST BEEN DULY

3    SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

4    THE TRUTH, TESTIFIED AS FOLLOWS:

5          BY THE CLERK:

6                STATE AND SPELL YOUR NAME FOR THE RECORD,

7          PLEASE.

8          BY THE WITNESS:

9                ANDREW SHERMAN, A-N-D-R-E-W  S-H-E-R-M-A-N.

10                    DIRECT EXAMINATION

11   BY MR. TIDWELL:

12   Q.   GOOD AFTERNOON, MR. SHERMAN.  FIRST, THANKS FOR

13        TRAVELING FROM NEW YORK TO ATTEND THE PROCEEDINGS

14        TODAY.

15             MR. SHERMAN, YOU'RE RABO BANKS'S IN-HOUSE

16        COUNSEL; IS THAT CORRECT?

17   A.   THAT'S CORRECT.

18   Q.   AND YOU'RE HERE TO TESTIFY REGARDING YOUR INVOLVEMENT

19        WITH RABO BANKS'S INVESTMENT IN CHEMTECH II THAT

20        OCCURRED IN 1998?

21   A.   THAT'S CORRECT.

22   Q.   CAN YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL BACKGROUND

23        AND WORK HISTORY PRIOR TO JOINING RABO BANK?

24   A.   SURE.  I GOT MY UNDERGRADUATE DEGREE IN FACTORS OF

25        BUSINESS ADMINISTRATION FROM THE UNIVERSITY OF

1       MICHIGAN IN 1989.  GOT MY J.D. FROM COLUMBIA

2       UNIVERSITY IN '92.  AFTER THAT I WAS WORKING FOR

3       SIMPSON, THATCHER AND BARTLET TILL '97.

4           BY THE REPORTER:

5               SAY THAT ONE MORE TIME, PLEASE, FOR WHO?

6           BY THE WITNESS:

7               SIMPSON, THATCHER AND BARTLET.  IT'S T-H-A-

8           T-C-H-E-R.

9   BY THE WITNESS:

10  A.   AND AT THAT POINT I TRANSFERRED TO RABO BANK.

11  BY MR. TIDWELL:

12  Q.   AND SINCE YOU'VE JOINED RABO BANK, WHAT ROLES AND

13       RESPONSIBILITIES HAVE YOU HELD?

14  A.   SEVERAL.  I JOINED RABO BANK AS A VICE PRESIDENT AND

15       U.S. COUNSEL.  AND OVER THE YEARS, PROMOTED FROM VICE

16       PRESIDENT TO SENIOR VICE PRESIDENT TO DIRECTOR TO

17       EXECUTIVE DIRECTOR TO MANAGING DIRECTOR AND ALSO THE

18       CORPORATE FUNCTIONAL TITLE FROM COUNSEL U.S. TO

19       ASSOCIATE GENERAL COUNSEL TO GENERAL COUNSEL.

20  Q.   AND HAVE YOU HAD ANY RESPONSIBILITY WITH RESPECT TO

21       RABO BANK'S STRUCTURED FINANCE GROUP?

22  A.   YES, I'VE BEEN -- SINCE '98 -- '97, '98 -- THE

23       PRIMARY COUNSEL, AND I WAS COUNSEL RESPONSIBLE FOR

24       THAT BUSINESS CLIENT.

25  Q.   CAN YOU TELL ME WHAT RABO BANK'S STRUCTURED FINANCE

1      GROUP DOES?

2   A.  RABO BANK'S STRUCTURED FINANCE GROUP IS THE CENTER OF

3      CONFIDENCE FOR MORE COMPLEX TRANSACTIONS THAT ARE NOT

4      PLAIN VANILLA, THEY DON'T FIT SQUARELY WITHIN THE

5      OTHER BUSINESS LINES OF THE BANK -- TRANSACTIONS THAT

6      ARE STRUCTURED AND -- AND HAVE MORE MOVING ELEMENTS

7      REQUIRED, THINKING OUTSIDE THE BOX, MORE CREATIVE

8      SOLUTIONS, ABILITY TO GET YOUR HANDS AROUND A

9      TRANSACTION MENTALLY AND INTELLECTUALLY.

10  Q.  AND SO HOW DO STRUCTURED FINANCINGS THAT WOULD BE

11      UNDERTAKEN BY RABO BANKS'S STRUCTURED FINANCE GROUP

12      DIFFER FROM, SAY, STANDARD TRANSACTIONS?

13  A.  IT'S REALLY IN THE LEVEL OF COMPLEXITY.  OR, NOT

14      NECESSARILY JUST COMPLEXITY.  SOME OF THE PLAIN

15      VANILLA REPEAT DEALS WE DO LIKE SECURITIZATIONS CAN

16      BE DEEMED COMPLEX.  THESE TRANSACTIONS TEND TO BE

17      MORE UNIQUE, ONE OFF, TAILORED, AND THEY REQUIRE A

18      CERTAIN ABILITY TO BE A PROBLEM SOLVER AND FIND

19      SOLUTIONS.

20  Q.  DO YOU KNOW, JUST GENERALLY SPEAKING, THE VOLUME OF

21      STRUCTURED FINANCING TRANSACTIONS UNDERTAKEN BY RABO

22      BANK?

23  A.  IT OBVIOUSLY VARIES YEAR TO YEAR.  I WOULD SAY

24      ROUGHLY 25 TO 40, 45 TRANSACTIONS A YEAR WOULD BE THE

25      VOLUME DEPENDING ON THE YEAR.  AND SIZE RANGE FROM --

1   USUALLY THEY DIDN'T DO MUCH LESS THAN A HUNDRED, TWO

2   HUNDRED MILLION, BUT THERE WERE SEVERAL SMALLER

3   TRANSACTIONS THAT WERE REPEAT TRANSACTIONS UP TO $4

4   AND $5 MILLION DOLLAR TRANSACTIONS.  I THINK THE

5   AVERAGE TRANSACTION SIZE, PRETTY CONSISTENTLY AROUND

6   350 TO 450 -- $350 MILLION TO $450 MILLION DOLLARS IS

7   PROBABLY WHERE THE AVERAGE WOULD BE.

8   Q.   AND WHAT THIS -- WITHOUT REVEALING ANY NAMES, WHAT

9   KIND OF CLIENTS SEEK STRUCTURED FINANCING FROM RABO

10   BANK?

11   A.   REALLY ALL, YOU KNOW, THERE'S NO SPECIFIC CLASS OF

12   CLIENTS THAT WOULD HAVE A STRUCTURED SOLUTION.  THE

13   CLIENT BASE IS GENERALLY FORTUNE 500 COMPANIES.  RABO

14   BANK IS A FOOD-AND-AGRICULTURAL FOCUS BANK.  ABOUT

15   TWO-THIRDS OF OUR PORTFOLIO IS FOOD AND AG BUSINESS.

16   THAT FOCUS DID NOT APPLY TO SPECIAL FINANCE.  THEY

17   WERE BASICALLY FREE TO PURSUE MOST FORTUNE 500

18   COMPANIES.  MOST OF THE CLIENTS WERE PROBABLY FORTUNE

19   200, FORTUNE 100 COMPANIES.  THEY WERE ALL EITHER

20   COMPANIES THAT HAD VERY HIGH CREDIT RATINGS -- WERE

21   INVESTMENT GRADE COMPANIES, OR HAD A VERY HIGH CREDIT

22   QUALITY AND POOLS OF ASSETS THAT THEY COULD USE TO

23   SUPPORT TRANSACTIONS.

24   Q.   AND ARE THE FINANCINGS THAT THE STRUCTURED FINANCE

25   GROUP UNDERTOOK, WERE THOSE TYPICALLY STRUCTURED AS

1       DEBT OR EQUITY INVESTMENTS?

2   A.  THERE IS NO TYPICAL, AND REALLY DEPENDING ON THE

3       PARTICULAR TRANSACTION.

4   Q.  SO THE STRUCTURED GROUP WOULD UNDERTAKE BOTH DEBT AND

5       EQUITY INVESTMENTS; IS THAT ---

6   A.  YES.  THE WAY THE STRUCTURED GROUP WORKED IS A

7       TRANSACTION WILL BE PRESENTED TO THEM BY A CLIENT OR

8       POTENTIAL CLIENT, SOMETIMES THROUGH ARRANGERS.  AND

9       WE WOULD EVALUATE THAT TRANSACTION ON IT'S MERITS AND

10      LOOK AT THE CREDIT AND LOOK AT THE RETURN AND MAKE A

11      DECISION.  SOME OF THOSE WERE PRESENTED TO US AS

12      EQUITY INVESTMENTS; SOME OF THOSE WERE PRESENTED TO

13      US AS DEBT, AS, YOU KNOW, IN THE FORM OF MAKING A

14      LOAN.  THERE WERE SOME LEASE DEALS.  WE ALSO DID A

15      NUMBER OF CAPITAL-RAISING DEALS FOR THE BANK -- WHAT

16      WE CALL FUNDING TRANSACTIONS THAT THE NET RESULT WAS

17      BRINING IN COST EFFECTIVE FUNDING FOR THE BANK FOR

18      THEIR CAPITAL TREATMENT FUND.

19  Q.  IS THERE ANYTHING UNIQUE ABOUT RABO THAT MAKES IT

20      MORE LIKELY TO INVEST IN EQUITY STRUCTURES RELATIVE

21      TO OTHER BANKS IN THE MARKET?

22  A.  YOU KNOW, THERE ARE TWO FACTORS THAT I THINK WOULD BE

23      RELEVANT.  ONE, AGAIN, THE CENTER OF CONFIDENCE THERE

24      WAS VERY, VERY STRONG.  THE BUSINESS TEAM UNDERSTOOD

25      THESE TRANSACTIONS, REALLY COULD GET THEIR HANDS

```
 1        AROUND THEM, KNEW WHERE THEY NEEDED TO HAVE THEIR
 2        PROTECTIONS, WHAT THEIR -- WHAT THEIR PRESSURE POINTS
 3        WERE, WHAT THE RETURN SHOULD BE.  BUT ALSO, RABO BANK
 4        IS A COOPERATIVE; IT DOESN'T HAVE ANY SHAREHOLDERS.
 5        WE'RE NOT PUBLICLY TRADED; WE'RE NOT EVEN PRIVATELY
 6        TRADED.  SO WE ARE NOT AS CONCERNED ABOUT BALANCE
 7        SHEET SIZE, RETURN ON EQUITY, RETURN ON ASSETS.
 8        THOSE MEASUREMENTS THAT ARE VERY KEY TO A LOT OF
 9        PUBLICLY TRADED BANKS AREN'T IMPORTANT TO RABO BANK.
10        SO THERE WERE CERTAIN TRANSACTIONS THAT WE WOULD DO
11        THAT MIGHT INCREASE OUR BALANCE SHEET SIGNIFICANTLY
12        THAT WOULD BE VERY DIFFICULT FOR MANY OTHER BANKS TO
13        DO BUT WERE NOT A FACTOR FOR US.
14   Q.   AND YOU TESTIFIED THAT YOU SUPPORTED THE STRUCTURED
15        FINANCE GROUP AS PART OF YOUR LEGAL ROLE WITH RABO
16        BANK.  CAN YOU TELL ME, WAS IT IN YOUR ROLE IN
17        SUPPORT OF THE STRUCTURED FINANCE GROUP THAT YOU
18        BECAME FAMILIAR WITH THE CHEMTECH II TRANSACTION?
19   A.   YES.
20   Q.   AND WHAT WAS YOUR RESPONSIBILITY WITH RESPECT TO
21        CHEMTECH II?
22   A.   OUR RESPONSIBILITY WITH CHEMTECH II WAS THE SAME AS
23        IT WOULD BE FOR ANY STRUCTURED TRANSACTION -- OR,
24        FRANKLY, ANY TRANSACTION THAT I WORK ON IN THE BANK.
25        MY ROLE EFFECTIVELY IS DUAL.  ONE, I NEED TO ENSURE
```

1      THAT THE BANK IS PROPERLY PROTECTED; THAT

2      DOCUMENTATION IS SUFFICIENT AND WORKS AND THAT THE

3      DOCUMENTATION IS IN COMPLIANCE WITH WHATEVER INTERNAL

4      APPROVALS ARE RECEIVE.  AND THE SECOND LEG OF THAT IS

5      TO PROVIDE, YOU KNOW, ADVICE AND MARKET KNOWLEDGE TO

6      THE BUSINESS TEAM AND ASSIST THEM ON THE BUSINESS

7      SIDE OF THE TRANSACTION, ADVISING THEM ON THE TERMS,

8      MAKING SURE THEY UNDERSTAND WHAT THE DOCUMENTS MEAN

9      IN TERMS OF ECONOMICS.

10  Q.  OKAY.  DID YOU WORK ON BOTH CHEMTECH I AND CHEMTECH

11      II?

12  A.  NO, I ONLY WORKED ON CHEMTECH II.

13  Q.  AND DID YOU HAVE AN UNDERSTANDING OF DOW'S OBJECTIVE

14      IN SOLICITING RABO BANKS'S'S INVESTMENT IN CHEMTECH

15      II?

16  A.  MY UNDERSTANDING WAS THAT DOW WAS LOOKING TO EFFECT A

17      TRANSACTION THAT WOULD GIVE THEM MINORITY EQUITY --

18      MINORITY INTEREST EQUITY.

19  Q.  WHAT'S THE SIGNIFICANCE OF MINORITY INTEREST EQUITY?

20  A.  THE SIGNIFICANCE OF EQUITY VERSUS SOME -- ANOTHER

21      STRUCTURE OR ---

22  Q.  WELL, IF DOW'S OBJECTIVE WAS TO RAISE MINORITY

23      INTEREST EQUITY, WHAT WAS THE SIGNIFICANCE TO DOW OF

24      RAISING EQUITY OR RAISING FUNDS IN THAT MANNER?

25  A.  I -- I ---

1        BY MR. SCHREIBER:

2              OBJECTION, YOUR HONOR.

3        BY THE COURT:

4           WHAT BASIS?

5        BY MR. SCHREIBER:

6              FOUNDATION.  I'M NOT SURE THE WITNESS IS

7        AWARE OF WHAT DOW WAS THINKING AT THE TIME.

8        BY THE COURT:

9              WHY DON'T YOU GO ON AND LAY A FOUNDATION,

10       IF YOU COULD?

11       BY MR. TIDWELL:

12             OKAY.

13  BY MR. TIDWELL:

14  Q.   WITHOUT -- JUST GENERALLY SPEAKING, WITHOUT REFERENCE

15       TO DOW SPECIFICALLY, DO YOU HAVE AN UNDERSTANDING OF

16       WHY A COMPANY MIGHT WANT TO RAISE EQUITY FINANCING OR

17       MINORITY EQUITY FINANCING RELATIVE TO, SAY, DEBT?

18  A.   SURE.  THERE ARE A HOST OF DIFFERENT REASONS WHY

19       EQUITY MIGHT BE MORE DESIRABLE THAN DEBT.  DEPENDING

20       ON THE TYPE OF EQUITY, YOU MAY OR MAY NOT HAVE FIXED

21       SCHEDULE PAYMENTS LIKE YOU HAVE ON DEBT.  BUT ALSO,

22       WHEN YOU LOOK AT THE ACCOUNTING TREATMENT, IF YOU'RE

23       RAISING EQUITY, IT'S GOING INTO YOUR CAPITAL LINE; IF

24       YOU'RE RAISING DEBT, IT'S GOING INTO YOUR DEBT LINE.

25       SO WHEN YOU ADD DEBT, YOU CHANGE VARIOUS MEASURES.

```
 1        WE TALKED EARLIER ABOUT RABO BANK NOT WORRYING ABOUT
 2        RETURN ON ASSETS.  PUBLIC COMPANIES WORRY A LOT ABOUT
 3        THEIR LEVERAGE RATIO AND THERE ARE OTHER DEBT-RELATED
 4        RATIOS THAT ARE VERY IMPORTANT.  ALSO, IF YOU HAVE --
 5        DEPENDING ON YOUR CREDIT FACILITIES -- YOUR REVOLVERS
 6        AND YOUR PLAIN, YOU KNOW, YOUR SORT OF PLAIN, VANILLA
 7        CREDIT FUNDING FACILITIES THAT YOU MIGHT HAVE WITH
 8        YOUR BANK GROUPS, OFTEN THERE ARE COVENANTS THAT
 9        RESTRICT HOW MUCH DEBT YOU CAN HAVE, RESTRICT HOW
10        MUCH LEVERAGE YOU CAN HAVE, AND OTHER DEBT RATIOS,
11        INTEREST CHARGE COVERAGE RATIOS.  AND ALSO, SOME OF
12        THOSE TRANSACTIONS, YOU HAVE -- YOUR PRICING IS BASED
13        OFF THE LEVERAGE RATE.  SO THE HIGHER YOUR LEVERAGE
14        IS, THE HIGHER YOUR COST OF YOUR BORROWING ON YOUR
15        REVOLVER.  AND FINALLY, RATINGS.  ALL THESE -- ALL
16        THESE FORMULAS, ALL THESE RATIOS PLAY INTO RATING
17        AGENCY ANALYSIS OF THE COMPANY -- THE COMPANY'S
18        RATING.
19   Q.   AND TO WHAT EXTENT, IF AT ALL, WAS DOW'S OBJECTIVE
20        CONSISTENT WITH THOSE OF OTHER RABO BANK CLIENTS IN
21        ENGAGING IN STRUCTURED FINANCING?
22   A.   AGAIN, ASSUMING THAT THEIR -- THEIR DESIRE WAS WHAT,
23        YOU KNOW, TO RAISE MINORITY INTEREST, WHICH IS WHAT I
24        BELIEVE IT WAS, IT WAS CONSISTENT WITH LOTS OF OTHER
25        TRANSACTIONS WE DID AND -- AND, YOU KNOW, DIFFERENT
```

1    FROM OTHERS.  IT WASN'T NECESSARILY CONSISTENT OR

2    INCONSISTENT.  LOTS OF TRANSACTIONS WERE BROUGHT FOR

3    THE PURPOSE OF RAISING MINORITY INTEREST OR HAVING

4    OTHER TRANSACTIONS THAT HAVE SPECIFIC ACCOUNTING

5    BENEFITS OR ACCOUNTING TREATMENTS.  SO IT WASN'T

6    REALLY INCONSISTENT OR CONSISTENT.

7  Q.  WHAT'S YOUR UNDERSTANDING OF THE TERM MONETIZATION?

8  A.  MONETIZATION CAN MEAN A LOT OF DIFFERENT THINGS TO

9    DIFFERENT PEOPLE.  TO ME, MONETIZATION MEANS USING

10    ASSETS THAT YOU HAVE THAT YOU DON'T WANT TO SELL OR

11    CAN'T SELL -- USING THEM TO CREATE LIQUIDITY IN

12    FUNDING -- A FORWARD SALE OR FINANCING AGAINST THOSE

13    ASSETS IN A MANNER WHERE YOU GET CASH NOW FOR THOSE

14    ASSETS SO YOU CAN DEPLOY THAT CASH IN YOUR BUSINESS.

15  Q.  AND DID RABO BANK'S STRUCTURED FINANCE GROUP ENGAGE

16    IN MONETIZATION FINANCING TRANSACTIONS?

17  A.  YES, THEY WERE ACTUALLY QUITE FREQUENT AND PRETTY

18    COMMON WITH US.  WE DID MULTIPLE BILLIONS OF DOLLARS

19    WORTH OF MONETIZATION STRUCTURES.

20  Q.  OKAY.  NOW, BACK TO RABO BANKS'S INVESTMENT IN

21    CHEMTECH II.  I'D LIKE TO TURN YOUR ATTENTION TO

22    DEMONSTRATIVE 12, AND I THINK THAT SHOULD BE IN THE

23    FIRST TAB IN YOUR BINDER.

24  A.  OH, IT -- I'M ASSUMING THAT'S THE SAME THING THAT'S

25    ON MY SCREEN.

1    Q.    CAN YOU PLEASE DESCRIBE WHAT'S BEING DEPICTED ON THE

2          SCREEN, GENERALLY?

3    A.    THIS APPEARS TO BE THE STRUCTURE CHART FOR THE

4          CHEMTECH II TRANSACTION AND RABO BANK AND RBDC'S

5          INVESTMENT IN THAT TRANSACTION.

6    Q.    OKAY.  SO USING THIS DIAGRAM, CAN YOU PLEASE JUST

7          WALK US THROUGH THE STEPS BY WHICH RABO BANK INVESTED

8          IN CHEMTECH?

9    A.    SURE.  UAFS, WHICH IS AN INDIRECT SUBSIDIARY OF RABO

10         BANK FORMED A SPECIAL PURPOSE ENTITY, RBDC, AND

11         CONTRIBUTED $6 MILLION DOLLARS WORTH OF EQUITY INTO

12         THAT ENTITY.  THAT ENTITY THEN WENT THROUGH AN

13         INTERCOMPANY LOAN AGREEMENT AND BORROWED $194 MILLION

14         DOLLARS FROM RABO BANK NEW YORK BRANCH AND THEN USED

15         THAT $200 MILLION DOLLARS CASH TO ACQUIRE A

16         PARTNERSHIP INTEREST, A PREFERRED PARTNERSHIP

17         INTEREST IN CHEMTECH II.

18   Q.    NOW, WHY DID RABO BANK NEW YORK FUND TO RBDC

19         PRIMARILY WITH DEBT CAPITAL?

20   A.    YOU KNOW, I CAN'T PROFESS TO KNOW EXACTLY WHY.  WHEN

21         WE FUND SUBSIDIARIES, THERE ARE VARIOUS WE COULD DO

22         IT.  WE COULD DO IT WITH 100 PERCENT EQUITY; WE COULD

23         DO IT WITH A PORTION OF EQUITY AND A PORTION OF DEBT;

24         WE COULD DO IT WITH ALL DEBT.  GENERALLY WHEN WE DID

25         IT WITH DEBT LIKE THIS, IT WAS SO THAT WE COULD

1        ENHANCE OUR FINANCING -- ENHANCE OUR FUNDING.  WE

2        COULD PUT THESE INTO CONDUITS THAT HAD BETTER CAPITAL

3        TREATMENT, BETTER FUNDING TREATMENT, OR WE COULD

4        SYNDICATE IT BY SELLING OFF PIECES TO OTHER BANKS IF

5        WE DIDN'T WANT TO HOLD THE ENTIRE EXPOSURE.  IT

6        ACTUALLY INDICATES HERE THAT THERE WAS A $150 MILLION

7        DOLLARS SYNDICATED LOAN FROM RABO BANKS NEW YORK.

8        I'M NOT REALLY SURE THAT'S AN ACCURATE DEPICTION; I

9        THINK IT WOULD HAVE BEEN $194 MILLION DOLLAR LOAN

10       THAT WAS SYNDICATED.  IN FACT, WE DIDN'T SYNDICATE

11       IT; I AM FAIRLY CERTAIN THAT WE DID FUND THIS THROUGH

12       A CONDUIT STRUCTURE THAT HAD FAVORABLE CAPITAL

13       TREATMENT FOR RABO BANK.

14  Q.   SO IT'S FAIR TO SAY THAT THE -- THAT RABO BANK NEW

15       YORK AND UAFS, THOSE ARE INTERNAL RABO BANK FUNDING

16       VEHICLES?

17  A.   WELL, RABO BANK NEW YORK BRANCH ISN'T ACTUALLY A

18       FUNDING VEHICLE.  THAT'S OUR OPERATING BRANCH IN THE

19       US.  BUT UAFS IS ONE OF OUR OPERATING SUBS THAT HOLDS

20       -- IT'S PURPOSE IS TO HOLD OTHER INVESTMENT SUBS.  SO

21       YES, YOU CAN CALL IT A FUNDING VEHICLE.

22  Q.   CAN YOU DESCRIBE THE CHEMTECH II PARTNERSHIP, IT'S

23       PRIMARY ASSETS AND OPERATIONS?

24  A.   CHEMTECH II HAD TWO PRIMARY ASSETS -- OR ACTUALLY

25       THREE PRIMARY ASSETS, TWO PRIMARY CLASSES.  THE FIRST

1  WAS $200 MILLION DOLLARS WORTH OF CASH AND CASH

2  EQUIVALENTS IN INTERCOMPANY LOANS; AND THE SECOND WAS

3  $800 MILLION DOLLARS WORTH OF PLANT ASSETS, WHICH

4  WERE COMPOSED OF TWO SEPARATE PLANTS.  THE EQUITY

5  OWNERSHIP STRUCTURE -- THERE WAS A GENERAL PARTNER,

6  WHICH WAS IFCO, THERE WAS A CLASS B PARTNER, WHICH

7  WAS DCDC, WHICH I THINK WAS DOW CHEMICAL DC, MAYBE.

8  I DON'T REMEMBER IF THAT'S THE ACTUAL NAME OR IF DCDC

9  WAS.  AND THEN A CLASS A PARTNER, WHICH WAS THE

10  PREFERRED EQUITY INTEREST, AND THAT WAS RBDC.

11 Q.  AND ECONOMICALLY, WHAT WERE THE FEATURES OF RBDC'S

12  CHEMTECH II LIMITED PARTNER INTEREST?

13 A.  ECONOMICALLY PRETTY CONSISTENT WITH ANY PREFERRED

14  EQUITY INTEREST.  WE MADE AN EQUITY CONTRIBUTION; WE

15  RECEIVED A PREFERRED RATE OF RETURN ON THAT, MEANING

16  WE GOT OUR RETURN AHEAD OF THE OTHER PARTNERS.  THEN

17  THERE WAS, THROUGH THE CAPITAL ACCOUNT MECHANISM, AN

18  ALLOCATION OF PROFITS AND LOSSES TO THE VARIOUS

19  PARTNERS.  AND RABO BANK -- RBDC, SORRY -- GOT AN

20  ALLOCATION, FIRST OF IT'S PREFERRED RETURN.  THEN

21  AFTER THE RETURNS WERE ALLOCATED, IT GOT, THROUGH THE

22  CAPITAL ACCOUNT ALLOCATIONS -- WAS ENTITLED TO 1

23  PERCENT OF THE RESIDUAL PROFITS AND BORE 1 PERCENT OF

24  THE RESIDUAL LOSS.

25 Q.  AND WHAT WAS RBDC'S CLAIM ON CHEMTECH IN LIQUIDATION?

1   A.   CLAIM ON CHEMTECH?  THE WAY A LIQUIDATION WOULD WORK

2        IS A LIQUIDATOR WOULD COME IN AND WOULD SELL ALL OF

3        THE ASSETS AND TURN THEM INTO CASH.  THE PROFIT OR A

4        LOSS ON THOSE SALES WOULD BE DETERMINED AND THEN

5        ALLOCATED TO THE PARTNER'S -- TO THE PARTNER'S

6        CAPITAL ACCOUNTS AND THEIR BACK CAPITAL ACCOUNT

7        BALANCES ADJUSTED.  AND THAT POINT IN TIME, THE

8        AGGREGATE CAPITAL ACCOUNT BALANCES WOULD EQUAL THE

9        AGGREGATE AMOUNT OF CASH, AND THEN THE LIQUIDATOR

10       WOULD DISTRIBUTE THE CAPITAL ACCOUNT BALANCES TO THE

11       -- IN THIS CASE, THREE PARTNERS.

12  Q.   SO IN LIQUIDATION, RBDC WOULD BE ENTITLED TO THE

13       BALANCE OF IT'S CAPITAL ACCOUNT?

14  A.   YES.

15  Q.   SO HOW, IF AT ALL, DOES THE ECONOMIC PROFILE YOU

16       DESCRIBED REGARDING RBDC'S CHEMTECH II LIMITED

17       PARTNER INTEREST DESCRIBE -- OR, I'M SORRY, COMPARE

18       WITH OTHER MARKET INSTRUMENTS WITH WHICH YOU ARE

19       FAMILIAR?

20  A.   I'M FAMILIAR WITH A WHOLE LOT OF OTHER MARKET

21       INSTRUMENTS, BUT STARTING WITH OTHER -- OTHER

22       PREFERRED EQUITY INTERESTS, EFFECTIVELY ECONOMICS ARE

23       FAIRLY THE SAME BETWEEN A PREFERRED MEMBER INTEREST,

24       I'M SORRY, PREFERRED PARTNER INTEREST IN A LIMITED

25       LIABILITY, SORRY, A LIMITED PARTNERSHIP.  IT IS

1    SIMILAR TO A PREFERRED MEMBER INTEREST IN AN LLC OR A

2    PREFERRED STOCK INTEREST IN A CORPORATION.  THE

3    STRUCTURES ARE DIFFERENT; THE MECHANICS MAY BE

4    DIFFERENT, BUT EFFECTIVELY THE ECONOMICS WOULD BE THE

5    SAME.  THE ECONOMICS VARY DRAMATICALLY FROM COMMON

6    EQUITY OR FROM DEBT.

7  Q.  SO IN WHAT WAY WOULD, SAY, A PREFERRED STOCK

8    INVESTMENT -- THE ECONOMICS OF A PREFERRED STOCK

9    INVESTMENT BE SIMILAR TO THOSE OF RBDC'S INVESTMENT

10    IN CHEMTECH II?

11  A.  WELL, GENERALLY IN BOTH OF THOSE STRUCTURES YOUR

12    HOLDER OF THE PREFERRED EQUITY GETS THE PREFERRED

13    RETURN, MEANING THEIR RETURN GETS PAID TO THEM BEFORE

14    ANYBODY ELSE GETS A RETURN.  AND GENERALLY THEY ARE A

15    PREFERRED POSITION.  PREFERRED STOCK DOESN'T HAVE

16    CAPITAL ACCOUNTS, BUT WOULD GENERALLY GET PAID OUT

17    FIRST IN PRIORITY TO THE OTHER -- THE OTHER

18    SHAREHOLDERS.  WHEREAS THAT PRIORITY MECHANISM IN A

19    PARTNERSHIP OR AN LLC AGREEMENT IS GENERALLY

20    ACCOMPLISHED THROUGH THE MECHANISM OF CAPITAL ACCOUNT

21    ALLOCATIONS.

22  Q.  OKAY.  AND TURNING BACK TO THE ECONOMIC FEATURES OF

23    RBDC'S INTEREST IN CHEMTECH II, YOU MENTIONED THE

24    PRIORITY RETURN WAS RECEIVED BEFORE OTHER ALLOCATIONS

25    OF PROFIT.  WAS RBDC'S PRIORITY RETURN GUARANTEED?

1  A.   NO.

2  Q.   WERE THERE ANY PROTECTIONS FOR RBDC'S PRIORITY RETURN

3       BUILT INTO THE STRUCTURE OF CHEMTECH II?

4  A.   AGAIN, PROTECTION IS A GENERAL -- VERY GENERAL TERM,

5       BUT SURE.  THERE WERE A NUMBER OF PROTECTIONS IN THE

6       PARTNERSHIP IN THE SENSE THAT THERE WERE RESTRICTIONS

7       ON WHAT THE PARTNERSHIP COULD AND COULDN'T DO, THE

8       TYPES OF ASSETS THE PARTNERSHIP COULD OWN,

9       LIMITATIONS ON THE PARTNERSHIP CREATING ANY OTHER

10      DEBT.  ALL THESE THINGS WOULD SOLIDIFY WHAT WE

11      ENVISIONED THE INVESTMENT TO BE AND THE CREDIT

12      PARAMETERS TO BE, MUCH THE WAY YOU WOULD IF YOU MADE

13      AN INVESTMENT IN A FUND.  YOU'D LOOK AT THE

14      INVESTMENT GUIDELINES OF THE FUND.  THEN THERE ARE

15      ALSO THE PROTECTIONS OF THE PRIORITIES THAT ARE BUILT

16      IN WITHIN THE CAPITAL ACCOUNT ALLOCATIONS.  WE GET

17      ALLOCATED THE AMOUNT OF OUR RETURN FIRST, AND THEN

18      THE REMAINING PROFITS ARE ALLOCATED IN A MANNER WHERE

19      WE WOULD ONLY GET ONE PERCENT OF THE UPSIDE OF THE

20      PROFIT, BUT WE ONLY GET A ONE PERCENT OF THE DOWNSIDE

21      OF THE LOSS, WHEREAS THE COMMON -- IN THIS CASE, THE

22      CLASS B AND THE GENERAL PARTNER, WOULD SHARE A

23      DISPROPORTIONATE PERCENTAGE OF THE UPSIDE AND A

24      DISPROPORTIONATE PERCENTAGE OF THE LOSS UNTIL THEIR

25      CAPITAL ACCOUNT WENT DOWN TO ZERO, IN WHICH CASE THAT

1       REMAINING LOSS WOULD BE ALLOCATED 100 PERCENT TO THE

2       CLASS A PARTNER.

3   Q.  AND THE CLASS A PARTNER WAS?

4   A.  RBDC.

5   Q.  SO IF THE -- DO YOU KNOW WHAT CHEMTECH II'S PRIMARY

6       SOURCE OF INCOME WAS?

7   A.  YES, THERE ARE TWO -- THERE ARE TWO INCOME STREAMS.

8       I'M NOT SURE WHICH ONE PRIMARY, BUT THEY HAD A LEASE

9       STREAM -- LEASE INCOME COMING OFF OF THE LEASE OF THE

10      TWO PLANT ASSETS TO DOW; AND THEN THEY HAD INTEREST

11      INCOME COMING FROM THE $200 MILLION DOLLARS IN

12      COMPANY DEBT THAT WAS ISSUED TO DOW.

13  Q.  IF THE LEASE PAYMENTS FROM DOW WERE INSUFFICIENT TO

14      GENERATE ENOUGH PROFIT TO COVER RBDC'S PRIORITY

15      RETURN OR IF DOW FAILED TO MAKE THE LEASE PAYMENTS,

16      WHAT RECOURSE DID RBDC HAVE?

17  A.  IN THE LIMITED PARTNERSHIP AGREEMENT THERE ARE KINDS

18      OF NOTICE EVENTS.  AND IF A CERTAIN NUMBER OF LIMITED

19      RETURN -- I'M SORRY, PREFERRED RETURNS WERE NOT PAID,

20      I THINK IT WAS TWO QUARTERS IN THIS CASE, BUT I DON'T

21      REMEMBER SPECIFICALLY, A NOTICE EVENT OCCURS, THEN

22      ALLOWS RBDC TO EXERCISE RIGHTS TO CAUSE THE

23      PARTNERSHIP TO BE LIQUIDATED.  THE LIQUIDATOR WOULD

24      COME IN; THEY WOULD SELL THE ASSETS.  WHETHER THEY --

25      IT WOULD BE DETERMINED WHETHER THOSE ASSETS WERE SOLD

1       AT PROFIT OR A LOSS.  THOSE PROFITS AND LOSSES WOULD

2       WASH THEIR WAY THROUGH THE CAPITAL ACCOUNTS AND

3       PEOPLE'S CAPITAL ACCOUNTS' BALANCES WOULD BE ADJUSTED

4       APPROPRIATELY, AND THE CASH PROCEEDS FROM THE

5       LIQUIDATION WOULD BE DISTRIBUTED IN ACCORDANCE WITH

6       THE CAPITAL ACCOUNTS.

7  Q.   YOU DESCRIBED THAT IN A LIQUIDATION THAT RBDC WOULD

8       RECEIVE THE BALANCE OF IT'S CAPITAL ACCOUNT.  CAN YOU

9       DESCRIBE JUST GENERALLY THE PURPOSE OF A CAPITAL

10      ACCOUNT?

11 A.   SURE.  CAPITAL ACCOUNTS, IN A LIMITED PARTNERSHIP

12      AGREEMENT OR AN LLC AGREEMENT, TRACK THE VALUE, FOR

13      LACK OF A BETTER WORD, OF THE EQUITY OWNER'S INTEREST

14      IN THE COMPANY.  AND SO AS PROFITS GET ALLOCATED, AS

15      THEY CONTRACTUALLY AGREE WHAT PERCENTAGE OF WHICH

16      PROFITS GO TO WHICH PARTNER.  THOSE PROFITS GET ADDED

17      TO THE CAPITAL ACCOUNT AND WOULD RAISE THE CAPITAL

18      ACCOUNT BALANCE, INCLUDING THROUGH THE ALLOCATION OF

19      A PREFERRED RETURN.  THEN EACH QUARTER, OR WHATEVER,

20      PERIODICALLY, YOU KNOW, GIVEN THE ENTITY, PAYMENTS

21      WERE MADE.  AS PAYMENTS WERE MADE OUT AMONG THE

22      VARIOUS INTERESTS, THE CAPITAL ACCOUNT WOULD BE

23      REDUCED.  SO IT'S A MATTER OF TRACKING WHAT THE

24      EQUITY INTEREST IN THE COMPANY IS FOR THE VARIOUS

25      EQUITY HOLDERS.

1   Q.   WAS RBDC'S CAPITAL ACCOUNT GUARANTEED IN CHEMTECH II?

2   A.   NO.

3   Q.   SO IN A LIQUIDATION OF CHEMTECH II, WOULD RBDC

4        RECEIVE DISTRIBUTIONS PRIOR TO CHEMTECH'S CREDITORS?

5   A.   NO.  CREDITORS GET -- CREDITORS WOULD GET PAID BEFORE

6        ANY OF THE EQUITY GOT PAID.  AND AGAIN, AFTER THAT,

7        THE ALLOCATE -- THE LOSS/GAIN WOULD BE CALCULATED AND

8        FUNNELED THROUGH THE CAPITAL ACCOUNTS.

9   Q.   OKAY.  PLEASE TURN TO WHAT'S BEEN MARKED AS JOINT

10       EXHIBIT 647.  IT SHOULD BE IN THE SECOND TAB IN YOUR

11       BINDER.  CAN YOU LET ME KNOW IF YOU RECOGNIZE THIS?

12  A.   I DO.

13  Q.   SO WHAT'S THE PURPOSE OF THIS DOCUMENT?

14  A.   THERE TECHNICALLY ARE THREE DOCUMENTS THAT ARE IN

15       THIS TAB.  FIRST PAGE, WHICH ENDS WITH 3661, IS A

16       REPORT OF THE RESULTS OF THE -- WHAT WE CALL RICC -

17       THE RABO BANKS'S INTERNATIONAL CREDIT COMMITTEE,

18       WHICH WAS THE INTERMEDIATE LEVEL CREDIT APPROVAL

19       BODY.  AND THE SECOND PAGE, OR THE BACK OF THE FRONT

20       PAGE, IS THE RESULTS OF THE EXECUTIVE BOARD, WHICH IS

21       THE HIGHEST LEVEL OF CREDIT APPROVAL.  AND THESE ARE

22       REPORTING ON OTHER RESULTS OF VARIOUS APPLICATIONS

23       THAT WERE IN FRONT OF THOSE COMMITTEES.  AND THEN THE

24       REMAINDER OF THE EXHIBIT IS THE CREDIT, EXCUSE ME,

25       CREDIT APPLICATION THAT WAS WRITTEN IN JUNE OF 1998

1    IN SUPPORT OF THE CHEMTECH II TRANSACTION.

2  Q.   OKAY.  ARE CREDIT APPLICATIONS USED FOR ALL OF RABO'S

3       INVESTMENTS, INCLUDING BOTH DEBT AND EQUITY

4       INVESTMENTS?

5  A.   THE STANDARD CREDIT -- FORM CREDIT APPLICATION IS

6       USED FOR ANY TRANSACTION THAT RABO BANK ENTERS INTO

7       THAT HAS ANY ECONOMIC INVOLVEMENT WHATSOEVER.  SO BE

8       IT PARTNERSHIP INVESTMENT, PREFERRED STOCK, A LOAN,

9       STRAIGHT-UP LOAN, A LEASING DEAL, A SECURITIZATION,

10      WHATEVER IT IS, THIS IS HOW THE RELATION MANAGER OR

11      THE PERSON RESPONSIBLE FOR THE TRANSACTION WOULD GET

12      INTERNAL APPROVAL TO PROCEED WITH THE TRANSACTION.

13 Q.   OKAY.  AND I THINK YOU TESTIFIED THAT THE DOCUMENT

14      APPEARING ON PAGE, OR BATES 3661 IS THE

15      RECOMMENDATION BY RICC.  CAN YOU TELL US WHAT RICC

16      IS?

17 A.   RICC IS THE RABO BANK INTERNATIONAL CREDIT COMMITTEE.

18      THE CREDIT APPROVAL STRUCTURE AT RABO BANK THERE IS

19      THE NEW YORK CREDIT COMMITTEE, OR WHAT WE CALL NYCC.

20      AND THAT IS THE FIRST STOP FOR ALL CREDIT

21      APPLICATIONS.  ANY EXPOSURE THAT'S WITHIN THEIR

22      APPROVAL LIMITS -- AND I DON'T REMEMBER WHAT THEIR

23      APPROVAL LIMITS WERE IN '98; I'M GOING TO GUESS IT

24      WAS $30 MILLION; NOW I THINK IT'S $45 -- GETS

25      APPROVED THERE -- APPROVED OR REJECTED THERE, AND

```
1         THAT'S THE END OF THE STORY.  IF IT'S ABOVE NYCC'S
2         CREDIT APPROVAL, THEY WILL EITHER REJECT IT, DECLINE
3         IT, OR RECOMMEND IT POSITIVELY TO THE NEXT LEVEL,
4         WHICH IS RICC -- RABO BANKS'S INTERNATIONAL CREDIT
5         COMMITTEE, WHO ALSO HAD IT'S OWN DOLLAR LIMIT OF
6         APPROVAL.  AGAIN, I DON'T HAVE ANY RECOLLECTION OF
7         WHAT IT WAS BACK IN '98; I'M NOT EVEN SURE I KNOW
8         WHAT IT IS NOW.  AND TWO OPTIONS WOULD HAPPEN THERE.
9         RICC COULD EITHER DENY THE APPLICATION, I'M SORRY,
10        THREE OPTIONS.  DENY IT.  APPROVE IT IF IT'S WITHIN
11        IT'S CREDIT LIMIT, OR RECOMMEND IT -- SEND IT UP TO
12        THE EXECUTIVE BOARD WITH A POSITIVE RECOMMENDATION.
13        THE EXECUTIVE BOARD IS ACTUALLY THE EXECUTIVE BOARD
14        OF RABO BANK, AND IT'S THE-BUCK-STOPS-HERE COMMITTEE,
15        AND THEY HAVE FINAL SAY ON ANYTHING THAT'S ABOVE THE
16        RICC APPROVAL LEVEL.
17 Q.     AND THIS DOCUMENT, BATES ENDING 3661, DOES THIS
18        DESCRIBE THE CHEMTECH II TRANSACTION TO ANYWHERE?
19 A.     THE FIRST ENTRY ON THE TOP OF THE PAGE IS THE
20        CHEMTECH II TRANSACTION.
21 Q.     AND WHAT DOES IT INDICATE WITH RESPECT TO THE
22        CHEMTECH II TRANSACTION?
23 A.     THAT THE RICC APPROVED -- I'M SORRY, RECOMMENDED IT
24        WITH A POSITIVE ADVICE TO THE EXECUTIVE BOARD.
25 Q.     TURNING TO 3662, DOES THE CHEMTECH II TRANSACTION
```

1          APPEAR ON THIS PAGE?

2    A.   YES, THE SECOND ENTRY ON THIS PAGE IS THE CHEMTECH

3          TRANSACTION.

4    Q.   AND WHAT ACTION WAS TAKEN?

5    A.   THIS WAS THE APPROVAL BY THE EXECUTIVE BOARD OF THE

6          PROPOSED TRANSACTION.

7    Q.   AND DO ALL DEBT AND EQUITY INVESTMENTS BY RABO BANK

8          FOLLOW THE SAME APPROVAL PROCEDURE?

9    A.   EVERY INVESTMENT.  EVERY TRANSACTION ENTERED INTO BY

10         RABO BANK GOES THROUGH THIS PROCEDURE.

11   Q.   SO IN THE MIDDLE OF THE PAGE THERE ON BATES 3662, IT

12         SAYS "BORROWER: DOW CHEMICAL."  WAS DOW A BORROWER IN

13         THE CHEMTECH II TRANSACTION?

14   A.   NO.

15   Q.   WHY DOES IT LIST BORROWER NEXT TO DOW'S NAME?

16   A.   IT'S A BIT OF A SQUARE-PEG, ROUND-HOLE MECHANISM.  A

17         DECISION HAD BEEN MADE PROBABLY AROUND '97, '98 --

18         '97, I THINK THAT ALL CREDIT APPLICATIONS NEED TO GO

19         THROUGH A STANDARD FORMAT, REGARDLESS.  AND THIS IS

20         THE STANDARD FORMAT.  AND THEN ALSO THE APPROVALS

21         COME IN A STANDARD FORMAT.  AND IT WAS JUST -- IT WAS

22         TOO BURDENSOME TO HAVE DIFFERENT TYPES AND DIFFERENT

23         FORMATS OF CREDIT APPLICATIONS GOING THROUGH THE

24         CREDIT PROCESS, DEPENDING ON WHAT THE TRANSACTION WAS

25         OR WHAT OFFICE WAS PITCHING IT.  SO THEY WENT TO A

1     STANDARD FORMAT, AND WE JUST USED THE TERM BORROWER

2     WHETHER IT'S A BORROWER, IT COULD BE A LESSOR, IT

3     COULD BE COUNTER PARTY FOR A SWAP TRANSACTION.  AND

4     AGAIN, IF YOU LOOK AT THAT, IT'S TITLED DOW CHEMICAL

5     COMPANY BECAUSE WE WILL AGGREGATE ALL OF THE EXPOSURE

6     THAT WE HAVE WITH ONE CLIENT IN THE SAME CREDIT

7     APPLICATION.  SO IN THE CREDIT APPLICATION, IF YOU

8     LOOK AT 3663, WE HAVE A FACILITY WHERE DOW -- WHERE

9     WE'LL BE MAKING AN EQUITY IN A SUBSIDIARY OF DOW. WE

10    HAVE A FINANCIAL-DERIVATIVES RISK LINE IN WHICH DOW

11    WILL BE OUR COUNTER PARTY.  WE HAVE A REVOLVING LINE

12    OF CREDIT, WHICH DOW WOULD BE OUR BORROWER, OTHER

13    THAN THE CANCELLATION OF THE LINE.  THEN THERE'S

14    ANOTHER DERIVATIVES LINE FOR SWAPS WHERE THEY'D BE A

15    COUNTER PARTY.  SO YOU CAN'T REALLY LIST ALL THE

16    DIFFERENT NOMENCLATURE.  AND THE DECISION WAS MADE

17    THAT WE WANT A STANDARD FORMAT.  AND ALTHOUGH THAT'S

18    NOT EXACTLY PRECISE IN EVERY INSTANCE, THE RISK OF

19    IT,  OR THE COST OF IT BEING NOT EXACTLY PRECISE WAS,

20    OF COURSE, OUTWEIGHED BY THE NECESSITY AND THE

21    BENEFIT OF HAVING A STANDARD FORM.

22 Q. OKAY.  AND JUST FOR THE RECORD, WHAT YOU WERE

23    REFERRING TO IN TERMS OF THE DIFFERENT EXPOSURES FOR

24    DOW WAS ON BATES 3663, AND YOU'RE REFERRING TO THE

25    NUMBERS NEAR THE TOP OF THE PAGE NEXT TO APPLICATION

```
 1        1, 2, 3, THOSE NUMBERS THERE?
 2   A.   YES.  SORRY; I SHOULD HAVE BEEN A LITTLE MORE
 3        SPECIFIC.
 4   Q.   NO, THAT'S FINE.  SO ON BATES 3663, WHAT DOES THIS
 5        PAGE DESCRIBE, GENERALLY?
 6   A.   THIS WAS THE -- THIS IS THE FRONT PAGE OF THE CREDIT
 7        APPLICATION SEEKING APPROVAL TO ENTER INTO THE EQUITY
 8        INVESTMENT IN CHEMTECH II THROUGH SPC.  AT THIS POINT
 9        WE HAD NOT FORMED THE SPC, SO WE DIDN'T KNOW THE
10        NAME.  SO WE USED GENERIC "SPC" TO REFER TO RBDC -
11        WHAT WOULD BE RBDC.
12   Q.   OKAY.  NEXT TO IT AT THE TOP OF THE DOCUMENT THERE IS
13        "SPC-" WITH DOW CHEMICAL COMPANY AS EFFECTIVE
14        GUARANTOR.  WHAT DOES IT MEAN WHEN IT SAYS WITH DOW
15        CHEMICAL COMPANY AS EFFECTIVE GUARANTOR?
16   A.   I DIDN'T WRITE IT, SO I DON'T KNOW EXACTLY WHAT THEIR
17        INTENT WAS.  MY INTERPRETATION OF IT IS THAT, YOU
18        KNOW, A LOT OF THIS, WE DON'T GET TOO GRANULAR ON A
19        CREDIT APPLICATION.  THE IDEA IS TO EXPLAIN IT TO THE
20        CREDIT COMMITTEE AND MAKE SURE THEY UNDERSTAND WHAT
21        THE CREDIT RISK IS.  AT THE END OF THE DAY, THE
22        INVESTMENT IS IN CHEMTECH II; CHEMTECH II HAS TWO
23        ASSETS -- OR THREE ASSETS AND TWO CLASSES OF ASSETS,
24        THAT ARE ALL DEPENDENT ON THE CREDIT PERFORMANCE OF
25        DOW.  SO AT THE END OF THE DAY, THE RISK IN THIS
```

1      TRANSACTION TO RABO BANK IS DOW PERFORMANCE RISK.

2      AND SO THAT'S WHY -- I BELIEVE THAT'S WHY IT'S

3      WRITTEN WITH DOW CHEMICAL BEING THE EFFECTIVE

4      GUARANTOR.  GUARANTOR IS NOT THE RIGHT WORD, BUT THE

5      INTENT COMES ACROSS.

6  Q.   OKAY.  SO THE DOCUMENT, BATES 3663, IS A SUMMARY OF

7      WHAT APPEARS ON THE REMAINDER OF THE DOCUMENT; IS

8      THAT CORRECT?

9  A.   YES, THE WAY THE STANDARD FORM CREDIT APPLICATION

10      WORKS, THERE IS A SUMMARY SECTION UP FRONT AND THEN

11      IT GOES INTO THE DETAIL IN THE BODY OF THE DOCUMENT.

12      SO THE DOCUMENT ITSELF IS A SUMMARY OF THE

13      TRANSACTION AND THE FRONT PAGE IS A SUMMARY OF THAT

14      SUMMARY.  SO IT DOES TEND TO GET A LITTLE

15      SHORTHANDED.

16  Q.   IF YOU TURN TO BATES 3668.  DOES THIS PAGE DESCRIBE

17      THE CHEMTECH II TRANSACTION IN MORE DETAIL THAN

18      APPEARS ON THE SUMMARY PAGE?

19  A.   YES.  I MEAN, THE STEPS HERE ARE SET OUT -- THE

20      SPECIFIC STEPS OF WHAT WOULD HAPPEN, AND THIS IS MORE

21      TRUE TO THE ACTUAL STRUCTURE.

22  Q.   OKAY.  I'M GOING TO START AT THE SECOND PARAGRAPH.

23      IT SAYS, "WE PROPOSE A FIVE-YEAR TERM LOAN FINANCING

24      STRUCTURE TO A RABO CONTROLLED SPC, WHICH IN TURN

25      WILL BECOME A LIMITED PARTNER IN THE DOW CHEMICAL

1    PARTNERSHIP."  IS THAT THE SAME THING OR THE SAME

2    STRUCTURE THAT YOU DESCRIBED WITH RESPECT TO

3    PLAINTIFF'S DEMONSTRATIVE 12?

4  A.  YES, THAT'S A LOAN TO RBDC, WHICH IN TURN WILL USE

5    THE PROCEEDS TO BECOME A LIMITED PARTNER IN CHEMTECH

6    II.

7  Q.  OKAY.  AND THE STEPS THAT ARE LISTED HERE IN THE

8    MIDDLE OF THE PAGE, STEPS ONE THROUGH FOUR -- CAN YOU

9    DESCRIBE WHAT THOSE STEPS ARE INTENDED TO CONVEY?

10  A.  THIS IS INTENDED TO CONVEY TO THE CREDIT COMMITTEE

11    WHAT THE STRUCTURE IS AND HOW IT WILL WORK.  CLEARLY,

12    NOT EVERY SINGLE STEP INVOLVED IS LISTED, BUT THE

13    MAJOR STEPS ARE.  THE FIRST ONE BEING THAT WE WOULD

14    FORM A SPECIAL PURPOSE COMPANY, WHICH WE DID; IT'S

15    RBDC.  THE SECOND BE THAT THAT COMPANY BE FINANCED

16    WITH A LOAN IN THE AMOUNT OF $200 MILLION, WHICH WE

17    DID, BUT WE DID A 194, 6 SPLIT.  BUT FROM CREDIT

18    COMMITTEE'S PERSPECTIVE, THEIR CONCERN IS THERE'S

19    $200 MILLION AT RISK.  THEY DON'T CARE WHAT FORMAT WE

20    USE TO FUND THE SPD OR SPC.  STEP THREE IS MAKING A

21    CAPITAL CONTRIBUTION INTO THE PARTNERSHIP.  AND

22    AGAIN, THE EFFECT IS THE SAME.  I DON'T BELIEVE WE

23    MADE A DIRECT CAPITAL CONTRIBUTION TO THE

24    PARTNERSHIP; I BELIEVE WE PURCHASED A PARTNERSHIP

25    INTEREST.  BUT FROM CREDIT'S PERSPECTIVE, THE EFFECT

1      ON THE CREDIT ANALYSIS IS INDIFFERENT.  SO WE DON'T

2      GET TOO TIED UP IN THE NICETIES THERE.  AND THEN STEP

3      FOUR IS THE PARTNERSHIP, BEING CHEMTECH II, ENTERING

4      INTO LEASES WITH DOW CHEMICAL.  AND ACTUALLY I DON'T

5      THINK WE SPECIFIED HERE THAT THE EXTRA $200 MILLION

6      WOULD BE USED FOR COMMITTED ASSETS, BUT THAT WAS --

7      THAT WAS THERE AS WELL.

8  Q.  OKAY.  I WANT TO TURN BACK TO BATES 3663.  THAT'S

9      THIS THIRD PAGE ON THE TAB.  LOOKING DOWN ALONG THE

10     LEFT-HAND SIDE, DO YOU SEE WHERE IT SAYS "PURPOSE"?

11 A.  I DO.

12 Q.  AND NEXT TO THAT IT SAYS, "PROVIDE A STRUCTURED

13     FINANCING TRANSACTION THAT WILL GIVE DOW CHEMICAL

14     COMPANY MINORITY INTEREST TREATMENT FOR FINANCIAL

15     REPORTING PURPOSES"?

16 A.  YES.

17 Q.  DO YOU SEE THAT?

18 A.  UH-HUH.

19 Q.  IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF DOW'S

20     OBJECTIVE IN CHEMTECH II?

21 A.  IT IS.

22 Q.  THE NEXT, COMING DOWN THE PAGE HERE, WE HAVE EXISTING

23     EXPOSURE AND TOTAL EXPOSURE.  WHAT ARE THOSE TWO

24     HEADINGS; WHAT IS THE INFORMATION CONTAINED NEXT TO

25     THOSE TWO HEADINGS?

1  A.   FOR ANY CLIENT THAT WE HAVE MORE THAN ONE EXPOSURE,

2       ANY FUTURE CREDIT APPLICATION NEEDS TO GIVE THE

3       AGGREGATE EXPOSURE BY VARIOUS CATEGORIES, AS YOU SEE

4       HERE, SO THAT THE CREDIT ANALYSIS CAN BE DONE AND THE

5       CREDIT COMMITTEE UNDERSTANDS THE TOTAL EXPOSURE THAT

6       WE HAVE FOR THAT CLIENT.  AT THE END OF THE DAY,

7       THAT'S THE KEY.  PUTTING ON $200 MILLION DOLLARS OF

8       EXPOSURE TO A COMPANY LIKE -- ANY FORTUNE 100

9       COMPANY, IF WE DIDN'T HAVE ANY EXPOSURE, IT'S NOT A

10      BIG DEAL.  PUTTING ON $200 MILLION DOLLARS EXPOSURE

11      TO THAT SAME COMPANY IF WE ALREADY HAD $2 BILLION

12      DOLLARS WORTH OF EXPOSURE IS A MORE SIGNIFICANT DEAL.

13      I THINK IT'S ABSOLUTELY CRUCIAL THAT -- FOR THE

14      CREDIT PROCESS THAT YOU KNOW WHAT THE OTHER EXPOSURES

15      ARE, WHAT THE INTENTS ARE, ET CETERA.

16 Q.   SO COMING DOWN TO CHANGES IN PROTECTION, WHAT DOES

17      THE INFORMATION OR THE LANGUAGE NEXT TO CHANGES IN

18      PROTECTION INTENDED TO CONVEY?

19 A.   THIS IS INTENDED TO CONVEY TO CREDIT WHAT THE

20      PROTECTIONS WILL BE IN THIS NEW TRANSACTION.

21      BASICALLY, WHAT ARE THE ASSETS AND WHAT ARE THE

22      INCOME STREAMS SUPPORTING THE EQUITY INVESTMENT IN

23      CHEMTECH II AND IT'S LISTED AS THE, YOU KNOW, THE

24      PLANTS AND THE LEASE.

25 Q.   AND DOES IT DESCRIBE HOW RBDC WILL RECEIVE THIS

1      PROTECTION FROM THE ASSETS?

2  A.  YES, IN THE SENSE THAT IT TALKS ABOUT THE PRO RATA

3      INTEREST IN THE PARTNERSHIP.

4  Q.  TURNING TO BATES 3664, NEAR THE TOP IT SAYS "SUMMARY

5      SPC LOAN."  DO YOU SEE THAT?

6  A.  I DO.

7  Q.  WHAT LOAN IS THAT REFERRING TO?

8  A.  THAT IS THE $200 MILLION DOLLAR LOAN.  IT TURNS OUT

9      TO BE $194 MILLION DOLLAR LOAN MADE BY RABO BANK, NEW

10     YORK BRANCH TO RBDC.

11 Q.  SO IF WE GO BACK TO PLAINTIFF'S DEMONSTRATIVE 12, THE

12     LOAN YOU'RE REFERRING TO -- THE SUMMARY SPC LOAN IS

13     REFERRING TO IS DEPICTED ON THIS DEMONSTRATIVE AS THE

14     $194 MILLION DOLLAR AMOUNT ON THE RIGHT HAND SIDE?

15 A.  THAT'S CORRECT.

16 Q.  SO BACK TO 3664, JOINT EXHIBIT 647, SO UNDER THE

17     HEADING OF "SUMMARY SPC LOAN," THE FIRST SENTENCE

18     READS, "DOW CHEMICAL COMPANY'S SENIOR MANAGEMENT HAS

19     REQUESTED A $200 MILLION DOLLAR STRUCTURED

20     TRANSACTION FROM RABO BANK WHICH WILL ENABLE THEM TO

21     USE THERE HYDROCARBON AND BENZENE FACILITIES TO

22     ATTRACT FINANCING THAT FOR ACCOUNTING PURPOSES WILL

23     BE TREATED AS MINORITY INTERESTS.  DO YOU SEE THAT?

24 A.  I DO.

25 Q.  AND DOES THAT REFLECT YOUR UNDERSTANDING OF DOW'S

```
 1        GOALS IN THE TRANSACTION?

 2   A.   IT DOES.

 3   Q.   THE LAST SENTENCE OF THE FIRST PARAGRAPH SAYS, "THE

 4        PARTNERSHIP DOCUMENTATION INCLUDES A GUARANTEE FROM

 5        DOW CHEMICAL COMPANY FOR LEASE PAYMENTS AND THE

 6        PREFERRED RETURN FOR OUR SPC LOAN, WHICH AGGREGATES

 7        $112 MILLION DOLLARS ANNUALLY AND IS MORE THAN

 8        SUFFICIENT TO COVER OUR DEBT SERVICE REQUIREMENTS."

 9        DO YOU KNOW WHAT GUARANTEE IS BEING REFERRED TO HERE?

10   A.   I DON'T KNOW FOR CERTAIN; WHAT I'M SUSPECTING BASED

11        ON MY EXPERIENCE WITH THESE TRANSACTIONS IS THAT WE

12        WERE BUILDING IN THE FLEXIBILITY THAT DOW WOULD NOT

13        ACTUALLY BE THE LESSEE UNDER THE TRIPLE NET LEASE,

14        BUT THEY MIGHT USE A SPECIAL PURPOSE ENTITY.  AND IF

15        SO, THAT THAT SPECIAL PURPOSE ENTITY WOULD NEED TO BE

16        GUARANTEED BY DOW.  AND THE POINT I TAKE FROM THE

17        SENTENCE IS THAT THERE WILL BE AN INCOME STREAM

18        COMING IN FROM DOW INTO CHEMTECH THAT WILL BE

19        SUFFICIENT TO PAY PREFERRED RETURN AND THUS ALLOW

20        RBDC TO COVER IT'S DEBT SERVICE UNDER THE $194

21        MILLION DOLLAR LOAN.

22   Q.   SO THIS IS A -- IF I'M UNDERSTANDING CORRECTLY, THIS

23        IS A GUARANTEE FROM CHEMTECH TO THE PARTY TO WHICH

24        CHEMTECH LEASED THE PLANT ASSETS; RIGHT?

25   A.   CORRECT.  IN THIS CASE, WE DIDN'T -- NEVER CAME TO
```

```
 1        FRUITION BECAUSE WE LEASED DIRECTLY, OR CHEMTECH
 2        LEASED DIRECTLY TO THE DEEP POCKET ENTITY, WHICH WAS
 3        DOW OR THE ENTITY.
 4   Q.   AND DO YOU KNOW WHETHER OR NOT THERE WAS ANY
 5        GUARANTEE PROVIDED TO RBDC IN THE CHEMTECH II
 6        TRANSACTION?
 7   A.   THERE WAS NO GUARANTEE PROVIDED TO RBDC THAT I HAVE
 8        ANY KNOWLEDGE OF.
 9   Q.   THERE WAS NO PAYMENT GUARANTEE PROVIDED TO RBDC?
10   A.   SORRY, CORRECT, YES.  THERE WAS NO PAYMENT GUARANTEE.
11        THERE IS A PERFORMANCE GUARANTEE WHERE -- WHICH IN MY
12        MIND IS MORE LIKE AN INDEMNITY.  AND THAT IS A
13        GUARANTEE BY DOW.  AGAIN, IF DOW WERE DIRECTLY THE
14        PARTNER IN CHEMTECH II, WE WOULDN'T HAVE REQUIRED IT,
15        JUST LIKE WE DIDN'T REQUIRE IT FOR THE LEASE.  BUT
16        SINCE THE PARTIES THAT WE WERE RELYING ON TO PERFORM
17        THEIR OBLIGATIONS UNDER THE LIMITED PARTNERSHIP
18        AGREEMENT WERE NOT IN AND OF THEMSELVES STAND-ALONE
19        CREDIT WORTHY ENTITIES, THEY WERE SPECIAL-PURPOSE
20        ENTITIES OR LIMITED-PURPOSE ENTITIES, WE WANTED
21        PROTECTION FROM DOW THAT THEY WOULD PERFORM IN
22        ACCORDANCE WITH THEIR CONTRACTS.
23   Q.   AND CAN YOU DESCRIBE THE DIFFERENCE BETWEEN A PAYMENT
24        GUARANTEE AND A PERFORMANCE GUARANTEE?
25   A.   SURE.  A PAYMENT GUARANTEE IS WHAT MOST PEOPLE THINK
```

1    ABOUT WHEN THEY THINK ABOUT A GUARANTEE WHEN A PARENT

2    SIGNS ON THEIR KID'S AUTO LOAN OR LEASE OR SOMETHING

3    LIKE THAT.  AND THAT SAYS IF THE PRIMARY OBLIGOR DOES

4    NOT PAY THE AMOUNTS WHEN AND AS DUE, THE GUARANTOR

5    WILL PAY THOSE AMOUNTS WHEN AND AS DUE.  THE

6    PERFORMANCE GUARANTEE, AGAIN IN MY MIND, IS MORE OF

7    AN INDEMNITY.  WHAT THE PERFORMANCE GUARANTEE SAYS IS

8    IF IFCO OR RBDC FAIL TO PERFORM THEIR CONTRACTUAL

9    OBLIGATIONS UNDER THE PARTNERSHIP AGREEMENT, DOW WILL

10    MAKE RBDC WHOLE.  SO YOU REALLY NEED TO ESTABLISH A

11    FAILURE TO PERFORM AND A LOSS, WHICH IS WHY TO ME

12    IT'S MORE OF AN INDEMNITY THAN A GUARANTEE.  WHEREAS

13    ANY PAYMENT GUARANTEE, YOU JUST NEED TO ESTABLISH

14    FAILURE TO PERFORM.  THE LOSS IS DEFINED IN THE FACT

15    THAT THERE WAS A PAYMENT MISSING.

16  Q.  WAS IT NORMAL IN RABO BANK'S STRUCTURED FINANCE GROUP

17    TO OBTAIN PERFORMANCE GUARANTEES OF THIS NATURE?

18  A.  IT'S ABSOLUTELY PAR FOR THE COURSE.  WE WOULD NOT

19    ENTER INTO A TRANSACTION WHERE THERE WAS A SUBSIDIARY

20    PERFORMING ANY OF THESE FUNCTIONS WITHOUT THE

21    CLIENT'S PERFORMANCE GUARANTEE.  WE GO INTO THESE

22    DEALS UNDERSTANDING THE PARAMETERS AND UNDERSTANDING

23    WHAT THE ASSETS WOULD BE AND WOULDN'T BE.  IT WOULD

24    BE DEVASTATING FOR RABO BAN IF IFCO AS GENERAL

25    PARTNER HAD DECIDED TO COLLECT THE $200 MILLION

1        DOLLAR NOTE FROM DOW AND INVEST IN ENRON ASSETS --

2        SELL THE BENZENE PLANTS, OR WHATEVER AND INVEST IN

3        WORLDCOM ASSETS.  IF THAT WERE TO HAPPEN, WE NEED TO

4        HAVE RECOURSE TO SOMEBODY THAT HAS DEEP ENOUGH

5        POCKETS TO BACK THE PERFORMANCE.

6   Q.   OKAY.  SO IN THIS SAME SENTENCE ON BATES 3664, THE

7        LAST SENTENCE OF THE FIRST PARAGRAPH, WHEN IT SAYS,

8        "$112 MILLION DOLLARS BEING SUFFICIENT TO COVER OUR

9        DEBT SERVICE REQUIREMENTS," WHAT DOES THAT MEAN?

10  A.   THAT'S ANOTHER INSTANCE OF THESE GUYS SORT OF

11       SHORTCUTTING THE LOGIC.  THE $112 MILLION DOLLAR

12       ANNUAL INCOME IS INCOME INTO CHEMTECH II, WHICH WILL

13       BE USED FIRST TO PAY THE PRIORITY RETURN ON THE CLASS

14       A PARTNER -- PARTNERSHIP INTEREST.  AND THAT CASH

15       FLOW INTO RBDC IS SUFFICIENT TO COVER RBDC'S DEBT

16       SERVICE REQUIREMENT.

17  Q.   OKAY.  SO THE FIRST SENTENCE OF THE NEXT PARAGRAPH

18       SAYS, "THE STRUCTURE INCLUDES RABO BANK, WHICH LENDS

19       TO AN SPC, WHICH CONTRIBUTES CAPITAL INTO A

20       PARTNERSHIP CONTROLLED BY DOW CHEMICAL COMPANY."  IS

21       THIS THE SAME STRUCTURE THAT WE DISCUSSED BACK ON

22       BATES 3668?

23  A.   YES.  DESPITE MY EARLIER STATEMENTS THAT WE TRY TO

24       KEEP THESE THINGS BRIEF, THEY TEND TO BE REPETITIVE

25       IN SOME WAYS.  THIS IS PROBABLY THE FOURTH PLACE

1        WE'VE SEEN THEM DESCRIBE IT.

2  Q.    OKAY.  WELL, I'LL TRY NOT TO REPEAT IT TOO OFTEN.

3  A.    I WASN'T CRITICIZING YOU, SIR.

4  Q.    THE THIRD SENTENCE IN THIS PARAGRAPH STARTS, "SINCE

5        THE SPC RABO BANK FUNDED WILL BE A LIMITED PARTNER,

6        CO-OWNER IN THE PARTNERSHIP WILL ALSO OWN PART OF THE

7        $800 MILLION DOLLAR APPRAISED ASSETS CONTRIBUTED INTO

8        THAT PARTNERSHIP, EFFECTIVELY COLLATERALIZING OUR

9        LOAN."  WHAT DOES THIS SENTENCE MEAN?

10 A.    AGAIN, I DIDN'T WRITE IT, SO I DON'T KNOW WHAT IT

11       MEANS.  I THINK THAT READING IT, IT SEEMS TO ME THAT

12       THE AUTHORS OF THE CREDIT APPLICATION TOOK A LITTLE

13       POETIC JUSTICE HERE -- POETIC LICENCE HERE.

14       EFFECTIVELY THEY'RE -- AGAIN, THEY'RE SHORTCUTTING.

15       THE LOAN THAT WE HAVE TO RBDC IS SECURED BY RBDC'S

16       EQUITY INVESTMENT IN CHEMTECH II.  AND THAT EQUITY

17       INVESTMENT IN CHEMTECH II REPRESENTS AN UNDIVIDED

18       INTEREST IN THE ASSETS.  SO I THINK WHAT THEY'RE

19       COMMUNICATING OR TYING TO COMMUNICATE OR WHAT I CAN

20       DIGEST FROM THIS IS THAT, YOU KNOW, OUR INVESTMENT IN

21       OUR LOAN TO RBDC IS SUPPORTED AND BACKED BY THE VALUE

22       OF THE $800 MILLION DOLLARS WORTH OF APPRAISED

23       ASSETS.  AGAIN, IT'S -- SOMETIMES, YOU KNOW, THEY GOT

24       A LITTLE LOOSE, AND IF YOU PICK OUT A STATEMENT HERE,

25       A STATEMENT THERE, THEY SEEM KIND OF NONSENSICAL.

1    AND READING IT 12 YEARS LATER, I GO, GEE, I'M NOT

2    SURE WHY THEY WROTE IT THAT WAY.  BUT WHEN YOU READ

3    THE -- YOU HAVE TO REALLY READ THE CREDIT APPLICATION

4    AS A WHOLE, PARTICULARLY AS IT GOES INTO THE DETAILS.

5    AND IT'S VERY CLEAR THAT, IN MY MIND AT LEAST, AND IT

6    WAS WHEN I SIGNED OFF ON THE DOCUMENTATION, THAT THE

7    CREDIT APPLICATION ACCURATELY REFLECTED THE NATURE OF

8    THE INVESTMENT AND THE RISK PROFILE IN THE

9    INVESTMENT.

10  Q.   SO DOWN I THE MIDDLE OF THIS PARAGRAPH THERE'S A

11       SENTENCE BEGINNING, "IN A DEFAULT SCENARIO" -- EXCUSE

12       ME, "IN A DEFAULT SCENARIO."  I THINK IT'S THE

13       TWELFTH LINE DOWN.

14  A.   YES.

15  Q.   IN A DEFAULT SCENARIO IF DOW CHEMICAL COMPANY DOES

16       NOT MAKE IT'S REQUIRED LEASE PAYMENT OR PRINCIPAL AT

17       MATURITY, THE GENERAL PARTNERS, DOW CHEMICAL COMPANY

18       SUBS, WILL TAKE A FIRST LOSS ON THE PARTNERSHIP,

19       POSITIONING THE RABO SPC LIMITED PARTNER AS THE

20       SENIOR SECURED LENDER WITH THE PLANTS AND THE SENIOR

21       DEBT FOR DOW AS SECURITY.  WHAT DOES IT MEAN WHEN IT

22       SAYS THAT THE GENERAL PARTNERS, THE DOW CHEMICAL

23       COMPANY OR THE SUBS, WILL TAKE A FIRST LOSS POSITION?

24  A.   THEY ARE ABOUT 99 PERCENT ACCURATE WITH THAT

25       STATEMENT.  THE LOSSES GET ALLOCATED 99 PERCENT TO

1        THE DOW PARTNERS, ONE PERCENT TO RBDC UNTIL THE DOW

2        PARTNERS INVESTMENT IS REDUCED TO ZERO, AT WHICH

3        POINT THERE IS ONLY ONE PARTNER LEFT WHO HAS TO BEAR

4        THE REMAINING LOSS.  SO THERE WAS A LITTLE BIT OF AN

5        OVERSTATEMENT HERE TO SAY IT'S A PURE FIRST LOSS.  IT

6        WAS A 99 PERCENT FIRST LOSS.

7    Q.  OKAY.  YOU TESTIFIED THAT RBDC'S INTEREST IN THE

8        CHEMTECH II PARTNERSHIP WAS EQUITY.  SO THE LAST PART

9        OF THIS SENTENCE WHICH SAYS THAT RBDC WAS A SENIOR

10        SECURED LENDER, HOW DOES THAT RELATE TO YOUR PRIOR

11        TESTIMONY?

12    A.  NOT MY PROUDEST MOMENT, AS THE AUTHORS OF THIS CREDIT

13        APPLICATION.  AGAIN, YOU KNOW, THE PURPOSE OF THE

14        CREDIT APPLICATION IS TO COMMUNICATE TO CREDIT WHAT

15        THE RISK PROFILE OF THE TRANSACTION IS AND WHAT THE

16        STRUCTURE IS.  IT MAY NOT OFTEN -- AND, YOU KNOW,

17        IT'S NOT UNUSUAL TO FIND SOME INTERNAL

18        INCONSISTENCIES.  AND YOU'LL NOTE THAT EVEN THOUGH

19        THAT SAYS IT HERE, THERE ARE SIX PLACES THAT, AS WE

20        POINTED OUT BEFORE, CLEARLY POINT OUT THAT IT'S A

21        LOAN MADE TO RBDC AND AN EQUITY INVESTMENT MADE IN

22        CHEMTECH II.  THE DOCUMENT UNFORTUNATELY IS NOT

23        ENTIRELY INTERNALLY CONSISTENT, AND THAT'S PROBABLY

24        JUST A LITTLE BIT OF LAZINESS ON THE PART OF THE

25        PEOPLE WHO WROTE IT MAYBE, OR JUST, YOU KNOW, THE

```
 1        COMFORT LEVEL THAT WHAT THEY WERE COMMUNICATING TO

 2        CREDIT WAS GETTING THROUGH.

 3   Q.   OKAY.  SO WHEN RABO BANK IS CONSIDERING AN

 4        INVESTMENT, DOES IT ANALYZE ANY OF THE RISKS

 5        ASSOCIATED WITH THAT INVESTMENT?

 6   A.   I GUESS.

 7   Q.   AND WHAT KIND OF RISKS WOULD RABO BANK ANALYZE?

 8   A.   I MEAN, THERE ARE A LOT OF RISKS IN ANY PARTICULAR

 9        INVESTMENT.  YOU KNOW, THERE COULD BE REGULATORY

10        RISKS, ET CETERA.  BUT THE PRIMARY RISK YOU GENERALLY

11        WOULD THINK ABOUT IN SOME SORT OF A CREDIT EXTENSION

12        LIKE THIS OR EQUITY INVESTMENT LIKE THIS WOULD BE

13        MARKET RISK AND CREDIT RISK.

14   Q.   AS A MATTER OF PRACTICE, DID RABO BANK ANALYZE EACH

15        OF THESE RISKS THAT YOU DESCRIBED, CREDIT AND MARKET

16        -- IN ALL OF YOUR INVESTMENTS, INCLUDING BOTH DEBT

17        AND EQUITY INVESTMENTS?

18   A.   YES.

19   Q.   OKAY.  DID RABO BANK FACE CREDIT RISKS WITH RESPECT

20        TO IT'S INVESTMENT IN CHEMTECH?

21   A.   YES.

22   Q.   WHAT WAS THE NATURE OF THAT CREDIT RISK?

23   A.   DOW PERFORMANCE.  IF THE CREDIT OF DOW DETERIORATED

24        AND DOW COULD NO LONGER PERFORM UNDER THE TRIPLE NET

25        LEASE OR THE INTERCOMPANY NOTE, RABO BANK WAS RBDC,
```

1        AND THEREFORE RABO BANK WAS AT RISK OF LOSS.

2   Q.   YOU MENTIONED TRIPLE NET LEASE.  CAN YOU DESCRIBE THE

3        PREVALENCE, IF ANY OF TRIPLE NET LEASES IN FINANCING

4        TRANSACTIONS?

5   A.   GENERALLY IF YOU ARE USING A LEASE AS A FINANCING

6        TOOL, IT WOULD BE A TRIPLE NET LEASE, MEANING THAT

7        THE LESSEE NEEDS TO PAY THE LEASE PAYMENTS CLEAN, NO

8        MATTER WHAT, AND THEY ALSO NEED TO PAY TAX AND ALL

9        THAT.  TRIPLE NET IS TAX.  BASED ON -- THERE ARE

10       THREE THINGS THAT COULD ARGUABLY NEGATE OR REDUCE THE

11       PAYMENT AND THEY NEED TO GROSSUP FOR ALL THOSE THREE

12       THINGS -- PAYMENTS.

13  Q.   OKAY.  SO WE WERE DISCUSSING CREDIT RISK BEFORE I

14       ASKED YOU ABOUT THE TRIPLE NET LEASE.  IF RABO BANK

15       WERE TO MAKE A PREFERRED EQUITY INVESTMENT IN AN

16       ENTITY THAT HAD A SINGLE CUSTOMER, WOULD IT EXAMINE

17       THE CREDIT QUALITY OF THE CUSTOMER?

18  A.   ABSOLUTELY.  IF YOU WERE MAKING -- IF YOU MAKE AN

19       INVESTMENT IN A MUTUAL FUND OR AN INVESTMENT VEHICLE,

20       YOU'RE GOING TO LOOK AT THAT INVESTMENT VEHICLE'S

21       INVESTMENT GUIDELINES.  YOU WANT TO KNOW WHAT IS THE

22       CREDIT ASSOCIATED WITH YOUR INVESTMENT.  WELL, IT'S

23       THE CREDIT ASSOCIATED WITH THE ASSETS THAT THE

24       INVESTMENT VEHICLE IS GOING TO PURCHASE.  SO IN A

25       SITUATION WHERE YOU ARE MAKING INVESTMENT IN AN

1    ENTITY WHOSE PURPOSE IS TO INVEST IN OR PROVIDE

2    CREDIT TO A PARTICULAR CORPORATION, THAT

3    CORPORATION'S CREDIT WORTHINESS IS THE KEY TO YOUR

4    GETTING REPAID ON YOUR INVESTMENT.

5  Q.  SO HAVING CREDIT RISK OR CREDIT EXPOSURE IS NOT --

6    DOESN'T TELL YOU WHETHER OR NOT A PARTICULAR

7    INVESTMENT IS A LOAN OR AN EQUITY INVESTMENT?

8  A.  NOT TO ME.  TO ME, ALMOST ANY INVESTMENT YOU MAKE HAS

9    CREDIT RISK GOING.

10  Q.  OKAY.  WITH RESPECT TO THE CHEMTECH II TRANSACTION,

11    DID RABO BANK HEDGE IT'S CREDIT EXPOSURE TO DOW?

12  A.  NOT IN '98, BUT WHEN WE RENEWED THE DEAL IN 2003, WE

13    DID.

14  Q.  HOW DID YOU DO THAT?

15  A.  WE PURCHASED CREDIT DEFAULT SWAPS AGAINST THE DOW

16    NAME.

17  Q.  WHAT'S A CREDIT DEFAULT SWAP?

18  A.  CREDIT DEFAULT SWAP IS A DERIVATIVE CONTRACT WHERE

19    THE WRITER OF THE CONTRACT AGREES TO PAY THE BUYER OF

20    THE CONTRACT IF A CREDIT EVENT OCCURS.  YOU CAN

21    NEGOTIATE IN THE CONTRACT WHAT THAT CREDIT EVENT IS,

22    BUT THE TYPICAL MARKET STANDARD, THERE ARE THREE

23    CREDIT EVENTS: BANKRUPTCY, FAILURE TO PAY, AND A

24    RESTRUCTURING OF DEBT.  IF ONE OF THOSE CREDIT EVENTS

25    IS TRIGGERED, THE BUYER OF THE CREDIT DEFAULT SWAP

1       RECEIVES A PAYMENT.  AND THERE'S TWO DIFFERENT WAYS

2       THAT CAN HAPPEN.  YOU CAN HAVE A PHYSICALLY SETTLED

3       CDS IN WHICH YOU'RE REQUIRED TO DELIVER A QUALIFYING

4       DEBT INSTRUMENT AND THE SELLER OF THE SWAP WILL PAY

5       YOU A HUNDRED CENTS A DOLLAR FOR THAT REGARDLESS OF

6       WHAT MARKET VALUE IS.  YOU CAN HAVE A SWAP THAT DOES

7       NOT REQUIRE A PHYSICAL SETTLEMENT OR THAT HAS NO

8       PHYSICAL SETTLEMENT, IN WHICH CASE YOU WOULD GO TO

9       THE SELLER OF THE SWAP AND THEY WOULD PAY YOU THE

10      DIFFERENCE BETWEEN A HUNDRED CENTS AND CURRENT MARKET

11      VALUE.  SO IF THERE WERE DEFAULT AND COMPANY XYZ WERE

12      TRADING AT 25 CENTS ON THE DOLLAR AND YOU HAVE

13      WRITTEN A $100.00 CREDIT DEFAULT SWAP, THE SELLER

14      WOULD HAVE TO PAY YOU $75.00.  AND SOME SWAPS ALLOW

15      THE HOLDER OF THE SWAP TO CHOOSE BETWEEN PHYSICAL

16      DELIVERY AND -- AND THE STANDARD SETTLEMENT.

17   Q. AND DOES BUYING A CREDIT DEFAULT SWAP IMPLY THAT RABO

18      BANK EXTENDED A LOAN TO DOW?

19   A. NOT AT ALL.  AGAIN, IN THE SCENARIO WHERE YOU'RE

20      INVESTING IN AN INVESTMENT VEHICLE, LET'S SAY YOU

21      INVEST IN AN INVESTMENT VEHICLE THAT OWNS THE TOP TEN

22      PHARMACEUTICAL NAMES.  A PARTICULAR WAY TO HEDGE AND

23      AN EFFECTIVE WAY TO HEDGE WOULD BE TO BUY CREDIT

24      DEFAULT SWAPS AGAINST THOSE TEN NAMES.  IF EVERYBODY

25      PERFORMS FINE, YOUR EQUITY INVESTMENT RETAINS IT'S

1        VALUE.  YOUR INCOME ON IT IS GOING TO BE REDUCED BY

2        THE PREMIUMS YOU PAY, THAT'S COST OF YOUR HEDGE,

3        WHICH ARE FINE.  IF ONE OR MORE OF THE TEN ENTITIES

4        IN THAT INVESTMENT VEHICLE GO INTO DEFAULT, THE VALUE

5        OF YOUR EQUITY IS GOING TO DROP.  BUT THEN YOU HAVE

6        HEDGED IT BECAUSE YOU HAVE A CLAIM AGAINST YOUR SWAP

7        COUNTER PARTY FOR A PAYMENT.  MATTER OF FACT, THAT'S

8        FAIRLY STANDARD TO USE CREDIT DEFAULT SWAPS TO HEDGE

9        RISK.  AND MATTER OF FACT, IF YOU LOOK AT WHAT

10       HAPPENED IN THE CREDIT CRISIS, ONE OF THE BIG

11       CRITICISMS OF THE MARKET WAS THAT THE CDS MARKET WAS

12       SOME HUGE MULTITUDE IN PRINCIPAL AMOUNT OF WHAT THE

13       ACTUAL UNDERLYING DEBT BEING ISSUED BY THESE

14       COMPANIES WAS.  PEOPLE WERE BUYING CREDIT DEFAULT

15       SWAPS AS HEDGES OR OPEN BETS, REGARDLESS OF WHETHER

16       THEY HAD A LOAN OR AN EQUITY INVESTMENT OR WERE JUST

17       TAKING A POSITION ON A COMPANY.

18  Q.   OKAY.  HOW DID RABO BANK TREAT IT'S INVESTMENT IN

19       CHEMTECH II FOR REGULATORY CAPITAL PURPOSES?

20  A.   WE TREATED IT AS AN EQUITY INVESTMENT.

21  Q.   AND FOR ACCOUNTING PURPOSES.

22  A.   WE TREATED IT AS AN EQUITY INVESTMENT.

23  Q.   AND FOR TAX?

24  A.   WE TREATED IT AS AN EQUITY INVESTMENT.

25  Q.   AND ARE YOU AWARE OF RABO BANK EVER TREATING IT'S --

1       OR RBDC'S INVESTMENT IN CHEMTECH II AS DEBT?

2   A.   NO.

3            BY MR. TIDWELL:

4               THANK YOU, MR. SHERMAN.  I HAVE NO FURTHER

5          QUESTIONS FOR YOU.

6          BY THE COURT:

7               OKAY.  THANK YOU, MR. TIDWELL.  NOW, IT'S

8          ABOUT TEN MINUTES TO 6:00.  I WILL ASSUME THAT

9          YOU HAVE A LOT MORE THAN TEN MINUTES OF CROSS

10         EXAMINATION QUESTIONS.

11         BY MR. SCHREIBER:

12              YES, YOUR HONOR.

13         BY THE COURT:

14              WELL, WHY DON'T WE TAKE A BREAK TONIGHT,

15         AND WE'LL BREAK AT THIS TIME.  WE'LL RESUME

16         PROMPTLY AT 8:30 TOMORROW.  I WILL NOTE,

17         HOWEVER, THAT -- GIVE ME A -- WELL, FIRST,

18         BEFORE WE GET INTO THESE HOUSEKEEPING MATTERS,

19         SIR, YOU'RE STILL UNDER OATH AND YOU'RE STILL

20         SWORN.  YOU'RE STILL SUBJECT TO THE RULE OF

21         SEQUESTRATION, MEANING THAT YOU CANNOT DISCUSS

22         YOUR TESTIMONY WITH ANY OTHER WITNESSES

23         OVERNIGHT.  DO YOU UNDERSTAND THAT, SIR?

24         BY THE WITNESS:

25              I DO, SIR.

1       BY THE COURT:

2              AND DO YOU AGREE TO ABIDE BY THAT RULE?

3       BY THE WITNESS:

4              I DO, SIR.

5       BY THE COURT:

6              VERY WELL. YOU ARE EXCUSED FOR THE EVENING,

7       AND I ASK YOU TO RETURN PROMPTLY AT 8:30

8       TOMORROW MORNING.  OKAY?

9       BY THE WITNESS:

10             YES.

11      BY THE COURT:

12             THANK YOU.

13             ALL RIGHT.  WE'LL RESUME MR. SHERMAN'S

14      TESTIMONY TOMORROW AT 8:30.  BUT I WANT TO GET A

15      SENSE OF HOW MUCH LONGER WE'RE GOING TO GO WITH

16      RESPECT TO PLAINTIFF'S WITNESSES.  I KNOW THAT

17      IN THE JOINT STATUS REPORT THAT YOU ALL

18      SUBMITTED BACK IN DECEMBER, I GUESS IT WAS, YOU

19      INDICATED YOU HAD AT LEAST FIVE WILL CALL; IS

20      THAT CORRECT, MR. MAGEE?

21      BY MR. MAGEE:

22             THAT'S PROBABLY CORRECT; I HAVEN'T LOOKED

23      BACK AT THE WILL-CALL LIST.

24      BY THE COURT:

25             HOW MANY MORE WITNESSES DO YOU ANTICIPATE

1        CALLING?

2        BY MR. MAGEE:

3             WE HAVE ONE MORE FACT WITNESS AFTER MR.

4        SHERMAN.

5        BY THE COURT:

6             OKAY.

7        BY MR. MAGEE:

8             AND THAT'S SHARON ORIEL, WHO IS UNAVAILABLE

9        UNTIL THURSDAY BECAUSE OF A MEMORIAL SERVICE.

10       BY THE COURT:

11            THAT'S RIGHT.  YOU RAISED THAT YESTERDAY

12       MORNING.

13       BY MR. MAGEE:

14            RIGHT.  THE ONLY OTHER WITNESSES WE HAVE

15       ARE OUR FOUR EXPERTS, THREE OF WHOM ARE GOING TO

16       BE TESTIFYING IN OUR CASE IN CHIEF, AND ONE OF

17       WHOM WILL TESTIFY IN REBUTTAL TO MR. HUBBARD AND

18       TO MR. FINARD AT THE END OF THE DEFENDANT'S

19       CASE.

20       BY THE COURT:

21            OKAY.

22       BY MR. MAGEE:

23            SO WE HAVE ONE FACT WITNESS LEFT AND OUR

24       FOUR EXPERTS, ONE OF WHOM WILL BE AT THE VERY

25       END, AND GOVERNMENT HAS FOUR EXPERTS.

1       BY THE COURT:

2           HOW LONG DO YOU ANTICIPATE THE EXPERTS

3       TESTIFYING?

4       BY MR. MAGEE:

5           I'M HOPING, YOUR HONOR, THAT -- THAT --

6       WELL, WE WILL GET THROUGH TOMORROW, I THINK, TWO

7       OF THE LONGER ONES, AND THERE MAY BE A VERY

8       SHORT ONE ON THURSDAY MORNING.  BUT IT'S

9       POSSIBLE WE'LL GET THROUGH ALL THREE.

10      BY THE COURT:

11          I'M JUST TRYING TO PLAN MY DOCKET RIGHT

12      NOW.

13      BY MR. MAGEE:

14          UNDERSTOOD.

15      BY THE COURT:

16          LET ME HEAR FROM -- FROM THE GOVERNMENT.

17      AND, MR. SAWYER, WHAT DO YOU ALL INTEND TO DO,

18      MR. WELSH?  HOW MANY WITNESSES -- FACT WITNESSES

19      DO YOU INTEND TO CALL?

20      BY MR. SAWYER:

21          WE DON'T INTEND TO CALL ANY FACT WITNESSES.

22      BY THE COURT:

23          AND YOU HAVE FOUR EXPERT WITNESSES?

24      BY MR. SAWYER:

25          THAT'S CORRECT.

```
 1        BY THE COURT:
 2             OKAY.  AND HOW LONG DO YOU ANTICIPATE
 3        PUTTING ON YOUR EVIDENCE?
 4        BY MR. SAWYER:
 5             WELL, I'M SUSPECTING THAT MR. FINARD AND
 6        MR. HUBBARD'S TESTIMONY WOULD BE IN THE
 7        NEIGHBORHOOD OF AN HOUR AND A HALF TO TWO HOURS.
 8        BY THE COURT:
 9             I JUST WANTED TO GET A SENSE.  WE'VE HAD
10        SOME DISCUSSIONS ABOUT PROCEEDING THROUGH
11        SATURDAY, AND I'M TRYING TO ASSESS RIGHT NOW
12        WHETHER WE SHOULD DO THAT OR WHETHER IF WE DON'T
13        FINISH UP ON FRIDAY, WHICH IT DOESN'T APPEAR
14        THAT WE WILL, BUT THERE'S ALWAYS A CHANCE,
15        WHETHER WE SHOULD RECONVENE ON MONDAY.  I'D
16        REALLY LIKE TO, IF POSSIBLE, BE COMPLETED WITH
17        THIS CASE, IF NOT BY MONDAY, THEN BY TUESDAY.
18        IT'S JUST THAT I'M ABSOLUTELY STACKED UP RIGHT
19        NOW.  WE HAVE -- WHEN WE COMPLETE THIS TRIAL, WE
20        HAVE ANOTHER TRIAL, AND THEN WE HAVE A TRIAL
21        IMMEDIATELY AFTER THAT, AND THEN A TWO WEEK
22        PUBLIC CORRUPTION TRIAL IMMEDIATELY AFTER THAT.
23        SO THIS IS AN EXCEPTIONALLY BUSY SUMMER FOR US.
24        AND IN ADDITION TO THAT, I HAVE CRIMINAL MATTERS
25        THAT I HAVE TO TAKE UP, WHICH IS ONE OF THE
```

1    REASONS WHY I WAS DELAYED TAKING THE BENCH

2    DURING THIS LAST BREAK BECAUSE I HAD A MEETING

3    WITH THE PROBATION OFFICER ON A CASE.

4         NOW, THURSDAY I HAVE TO HOLD A HEARING IN A

5    CRIMINAL CASE, SO WE'RE GOING TO -- WE'RE GOING

6    TO CONCLUDE ON WEDNESDAY -- WE'LL WRAP UP THE

7    DAY'S TESTIMONY AT 4:00 P.M.  BECAUSE, AGAIN, I

8    NEED TO HAVE A CRIMINAL EVIDENTIARY HEARING AT

9    FOUR O'CLOCK THURSDAY AFTERNOON.

10   BY MR. MAGEE:

11        THAT'S THURSDAY?  EXCUSE ME, YOU SAID

12   THURSDAY AND THEN YOU SAID WEDNESDAY.  SO I WANT

13   TO ---

14   BY THE COURT:

15        THURSDAY AFTERNOON.  I MISSPOKE THERE ONLY

16   BECAUSE I GAVE THE PROSECUTOR AND THE DEFENSE

17   ATTORNEY THE CHOICE OF WEDNESDAY OR THURSDAY.

18   I'M TOLD THAT THEY'D RATHER COME IN ON THURSDAY.

19   SO WE'LL END A LITTLE EARLY ON THURSDAY.  WE MAY

20   -- I'LL LET YOU ALL KNOW TOMORROW AFTER I CONFER

21   WITH MY VERY COMPETENT COURT REPORTER, YOU MAY

22   ACTUALLY START A LITTLE EARLIER ON THURSDAY.  WE

23   MAY START AT EIGHT O'CLOCK ON THURSDAY, IF --

24   UNLESS CLARE LETS ME HAVE IT.  THESE TRANSCRIPTS

25   THAT YOU ALL HAVE ORDER ARE REALLY WORKING

1    EVERYONE HERE.  SO -- BUT WE'RE GOING TO GO ON

2    AND ACCOMMODATE YOU GUYS AND GET YOU THOSE

3    TRANSCRIPTS.

4        BUT I WANTED TO DISCUSS THIS ISSUE WITH

5    YOU, FIRST SO THAT I COULD HAVE A SENSE OF WHERE

6    YOU ALL ARE GOING TO GO, BECAUSE AGAIN I'VE GOT

7    SOME OTHER HEARINGS I'VE GOT TO SCHEDULE AND I

8    DON'T WANT TO INCONVENIENCE THE LITIGANTS FOR

9    THOSE.  AND ALSO I WANTED TO GIVE YOU ALL A

10   SENSE OF WHAT I NEEDED TO DO LATER ON THIS WEEK

11   WITH RESPECT TO THESE OTHER CRIMINAL MATTERS.

12       SO OTHER THAN THAT, IS THERE ANYTHING ELSE

13   THAT WE NEED TO TAKE UP AT THIS TIME BEFORE WE

14   ADJOURN FOR THE DAY?

15   BY MR. MAGEE:

16       NOT FOR THE PLAINTIFF, YOUR HONOR.

17   BY MR. SAWYER:

18       NO, YOUR HONOR.

19   BY THE COURT:

20       OKAY.  SO WE'LL RESUME PROMPTLY AT 8:30

21   TOMORROW MORNING.  COURT IS ADJOURNED.

22       (THEREFORE, AT 5:55 P.M. THE COURT IS IN

23        RECESS FOR THE DAY.)

24

25

1                C E R T I F I C A T E

2

3            I CERTIFY THAT THE FOREGOING IS A CORRECT

4      TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE

5      ABOVE-ENTITLED NUMBERED MATTER.

6

7      *Clare Smith-Neely*

8            CLARE SMITH-NEELY, CCR

9            OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23