# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

CHEMTECH ROYALTY      :    NO:  05-994-BAJ-DLD
ASSOCIATES, L.P.        :    NO:  06-258-BAJ-DLD
                      :    NO:  07-405-BAJ-DLD
     VERSUS         :
                      :    JUNE  22, 2011
UNITED STATES OF AMERICA :
                      :     9:00 A.M.

## TRIAL  TRANSCRIPT  --  VOLUME 3
### OF THE ABOVE PROCEEDINGS HELD
### BEFORE THE HONORABLE BRIAN A. JACKSON

### UNITED STATES DISTRICT JUDGE

====================================================================

# A P P E A R A N C E S:

FOR THE PLAINTIFF, CHEMTECH ROYALTY ASSOCIATES, L.P.

    JOHN B. MAGEE, ESQ.
    CHRISTOPER P. MURPHY, ESQ.
    HARTMAN E. BLANCHARD, ESQ.
    ROYCE L. TIDWELL, ESQ.
    ROBERT A. LEONARD, ESQ.
    WASHINGTON, D.C. 20006-1806

FOR THE DEFENDANT, UNITED STATES OF AMERICA :
    THOMAS J. SAWYER, E SQ.
    ROBERT L. WELSH, ESQ.
    THOMAS F. KOELBL, ESQ.
    PHILIP M. SCHREIBER, ESQ.
    WASHINGTON, D.C.  20044

      REPORTED BY: CLARE SMITH-NEELY, CCR

## BATON ROUGE, LA 70801

1

2                                  I N D E X

3

4     ATTORNEY:              WITNESS:                        PAGE:

5     PHILIP SCHREIBER      ANDREW SHERMAN        CROSS       04

6     ROYCE TIDWELL         ANDREW SHERMAN        REDIRECT    53

7     ROBERT LEONARD        DANIEL KLEINBERGER    DIRECT      65

8     PHILIP SCHREIBER      DANIEL KLEINBERGER    CROSS       106

9     ROBERT LEONARD        DANIEL KLEINBERGER    REDIRECT    118

10    HARTMAN BLANCHARD     MERLE ERICKSON        DIRECT      121

11    PHILIP SCHREIBER      MERLE ERICKSON        CROSS       234

12    HARTMAN BLANCHARD     MERLE ERICKSON        REDIRECT    276

13    CHRIS MURPHY          GILBERT SCHWARTZ      DIRECT      282

14    THOMAS SAWYER         GILBERT SCHWARTZ      CROSS       323

15    CHRIS MURPHY          GILBERT SCHWARTZ      REDIRECT    346

16

17

18

19

20

21

22

23

24

25

1          BY THE CLERK:

2                  THE HONORABLE UNITED STATES DISTRICT COURT,

3          THE MIDDLE DISTRICT OF LOUISIANA IS NOW IN

4          SESSION.  ORDER AND SILENCE ARE NOW COMMANDED.

5          GOD SAVE THE UNITED STATES AND THIS HONORABLE

6          COURT.  THE HONORABLE BRIAN A. JACKSON

7          PRESIDING.

8          BY THE COURT:

9                  GOOD MORNING, EVERYONE.  PLEASE BE SEATED.

10         BY MR. MAGEE:

11                 GOOD MORNING, YOUR HONOR.

12         BY MR. SCHREIBER:

13                 GOOD MORNING.

14         BY THE COURT:

15                 I HOPE EVERYONE HAD A GOOD EVENING.

16                 I GUESS WE'RE READY TO PROCEED WITH MR.

17         SHERMAN'S CROSS-EXAMINATION THIS MORNING, I TAKE

18         IT?

19         BY MR. SCHREIBER:

20                 YES, YOUR HONOR.

21         BY THE COURT:

22                 IS THE GOVERNMENT PREPARED?

23         BY MR. SCHREIBER:

24                 YES, SIR.

25         BY THE COURT:

1         MR. SHERMAN, WOULD YOU PLEASE HAVE A SEAT

2     IN THE -- ON THE WITNESS STAND?  AND I WILL

3     REMIND YOU, SIR, THAT YOU HAVE ALREADY BEEN

4     SWORN.

5         AND YOU MAY PROCEED, SIR.

6     BY MR. SCHREIBER:

7         THANK YOU, YOUR HONOR.

8             CROSS-EXAMINATION

9  BY MR. SCHREIBER:

10 Q.   MR. SHERMAN, WOULD YOU PLEASE STATE YOUR NAME AGAIN

11      FOR THE RECORD?

12 A.   YES.  IT'S ANDREW SHERMAN.

13 Q.   THANK YOU, SIR.  GOOD MORNING, MR. SHERMAN.

14 A.   GOOD MORNING.

15 Q.   YOU TESTIFIED IN A DEPOSITION IN THIS CASE, CORRECT?

16 A.   THAT'S CORRECT.

17 Q.   AND THAT WAS IN AROUND MAY, 2008; IS THAT RIGHT?

18 A.   I DON'T RECALL.  BUT THAT SOUNDS ABOUT RIGHT.

19 Q.   2008 WOULD BE APPROXIMATE?

20 A.   YES.  I THINK SO.

21 Q.   AND THE DEPOSITION WAS A 30B6 DEPOSITION; ISN'T THAT

22      CORRECT?

23 A.   THAT'S CORRECT.

24 Q.   AND IN IT YOU'RE TESTIFYING ON BEHALF OF RBDC, RIGHT?

25 A.   THAT'S MY UNDERSTANDING HOW IT WORKS.  YES.

1   Q.   IT WASN'T -- IT WASN'T JUST YOUR PERSONAL KNOWLEDGE

2        THAT YOU WERE TESTIFYING TO, IT WAS THE KNOWLEDGE OF

3        RBDC AS AN ENTITY, CORRECT?

4   A.   CORRECT.   THAT'S MY UNDERSTANDING.

5   Q.   AND THE SUBPOENA FOR YOUR DEPOSITION, IT REQUIRED YOU

6        TO BECOME KNOWLEDGEABLE IN CERTAIN AREAS OF RBDC'S

7        ACTIVITIES, RIGHT?

8   A.   THAT'S, AGAIN, MY UNDERSTANDING.   YES.

9   Q.   FOR EXAMPLE, YOU HAD TO BECOME KNOWLEDGEABLE ABOUT

10       COMMUNICATIONS BETWEEN RBDC AND DOW REGARDING

11       CHEMTECH II, RIGHT?

12  A.   I DON'T RECALL SPECIFICALLY WHAT I NEEDED TO DO IN --

13       IN CONNECTION WITH THE DEPOSITION.   BUT I DO KNOW

14       THAT I HAD TO DO CERTAIN RESEARCH AND GET MYSELF

15       FAMILIAR WITH CERTAIN TOPICS.

16  Q.   MR. SHERMAN, IF YOU'LL TURN TO THE FIRST TAB IN YOUR

17       -- IN YOUR PACKET.

18            BY THE COURT:

19               THAT'S THE GOVERNMENT DOCUMENTS?

20  BY MR. SCHREIBER:

21  Q.   YES, MR. SHERMAN.   THIS IS YOUR DEPOSITION "EXHIBIT

22       613," IF WE CAN PULL IT UP ON THE SCREEN.

23            MR. SHERMAN, THIS IS THE SUBPOENA ISSUED TO RBDC

24       IN THIS LITIGATION; ISN'T THAT RIGHT?

25  A.   IT CERTAINLY APPEARS TO BE.

1  Q.  SIR, IF YOU'LL FLIP TO PAGE THREE, ATTACHMENT TO

2      SUBPOENA DESIGNATION REQUIREMENT.  DO YOU SEE THAT,

3      SIR?

4  A.  I DO.

5  Q.  IT SAYS, "ALL COMMUNICATIONS WITH THE DOW CHEMICAL

6      COMPANY, DOW, ITS SUBSIDIARIES AND/OR ENTITIES IN ANY

7      WAY RELATED TO DOW WITH WHOM RBDC HAD DEALINGS IN

8      CONNECTION WITH OR CHEMTECH II."

9          DO YOU SEE THAT, SIR?

10 A.  I DO.

11 Q.  SO THAT WAS PART OF YOUR RESPONSIBILITY IS TO BECOME

12     AWARE OF COMMUNICATIONS OF THE DOW CHEMICAL COMPANY,

13     CORRECT?

14 A.  YOU'RE MAKING THAT ASSUMPTION.  I'M READING THIS THAT

15     SAYS, "WE SHALL DESIGNATE ONE OR MORE OFFICERS,

16     DIRECTORS OR MANAGING AGENTS OR OTHER PERSONS WHO CAN

17     TEST -- WHO CAN SANCTITY TESTIFY ON ITS BEHALF WITH

18     RESPECT TO THE FOLLOWING MATTERS."  I DON'T SEE

19     ANYWHERE YOU'RE READING IN HERE THAT I HAD A DUTY TO

20     EDUCATE MYSELF.

21         BUT AS I SAID, IN THAT TIME I MET WITH OUR

22     COUNSEL.  I'M NOT A LITIGATOR.  I MET WITH LITIGATION

23     COUNSEL, WAS ADVISED BY THE LITIGATION COUNSEL, AND

24     DID WHAT WE THOUGHT WAS NECESSARY AND APPROPRIATE TO

25     PREPARE FOR THAT DEPOSITION.

1   Q.   SIR, YOU DID AT YOUR DEPOSITION COMPLY WITH THE

2        SUBPOENA, CORRECT?

3   A.   TO THE BEST OF MY KNOWLEDGE.

4   Q.   TO THE -- TO THE BEST --

5   A.   YES.

6   Q.   -- OF YOUR UNDERSTANDING?

7   A.   ABSOLUTELY.

8   Q.   AND YOU TESTIFIED IN YOUR DEPOSITION, SIR, THAT THESE

9        FIVE MATTERS, THE FIFTH ONE'S ON THE BACK PAGE, THAT

10       YOU LEARNED THOSE TOPICS THAT WERE ATTACHED TO THE

11       SUBPOENA AS AN ATTACHMENT TO A LEVEL YOU THOUGHT YOU

12       WERE COMFORTABLE WITH, RIGHT?

13  A.   I -- I DON'T RECALL MY SPECIFIC TESTIMONY.  BUT THAT

14       SOUNDS ACCURATE.  YES.

15  Q.   OKAY.  THANK YOU, SIR.  NOW, AS A LAWYER FOR RABO

16       BANK, YOUR ROLE HAS BEEN TO SUPPORT THE FINANCIAL

17       GOALS OF THE BANK; IS THAT CORRECT?  WITH RESPECT TO

18       ITS LEGAL ISSUES.  I COULD SAY THAT.

19  A.   IF YOU'RE MAKING A GENERALIZATION AS TO WHAT A

20       LAWYER'S JOB IS,  I'M NOT GOING TO ARGUE THAT.

21  Q.   OKAY.

22  A.   THAT'S NOT ANYWHERE IN MY JOB DESCRIPTION OR IN MY

23       PERFORMANCE GOALS, ONE OF MY GOALS SPECIFICALLY.  I

24       WOULDN'T DISAGREE WITH YOU THAT AS ANY EMPLOYEE OF

25       RABO BANK, ONE OF OUR GOALS IS TO HELP PURSUE THE

1      GOALS OF THE INSTITUTION.

2   Q.   AND SPECIFICALLY AS A LAWYER FOR RABO BANK, YOU WOULD

3        SAY THAT ONE OF YOUR SPECIFIC GOALS AS AN ATTORNEY

4        FOR THE COMPANY IS TO SUPPORT ITS MISSION OR ITS

5        MULTIPLE MISSIONS AS A LAWYER?

6   A.   YES.  AS MY ROLE AS A LAWYER FOR OUR BANK IS TO

7        SUPPORT THE MISSIONS OF THE INSTITUTIONS, THE GOALS

8        OF THE INSTITUTION AND THE THINGS THAT THEY WANT TO

9        ACHIEVE.

10  Q.   AND THOSE ARE GOOD OBVIOUS POINTS, SIR.  I APOLOGIZE

11       FOR THAT.

12            THE BANK, IN ESSENCE, YOU WOULD SAY IS YOUR

13       CLIENT, RIGHT?

14  A.   YES.

15  Q.   FROM THE PERSPECTIVE OF THE BANK, WITH REGARD TO

16       CHEMTECH II SPECIFICALLY, IT WAS YOUR RESPONSIBILITY

17       FOR ITS LEGAL ISSUES; IS THAT RIGHT?

18  A.   YES.  IT WAS MY RESPONSIBILITY TO ADVISE THE BANK ON

19       LEGAL ISSUES WITH RESPECT TO CHEMTECH II TRANSACTION.

20  Q.   BUT CHEMTECH II -- AND YOU TESTIFIED YESTERDAY WASN'T

21       YOUR ONLY RESPONSIBILITY; ISN'T THAT CORRECT?

22  A.   THAT IS CORRECT.

23  Q.   THERE WERE OTHER TRANSACTIONS THAT YOU WERE WORKING

24       ON DURING THIS TIME PERIOD, I'M SURE, BEFORE AND

25       AFTER?

```
 1    A.   ABSOLUTELY.

 2    Q.   DOZENS AND DOZENS OF TRANSACTIONS IN CASES AND

 3         WHATNOT?

 4    A.   MANY DIFFERENT MATTERS AND RESPONSIBILITIES AT ANY

 5         GIVEN TIME, YES.

 6    Q.   IN THE COURSE OF PROVIDING YOUR ADVICE TO RABO, YOU

 7         HAVE REVIEWED, I'M ASSUMING, A SIGNIFICANT NUMBER OF

 8         DOCUMENTS, RIGHT?

 9    A.   SURE.

10    Q.   I'M SURE YOU LOOKED AT LEGAL DOCUMENTS EVERY DAY,

11         RIGHT?

12    A.   ABSOLUTELY.

13    Q.   NOW, YOU MAY NOT BE FAMILIAR WITH EVERY DOCUMENT, BUT

14         YOU'RE FAMILIAR WITH A WIDE VARIETY OF RABO BANK

15         DOCUMENTS; ISN'T THAT CORRECT?

16    A.   THAT'S CORRECT.

17    Q.   AS YOU SAID, OF COURSE YOU'RE FAMILIAR WITH THE FORM

18         OF RABO'S LEGAL DOCUMENTS, RIGHT?

19    A.   AGAIN, I'M NOT TRYING TO BE DIFFICULT.  BUT THE FORM

20         OF RABO'S LEGAL DOCUMENTS?  WE DON'T HAVE -- RABO

21         BANK DOES NOT HAVE FORM DOCUMENTS.

22    Q.   FAIR ENOUGH.  YOU -- YOU'RE FAMILIAR ENOUGH WITH RABO

23         BANK'S LEGAL DOCUMENTS?

24    A.   HOW?

25    Q.   WHEN CASES -- WHEN YOU WERE INVOLVED IN THOSE CASES?
```

1  A.   YES.  WHEN I'M ACTIVELY INVOLVED IN A CASE, I'M

2       CERTAINLY FAMILIAR WITH THE RELEVANT DOCUMENTS.  I

3       CAN'T SWEAR TO MY RECOLLECTION MUCH AFTER WE CLOSE

4       THE DEAL, BUT WHILE I'M ACTIVELY REPRESENTING THE

5       BANK I AM FAMILIAR WITH THE DOCUMENTS.

6  Q.   AND, SIR, YOU'RE GENERALLY FAMILIAR WITH AND CAN

7       IDENTIFY EMPLOYEES THAT YOU'RE AWARE OF AT RABO BANK,

8       AS WELL?

9  A.   SURE.

10 Q.   ARE YOU FAMILIAR WITH THE INTERNAL CREDIT DOCUMENTS

11      FOR RABO BANK AS WE SAW YESTERDAY WITH THE DIRECT

12      TESTIMONY?

13 A.   YES.

14 Q.   ARE YOU FAMILIAR WITH STRUCTURED FINANCE DOCUMENTS

15      THAT COME ACROSS YOUR DESK AT RABO BANK?

16 A.   YES.

17 Q.   THE TYPES OF DOCUMENTS THAT COME ABOUT IN A GENERAL

18      DUE DILIGENCE, LET'S SAY, FOR A COMPANY OR A

19      TRANSACTION YOU'RE WORKING ON?

20 A.   YOU'RE ASKING ME IF I'M FAMILIAR WITH IT?

21 Q.   YES, SIR.

22 A.   YES.

23 Q.   THAT INCLUDES GTC MEMORANDA; IS THAT RIGHT?

24 A.   NOT NECESSARILY.  I AM NOT PART OF THE GTC PROCESS.

25      THAT'S A CREDIT APPROVAL PROCESS.  WELL, ACTUALLY

1    IT'S NOT EVEN A CREDIT PROCESS.  THAT'S A BANK

2    APPROVAL AND ASSET -- AND TRANSACTION MANUAL PROCESS

3    THAT DOES NOT INVOLVE LEGAL.

4  Q.  WELL, CAN YOU DESCRIBE WHAT GTC STANDS FOR?

5  A.  EMBARRASSINGLY ENOUGH, I CAN'T.  GLOBAL TRANSACTIONS

6    COMMITTEE, I BELIEVE, IS RIGHT.  AND IT'S A COMMITTEE

7    IN THE HEAD OFFICE.

8  Q.  SIR, YOU SAY -- I THINK YOU SAID THIS ALREADY THAT

9    YOU'RE A CORPORATE LAWYER, NOT A LITIGATOR, RIGHT?

10  A.  THAT'S CORRECT.

11  Q.  AND YOU SPENT FIVE YEARS AT SIMPSON, THACHER AND

12    BARTLETT IN NEW YORK BEFORE MOVING ON TO RABO BANK?

13  A.  ROUGHLY, YES.

14  Q.  ABOUT FOUR TO FIVE YEARS.  AND YOUR WORK AT SIMPSON,

15    I BELIEVE YOU TESTIFIED IN YOUR DEPOSITION, THAT YOUR

16    WORK AT SIMPSON, THACHER WAS LARGELY ON THE CORPORATE

17    SIDE, CORRECT?

18  A.  THAT'S CORRECT.

19  Q.  DRAFTING DOCUMENTS -- I ASSUME THAT INCLUDED DRAFTING

20    DOCUMENTS?

21  A.  IT DID.

22  Q.  EDITING OF DOCUMENTS?

23  A.  SURE.

24  Q.  REVIEWING RED LINE CHANGES OF DOCUMENTS?

25  A.  YES.

1   Q.  CORPORATE LAWYERS DO THAT ALL THE TIME; IS THAT

2       RIGHT?

3   A.  I DID.

4   Q.  AND THAT'S SUFFICIENT, CORRECT?

5   A.  (NO RESPONSE)

6   Q.  IN 2008 AT RABO BANK YOU WERE THE HEAD OF MERGERS AND

7       ACQUISITIONS LEGAL TEAM IN NEW YORK?

8   A.  THERE IS NO MERGERS AND ACQUISITIONS LEGAL TEAM.  I

9       WAS THE LAWYER WHO WAS RESPONSIBLE FOR THE M AND A

10      ACTIVITIES, IN THE SAME WAY I WAS THE LAWYER WHO WAS

11      RESPONSIBLE FOR THE STRUCTURED FINANCING ACTIVITIES.

12  Q.  I SEE.  AND YOU STATED IN YOUR -- IN YOUR DIRECT

13      TESTIMONY, IT SEEMS LIKE YOU'VE MOVED UP CONSIDERABLY

14      SINCE THEN.

15  A.  MY MOTHER WOULD LIKE TO THINK SO.

16  Q.  THEN AGAIN, I'M ASSUMING, SIR, AT RABO BANK THAT YOU

17      DRAFTED, EDITED AND MADE CHANGES TO VARIOUS

18      DOCUMENTS?

19  A.  YES, I DO.

20  Q.  MR. SHERMAN, YOU STATED YESTERDAY DURING YOUR DIRECT

21      EXAMINATION THAT RBDC WOULD GET PAID ONLY AFTER

22      CHEMTECH II'S CREDITORS WERE PAID OUT; ISN'T THAT

23      RIGHT?

24  A.  THAT'S CORRECT.

25  Q.  CHEMTECH II DIDN'T HAVE ANY CREDITORS; ISN'T THAT

1     CORRECT?

2  A.  NO, THAT'S NOT CORRECT.

3  Q.  WHAT CREDITORS DID CHEMTECH II HAVE?

4  A.  IRS, THEIR AUDITORS, THEIR -- YOU KNOW, THEY'RE --

5     THEY -- UNDER THE DOCUMENTATION THERE WERE

6     PROHIBITIONS ON HAVING INCURRED INDEBTEDNESS.

7  Q.  UH HUH.

8  A.  BUT NOT HAVING DEBT AND NOT HAVING CREDITORS IS NOT

9     THE SAME.

10  Q.  OKAY.  LET'S -- LET'S FOCUS ON DEBT, THEN.

11     CHEMTECH II DIDN'T HAVE ANY OUTSTANDING DEBT;

12     ISN'T THAT RIGHT?

13  A.  THEY WERE NOT -- THEY WERE NOT CONTRACTUALLY ALLOWED

14     TO PUT DEBT ON.  IF CHEMTECH II HAD ENGAGED DEBT, IT

15     WOULD HAVE BEEN IN VIOLATION OF THE LLC AGREEMENT.

16     YES.

17  Q.  AND IF THEY WERE IN VIOLATION OF THE LLC AGREEMENT,

18     THAT WOULD BE THE GENERAL PARTNER WHO INCURRED THE --

19     WHO WOULD HAVE BREACHED THAT AGREEMENT, CORRECT?

20  A.  THE -- THE GENERAL PARTNER WOULD HAVE BREACHED THE

21     AGREEMENT.  THAT WOULD NOT HAVE, AT LEAST IN MY

22     EXPERIENCE, NOT AFFECT THE ENFORCEABILITY OF THE DEBT

23     AGAINST CHEMTECH II PARTNERSHIP.

24  Q.  WELL, LET'S FOCUS ON -- A SECOND ON -- YOU SAID THAT

25     CHEMTECH II COULD NOT TAKE ON ANY ADDITIONAL DEBT.

1       THERE WERE PROVISIONS IN THE PARTNERSHIP AGREEMENT

2       THAT PREVENTED THAT; IS THAT CORRECT?

3   A.  CORRECT.  I BELIEVE IT'S ARTICLE FIVE OF THE

4       PARTNERSHIP AGREEMENT.

5   Q.  OKAY.

6   A.  THAT'S -- THAT STARTS WITH THE MANAGING PARTNER OR

7       THE GENERAL PARTNER CAN AND CANNOT DO WITHOUT THE

8       CONSENT OF THE OTHER PARTNERS.

9   Q.  AND THE OTHER NAMED PARTNER IN THIS CASE WAS RBDC,

10      CORRECT?  OR ONE OF THE OTHER PARTNERS WAS RBDC?

11  A.  RBDC WOULD HAVE A CONSENT TO THAT.  THAT'S CORRECT.

12  Q.  AND SO ISN'T IT TRUE THAT RBDC -- I'M SORRY.  LET ME

13      BACK UP.

14          ISN'T IT TRUE THAT RABO -- ONCE AGAIN I'M

15      CONFUSING THE PARTIES.

16          ISN'T IT TRUE THAT CHEMTECH II COULD NOT BE

17      BURDENED WITH ADDITIONAL DEBT WITHOUT RBDC'S CONSENT?

18      THAT'S WHAT YOU'RE SAYING, CORRECT?

19  A.  NO.

20  Q.  WHAT ARE YOU SAYING, SIR?

21  A.  CONTRACTUALLY, THEY WERE NOT ALLOWED TO DO IT.  IT

22      COULD HAPPEN.  IF IT HAPPENED THERE WOULD BE

23      REPERCUSSIONS.  THE REPERCUSSIONS WOULD BE A NOTICE

24      EVENT WOULD OCCUR AND THE PARTNERS WOULD HAVE THE

25      RIGHT TO CAUSE THE LIQUIDATION OF THE PARTNERSHIP.

1            IN THAT LIQUIDATION OF THE PARTNERSHIP, ANY DEBT

2       THAT WAS PUT ON IN VIOLATION OF THOSE RESTRICTIONS

3       WOULD STILL COME IN FRONT OF THE EQUITY PARTNERS,

4       INCLUDING RBDC.

5   Q.  SO YOU WOULD HAVE A LAWSUIT AGAINST THE GENERAL

6       PARTNER IFCO AND DOW CHEMICAL COMPANY FOR THAT AMOUNT

7       OF DEBT; ISN'T THAT RIGHT?

8   A.  ABSOLUTELY HAVING A LAWSUIT, WHETHER -- NOT

9       NECESSARILY FOR THAT AMOUNT OF DEBT, FOR ANY LOSSES

10       THAT WE INCURRED AS A RESULT OF THEM INCURRING THAT

11       DEBT.  IF ON LIQUIDATION WE STILL GOT PAID IN FULL,

12       WE WOULDN'T HAVE MUCH OF A LAWSUIT.

13   Q.  WELL, YOU ---

14   A.  I DRAW THIS DISTINCTION BECAUSE IT'S IMPORTANT AND

15       PEOPLE DON'T UNDERSTAND IT, EVEN IN, YOU KNOW,

16       CONCEPTS OF COVENANTS.  IF A COMPANY IN AN AGREEMENT

17       HAS A COVENANT NOT TO DO SOMETHING.  THAT DOES NOT

18       MEAN THEY CANNOT DO IT.

19   Q.  I UNDERSTAND THAT, SIR.  AND JUST ---

20   A.  IT JUST MEANS THERE WILL BE REPERCUSSION IF THEY DO.

21   Q.  I GUESS -- AND THIS IS MY POINT, SIR, MR. SHERMAN, IS

22       THAT -- IF -- IF THE GENERAL PARTNER HAD -- HAD DONE

23       SOMETHING THAT THEY WEREN'T SUPPOSED TO DO ON THE

24       PARTNERSHIP AGREEMENT, YOU WOULD HAVE HAD FULL RIGHT

25       TO SUE GENERAL PARTNER AND DOW FOR YOUR LOSS?

1   A.   WE WOULD HAVE A RIGHT TO SUE THE GENERAL PARTNER

2        UNDER THE PARTNERSHIP AGREEMENT.  AND WE WOULD HAVE A

3        RIGHT TO SUE DOW UNDER THE PERFORMANCE GUARANTEE.

4        THAT'S CORRECT.

5   Q.   OKAY.  BUT AS A GENERAL MATTER, IF THEY FOLLOWED THE

6        LAW AND FOLLOWED THE PARTNERSHIP AGREEMENT, THEY

7        COULD NOT TAKE ON ADDITIONAL DEBT?

8   A.   CORRECT.  PERFORMING -- PERFORMING IN ACCORDANCE WITH

9        THE PRACTICE GIVEN, IT WOULD NOT ALLOW THEM TO TAKE

10       ON ADDITIONAL DEBT WITHOUT OUR CONSENT.

11  Q.   NOW, MR. SHERMAN, I BELIEVE YOU TESTIFIED IN YOUR

12       DEPOSITION THAT RBDC'S PROTECTION IN THIS TRANSACTION

13       INCLUDED THE APPROXIMATE 800 MILLION DOLLARS OF PLANT

14       ASSETS HERE IN LOUISIANA, PLUS APPROXIMATELY 200

15       MILLION DOLLARS OF SUPPOSEDLY LIQUID INVESTMENT

16       ASSETS; IS THAT CORRECT?

17  A.   THAT'S CORRECT.

18  Q.   AND ALL OF THAT PROTECTED RBDC'S 200 MILLION DOLLAR

19       INVESTMENT IN CHEMTECH II?

20  A.   YES.

21  Q.   IT WAS APPROXIMATELY, ADDING THOSE TWO NUMBERS

22       TOGETHER, A BILLION DOLLARS IN ASSET PROTECTION;

23       ISN'T THAT RIGHT?

24  A.   THE ASSET BASE WAS, YES, A BILLION DOLLARS.

25  Q.   NOW, MR. SHERMAN, DOW MADE LEASE PAYMENTS TO CHEMTECH

| | |
|---|---|
| 1 | II FOR THE USE OF ITS PLANT, CORRECT? |
| 2 | A.   IT'S MY UNDERSTANDING.  I ASSUME IT WAS DONE. |
| 3 | Q.   AND THOSE PAYMENTS WERE MADE PURSUANT TO A LEASE |
| 4 | AGREEMENT, RIGHT? |
| 5 | A.   CORRECT. |
| 6 | Q.   AND IT WAS THE LEASE PAYMENTS FROM DOW TO CHEMTECH II |
| 7 | THAT PROVIDED CHEMTECH II ITS PRIMARY SOURCE OF CASH |
| 8 | FLOW; ISN'T THAT RIGHT? |
| 9 | A.   I'M NOT COMFORTABLE WITH THE CATEGORIZATION OF |
| 10 | PRIMARY.  THERE WERE TWO SOURCES OF CASH FLOW. |
| 11 | THAT'S ONE OF THEM.  THE SECOND ONE WAS ON THE 200 |
| 12 | MILLION DOLLARS OF COMPANY DEBT.  I'M NOT SURE WHICH |
| 13 | WOULD BE DEEMED PRIMARY. |
| 14 | Q.   WELL, LET ME -- LET ME BREAK IT DOWN, SIR. |
| 15 | ARE YOU AWARE -- YOU'RE AWARE THAT THE PAYMENTS |
| 16 | TO CHEMTECH II FOR ROYALTY AMOUNTS -- I'M SORRY, FOR |
| 17 | LEASE AMOUNTS -- CHEMTECH II LEASE AMOUNTS WERE |
| 18 | BETWEEN 60 AND 70 MILLION DOLLARS; IS THAT RIGHT? |
| 19 | A.   I -- I DON'T KNOW THE DOLLAR AMOUNT OF THE LEASE |
| 20 | PAYMENTS WERE. |
| 21 | Q.   WELL, DO YOU THINK THAT THE INTEREST ON INVESTMENTS |
| 22 | IS 70 MILLION DOLLARS? |
| 23 | A.   EXCUSE ME? |
| 24 | Q.   DO YOU THINK THE INTEREST ON -- EXCUSE ME.  THE |
| 25 | INTEREST ON THE INVESTMENTS BEING HELD BY A CHEMTECH |

1    SUBSIDIARY APPROACHED 60 TO 70 MILLION DOLLARS A

2    YEAR?

3  A.   I HAVE NO IDEA WHAT THE INTEREST RATE WAS, WHAT LIBOR

4    WAS.  I DON'T RECALL WHAT THE SPREAD WAS.  I DON'T

5    SUSPECT THAT A 200 MILLION DOLLAR DEBT INSTRUMENT

6    WOULD YIELD 60 TO 70 MILLION DOLLARS WORTH OF

7    INTEREST INCOME.  ALTHOUGH I DON'T KNOW THAT THE

8    INCOME STREAM WAS 60 TO 70 MILLION DOLLARS.

9         BY MR. SCHREIBER:

10         WELL, YOUR HONOR, IT'S STIPULATED IN THIS

11         CASE THAT THAT IS APPROXIMATELY THE LEASE

12         PAYMENTS PER YEAR THAT WAS GOING BETWEEN DOW AND

13         CHEMTECH II.

14         BY THE COURT:

15         VERY WELL.

16  BY THE WITNESS:

17  A.   AND I'M NOT CONTESTING IT WAS.  I JUST CAN'T TESTIFY

18    THAT IT WAS.

19  BY MR. SCHREIBER:

20  Q.   AND THAT -- THAT -- THAT'S FAIR.  ASSUMING THAT THAT

21    IS THE CASE, BECAUSE IT HAS BEEN STIPULATED TO, WOULD

22    YOU AGREE THAT THAT WAS A PRIMARY SOURCE FOR CHEMTECH

23    II'S CASH FLOWS?

24  A.   AGAIN, I'M NOT TRYING TO BE DIFFICULT.  BUT I REALLY

25    DO NOT FEEL COMFORTABLE --

```
 1   Q.   WELL, LET'S SAY -- LET'S SAY THAT --

 2   A.   -- IN SAYING ---

 3   Q.   -- LET'S ---

 4          BY THE COURT:

 5               LET HIM ANSWER, MR. SCHREIBER.

 6          BY MR. SCHREIBER:

 7               SURE.

 8   BY THE WITNESS:

 9   A.   I'M NOT -- I'M NOT COMFORTABLE WITH THE

10        CHARACTERIZATION OF PRIMARY OR PRINCIPAL INVOLVED.

11   BY MR. SCHREIBER:

12   Q.   THAT'S FINE.  WE CAN REMOVE IT FROM THE QUESTION.

13   A.   IT WAS A -- THERE WERE, AS I UNDERSTAND IT, TWO

14        SOURCES OF INCOME.

15   Q.   THAT'S FINE.  IF YOU DON'T REMEMBER THE CONVERSATION,

16        SIR, IT'S NOT A PROBLEM.

17          THE LEASE AGREEMENT -- GOING BACK TO THE LEASE

18        AGREEMENT.  YOU TESTIFIED YESTERDAY IT'S CALLED A

19        TRIPLE NET LEASE, CORRECT?

20   A.   THAT'S CORRECT.

21   Q.   AND YOU COULDN'T REALLY RECALL, BUT I BELIEVE IT

22        MEANS THAT IN THIS CASE DOW PAYS ALL THE REAL ESTATE

23        TAXES, THE BUILDING INSURANCE AND THE MAINTENANCE;

24        ISN'T THAT CORRECT?

25   A.   THAT SOUNDS LIKE THE TRIPLES THAT ARE REFERRED TO IN
```

1  TRIPLE NET, YES.

2  Q.  NOW, THE LEASE WAS ALSO CONSIDERED -- YOU TESTIFIED

3      IN YOUR DEPOSITION THAT A LEASE WAS ALSO CONSIDERED A

4      HELL-OR-HIGH WATER LEASE.

5  A.  I DON'T RECALL SPECIFICALLY TESTIFYING TO THAT, BUT

6      THAT SOUNDS CORRECT TO ME, YES.

7  Q.  WELL, YESTERDAY DURING YOUR DIRECT EXAMINATION YOU

8      SAID THAT -- THAT THE LEASE AGREEMENT MEANT THAT DOW

9      STILL HAD TO MAKE THE LEASE PAYMENT TO CHEMTECH II NO

10     MATTER WHAT.  I BELIEVE YOU USED THE WORDS, "NO

11     MATTER WHAT."

12 A.  OKAY. I MAY HAVE SAID THAT.

13 Q.  EVEN IF THE PLANT BURNED DOWN, DOW STILL WOULD HAVE

14     MADE THE LEASE PAYMENTS TO CHEMTECH II; ISN'T THAT

15     RIGHT?

16 A.  I DON'T HAVE THE LEASE IN FRONT OF ME.  THAT IS

17     CONSISTENT WITH MY RECOLLECTION.

18 Q.  ASSUMING -- ASSUMING THAT IS, YOU KNOW, THE HELL-OR-

19     HIGH WATER LEASE.

20 A.  OKAY.

21 Q.  OKAY.  THE PLANT COULD BECOME UNPRODUCTIVE, FOR

22     WHATEVER REASON, DOW STILL WOULD HAVE HAD TO MAKE

23     THOSE LEASE PAYMENTS?

24 A.  THAT WOULD BE HOW A HELL-OR-HIGH WATER LEASE WOULD

25     WORK.  YES.

1   Q.   RIGHT.  IT COULD HAVE BEEN FLOODED BY THE MISSISSIPPI

2        RIVER, SIR, AND DOW STILL WOULD HAVE HAD TO MAKE

3        THOSE LEASE PAYMENTS TO CHEMTECH II?

4   A.   THAT'S MY UNDERSTANDING OF HOW A HELL-OR-HIGH WATER

5        LEASE WOULD WORK.  YES.

6   Q.   IT COULD HAVE BEEN HIT BY A TORNADO?

7   A.   RIGHT.

8   Q.   I CERTAINLY DON'T HOPE THAT THAT IS THE CASE, BUT IT

9        -- IT COULD HAVE HAPPENED, RIGHT?

10  A.   ABSOLUTELY.

11  Q.   IT COULD HAVE CRUMBLED TO PIECES; ISN'T THAT RIGHT?

12       AND DOW STILL WOULD HAVE HAD TO HAVE MADE LEASE

13       PAYMENTS TO CHEMTECH II?

14  A.   AGAIN, I DON'T HAVE THE LEASE DOCUMENT IN FRONT OF

15       ME.  I CAN'T REVIEW THE LEASE DOCUMENT.  BUT THAT IS

16       MY UNDERSTANDING OF HOW A HELL-OR-HIGH WATER LEASE

17       WORKS.  AND IT IS MY RECOLLECTION THAT WE HAD THE

18       HELL-OR-HIGH WATER LEASE IN THIS TRANSACTION.

19  Q.   MR. SHERMAN, THE PLANT HERE IN LOUISIANA, IT'S A

20       CHEMICAL PLANT, CORRECT?

21  A.   YES.

22  Q.   AND ONE REASON THAT CHEMICAL PLANTS CAN BE RISKY

23       INVESTMENTS IS BECAUSE THEY CAN CAUSE ENVIRONMENTAL

24       DAMAGE TO THE AREA, RIGHT?

25  A.   AGAIN, I'M NOT AN EXPERT.  AS A LAYMAN, THOUGH, I

1        WOULD CERTAINLY AGREE WITH THAT ASSESSMENT.

2   Q.   AND THE REASON THAT THAT IS RISKY IS THAT CAN CAUSE A

3        MULTITUDE OF LITIGATION, UNFORTUNATELY, AS WE'RE

4        AWARE; ISN'T THAT RIGHT?

5   A.   I GUESS IT DEPENDS ON WHO YOU'RE -- WHO YOU'RE SAYING

6        IT'S RISKY TO.  AS AN INVESTOR?

7   Q.   AS AN INVESTOR.

8   A.   AS AN INVESTOR IN CHEMTECH, IT'S RISKY TO US BECAUSE

9        THE -- THERE WOULD BE CREDITORS GENERATED BY THOSE

10       ENVIRONMENTAL ACTIONS.  AND THOSE CREDITORS WOULD

11       HAVE FIRST CRACK AT THE ASSET VALUE OF THE

12       PARTNERSHIP AHEAD OF MINOR PARTERSHIP INTEREST.

13            SO, YES, IT WOULD BE RISKY.

14  Q.   MR. SHERMAN, ISN'T IT TRUE THAT HERE WITH REGARD TO

15       RBDC, THAT IT WAS NOT GOING TO BE LIABLE FOR ANY

16       ENVIRONMENTAL RISKS ASSOCIATED WITH THE CHEMICAL

17       PLANT IN LOUISIANA?

18  A.   THAT WOULD BE TRUE IN ANY LIMITED PARTNERSHIP

19       SITUATION.  LIMITED PARTNERS ARE, BY DEFINITION,

20       LIMITED PARTNERS.  THEIR INVESTMENT AND THEIR

21       LIABILITY -- THEIR LIABILITY IS LIMITED TO THE AMOUNT

22       INVESTED, JUST AS IT WOULD BE AS A CORPORATE STOCK

23       SHAREHOLDER.

24            SO, YES, A LIMITED PARTNER IN CHEMTECH II WOULD

25       NOT HAVE DIRECT LIABILITY FOR THE ENVIRONMENTAL

1    CLAIMS AGAINST THE PARTNERSHIP.

2  Q.  THANK YOU, MR. SHERMAN.

3       IN 2003, I BELIEVE YOU TESTIFIED YESTERDAY, IN

4       2003 RABO BANK TOOK OUT CREDIT DEFAULTS LOST IN THE

5       DOW NAME.  MAYBE IT'S AGAINST THE DOW NAME.  MAYBE

6       I'M NOT USING THE TERMINOLOGY RIGHT.

7  A.  YES.  YES.  WE PURCHASED CREDIT PROTECTION AGAINST

8       DOW CREDIT RISK BY BUYING CDS.

9  Q.  AND THE CDS THAT RABO TOOK OUT, IT WAS BASICALLY AN

10      INSURANCE POLICY ON DOW, RIGHT?

11  A.  IT ALLOWS US TO RECEIVE PAYMENT IF ONE OF THE THREE

12      CREDIT EVENTS HAPPENS WITH RESPECT TO DOW.

13  Q.  AND SO IF DOW WERE -- HAPPENED TO GO INTO BANKRUPTCY,

14      RBDC COULD GET BACK ITS 200 MILLION DOLLARS IN FULL,

15      VIS A' VIS THE SWAP.

16  A.  IF DOW WERE TO GO INTO BANKRUPTCY, THERE WOULD BE A

17      CREDIT EVENT UNDER THE CDS.  AND IF RABO -- IF RBDC

18      WERE ABLE TO DELIVER A DELIVERABLE, IN ACCORDANCE

19      WITH THAT CDS TO THE COUNTER PARTY, AND ASSUMING THE

20      COUNTER PARTY WERE CREDIT WORTHY AND ABLE TO PERFORM

21      ON THE CDS, THEN WE WOULD EXPECT RBDC TO RECOVER IN

22      FULL.  THAT'S WHY -- THAT'S WHY WE USE THAT AS A

23      HEDGE.

24  Q.  SURE.  AND THAT MONEY WOULDN'T COME FROM DOW, IT

25      COMES FROM OTHER FINANCIAL INSTITUTIONS; ISN'T THAT

```
 1        RIGHT?
 2   A.   THAT MONEY WOULD COME FROM OUR COUNTER PARTIES.  THEY
 3        DON'T KNOW FOR CERTAIN THAT ALL OUR COUNTER PARTIES
 4        IN THE CDS WERE INITIALLY, QUOTE UNQUOTE, FINANCIAL
 5        INSTITUTIONS.
 6   Q.   THEY -- THEY WERE NOT DOW-RELATED PARTIES?
 7   A.   THEY WERE NOT DOW-RELATED PARTIES.
 8   Q.   AND TYPICALLY WHEN YOU PURCHASE CDS'S YOU USUALLY
 9        PURCHASE THEM FROM FINANCIAL INSTITUTIONS, CITY BANK
10        OR ---
11   A.   I -- I'M NOT CERTAIN OF THE -- THE UNIVERSAL PLAYERS.
12        I DON'T THINK THEY'RE ALL NECESSARY BANK.
13   Q.   OKAY.
14   A.   I THINK THERE ARE HEDGE FUNDS OUT THERE SELLING CDS.
15        I DON'T KNOW IF THEY QUALIFY IN YOUR DEPOSITION OF
16        FINANCIAL INSTITUTION.  ONCE AGAIN, IT'S VERY
17        IMPORTANT FOR ME TO BE SPECIFIC.
18   Q.   NO, THAT'S FINE.  MR. SHERMAN, YOU -- YOU TESTIFIED
19        ABOUT DELIVER -- DELIVERING -- I'M SORRY.  I'M NOT
20        SURE OF THE WORD YOU USED.
21   A.   DELIVERABLE.
22   Q.   DELIVERABLE UNDER THE CDS OR YOU GET PAID 200 MILLION
23        DOLLARS, RIGHT?
24   A.   (NO RESPONSE)
25   Q.   I'M GOING TO NEED AN AUDIBLE ANSWER, SIR.
```

```
 1  A.   OH, YES.

 2  Q.   OKAY.  THANK YOU.  ISN'T IT TRUE THAT RBDC WAS ABLE

 3       TO GET A DOW NOTE INTO A SEPARATE DEPOSITORY WHICH IS

 4       HELD BY JP MORGAN IN TRUST FOR RBDC?

 5  A.   THAT'S MY RECOLLECTION.

 6  Q.   AND THAT'S BECAUSE THE DOW NOTE WAS -- WOULD NOT BE

 7       SO TAKEN IN DOW BANKRUPTCY?  IT WOULD PROVIDE RBDC

 8       WITH THAT DELIVERABLE THAT YOU WERE TALKING ABOUT?

 9  A.   I'M NOT SURE I UNDERSTAND THE FIRST PART WHEN YOU SAY

10       IT WOULDN'T BE SUBJECT TO A BANKRUPTCY.

11           BY THE COURT:

12               WHY DON'T YOU REPHRASE IT. I DON'T THINK

13           I UNDERSTAND THE QUESTION.

14           BY MR. SCHREIBER:

15               SURE, YOUR HONOR.  I'M SORRY.

16  BY MR. SCHREIBER:

17  Q.   MR. SHERMAN, I CAN BREAK THAT DOWN EVEN MORE.  RBDC

18       WAS ABLE TO GET A DELIVERABLE DOW NOTE OUTSIDE OF DOW

19       CHEMICAL COMPANY.  IT WAS HELD IN TRUST TO JP MORGAN;

20       ISN'T THAT RIGHT?

21  A.   THAT'S MY RECOLLECTION.  YES.

22  Q.   OKAY.  AND THAT -- THAT DELIVERABLE WOULD ALLOW RBDC

23       TO, FOR LACK OF A BETTER WORD, COLLECT ON THE 200

24       MILLION DOLLAR SWAP WITH YOUR COUNTER PARTIES?

25  A.   YES.
```

1  Q.   OKAY.  SO EVEN IN A WORSE-CASE SCENARIO FOR THE DOW

2       CHEMICAL COMPANY IMPLODES OVERNIGHT, RABO BANK WOULD

3       BE -- STILL GET ITS 200 MILLION DOLLARS BACK FROM

4       THOSE COUNTER PARTIES?

5  A.   ASSUMING ALL THE MECHANICS WORKED, AS I WAS INTRUSTED

6       TO MAKE SURE THEY WORKED, AND THAT OUR COUNTER

7       PARTIES WERE CREDIT WORTHY, YES.  WE HAD HEDGED --

8       FULLY HEDGED ANY EXTERIOR MARKET, OUR DOW CREDIT

9       RISK.  ABSOLUTELY.  THAT WAS THE PURPOSE OF THE

10      HEDGE.

11 Q.   I UNDERSTAND THAT, SIR.  MR. SHERMAN, TURNING TO WHAT

12      HAPPENS IN A LIQUIDATION OF CHEMTECH II, RABO BANK

13      WOULD GET PAID OUT AFTER WHAT YOU CALL CREDITORS,

14      WOULD BE PAID OUT FIRST BE -- BECAUSE OF ITS

15      PREFERRED -- EXCUSE ME.  BECAUSE OF ITS PREFERRED

16      POSITIONING, CORRECT?

17 A.   NO.  THE CAPITAL ACCOUNT ALLOCATIONS OCCUR.  AND THE

18      ADJUSTMENTS TO THE CAPITAL ACCOUNT ALLOCATIONS ARE

19      MADE.  AND THEN ALL PARTNERS ARE PAID OUT

20      SIMULTANEOUSLY IN A LIQUIDATION.

21 Q.   SO YOU'RE SAYING THAT THE GENERAL PARTNER, DOW, IS

22      NOT IN A FIRST LOSS POSITION?

23 A.   NO.  THE GENERAL PARTNER, DOW, HAD A 99 PERCENT FIRST

24      LOSS POSITION BY VIRTUE OF THE MECHANICS OF THE

25      CAPITAL ACCOUNTS.  IF THERE WERE A $100.00 LOSS, IT

1    FLOWS THROUGH THE CAPITAL ACCOUNT ALLOCATIONS, AND

2    THEN IT HITS THE DIFFERENT CAPITAL ACCOUNTS IN

3    ACCORDANCE WITH THOSE, AND THE BALANCES ARE ADJUSTED.

4    SO THE LOSSES MAY GO TO THE OTHER PARTNERS BEFORE

5    THEY GO TO RBDC.  BUT ONCE -- IT'S ONLY WHEN THOSE

6    ALLOCATIONS ARE MADE AND YOUR CAPITAL -- CAPITAL

7    ACCOUNT BALANCES EQUAL TO YOUR CASH THAT YOU THEN

8    DISTRIBUTE THE CASH OUT.  AND YOU DISTRIBUTE IT TO

9    ALL THE -- ALL THE MEMBERS OR PARTNERS AT THE SAME

10   TIME.

11 Q.   MR. SHERMAN, YOU TESTIFIED YESTERDAY, AND CORRECT ME

12   IF I'M WRONG.  BUT I BELIEVE YOU SAID THAT THE

13   CHEMTECH TRANS -- CHEMTECH II TRANSACTION WAS A ONE-

14   OFF TRANSACTION FOR RABO BANK?

15 A.   I DON'T RECALL TESTIFYING TO THAT.

16        BY MR. SCHREIBER:

17           YOUR HONOR, COULD I HAVE A QUICK SECOND?  I

18        BELIEVE WE RECENTLY GOT YESTERDAY'S DAILY

19        TRANSCRIPT.

20 BY MR. SCHREIBER:

21 Q.   MR. SHERMAN, CAN YOU PLEASE TURN TO "JOINT EXHIBIT

22   647" IN YOUR BLACK BINDER, WHICH I BELIEVE -- EITHER

23   BINDER, BUT IT'S EITHER IN YOUR BLACK BINDER OR YOUR

24   WHITE BINDER.

25        IF YOU TURN, SIR, TO THE FOURTH PAGE OF THAT

```
 1        DOCUMENT, BATES ENDING 3663 -- I'M SORRY, BATES

 2        ENDING 3664.

 3  A.    YES.

 4  Q.    READING FROM THE MIDDLE OF THE FIRST PARAGRAPH IT

 5        SAYS, "THE STRUCTURES VIRTUALLY" -- AND YOU'RE

 6        TALKING ABOUT CHEMTECH II HERE, RIGHT, IT'S A

 7        CHEMTECH II DOCUMENT THAT YOU WALKED THROUGH?

 8  A.    THAT'S CORRECT.

 9  Q.    OKAY.  THE STRUCTURE MEANING CHEMTECH II, CORRECT?

10  A.    YES, SIR.

11  Q.    THE STRUCTURE IS VIRTUALLY IDENTICAL TO OUR PREVIOUS

12        FINANCING TRANSACTIONS FOR SARA LEE, D&B, COGNIZANT

13        AND THE RECENTLY APPROVED NEILSON MEDIA TRANSACTION.

14        DO YOU SEE THAT, SIR?

15  A.    I DO.

16  Q.    IF YOU NOTICE, SIR, WAS D&B DUNN AND BRADSTREET?

17  A.    THAT'S MY RECOLLECTION.  YES.

18  Q.    SO, IN FACT, RABO BANK HAD DONE A CHEMTECH II-LIKE

19        TRANSACTION FOR THOSE FOUR OTHER COMPANIES; IS THAT

20        RIGHT?

21  A.    OH, BOY.  I CAN'T REALLY MAKE THAT GENERAL STATEMENT.

22        I THINK -- MY RECOLLECTION IS THAT WE HAD

23        TRANSACTIONS.  WE DID DO TRANSACTIONS INVOLVING SARA

24        LEE, DUNN AND BRADSTREET, COGNIZANT AND NEILSON.  I

25        DON'T REMEMBER THE SPECIFICS THEN ON WHERE THEY WERE
```

```
 1        SIMILAR OR MAY HAVE DIFFERED FROM THIS.  BUT
 2        CERTAINLY THE STATEMENT AND CREDIT APPLICATION IS
 3        THAT THEY ARE STRUCTURES ARE SIMILAR.  I HAVE NO
 4        REASON TO BELIEVE THAT THAT'S ERRONEOUS.
 5   Q.   WELL, IT SAYS, "VIRTUALLY IDENTICAL" IS WHAT THE
 6        STATEMENT IS; IS THAT RIGHT?
 7   A.   I -- AGAIN, I DON'T HAVE A SPECIFIC RECOLLECTION FOR
 8        THOSE TRANSACTIONS.  BUT I HAVE NO BASIS FOR
 9        BELIEVING THAT THAT'S INACCURATE.
10   Q.   THANK YOU, SIR.  MR. SHERMAN, WHEN YOU WERE WALKING
11        THROUGH "JOINT EXHIBIT 647" YESTERDAY, YOU WERE
12        DESCRIBING TO MR. TIDWELL THAT SOMETIMES THESE CREDIT
13        DOCUMENTS ARE WRITTEN IN INEXACT -- IN INEXACT WAYS.
14   A.   CORRECT.
15   Q.   AND WHEN YOU WERE EXPLAINING HOW THE WORD -- AND YOU
16        WERE EXPLAINING HOW FREQUENTLY THE WORD LOAN DOESN'T
17        ALWAYS MEAN LOAN IN THIS CONTEXT, RIGHT; IT'S A
18        GENERIC TERM?
19   A.   I DON'T RECALL SPECIFICALLY TALKING ABOUT THE WORD
20        LOAN.  I KNOW WE USED -- WE TALKED ABOUT THE WORD
21        BORROWER AND HOW IT'S USED ON OUR TEMPLATES.  I DON'T
22        BELIEVE WE HAD A CONVERSATION WITH THE WORD LOAN.
23        YOU CAN -- PERHAPS MY MEMORY OR MY RECOLLECTION IS
24        FAULTY.
25   Q.   I THOUGHT YOU SAID THE WORD BORROWER DOESN'T ALWAYS
```

```
 1        MEAN THE WORD BORROWER?

 2   A.   CORRECT.

 3   Q.   OKAY.  AND MR. TIDWELL, I BELIEVE, ALSO DIRECTED YOU

 4        TO THE WORD GUARANTEE IN THIS DOCUMENT.

 5   A.   YES.

 6   Q.   DO YOU RECALL THAT?  AND YOU SAID THAT THE WORD

 7        GUARANTEE IS ALSO -- IT'S MISLEADING BECAUSE YOU --

 8        YOUR IMPRESSION IS THAT IT WASN'T A GUARANTEE

 9        INVOLVED IN THIS CASE, CORRECT?

10   A.   I DON'T REMEMBER THE CONTEXT IN WHAT YOU'RE

11        REFERRING.  THERE WERE A FEW DIFFERENT PLACES WHERE

12        WE USED THE WORD GUARANTEE.

13   Q.   AND YOUR RESPONSE TO HIS QUESTION -- HIS QUESTIONS

14        WAS THAT YOU DIDN'T HAVE A GUARANTEE, CORRECT, IN

15        CHEMTECH II?

16   A.   MY RESPONSE, I BELIEVE, TO THE QUESTION -- IF WE'RE

17        TALKING ABOUT THE SAME QUESTION, WAS THAT WE DID NOT

18        HAVE A GUARANTEE OF THE LEASE IN CHEMTECH II BECAUSE

19        DOW ENDED UP BEING THE DIRECT LESSOR.

20   Q.   NOW, AND MR. TIDWELL I BELIEVE ALSO DIRECTED YOU TO

21        THE WORD LENDER, WHICH APPEARS FREQUENTLY THROUGHOUT

22        THIS DOCUMENT AND OTHER DOCUMENTS LIKE IT; IS THAT

23        CORRECT?  DO YOU RECALL THAT?

24   A.   I RECALL HIM POINTING TO AN INSTANCE IN THE WORD

25        LENDER.  I DISAGREE WITH THE CHARACTERIZATION THAT IT
```

1     OCCURS FREQUENTLY THROUGHOUT THIS DOCUMENT.

2 Q.   FAIR ENOUGH, SIR.  I JUST WANT TO CLARIFY WHAT YOUR

3     -- YOUR POSITION HAS BEEN WITH REGARD TO "JOINT

4     EXHIBIT 647."  THAT BORROWER DOESN'T ALWAYS MEAN

5     BORROWER; IS THAT WHAT YOU'RE SAYING?

6 A.   THE WORD BORROWER IS ONLY USED IN THIS EXHIBIT IN THE

7     PLACE HOLDER IN THE TITLING OF POINTS ON THE FORMAT

8     FOR OUR APPROVALS.  AND IN THAT CASE, THAT BORROWER

9     LINE HAS -- DOES NOT ALWAYS MEAN SPECIFICALLY A

10     BORROWER ON THE LOAN AGREEMENT.  IT'S MEANT TO BE

11     SORT OF A CREDIT PARTY OR --

12 Q.   I UNDER ---

13 A.   -- A COUNTER PARTY.

14 Q.   I UNDERSTAND.  BUT YOU'RE SAYING THAT BORROWER

15     DOESN'T ALWAYS MEAN WHAT IT SAYS IN THE APPLICATION?

16     IT MEANS SOMETHING ELSE, ACCORDING TO WHAT YOU'RE

17     SAYING; ISN'T THAT RIGHT?

18 A.   (NO RESPONSE)

19 Q.   IS IT A VARIATION OF WHAT THE WORD ---

20       BY THE COURT:

21         LET -- LET -- LET HIM ANSWER.

22       BY MR. SCHREIBER:

23         SURE.

24 BY THE WITNESS:

25 A.   I -- I THINK YOUR STATEMENT IS A LITTLE STRONG. BUT

1       FOR THE SAKE OF ARGUMENT, YES, BORROWER CAN MEAN MORE

2       THAN JUST BORROWER.

3  BY MR. SCHREIBER:

4  Q.   THAT'S YOUR INTERPRETATION OF THE DOCUMENT?

5  A.   YES.

6  Q.   AND GUARANTEE DOESN'T MEAN GUARANTEE IN THIS

7       DOCUMENT?

8  A.   I'M NOT FOLLOWING YOUR LOGIC.

9  Q.   WE, I BELIEVE, DISAGREED WITH MR. -- YOU AGREED WITH

10      MR. TIDWELL THAT SAID THAT THERE WAS NO GUARANTEE, AS

11      USED THIS DOCUMENT?

12          BY THE COURT:

13              DON'T ANSWER THE QUESTION.

14          BY MR. TIDWELL:

15              YOUR HONOR, HE'S TESTIFIED ON DIRECT ABOUT

16          A NUMBER OF GUARANTEES: A PAYMENT GUARANTEE AND

17          PERFORMANCE GUARANTEE.  I THINK THE QUESTION IS

18          CONFUSING.  I THINK IT'S MISCHARACTERIZING HIS

19          PRIOR TESTIMONY.

20          BY THE COURT:

21              YOU WANT TO --

22          BY MR. SCHREIBER:

23              I CAN MOVE ON, YOUR HONOR.

24          BY THE COURT:

25              -- REPHRASE IT.  YES, LET'S MOVE ON.

1              BY MR. SCHREIBER:

2                   I CAN HAVE HIM MOVE ON.

3              BY THE COURT:

4                   LET'S MOVE ON.

5    BY MR. SCHREIBER:

6    Q.   MR. SHERMAN, ISN'T IT TRUE, SIR, THAT ANALYSTS AT

7         RABO BANK CALCULATING THE AMOUNT OF DOW'S OVERALL

8         DEBT INCLUDED THE ADDITIONAL 200 MILLION DOLLARS IN

9         DEBT BECAUSE OF THE CHEMTECH II TRANSACTION?

10   A.   AGAIN, I -- I'M NOT CERTAIN AS TO WHAT -- WHAT THE

11        CREDIT ANALYSTS DID OR DID NOT INCLUDE.  BUT I DO

12        KNOW THAT THERE ARE -- ANY WORK THAT THEY DID IN THE

13        DOW CASE SCENARIO ADDED THE 200 DOLLARS IN -- 200

14        MILLION DOLLARS IN TO SEE WHAT IT WOULD DO TO THE

15        ANALYSIS.

16   Q.   SO IF I CAN DIRECT YOUR ATTENTION TO "JOINT EXHIBIT

17        840."  THIS IS ALSO YOUR DEPOSITION IN "EXHIBIT 644."

18        DO YOU SEE THIS DOCUMENT, SIR?

19   A.   YES.

20   Q.   LOOKING AT THIS E-MAIL THREAD, IT APPEARS TO BE

21        BETWEEN RAY GAGNE.

22   A.   GAGNE.

23   Q.   GAGNE.  I APOLOGIZE.  WHO WAS A CREDIT OFFICER IN

24        STRUCTURE FINANCE AT RABO BANK; ISN'T THAT RIGHT?

25   A.   THAT IS CORRECT.

```
 1   Q.   AND JOOST HEIJNEN.  I'M SURE I'M BUTCHERING HIS LAST

 2        NAME.  YOU CAN CORRECT ME.  GO AHEAD.

 3   A.   I WISH I COULD.  I -- THE PROPER PRONUNCIATION OF THE

 4        FIRST NAME IS JOOST.

 5   Q.   OKAY.

 6   A.   I COULDN'T PRONOUNCE HIS LAST NAME IF I NEEDED TO.

 7   Q.   WELL, I'LL TRY AND JUST SAY JOOST.  THE SUBJECT OF

 8        THE E-MAIL IS DOW CHEMICAL COMPANY, CORRECT?

 9   A.   YES.

10   Q.   DIRECTING YOUR ATTENTION TO THE E-MAIL IN THE MIDDLE

11        OF THE PAGE AT 9:04 A.M.

12   A.   YES.

13   Q.   DO YOU SEE THAT, SIR?

14   A.   UH HUH.

15   Q.   THERE'S A QUESTION FROM -- FROM JOOST TO MR. -- I'M

16        SORRY, MR. --

17   A.   GAGNE.

18   Q.   -- GAGNE, MR. GAGNE, WHICH SAYS, "WILL RABO BANKS

19        EXPOSURE BE SOLELY ACCOUNTED FOR IN A MINORITY

20        INTEREST USING IFRS?"  DO YOU SEE WHERE HE SAYS THAT,

21        SIR?

22   A.   I DO.

23   Q.   NOW, IFRS HAS TO DO WITH THE ACCOUNTING TREATMENT OF

24        THE TRANSACTION, RIGHT?

25   A.   IFRS IS THE INTERNATIONAL ACCOUNTING STANDARD THAT
```

1      REPLACED DUTCH GAAP FOR DUTCH COMPANIES, I BELIEVE

2      SOME TIME AROUND 2005.

3   Q.  THANK YOU, MR. SHERMAN.  NOW, LOOKING AT THE

4      RESPONSE, WHICH IS ABOVE, THE RESPONSE FROM MR. GAGNE

5      AT 5:20 P.M.  DO YOU SEE THE SENTENCE HALFWAY DOWN?

6      IT STARTS, "AS FAR AS THE MINORITY INTEREST TREATMENT

7      IS CONCERNED."  DO YOU SEE THAT, SIR?

8   A.  THAT'S CORRECT.

9   Q.  OKAY.  AND THE MINORITY INTEREST IS RABO BANK -- I'M

10     SORRY.  IS RBDC'S INTEREST IN CHEMTECH II, ISN'T IT?

11  A.  I BELIEVE THAT'S WHAT HE'S REFERRING TO.

12  Q.  OKAY.  SO HE'S SAYING THAT AS FAR AS RBDC'S INTEREST

13     IN CHEMTECH II IS CONCERNED, IT'S NOT CLEAR TO ME HOW

14     THIS WILL BE HANDLED.  WORSE CASE IS THAT IT WILL BE

15     TREATED AS DEBT INSTEAD OF MINORITY INTEREST.  BUT IN

16     THE SCHEME OF DOW'S BALANCE SHEET, THIS WOULD NOT BE

17     OVERLY MATERIAL.  AND IN ANY CASE, OUR FINANCIAL

18     ANALYSTS INCLUDES BRAVO'S 200 MILLION DOLLARS AS

19     DEBT.  DO YOU SEE THAT, SIR?

20  A.  I DO.

21  Q.  SO MR. GAGNE SAYS THE CREDIT OFFICER WAS INCLUDING

22     RBDC'S 200 MILLION DOLLARS IN CHEMTECH AS DEBT FOR

23     THEIR ANALYSIS; ISN'T THAT RIGHT?

24  A.  I -- I'M NOT 100 PERCENT SURE THAT YOU CAN MAKE THAT

25     JUMP FROM HERE.  IT'S CERTAINLY AN ASSERTION THAT HE

1    MAKES IN THE STATEMENT THAT HE MAKES.  BUT YOU NEED

2    TO TAKE THIS IN CONTEXT OF WHAT THIS E-MAIL IS.  THIS

3    E-MAIL IS SOMEBODY FROM HEAD OFFICE INQUIRING AS TO

4    WHETHER THE CHANGE FROM DUTCH GAAP TO IFRS IS GOING

5    TO CHANGE HOW RABO BANK NEEDS TO RECORD THIS EQUITY

6    INVESTMENT ON ITS FINANCIAL STATEMENTS.  AND THERE'S

7    ALWAYS A QUESTION OF CONSISTENCY BETWEEN IFRS AND

8    U.S. GAAP.  AND IF UNDER U.S. GAAP DOW IS RECORDING

9    THIS AS MINORITY INTEREST, WE WANT TO SEE IF UNDER

10    IFRS THAT'S THE RIGHT TREATMENT AS WELL.  SO THAT WE

11    HAVE CONSISTENT TREATMENT.  IF THERE'S NOT A

12    CONSISTENT TREATMENT, THEN THERE'S A WHOLE SORT OF --

13    THE ACCOUNTING FOLKS GO THROUGH ALL SORTS OF

14    PROCEDURES TO DECIDE HOW TO BEST DO IT.

15        SO THAT'S THE CONTEXT OF THIS E-MAIL.  RAISE

16    RESPONSES, BASICALLY, THAT U.S. GAAP REQUIRES DOW TO

17    CONSOLIDATE IT BECAUSE OF ITS 80 PERCENT INTEREST AND

18    RABO'S 20 PERCENT INTEREST IS MINORITY INTEREST.  HIS

19    READING OF IFRS DOESN'T SEEM TO CHANGE THAT.  HE SAYS

20    HE'S NOT CLEAR HOW IT COULD BE HANDLED, WHICH IS

21    REASONABLE.  HE'S A CREDIT PERSON.  HE'S NOT AN

22    ACCOUNTANT.

23        THE NEXT STATEMENT IS A BIT OF A NONSEQUETOR TO

24    ME WHERE HE SAYS IN ANY CASE REFERS TO IT AS DEBT.

25    I'M NOT REALLY SURE WHAT THE POINT WAS THAT HE'S

1    MAKING THERE.  BUT FOR A -- BUT HE'S MAKING A

2    STATEMENT THAT FOR THEIR -- DOW, THEIR WORST CASE

3    CREDIT ANALYSIS, YOU KNOW, ASSUMING -- THAT'S WHAT WE

4    DO.  WE DO A -- A BASE CASE, A -- AN OPTIMISTIC CASE

5    AND A WORST-CASE ANALYSIS ON ANY CREDIT.  AND IN THE

6    WORST-CASE ANALYSIS, FOR WHATEVER REASON, THEY'VE

7    ADDED THE 200 MILLION DOLLARS BACK IN TO THE DEBT TO

8    SEE HOW IT WOULD AFFECT DOW'S ABILITY TO PERFORM.

9  Q.  MR. SHERMAN, RBDC TERMINATED ITS PARTICIPATION IN

10    CHEMTECH II IN 2008, CORRECT?  CORRECT?

11 A.  RBDC SOLD ITS LIMITED PARTNERSHIP INTEREST IN 2008.

12    THAT'S CORRECT.

13 Q.  AND PART OF THAT WAS RBDC DELIVERING A LIQUIDATION

14    NOTICE TO THE GENERAL PARTNER?

15 A.  I DON'T SPECIFICALLY RECALL WHETHER WE DELIVERED A

16    LIQUIDATION NOTICE AND THEN THE PURCHASE OPTION WAS

17    EXERCISED, OR WHETHER WE JUST CONTRACTUALLY AGREED TO

18    SELL.

19 Q.  EITHER WAY, RBDC GOT OUT OF THE TRANSACTION?

20 A.  THAT'S CORRECT.

21 Q.  AND THAT WAS IN 2008?

22 A.  THAT'S CORRECT.

23 Q.  OKAY.  ISN'T IT TRUE THAT BEFORE -- BEFORE RBDC

24    DECIDED TO GET OUT OF THE -- BEFORE DOW DECIDED TO

25    PURCHASE RBDC'S INTEREST IN CHEMTECH, THAT THE

 1      PARTIES HAD NEGOTIATED POSSIBILITY OF EXTENDING THE

 2      TRANSACTION?

 3   A.   I CAN'T SPEAK TO THAT.  I KNOW FROM DOCUMENTATION

 4      THAT I HAVE SEEN THAT THE RELATIONSHIP -- THE DOW

 5      RELATIONSHIP TEAM AT RABO BANK WAS PURSUING APPROVALS

 6      TO EXTEND THE TRANSACTION.

 7   Q.   AND THE ---

 8   A.   I DON'T KNOW WHAT CONVERSATIONS THEY HAD HAD WITH DOW

 9      ABOUT THAT.

10         BY THE COURT:

11            SO THE ANSWER IS YES, CORRECT?

12         BY THE WITNESS:

13            I THINK SO.

14   BY THE WITNESS:

15   A.   THE ANSWER IS YES. WE WERE INVESTIGATING -- WE WERE

16      CONSIDERING MOVING FORWARD WITH THE TRANSACTION.

17   BY MR. SCHREIBER:

18   Q.   LET ME PUT IT THIS WAY, MR. SHERMAN. THERE ARE

19      DOCUMENTS THAT ARE PRODUCED IN THIS CASE WHERE

20      YOU'RE ON VARIOUS E-MAILS NEGOTIATING DIFFERENT

21      PROVISIONS OF AN EXTENSION OF RBDC'S INVESTMENT IN

22      CHEMTECH II, CORRECT?

23   A.   WITH DOW?

24   Q.   WITH DOW.

25   A.   OKAY.  AGAIN, I -- I JUST -- I'M NOT SAYING IT DIDN'T

1      HAPPEN.

2  Q.   OKAY.

3  A.   I'M JUST SAYING I DON'T HAVE A BASIS FOR, YOU KNOW, A

4       RECOLLECTION AS TO WHETHER WE TALKED TO DOW.

5  Q.   DO YOU RECALL ---

6           BY THE COURT:

7               WAIT, WAIT.  IS THERE AN OBJECTION?

8           BY MR. TIDWELL:

9               I THINK IF THERE ARE DOCUMENTS THAT MR.

10          SCHREIBER WOULD LIKE TO SHOW THE WITNESS THAT

11          SHOW HIS NEGOTIATIONS WITH DOW, THAT WILL BE

12          HELPFUL.

13          BY THE COURT:

14              I DON'T THINK IT'S NECESSARY.  I AGREE THAT

15          IF HE'S GOING TO REFERENCE SOME DOCUMENTS,

16          USUALLY YOU WOULD WANT THE WITNESS TO AT LEAST

17          REVIEW IT TO REFRESH HIS RECOLLECTION.  BUT IN

18          THIS CASE I THINK HE'S SUFFICIENTLY ANSWERED THE

19          QUESTION.  THANK YOU, MR. TIDWELL.

20          BY MR. TIDWELL:

21              THANK YOU.

22          BY MR. SCHREIBER:

23              THANK YOU, YOUR HONOR.  I DEFINITELY AGREE.

24  BY MR. SCHREIBER:

25  Q.   MR. SHERMAN, ISN'T IT TRUE THAT ONE REASON THAT WAS

1    OFFERED TO SEND THE CHEMTECH TRANSACTION WAS THAT

2    RABO BANK THOUGHT IT MIGHT HELP DOW REFUTE THE IRS'S

3    ASSERTION THAT RBDC'S INTEREST WAS DEBT?

4  A.  I DON'T HAVE ANY RECOLLECTION OF THAT BEING DISCUSSED

5    WITH DOW.  I DO HAVE A RECOLLECTION OF THAT BEING

6    ADDED AS ONE OF THE BASES FOR GOING FORWARD IN THE

7    INTERNAL COMMUNICATIONS.

8  Q.  SO IS THE ANSWER YES?

9  A.  THE ANSWER IS, I -- YOU -- IT DEPENDS ON WHAT YOU'RE

10    ASKING.  IF YOU'RE ASKING WHETHER THE -- ONE OF THE

11    REASONS WE PROVIDED TO DOW, I CAN'T ANSWER THAT

12    QUESTION.

13        IF YOU'RE ASKING WHETHER ONE OF THE REASONS THAT

14    THE RELATIONSHIP MANAGERS PRESENTED TO CREDIT AS TO

15    WHY THEY BELIEVE RABO BANK SHOULD GO FORWARD IS THAT

16    MAY BE BENEFICIAL TO DOW TO DO SO.  THEN, YES, THAT

17    WAS DEFINITELY SOME DOCUMENTATION THAT I REVIEWED.

18  Q.  WELL, FOCUSING, MR. SHERMAN, ON THE LATTER HALF OF

19    YOUR ANSWER.

20  A.  UH HUH.

21  Q.  IT'S TRUE, THEN, THAT THE RELATIONSHIP MANAGEMENT OF

22    RABO BANK, THAT EXTENSION OF THE RBDC OR CHEMTECH II

23    TRANSACTION WOULD HELP DOW WITH ITS -- WITH ITS

24    LITIGATION AGAINST THE IRS IN THIS CASE?

25  A.  I CANNOT SPEAK TO WHAT THE RELATIONSHIP MANAGERS

1          THOUGHT OR DIDN'T THINK.  I KNOW THERE'S A DOCUMENT.

2          I WOULD BE MUCH MORE COMFORTABLE LOOKING AT THE

3          DOCUMENT AND THE LANGUAGE AND TELLING YOU HOW I

4          INTERPRET THAT LANGUAGE.

5    Q.    MR. SHERMAN, MOST PARTIES ENTER INTO A TRANSACTION

6          WITH RABO BANK, I'M ASSUMING, TO DO SO TO TRY AND

7          MAKE SOME SORT OF BENEFIT, CORRECT?  FINANCIAL,

8          FISCAL, ECONOMIC BENEFIT?

9    A.    IT'S A VERY GENERAL QUESTION.  I THINK YOU'RE

10         PROBABLY AS EQUALLY ---

11              BY THE COURT:

12                  MR. SHERMAN -- MR. SHERMAN, STOP.  JUST

13              ANSWER THE QUESTION, MR. SHERMAN.  THIS IS NOT A

14              COLLOQUY BETWEEN THE TWO OF YOU.  HE ASKS THE

15              QUESTIONS AND YOU ANSWER.  NOW, YOU'RE A VERY

16              BRIGHT MAN.  I KNOW AS A LAWYER YOU'RE

17              ACCUSTOMED TO ASKING THE QUESTIONS AND NOT

18              ANSWERING THE QUESTIONS.  YOU DON'T NEED TO

19              ELABORATE EXTENSIVELY ON EVERY ANSWER.  BUT I

20              WANT TO GIVE YOU EVERY OPPORTUNITY TO ANSWER THE

21              QUESTION FULLY TO YOUR SATISFACTION.  YOU HAVE

22              EVERY RIGHT TO DO THAT.  BUT YOU DON'T HAVE A

23              RIGHT TO ANSWER -- TO ASK QUESTIONS OF THE

24              QUESTIONER, IF YOU WILL.  JUST ANSWER THE

25              QUESTION AS DIRECTLY AND SUCCINCTLY AS POSSIBLE.

1           OKAY?

2           BY THE WITNESS:

3               MY APOLOGIES, YOUR HONOR.

4           BY THE COURT:

5               NO APOLOGIES ARE NECESSARY, SIR.  I JUST

6           WANT TO MAKE SURE WE UNDERSTAND THE GROUND

7           RULES.  PLEASE PROCEED.

8   BY MR. SCHREIBER:

9   Q.   MR. SHERMAN, GENERALLY SPEAKING, MOST PARTIES WILL

10       ENTER INTO A TRANSACTION WITH RABO BANK FOR SOME SORT

11       OF BENEFIT, BE IT FINANCIAL, ECONOMIC, FISCAL,

12       CORRECT?

13  A.   I WILL AGREE THAT'S CORRECT.

14  Q.   OKAY.  USUALLY THE OTHER SIDE -- USUALLY THEY WANTED

15       SOME MONEY FROM RABO BANK?

16  A.   MOST OFTEN, YES.  BUT WE ALSO DO FUNDING TRANSACTIONS

17       WHERE THE REVERSE IS THE EFFECT.

18  Q.   OKAY.  NOW, ISN'T IT TRUE THAT WHEN DOW REQUESTED AN

19       EXTENSION OF CHEMTECH II, THE RELATIONSHIP MANAGERS

20       WERE TALKING ABOUT, THAT RABO BANK WAS AWARE THAT

21       DOW'S REQUEST WAS NOT BASED ON A SPECIFIC FINANCIAL

22       BENEFITS?

23  A.   I'M SORRY.  I DON'T UNDERSTAND THE QUESTION OR HOW I

24       WOULD HAVE A BASIS FOR KNOWING WHAT DOW'S REQUEST IS

25       BASED ON.

1    Q.   WELL, IF YOU CAN TURN, SIR, TO "DEFENDANT'S EXHIBIT

2         52, 52."   NOW, IF YOU COULD TURN TO, I BELIEVE, IT'S

3         THE THIRD PAGE BATES LABELED ROB/DOW20012120.

4    A.   YES.

5    Q.   DO YOU SEE THAT, SIR?

6    A.   UH HUH.

7    Q.   NOW, AT THE BOTTOM IT SAYS ---

8              BY MR. SCHREIBER:

9                   SORRY, YOUR HONOR.

10             BY THE COURT:

11                  TAKE -- THAT'S OKAY.   TAKE YOUR TIME.

12   BY MR. SCHREIBER:

13   Q.   SORRY.   TURN BACK ONE PAGE TO BATES 12119.   LOOKING

14        AT THE BOTTOM OF THAT PAGE, THE VERY BOTTOM, IT SAYS,

15        "UNDER THE TERMS OF THE AMENDED PARTNERSHIP

16        AGREEMENT."   DO YOU SEE THAT, SIR?

17   A.   I DO.

18   Q.   OKAY.   UNDER THE TERMS OF THE AMENDED PARTNERSHIP

19        AGREEMENT, RBDC HAS THE RIGHT TO CAUSE A LIQUIDATION

20        OF THE PARTNERSHIP ON JUNE 26TH, 2008, UNLESS DOW

21        ELECTS TO PURCHASE RBDC'S INTEREST.   DOW HAS

22        REQUESTED INSTEAD THAT RBDC CONTINUE AS A PARTNER IN

23        CHEMTECH FOR AN ADDITIONAL TWO YEARS.

24             LET'S SKIP DOWN TWO MORE PARAGRAPHS ON THE NEXT

25        PAGE, IF I CAN.

1              WE UNDERSTAND THAT DOW'S DECISION TO EXTEND THIS

2        TRANSACTION IS NOT BASED ON ANY SPECIFIC FINANCIAL

3        BENEFITS.  SO THAT IT'S DECISION TO EXTENT ---

4             BY THE COURT:

5                  YOU ---

6             BY MR. SCHREIBER:

7                  I'M SORRY?

8             BY THE COURT:

9                  YOU MISSPOKE.  IT'S NOT ---

10            BY MR. SCHREIBER:

11                 FISCAL.  SORRY.

12   BY MR. SCHREIBER:

13   Q.   IT'S NOT BASED ON ANY SPECIFIC FISCAL BENEFITS.  SO

14        THAT IT'S DECISION TO EXTEND THE TRANSACTION WE RATED

15        AGAINST THE COST OF THE FUNDAMENTAL TERMS AVAILABLE

16        TO IT, TAKING INTO ACCOUNT THE MINORITY EQUITY

17        ASPECTS IN THE CHEMTECH STRUCTURE.

18            DO YOU SEE THAT, SIR?

19   A.   I DO.

20   Q.   DOES THAT REFLECT THAT RABO BANK'S UNDERSTANDING WAS

21        THAT DOW'S REQUEST FOR A TWO YEAR EXTENSION WAS NOT

22        BASED ON ANY SPECIFIC FISCAL BENEFITS FOR DOW?

23   A.   YES.

24   Q.   NOW, MR. SHERMAN, WHILE WE'RE LOOKING AT "D52," IF

25        YOU TURN TO THE FOURTH PAGE, BATES NUMBER 12121.  DO

1        YOU SEE THAT, SIR?

2    A.   I'M ON THAT PAGE, YES.

3    Q.   THANK YOU.  DO YOU SEE WHERE IT SAYS, "TTT THOUGHTS"?

4    A.   YES.

5    Q.   DO YOU KNOW WHAT TTT STANDS FOR?

6    A.   I BELIEVE IT'S TRANSACTION TEAM TAX.  IT MAY BE TAX

7        TRANSACTION TEAM.  THOSE ARE THE THREE T'S.

8    Q.   ARE YOU A PART OF THE TAX TRANSACTION TEAM?

9    A.   I AM NOT.   THAT'S THE HEAD OFFICE TEAM.

10   Q.   HEAD OFFICE MEANING?

11   A.   OUR HEAD OFFICE IN UTRECHT, NETHERLANDS.

12   Q.   LOOKING AT THE SECOND PARAGRAPH, SIR.  IT SAYS -- THE

13       FIRST SENTENCE, "DOW'S POSITION IS REPORTED TO HAVE

14       STRONG OPINIONS OF TAX COUNSEL."  DO YOU SEE THAT?

15   A.   I DO.

16   Q.   WERE YOU AS COUNSEL FOR RABO BANK INFORMED OF THE

17       OPINIONS OF DOW'S TAX COUNSEL IN THE CHEMTECH II

18       MATTER?

19   A.   I DON'T RECALL BEING INFORMED.  WE MAY HAVE BEEN

20       INFORMED.  WHETHER OR NOT THEY HAD AN OPINION, WE

21       WOULD HAVE NOT LIKELY BEEN INFORMED TO THE CONTENTS

22       OF THAT OPINION.

23   Q.   DO YOU DON'T RECALL?

24   A.   I DON'T RECALL SPECIFICALLY.

25   Q.   WAS RABO BANK EVER PROVIDE ANY DOCUMENTATION THAT

1  REFLECTED THE OPINION OF DOW'S TAX COUNSEL ON THIS

2  CASE?

3  A.   NOT THAT I'M AWARE OF.

4  Q.   NOW, TURNING BACK TO -- WELL, TURNING TO -- WE WERE

5  ON "D52" STILL ARE YOU AWARE THERE ARE VARIOUS DRAFTS

6  OF THESE -- THIS DOCUMENT THAT WAS PREPARED, THIS GTC

7  PROPOSAL?

8  A.   AGAIN, NOT SPECIFICALLY AWARE OF IT.  BUT NOT AT ALL

9  SURPRISED.

10  Q.   BECAUSE ITEMS GO THROUGH DRAFTS FREQUENTLY?

11  A.   YES.

12  Q.   NOW, SIR, YOU WANT TO TURN TO THE FIRST PAGE OF

13  "D52."  THE DATE ON THIS IS MAY 16TH, 2008, CORRECT?

14  A.   YES.

15  Q.   THIS E-MAIL AT THE TOP?

16  A.   YES.

17  Q.   AND THE SUBJECT OF THE E-MAIL AT THE TOP IS MAY 16TH,

18  2008, GTC PROPOSAL?

19  A.   YES.

20  Q.   YOU SEE THAT, SIR?  AND THE TIME ON THIS DOCUMENT IS

21  9:25 P.M., CORRECT?

22  A.   THAT'S CORRECT.

23  Q.   SIR, IF I CAN TURN YOUR ATTENTION NOW TO "D39."

24  "DEFENDANT'S 39."  DO YOU HAVE THAT, SIR?

25  A.   I DO.

```
 1  Q.   SEE HOW THE SUBJECT IS ALSO MAY, 2008, GTC

 2       APPLICATION?

 3  A.   I DO.

 4  Q.   AND YOU SEE THE DATE OF THIS DOCUMENT, IT'S ALSO MAY

 5       16TH, 2008, RIGHT?

 6  A.   YES.

 7  Q.   AND THE TIME OF THIS DOCUMENT IS 8:49 P.M., CORRECT?

 8  A.   YES.

 9  Q.   SO THIS IS AN EARLIER VERSION OF THE ONE WE JUST

10       LOOKED AT?

11  A.   IT'S A SECOND -- MAY VERY WELL BE A SEPARATE VERSION.

12  Q.   OKAY.

13  A.   THEN WE HAVE VARIOUS PEOPLE REVIEWING IT AND SENDING

14       THEIR COMMENTS OUT AT VARIOUS TIMES.

15  Q.   TEMPORARILY, THOUGH, THIS IS EARLIER IN TIME THAN THE

16       ONE WE WERE JUST LOOKING AT?

17  A.   THE E-MAIL IS, YES.

18  Q.   THE E-MAIL IS.  AND THE -- I'M SORRY.  AND THE E-MAIL

19       IS FROM A J. SCHWARTZ TO ARNOLD SCHRAA AND THE NAME

20       OT KWAST.

21  A.   YES.  OT KWAST.

22  Q.   THOSE ARE ALL RABO BANK EMPLOYEES?

23  A.   THEY WERE AT THE TIME.  YES.

24  Q.   THEY WERE AT THE TIME.  AND E-MAIL TEXT SAYS, "FINAL

25       TWEAKS TO REFLECT COMMENTS FROM TERRY."  CORRECT?
```

1  A.  CORRECT.

2  Q.  AND TERRY IS TERRANCE MCKAY?

3  A.  YES.

4  Q.  AND HE'S A RABO BANK EMPLOYEE?

5  A.  HE WAS AT THE TIME.

6  Q.  DO YOU KNOW WHAT HIS ROLE WAS AT RABO BANK AT THE

7      TIME?

8  A.  HE WAS THE -- I DON'T -- HE WAS THE HEAD OF

9      STRUCTURED FINANCE.  IN 2008, I BELIEVE HE WAS

10     PROBABLY ALSO AT THAT TIME THE GLOBAL HEAD OF

11     STRUCTURED FINANCE.  ALTHOUGH I CAN'T RECALL

12     SPECIFICALLY WHEN HE TOOK OFF FOR THAT BIGGER ROLE.

13 Q.  WAS HE INVOLVED IN THE RELATIONSHIP, MANAGEMENT PART

14     OF RABO BANK AT ALL?

15 A.  AS A HEAD OF THE GROUP, HE WAS.  BUT HE WAS NOT A,

16     QUOTE UNQUOTE, RELATIONSHIP MANAGER.  HE WOULDN'T

17     HAVE BEEN THE PRIMARY BUSINESS PERSON ON ANY ONE

18     CLIENT OR TRANSACTION.

19 Q.  BUT HE PROBABLY WOULD HAVE BEEN INVOLVED TO SOME

20     EXTENT?

21 A.  ABSOLUTELY.

22 Q.  TURNING, SIR, IF YOU LOOK AT THE BOTTOM OF PAGE --

23     PAGE TWO.  BATES NUMBER 11646 FOR THE RECORD.

24 A.  THAT'S MY PAGE ONE.  BUT, OKAY.

25 Q.  WE HAVE THE PAGE UP ON THE SCREEN THAT IT'S YOUR

```
 1 ║  BINDER, SIR, CORRECT?

 2 ║  A.   YES.

 3 ║  Q.   OKAY.  LOOKING AT THE VERY BOTTOM, THE VERY LAST

 4 ║       THREE WORDS ON THAT PAGE AND THEN WE'LL MOVE TO THE

 5 ║       NEXT PAGE.  "DOW HAS REQUESTED INSTEAD THAT RBDC

 6 ║       CONTINUE AS A PARTNER IN CHEMTECH II LP FOR TWO

 7 ║       ADDITIONAL YEARS."

 8 ║            DO YOU SEE THAT, SIR?

 9 ║  A.   I DO.

10 ║  Q.   NOW, THAT UNDERLINING THAT'S UNDER AS A PARTNER, THAT

11 ║       MEANS THAT EITHER TERRY OR SOMEBODY -- SOMEBODY AT

12 ║       TERRY'S DIRECTION INSERTED THAT LANGUAGE INTO THIS

13 ║       DOCUMENT; ISN'T THAT RIGHT?

14 ║  A.   THAT'S CORRECT.

15 ║  Q.   BECAUSE YOU'RE FAMILIAR WITH RED-LINING, YOU SAID

16 ║       EARLIER?

17 ║  A.   YES.

18 ║  Q.   OKAY.  AND IF YOU LOOK AT THE RIGHT SIDE OF THE PAGE

19 ║       YOU CAN SEE WHERE LANGUAGE WAS DELETED, CORRECT?

20 ║  A.   YES.

21 ║  Q.   AND ONE OF THE THINGS DELETED WAS, ITS INVESTMENT?

22 ║  A.   THAT'S CORRECT.

23 ║  Q.   NOW, SO EITHER TERRY OR AT TERRY'S DIRECTION, I'M

24 ║       SORRY, I SHOULD CALL HIM MR. MCKAY.  AT MR. MCKAY'S

25 ║       DIRECTION OR -- OR MR. MCKAY HIMSELF, SOMEBODY
```

1        CHANGED THE SENTENCE FROM, DOW HAS REQUESTED INSTEAD

2        THAT RBDC CONTINUE ITS INVESTMENTS, TO, DOW HAS

3        REQUESTED INSTEAD THAT RBDC CONTINUE AS A PARTNER;

4        ISN'T THAT RIGHT?

5    A.  SURE.

6    Q.  OKAY.  TURNING, MR. SHERMAN, TO PAGE FOUR -- FOUR OF

7        THIS EXHIBIT, "D39," BATES NUMBER 11648.  LOOKING AT

8        THE VERY BOTTOM OF THE PAGE, WHICH IS UNDER IFRS

9        TREATMENT.  DO YOU SEE THAT, SIR?

10   A.  NOT EXACTLY.  YES.

11   Q.  WE TALKED ABOUT IFRS, THE ACCOUNTING STANDARD THAT

12       YOU MENTIONED EARLIER, RIGHT?

13   A.  YES.

14   Q.  OKAY.  THE SENTENCE SAYS, "RBDC'S INVESTMENT IN

15       CHEMTECH II LP IS A PREFERRED PARTNERSHIP INTEREST.

16       RABO BANK TREATS ITS INTEREST AS EQUITY" -- I'M

17       SORRY,  "AS AN EQUITY INTEREST IN ITS CONSOLIDATED

18       BALANCE SHEET."  THAT'S WHAT IT SAYS, CORRECT?

19   A.  THAT'S CORRECT.

20   Q.  I APOLOGIZE FOR MISSPEAKING A LITTLE BIT THERE.

21            IF YOU LOOK ON THE BOTTOM RIGHT OF THIS PAGE, IT

22       -- IT SHOWS THE DELETIONS, JUST LIKE BEFORE, CORRECT?

23   A.  THAT'S CORRECT.

24   Q.  AND WHAT WAS DELETED, EITHER AT MR. MCKAY'S DIRECTION

25       OR HE DID IT HIMSELF.  IT SAYS, "UNDER BIS."  NOW,

1   BIS ARE THE BASEL ACCORDS THAT DEAL WITH THE

2   REGULATION OF THOSE BANKS, CORRECT?

3   A.   THAT'S CORRECT.

4   Q.   OKAY.  SO IT SAYS, "UNDER BIS 1, BASEL ACCORD 1,

5   UNDER BIS 1, HOWEVER, THE INTEREST IS TREATED AS A --

6   UNDER -- AS A DEBT INSTRUMENT, BECAUSE RABO BANK HAS

7   A PREFERRED CLAIM ON THE ASSETS OF CHEMTECH II."

8        ISN'T IT TRUE, SIR, THAT SENTENCE WAS DELETED

9   FROM THIS DOCUMENT?

10  A.   IT IS TRUE THAT THAT SENTENCE WAS DELETED FROM THIS

11  DOCUMENT.

12       BY THE COURT:

13           AND WHAT IS BIS AGAIN?

14       BY MR. SCHREIBER:

15           SORRY.

16       BY THE WITNESS:

17           IT'S THE BASEL ACCORD.  I DON'T REMEMBER

18       EXACTLY WHAT BIS STANDS FOR.  BUT IT IS THE

19       INTERNATIONAL RULES THAT SET FORTH HOW MUCH

20       CAPITAL A BANK HAS TO HOLD UNDER INVESTMENT.  IN

21       THIS CASE, IF YOU OWN AN EQUITY INTEREST, BASEL

22       ALLOWS YOU TO LOOK THROUGH TO THE UNDERLYING

23       ASSETS OF THE PARTNERSHIP.  IF THEY DIDN'T DO

24       THAT, WE WOULD HAVE TO HOLD 200 MILLION DOLLARS

25       WORTH OF CAPITAL AGAINST THIS INVESTMENT.

1           BECAUSE THE BIS RULES ALLOWING US TO LOOK

2           THROUGH, WE GET TO LOOK THROUGH IT AND IT

3           BECOMES A CORPORATE CREDIT.  SO WE HAVE TO ONLY

4           HOLD EIGHT PERCENT OF THE 200 MILLION DOLLARS.

5           SO THAT'S THE LOOK THROUGH, IS VERY SIGNIFICANT

6           FROM A BANK'S PERSPECTIVE OF THEIR CAPITAL COST

7           OF DOING A TRANSACTION.

8           BY THE COURT:

9                THANK YOU, MR. SHERMAN.

10          BY MR. SCHREIBER:

11               YOUR HONOR, I BELIEVE BIS STANDS FOR BANK

12          OF INTERNATIONAL SETTLEMENTS, OR SOMETHING VERY

13          CLOSE TO THAT.

14  BY MR. SCHREIBER:

15  Q.  JUST TO BE CLEAR, SIR, MR. SHERMAN.  SO AN ATTORNEY

16      OR SOMEBODY AT THE ATTORNEYS' DIRECTION DELETED THAT

17      LINE, .BIS, FROM THIS DOCUMENT?

18  A.  AGAIN, I -- THAT'S WHAT THE BLACK LINING SHOWS. YES.

19  Q.  THANK YOU, MR. SHERMAN.  I HAVE NO FURTHER QUESTIONS

20      AT THIS TIME.

21          BY THE COURT:

22               THANK YOU.  MR. TIDWELL, ANY RE-DIRECT OF

23          THE WITNESS?

24          BY MR. TIDWELL:

25               YES, SIR.  JUST ONE MOMENT.

1          BY THE COURT:

2              SURE.

3                  RE-DIRECT EXAMINATION

4    BY MR. TIDWELL:

5    Q.    GOOD MORNING, MR. SHERMAN.

6    A.    GOOD MORNING.

7    Q.    JUST A COUPLE OF QUESTIONS, SO IT SHOULD BE BRIEF.

8          WHEN YOU WERE DISCUSSING TRIPLE-NET LEASE OR THE

9          HELL-OR-HIGH WATER LEASE REGARDING THE PLAQUEMINE

10         PLANT ASSETS THAT WERE PUT INTO THE PARTNERSHIP AND

11         THEN LEASED TO DOW.  HOW COMMON OR HOW PREVALENT ARE

12         TRIPLE-NET LEASES OR HELL-OR-HIGH WATER LEASES IN

13         FINANCING TRANSACTIONS?

14   A.    IN MY EXPERIENCE, WE'RE ACTUALLY FINANCING THE LEASE

15         STREAM, THE INCOME OFF THE LEASE.  THEY'RE EXTREMELY

16         PREVALENT.  YOU WANT TO MAKE SURE THAT THAT LEASE

17         AGREEMENT IS GOING TO BE THERE.  YOU'RE FINANCING A

18         RECEIVABLE EFFECTIVELY UNDER THE LEASE.  YOU WANT TO

19         MAKE SURE THAT THEIR RECEIVABLES IS GOING TO BE

20         THERE.

21   Q.    OKAY.  TURNING TO THE DISCUSSION ABOUT THE CREDIT

22         DEFAULT SWAP.  WHEN YOU HEDGE AN INVESTMENT USING A

23         CREDIT DEFAULT SWAP, DOES IT CHANGE THE NATURE OF THE

24         UNDERLYING INVESTMENT?

25   A.    NO.

1    Q.    AND YOU CAN -- IS IT -- WOULD RABO BANK HEDGE ITS

2          EXPOSURE, ITS CREDIT EXPOSURE, IN EITHER A DEBT OR

3          EQUITY INVESTMENT USING A CREDIT DEFAULT SWAP?

4    A.    IF THERE WAS A DECISION THAT WE DIDN'T WANT TO HOLD

5          THE ENTIRE EXPOSURE, THE CREDIT DEFAULT SWAP WOULD BE

6          ONE OF THE WAYS THAT WE COULD OFF-LAY THAT RISK IN

7          EITHER A DEBT OR AN EQUITY TRANSACTION OR ANY

8          TRANSACTION, FOR THAT MATTER.

9    Q.    OKAY.  I'D LIKE TO TURN YOUR ATTENTION BACK TO "JOINT

10         EXHIBIT 647."  ON -- ON CROSS-EXAMINATION YOU WERE

11         ASKED ABOUT WHETHER OR NOT BORROWER REALLY MEANT

12         BORROWER OR LOAN REALLY MEANT LOAN.  DO YOU HAVE AN

13         UNDERSTANDING OF GENERALLY IN THIS DOCUMENT WHENEVER

14         THE DOCUMENT USES LOAN OR BORROWER -- I'M SORRY.

15         WHEN THE DOCUMENT USES LOAN WHAT IT'S REFERRING TO?

16   A.    THAT AGAIN BEING CAUTIOUS OF GENERAL STATEMENTS.  BUT

17         MY UNDERSTANDING, MY RECOLLECTION IS WHEN WE -- LOAN

18         IS USED MANY PLACES IN HERE TO REFER TO THE 200

19         MILLION DOLLAR FUNDING OF RBDC BY RABO BANK, WHICH

20         ENDED UP BEING BROKEN INTO A SIX MILLION DOLLAR

21         EQUITY CONTRIBUTION AND A 194 MILLION DOLLAR LOAN.

22         AND THAT FUNDING, THE PROCEEDS OF THAT FUNDING, WAS

23         WHAT RBDC USED TO MAKE ITS 200 MILLION DOLLAR

24         INVESTMENT IN THE CHEMTECH PARTNERSHIP.

25   Q.    OKAY.  TURNING TO "EXHIBIT D52."  BATES ENDING 12121.

1        I THINK THAT'S IN THE WHITE BINDER.

2   A.   YES.

3   Q.   THE GOVERNMENT DIRECTED YOUR ATTENTION TO A SENTENCE

4        DOWN UNDER TTT THOUGHTS, THE SECOND PARAGRAPH.

5            BY THE COURT:

6                ONE MOMENT, MR. TIDWELL.  WE'RE WAITING FOR

7            IT TO COME UP ON THE ---

8            BY MR. TIDWELL:

9                OH, OKAY.

10           BY THE COURT:

11               WE HAVE TO SWITCH SCREENS.  IT SHOULD

12           BE UP IN JUST A MOMENT.  WHAT WAS THE BATES

13           NUMBER ON THAT?

14           BY MR. TIDWELL:

15               IT'S 12121.  IT'S "EXHIBIT D52."

16  BY MR. TIDWELL:

17  Q.   AND IF WE COULD GO TO 12121, PLEASE.

18  A.   THANK YOU.

19  Q.   OKAY.  SO DOWN AT THE BOTTOM, NEAR THE BOTTOM HERE IT

20       SAYS, "WE BELIEVE THAT AN EXTENSION OF RABO BANK'S

21       PARTICIPATION IN THE PARTNERSHIP WILL POSSIBLY HELP

22       DOW TO REFUTE AN IRS ASSERTION.  THE RBDC'S INTEREST

23       SHOULD BE TREATED AS DEBT."  AND YOU WERE ASKED ABOUT

24       THIS IN YOUR CROSS-EXAMINATION?

25  A.   UH HUH.  YES.

1   Q.   WHY WOULD -- AND I THINK YOU TESTIFIED THAT A

2        RELATIONSHIP MANAGER WOULD HAVE HAD INPUT INTO THIS

3        DOCUMENT?

4   A.   YES.  THIS WOULD HAVE BEEN WRITTEN BY THE BUSINESS

5        PEOPLE IN THE STRUCTURED FINANCE GROUP.

6   Q.   WHY WOULD A RELATIONSHIP MANAGER PUT SOMETHING LIKE

7        THAT IN A DOCUMENT LIKE THIS?

8             BY MR. SCHREIBER:

9                  OBJECTION, YOUR HONOR.

10            BY THE COURT:

11                 WHAT ---

12            BY MR. SCHREIBER:

13                 TO THE EXTENT HE KNOWS.  THERE'S NO

14            FOUNDATION THAT HE KNOWS WHY.

15            BY THE COURT:

16                 YOU CAN -- YOU CAN LAY A FOUNDATION, MR.

17            TIDWELL.  IF THE WITNESS KNOWS.  IF HE DOESN'T

18            KNOW, THAT'S FINE.  BUT LET'S -- WHY DON'T YOU

19            GO ON AND LAY A FOUNDATION.

20            BY MR. TIDWELL:

21                 SURE.

22  BY MR. TIDWELL:

23  Q.   ARE YOU FAMILIAR WITH THE PURPOSE OF THESE DOCUMENTS,

24       MR. SHERMAN?

25  A.   I -- I AM.

1  Q.   AND WHAT'S THE GENERAL PURPOSE OF THIS DOCUMENT?

2  A.   THE PURPOSE OF THIS DOCUMENT IS TO GET APPROVAL TO

3       PROCEED WITH THE TRANSACTION.  THERE ARE -- WE HAVE

4       STRUCTURED FINANCE --  WE HAVE SEVERAL DIFFERENT

5       COMMITTEES AND PROCESSES THAT NEED TO GO THROUGH ONE

6       -- ONE OF IT IS CREDIT AND ONE OF IT IS -- ONE OF

7       WHICH IS TTT AND ONE OF WHICH IS QTC. THOSE ARE

8       GLOBAL BODIES JUST MONITORING WHAT THE BUSINESS IS

9       DOING MAKING SURE IT'S CONSISTENT GLOBALLY?

10 Q.   IF YOU KNOW, ARE RELATIONSHIP MANAGERS COMPENSATED IN

11      ANY WAY BASED ON WHETHER OR NOT A TRANSACTION GETS

12      APPROVED.

13 A.   RELATIONSHIP MANAGER ARE -- ARE PRIMARILY BONUS BASED

14      IN THEIR COMPENSATION AND THEIR BONUSES ARE

15      DETERMINED ON THEIR INDIVIDUAL PERFORMANCE, THE

16      GROUP'S PERFORMANCE AND THE BANKS PERFORMANCE.  SO

17      WHILE THEY MAY NOT BE COMPENSATED DIRECTLY ON THE

18      NUMBER OF TRANSACTIONS THEY HAVE APPROVED, THEY

19      CERTAINLY ARE -- THEIR COMPENSATION IS CERTAINLY

20      RELATED TO THE -- TO THE SUCCESS OF THE -- OF THE

21      DEPARTMENT WHICH WE REQUIRE THAT DEALS BE APPROVED.

22 Q.   OKAY.  GIVEN THAT UNDERSTANDING, DO YOU -- DO YOU

23      HAVE ANY UNDERSTANDING AS TO WHY A RELATIONSHIP

24      MANAGER WOULD PUT A STATEMENT LIKE THIS IN AN

25      APPROVAL DOCUMENT?

1   A.   BASED ON, YOU KNOW, MY EXPERIENCE WITH THE APPROVAL

2        DOCUMENTS OVER THE 15 YEARS I'VE BEEN WITH THE BANK,

3        IT'S THE RELATION MANAGER'S JOB TO LAY OUT THE CASE

4        FOR WHY THE BANK SHOULD ENTER INTO THE TRANSACTION.

5        THEY'RE SUPPOSED TO LAY OUT THE RISKS AND THE

6        MITIGANTS AND THE OVERALL ARGUMENT FOR ENTERING INTO

7        THE TRANSACTION.  IF THEY DON'T THINK THERE'S AN

8        OVERALL ARGUMENT, THEY WOULDN'T MAKE AN APPLICATION.

9        YOU WANT TO INCLUDE ALL THE BENEFITS TO THE BANK

10       AND ALL THE BENEFITS TO THE CLIENT.  AS A MATTER OF

11       FACT, OUR CREDIT AGREEMENTS HAVE A RELATIONSHIP

12       ASPECTS SECTION TO THEM WHERE THE RELATION MANAGER

13       EXPLAINS TO THE APPROVAL BODIES WHAT THE BANK -- WHAT

14       THE TRANSACTION IS IN GENERAL TO THE OVERALL

15       RELATIONSHIP.  ARE WE LOOKING TO GET AN AGENCY DEAL

16       WITH THIS CLIENT?  ARE WE LOOKING TO DO SOME OTHER

17       CROSS-SELL BUSINESS THAT DOING THIS TRANSACTION WOULD

18       BE BENEFICIAL TO THAT RELATIONSHIP.

19       SO OBVIOUSLY THE PERSON HERE SEEMED TO BELIEVE

20       THAT EXTENDING THE DEAL WOULD HELP DOW IN ITS

21       ARGUMENT -- IN ITS POSITION THAT THE PARTNERSHIP BE

22       TREATED AS A PARTNERSHIP.  I DON'T KNOW WHERE THEY

23       GOT BASIS OR WHETHER THAT BASIS WAS ACCURATE.  BUT

24       THAT WAS THEIR BELIEF WHEN THEY PRESENTED IT,

25       BELIEVING THAT THAT WOULD BE A POSITIVE FOR MOVING

1      FORWARD IN THE TRANSACTION.

2   Q.   OKAY.  READING THIS HERE WHAT'S WRITTEN ON THE PAGE,

3        DOES THIS IN ANY WAY REFLECT WHAT DOW BELIEVED ABOUT

4        A CONTINUATION OF THE PARTNERSHIP?

5   A.   THIS STATEMENT IS THAT WE BELIEVE, WHICH IS THE

6        OFFICE OF -- OF THE APPROVAL BUSINESS IN THIS

7        STATEMENT HERE AS TO WHETHER OR NOT DOW SHARES THAT

8        BELIEF OR COMMUNICATED THAT WITH THEM.

9   Q.   OKAY.  IN THIS SAME "EXHIBIT D39," I BELIEVE I MUST

10       HAVE IT CONFUSED, ON BATES 11647.

11  A.   YES.

12  Q.   AT THE TOP ON CROSS-EXAMINATION THE GOVERNMENT

13       POINTED OUT THE CHANGE IN THIS DOCUMENT FROM ITS

14       INVESTMENT TO AS A PARTNER, IN TERMS OF RBDC'S

15       CONTINUANCE IN CHEMTECH II.  DO YOU RECALL THAT?

16  A.   I DO RECALL THAT.

17  Q.   IN YOUR OPINION, IS THERE ANY DIFFERENCE ---

18            BY THE COURT:

19                 I'M SORRY, MR. TIDWELL.  WHAT DOCUMENT ARE

20            WE USING -- REFERRING TO?

21            BY MR. TIDWELL:

22                 I'M IN -- I THINK I'M IN "DEFENDANT'S 39,"

23            BATES 11647.

24            BY THE COURT:

25                 OKAY.

1  BY MR. TIDWELL:

2  Q.   AT THE TOP THE GOVERNMENT POINTED OUT THE CHANGE IN

3       THIS DOCUMENT FROM -- THAT RBDC CONTINUE ITS

4       INVESTMENT IN CHEMTECH II TO -- THAT RBDC CONTINUE AS

5       A PARTNER IN CHEMTECH II; IS THAT RIGHT?

6  A.   THAT'S CORRECT.

7  Q.   IS THERE ANY DIFFERENCE, FROM YOUR PERSPECTIVE, IN

8       TERMS OF THAT LANGUAGE CHANGE?  DID THAT LANGUAGE

9       CHANGE HAVE ANY SIGNIFICANCE TO YOU?

10 A.   NOT MATERIALLY.  I MEAN, IT'S MORE  -- IT'S PARTNER

11      IS MORE SPECIFIC AS TO THE TYPE OF INVESTMENT.

12      ENTIRELY CONSISTENT.

13 Q.   OKAY.  IF WE COULD BRING UP "DEFENDANT'S 52," PLEASE.

14      AND BATES 12120.  THERE'S A PARAGRAPH NEAR THE BOTTOM

15      HERE THAT WAS REFERRED TO IN YOUR CROSS-EXAMINATION.

16      IT REFERS TO -- OR IT SAYS, "WE UNDERSTAND THAT DOW'S

17      DECISION TO EXTEND THIS TRANSACTION IS NOT BASED ON

18      ANY SPECIFIC FISCAL BENEFITS.  SO THAT IT'S DECISION

19      TO EXTEND THE TRANSACTION WILL BE WEIGHTED AGAINST

20      THE COST OF OTHER FUNDING ALTERNATIVES AVAILABLE TO

21      IT, TAKING INTO ACCOUNT THE MINORITY EQUITY ASPECTS

22      OF THE CHEMTECH STRUCTURE."

23          ON CROSS, THE GOVERNMENT ASKED YOU WHETHER OR

24      NOT THIS SENTENCE REFERRED -- WHETHER OR NOT THIS

25      SENTENCE SAID THAT DOW DIDN'T HAVE -- WASN'T SEEKING

1       FISCAL BENEFITS.

2           DOES THIS SENTENCE ANY OTHER BENEFITS THAT DOW

3       MIGHT BE SEEKING?

4   A.  IT -- IT SEEMS WHAT IT'S SAYING HERE, IT MEANS THAT

5       DOW IS GOING TO MAKE AN ANALYSIS ON THE COST OF

6       FUNDING OF KEEPING THE FUNDING AND DO A MINORITY

7       INTEREST, VERSUS WHATEVER THEIR OTHER VARIOUS

8       ALTERNATIVES WERE.

9           SO THOSE ARE WHAT -- WHAT I WOULD CALL PROBABLY

10      THE FINANCIAL BENEFITS, WHICH IN MY MIND IS A SUBSET

11      OF FISCAL.

12  Q.  OKAY.  AND IS THIS -- DOES TAKING INTO -- WHERE IT

13      SAYS HERE, "TAKING INTO ACCOUNT THE MINORITY EQUITY

14      ASPECTS," IS THAT CONSISTENT WITH YOUR UNDERSTANDING

15      OF DOW'S PURPOSE FOR THE CHEMTECH TRANSACTION IN

16      1998?

17  A.  THAT IS CONSISTENT WITH MY UNDERSTANDING OF THEIR

18      PURPOSE.  YES.

19  Q.  THANK YOU.

20          BY MR. TIDWELL:

21              I HAVE NOTHING FURTHER, YOUR HONOR.

22          BY THE COURT:

23              THANK YOU, MR. TIDWELL.

24          BY MR. SCHREIBER:

25              NO FURTHER QUESTIONS, YOUR HONOR.

1    BY THE COURT:

2      MR. SHERMAN, THANK YOU FOR COMING IN TODAY.

3    YOU ARE EXCUSED, SIR.

4      OKAY.  MR. MAGEE?

5    BY MR. MAGEE:

6      THANK YOU, YOUR HONOR.  THANK YOU, YOUR

7    HONOR.  I HAVE A COUPLE OF ADMINISTRATIVE

8    MATTERS JUST TO -- FOR THE RECORD.

9      YESTERDAY WE DISCUSSED THE ISSUE OF PEDRO

10    REINHARD'S LITIGATION AND WE AGREED THAT BECAUSE

11    "D66," I BELIEVE, IS ENTERED INTO EVIDENCE, THAT

12    WE WOULD ENTER INTO EVIDENCE MR. REINHARD'S

13    COMPLAINT AGAINST THE DOW CHEMICAL COMPANY,

14    WHICH WE HAVE MARKED AS -- I FORGOT MY GLASSES

15    -- "P14."

16    BY THE COURT:

17      OKAY.  IT WILL BE ADMITTED.  AND THAT'S --

18    THAT'S THE ANSWER TO THE COMPLAINT; IS THAT

19    CORRECT?

20    BY MR. MAGEE:

21      NO, IT IS NOT, YOUR HONOR.  IT IS PEDRO

22    REINHARD'S INITIATION AT ISSUE AGAINST THE DOW

23    CHEMICAL COMPANY.

24    BY THE COURT:

25      OKAY.  I SEE.  OKAY.

1        BEFORE WE -- DO YOU WISH TO BE HEARD ON

2    THAT, MR. WELSH?

3    BY MR. WELSH:

4        NO.  I HAVE NO OBJECTION WHATSOEVER, YOUR

5    HONOR.  I JUST WANTED TO KNOW IF THE COURT WOULD

6    LIKE TO ALSO HAVE MR. REINHARD'S ANSWER TO THE

7    COMPLAINT THAT ---

8    BY THE COURT:

9        I -- I'M HAPPY TO RECEIVE ANY PLEADINGS

10   ASSOCIATED WITH THAT LAWSUIT THAT EITHER SIDE

11   WANTS TO PUT IN THE RECORD.  I'LL -- I'LL BE

12   HAPPY TO TAKE A LOOK AT IT.

13   BY MR. WELSH:

14       WE'LL GET A COPY OF THAT FOR YOU,

15   YOUR HONOR.

16   BY THE COURT:

17       THANK YOU.

18   BY MR. MAGEE:

19       THE SECOND RECORD OF ISSUE, YOUR HONOR.

20   AFTER THE OPENING STATEMENTS WHEN I MOVED INTO

21   EVIDENCE THE STIPULATED EXHIBITS AND SO ON,

22   THERE WAS A SUPPLEMENTAL JOINT STIPULATION OF

23   FACT THAT WE ENTERED INTO THAT WAS NOT INCLUDED

24   IN THOSE EXHIBITS.  AND I WANT TO MOVE FOR ITS

25   ADMISSION INTO EVIDENCE AT THIS POINT IN TIME.

1    BY THE COURT:

2         VERY WELL.  IT WILL BE ADMITTED.

3    BY MR. MAGEE:

4         JUST FOR THE RECORD, IT'S ENTITLED

5    SUPPLEMENTAL JOINT STIPULATION OF FACT, 1993 TO

6    2003.  AND IT'S DATED JUNE 17TH, 2011, FOR THE

7    RECORD.

8    BY THE COURT:

9         VERY WELL.

10    BY MR. MAGEE:

11         I INFORMED THE COURT EARLIER WE WERE

12    THROUGH WITH OUR FACT WITNESSES, EXCEPT SHARON

13    ORIEL, WHO WILL APPEAR TOMORROW MORNING AFTER

14    SHE COMES IN TONIGHT.  SO WE'RE GOING TO

15    COMMENCE EXAMINATION OF OUR EXPERT WITNESSES.

16    WE'RE GOING TO START WITH MR. DANIEL

17    KLEINBERGER, WHO WILL BE PRESENTED BY MR. ROBERT

18    LEONARD.

19    BY THE COURT:

20         VERY WELL.

21    BY THE CLERK:

22         RAISE YOUR RIGHT HAND.

23

24

25

1 │ THE WITNESS, DANIEL KLEINBERGER, AFTER HAVING FIRST BEEN

2 │ DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING

3 │ BUT THE TRUTH, TESTIFIED AS FOLLOWS:

4 │       BY THE CLERK:

5 │         STATE AND SPELL YOUR NAME FOR THE RECORD.

6 │       BY THE WITNESS:

7 │         DANIEL S. KLEINBERGER, D-A-N-I-E-L, S. AS

8 │       IN SAM.  KLEINBERGER, K-L-E-I-N-B-E-R-G-E-R.

9 │       BY THE COURT:

10 │       MR. LEONARD, YOU MAY PROCEED.

11 │       BY MR. LEONARD:

12 │         THANK YOU, YOUR HONOR.  ROBERT LEONARD FOR

13 │       THE PLAINTIFF.

14 │              DIRECT EXAMINATION

15 │ BY MR. LEONARD:

16 │ Q.   GOOD MORNING, MR. KLEINBERGER.

17 │ A.   GOOD MORNING.

18 │ Q.   I JUST HANDED YOU A -- A BINDER.  IF YOU'LL TURN TO

19 │     THE SECOND TAB. YOUR EXPERT REPORT IS LISTED THERE AS

20 │     PX6, WHICH HAS BEEN ADMITTED INTO EVIDENCE.  WOULD

21 │     YOU PLEASE TURN TO PAGE ONE?

22 │     WOULD YOU SUMMARIZE THE SCOPE OF YOUR ASSIGNMENT

23 │     IN THIS CASE, PLEASE?

24 │ A.   I WAS ASKED TO LOOK AT THE CHEMTECH -- CHEMTECH

25 │     RELATIONSHIPS -- CHEMTECH LIMITED PARTNERSHIP.  AND

1    BASED ON MY EXPERIENCE WITH HOW PEOPLE USE LIMITED

2    PARTNERSHIPS, I WAS ASKED TO DETERMINE WHETHER THIS

3    PARTNERSHIP WAS WITHIN THE RANGE OF -- OF NORMAL FOR

4    LIMITED PARTNERSHIPS.

5  Q.  AND HAVE YOU EVER BEEN ASKED TO OFFER AN OPINION LIKE

6    THIS IN THE PAST?

7  A.  YES, I HAVE.

8  Q.  COULD YOU DESCRIBE THAT CIRCUMSTANCE?

9  A.  YES.  SEVERAL YEARS AGO I WAS RETAINED BY THE SERVICE

10    -- BY THE INTERNAL REVENUE SERVICE IN A CHALLENGE

11    THAT THEY MADE TO A FAMILY LIMITED PARTNERSHIP.  AND

12    I WAS ASKED TO LOOK AT THAT PARTNERSHIP RELATIONSHIP

13    AND DETERMINE WHETHER IT WAS WITHIN THE RANGE OF

14    NORMAL FOR AN ARM'S LENGTH TRANSACTION, WHERE THE

15    PEOPLE WOULD -- PEOPLE AT ARMS LENGTH WOULD ACTUALLY

16    DO WHAT HAD BEEN DONE.

17  Q.  AND WHAT COURT WAS THAT BEFORE?

18  A.  THAT WAS IN THE TAX COURT.

19  Q.  AND DID THE TAX COURT ACCEPT YOU AS AN EXPERT ON ARMS

20    LENGTH LIMITED PARTNERSHIPS?

21  A.  THEY DID.

22  Q.  PLEASE BRING UP "PLAINTIFF'S DEMONSTRATIVE EXHIBIT

23    2," WHICH IS TAB ONE IN YOUR BINDER.  THIS EXHIBIT

24    SUMMARIZES YOUR CONCLUSIONS, MR. KLEINBERGER, IN THIS

25    CASE.  COULD YOU SUMMARIZE THOSE FOR THE COURT,

1        PLEASE?

2   A.   YES.   THIS -- THIS SLIDE LAYS OUT THE ELEMENTS OF MY

3        OVERALL CONCLUSION, WHICH WAS THAT THIS LIMITED

4        PARTNERSHIP ARRANGEMENT WAS WELL WITHIN THE RANGE OF

5        NORMAL.   THAT IT WAS NOT OUT OF SYNC WITH THE WAY

6        PEOPLE USED LIMITED PARTNERSHIPS.   IN FACT, THAT IT

7        WAS A -- A TYPE OF ONE OF THE MAJOR -- AN EXAMPLE OF

8        ONE OF THE MAJOR MODERN USES OF LIMITED PARTNERSHIPS.

9   Q.   AND WHAT QUALIFIES YOU TO MAKE THIS DETERMINATION?

10  A.   WELL, I HAVE BEEN STUDYING THE WAY BUSINESS PEOPLE

11       USE BUSINESS ORGANIZATIONS FOR ABOUT 25 YEARS.   IN

12       1997, I WAS ASKED BY THE NATIONAL CONFERENCE OF

13       COMMISSIONERS ON UNIFORM STATE LAW TO SERVE AS THE

14       REPORTER FOR THEIR PROJECT TO MODERNIZE THE UNIFORM

15       LIMITED PARTNERSHIP ACT.   AND THAT PROJECT TOOK FOUR

16       YEARS.   AND, IN FACT, IT -- EFFORTS CONTINUE TODAY.

17           MY JOB IN -- AS RECORDER WAS PART DRAFTER AND

18       PART RESEARCHER.   WE WERE CONCERNED ON THE DRAFTING

19       COMMITTEE, ESPECIALLY GIVEN THE ADMIN OF LIMITED

20       LIABILITY COMPANIES, TO CRAFT THE LIMITED PARTNERSHIP

21       ACT THAT WOULD FIT THE WAY PEOPLE ON THE GROUND WERE

22       ACTUALLY USING THIS VEHICLE.   AND WE HAD, AS A

23       RESOURCE, SOME OF THE LEADING LIMITED PARTNER --

24       PARTNERSHIP PRACTITIONERS IN THE COUNTRY.   MANY OF

25       WHOM WERE AMERICAN BAR ASSOCIATION ADVISORS TO THE

1      COMMITTEE.

2          I MADE A NUMBER OF PRESENTATIONS TO WHAT WAS

3      THEN CALLED THE ABA BUSINESS LAW SECTIONS COMMITTEE

4      ON PARTNERSHIPS AND UNINCORPORATED BUSINESS

5      ORGANIZATIONS ABOUT THE DRAFTING PROCESS.  AND GOT

6      REACTIONS FROM PEOPLE, WHICH WERE ESSENTIALLY TWO

7      SOURCE, ONE NOT RELEVANT HERE, WHICH ARE QUESTIONS

8      ABOUT THE WORDING.  BUT THE OTHER KIND OF REACTION

9      WAS HOW IS THIS GOING TO PLAY OUT, VIS A' VIS, THIS

10     ARRANGEMENT THAT I'M DOING?

11  Q.  AND WHAT IS YOUR -- YOUR CURRENT PROFESSION?

12  A.  I'M A PROFESSOR OF LAW.

13  Q.  HOW LONG HAVE YOU BEEN A PROFESSOR?

14  A.  TWENTY-FIVE YEARS.

15  Q.  AND DO YOU HAVE ANY PARTICULAR SPECIALIZATION THAT

16     YOU TEACH TO FUTURE LAWYERS?

17  A.  WELL, MY PRINCIPAL JOB IS TO TEACH THEM HOW TO THINK

18     CRITICALLY.  BUT IN TERMS OF DOCTRINE, I TAUGHT THAT

19     -- I TEACH A COURSE ON AGENCY PARTNERSHIPS AND

20     LIABILITY COMPANIES.  I'VE TAUGHT COURSES ON

21     CORPORATIONS.  I TEACH CONTRACT LAW.

22  Q.  AND OVER THE COURSE OF YOUR EXPERIENCE THAT YOU JUST

23     DESCRIBED, BOTH ACADEMIC AND PRACTICAL EXPERIENCE

24     WITH LIMITED PARTNERSHIPS, COULD YOU ESTIMATE ABOUT

25     HOW MANY LIMITED PARTNERSHIP AGREEMENTS THAT YOU HAVE

1     REVIEWED?

2  A.   HUNDREDS.

3  Q.   AND HAVE YOU REVIEWED THE CHEMTECH PARTNERSHIP

4     AGREEMENT IN ITS ENTIRETY?  THAT'S "JOINT EXHIBIT

5     2L."

6  A.   YES.  SEVERAL TIMES.

7  Q.   AND HAVE YOU ATTENDED THE TRIAL PROCEEDINGS THUS FAR?

8  A.   YES.

9  Q.   HAVE YOU HEARD THE TRIAL TESTIMONY OF DOW EXECUTIVES

10     ENRIQUE FALLA AND GEOFFREY MERSZEI?

11  A.   I HAVE.

12  Q.   WOULD YOU PLEASE TURN TO PAGE SEVEN OF YOUR REPORT?

13          BY THE COURT:

14            BEFORE WE BEGIN, LET ME JUST MAKE SURE I

15          UNDERSTAND.  I ASSUME THAT THERE'S NO OBJECTIONS

16          TO EACH OTHER'S -- BOTH SIDE'S WITNESSES?

17          THERE'S NO DISPUTE ABOUT THAT, I TAKE IT?

18          BY MR. MAGEE:

19            NO DISPUTE ABOUT QUALIFICATIONS, AND THE

20          REPORTS THAT ARE ADMITTED INTO EVIDENCE.

21          BY THE COURT:

22            CORRECT.  THAT -- ON BOTH SIDES.  CORRECT?

23          BY MR. WELSH:

24            YES, YOUR HONOR.

25          BY THE COURT:

1          OKAY.  I JUST WANTED THE RECORD TO BE

2          CLEAR.  YOU MAY PROCEED.

3  BY MR. LEONARD:

4  Q.  HAVE YOU REACHED PAGE SEVEN, PROFESSOR?

5  A.  I HAVE.

6  Q.  DOES THE TESTIMONY OF MR. MERSZEI AND MR. FALLA

7      CONSISTENT WITH YOUR UNDERSTANDING OF DOW'S BUSINESS

8      PURPOSE AS IS REFLECTED IN YOUR REPORT UNDER THE

9      HEADING, FORMATION AND PURPOSE?

10 A.  YES.  ENTIRELY.

11 Q.  HOW SO?

12 A.  WELL, I WROTE THE REPORT BASED ON MATERIALS I HAD

13     READ.  WHAT WAS EVIDENT TO ME, SALIENT ABOUT DOW'S

14     PURPOSES IN SETTING UP THIS LIMITED PARTNERSHIP, TWO

15     THINGS.

16          ONE, THEY WERE CRITICALLY CONCERNED WITH THEIR

17     DEBT-TO-CAPITAL RATIO.  THEY WERE NEAR WHAT THEY

18     CONSIDERED, AND WHAT THE RATING AGENCIES CONSIDERED A

19     DANGER LINE.  THEY NEEDED CAPITAL.  THEY'RE A CAPITAL

20     HUNGRY ENTITY.  AND THEY -- THIS WAS A WAY TO GET

21     FUNDING.  AND RATHER THAN HAVING HURT THEIR DEBT-TO-

22     EQUITY RATIO, THAT'S A HELP.  THAT WAS ONE THING.

23          THE OTHER BUSINESS NOTION WAS THAT THEY HAD --

24     THEY OWNED A SET OF ASSETS -- THESE PATENTS, WHICH

25     WERE OF CONSIDERABLE VALUE TO THEM.  AND THEY REALLY

1    WERE PART OF THE ECONOMIC STRENGTH OF DOW.  BUT THAT

2    DID NOT APPEAR ON THE BOOKS OF -- OF THE COMPANY.

3         SO WHEN THEY WERE LOOKING FOR A WAY THROUGH AN

4    ARM'S LENGTH TRANSACTION TO GET AN ACTUAL MARKET

5    VALUE FOR THESE ASSETS SO THAT -- SO THAT THE FORM

6    WILL FOLLOW THE ECONOMIC SUBSTANCE.  THAT'S BEEN

7    REFERRED TO HERE A LOT AS MONETIZING THOSE ASSETS.

8         AND SO THAT'S WHAT THE DOCUMENTS SAID TO ME.

9    AND I HEARD BOTH OF THOSE WITNESSES EXPLAIN THAT

10    REPEATEDLY.  AND SO IT WAS LIKE THE -- THE WORDS

11    COMING TO LIFE.

12  Q.  NOW, DURING THE COURSE OF YOUR CAREER OBSERVING,

13    WRITING ABOUT, TEACHING LIMITED PARTNERSHIPS, DID YOU

14    BECOME FAMILIAR WITH WHETHER IT'S COMMON FOR

15    BUSINESSES TO USE LIMITED PARTNERSHIP FORM TO ACHIEVE

16    PARTICULAR FINANCING OBJECTIVES?

17  A.  YES, I DID.

18  Q.  AND IN YOUR EXPERIENCE HOW COMMONLY IS THAT DONE?

19  A.  IT'S QUITE COMMON.  THERE ARE A RANGE OF -- OF USES

20    FOR -- FOR LIMITED PARTNERSHIPS.  AND ONE OF THE

21    MAJOR SUBCATEGORIES IS THE -- ARRANGEMENT TO POOL

22    ASSETS TO BE ABLE TO TAKE ADVANTAGE OF FINANCIAL --

23    FINANCIAL OPPORTUNITIES THAT WITHOUT THE POOLING YOU

24    WOULDN'T BE ABLE TO DO.

25         AND IF ANYTHING, IN TERMS OF PROPORTION, THIS IS

1     A HIGHER PROPORTION THAN IT USED TO BE.  NOT BECAUSE

2     -- WELL, BECAUSE OF LIMITED LIABILITY COMPANIES HAVE

3     CHASED LIMITED PARTNERSHIPS OUT OF A LOT OF AREAS.

4     BUT THIS IS ONE IN WHICH LIMITED PARTNERSHIPS STILL

5     REMAIN VERY KEY.

6  Q.  WOULD YOU PLEASE TURN TO THE FOURTH TAB IN YOUR

7     BINDER.  THIS IS "PLAINTIFF'S DEMONSTRATIVE EXHIBIT

8     1."

9        PROFESSOR, YOUR REPORT INDICATES THAT THE CHOICE

10    OF A LIMITED PARTNERSHIP FORM WAS APPROPRIATE, GIVEN

11    DOW'S BUSINESS OBJECTIVES.  WOULD YOU SUMMARIZE AT A

12    GENERAL LEVEL WHY YOU REACHED THAT CONCLUSION?

13 A.  WELL, THERE WERE SEVERAL REASONS.  THE -- AS -- AS

14    THEY UNDERSTOOD THE DEBT-TO-CAPITAL ISSUE, AND AS

15    THEY TESTIFIED, IF THEY USED A -- A RELATIONSHIP

16    WHERE THEY BROUGHT IN PEOPLE OR CO-OWNERS OF SOME

17    POOLED ASSETS, THAT WOULD COUNT AS MINORITY INTEREST

18    AND IT WOULD INCREASE THEIR NON-DEBT EQUITY.

19       SECONDLY, IN ORDER TO MAKE SOPHISTICATED

20    ARRANGEMENTS ABOUT RISK AND RETURN, IT IS VERY, VERY

21    USEFUL TO HAVE A LIMITED PARTNERSHIP AS THE VEHICLE

22    HOUSING YOUR DEAL, BECAUSE LIMITED PARTNERSHIPS ARE

23    THE HALLMARK THAT YOU CAN STRUCTURE THEM WITH GREAT

24    DETAIL, WITH GREAT FLEXIBILITY.

25       AND AT THIS TIME, AS WELL, LIMITED LIABILITY

1       COMPANIES WERE STILL PRETTY NEW.  AND A LOT OF PEOPLE

2       CONTINUED TO USE LIMITED PARTNERSHIPS BECAUSE THE

3       INVESTMENT COMMUNITY LOOKED AND WOULDN'T USE LLC'S.

4           IN FACT, SILICATES THAT PEOPLE IN -- IN NEW YORK

5       -- IN NEW YORK CITY BAR AREN'T VERY COMFORTABLE USING

6       LLC'S UNLESS THEY ARE BORN IN DELAWARE.

7   Q.  AND JUST FOR CLARIFICATION.  WHEN YOU SAID THE

8       INVESTMENT COMMUNITY, YOU MEAN POTENTIAL INVESTORS?

9   A.  YES.

10  Q.  IS THAT CORRECT?

11  A.  YES.

12  Q.  PROFESSOR, PAGES SEVEN THROUGH 11 OF YOUR REPORT,

13      DESCRIBE IN DETAIL THE STRUCTURE AND ECONOMICS OF THE

14      CHEMTECH PARTNERSHIP.  AND I WANT TO GO THROUGH THOSE

15      ASPECTS INDIVIDUALLY.

16          SO IF WE COULD START WITH VOTING AND MANAGEMENT

17      RIGHTS?  WOULD YOU TURN TO SECTION 6.1 OF THE "JOINT

18      EXHIBIT 2L."  THIS IS AT BATES CT36540.

19          BY THE COURT:

20              WHAT PAGE?  THE BATES ---

21          BY MR. LEONARD:

22              36540.

23          BY THE COURT:

24              THANK YOU.

25  BY MR. LEONARD:

1   Q.   THIS SECTION PROHIBITS THE LIMITED PARTNERS FROM

2        EXERCISING ANY RIGHTS OR POWER TO TAKE PART IN THE

3        MANAGEMENT OR CONTROL OF THE PARTNERSHIP.

4            HOW COMMON IS IT FOR A LIMITED PARTNERSHIP

5        AGREEMENT TO LIMIT THE MANAGEMENT POWERS OF ITS

6        LIMITED PARTNERS?

7            BY MR. SCHREIBER:

8                OBJECTION, YOUR HONOR.

9            BY THE COURT:

10               THE OBJECTION?

11           BY MR. SCHREIBER:

12               THE OBJECTION IS THAT -- IS THAT MR.

13       LEONARD IS TELLING HIM WHAT IT MEANS.  HE'S NOT

14       READING THE DOCUMENT.  HE'S SAYING, THIS MEANS

15       THAT LIMITED PARTNERS DIDN'T HAVE AS MUCH

16       CONTROL.  I KNOW IT'S THIN LINE ---

17           BY THE COURT:

18               YES, I -- I UNDERSTAND.  I'LL -- I'LL

19       SUSTAIN THE OBJECTION, ONLY -- MR. LEONARD, YOU

20       MAY ASK HIM SPECIFICALLY WHAT IT MEANS OR WHAT

21       -- WHAT HE MEANS IN HIS REPORT.  IF YOU WOULD

22       SIMPLY REPHRASE THE QUESTION, IS WHAT I'M ASKING

23       YOU TO DO.  OKAY?

24  BY MR. LEONARD:

25  Q.   PROFESSOR, HAVE YOU READ SECTION 6.1?

1   A.   I HAVE.

2   Q.   WOULD YOU PLEASE SUMMARIZE YOUR UNDERSTANDING OF THAT

3        PROVISION?

4   A.   IT STATES TWO BASIC PRINCIPALS.  ONE IS THAT

5        BASICALLY A LIMITED PARTNERS HAVE NO RULE AND NO

6        RIGHT IN GOVERNANCE.

7             THE SECOND ONE IS, EXCEPT AS THE LIMITED

8        PARTNERSHIP AGREEMENT SPECIFICALLY PROVIDES.

9   Q.   AND IS THIS A COMMON FEATURE COMMONLY FOUND IN

10       LIMITED PARTNERSHIP ARRANGEMENTS?

11  A.   IT'S CHARACTERISTIC.  IT IS ONE OF THE HALLMARKS OF A

12       LIMITED PARTNERSHIP.  THAT'S WHY THEY CALL IT LIMITED

13       PARTNERS.

14  Q.   AND YOU JUST MENTIONED THAT IT RESTRICTS THE ABILITY

15       OF A LIMITED PARTNERSHIP TO MANAGE THE AFFAIRS OF THE

16       PARTNERSHIP. SO WHO IS MANAGING THE PARTNERSHIP?

17  A.   PARTNERSHIP -- THE PARTNERSHIP HERE, AS IS THE CASE

18       WITH LIMITED PARTNERS CHARACTERISTICALLY, IS MANAGED

19       BY THE GENERAL PARTNER.

20            IF YOU LOOK AT THE PREFATORY NOTE TO THE NEWEST

21       UNIFORM LIMITED PARTNERSHIP ACT, YOU'LL SEE A

22       STATEMENT -- DESCRIPTION OF REALITY, WHICH IS THAT

23       LIMITED PARTNERSHIPS ARE PARTICULARLY ATTRACTIVE WHEN

24       THE DEAL INVOLVES TIGHTLY CENTRALIZED MANAGEMENT

25       THAT'S ENTRENCHED.

1   Q.   AND ARE THERE ANY HISTORICAL REASONS WHY LIMITED

2        PARTNERS ARE RESTRICTED FROM PARTICIPATION IN

3        MANAGEMENT?

4   A.   YES.  LIMITED PARTNERS -- LET'S -- LET'S LOOK AT THE

5        PAST COUPLE OF CENTURIES.  PEOPLE DEBATE ABOUT WHERE

6        THE LIMITED PARTNERSHIPS BEGAN OVER IN THE MIDDLE

7        AGES OR IN ROME.

8             BUT THEY'RE AN OUTGROWTH.  THEY'RE A VARIATION

9        OF A GENERAL PARTNERSHIP, WHERE EVERY OWNER -- BY

10       BEING AN OWNER, NOT ONLY HAS THE RIGHT TO MANAGE, BUT

11       PERSONAL LIABILITY FOR THE DEBTS OF THE ENTITY,

12       AUTOMATICALLY.

13            IN A LIMITED PARTNERSHIP, THE IDEA WAS THAT YOU

14       OUGHT TO BE ABLE TO HAVE A SENSE OF PASSIVE

15       INVESTORS.  AND THEY WERE -- THE TRADE OFF WAS, THEY

16       GOT A LIABILITY SHIELD.  THEY ARE NOT AUTOMATICALLY

17       LIABLE FOR THE DEBTS OF THE ENTITY.  BUT THEIR ROLE

18       IN GOVERNANCE IS VERY, VERY LIMITED.

19            IN FACT, UNDER THE LAW OF MANY STATES, AND THIS

20       IS -- THIS IS PRACTICAL REALITY AS WELL.  A LIMITED

21       PARTNER WHO GETS TOO INVOLVED IN THE MANAGEMENT OF A

22       PARTNERSHIP RISKS LOSING THEIR LIMITED LIABILITY.

23   Q.   AND YOU MENTIONED THAT THE GENERAL PARTNER IS THE --

24       THE PARTY THAT'S IN GENERAL CONTROL OF LIMITED

25       PARTNERSHIP.

1        NOW, IS IT COMMON IN LIMITED PARTNERSHIP

2    ARRANGEMENTS FOR THAT GENERAL PARTNER TO LOAN ITS OWN

3    EMPLOYEES TO HANDLE THE DAY-TO-DAY OPERATIONS OF THE

4    PARTNERSHIP?

5  A.   IT'S -- IN THE -- THE LION'S SHARE SITUATIONS, WHICH

6    I'M FAMILIAR, IT IS TYPICAL FOR THE GENERAL PARTNER,

7    AS PART OF ITS ROLE AS MANAGER, TO STAFF UP THE --

8    THE LIMITED PARTNERSHIPS NEEDS.

9        NOW, WHETHER THEY'RE LOANED OR WHETHER THEY'RE

10   ALLOCATED OR WHETHER THEY'RE -- THERE'S A MANAGEMENT

11   FEE OR WHATEVER, BUT IT IS -- PARTICULARLY IN A

12   FINANCING PARTNERSHIP.

13       BUT -- BUT ALSO IN OTHERS.  IT IS TYPICAL FOR

14   THE LIMITED PARTNERSHIP NOT TO HAVE EMPLOYEES.  IN

15   FACT, ONE OF THE THINGS YOU FIND PEOPLE AGREEING TO

16   -- SPECIFICALLY AGREEING TO THIS, BECAUSE OTHERWISE

17   IF THE GENERAL PARTNER CHARGES THE LIMITED

18   PARTNERSHIP FOR PROVIDING, FOR EXAMPLE, OFFICE SPACE

19   OR FOR THE ACCOUNTING FUNCTION THAT IT'S PROVIDING.

20   THAT'S A CONFLICT OF INTEREST.  THAT'S THE GENERAL

21   PARTNER -- AS THE MANAGER DEALING WITH ITSELF.  AND

22   SO THE -- YOU TYPICALLY SEE IN AGREEMENTS THE ABILITY

23   TO DO THAT. SO IT'S CHARACTERISTIC.

24  Q.   ALL RIGHT.  LET'S TURN TO THE BATES CT36541 AND

25   SECTION 6.2 TITLED VOTING RIGHTS.  THIS SECTION

1    STATES, "THE LIMITED PARTNERS SHALL HAVE THE RIGHT TO

2    VOTE ONLY ON THOSE MATTERS SPECIFICALLY RESERVED FOR

3    THEIR VOTE WHICH ARE SET FORTH IN THIS AGREEMENT OR

4    IS REQUIRED IN THE ACT."

5     ARE YOU FAMILIAR WITH WHAT SECTION 6.2 GOVERNS?

6  A.   YES, I AM.

7  Q.   AND CAN YOU PLEASE EXPLAIN THAT FOR THE COURT?

8  A.   THERE ARE SPECIFIED MATTERS ON WHICH THE LIMITED

9    PARTNERS ARE GIVEN THE RIGHT TO VOTE OR CONSENT.

10   THESE, ACCORDING TO 6.2, ARE ALL THERE ARE.  OTHER

11   THAN THAT'S WHAT'S ABSOLUTELY REQUIRED BY THE ACT.

12    SO WHAT IT'S SAYING IS, FOLKS, IF YOU WANT TO

13   LOOK AT -- IF YOU WANT TO UNDERSTAND THE GOVERNMENTS

14   ROLE OF LIMITED PARTNERS, LOOK AT THIS DOCUMENT.

15 Q.   AND I BELIEVE YOU -- YOU SAID IT GOVERNS THE RIGHT TO

16   CONSENT, AS WELL.

17    IF YOU LOOK AT 6 -- SECTION 6.3.  IS THAT THE

18   PROVISION TO WHICH YOU WERE REFERRING?

19 A.   YES.  THERE IS, IN FACT, IN THE PRACTICE AND SORT OF

20   THE CUSTOM AND USAGE OF LIMITED PARTNERSHIPS, SOME

21   CONFLATION BETWEEN VOTING AND CONSENT.  AND, IN FACT,

22   RECENTLY WE PULLED THE WORD VOTING OUT OF THE UNIFORM

23   STATUTE BECAUSE IT WAS SEEN AS CONFUSING.

24    THE BASIC NOTION IS THIS.  THAT THE AGREEMENT

25   WOULD SET OUT CERTAIN MATTERS IN WHICH THINGS CAN'T

```
 1        BE DONE WITHOUT EITHER THE CONSENT OR -- OR THE

 2        VOTER, ALL THE PARTNERS OR SOME OF THE PARTNERS OR

 3        WHATEVER.

 4            VOTING IN THIS CONTEXT DOES NOT MEAN EVERYBODY

 5        HAS TO SHOW UP AT THE SAME TIME AND WE CAST BALLOTS.

 6   Q.   IF YOU WOULD TURN TO BATES 36523.  SECTION 5.3, WHICH

 7        LISTS 39 PROVISIONS FOR WHICH THE LIMITED PARTNER

 8        CONSENT IS NECESSARY TO APPROVE ACTIONS OF THE

 9        GENERAL PARTNER.  HAVE YOU REVIEWED THESE?

10   A.   YES.

11   Q.   AND ARE THESE TYPES OF PROVISIONS COMMON IN LIMITED

12        PARTNERSHIP ARRANGEMENTS?

13   A.   THIS TYPE OF PROVISION, YES.  NOT NECESSARILY EXACTLY

14        EVERY ONE OF THOSE.  BUT WHAT -- WHAT THESE

15        PROVISIONS HAVE IN COMMON IS THAT THEY GIVE THE

16        LIMITED PARTNERS EITHER VETO OR CONSENT RIGHTS OVER

17        ANYTHING THAT WOULD SUBSTANTIALLY DEVIATE FROM THE

18        DEAL; THAT'S COMMON.

19            IT IS COMMON TO UNDERSTAND THE DEAL AND THEN

20        START THINKING ABOUT -- BECAUSE A GENERAL PRATNER HAS

21        THE POWER TO DO ANYTHING THAT IS ESSENTIALLY NOT

22        PROSCRIBED FOR IT, THEN START THINKING ABOUT, OKAY,

23        WHAT ARE ALL THE THINGS THAT WE WANT TO MAKE SURE IT

24        DOESN'T GET DONE, BECAUSE THAT'S NOT THE DEAL.  AND

25        IF YOU DON'T DO THAT WELL, YOU'RE IN A LOT OF
```

1        TROUBLE, ACTUALLY.

2            AND SO THIS IS -- THESE ARE DEAL PROTECTORS.

3   Q.  LET'S TAKE A LOOK AT AN EXAMPLE OF ONE.  IF YOU TURN

4        TO SECTION 5.3A, ROMAN X16 AT BATES 36525.

5   A.  I SEE IT.

6   Q.  THIS PROVISION REQUIRES LIMITED PARTNER CONSENT.  TO

7        CAUSE OR PERMIT THE PARTNERSHIP -- FOR THE

8        PARTNERSHIP SUBSIDIARY TO MERGE OR CONSOLIDATE WITH

9        OR INTO ANY PERSON.

10           IS THIS A COMMON RIGHT AFFORDED LIMITED -- A

11       COMMON CONSENT RIGHT AFFORDED LIMITED PARTNERS?

12  A.  YES.  IT'S ACTUALLY ABSOLUTELY CRUCIAL, AS SOME

13       LAWYERS IN DELAWARE FOUND OUT TO ITS DISMAY.  BECAUSE

14       IF YOU COULD MERGE, YOU COULD CHANGE THE AGREEMENT.

15       BECAUSE THE -- THE NEW MERGED ENTITY HAS TO -- COULD

16       HAVE A TOTALLY DIFFERENT AGREEMENT.

17           SO, YES, THIS IS CHARACTERISTIC.  YOU DON'T DO

18       THIS, THESE DAYS.  YOU DON'T LOOK TO THIS ISSUE THESE

19       DAYS.  IN 1993, BUT IT'S MALPRACTICE NOT TO LOOK AT

20       THIS ISSUE.

21  Q.  OKAY.  DR. GLENN HUBBARD HAS AUTHORED AN EXPERT

22       REPORT ON BEHALF OF THE UNITED STATES IN THIS MATTER,

23       WHICH IS IN EVIDENCE AS "DX4."  HAVE YOU REVIEWED DR.

24       HUBBARD'S REPORT?

25  A.  YES, I HAVE.

1  Q.   HE STATES AT PAGE 44 OF HIS REPORT, AND I QUOTE,

2       "HENCE, WHILE THE BANKS WERE GRANTED SOME MANAGEMENT

3       OR VOTING RIGHTS, THESE WERE LIMITED IN SCOPE AND

4       AUTHORITY.  AS A RESULT, IN THE CONTEXT OF A DEBT

5       VERSUS EQUITY CLASSIFICATION ANALYSIS OF THE CLASS A

6       INTERESTS, THIS FACTOR IS NOT CONCLUSIVE."  END

7       QUOTE.

8            WHAT IS YOUR REACTION TO THIS ANALYSIS?

9            BY MR. SCHNEIDER:

10                OBJECTION, YOUR HONOR.  IT'S NOT CLEAR TO

11           ME WHAT EXACTLY THE QUESTION IS.  MR. -- DR.

12           HUBBARD IS AN ECONOMIC EXPERT.  AND CLEARLY

13           PROFESSOR KLEINBERGER IS NOT AN ECONOMIC EXPERT.

14           HE HASN'T BEEN TENDERED AS SUCH.  IF HE'S GOING

15           TO BE COMMENTING ON PROFESSOR HUBBARD'S -- DR.

16           HUBBARD'S ECONOMIC ANALYSIS IN HIS REPORT, I

17           DON'T THINK HE'S QUALIFIED TO DO SO.  I DON'T

18           THINK HE'S BEEN TENDERED AS A WITNESS AS SUCH.

19           BY THE COURT:

20                WELL, I -- I -- I TEND TO AGREE.  BUT I --

21           I WILL LET THE WITNESS ANSWER.  I MEAN, IF HE

22           HAS A REACTION TO THIS.  BUT THIS GENERAL

23           STATEMENT, I'LL LET HIM OFFER IT.  WITH THE

24           CAVEAT THAT YOU DESCRIBED, THAT HE'S NOT AN

25           EXPERT.

1              I MEAN, LET ME JUST UNDERSTAND NOW, MR.

2         HUBBARD IS AN ECONOMICS EXPERT; IS THAT -- IS

3         THAT CORRECT?

4         BY MR. SCHREIBER:

5              DR. HUBBARD IS AN ECONOMICS EXPERT.  YES.

6         BY THE COURT:

7              THIS WITNESS IS NOT AN ECONOMICS EXPERT?

8         BY MR. SCHREIBER:

9              CORRECT.  AND -- WELL, MY UNDERSTANDING,

10        YOUR HONOR, IS THAT THE POINTS THAT THEY WERE

11        GETTING AT ARE DIFFERENT.

12        BY THE COURT:

13             I UNDERSTAND.  I UNDERSTAND.  WELL, I -- I

14             ---

15        BY MR. SCHREIBER:

16             WE CAN SEE HOW HE ANSWERS, SIR.

17        BY THE COURT:

18             YES.  I -- I'LL OVERRULE THE OBJECTION.

19        I'LL -- I WILL ALLOW THE WITNESS TO ANSWER THE

20        QUESTION.

21  BY THE WITNESS:

22  A.   I LOOK AT THIS REPORT.  I'M NOT AN ECONOMICS EXPERT.

23       THE LAST TIME I STUDIED ECONOMICS, I WAS A FRESHMAN.

24       AND PART OF THAT IS MARXIST ECONOMICS.

25             SO WHAT I DID TO LOOK AT THIS REPORT WAS LOOK AT

1    THE -- THE STATEMENTS, NOT PASS JUDGMENT ON THE

2    ECONOMICS, BUT TO -- TO ASK WHETHER OR NOT THE

3    STATEMENTS FIT WITH THE WAY PEOPLE IN MY WORLD SEE

4    LIMITED PARTNERSHIP INTERESTS.

5        SO I'M NOT COMMENTING ON OR CRITICIZING THE

6    ECONOMIC BALANCES.  I -- I -- MY ROLE HERE IS TO SAY

7    THAT IF -- IT WAS TO THINK ABOUT, DOES THIS

8    CHARACTERIZATION FIT WITH THE WAY PEOPLE WHO USE

9    LIMITED PARTNERSHIPS AND LIMITED PARTNERSHIPS

10    INTERESTS UNDERSTAND THEIR WORLD.  AND THIS

11    PARTICULAR STATEMENT, FOR EXAMPLE, DOESN'T FIT WITH

12    THAT WORLD AT ALL.

13  BY MR. LEONARD:

14  Q.    WHY IS THAT?

15  A.    WELL, BECAUSE LIMITED PARTNERS HAVE LIMITED RIGHTS,

16    CHARACTERISTIC.  THAT'S THE CHARACTER -- THAT'S THE

17    GOVERNANCE CHARACTER OF LIMITED PARTNERSHIP

18    INTERESTS.

19  Q.    I WANT TO TURN NOW TO CHEMTECH'S ECONOMIC STRUCTURE.

20        IT IS STIPULATED IN THIS CASE THAT THE INVESTORS

21    CONTRIBUTED 200 MILLION DOLLARS IN EXCHANGE FOR AN

22    INTEREST IN THE CHEMTECH PARTNERSHIP.  THAT WAS

23    ROUGHLY 20 PERCENT OWNERSHIP INTEREST.

24        YOU ALSO UNDERSTAND THAT THE PARTNERSHIP

25    AGREEMENT PROVIDES THAT THE INVESTOR RECEIVE A

1      PRIORITY RETURN AS WELL AS A ONE-PERCENT

2      PARTICIPATION IN RESIDUAL PROFITS ONCE THAT PRIORITY

3      RETURN HAD BEEN SATISFIED, AS WELL AS A ONE-PERCENT

4      PARTICIPATION IN GAINS AND LOSSES RELATED TO MARK-TO-

5      MARKET EVENTS, SUCH AS PATENT DISTRIBUTIONS.

6  A.   YES.

7  Q.   BASED ON YOUR PRACTICAL EXPERIENCE AND HOW BUSINESSES

8      STRUCTURE LIMITED PARTNERSHIPS AND WHY THEY USE THEM,

9      DOES THIS TYPE OF SHIFTING OF AN ENTERPRISE'S PROFIT

10      FLOW COMMON?

11  A.   YES.  IT'S VERY COMMON.

12  Q.   HOW SO?

13  A.   WELL, IT'S -- THE ANSWER TO THAT -- ON -- ON TWO

14      LINES. ONE, IT'S COMMON BECAUSE DEALS OFTEN INVOLVE

15      THAT KIND OF CHANGE, THAT ONE PARTY COMES INTO THE

16      DEAL AND GETS THE SUGAR AT THE FRONT END AND MAYBE A

17      LITTLE BIT AT THE BACK, AND THEN THINGS FLIP AROUND.

18          WHY IT'S COMMON IN LIMITED PARTNERSHIPS, IS THAT

19      THE LIMITED PARTNERSHIP STRUCTURE IS EXCELLENT FOR

20      DOING THAT.  BECAUSE THERE ARE NO LEGAL BARRIERS TO

21      -- THERE -- THERE ARE NO BARRIERS TO STRUCTURING A

22      DEAL THAT WAY.  AND YOU CAN HAVE AS MUCH COMPLEXITY

23      AS THE FINANCIAL PEOPLE CAN FIGURE OUT.  AND YOU JUST

24      WRITE IT DOWN AND IT WORKS.

25  Q.   AT PAGE 28 OF HIS EXPERT REPORT, DR. HUBBARD STATES,

1      "DESPITE A ROUGHLY 20 PERCENT OWNERSHIP INTEREST OF

2      CHEMTECH, THE CLASS A INTERESTS WERE ENTITLED TO

3      RECEIVE ONLY ONE PERCENT OF ADDITIONAL PROFITS.  IN

4      CONTRAST, THE CLASS B INTERESTS, WHICH REPRESENTED

5      ROUGHLY 80 PERCENT OF CHEMTECH, RETAINED 98 PERCENT

6      OF THE PROFITS."  END QUOTE.

7          WHAT IS YOUR REACTION TO THAT STATEMENT?

8    A.    MY REACTION TO THAT STATEMENT IS THAT -- THAT'S

9      LOOKING AT ONLY HALF THE DEAL.  THE FRONT HALF OF THE

10     DEAL ALLOCATES 99 PERCENT OF THE PROFITS UNTIL YOU

11     GET YOUR -- YOUR PREFERRED RETURN.

12   Q.    DR. HUBBARD CLAIMS THAT DOW ATTEMPTED TO LIMIT THE

13     INVESTOR'S ONE PERCENT PARTICIPATION IN MARK-TO-

14     MARKET GAINS, BECAUSE THE PARTNERSHIP AGREEMENTS

15     SPECIFIED THAT THE SAME METHODOLOGY USED TO INITIALLY

16     VALUE THE PATENTS BE USED UPON EXIT OF THE CLASS A

17     INVESTORS.

18         DO YOU AGREE WITH DR. HUBBARD THAT THAT IS AN

19     INAPPROPRIATE WAY TO ASSIGN VALUE TO METHODOLOGY?

20         BY MR. SCHREIBER:

21             OBJECTION -- SAME OBJECTION, YOUR HONOR.

22         THEY'RE ASKING DIFFERENT QUESTIONS.  HE'S NOT

23         BEEN TENDERED AS AN EXPERT IN ECONOMICS.  AND

24         DR. HUBBARD'S REPORT IS ECONOMICS STRAIGHT.

25         BY THE COURT:

1           I UNDERSTAND.  I WILL ALLOW THE -- THE

2           TESTIMONY.  MR. HUBBARD -- DR. HUBBARD WILL

3           TESTIFY AND CLARIFY.  BUT I -- I'M KEENLY AWARE

4           OF THE DIFFERENCES BETWEEN THE TWO.

5           BY MR. SCHREIBER:

6               THANK YOU, YOUR HONOR.

7           BY THE COURT:

8               THANK YOU.

9    BY THE WITNESS:

10   A.   CAN YOU RESTATE THE QUESTION FOR ME?

11   BY MR. LEONARD:

12   Q.   SURE.  DR. HUBBARD CLAIMS THAT DOW ATTEMPTED TO LIMIT

13       THE INVESTORS ONE PERCENT PARTICIPATION IN MARK-TO-

14       MARKET GAINS, BECAUSE THE PARTNERSHIP AGREEMENT

15       SPECIFIED THAT THE SAME METHODOLOGY USED TO INITIALLY

16       VALUE THE PATENTS BE USED TO FINANCE THE CLASS A

17       INVESTORS.

18           AT PAGE 32 OF HIS REPORT HE STATES, AND I QUOTE,

19       "RESTRICTING THE VALUATION METHODOLOGY AND APPRAISER

20       TO THE SAME ONE USED TO ORIGINALLY VALUE THE PATENTS

21       WOULD TEND TO REDUCE THE VARIABILITY AND POTENTIAL --

22       AND THE POTENTIAL INCREASE OR DECREASE IN VALUE WHEN

23       THE PATENTS WERE MARK-TO-MARKET."  END QUOTE.

24           DO YOU AGREE WITH DR. HUBBARD?

25   A.   WELL, MY -- MY PERSPECTIVE ON THIS IS BASED ON WHAT I

1    KNOW WERE LIMITED PARTNERSHIPS AND, MOREOVER, WHAT I

2    KNOW OF THE WORLD OF -- OF OTHER KINDS OF BUSINESS

3    ORGANIZATIONS.

4         I HAVE READ HUNDREDS AND HUNDREDS OF VALUATION

5    PROVISIONS AND CONTEXT WITH LIMITED PARTNERSHIPS,  IN

6    CONTEXT OF POST-SALE CORPORATIONS IN THE CONTEXT OF

7    LLC.  I HAVE NEVER SEEN THAT -- A PROVISION THAT

8    REFLECTS WHAT DR. HUBBARD SUGGESTS SHOULD BE THE

9    CASE.  BECAUSE IT'S ESSENTIALLY YOU'RE SAYING, OKAY,

10   WE'RE GOING TO COMPARE TWO VALUES OVER TIME.

11        THE FIRST WE'LL USE THE APPLE METHOD TO VALUE

12   AND THEN LATER WE'RE GOING TO USE THE ORANGE METHOD.

13   NOBODY DOES IT THAT WAY.

14 Q.  WOULD YOU PLEASE REFER BACK TO YOUR EXPERT REPORT?

15   SECOND TAB IN YOUR BINDER.  AND TURN TO THE TOP OF

16   PAGE 11.

17 A.  I'M THERE.

18 Q.  AT THE TOP OF PAGE 11 YOU STATE THAT CHEMTECH TRACKED

19   THE RELEVANT FAIR MARKET VALUE OF PROPERTY

20   CONTRIBUTIONS AND CONTINUING FINANCIAL INTERESTS OF

21   EACH OF ITS PARTNERS THROUGH THE CONCEPT OF CAPITAL

22   ACCOUNTS TO REFLECT THE ECONOMICS OF THE INVESTMENT

23   ARRANGEMENT.

24        WHAT IS THE ROLE OF CAPITAL ACCOUNTS, GENERALLY,

25   IN LIMITED PARTNERSHIPS?

1   A.   CAPITAL ACCOUNTS -- THE CAPITAL ACCOUNTS IS THE

2        CONCEPT -- THE -- THE DEVICE MECHANISM THAT IS USED

3        TO TRACK EACH CO-OWNER'S SHARE OF -- OF -- OF THE

4        WEALTH OWNED BY THE -- BY THE LIMITED PARTNERSHIP.

5   Q.   AND ARE YOU AWARE OF ANY OTHER METHOD BY WHICH A

6        PARTNERSHIP CAN TRACK AN OWNER'S ECONOMIC INTEREST?

7   A.   IN A LIMITED PARTNERSHIP?

8   Q.   YES.

9   A.   I'VE NEVER SEEN A DIFFERENT ONE.

10  Q.   WOULD YOU PLEASE TURN TO PAGE TEN OF YOUR REPORT?

11       WE'LL FOCUS ON THE FIRST SENTENCE IN THE FIRST FULL

12       PARAGRAPH ON PAGE TEN WHICH -- WHICH STATES, AND I

13       QUOTE.  "IN A PARTNERSHIP ALLOCATION OF PROFITS IS

14       NOT THE SAME AS DISTRIBUTIONS."

15            CAN YOU PLEASE EXPLAIN FOR THE COURT IN A LITTLE

16       MORE DETAIL WHAT YOU MEAN HERE?

17  A.   YES.  THIS IS PART OF THE WAY IN WHICH PEOPLE

18       UNDERSTAND THE RELATIVE STAKES AS CO-OWNERS IN THE

19       VENTURE.  SUPPOSE THAT THE LIMITED PARTNERSHIP MAKES

20       A PROFIT.  THAT MEANS THAT THE ENTERPRISE IS NOW

21       WEALTHIER THAN IT WAS.  SO WE HAVE TO HAVE A

22       MECHANISM FOR FIGURING OUT HOW THAT INCREASE IN

23       WEALTH IS SHARED AMONG THE VARIOUS CO-OWNERS.  THAT'S

24       A PROFIT ALLOCATION.  AND IF IT'S A LOSS, WE HAVE TO

25       FIGURE OUT HOW TO SHARE THAT DECREASE IN WEALTH.

1    THAT'S A REFLECTION ON YOUR POTENTIAL FOR GETTING

2    BENEFIT ON.  BUT THERE IS -- THAT -- THAT DOESN'T

3    MEAN YOU GET A PENNY IN YOUR POCKET.

4        IF THE LIMITED PARTNERSHIP DECIDES, WHETHER FROM

5    THE DISCRETION OF THE GENERAL PARTNER OR BY -- BY

6    PRIOR AGREEMENT, TO ACTUALLY PAY OUT THINGS OF VALUE

7    TO THE OWNERS IN RESPECT TO THEIR OWNERSHIP INTEREST,

8    THAT'S A DISTRIBUTION.  AND -- AND THEY'RE ALMOST

9    ALWAYS CASH DISTRIBUTIONS.

10        THAT THEN HAS TO BE REFLECTED IN THE -- IN THE

11    CAPITAL ACCOUNT BY A DECREASE.  BECAUSE ONCE THAT --

12    THAT -- THAT PROPERTY OR THAT MONEY HAS BEEN PAID OUT

13    OF THE ENTERPRISE, THE ENTERPRISE IS NOW LESS

14    WEALTHY.  SO WE HAVE TO -- WE HAVE TO BRING THE

15    OWNERS' STAKE DOWN TO -- TO THAT.

16  Q.  AND WHAT WOULD OCCUR IF ALLOCATED PROFITS WERE

17    INSUFFICIENT TO FUND CASH DISTRIBUTIONS?

18  A.  WELL, ASSUMING THAT YOU MADE A CASH DISTRIBUTION,

19    WHAT WOULD HAPPEN WOULD BE THAT AS YOU DECREASED YOUR

20    CAPITAL ACCOUNT, ONCE YOU -- ONCE YOU WENT BELOW WHAT

21    HAD BEEN ALLOCATED TO THE PARTNER IN PROFIT, THERE'S

22    STILL WEALTH THAT -- THAT CAN BE WITHDRAWN.  BUT WHAT

23    YOU'RE DOING IS, YOU'RE DECREASING YOUR CAPITAL

24    ACCOUNT BELOW WHERE IT STARTED.  WHICH MEANS THAT

25    YOU'RE ESSENTIALLY CANNIBALIZING YOUR OWN INVESTMENT.

1  Q.   AND -- I'M SORRY.  CONTINUE.

2  A.   AND IF YOU LOOK AT WHAT WOULD HAPPEN THEN UPON EITHER

3       THE LIQUIDATION OF THE ENTERPRISE OR IF THERE IS A

4       BUYOUT OF A PARTNER, THAT IS CALCULATED IN TERMS OF A

5       CAPITAL ACCOUNT, YOU CANNIBALIZE YOUR CAPITAL

6       ACCOUNT, MEANS YOU'RE GOING TO GET LESS BACK.  YOU

7       DON'T GET A RETURN OF YOUR ORIGINAL INVESTMENT.

8  Q.   AND IS IT COMMON IN LIMITED PARTNERSHIPS FOR PROFIT

9       ALLOCATIONS TO DIFFER FROM DISTRIBUTIONS?

10 A.   FROM -- FROM TIME TO TIME, YES.  AND IT WAS -- TO

11      GIVE A -- TO GIVE AN EXAMPLE OF THAT, THAT'S A --

12      DIFFERENT FROM -- FROM THIS SITUATION TO SORT OF SHED

13      LIGHT BY THE CONTRAST.

14           SOMETIMES WHAT HAPPENS IS THE LIMITED

15      PARTNERSHIP WILL MAKE A PROFIT.  BUT IT WILL WANT TO

16      KEEP ALL OF THAT PROFIT TO USE IT.  AND SO IT WON'T

17      DISTRIBUTE IT.  IN THAT EVENT, THE -- THE CO-OWNERS

18      HAVE TAX LIABILITY BECAUSE THEY'VE GOT THE PROFITS

19      BUT THEY GOT NO MONEY.

20 Q.   PROFESSOR KLEINBERGER, HAVE YOU REVIEWED THE PATENT

21      LICENSE AGREEMENT BETWEEN CHEMTECH I AND THE DOW

22      CHEMICAL COMPANY, WHICH IS IN EVIDENCE AS "JOINT

23      EXHIBIT 2 CAPITAL O"?

24 A.   I HAVE.

25 Q.   AND HAVE YOU ALSO REVIEWED THE LEASE AGREEMENT

1    BETWEEN CHEMTECH II AND THE DOW CHEMICAL COMPANY,

2    WHICH IS IN EVIDENCE AS "JOINT EXHIBIT 3T"?

3  A.   YES I HAVE.

4  Q.   BASED ON YOUR PRACTICAL EXPERIENCE, IS IT NORMAL FOR

5    LIMITED PARTNERSHIPS TO NEGOTIATE CONTRACTUAL

6    ARRANGEMENTS THAT PRODUCE RELATIVELY STABLE CASH

7    FLOWS?

8  A.   IT DEPENDS ON THE NATURE OF THE DEAL.  IT'S CERTAINLY

9    NORMAL FOR A WHOLE TYPE OR SUBCATEGORY OF LIMITED

10    PARTNERSHIPS.

11       LIMITED PARTNERSHIPS RUN THE GAMUT FROM HIGHLY

12    SPECULATIVE, WHERE YOU WOULD EXPECT THE RETURNS AND

13    REWARDS TO BE HIGH, TO VERY VERY STABLE.  SO IN THOSE

14    SET OF CIRCUMSTANCES WHERE PEOPLE ARE POOLING THEIR

15    RESOURCES SO THAT THEY CAN HAVE ACCESS TO A STREAM OF

16    VALUE THAT THEY OTHERWISE WOULDN'T HAVE, IT -- IT'S

17    CHARACTERISTIC TO TRY TO LOCK UP THOSE -- THOSE --

18    THAT STREAM OF RESOURCES.

19  Q.   AT PAGE 26 OF HIS REPORT, DR. HUBBARD STATES, AND I

20    QUOTE.  "VARIOUS ELEMENTS OF THE AGREEMENT APPEAR

21    SUFFICIENTLY REMOVED ANY MEANINGFUL RISK OF

22    GENERATING INSUFFICIENT PROFITS."  END QUOTE.

23       DOES THAT STATEMENT UNDERMINE YOUR OPINIONS

24    RELATING TO CHEMTECH?

25  A.   NO.  IT -- IT CORRESPONDS WITH MINE, IN THE SENSE

1   THAT THAT'S WHAT I'M TALKING ABOUT.  THERE ARE

2   SITUATIONS IN WHICH THE DEAL IS FOR A SAFE INVESTMENT

3   BY THE OWNERS.  THERE ARE -- FOR EXAMPLE, IF YOU'RE A

4   PENSION FUND AND YOU'RE GOING TO INVEST IN A LIMITED

5   PARTNERSHIP INTEREST, YOU'RE GOING TO WANT THERE TO

6   BE A PRETTY STABLE SOURCE OF THE PREFERRED RETURN,

7   IF THAT'S WHAT YOU BARGAIN FOR.  OTHERWISE, YOU KNOW,

8   PENSION FUNDS ARE -- THEY HAVE TO BE.  THEY'RE

9   SUPPOSED TO BE VERY PRUDENT INVESTMENTS.

10  Q.  PROFESSOR KLEINBERGER, HAVE YOU REVIEWED THE DOW

11  LIMITED PARTNER GUARANTEE?

12  A.  YES.

13  Q.  WHAT'S YOUR UNDERSTANDING OF THE -- OF THE SUBSTANCE

14  OF THAT DOCUMENT?

15  A.  THE -- THE -- THE DOW GUARANTEES WERE ESSENTIALLY

16  WHEREVER THERE WAS AN OBLIGATION IMPOSED BY THE DEAL

17  ON A DOW SUBSIDIARY, A PARENT GUARANTEED THAT

18  OBLIGATION.

19  Q.  ARE THESE TYPES OF PERFORMANCE GUARANTEES COMMONLY

20  FOUND IN LIMITED PARTNERSHIP ARRANGEMENTS?

21  A.  ANY TIME YOU HAVE A SOPHISTICATED INVESTOR, DEALING

22  WITH A -- AN ENTITY THAT HAS SUBSIDIARIES, IT IS MORE

23  THAN COMMON PLACE.  IT WOULD BE REALLY ASTOUNDING IF

24  THE PARENT DID NOT GUARANTEE.  THE ONLY EXCEPTION

25  WOULD BE IF THE -- WELL, ACTUALLY I CAN'T EVEN THINK

1    OF AN EXCEPTION.  I'VE NEVER SEEN AN EXCEPTION.

2  Q.  ARE YOU AWARE OF WHETHER THE CHEMTECH PARTNERSHIP HAD

3    A LIMITED LIFE?

4  A.  I AM AWARE.

5  Q.  DID IT?

6  A.  NO.

7  Q.  WOULD YOU PLEASE TURN TO SECTION 14.1 OF "JOINT

8    EXHIBIT 2L" AT BATES CT36571?

9  A.  I'M THERE.

10 Q.  THIS SECTION IS TITLED OPTIONAL LIQUIDATION EVENTS.

11   AND LISTS 23 SEPARATE EVENTS THAT PERMIT THE

12   INVESTORS TO INITIATE AN EXIT FROM THE PARTNERSHIP.

13     DO THESE PROVISIONS RESULT IN A PARTNERSHIP

14   HAVING AN EFFECTIVE LIMITED LIFE?

15 A.  NO.  IF YOU WANT A LIMITED LIFE TO A PARTNERSHIP, YOU

16   CREATE A TERM OF YEARS MONTHS AND DAYS AND WHATEVER.

17   AND IN THAT EVENT THE PARTNERSHIP WILL DISSOLVE.  IT

18   WILL BE OBLIGED TO WIND UP ITS BUSINESS, UNLESS THE

19   CO-OWNERS AGREE OTHERWISE.

20     THESE OPTIONAL EVENTS ARE MORE IN THE NATURE OF

21   A PUT AND CALL.  AND SO THAT -- SO THEY'RE

22   DISTINGUISHED IN TWO WAYS.

23     ONE, ONLY IF ONE PART OR ANOTHER PICKS UP THE

24   OPTION, SO TO SPEAK, THE -- DO THINGS CHANGE.

25     SECONDLY, ALTHOUGH THE FIRST STEP IN ONE OF THE

```
 1        LIMITED PARTNERS DECIDE THEY WANT TO DO SOMETHING
 2        WITH ALL THESE PROVISIONS, THE FIRST STEP IS GIVING
 3        NOTICE SAYING BASICALLY WE'RE GOING TO LIQUIDATE.
 4        BUT THE -- THEN THAT CREATES AN IMMEDIATE RIGHT IN
 5        THE OTHER PARTNERS TO AVOID THE LIQUIDATION BY BUYING
 6        OUT THE -- THE PEOPLE WHO WANT TO LIQUIDATE.
 7             SO PRACTICALLY SPEAKING, IT'S -- IT'S LIKE A --
 8        A PUT OPTION.
 9   Q.   NOW, ARE THESE TYPES OF PROVISIONS COMMONLY FOUND IN
10        LIMITED PARTNERSHIP ARRANGEMENTS?
11   A.   IN MANY, MANY LIMITED PARTNERSHIP ARRANGEMENTS.
12        PARTICULARLY ONES WHEN PEOPLE ARE INVESTING -- PEOPLE
13        WHO PAY MAJOR, MAJOR ASPECT OF -- OF THE DEAL IS
14        UNDER WHAT CIRCUMSTANCES CAN THE INVESTOR GET HIS OR
15        MOST USUALLY ITS MONEY OUT.  SO, YES, THEY ARE
16        COMMON.  IT MIGHT BE-- IF YOU -- YES.  THEY --
17        THEY'RE COMMON IN THIS TYPE OF -- OF DEAL.
18   Q.   PROFESSOR KLEINBERGER, DO THE INVESTORS' INTERESTS
19        HAVE LIMITED LIVES?
20   A.   DO THE INVESTORS INTERESTS HAVE LIMITED LIVES?  NO.
21        I MEAN, THEY -- IN THE SENSE THAT THE -- THE LIMITED
22        PARTNERSHIP INTEREST CONTINUE -- CONTINUE IN
23        EXISTENCE AS LONG AS THE LIMITED PARTNERSHIP IS IN
24        EXISTENCE.  OR -- AND YOU -- YOU COULD STRUCTURE A
25        BUYOUT IN A NUMBER OF WAYS.  YOU MIGHT BUY IN THE
```

1      AGREEMENT -- YOU MIGHT BUY THE LIMITED PARTNERS'

2      INTERESTS, IN WHICH CASE IT WOULD CONTINUE.  YOU

3      MIGHT BUY THE LIMITED PARTNER OUT AND THEN SELL THAT

4      SAME SORT OF STAKE IN THE VENTURE TO SOMEBODY ELSE.

5           SO -- BUT -- BUT LIMITED PARTNERSHIP OWNERSHIP

6      IS NOT LIKE CORPORATE STOCK, IN THE SENSE THAT

7      THERE'S NO SUCH THING AS TREASURY STOCK.

8   Q.  AT PAGE 41 OF HIS REPORT, DR. HUBBARD STATES, AND I

9       QUOTE.  "MY REVIEW OF THE DOCUMENTS SUGGEST THAT

10      CHEMTECH, AND THEREFORE THE CLASS A INTERESTS,

11      EFFECTIVELY HAVE A LIMITED LIFE."  END QUOTE.

12           DO YOU AGREE WITH DR. HUBBARD?

13  A.  WELL, I -- I MEAN, MY VIEW IS WHAT I JUST SAID.  AND

14      IF YOU WANTED A LIMITED LIFE IRRESPECTIVE OF THE WAY

15      PEOPLE THINK OF LIMITED PARTNERSHIPS, OKAY, THEN YOU

16      WOULD CREATE A LIMITED PARTNERSHIP FOR A PARTICULAR

17      TERM.  AND THAT WASN'T THE CASE HERE.  IT WAS A

18      LIMITED PARTNERSHIP THAT WAS CONTINUING INDEFINITELY

19      UNTIL AND UNLESS SOMEBODY HAD A RIGHT TO GET OUT OR

20      PUSH THE OTHER PERSON OUT.  EXERCISE THAT RIGHT.

21  Q.  NOW, ARE YOU AWARE THAT THE PARTIES HAVE ENTERED INTO

22      FACT STIPULATIONS WHERE THEY HAVE -- THE PARTIES HAVE

23      STIPULATED THAT THE INVESTMENT IN CHEMTECH II

24      EXTENDED ITS INITIAL INVESTMENT FOR AN ADDITIONAL

25      FIVE YEARS?  ARE YOU AWARE OF THAT FACT?

1  A.  I AM.

2  Q.  IS THAT CONSISTENT WITH YOUR TESTIMONY THAT THESE ARE

3      OPTIONAL EVENTS?

4  A.  YES.  ALONG WITH THE FACT THAT CHEMTECH II IS THE

5      SAME LIMITED PARTNERSHIP AS CHEMTECH I.  IT'S THE

6      SAME LEGAL ENTITY.

7  Q.  WHAT DO YOU MEAN BY THAT?

8  A.  WHAT I MEAN IS THAT ALTHOUGH THEY -- A NEW INVESTOR

9      CAME IN AND NEW ASSETS CAME IN, IT'S STILL THE SAME

10     ENTITY.  THEY NEVER -- DIDN'T EVEN SET UP A NEW

11     LIMITED PARTNERSHIP.  THEY USED THE OLD ONE AND THEY

12     CHANGED ITS NAME.

13 Q.  DO ANY OF THE PROVISIONS OF SECTION 14.1 ALLOW THE

14     INVESTORS TO FORCE THE PARTNERSHIP INTO BANKRUPTCY?

15 A.  NO.  NO.  THAT WOULD BE UNCHARACTERISTIC OF A LIMITED

16     PARTNER.

17 Q.  AND WHY DO YOU SAY THAT?

18 A.  WELL, IN ORDER TO FORCE SOMEBODY TO BANKRUPTCY, YOU

19     HAVE TO BE A CREDITOR.  YOU HAVE TO SAY, I AM OWED A

20     SPECIFIC DEBT.  AND THE -- THE -- THE PERSON THAT

21     OWES ME THAT MONEY CAN'T PAY BECAUSE THEY'RE

22     INSOLVENT.  BUT A LIMITED -- A CLASS A LIMITED

23     PARTNERS DIDN'T HAVE AN OBLIGATION TOWARDS THAT.  NO

24     ONE PROMISED THEM UNCONDITIONALLY THAT THEY WOULD GET

25     ANYTHING.  THEY HAD RIGHTS IF THINGS DIDN'T TURN OUT

1    THE WAY THEY LIKED, THEY COULD GET OUT.  BUT THE

2    COULDN'T -- IF -- IF -- BUT THEY -- THEY COULDN'T SAY

3    YOU'VE BREACHED THE CONTRACT.

4  Q.  PROFESSOR, WOULD YOU PLEASE TURN TO SECTION 12.2,

5    "JOINT EXHIBIT 2L," AT BATES CT36565?  AND THIS

6    PROVISION ALSO CARRIES OVER TO 66, AS WELL.

7  A.  OKAY.

8  Q.  WOULD YOU PLEASE EXPLAIN TO THE COURT YOUR

9    UNDERSTANDING OF THE SUBSTANCE OF THIS PROVISION?

10 A.  YES.  TERM OF -- OF ART.  WHEN A PARTNERSHIP

11   DISSOLVES, THAT IS NOT THE END OF THE PARTNERSHIP.

12   IT'S THE BEGINNING OF THE END.  WHAT THEN HAPPENS IS

13   A PROCESS OF WINDING UP THE PARTNERSHIP.  YOU MARTIAL

14   THE ASSETS.  YOU PAY OFF THE CREDITORS, IF YOU HAVE

15   ENOUGH MONEY.  IF THERE'S -- IF THERE'S MONEY LEFT

16   OVER, THEN YOU RETURN IT TO THE PEOPLE WHO ARE CALLED

17   THE RESIDUAL CLAIMANTS, TO THE OWNERS, THEIR SHARE OF

18   THE WEALTH THAT'S LEFT OVER.

19 Q.  AND IN THIS -- UNDER THIS AGREEMENT, WHO ARE THE

20   RESIDUAL CLAIMANTS?

21 A.  THE PARTNERS.

22 Q.  AND IS THIS A TYPICAL PROVISION OF A LIMITED

23   PARTNERSHIP ARRANGEMENTS?

24 A.  IT'S UNIVERSAL.  YOU -- IN THE SENSE THAT IN A

25   LIMITED PARTNERSHIP YOU MUST PAY OR MAKE PROVISIONS

1    FOR -- PRIOR TO THE LIQUIDATION YOU MUST PAY OR MAKE

2    PROVISIONS FOR YOUR CREDITORS BEFORE YOU RETURN

3    ANYTHING TO THE -- TO THE OWNERS TO THE LIMITED

4    PARTNERS IN GENERAL.  IT'S THE -- YOU CAN'T CHANGE

5    THEM.

6  Q.  AT BATES 39 OF HIS REPORT, DR. HUBBARD REFERS TO

7    CERTAIN LIMITATIONS ON THE ABILITY OF CHEMTECH TO

8    INCUR DEBT AND EXPENSE.  AND STATES THAT, AND I

9    QUOTE. "THESE RESTRICTIONS RESULTED IN A STRUCTURE

10   WITH A LIMITED PRIORITY RISK TO THE CLASS A

11   INTERESTS."  END QUOTE.

12      HOW DOES THAT STATEMENT IMPACT YOUR OPINIONS

13   REGARDING CHEMTECH?

14 A.  WELL, AGAIN, I'M TALKING HERE ABOUT WHAT MY

15   EXPERIENCE IS WITH REGARD TO THE WAY PEOPLE USE

16   LIMITED PARTNERSHIPS.  AND IT IS NOT AT ALL UNUSUAL.

17   THIS IS -- THIS IS SORT OF A DEAL PROTECTOR IN THE

18   SENSE THAT YOU UNDERSTAND THE NATURE OF WHAT THE

19   LIMITED PARTNERSHIP IS SUPPOSED TO BE DOING.  YOU

20   UNDERSTAND THE GENERAL PARTNER HAS FULL AUTHORITY TO

21   MANAGE THE ENTERPRISE TOWARDS THAT END.  THEN YOU

22   START, AS I SAID, RESTRICTING WHAT THE GENERAL

23   PARTNER CAN DO THAT WOULD MESS UP THE DEAL.  AND --

24   OR CHANGE THE DEAL.

25      SO, YOU KNOW, I -- I'M NOT SAYING THAT I'VE

1    SEEN, YOU KNOW, THIS IN IT'S EXACT PROVISIONS,

2    INCLUDING THIS ONE ALL THE TIME.  WHAT I AM SAYING IS

3    THAT YOU SEE THOSE KINDS OF CONSTRAINTS COMMONLY.

4         YOU KNOW, FOR EXAMPLE, IF YOU HAVE A -- A

5    LIMITED PARTNERSHIP THAT'S GOING TO BUILD A -- AND --

6    AND RENT OUT THE -- A SHOPPING CENTER.  IT'S NOT

7    UNUSUAL TO HAVE THE LIMITED PARTNERSHIP AGREEMENT

8    REQUIRING A GENERAL PARTNER ANNUALLY TO PROPOSE A

9    BUSINESS PLAN AND A BUDGET TO LIMIT THIS.  AND IT

10   WILL LIMIT A RIGHT TO PROVE THAT.  AND THEN THE

11   GENERAL PARTNER HAS TO STICK TO IT.

12        SO THESE KINDS OF STRICTURES ARE, AS I SAID,

13   FOUND COMMONLY AND THEY PROTECT THE DEAL.

14 Q.  WOULD YOU PLEASE TURN TO "JOINT EXHIBIT 2B" IN YOUR

15   BINDER, WHICH I BELIEVE IS THE FIFTH TAB.

16 A.  I'M THERE.

17        BY THE COURT:

18            MR. LEONARD, HOW MUCH LONGER DO WE HAVE?

19        BY MR. LEONARD:

20            I HAVE ABOUT FIVE OR TEN MINUTES, YOUR

21        HONOR.

22        BY THE COURT:

23            OKAY.  WELL, WHY DON'T WE TRY TO FINISH UP

24        BEFORE WE TAKE OUR FIRST BREAK.

25        BY MR. LEONARD:

1              OKAY.

2          BY THE COURT:

3              SO PLEASE CONTINUE.

4   BY MR. LEONARD:

5   Q.   THIS IS THE INVESTMENT AGREEMENT BETWEEN CHEMTECH AND

6        BBL, ONE OF THE BANK INVESTORS.  HAVE YOU REVIEWED

7        THIS AGREEMENT IN ITS ENTIRETY?

8   A.   THIS IS "2B"?  INFO COMPANY -- SIGNATURE PAGE?  OKAY.

9        I HAVE -- I HAVE REVIEWED IT.  I'M JUST LOOKING FOR

10       THE SIGNATURE PAGE.  BUT I -- I -- I ACCEPT YOUR

11       ASSERTION THAT'S WHO SIGNED IT.

12  Q.   WOULD YOU PLEASE TURN TO SECTION 7.2 AT PAGE CT35794?

13  A.   OKAY.

14  Q.   COULD YOU PLEASE EXPLAIN TO THE COURT YOUR

15       UNDERSTANDING OF THIS PROVISION?

16  A.   THE -- THE ONE THAT BEGINS ON THAT PAGE, 7.2?

17  Q.   YES, SIR.

18  A.   THIS IS DOW PUTTING ITS -- ITS MONEY WHERE ITS MOUTH

19       WAS, IN THE SENSE -- AS PART OF THE DEAL THAT -- THAT

20       DOW OFFERED TO -- TO ITS INVESTORS WAS THAT YOU'RE

21       NOT GOING TO BE SUBJECT TO U.S. TAXES.  AND THE

22       INVESTORS DID WHAT I USED TO DO ALL THE TIME.  WHEN

23       SOMEONE SAYS, THIS IS GOING TO HAPPEN.  I SAID,

24       YOU'RE SURE OF THAT?  AND THEY HAD -- THEY WOULD SAY,

25       YES.  SO, OKAY, PROMISE IT IF YOU'RE THAT SURE.  AND

1    THAT'S WHAT THIS IS.

2        DOW SAID, YOU WILL NOT BE TAXED.  AND THEY SAID,

3    OKAY.  GIVE US COMFORT.  PROMISE US THAT IF YOU'RE

4    WRONG, YOU WILL TAKE THE HIT, NOT US.

5  Q.  AND IS THAT A COMMON PROVISION IN LIMITED PARTNERSHIP

6    ARRANGEMENTS?

7  A.  GENERALLY, YES.  AND SPECIFICALLY WITH REGARD TO

8    TAXES.  WHEN -- YES.  WHEN PEOPLE MAKE

9    REPRESENTATIONS ABOUT THEM.

10 Q.  WOULD YOU PLEASE TURN TO "JOINT EXHIBIT 192"?

11 A.  OKAY.

12 Q.  THIS IS A 1993 DOW ANNUAL REPORT.  AND IF YOU TURN TO

13    PAGE CT68542.

14 A.  I AM THERE.

15 Q.  IF YOU LOOK IN THE FOURTH PARAGRAPH, THE LAST

16    SENTENCE STATES -- AND THIS IS DESCRIBING THE

17    CHEMTECH ARRANGEMENT.

18        BY MR. SCHREIBER:

19            YOUR HONOR, I OBJECT TO THIS DOCUMENT

20        COMING IN AT THIS TIME.  IF YOU WILL LOOK AT DR.

21        -- I'M SORRY, PROFESSOR KLEINBERGER'S REPORT, HE

22        LOOKS AT DOCUMENTS HE CONSIDERED IN HIS REPORT.

23        THIS DOCUMENT IS NOT LISTED.  THAT'S NOT IN THE

24        SCOPE OF HIS TESTIMONY.  THIS IS -- THIS IS

25        COMING IN AS SUBSTANTIALLY DIRECT EVIDENCE.

1      BY THE COURT:

2          SO -- SO IN OTHER WORDS, HAVE YOU SEEN THIS

3      DOCUMENT BEFORE, DOCTOR?

4      BY THE WITNESS:

5          I HAVE SEEN IT, BUT NOT -- I MEAN, I

6      BELIEVE COUNSEL -- IT'S NOT ON THE LIST, I DID

7      NOT SEE IT WHEN I ---

8      BY THE COURT:

9          OKAY.  SO IF HE DIDN'T SEE IT, YOUR

10     OBJECTION IS THAT ---

11     BY MR. SCHREIBER:

12         SORRY, YOUR HONOR.  IT'S OUTSIDE THE SCOPE

13     OF HIS -- HIS EXPERT REPORT.  IT HASN'T BEEN

14     LISTED ---

15     BY THE COURT:

16         HE DIDN'T LIST IT IN THE EXPERT ---

17     BY MR. LEONARD:

18         YOUR HONOR, I'M NOT OFFERING -- I'M NOT

19     OFFERING THIS DOCUMENT FOR ANY SUBSTANTIVE

20     PURPOSES OTHER THAN TO ASK PROFESSOR KLEINBERGER

21     TO COMMENT.

22     BY THE COURT:

23         TO COMMENT ON THE REPORT ITSELF.  BUT HE

24     HASN'T HAD A CHANCE TO INCLUDE IT IN HIS REPORT.

25     SO I DON'T -- I GUESS THE GOVERNMENT'S POSITION

1            IS THAT THEY HAVEN'T HAD A CHANCE, TO THE EXTENT

2            HE WAS DEPOSED, TO EVEN ASK HIM ABOUT THAT,

3            CORRECT?

4            BY MR. SCHREIBER:

5                ABSOLUTELY, CORRECT, YOUR HONOR.  ANY

6            QUESTION THAT COUNSEL IS ASKING HIM TO THE

7            EXTENT THAT IT IS SUBSTANTIVE, I MEAN, THERE IS

8            NO NON-SUBSTANTIVE QUESTION HERE.  SO ---

9            BY THE COURT:

10                YES.  WELL, I -- I'LL SUSTAIN THE

11            OBJECTION.  WHY DON'T WE MOVE ON TO -- TO

12            ANOTHER.

13   BY MR. LEONARD:

14   Q.   PROFESSOR KLEINBERGER, YOU WERE PRESENT DURING ANDREW

15        SHERMAN'S TESTIMONY YESTERDAY AND TODAY; IS THAT

16        CORRECT?

17   A.   YES, I WAS.

18   Q.   TO WHAT EXTENT WAS HIS TESTIMONY REGARDING THE

19        STRUCTURE ON OPERATIONAL ASPECTS OF THE CHEMTECH II

20        PARTNERSHIP, AS WELL AS RBDC'S INTEREST IN CHEMTECH

21        II SPECIFICALLY CONSTANT WITH YOUR UNDERSTANDING OF

22        LIMITED PARTNERSHIPS AND WHAT YOU SAID TODAY?

23   A.   COMPLETELY CONSISTENT.

24   Q.   FINALLY, PROFESSOR KLEINBERGER, DR. HUBBARD AFFIXED

25        FOOTNOTE THREE OF HIS REPORT STATES THAT, QUOTE, "TO

1      PROVIDE AN OPINION ON WHETHER THE CLASS A INTERESTS

2      WERE IN SUBSTANCE A DEBT OR EQUITY INVESTMENT, IT IS

3      NECESSARY TO EVALUATE THE CHARACTERISTICS RELATIVE TO

4      THEORETICALLY PURE DEBT IN COMMON EQUITY CLAIMS." END

5      QUOTE.

6            IS DR. HUBBARD'S FRAMEWORK SUITABLE FOR

7      ANALYZING LIMITED PARTNERSHIP INTERESTS?

8  A.  WHAT I -- WHAT I CAN TELL YOU IS ONLY WHAT I KNOW

9      ABOUT THE WAY PEOPLE UNDER -- WHO USE LIMITED

10     PARTNERSHIPS UNDERSTAND THEIR INTERESTS.  AND THEY DO

11     NOT UNDERSTAND THEIR INTERESTS, THEIR OWNERSHIP

12     INTERESTS, AS LIKE COMMON STOCK.  IT'S -- IT'S NOT A

13     FRAME OF REFERENCE.

14           THEY -- IF -- IF AND WHEN THEY MOVE TO THE

15     CORPORATE SIDE FOR A FRAME OF REFERENCE IT WOULD --

16     IN A SITUATION LIKE THIS, THEY WOULD LOOK AT

17     PREFERRED STOCK, NOT COMMON STOCK.

18           ALSO, THE IDEA -- AGAIN, I -- I'M ONLY TALKING

19     ABOUT WHAT PEOPLE IN MY WORLD, THE WAY THEY THINK.

20     OKAY?  THE -- THE NOTION THAT -- THAT YOU WILL HAVE

21     TO CHARACTERIZE BY POLAR OPPOSITES IS -- IT'S -- I

22     THINK IT'S FAIR TO SAY IT ANTITHETICAL TO THE WAY

23     PEOPLE THINK OF LIMITED PARTNERSHIP INTERESTS.  THAT

24     IS TO SAY, YOU'RE GOING TO STRUCTURE THEM IN VARIOUS

25     WAYS.  AND IN SOME -- AND SO BOTH -- BUT, AGAIN, IN

1    MY WORLD, THE FRAME OF REFERENCE TO -- TO COMMON

2    STOCK WOULD NOT COMPUTE IN MY -- IN MY WORLD.  NOR

3    WOULD THE NOTION OF THESE POLAR OPPOSITES IN ONE

4    PERSPECTIVE.

5  Q.  THANK YOU, PROFESSOR.

6        BY MR. LEONARD:

7            YOUR HONOR, I HAVE NO FURTHER QUESTIONS.

8        BY THE COURT:

9            OKAY.  THANK YOU, MR. LEONARD.  IT IS NOW

10        10:35.  WE HAVE RUN QUITE LONG THIS MORNING.

11        LET'S TAKE A 15-MINUTE BREAK.

12            AND, DOCTOR, WHEN WE RESUME, YOU WILL BE

13        CROSS-EXAMINED BY MR. SCHREIBER AT THAT TIME.

14        OKAY?

15            COURT IS IN RECESS.

16            (THEREFORE, AT THIS TIME, THE COURT IS IN

17            RECESS.)

18            (THEREFORE, AT THIS TIME, THE PROCEEDINGS

19            WERE RESUMED.)

20        BY THE COURT:

21            BE SEATED.

22            OKAY.  ARE YOU READY FOR CROSS-EXAMINATION,

23        MR. SCHREIBER?

24        BY MR. SCHREIBER:

25            YES, YOUR HONOR.  THANK YOU.

1          BY THE COURT:

2                 PLEASE PROCEED.

3             BY MR. SCHREIBER:

4                 YOUR HONOR, MAY I APPROACH THE WITNESS?

5             BY THE COURT:

6                 YOU MAY.

7                        CROSS-EXAMINATION

8    BY MR. SCHREIBER:

9    Q.   GOOD MORNING, PROFESSOR KLEINBERGER.

10   A.   GOOD MORNING.

11   Q.   MR. KLEINBERGER, PLEASE TURN TO "EXHIBIT 2" OF YOUR

12        REPORT, IF YOU WOULD, PLEASE.  THE VERY BACK LAST TWO

13        PAGES.  YOU GOT IT?

14   A.   I HAVE IT.

15   Q.   "EXHIBIT TO D. KLEINBERGER DOCUMENTS CONSIDERED."  DO

16        YOU SEE THAT, SIR?

17   A.   I DO.

18   Q.   AND YOU LISTED HERE ALL THE MATERIALS YOU CONSIDERED

19        IN REACHING YOUR OPINION IN YOUR REBUTTAL REPORT; IS

20        THAT CORRECT?

21   A.   YES.  BEST OF MY KNOWLEDGE AT THAT TIME.

22   Q.   SO THE BEST OF YOUR KNOWLEDGE.  IF SOMETHING ISN'T

23        LISTED HERE, THEN YOU DIDN'T CONSIDER IT FOR PURPOSES

24        OF CREATING YOUR OPINION; ISN'T THAT CORRECT?

25   A.   THAT -- THAT IS CORRECT.

1    Q.   TO THE BEST OF YOUR KNOWLEDGE, OF COURSE.

2         SO LOOKING AT "EXHIBIT 2," IF YOU -- LOOK UNDER

3    EXTRA REPORTS.  JUST TO BE CLEAR, YOU DIDN'T CONSIDER

4    THE EXPERT REPORT OF KEN STERN, DID YOU?

5    A.   THAT'S THE FIRST TIME I'VE HEARD THAT NAME.

6    Q.   OKAY.  SO THE ANSWER IS NO?

7    A.   I'M SORRY.  THE ANSWER IS NO.

8    Q.   OKAY.  IF YOU'LL TURN TO THE SECOND PAGE, SIR, UNDER

9    DEPOSITIONS.  DO YOU SEE THAT?

10   A.   YES, SIR.

11   Q.   LOOKING AT THIS LIST, YOU DIDN'T CONSIDER THE

12   DEPOSITION TESTIMONY OF PEDRO REINHARD, A DOW

13   TREASURER AND CFO; ISN'T THAT RIGHT?

14   A.   THAT IS CORRECT.

15   Q.   AND YOU'VE BEEN SITTING THROUGH TRIAL, AS YOU

16   MENTIONED ON YOUR DIRECT EXAMINATION.  SO YOU'RE

17   AWARE THAT SEVERAL DOW EMPLOYEES HAVE -- HAVE

18   TESTIFIED THAT THIS TRANSACTION -- THIS CHEMTECH

19   TRANSACTION, WAS BASICALLY HIS BABY, FOR LACK OF A

20   BETTER WORD?

21   A.   I'M ---

22   Q.   ISN'T IT THE FOCAL POINT OF TESTIMONY?  CAN I PUT IT

23   THAT WAY?

24   A.   THERE WERE A LOT OF QUESTIONS ASKED ABOUT IT.  YES.

25   Q.   OKAY.  AND YOU DIDN'T CONSIDER HIS DEPOSITION IN

1      REACHING YOUR OPINION; ISN'T THAT CORRECT?

2  A.   THAT IS CORRECT.

3  Q.   YOU ALSO DIDN'T CONSIDER THE DEPOSITION TESTIMONY OF

4      CRAIG JONES, CHUCK HAHN OR BILL CURRY; ISN'T THAT

5      CORRECT?

6  A.   THAT'S ALSO CORRECT.

7  Q.   AND THOSE WERE ALL DOW TAX LAWYERS, RIGHT?

8  A.   I ACCEPT YOUR STATEMENT.  I DON'T ---

9  Q.   I'M SORRY.  YOU DIDN'T CONSIDER THE DEPOSITION

10      TESTIMONY OF DAVID ACKERT, THE GOLDMAN SACHS HEAD OF

11      PROJECT DEVELOPMENT; ISN'T THAT CORRECT?

12  A.   THAT'S ALSO CORRECT.

13  Q.   YOU DIDN'T CONSIDER THE DEPOSITION TESTIMONY OF

14      WILLIAM EDWARDS FROM ARTHUR D. LITTLE, THE PATENT

15      EVALUATION FIRM?

16  A.   THAT IS ALSO CORRECT.

17  Q.   YOU DIDN'T CONSIDER THE DEPOSITION TESTIMONY OF SANDY

18      HALLMARK, OUTSIDE COUNSEL FOR DOW, WHO HELPED DRAFT

19      THE TRANSACTIONS DOCUMENTS; ISN'T THAT CORRECT?

20  A.   THAT'S CORRECT.

21  Q.   NOW, TURNING TO THE -- TO THE COMPANY DOCUMENTS, THE

22      BUSINESS DOCUMENTS.  OKAY.  YOU LISTED HERE THE ONES

23      WITH THE CT BATES PREFIXES.  DO YOU SEE THAT, SIR?

24  A.   YES.

25  Q.   IT COVERS BOTH PAGES.  LOOKING -- LOOKING AT HIS LIST

1     ON THIS PAGE AND THE NEXT, IT'S TRUE, ISN'T IT, THAT

2     IN FORMULATING YOUR REPORT CONSIDERED APPROXIMATELY

3     LESS THAN 2,000 PAGES OF INFORMATION THAT WERE

4     PRODUCED IN THIS CASE?

5  A.  I HAVEN'T ADDED IT UP.  IF YOU'RE TELLING ME THAT'S

6     WHAT IT ADDS UP TO, I ACCEPT THAT.

7  Q.  WELL, PROFESSOR KLEINBERGER, I HAVE FOUR REAMS OF

8     PAPER.  DO YOU REMEMBER ABOUT FOUR OF THESE BEFORE

9     WRITING YOUR REPORT?

10 A.  IT'S BEEN A LONG TIME.  BUT I -- I -- I'M NOT ARGUING

11    WITH YOU.  IF YOU'RE TELLING ME THAT WHAT I'VE LISTED

12    HERE ADDS UP TO WHAT YOU SAY IT ADDS UP TO, I ACCEPT

13    THAT.  AND THAT'S -- THE ANSWER IS YES.

14 Q.  ARE YOU AWARE THAT BY THE TIME YOUR REPORT WAS

15    SUBMITTED IN THIS CASE, OVER 95,000 PAGES HAVE BEEN

16    PRODUCED IN THE COURSE OF DISCOVERY?

17 A.  I WAS NOT AWARE OF THAT.

18 Q.  SO ROUGHLY SPEAKING, YOUR 2,000 PAGES IS A TINY

19    FRACTION OF DOCUMENTS THAT WERE AVAILABLE FOR YOU TO

20    CONSIDER IN WRITING YOUR REPORT; ISN'T THAT RIGHT?

21 A.  THAT'S TRUE.  AND HAD I ASKED FOR ANYTHING, THEY

22    WOULD HAVE GIVEN IT TO ME.  THAT'S RIGHT.  ANYTHING

23    THAT WAS -- THAT I HAD -- I MEAN, THEY TOLD ME AT THE

24    OUTSET, ANYTHING YOU WANT, WE'LL GET IT FOR YOU.

25 Q.  YES.  BUT, SIR, YOU DIDN'T WANT ALL THOSE PAGES;

1       ISN'T THAT CORRECT?  YOU -- YOU LOOKED AT -- YOU

2       LOOKED AT TWO PERCENT OF THE DOCUMENTS THAT WERE

3       AVAILABLE TO YOU?

4    A.  YES.

5    Q.  AND LOOKING AT THIS, PROFESSOR KLEINBERGER, YOU'RE

6       AWARE, I ASSUME, THAT THE CT BATES PREFIX MEANS THE

7       DOCUMENT WAS PRODUCED BY DOW OR DOW AFFILIATE; ISN'T

8       THAT CORRECT?

9           BY THE COURT:

10              WAIT.  IS THERE -- IS THERE AN OBJECTION?

11          BY MR. LEONARD:

12              YOUR HONOR, I JUST HAVE A GENERAL OBJECTION

13          TO THE RELEVANCE OF THIS LINE OF QUESTIONING.

14          PROFESSOR KLEINBERGER'S OPINION IS BASED ON THE

15          DOCUMENTS THAT WERE EXECUTED, THE FORMAL

16          DOCUMENTS THAT WERE EXECUTED TO ENTER INTO THE

17          CHEMTECH PARTNERSHIP.

18          BY THE COURT:

19              I BELIEVE THAT'S WHAT HE TESTIFIED ABOUT.

20          I -- I UNDERSTAND YOUR POINT, MR. SCHREIBER.

21          THIS WITNESS DID NOT HAVE AN OPPORTUNITY,

22          PERHAPS DIDN'T REQUEST THE OPPORTUNITY, TO

23          REVIEW EVERY SINGLE DOCUMENT THAT WAS PRODUCED

24          IN DISCOVERY.  AND IT'S DULY NOTED.

25          BY MR. SCHREIBER:

1              YOUR HONOR, MY -- MY -- WELL, I DON'T WANT

2          TO I GUESS MY POINT OF COURT.  I DON'T WANT TO

3          GO INTO ARGUMENT.  BUT I'LL JUST CONTINUE, SIR.

4  BY MR. SCHREIBER:

5  Q.  PROFESSOR KLEINBERGER, LOOKING AT THIS, YOU'RE AWARE

6      THAT CT BATES PREFIX MEANS THE DOCUMENT WAS PRODUCED

7      BY DOW OR DOW AFFILIATES?

8          BY THE COURT:

9              ARE YOU AWARE OF THAT, SIR?

10  BY THE WITNESS:

11  A.  YES, I AM.

12  BY MR. SCHREIBER:

13  Q.  SO BASED THE PREFIXES YOU'VE LISTED HERE, YOU DIDN'T

14      CONSIDER ANY DOCUMENTS PRODUCED BY DELOITTE AND

15      TOUCH; ISN'T THAT RIGHT?

16  A.  THAT IS CORRECT.

17  Q.  OR RABO BANK?

18  A.  THAT IS CORRECT.

19  Q.  OR KREDIET BANK?

20  A.  THAT IS CORRECT.

21  Q.  OR PETERSON CONSULTING?

22  A.  THAT IS CORRECT.

23  Q.  OR THE INTERNAL REVENUE SERVICE?

24  A.  THAT IS CERTAINLY CORRECT.

25  Q.  THE ONLY PREFIX YOU LISTED WAS CT DOCUMENTS, CORRECT?

1   A.   THAT IS CORRECT.

2   Q.   PROFESSOR KLEINBERGER, YOU DIDN'T CONSIDER THE

3        GOLDMAN SACHS' -- GOLDMAN SACHS' PROMOTIONAL

4        PRESENTATION MATERIALS FROM 1992 IN YOUR REPORT;

5        ISN'T THAT RIGHT?  IT'S BATES LABEL CT11246 THROUGH

6        63.  "JOINT EXHIBIT A."  I BELIEVE IT'S IN YOUR

7        BINDER.

8   A.   THE ONLY -- I DON'T SEE IT HERE, SO I DIDN'T -- I

9        DON'T RECALL REVIEWING IT.  THE ONLY -- THE ONLY

10       QUALIFICATION TO THAT ANSWER WOULD THAT IF IN SOME OF

11       THE EXPERT REPORTS THAT I -- THAT I READ, I -- THERE

12       MAY HAVE BEEN REFERENCES TO THE PROMOTIONAL

13       MATERIALS.

14  Q.   PROFESSOR KLEINBERGER, YOU DIDN'T REVIEW THE -- WELL,

15       THE SAME CAVEAT, FROM WHAT I UNDERSTAND.  YOU DIDN'T

16       REVIEW THE GOLDMAN SACHS, WHAT'S BEEN CALLED THE IF-

17       MODEL EITHER; ISN'T THAT CORRECT?  AND A COPY OF THAT

18       IS IN YOUR BINDER, IF YOU WANT TO LOOK AT IT.

19  A.   AGAIN, UNLESS -- THE ANSWER IS NO.  UNLESS IT WAS IN

20       SOME WAY MENTIONED IN ONE OF THE EXPERT REPORTS.

21  Q.   NOW, PROFESSOR KLEINBERGER, YOUR FOCUS AS YOU

22       TESTIFIED AS A LAW SCHOOL PROFESSOR HAS BEEN THE LAW

23       OF BUSINESS ORGANIZATIONS, COMMERCIAL LAW AND

24       CONTRACTS, CORRECT?

25  A.   THAT'S THE -- THAT'S ONE PART.  WHAT I TESTIFIED TO

1        IS THAT I HAVE ALSO SPENT AN AWFUL LOT OF TIME

2        STUDYING THE WAY PEOPLE ACTUALLY USE THESE

3        ORGANIZATIONS.

4    Q.    EITHER WAY, SIR, YOU'RE NOT A TAX LAW EXPERT,

5        CORRECT?

6    A.    THAT IS ABSOLUTELY CORRECT.

7    Q.    AND YOU'RE NOT AN ACCOUNTING EXPERT?

8    A.    THAT IS ALSO CORRECT.

9    Q.    AND YOU'RE ALSO NOT FAMILIAR WITH THE ACCOUNTING

10        STANDARDS USED FOR DETERMINING WHETHER A SECURITY IS

11        DEBT OR EQUITY?

12   A.    THAT IS CORRECT.

13   Q.    AND IT -- IT WAS NOT PART OF YOUR ASSIGNMENT IN THIS

14        CASE TO LOOK AT MR. FINARD'S REPORT FROM THE

15        PERSPECTIVE  OF A CAPITAL MARKETS?

16   A.    NO.  I -- I -- I LOOKED AT HIS REPORT FROM THE SAME

17        PERSPECTIVE FROM WHICH I LOOKED AT MR. -- AT DR.

18        HUBBARD'S REPORT.

19   Q.    I UNDERSTAND THAT, SIR.  AND YOU'RE NOT AN EXPERT --

20        SPEAKING OF DR. HUBBARD, YOU'RE NOT AN EXPERT IN HOW

21        A TRANSACTION WOULD BE VIEWED FROM A FINANCE

22        PERSPECTIVE; ISN'T THAT RIGHT?

23   A.    THAT IS ABSOLUTELY CORRECT.

24   Q.    AND YOU MENTIONED THIS EARLIER.  AND YOU ALSO

25        MENTIONED -- MENTIONED THAT YOUR DEPOSITION SO IT

```
1          MUST HAVE STUCK.  YOU COULD PROVIDE A MARXIST
2          ECONOMIC PERSPECTIVE ON THIS TRANSACTION.  YOU'RE NOT
3          AN ECONOMIST, CORRECT?
4   A.    NO.  NOR AM I A MARXIST.
5                BY THE COURT:
6                     THAT'S GOOD TO HEAR.
7                BY THE WITNESS:
8                     I'VE LEARNED A LOT SINCE COLLEGE, YOUR
9          HONOR.
10               BY THE COURT:
11                    WE MAY HAVE TO CALL THE MARSHALS IN.  WE
12               MIGHT HAVE SOME MORE WORK TO DO AROUND HERE.
13                    ALL RIGHT.
14  BY MR. SCHREIBER:
15  Q.    SO, PROFESSOR KLEINBERGER, YOU WEREN'T ASKED TO
16        INVESTIGATE WHETHER THE FOREIGN BANKS' INTEREST WERE
17        MORE LIKE DEBT OR EQUITY FROM THE PERSPECTIVE OF AN
18        ECONOMIST; ISN'T THAT RIGHT?
19  A.    THAT'S ABSOLUTELY CORRECT.
20  Q.    YOU WERE ASKED -- WELL, SIR, YOU MENTIONED A TAX
21        COURT CASE IN WHICH YOU TESTIFIED?
22  A.    YES.
23  Q.    WAS THAT THE HOLMAN TAX COURT CASE?
24  A.    THAT IS.
25  Q.    OKAY.  ISN'T IT TRUE THAT THE TAX COURT IN THE HOLMAN
```

1  CASE ACCEPTED THE GOVERNMENT'S ARGUMENT THAT THE

2  LIMITED PARTNERSHIP WAS NOT A BONA FIDE BUSINESS

3  ARRANGEMENT, BUT WAS A MERE DEVICE TO TRANSFER

4  PROPERTY FOR LESS THAN ADEQUATE CONSIDERATION?

5  A.  I DO NOT RECALL.  IT TOOK FOREVER FOR THAT DECISION

6  TO BE RENDERED.  BUT I -- I DON'T HAVE A REASON TO --

7  TO DOUBT IT, ASSUMING MY TESTIMONY WAS THAT BASED ON

8  WHAT I KNEW AND THE PARTNERSHIP AGREEMENTS, IN FACT,

9  THAT THE TAXPAYER PRESENTED IN THAT CASE, THAT THIS

10  WAS NOT AN ARRANGEMENT THAT ANY ARM'S LENGTH INVESTOR

11  IN HIS OR HER RIGHT MIND WOULD HAVE MADE.

12  Q.  PROFESSOR KLEINBERGER, YOU -- RETURN TO YOUR REPORT.

13  I THINK IT'S "EXHIBIT 6," OR "PLAINTIFF'S EXPERT

14  EXHIBIT 6 -- PX6."

15  A.  I HAVE IT.

16  Q.  THANK YOU, SIR.  NOW, YOU CALLED YOUR REPORT A

17  REBUTTAL REPORT, CORRECT?

18  A.  YES.

19  Q.  SKIPPING THROUGH IT, I COULDN'T FIND ANY OF THE FOUR

20  GOVERNMENT EXPERT NAMES APPEAR ANYWHERE IN THE BODY

21  OF YOUR REPORT.  COULD YOU?

22  A.  I ACCEPT YOUR ---

23  Q.  WELL, YOU CAN TAKE A LOOK, SIR.  IT'S NOT THAT LONG.

24  A.  I ACCEPT YOUR REPRESENTATION.  WHY WOULD I DOUBT YOU?

25  Q.  YOU SHOULDN'T.  THANK YOU.  I APPRECIATE THAT.

1           PLEASE TURN, SIR, TO PAGE 20 OF YOUR REPORT.

2           BY THE COURT:

3               AND, BY THE WAY, I DO DOUBT MR. SCHREIBER

4           SOMETIMES.  BUT I MOST CERTAINLY DO ---

5           BY MR. SCHREIBER:

6               THANK YOU, YOUR HONOR.

7           BY THE COURT:

8               OKAY.

9   BY MR. SCHREIBER:

10  Q.   DO YOU HAVE PAGE 20?

11  A.   I DO.

12  Q.   NOW, THE LAST PARAGRAPH SAYS, "UPON DISSOLUTION, ANY

13       RETURN OF THE CLASS A LIMITED PARTNERS CAPITAL WAS

14       JUNIOR TO PAYMENTS OF ALL CREDITORS OF THE LIMITED

15       PARTNERSHIP, INCLUDING PARTNERS OF GUARANTEED

16       PAYMENTS."  DO YOU SEE THAT, SIR?

17  A.   I DO.

18  Q.   YOU'RE AWARE, AND YOU TESTIFIED IN YOUR DEPOSITION,

19       THAT CHEMTECH DIDN'T HAVE ANY SIGNIFICANT CREDITORS;

20       ISN'T THAT RIGHT?

21  A.   I BELIEVE THAT TO BE THE CASE.  YES.

22  Q.   SIR, PLEASE TURN TO PAGE 24 OF YOUR EXPERT REPORT.

23  A.   I'M THERE.

24  Q.   AND YOU STATE HERE THAT, QUOTE, "A LIMITED

25       PARTNERSHIP ARRANGEMENTS INVOLVED THE COMPLICATED

1    INVESTMENT STRUCTURE THROUGH WHICH DOW SOUGHT TO MEET

2    A KEY BUSINESS NEED WHILE COMPLYING WITH SEVERAL

3    OVERLAPPING CONCEPTUAL REGIMES; I.E., ENTITY LAW,

4    ACCOUNTING PRINCIPALS TAX LAW."  DID I READ THAT

5    CORRECTLY, SIR?

6  A.  YES, YOU DID.

7  Q.  OKAY.  SIR, AND YOU SAID EARLIER, YOU'RE NOT AN

8    ACCOUNTANT, CORRECT?

9  A.  YES.  THAT'S CORRECT.

10  Q.  SO YOU DON'T ACTUALLY KNOW WHETHER DOW COMPLIED --

11    USING YOUR WORD, YOUR WORD, COMPLIED WITH, QUOTE,

12    "ACCOUNTING PRINCIPALS" AS YOU SAY IN YOUR -- IN YOUR

13    REPORT; ISN'T THAT RIGHT?

14  A.  ACTUALLY, I DON'T SAY -- I DON'T THINK I MAKE THE

15    STATEMENT THAT YOU SAY I MADE.  I DIDN'T SAY THAT

16    THEY COMPILED.  I SAID, "WHAT THEY SOUGHT TO DO WAS

17    TO MEET THESE NEEDS WHILE COMPLYING WITH THE OTHERS."

18  Q.  FAIR ENOUGH.  YOU DIDN'T DO ANY OTHER -- YOU DIDN'T

19    DO AN ANALYSIS TO DETERMINE WHETHER DOW ACTUALLY

20    COMPLIED WITH ANY ACCOUNTING PRINCIPALS, AS YOU SAID?

21  A.  NO.  THAT'S NOT MY AREA OF EXPERTISE.

22  Q.  AND YOU'RE NOT A TAX LAWYER, AS YOU SAID, CORRECT?

23  A.  (NO RESPONSE)

24  Q.  AND SO YOU DIDN'T DO -- I'M SORRY.  I NEED AN AUDIBLE

25    RESPONSE TO THAT.

1   A.   I THOUGHT YOU MADE REFERENCE TO THE QUESTION.  I AM

2        NOT A TAX LAWYER.

3   Q.   AND SO YOU DON'T ACTUALLY KNOW WHETHER DOW HAD

4        COMPLIED WITH, QUOTE, "TAX LAW"; ISN'T THAT RIGHT?

5   A.   RIGHT.  THAT'S WHAT I BELIEVE THAT WE'RE DOING HERE.

6             BY MR. SCHREIBER:

7                  YOUR HONOR, I HAVE NO FURTHER QUESTIONS FOR

8             PROFESSOR KLEINBERGER AT THIS TIME.

9             BY THE COURT:

10                 THANK YOU, MR. SCHREIBER.

11                 MR. LEONARD, ANY RE-DIRECT?

12            BY MR. LEONARD:

13                 I HAVE -- JUST ONE MOMENT, YOUR HONOR.

14            BY THE COURT:

15                 SURE.

16            BY MR. LEONARD:

17                 THANK YOU, YOUR HONOR.

18                     RE-DIRECT EXAMINATION

19  BY MR. LEONARD:

20  Q.   PROFESSOR KLEINBERGER, I THINK MR. SCHREIBER ASKED

21       YOU A QUESTION ABOUT THE HOLMAN CASE.  AND HE WAS

22       AWARE OF WHETHER -- OR HE ASKED WHETHER YOU WERE

23       AWARE THAT THE GOVERNMENT'S THEORY PREVAILED IN THAT

24       CASE.

25            I BELIEVE YOU TESTIFIED ABOUT THIS ON DIRECT.

1          BUT COULD YOU JUST TELL US -- TELL THE COURT AGAIN

2          WHAT -- WHAT PARTY YOU REPRESENTED IN THAT CASE?

3    A.    I WAS RETAINED AS AN EXPERT BY THE INTERNAL REVENUE

4          SERVICE.

5    Q.    THANK YOU VERY MUCH.

6              BY MR. LEONARD:

7                  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

8              BY THE COURT:

9                  THANK YOU.  DR. KLEINBERGER, THANK YOU VERY

10         MUCH FOR COMING IN TODAY, SIR.  YOU ARE EXCUSED.

11             BY THE WITNESS:

12                 THANK YOU, YOUR HONOR.

13             BY THE COURT:

14                 AND, MR. MAGEE, YOU MAY CALL YOUR NEXT

15         WITNESS.

16             BY MR. MAGEE:

17                 THANK YOU, YOUR HONOR.  WE'RE GOING TO

18         CALL PROFESSOR MERLE ERICKSON.  AND HE WILL BE

19         EXAMINED BY MR. BLANCHARD.

20             BY THE COURT:

21                 VERY WELL.

22             BY MR. BLANCHARD:

23                 AND, YOUR HONOR, IF I JUST MAY HAVE ONE

24         MOMENT TO DISTRIBUTE PROFESSOR ERICKSON'S

25         BINDERS, HIS WITNESS BINDERS.

1    BY THE COURT:

2        MR. MAGEE, I'M GOING TO NEED YOU TO DO ME A

3    FAVOR BEFORE YOU LEAVE TOWN.  I'M GOING TO NEED

4    YOU TO GIVE MR. CASTILLE LESSONS ON HOW TO TIE A

5    BOW TIE BEFORE YOU LEAVE.

6    BY MR. CASTILLE:

7        YOUR HONOR, WHEN I WALKED IN THIS MORNING I

8    KNEW THAT COMMENT WAS COMING.  AND I WANT YOU TO

9    KNOW I'VE BEEN PRACTICING.

10   BY THE COURT:

11       ALL RIGHT.  I'M GOING TO TEST YOU, THEN, AT

12   THE END OF THE DAY.

13   BY MR. CASTILLE:

14       AND I WILL FAIL MISERABLY.

15   BY THE COURT:

16       THANK YOU.

17   BY MR. MAGEE:

18       NOT IF I INSTRUCT HIM, YOUR HONOR.

19   BY THE COURT:

20       OKAY.

21   BY THE CLERK:

22       RAISE YOUR RIGHT HAND.

23

24

25

1   THE WITNESS, MERLE ERICKSON, AFTER HAVING FIRST BEEN DULY

2   SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

3   THE TRUTH, TESTIFIED AS FOLLOWS:

4           BY THE CLERK:

5               PLEASE STATE AND SPELL YOUR NAME FOR THE

6           RECORD.

7           BY THE WITNESS:

8               MY NAME IS MERLE ERICKSON, M-E-R-L-E.

9           LAST NAME ERICKSON, E-R-I-C-K-S-O-N.

10          BY THE COURT:

11              YOU MAY PROCEED.

12          BY MR. BLANCHARD:

13              GOOD MORNING, AGAIN, YOUR HONOR.  HARTY

14          BLANCHARD ON BEHALF OF PLAINTIFF.

15                      DIRECT-EXAMINATION

16  BY MR. BLANCHARD:

17  Q.   GOOD MORNING, DR. ERICKSON.

18  A.   GOOD MORNING.

19  Q.   PROFESSOR ERICKSON, YOU PREPARED THREE EXPERT REPORTS

20       IN THIS CASE; IS THAT CORRECT?

21  A.   YES, IT IS.

22  Q.   AND THOSE SHOULD BE IN FRONT OF YOU IN YOUR BINDER.

23       THEY'VE BEEN ADMITTED INTO EVIDENCE AS "PEX 3, 4" AND

24       "5."

25  A.   I DON'T HAVE A BINDER, MR. BLANCHARD.  I'M SORRY.

1  Q.  EXCUSE ME.

2  A.  OKAY.

3  Q.  THEY NOW SHOULD BE IN FRONT OF YOU.

4  A.  YES, SIR.

5  Q.  AS "EXHIBITS PEX 3, 4" AND "5," CORRESPONDING TO YOUR

6      INITIAL REPORT, YOUR REBUTTAL REPORT, AND YOUR

7      SUPPLEMENTAL REBUTTAL REPORT.

8          AND THEN YOU SUBMITTED A FULL CV AS "EXHIBIT A"

9      TO YOUR INITIAL REPORT.  SO I JUST WANT TO FOCUS ON A

10     FEW AREAS OF YOUR BACKGROUND.

11         YOU'RE CURRENTLY PROFESSOR OF ACCOUNTING AT THE

12     UNIVERSITY OF CHICAGO'S BOOTH SCHOOL OF BUSINESS?

13 A.  THAT'S CORRECT.

14 Q.  IS THAT A TENURED POSITION?

15 A.  YES, IT IS.

16 Q.  WHAT'S THE REPUTATION OF CHICAGO'S BOOTH SCHOOL OF

17     THE ACCOUNTING DEPARTMENT WITHIN CHICAGO'S BOOTH

18     SCHOOL OF BUSINESS?

19 A.  IT HISTORICALLY WOULD BE CONSIDERED ONE OF THE TOP

20     ACCOUNTING DEPARTMENTS IN THE COUNTRY, IF NOT THE

21     BEST.

22 Q.  YOU HOLD A PH.D. IN ACCOUNTING?

23 A.  YES, I DO.

24 Q.  DO YOU ALSO -- ARE YOU ALSO A CERTIFIED PUBLIC

25     ACCOUNTANT?

1   A.   YES, I AM.

2   Q.   WHAT AREAS OF ACCOUNTING HAVE YOU FOCUSED ON IN YOUR

3        SCHOLARSHIP?

4   A.   THE TWO BASIC AREAS THAT -- THE WAY IN WHICH TAXES

5        AFFECT BUSINESS DECISIONS, AND, ALSO, THE WAY IN

6        WHICH GAAP ACCOUNTING OR FINANCIAL ACCOUNTING

7        POLICIES AFFECT THE WAY IN WHICH FIRMS ENGAGE IN

8        TRANSACTIONS AND -- AND THE EFFECTS OF THOSE -- THOSE

9        KINDS OF FACTORS ON VARIOUS ISSUES, MARKETS, ET

10       CETERA.

11  Q.   COULD YOU EXPAND ON THAT A LITTLE BIT MORE, EACH OF

12       THOSE TWO AREAS?

13  A.   SURE.  SO I'M -- SOME OF THE RESEARCH I'VE DONE

14       FOCUSES ON THE WAY IN WHICH CERTAIN ELEMENTS OF THE

15       TAX LAW AFFECT THE WAY IN WHICH MERGES AND

16       ACQUISITIONS ARE STRUCTURED AND PRICED, HOW TAXES

17       AFFECT THE PRICES PAID IN ACQUISITIONS, HOW TAXES

18       AFFECT SECURITY PRICES, THOSE KINDS OF THINGS.

19            WITH REGARD TO THE GAAP ACCOUNTING ISSUES, I'VE

20       DONE STUDIES ON THE WAY IN WHICH GAAP RULES OR

21       POLICIES AFFECT THE WAY IN WHICH FINANCING

22       TRANSACTIONS OCCUR AND VARIOUS OTHER TYPES OF AFFECTS

23       OF GAAP ACCOUNTING.

24  Q.   COULD YOU DESCRIBE YOUR TEACHING RESPONSIBILITIES?

25  A.   SURE.  I -- I TEACH A CLASS IN OUR MBA PROGRAM CALLED

1    TAXES AND BUSINESS STRATEGY.  AND I ALSO TEACH A

2    VARIETY OF EXECUTIVE EDUCATION COURSES THAT DEAL IN

3    -- IN MANY CASES WITH DISTINCT TOPICS IN MY MBA

4    CLASS.  I ALSO TEACH SOME FINANCIAL ACCOUNTING

5    COURSES OR FINANCIAL STATEMENT ANALYSIS COURSES FOR

6    BUSINESSES OUT IN THE CHICAGO AREA.

7  Q.  HAVE YOU AUTHORED ANY TEXTBOOKS IN CONNECTION WITH

8    YOUR TEACHING?

9  A.  YES, I HAVE.  I'M THE CO-AUTHOR OF THE TEXTBOOK

10    TITLED TAXES AND STRATEGY THAT'S CURRENTLY IN ITS

11    FOURTH EDITION.  WE'RE STARTING WORK ON THE 5TH.  I'M

12    ALSO THE AUTHOR OF, EXCUSE ME, A CASE BOOK TITLED

13    CASES IN TAX STRATEGY.  AND I'VE CO-AUTHORED SOME OF

14    THE CASES IN THAT BOOK.  AND THERE ARE SOME OTHER

15    PEOPLE THAT HAVE WRITTEN CASES, AS WELL.

16  Q.  PROFESSOR ERICKSON, I UNDERSTAND YOU'VE TESTIFIED

17    PREVIOUSLY AS AN EXPERT WITNESS IN ACCOUNTING?

18  A.  YES, I HAVE.

19  Q.  HAVE ANY OF THOSE CASES INVOLVED TAX ISSUES?

20  A.  THEY HAVE.

21  Q.  AND HAVE YOU TESTIFIED FOR THE GOVERNMENT IN THOSE

22    CASES OR FOR THE TAXPAYER?

23  A.  SOMETIMES I TESTIFIED FOR THE TAXPAYER, SOMETIMES FOR

24    THE GOVERNMENT.

25  Q.  ALL RIGHT.  PROFESSOR ERICKSON, WHAT I'D LIKE TO DO

1    IS TURN TO THE SUMMARY OF THE THREE MAIN OPINIONS YOU

2    GAVE IN THIS CASE AND THE CONCLUSIONS THAT YOU

3    REACHED, AND WE'LL COME BACK AND LOOK AT EACH ONE IN

4    A LITTLE MORE DETAIL.

5    AND IF WE COULD PLEASE TAKE A LOOK NOW AT

6    "PLAINTIFF'S DEMONSTRATIVE 3."  AND YOUR FIRST

7    OPINION IN THIS CASE IS THAT IT WAS REASONABLE FOR

8    DOW TO BELIEVE THAT IT WOULD ACHIEVE A SUBSTANTIAL

9    ECONOMIC ADVANTAGE BY STRUCTURING CHEMTECH TO RAISE

10    MINORITY EQUITY CLIENTS.

11    WHAT WERE THE FAVORABLE ACCOUNTING IMPACTS IN

12    THE CHEMTECH TRANSACTION?

13  A.    TWO BASIC FAVORABLE FINANCIAL ACCOUNTING IMPACTS.

14    THE FIRST IS THAT THE CHEMTECH TRANSACTION ALLOWED

15    DOW TO RAISE CAPITAL IN A WAY THAT WAS NOT DEBT ON

16    ITS BALANCE SHEET.  IT WAS AN EQUITY TRANSACTION,

17    WHICH IMPROVED DOW'S DEBT TO CAPITAL RATIOS, WHICH WE

18    HEARD DISCUSSED AT LENGTH BY BOTH MR. FALLA AND MR.

19    MERSZEI.

20    THE SECOND ACCOUNTING BENEFIT WAS REFERRED TO AS

21    THE MONETIZATION, WHICH WAS -- THIS TRANSACTION

22    ALLOWED DOW TO, EXCUSE ME, REALIZE BOTH CASH

23    ASSOCIATED WITH THE PATENTS AND HAD VERY LOW BOOK

24    VALUE, AS WELL AS TO DISCLOSE TO THE MARKET THAT IT

25    HAD ASSETS ON ITS BALANCE SHEET WITH LOW BOOK VALUES

1    BUT SUBSTANTIAL ECONOMIC VALUE.

2  Q.   ALL RIGHT.  AND, AGAIN, WE'RE GOING TO COME BACK TO

3       THE DETAILS.  BUT IF YOU COULD JUST TELL ME NOW AT A

4       GENERAL LEVEL. HOW DID YOU ASSESS THE REASONABLENESS

5       OF DOW'S BELIEF BOTH IN 1993 WHEN IT ENTERED INTO THE

6       CHEMTECH I TRANSACTION AND THEN AGAIN IN 1998 WHEN

7       THE TRANSACTION WAS RESTRUCTURED INTO CHEMTECH II?

8  A.   SURE.  SO I DID A COUPLE OF THINGS.  I LOOKED AT

9       DOW'S FINANCIAL CONDITION IN 1990 -- IN THE EARLY

10      1990'S AND IN THE LATE 1990'S AS WELL, CHEMTECH II.

11      AND I PLACED DOW'S FINANCIAL POSITION RELATIVE TO THE

12      STATEMENTS BY DOW'S EXECUTIVES ABOUT THEIR

13      MOTIVATIONS TO DO CHEMTECH, WHICH WAS TO OBTAIN

14      FAVORABLE BALANCE SHEET TREATMENT AND IMPROVE DOW'S

15      DEBT-TO-CAPITAL RATIOS, IN ADDITION TO THE

16      MONETIZATION BENEFIT.

17          THEN WHAT I DID WAS I COMPARED DOW'S OBJECTIVES

18      IN CHEMTECH TO THE ACTIONS OF OTHER EXECUTIVES BASED

19      UPON MY PROFESSIONAL EXPERIENCE, BASED UPON THE

20      PRACTITIONER LITERATURE, ARTICLES WRITTEN BY CFO'S

21      AND MAGAZINES LIKE FINANCIAL EXECUTIVE, AS WELL AS

22      ACADEMIC ARTICLES THAT STUDY WHAT KIND OF FACTORS

23      INFLUENCE EXECUTIVE BEHAVIOR.

24          AND THEN, FINALLY, I LOOKED AT -- AND -- AND

25      DREW UPON MY KNOWLEDGE OF THE WAY IN WHICH THE IRS

1    AND -- AND VARIOUS BRANCHES OF THE GOVERNMENT HAVE

2    VIEWED TRANSACTIONS IN WHICH TAXPAYERS HAVE SOUGHT TO

3    IMPROVE THEIR BALANCE SHEETS IN THE WAY IN WHICH DOW

4    DID.

5  Q.  OKAY.  LET'S -- LET'S TURN NOW TO "PLAINTIFF'S

6    DEMONSTRATIVE 4."  AND YOUR SECOND OPINION IS THAT

7    DOW'S CONSOLIDATED ACCOUNTING OF THE CLASS A LIMITED

8    PARTNER INTEREST AS MINORITY EQUITY WAS PROPER.  WHAT

9    ARE THE OBJECTIVES OF CONSOLIDATED GAAP?

10 A.  WELL, THE OBJECTIVES OF CONSOLIDATED GAAP ARE TO

11    PRESENT THE ECONOMICS OF THE CONSOLIDATED ENTITY.  IN

12    THIS CASE THE DOW CHEMICAL CORPORATION.  AND WE SAY

13    THE CONSOLIDATED ENTITY, WE MEAN THE DOW PARENT

14    COMPANY AND ALL THE ENTITIES IN WHICH IT OWNS MORE

15    THAN 50 PERCENT.  THE OBJECTIVE IS TO PRESENT THE

16    ECONOMICS OF THAT CONSOLIDATED GROUP OF BUSINESS

17    ENTITIES.

18 Q.  WHEN YOU TALK ABOUT THE BUSINESS ENTITIES THAT DOW

19    OWNED, WOULD THAT INCLUDE PARTNERSHIPS?

20 A.  YES.

21 Q.  WHAT DID YOU CONCLUDE REGARDING THE CONSOLIDATED GAAP

22    ACCOUNTING FOR CHEMTECH?

23 A.  I CONCLUDED THAT DOW'S CONSOLIDATED GAAP ACCOUNTING

24    WAS APPROPRIATE AND COMPLIED WITH GAAP.

25 Q.  WHAT IS MINORITY EQUITY OR MINORITY INTERESTS?

1  A.   MINORITY EQUITY IS A FORM OF EQUITY CAPITAL.  BUT

2       EFFECTIVELY WHAT IT IS, IS A EQUITY STAKE IN A

3       SUBSIDIARY COMPANY OF A PARENT.

4            SO, FOR EXAMPLE, DOW HAS A SUBSIDIARY COMPANY.

5       LET'S SAY THAT -- THAT MANUFACTURES A PARTICULAR TYPE

6       OF CHEMICAL.  DOW OWNS 80 PERCENT.  MAYBE TIAA-CREF

7       OWNS 20 PERCENT OF THE STOCK OF THAT COMPANY.  THE 20

8       PERCENT THAT CREF OWNS, THAT'S THE MINORITY EQUITY.

9       IT'S AN EQUITY POSITION.  IT'S JUST OWNED IN A

10      SUBSIDIARY OF A COMPANY LIKE DOW BY AN OUTSIDE PARTY.

11 Q.   WHAT DID YOU CONCLUDE ABOUT THE MINORITY EQUITY

12      CLASSIFICATION OF THE CLASS A LIMITED PARTNER

13      INTERESTS IN THIS CASE?

14 A.   I CONCLUDED THAT DOW'S MINORITY EQUITY ACCOUNTING

15      UNDER GAAP WAS APPROPRIATE.

16 Q.   LET'S LOOK NOW AT "PLAINTIFF'S DEMONSTRATIVE 5."

17      IT'S THE LAST OF YOUR THREE OPINIONS THAT THE

18      CHEMTECH PARTNERSHIP BOOK ACCOUNTING ACCURATELY

19      REFLECTS THE ECONOMIC BARGAIN AMONG THE PARTIES.  AND

20      YOU -- YOU DESCRIBED BRIEFLY DOW'S CONSOLIDATED

21      ACCOUNTING REPRESENTING THE ECONOMICS OF DOW AND IT'S

22      CONSOLIDATED SUBSIDIARIES.

23           JUST AS A CONCEPTUAL MATTER, HOW DOES A

24      PARTNERSHIP BOOK ACCOUNTING, HOW DOES THE GOAL OF

25      PARTNERSHIP BOOK ACCOUNTING DIFFER FROM THAT OF

1       CONSOLIDATED GAAP ACCOUNTING?

2   A.  SURE.  SO, AGAIN, THE CONSOLIDATED GAAP ACCOUNTING IS

3       DESIGNED TO TRACK THE ECONOMICS OF THE DOW

4       CONSOLIDATED ENTITY IN ALL THE SUBSIDIARY HOLDINGS.

5           THE PARTNERSHIP BOOK ACCOUNTING IS DESIGNED TO

6       TRACK THE ECONOMICS OF JUST THE CHEMTECH PARTNERSHIP.

7       THAT'S THE DIFFERENCE, THE SCOPE DIFFERENCE.

8   Q.  DID THE PARTNERSHIP BOOK ACCOUNTING ACHIEVE THOSE

9       GOALS WITH RESPECT TO CHEMTECH?

10  A.  YES, IT DID.

11  Q.  OKAY.  ALL RIGHT.  LET'S SORT OF GO BACK NOW AND LOOK

12      AT EACH ONE OF THESE THREE OPINIONS IN MORE DETAIL.

13          SO LET'S PUT BACK "PLAINTIFF'S DEMONSTRATIVE 3"

14      ONTO THE SCREEN.

15          AS WE DISCUSSED, YOUR INITIAL REPORT, "PEX3,"

16      CONCLUDED THAT IT WAS REASONABLE FOR DOW TO BELIEVE

17      THAT THE CHEMTECH PARTNERSHIP WOULD PROVIDE

18      SUBSTANTIAL ECONOMIC BENEFITS.  AND AS I THINK IS

19      FOOTNOTED ON THIS DEMONSTRATIVE, THAT'S DISCUSSED,

20      AMONG OTHER PLACES, AT PAGES 61 TO 84 OF "PEX3."

21          PROFESSOR ERICKSON, YOU'VE HEARD THE TESTIMONY

22      OF MR. FALLA DURING THIS TRIAL?

23  A.  YES, I HAVE.

24  Q.  AND YOU'VE HEARD THE TESTIMONY OF MR. MERSZEI AS

25      WELL?

1  A.   YES, I HAVE.

2  Q.   HAVE YOU ALSO REVIEWED THE PARTIES' JOINT STIPULATION

3       OF FACT SUBMITTED IN THE CASE?

4  A.   I HAVE.

5  Q.   TO WHAT EXTENT, IF AT ALL, ARE THE TESTIMONY AND

6       STIPULATIONS CONSISTENT WITH THE OPINIONS EXPRESSED

7       IN YOUR REPORT?

8  A.   THEY'RE CONSISTENT.  IF ANYTHING, THE TESTIMONY OF

9       MR. FALLA AND MR. MERSZEI STRENGTHENS THOSE VIEWS AND

10      THOSE POSITIONS.

11 Q.   NOW, WITH RESPECT TO YOUR FIRST OPINION, I'D LIKE YOU

12      TO HELP US UNDERSTAND IN A LITTLE BIT MORE DETAIL THE

13      POTENTIAL BENEFITS OF THE ACCOUNTING TREATMENT HERE.

14           BY WAY OF REVIEW, WHAT WAS THE BENEFICIAL

15      ACCOUNTING TREATMENT?

16 A.   AGAIN, THE BENEFICIAL ACCOUNTING TREATMENT WAS

17      RAISING CAPITAL THE WAY IT WAS NOT DEBT ON DOW'S

18      FINANCIAL STATEMENTS.  EXCUSE ME.  IN DOING SO, DOW

19      IS -- EXCUSE ME.  DOW RAISED CAPITAL THAT WAS EQUITY

20      ON ITS AUDITED FINANCIAL STATEMENTS AND, THEREFORE,

21      THAT CAPITAL IMPROVED DOW'S DEBT-TO-CAPITAL RATIOS,

22      WHICH ARE AN IMPORTANT RATIO FOR A VARIETY OF

23      REASONS, AS WAS ARTICULATED QUITE LENGTHY AND A QUITE

24      LENGTHY WAY BY MR. FALLA AND MR. MERSZEI.  BUT IT WAS

25      ALSO DISCUSSED IN OUR REPORTS.

1  Q.  AND HAVE YOU CONSIDERED ANY OTHER POTENTIAL BENEFITS

2      TO THE ACCOUNTING TREATMENT?

3  A.  YES.  AGAIN, THERE'S THE MONETIZATION THAT WE

4      DISCUSSED WHERE DOW THAT HAD IN THE CHEMTECH I

5      TRANSACTION, PATENTS, AN INTANGIBLE ASSET THAT HAD A

6      VERY LOW BOOK VALUE.  AND THOSE -- THOSE LOW BOOK

7      VALUE ASSETS WERE UTILIZED IN THIS FINANCING

8      TRANSACTION.  AND ALLOWED DOW TO DISCLOSE TO THE

9      MARKET THAT IT HAD ASSETS WITH A LOW BOOK VALUE, BUT

10      SUBSTANTIAL ECONOMIC VALUE ON ITS FINANCIAL

11      STATEMENTS.

12  Q.  OKAY.  I'D LIKE TO TALK ABOUT EACH OF THOSE ELEMENTS.

13         WHY DID EQUITY TREATMENT MATTER?

14  A.  WELL, AGAIN, WE -- WE -- WE HEARD THE TESTIMONY OF

15      MR. FALLA AND MR. MERSZEI.  BUT JUST TO REITERATE, IN

16      1992 DOW'S DEBT-TO-CAPITAL RATIOS WERE ABOVE THE

17      THRESHOLD OF -- OF THE 40 PERCENT THAT WAS TALKED

18      ABOUT AT LENGTH BY DOW AND -- AND IT WAS MENTIONED

19      HERE QUITE A BIT THIS WEEK, ABOUT 42 AND A HALF

20      PERCENT.  DOW WAS CONCERNED ABOUT A RATING DOWN

21      GRADE.  AND, AS I UNDERSTAND, IT WAS ENGAGED IN A

22      VARIETY OF ACTIONS TO TRY TO IMPROVE ITS DEBT-TO-

23      CAPITAL RATIO.  ONE OF THOSE ACTIONS WAS THE CHEMTECH

24      TRANSACTION IN WHICH DOW RAISED, I BELIEVE, CAPITAL

25      WHICH REDUCED AND IMPROVED DOW'S DEBT-TO-CAPITAL

1       RATIO.

2  Q.   WE'VE HEARD A LOT ABOUT CREDIT RATING.  WHY WAS

3       CREDIT RATING IMPORTANT?

4  A.   WELL, AGAIN, A CREDIT RATING IS IMPORTANT TO -- TO

5       AFFIRM FOR A VARIETY OF REASONS.  IT AFFECTS THIS

6       COST TO CAPITAL AT WHAT RATE BORROWERS ---

7       IT CAN ALSO AFFECT -- AGAIN, MR. MERSZEI TALKED ABOUT

8       AFFIRMS DEALING WITH ITS STAKEHOLDERS AND SUPPLIERS

9       AND EMPLOYEES, AS MR. MERSZEI TESTIFIED.

10          IT'S MY UNDERSTANDING AS WELL THAT IF A CREDIT

11      RATING DROPS BELOW A CERTAIN LEVEL FOR -- LIKE DOW,

12      THEY CAN LOSE ACCESS TO COMMERCIAL PAPER MARKETS FOR

13      THAT -- THAT SOURCE OF FUNDING CAN BECOME EXTREMELY

14      EXPENSIVE, RELATIVELY SPEAKING.  AND THAT CAN INHIBIT

15      THE FIRM'S ABILITY TO PURSUE THEIR STRATEGIC ACTIONS

16      AND CAN, IF YOU WILL, HAMSTRING A FIRM.

17 Q.   I'D LIKE TO TURN NOW TO THE MECHANICS OF THE DEBT TO

18      TOTAL CAPITAL RATIO THAT YOU'VE MENTIONED.  IF WE

19      COULD TURN TO "PLAINTIFF'S DEMONSTRATIVE 6."

20          PLEASE EXPLAIN, LOOKING AT THIS DEMONSTRATIVE,

21      THE COMPONENTS OF THE RATIO.

22 A.   SURE.  SO THE -- FIRST OF ALL, I WOULD NOTE THAT THIS

23      RATIO THAT'S ON THE DEMONSTRATIVE COMES FROM STANDARD

24      AND POOR'S.  THIS IS STANDARD AND POOR'S DEFINITION.

25          AND THAT THE DEBT-TO-TOTAL CAPITAL RATIO, WHICH

1    WE HEARD DISCUSSED EARLIER THIS WEEK, IS DEFINED AS

2    TOTAL DEBT IN THE NUMERATOR, DIVIDED BY TOTAL DEBT,

3    PLUS EQUITY IN THE DENOMINATOR.  SO TOTAL CAPITAL IS

4    -- IS TOTAL DEBT PLUS EQUITY.

5        NOW, IF WE LOOK TO THE GLOSSARY OF THE STANDARD

6    AND POOR'S DOCUMENT, WE SEE THE WAY THAT STANDARD AND

7    POOR'S DEFINES EACH OF THESE TERMS, WHICH WOULD, OF

8    COURSE, WE WOULD NEED TO KNOW TO UNDERSTAND THE

9    RATIO.

10       AND EQUITY IS SHAREHOLDERS EQUITY, INCLUDING

11   PREFERRED STOCK, PLUS MINORITY INTEREST.  SO YOU SEE

12   THERE THAT THAT MINORITY INTEREST CAPITAL THAT'S BEEN

13   TALKED ABOUT SO MUCH THIS WEEK AND THE CHEMTECH

14   TRANSACTION IS PART OF EQUITY IN THIS RATIO.

15       AND THEN WE HAVE, OF COURSE, THE DEFINITION OF

16   TOTAL DEBT, LONG-TERM DEBT, PLUS CURRENT MATURITIES,

17   COMMERCIAL PAPER, ET CETERA.

18 Q.  OKAY.  LET'S TURN TO "PLAINTIFF'S DEMONSTRATIVE 7."

19   USING THIS EXHIBIT, PLEASE, IF YOU COULD COMPARE THE

20   IMPACT OF RAISING THE DEBT VERSUS EQUITY CAPITAL?

21 A.  SURE.  SO THE -- THE ILLUSTRATION HERE JUST LAYS OUT

22   A VERY BASIC SETUP TO HELP UNDERSTAND HOW DIFFERENT

23   SOURCES OF FINANCING AFFECT THE DEBT-TO-CAPITAL

24   RATIO.

25       BUT IF WE START WITH OUR BASELINE EXAMPLE, WHICH

1    IS IN THE FIRST ROW, UNDER -- OUR BASELINE SETUP IS

2    $100.00 OF ASSETS, WHICH IS FINANCED $40.00 WITH DEBT

3    AND 60 OF EQUITY.  OUR TOTAL CAPITAL THEN IS 40 OF

4    DEBT PLUS 60 OF EQUITY OR 100.

5         THE DEBT TO CAPITAL RATIO THEN IS TOTAL DEBT OF

6    40, DIVIDED BY 100 OF THE CAPITAL OR 40 PERCENT.

7    THAT'S THE 40 PERCENT APPROXIMATE BENCHMARK THAT

8    WE'VE TALKED ABOUT SO MUCH.

9         NOW, WHAT IF A FIRM IN THAT SITUATION WERE TO

10   RAISE $10.00 OF DEBT, WHAT WOULD BE THE EFFECT ON THE

11   DEBT TO CAPITAL RATIO?  WELL, THE FIRM ISSUES $10.00

12   OF DEBT, GETS $10.00 CASH.  SO TOTAL ASSETS GO UP BY

13   10 TO 110.  THE TOTAL DEBT ALSO GOES UP BY 10 FROM 40

14   TO 50, FROM ISSUED DEBT. EQUITY IS UNCHANGED.  TOTAL

15   CAPITAL IS NOW 110.  DEBT IS 50.  TOTAL CAPITAL IS

16   110.  THE DEBT TO CAPITAL RATIO RISES TO 45 AND A

17   HALF PERCENT.  IF THE FIRM ISSUES DEBT, THE DEBT TO

18   CAPITAL RATIO RISES.  THAT'S AN UNFAVORABLE CHANGE IN

19   THE DEBT-TO-CAPITAL RATIO FROM A RATING PERSPECTIVE.

20        SCENARIO TWO, ON THE OTHER HAND, IF THE FIRM

21   INSTEAD OF ISSUING DEBT, ISSUES MINORITY INTEREST

22   EQUITY, AGAIN, THE TOTAL ASSETS OF THE FIRM WILL BE

23   110.  THERE'S AN ADDITIONAL $10.00 OF -- OF RESOURCES

24   GENERATED FROM FINANCING, $10.00 CASH.  THE RIGHT-

25   HAND SIDE OF THE BALANCE SHEET HAS CHANGED, HOWEVER.

1    THERE'S NOW $40.00 OF DEBT AND $70.00 OF EQUITY.

2    DEBT HAS NOT CHANGED.  EQUITY HAS INCREASED.  SO MY

3    DEBT TO CAPITAL RATIO, WE HAVE 40 OF DEBT, DIVIDED BY

4    THE 110 OF CAPITAL.  OUR DEBT TO CAPITAL RATIO HAS

5    GONE DOWN TO 36.4 PERCENT.

6         SO THIS IS THE EFFECT THAT WE HEARD DOW'S

7    EXECUTIVES TALKING ABOUT.  THEY SOUGHT TO RAISE

8    MINORITY INTEREST EQUITY CAPITAL IN ORDER TO IMPROVE

9    THEIR DEBT-TO-CAPITAL RATIO.

10   Q.  NOW, THERE'S A SCENARIO THAT'S NOT LISTED ON THIS

11   EXHIBIT, BUT I'D LIKE TO ASK IF YOU COULD TAKE US

12   THROUGH AND EXPLAIN HOW THE BASELINE CASE WOULD VARY

13   IF THE CAPITAL THAT WERE RAISED WERE -- WERE A

14   MINORITY EQUITY CAPITAL THAT WAS THEN USED TO RETIRE

15   OR REPLACE EXISTING DEBT.

16   A.  SURE.  SO IN -- IN THAT CASE, WHAT WOULD HAPPEN IS

17   THE FIRM WOULD REALIZE $10.00 OF CASH, BUT THE $10.00

18   OF CASH WOULD BE PAID TO DEBT HOLDERS.  SO THE FIRM'S

19   TOTAL ASSETS WOULD NOT CHANGE.

20        WHAT WOULD CHANGE IS THE AMOUNT OF DEBT IN THE

21   CAPITAL STRUCTURE AND THE AMOUNT OF EQUITY.  DEBT

22   WOULD GO DOWN BY TEN TO 30.  EQUITY WOULD GO UP TO

23   70.  SO IN THAT SCENARIO, THE DEBT-TO-CAPITAL RATIO

24   WOULD GO DOWN TO 30 PERCENT, EVEN MORE THAN WHAT WE

25   SEE HERE IN SCENARIO TWO.

1  Q.    PROFESSOR ERICKSON, YOUR OPINION ON DOW'S ANTICIPATED

2        ECONOMIC BENEFIT RELIES PARTLY ON TESTIMONY FROM DOW

3        EXECUTIVES THAT DOW TARGETED 40 PERCENT AS A MAXIMUM

4        DEBT-TO-CAPITAL RATIO NECESSARY TO MAINTAIN ITS

5        RATINGS WITH THE RATING AGENCIES; IS THAT RIGHT?

6  A.    THAT'S CORRECT.

7  Q.    DID YOU MAKE ANY EFFORT TO VERIFY THE REASONABLENESS

8        OF DOW'S BELIEFS ABOUT THE SIGNIFICANCE OF THE DEBT

9        RATIO?

10 A.    YES, I DID.

11 Q.    AND WHAT DID YOU DO TO VERIFY THE REASONABLENESS?

12 A.    WELL, I REVIEWED SOME STANDARD AND POOR'S DOCUMENTS

13       THAT SPEAK TO GUIDELINES THAT STANDARD AND POOR'S HAS

14       WITH REGARD TO THE DEBT-TO-CAPITAL RATIO AND WHAT

15       LEVEL OF DEBT-TO-CAPITAL RATIO A PARTICULAR FIRM CAN

16       HAVE AS A -- AS GENERAL MAXIMUM WHILE MAINTAINING AN

17       A RATING.

18            SO FOR DOW, THE 40 PERCENT MAXIMUM DEBT-TO-

19       CAPITAL THAT THEY DISCUSSED CORRESPONDS TO A FIGURE

20       IN A CHART PUBLISHED BY STANDARD AND POOR'S EACH --

21       EACH AND EVERY YEAR FROM 1992 THROUGH WHATEVER YEAR I

22       ACTUALLY DOWNLOAD THE STANDARD AND POOR'S DOCUMENTS.

23       SO IT'S -- IT'S IN A MATRIX THAT STANDARD AND POOR'S

24       PUBLISHES.

25 Q.    OKAY.  LET'S TAKE A LOOK AT THAT MATRIX.  I'D LIKE TO

1    SHOW YOU WHAT'S BEEN MARKED "PLAINTIFF'S

2    DEMONSTRATIVE 8."  AND THIS IS SOURCE FROM ONE OF THE

3    CONTEMPORANEOUS S&P DOCUMENTS THAT I BELIEVE YOU

4    RELIED ON.  IT'S BEEN MARKED AND ADMITTED, ACTUALLY,

5    AS "EXHIBIT P12."

6         NOW, THE ROWS RUNNING ACROSS THE TOP OF THIS

7    CHART REFLECT RATING CATEGORY.  WHAT DOES RATING

8    CATEGORY REPRESENT?

9  A.  THAT'S THE FIRM'S CREDIT RATING AND IT -- AS I THINK

10    -- I THINK MAYBE MR. FALLA DISCUSSED THIS.  TRIPLE A

11    IS THE BEST.  DOUBLE-A IS THE NEXT BEST.  AND MOVING

12    ACROSS THE STREET TO DOUBLE-B BEING THE WORST ON THIS

13    CHART.

14  Q.  THE LEFT-HAND SIDE OF THE CHART REFERS TO COMPANY

15    BUSINESS RISKS PROFILE.  WHAT DOES THAT REFER TO?

16  A.  THAT REFERS TO A VARIETY OF FACTORS ABOUT, EXCUSE ME,

17    HOW RISKY THE -- THE BUSINESS IS AND HOW WELL

18    DIVERSIFIED THE FIRM IS, ET CETERA.  THE -- THE WAY

19    THIS CHART WORKS, AT THE TOP OF THE CHART, AN

20    EXCELLENT BUSINESS RISK IS THE BEST.  VERY WELL

21    MANAGED, DIVERSIFIED.  IT'S A SOLID COMPANY.  GOING

22    DOWN THE CHART YOU SEE THE VERY LAST ROW IS

23    VULNERABLE.  AND IT'S A FIRM THAT HAS SIGNIFICANT

24    BUSINESS RISKS, FOR WHATEVER REASON.

25  Q.  ARE YOU AWARE OF WHAT DOW'S BUSINESS RISK PROFILE

1    WAS, BOTH IN 1993 WHEN IT ENTERED INTO CHEMTECH I,

2    AND AGAIN IN 1998 WHEN IT ENTERED INTO CHEMTECH II?

3 A.   IT'S MY UNDERSTANDING THEY WERE CONSIDERED ABOVE

4    AVERAGE BY STANDARD AND POOR'S.  AND I THINK THE

5    TESTIMONY OF DOW'S EXECUTIVES CORROBORATED THAT.

6 Q.   CAN YOU EXPLAIN WHAT THIS CHART TELLS YOU THEN ABOUT

7    DOW AT THOSE TIMES?

8 A.   SURE.  SO IN THIS STANDARD AND POOR'S DOCUMENTS THAT

9    INCLUDE THE -- THIS TABULATION THAT WE'RE DISCUSSING.

10    STANDARD AND POOR'S REFERS TO THESE AS GUIDELINES FOR

11    RATINGS.  THOSE TWO RATIOS WE DISCUSSED, THIS ONE AND

12    THEN ANOTHER ONE THAT MR. FALLA HAD ELABORATED ON,

13    WHICH IS A CASH-FLOW TYPE OF RATIO.

14    BUT WHAT THESE -- DEBT-TO-CAPITALIZATION

15    GUIDELINE TELLS YOU IS THE APPROXIMATE OR THE MAXIMUM

16    DEBT-TO-CAPITAL RATIO THAT A FIRM COULD HAVE GIVEN A

17    LEVEL OF RISK CAN HAVE TO MAINTAIN A PARTICULAR

18    RATING.

19    SO IN THE CASE OF DOW, IF WE LOOK AT THIS CHART

20    AND WHAT WE HAVE ON MY SCREEN.  BUT IF WE LOOK AT

21    DOW, DOW IS ABOVE AVERAGE.  THEY WERE A-RATED.  DOW

22    WANTED TO MAINTAIN THAT A-RATING.  ACCORDING TO THE

23    S&P GUIDELINES, THE MAXIMUM DEBT-TO-CAPITAL RATIO,

24    APPROXIMATELY, THAT DOW COULD HAVE WAS 40 PERCENT.

25    IF THEY EXCEEDED THAT, THEY INCREASED THE LIKELIHOOD

1      OF BEING DOWNGRADED.

2   Q.   NOW, THE GOVERNMENT'S ECONOMIST, DR. HUBBARD, STATED

3        IN HIS REBUTTAL REPORT, WHICH IS "DEX5," PAGE 38,

4        THAT, QUOTE, "THE DEBT-TO-CAPITAL RATIO OF 41 PERCENT

5        IN 1993 STILL WOULD NOT HAVE APPROACHED THE 50

6        PERCENT AS SHOWN IN DR. ERICKSON'S REPORT.  AND AS

7        SPECIFIED BY S&P FOR COMPANIES WITH ABOVE-AVERAGE

8        BUSINESS POSITION RISKS, SUCH AS DOW."

9            WHY IS PROFESSOR HUBBARD, IF YOU KNOW, BASING

10       HIS ANALYSIS ON 50 PERCENT DEBT-TO-CAPITAL CEILING?

11  A.   I HAVE NO IDEA.  I -- I ASSUME HE MISREAD THE CHART

12       OR SOMEONE THAT WORKS FOR HIM MISREAD THE CHART.  AND

13       HE APPEARS TO HAVE CORRECTED IT IN HIS DEMONSTRATIVES

14       FOR THIS TRIAL AND IS NOW USING A 40 PERCENT FIGURE

15       IN ONE OF HIS DEMONSTRATIVES.

16  Q.   I'D LIKE TO SHOW YOU WHAT'S BEEN MARKED "PLAINTIFF'S

17       DEMONSTRATIVE 9."  THIS SHOWS DOW'S DEBT-TO-CAPITAL

18       RATIO FROM 1990 THROUGH 1998.

19           WHAT INFERENCES, IF ANY, CAN YOU DRAW FROM THIS

20       EXHIBIT?

21  A.   WELL, JUST TO -- TO CULL OUT WHAT THE EXHIBIT IS --

22       IS PRESENTING THE -- THE BAR CHARTS ARE -- THEY ARE

23       THE CAPITAL RATIOS FOR THE YEARS 1990 TO 1998.  AND

24       THE -- THE RED DASHED LINE ACROSS THE 40 PERCENT IS

25       -- IS DRAWN FROM THE TABLE THAT WE WERE JUST WORKING

1    WITH, WHERE THAT WAS THE 40 PERCENT MAXIMUM RATIO FOR

2    STANDARD AND POOR'S.

3        SO WHAT YOU SEE IS, IN 1992, DOW'S DEBT-TO-

4    CAPITAL RATIO HAD CREPT UP ABOVE 40 PERCENT AND --

5    AND WAS RISING.  AND THAT'S CONSISTENT WITH THE

6    TESTIMONY OF MR. FALLA AND MR. MERSZEI, THAT THEY

7    WERE -- HAD BEEN INFORMED THAT -- THAT DOW WAS

8    GETTING THEIR DEBT RATING DOWN -- DOWNGRADED.  I

9    DON'T REMEMBER IF MR. FALLA SAID THAT IT WAS MAYBE A

10   MIRACLE THAT THEY HADN'T BEEN DOWNGRADED OR -- OR HE

11   HAD MADE SOME COMMENT TO THAT EFFECT.

12       BUT THEN WHAT WE SEE HAPPENING IN 1993, WHICH IS

13   THE YEAR CHEMTECH I, IS DOW'S DEBT-TO-CAPITAL RATIO

14   DECLINES.  IT CONTINUES TO DECLINE THROUGH THE MID-

15   1990'S.  SO THIS IS CONSISTENT WITH THE TESTIMONY OF

16   DOW'S EXECUTIVES, THAT THEY FELT THAT THEY WERE UP

17   AGAINST A DEBT-TO-CAPITAL CEILING.  AND THEY TOOK

18   ACTIONS IN 1993 TO MITIGATE THE EFFECTS OF -- OF

19   THEIR RISING DEBT-TO-CAPITAL RATIO AND IMPROVE THAT

20   RATIO SO THAT THEY WOULD NOT BE DOWNGRADED.

21 Q.  AS YOU POINTED OUT TO US, PROFESSOR ERICKSON, THE

22   DEBT-TO-TOTAL CAPITAL RATIO DID EXCEED THIS 40

23   PERCENT WITHOUT A DOW BEING DOWNGRADED.  DOESN'T THAT

24   CALL INTO QUESTION 40 PERCENT AS THE CEILING ON DOW'S

25   DEBT-TO-TOTAL CAPITAL RATIO?

1  A.   IF YOU READ THE TEXT IN THE STANDARD AND POOR'S --

2       AND THE ANSWER IS NO.

3          IF YOU READ THE TEXT IN THE STANDARD AND POOR'S

4       REPORT, IT SAYS THAT A FIRM OF A GIVEN RISK CAN

5       TOLERATE ABOUT THIS 40 PERCENT LEVEL.  SO IT'S NOT AN

6       ABSOLUTE THRESHOLD THAT IF YOU CROSS IT YOU'RE DOWN

7       GRADED.  IT'S -- IT'S -- IT'S AN ABOUT THRESHOLD THAT

8       I THINK WE HEARD.  AGAIN, MR. FALLA AND MR. MERSZEI

9       TESTIFIED ABOUT THE ROLE THAT THIS PARTICULAR RATIO

10      PLAYED IN THEIR RATINGS AND THAT THEY WERE, IN THEIR

11      CONVERSATIONS WITH THE RATING AGENCIES, IT WAS

12      INDICATED THAT THEY WERE PRESSING UP AGAINST A DOWN-

13      GRADE BECAUSE OF THIS UNFAVORABLE CHANGE IN THEIR

14      DEBT-TO-CAPITAL RATIO.

15 Q.   I'D LIKE TO MOVE TO THE BENEFIT WE'VE HEARD REFEREED

16      TO AS MONETIZATION OF ASSETS WITH A LOW BOOK VALUE,

17      BUT SUBSTANTIAL ECONOMIC VALUE.

18         IF YOU COULD JUST TELL US FIRST, WHAT DOES IT

19      MEAN FOR PURPOSES OF GAAP ACCOUNTING FOR AN ASSET TO

20      HAVE A LOW BOOK VALUE?

21 A.   GENERALLY WHAT WE MEAN THERE IS THAT THE VALUE OF THE

22      ASSET ON THE GAAP FINANCIAL STATEMENTS IS LOW.  IT --

23      IT DOESN'T CORRESPOND TO THE -- TO THE ECONOMIC VALUE

24      OF -- OF THE ASSET IN QUESTION.

25 Q.   WHY WAS IT THAT THE PATENTS THAT WERE CONTRIBUTED IN

1  THE CHEMTECH I WOULD HAVE HAD AN ECONOMIC VALUE OF

2  APPROXIMATELY 883 MILLION AT THE TIME WHEN THE CLASS

3  A INVESTORS ENTERED THE PARTNERSHIP, BUT A BOOK VALUE

4  OF ONLY $54,000.00?

5  A.  THIS IS A RESULT OF THE REQUIRED ACCOUNTING POLICIES

6  FOR THIS TYPE OF ASSET.  UNDER GAAP, WHEN FIRMS LIKE

7  DOW MAKE RESEARCH-AND-DEVELOP EXPENDITURES TO DEVELOP

8  PATENTS AND TECHNOLOGY, THEY'RE REQUIRED TO EXPENSE

9  THOSE COSTS.  THEY DON'T GET TO CAPITALIZE THEM AND

10  TURN IT INTO AN ASSET.

11  AND SO WHAT HAPPENS, DOW SPENDS TENS OF MILLIONS

12  OR HUNDREDS OF MILLIONS OF DOLLARS DOING RESEARCH AND

13  DEVELOPMENT, BUT THEY DON'T GET TO REPORT THE VALUE

14  OF THE INTANGIBLE ASSETS THAT SPRANG FROM THOSE

15  EFFORTS.

16  SO THIS IS -- THIS IS COMMON IN MANY -- MANY

17  FIRMS ACROSS THE -- THE U.S.  AND THIS WAS A -- THIS

18  -- IF YOU WILL, A PROBLEM WAS NOTED BY A NUMBER OF

19  PEOPLE WHO COMMENTED TO THE -- THE FINANCIAL

20  ACCOUNTING STANDARDS BOARD THAT MANY FIRMS LIKE DOW

21  HAD HIGHLY VALUED INTANGIBLE ASSETS ON THEIR BALANCE

22  SHEET, BUT DIDN'T HAVE A BOOK VALUE.  AND THAT THAT

23  WAS NOT IDEAL ACCOUNTING.

24  Q.  PLEASE EXPLAIN WHAT YOU MEAN BY THE TERM MONETIZATION

25  AND WHY YOU BELIEVE IT REPRESENTED A BENEFIT.

1  A.   MONETIZATION IS A TERM THAT'S USED DIFFERENTLY BY --

2       BY DIFFERENT PEOPLE IN DIFFERENT CONTEXTS.

3            BUT AS I UNDERSTAND THE WAY THE TERM IS USED BY

4       DOW, THERE'S -- THERE'S TWO ELEMENTS.  THERE'S THE

5       ACTUAL CASH THAT DOW REALIZED BY EMPLOYING THE -- THE

6       PATENT ASSETS AND THE -- THE PARTNERSHIP

7       TRANSACTIONS, THE 200 MILLION DOLLARS OF MINORITY

8       EQUITY FINANCING.  THAT WAS A MONETIZATION OF A LOW

9       BOOK VALUE ASSET.  THEY REALIZED SOME CASH FROM THE

10      TRANSACTION.

11           THE SECOND LEG OF THE MONETIZATION IS THAT DOW

12      IS ABLE TO DISCLOSE TO THE CAPITAL MARKETS, IT

13      SHAREHOLDERS, WHICH I THINK MR. MERSZEI TALKED ABOUT

14      THIS.  THAT IT IS DOING A TRANSACTION, MARKET

15      TRANSACTION, AND IT HAS ASSETS THAT ARE NOT RECORDED

16      ON ITS BALANCE SHEET OR HAVE A VERY LOW VALUE, BUT

17      THEY HAVE SUBSTANTIAL ECONOMIC VALUE.  THAT'S A

18      CREDIBLE DISCLOSURE THAT -- THAT CAN BE MADE.  AND I

19      THINK MR. MERSZEI'S WORDS WERE NOT -- NOT QUITE THE

20      SAME AS MINE.  BUT I THINK HE TALKED ABOUT THE

21      RECOGNITION OF ITS VALUE AS PART OF THE MONETIZATION.

22  Q.   I'D LIKE TO CIRCLE BACK NOW TO WHY A FIRM LIKE DOW

23      MIGHT CARE ABOUT ITS CREDIT RATING.

24           BEFORE I DO THAT, LET ME JUST ASK YOU, PROFESSOR

25      ERICKSON, DID YOU QUANTIFY THE IMPACT, THE

1    INCREMENTAL ECONOMIC BENEFITS TO DOW OF ADDING 200

2    MILLION IN EQUITY FUNDS TO ITS OVERALL CAPITAL

3    STRUCTURE?

4  A.  I DID NOT PUT A POINT ESTIMATE ON -- ON THE -- THE

5    VALUE OF THE EXPECTED BENEFITS.

6       WHAT I DID INSTEAD WAS I PROVIDED, HOPEFULLY, A

7    VARIETY OF INFORMATION ABOUT THE TYPES OF BENEFITS

8    THAT DOW COULD EXPECT TO REALIZE AND THE VALUE OF

9    THOSE TYPES OF BENEFITS THAT WERE PURSUED AND

10    REALIZED BY OTHER FIRMS, MANY, MANY OTHER FIRMS.

11  Q.  WHY DIDN'T YOU PUT A PRECISE ESTIMATE ON THE 200

12    MILLION?

13  A.  IT'S ALMOST IMPOSSIBLE TO PUT A PRECISE ESTIMATE ON

14    THAT, GIVEN THAT THE CHEMTECH TRANSACTION WAS PART

15    OF, AS I UNDERSTAND, THE -- OF ABOUT A THREE BILLION

16    DOLLAR -- WHAT DOW REFERRED TO AS OFF-BALANCE SHEET

17    FINANCING STRATEGY.  IT'S -- IT'S ALMOST IMPOSSIBLE

18    TO ISOLATE OUT THAT -- THAT PARTICULAR SEGMENT OF THE

19    -- OF THE STRATEGY.

20  Q.  ARE YOU AWARE HOW THE RATING AGENCIES TREATED

21    MINORITY EQUITY FINANCING DURING THE 1993 THROUGH

22    1998 TIME FRAME?

23  A.  YES.  THEY -- THEY TREATED IT AS EQUITY.  WE -- WE

24    SAW A MOMENT AGO FROM THE STANDARD AND POOR'S

25    DEFINITION.

1  Q.  LET'S TAKE A LOOK AT "PLAINTIFF'S DEMONSTRATIVE 30."

2  A.  OKAY.

3  Q.  IF YOU WOULD PLEASE EXPLAIN WHAT THIS EXHIBIT IS

4      SHOWING AND HOW IT RELATES TO THE CHEMTECH BENEFITS?

5  A.  SO THE -- THIS CHART ILLUSTRATES DOW'S, AS REPORTED,

6      DEBT-TO-CAPITAL RATIO.  THAT'S THE BLUE BAR.  THE --

7      DEPENDING ON YOUR COMPUTER, MINE IS ORANGE.  I THINK.

8      BUT THE YELLOW BAR IS WHAT DOW'S DEBT-TO-CAPITAL

9      RATIO WOULD BE IF ALL OF DOW'S OFF-BALANCE SHEET DEBT

10     WAS ON-BALANCE SHEET.  SEE, IF ALL THE OFF-BALANCE

11     SHEET FINANCING WAS -- WAS ON-BALANCE SHEET DEBT,

12     DOW'S DEBT TO CAPITAL RATIO WOULD BE WAY ABOVE 50

13     PERCENT.

14 Q.  HOW MIGHT A RATING DOWNGRADE IMPACT A CORPORATION?

15 A.  IT -- IT CAN HAVE A VARIETY OF ADVERSE EFFECTS.

16     AGAIN, AS I THINK WE HEARD MR. MERSZEI TESTIFY ABOUT

17     IT.

18         BUT -- BUT BASICALLY, A DOWNGRADE TYPICALLY

19     RESULTS IN INCREASED BORROWING COSTS.  IT MAY RESULT

20     IN A LOSS OF ACCESS TO CERTAIN CAPITAL MARKETS,

21     COMMERCIAL PAPER.  IT CAN HAVE -- RESULT IN COSTS AND

22     DEALING WITH VARIOUS PARTIES THE FIRM CONTRACTS WITH.

23         THE EXAMPLE MR. MERSZEI GAVE WITH REGARD TO BP

24     MAKING DOW PAY CASH AS YOU GO, I THINK ILLUSTRATES

25     THAT VERY CLEARLY.

1        IT WAS A WHOLE VARIETY OF COSTS THAT CAN BE

2    TRIGGERED AS A RESULT OF A RATING DOWNGRADE.

3  Q.  CAN A RATING DOWNGRADE INFLUENCE A FIRM'S STOCK

4    PRICE?

5  A.  YES.  THERE IS A LARGE SAMPLE OF ACADEMIC STUDIES

6    THAT ESTIMATE THE AVERAGE EFFECT ON A FIRM'S STOCK

7    PRICE IN THE RATINGS DOWNGRADED, AND THAT EFFECT IS

8    ON A MAGNITUDE OF ONE TO TWO PERCENT.

9  Q.  I MIGHT -- I MIGHT COME BACK TO THAT IN JUST A

10    SECOND, PROFESSOR ERICKSON.

11        BUT CAN YOU TELL ME.  IS A RATING DOWNGRADE THE

12    ONLY RATING ACTION THAT CAN IMPACT A STOCK PRICE?

13  A.  NO.  BEING PLACED ON CREDIT WATCH OR -- OR ANY TYPE

14    OF ADVERSE PRONOUNCEMENT BY THE RATING AGENCIES CAN

15    HAVE AN ADVERSE STOCK CONSEQUENCES.  I THINK IN MY

16    THIRD REPORT I MENTIONED THAT GE'S CREDIT RATING WAS

17    -- THERE WAS A NEGATIVE STATEMENT BY ONE OF THE

18    RATING AGENCIES, AND GE'S STOCK PRICE, I THINK,

19    DROPPED EIGHT PERCENT IN RESPONSE.  SO IT DOESN'T

20    JUST HAVE TO BE A DOWNGRADE.

21  Q.  OKAY.  OKAY.  SO NOW I'D LIKE TO TURN TO THE RESEARCH

22    THAT YOU WERE BEGINNING TO TALK ABOUT WHEN I CUT YOU

23    OFF A SECOND AGO.

24        THERE IS A -- THERE IS A DISCUSSION OF EMPIRICAL

25    EVIDENCE QUANTIFYING THE COST IN TERMS OF RATINGS

1    DOWNGRADES THAT'S DISCUSSED IN "PEX5" AT PAGES 10

2    THROUGH 14.  AND YOU MENTIONED THAT THE RATING DOWN-

3    GRADE COULD IMPACT A FIRM ADVERSELY IN TERMS OF STOCK

4    PRICE.

5        I'D JUST LIKE TO DRAW YOUR ATTENTION NOW TO THE

6    CHART ON PAGE 12 OF "PEX5," AND ASK YOU TO SUMMARIZE

7    WHAT THAT RESEARCH SHOWS AND ITS IMPLICATIONS TO DOW.

8  A.  SURE.  SO THIS -- WHAT I DID IN THIS CHART IS TO --

9    TO SIMPLIFY IT IS I PRESENTED THE -- THE SUMMARY

10   RESULTS OF A COUPLE OF VERY WELL KNOWN ACADEMIC

11   STUDIES, WHICH WERE AUTHORED BY PEOPLE AT THE

12   UNIVERSITY OF CHICAGO.

13       AND WHAT THEY FOUND WAS THAT CREDIT RATING DOWN

14   GRADES ARE BEING PLACED ON CREDIT WATCH RESULTS IN

15   ADVERSE STOCK PRICE EFFECTS.   AND -- AND AT A

16   VERY HIGH LEVEL, WHICH IS WHAT RESEARCH FINDS IS THAT

17   STOCK PRICE DROPS BY ABOUT ONE-TO-TWO PERCENT ON

18   AVERAGE IN RESPONSE TO A CREDIT-ATING DOWNGRADE.

19       WHAT I THEN DID WAS I ESTIMATED HOW MUCH THE

20   SHAREHOLDER WEALTH LOSS WOULD BE FOR DOW, ASSUMING AN

21   AVERAGE DROP IN STOCK PRICE FROM A RATING DOWNGRADE

22   IN 1993.  AND, AGAIN, JUST IN VERY SIMPLE TERMS, A

23   RATING DOWNGRADE WOULD HAVE RESULTED IN APPROXIMATELY

24   SHAREHOLDER WEALTH LOSSES OF BETWEEN, I THINK ABOUT

25   135 MILLION TO 360 MILLION DOLLARS, BASED UPON THIS

1    PRIOR ACADEMIC RESEARCH.

2  Q.  TO WHAT EXTENT, IF ANY, ARE YOU AWARE OF SUPPORT FOR

3    NUMBERS OF THAT MAGNITUDE IN THE CONTEXT OF DOW?

4  A.  WELL, I -- I'M AWARE THAT DOW WAS DOWNGRADED IN 2008.

5    AND MR. MERSZEI DISCUSSED THAT DOWNGRADE WHEN HE

6    TESTIFIED.  I THINK IT WAS ON MONDAY OR TUESDAY.

7      BUT THE FINANCIAL PRESS REPORTED THAT DOW STOCK

8    PRICE DROPPED, EXCUSE ME, 19 PERCENT WHEN THEY WERE

9    DOWNGRADED IN 2008.

10      IN ADDITION, THE FINANCIAL PRESS REPORTED THAT

11    THE DOWNGRADED COULD -- COULD COST DOW NORTH OF ONE

12    BILLION DOLLARS IN ADDITIONAL BORROWING COSTS.  SO

13    THE -- THE EFFECTS OF THE ACTUAL DOWNGRADE IN 2008

14    ARE -- ARE LARGER THAN WHAT I'VE ESTIMATED HERE IN

15    THIS TABLE.  AND WE HEARD MR. MERSZEI TALK ABOUT SOME

16    OF THE OTHER DIFFICULT-TO-QUANTIFY TYPES OF COSTS

17    THAT DOW HAD TO BEAR BECAUSE OF THE ACTUAL DOWN

18    GRADE.

19      SO, AGAIN, THE POINT IS THESE DOWNGRADES ARE

20    COSTLY AND EXPECTATIONS ARE VERY COSTLY.

21  Q.  YOU CITE IN YOUR REPORT TO EXTENSIVE EMPIRICAL

22    EVIDENCE THAT FIRMS ACTIVELY MANAGE THE BALANCE

23    SHEETS TO MANAGE THEIR DEBT-TO-CAPITAL RATIOS AND

24    MAINTAIN THEIR CREDIT RATINGS.  AND THIS IS

25    SUMMARIZED IN PART IN "PEX5" AT PAGES EIGHT THROUGH

1    TEN.

2        I'D JUST LIKE TO GET -- YOU TO GIVE US ONE

3    EXAMPLE OF SOME OF THAT RESEARCH.  AND PLEASE

4    SUMMARIZE THE KISGEN RESEARCH.

5 A.  SURE.  I'D BE HAPPY TO.  SO THERE WAS A -- A STUDY

6    PUBLISHED IN -- I THINK IT'S 2006, IN THE JOURNAL OF

7    FINANCE, WHICH IS, I THINK, WIDELY CONSIDERED THE

8    BEST FINANCE JOURNAL THERE IS.  BY A GENTLEMAN NAMED

9    DARREN KISGEN.  AND WHAT HE DID WAS, HE LOOKED TO SEE

10   IF A FIRM'S PROXIMITY TO A RATING DOWNGRADE

11   INFLUENCED THE CAPITAL STRUCTURE CHOICES OF THE FIRM.

12       THAT IS, DO FIRMS THAT WERE CLOSE TO A RATINGS

13   DOWNGRADE, WERE THEY MORE LIKELY TO ISSUE EQUITY THAN

14   DEBT.  AND IN 2006, THIS WAS CONSIDERED NEW.  WE

15   DIDN'T -- WE DIDN'T KNOW THAT IF FIRMS DID THAT OR

16   NOT IN TERMS OF THE EMPIRICAL LITERATURE.

17       SO HE -- HE DOES A VARIETY OF THINGS.  BUT HE

18   LOOKS AT 10,000 FIRM-YEAR OBSERVATIONS.  HE LOOKS AT

19   MANY FIRMS OVER MANY YEARS.  AND WHAT HE FINDS IS

20   THAT FIRMS THAT ARE NEAR A DEBT RATING DOWNGRADE

21   MEASURE IT A COUPLE OF DIFFERENT WAYS.

22       THOSE FIRMS ARE MORE LIKELY TO ISSUE EQUITY THAN

23   DEBT.  THIS IS EXACTLY WHAT DOW SAID IT WAS DOING IN

24   CHEMTECH I AND CHEMTECH II.

25       IN ADDITION TO THAT, WHAT MR. KISGEN DOES, IS

1    VERY MUCH ALONG THE SAME LINES OF WHAT I DO IN MY

2    REPORTS, TO SOME EXTENT.  HE PROVIDES A VARIETY OF

3    WHAT SOME PEOPLE REFER TO AS ANECDOTAL EVIDENCE.  HE

4    PROVIDES A VARIETY OF EXAMPLES OF FIRMS, LARGE, WELL-

5    KNOWN FIRMS, THAT TAKE SPECIFIC ACTIONS TO TRY TO

6    EITHER GET THEIR CREDIT RATING BACK UP TO AVOID A

7    DOWNGRADE.  SO THIS WAS CONSIDERED NEW TO THE

8    ACADEMIC LITERATURE, EVEN THOUGH WITHIN THE

9    PRACTITIONER COMMUNITY IT WAS VERY WELL KNOWN THAT

10   FIRMS TOOK ACTIONS TO PRESERVE THEIR CREDIT RATINGS.

11       AND -- AND JUST TO FOLLOW-UP ON THAT.  THE KISGEN

12   STUDY WAS A PART OF -- A PART MOTIVATED BY A SURVEY

13   OF CFO'S THAT WAS DONE BY TWO GENTLEMEN, JOHN GRAHAM

14   AND CAMPBELL HARVY, WHO ARE FINANCE PROFESSORS AT

15   DUKE.  AND WHAT THEY FOUND WHEN THEY SURVEYED CFO'S

16   IS THAT THE TWO MOST IMPORTANT THINGS THAT AFFECT

17   CAPITAL STRUCTURE, THAT IS RAISING DEBT OR EQUITY OR

18   CREDIT, IS RATINGS AND FINANCIAL FLEXIBILITY.  AND SO

19   THE KISGEN STUDY WENT OUT AND DID A -- AN EMPIRICAL

20   ANALYSIS OF THE CREDIT RATING ASPECT AND CONFIRMED

21   WHAT THOSE -- WHAT WAS DOCUMENTED IN THE SURVEY.

22 Q.  I'D LIKE TO TURN NOW TO SOME OF YOUR OWN ACADEMIC

23   RESEARCH, IN PARTICULAR RELATING TO AN INSTRUMENT

24   KNOWN AS MIPS.

25       FIRST OFF CAN YOU EXPLAIN GENERALLY WHAT MIPS

1    WAS?

2  A.    SURE.  MIPS IS THE FINANCING TRANSACTION THAT IS

3        DESIGNED TO BE TREATED AS EQUITY ON THE FIRM'S

4        FINANCIAL STATEMENTS.  AND IT -- IT PROVIDES TAX

5        BENEFITS, WHAT IS REFERRED TO AS TAX DEDUCTIBLE EQUITY

6        AT THE TIME.  BUT IT'S MONTHLY INCOME PREFERRED

7        SECURITIES.

8  Q.    YOUR RESEARCH IS DISCUSSED IN SOME DEPTH AT "PEX3" AT

9        PAGES 73 THROUGH 78.  AND ALSO AT "PEX 5."  CAN YOU

10       SUMMARIZE AT A HIGH LEVEL WHAT YOU WERE INVESTIGATING?

11 A.    SURE.  IN -- IN THE -- IN THE STUDY WE DID SEVERAL

12       THINGS.  BUT -- BUT IN TERMS OF -- OF WHAT WE WERE

13       TALKING ABOUT IN -- IN -- IN THIS CASE, WHAT WE DID

14       WAS WE LOOKED AT THIS -- THIS TRANSACTION MIPS AND --

15       WHICH STARTED IN 1993.  IT WAS CREATED IN 1993.  WE

16       LOOKED AT A VARIETY OF FIRMS THAT ISSUED MIPS.  AND WE

17       ESTIMATED HOW MUCH THEY PAID TO IMPROVE THEIR BALANCE

18       SHEETS THROUGH THE USE OF THE MIPS FINANCING

19       TRANSACTION.

20 Q.    ALL RIGHT.  AND WHAT TYPES OF OBJECTIVE MEASURES DID

21       YOU USE TO ANALYZE WHAT FIRMS WERE --

22 A.    WE ---

23 Q.    -- WILLING TO PAY -- BENEFITS?

24 A.    SURE.  WE -- WE USED TWO -- TWO BASIC MEASURES.  THE

25       FIRST WERE THE TRANSACTIONS COSTS THAT -- THAT FIRMS

1    INCUR, WHAT DID THEY PAY TO -- TO DO THE TRANSACTION,

2    OUT-OF-POCKET COSTS.

3        THE SECOND ESTIMATE WAS AN OPPORTUNITY COST

4    ESTIMATE.  WE ESTIMATED HOW MUCH FOR THE ECONOMIC

5    BENEFITS THAT WERE FHORGENE TO DO THE MIPS TRANSACTION

6    IN A PARTICULAR FORM INSTEAD OF SOMETHING ELSE.

7  Q.  AND WHAT DID YOU CONCLUDE?

8  A.  WE CONCLUDED THAT FIRMS PAID BETWEEN TEN AND 43

9    MILLION DOLLARS TO IMPROVE THEIR BALANCE SHEETS, WHICH

10    CORRESPONDS TO BETWEEN ABOUT FOUR AND 22 PERCENT OF

11    THEIR CAPITAL RAISED.

12  Q.  SO IS I FAIR TO SAY THEN THAT THOSE NUMBERS OF FOUR TO

13    22 PERCENT OF THE CAPITAL RAISED REPRESENT A CEILING

14    ON THE VALUE OF THE ACCOUNTING BENEFITS?

15  A.  NO.  THOSE ARE THE MINIMUM VALUE OF THE ACCOUNTING

16    BENEFITS.  FIRMS TEND TO BELIEVE THE ACCOUNTING

17    BENEFITS WERE WORTH AT LEAST AS MUCH AS THEY PAID, AS

18    LEAST AS MUCH AS THEY GAVE UP.  SO THE ACCOUNTING

19    BENEFITS HAD TO BE WORTH MORE THAN THE AMOUNTS WE

20    ESTIMATED.

21  Q.  AND YOU TALKED ABOUT SOME OF THE EMPIRICAL RESEARCH

22    CITED IN YOUR REPORTS THAT'S SPECIFIC TO RATINGS

23    MANAGEMENT.  YOU MADE SOME BROADER OBSERVATIONS IN

24    YOUR REPORTS THAT THE BEHAVIOR OF DOW WAS CONSISTENT

25    WITH BEHAVIOR OF BUSINESSES IN A WIDE RANGE OF

1    DIFFERENT CONTEXT.  AND I'D JUST LIKE TO LOOK FEW OF

2    THOSE.

3         THESE OBSERVATIONS ARE DISCUSSED IN DEPTH IN YOUR

4    INITIAL REPORT, "PEX 3," ALSO IN YOUR SUPPLEMENTAL

5    REVOLVE REPORT "PEX 5."

6         LET'S START WITH WHAT YOU FOUND IN PRACTITIONER

7    PUBLICATIONS.

8  A.  OKAY.  SURE.  AGAIN, I WAS FAMILIAR WITH THIS

9    LITERATURE FROM OTHER WORK I'VE DONE.  BUT

10   EFFECTIVELY, IF YOU LOOK AT THE PRACTITIONER

11   LITERATURE YOU SEE A WHOLE HOST OF ARTICLES THAT

12   DISCUSS THE FACT THAT FINANCIAL EXECUTIVES STRUCTURE

13   TRANSACTIONS TO ACHIEVE THAT BENEFICIAL ACCOUNTING.

14   AND THIS IS ACROSS A SPECTRUM OF TRANSACTIONS.  IT

15   MIGHT BE FINANCING, LEASES, ACQUISITIONS, THE WAY IN

16   WHICH EXECUTIVES ARE COMPENSATED.  SO I -- I PLACE

17   DOW'S ACTIONS IN THE CONTEXT OF -- OF THE DOCUMENTED

18   BEHAVIOR OF OTHER FIRMS IN THESE PRACTITIONER

19   ARTICLES.

20 Q.  YOU BRIEFLY MENTIONED GRAHAM AND HARVEY, SO I DON'T

21   WANT TO RETREAD OVER OLD GROUND IF YOU'VE COVERED

22   THIS.

23        BUT CAN YOU DESCRIBE ANY ADDITIONAL INFORMATION

24   RELATING TO THE RESEARCH OF GRAHAM, HARVEY AND

25   RAJEOPAUL?

1    A.    SURE.   AND -- AND JUST SO I'M CLEAR.   BUT TO SAY THAT

2          I'VE REFERENCED -- THERE'S TWO DIFFERENT STUDIES.   BUT

3          THE FIRST ONE IS THIS GRAHAM AND HARVEY.

4              AND THAT WAS THE -- THAT WAS THE STUDY ABOUT --

5          THAT DEALT WITH THESE -- THESE CAPITAL STRUCTURES

6          CHOICES.

7              THE SECOND STUDY THAT YOU JUST ASKED ME ABOUT IS

8          GRAHAM, HARVEY AND RAJEOPAUL AND -- AND IN JUST --

9          JUST BY WAY OF CREDIBILITY, IF YOU WILL.   GRAHAM AND

10         HARVEY ARE THE EDITORS, THE CURRENT EDITORS, OF THE

11         JOURNAL OF FINANCE, THE BEST FINANCE JOURNAL IN THE

12         WORLD.

13             THEY DID A STUDY, AGAIN, WHERE THEY SURVEYED

14         CFO'S.   I DON'T KNOW EXACTLY HOW THEY GOT ACCESS TO

15         THESE PEOPLE.   BUT CFO'S OF LARGE CORPORATIONS, THE

16         TYPE OF PEOPLE THAT WE'VE HEARD TESTIFYING HERE IN

17         THIS MATTER.   AND THEY ASKED THEM A VARIETY OF

18         QUESTIONS ABOUT WHAT INFLUENCED THE WAY IN WHICH THEY

19         MADE DECISIONS.

20             AND ONE OF THE THINGS THAT CAME FROM THAT -- THAT

21         SURVEY IS CFO'S TOLD GRAHAM AND HARVEY THAT THEY'RE

22         WILLING TO INCUR REAL COSTS TO IMPROVE THEIR FINANCIAL

23         STATEMENTS.   AGAIN, EXACTLY WHAT WE HEAR DOW SAYING

24         THEY DID FOR THE CHEMTECH, AND CONSISTENT WITH THE

25         PRACTITIONER ARTICLES THAT I REFERRED TO A MOMENT AGO.

1    THAT ARTICLE IS -- I THINK IT WAS AN AWARD WINNING

2    ARTICLE.  I THINK IT WON THE NOTABLE CONTRIBUTION

3    LITERATURE AWARD A YEAR OR TWO AFTER IT WAS PUBLISHED.

4    IT'S VERY WELL REGARDED, A VERY WELL CITED ARTICLE.

5    IT'S CONSIDERED TO HAVE OPENED UP A LOT OF PEOPLE'S

6    EYES TO THE WAY THE REAL WORLD WORKS.

7  Q.  TO WHAT EXTENT, IF ANY, HAVE THE EXPERIENCES OF YOUR

8    FORMER STUDENTS INFLUENCED YOUR VIEWS IN THIS CASE?

9  A.  THEY DEFINITELY INFLUENCED MY VIEWS.  MY -- MY

10    STUDENTS, MANY GO TO WORK ON WALL STREET OR THEY

11    BECOME ASSISTANT CFO'S OR TREASURERS, DO THAT KIND OF

12    WORK.  AND I HEAR FROM THEM REPEATEDLY AFTER THEY'VE

13    BEEN IN MY CLASS THAT AS SOON AS THEY GET TO WHATEVER

14    WALL STREET FIRM OR WHATEVER CORPORATION THEY'RE

15    WORKING AT, ONE OF THE FIRST THINGS THEY WORK ON IS

16    -- IS A TRANSACTION LIKE MIPS OR LIKE SOMETHING WE

17    TALKED ABOUT IN CLASS.  AND THEY'LL BE E-MAILING ME OR

18    STOP BY MY OFFICE AND SAY, "WOW, LOOK AT THIS

19    TRANSACTION WE'RE DOING.  IT'S -- IT'S JUST LIKE WHAT

20    YOU TALKED ABOUT IN CLASS."  WE GO TO GREAT TROUBLE TO

21    STRUCTURE THESE TRANSACTIONS TO MAKE SURE THAT WE GET

22    THE BEST POSSIBLE ACCOUNTING TREATMENT, GIVEB IT SOME

23    OTHER FACTORS.

24        SO THEY -- THEY CORROBORATE,  AGAIN, THE THINGS

25    THAT WE'RE TALKING ABOUT.

1   Q.   YOU'VE ALSO DONE CONSULTING WORK.  HAS THAT BEEN

2        RELEVANT TO YOUR OPINIONS IN THIS CASE?

3   A.   YES, IT HAS.  I -- I'VE DONE -- SEVERAL YEARS AGO

4        QUITE A BIT OF RESEARCH AND CONSULTING DEALING WITH

5        STRUCTURED FINANCE TRANSACTIONS AND TRANSACTIONS THAT

6        WERE DONE IN PART TO ACHIEVE FINANCIAL ACCOUNTING

7        BENEFITS.  AND THE -- THE OPINIONS I EXPRESS IN THIS

8        CASE AND THAT I'M ARTICULATING TO YOU TODAY ARE -- ARE

9        BASED IN PART ON MY EXPERIENCE.  THEY'RE RELATED -- AS

10       I SAID, I'VE DONE A LOT OF RESEARCH AND SAW A LOT OF

11       TRANSACTIONS THAT WERE STRUCTURED FINANCE AND

12       MOTIVATED IN PART BY GETTING BENEFICIAL ACCOUNTING.

13  Q.   ARE THERE ANY OTHER SOURCES THAT YOU FOUND PERSUASIVE?

14  A.   YES, SIR.  THERE ARE.  SO IN GETTING BACK TO MY

15       TEACHING AT -- IN MY MBA CLASS IN CHICAGO I -- I

16       DISCUSS A LOT OF THE THINGS THAT YOU AND I ARE

17       DISCUSSING HERE, MR. BLANCHARD.  AND SOME OF THE

18       THINGS THAT I -- I COVER WITH MY STUDENTS ARE

19       STATEMENTS AND PUBLICATIONS OF THE INTERNAL REVENUE

20       SERVICE, THE JOINT COMMITTEE ON TAXATION AND EVEN

21       COURT CASES.  AND FROM -- FROM THAT TEACHING AND --

22       AND FROM THE CONSULTING WORK I'VE DONE THAT DEALS WITH

23       THOSE MATERIALS, I'M AWARE OF THE FACT THAT THE -- THE

24       TAXING AUTHORITY HAS SAID THAT IMPROVING YOUR BALANCE

25       SHEET, ATTAINING FINANCIAL ACCOUNTING BENEFITS IS A

1   LEGITIMATE BUSINESS PURPOSE FOR A TRANSACTION, AND IT

2   IS A TRANSACTION OF ECONOMIC SUBSTANCE.

3       SO I'M FAMILIAR WITH THAT PHENOMENON, AGAIN FROM

4   MY EXPOSURE TO THOSE KINDS OF MATERIALS.

5  Q.  DR. HUBBARD, AGAIN, THE GOVERNMENT'S ECONOMIC EXPERT,

6   CLAIMS SPECIFICALLY WITH RESPECT TO DOW THAT THERE IS

7   NO OBJECTIVE EVIDENCE; THAT IT WAS REASONABLE FOR DOW

8   TO BELIEVE THAT THE ACCOUNTING TREATMENT OF THE CLASS

9   A INTERESTS WOULD PROVIDE BENEFIT.  DO YOU AGREE?

10 A.  NO.  I -- I DISAGREE TOTALLY.  I DON'T -- I DON'T

11   UNDERSTAND HOW ONE CAN SAY THERE'S NO OBJECTIVE

12   EVIDENCE THAT IT WAS REASONABLE TO BELIEVE THAT

13   ACHIEVING THESE KINDS OF BENEFITS, WOULD PROVIDE A

14   BENEFIT TO DOW.

15       THERE'S A WHOLE HOST OF SOURCES, WHICH I JUST

16   DISCUSSED WITH YOU, MR. BLANCHARD, THAT INDICATED THAT

17   MANY OTHER FINANCIAL EXECUTIVES PURSUED THE SAME TYPES

18   OF BENEFITS, DID SO REPEATEDLY.  AND IF THESE

19   ACCOUNTING BENEFITS DID NOT PROVIDE REAL ECONOMIC

20   VALUE, FIRMS WOULD NOT CONTINUE TO PURSUE THEM.

21       THERE'S A WHOLE HOST OF ACADEMIC LITERATURE WE

22   JUST TALKED ABOUT THAT IS WHOLLY CONSISTENT WITH WHAT

23   I'VE SAID IN MY REPORTS, THAT FIRMS PURSUE THESE VERY

24   BENEFITS. THEY'RE DISINTERESTED PARTIES.  THEY'RE NOT

25   INVOLVED IN THIS CASE.  AS FAR AS I KNOW THIS IS

1    OBJECTIVE EVIDENCE FROM OUTSIDE OF ANYONE AT DOW OR

2    INVOLVED IN THE CASE.

3         AGAIN, WE HAVE STATEMENTS FROM THE UNITED STATES

4    GOVERNMENT THAT IMPROVING A FIRM'S BALANCE SHEET IS A

5    TRANSACTION THAT HAS ECONOMIC SUBSTANCE AND BUSINESS

6    PURPOSE.

7         I DON'T UNDERSTAND HOW DR. HUBBARD CAN SAY THAT

8    IS NOT OBJECTIVE EVIDENCE.  THAT IT WAS REASONABLE TO

9    BELIEVE, IN DOW'S CASE, THAT IT WOULD ACHIEVE THE SAME

10   KINDS OF -- OF ECONOMIC BENEFIT.

11        AND EVEN IF WE LOOK AT DR. HUBBARD'S REPORT,

12   "EXHIBIT 33," HE HAS GOT ABOUT 90 FIRMS LISTED THERE

13   THAT DID MIPS TRANSACTIONS.  MIPS WERE CREATED TO

14   PROVIDE AN ACCOUNTING BENEFIT.

15        IN HIS LIST OF FIRMS HE HAS A NUMBER OF FIRMS

16   THAT DO MORE THAN ONE MIPS TRANSACTION.  IF MIPS

17   DIDN'T PROVIDE SIGNIFICANT ECONOMIC BENEFITS, WHY DO

18   FIRMS REPEATEDLY DO THOSE -- THOSE TRANSACTIONS AND

19   INCUR THOSE COSTS?

20        SO I THINK THAT'S OBJECTIVE EVIDENCE.  I DON'T

21   UNDERSTAND HOW HE CAN SAY THERE'S NO OBJECTIVE

22   EVIDENCE.

23        BY MR. BLANCHARD:

24             YOUR HONOR, AT THIS TIME I'M HAPPY CERTAINLY

25        TO CONTINUE AS LONG AS YOU WOULD LIKE.  TO THE

1        EXTENT YOU WERE THINKING ABOUT A LUNCH BREAK,

2        THIS IS -- WE'RE DONE WITH DISCUSSING DR.

3        ERICKSON'S FIRST OPINIONS.  SO WE COULD BREAK

4        HERE OR I'LL BE HAPPY TO CONTINUE AS LONG AS

5        YOU'D LIKE.

6        BY THE COURT:

7            I WAS GETTING READY TO -- YOU HAVE TWO MORE

8        -- TWO MORE OPINIONS TO DISCUSS?

9        BY MR. BLANCHARD:

10           YES, SIR.  YES, SIR.  WE DO.

11       BY THE COURT:

12           I DON'T THINK WE'LL COVER THAT IN THE NEXT

13       THREE MINUTES, SO ---

14       BY MR. BLANCHARD:

15           DOUBTFUL.

16       BY THE COURT:

17           I -- I AGREE WITH YOU, MR. BLANCHARD.  THIS

18       IS A GOOD PLACE TO STOP FOR LUNCH.

19           SO WE'LL TAKE A ONE-HOUR BREAK.

20       DOCTOR, I WOULD REMIND YOU YOU'RE STILL

21       UNDER OATH.  THAT YOU WILL RETURN IN ONE HOUR AND

22       WE CAN RESUME YOUR TESTIMONY AT THAT TIME.  OKAY?

23       BY THE WITNESS:

24           YES, SIR.

25       BY THE COURT:

1              THANK YOU.   COURT IS IN RECESS.

2                   (THEREFORE, AT THIS TIME THE COURT IS IN

3                   RECESS FOR LUNCH.)

4                   (THEREFORE, AT THIS TIME, THE PROCEEDINGS

5                   ARE CONTINUED.)   (DIRECT EXAMINATION

6                   CONTINUED BY MR. BLANCHARD.)

7                        EXAMINATION

8   BY MR. BLANCHARD:

9   Q.   PROFESSOR ERICKSON, BEFORE LUNCH WE DISCUSSED YOUR

10      OPINION THAT IT WAS REASONABLE FOR DOW TO BELIEVE THAT

11      IT COULD ACHIEVE SUBSTANTIAL ECONOMIC BENEFIT THROUGH

12      ENTERING INTO THE CHEMTECH PARTNERSHIP.   WHAT I'D LIKE

13      TO DO NOW IS TURN TO THE MECHANICS OF THAT BENEFIT. IF

14      WE COULD PUT BACK PLAINTIFF'S DEMONSTRATIVE 4, YOUR

15      SECOND OPINION ADDRESSES THE GAAP ACCOUNTING BENEFITS

16      OF CHEMTECH.   JUST TAKING A STEP BACK TO GENERAL

17      PRINCIPLES, WHAT IS THE FUNCTION OF GAAP?

18  A.   GAAP IS DESIGNED TO PRESENT THE ECONOMICS OF THE FIRM,

19      ITS CURRENT FINANCIAL POSITION, ASSETS, LIABILITIES,

20      RESULTS OF OPERATION AT A PARTICULAR POINT IN TIME,

21      REPRESENT THOSE ECONOMICS.   AND THE REASON THAT WE

22      HAVE GAAP STATEMENTS IS SO THAT USERS OF THOSE

23      FINANCIAL STATEMENTS CAN GET A PICTURE OF WHAT IS

24      HAPPENING AT THE FIRM ECONOMICALLY, WHAT IS THE

25      RESULTS OF ITS OPERATIONS.   AGAIN, IT'S ASSETS,

1    LIABILITIES, ET CETERA.  THE GAAP STATEMENTS ARE USED

2    BY A VARIETY OF GROUPS: STOCKHOLDER, DEBT HOLDERS,

3    EMPLOYEES, THOSE TYPES OF PEOPLE.

4  Q.  DR. HUBBARD IN HIS REPORT SUGGESTS THAT DOW WAS

5    ATTEMPTING TO OBSCURE THE TRUE DEBT-LIKE ECONOMIC

6    CHARACTERISTICS OF THE CLASS A LIMITED PARTNERSHIP

7    INTERESTS IN CHEMTECH.  HOW DOES THAT ASSERTION FIT

8    WITHIN THE CONTEXT OF GAAP?

9  A.  IT'S INCONSISTENT WITH THE OBJECTIVES OF GAAP.  THE

10    OBJECTIVES OF GAAP ARE TO REPRESENT THE ECONOMICS OF A

11    PARTICULAR TRANSACTION, IN THIS CASE, SECURITY.  AND

12    SO THAT ASSERTION BY PROFESSOR HUBBARD IS INCONSISTENT

13    WITH A FUNDAMENTAL OBJECTIVE OF GAAP.

14  Q.  WHAT ARE THE SOURCES OF GAAP USED TO ACHIEVE THE

15    OBJECTIVES YOU'VE DESCRIBED?

16  A.  THERE ARE A VARIETY OF SOURCES OF RULES OF GAAP.  THEY

17    COME FROM WHAT USED TO BE CALLED A HIERARCHY OF GAAP.

18    NOW WE HAVE SOMETHING CALLED GAAP CODIFICATION.  BUT

19    THIS HIERARCHY AT THE TIME IN QUESTION WAS ESSENTIALLY

20    A SET OF RULES FROM DIFFERENT SOURCES, STANDARDS

21    ISSUED BY THE FINANCIAL ACCOUNTING STANDARDS BOARD,

22    PRONOUNCEMENTS OF THE AMERICAN INSTITUTE OF CERTIFIED

23    PUBLIC ACCOUNTANTS, THINGS LIKE THAT, IN ADDITION TO

24    WIDELY-HELD INDUSTRY PRACTICES.

25  Q.  YOUR SECOND OPINION IS THAT DOW'S CONSOLIDATED GAAP

1     ACCOUNTING OF THE CLASS A LIMITED PARTNER INTEREST AS

2     MINORITY EQUITY WAS PROPER.  TO WHAT EXTENT, IF AT

3     ALL, DID THE CONSOLIDATED GAAP ACCOUNTING REFLECT THE

4     SUBSTANCE OF THE PARTNERSHIP STRUCTURE?

5   A.  IT DID REFLECT THE SUBSTANCE IN THAT THE CLASS A

6     INTERESTS WERE IN SUBSTANCE EQUITY AND WERE

7     APPROPRIATELY TREATED THAT WAY ON THE GAAP FINANCIAL

8     STATEMENTS.

9   Q.  NOW, THE FIRST ELEMENT OF YOUR SECOND OPINION IS THAT

10     THE GAAP CONSOLIDATION OF THE CHEMTECH PARTNERSHIP WAS

11     PROPER.  CAN YOU START BY EXPLAINING THE NATURE AND

12     PURPOSE OF GAAP CONSOLIDATION?

13   A.  AGAIN, THE PURPOSE OF GAAP CONSOLIDATION IS TO BRING

14     TOGETHER INTO ONE SET OF FINANCIAL STATEMENTS THE

15     RESULTS OF OPERATIONS, ASSETS, LIABILITIES OF A PARENT

16     COMPANY, DOW, THE PARENT, AND ALL OF THE SUBSIDIARIES.

17     THEY'RE ALL CONSOLIDATED TOGETHER.  IN DOING SO IT'S

18     IMPORTANT TO ELIMINATE TRANSACTIONS BETWEEN THE DOW

19     PARENT AND THE CONSOLIDATED ENTITY SO THAT WE DON'T

20     DOUBLE COUNT ASSETS, LIABILITIES, REVENUES AND

21     EXPENSES TO ACCOMPLISH THE GOAL THAT WE TALKED ABOUT

22     BEFORE LUNCH AND JUST RECENTLY, WHICH IS TO HAVE

23     FINANCIAL STATEMENTS THAT REFLECT THE ECONOMIC

24     POSITION OF A COMPANY LIKE DOW.

25   Q.  LET'S TURN TO PLAINTIFF'S DEMONSTRATIVE 10. THIS

1    SUMMARIZES THE OWNERSHIP OF CHEMTECH AS OF AUGUST

2    1993, WHEN THE BANKS ENTERED THE PARTNERSHIP.  CAN YOU

3    TELL US WHAT THE DOTTED LINE REPRESENTS?

4  A.   SURE.  THE RED -- EVERY ENTITY INSIDE THE RED DOTTED

5    LINE IS CONSOLIDATED WITHIN DOW'S AUDITED GAAP

6    FINANCIAL STATEMENTS.  SO ALL OF THE ENTITIES WITHIN

7    THE RED BOX -- DOW EUROPE, DTPC, CHEMTECH, CPI -- ARE

8    ALL CONSOLIDATED AS PART OF DOW'S AUDITED FINANCIAL

9    STATEMENTS.

10  Q.   AND WHY WAS THE CHEMTECH PARTNERSHIP CONSOLIDATED EVEN

11    THOUGH IT HAD OUTSIDE OWNERS?

12  A.   BECAUSE DOW OWNED MORE THAN 50 PERCENT OF CHEMTECH, SO

13    UNDER GAAP WE CONSOLIDATE THOSE ENTITIES.

14  Q.   WHAT'S THE IMPACT OF CONSOLIDATION?

15  A.   AGAIN, THE IMPACT OF CONSOLIDATION IS THAT THE ASSETS

16    AND LIABILITIES OF ALL THESE ENTITIES ARE ROLLED UP

17    INTO DOW'S AUDITED FINANCIAL STATEMENTS AND

18    INTERCOMPANY TRANSACTIONS ARE ELIMINATED BETWEEN, FOR

19    EXAMPLE, DOW AND CHEMTECH OR DTPC AND CHEMTECH.

20  Q.   CAN YOU SUMMARIZE THE INTERCOMPANY TRANSACTIONS THAT

21    WOULD BE ELIMINATED IN CONSOLIDATION HERE WITH RESPECT

22    TO THIS CHART?

23  A.   SURE.  WITHOUT BEING ALL INCLUSIVE, FOR EXAMPLE, THE

24    ROYALTY PAYMENT MADE FROM DOW CHEMICAL TO CHEMTECH

25    WOULD BE ELIMINATED IN CONSOLIDATION.  SO WE WOULD NOT

1      SEE THAT EXPENSE ON DOW'S AUDITED FINANCIAL

2      STATEMENTS.  THE INTEREST INCOME THAT CPI REALIZED

3      FROM DOW FROM THE INTERCOMPANY LOAN WOULD NOT -- WOULD

4      BE ELIMINATED IN CONSOLIDATION. WE WOULD NOT SEE THAT

5      AS PART OF THE INCOME STATEMENT OF THE CONSOLIDATED

6      GROUP.  INTER COMPANY LOANS AND RECEIVABLES WOULD BE

7      ELIMINATED, THOSE TYPES OF ACCOUNTS.

8  Q.  WHAT WOULD HAVE HAPPENED IF THOSE TRANSACTIONS HADN'T

9      BEEN ELIMINATED IN CONSOLIDATION?

10 A.  THERE WOULD BE, AS I SAID, DOUBLE COUNTING OF ASSETS,

11     LIABILITIES, REVENUES, AND EXPENSES BECAUSE THE

12     INTERCOMPANY EVENTS WOULD BE COUNTED TWICE ON THE

13     AUDITED FINANCIAL STATEMENTS, WHICH WOULD THEN NOT

14     REFLECT THE ECONOMICS OF THE CONSOLIDATED DOW GROUP.

15 Q.  WHAT TRANSACTIONS ON THIS CHART WEREN'T ELIMINATED IN

16     CONSOLIDATION?

17 A.  THE 200 MILLION DOLLAR INVESTMENT BY THE CLASS A

18     LIMITED PARTNERS WAS NOT ELIMINATED IN CONSOLIDATION.

19     THAT APPEARS ON DOW'S AUDITED FINANCIAL STATEMENTS AS

20     MINORITY INTEREST EQUITY.  IN ADDITION, I THINK THIS

21     WAS COVERED WITH SOME OF THE DOW WITNESSES, THE

22     MINORITY INTEREST SHARE OF INCOME OF DOW IS ALSO

23     INCLUDED IN THE AUDITED INCOME STATEMENTS SO THAT THE

24     CLASS A PARTNERS' SHARE OF CONSOLIDATED DOW'S NET

25     INCOME IS ALSO NOT ELIMINATED.

1    Q.   THE GOVERNMENT, IN THIS CASE, HAS DESCRIBED THE CASH

2         FLOWS ELIMINATED IN CONSOLIDATION AS CIRCULAR.  IN

3         YOUR EXPERIENCE, ARE THESE TYPES OF INTERCOMPANY CASH

4         FLOWS UNUSUAL AMONG THE PARENT CORPORATION AND ITS

5         SUBSIDIARY ENTITIES?

6    A.   NO, NOT AT ALL.  THAT'S THE WHOLE POINT OF

7         CONSOLIDATION IS TO ELIMINATE THOSE TYPES OF

8         TRANSACTIONS THAT THE GOVERNMENT HAS REFEREED TO AS

9         CIRCULAR.

10   Q.   LET'S TURN TO PLAINTIFF'S DEMONSTRATIVE 11.  AND THIS

11        SHOWS THE CHEMTECH II STRUCTURE.  HOW DO THE

12        CONSOLIDATION PRINCIPLES YOU JUST DISCUSSED RELATE TO

13        CHEMTECH II?

14   A.   SAME BASIC PRINCIPLES.  EVERYTHING WITHIN THE DOTTED

15        RED BOX IS CONSOLIDATED INTO THE DOW, PARENT

16        COMPANY'S, AUDITED FINANCIAL STATEMENTS.  AGAIN, THE

17        CLASS A PARTNER HERE, RBDC, IS PRESENTED AS MINORITY

18        INTEREST EQUITY ON DOW'S BALANCE SHEET AT THE SAME

19        ACCOUNTING INCOME STATEMENT.

20   Q.   PROFESSOR ERICKSON, YOU'VE REVIEWED THE REPORTS OF THE

21        GOVERNMENT'S ACCOUNTING EXPERT, STEVEN HENNING?

22   A.   YES, I HAVE.

23   Q.   DID YOU ATTEND HIS DEPOSITION?

24   A.   I DID.

25   Q.   DID DR. HENNING DISPUTE YOUR ANALYSIS OF THE

1    CONSOLIDATION?

2  A.  HE DID NOT.  HE AGREED WITH ALL THE MECHANICS OF THE

3      CONSOLIDATION.  THE ONLY THING HE DISAGREED WITH WAS

4      THAT HE BELIEVE THE CLASS A INVESTORS ARE NOT EQUITY

5      HOLDERS, BUT ARE DEBT HOLDERS FOR U.S. GAAP PURPOSES.

6  Q.  LET'S MOVE OFF OF THE CONSOLIDATION THEN AND TURN TO

7      THE CLASSIFICATION OF THE CLASS A LIMITED PARTNERSHIP

8      INTEREST AS MINORITY EQUITY.  HOW OFTEN DO ACCOUNTANTS

9      EVALUATE WHETHER A SECURITY IS DEBT OR EQUITY?

10 A.  ALL THE TIME.  THIS IS SOMETHING THAT ACCOUNTANTS DO I

11     WOULDN'T SAY EVERY DAY, BUT CONSTANTLY.  ANY AND EVERY

12     COMPANY IN THE UNITED STATES THAT FILES FINANCIAL

13     STATEMENTS, THE ACCOUNTANTS HAVE TO MAKE A

14     DETERMINATION ABOUT WHAT'S DEBT AND WHAT'S EQUITY.

15     AUDITORS IN EVERY PUBLIC ACCOUNTING FIRM THAT ARE OUT

16     DOING AUDITS HAVE TO MAKE A DETERMINATION ABOUT, ARE

17     THINGS DEBT OR EQUITY IN ORDER FOR THE FINANCIAL

18     STATEMENTS TO BE PROPERLY PREPARED AND FILED IN

19     ACCORDANCE WITH GAAP.  THIS IS SOMETHING THAT

20     ACCOUNTANTS DO ALL THE TIME.  WE HAVE RULES THAT HELP

21     US MAKE THESE DETERMINATIONS.  WE ARE LICENSED.  WE

22     HAVE STANDARDS WE FOLLOW.  IT'S SOMETHING WE DO ALL

23     THE TIME.

24 Q.  YOU MENTIONED THAT WE HAVE RULES.  DOES GAAP HAVE

25     ACCEPTED DEFINITIONS OF DEBT AND EQUITY?

1   A.   YES, WE DO.

2   Q.   WHERE DO THOSE APPEAR?

3   A.   THEY APPEAR IN STATEMENT OF FINANCIAL ACCOUNTING

4        CONCEPTS NUMBER SIX, AND FOR CERTAIN SPECIFIC INDUSTRY

5        TYPE EXAMPLES, THE MAY APPEAR IN OTHER PRACTITIONER-

6        TYPE GUIDES. UNDER CURRENT GAAP THEY STILL RESIDE IN

7        THE CONCEPTS STATEMENTS EVEN THOUGH I REFERRED TO THE

8        GAAP CODIFICATION EARLIER.

9   Q.   YOU MENTIONED STATEMENT OF FINANCIAL ACCOUNTING

10       CONCEPT SIX, WHICH I THINK I'LL REFER TO AND YOU DO IN

11       YOUR REPORTS AS CON-6.  CAN YOU EXPLAIN WHAT THAT IS?

12   A.   SURE.  CON-6 IS -- CONTAINS DEFINITIONS OF BASIC

13       ELEMENTS OF FINANCIAL STATEMENTS, REVENUES, EXPENSES,

14       ASSETS, LIABILITIES, AND EQUITY AND SOME OTHER RELATED

15       DEFINITIONS.  BUT IT PROVIDES THE DEFINITIONS OF THE

16       BUILDING BLOCKS OF GAAP ACCOUNTING, THE DEFINITIONS,

17       THE BASIC DEFINITIONS.

18   Q.   LET'S TURN TO JOINT EXHIBIT 192, WHICH IS DOW'S 1993

19       ANNUAL REPORT.  I'M GOING TO DIRECT YOUR ATTENTION TO

20       BATES PAGES 68525 AND 526, WHICH IS DOW'S GAAP BALANCE

21       SHEET.  WHERE ON THIS BALANCE SHEET IS THE 200 MILLION

22       OF MINORITY EQUITY OBTAINED THROUGH CHEMTECH?

23   A.   ON MY SCREEN IT'S ON THE RIGHT-HAND PORTION RIGHT IN

24       THE MIDDLE OF THE PAGE.

25   Q.   SO THIS WOULD BE BATES PAGE 68526.

1  A.  I CAN'T SEE THE BATES PAGE BUT I'LL TAKE YOUR WORD FOR

2      IT.  BUT IT'S RIGHT IN THE MIDDLE OF THE PAGE THERE

3      WHERE IT SAYS MINORITY INTEREST IN SUBSIDIARY

4      COMPANIES.  YEAH, RIGHT THERE. (INDICATING)

5  Q.  NOW, THE AMOUNT REFLECTED IN THE MINORITY INTEREST

6      LINE REFLECTS, IN THOUSANDS, 2439, SO OBVIOUSLY THAT

7      AGGREGATES CHEMTECH WITH A NUMBER OF OTHER MINORITY

8      EQUITY FINANCINGS?

9  A.  THAT'S CORRECT.  THERE ARE OTHER MINORITY EQUITY

10     FINANCING TRANSACTIONS THAT -- AGAIN, I BELIEVE THOSE

11     WERE DISCUSSED WITH EITHER MR. FALLA OR MR. MERSZEI.

12 Q.  AND NOTE R TO THE ANNUAL REPORT WHICH APPEARS ON BATES

13     PAGE 68542 CONTAINS A MORE DETAILED DISCUSSION OF THE

14     CHEMTECH TRANSACTION.  BEFORE WE LOOK AT THE NOTE, CAN

15     YOU TELL US GENERALLY THE ROLE OF FOOTNOTES IN GAAP

16     FINANCIAL STATEMENTS?

17 A.  SURE.  THE FOOTNOTES PROVIDE ADDITIONAL INFORMATION TO

18     READERS OF THE FINANCIAL STATEMENTS ABOUT WHAT'S

19     CAUSING CHANGES IN ACCOUNTS, WHAT MAKES UP THE

20     COMPONENT BALANCES, ADDITIONAL INFORMATION, IF THERE'S

21     GAAP CHOICES ABOUT VALUATION ALLOWANCES, WHAT THOSE

22     CHOICES MEAN.  JUST ADDITIONAL DETAIL TO SUPPORT OR

23     EXPLAIN THE AMOUNTS IN THE STATEMENTS.

24 Q.  MR. FALLA TESTIFIED IN SOME DETAIL REGARDING THIS

25     NOTE, SO I DON'T THINK WE NEED TO GO THROUGH, BACK

1       THROUGH ALL OF THAT.  IF YOU COULD JUST TELL US IN A

2       GENERAL LEVEL THE SIGNIFICANCE OF THIS DISCLOSURE TO

3       YOUR OPINION ON DOW'S GAAP CLASSIFICATION OF CHEMTECH.

4 A.   SURE.  SO IF WE LOOK AT THE DISCLOSURE, IT TALKS ABOUT

5       CHEMTECH IN A VARIETY OF PLACES, BUT IT USES WORDS

6       LIKE PARTNERS, PARTNER INTERESTS, PRIORITY RETURN,

7       SHARING AND RESIDUAL EARNINGS.  ALL OF THE LANGUAGE

8       THAT IS USED HERE IS EQUITY LANGUAGE.  IT'S NOT DEBT

9       LANGUAGE.  THIS FOOTNOTE, WHICH DOW PUT TOGETHER BUT

10      IS APPROVED BY DOW'S AUDITOR, COULD NOT USE THIS

11      LANGUAGE.  IT WOULD NOT BE APPROVED BY DOW'S AUDITOR

12      IF THE CLASS A INTEREST WERE DEBT.  THIS IS EQUITY

13      LANGUAGE.  IT'S VERY CLEAR.

14 Q.  PROFESSOR ERICKSON, YOU MENTIONED DOW'S AUDITOR, WHICH

15      WAS DELOITTE.  I TAKE YOU ARE FAMILIAR WITH THE

16      PROCESS BY WHICH LARGE PUBLICALLY TRADED COMPANIES

17      ISSUE THEIR GAAP FINANCIAL STATEMENTS?

18 A.   YES, I AM.

19 Q.  CAN YOU DESCRIBE THAT PROCESS?

20 A.   SURE.  JUST AT A HIGH LEVEL, BASICALLY THE WAY IT

21      WORKS IS A COMPANY LIKE DOW ASSEMBLES A HUGE AMOUNT OF

22      FINANCIAL INFORMATION TOGETHER, LEDGERS AND THE LIKE,

23      AND PREPARES SOME TYPE OF DRAFT FINANCIAL STATEMENTS:

24      BALANCE SHEET, INCOME STATEMENT, STATEMENT OF CASH

25      FLOWS.  THEN THE AUDITOR, DELOITTE AND TOUCHE IN THIS

1    CASE, WOULD COME IN AND WOULD DO A VARIETY OF TESTS

2    AND REVIEWS OF THOSE AMOUNTS.  SO, FOR EXAMPLE, ONE OF

3    THE THINGS THAT AN AUDITOR WOULD DO IS TEST TO MAKE

4    SURE THAT THE REVENUES THAT ARE CLAIMED BY THE FIRM

5    ACTUALLY HAPPENED.  THEY'LL LOOK AT CREDIT CARD

6    RECEIPTS OR LOOK AT CONTRACTS JUST TO MAKE SURE THAT

7    THE TRANSACTIONS WERE BONAFIDE, OR REAL.  IN ADDITION

8    TO THAT TYPE OF ANALYSIS, THE AUDIT FIRM WOULD REVIEW

9    THE ACCOUNTING CHOICES AND POLICIES THAT WERE MADE BY

10   THE FIRM, BY DOW, TO MAKE SURE THAT THEY COMPLIED WITH

11   GAAP.  SO THERE'S TWO PRONGS, IF YOU WOULD.  THERE'S

12   MORE TO IT THAN THIS; I'M SIMPLIFYING.  BUT THEY TEST

13   THE BALANCES TO MAKE SURE THAT THE TRANSACTIONS

14   HAPPENED AND THEY REVIEW THE GAAP ACCOUNTING POLICIES

15   AND CHOICES TO MAKE SURE THEY ARE APPROPRIATE.

16   ULTIMATELY, THEN, MAYBE AFTER SOME MODIFICATION WITH

17   THE DRAFT FINANCIAL STATEMENTS, THE AUDITORS WILL

18   AGREE TO ISSUE AN OPINION THAT THE FINANCIAL

19   STATEMENTS ARE PREPARED IN COMPLIANCE WITH GAAP.

20   AGAIN, LAYMAN'S-TERM TYPE OF EXPLANATION.  BUT THAT'S

21   ESSENTIALLY HOW THE AUDIT TAKES PLACE.

22 Q.  IS IT COMMON FOR A COMPANY'S AUDITOR TO PREPARE A

23   MEMORANDUM MEMORIALIZING THE TREATMENT OF PARTICULAR

24   GAAP ITEMS?

25 A.  YES, IT IS.

1  Q.  ARE YOU AWARE OF ANY SUCH ANALYSES WITH RESPECT TO THE

2      CHEMTECH PARTNERSHIP?

3  A.  YES, I AM.  THERE WAS A MEMO -- THERE'S TWO MEMOS THAT

4      DELOITTE AND TOUCHE PREPARED TO ANALYZE THE GAAP

5      ACCOUNTING TREATMENT OF THE CLASS A INTEREST, ONE FOR

6      CHEMTECH I AND ONE FOR CHEMTECH II.

7  Q.  TO WHAT EXTENT, IF ANY, DID YOU USE DELOITTE'S

8      ANALYSES IN REACHING YOUR OWN CONCLUSION REGARDING THE

9      CLASSIFICATION OF THE CLASS A LIMITED PARTNERSHIP

10     INTERESTS AS MINORITY INTERESTS?

11 A.  I REVIEWED THEIR MEMO AND LOOKED AT WHAT THEY DID AND

12     AGREED WITH THEIR CONCLUSIONS, BUT I RELIED ON THEIR

13     WORK IN PART TO SEE WHAT AUTHORITY THEY THOUGHT WAS

14     APPROPRIATE, WHICH WERE THE SAME THINGS THAT I THOUGHT

15     WAS APPROPRIATE. SO I REVIEWED THEIR ANALYSIS, AGREED

16     WITH IT, AND THEN I DID MY OWN INDEPENDENT REVIEW.

17 Q.  LET'S TURN TO EXHIBIT P2, WHICH HAS BEEN ADMITTED INTO

18     EVIDENCE.  THIS IS ONE OF THE DELOITTE MEMORANDA -- IS

19     THIS ONE OF THE DELOITTE MEMORANDA YOU REFERRED TO

20     DURING THE COURSE OF YOUR ANALYSIS?

21 A   YES.  I BELIEVE THIS IS THE CHEMTECH I MEMO.

22 Q.  WAS THERE A SIMILAR ANALYSIS RELATING TO CHEMTECH II?

23 A.  YES, THERE WAS.

24 Q.  CAN YOU TAKE US THROUGH THIS MEMO AND REFER US TO THE

25     ELEMENTS THAT YOU FOUND MOST SIGNIFICANT TO YOUR OWN

1    ANALYSIS?

2  A.   SURE.  I THINK WE NEED TO -- THE MEMO DESCRIBES THE

3       CHEMTECH PARTNERSHIP AND VARIOUS ELEMENTS OF IT IN THE

4       FIRST FEW PAGES OF IT, BUT I THINK IF WE GO BACK TO

5       MAYBE PAGE 5.

6  Q.   I'M JUST GOING TO -- LET'S GET A BATES PAGE FOR THAT

7       REFERENCE, WHICH IS ---

8  A.   OKAY.  IT'S PAGE 4.  I WAS WRONG.

9            BY THE WITNESS:

10               THANK YOU, NOEL

11  BY MR. BLANCHARD:

12  Q.   AND THAT'S BATES ENDING DT 002804?

13  A.   YES, SIR.  SO THERE'S A COUPLE THINGS HERE THAT ARE

14       PARTICULARLY RELEVANT.  SO UNDER THE CONCLUSION, YOU

15       SEE THE VERY FIRST SENTENCE THERE SAYS, THE PROPER

16       CLASSIFICATION OF THE CASH CONTRIBUTIONS IS BASED UPON

17       THE SUBSTANCE OF THE ARRANGEMENT BETWEEN IFCO AND

18       CHEMTECH.  SO DELOITTE IS SAYING, WE REACHED THAT

19       CONCLUSION BASED UPON THE SUBSTANCE OF THIS

20       TRANSACTION.  THEY GO ON -- AT THE END OF THE NEXT

21       SENTENCE, THEY SAY, WE BELIEVE THE PREDOMINANT

22       CHARACTERISTICS AND SUBSTANCE IS THAT OF EQUITY.  THEY

23       THEN TALK ABOUT HOW THEY REACHED THEIR CONCLUSION.

24       AND IF WE GO A LITTLE BIT FARTHER DOWN, AFTER THE TWO

25       BULLET POINTS THAT ARE CHARACTERISTICS THAT ARE DEBT

1      LIKE, THEY DISCUSS CHARACTERISTICS THAT ARE EQUITY

2      LIKE, INCLUDING RESIDUAL CLAIM, OWNERSHIP INTEREST IN

3      THE ASSETS, SHARING THE UPSIDE POTENTIAL OF CHEMTECH.

4      THE SAME KIND OF THINGS THAT I TALK ABOUT IN MY

5      REPORT.

6  Q.   DOES THIS MEMO CONTAIN AN ANALYSIS OF THE STRUCTURE OF

7      CHEMTECH?

8  A.   IT DOES.

9  Q.   TO WHAT EXTENT, IF AT ALL, DOES THIS MEMO COMPARE THE

10      CLASS A INTEREST TO PREFERRED STOCK?

11  A.   THERE'S A MENTION ON BATES PAGE 2805 THAT ANALOGIZES

12      THE CLASS A INTEREST TO PREFERRED STOCK.

13  Q.   DOES THIS MEMO ADDRESS THE ISSUE OF GUARANTEES OF DOW

14      CHEMICAL CORPORATION?

15  A.   I BELIEVE IT DOES.  IT DISCUSSES PERFORMANCE

16      GUARANTEES ON MAYBE THE LAST PAGE OF THE MEMO.

17  Q.   LET'S LOOK AT THAT, BATES PAGE DT 002806.  CAN YOU

18      DIRECT US TO THE LANGUAGE YOU ARE REFERRING TO,

19      PROFESSOR ERICKSON?

20  A.   I THINK IT'S UNDER THE CAPTION REVIEW OF FINAL

21      DOCUMENTS AND IT'S THIS -- THE PARAGRAPH UNDER THE TWO

22      BULLET POINTS, THE ABOVE ITEMS.  I THINK IT'S IN THAT

23      PARAGRAPH WHERE THERE'S A DISCUSSION ABOUT THE

24      PERFORMANCE GUARANTEE.

25  Q.   TO WHAT EXTENT DOES THIS MEMO INDICATED THE LEVEL OF

1  REVIEW WITHIN DELOITTE THAT THIS ISSUE -- TO WHICH

2  THIS ISSUE WAS RAISED?

3  A.  IT INDICATES THAT THE ISSUE WAS REVIEWED AT THE

4  NATIONAL OFFICE OF DELOITTE AND TOUCHE.

5  Q.  HOW, IF AT ALL, IS THAT SIGNIFICANT TO YOU?

6  A.  WELL, IT'S A NONTRIVIAL FACT.  AT THE ACCOUNTING FIRMS

7  PARTICULARLY AT THIS TIME -- I'M NOT SURE IF THEY

8  STILL OPERATE THIS WAY, BUT I THINK THEY DO -- THE

9  TECHNICAL EXPERTS OF AN ACCOUNTING FIRM WILL RESIDE IN

10  A PARTICULAR OFFICE.  SOMETIMES IT'S WASHINGTON, DC;

11  SOMETIMES IT'S WHATEVER THE MAIN OFFICE OF THE FIRM

12  IS.  AND IF THE AUDITOR, DELOITTE AND TOUCHE, WANTS TO

13  GET COMFORT ON A PARTICULAR ISSUE, THEY CAN GO TO THE

14  NATIONAL OFFICE AND TALK TO THAT FIRM'S NATIONAL

15  EXPERTS TO MAKE SURE THAT WHAT WAS BEING SAID HERE IS

16  APPROPRIATE.  AND TYPICALLY THE PEOPLE AT THE NATIONAL

17  OFFICE ARE THE KIND OF PEOPLE WHO CONSULT WITH THE

18  FASB, SERVE ON SUBSIDIARY BOARDS OF THE FASB, WHICH IS

19  THE FINANCIAL ACCOUNTING STANDARDS BOARD, THE PEOPLE

20  WHO SET THE GAAP ACCOUNTING POLICIES.  SO ESSENTIALLY

21  WHAT THIS MEMO IS INDICATING IS THERE WAS A VERY

22  THOROUGH REVIEW OF THIS ISSUE WITH SOME TECHNICAL

23  KNOWLEDGE WHERE PEOPLE AT THE NATIONAL LEVEL WERE

24  INVOLVED, AGREED THAT THE CLASS A INTEREST WERE IN

25  SUBSTANCE EQUITY AND SHOULD BE TREATED AS EQUITY UNDER

1       THE U.S. GAAP.

2   Q.  DID YOU CONDUCT ANY FURTHER ANALYSIS RELATING TO THE

3       GAAP CLASSIFICATION?

4   A.  I DID MY OWN ANALYSIS OF THAT ISSUE, YES,

5   Q.  WHAT DID THAT ANALYSIS ENTAIL?

6   A.  I REVIEWED THE LIMITED PARTNERSHIP AGREEMENTS AND

7       BROUGHT TO BEAR MY KNOWLEDGE OF ACCOUNTING, LOOKED AT

8       THE RELEVANT ACCOUNTING STANDARDS IN CONJUNCTION WITH

9       THE CONTRACT, THE PARTNERSHIP AGREEMENT, TO REACH MY

10      DETERMINATION ABOUT THE PROPER GAAP ACCOUNTING FOR THE

11      CLASS A INTEREST.

12  Q.  AND AGAIN, WHAT GAAP AUTHORITIES PROVIDED YOUR

13      GUIDANCE ON THIS?

14  A.  IN THIS CASE, IT WAS CON-6 THAT WE DISCUSSED EARLIER

15      AND THEN ALSO WIDELY-USED PROFESSIONAL PRACTICE, SOME

16      THINGS THAT WE LOOK TO AS GAAP AUTHORITY OR ACCEPTED

17      INDUSTRY PRACTICE.

18  Q.  FOR THE RECORD, A COPY OF CON-6 IS ATTACHED TO YOUR

19      REBUTTAL REPORT, WHICH IS PEX 4.  FEEL FREE TO KEEP

20      THAT HANDY AS WE DISCUSS THIS IF YOU WANT TO REFER US

21      TO ANY PARTICULAR SECTIONS ALONG THE WAY.  LET'S TURN

22      TO PLAINTIFF'S DEMONSTRATIVE 13.  THIS IS DERIVED FROM

23      A TABLE FROM YOUR REBUTTAL REPORT, PEX 4, WHICH IS

24      LOCATED AT PAGE 24.  IF YOU COULD START, PLEASE, BY

25      ORIENTING US TO THE ELEMENTS OF THE CHART.  AND ON THE

1      LEFT-SIDE THERE ARE A LIFT OF FACTORS.  WHAT DO THOSE

2      REPRESENT?

3  A.  THESE ARE VARIOUS FACTORS OR CHARACTERISTICS THAT ARE

4      EITHER EXPLICITLY ARTICULATED IN CON-6 OR INDUSTRY

5      PRACTICE OR WERE FACTORS THAT WERE RAISED BY THE

6      GOVERNMENT'S EXPERTS.

7  Q.  YOU THEN LIST THREE COLUMNS, ONE FOR DEBT, ONE FOR

8      NON-VOTING, NON-PARTICIPATING PREFERRED STOCK, AND ONE

9      FOR THE CLASS A LIMITED PARTNER INTEREST. WHY DID YOU

10     CHOOSE TO COMPARE THE CLASS A LIMITED PARTNER INTEREST

11     WITH DEBT?

12 A.  THAT'S WHAT THE GOVERNMENT'S EXPERTS DID, AND SO TO

13     PROVIDE A COMPARISON TO THEIR ANALYSIS, I COMPARED THE

14     CLASS A INTEREST TO DEBT.

15 Q.  THE GOVERNMENT'S EXPERTS HAVE ALSO COMPARED THE CLASS

16     A LIMITED PARTNER INTEREST WITH COMMON STOCK.  WHY DID

17     YOU CHOOSE TO COMPARE THEM WITH PREFERRED STOCK?

18 A.  WELL, AS I NOTE IN MY REPORT, THE CLASS A INTEREST

19     HAVE SEVERAL FEATURES THAT ARE COMMON WITH PREFERRED

20     STOCK, SO IT WAS AN OBVIOUS COMPARISON TO MAKE.  IN

21     ADDITION, PREFERRED STOCK IS EQUITY UNDER U.S. GAAP.

22     SO TO COMPARE THE CLASS A INTEREST TO AN ACCEPTED

23     EQUITY INSTRUMENT OF U.S. GAAP IS INFORMATIVE.  AND

24     WHEN I GO THROUGH THIS EXERCISE, WE SEE THAT THE CLASS

25     A INTEREST ARE MORE EQUITY LIKE THAN AN ACCEPTED TYPE

1          OF PREFERRED STOCK THAT IS EQUITY UNDER U.S. GAAP.

2    Q.   LET'S RUN THROUGH THE FACTORS STARTING WITH PRIORITY

3          AND LIQUIDATION.  WHERE IS THIS FACTOR DERIVED FROM?

4    A.   IT COMES FROM CON-6 AND I BELIEVE IT'S PARAGRAPH 49

5          SPECIFICALLY.

6    Q.   CAN YOU EXPLAIN THE ANALYSIS WITH RESPECT TO DEBT?

7    A.   YES.  WHAT CON-6 TELLS US IS EQUITY IS THE RESIDUAL

8          CLAIM ON THE FIRM'S ASSETS.  SO DEBT IS PAID FIRST IN

9          LIQUIDATION; EQUITY IS PAID AFTER DEBT.

10   Q.   HOW DOES THE ANALYSIS DIFFER WITH RESPECT TO PREFERRED

11         STOCK?

12   A.   PREFERRED STOCK TYPICALLY IS PAID AFTER DEBT BUT

13         BEFORE COMMON STOCK.  SO IN THE CHART, WHICH I DON'T

14         SEE ON THE SCREEN ON RIGHT NOW -- BUT IN THE CHART YOU

15         SEE THAT FOR PRIORITY LIQUIDATION I HAVE AFTER DEBT,

16         BEFORE COMMON FOR PREFERRED STOCK.

17   Q.   DOES GAAP ADDRESS INTEREST THAT MAY BE PAYABLE AFTER

18         DEBT BUT BEFORE SOME OTHER CLASSES OF EQUITY?

19   A.   IT DOES.  AND THOSE ARE REFERRED TO AS PREFERRED

20         STOCK.  IT'S WELL KNOWN WITHIN GAAP THAT THERE ARE

21         MORE THAN ONE -- THERE CAN BE MORE THAN ONE CLASS OF

22         EQUITY IN A FIRM WHETHER IT BE A CORPORATION OR A

23         PARTNERSHIP.  AND SO GAAP DOES SPEAK TO THE NOTION OF

24         PREFERRED STOCK QUITE REGULARLY, BASIC UNDERGRADUATE

25         ACCOUNTING TEXTBOOKS.

1  Q.  I'D LIKE TO BRIEFLY SHOW YOU A PAGE OUT OF THE

2      PARTNERSHIP AGREEMENT, WHICH IS JOINT EXHIBIT 2L, I

3      BELIEVE STARTING AT THE BATES PAGE 36565, SECTION

4      12.2, THE PARTNERSHIP AGREEMENT.  AND THIS CARRIES

5      OVER THEN, I BELIEVE, ACTUALLY ONTO THE NEXT TWO

6      PAGES.  BUT FOCUSING ON THE LANGUAGE AT THE BOTTOM OF

7      BATES PAGE ENDING 36566, CAN YOU EXPLAIN HOW, IF AT

8      ALL, THIS SECTION RELATED TO YOUR ANALYSIS OF PRIORITY

9      AND LIQUIDATION?

10 A.  SURE.  THIS SECTION, AS I RECALL, EXPLAINS THE

11     LIQUIDATION PROCEDURES OF THE CHEMTECH PARTNERSHIP AND

12     WALKS THROUGH WHICH CLAIMS ARE PAID FIRST AND THE

13     ORDERING.  AND AS YOU SEE UNDER -- I DON'T KNOW IF

14     THAT'S ROMAN A, OR HOW I'M SUPPOSED TO EXPLAIN THAT,

15     BUT UNDER E WITH THE BRACKETS AROUND IT, IT SAYS, "THE

16     BALANCE, IF ANY, TO THE PARTNERS IN ACCORDANCE WITH

17     THEIR POSITIVE CAPITAL ACCOUNTS," AND THEN IT GOES ON.

18     THAT PAYMENT TO THE PARTNERS COMES AFTER DEBT HAS BEEN

19     SATISFIED, AND MOREOVER THE PAYMENT TO THE CLASS A

20     PARTNERS IS MADE AT THE VERY SAME TIME AS PAYMENTS ARE

21     MADE TO THE CLASS B AND THE GENERAL PARTNER.  SO THE

22     CLASS A PARTNERS ARE AT EQUAL PRIORITY IN LIQUIDATION.

23     SO THEY ARE THE RESIDUAL CLAIMANT UNDER THE

24     PARTNERSHIP AGREEMENT.  THAT MAKES THEM EQUITY.

25 Q.  HOW DID THE GOVERNMENT'S ACCOUNTING EXPERT, DR.

1    HENNING, HANDLE PRIORITY IN LIQUIDATION IN HIS

2    REPORTS?

3  A.  HE IGNORED IT.  HE NEVER DISCUSSES IT.

4  Q.  HOW IMPORTANT TO YOU IS THIS FACTOR IN A DEBT-EQUITY

5    ANALYSIS?

6  A.  IT'S CRITICAL.  AS WE SAW WITH THE DEFINITION OF CON--

7    6 A FEW SCREENS AGO, THE BASIC DEFINITION OF EQUITY IS

8    THAT IT'S THE RESIDUAL CLAIM.  AND IN THESE ASSETS,

9    WE CAN SEE HERE FROM THE PARTNERSHIP AGREEMENT THE

10    CLASS A INTEREST ARE RESIDUAL CLAIMANTS.  THEY MEET

11    THE BASIC DEFINITION OF EQUITY.  DR. HENNING DID NOT

12    ADDRESS THAT ISSUE AND IGNORED IT IN HIS REPORTS.

13  Q.  THE GOVERNMENT'S ECONOMIST, DR. HUBBARD, RECOGNIZES

14    THAT PRIORITY IN LIQUIDATION IS EQUITY LIKE IN HIS

15    REPORT.  BUT CLAIMS THAT LIMITATIONS ON TRADE CREDIT

16    AND DEBT THAT COULD BE ISSUED BY A PARTNERSHIP WITHOUT

17    CLASS A CONSENT, QUOTE, VIRTUALLY ELIMINATED ANY RISK

18    BEYOND THE POTENTIAL RISK OF A DOW BANKRUPTCY FACED BY

19    THE CLASS A INTEREST IN RECEIVING THE FULL VALUE OF

20    THEIR CAPITAL ACCOUNTS.  I BELIEVE THAT APPEARS ON

21    PAGE 39 OF DEX 4, ONE OF PROFESSOR HUBBARD'S REPORTS.

22    DO YOU HAVE A RESPONSE TO THAT ASSERTION?

23  A.  YES.  UNDER -- THERE'S NOTHING IN GAAP THAT SAYS IF

24    YOU HAVE A FIRM WITH NO DEBT IN ITS CAPITAL STRUCTURE,

25    THAT CONVERTS SOME OF THE EQUITY CLAIMS INTO DEBT,

1      WHICH SEEMS TO BE WHAT PROFESSOR HUBBARD IS SAYING.

2      THERE IS NO SUCH CONCEPT IN GAAP.

3   Q.  THE NEXT FACTOR LISTED ON THE CHART, IF WE TURN BACK

4      TO PLAINTIFF'S DEMONSTRATIVE 13, IS VOTING RIGHTS.

5      WHAT DO YOU MEAN BY VOTING RIGHTS?

6   A.  ABILITY TO VOTE ON ACTIONS OF THE FIRM, CHOICES THAT

7      THE FIRM MAKES, POLICIES.

8   Q.  CAN YOU POINT TO GAAP AUTHORITY FOR THE RELEVANCE OF

9      THIS FACTOR?

10  A.  THIS WOULD BE TYPICALLY BE FROM WIDELY ACCEPTED

11     PRACTICES.  IT DOESN'T APPEAR, IN THAT LANGUAGE

12     ANYWAY, IN CON-6.

13  Q.  DOES STRAIGHT DEBT EVER HAVE ANY VOTING RIGHTS?

14  A.  NO.

15  Q.  AND NON-VOTING, PREFERRED STOCK, I TAKE IT BY

16     DEFINITION, THAT DOESN'T HAVE VOTING RIGHTS?

17  A.  THAT'S CORRECT.

18  Q.  ARE THERE PREFERRED STOCKS THAT DO VOTE?

19  A.  YES, THERE ARE.

20  Q.  WHY DIDN'T YOU USE VOTING PREFERRED FOR YOUR

21     COMPARISON HERE?

22  A.  I DID THAT IN MY REPORT.  THE TABLE IN MY REPORT HAS

23     FOUR COLUMNS, BUT IN THE INTEREST OF BREVITY, I ONLY

24     HAVE THREE COLUMNS IN THIS DEMONSTRATIVE. AND IN

25     ADDITION, THE PREFERRED STOCK THAT WE ARE DISCUSSING

1    IS THE LEAST EQUITY LIKE OF THE TWO.  AND YOU CAN SEE

2    THAT CLASS A INTERESTS ARE MORE EQUITY LIKE THAN A

3    PREFERRED STOCK THAT IS ACCEPTED AS EQUITY UNDER U.S.

4    GAAP.

5  Q.  WITH RESPECT TO THE CLASS A LIMITED INTEREST, YOU'VE

6    SAID, YES, LIMITED.  WHAT DID YOU MEAN BY THAT?

7  A.  THAT THE CLASS A LIMITED PARTNERS HAD LIMITED VOTING

8    RIGHTS, WHICH I BELIEVE -- I WAS HERE FOR PROFESSOR

9    KLEINBERGER'S TESTIMONY. HE WENT THROUGH SOME OF THOSE

10   LIMITED VOTING RIGHTS.  I THINK THEY RELATE TO MERGERS

11   AND ACQUISITIONS, TAKING ON DEBT, SUBLICENSING, MAYBE,

12   IF THAT'S THE RIGHT WORD, THE PATENTS IN CHEMTECH.  SO

13   THEY HAVE LIMITED VOTING RIGHTS WITH REGARD TO SOME OF

14   THE ACTIVITIES OF  CHEMTECH.

15  Q.  NEXT IS PARTICIPATION.  WHAT DOES PARTICIPATION REFER

16   TO?

17  A.  PARTICIPATION -- AND BY THE WAY, JUST TO GO BACK; I

18   DIDN'T QUITE FINISH MY THOUGHT. BUT THE FACT THAT THE

19   CLASS A INTEREST HAD VOTING RIGHTS IS AN EQUITY LIKE

20   CHARACTERISTIC.  YOU CAN SEE THEY ARE MORE EQUITY LIKE

21   THAN THE NON-VOTING PREFERRED STOCK.  SO I APOLOGIZE

22   FOR NOT CLOSING THE LOOP ON THAT.  PARTICIPATION

23   REFERS TO SHARING THE PROFITS OF THE FIRM, DOES THE

24   SECURITY SHARE IN PROFITS, PARTICIPATE IN PROFITS OF

25   THE FIRM.

1  Q.  WHAT IS THE GAAP AUTHORITY FOR THE RELEVANCE OF

2      PARTICIPATION IN PROFITS?

3  A.  I THINK IT'S MAYBE PARAGRAPH 50 AND 51 OF CON-6, WHICH

4      TALKS ABOUT THE FACT THAT -- THERE'S A DISCUSSION --

5      THE LANGUAGE IS EFFECTIVELY ALONG THE LINES THAT THE

6      OWNERS, EQUITY OWNERS, BENEFIT IF THE FIRM IS

7      PROFITABLE.  THEY SHARE IN THE FIRM'S PROFIT.  THERE'S

8      A LOT OF LANGUAGE LIKE THAT IN CON-6.  BUT THAT

9      LANGUAGE APPEARS IN THESE PARAGRAPHS.

10 Q.  DOES STRAIGHT DEBT EVER PARTICIPATE IN THE PROFITS OF

11     A FIRM?

12 A.  NO, IT DOES NOT.

13 Q.  WITH RESPECT TO NON-PARTICIPATING PREFERRED STOCK, I'M

14     ASSUMING BY DEFINITION THAT IT DOESN'T PARTICIPATE

15     OVER AND ABOVE ITS STATED YIELD; IS THAT RIGHT?

16 A.  THAT'S CORRECT.

17 Q.  I TAKE IT THERE ARE PREFERRED STOCKS THAT DO

18     PARTICIPATE IN PROFITS OVER AND ABOVE ITS STATED

19     YIELD?

20 A.  YES, THERE ARE.

21 Q.  AGAIN, WHY DIDN'T YOU USE PARTICIPATING, PREFERRED

22     STOCK IN YOUR COMPARISON HERE?

23 A.  I DID THAT IN MY REPORT, BUT I PICKED THE LEAST EQUITY

24     LIKE OF THE TWO PREFERRED STOCKS FOR PURPOSES OF THE

25     DISCUSSION TODAY. IN THIS PARTICULAR -- PREFERRED

1    STOCK, AGAIN, IS EQUITY FOR U.S. GAAP AND THE CLASS A

2    INTERESTS ARE MORE EQUITY LIKE THAN THE LEAST EQUITY

3    LIKE OF THE TWO PREFERRED STOCKS.

4  Q.  WITH RESPECT TO THE PARTICIPATION OF THE CLASS A

5    LIMITED PARTNERSHIP INTERESTS, THE CHART INDICATES,

6    YES, AND 1 PERCENT, PARENS, RESIDUAL PROFITS, MTM. I

7    WANT TO TALK ABOUT YOUR REFERENCE TO THE 1 PERCENT,

8    BUT LET ME ASK YOU FIRST, THE CLASS A LIMITED PARTNERS

9    WERE ALLOCATED A PRIORITY RETURN OF 6.947 PERCENT.

10    ARE YOU AWARE OF WHAT APPROXIMATE PERCENTAGE OF

11    CHEMTECH'S BOOK PROFITS THE 6.947 PERCENT COMPRISED?

12  A.  I BELIEVE IT WAS ABOUT 90 PERCENT OF THE -- CHEMTECH

13    I'S PROFITS WERE EQUIVALENT TO THAT 6.947 PERCENT

14    PRIORITY RETURN.

15  Q.  WHAT DOES RESIDUAL PROFITS REFER TO?

16  A.  PROFITS ABOVE THE PRIORITY RETURN.

17  Q.  AND TO WHAT EXTENT DID THE CLASS A PARTNERS SHARE IN

18    RESIDUAL PROFITS?

19  A.  THEY SHARED 1 PERCENT IN RESIDUAL PROFITS.

20  Q.  MTM, I BELIEVE, IS A REFERENCE TO MARK-TO-MARKET

21    GAINS.  FROM AN ACCOUNTING PERSPECTIVE, WHAT WERE THE

22    MARK-TO-MARKET PROVISION DESIGNED TO ACHIEVE?

23  A.  THE MARK-TO-MARKET PROVISIONS WERE DESIGNED TO REFLECT

24    THE INCREASES OR DECREASES IN VALUE OF ASSETS WITHIN

25    THE PARTNERSHIP SUCH THAT WHEN THERE WAS A

1    DISTRIBUTION EVENT OR AN EVENT IN WHICH A DISTRIBUTION

2    WAS TO BE MADE TO ONE OF THE PARTNERS, THERE WOULD BE

3    A MARK-TO-MARK EVENT, OR PATENTS IN PARTICULAR WOULD

4    BE MARKED AT THEIR THEN CURRENT MARKET VALUE. THE

5    MARKING TO MARKET IS THE PATENTS HAVE GONE UP IN VALUE

6    AND WOULD RESULT IN A GAIN.  THAT GAIN WAS THEN

7    ALLOCATED ONE PERCENT TO THE CLASS A PARTNERS AND THE

8    REMAINDER GOING TO THE GENERAL AND THE CLASS B

9    PARTNER.

10  Q.   AND WHAT WOULD HAVE HAPPENED IF THERE HAD BEEN A MARK-

11       TO-MARKET LOSS?

12  A.   THE LOSSES WERE ALLOCATED ONE PERCENT TO THE CLASS A

13       PARTNER.

14  Q.   THE GOVERNMENT'S EXPERTS HAVE CLAIMED THAT THIS ONE

15       PERCENT RESIDUAL PARTICIPATION WAS DISPROPORTIONATELY

16       LOW AS COMPARED WITH THE CLASS A LIMITED PARTNERS' 20

17       PERCENT CAPITAL OWNERSHIP INTEREST.  DOES THAT

18       UNDERMINE YOUR PARTICIPATION ANALYSIS?

19  A.   NO, NOT AT ALL.  THIS TIERING OF RETURNS TO DIFFERENT

20       CLASSES OF EQUITY IS NOT UNCOMMON.  AS PROFESSOR

21       KLEINBERGER SAID, IN HIS EXPERIENCE, HE SEES THIS KIND

22       OF THING IN LIMITED PARTNERSHIPS.  IN CORPORATIONS WE

23       SEE THIS TYPE OF ARRANGEMENT WITH PREFERRED STOCKS

24       WHERE PREFERRED SHAREHOLDERS GET A PRIORITY RETURN.

25       THEY GET THE FIRST BITE AT THE PROFITS, BUT THEN THEY

1    SHARE IN A RELATIVELY SMALLER PERCENTAGE OF THE

2    UPSIDE.  SO THIS IS NOT INCONSISTENT AT ALL.  AND

3    FURTHERMORE, IF WE STEP BACK AND LOOK AT THE TOTALITY

4    OF PROFITS ALLOCATED TO CLASS A PARTNERS, THEY WERE

5    ALLOCATED WITH ABOUT 20 PERCENT OWNERSHIP INTEREST, 92

6    OR 93 PERCENT OF ALL THE PROFITS, I THINK, IN CHEMTECH

7    I.  SO THE NATURE OF THE PROFIT SHARING IS ACTUALLY

8    OPPOSITE OF THE REPRESENTATION MADE BY THE

9    GOVERNMENT'S EXPERTS.

10   Q.  ARE THESE TYPES OF TRADEOFFS RECOGNIZED IN CON-6?

11   A.  YES, THEY ARE.  IN SPECIFIC THEY ARE DISCUSSED IN

12   PARAGRAPH 62, IF I CAN JUST LOOK AT THAT.  ONE OF THE

13   THINGS ---

14   Q.  FOR THE RECORD, DO WE HAVE -- IS THIS PAGE BATES

15   NUMBERED IN THERE?

16   A.  I DON'T ---

17   Q.  IT MAY NOT BE.  OKAY.  LET'S ---

18   A.  IT'S 6-18 IS THE PAGE.

19   Q.  THANK YOU.

20   A.  SO AS I UNDERSTAND THE REPORTS OF THE GOVERNMENT'S

21   EXPERTS, ONE OF THE THINGS THAT THEY DO IS THEY

22   COMPARE THE CLASS A INTEREST TO EITHER PURE DEBT OR

23   COMMON EQUITY AND THEY DON'T REALLY CONSIDER THE FACT

24   THAT THERE'S MULTIPLE CLASSES OF EQUITY THAT HAS

25   DIFFERENT RIGHTS, DIFFERENT PROFIT SHARING AND

1   DIFFERENT RISKS. AND YOU CAN SEE HERE IN PARAGRAPH 62

2   -- IF IT'S ALL RIGHT, I'LL JUST READ A LITTLE BIT OF

3   IT -- IT SAYS, "AN ENTERPRISE MAY HAVE SEVERAL CLASSES

4   OF EQUITY. FOR EXAMPLE, ONE OR MORE CLASSES EACH OF

5   COMMON STOCK OR PREFERRED STOCK WITH DIFFERENT DEGREES

6   OF RISK STEMMING FROM DIFFERENT RIGHTS PARTICIPATE IN

7   DISTRIBUTIONS OF ENTERPRISE ASSETS OR DIFFERENT

8   PRIORITIES OF CLAIMS ON ENTERPRISE ASSETS IN THE EVENT

9   OF LIQUIDATION. THAT IS, SOME CLASSES OF OWNERS MAY

10  BEAR RELATIVELY MORE OF THE RISKS OF AN ENTERPRISE'S

11  NONPROFITABILITY OR MAY BENEFIT RELATIVELY MORE FROM

12  ITS PROFITABILITY OR BOTH THAN OTHER CLASSES OF

13  OWNERS." SO AGAIN, THAT'S EXACTLY WHAT WE'RE TALKING

14  ABOUT HERE. I THINK IN THE CHEMTECH SITUATION WE HAVE

15  A CLASS A PARTNER WHO HAS A RIGHT TO A PRIORITY RETURN

16  BUT HAS DIFFERENT RISK CHARACTERISTICS THAN SOME OF

17  THE OTHER OWNERS. SO THIS IS EXPLICITLY RECOGNIZED IN

18  GAAP AS A POSSIBLITY TO HAVE MULTIPLE CLASSES OF

19  EQUITY LIKE WE HAVE AT CHEMTECH.

20  Q.  DID YOU CONSIDER LOSS PARTICIPATION IN YOUR ANALYSIS?

21  A.  YES.

22  Q.  CAN YOU TELL US WHAT -- HOW THAT AFFECTED YOUR

23      ANALYSIS?

24          BY THE COURT:

25              WHAT DID YOU CALL IT?

1          BY MR. BLANCHARD:

2               SORRY, LOSS PARTICIPATION.

3

4   BY THE WITNESS:

5   A.   I THINK YOU WENT -- SOMEBODY WENT THROUGH THIS WITH

6        MR. VALENZUELA, THAT IT WAS A MARK-TO-MARKET EVENT

7        WHERE TWO OF THE PORTFOLIOS RESULTED IN LOSSES OF

8        ABOUT 50 MILLION DOLLARS OR 55 MILLION DOLLARS AND THE

9        CLASS A PARTNERS CAPITAL ACCOUNTS WERE THEN REDUCED BY

10       1 PERCENT, THEIR SHARE OF THE LOSSES, $500,000.

11  BY MR. BLANCHARD:

12  Q.   YOU'RE REFERRING TO THE $500,000 WHICH WOULD HAVE BEEN

13       ONE PERCENT THAT WAS NETTED OUT OF AN OVERALL MARK-TO-

14       MARKET GAIN IN 1997?

15  A.   YES, THAT'S RIGHT.  MY RECOLLECTION IS THAT -- I THINK

16       YOU HAD AN EXHIBIT OR SOMEONE HAD AN EXHIBIT YESTERDAY

17       WITH MR. VALENZUELA WHERE THERE WAS ONE PORTFOLIO OF

18       PATENTS THAT HAD GONE UP IN VALUE MORE THAN TENFOLD,

19       AND THERE WERE TWO PORTFOLIO OF PATENTS THAT HAD

20       BECOME TOTALLY WORTHLESS.  THE PATENT PORTFOLIOS THAT

21       HAD BECOME TOTALLY WORTHLESS HAD DECLINED IN VALUE BY

22       ABOUT 55 MILLION, I BELIEVE.  AND SO THE CLASS A

23       PARTNERS SHARE OF THAT LOSS WAS 550,000.00.  BUT THAT

24       WAS NETTED AGAINST THIS VERY LARGE MARK-TO-MARKET GAIN

25       ON THE OTHER PATENT PORTFOLIO THAT YOU REFERRED TO,

1     MR. BLANCHARD.

2  Q.  THE GOVERNMENT'S EXPERTS HAVE CLAIMED THAT THIS ONE

3     PERCENT LOSS PARTICIPATION WAS DE MINIMIS.  FOR

4     EXAMPLE, DR. HUBBARD SAYS IN DEX 4 THAT, QUOTE, "THIS

5     UNWILLINGNESS TO ACCEPT A REAL POSSIBILITY OF A

6     DOWNSIDE RISK IS ANTITHETICAL TO THE CONCEPT OF AN

7     EQUITY ARRANGEMENT," PAGE 32 OF DEX 4.  HOW DOES THAT

8     ASSERTION IMPACT YOUR ANALYSIS?

9  A.  THERE'S NOTHING THAT SAYS THAT -- IN GAAP IT SAYS IF

10     YOU HAVE A LOW RISK OF LOSS, THAT TURNS AN EQUITY INTO

11     A DEBT SECURITY.  IN FACT THERE WAS A MEETING A COUPLE

12     YEARS AGO OF THE FASB.  THEY'RE CONSIDERING CHANGES TO

13     THE DEFINITIONS OF DEBT AND EQUITY.  AND ONE OF THE

14     PEOPLE ON THE FASB -- HIS NAME IS TOM LINSMEIER --

15     MADE A COMMENT DIRECTLY ON POINT HERE.  HE HAS

16     EFFECTIVELY SAID THAT RISK OF LOSS CANNOT BE USED TO

17     MAKE THE DETERMINATION ABOUT WHETHER OR NOT SOMETHING

18     IS EQUITY.

19  Q.  THE NEXT FACTOR ON THE CHART IS REQUIRED PERIODIC

20     PAYMENT.  WHAT'S THE GAAP AUTHORITY FOR THAT, DOCTOR?

21  A.  THIS FACTOR COMES IN RESPONSE TO DR. HENNING'S REPORT.

22     IT'S COMMONLY KNOWN THAT STRAIGHT DEBT INSTRUMENTS

23     REQUIRE PERIODIC PAYMENTS, BUT IT'S NOT EXPLICITLY

24     STATED THAT WAY IN CON-6.

25  Q.  DR. HENNING, IN FACT, PLACES GREAT WEIGHT ON THIS

1   FACTOR, CLAIMING THAT REQUIRED DISTRIBUTIONS UNDER

2   SECTION 4.2 OF THE CHEMTECH AGREEMENT MET THE

3   DEFINITION UNDER CON-6, A LIABILITY.  CAN YOU EXPLAIN

4   WHY YOU DISAGREE WITH DR. HENNING?

5   A.   SURE.  A COUPLE OF THINGS, BUT THE MAIN ONE IS THAT HE

6   ANALOGIZES THE REQUIRED PERIODIC PAYMENT TO INTEREST

7   EXPENSE, AND THE DIFFERENCE IS THAT -- WHICH HE

8   ACTUALLY ACKNOWLEDGES -- THE DIFFERENCE IS THAT WITH

9   THE CHEMTECH PARTNERSHIP, IF PROFITS WERE LESS THAN

10   THE PAYMENT UNDER SECTION 4.2, THAT WOULD RESULT IN A

11   RETURN OF CAPITAL, THE PARTNERS' CAPITAL.  THAT WOULD

12   NOT HAPPEN WITH THE DEBT INSTRUMENT.  SO LATER IN DR.

13   HENNINGS' REPORT, HE ACTUALLY MAKES THE COMMENT, IF

14   PROFITS WERE INSUFFICIENT TO COVER THE SECTION 4.2

15   DISTRIBUTION, THERE'S A REDUCTION IN PARTNER CAPITAL.

16   WELL, IF WE GO BACK TO THAT BASIC DEFINITION OF EQUITY

17   THAT WE WERE TALKING ABOUT IN SOME OF THE OTHER

18   RELATED PARAGRAPHS, MR. BLANCHARD, -- WE DON'T NEED TO

19   GO BACK -- BUT IT ESSENTIALLY SAYS THAT DISTRIBUTIONS

20   TO OWNERS REDUCE EQUITY.  SO THE PERIODIC PAYMENT HERE

21   REDUCES OWNERS' EQUITY, WHICH MEANS THAT THE CLASS A

22   INTEREST ARE EQUITY.

23   Q.   THE NEXT FACTOR LISTED IS MATURITY DATE.  WHY HAVE YOU

24   INCLUDED THAT?

25   A.   THAT, AGAIN, I BELIEVE WAS INCLUDED BY THE

1    GOVERNMENT'S EXPERTS.

2  Q.  STARTING WITH DEBT, DOES STRAIGHT DEBT ALWAYS HAVE A

3    MATURITY DATE?

4  A.  YES.

5  Q.  WHAT DOES IT MEAN WITH RESPECT TO PREFERRED STOCK TO

6    SAY THAT IT CAN BE FIXED, PERPETUAL, OR CALLABLE?

7  A.  IT COULD HAVE A FIXED LIFE OF SAY 30 YEARS OR 50

8    YEARS.  IT COULD BE PERPETUAL, NO SPECIFIED LIFE, OR

9    IT MIGHT BE CALLABLE; THAT IS THE ISSUING CORPORATION

10    MAY HAVE THE RIGHT TO CALL IT AT ITS PRESPECIFIED

11    PRICE AFTER 5 YEARS OR 10 YEARS, BUY IT BACK.

12  Q.  DID THE CLASS A PARTNERSHIP INTEREST HAVE A FIXED

13    MATURITY.

14  A.  NO, THEY DID NOT.  THEY HAD AN INDEFINITE LIFE WITH

15    NOTICE PROVISIONS.

16  Q.  WHAT WAS THE NATURE OF THE NOTICE PROVISIONS YOU ARE

17    REFERRING TO?

18  A.  THEY WERE SIMILAR IN SOME SENSE TO PUT-AND-CALL

19    OPTIONS.

20  Q.  COULD YOU EXPAND ON THAT?

21  A.  SURE.  SO THE -- I THINK THAT THE -- DOW, THROUGH

22    DTPC, HAD A CALL OPTION TO BUY THE CLASS A INTEREST IN

23    AUGUST OF 2000.  I BELIEVE IT WAS SEVEN YEARS AFTER

24    THE FORMATION.  AND THE CLASS A INVESTORS HAD THE

25    RIGHT OR THE OPTION TO PUT THEIR OWNERSHIP INTEREST

1  BACK TO CHEMTECH IF CERTAIN EVENTS OCCURRED, WHICH I

2  THINK WERE TALKED ABOUT AT VARIOUS TIMES AND THIS

3  MORNING WITH MR. KLEINBERGER, CERTAIN TESTS WEREN'T

4  DONE, AND THE LIKE.

5  Q.  IN DR. HUBBARD'S REBUTTAL REPORT HE INDICATES THAT

6  WITH RESPECT TO THE OPTIONS YOU ARE REFERRING TO,

7  QUOTE, "THIS OPTION CLOSELY RESEMBLES CALL PROVISIONS

8  FOUND IN DEBT CONTRACTS." CAN YOU COMMENT ON THAT

9  STATEMENT?

10  A.  SURE.  SO AGAIN THIS ILLUSTRATES ONE OF THE

11  SHORTCOMINGS IN THE GOVERNMENT'S EXPERTS' REPORTS.

12  PROFESSOR HUBBARD NOTES THAT THE CLASS A INTEREST HAVE

13  CALL PROVISIONS AND HE SAYS -- IMPLIES THAT MAKES THEM

14  DEBT LIKE.  THE REALITY OF IT IS, DURING THE PERIOD IN

15  QUESTION, 75 PERCENT OF PREFERRED STOCKS WERE

16  CALLABLE, AND THIS IS ARTICULATED IN A PAPER THAT

17  PROFESSOR HUBBARD CITES REPEATEDLY IN HIS REPORT.  SO

18  WHAT HE CALLS A DEBT FEATURE IS ACTUALLY A FEATURE

19  COMMON TO PREFERRED STOCK.

20  Q.  THE FINAL FACTOR ON THE LIST IS, CAN FORCE BANKRUPTCY.

21  DR. HENNING NEVER ADDRESSES THIS FACTOR.  CAN YOU

22  EXPLAIN THE SIGNIFICANCE OF THAT OVERSIGHT?

23  A.  SURE.  IT'S A COMMON FEATURE OF DEBT THAT DEBT CAN

24  FORCE BANKRUPTCY.  EQUITY CANNOT.  THIS IS SOMETHING I

25  THINK THAT PROFESSOR HUBBARD NOTES.  IT'S ANOTHER

1      OMISSION OF A SIGNIFICANT FACTOR BY DR. HENNING.

2  Q.  CAN YOU SUMMARIZE IN PLAINTIFF'S DEMONSTRATIVE 13 THEN

3      HOW THAT SUPPORTS YOUR CONCLUSION ON THE MINORITY

4      EQUITY CLASSIFICATION?

5  A.  YES.  IF WE GO THROUGH THESE CHARACTERISTICS, WE SEE

6      THAT, WITH THE EXCEPTION OF THE REQUIRED PERIODIC

7      PAYMENT, THE CLASS A INTERESTS HAVE EQUITY

8      CHARACTERISTICS, AND I EXPLAIN THE COMPLICATED FACTOR

9      WITH REQUIRED PERIODIC PAYMENT.  YOU ALSO SEE THAT THE

10      CLASS A INTERESTS ARE MORE EQUITY LIKE THAN AN

11      ACCEPTED EQUITY SECURITY UNDER U.S. GAAP.  SO THIS

12      DEMONSTRATIVE ILLUSTRATES, I THINK, QUITE CLEARLY THAT

13      THE CLASS A INTERESTS WERE APPROPRIATELY TREATED AS

14      EQUITY UNDER U.S. GAAP.

15  Q.  PROFESSOR ERICKSON, DR. HENNING OPINES IN HIS INITIAL

16      REPORT THAT DOW'S CHARACTERIZATION OF THE CLASS A

17      PARTNER INTEREST AS MINORITY EQUITY, QUOTE, "VIOLATED

18      GAAP."  I KNOW YOU REBUT DR. HENNING IN DEPTH AT PAGES

19      24 THROUGH 37 OF YOUR REBUTTAL REPORT, PEX 4.  COULD

20      YOU PLEASE SUMMARIZE YOUR REACTION TO THIS OPINION?

21  A.  THAT CONCLUSION IS UNREASONABLE AND UNSUPPORTED. TO

22      SAY THAT DOW VIOLATED GAAP IS A FAIRLY SERIOUS CHARGE.

23      IT'S BASICALLY SAYING THEY BROKE THE ACCOUNTING LAW.

24      IT'S NOT A MINOR THING.  AND WHAT HE'S EFFECTIVELY

25      SAYING IS THAT DOW'S ACCOUNTANTS, CHEMTECH'S

1    ACCOUNTANTS, DELOITTE AND TOUCHE ALL VIOLATED GAAP FOR

2    MORE THAN A DECADE WITHOUT REALLY ANY BASIS TO MAKE

3    THAT STATEMENT.  AND IF WE GO A LITTLE FARTHER, DR.

4    HENNING IS BASICALLY RESTING HIS CONCLUSION ON WHAT HE

5    REFERS TO AS SUBSTANCE OVER FORM, AND WHILE HE'S DOING

6    THAT, WHAT HE CALLS HIS SUBSTANCE-OVER-FORM ANALYSIS,

7    HE OMITS SEVERAL SIGNIFICANT FACTORS IN HIS REVIEW OF

8    THE CLASS A INTEREST IN HIS PURPORTED ANALYSIS OF

9    SUBSTANCE.

10   Q.   IS SUBSTANCE OVER FORM A GAAP RULE?

11   A.   NO, IT'S NOT A RULE. IT'S -- IN FACT, IF WE WERE TO

12   LOOK AT CONCEPT STATEMENT NUMBER TWO, THERE'S A

13   DISCUSSION IN PARAGRAPH 160 OF SUBSTANCE OVER FORM AND

14   THAT PARAGRAPH EXPLICITLY INDICATES THAT THAT NOTION

15   WAS REJECTED AS PART OF CONCEPT STATEMENT NUMBER TWO

16   AND GOES ON TO SAY THAT SUBSTANCE OVER FORM IS A VAGUE

17   CONCEPT THAT DEFIES PRECISE DEFINITION.

18   Q.   DOES THAT MEAN THAT THE SUBSTANCE OF THE CHEMTECH

19   PARTNERSHIP WAS IRRELEVANT TO YOUR OWN ANALYSIS?

20   A.   NO, IT DOES NOT.

21   Q.   CAN YOU EXPAND ON THAT?

22   A.   SURE.  AGAIN, THE OBJECTIVE OF GAAP IS TO REPRESENT

23   THE SUBSTANCE OF THE UNDERLYING TRANSACTIONS, AND AS

24   WE'VE SEEN NOW, DELOITTE AND TOUCHE LOOKED AT THE

25   SUBSTANCE OF THE CLASS A INTEREST.  THEY CONCLUDED IN

1    SUBSTANCE THEY WERE EQUITY.  I'VE WALKED THROUGH MY

2    ANALYSIS OF THE CLASS A LIMITED PARTNERSHIP INTEREST

3    FEATURES.  IN SUBSTANCE THEY WERE EQUITY.  SO THE

4    OBJECTIVE OF GAAP IS TO REFLECT THE SUBSTANCE AND I

5    DON'T WANT TO LEAVE THE IMPRESSION THAT THAT IS NOT

6    THE CASE.

7  Q.  PROFESSOR HUBBARD USES A POLAR ANALYSIS COMPARING

8    STRAIGHT DEBT AND COMMON EQUITY, AS WE'VE DISCUSSED,

9    TO CONCLUDE THAT THE CLASS A INTEREST WERE, QUOTE,

10    MORE AKIN TO DEBT THAN EQUITY.  CAN YOU CONTRAST YOUR

11    APPROACH WITH DR. HUBBARD'S?

12  A.  YES.  SO A FIRST DIFFERENCE IS THAT, AS I SAID

13    EARLIER, IN ACCOUNTING WE HAVE RULES, WE HAVE

14    DEFINITIONS OF DEBT AND EQUITY.  WE MAKE THESE

15    DETERMINATIONS ALL THE TIME.  EVERY MAJOR CORPORATION

16    MAKES THESE DETERMINATIONS ALL THE TIME. IT'S

17    SOMETHING THAT ACCOUNTANTS DO.  TO MY KNOWLEDGE,

18    ECONOMISTS DON'T HAVE A SIMILAR SET OF RULES. I HAD TO

19    PASS A TEST WHEN I WAS -- TO BECOME A CPA.  OTHER

20    PEOPLE HAVE TO DO THAT SAME KIND OF THING.  WE'RE

21    LICENSED; WE HAVE RULES; WE HAVE STANDARDS.  I DON'T

22    THINK THERE'S ANY ANALOG IN ECONOMICS TO DOING THIS

23    KIND OF ANALYSIS.  FURTHERMORE, SOME OF THE FACTORS

24    THAT PROFESSOR HUBBARD LOOKS AT, WITH ALL DUE RESPECT,

25    HE SEEMS TO DISMISS THEM FOR SOME AD HOC REASONS. AND

1    THEN LASTLY, AS I THINK I'VE SAID A FEW TIMES HERE

2    THIS AFTERNOON, THE GOVERNMENT'S EXPERTS, INCLUDING

3    PROFESSOR HUBBARD, DON'T CONSIDER PREFERRED STOCK AS A

4    SECURITY TO WHICH TO COMPARE THE CLASS A INTEREST.

5    AND THAT'S SOMEWHAT SURPRISING FOR PROFESSOR HUBBARD

6    SINCE HE'S COMMENTED TO THE FINANCIAL PRESS PUBLICALLY

7    DURING THE FINANCIAL CRISIS ABOUT THE EFFICIENT USE OF

8    PREFERRED STOCK IN THE TARP PROGRAM.  IT DOESN'T BRING

9    IT TO BEAR HEAR IN THIS MATTER.  SO THOSE, I THINK,

10   ARE THE MAIN CRITICISMS.

11  Q.  I'D LIKE TO TURN TO YOUR FINAL OPINION NOW, SO LET'S

12   CIRCLE BACK, IF WE COULD, TO PLAINTIFF'S DEMONSTRATIVE

13   FIVE AND WE WANT TO MOVE YOUR THIRD CONCLUSION THAT

14   THE PARTNERSHIP BOOK ACCOUNTING REFLECTED THE

15   ECONOMICS OF THE PARTY'S DEAL.  BY WAY OF REVIEW, WHEN

16   YOU REFER TO PARTNERSHIP BOOK ACCOUNTING, HOW DOES

17   THAT DIFFER FROM CONSOLIDATED GAAP ACCOUNTING?

18  A.  AGAIN, THE PARTNERSHIP BOOK ACCOUNTING IS DESIGNED TO

19   TRACK JUST THE ECONOMICS OF THE PARTNERSHIP ITSELF,

20   NOT THE CONSOLIDATED GAAP.

21  Q.  HOW DOES THAT MANIFEST ITSELF IN TERMS OF CONCRETE

22   DIFFERENCES HERE?

23  A.  SURE.  SO THE MAIN DIFFERENCE IS THAT ON DOW'S

24   CONSOLIDATED GAAP FINANCIAL STATEMENTS, THE PATENT

25   ASSETS REMAINED AT THEIR HISTORIC BOOK VALUE, WHICH

1      WAS ABOUT 54,000 YOU SAID.  ON CHEMTECH'S PARTNERSHIP

2      BOOKS, THE PATIENT ASSETS WERE RECORDED AT THEIR THEN

3      CURRENT FAIR MARKET VALUE, WHICH I THINK WAS ON THE

4      ORDER OF ABOUT 882 MILLION DOLLARS AT THE TIME OF

5      CHEMTECH I. THAT'S THE PRIMARY ACTUAL DIFFERENCE IN

6      ACCOUNTING BETWEEN CONSOLIDATED DOW AND THE

7      PARTNERSHIP BOOK ACCOUNTING.

8   Q.  IN THE CONTEXT OF THE PARTY'S ECONOMIC DEAL, WHY DOES

9      IT MAKE SENSE FOR PARTNERSHIP BOOK ACCOUNTING TO

10      DIFFER FROM THE CONSOLIDATED GAAP ACCOUNTING CONCEPTS?

11  A.  WELL, AGAIN, THERE'S DIFFERENT OBJECTIVES.  THE

12      PARTNERSHIP BOOK ACCOUNTING IS TRYING TO REFLECT THE

13      ECONOMICS OF THE ARRANGEMENT AMONG THE PARTNERS.  THE

14      DOW CONSOLIDATED BOOKS ARE DESIGNED TO REFLECT THE

15      CONSOLIDATED DOW GROUP.  IT WOULDN'T MAKE SENSE FOR

16      THE CONSOLIDATED DOW GROUP TO RECOGNIZE THE PATENTS AT

17      900 MILLION DOLLARS ON THEIR FINANCIAL STATEMENT

18      BECAUSE IF THEY DID THAT WOULD CREATE A 900 MILLION

19      DOLLAR GAIN ON DOW'S FINANCIAL STATEMENTS, AND

20      OBVIOUSLY WE CAN'T HAVE CORPORATIONS CONTRIBUTING

21      ASSETS TO SUBSIDIARIES RECOGNIZING VERY LARGE GAINS.

22      THAT WOULD BE MISLEADING AND INAPPROPRIATE.  SO THAT'S

23      THE BASIC -- THAT'S THE BASIC RULES.  THE PATENTS ARE

24      STILL UNDER OR HELD WITHIN AN ENTITY THAT DOW OWNS A

25      MAJORITY INTEREST.

1  Q.  WE'VE SPOKEN ABOUT THE PARTNER'S CAPITAL ACCOUNTS.

2      CAN YOU TELL US WHAT THE FUNCTION OF A CAPITAL ACCOUNT

3      IS IN THE PARTNERSHIP CONTEXT?

4  A.  YES.  THE FUNCTION OF THE CAPITAL ACCOUNT IS TO TRACK

5      THE PARTNERS' INVESTMENT IN THE PARTNERSHIP. IT

6      RECORDS THEIR INITIAL CAPITAL CONTRIBUTION PLUS

7      PROFITS LESS LOSSES MINUS DISTRIBUTIONS.  IT KEEPS

8      TRACK OF THEIR OWNERSHIP POSITION IN THE PARTNERSHIP.

9  Q.  LET'S LOOK AT THAT IN A BIT MORE DETAIL.  TURN TO

10     PLAINTIFF'S DEMONSTRATIVE 14.  IF YOU WOULD, JUST WALK

11     US THROUGH THE HIGH LEVEL MECHANICS.

12 A.  SURE.  SO THE WAY THE PARTNER CAPITAL ACCOUNTS WORK

13     ARE AS FOLLOWS: EACH PARTNER STARTS OUT WITH A BALANCE

14     IN A CAPITAL ACCOUNT EQUAL TO THE FAIR MARKET VALUE OF

15     THE PROPERTY CONTRIBUTED.  SO IN THIS CASE IN THE

16     EXAMPLE OF THE CLASS B PARTNER WHO CONTRIBUTED THE

17     PATENT ASSETS -- EXCUSE ME.  THE BEGINNING CAPITAL

18     ACCOUNT BALANCE WOULD BE 883 MILLION DOLLARS.  TO THAT

19     CAPITAL ACCOUNT BALANCE WOULD BE ADDED PROFITS AND

20     MARK-TO-MARKET GAINS.  SO WE'VE TALKED ABOUT THOSE A

21     LITTLE BIT.  THE MARK-TO-MARKET GAINS FOR THE CLASS A

22     PARTNERS OVER THE LIFE OF THE PARTNERSHIP WERE ABOUT

23     2.9 MILLION DOLLARS.  THOSE GAINS WERE ADDED THEN TO

24     THE CLASS A PARTNERS' CAPITAL ACCOUNTS.  PERIODIC

25     LOSSES AND MARK-TO- MARKET LOSSES WERE REDUCTIONS IN

```
1        THE PARTNER CAPITAL ACCOUNTS. SO WE HAD THE DISCUSSION
2        A MOMENT AGO ABOUT THE MARK-TO-MARKET LOSSES ON THOSE
3        TWO PATENT PORTFOLIOS.  THOSE LOSSES REDUCED PARTNER
4        CAPITAL ACCOUNTS.  THEN DISTRIBUTIONS OF THE FAIR
5        MARKET VALUE OF EITHER CASH OR PROPERTY TO THE
6        PARTNERS, WHETHER THAT BE THE RECURRENT DISTRIBUTIONS
7        UNDER SECTION 4.2 OR DISTRIBUTIONS OF PROPERTY THAT
8        ARE INFREQUENT, THEY REDUCE THE PARTNER CAPITAL
9        ACCOUNTS.  THE SUM OF ALL THOSE EVENTS GIVES US THE
10       ENDING PARTNER CAPITAL ACCOUNT AT A PARTICULAR POINT
11       IN TIME.
12  Q.   CAN YOU EXPLAIN THE RELATIONSHIP OF THE CAPITAL
13       ACCOUNTS TO THE NET ASSETS OF THE PARTNERSHIP?
14  A.   THEY SHOULD BE EQUIVALENT AT ANY POINT IN TIME,
15       ASSUMING YOU'VE HAD A MARK-TO-MARKET EVENT.
16  Q.   WHEN YOU SAY "THEY," ARE YOU REFERRING TO THE
17       AGGREGATE CAPITAL ACCOUNT VALUE?
18  A.   YES.  I'M SORRY.  THE AGGREGATE CAPITAL ACCOUNT VALUE
19       OF THE PARTNERSHIP SHOULD BE EQUAL TO THE NET ASSETS
20       OF THE PARTNERSHIP.
21  Q.   PROFESSOR ERICKSON, AS YOU MENTIONED WHEN WE WERE
22       DISCUSSING THE FACTORS RELEVANT TO DOW'S MINORITY
23       EQUITY CLASSIFICATION, YOU MADE THE POINT THAT THE
24       CLASS A PARTNERS WERE ENTITLED TO PERIODIC
25       DISTRIBUTIONS EQUAL TO THEIR PRIORITY RETURN AMOUNTS.
```

1    I WANT TO SHOW YOU PLAINTIFF'S DEMONSTRATIVE 15 AND

2    ASK YOU TO EXPLAIN HOW THOSE DISTRIBUTIONS RELATED TO

3    THE PROFIT ALLOCATIONS OF PRIORITY RETURN USING THIS

4    DEMONSTRATIVE.

5  A.   OKAY.  SURE.  THE POINT OF THE DEMONSTRATE IS TO

6    ILLUSTRATE THE DIFFERENCE BETWEEN A PROFIT ALLOCATION

7    AND A DISTRIBUTION.  AND IN PARTICULAR IN THIS CASE,

8    THE DISTRIBUTION WILL -- IT EXCEEDS THE AMOUNT OF THE

9    PROFIT ALLOCATED.  SO THE CLASS A PARTNERS STARTED

10   WITH A 200 MILLION DOLLAR CAPITAL ACCOUNT BALANCE.

11   ASSUME ABOUT A 14 MILLION DOLLAR DISTRIBUTION UNDER

12   SECTION 4.2 DURING A YEAR.  THAT CASH DISTRIBUTION

13   REDUCES THE PARTNER CAPITAL ACCOUNT JUST AS WE WENT

14   THROUGH A MOMENT AGO.  LET'S ASSUME IN THAT PARTICULAR

15   YEAR THE PROFIT ALLOCATED TO THE CLASS A PARTNERS WAS

16   10 MILLION DOLLARS.  IN THAT CASE -- EXCUSE ME.  A

17   PROFIT ALLOCATION INCREASES THE PARTNER CAPITAL

18   ACCOUNT.  IN THAT CASE WE SEE THAT THE PARTNER CAPITAL

19   ACCOUNT IS DECREASED FROM 200 TO 196.  SO IN A

20   SITUATION WHERE PROFITS ARE LESS THAN THE RECURRING

21   DISTRIBUTION, YOU HAVE A REDUCTION IN THE PARTNER

22   CAPITAL ACCOUNT. NOW, THIS WOULD NOT HAPPEN IF THE

23   CLASS A INTEREST WERE DEBT.  WE DON'T GET THE SAME

24   OUTCOME HERE.  THIS ILLUSTRATES THE EQUITY NATURE OF

25   THE CLASS A INTEREST.

1  Q.  ONE COMPONENT OF THE CAPITAL ACCOUNT THAT YOU

2      DESCRIBED IS PROFIT ALLOCATIONS.  CAN YOU EXPLAIN HOW

3      PROFITS WERE COMPUTED UNDER THE CHEMTECH I PARTNERSHIP

4      AGREEMENT?

5  A.  SURE.  AS I RECALL, THERE ARE ROYALTY PAYMENTS THAT

6      ARE RECEIVED BY CHEMTECH AND THAT'S THE PRIORITY

7      SOURCE OF REVENUE.  AND THEN THERE ARE FOUR OR FIVE

8      EXPENSES.  THERE'S PATENT AMORTIZATION EXPENSE, WHICH

9      IS A LARGE EXPENSE. THERE'S A GUARANTIED PAYMENT TO

10     THE CLASS B PARTNER. THERE ARE -- THERE'S A MANAGEMENT

11     FEE AND THEN THERE ARE SOME MISCELLANEOUS EXPENSES.  I

12     THINK THOSE ARE THE FOUR MAIN EXPENSES.

13 Q.  YOU MENTIONED AMORTIZATION, PATENT AMORTIZATION

14     EXPENSE.  WHAT DOES AMORTIZATION REPRESENT AND HOW IS

15     IT CALCULATED?

16 A.  AMORTIZATION REPRESENTS THE PERIODIC UTILIZATION FOR

17     EACH PARTICULAR PERIOD OF AN INTANGIBLE ASSET.  SO

18     WITH SOMETHING LIKE PATENTS THAT CAN BE USED UP.  I

19     DON'T' UNDERSTAND EXACTLY THE LAW OF PATENTS BUT THEY

20     HAVE A LIMITED LIFE, AS I UNDERSTAND IT, AND THE

21     PATENT EXPIRES AT SOME POINT.  SO YOU CAN ONLY USE

22     THAT PATENT PRESUMABLY FOR SOME PERIOD OF TIME.  SO

23     WHAT ONE DOES IS WE RECOGNIZE THE USE -- THE

24     UTILIZATION OF THAT PATENT AFTER EACH PERIOD AS IT

25     DECLINES IN VALUE.  THAT'S AMORTIZATION EXPENSE.  AND

1    WHAT WE'RE REALLY DOING IS WE'RE MATCHING THE EXPENSE

2    OF USING A PATENT WITH THE REVENUES IT GENERATES SO

3    THAT WE MATCH REVENUES AND EXPENSES, WHICH IS A BASIC

4    PRINCIPLE OF ACCOUNTING.

5  Q.   HOW DID THESE PROFIT AMOUNTS FLOW THROUGH TO THE

6    PARTNERS' CAPITAL ACCOUNTS?

7  A.   AFTER CHEMTECH COMPUTED ITS PROFITS, THEN PROFITS WERE

8    ALLOCATED TO THE PARTNERS FOLLOWING A FORMULATED

9    APPROACH, WHICH I THINK I REMEMBER HEARING IT

10    DISCUSSED BY ONE OF THE FACT WITNESSES.  I CAN'T

11    REMEMBER WHO.  BUT THAT'S WHEN WE GET INTO THE

12    PRIORITY RETURN OF 6.947 PERCENT THAT GOES 99 PERCENT

13    TO THE CLASS A PARTNER AND ONE PERCENT TO THE OTHER

14    PARTNERS AND SO ON WITH THIS WATERFALL THAT WE

15    DISCUSSED.

16  Q.   AS HAS BEEN STIPULATED AND DISCUSSED, THE CLASS A

17    LIMITED PARTNERS WERE ALLOCATED APPROXIMATELY 2.9

18    MILLION OF MARK-TO-MARKET GAINS DURING THE COURSE OF

19    THEIR INVESTMENT IN CHEMTECH I.  HOW DID THIS

20    ALLOCATION IMPACT THEIR CAPITAL ACCOUNTS?

21  A.   THAT ALLOCATION INCREASED THEIR CAPITAL ACCOUNT.

22  Q.   ON PURCHASE OF THE CLASS A LIMITED PARTNERS' INTEREST

23    IN 1998, IT STIPULATED THAT IFCO PAID A PURCHASE PRICE

24    THAT INCLUDED THE CAPITAL ACCOUNT BALANCES OF THE

25    CLASS A PARTNERS.  TO WHAT EXTENT WERE THE ENDING

1     CAPITAL ACCOUNT BALANCES REFLECTIVE OF THE CAPITAL

2     ACCOUNT MAINTENANCE PRINCIPLES WE'VE BEEN DISCUSSING?

3 A.  THEY FOLLOW THOSE PRINCIPLES, AND THAT 2.9 MILLION

4     DOLLAR MARK-TO-MARKET GAIN THAT YOU REFERRED TO, THE

5     CLASS A PARTNERS ULTIMATELY RECEIVED THE CASH

6     ASSOCIATED WITH THAT MARK-TO-MARKET GAIN WHEN THEY

7     SOLD THEIR INTEREST IN THE TRANSACTION THAT YOU JUST

8     REFERRED TO.

9 Q.  HAVE YOU REVIEWED THE CHEMTECH I AND CHEMTECH II

10     PARTNERSHIP AGREEMENTS?

11 A.  YES, I HAVE.

12 Q.  HAVE YOU ALSO REVIEWED THE PARTY'S STIPULATED

13     PARTNERSHIP BOOK ACCOUNTING FOR 1993 THROUGH 2003?

14 A.  YES, I HAVE.

15 Q.  TO WHAT EXTENT, IF AT ALL, DID YOU CONCLUDE THAT THE

16     PARTNERSHIP BOOK ACCOUNTING FOR CHEMTECH I AND

17     CHEMTECH II ACCURATELY REFLECTED THE ECONOMIC TERMS OF

18     THE PARTNERSHIP AGREEMENT?

19 A.  I CONCLUDED THAT IT DID.

20 Q.  ARE YOU AWARE WHETHER THE GOVERNMENT'S ACCOUNTING

21     EXPERT, DR. HENNING, HAS DISPUTED YOUR DESCRIPTION OF

22     THE PARTNERSHIP BOOK ACCOUNTING?

23 A.  AT HIS DEPOSITION HE DID NOT DISPUTE ANY ELEMENT OF

24     THE BOOK ACCOUNTING IS MY RECOLLECTION. HE AGREED THAT

25     IT WAS CORRECT AS I HAD ARTICULATED IT.

1 Q.   IN CONNECTION WITH YOUR PROFESSIONAL WORK, HAVE YOU

2      HAD OCCASION TO BECOME FAMILIAR WITH PARTNERSHIP

3      ACCOUNTING, BOOK ACCOUNTING RULES UNDER SECTION 704B?

4 A.   A LITTLE BIT.

5 Q.   DID YOU COMPARE THE ALLOCATIONS UNDER THE CAPITAL

6      ACCOUNT MAINTENANCE THAT WAS CONDUCTED IN CHEMTECH

7      WITH THOSE PROVISIONS?

8 A.   I DID FOR -- I THINK THERE'S MAYBE SEVEN OF THEM --

9      FOR THE FIRST FIVE, I DID. THE SIXTH ONE AND THE

10     SEVENTH ONE I WAS UNABLE TO DO THAT.  BUT FOR THE

11     FIRST FIVE, I COMPARED THE PARTNERSHIP BOOK ACCOUNTING

12     TO THOSE FIRST FIVE ELEMENTS.

13 Q.   WHAT DID YOU CONCLUDE?

14 A.   THAT THEY FOLLOW THOSE PROCEDURES.

15 Q.   I'D LIKE TO TURN NOW TO SOME REBUTTAL POINTS, CHIEFLY

16     SOME REBUTTAL POINTS IN CONNECTION WITH SOME OF DR.

17     HUBBARD'S OPINIONS.  THE FIRST OF THOSE RELATES TO HIS

18     CRITICISM OF YOUR INITIAL REPORT BASED ON THE

19     EFFICIENT MARKET'S HYPOTHESIS.  HE CRITICIZES YOUR

20     OPINION RELATING TO DOW'S REASONABLE EXPECTATION OF

21     ECONOMIC BENEFIT.  LET ME ASK YOU, DO YOU HAVE A

22     GENERAL UNDERSTANDING WHAT IS MEANT BY THE PHRASE

23     "EFFICIENT MARKET'S HYPOTHESIS"?

24 A.   YES, I DO.

25 Q.   COULD YOU RELAY THAT TO US?

1  A.    SURE.  THE BASIC IDEA UNDER THE EFFICIENT MARKET

2        HYPOTHESIS IS THAT MARKET PRICES REFLECT AVAILABLE

3        INFORMATION BECAUSE IF THEY DIDN'T, THEN SOMEONE COULD

4        TRADE AND MAKE MONEY.  SO THEREFORE THE MARKET PRICE

5        MUST ALWAYS BE RIGHT.  THAT'S WHAT PEOPLE  USED TO

6        SAY ANYWAY.  NOW WHAT THEY TYPICALLY SAY IS THE MARKET

7        PRICE MAY BE WRONG, BUT YOU CAN'T MAKE ANY MONEY FROM

8        THE WRONG PRICE BECAUSE YOU'RE NOT SURE WHEN IT WILL

9        GET TO BE THE RIGHT PRICE.

10 Q.    PROFESSOR HUBBARD STATES THAT, QUOTE, "ONE OF THE

11       POTENTIAL SOURCES OF BENEFIT FROM THE CHEMTECH

12       TRANSACTION, ACCORDING TO DR. ERICKSON'S REPORT, IS

13       THAT DOW COULD USE A PARTICULAR TYPE OF ACCOUNTING

14       TREATMENT TO CONCEAL THE TRUE NATURE OF ITS

15       FINANCING."  IS THAT WHAT YOU ARGUED IN YOUR REPORT?

16 A.    NO, IT'S NOT.

17 Q.    WHY NOT?

18 A.    WHAT I ARGUED IN MY REPORT WAS THAT DOW STRUCTURED THE

19       CHEMTECH TRANSACTION SO THAT IT WOULD APPROPRIATELY

20       ACCOUNT FOR THE CLASS A INTEREST AS EQUITY UNDER U.S.

21       GAAP.  THERE'S NO ATTEMPT TO FOOL THE MARKET.  WHAT

22       DOW DID WAS TRY TO AND DID STRUCTURE THE TRANSACTION

23       SO THAT IT WAS APPROPRIATE AND PROPER TO ACCOUNT FOR

24       THE CLASS A INTEREST AS EQUITY.

25 Q.    DO YOU HAVE A GENERAL VIEW OF THE EFFICIENT MARKET'S

1  HYPOTHESIS?

2  A.  YES, I DO.  I'M VERY FAMILIAR WITH IT, AND, AS I

3  DISCUSSED AT MY DEPOSITION, IT'S -- FOR ANYONE WHO'S A

4  PH.D IN A BUSINESS SCHOOL, IT'S KIND OF A STARTING

5  PRINCIPLE IN YOUR BEGINNING PH.D PROGRAM, SO I'M VERY

6  FAMILIAR WITH IT.  IT'S A WELL-KNOWN IDEA.  IT'S VERY

7  USEFUL IN TERMS OF THE WAY WE MIGHT THINK ABOUT HOW

8  INFORMATION AFFECTS SECURITY PRICES.

9  Q.  TO WHAT EXTENT, IF AT ALL, IS THERE EVIDENCE

10  INDICATING THAT THE MARKET IS NOT EFFICIENT?

11  A.  THERE'S A LOT OF EVIDENCE THAT THE MARKET IS NOT

12  EFFICIENT AND ONE DOESN'T HAVE TO LOOK VERY FAR.

13  WHAT'S HAPPENED IN THE LAST FEW YEARS IS PRETTY

14  OVERWHELMING EVIDENCE TO THAT, TO THAT CASE.

15  Q.  DOES THE REAL WORLD BEHAVE IN ACCORDANCE WITH THE

16  THEORY?

17  A.  NO, IT DOES NOT.  AND THAT'S ONE OF THE COMMENTS THAT

18  YOU SEE QUITE A BIT THESE DAYS, THAT WHAT'S HAPPENED

19  AT VARIOUS POINTS IN TIME DO NOT CALIBRATE WITH THE

20  THEORY.

21  Q.  DO NON-ACADEMICS UNIFORMLY ENDORSE THE EFFICIENT

22  MARKETS THEORY?

23  A.  NO, THEY DON'T.  THE PERSON WHO CAME UP WITH THE

24  EFFICIENT-MARKET HYPOTHESIS IS A PROFESSOR AT THE

25  UNIVERSITY OF CHICAGO.  HIS OFFICE IS RIGHT DOWN THE

1    HALL FROM ME.  I SEE HIM ALL THE TIME.  HE'S A GREAT

2    GUY.  HIS NAME IS GENE FAMA.  AND HE DID A SHORT

3    ARTICLE ON THE WEBSITE FOR THE FUND THAT HE RUNS.  AND

4    EFFECTIVELY WHAT HE SAID ON THIS WEBSITE WAS THAT MOST

5    ACTIVE FUND MANAGERS DON'T BELIEVE IN THE EFFICIENT

6    MARKET HYPOTHESIS.  HEDGE FUNDS DON'T BELIEVE IN THE

7    EFFICIENT MARKET HYPOTHESIS.  AND HE'S IN THE MINORITY

8    OF PEOPLE WHO BELIEVE IN THE EFFICIENT MARKET

9    HYPOTHESIS.  SO THIS IS THE PERSON WHO CAME UP WITH

10   THE THEORY.  IT'S A RECENT ARTICLE HE WROTE, I DON'T

11   KNOW, A YEAR OR SO AGO.

12 Q.  IS THERE EMPIRICAL EVIDENCE FROM THE ACADEMIC

13   LITERATURE THAT THE MARKET IS NOT EFFICIENT WITH

14   RESPECT TO SOME ACCOUNTING INFORMATION?

15 A.  YES, THERE IS.  THERE'S EVIDENCE THAT THE MARKET IS

16   INEFFICIENT WITH REGARD TO VERY BASIC TYPES OF

17   ACCOUNTING INFORMATION IN ADDITION TO MORE COMPLEX

18   TYPES OF ACCOUNTING INFORMATION.

19 Q.  DO EMPIRICAL STUDIES PROVIDE EVIDENCE OF MARKET

20   INEFFICIENCY WITH RESPECT TO THE ACCOUNTING FOR OFF-

21   BALANCE SHEET TRANSACTIONS?

22 A.  YES.  THERE'S A VARIETY OF PUBLICATIONS THAT INDICATE

23   THAT STOCK PRICES ARE NOT EFFICIENT WITH RESPECT TO

24   OFF-BALANCE SHEET TYPE TRANSACTIONS LIKE PENSIONS AND

25   LEASES.

1  Q.  ARE YOU CLAIMING THAT DOW'S ANTICIPATED BENEFIT FROM

2      THE MINORITY EQUITY TREATMENT IN THE CHEMTECH

3      TRANSACTION WAS THE RESULT OF MARKET INEFFICIENCY?

4  A.  NO.

5  Q.  CAN YOU EXPAND ON THAT, PLEASE?

6  A.  AGAIN, DOW'S OBJECTIVE IN CHEMTECH WAS TO STRUCTURE

7      THE CLASS A INTERESTS SO THAT THEY WERE APPROPRIATELY

8      TREATED AS EQUITY UNDER U.S. GAAP.  WE'VE SEEN IN THE

9      TESTIMONY OF THE DOW FACT WITNESSES AND HOPEFULLY IN

10     MY TESTIMONY THIS AFTERNOON THAT THE CREDIT RATING

11     AGENCIES HAD A VERY SPECIFIC DEFINITION OF WHAT TYPES

12     OF ITEMS AFFECTED THE DEBT-TO-CAPITAL RATIO IN A

13     POSITIVE WAY AND WHAT AFFECTED IT IN A NEGATIVE WAY.

14     THIS TRANSACTIONS WAS STRUCTURED SO PROPERLY TO BE

15     ACCOUNTED FOR AS EQUITY AND TO FAVORABLY IMPACT THAT

16     RATIO.

17 Q.  DO USERS OF GAAP FINANCIAL STATEMENTS TYPICALLY

18     CONDUCT INDEPENDENT INVESTIGATION INTO THE ECONOMICS

19     OF TRANSACTIONS REFLECTED IN THOSE FINANCIAL

20     STATEMENTS?

21 A.  NO, THEY DON'T.  THEY DO NOT DO THEIR OWN AUDIT OF THE

22     FINANCIAL STATEMENTS THAT THEY'RE REVIEWING.  AND

23     SPECIFICALLY IF WE LOOK AT THE STANDARD AND POOR'S

24     DOCUMENTS THAT HAVE BEEN REFERRED TO IN THIS CASE,

25     STANDARD AND POOR'S THEMSELVES SAYS WE RELY ON THE

1    AUDITED FINANCIAL STATEMENTS. WHEN STANDARD AND POOR'S

2    HAS TESTIFIED IN FRONT OF CONGRESS, THEY HAVE

3    EXPLICITLY TOLD CONGRESS, WE DO NOT AUDIT THE

4    FINANCIAL STATEMENTS OF THE FIRMS WE RATE; WE RELY ON

5    THE AUDITORS; WE'RE NOT FORENSIC ACCOUNTANTS.

6  Q.   I WANT ASK YOU TO ADDRESS THE GOVERNMENT'S CLAIM THAT

7    SO-CALLED MIPS FINANCING INSTRUMENTS WE TOUCHED ON

8    BRIEFLY IN CONNECTION WITH YOUR OWN RESEARCH, PROVIDE

9    A LOWER-COST ALTERNATIVE TO THE CHEMTECH TRANSACTION.

10    BEFORE WE ADDRESS THAT SPECIFIC ASSERTION, I JUST WANT

11    TO PAUSE BRIEFLY TO GIVE YOU A CHANCE TO EXPLAIN TO

12    THE COURT WHAT MIPS ARE AND WHY THEIR CHARACTERISTICS

13    ARE USEFUL TO THE CASE.  FIRST OF ALL, WHAT DOES THE

14    ACRONYM MIPS STAND FOR?

15  A.   IT STANDS FOR MONTHLY INCOME PREFERRED SECURITIES.

16  Q.   IS THERE A SIMILAR INSTRUMENT KNOWN AS TPS, OR TRUST

17    PREFERRED STOCK?

18  A.   YES, THERE IS.  SO MIPS WERE DONE THROUGH A

19    PARTNERSHIP STRUCTURE TYPICALLY, AND TRUST PREFERRED

20    STOCK WAS DONE THROUGH A TRUST.  AND I THINK MR. FALLA

21    MENTIONED TRUST PREFERRED STOCK IN HIS TESTIMONY AND

22    SAID THAT DOW HAD CONSIDERED BUT REJECTED TRUST-

23    PREFERRED STOCK AT SOME POINT IN TIME AND THAT THE

24    REASON HE REJECTED IT WAS BECAUSE HE FELT THAT WAS TOO

25    AGGRESSIVE IN TERMS OF THE TAX. BUT I THINK WE'RE

1    GOING TO TALK ABOUT A LITTLE BIT HOW MIPS AND TRUST

2    PREFERRED STOCK WORK.

3  Q.   YOU PUBLISHED AN ARTICLE ON MIPS, CORRECT?

4  A.   YES, SIR.

5  Q.   IS MIPS ALSO THE SUBJECT OF YOUR TEACHING?

6  A.   YES, IT IS.  I HAVE A TEACHING CASE ON MIPS THAT I'VE

7    DONE FOR MANY YEARS, AND IT'S ALSO USED AT OTHER

8    UNIVERSITIES AROUND THE COUNTRY.

9  Q.   YOU DISCUSS MIPS AT SOME LENGTH IN YOUR REPORTS AND

10    I'D LIKE YOU TO PLEASE EXPLAIN WHY.

11  A.   SURE.  SO THE -- AS I SAID BEFORE LUNCH, MIPS WERE A

12    TRANSACTION THAT WAS DESIGNED TO ACHIEVE SOME OF THE

13    SAME BENEFITS THAT THE CHEMTECH TRANSACTIONS WERE

14    DESIGNED TO ACHIEVE, BENEFICIAL BALANCE SHEET

15    TREATMENT. AND MIPS WERE A TRANSACTION THAT I WAS

16    FAMILIAR WITH WHEN I CAME TO THIS CASE BUT WERE A

17    FINANCIAL SECURITY THAT WAS EXTREMELY POPULAR AND

18    EXPLODED IN USE NOT LONG AFTER THE TIME OF THE

19    CHEMTECH TRANSACTION.  SO WE HAVE A TRANSACTION THAT

20    HAS SOME SIMILAR STRUCTURAL FEATURES. IT'S DESIGNED TO

21    ACHIEVE SOME OF THE SAME BENEFITS THAT CHEMTECH WAS

22    DESIGNED TO ACHIEVE AND ACHIEVED SOME OF THOSE

23    OBJECTIVES BASED ON SIMILAR GAAP PRINCIPLES.  AND THEN

24    FINALLY WE ALSO -- AS I SAID BEFORE, THIS IS A

25    SECURITY THAT THE IRS AND THE TAXING AUTHORITIES

1  LOOKED AT AND APPROVED AS HAVING A BUSINESS PURPOSE

2  AND ECONOMIC SUBSTANCE.

3 Q. HOW PREVALENT WAS MIPS DURING THE 1990S?

4 A. VERY PREVALENT.  THEY WERE FIRST ISSUED IN 1993 AND I

5  THINK BY 1996 THEY COMPRISED 70 PERCENT OF THE

6  PREFERRED STOCK MARKET.  THEY WERE ISSUED BY MANY OF

7  THE LARGEST AND MOST WELL-KNOWN COMPANIES IN AMERICA:

8  FORD, GENERAL MOTORS, MANY OF THE MAJOR FINANCIAL

9  INSTITUTIONS, ILLINOIS POWER, CONAGRA.  EXTREMELY

10  POPULAR PRODUCT, WAS REFERRED TO AS THE HOLY GRAIL OF

11  EQUITY, MANY ARTICLES IN THE PRACTITIONER PRESS ABOUT

12  THE MULTITUDE OF -- OR RATHER HOW BENEFICIAL MIPS WERE

13  TO ISSUING CORPORATIONS.

14 Q. ARE YOU AWARE APPROXIMATELY DOLLAR VALUE IF MIPS WERE

15  ISSUED OVER TIME?

16 A. I THINK THE GRAND TOTAL WAS AROUND 300 BILLION OR A

17  LITTLE BIT MORE.

18 Q. YOU SUMMARIZE THE STRUCTURE OF MIPS IN PEX 3 AT PAGES

19  76 AND 77 AND THAT'S REPRODUCED IN PLAINTIFF'S

20  DEMONSTRATIVE 16, WHICH I'D LIKE TO TAKE A LOOK AT

21  NOW. USING THIS EXHIBIT, CAN YOU EXPLAIN THE BASIC

22  MIPS STRUCTURE AND COMPARE IT TO CHEMTECH?

23 A. SURE.  THE MIPS STRUCTURE IS ON THE RIGHT-HAND SIDE OF

24  THE CHART AND THIS IS SOMEWHAT SIMPLIFIED, OF COURSE.

25  BUT WHAT YOU HAVE WITH THE MIPS ISSUING FIRM -- AND

1    THE FIRST MIPS ISSUING FIRM WAS TEXACO, SO THE MIPS

2    ISSUING FIRM IS TEXACO.  IT SETS UP A PARTNERSHIP.

3    THAT PARTNERSHIP ISSUES LIMITED PARTNERSHIP UNITS TO

4    INVESTORS.  THE PARTNERSHIP THEN LENDS THAT MONEY TO

5    TEXACO FOR A DEBT INSTRUMENT.  THEN WHAT TEXACO AGREES

6    TO DO IS MAKE AN INTEREST PAYMENT TO THE PARTNERSHIP

7    EACH PERIOD, THAT INTEREST PAYMENT THAT FUNDS THE

8    DIVIDEND DISTRIBUTION TO THE LIMITED PARTNERS. IT'S A

9    PASS-THROUGH TYPE DEBT STRUCTURE.  AS YOU SEE, WE

10   CONSOLIDATE EVERYTHING IN THE RED BOX LIKE WE WERE

11   TALKING ABOUT EARLIER FOR GAAP PURPOSES, SO FOR

12   FINANCIAL ACCOUNTING, MIPS ARE TREATED AS MINORITY

13   EQUITY CAPITAL OR SOME VARIATION OF THAT NOMENCLATURE,

14   WHICH IS VERY SIMILAR TO WHAT WE HAVE WITH CHEMTECH.

15   NOW, IF WE MOVE OVER TO THE LEFT-HAND SIDE OF THE

16   SCREEN, WE SEE THE BASIC CHEMTECH STRUCTURE THAT HAS

17   BEEN SIMPLIFIED. BUT AGAIN, WE'VE GOT THE SAME BASIC

18   LAYOUT.  WE HAVE A PARTNERSHIP, A MINORITY INTEREST,

19   LIMITED PARTNER INVESTORS, MINORITY EQUITY CAPITAL

20   TREATMENT.  SAME BASIC STRUCTURE. THE DIFFERENCE IS

21   THAT MIPS IS A PASS-THROUGH DEBT INSTRUMENT, WHICH WAS

22   I THINK THE THING THAT MR. FALLA DID NOT LIKE.

23   CHEMTECH IS A PARTNERSHIP THAT HAS THE PATENT ASSETS,

24   ROYALTIES, A SLIGHTLY DIFFERENT STRUCTURE.

25 Q.  I'D LIKE TO TURN TO MIPS COSTS AND SOME OF THE

1    GOVERNMENT'S ASSERTIONS THERE. IN THERE PROPOSED

2    FINDINGS OF FACT AND CONCLUSIONS OF LAW, THE

3    GOVERNMENT STATES THE FOLLOWING: QUOTE, "OTHER FORMS

4    OF FINANCING EXISTED THAT WOULD HAVE ALLOWED DOW TO

5    ACHIEVE OFF-BALANCE SHEET FINANCING. THIS ALTERNATIVE

6    FORM IS KNOWN AS TRUST PREFERRED STOCK, KNOWN AS TPS

7    OR MIPS. THE TRANSACTION COST FOR MIPS WERE ROUGHLY

8    6.3 PERCENT OF THE AMOUNT ISSUED, BUT THE TYPICAL

9    TRANSACTION COST FOR A MIPS TRANSACTION DURING THIS

10   PERIOD WAS ROUGHLY 3.5 PERCENT." DO YOU AGREE THAT

11   MIPS WAS LESS COSTLY TO CHEMTECH?

12 A.  NO.

13 Q.  WHY NOT?

14 A.  WELL, A COUPLE OF REASONS. AT THE TIME OF THE

15   CHEMTECH TRANSACTION IN 1993, WE HAD INFORMATION ABOUT

16   THE TRANSACTIONS COST OF ONE OF THE TWO FIRMS THAT DID

17   MIPS IN 1993 AND THEREAFTER. AND WE HAVE, IF YOU

18   WILL, THE ALL-IN TRANSACTIONS COSTS, BOTH PUBLIC

19   TRANSACTIONS COST DATA AND THE PRIVATE DATA THAT

20   PEOPLE LIKE ME, AS AN ACADEMIC, DON'T TYPICALLY GET TO

21   SEE. AND SO WE HAVE THAT INFORMATION WHICH COMES FROM

22   A GOVERNMENT REPORT. THE JOINT COMMITTEE ON TAXATION

23   REPORT ON ENRON CONTAINS TRANSACTIONS FEES THAT ENRON

24   PAID TO DO THREE MIPS ISSUANCES, ONE IN 1993. AND IF

25   WE LOOK AT THOSE TRANSACTIONS COSTS, THEY ARE NOT 3.5

1      PERCENT, AS YOU ARTICULATED IN THE QUOTE FROM THE

2      GOVERNMENT'S BRIEF OR ARGUMENT.  I DON'T KNOW WHAT

3      THAT WAS.  THEY'RE MORE LIKE 7.35 PERCENT.

4  Q.  I'D LIKE TO COME BACK AND TAKE A LITTLE BIT MORE

5      DETAILED LOOK AT THAT.  LET'S LOOK FIRST AT

6      PLAINTIFF'S DEMONSTRATIVE 17, WHICH HAS ONE EXCERPT

7      FROM THE JCT REPORT YOU WERE JUST DESCRIBING, AND I'D

8      LIKE FOR YOU TO EXPLAIN THE SIGNIFICANCE OF THIS

9      STATEMENT AND OTHER STATEMENTS IN THE JCT REPORT TO

10     YOUR OPINION.

11  A.  SURE.  SO THE JCT REPORT ANALYZED A VARIETY OF

12     TRANSACTIONS THAT ENRON DID THAT MANY OF WHICH HAD A

13     FINANCIAL ACCOUNTING OBJECTIVE.  AND A COUPLE, OR SOME

14     OF THE TRANSACTIONS THAT THE JCT ANALYZED IN ITS

15     AUTOPSY OF ENRON WERE THE MIPS TRANSACTIONS THAT ENRON

16     HAD DONE AND THAT OTHER TAXPAYERS HAD DONE.  AND SO

17     WHAT WE HAVE IS THE JCT COMMENTING AND TELLING US

18     ABOUT THE IRS'S REVIEW OF THESE MIPS TRANSACTIONS,

19     WHAT THE JCT DID WITH REGARD TO THOSE TRANSACTIONS,

20     AND THEN SOME, IF YOU WILL, POLICY TYPES OF

21     STATEMENTS.  SO WHAT WE HAVE HERE ON THE SCREEN IS AN

22     EXCERPT FROM THE JCT REPORT, AND THIS IS THE KIND OF

23     THING I USE WITH MY STUDENTS, BOTH MY MBA STUDENTS AND

24     MY EXECUTIVES. I HAND THIS VERY MATERIAL OUT TO MY

25     STUDENTS.  SO HERE'S WHAT THE JCT REPORTS THAT THE IRS

1    CONCLUDED ABOUT A MIPS TRANSACTION DONE BY A

2    PARTICULAR TAXPAYER.  NOT ENRON.  THIS IS NOT ENRON

3    TAX PAYER.  IT'S A DIFFERENT TAXPAYER.  SO WHAT THE

4    IRS SAYS -- AND I'M JUST GOING TO READ THIS BRIEFLY.

5    "THE IRS ALSO CONCLUDED THAT THE LLC'S ISSUANCE OF THE

6    PREFERRED SECURITIES AND SUBSEQUENT LOSS TO THE

7    CORPORATION HAD ECONOMIC SUBSTANCE BECAUSE THE

8    TRANSACTION SERVED NON-TAX BUSINESS PURPOSES,

9    INCLUDING THREE THINGS.  THE FIRST IS THE PROVISION OF

10   FUNDS FOR WORKING CAPITAL AND GENERAL CORPORATE

11   PURPOSES."  WE HEARD TESTIMONY FROM MR. FALLA AND MR.

12   MERSZEI THAT THAT WAS THE INTENTION OF THE USE OF

13   FUNDS IN THIS MATTER.  SECOND, A REDUCTION IN THE

14   CORPORATION'S OVERALL COST OF CAPITAL.  THIRD, A

15   REDUCTION IN THE CORPORATION'S DEBT-TO-EQUITY RATIO.

16   SO HERE WE HAVE A BRANCH OF THE UNITED STATES CONGRESS

17   COMMENTING ABOUT THE IRS'S ADJUDICATION OF A MIPS

18   TRANSACTION WHERE THE IRS SAID, RAISING FUNDS FOR

19   GENERAL CORPORATE AND YOU IMPROVE YOUR DEBT-TO- EQUITY

20   RATIOS, WHICH IS AN ANALOG OF THE DEBT-TO- CAPITAL

21   RATIO, GIVES A TRANSACTION ECONOMIC SUBSTANCE AND

22   BUSINESS PURPOSE.  THAT'S A VERY SIGNIFICANT FACT IN

23   MY MIND.  IF WE LOOK FURTHER AT THIS DOCUMENT, THE JCT

24   GOES ON TO SAY THAT MIPS TRANSACTIONS WERE DONE BY

25   MANY TAXPAYERS AND ACHIEVED A, QUOTE, "IDEAL

1  OBJECTIVE."

2  Q.  LET'S TURN TO PLAINTIFF'S DEMONSTRATIVE 18, CHEMTECH

3  MIPS TRANSACTION COST COMPARISON.  THE TOP HALF OF THE

4  CHART PROVIDES INFORMATION ON MIPS COST AS SET FORTH

5  IN THE JCT REPORT.  IS THAT THE REPORT YOU WERE JUST

6  DISCUSSING?

7  A.  YES, IT IS.

8  Q.  WHAT INFORMATION DID THE JCT CONTAIN RELATING TO MIPS

9  TRANSACTION COSTS?

10  A.  THIS DEMONSTRATIVE JUST INCLUDES THE 1993 MIPS

11  TRANSACTION THAT ENRON DID.  SO AGAIN, JUST TO

12  REFRESH, THERE WERE TWO MIPS TRANSACTIONS IN 1993.

13  ONE WAS DONE BY TEXACO. THAT WAS THE FIRST ONE.  ENRON

14  WAS THE SECOND.  ENRON RAISED 200 MILLION DOLLARS OF

15  CAPITAL WITH ITS MIPS TRANSACTION IN 1993.  THE JCT

16  REPORTS THAT THE TRANSACTION FEES, WHAT WAS PAID TO

17  THE INVESTMENT BANKS AND THE UNDERWRITERS, WAS 14.69

18  MILLION DOLLARS.  THAT'S EQUAL TO 7.35 PERCENT OF THE

19  CAPITAL RAISED.  NOW, PROFESSOR HUBBARD LOOKS AT THIS

20  VERY SAME TRANSACTION, AND THIS IS THE BASIS OF THAT

21  QUOTE FROM THE GOVERNMENT THAT I THINK YOU READ ABOUT,

22  THE 3.5 PERCENT.  HE ESTIMATES THAT THE TRANSACTION

23  FEES FOR THIS TRANSACTION WERE 6.6 MILLION, WHICH IS

24  3.3 PERCENT.  SO YOU CAN SEE WE HAVE A GOVERNMENT

25  REPORT THAT HAS CONFIDENTIAL DATA TELLING US THE

1    TRANSACTION FEES WERE MORE THAN DOUBLE PROFESSOR

2    HUBBARD'S ESTIMATE.  NOW, MOVING TO CHEMTECH, CHEMTECH

3    WAS COMPLETED IN 1993, SAME YEAR AS THE ENRON MIPS

4    TRANSACTION.  TWO HUNDRED MILLION DOLLARS OF CAPITAL

5    WAS RAISED.  THE TRANSACTION FEES OF CHEMTECH, 12.65

6    MILLION DOLLARS. 6.32 PERCENT IS THE PERCENTAGE OF THE

7    CAPITAL RAISED.  SO WHAT WE HAVE IS A TRANSACTION MIPS

8    WHICH PROFESSOR HUBBARD SAYS WOULD PROVIDE THE SAME

9    NON-TAX BENEFITS AS CHEMTECH.  THE GOVERNMENT'S

10   MOTIONS I UNDERSTAND SAY THE SAME THING.  WE HAVE

11   TRANSACTIONS FEES FOR A CONTEMPORANEOUS MIPS

12   TRANSACTION DONE IN 1993.  THOSE FEES ARE HIGHER THAN

13   THE FEES IN THE CHEMTECH TRANSACTION.  THE IRS

14   REVIEWED ENRON'S MIPS TRANSACTION, APPROVED IT AS

15   HAVING A LEGITIMATE BUSINESS PURPOSE AND ECONOMIC

16   SUBSTANCE.  SO WHAT WE HAVE HERE ARE VERY COMPARABLE

17   TRANSACTIONS IN AT LEAST THE GOVERNMENT'S WORDS AND

18   DR. HUBBARD'S WORDS.  YOU HAVE TRANSACTION-COST

19   INFORMATION AND SO THE TRANSACTION COST OF CHEMTECH

20   AND MIPS WERE COMPARABLE.  MIPS WAS A LITTLE LESS OR

21   EXCUSE ME CHEMTECH IS A LITTLE BIT LESS.  THE

22   GOVERNMENT APPROVED THE TAX TREATMENT OF MIPS, SAID

23   MIPS HAD A VALID BUSINESS PURPOSE AND ECONOMIC

24   SUBSTANCE.  CHEMTECH WAS DESIGNED TO ACHIEVE VERY

25   SIMILAR NON-TAX BUSINESS OBJECTIVES TO MIPS.  SO WE'VE

1        GOT VERY COMPARABLE TRANSACTIONS, VERY COMPARABLE

2        OBJECTIVES.  WE ALREADY HAVE EVIDENCE THAT THE

3        GOVERNMENT HAS CONCLUDED THAT MIPS IS A TRANSACTION

4        WITH BUSINESS PURPOSE AND ECONOMIC SUBSTANCE.

5    Q.  TO WHAT DO YOU ATTRIBUTE THE DISCREPANCY BETWEEN THE

6        PUBLICLY AVAILABLE DATA USED BY PROFESSOR HUBBARD AND

7        THE DATA IN THE JCT REPORT WITH RESPECT TO THE MIPS

8        COST?

9    A.  SURE.  SO THE ESTIMATE THAT PROFESSOR HUBBARD MAKES IS

10       VERY SIMILAR TO THE ESTIMATE I MADE IN MY OWN

11       PUBLISHED STUDY.  I USED A VERY SIMILAR METHODOLOGY,

12       CAME UP WITH SIMILAR TYPES OF NUMBERS. THE PROBLEM

13       WITH THAT APPROACH IS IT LOOKS AT ONLY THE PROSPECTUS

14       OF THE MIPS ISSUANCE AND IT DOES NOT INCLUDE OTHER

15       COSTS THAT ARE NOT INCLUDED THEREIN.  SO, FOR EXAMPLE,

16       WHAT I THINK, WHAT I THINK THE ESTIMATES THAT

17       PROFESSOR HUBBARD MADE AND I MADE IN MY PUBLISHED

18       STUDY ARE MISSING, ARE SOME LEGAL FEES.  SO FOR

19       EXAMPLE, ENRON'S MIPS TRANSACTION HAS TWO -- THERE ARE

20       TWO LEGAL OPINIONS IN THE JCT REPORT IN APPENDIX B

21       THAT WERE OFFERED BY VINSON AND ELKINS.  I DON'T THINK

22       THOSE FEES ARE INCLUDED IN THERE.  GOLDMAN, IF YOU

23       LOOK AT THE PROSPECTUS, GOLDMAN -- THE FEES PAID TO

24       GOLDMAN SACHS ON THIS MIPS TRANSACTION WOULD'VE ONLY

25       BEEN ABOUT $453,000.  MIPS WAS CONSIDERED A HUGE

1    INNOVATION, THE HOLY GRAIL OF PREFERRED STOCK, AND

2    THERE'S NO WAY GOLDMAN SACHS DID THAT DEAL FOR

3    453,000.  SO WHAT'S MISSING IN THIS ESTIMATE IS SOME

4    KIND OF STRUCTURED FEE THAT GOLDMAN SACHS WOULD CHARGE

5    TO PUT THIS TRANSACTION TOGETHER.  SO WHEN YOU START

6    TO INCLUDE ALL THOSE TYPES OF COSTS IN ADDITION TO

7    WHAT YOU SEE IN THE PROSPECTUS, YOU GET TOWARDS THE

8    NUMBER THAT LOOKS VERY COMPARABLE TO CHEMTECH.

9         BY THE COURT:

10         MR. SCHREIBER, YOU HAVE AN OBJECTION?

11         BY MR. SCHREIBER:

12         YES, SIR, A STRENUOUS ONE AT THAT.

13         DURING HIS DEPOSITION, DR. ERICKSON REFUSED

14         TO ANSWER QUESTIONS OF THE GOVERNMENT'S

15         COUNSEL ABOUT THESE CONFIDENTIAL COSTS OF

16         MIPS.  THEY WERE NEVER PROVIDED TO THE

17         GOVERNMENT BY DR. ERICKSON.  HE CLAIMED

18         THERE WAS A CONFIDENTIALITY ORDER IN ANOTHER

19         CASE HE HAD WORKED ON.  WE HAD SEEN PRIVATE,

20         CONFIDENTIAL INFORMATION AND HE NEVER SHARED

21         THAT WITH THE GOVERNMENT DESPITE REPEATED

22         REQUEST DURING HIS DEPOSITION.  NOW FOR THE

23         FIRST TIME TODAY AT HIS TESTIMONY AT TRIAL,

24         HE IS INFORMING THE COURT ABOUT THESE OTHER

25         COSTS THAT ARE ASSOCIATED WITH THIS 14.69

1           MILLION DOLLAR NUMBER.  I DON'T KNOW WHERE

2           THIS IS COMING FROM BECAUSE IF THE

3           CONFIDENTIALITY ORDER PREVENTED HIM FROM

4           TESTIFYING TO IT A COUPLE OF YEARS, HOW IS

5           IT TODAY THAT HE CAN INFORM THE COURT OF

6           THAT AND NOT INFORM THE GOVERNMENT

7           BEFOREHAND?

8     BY THE COURT:

9           MR. BLANCHARD?

10    BY MR. BLANCHARD:

11          WELL, YOUR HONOR, THAT'S JUST, WITH ALL

12    RESPECT, A BIT OF A MISCHARACTERIZATION.  I'LL

13    EXPLAIN WHY.  PROFESSOR ERICKSON DISCUSSED THIS

14    JCT MIPS DATA IN HIS REPORTS EXTENSIVELY.  THE

15    JCT REPORT IS A PUBLICLY AVAILABLE DOCUMENT, AND

16    AS I UNDERSTAND IT, PROFESSOR ERICKSON'S OPINION

17    IS BASED ONLY ON THE PUBLICLY AVAILABLE COST DATA

18    THAT'S LISTED IN THE JCT REPORT.  HE'S NOT BASING

19    HIS OPINION -- AND WE CAN -- I'D BE HAPPY TO HAVE

20    SOME FOLLOW-UP QUESTIONS TO THAT EFFECT.  BUT

21    HE'S NOT BASING HIS OPINION ON ANYTHING THAT IS

22    NOT PUBLICLY AVAILABLE IN THAT JCT REPORT.

23    BY THE COURT:

24          MR. SCHREIBER, YOU HAVE REASON TO BELIEVE

25    THAT THE WITNESS IS BASING HIS TESTIMONY AND

1    REACHING CONCLUSIONS BASED UPON CONFIDENTIAL

2    INFORMATION NOT PUBLICLY AVAILABLE?

3    BY MR. SCHREIBER:

4        ONLY IN THAT AT HIS DEPOSITION HE COULDN'T

5    PROVIDE THE ANSWER HE JUST GAVE THE COURT -- GAVE

6    TO MR. BLANCHARD IN FRONT OF THE COURT.  AT HIS

7    DEPOSITION HE SAID HE HAS CONFIDENTIAL

8    INFORMATION FOR THREE MIPS TRANSACTIONS AND HE

9    COULD NOT RELAY TO COUNSEL WHO WAS QUESTIONING

10   HIM THE BASIS FOR THAT OR THE REASON WHY.

11   BY THE COURT:

12       WELL, LET'S JUST MAKE SURE, MR. BLANCHARD,

13   THAT -- I WANT TO BE CLEAR ON WHAT INFORMATION

14   THE PROFESSOR IS RELYING ON BECAUSE I THINK

15   FRANKLY MR. SCHREIBER IS RIGHT. IF HE'S RELYING

16   ON ANYTHING OTHER THAN THAT'S MAYBE -- THAT'S

17   PUBLICALLY AVAILABLE, LET'S SAY, WE MAY HAVE A

18   PROBLEM WITH THE TESTIMONY.  I'LL GO ON AND GIVE

19   YOU SOME LATITUDE TO QUESTION THE WITNESS ABOUT

20   THAT.  GENERALLY SPEAKING, I THINK WE SHOULD MOVE

21   ON FROM THIS TOPIC, BUT GO ON AND ESTABLISH THAT.

22   THIS IS NOT TESTIMONY OR CONCLUSIONS REACHED

23   BASED UPON HIS REVIEW OF CONFIDENTIAL INFORMATION

24   NOT DISCLOSED TO THE GOVERNMENT DESPITE THEIR

25   REQUEST.

1  BY MR. BLANCHARD:

2  Q.  PROFESSOR ERICKSON, COULD YOU PLEASE ANSWER JUDGE

3      JACKSON'S QUESTION?  IS YOUR OPINION RELATING TO MIPS

4      COST BASED IN ANY WAY ON CONFIDENTIAL INFORMATION

5      RELATING TO THESE MIPS COSTS?

6  A.  NO, IT'S NOT.  AND I WILL GIVE YOU A LITTLE

7      INFORMATION.  YOU ASKED ME TO SPECULATE ABOUT WHAT

8      WOULD EXPLAIN THE DIFFERENCE.

9          THE WITNESS:

10             I BELIEVE, YOUR HONOR, THAT AT MY

11             DEPOSITION I SAID I THINK WHAT EXPLAINS IT IS AN

12             INVESTMENT BANKING STRUCTURING FEE AND A LEGAL

13             OPINION.  I SAID I DON'T HAVE THAT DATA.  I TOLD

14             MS. MORRIS, WHO WAS DEPOSING ME, I HAD SEEN THAT

15             DATA IN ANOTHER MATTER.  I NO LONGER HAVE IT.  I

16             DO NOT HAVE IT.  SO I THINK I GAVE A VERY SIMILAR

17             ANSWER AT MY DEPOSITION ABOUT WHAT I THOUGHT THE

18             DIFFERENCE WAS.  IT WAS AN I-BANK STRUCTURING FEE

19             AND THAT IT WAS THESE LEGAL FEES.  I BELIEVE

20             THAT'S THE TESTIMONY I GAVE.  I DID SAY TO MS.

21             MORRIS, WHO WAS THE DEPARTMENT OF JUSTICE

22             ATTORNEY THAT I COULD NOT REMEMBER EXACTLY,

23             WITHOUT SEEING THE DOCUMENT, WHAT THE FEES WERE

24             AND IT WAS PART OF A CASE THAT WAS SEALED AND I

25             COULDN'T SAY MUCH MORE ABOUT IT.  SO I APOLOGIZE

1       -- THAT'S MY RECOLLECTION OF MY DEPOSITION

2       TESTIMONY.

3       BY THE COURT:

4           MR. SCHREIBER?

5       BY MR. SCHREIBER:

6           TWO POINTS, YOUR HONOR.  ONE, TO THE EXTENT

7       HE'S JUST SAYING THE TRANSACTION FEES WERE 14.69

8       MILLION DOLLARS, THAT SPECIFIC NUMBER ITSELF IS

9       IN THE JCT REPORT.  I HAVE NO OBJECTION TO THAT

10      NUMBER ITSELF.  WHAT I BELIEVE PROFESSOR ERICKSON

11      TESTIFIED IN HIS DEPOSITION WAS THAT HE HAD THE

12      UNDERSTANDING WHAT THE BASIS FOR THAT NUMBER IS

13      AND WHY IT DIFFERS FROM HIS OWN PUBLISHED STUDY

14      AND WHY IT DIFFERS FROM THE STUDY THAT DR.

15      HUBBARD, IN HIS OWN REPORT, CITES. AND THAT WAS

16      THE INFORMATION SPECIFICALLY.  THE BASIS FOR THAT

17      NUMBER WAS WHAT WAS DOCUMENTED.

18      BY THE COURT:

19          IS THE BASIS FOR THAT NUMBER INCLUDED IN

20      THE JTC REPORT?

21      BY MR. SCHREIBER:

22          NO, YOUR HONOR.  THAT'S THE POINT, IS THAT

23      WE CANNOT COMPARE APPLES TO APPLES BECAUSE

24      PROFESSOR ERICKSON, IN HIS DEPOSITION, DID NOT

25      PROVIDE THE BASIS FOR THAT NUMBER.  NOW AT TRIAL

1          HE'S SAYING NOW HE'S SPECULATING AS TO WHAT COULD

2          BE INCLUDED, BUT HE'S GOT THE INFORMATION IN HIS

3          MIND ANYWAY.

4          BY THE COURT:

5              I UNDERSTAND YOUR POINT, BUT WE PROBABLY

6          NEED TO MOVE ON FROM THIS LINE OF QUESTIONING.

7          BY MR. BLANCHARD:

8              I AGREE, YOUR HONOR.

9          BY THE COURT:

10             THANK YOU, MR. SCHREIBER.

11    BY MR. BLANCHARD:

12    Q.   LET'S MOVE ON TO THE MIPS YIELD SPREAD, PROFESSOR

13         ERICKSON.  PROFESSOR HUBBARD ALSO CLAIMS THAT THE

14         YIELD PREMIUM ON CHEMTECH EXCEEDED THE YIELD PREMIUM

15         ON MIPS.  DO YOU AGREE WITH PROFESSOR HUBBARD'S

16         ANALYSIS OF THE YIELD SPREAD?

17    A.   NO.

18    Q.   LET'S START WITH THE YIELD FOR CHEMTECH.  WHAT RANGE

19         DOES DR. HUBBARD PROVIDE FOR THE CHEMTECH YIELD?

20    A.   I BELIEVE IT'S 7.13 PERCENT TO 7.89 PERCENT.

21    Q.   WHAT DOES THE 7.13 REPRESENT?

22    A.   I BELIEVE THAT'S THE COMPOUNDED RATE OF RETURN FOR THE

23         6.947 PERCENT IF IT'S PAID QUARTERLY.

24    Q.   HOW ABOUT THE 7.89 PERCENT AT THE OTHER RANGE OF DR.

25         HUBBARD'S COMPUTATION FOR THE CHEMTECH YIELD?

1    A.   THAT'S THE -- IT'S MY UNDERSTANDING THAT'S THE

2         EFFECTIVE ACTUAL RATE OF RETURN, INCLUDING MARK-TO-

3         MARKET EVENTS AND OTHER PAYMENTS TO THE CLASS A

4         PARTNERS.

5    Q.   DOES DR. HUBBARD PROVIDE A MIPS YIELD TO COMPARE --

6         EXCUSE ME.  YES, DOES DR. HUBBARD PROVIDE A MIPS YIELD

7         TO COMPARE WITH THE CHEMTECH YIELD?

8    A.   NO, HE DOES NOT.

9    Q.   IS THERE DATA AVAILABLE TO PROVIDE THE MIPS YIELD TO

10        PROFESSOR HUBBARD?

11   A.   YES.

12   Q.   LET'S TAKE A LOOK AT THOSE ONE AT A TIME.  WHAT'S THE

13        FIRST SOURCE OF THAT?

14   A.   THE FIRST SOURCE IS AN ARTICLE THAT PROFESSOR HUBBARD

15        PUBLISHED.

16   Q.   CAN YOU EXPLAIN HOW THAT -- WHAT THAT PROVIDED?

17   A.   SURE.  IN AN ARTICLE THAT HE WROTE, HE NOTED THAT MIPS

18        YIELDED ABOUT 75 BASIS POINTS MORE THAN PREFERRED

19        STOCK, SO WE CAN ESTIMATE THE YIELD ON A HYPOTHETICAL

20        DOW MIPS ISSUE AS A PREFERRED STOCK YIELD PLUS 75

21        BASIS POINTS.

22   Q.   AND WHAT YIELD DOES THAT RESULT IN?

23   A.   AT THE TIME OF THE CHEMTECH TRANSACTION, THE AVERAGE

24        YIELD ON A BASKET OF PREFERRED STOCKS IN THE WEEK

25        RIGHT BEFORE THE CHEMTECH TRANSACTION WAS ABOUT 6.89

1    PERCENT.  IF WE ADD 75 BASIS POINTS, THAT GETS US TO

2    ABOUT 7.55, 7.6 PERCENT, SOMETHING LIKE THAT.  IN

3    ADDITION, AT ABOUT THE TIME OF THE CHEMTECH

4    TRANSACTION, BALTIMORE GAS AND ELECTRIC DID A

5    PREFERRED STOCK ISSUED.  I THINK THEY WERE RATED A,

6    SAME AS DOW, AND THEIR PREFERRED STOCK YIELDED 6.97

7    PERCENT.  IF WE ADD THE 75 BASIS POINTS TO BALTIMORE

8    GAS AND ELECTRIC'S YIELD, WE GET ABOUT 7.7 PERCENT.

9  Q.  DOES PROFESSOR HUBBARD CITE TO HIS OWN RESEARCH IN HIS

10    EXPERT REPORTS?

11 A.  NO, HE DOES NOT, NOT THAT ARTICLE.

12 Q.  WHAT'S THE SECOND SOURCE YOU MENTIONED?

13 A.  AN ARTICLE THAT PROFESSOR HUBBARD CITES AT SOME LENGTH

14    BY FRISCHMAN AND WORFIELD.

15 Q.  WHAT DOES THAT STUDY SHOW WITH RESPECT TO THE YIELDS?

16 A.  THAT STUDY ESTIMATES THAT THE YIELD ON TRUST PREFERRED

17    STOCK IS 120 BASIS POINTS HIGHER THAN THE YIELD ON

18    DEBT.

19 Q.  WHAT'S THE IMPLICATION ON THAT?

20 A.  IF I USE PROFESSOR'S DEBT YIELD IN HIS EXHIBIT 21,

21    WHICH IS I THINK IS 6.31 PERCENT, AND I ADD 120 BASIS

22    POINTS PER THE FRISCHMAN AND WORFIELD STUDY, I GET

23    ABOUT 7 AND A HALF PERCENT AS THE YIELD FOR A

24    HYPOTHETICAL DOW MIPS ISSUE.

25 Q.  YOU MENTIONED PROFESSOR HUBBARD CITED THE FRISCHMAN

1          AND WORFIELD DATA?

2  A.   THAT'S CORRECT.

3  Q.   DID HE CITE THIS PARTICULAR YIELD DATA?

4  A.   NO, HE DID NOT.

5  Q.   YOU MENTIONED A THIRD SOURCE.  EXPLAIN WHAT THAT IS.

6  A.   MY PUBLISHED STUDY OF MIPS.  WE ESTIMATE THAT MIPS

7       PAID BETWEEN -- ABOUT THREE TENTHS OF A PERCENT MORE

8       THAN A COMPARABLE DEBT ISSUE, WHICH WAS THE DEBT ISSUE

9       THAT WOULD PASS THROUGH THE PARTNERSHIP STRUCTURE.

10      AND TO DO THAT ESTIMATE, WHAT I DID WAS I LOOKED AT

11      THE YIELD ON A 30-YEAR A RATED CORPORATE BOND WHICH

12      FOLLOWS THE METHODOLOGY THAT PROFESSOR HUBBARD USED.

13      THAT YIELD WAS ABOUT 7.3 PERCENT, 7.28, I BELIEVE.

14      AND IF WE ADDED THAT THREE TENTHS OF A PERCENT, WHICH

15      IS PER MY PUBLISHED STUDY, THAT GETS YOU TO ABOUT 7.58

16      OR 7.6 PERCENT.

17 Q.   HAVING LOOKED AT THESE THREE DATA SOURCES, WHAT DO

18      THEY SUGGEST ABOUT PROF. HUBBARD'S COMPARISON OF

19      CHEMTECH TO MIPS COST -- YIELD SPREADS, EXCUSE ME.

20 A.   BASED ON THOSE ESTIMATES, WE SEE THAT THE YIELD ON

21      CHEMTECH WAS VERY CLOSE TO THE YIELD ON MIPS BASED ON

22      THREE DIFFERENT ESTIMATES, ONE FROM PROF. HUBBARD'S

23      STUDY, ONE FROM THE STUDY HE CITES, AND ONE FROM MY

24      STUDY.  FURTHERMORE, THE YIELD ON CHEMTECH SHOULD HAVE

25      BEEN A LITTLE HIGHER THAN THE YIELD ON MIPS BECAUSE

1    CHEMTECH HAD PROFIT SHARING.  MIPS HAS NO SUCH PROFIT

2    SHARING, SO THE ACTUAL PROFIT SHARING HERE, THE 2.9

3    MILLION DOLLAR MARK-TO- MARKET, IS ACTUALLY WHAT

4    LARGELY EXPLAINS THE DIFFERENCE BETWEEN THE 7.89 PER

5    PROF HUBBARD AND THESE OTHER ESTIMATES THAT I JUST DID

6    WITH YOU, MR. BLANCHARD.

7  Q.  DID YOU COMPARE THE COST OF CHEMTECH TO THE COST OF

8    ANY OTHER MEANS OF RAISING CAPITAL?

9  A.  YES, I DID.  I COMPARED THE YIELD ON CHEMTECH TO THE

10    YIELD ON PREFERRED STOCK AND I COMPARED THE COST OF

11    -- THE TRANSACTION COST OF CHEMTECH TO THE TRANSACTION

12    COST OF A SEASONED EQUITY OFFER.

13  Q.  WHAT DID YOU OBSERVE IN THE CASE OF A YIELD ON

14    PREFERRED STOCK?

15  A.  AS I SAID A SECOND AGO, THE YIELD ON A BASKET OF

16    PREFERRED STOCKS AT ABOUT THE TIME CHEMTECH CLOSED WAS

17    6.89 PERCENT, WHICH IS VERY CLOSE OBVIOUSLY TO THE

18    6.947 PERCENT PRIORITY RETURN.

19  Q.  WASN'T THAT AVERAGE RATE YOU JUST REFERRED TO BASED ON

20    NON-CALLABLE STOCKS?

21  A.  THAT'S CORRECT.

22  Q.  DOES THAT UNDERMINE YOUR RELIANCE ON THAT AVERAGE?

23  A.  NO. AND I DIDN'T KNOW THAT AT MY DEPOSITION, BUT THE

24    GOVERNMENT POINTED THAT FACT OUT TO ME, THAT IT

25    DOESN'T UNDERMINE THE ANALYSIS. IT'S A BASKET OF

1    PREFERRED STOCKS, SOME OF WHICH ARE GOING TO BE

2    SOMEWHAT DIFFERENT THAN DOW IN VARIOUS DIFFERENT WAYS.

3    BUT THE 6.89 PERCENT GIVES US A ROUGH AVERAGE THAT

4    SHOWS THE YIELD ON THE CLASS A INTEREST.  WE'RE VERY

5    CLOSE TO A COMPARABLE SET OF PREFERRED STOCKS.

6  Q.  YOU MENTIONED SEASONED EQUITY. WHAT IS SEASONED

7    EQUITY?

8  A.  SEASONED EQUITY IS A SECONDARY EQUITY OFFERING THAT A

9    FIRM DOES.  IT'S NOT THEIR INITIAL PUBLIC OFFERING.

10    IT'S A SECONDARY OFFERING. SO FOR EXAMPLE, IF A YEAR

11    NOW, GROUPON WERE TO SELL SOME MORE STOCK, THAT WOULD

12    BE A SECONDARY OFFER.

13  Q.  WHAT ARE THE TRANSACTION COSTS GENERALLY TO ISSUE

14    SEASONED EQUITY?

15  A.  AT 7 PERCENT OF THE CAPITAL RAISED ACCORDING TO A

16    STUDY THAT PROFESSOR HUBBARD CITES.

17  Q.  WHAT IF ANY IMPACT DOES RAISING SEASONED EQUITY HAVE

18    ON A FIRM'S SHARE PRICE?

19  A.  ON AVERAGE IF YOU DO A SEASONED EQUITY OFFERING, THE

20    FIRM IN QUESTION'S STOCK PRICE DROPS BY ABOUT 3

21    PERCENT.

22  Q.  ARE THERE STUDIES COMPARING THE IMPACT OF RASING MIPS

23    WITH ISSUING SEASONED EQUITY?

24  A.  YES.  A STUDY THAT PROFESSOR HUBBARD CITES EXTENSIVELY

25    BY IRVINE AND ROSENFELD NOTES THAT ISSUING MIPS DOES

1    NOT APPEAR TO RESULT IN THE SHAREHOLDER LOSS OF A

2    SEASONED EQUITY OFFERING AND PROF HUBBARD ANALOGIZES

3    MIPS TO CHEMTECH.

4  Q.  WITH RESPECT TO THIS ERVINE AND ROSENFELD STUDY THAT

5    YOU MENTIONED, PROFESSOR HUBBARD CLAIMS THAT STUDY

6    DEMONSTRATES THAT ISSUING MIPS FOR GENERAL CORPORATE

7    PURPOSES OR TO REDUCE DEBT RESULTS IN ZERO OR NEGATIVE

8    ECONOMIC ADVANTAGE.  CAN YOU EXPLAIN THE NATURE OF

9    THAT STUDY?

10  A.  YES.  IT'S WHAT'S CALLED AN EVENT STUDY WHERE WHAT THE

11    RESEARCHER DOES IS LOOK AT A PARTICULAR SET OF EVENTS,

12    AN ACQUISITION, AND LOOK AT THE WAY THE STOCK MARKET

13    MOVES ON THE ANNOUNCEMENT DATE OF THE ACQUISITION. IN

14    THIS CASE, WHAT THE RESEARCHERS DID WAS THEY LOOKED AT

15    THE STOCK MARKET RESPONSE TO THE ANNOUNCEMENT OF THE

16    MIPS ISSUE.

17  Q.  WHAT DID THE STUDY SHOW WITH RESPECT TO MIPS?

18  A.  FOR MIPS THAT WERE ISSUED FOR GENERAL CORPORATE

19    PURPOSES, THS STUDY FOUND AN INSIGNIFICANT STOCK

20    MARKET REACTION OR A ZERO STOCK MARKET REACTION.

21  Q.  DO THOSE RESULTS SUPPORT DR. HUBBARD'S CLAIM THAT MIPS

22    PROVIDE NO ECONOMIC ADVANTAGE?

23  A.  WHAT THEY SUGGEST IS THAT MIPS PROVIDE ECONOMIC

24    BENEFITS THAT ARE EQUAL TO ECONOMIC COSTS.  NO MARKET

25    REACTION.  BUT IN ADDITION IT'S PROBABLY WORTH NOTING

1      THAT IF WE WERE TO LOOK AT THE TABLE IN THE STUDY, I

2      THINK THERE'S MAYBE 59 FIRMS THAT ISSUED MIPS FOR

3      GENERAL CORPORATE PURPOSES.  THIRTY OF THOSE REALIZED

4      A POSITIVE RETURN.  SO MORE THAN HALF, WHICH IS NOT

5      STATISTICALLY SIGNIFICANT IF IT'S STATICAL TESTED.

6      SO, MORE THAN HALF OF THE FIRMS WHO DID MIPS FOR THE

7      KIND OF TRANSACTION THAT PROFESSOR HUBBARD ANALYZED,

8      REALIZED A POSITIVE STOCK MARKET RETURN.

9    Q.  TO WHAT EXTENT, IF AT ALL, IS THE IRVINE-ROSENFELD

10     STUDY CONSISTENT WITH DOW'S BUSINESS PURPOSE FOR THE

11     CHEMTECH TRANSACTION?

12   A.  THE IRVINE-ROSENFELD STUDY NOTES SEVERAL THINGS THAT

13     ARE CONSISTENT WITH CHEMTECH'S BUSINESS PURPOSE.

14     IRVINE AND ROSENFELD NOTE THAT MIPS IS TANTAMOUNT TO

15     PREFERRED STOCK FOR EQUITY RATING PURPOSES, MIPS

16     INCREASES A FIRM'S EQUITY BASE, AND THAT FIRMS THAT

17     DID MIPS DID SO BECAUSE THEY WERE SEEKING FINANCIAL

18     FLEXIBILITY, WHICH AGAIN IS ONE OF THE THINGS THAT

19     WE'VE HEARD FROM DOW'S EXECUTIVES THEY WERE SEEKING.

20   Q.  PROFESSOR HUBBARD CLAIMS GENERALLY THAT, QUOTE, "OFF-

21     BALANCE SHEET FINANCINGS PROVIDES NO MEASURABLE

22     BENEFIT IN AN EFFICIENT MARKET." DO YOU AGREE?

23   A.  READ THAT AGAIN. I'M SORRY.

24   Q.  PROFESSOR HUBBARD'S CLAIM IS THAT OFF-BALANCE SHEET

25     FINANCING PROVIDES NO MEASURABLE BENEFIT IN AN

1    EFFICIENT MARKET.  DO YOU AGREE?

2 A.  NO, I DON'T.  ONE OF THE THINGS THAT PROFESSOR HUBBARD

3    SAYS IS THAT -- SOMETHING ALONG THE LINES THAT THERE'S

4    NO EVIDENCE THAT THE MARKET IS INEFFICIENT IN REGARD

5    TO OFF-BALANCE SHEET FINANCING. AND JUST AS A SIMPLE

6    EXAMPLE, THERE WAS AN ARTICLE PUBLISHED IN 1990 BY TWO

7    AUTHORS, LANDSMEN AND OHLSON. OHLSON IS SPELLED O-H-L-

8    S-O-N.  JIM OHLSON WAS AT COLUMBIA AT THE TIME.  THE

9    TITLE -- WHICH IS THE SCHOOL AT WHICH PROFESSOR

10   HUBBARD IS THE DEAN. THE ARTICLE DEALS WITH WHETHER OR

11   NOT THE MARKET IS EFFICIENT WITH RESPECT TO OFF-

12   BALANCE SHEET PENSION LIABILITIES. THE STUDY CONCLUDES

13   THE MARKET IS INEFFICIENT WITH RESPECT TO OFF-BALANCE

14   SHEET PENSION LIABILITIES.  THAT DIRECTLY REFUTES WHAT

15   PROFESSOR HUBBARD SAYS.  THERE IS A VARIETY OF OTHER

16   STUDIES LIKE THAT WE COULD TALK ABOUT BUT I DON'T

17   THINK ANYONE IS INTERESTED IN HEARING ME TALK ABOUT

18   THAT. BUT THERE IS A VARIETY OF OTHER STUDIES THAT

19   HAVE SIMILAR TYPES OF CONCLUSION ABOUT OFF-BALANCE

20   SHEET PENSION FINANCING, LEASE FINANCING.  SO I DON'T

21   AGREE WITH THAT STATEMENT.

22 Q.  THANK YOU, PROF ERICKSON.

23        BY MR. BLANCHARD:

24           YOUR HONOR, I HAVE NO FURTHER QUESTIONS

25           AT THIS TIME.

1       BY THE COURT:

2               THANK YOU, MR. BLANCHARD.  MR.

3           SCHREIBER?

4           BY MR. SCHREIBER:

5               YOUR HONOR, I REQUEST A BRIEF RECESS

6       BEFORE WE GET INTO CROSS-EXAMINATION, IF ONLY FOR

7       FIVE MINUTES. IS THAT OKAY?

8           BY THE COURT:

9               WELL, IT WILL HAVE TO BE A LITTLE

10      LONGER THAN FIVE MINUTES.  WHAT I WOULD LIKE TO

11      DO TODAY IS TAKE, AS WE DID YESTERDAY, A COUPLE

12      OF BREAKS, SO NOW IS A GOOD TIME FOR US TO TAKE

13      OUR FIRST OF THE TWO BREAKS. AND THEN WE'LL TAKE

14      ONE MORE BREAK, AND ONCE AGAIN, AS WE DID

15      YESTERDAY, WE'LL TRY TO GO AT LEAST TO SIX

16      O'CLOCK TONIGHT, PERHAPS A LITTLE LATER TONIGHT.

17      LET'S JUST SEE HOW THINGS GO.  BUT WE WILL STAND

18      IN RECESS FOR THE NEXT 15 MINUTES.

19          (THEREFORE, AT THIS TIME, COURT IS IN RECESS

20           FOR A BRIEF BREAK.)

21          (THEREFORE, AT THIS TIME, THE PROCEEDINGS

22           ARE CONTINUED.)

23      BY THE COURT:

24          PLEASE BE SEATED.

25          OKAY.  MR. SCHREIBER?

1        BY MR. SCHREIBER:

2              YES, YOUR HONOR.

3        BY THE COURT:

4              YOU MAY PROCEED WITH CROSS-EXAMINATION.

5        BY MR. SCHREIBER:

6              THANK YOU, YOUR HONOR.

7                    CROSS-EXAMINATION

8    BY MR. SCHREIBER:

9    Q.   MR. ERICKSON, GOOD AFTERNOON.

10   A.   GOOD AFTERNOON.

11   Q.   ONE QUICK HOUSEKEEPING MATTER BEFORE WE REALLY GET

12        INTO IT.  YOU MENTIONED A STUDY, ABOUT, SOMETHING

13        ABOUT 75 CASES -- POINTS THAT WAS MENTIONED.  CAN YOU

14        PROVIDE A CITATION FOR THAT?

15   A.   YOU'RE TALKING ABOUT PROFESSOR HUBBARD'S STUDY?

16   Q.   I'M NOT SURE; I CAN'T REMEMBER FROM YOUR TESTIMONY

17        EARLIER.  I'M SORRY.

18   A.   SURE.  IT'S A STUDY ON PROFESSOR HUBBARD'S VITAE

19        FUNDAMENTALS OF TAX REFORM WITH BILL GENTRY.  AND THE

20        INFORMATION YOU'RE LOOKING FOR IS ON PAGE 206.

21   Q.   OKAY.  THANK YOU, SIR.  NOW, PROFESSOR ERICKSON, I

22        JUST WANT TO CLARIFY SOME OF YOUR EDUCATIONAL

23        BACKGROUND IF I MAY.  YOU WENT TO ROCKHURST COLLEGE

24        AND GRADUATED IN 1987; IS THAT CORRECT?

25   A.   YES, SIR.

1  Q.  AND YOUR DEGREE THERE WAS A B.S. IN ACCOUNTING; IS

2      THAT RIGHT?

3  A.  YES.

4  Q.  AND AFTER THAT YOU WENT TO ARIZONA STATE AND GOT AN

5      M.B.A.?

6  A.  YES.

7  Q.  AND THEN YOU WENT TO THE UNIVERSITY OF ARIZONA AND

8      RECEIVED YOUR PH.D.; CORRECT?

9  A.  I WORKED FOR A WHILE IN-BETWEEN, BUT YES, THAT'S

10     RIGHT.

11 Q.  OKAY.  BUT AS FAR AS EDUCATIONAL BACKGROUND, THAT'S

12     CORRECT?

13 A.  YES, SIR.

14 Q.  OKAY.  AND THAT WAS IN -- PH.D. WAS COMPLETED IN 1996;

15     IS THAT RIGHT?

16 A.  THAT SOUNDS RIGHT, YES.

17 Q.  AND YOUR UNDERGRADUATE DEGREE IS NOT IN ECONOMICS;

18     ISN'T THAT RIGHT?

19 A.  NO.

20 Q.  THAT'S NOT RIGHT OR ---

21 A.  IT'S NOT IN ECONOMICS; YOU'RE CORRECT.  I'M SORRY.

22 Q.  I'M SORRY. THE QUESTION WAS ILL FORMED.  AND YOUR

23     PH.D. IS IN ACCOUNTING, CORRECT?

24 A.  THE SPECIALTY IS IN ACCOUNTING; THAT'S CORRECT.

25 Q.  IT'S NOT AN ECONOMICS PH.D.?

1   A.   THAT'S CORRECT.  THE -- IF I COULD CLARIFY.  ALL THE

2        COURSES THAT BUSINESS STUDENTS TAKE GETTING THEIR

3        PH.D., THERE'S A COMMON COURSE -- SET OF COURSES THAT

4        ARE PARTLY COMPRISED OF ECONOMICS.  BUT MY SPECIALTY

5        WAS NOT IN ECONOMICS, THAT'S CORRECT.

6   Q.   AND CURRENTLY YOU'RE A PROFESSOR OF ACCOUNTING; IS

7        THAT RIGHT?

8   A.   YES, SIR.

9   Q.   NOW, TO YOUR KNOWLEDGE, DR. HUBBARD ISN'T AN

10       ACCOUNTANT; CORRECT?

11  A.   NOT TO MY KNOWLEDGE, NO.

12  Q.   AND NOTHING IN HIS REPORT PURPORTS TO CLAIM THAT HE

13       WAS EVALUATING THE FOREIGN BANKS INTEREST IN CHEMTECH

14       PER U.S. GAAP RULES, CORRECT?

15  A.   I'M NOT SURE BECAUSE HE DOES TALK ABOUT THE RELATIVE

16       ACCOUNTING BENEFITS OF CHEMTECH, SO I'M NOT SURE.

17  Q.   BUT HIS ANALYSIS WAS AN ECONOMIC ANALYSIS OF

18       ACCOUNTING BENEFITS, NOT ONE FOR PURPOSES OF GAAP?  IF

19       YOU DON'T KNOW, IT'S OKAY.

20  A.   I DON'T KNOW HOW TO ANSWER YOUR QUESTION.  I'M SORRY.

21  Q.   OKAY.  WE CAN CLARIFY THAT WITH DR. HUBBARD WHEN HE

22       TESTIFIES.  PROFESSOR ERICKSON, WHO'S DR. CARRON?

23  A.   HE'S AN EXPERT FOR DOW, SO I THINK HE'S AN ECONOMIST.

24  Q.   AND PROFESSOR ERICKSON, YOU TALKED WITH MR. BLANCHARD

25       A LITTLE BIT ABOUT THIS IN YOUR DIRECT TESTIMONY.

1    YOU'RE FAMILIAR WITH THE IDEA OF MARKET EFFICIENCY;

2    CORRECT?

3  A.    CORRECT.

4  Q.    JUST IN THE WAY OF ACCOUNTING IN THE PUBLIC STOCK

5    MARKET.

6  A.    YES; RIGHT.

7  Q.    THE CONCEPT THAT AS YOU DESCRIBED IT WAS THAT

8    INFORMATION IS GENERALLY, FOR LACK OF A BETTER WORD,

9    IMPOUNDED INTO A STOCK PRICE -- THE VALUE OF STOCK

10    PRICE -- WITH A VARYING DEGREE OF EFFICIENCY; IS THAT

11    RIGHT?

12  A.    THAT -- THAT'S THE WAY THAT THE THEORY IS, I THINK, IF

13    I UNDERSTAND YOU, YES.

14  Q.    AND THERE ARE DIFFERENT FORMS OF MARKET EFFICIENCY

15    THEORY; CORRECT?  STRONG, SEMI-STRONG, AND WEAK?

16  A.    YES.

17  Q.    THE DIFFERENCE BETWEEN THOSE, AS I UNDERSTAND IT,

18    DEPENDS ON HOW COMPLETELY AND HOW QUICKLY THE MARKET

19    IMPOUNDS THE INFORMATION, AND IT'S ALSO WHETHER THE

20    INFORMATION IS PUBLIC OR PRIVATE.  IS THAT A FAIR

21    ASSESSMENT?

22  A.    WELL, I THINK HOW QUICKLY THE INFORMATION IS POUNDED

23    HAS TO DO WITH WHETHER THERE'S EFFICIENCY OR NOT, TYPE

24    OF INFORMATION RELATES TO ONE OF THOSE THREE FORMS

25    THAT YOU REFER TO.

1  Q.  SO THAT'S PARTIALLY RIGHT?

2  A.  I DON'T KNOW, BUT I WAS JUST TRYING TO HELP.

3  Q.  OKAY.  APPRECIATE THAT, SIR.  DO YOU AGREE WITH DR.

4      CARRON THAT THE NEW YORK STOCK EXCHANGE, AS AN

5      EXAMPLE, IS A SEMI-STRONG FORM OF MARKET EFFICIENCY?

6  A.  NO.

7  Q.  PROFESSOR ERICKSON ---

8          BY MR. SCHREIBER:

9              I APOLOGIZE TO THE COURT; I KNOW IT'S HEARD

10         A LOT ABOUT MOPS TODAY.  I'LL TRY AND KEEP MY

11         DISCUSSION WITH DR. ERICKSON AS BRIEF AS POSSIBLE

12         ON ---

13         BY THE COURT:

14             FINE.  TAKE WHATEVER TIME YOU NEED, MR.

15         SCHREIBER.

16         BY MR. SCHREIBER:

17             THANK YOU, SIR.

18  BY MR. SCHREIBER:

19  Q.  NOW, PROFESSOR ERICKSON, MIPS ARE A TYPE OF PREFERRED

20      STOCK; CORRECT?

21  A.  SOME PEOPLE REFER TO IT THAT WAY.  THEY'RE A PREFERRED

22      SECURITY.

23  Q.  PREFERRED SECURITY.  AND THEN YOU SAID THAT STANDS FOR

24      MONTHLY INCOME PREFERRED SECURITIES; CORRECT?

25  A.  THAT'S CORRECT.

1    Q.    AND, DR. ERICKSON, YOUR OPENING REPORT COMPARES THE

2          FOREIGN BANKS INTEREST IN CHEMTECH TO MIPS; ISN'T THAT

3          RIGHT?

4    A.    YES, IN SOME REGARDS.

5    Q.    WELL, YOU COMPARED THEM IN YOUR REPORT AND SAID THAT

6          THE BALANCE SHEET ACCOUNTING TREATMENT IS SIMILAR;

7          ISN'T THAT RIGHT?

8    A.    I BELIEVE I USED LANGUAGE LIKE THAT, YES.

9    Q.    AND THE UNDERLYING MOTIVATION FOR ENGAGING IN

10         TRANSACTIONS IS SIMILAR?

11   A.    AS WE DISCUSSED WITH MR. BLANCHARD, YES, THERE'S A

12         UNDERLYING BALANCE SHEET OBJECTIVE.

13   Q.    AND THOSE ARE SIMILAR AS BETWEEN CHEMTECH AND MIPS?

14   A.    YES.

15   Q.    AND THE WAY IN WHICH THE TRANSACTIONS TAKE SHAPE, IN

16         YOUR REPORT YOU GENERALLY DISCUSS HOW THEY'RE SIMILAR

17         AS WELL; CORRECT?

18   A.    YES, THERE ARE SOME COMMON FEATURES; CORRECT.

19   Q.    AND THE WAY IN WHICH THE TRANSACTIONS ARE CONSUMMATED,

20         THERE ARE ALSO SIMILAR FEATURES; IS THAT RIGHT?

21   A.    I DON'T KNOW.  THERE ARE SOME DIFFERENCES THERE, I

22         THINK.

23   Q.    OKAY.  BUT YOUR VIEW IS GENERALLY THOSE

24         CHARACTERISTICS AS BETWEEN THE FOREIGN BANKS INTEREST

25         IN CHEMTECH AND MIPS ARE IN LARGE PART SIMILAR; ISN'T

1      THAT RIGHT?

2  A.  THERE ARE SIMILARITIES, BUT THERE ARE DEFINITELY

3      DIFFERENCES.

4  Q.  OKAY.  BUT WE JUST WANTED TO REMEMBER THE

5      SIMILARITIES; CORRECT -- BALANCE SHEET TREATMENT,

6      MOTIVATION?

7  A.  I DON'T WANT TO -- I DON'T WANT TO NOT ANSWER YOUR

8      QUESTIONS, BUT I THINK YOUR LAST QUESTION WAS ABOUT

9      THE SECURITIES THEMSELVES AND THE CLAIMS.

10 Q.  WE CAN TALK ABOUT THE TRANSACTIONS IF YOU FEEL MORE

11     COMFORTABLE WITH THAT.

12 A.  WELL, I MEAN, I'M – I'M SORRY; I'M JUST TRYING TO

13     ANSWER YOUR QUESTION.

14 Q.  SURE.  LET ME TRY TO REPHRASE AND MAYBE THIS WILL HELP

15     A LITTLE BIT.  WHEN YOU ARE COMPARING CHEMTECH TO

16     MIPS, YOU WERE COMPARING TRANSACTIONS OR THE

17     SECURITIES TO THE THIRD PARTY INVESTORS?

18 A.  THERE'S DIFFERENT PARTS OF WHAT I DO IN MY REPORT.  SO

19     PART OF WHAT I DO IS COMPARE THE OBJECTIVE OF THE

20     TRANSACTIONS AND THE ACCOUNTING AND THE CONSOLIDATION

21     FOR GAAP PURPOSES IN TERMS OF THE SECURITIES

22     THEMSELVES.  I THINK I HAVE A FOOTNOTE IN THE SECOND

23     REPORT IN THE TABLE COMPARING THE CLASS A INTEREST IN

24     TWO KINDS OF PREFERRED STOCK, WHERE I DROPPED A

25     FOOTNOTE IN ON MIPS.

1  Q.   OKAY.  BUT FOR BALANCE SHEET ACCOUNTING TREATMENT,

2       THEY WERE TREATED THE SAME; CORRECT?  FROM YOUR

3       PERSPECTIVE, THEY SHOULD HAVE BEEN TREATED THE SAME?

4  A.   THEY WERE TREATED VERY SIMILAR.  THEY -- IN THAT THEY

5       WERE MINORITY EQUITY SUM FUNDS, DIFFERED IN THE WAY

6       THEY TREATED MIPS FROM THE WAY DOW TREATED CHEMTECH.

7       BUT, YES, THERE'S A LOT OF SIMILARITIES.

8  Q.   AND YOU JUST SAID GENERALLY A KNOWING MOTIVATION FOR

9       ENGAGING IN THOSE TRANSACTIONS WAS SIMILAR; CORRECT?

10 A.   THERE WAS A SIMILAR MOTIVATION IN REGARDS TO GETTING

11      FINANCIAL ACCOUNTING TREATMENT, YES.

12 Q.   WE SAW ON THE SCREEN -- I'M NOT SURE IF YOU CAN PULL

13      IT UP -- WE SAW ON THE SCREEN IN PLAINTIFF'S

14      DEMONSTRATIVE WHERE YOU WERE COMPARING THE STRUCTURE

15      OF MIPS TO THE STRUCTURE OF CHEMTECH; DO YOU RECALL

16      THAT?

17 A.   YES.

18 Q.   DO YOU RECALL WHAT SLIDE THAT WAS?  I APOLOGIZE.  I

19      DON'T ACTUALLY HAVE IT.

20 A.   I'M SORRY?

21 Q.   COULD WE PULL UP PLAINTIFF'S 16; DO YOU HAVE THAT ON

22      YOUR SCREEN, SIR?

23 A.   YES; YES, I DO.

24 Q.   SO YOUR POINT HERE, IF I RECALL FROM YOUR TESTIMONY,

25      WAS THAT THE STRUCTURE IN THE GAAP CONSOLIDATION

```
 1          SHOULD HAVE BEEN SIMILAR BETWEEN MIPS AND CHEMTECH;

 2          CORRECT?

 3    A.    I THINK THE POINT WAS THAT YOU GET TO THE MINORITY

 4          INTEREST BALANCE SHEET TREATMENT THROUGH SIMILAR

 5          ACCOUNTING PROCEDURES AND SIMILAR STRUCTURES.

 6    Q.    THE STRUCTURES -- YES, THE STRUCTURES LOOK VERY

 7          SIMILAR, DON'T THEY?

 8    A.    YES.

 9    Q.    OKAY.  NOW, DR. ERICKSON, YOU'RE AWARE, OF COURSE, AND

10          UNDERSTANDING THE OBVIOUS HERE.  THIS IS TAX CASE,

11          ISN'T THAT RIGHT?

12    A.    THAT'S MY UNDERSTANDING, YES.

13    Q.    MIPS ARE TREATED AS DEBT FOR TAX PURPOSES; ISN'T THAT

14          CORRECT?

15    A.    I BELIEVE THAT'S CORRECT, YES.  AND JUST CLARIFY, IF

16          IT'S ALL RIGHT?

17              BY THE COURT:

18                  YES.  GO AHEAD AND ANSWER THE QUESTION.

19    BY THE WITNESS:

20    A.    THE -- THE MIPS THAT ARE TREATED AS DEBT FOR TAX

21          PURPOSES, AS YOU SAID, MR. SCHREIBER, THAT'S THE

22          TRANSACTION BETWEEN TEXACO AND THE PARTNERSHIP.  THE

23          SECURITIES THEMSELVES ARE NOT TREATED AS DEBT.

24    BY MR. SCHREIBER:

25    Q.    NO, I UNDERSTAND THAT.
```

1  A.    AS A ---

2  Q.    I UNDERSTAND THE TREATMENT.

3  A.    OKAY.  I JUST ---

4        BY THE COURT:

5            JUST FOR TAX PURPOSES?

6        BY MR. SCHREIBER:

7            YES, SIR; YES, SIR.  I UNDERSTAND THAT;

8        THAT'S FINE.

9  BY MR. SCHREIBER:

10  Q.    NOW, DR. ERICKSON, YOU, AS YOU STATED MULTIPLE TIMES

11       DURING YOUR DIRECT TESTIMONY, YOU HEARD THE TESTIMONY

12       OF THE DOW WITNESS, MR. FALLA; RIGHT?

13  A.    YES.

14  Q.    AND HE TESTIFIED THAT DOW WAS PRESENTED WITH MIPS AS A

15       FINANCING ALTERNATIVE -- EITHER TPS OR MIPS; I'M NOT

16       SURE WHICH ONE HE SAID.  DO YOU RECALL THAT?

17  A.    I DO.

18  Q.    AND HE ALSO STATED THAT DOW REJECTED, I WAS SAYING

19       MIPS.  WE CAN INCORPORATE THAT IN GENERAL.  AND HE

20       TESTIFIED THAT DOW REJECTED MIPS AS A FINANCING

21       TRANSACTION; ISN'T THAT RIGHT?

22  A.    YES, THAT'S WHAT I RECALL HIM SAYING.

23  Q.    AND DO YOU RECALL THAT HE STATED THAT DOW REJECTED

24       MIPS BECAUSE DOW THOUGHT IT WAS MORE OF A TAX SCHEME

25       THAN ANYTHING ELSE; ISN'T THAT RIGHT?

1  A.    I DON'T REMEMBER HIS EXACT WORDS, BUT I REMEMBER HE

2        WAS UNCOMFORTABLE WITH THE CHARACTERIZATION OF THE

3        PREFERRED SECURITIES AS DEBT LIKE IN SOME WAY.

4  Q.    NOW, DR. ERICKSON, YOU REFERENCED IN YOUR DIRECT

5        TESTIMONY DR. HUBBARD'S EXHIBIT 33; DO YOU RECALL

6        THAT?

7  A.    YES, I DO.

8  Q.    AND YOU SAID THAT IT SHOWS THAT THERE MUST HAVE BEEN

9        AN ACCOUNTING BENEFIT, BECAUSE THAT'S WHY ALL THESE

10       COMPANIES ENGAGED IN MIPS TRANSACTIONS IN THE '90'S;

11       RIGHT?

12 A.    I THINK WHAT I SAID WAS THAT WE SEE THAT THERE ARE

13       SOME FIRMS THAT ISSUED MIPS MORE THAN ONCE, AND IT WAS

14       WELL KNOWN THAT MIPS HAD A BENEFICIAL ACCOUNTING

15       TREATMENT.  AND SO THAT PROVIDES AN INDICATION THAT

16       FIRMS WHO DID THEM ONCE GOT A BENEFIT AND DID IT

17       AGAIN.

18 Q.    ISN'T IT TRUE, SIR, THAT BECAUSE MIPS PROVIDED A TAX

19       DEDUCTION, THAT ALSO PROVIDED ADDITIONAL REASONS TO DO

20       MIPS?

21 A.    NO.

22 Q.    WHY NOT?

23 A.    BECAUSE YOU COULD GET THAT TREATMENT WITH DEBT.  THE

24       BENEFIT OF THE MIPS IS THAT YOU GET THE DEBT TREATMENT

25       FOR TAX, BUT THE GAAP DOESN'T.

1   Q.   NO, THAT'S MY POINT, SIR, IS THAT YOU COULD ISSUE --

2        HAVE -- DO A MIPS ISSUANCE FOR TAX REASONS, NOT JUST

3        FOR ACCOUNTING REASONS; ISN'T THAT POSSIBLE?

4   A.   I DON'T UNDERSTAND.

5   Q.   WELL, YOUR COMMENT, I BELIEVE, ON DIRECT TESTIMONY WAS

6        THAT DR. HUBBARD'S EXHIBIT 33 IDENTIFIED MULTIPLE

7        COMPANIES THAT ISSUED MIPS MULTIPLE TIMES; CORRECT?

8   A.   YES.

9   Q.   AND YOUR TESTIMONY ON DIRECT WAS THAT THIS SHOWS THAT

10       THERE MUST HAVE BEEN AN ACCOUNTING BENEFIT; AM I

11       CHARACTERIZING YOUR TESTIMONY ACCURATELY?

12  A.   I SAID SOMETHING LIKE THAT.

13  Q.   OKAY.  BUT ISN'T ANOTHER REASON TO DO A MIPS ISSUANCE

14       IS BECAUSE IT PROVIDED TAX BENEFITS?

15  A.   PART OF THE BENEFIT OF THE MIPS STRUCTURE IS THAT IT

16       PROVIDED A TAX BENEFIT.  BUT IT PROVIDES A TAX BENEFIT

17       AT THE SAME TIME THAT IT PROVIDES AN ACCOUNTING

18       BENEFIT.

19  Q.   I UNDERSTAND THAT.

20            BY THE COURT:

21                SO THE ANSWER IS YES.

22            BY MR. SCHREIBER:

23                THE ANSWER -- THANK YOU, YOUR HONOR.

24  BY THE WITNESS:

25  A.   OKAY.  I'M SORRY ABOUT THAT.

1  BY MR. SCHREIBER:

2  Q.  THANK YOU, SIR.  I JUST WANT TO BE CLEAR.  YOU DIDN'T

3      MENTION THE TAX BENEFIT IN YOUR DIRECT EXAMINATION;

4      ISN'T THAT RIGHT?

5  A.  I DON'T THINK SO.

6  Q.  NOW, PROFESSOR ERICKSON, THERE IS NO SLIDE THAT WAS

7      PULLED UP, AND AGAIN, I APOLOGIZE.  IT'S THE CHART

8      THAT SHOWS THE COST OF DOING MIPS COMPARED TO THE COST

9      OF CHEMTECH.  IS THAT P-16?  P-18?  P-18.  WOULD YOU

10     PULL THAT UP REAL QUICK, PLEASE?  THIS ONE.

11 A.  YES.

12 Q.  OKAY. NOW, DR. ERICKSON, ONE QUESTION ABOUT THIS.  DO

13     YOU SEE ON HERE WHERE IT SAYS CHEMTECH -- THE

14     STRUCTURE OF CHEMTECH --

15 A.  YES.

16 Q.  -- AND THE AMOUNT ISSUED?

17 A.  YES.

18 Q.  THE $200 MILLION DOLLARS.  ISN'T IT TRUE THAT CPI, THE

19     CHEMTECH I SUBSIDIARY HAD TO HOLD $50 MILLION DOLLARS

20     IN ASSETS?

21 A.  YES, I BELIEVE THAT'S TRUE.

22 Q.  AND SO THAT MONEY WAS NOT AVAILABLE TO LOAN BACK TO

23     DOW CHEMICAL COMPANY THROUGH IT'S SUBSIDIARIES?

24 A.  I THINK THAT'S CORRECT, YES.

25 Q.  SO SHOULDN'T THAT NUMBER ACTUALLY BE $150 MILLION?

1    A.    NO.

2    Q.    EVEN THOUGH $50 MILLION DOLLARS IN A SUBSIDIARY THAT

3          DOESN'T HAVE ACCESS TO DOW CHEMICAL COMPANY?

4    A.    YES.

5    Q.    NOW, PROFESSOR ERICKSON, THERE'S BEEN A BIT OF DEBATE

6          BETWEEN YOU AND DR. HUBBARD OF WHETHER THERE WERE

7          CHEAPER OPTIONS THAT DOW COULD HAVE AVAILED THEMSELVES

8          -- ITSELF OF IF THEY WANTED TO RAISE $200 MILLION

9          DOLLARS AND NOT IMPACT THEIR RATIOS, CORRECT?  THERE'S

10         A DEBATE BETWEEN YOU AND DR. HUBBARD ON THAT POINT?

11   A.    I'M NOT EXACTLY SURE, BUT HE TALKS ABOUT A CHEAPER

12         COST OF MIPS; THAT'S RIGHT.

13   Q.    AND WE'VE HAD THIS DISCUSSION ALREADY TODAY, SO I'M

14         NOT GOING TO BELABOR THE POINT.  BUT YOU, SIR,

15         DEMONSTRATE YOUR POINT THAT MIPS WAS NOT A CHEAPER

16         ALTERNATIVE FOR DOW.  YOU RELY ON CERTAIN DATA -- AND

17         WE DISCUSSED THIS AT LENGTH, THAT YOU RECEIVED AS PART

18         OF ANOTHER MATTER THAT YOU WERE INVOLVED IN; CORRECT?

19   A.    NO, SIR.

20   Q.    THAT'S NOT TRUE?

21   A.    NO.

22   Q.    SO IN YOUR DEPOSITION WHEN YOU REFUSED TO PROVIDE

23         INFORMATION TO MS. MORRIS, THE GOVERNMENT COUNSEL,

24         THAT WAS NOT SOMETHING THAT YOU HAD RELIED ON?

25   A.    I RELIED ON THE PUBLICLY AVAILABLE JCT REPORT.

1  Q.  AT THE TIME, YOU DIDN'T HAVE -- YOU'RE SAYING, SIR,

2      THAT YOU DID NOT HAVE INFORMATION THAT YOU DID NOT

3      SHARE WITH MS. MORRIS?

4  A.  I MEAN, AS I TOLD MS. MORRIS, I -- I HAD SEEN THE

5      LETTER THAT'S REFERENCED IN THE JCT REPORT.

6  Q.  THIS IS THE SKADDEN LETTER; IS THAT WHAT IT WAS?

7  A.  YES, THAT'S MY RECOLLECTION.

8  Q.  SCATUM -- SCATUM LETTER.

9  A.  AND I -- SHE ASKED ME IF I'D SEEN IT.  I TOLD HER I

10     HAD.  SHE ASKED ME IF I STILL HAD IT.  I TOLD HER I DO

11     NOT.  I HAD RETURNED ALL OF THOSE DOCUMENTS WHEN THE

12     OTHER MATTER I REFERRED TO WAS COMPLETED.  I DO NOT

13     HAVE THAT DOCUMENT.

14 Q.  OKAY.  SIR, YOU MENTIONED IN YOUR DIRECT TESTIMONY

15     THAT YOU PUBLISHED A STUDY ON THE COST OF MIPS

16     TRANSACTIONS IN THE '90'S; CORRECT?

17 A.  YES, SIR.

18 Q.  BUT FOR PLAINTIFF'S EXHIBIT, I'M SORRY,  PLAINTIFF'S

19     DEMONSTRATIVE 18, IF YOU COULD PULL IT UP AGAIN REAL

20     BRIEFLY, FOR PLAINTIFF'S EXHIBIT 18,  SORRY,

21     DEMONSTRATIVE EXHIBIT 18, YOU'RE NOT RELYING YOUR OWN

22     PUBLISHED PERIODED STUDY TO CALCULATE THE COST OF

23     MIPS; IS THAT CORRECT?  THE NUMBER THAT'S SHOWN IN

24     THIS DEMONSTRATIVE IS WHAT I'M REFERRING TO.

25 A.  THAT'S CORRECT.

1  Q.   IN YOUR STUDY, YOU HAD DOZENS OF ISSUANCES THAT YOU

2       LOOKED AT; RIGHT?

3  A.   YES, SIR.

4  Q.   LOTS OF DATA POINTS, BASICALLY?

5  A.   YES.

6  Q.   I BELIEVE, CORRECT ME IF I'M WRONG, I BELIEVE YOUR

7       STATEMENT HAD 158 ISSUANCES OF TRUST PREFERRED STOCK;

8       IS THAT RIGHT?

9  A.   I BELIEVE THAT'S CORRECT; I WAS GOING TO SAY THAT

10      NUMBER.

11 Q.   YOU'RE VERY GOOD AT REMEMBERING NUMBERS, SIR, I MUST

12      SAY.  AND YOUR STUDY LOOKED AT 44 INSTANCES OF WHERE

13      THE PROCEEDS OF THE ISSUANCES WERE USED TO PAY DOWN

14      DEBT; ISN'T THAT RIGHT?

15 A.   THAT SOUNDS RIGHT.

16 Q.   OKAY.  DO YOU RECALL HOW MANY DIFFERENT COMPANIES WERE

17      CAPTURED IN THIS STUDY?

18 A.   DO YOU MEAN THE 158?

19 Q.   YES.  DO YOU REMEMBER HOW MANY COMPANIES THAT

20      REFLECTED?

21 A.   NO, I DON'T.

22 Q.   DO YOU RECALL HOW MANY DIFFERENT INDUSTRIES THAT THESE

23      COMPANIES WERE INVOLVED IN THAT WERE IN YOUR STUDY?

24 A.   I DON'T REMEMBER IF WE TABULATED THAT INFORMATION OR

25      NOT.

1    Q.    BUT IT WAS A LOT OF DATA POINTS, ESSENTIALLY?

2    A.    YES, SIR.

3    Q.    FOR COMPARISON, WITH REGARD TO PLAINTIFF'S

4          DEMONSTRATIVE 18, THE NUMBER OF DATA POINTS RELIED ON

5          YOUR -- ON HERE IS ONE; CORRECT?

6    A.    YES, SIR.

7    Q.    IN YOUR REPORT YOU'RE RELYING ON -- YOUR EXPERT

8          REPORT, THAT IS -- YOU'RE RELYING ON THE ENRON

9          TRANSACTIONS THAT TOTALED THREE POINTS; ISN'T THAT

10         RIGHT?

11   A.    IN -- IN THAT PART OF THE REPORT, YES, BUT IN ANOTHER

12         PART, NO.

13   Q.    NOW, SIR, THE DATA YOU'RE RELYING ON FOR PLAINTIFF'S

14         EXHIBIT, DEMONSTRATIVE EXHIBIT 18 IS FROM ENRON

15         CORPORATION, A COMPANY THAT DECLARED BANKRUPTCY AFTER

16         HIDING BILLIONS AND BILLIONS OF DOLLARS IN DEBT FROM

17         THE PUBLIC AND IT'S AUDITORS; ISN'T THAT CORRECT?

18   A.    I'M NOT SURE HOW MUCH DEBT THEY HID FROM THEIR

19         AUDITORS,  BUT YES, SIR, THEY DID FILE FOR BANKRUPTCY.

20              BY THE COURT:

21                  AND IT IS FROM ENRON?

22              BY THE WITNESS:

23                  YES, IT IS FROM ENRON.

24   BY MR. SCHREIBER:

25   Q.    IT IS FROM ENRON -- ENRON CORPORATION?

1    A.    YES, SIR.  THIS -- THIS OBSERVATION.

2    Q.    AT THE TIME OF IT'S COLLAPSE, ENRON CORPORATION, THAT

3          WAS THE LARGEST U.S. BANKRUPTCY EVER, WASN'T IT?

4              BY THE COURT:

5                  OR, DO YOU KNOW?

6              BY THE WITNESS:

7                  I DON'T KNOW IF WORLDCOM WAS BIGGER OR IF

8              OR IF ENRON.  I DON'T KNOW.

9    BY MR. SCHREIBER:

10   Q.    WELL, WE'LL TRY AND CLARIFY THIS FOR THE COURT, IF I

11         MAY.  YOU'RE HANGING YOUR HAT FOR THIS EXHIBIT, THIS

12         DEMONSTRATIVE, ON DATA FROM THE ENRON CORPORATION;

13         ISN'T THAT RIGHT?

14   A.    THIS DATA IS FROM ENRON CORPORATION; CORRECT.

15   Q.    AND THAT'S WHAT YOU'RE RELYING ON FOR THIS

16         DEMONSTRATIVE?

17   A.    THAT'S CORRECT.

18   Q.    PROFESSOR ERICKSON, YOUR EXPERT REPORTS -- WELL, LET

19         ME BACK UP.  PROFESSOR ERICKSON, YOUR 1999 STUDY

20         REFERENCED EARLIER INCLUDED COSTS OF MIPS

21         TRANSACTIONS.  THAT WASN'T WRITTEN FOR THIS

22         LITIGATION; ISN'T THAT RIGHT?

23   A.    NO, IT WAS NOT.

24   Q.    YOUR EXPERT REPORT, SIR, IN THIS MATTER -- THEY WERE

25         WRITTEN SPECIFICALLY FOR THIS LAWSUIT; ISN'T THAT

1     RIGHT?

2  A.  YES, THAT'S RIGHT.

3  Q.  DR. ERICKSON, I'D LIKE TO TURN TO PAGE 69 OF YOUR

4     OPENING REPORT, IF I MAY.  YES, THAT'S IT.

5     (INDICATING)

6  A.  I'M GOING TO LOOK AT THE PAPER, IF THAT'S OKAY.

7  Q.  YES, TAKE YOUR TIME.

8  A.  OKAY.

9  Q.  LOOKING AT THIS PAGE, YOU SAY THAT ONE REASON FIRMS

10     TRY TO KEEP DEBT OFF THE BALANCE SHEET IS "UNWARY

11     LENDERS MAY IGNORE OFF-BALANCE SHEET FINANCING AND SET

12     LOWER INTEREST RATES FOR LOANS THAN THE UNDERLYING

13     RISK LEVELS WARRANT."  DID I READ THAT CORRECTLY, SIR?

14  A.  YES, YOU DID READ THAT CORRECTLY.

15  Q.  NOW, YOU TESTIFIED, DR. ERICKSON, THAT YOU THOUGHT

16     THAT WHAT DOW DID IN THE CHEMTECH TRANSACTION WAS --

17     WAS TRANSPARENT; CORRECT?

18  A.  I BELIEVE THAT'S TRUE.  BUT I DON'T THINK I WAS ASKED

19     ABOUT THAT.  BUT YES.

20  Q.  OKAY.  YOU HEARD THE TESTIMONY OF MR. FALLA; CORRECT?

21  A.  YES.

22  Q.  AND HE SAID THAT DOW WAS NOT TRYING TO FOOL THE

23     INVESTING PUBLIC BY CATEGORIZING CHEMTECH AS MINORITY

24     EQUITY; CORRECT?

25  A.  YES, I RECALL THAT.

1    Q.    THE MARKET WAS AWARE OF WHAT DOW WAS DOING; THERE WAS

2          NO SUBTERFUGE?

3    A.    YES.

4    Q.    NOW, MR. MERSZEI, HE WAS A DOW WITNESS -- ANOTHER DOW

5          WITNESS SAID BASICALLY THE SAME THING, THAT DOW WAS

6          NOT TRYING TO FOOL EITHER THE RATING AGENCIES OR THE

7          INVESTING PUBLIC; ISN'T THAT CORRECT?

8    A.    I BELIEVE SO, YES.

9    Q.    SO IN THAT CASE, SIR, THERE WOULDN'T BE ANY UNWARY

10         LENDERS; ISN'T THAT RIGHT?

11   A.    THAT'S PROBABLY CORRECT, YES.

12   Q.    SO THIS POINT IN YOUR REPORT IS JUST A THEORETICAL

13         POINT; IT DOESN'T APPLY TO DOW IN THIS CASE; IS THAT

14         WHAT YOU'RE SAYING?

15   A.    NOT EXACTLY.

16   Q.    IT DOES APPLY TO DOW OR IT DOESN'T APPLY TO DOW?  I'M

17         NOT CLEAR.

18   A.    I'M SORRY. IT DOES NOT APPLY TO DOW.

19   Q.    OKAY.  SO THIS LINE THAT SAYS, "UNWARY LENDERS MAY

20         IGNORE OFF-BALANCE SHEET FINANCING," BLAH, BLAH, BLAH,

21         BLAH, DOES NOT APPLY TO DOW CHEMICAL COMPANY IN THE

22         CHEMTECH TRANSACTION?

23   A.    THAT WAS NOT THE INTENT.  WHETHER -- WHETHER THAT IS

24         TRUE, THAT SOME OF THEIR LENDERS WERE UNWARY, I DON'T

25         KNOW.  BUT THAT WAS NOT THEIR INTENT.

1    BY THE COURT:

2        AS YOU UNDERSTOOD?

3    BY THE WITNESS:

4        YES, CORRECT.

5  BY MR. SCHREIBER:

6  Q.  PROFESSOR ERICKSON, PLEASE TURN TO PAGE FIVE OF YOUR

7      ORIGINAL EXPERT REPORT, PLEASE.  I WANT TO READ FROM

8      THE VERY TOP.  PLEASE TELL ME, AGAIN, IF I'VE READ

9      THAT SECTION CORRECTLY.

10  A.  OKAY.

11  Q.  AND PLEASE DO SO, BECAUSE I HAVE READ THINGS

12      INCORRECTLY BEFORE.

13  A.  OKAY.

14  Q.  "INCREASES IN DEBT RATIOS CAN CONTRIBUTE TO A DEBT

15      RATING DOWNGRADE.  AND AS A RESULT BORROWING COSTS CAN

16      INCREASE.  FURTHERMORE, INCREASES IN THESE RATIOS CAN

17      LEAD A FIRM TO VIOLATE IT'S DEBT COVENANT.  SUCH

18      VIOLATIONS ARE COSTLY AND POTENTIALLY PROBLEMATIC FOR

19      THE FIRM.  FOR THE FOREGOING REASONS, DOW, LIKE MANY

20      OTHER FIRMS, ATTEMPTED AND ATTEMPTS TO KEEP THESE

21      RATIOS WITHIN A RANGE THAT DOES NOT LEAD TO SUCH

22      COST."  DID I READ THAT SECTION CORRECTLY?

23  A.  I BELIEVE SO, YES.

24  Q.  THANK YOU, SIR.  NOW, AGAIN, CAN YOU TURN BACK TO YOUR

25      EXPERT REPORT, PAGE 68.  IT'S BASICALLY WHERE YOU WERE

1    BEFORE, DR. ERICKSON.  THIS TIME I'M GOING TO START

2    READING FROM THE VERY BOTTOM OF THE PAGE AND I'M GOING

3    TO SKIP AHEAD.  PLEASE TELL ME IF I'VE READ THE

4    SECTIONS CORRECTLY.  "A WIDELY USED ACCOUNTING

5    TEXTBOOK EXPLAINS FIRMS STANDARD MOTIVATION FOR

6    ARRANGING FINANCING TRANSACTIONS SO AS TO KEEP DEBT

7    OFF THE BALANCE SHEET."  NOW, SKIPPING AHEAD TO THE

8    NEXT PAGE, IF YOU CAN.  UNDERNEATH WHERE WE TALKED

9    ABOUT UNWARY LENDERS, IT SAYS, "NUMBER TWO, IT AVOIDS

10   DEBT COVENANT VIOLATIONS.  COVENANTS IN EXISTING DEBT

11   CONTRACTS MAY RESTRICT A FIRM'S INCREASING DEBT RATIOS

12   ABOVE CERTAIN DEFINED LEVELS."  DID I READ THAT

13   CORRECTLY, SIR?

14  A.  YES.

15  Q.  OKAY.  SO IN YOUR -- ON PAGE 5 YOU SAID THAT DOW WAS

16   TRYING TO HELP IT'S RATIOS AS TO NOT VIOLATE DEBT

17   COVENANTS; CORRECT?

18  A.  I -- I SAID THAT WAS ONE OF THE THINGS.

19  Q.  ONE OF THE THINGS, SURE.  AND YOU REITERATE THAT POINT

20   HERE ON PAGE -- I THINK IT'S 69 OF YOUR ORIGINAL

21   EXPERT REPORT; CORRECT?  YOU'RE HIGHLIGHTING THE

22   IMPORT OF, BUT NOT VIOLATING DEBT COVENANTS ON THIS

23   REPORT?

24  A.  GENERICALLY, YES.

25  Q.  NOW, SIR, YOU'RE NOT AWARE OF ANY EXISTING DEBT

1    COVENANTS PER THE DOW CHEMICAL COMPANY THAT WOULD HAVE

2    BEEN VIOLATED IF THE $200 MILLION DOLLARS OF

3    INVESTMENT WERE CLASSIFIED AS DEBT INSTEAD OF MINORITY

4    INTEREST; ISN'T THAT RIGHT?

5 A.  THAT'S RIGHT.

6 Q.  NOW, AT THE TIME YOU WROTE YOUR REPORT, YOU WERE

7    UNAWARE OF ANY DEBT COVENANTS THAT DOW WOULD HAVE

8    VIOLATED WITH AN ADDITIONAL $200 MILLION DOLLARS OF

9    DEBT; ISN'T THAT RIGHT?

10 A.  THAT'S CORRECT.

11 Q.  PROFESSOR ERICKSON, YOUR TESTIMONY ON DIRECT WAS A

12    LITTLE CONFUSING TO ME ON -- ON THIS POINT, SO I JUST

13    WANT TO CLARIFY IT.  IN THE WORLD OF U.S. ACCOUNTING,

14    IT'S TRUE THAT ONE LOOKS AT THE SUBSTANTIVE ECONOMIC

15    CHARACTERISTICS OF TRANSACTIONS TO DETERMINE THE

16    APPROPRIATE ACCOUNTING; ISN'T THAT RIGHT?

17 A.  THAT'S THE IDEA, YES.  SOMETIMES, WE -- AS WE

18    DISCUSSED WITH MS. MORRIS IN MY DEPOSITION, THERE'S

19    PLACES WHERE THE RULES DON'T ACCOMPLISH THAT.

20 Q.  THAT SEEMS PRETTY FEW AND FAR BETWEEN, LARGELY; RIGHT?

21    OH, DON'T WORRY ABOUT THAT; I'M NOT SURE ---

22 A.  I DON'T KNOW.  I MEAN, I GAVE AN EXAMPLE THAT I'M

23    FAMILIAR WITH, THAT I WORK WITH ALL THE TIME.  SO I

24    DON'T KNOW HOW FAR AND FEW BETWEEN THAT IS.

25 Q.  BUT GENERALLY SPEAKING FOR U.S. GAAP, THE POINT IS TO

1        REFLECT THE SUBSTANCE OF AN ARRANGEMENT; ISN'T THAT

2        RIGHT?

3   A.   YES.

4   Q.   THE ECONOMIC REALITY OF A TRANSACTION?

5   A.   YES.

6   Q.   NOW, DR. ERICKSON, YOU TESTIFIED ON DIRECT EXAMINATION

7        THAT THE BANKS RECEIVED APPROXIMATELY 90 PERCENT OF

8        PROFITS IN CHEMTECH I.  DOES THAT MEAN THAT THEY

9        RECEIVED 93 PERCENT OF THE CASH FLOWS FROM THE ROYALTY

10       PAYMENTS?

11  A.   NO.

12  Q.   THE CASH FLOW FROM THE ROYALTY PAYMENTS WERE ABOUT

13       $140 MILLION DOLLARS; IS THAT RIGHT?

14  A.   I THINK THAT'S THE REVENUE; I THINK THAT'S RIGHT.

15  Q.   THE MONEY FROM DOW TO CHEMTECH FOR USE OF THE PATENTS;

16       CORRECT?

17  A.   YES.  I JUST -- I WASN'T SURE IF YOU WERE TALKING

18       ABOUT THE REVENUE OR THE PROFIT.

19  Q.   WELL ---

20  A.   I'M SORRY; I'M JUST TRYING TO ---

21  Q.   SURE; NO.  I JUST WANT TO BE CLEAR THAT THE CLASS A

22       PARTNERS -- THE LIMITED -- THE FOREIGN BANKS IN THIS

23       TRANSACTION DID NOT RECEIVE APPROXIMATELY 90 PERCENT

24       OF THE $100 PLUS MILLION DOLLARS OF ROYALTY PAYMENTS?

25  A.   THEY DID NOT RECEIVE 90 PERCENT OF THE CASH FLOW.

1   Q.   OF THE CASH FLOW; OKAY.

2   A.   YES, YES.

3   Q.   PROFESSOR ERICKSON, MARKETPLACE INVESTORS MAY VIEW

4        PREFERRED STOCK AS DEBT AND NOT EQUITY; ISN'T THAT

5        RIGHT?

6   A.   I THINK THERE'S SOME STUDIES THAT REACH CONCLUSIONS

7        LIKE THAT.  I DON'T NOW HOW PREVELANT THAT IS.

8   Q.   THAT'S IN PART BECAUSE PREFERRED STOCK IS A HYBRID

9        SECURITY; ISN'T THAT RIGHT?

10  A.   IT IS A HYBRID SECURITY.

11  Q.   IT HAS TRAITS OF BOTH DEBT AND EQUITY?

12  A.   TYPICALLY, YES.

13  Q.   AND YOU AGREE THAT SOME TYPES OF PREFERRED STOCK ARE

14       MORE LIKE EQUITY THAN OTHER TYPES?

15  A.   YES.

16  Q.   TURNING, SIR, EXCUSE ME, TURNING, SIR, TO TABLE ONE IN

17       YOUR REBUTTAL REPORT.  I BELIEVE THIS IS PAGE 24. THIS

18       TABLE COMPARES A NUMBER OF BASES OF FOREIGN BANKS

19       INTEREST TO DEBT AND TWO TYPES OF DEFERRED STOCK;

20       CORRECT?

21  A.   YES.

22  Q.   PROFESSOR ERICKSON, YOU'RE AWARE, I ASSUME, THAT THERE

23       ARE OTHER TYPES OF PREFERRED STOCK THAN THE TWO YOU

24       HAVE LISTED HERE; CORRECT?

25  A.   YES.

1  Q.   I'D LIKE TO RUN THROUGH A FEW OF THEM TOGETHER, IF YOU

2       DON'T MIND.  OKAY.  THERE'S CONVERTIBLE PREFERRED

3       STOCK; RIGHT?

4  A.   YES.

5  Q.   THERE'S NONCONVERTIBLE PREFERRED STOCK?

6  A.   YES.

7  Q.   DO YOU KNOW WHAT CONVERTIBLE IS?

8  A.   YES.

9  Q.   CAN YOU PLEASE EXPLAIN IT TO THE COURT?

10 A.   IF THE SECURITY IN QUESTION CAN BE CONVERTED INTO SOME

11      OTHER TYPE OF SECURITY -- DEBT OR COMMON STOCK, OR

12      SOMETHING ELSE.

13 Q.   THE FOREIGN BANKS INTERESTS HERE WERE CLOSER TO

14      NONCONVERTIBLE; CORRECT?

15 A.   YES.

16 Q.   IN OTHER WORDS, THE BANKS COULDN'T EXCHANGE THEIR

17      INTEREST FOR ANY OTHER TYPE OF SECURITY IN CHEMTECH?

18 A.   THAT'S MY UNDERSTANDING.

19 Q.   THERE'S ALSO CUMULATIVE PREFERRED STOCK; CORRECT?

20 A.   YES.

21 Q.   AND NONCUMULATIVE?

22 A.   YES.

23 Q.   AND DO YOU KNOW WHAT CUMULATIVE MEANS?

24 A.   YES.

25 Q.   WOULD YOU PLEASE EXPLAIN IT TO THE COURT?'

1  A.  THAT PROFITS OR DIVIDENDS ACCUMULATE IF THEY'RE NOT

2      PAID.

3  Q.  THERE'S ALSO CALLABLE PREFERRED STOCK; CORRECT?

4  A.  YES.

5  Q.  AND THERE'S NONCALLABLE PREFERRED STOCK?

6  A.  CORRECT.

7  Q.  AND AGAIN, IF YOU KNOW WHAT IT MEANS, WOULD YOU PLEASE

8      EXPLAIN IT TO THE COURT?

9  A.  YES.  A CALLABLE PREFERRED STOCK WOULD BE ONE THAT THE

10     ISSUER HAS THE RIGHT TO CALL AFTER FIVE OR SEVEN YEARS

11     AT SOME PRE-SPECIFIED PRICE ON A PARTICULAR DATE.

12 Q.  THERE'S ALSO PARTICIPATING PREFERRED STOCK; CORRECT?

13 A.  YES.

14 Q.  AND NONPARTICIPATING PREFERRED STOCK?

15 A.  CORRECT.

16 Q.  AND AGAIN, WOULD YOU PLEASE BRIEFLY EXPLAIN WHAT THAT

17     MEANS TO THE COURT, IF YOU KNOW?

18 A.  SURE. PARTICIPATING MEANS THAT THE SECURITY

19     PARTICIPATES IN PROFITS HOWEVER DEFINED.  NOT

20     PARTICIPATING MEANS THAT THEY DO NOT PARTICIPATE.

21 Q.  AND, DR. ERICKSON, THERE'S ALSO EXCHANGEABLE PREFERRED

22     STOCK; ISN'T THAT RIGHT?

23 A.  THERE CAN BE, I BELIEVE, YES.

24 Q.  I'M SORRY, I DIDN'T CATCH YOUR ANSWER.

25 A.  THERE CAN BE, I BELIEVE, YES.

1   Q.   THERE'S A CONVERTIBLE MONEY-MARKET PREFERRED; DO YOU

2        KNOW -- HAVE YOU HEARD OF THAT?

3   A.   I THINK I WAS ASKED ABOUT IT IN MY DEPOSITION, BUT I'M

4        NOT FAMILIAR WITH THAT.

5   Q.   SOMETHING CALLED PERKS PREFERRED-EQUITY REDEMPTION

6        CUMULATIVE STOCK, ARE YOU FAMILIAR WITH THAT?

7   A.   I WAS ASKED ABOUT THIS IN MY DEPOSITION, TOO, AND I

8        DON'T REMEMBER EXACTLY WHAT IT WAS.  BUT I KNOW -- I

9        REMEMBER AT ONE POINT IN TIME THEY DID, YES.

10  Q.   WELL, WE JUST LISTED A NUMBER OF DIFFERENT TYPES OF

11       TERMS THAT COULD BE FOUND WITHIN PREFERRED STOCK;

12       CORRECT?

13  A.   YES.

14  Q.   IN FACT, THESE TRAITS CAN BE CONJUNCTIVE, MEANING --

15       BY THAT I MEAN YOU CAN HAVE MORE THAN ONE TRAIT IN A

16       SINGLE SECURITY; ISN'T THAT CORRECT?

17  A.   YES.

18  Q.   YOU CAN HAVE NONCALLABLE, NONCUMULATIVE PREFERRED

19       STOCK; CORRECT?

20  A.   SURE.

21  Q.   YOU CAN HAVE NONCALLABLE CUMULATIVE?

22  A.   I BELIEVE SO.

23  Q.   YOU CAN HAVE CUMULATIVE, NONCONVERTIBLE-PREFERRED

24       STOCK; CORRECT?

25  A.   YES.

1  Q.   YOU CAN HAVE CONVERTIBLE NONPARTICIPATING?

2  A.   I IMAGINE SO.

3  Q.   YOU CAN HAVE NONCUMULATIVE CALLABLE-PREFERRED STOCK?

4  A.   SAY THAT ONE AGAIN.

5  Q.   SURE.   NONCUMULATIVE CALLABLE-PREFERRED STOCK?

6  A.   YES, I THINK SO.

7  Q.   YOU ALSO CAN GET THREE OF THESE IN A ROW; RIGHT --

8       NONCALLABLE PARTICIPATING, NONCUMULATIVE-PREFERRED

9       STOCK; CORRECT?

10 A.   YES.

11 Q.   SO YOUR TABLE ONE HERE COMPARES THE FOREIGN BANKS'

12      INTEREST IN TWO TYPES OF PREFERRED STOCKS.   BUT THERE

13      ARE LITERALLY DOZENS AND DOZENS AND DOZENS OF TYPES OF

14      PREFERRED STOCKS; ISN'T THAT RIGHT?

15 A.   THERE ARE A LOT OF POTENTIAL DIFFERENT TYPES OF

16      PREFERRED STOCK, YES.

17 Q.   DR. ERICKSON, IF YOU WILL, PLEASE, SIR, TURNING TO

18      PLAINTIFF'S SLIDES -- SLIDE NINE -- SLIDE NINE.   THIS

19      IS THE DOW DEBT-TO-CAPITAL RATIO SLIDE.   DO YOU SEE

20      THAT, SIR?

21 A.   YES.

22 Q.   NOW ACCORDING TO THIS SLIDE, AND THIS HAS BEEN

23      TESTIFIED TO A COUPLE OF TIMES, BUT I WANT TO RE-

24      EMPHASIZE THE POINT.   DOW EXCEEDED THAT 40 PERCENT --

25      WHAT YOU CALL A MAXIMUM DEBT-TO-CAPITAL RATIO IN 1990;

1       ISN'T THAT RIGHT?

2   A.  I'M SORRY, I WAS -- BUT YES, I THINK WHAT YOU SAID IS

3       CORRECT.

4   Q.  IN 1991 IT ALSO STATED THE 40 PERCENT MAXIMUM THAT YOU

5       HAVE LISTED ON THIS CHART; ISN'T THAT RIGHT?

6   A.  THAT'S CORRECT.

7   Q.  SAME IN '92, ALSO VIOLATED THAT MAXIMUM AND EXCEEDED

8       THE 40 PERCENT DEBT-TO-CAPITAL RATIO; CORRECT?

9   A.  IT'S ABOUT 40 PERCENT.

10  Q.  AND THEN AGAIN, AS YOU LOOK FURTHER ON, '97, '98, THE

11      SAME HOLDS TRUE; CORRECT?

12  A.  YES, SIR.

13  Q.  AND JUST -- JUST LIKE IT WAS ON DIRECT, I WANT TO MAKE

14      SURE OF THIS.  DOW WASN'T DOWNGRADED IN 1990; RIGHT?

15  A.  NOT TO MY KNOWLEDGE.

16  Q.  OR '91?

17  A.  THAT'S CORRECT.

18  Q.  OR '92?

19  A.  THAT'S CORRECT.

20  Q.  OR '97?

21  A.  THAT'S CORRECT.

22  Q.  OR '98?

23  A.  THAT'S CORRECT.

24  Q.  PROFESSOR ERICKSON, IF YOU CAN LOOK AT SLIDE EIGHT; I

25      THINK IT WAS SLIDE EIGHT, DEMONSTRATIVE.  THIS IS THE

1      DEBT-TO-TOTAL CAPITALIZATION THAT THERE'S A COPY AND

2      PASTE FROM THE S&P REPORT, RIGHT?  THE S&P

3      PUBLICATION?

4  A.  YES.

5  Q.  NOW, YOU MENTIONED SOMETHING ABOUT DR. HUBBARD'S

6      REPORT.  I WASN'T SURE EXACTLY WHAT YOU WERE GETTING

7      AT.  I THINK THAT WHAT DR. HUBBARD WAS TRYING TO SAY

8      WAS THAT THEIR DEBT-TO-CAPITAL -- AND CORRECT ME IF

9      I'M WRONG, PLEASE. I DON'T WANT TO MISCHARACTERIZE

10     YOUR INTERPRETATION.  BUT YOU WERE TRYING TO SAY THAT

11     DR. HUBBARD MENTIONED SOMETHING ABOUT A 50, AND YOU

12     DIDN'T KNOW WHERE THAT 50 CAME FROM.  DO YOU REMEMBER

13     THAT?

14 A.  YES.

15 Q.  SIR, I BELIEVE WHAT DR. HUBBARD WAS TRYING TO SAY, AND

16     CORRECT ME IF YOU DON'T RECALL THIS, IS THAT DOW WAS

17     CLOSER TO THE TRIPLE "B" -- EXCUSE ME, LET ME REPHRASE

18     IT.  DOW WAS NOT CLOSER TO THE TRIPLE "B" RATING THAN

19     IT WAS TO THE SINGLE "A" RATING?

20         BY THE COURT:

21             DON'T ANSWER THE QUESTION.

22         BY MR. BLANCHARD:

23             I'M SORRY.  WE'D JUST ASK IF THERE'S -- IS

24         THERE A PORTION OF DR. HUBBARD'S TESTIMONY THAT

25         YOU'RE REFERRING TO HERE, SPECIFICALLY?

1      BY MR. SCHREIBER:

2          WHEN HE TESTIFIES ON FRIDAY.

3      BY THE COURT:

4          NO. WAIT, WAIT.  TIME OUT.  LET'S DISPENSE

5      WITH THE GAMES, GENTLEMEN.  THE QUESTION IS, IF I

6      UNDERSTAND YOU, MR. BLANCHARD, YOU WOULD LIKE

7      MR. SCHREIBER TO REFER TO THAT PORTION OF THE

8      DIRECT TESTIMONY WHERE YOU REFERENCED DR.

9      HUBBARD'S REPORT; IS THAT YOUR QUESTION?

10     BY MR. BLANCHARD:

11         YES, YOUR HONOR, I BELIEVE SO, JUST SO I'M

12     SURE THAT WE'RE ALL ON THE SAME PAGE ---

13     BY THE COURT:

14         THERE WERE SEVERAL TIMES, MR. SCHREIBER,

15     THAT MR. BLANCHARD REFERENCED DR. HUBBARD'S

16     REPORT.  I THINK IT WOULD BE FAIR TO THIS WITNESS

17     IF YOU WOULD AT LEAST FOCUS ON THAT PORTION OR

18     THOSE QUESTIONS FROM MR. BLANCHARD THAT DESCRIBE

19     THAT PARTICULAR SECTION OF THE REPORT.

20     BY MR. SCHREIBER:

21         YOUR HONOR, I COULD WITHDRAW THE QUESTION AT

22     THIS POINT.  I DON'T THINK IT'S OF MUCH IMPORT.

23     BY THE COURT:

24         VERY WELL.

25  BY MR. SCHREIBER:

1  Q.   DR. ERICKSON, DIRECTING YOUR ATTENTION TO PAGE 10 OF

2       YOUR SUPPLEMENTAL REPORT, OR YOUR THIRD REPORT, SIR.

3  A.   OKAY.

4  Q.   SUBPART "D" IS ENTITLED "CREDIT RATINGS DOWNGRADES ARE

5       COSTLY"; CORRECT?

6  A.   YES.

7  Q.   DO YOU SEE THAT, SIR?  NOW THIS PART OF YOUR

8       SUPPLEMENTAL REPORT, CORRECT ME IF I'M WRONG,

9       DESCRIBES THE RATINGS DOWNGRADES THAT ARE ECONOMICALLY

10      HARMFUL -- THAT -- THAT RATINGS DOWNGRADES ARE BOUND

11      TO BE HARMFUL BY, "PROVIDING SEVERAL EXAMPLES OF THE

12      COST OF DEBT RATING DOWNGRADES FROM THE FINANCIAL

13      PRESS"; IS THAT CORRECT?

14 A.   I'M NOT SURE WHERE YOU'RE READING THAT FROM.

15 Q.   GO TO THE SECOND -- SIR, GO TO THE SECOND PARAGRAPH,

16      LAST LINE, "I PROVIDE" -- "I ALSO PROVIDE SEVERAL

17      EXAMPLES OF THE COST OF DEBT RATINGS DOWNGRADES FROM A

18      FINANCIAL PRESS."

19 A.   I'M SORRY; I WASN'T FOLLOWING YOU.  YES, THAT'S

20      CORRECT.

21 Q.   THAT'S NO PROBLEM.  I REALIZE THAT THERE ARE THREE

22      REPORTS HERE.  NOW, SIR, IF WE CAN -- THIS PART OF

23      YOUR SUPPLEMENTAL REPORT -- I'M SORRY.  LET'S GO ON,

24      SIR, TO PAGE 13 OF THE SAME REPORT WHICH IS THREE

25      PAGES LATER.  WE'RE STILL IN THAT SAME SECTION OF YOUR

1        ANALYSIS OF YOUR REPORT; CORRECT?

2  A.   I BELIEVE SO, YES.

3  Q.   I'M GOING TO READ THE SENTENCE ON PAGE 13 AND THEN

4       PLEASE TELL ME IF I'VE READ IT CORRECTLY, "DOW'S

5       RATINGS WERE DOWNGRADED ON DECEMBER 29TH, 2008, AND THE

6       STOCK PRICE FELL BY 19 PERCENT ON THAT DAY."  DID I

7       READ THAT CORRECTLY, SIR?

8  A.   YES, YOU DID.

9  Q.   YOUR CITATION AT THE END OF THAT PARAGRAPH IS TO A

10      <u>WALL STREET JOURNAL</u> ARTICLE FROM DECEMBER 30TH, 2008;

11      CORRECT?

12 A.   I BELIEVE SO, YES.

13 Q.   SIR, I'M GOING TO PULL UP THAT ARTICLE WHICH WAS

14      MARKED IN YOUR DEPOSITION AS "ERICKSON DEPO 13."

15           BY MR. SCHREIBER:

16              YOUR HONOR, MAY I APPROACH?

17           BY THE COURT:

18              YOU MAY.

19 BY MR. SCHREIBER:

20 Q.   NOW, PROFESSOR ERICKSON, I'M GOING TO READ, STARTING

21      IN THE MIDDLE OF THE FOURTH PARAGRAPH.  PLEASE TELL ME

22      IF I'VE READ THE SECTION OF THE ARTICLE CORRECTLY.

23      "AFTER THE CLOSE OF REGULAR TRADING, STANDARD AND

24      POOR'S RATING SERVICE LOWERED IT'S RATING ON DOW'S

25      DEBT TO TWO NOTCHES ABOVE JUNK TERRITORY."  DID I READ

1           THAT CORRECTLY, SIR?

2    A.    YOU DID.

3    Q.    PROFESSOR ERICKSON, THE STORY SAYS THAT THE FORMAL

4          RATINGS DOWNGRADE OCCURRED AFTER THE MARKETS WERE

5          CLOSED; CORRECT?

6    A.    IT DOES.

7    Q.    YOUR SENTENCE ON PAGE 13 FROM YOUR REPORT PUTS THE

8          RATINGS DOWNGRADE FIRST AND STOCK PRICE DROPPING

9          SECOND; ISN'T THAT RIGHT?  COULD WE PULL IT BACK UP ON

10         THE SCREEN?

11   A.    I SEE THE SENTENCE; I'M JUST NOT SURE HOW TO ANSWER.

12   Q.    WELL, I'M ASKING YOU A SIMPLE CHRONOLOGICAL QUESTION.

13         YOUR SENTENCE SAYS AFTER -- I'M SORRY -- YOUR SENTENCE

14         SAYS, "DOW'S RATINGS WERE DOWNGRADED ON DECEMBER 29TH,

15         2008, AND THE STOCK PRICE FELL 19 PERCENT ON THAT

16         DAY."

17   A.    WELL, I'M NOT SURE THAT'S CHRONOLOGICAL; IT'S THE

18         "AND" AND I'M NOT -- I'M NOT THE MOST GIFTED WRITER

19         AND NOT VERY GOOD WITH THE ENGLISH LANGUAGE.  THE

20         "AND" IS JUST JOINING THOSE TWO PHRASES TOGETHER, SO I

21         DON'T NECESSARILY THINK IT'S CHRONOLOGICAL.

22   BY MR. SCHREIBER:

23   Q.    LET ME ASK YOU THIS, SIR:  THE RATINGS DOWNGRADE

24         OCCURRED AFTER THE STOCK PRICE FELL; ISN'T THAT RIGHT?

25   A.    THAT'S WHAT THE ARTICLE SAID; THAT'S CORRECT.

1  Q.  DR. ERICKSON, PLEASE TURN IN YOUR BINDER TO DELOITTE

2      AND TOUCHE MEMO THAT WAS HIGHLIGHTED BY MR. BLANCHARD.

3      I BELIEVE IT'S JOINT -- I'M SORRY -- PLAINTIFF'S

4      EXHIBIT 2, WHICH IS ALSO YOUR DEPO EXHIBIT 8, FOR THE

5      RECORD.  I HAVE A QUICK QUESTION ABOUT THIS.  IF YOU'D

6      SCROLL TO THE THIRD -- THE LAST THIRD OF THE PAGE, THE

7      SENTENCE -- THE PARAGRAPH SAYS IFCO REPRESENTS THE

8      ONLY NON-DOW PARTIES; DO YOU SEE THAT PARAGRAPH, SIR?

9      I KNOW IT'S A BAD COPY AND HARD TO READ.

10 A.  YOU'RE ON THE FIRST PAGE?

11 Q.  I'M SORRY, THE FIRST PAGE.

12 A.  I SEE THAT, YES, SIR.

13 Q.  OKAY.  TWO LINES DOWN, I'M GOING TO READ THIS AND ASK

14     YOU A QUESTION. "THIS SUMMARY WAS PREPARED BASED UPON

15     REVIEWS OF THE FORMATION DOCUMENTS FOR CHEMTECH AND

16     DISCUSSIONS WITH DOW PERSONNEL BETWEEN CAROL ASHLEY,

17     ASSISTANT CONTROLLER, BILL CURRY, TAX ATTORNEY, AND

18     PAUL BRINK, CORPORATE TAX DIRECTOR."  DID I READ THAT

19     CORRECTLY, SIR?

20 A.  YES.

21 Q.  PROFESSOR ERICKSON, YOU WERE RETAINED -- YOU WERE

22     RETAINED AS AN EXPERT FOR THE DEFENDANT IN A CASE

23     CALLED NATIONAL AUSTRALIA BANK V. UNITED STATES; ISN'T

24     THAT RIGHT?

25 A.  YES.

1  Q.   AND THAT WAS IN 2003 AND 2004?

2  A.   I DON'T REMEMBER.

3  Q.   DO YOU RECALL THAT CASE WAS IN THE U.S. COURT OF

4       FEDERAL CLAIMS IN WASHINGTON, D.C., BEFORE JUDGE

5       BRUGGINK?

6  A.   YES, I DO.

7            BY MR. SCHREIBER:

8                YOUR HONOR, FOR THE RECORD, THE COURT'S

9            OPINION WAS FILED DECEMBER 29TH, 2004, AT 63 FED

10           CLAIMS, 352 FEDERAL COURT.

11           BY THE COURT:

12               GIVE ME THAT CITATION AGAIN.

13           BY MR. SCHREIBER:

14               I'LL PROVIDE YOU A COPY OF THE ---

15               YOUR HONOR, MAY I APPROACH?

16           BY THE COURT:

17               YOU MAY.

18  BY MR. SCHREIBER:

19  Q.   PROFESSOR ERICKSON, ARE YOU AWARE, SIR, THAT JUDGE

20       BRUGGINK GRANTED SUMMARY JUDGMENT FOR THE PLAINTIFF IN

21       THAT CASE?

22  A.   YES, I KNOW.

23  Q.   I'M SORRY?

24  A.   YES, SIR.

25  Q.   ARE YOU AWARE THAT IN JUNE, SIR, THE JUDGE STATED

1    THAT, "DR. ERICKSON, APPARENTLY RECOGNIZING THAT THERE

2    IS NO CONTRACTUAL LEGAL TIME LIMIT BETWEEN CLAIMING

3    THE DEDUCTION AND SEEKING WRITE DOWN APPROVAL SIMPLY

4    MIX ONE UP SIX MONTHS.  DEFENDANT, HOWEVER, CANNOT

5    POINT TO A SINGLE INSTANCE IN WHICH IT'S DEDUCTION WAS

6    DISALLOWED MERELY BECAUSE IT VIOLATED DR. ERICKSON'S

7    SIX-MONTH RULE.  IN HIS DEPOSITION, DR. ERICKSON

8    ACKNOWLEDGE THAT THE IRS DID NOT HAVE SUCH A RULE.  'I

9    DON'T SEE HOW THEY COULD HAVE APPLIED THE ANALYSIS IN

10    MY SECTION 6 REGARDING THE SIX-MONTH RULE TO THE AUDIT

11    THAT WAS COMPLETED UP TO TEN YEARS PRIOR TO THE DATE

12    OF ISSUE OF MY REPORT.'" AND THERE'S A CITATION.

13    "WHEN PRESSED ON THE ISSUE, HE" -- MEANING YOU, DR.

14    ERICKSON. "HE ADMITTED THAT HIS SIX-MONTH RULE AND HIS

15    CORRESPONDING ANALYSIS WERE THE 'RESULT OF THIS

16    LITIGATION.'" WERE YOU AWARE THAT THE JUDGE IN THAT

17    CASE ACCUSED YOU OF MAKING UP A STANDARD FOR PURPOSES

18    OF THAT LITIGATION?

19        BY THE COURT:

20            I BELIEVE WE HAVE AN OBJECTION TO THAT.

21        BY MR. BLANCHARD:

22            OBJECTION, YOUR HONOR.  I JUST -- A COUPLE

23        OF THINGS.  FIRST OF ALL, I JUST WANT TO NOTE

24        THAT THIS DOCUMENT IS NOT IN THE RECORD, NOT

25        CITED IN ANY OF THE REPORTS, SO OBVIOUSLY NOT

1       ADMITTED.  AND I JUST WANT TO BE SURE THAT WE

2       HAVE RELEVANCE FOR WHAT MR. SCHREIBER IS DOING IN

3       TERMS OF SOME FORM OF IMPEACHMENT.

4       BY MR. SCHREIBER:

5            I HAVE A RESPONSE, SIR.

6       BY THE COURT:

7            MR. SCHREIBER, WHAT'S YOUR RESPONSE TO THAT?

8       BY MR. SCHREIBER:

9            THE RESPONSE IS VERY SIMPLE.  I'M NOT

10      SEEKING TO ADMIT THIS INTO THE RECORD AS

11      SUBSTANTIVE EVIDENCE.  I HAPPENED TO MARK IT FOR

12      IDENTIFICATION PURPOSES ONLY.  SECOND, IT GOES TO

13      PROFESSOR ERICKSON'S CREDIBILITY WHEN ANOTHER

14      JUDGE IN A FEDERAL -- FEDERAL COURT SAYS THAT HE

15      MAKES UP STANDARDS FOR PURPOSE OF LITIGATION.

16      BY THE COURT:

17           OKAY.  WELL, YOU'RE RIGHT; IT WON'T COME IN

18      NOW.  BUT SINCE YOU'VE READ IT TO THE -- TO THE

19      WITNESS, MR. BLANCHARD, I'M GOING TO GIVE DR.

20      ERICKSON AN OPPORTUNITY TO RESPOND TO THAT.  I

21      THINK IN FAIRNESS TO THE WITNESS, I THINK HE

22      OUGHT TO BE PERMITTED TO RESPOND.  BUT AGAIN, THE

23      -- CERTAINLY THE OPINION WILL NOT BE ENTERED INTO

24      EVIDENCE.

25      BY MR. SCHREIBER:

1        THAT WAS NOT MY INTENT, YOUR HONOR.

2    BY THE COURT:

3        DO YOU HAVE A RESPONSE TO THIS, DR.

4    ERICKSON?

5    BY THE WITNESS:

6        SURE.  I BELIEVE THIS WAS REVERSED ON

7    APPEAL, AND I DO REMEMBER THIS CASE.  THE -- I

8    WORKED FOR THE GOVERNMENT, THE DEPARTMENT OF

9    JUSTICE.  AN ATTORNEY NAMED BRIAN HOUSLING.  AND

10   IF I RECALL CORRECTLY THERE WAS SOME ANALYSIS OF

11   THE AGING OF SOME BALANCES FOR PURPOSES OF

12   REIMBURSEMENT BY THE GOVERNMENT.  THERE HAD BEEN

13   SOME LITIGATION.  AND I HAD SORTED THESE INTO

14   BASKETS BY KIND.  AND THERE WAS A QUESTION IN MY

15   DEPOSITION ABOUT WHAT WAS THE BASIS FOR THAT.  I

16   WAS ASKED TO SORT THIS DATA THIS WAY.  THE

17   INFORMATION IS CHARACTERIZED THAT WAY BY THE

18   JUDGE.  BUT AGAIN, THIS WAS REVERSED ON APPEAL

19   AND -- AND THE GOVERNMENT WAS PLEASED WITH THE

20       THE OUTCOME OF THE REVERSAL.

21   BY MR. SCHREIBER:

22   Q.   YOU'RE AWARE, SIR, THAT IT WASN'T REVERSED ON APPEAL

23       AS TO JUDGE BRUGGINK'S CHARACTERIZATION OF YOUR REPORT

24       OR DEPOSITION; ISN'T THAT RIGHT?

25   A.   I DON'T KNOW EXACTLY WHAT THE ULTIMATE OUTCOME WAS.  I

1       RECEIVED A CALL THAT IT HAD BEEN SETTLED AND THAT THE

2       DOJ WAS QUITE HAPPY WITH THE SETTLEMENT AFTER THE

3       REVERSAL.

4            BY MR. SCHREIBER:

5                 YOUR HONOR, ONE MOMENT, PLEASE.

6            BY THE COURT:

7                 SURE.

8            BY MR. SCHREIBER:

9                 THANK YOU, YOUR HONOR.

10           BY THE COURT:

11                YOU MAY PROCEED, MR. SCHREIBER.

12           BY MR. SCHREIBER:

13                YOUR HONOR,  I HAVE NO FURTHER QUESTIONS FOR

14      DR. ERICKSON.  THANK YOU.

15           BY THE COURT:

16                THANK YOU, SIR.

17                MR. BLANCHARD, ANY REDIRECT?

18           BY MR. BLANCHARD:

19                YES, YOUR HONOR, IF I MAY HAVE JUST A VERY

20      BRIEF MOMENT.

21           BY THE COURT:

22                SURE.

23                    REDIRECT EXAMINATION

24  BY MR. BLANCHARD:

25  Q.   OKAY, PROFESSOR ERICKSON.

1          BY MR. BLANCHARD:

2               LET'S BE SURE THAT WE SWITCHED OVER TO YOU.

3          NOEL, DO YOU HAVE -- HE'S ALL READY TO CALL THE

4          EXHIBIT DOWN.

5          BY MR. BLANCHARD:

6               ALL RIGHT.

7     BY MR. BLANCHARD:

8     Q.   I THINK WE COULD FIRST PULL UP PLAINTIFF'S

9          DEMONSTRATIVE 16.  AND JUST LOOKING BACK, AGAIN, TO

10         THE DIAGRAM THAT WE HAD LOOKED AT, PROFESSOR ERICKSON,

11         AND THAT YOU LOOKED AT WITH MR. SCHREIBER.  AND JUST

12         WHAT I WANT TO DO IS JUST BE SURE I UNDERSTAND YOUR

13         RESPONSES TO HIS QUESTIONS.  IF WE FOCUS ON MIPS AND

14         THE INTERESTS OF THE MIPS LIMITED PARTNERS, IS IT YOUR

15         UNDERSTANDING THAT THOSE WERE TREATED AS EQUITY FOR

16         TAX PURPOSES?

17    A.   THE -- THE MIPS HOLDERS?  YES, THAT'S MY

18         UNDERSTANDING.  THE PARTNERSHIP WAS RESPECTED.

19    Q.   ALL RIGHT.  NOW, WITH RESPECT TO MIPS AND THE MIPS

20         BENEFITS, THERE'S A TAX BENEFIT FOR DEBT HOLDERS;

21         CORRECT?

22    A.   YES.

23    Q.   AND WHAT IS THAT BENEFIT?

24    A.   IT'S THE DEDUCTION ON INTEREST.

25    Q.   ALL RIGHT.  IS THERE AN ANALOG FOR THAT BENEFIT IN THE

1        MIPS STRUCTURE?

2   A.   YES.

3   Q.   CAN YOU DIRECT US TO WHERE THAT SHOWS UP ON THIS

4        CHART?

5   A.   SURE I CAN.  THE LINE GOING BETWEEN THE MIPS ISSUING

6        FIRM AND XYZ PARTNERSHIP -- THE DEBENTURE.  THAT  THAT

7        DEBT GIVES RISE TO THE INTEREST DEDUCTION RIGHT NEXT

8        TO IT.  WE SEE THE INTEREST DEDUCTION RIGHT NEXT TO

9        IT.  THAT INTEREST EXPENSE THAT GOES TO XYZ

10       PARTNERSHIP, THAT IS THE DEDUCTION THAT THE ISSUING

11       FIRM GETS FOR TAX PURPOSES.

12  Q.   SO IT GETS A DEDUCTION ANALOGOUS TO WHAT WOULD BE AN

13       INTEREST PAYMENT; CORRECT?

14  A.   YES, SIR.

15  Q.   BUT THEN IS THERE ADDITIONAL BENEFIT OVER AND ABOVE

16       THE INTEREST DEDUCTION?

17  A.   NO.

18  Q.   HOW ABOUT FOR ACCOUNTING PURPOSES VERSUS DEBT?

19  A.   ARE YOU ASKING ME IS IT TREATED AS A DEBT FOR

20       ACCOUNTING PURPOSES?

21  Q.   I'M ASKING YOU IS THERE ANY OTHER BENEFIT FOR

22       ACCOUNTING PURPOSES VERSUS DEBT?

23  A.   YES, THIS IS TREATED AS -- AS NON-DEBT FOR ACCOUNTING

24       PURPOSES.

25  Q.   ALL RIGHT.  YOU DISCUSSED WITH MR. SCHREIBER THE FACT

1    THAT YOU RELIED FOR YOUR -- IN YOUR ANALYSIS OF MIPS

2    COSTS ON THE DATA POINT IN 1993 OF ONE TRANSACTION,

3    AND MR. SCHREIBER ASKED YOU, WELL, WHY DIDN'T -- IN

4    EFFECT, SHOULDN'T THAT BE OUTWEIGHED BY THE MANY MORE

5    PROSPECTUSES THAT, FOR EXAMPLE, PROFESSOR HUBBARD USES

6    AND, FOR EXAMPLE, THAT YOU CITED IN YOUR OWN STUDY.

7    DO YOU HAVE A RESPONSE TO THAT?

8  A.  SURE, THE -- A COUPLE OF POINTS.  IN -- IN MY STUDY,

9    AS I SAID EARLIER, WE ESTIMATED THE DIRECT

10    TRANSACTIONS COSTS THAT FIRMS INCURRED AND THE

11    OPPORTUNITY COSTS THEY INCURRED TO DO MIPS.  THE

12    OPPORTUNITY COSTS WERE ON THE ORDER OF MAGNITUDE OF

13    $40 MILLION DOLLARS PER TRANSACTION.  SO THAT MEANS

14    THE ACCOUNTING BENEFITS WERE VALUED BY THESE FIRMS

15    NORTH OF $40 MILLION DOLLARS.  AND THAT WAS NOT

16    DISCUSSED.  SECOND, AGAIN, THE POINT OF DISCUSSING THE

17    JCT REPORT -- AND I -- I HAND MY STUDENTS THE -- THE

18    DOCUMENT FROM THE -- THE TABLE FROM THE JCT REPORT FOR

19    THE TRANSACTION FEES BECAUSE THEY DO A CASE WHERE THEY

20    USE MY PUBLISHED STUDY.  AND SOMETIMES BEFORE I

21    ACTUALLY HAND THEM THE JCT REPORT, THEY WILL POINT IT

22    OUT TO ME AND SAY HEY, PROFESSOR ERICKSON, YOUR STUDY

23    UNDERESTIMATES THE COSTS OF THE MIPS ISSUES.  I GIVE

24    THEM THOSE TABLES.  I USE THIS AS A WAY TO POINT OUT

25    SOMETIMES THE PROBLEMS WITH RESEARCH WHEN ALL YOU HAVE

1    IS PUBLICLY AVAILABLE DATA.  SO THE POINT IS WE HAVE

2    FULL CONFIDENTIAL DATA ON THREE TRANSACTIONS.  AND FOR

3    THE TRANSACTIONS IN MY SAMPLE THAT PROFESSOR HUBBARD

4    LOOKS AT, WE DON'T HAVE ALL THE COSTS.

5  Q.   AND WITH RESPECT TO THE DATA IN THE JCT REPORT -- AND

6    AGAIN, WE'RE BASING THIS JUST ON PUBLICLY AVAILABLE

7    DATA, WHAT IS YOUR OPINION OF THE RELIABILITY OF THE

8    DATA IN THE JCT REPORT VERSUS THE DATA YOU USED IN

9    YOUR STUDY?

10  A.   I'VE SPENT QUITE A BIT OF TIME WITH THE JCT REPORT,

11    AND ONE OF THE PRIMARY FOCUSES IN THAT REPORT ARE

12    TRANSACTIONS FEES THAT WERE PAID TO VARIOUS PARTIES.

13    AND THERE'S AN EXTENSIVE DISCUSSION OF THOSE

14    TRANSACTIONS FEES IN THE REPORT.  AND NOWHERE IS THERE

15    ANY MENTION THAT THE MIPS FEES ARE OUT OF LINE OR

16    INCORRECT.  SO THOSE NUMBERS WERE CHECKED AND ANALYZED

17    QUITE CAREFULLY.  SO I THINK THOSE NUMBERS ARE VERY

18    RELIABLE NUMBERS.

19  Q.   IF WE COULD TURN TO YOUR REBUTTAL REPORT, THE TABLE

20    YOU LOOKED AT WITH MR. SCHREIBER ON, I BELIEVE, PAGE

21    24.  I'M JUST WAITING FOR IT TO COME UP ON MY SCREEN.

22  A.   YES, I'VE GOT IT, THANK YOU.

23  Q.   ALL RIGHT.  WHY DID YOU NOT INCLUDE OTHER TYPES OF

24    PREFERRED STOCK IN THAT TABLE?

25  A.   WELL, IN THE INTEREST OF BREVITY, WHAT I DID WAS I

1    INCLUDED THE TWO OBVIOUS, BASIC TYPES OF PREFERRED

2    STOCK THAT ARE EQUITY FOR GAAP PURPOSES TO ILLUSTRATE

3    A VERY SIMPLE COMPARISON THAT THE CLASS A INTERESTS

4    ARE MORE EQUITY LIKE BY FAR THAN ONE AND POSSIBLY AS

5    EQUITY LIKE AS THE OTHER.  SO THE CLASS A INTERESTS

6    ARE MORE EQUITY LIKE FOR U.S. GAAP PURPOSES THAN TWO

7    WELL-ACCEPTED EQUITY SECURITIES FOR U.S. GAAP.

8         BY MR. BLANCHARD:

9              THANK YOU VERY MUCH, PROFESSOR ERICKSON.

10              YOUR HONOR, I HAVE NO FURTHER QUESTIONS.

11         BY THE COURT:

12              OKAY.  THANK YOU, MR. BLANCHARD.

13              PROFESSOR ERICKSON, THANK YOU FOR COMING IN

14         TODAY, SIR.  YOU ARE EXCUSED.

15         BY THE WITNESS:

16              MY PLEASURE.  THANK YOU.

17         BY THE COURT:

18              OKAY.  MR. BLANCHARD OR MR. MAGEE, YOU MAY

19         CALL YOUR NEXT WITNESS.

20         BY MR. MAGEE:

21              YOUR HONOR, OUR NEXT WITNESS IS GOING TO BE

22         MR. GILL SCHWARTZ, WHO IS GOING TO BE PRESENTED

23         BY CHRISTOPHER MURPHY.

24         BY THE COURT: VERY GOOD.

25

1  THE WITNESS, GILBERT SCHWARTZ, AFTER HAVING BEEN FIRST DULY

2  SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

3  THE TRUTH, TESTIFIED AS FOLLOWS:

4          BY THE CLERK:

5              STATE YOUR NAME AND SPELL IT FOR THE RECORD.

6          BY THE WITNESS:

7              WOULD IT HELP IF I GAVE YOU A BUSINESS CARD?

8          BY THE REPORTER:

9              WELL, YOU STILL NEED TO ---

10         BY THE COURT:

11             WELL, YOU STILL NEED YOU TO SPELL IT FOR THE

12             RECORD.  BUT A BUSINESS CARD WOULD HELP; THANK

13             YOU VERY MUCH.

14         BY THE WITNESS:

15             THANK YOU, YOUR HONOR.

16             YES, MY NAME IS GILBERT SCHWARTZ – G-I-L-B-

17             E-R-T   S-C-H-W-A-R-T-Z.

18         BY MR. MURPHY:

19             CHRISTOPHER MURPHY FOR THE PLAINTIFF.  I

20             THINK I NEED TO APPROACH THE WITNESS AND GIVE HIM

21             HIS BINDER.

22         BY THE COURT:

23             YOU MAY.

24         BY MR. MURPHY:

25             THANK YOU.

1    BY THE COURT:

2         YOU MAY PROCEED.

3    BY MR. MURPHY:

4         ALL RIGHT.  THANK YOU, YOUR HONOR.

5                   DIRECT EXAMINATION

6    BY MR. MURPHY:

7    Q.   GOOD AFTERNOON, MR. SCHWARTZ.  HOW ARE YOU TODAY?

8    A.   I'M DOING FINE; THANK YOU, MR. MURPHY.

9    Q.   OKAY.  BOTH OF YOUR REPORTS, WHICH ARE NUMBERED PEX-7

10        AND PEX-8 HAVE BEEN MOVED INTO EVIDENCE IN THIS CASE.

11        I'D LIKE TO START RIGHT AWAY BY TURNING TO PEX-7,

12        WHICH IS YOUR OPENING REPORT, AND IT DEALS WITH HOW

13        THE CLASS A INTERESTS REGARDED THEIR INTEREST IN

14        CHEMTECH FOR U.S. BANKING LAW PURPOSES.  I'D LIKE TO

15        START BY FLIPPING TO EXHIBIT A.  EXHIBIT A IS

16        ESSENTIALLY YOUR CV.  IT DETAILS YOUR BACKGROUND AND

17        YOUR EXPERIENCE.

18   A.   THAT'S CORRECT.

19   Q.   LET'S START WITH YOUR TIME AT THE FEDERAL RESERVE,

20        WHICH IS MENTIONED ON THE BOTTOM OF PAGE ONE OF

21        EXHIBIT A THERE.  WHAT WAS THE SCOPE OF YOUR POSITION

22        AT THE FEDERAL RESERVE?

23   A.   THE FEDERAL RESERVE -- I STARTED AS A LAWYER IN THE

24        LEGAL DIVISION.  MY ROLE WAS TO ADVISE THE FEDERAL

25        RESERVE BOARD IN WASHINGTON ABOUT A NUMBER OF AREAS

1    -- MONETARY POLICY, LEGAL ISSUES RELATED TO MONETARY

2    POLICY, LEGAL ISSUES RELATING TO THE DISCOUNT WINDOW,

3    THAT IS, LENDING TO FINANCIAL INSTITUTIONS, REGULATORY

4    MATTERS, BANK REGULATORY MATTERS, AND BANK HOLDING

5    COMPANY ACT MATTERS, AS WELL AS PAYMENT SYSTEM ISSUES.

6  Q.  AND WHEN DID YOU CONCLUDE YOUR TIME AT THE FEDERAL

7    RESERVE BANK?

8  A.  I WORKED AT THE FEDERAL RESERVE FROM 1974 UNTIL 1985.

9    WHEN I LEFT IN 1985 I WS ASSOCIATE GENERAL COUNSEL IN

10   THE LEGAL DIVISION.

11 Q.  AND YOU SAID YOU LEFT.  WHERE DID YOU HEAD OFF TO

12   AFTER THAT?

13 A.  YES, I WENT TO SKADDEN, ARPS, THEIR WASHINGTON OFFICE.

14   IT'S A PRIVATE LAW FIRM.  AND MY WORK AT SKADDEN, ARPS

15   WAS VERY SIMILAR TO THE WORK AT THE FEDERAL RESERVE,

16   EXCEPT INSTEAD OF ADVISING THE FEDERAL RESERVE BOARD,

17   I WAS ADVISING CLIENTS --BANKING CLIENTS AND OTHER

18   FINANCIAL INSTITUTIONS ON THE SAME TYPES OF MATTERS

19   THAT I ADVISED THE BOARD, AND THAT IS DISCOUNT WINDOW,

20   LENDING ISSUES, PAYMENT SYSTEM ISSUES, AND REGULATORY

21   ISSUES DEALING WITH THE FEDERAL REGULATORS.

22 Q.  OKAY.  AND HOW LONG DID YOU STAY AT SKADDEN?

23 A.  I WAS AT SCADDEN FROM 1985 UNTIL 1995.

24 Q.  AND THEN WHERE DID YOU GO NEXT?

25 A.  I STARTED MY OWN LAW FIRM WITH A COLLEAGUE OF MINE.

1       THE LAW FIRM IS SCHWARTZ AND BALLEN.  AND WE ARE

2       LOCATED IN WASHINGTON, D.C.  THE WORK -- SCOPE OF THE

3       WORK WE DO IS VERY SIMILAR TO THE WORK AT SKADDEN IN

4       TERMS OF REPRESENTING CLIENTS BEFORE BANKING AGENCIES,

5       ADVISING THEM ON REGULATORY MATTERS, BANK HOLDING

6       COMPANY ACT MATTERS, AND PAYMENT SYSTEM ISSUES.

7  Q.   OKAY.  NOW, YOU MENTIONED BANKING AGENCIES, REGULATORY

8       AGENCIES.  CAN YOU GIVE ME AN EXAMPLE OF SOME OF THE

9       DIFFERENT AGENCIES THAT YOU DO INTERACT WITH?

10 A.   YES, WE HAVE A PRETTY COMPLICATED SYSTEM OF BANK

11      REGULATORY MATTERS IN THIS COUNTRY THAT JUST GREW UP

12      OVER THE YEARS.  THE FEDERAL RESERVE BOARD IS

13      RESPONSIBLE FOR REGULATING BANK HOLDING COMPANIES,

14      THAT IS, COMPANIES THAT OWN BANKS AND CONTROL BANKS,

15      AS WELL AS STATE CHARTERED INSTITUTIONS THAT ARE

16      MEMBERS OF THE FEDERAL RESERVE SYSTEM.  THE OFFICE OF

17      THE CONTROLLER OF THE CURRENCY IS THE REGULATOR AND

18      SUPERVISOR FOR NATIONAL BANKS, THAT IS, BANKS THAT ARE

19      CHARTERED BY THE FEDERAL GOVERNMENT.  THE OFFICE OF

20      RISK SUPERVISION IS THE ENTITY THAT IS RESPONSIBLE FOR

21      REGULATING STATE CHARTERED AS WELL AS NATIONALLY,

22      FEDERALLY CHARTERED SAVINGS ASSOCIATIONS.  AND THE

23      FEDERAL DEPOSIT INSURANCE CORPORATION IS RESPONSIBLE

24      FOR NOT ONLY MAINTAINING AND PRESERVING THE DEPOSIT

25      INSURANCE FUND FOR ALL FINANCIAL INSTITUTIONS, BUT

1        ALSO REGULATING STATE NON-MEMBER BANKS, THAT IS, BANKS

2        THAT ARE NOT MEMBERS OF THE FEDERAL RESERVE.  SO IT'S

3        A PRETTY COMPLICATED SYSTEM DEALING WITH ALL -- WITH

4        ALL FIVE AGENCIES.

5   Q.   OKAY.  GREAT.  WELL, NOW, LET'S DIVE INTO YOUR REPORTS

6        IN THIS MATTER.  I WANT TO START WITH THE OPENING

7        REPORT, PEX-7.  NOW I'D LIKE YOU TO LOOK AT

8        PLAINTIFF'S DEMONSTRATIVE EXHIBIT 19, JUST THE SECOND

9        TAB IN YOUR BINDER THERE.

10  A.   I SEE IT.

11  Q.   THIS IS THE OPINION FROM YOUR OPENING REPORT ON NUMBER

12       ONE OF THE SLIDE.  CAN YOU SUMMARIZE YOUR OPINION IN

13       THIS REPORT, PLEASE?

14  A.   YES, I WAS ASKED TO TAKE A LOOK AT THE MATERIALS

15       RELATING TO THIS CASE AND RENDER AN OPINION AS TO WHAT

16       MY VIEW WAS AS TO WHAT THE INVESTORS IN CHEMTECH

17       REGARDED THEIR INVESTMENT AS FOR PURPOSES OF U.S.

18       BANKING LAW.  AND I CAME TO THE CONCLUSION THAT WITH

19       RESPECT TO THE FIRST OPINION THAT THE INVESTMENT IN

20       CHEMTECH, IT WAS TREATED AS A LOAN, THERE WOULD HAVE

21       BEEN NO REASON TO GO TO THE FEDERAL RESERVE AND ASKING

22       THE FEDERAL RESERVE FOR SOME TYPE OF OPINION OR SOME

23       TYPE OF RULING.

24  Q.   OKAY.  NOW YOU MENTIONED THE MATERIALS CONSIDERED.

25       LET'S TAKE A LOOK AT THOSE REALLY QUICKLY HERE.  TURN

1      BACK TO PEX-7, YOUR OPENING REPORT, AND LET'S LOOK AT

2      EXHIBIT B.

3  A.   YES.

4  Q.   THIS IS DOCUMENTS AND MATERIALS CONSIDERED.  IT LISTS

5      THE MATERIALS YOU CONSIDERED IN FORMING YOUR OPINION.

6      CAN YOU JUST QUICKLY DESCRIBE HOW YOU ACTUALLY REACHED

7      YOUR CONCLUSION THAT THE BANKS REGARDED THEIR LIMITED

8      PARTNER INTEREST IN CHEMTECH AS EQUITY FOR U.S.

9      BANKING LAW PURPOSES?

10 A.   YES, I REVIEWED, OBVIOUSLY, THE STATUTORY FRAMEWORK

11      FOR -- THAT WOULD APPLY TO THESE TYPES OF TRANSACTIONS

12      -- THIS TYPE OF TRANSACTION. I ALSO REVIEWED THE

13      DEPOSITIONS OF A NUMBER OF THE WITNESSES FOR THE

14      BANKS.  I ALSO REVIEWED LETTERS RELATING TO HOW THE

15      BANKS WERE TO TREAT THIS FOR PURPOSES OF VARIOUS

16      FOREIGN LAWS, AND WELL AS MOST IMPORTANTLY A

17      SUBMISSION THAT WAS MADE BY COUNSEL TO THE FEDERAL

18      RESERVE BANK OF NEW YORK WHICH OUTLINED A TRANSACTION

19      THAT WAS VERY SIMILAR TO CHEMTECH -- THAT DESCRIBED IT

20      AND ASKED THE FEDERAL RESERVE TO CONCUR IN THE

21      CONCLUSION THAT THE BANKS REGARDED THIS INVESTMENT IN

22      CHEMTECH AS AN EQUITY INVESTMENT THAT FELL WITHIN AN

23      EXCEPTION WITHIN THE BANK HOLDING COMPANY ACT AND

24      THEREFORE WAS A PERMISSIBLE INVESTMENT BY THE FOREIGN

25      BANKS.

1    Q.    OKAY.  AND YOU MENTIONED THIS LETTER -- THIS

2          REGULATORY RECORD.  IS THAT NUMBER FIVE THAT'S LISTED

3          HERE IN EXHIBIT B?

4    A.    THAT IS CORRECT.

5    Q.    NOW JUST FOR THE RECORD -- AND WE'LL GET TO IT -- THAT

6          REGULATORY SUBMISSION IS JOINT EXHIBIT 119.  BUT

7          BEFORE WE GO TO THAT, LET'S LOOK BACK TO THE ANALYSIS

8          IN YOUR ACTUAL OPENING REPORT, PEX-7.  I'D LIKE YOU TO

9          TURN TO PAGE 2 IN THAT REPORT, AND IN PARTICULAR FOCUS

10         ON THE SECOND PARAGRAPH UNDER "SUMMARY."  THIS

11         DISCUSSES U.S. BANKING LAW AT THE TIME OF THE

12         TRANSACTION IN '93.  CAN YOU JUST SUMMARIZE WHAT U.S.

13         BANKING LAW YOUR REPORT ADDRESSES HERE?

14   A.    CERTAINLY.  THERE ARE TWO OF THE STATUTES THAT ARE AT

15         PLAY HERE -- THE BANK HOLDING COMPANY ACT, AS WELL AS

16         THE INTERNATIONAL BANKING ACT OF 1978.  AND LET ME

17         PROVIDE A LITTLE BIT OF BACKGROUND.  FOR MANY, MANY,

18         MANY YEARS IN THIS COUNTRY WE HAVE HAD A NATIONAL

19         POLICY OF PROHIBITING BANKING ORGANIZATIONS FROM

20         ENGAGING IN COMMERCIAL ACTIVITIES.  AS A RESULT, A

21         BANK CANNOT OWN A STEEL MILL AND A STEEL MILL CANNOT

22         OWN A BANK.  THE SEPARATION OF BANKING AND COMMERCE IS

23         A FUNDAMENTAL PRINCIPLE IN BANKING.  AND THE FEDERAL

24         RESERVE AND THE OTHER BANKING AGENCIES RELIGIOUSLY

25         ENFORCE THAT SEPARATION.  AS A RESULT, YOU DO NOT SEE

1    BANKING ORGANIZATIONS CONTROLLING COMMERCIAL

2    ENTERPRISES EXCEPT FOR VERY SMALL EXCEPTIONS THAT

3    APPLY.  WHEN THE BANK -- WHEN THE INTERNATIONAL

4    BANKING ACT OF 1978 WAS BEING CONSIDERED BY CONGRESS,

5    THE CONGRESS RECOGNIZED -- AND THE FOREIGN BANKS, OF

6    COURSE, BROUGHT IT TO THEIR ATTENTION -- THAT A NUMBER

7    OF FOREIGN BANKS, BECAUSE THEY'RE NOT SUBJECT TO THE

8    BANK HOLDING COMPANY ACT OF 1978, WERE ABLE TO MAKE

9    INVESTMENTS IN U.S. COMMERCIAL ENTERPRISES.  SO FOR

10    EXAMPLE, DEUTSCHE BANK HAD MAJOR INVESTMENTS IN

11    DAIMLER BENZ, AND DIAMLER BENZ OWNED -- HAD OUTLETS IN

12    THE UNITED STATES.  SO THERE WERE COMMERCIAL

13    ACTIVITIES IN THE UNITED STATES THAT WERE GOING ON.

14        IN ADDITION, A NUMBER OF FOREIGN BANKS OWNED

15    FOREIGN COMPANIES THAT HAD SLIGHT ACTIVITIES IN THE

16    UNITED STATES -- ACTIVITIES THAT WERE MINOR AND

17    INCIDENTAL TO THEIR FOREIGN ACTIVITIES.  CONGRESS TOOK

18    INTO ACCOUNT WHEN THEY ENACTED THE INTERNATIONALS

19    BANKING ACT IN 1978 THE FACT THAT THERE WERE ENTITIES

20    THAT HAD -- COMMERCIAL BANKING ENTITIES, FOREIGN

21    BANKING ENTITIES THAT HAD COMMERCIAL ACTIVITIES IN THE

22    UNITED STATES.  THEY GRAND FATHERED THOSE ACTIVITIES

23    AND THOSE BANKS FOR THOSE ACTIVITIES, AND IN ADDITION,

24    THEY CREATED AN EXCEPTION FOR FOREIGN BANKS THAT WOULD

25    BE INVESTING IN A FOREIGN COMPANY OR A U.S. COMPANY

1       THAT ENGAGED VIRTUALLY ENTIRELY OUTSIDE OF THE UNITED

2       STATES, BUT HAD A SMALL, INCIDENTAL ACTIVITIES IN THE

3       UNITED STATES.  AND THAT EXCEPTION WAS PRESENTED IN

4       REGULATION Y, WHICH IS THE FEDERAL RESERVE REGULATION

5       THAT DEALS WITH BANK HOLDING COMPANIES.  AND THE

6       SENTENCE THAT'S HIGHLIGHTED MAKES A -- IS, IN EFFECT,

7       A REFERENCE TO THE EXCEPTION IN THE BANK HOLDING

8       COMPANY ACT FOR FOREIGN BANKS THAT ARE MAKING

9       INVESTMENTS IN COMMERCIAL COMPANIES THAT HAPPEN TO DO

10      A SMALL AMOUNT OF BUSINESS IN THE UNITED STATES.

11  Q.  OKAY.  SO JUST TO CLARIFY THAT, COULD A FOREIGN BANK,

12      AT THE TIME OF THE CHEMTECH TRANSACTION, MAKE AN

13      INVESTMENT IN A COMMERCIAL COMPANY IN THE UNITED

14      STATES?

15  A.  THEY COULD MAKE A SMALL INVESTMENT IN A COMPANY THAT

16      IS DOING BUSINESS IN THE UNITED STATES.  THE

17      ACTIVITIES WOULD HAVE TO BE INCIDENTAL TO THEIR

18      FOREIGN ACTIVITIES.

19  Q.  OKAY.  GREAT.  YOU SAID INCIDENTAL?

20  A.  YES.

21  Q.  WHAT DOES INCIDENTAL MEAN IN THE CONTEXT OF THE

22      EXCEPTION WE WERE JUST LOOKING AT?

23  A.  WELL, LET ME GIVE YOU AN EXAMPLE, AND THE CHEMTECH IS

24      A PERFECT EXAMPLE BECAUSE THOSE TYPES OF ACTIVITIES

25      WERE DESCRIBED AS INCIDENTAL.  HAVING AN AGENT IN THE

1    UNITED STATES WOULD BE REGARDED AS INCIDENTAL.  BEING

2    FORMED AS A LIMITED PARTNERSHIP IN DELAWARE, BECAUSE

3    IT WAS A -- IN EFFECT, A U.S. ENTITY, THAT'S REGARDED

4    AS INCIDENTAL, NOTWITHSTANDING THE FACT THAT ALL OF

5    THE ACTIVITIES WOULD BE DONE OUTSIDE OF THE UNITED

6    STATES.  HOLDING PATENTS -- U.S. PATENTS, AND THEN

7    LICENSING THOSE PATENTS BACK TO SOME OTHER ENTITY.

8    THAT WAS ALSO -- IS REGARDED AND CAN BE REGARDED AS

9    INCIDENTAL.  ENGAGING IN TRANSACTIONS IN U.S. DOLLARS,

10    FOR EXAMPLE, BECAUSE THE PAYMENTS WOULD COME THROUGH

11    U.S. BANKS BECAUSE THEY WERE DOLLARS.  AGAIN, THAT

12    WOULD BE AN EXAMPLE OF INCIDENTAL ACTIVITIES.

13  Q.    OKAY.  LET'S TURN YOUR ATTENTION TO THE NEXT PARAGRAPH

14    IN YOUR REPORT.  IT STATES ON THE FIRST -- START OF

15    THE PARAGRAPH THERE, EXCUSE ME.

16  A.    I'M SORRY, WHAT PAGE ARE WE ON?

17  Q.    WE'RE STILL ON PAGE 2 HERE.

18  A.    OKAY.

19  Q.    AND IT'S THE PARAGRAPH THAT BEGINS, "IF THE FOREIGN

20    BANKS REGARDED THEIR LIMITED PARTNERSHIPS, PARTNERSHIP

21    INTEREST IN CHEMTECH AS LOANS AND THEREFORE A BANKING

22    ACTIVITY, THEN UNDER U.S. LAW, THE BANKS COULD HAVE

23    ACQUIRED LIMITED PARTNERSHIP INTEREST WITHOUT CONCERN

24    THAT THE TRANSACTION WAS IMPERMISSIBLE UNDER U.S.

25    BANKING LAW."  HOW, IF AT ALL, DOES THE IMPLICATION OF

1        MAKING A LOAN DIFFER FROM MAKING AN EQUITY INVESTMENT

2        FOR U.S. BANKING LAW PURPOSES?

3   A.   BANKS ARE IN THE BUSINESS OF MAKING LOANS.  IT'S A

4        CORE BANKING FUNCTION.  THAT'S WHAT BANKS DO; THEY

5        MAKE LOANS.  THEY MAKE COMMERCIAL LOANS, THEY MAKE

6        AUTOMOBILE LOANS, CREDIT CARD LOANS.  THAT'S WHAT

7        THEY'RE AUTHORIZED TO DO AS A MATTER OF THEIR CHARTER

8        AND AS A MATTER OF THEIR LICENSE WHEN YOU ARE DEALING

9        WITH THE FOREIGN BANKS.  THEY WOULD NOT HAVE TO GET

10       ANY APPROVAL, THEY WOULD NOT HAVE TO SEEK ANY

11       APPROVAL, THEY WOULD NOT EVEN HAVE TO ASK ANY GUIDANCE

12       WHATSOEVER FROM ANY REGULATOR IF THEY'RE GOING TO BE

13       ENGAGING IN LENDING, WHICH, AS I SAID, IS A CORE

14       BANKING FUNCTION.  THAT'S WHAT BANKS DO.  YOU DON'T

15       ASK PEOPLE FOR APPROVAL WHEN THAT'S WHAT YOU'RE

16       SUPPOSED TO BE DOING.  AND OF COURSE, AS WE SEE TODAY,

17       THAT'S SOMETHING THAT THE GOVERNMENT IS ENCOURAGING

18       BANKS TO DO -- NAMELY, TO LEND MORE MONEY TO PEOPLE.

19  Q.   OKAY.  WELL, LET'S TALK ABOUT SOME APPROVAL THAT WAS

20       SOUGHT IN THIS TRANSACTION.  AND LIKE I SAID BEFORE,

21       JOINT EXHIBIT 119, WHICH IS IN YOUR BINDER THERE, IS

22       THE REGULATORY SUBMISSION TO THE FEDERAL RESERVE THAT

23       YOU TALKED ABOUT PREVIOUSLY.  I'D LIKE TO FLIP TO THE

24       SECOND PAGE OF THE DOCUMENT, WHICH IS BATES NUMBER

25       KBC/DOW 000304.  NOW, AS YOU CAN SEE ON THIS DOCUMENT,

1     IT'S A MEMO DATED JULY 21ST, 1993, AND IT'S FROM SARA

2     MCLEOD, IF I'M PRONOUNCING THAT CORRECTLY, OF HOWARD

3     DARBY AND LEVIN, AND IT'S TO A NUMBER OF INDIVIDUALS

4     AT DIFFERENT FOREIGN BANKS, AND THE "RE" LINE SAYS,

5     "CHEMTECH ROYALTY ASSOCIATES, LP-BANK HOLDING COMPANY

6     ACT."  DO YOU KNOW WHAT THE ROLE OF HOWARD DARBY AND

7     LEVIN WAS?

8  A.  I BELIEVE HOWARD DARBY AND LEVIN WERE REPRESENTING THE

9     BANKS IN CONNECTION WITH THE CHEMTECH TRANSACTION.

10 Q.  AND THERE'S A BUNCH OF DIFFERENT FOREIGN BANKS LISTED

11    HERE.  WHO ARE THESE DIFFERENT FOREIGN BANKS?

12 A.  SOME OF THEM ARE INVESTORS IN THE CHEMTECH

13    TRANSACTION.  BANK BRUSSELS IS ON THERE, DRESDNER

14    BANK, KREDIET BANK, NATWEST BANK, AND RABO BANK I

15    BELIEVE WERE INVESTORS IN THE CHEMTECH TRANSACTION.

16 Q.  OKAY.  GREAT.  NOW, LET'S LOOK AT THIS VERY SHORT

17    COVER MEMO, WHICH INDICATES IT'S ATTACHING A LETTER

18    THAT WAS SENT TO THE GENERAL COUNSEL OF THE FEDERAL

19    RESERVE BANK IN NEW YORK REGARDING THE AVAILABILITY OF

20    AN EXEMPTION UNDER REGULATION K OF THE BANK HOLDING

21    COMPANY ACT FOR THE BANKS' INVESTMENT IN CHEMTECH.

22    WHAT IS THE EXEMPTION UNDER REGULATION K THAT'S BEING

23    REFERRED TO?

24 A.  THE EXEMPTION UNDER REGULATION K IS THE ONE I JUST

25    DISCUSSED A FEW MINUTES AGO, AND THAT IS THERE IS A

1    GENERAL PROHIBITION AGAINST FOREIGN BANKS, AS WELL AS

2    U.S. BANKS, FROM INVESTING IN COMMERCIAL ENTITIES.

3    THIS EXEMPTION IS THE EXEMPTION THAT ALLOWS A FOREIGN

4    BANK TO INVEST IN A COMMERCIAL COMPANY AS LONG AS IT'S

5    U.S. ACTIVITIES ARE ONLY INCIDENTAL TO THEIR FOREIGN

6    OR INTERNATIONAL TRANSACTIONS.  AND AGAIN, THAT'S

7    CODIFIED IN REGULATION Y.

8  Q.  OKAY.  GREAT.  LET'S TURN TO THE ACTUAL LETTER FROM

9    KING AND SPALDING WHICH IS AT BATES KBC/DOW 000305.

10    AS YOU CAN SEE HERE, IT IS A LETTER DATED JULY 20TH,

11    1993, AND IT'S FROM PETER STORY, WHO IS AN ATTORNEY AT

12    KING AND SPALDING TO ERNEST PATRIKIS, WHO IS THE

13    GENERAL COUNSEL AND EXECUTIVE VICE PRESIDENT AT THE

14    FEDERAL RESERVE.  TO THE BEST OF YOUR KNOWLEDGE, WHO

15    DOES KING AND SPALDING REPRESENT HERE IN THIS DEAL?

16  A.  KING AND SPALDING IS REPRESENTING DOW CHEMICAL.

17  Q.  AND LET'S TALK ABOUT YOUR EXPERIENCE A LITTLE.  IN

18    YOUR PROFESSIONAL PRACTICE, HAVE YOU EVER SENT A

19    LETTER LIKE THIS TO THE FEDERAL RESERVE SEEKING PRE-

20    TRANSACTION APPROVAL?

21  A.  YES, MANY TIMES.

22  Q.  SO IS IT COMMON IN YOUR PRACTICE?

23  A.  IT'S VERY COMMON.  IT'S ADVISABLE WHEN YOU HAVE A

24    PROVISION THAT IS UNCLEAR AS TO WHAT THE REGULATORY

25    SCOPE IS IN TERMS OF WHETHER YOU COME WITHIN THE

1    REGULATORY SCOPE TO SEEK GUIDANCE FROM ONE OF THE

2    BANKING AGENCIES IN CONNECTION WITH A TRANSACTION.

3  Q.    ALL RIGHT.  LET'S STAY ON THIS SAME PAGE, AND THE

4    LETTER STATES AT THE BEGINNING OF THE SECOND

5    PARAGRAPH, "WITH LARRY AND SCOTT'S PERMISSION, I HAVE

6    COMPILED THE FOLLOWING DESCRIPTION OF THE PROPOSED

7    TRANSACTION BASED ON THE NOTES I HAVE PREPARED FOR OUR

8    EARLIER CONVERSATION."  LARRY AND SCOTT ARE THE HOWARD

9    DARBY AND LEVIN ATTORNEYS REFERRED TO IN THE PRIOR

10    PARAGRAPH.  WHAT IS THE PROPOSED TRANSACTION HERE

11    REFERRING TO?

12  A.    THE PROPOSED TRANSACTION IS A TRANSACTION THAT IS VERY

13    SIMILAR TO THE CHEMTECH TRANSACTION.  AND I BELIEVE IT

14    IS A REFERENCE TO CHEMTECH BECAUSE THE MEMORANDUM --

15    THE HOWARD DARBY AND LEVIN MEMORANDUM

16    -- SARA MCLEOD'S MEMORANDUM -- DISCUSSES THE FACT

17    THAT THIS WAS A LETTER THAT WAS SENT TO THE FEDERAL

18    RESERVE SUMMARIZING THE CONVERSATION THAT KING AND

19    SPALDING AND HOWARD DARBY AND LEVIN'S ATTORNEYS HAD

20    WITH THE FEDERAL RESERVE, GENERAL COUNSEL REGARDING

21    THE BANKS' INVESTMENT IN CHEMTECH.  SO I BELIEVE THAT

22    IT DESCRIBES THE CHEMTECH TRANSACTION.

23  Q.    LET'S JUMP AHEAD NOW.  LET'S LOOK AT PAGE 3 OF THE

24    LETTER, BATES THAT ENDS IN 307.  LET'S LOOK AT THE

25    FIRST AND SECOND FULL PARAGRAPHS ON THE PAGE, AND THEY

1       DISCUSS GENERALLY THE FACT THAT THE PARTNERSHIP WILL

2       HAVE A REGISTERED OFFICE AND A WASHINGTON, D.C., BASED

3       AGENT, AND THINGS OF THAT NATURE.  WHY DOES THE LETTER

4       MENTION THESE CONTACTS THAT THE PARTNERSHIP WILL HAVE

5       WITH THE U.S.?

6    A.  YES.  I THINK WHAT IT IS TRYING TO DO IS TO DESCRIBE

7       WHAT CONTACTS THERE WOULD BE TO DEMONSTRATE THAT THOSE

8       CONTACTS WERE SIMPLY INCIDENTAL TO CHEMTECH'S OR TO

9       THE ENTITY'S TRANSACTIONS OUTSIDE THE UNITED STATES SO

10      THAT ALL OF THE INTERNATIONAL ACTIVITIES WOULD BE

11      CONDUCTED OUTSIDE OF THE UNITED STATES AND ONLY SMALL

12      NUMBER OF ACTIVITIES THAT WOULD BE REGARDED AS

13      INCIDENTAL WOULD BE IN THE UNITED STATES.  AND AS A

14      RESULT, THEY WERE STATING THEIR VIEW THAT THAT SHOULD

15      FALL WITHIN THE EXCEPTION IN REGULATION Y FOR EQUITY

16      INVESTMENTS THAT WERE MADE BY FOREIGN BANKS IN

17      COMMERCIAL ENTITIES.

18   Q.  OKAY.  SO IN YOUR OPINION, WHY WOULD THEY HAVE TO

19      MENTION THAT IN THIS LETTER IF THEY WERE JUST

20      INCIDENTAL?

21   A.  BECAUSE THE TERM INCIDENTAL IS NOT A VERY DEFINED

22      TERM, AND IN ORDER TO DETERMINE WHETHER ACTIVITIES ARE

23      INCIDENTAL, YOU HAVE TO DESCRIBE TO THE FEDERAL

24      RESERVE AND TO THE REGULATOR PRECISELY WHAT THE SCOPE

25      OF THOSE ACTIVITIES WOULD BE.

1  Q.    OKAY.  NOW LET'S LOOK AT THE VERY LAST PARAGRAPH ON

2        THAT SAME PAGE.  I'M JUST GOING TO READ AN EXCERPT

3        FROM THE PARAGRAPH.  IT STATES, "ON THESE FACTS AS

4        EXPLICATED THUS FAR, WE BELIEVE THAT EACH PARTNERSHIP

5        CONSTITUTES A COMPANY THAT IS NOT ENGAGED DIRECTLY OR

6        INDIRECTLY IN ANY ACTIVITIES IN THE UNITED STATES

7        OTHER THAN THOSE THAT ARE INCIDENTAL TO THE

8        INTERNATIONAL OR FOREIGN BUSINESS OF SUCH COMPANY.

9        AND, THEREFORE, THAT THE ACQUISITION BY EACH BANK OF

10       IT'S LIMITED PARTNERSHIP INTEREST DOES NOT REQUIRE ANY

11       PRIOR NOTICE OR PRIOR APPROVAL UNDER THE BANK HOLDING

12       COMPANY ACT BY VIRTUE OF THE EXEMPTION AFFORDED BY

13       SECTION 211.23F3 OF REGULATION K."  SO AFTER REVIEWING

14       THIS LETTER, AND IN PARTICULAR, THIS LAST PARAGRAPH

15       HERE THAT I JUST READ, IN YOUR OPINION, WHAT WAS THE

16       PURPOSE OF SENDING THIS LETTER?

17  A.   THE PURPOSE OF SENDING THE LETTER WAS TO SEEK GUIDANCE

18       FROM THE FEDERAL RESERVE REGARDING WHETHER THE EQUITY

19       INVESTMENTS THAT WOULD BE MADE BY THE BANKS WOULD BE

20       REGARDED AS COMING WITHIN THE EXCEPTION IN REGULATION

21       -- IN REGULATION Y FOR -- TO REGULATION K FOR

22       INVESTMENTS AND ACTIVITIES THAT ARE PERMISSIBLE IF

23       THEY ARE ONLY INCIDENTAL TO THEIR INTERNATIONAL

24       BUSINESS.  SO THEY'RE SEEKING GUIDANCE RELATING TO THE

25       PERMISSIBILITY OF THE EQUITY INVESTMENTS BY THE BANKS.

1  Q.   NOW, DID YOU SEE ANY EVIDENCE THAT KING AND SPALDING

2       OR HOWARD DARBY LEVIN EVER RECEIVED ANY WRITTEN

3       CONFIRMATION THAT THE FEDERAL RESERVE AGREED WITH THE

4       EXPLANATION AND THE EXEMPTION SET OUT IN THIS LETTER?

5  A.   I DID NOT SEE ANYTHING.

6  Q.   NOW, BASED ON YOUR EXPERIENCE AT THE FEDERAL RESERVE

7       AND IN INTERACTING WITH THE FEDERAL RESERVE IN PRIVATE

8       PRACTICE, HOW WOULD THE FED NORMALLY HAVE RESPONDED TO

9       A LETTER LIKE THIS?

10 A.   TYPICALLY THE FEDERAL RESERVE, AS WELL AS THE OTHER

11      AGENCIES, DO NOT WRITE LETTERS IN RESPONSE.  INDEED,

12      THIS LETTER POINTS IN THE VERY LAST LINE TO CONTINUING

13      CONVERSATIONS.  TYPICALLY WHAT THE FEDERAL RESERVE

14      DOES IS TO RESPOND, IF ASKED, BY SAYING WE HAVE NO

15      OBJECTION OR WE AGREE WITH YOU, OR SOMETHING TO THAT

16      EFFECT.

17 Q.   NOW IF THE FEDERAL RESERVE HAD DISAGREED IN ANY WAY,

18      WOULD THE BANKS HAVE GONE FORWARD WITH THE INVESTMENT?

19 A.   I DOUBT IT VERY MUCH.  I THINK THAT THERE ARE

20      TREMENDOUS AND SIGNIFICANT PENALTIES ASSOCIATED WITH

21      VIOLATING THE BANK HOLDING COMPANY ACT AND THE

22      INTERNATIONAL BANKING ACT -- CIVIL MONEY PENALTIES,

23      EVEN CRIMINAL VIOLATIONS FOR WILLFUL VIOLATIONS.  SO

24      ANY BANK THAT HAD BEEN TOLD BY THE REGULATOR -- IN

25      THIS CASE, THE FEDERAL RESERVE, THAT THEY DIDN'T

1      AGREE, IT WOULD BE PERILOUS FOR THEM TO PROCEED WITH

2      THE TRANSACTION.

3  Q.  OKAY.  NOW, LET'S JUST WRAP UP YOUR FIRST REPORT HERE

4      BY FLIPPING BACK TO THAT DEMONSTRATIVE, PLAINTIFF'S

5      DEMONSTRATIVE EXHIBIT 19, WHICH, AGAIN, SUMMARIZES

6      YOUR CONCLUSION.  HOW, IF AT ALL, DOES THE LETTER THAT

7      WE JUST LOOKED AT, JOINT EXHIBIT 119, SUPPORT YOUR

8      CONCLUSION?

9  A.  IT SUPPORTS THE CONCLUSION BY VIRTUE OF THE FACT THAT

10     THE WAY THE TRANSACTION WAS DESCRIBED TO THE FEDERAL

11     RESERVE BY THE BANKS WAS THAT THE TRANSACTION WAS AN

12     EQUITY INVESTMENT IN AN ORGANIZATION THAT WAS VERY

13     SIMILAR TO CHEMTECH.  AND AS A RESULT, THE BANK'S

14     POSITION WAS THAT IT FELL WITHIN THE EXCEPTION TO THE

15     BANK HOLDING COMPANY ACT AND TO REGULATION K THAT

16     ALLOWED THEM TO MAKE AN INVESTMENT -- AN EQUITY

17     INVESTMENT IN AN ORGANIZATION OUTSIDE THE -- THAT WAS

18     ENGAGED IN BUSINESS OUTSIDE THE UNITED STATES AND ONLY

19     INCIDENTAL ACTIVITIES OCCURRED IN THE UNITED STATES.

20 Q.  SO IF THE BANKS CONSIDERED THEIR INVESTMENTS IN

21     CHEMTECH TO BE LOANS, HOW MIGHT THE SUBMISSION THAT WE

22     JUST LOOKED AT ---

23 A.  IT WOULD BE ENTIRELY DIFFERENT.  THEY WOULD NOT HAVE

24     TO -- ONE, THEY WOULD NOT HAVE TO MAKE A SUBMISSION.

25     BUT IF THEY WERE GOING TO MAKE A SUBMISSION, THE

1      SUBMISSION WOULD BE COUCHED IN TERMS OF DESCRIBING WHY

2      THE TRANSACTION SHOULD BE TREATED AS A LOAN AND,

3      THEREFORE, THERE WOULDN'T BE ANY NEED FOR FEDERAL

4      RESERVE APPROVAL.

5  Q.  SO IT'S POSSIBLE THERE MIGHT NOT EVEN HAVE BEEN A

6      SUBMISSION?

7  A.  THERE SHOULDN'T HAVE BEEN A SUBMISSION.  I DON'T THINK

8      COUNSEL WOULD HAVE ADVISED THEM TO MAKE A SUBMISSION

9      IF THEY WERE MAKING A LOAN, BECAUSE THAT'S WHAT BANKS

10      DO; THEY MAKE LOANS.

11  Q.  OKAY.  SO TO WHAT EXTENT WERE THE OTHER MATERIALS THAT

12      YOU REVIEWED ASIDE FROM JUST THIS JOINT EXHIBIT 119,

13      INCLUDING THE FOREIGN BANK DEPOSITIONS AS OTHER

14      MATERIALS YOU REVIEWED -- HOW WERE THOSE CONSISTENT

15      WITH YOUR CONCLUSION?

16  A.  I BELIEVE THEY WERE CONSISTENT BECAUSE THE BANK -- THE

17      BANK DOCUMENTATION CHARACTERIZED THE TRANSACTION AS

18      EQUITY INVESTMENTS AND THE DEPOSITIONS -- THE BANK

19      REPRESENTATIVE'S DEPOSITIONS ALSO CONSIDERED THEM TO

20      BE EQUITY INVESTMENTS AS WELL.

21  Q.  OKAY.  THANK YOU.  YOU ALSO FILED A REBUTTAL REPORT IN

22      THIS CASE?

23  A.  THAT'S CORRECT.

24  Q.  AND THAT IS PLAINTIFF'S, EXCUSE ME, THAT IS PEX-8, FOR

25      THE RECORD.  BEFORE WE GO THERE, LET'S STAY ON

1       DEMONSTRATIVE 19, WHICH SUMMARIZES THE OPINION IN YOUR

2       SECOND REPORT AT NUMBER 2.  CAN YOU JUST SUMMARIZE FOR

3       THE COURT YOUR OPINION IN THIS SECOND SUPPLEMENTAL

4       REPORT?

5   A.  YES.  THAT REPORT WAS PREPARED IN RESPONSE TO OTHER

6       REPORTS THAT HAD BEEN SUBMITTED THAT CONCLUDED THAT

7       UNDER FOREIGN BANKING LAWS THE CHEMTECH TRANSACTION

8       WAS REGARDED AS A LOAN.  AFTER REVIEWING THE

9       DOCUMENTATION, REVIEWING THE REPORTS, AND GOING BACK

10      AND LOOKING AGAIN AT THE DEPOSITIONS AND OTHER

11      MATERIALS, IT BECAME VERY CLEAR TO ME THAT THOSE

12      REPORTS CLEARLY MISUNDERSTOOD OR MIS-CITED WHAT THE

13      DOCUMENTATION WAS.  AND AS A RESULT, IT SEEMED TO ME

14      THAT IF YOU REALLY UNDERSTAND WHAT'S GOING ON IN THE

15      CAPITAL AREAS AND IN THE BANK REGULATORY AREA THAT THE

16      CONCLUSION YOU'D HAVE TO COME TO IS THAT IT WOULD BE

17      INCORRECT TO COME TO A CONCLUSION UNDER U.S. LAW,

18      CERTAINLY UNDER U.S. BANKING LAW, AS THE NATURE OF THE

19      TRANSACTION BY LOOKING AT FOREIGN BANKING PROVISIONS

20      AND FOREIGN BANK CAPITAL PROVISIONS.

21  Q.  OKAY.  WELL, LET'S LOOK AT YOUR REPORT HERE.  IT'S

22      PEX-8; IT'S IN THE BINDER.  LET'S FLIP TO PAGE ONE,

23      AND THE SECOND PARAGRAPH SAYS THAT YOU WERE ASKED BY

24      COUNSEL TO REVIEW THREE OF THE DEFENDANT'S EXPERT

25      REPORTS DATED SEPTEMBER 15TH, 2008, AND EXAMINE THE

1    CONCLUSIONS SET FORTH IN THOSE REPORTS.  YOU JUST

2    TALKED A LITTLE BIT ABOUT THAT, BUT JUST FOR THE

3    RECORD, FOOTNOTE 2, IF I'M CORRECT, LISTS THE THREE

4    REPORTS YOU REVIEWED.  AND ARE THOSE THE REPORTS OF

5    STEVEN HENNING, GLENN HUBBARD, AND JOEL FINARD?

6  A.  THAT'S CORRECT.

7  Q.  OKAY.  YOU THEN GO ON ON PAGE 2 TO TALK ABOUT THE

8    FEDERAL RESERVE LETTER.  LET'S START THERE.  AGAIN,

9    THAT'S JOINT EXHIBIT 119.  WHY DID YOU MENTION THE

10    LETTER AGAIN HERE IN YOUR REBUTTAL REPORT?

11  A.  BECAUSE THE REPORTS THAT I'D REVIEWED IGNORED THAT

12    LETTER AND DID NOT MAKE ANY MENTION WHATSOEVER OF THE

13    SUBMISSION THAT HAD BEEN MADE BY COUNSEL TO THE

14    FEDERAL RESERVE BANK OF NEW YORK SEEKING FEDERAL

15    RESERVE GUIDANCE AS TO WHETHER THE EQUITY INVESTMENT

16    IN A TRANSACTION SUCH AS CHEMTECH WAS PERMISSIBLE.

17    THAT'S A CRITICAL PIECE OF INFORMATION THAT SHOULD BE

18    LOOKED AT AND TAKEN INTO ACCOUNT IN ANY REPORT.

19  Q.  SO YOU FEEL LIKE IT'S DEMONSTRATIVE EVIDENCE THAT

20    SHOULD HAVE BEEN REVIEWED BY THE EXPERTS; AM I

21    UNDERSTANDING THAT CORRECTLY?

22  A.  YES, YES.

23  Q.  OKAY.  NOW YOU GO ON THEN TO MENTION THE ARTHUR

24    ANDERSON LETTERS, AS YOU CALL THEM, IN YOUR REBUTTAL

25    REPORT.  YOU MENTION THOSE ON PAGE ONE.  FOR THE

1    RECORD, THE ARTHUR ANDERSON LETTERS IN THIS CASE ARE

2    JOINT EXHIBIT 51 AND JOINT EXHIBIT 74.  CAN YOU JUST

3    TELL ME WHAT TYPE OF ANALYSIS IS PERFORMED IN THESE

4    ARTHUR ANDERSON LETTERS?

5  A.  THOSE LETTERS GENERALLY TALK ABOUT THE APPLICATION OF

6    FOREIGN BANK CAPITAL REQUIREMENTS UNDER FOREIGN BANK

7    REGULATIONS ON THE CHEMTECH TRANSACTION -- HOW THE

8    BANKS SHOULD BE TREATING IT FOR CAPITAL ADEQUACY

9    PURPOSES.

10  Q.  AND DO THOSE REPORTS PERFORM AN ANALYSIS -- JUST A

11    GENERAL ANALYSIS OR A COUNTRY-BY-COUNTRY ANALYSIS; HOW

12    DOES THAT WORK?

13  A.  I THOUGHT IT WAS A GENERAL ANALYSIS IF I REMEMBER THEM

14    CORRECTLY.

15  Q.  DID THEY ANALYZE EACH INDIVIDUAL COUNTRY DIFFERENTLY?

16  A.  NO.

17  Q.  JUST TO BE CLEAR, I'M SPEAKING ABOUT THE ARTHUR

18    ANDERSON LETTERS.  MAYBE IT WOULD HELP US TO FLIP TO

19    ONE OF THEM.  FOR EXAMPLE ---

20  A.  OH, I'M SORRY.  YOU'RE TALKING ABOUT THE ARTHUR

21    ANDERSON; I THOUGHT YOU WERE TALKING ABOUT THE

22    REPORTS.  EXCUSE ME.

23  Q.  NO, I'M ---

24  A.  OH, I'M SORRY.  THE ARTHUR ANDERSON LETTERS, YES, THEY

25    GO THROUGH COUNTRY BY COUNTRY AS TO WHAT THE CAPITAL

1          TREATMENT WOULD BE.  I'M SORRY; I THOUGHT YOU WERE

2          REFERRING TO THE EXPERT REPORTS.

3    Q.    OKAY.  SO JUST TO CLEAN IT UP A LITTLE BIT HERE, I'M

4          GOING TO ASK YOU THE QUESTION AGAIN, IF THAT'S ALL

5          RIGHT, YOUR HONOR.

6              BY THE COURT:

7                  OKAY.  SURE.

8    BY MR. MURPHY:

9    Q.    SO YOU ALSO MENTIONED THE ARTHUR ANDERSON LETTERS IN

10         YOUR REBUTTAL REPORT.  FOR THE RECORD, THOSE ARE JOINT

11         EXHIBIT 51 AND JOINT EXHIBIT 74.  WHAT TYPE OF

12         ANALYSIS IS PERFORMED IN THESE LETTERS?

13   A.    YES.  ARTHUR ANDERSON WENT THROUGH AND ANALYZED EACH

14         COUNTRY OF THE INVESTORS, THE BANK INVESTORS: GREAT

15         BRITAIN, BELGIUM, THE NETHERLANDS, AND GERMANY.  AND

16         WENT THROUGH THE CAPITAL REQUIREMENTS AND THE

17         REPORTING REQUIREMENTS IN THOSE COUNTRIES WITH RESPECT

18         TO HOW THE BANKS SHOULD TREAT THE INVESTMENT IN

19         CHEMTECH AND HOW MUCH CAPITAL THEY SHOULD KEEP AGAINST

20         THAT TRANSACTION.

21   Q.    SO WHY WOULD THE FOREIGN BANK REGULATORY TREATMENT AND

22         RISK BASED CAPITAL TREATMENT OF THE TRANSACTION IN

23         THOSE DIFFERENT COUNTRIES BE RELEVANT TO THE BANKS

24         THAT WERE GOING TO INVEST IN CHEMTECH?

25             BY MR. SAWYER:

1       OBJECTION, YOUR HONOR.  WE'RE GETTING INTO A

2    MATTER THAT'S OUTSIDE OF THE EXPERTISE OF THIS

3    WITNESS.  IN THE DEMONSTRATIVE EXHIBIT THAT THEY

4    PUT UP EXPLAINING THE BASIS OF HIS OPINION IN THE

5    REBUTTAL REPORT I DON'T THINK IS AN ACCURATE

6    DESCRIPTION OF WHAT HIS REAL OPINION IN THE

7    REBUTTAL REPORT WAS.  ON PAGE -- AND MR. SCHWARTZ

8    IS NOT A FOREIGN BANKING LAW EXPERT; HE'S A U.S.

9    BANKING LAW EXPERT.  WHAT HE'S SAID IN HIS

10   REBUTTAL REPORT IS THAT IT IS INAPPROPRIATE --

11   AND I'M AT PAGE 3.  "IT IS INAPPROPRIATE TO COME

12   TO ANY CONCLUSION AS TO WHETHER THE INVESTMENTS

13   BY THE FOREIGN BANKS IN CHEMTECH WERE DEBT OR

14   EQUITY UNDER U.S. LAW, BASED ON THE MANNER IN

15   WHICH THE INVESTMENT IN CHEMTECH WAS TREATED BY

16   THE BANK UNDER BANK CAPITAL AND REPORTING

17   REQUIREMENTS OF THE FOREIGN HOME COUNTRY."  SO

18   HIS OPINION IS BASED ON U.S. BANKING LAW, AND

19   WE'RE GETTING INTO A PART OF HIS TESTIMONY WHERE

20   HE'S ABOUT TO TAKE AN ARTHUR ANDERSON LETTER TO -

21   - THAT IS BASED ON FOREIGN LAW AND APPLY THAT TO

22   THE FACTS OF THIS CASE.  THAT'S INVADING THE

23   JUDICIAL PROVIDENCE OF THE JUDGE.  HE'S NOT A

24   FOREIGN BANKING LAW EXPERT, AND YOUR HONOR

25   DOESN'T NEED HELP APPLYING FOREIGN BANKING LAW TO

1    THIS CASE.

2    BY THE COURT:

3        YOU'RE ABSOLUTELY RIGHT ABOUT THAT.  BUT LET

4    ME HEAR FROM MR. MURPHY.

5    BY MR. MURPHY:

6        SURE, YOUR HONOR.  FIRST OF ALL, HE'S NOT

7    GOING TO OPINE ON THE FOREIGN LAW OR THE ACCURACY

8    OF THE ARTHUR ANDERSON LETTERS.  ALL I'M TRYING

9    TO DO RIGHT NOW IS JUST LAY A FOUNDATION FOR MR.

10   SCHWARTZ, WHO DOES HAVE EXPERTISE IN BANKING LAW

11   AND IN THE BASEL ACCORD BANK REGULATORY AND BANK

12   CAPITAL REQUIREMENTS TO DESCRIBE FOR THE COURT

13   HOW THOSE DIFFER FROM COUNTRY TO COUNTRY.  SECOND

14   OF ALL, EVEN IF HE WERE OPINING ON FOREIGN LAW,

15   FOREIGN LAW IS A FACTUAL MATTER IN WHICH YOU CAN

16   HAVE EXPERT TESTIMONY.  THERE'S NO LIMITATION

17   WHEN YOU HAVE FOREIGN LAW TO EXCLUDE EXPERT

18   TESTIMONY ON THAT SUBJECT.  SO REALLY ---

19   BY THE COURT:

20       DID THIS WITNESS PREPARE -- IN HIS REPORT,

21   DID HE RELY ON FOREIGN LAW?

22   BY MR. MURPHY:

23       HE RELIED ONLY UPON THE ANALYSIS THAT ARTHUR

24   ANDERSON PERFORMED UNDER FOREIGN LAW.  AND LET ME

25   JUST SAY ANOTHER THING, YOUR HONOR.  THIS SOUNDS

1          TO ME LIKE MR. SAWYER IS REALLY TRYING TO EXCLUDE

2          MR. SCHWARTZ'S SECOND REPORT.

3          BY THE COURT:

4              WELL, NO, I DON'T THINK THAT'S WHAT IT WAS.

5          MR. SAWYER, WHAT'S YOUR RESPONSE?

6          BY MR. SAWYER:

7              WELL, I -- FIRST OF ALL, I DID HAVE A

8          DAUBERT MOTION DRAFTED, YOU KNOW, DECIDING

9          WHETHER TO FILE A MOTION TO EXCLUDE.  AND THE

10         REASON WE DIDN'T FILE IT IS BECAUSE HIS OPINION,

11         AS I SAID ON PAGE 3 OF THE REBUTTAL REPORT, IS

12         EXPRESSLY LIMITED TO U.S. BANKING LAW.  HE'S NOT

13         A FOREIGN BANKING LAW EXPERT; IT'S INAPPROPRIATE

14         FOR HIM TO OPINE ON FOREIGN BANKING LAW.  AND IF

15         HE CAN RELYING ON A LETTER THAT'S ALREADY IN

16         EVIDENCE AND APPLYING THAT LETTER TO THE FACTS OF

17         THIS CASE, THAT'S SOMETHING THAT WE CAN DO AN

18         ARGUMENT ---

19         BY THE COURT:

20             I DON'T WANT HIM TO -- I DON'T WANT ANY

21         TESTIMONY, AGAIN, THAT MAY BE DIRECTED --

22         INSTRUCTIVE ON THE ISSUES OF THE APPLICABILITY OF

23         FOREIGN LAW ON THIS TRANSACTION AT ISSUE.

24         HOWEVER, I WILL GIVE YOU SOME LATITUDE TO

25         QUESTION THE WITNESS ABOUT U.S. BANKING LAW.  I

1    DON'T WANT AN ANALYSIS OR A COMPARISON BETWEEN

2    THE U.S. LAWS AND THE FOREIGN LAWS UNLESS THE

3    WITNESS PREPARED A REPORT ON IT AND IS SO

4    QUALIFIED AS AN EXPERT IN FOREIGN BANKING LAW.

5    BY MR. MURPHY:

6        WELL, IF I COULD JUST RESPOND, YOUR HONOR.

7    BY THE COURT:

8        YES, SIR.

9    BY MR. MURPHY:

10        WHAT THE REPORT DOES -- AND I DON'T QUITE

11    UNDERSTAND MR. SAWYER'S OBJECTION.  I MEAN, HE'S

12    SAYING THAT HE HAD A DAUBERT REPORT READY TO GO.

13    BY THE COURT:

14        WELL, HE DID.  LET'S JUST GET TO THE POINT

15    NOW.  DON'T WORRY ABOUT MR. SAWYER'S OBJECTION.

16    I MEAN, DO YOU UNDERSTAND MY RULING?  AGAIN, I'M

17    GOING TO GIVE YOU SOME VERY LIMITED LATITUDE

18    HERE.  BUT AGAIN, I DON'T WANT AN ANALYSIS OF

19    U.S. VERSUS FOREIGN BANKING LAWS AND I DON'T WANT

20    SPECULATION OR EXTRAPOLATION ABOUT WHAT WOULD

21    HAVE HAPPENED UNDER FOREIGN BANK LAWS, AND THAT

22    SORT OF THING.

23    BY MR. MURPHY:

24        COULD I ---

25    BY THE COURT:

1          IF THE ---

2     BY MR. MURPHY:

3          ALL I --- WHAT MR. SCHWARTZ IS ABOUT TO

4     TESTIFY TO IS NOT AN EXTRAPOLATION OF FOREIGN

5     LAW.  HE'S MERELY GOING TO DESCRIBE FOR THE COURT

6     THAT UNDER BASEL -- UNDER THE BASEL ACCORD, WHICH

7     I THINK HE DOES QUALIFY AS AN EXPERT IN, THERE

8     ARE -- THERE'S A COUNTRY-BY-COUNTRY ANALYSIS AS

9     TO HOW BANK CAPITAL RULES ARE APPLIED.  HE GOES

10    THROUGH HIS REPORT AND USES SOME EXAMPLES ON HOW

11    THAT APPLIES IN THE UNITED STATES.  HE THEN LOOKS

12    AT THE ---

13    BY THE COURT:

14         AND THAT'S ACCEPTABLE.

15    BY MR. MURPHY:

16         BUT HE THEN LOOKS AT ARTHUR ANDERSON LETTERS

17    THAT TALK ABOUT CONCLUSIONS IN THE OTHER COUNTRY,

18    AND THEN ALL HE SAYS IS, LOOK, HERE'S HOW IT

19    WORKS IN THE U.S.; HERE'S HOW IT WORKS IN OTHER

20    COUNTRIES.  I'M NOT SAYING I KNOW HOW IT WORKS IN

21    OTHER COUNTRIES, JUST THAT THERE'S EVIDENCE THAT

22    THERE IS A VARIETY OF WAYS THAT INVESTMENTS ARE

23    TREATED FOR BANK REGULATORY PURPOSES.  SO FOR

24    THAT REASON, I REACHED THE CONCLUSION THAT USING

25    THE DIFFERING COUNTRY APPROACH OF BANK REGULATORY

1    CAPITAL PURPOSES IS NOT AN APPROPRIATE METHOD

2    UNDER U.S. BANKING LAWS TO MAKE A DETERMINATION

3    AS TO WHETHER THE INVESTMENT WAS DEBT OR EQUITY.

4    BY THE COURT:

5        OKAY.  AGAIN, I'M GOING TO GIVE YOU VERY

6    LIMITED LATITUDE ON THIS.  BUT I REALLY DO NOT

7    WANT AN ANALYSIS OR COMPARISON OF U.S. VERSUS

8    FOREIGN BANK LAWS.  I WILL ALLOW YOU TO QUESTION

9    HIM IF, IN FACT, HE RELIED ON THE ARTHUR ANDERSON

10    LETTERS.  I WILL ALLOW YOU VERY LIMITED LATITUDE

11    TO LET HIM EXPLAIN HOW AND WHY.  BUT AGAIN, I

12    DON'T WANT HIM TO ELABORATE ON THE FOREIGN

13    BANKING LAWS.  THAT'S REALLY NOT AT ISSUE HERE.

14    SO AGAIN, I'M GOING TO GIVE YOU SOME LATITUDE

15    HERE, BUT -- ALL RIGHT?

16    BY MR. MURPHY:

17        WELL, I APPRECIATE IT, YOUR HONOR.  AND I'LL

18    DO MY BEST TO KEEP IT NARROW.  AND IF I STEP OUT

19    OF BOUNDS ---

20    BY THE COURT:

21        I WILL LET YOU KNOW.

22    BY MR. MURPHY:

23        I APPRECIATE THAT.

24    BY THE COURT:

25        I WILL LET YOU KNOW.

 1  BY MR. MURPHY:

 2  Q.    OKAY.  SO LET'S TALK ABOUT BASEL A LITTLE BIT.  HOW IS

 3        THE BASEL FRAMEWORK APPLIED IN DIFFERENT COUNTRIES?

 4  A.    WELL, LET ME BACK UP, BECAUSE I THINK SOME CONTEXT OF

 5        THIS IS VERY IMPORTANT TO UNDERSTANDING WHAT'S GOING

 6        ON HERE.  WHEN I WAS AT THE FEDERAL RESERVE, THE ISSUE

 7        OF CAPITAL REQUIREMENTS CAME UP.  CHAIRMAN VOLCKER --

 8        PAUL VOLCKER, WHO AT THE TIME WAS CHAIRMAN OF THE

 9        FEDERAL RESERVE, WAS VERY CONCERNED ABOUT BANK

10        CAPITAL.  AND I THINK AS HAS BEEN PROVEN AND

11        DEMONSTRATED IN THE LAST SEVERAL YEARS, BANK CAPITAL

12        IS VITALLY IMPORTANT AND CRITICAL TO PRESERVING THE

13        SAFETY AND SOUNDNESS OF BANKING INSTITUTIONS.  AND

14        INDEED, THE ENTIRE TARP LEGISLATION AND THE TARP

15        PROGRAM WAS BASED UPON THE GOVERNMENT CONTRIBUTING

16        BILLIONS AND BILLIONS OF DOLLARS TO BANKS IN THE FORM

17        OF CAPITAL BECAUSE CAPITAL IS ABSOLUTELY VITAL AND

18        CRITICAL TO PRESERVING THE NATION'S AND THE

19        INTERNATIONAL FINANCIAL SYSTEM.  THE BANKING

20        REGULATORS -- THE FEDERAL RESERVE, THE CONTROLLER OF

21        THE CURRENCY, AND THE FDIC, AS WELL AS THE OFFICE OF

22        THRIFT SUPERVISION BACK IN THE 1980'S WHEN I WAS AT

23        THE FED, STARTED PUTTING PRESSURE ON U.S. BANKS TO

24        INCREASE THEIR CAPITAL, RECOGNIZING THAT THEY NEEDED

25        MORE CAPITAL TO WEATHER THE STORMS THAT WERE GOING TO

1   BE FORTHCOMING.  THE U.S. BANKS SAID WAIT A MINUTE,

2   YOU HAVE ALL THESE FOREIGN BANKS OUT THERE THAT DON'T

3   HAVE CAPITAL REQUIREMENTS, THE PRESSURE'S NOT BEING

4   PUT ON THEM.  WE'RE GOING TO BE PUT AT A MAJOR

5   COMPETITIVE DISADVANTAGE VIS A' VIS THE FOREIGN BANKS

6   IF WE HAVE TO PUT UP MORE CAPITAL.  AS A RESULT, THE

7   FEDERAL RESERVE AND THE OTHER REGULATORS WENT TO

8   BASEL, SWITZERLAND, AND BASEL, SWITZERLAND, IS THE

9   CENTER OF THE BANK FOR INTERNATIONAL SETTLEMENTS.  THE

10  BANK FOR INTERNATIONAL SETTLEMENTS IS A VENUE WHERE

11  ALL THE WORLD'S BANKERS -- BANK REGULATORS GET

12  TOGETHER.  THE SUPERVISORS FOR ALL THE MAJOR COUNTRIES

13  GET TOGETHER AND DISCUSS VARIOUS SUPERVISORY ISSUES.

14  AND THE U.S. REGULATORS ESSENTIALLY BROUGHT THE ISSUE

15  OF CAPITAL TO BASEL TO DISCUSS THE NEED FOR MORE

16  CAPITAL IN ALL THE BANKS IN THE WORLD.  AND AS A

17  RESULT, AFTER SEVERAL YEARS OF DISCUSSION AND SEVERAL

18  YEARS OF NEGOTIATION, THE SO-CALLED BASEL ACCORD

19  BETWEEN THE BANKING REGULATORS THROUGHOUT THE WORLD

20  WAS REACHED, WHICH REQUIRED ALL BANKS IN MAJOR

21  COUNTRIES TO MAINTAIN A CERTAIN AMOUNT OF CAPITAL

22  AGAINST THEIR ASSETS TO PROTECT THEM IN THE EVENT OF

23  MAJOR PROBLEMS.

24  Q.   NOW, IS BASEL APPLIED UNIFORMLY THROUGHOUT THE WORLD?

25  A.   THERE ARE A UNIFORM SET OF REQUIREMENTS UNDER THE

1    BASEL ACCORD.  FOR EXAMPLE, ALL COUNTRIES IN 1993, AT

2    THE TIME ALL BANKS -- ALL COUNTRIES AGREED THAT ALL

3    BANKS WERE REQUIRED TO MAINTAIN WHAT'S KNOWN AS TIER-

4    1 CAPITAL IN AN AMOUNT EQUAL TO 4 PERCENT OF THEIR

5    RISK-BASED ASSETS.  AND THE TOTAL CAPITAL WHICH IS

6    TIER 1 IS IN BASIC EQUITY PLUS OTHER -- OTHER THINGS

7    LIKE PREFERRED STOCK AND OTHER TYPES OF HYBRID

8    INSTRUMENTS, TIER 2, AT 8 PERCENT OF THEIR TOTAL RISK-

9    BASED ASSETS.  NOW, THERE ARE ALSO AREAS THAT ARE

10   PERMITTED TO BE LOCAL -- LOCAL CHANGES, FOR EXAMPLE.

11   MORTGAGES, WHICH ARE IN THE U.S. OBVIOUSLY VERY

12   IMPORTANT, HAVE A LOWER RISK WEIGHTING.  THEY --

13   INSTITUTIONS, EXCUSE ME, COUNTRIES WERE PERMITTED TO

14   CREATE LOWER RISK WEIGHTING FOR CERTAIN TYPES OF

15   ASSETS LIKE MORTGAGES.  SO MORTGAGES ARE -- U.S.

16   DECIDED TO RISK WEIGHT MORTGAGES AT 50 PERCENT OF WHAT

17   OTHER LOANS WOULD BE.  OTHER TYPES OF ENTITIES,

18   EQUITY, FOR EXAMPLE, IN THE UNITED STATES HAS A MUCH

19   HIGHER CAPITAL CHARGE THAN DO LOANS -- NORMAL LOANS.

20   SO IF A BANK IN THE U.S. WERE MAKING A LOAN, THAT

21   WOULD BE RISK WEIGHTED AT 100 PERCENT; IF THEY'RE

22   MAKING AN EQUITY INVESTMENT, THERE'S A HIGHER CHARGE

23   FOR MAKING AN EQUITY INVESTMENT.  AND FOREIGN

24   COUNTRIES WERE PERMITTED TO HAVE THE SAME TYPE OF

25   LATITUDE TO DECIDE AT CERTAIN AREAS LIKE THE STATION

1  BETWEEN RISK WEIGHTING ON LOANS AND EQUITY

2  INVESTMENTS, AS TO HOW THEY WANTED TO TREAT THEM.  SO

3  THERE IS A FUNDAMENTAL CORE-TYPE PROVISIONS THAT HAVE

4  TO BE FOLLOWED THROUGHOUT THE WORLD, BUT THEN THERE

5  ARE SOME LOCAL EXCEPTIONS THAT ARE PERMITTED.

6  Q.  OKAY.  NOW, YOU WERE TALKING ABOUT THE RISK WEIGHTING

7      AND HOW IT WORKS.  IS IT RIGHT, THEN, IN YOUR REBUTTAL

8      REPORT, PEX-8, PAGES 4 TO 9, YOU PRESENT EXAMPLES OF

9      HOW A CAPITAL INSTITUTION IS REQUIRED TO MAINTAIN

10     CHARGES BASED ON WHETHER THE INVESTMENT IS AN EQUITY

11     OR A LOAN?

12 A.  THAT'S CORRECT.

13 Q.  OKAY.  NOW, AM I CORRECT THAT YOU DID RELY ON THE

14     ARTHUR ANDERSON LETTERS ---

15 A.  LET ME JUST SAY IN TERMS OF THE REPORT ITSELF, IT ALSO

16     INDICATES, I THINK -- AND I WON'T GO INTO THE

17     CALCULATIONS, BUT I THINK THAT IT PRESENTS VERY

18     GRAPHICALLY THE FACT THAT IN THE UNITED STATES IF A

19     BANK MAINTAINS A LOAN, THE AMOUNT OF CAPITAL THAT THEY

20     HAVE TO MAINTAIN ON THAT LOAN IS FAR LESS THAN THE

21     AMOUNT OF CAPITAL THAT THEY WOULD HAVE TO MAKE IF THEY

22     WERE TREATING IT AS AN EQUITY INVESTMENT.

23 Q.  OKAY.  WELL, NOW LET'S TRY TO MOVE ON TO THESE ARTHUR

24     ANDERSON LETTERS, WHICH AGAIN, FOR THE RECORD, OR

25     JOINT EXHIBITS 51 AND 74.  DID YOU RELY ON THOSE

1       LETTERS WHEN YOU FORMED YOUR REBUTTAL ---

2   A.  YES, YES.  I'M NOT AN EXPERT ON FOREIGN BANK LAW; I

3       JUST TOOK THEM AT THEIR FACE VALUE.

4   Q.  OKAY.  NOW, AS YOU SAID BEFORE, THEY HAVE COUNTRY BY

5       COUNTRY ANALYSIS; CORRECT?

6   A.  THAT'S RIGHT.

7   Q.  AND THEY ANALYZE IN BOTH OF THE LETTERS GERMANY, THE

8       NETHERLANDS, THE UNITED KINGDOM, AND BELGIUM; IS THAT

9       RIGHT?

10  A.  THAT'S RIGHT.

11  Q.  NOW, YOU ANALYZED ARTHUR ANDERSON'S CONCLUSIONS IN

12      YOUR REPORT, AND I'D LIKE TO JUST GO QUICKLY THROUGH

13      THE COUNTRY-BY-COUNTRY ANALYSIS WITH BANKS FROM THOSE

14      FOUR COUNTRIES.

15          BY MR. SAWYER:

16              OKAY, YOUR HONOR, I OBJECT.  IF HE'S

17          APPLYING -- HE'S A U.S. LAW EXPERT; HE'S APPLYING

18          A DOCUMENT WE'VE ALLOWED INTO EVIDENCE ON FOREIGN

19          LAW, AND WE'RE GETTING TO A PART WHERE HE'S GOING

20          TO TRY TO APPLY THAT TO THE FACTS OF THIS CASE.

21          HIS OPINION -- HIS TESTIMONY SHOULD BE LIMITED TO

22          THE OPINION -- THE OPINION THAT HE'S RENDERED,

23          WHICH IS THAT

24          ---

25          BY THE COURT:

1          LET ME JUST SAY I AGREE, MR. SAWYER.  I'M

2     SURE THAT MR. MURPHY IS GOING TO ENSURE THAT HIS

3     OPINION WILL SIMPLY BE LIMITED TO THOSE

4     CONCLUSIONS HE REACHED THAT ARE DESCRIBED IN HIS

5     REPORT; IS THAT RIGHT, MR. MURPHY?

6     BY MR. MURPHY:

7          THAT'S RIGHT.  AND IF I COULD JUST MAYBE

8     HELP THE COURT OUT HERE, I'LL GO ---

9     BY THE COURT:

10         AGAIN, HE'S ALREADY TESTIFIED, MR. SAWYER,

11     HE'S RELIED ON THIS.  SO HE'S GOT A RIGHT TO

12     EXPLAIN HOW AND WHY HE RELIED ON IN REACHING THE

13     CONCLUSIONS HE REACHED.  BUT AGAIN, MR. MURPHY,

14     LET'S BE SURE HE DOESN'T GO BEYOND THAT -- BEYOND

15     THAT CONCLUSION.

16     BY MR. MURPHY:

17         I'M GOING TO ABSOLUTELY DO MY BEST ON THAT,

18     YOUR HONOR.

19     BY THE COURT:

20         VERY WELL.

21     BY MR. MURPHY:

22         AND IF -- MAYBE BEFORE WE DO THIS, REAL

23     QUICKLY, I COULD JUST READ FROM HIS CONCLUSION ON

24     PAGE 15 OF HIS REPORT WHICH SAYS, "BANK RISK

25     BASED CAPITAL REQUIREMENTS DIFFER MARKEDLY FROM

1          COUNTRY TO COUNTRY, AS DETERMINED BY THE BANKING

2          AUTHORITIES OF THE COUNTRIES IN WHICH THE BANKS

3          ARE LOCATED." THAT WAS IN HIS REPORT AND THAT IS

4          ALL I'M GOING TO HAVE HIM TESTIFY TO BASED ON THE

5          ARTHUR ANDERSON LETTERS.

6          BY THE COURT:

7                VERY WELL.  LET'S PROCEED.

8          BY MR. MURPHY:

9                ALL RIGHT.  THANK YOU, YOUR HONOR.

10  BY MR. MURPHY:

11  Q.  SO AS WE WERE JUST TALKING ABOUT, THERE ARE FOUR

12      COUNTRIES THAT YOU ANALYZED IN YOUR REPORT:  GERMANY,

13      THE NETHERLANDS, THE UNITED KINGDOM, AND BELGIUM.  ON

14      PAGE 10 OF YOUR REBUTTAL REPORT YOU TALK ABOUT GERMANY

15      AND THE ARTHUR ANDERSON LETTER.  WHAT DID THE ARTHUR

16      ANDERSON LETTER CONCLUDE ABOUT THE TREATMENT OF THE

17      INVESTMENT UNDER GERMAN RISK-BASED CAPITAL

18      REQUIREMENTS?

19  A.  THE WAY I READ THE ARTHUR ANDERSON LETTER, IT SUGGESTS

20      THAT UNLIKE THE UNITED STATES, WHERE EQUITY

21      INVESTMENTS HAVE A HIGHER CAPITAL CHARGE THAN LOANS,

22      IN GERMANY, ACCORDING TO ARTHUR ANDERSON, LOANS AND

23      EQUITY INVESTMENTS HAVE THE SAME RISK-BASED CAPITAL

24      TREATMENT.  SO THERE WOULD BE NO DISTINCTION BETWEEN

25      THE AMOUNT OF CAPITAL THAT A GERMAN BANK WOULD HAVE TO

1        MAINTAIN AGAINST THE EQUITY INVESTMENT VERSUS A LOAN.

2        IT SHOULD MAKE NO DIFFERENCE.

3    Q.    OKAY.  LET'S FLIP FORWARD TO PAGE 12 OF YOUR REPORT

4        WHERE YOU ANALYZED THE NETHERLANDS.  SAME QUESTION:

5        WHAT DID ARTHUR ANDERSON CONCLUDE WITH RESPECT TO THE

6        NETHERLANDS?

7    A.    ARTHUR ANDERSON CONCLUDED THAT A EQUITY INVESTMENT

8        WOULD BE TREATED IN THE SAME WAY THAT A LOAN WOULD BE

9        TREATED FOR PURPOSES OF CAPITAL ADEQUACY.

10   Q.    SO IS THAT SIMILAR TO GERMANY?

11   A.    YES.

12   Q.    OKAY.  LET'S MOVE FORWARD TO PAGE 14 OF YOUR REBUTTAL

13       REPORT NOW WHERE IT TALKS ABOUT THE UNITED KINGDOM.

14       WHAT DID ARTHUR ANDERSON'S LETTER CONCLUDE WITH

15       RESPECT TO THE UNITED KINGDOM?

16   A.    IT CONCLUDED THAT IT WOULD BE TREATED AS BOTH AN

17       EQUITY INVESTMENT -- PARTIALLY AS AN EQUITY INVESTMENT

18       AND PARTIALLY AS A LOAN; AND, THEREFORE, CAPITAL WOULD

19       HAVE TO BE MAINTAINED IN ACCORDANCE WITH THE

20       REQUIREMENTS PARTLY AS EQUITY, PARTLY AS A LOAN.

21   Q.    OKAY.  NOW WE'VE GOT BELGIUM UP NEXT.  LET'S LOOK AT

22       PAGE 14 AND 15 OF YOUR REBUTTAL REPORT.  SO WHAT DID

23       ARTHUR ANDERSON CONCLUDE WITH RESPECT TO BELGIUM?

24   A.    THEY CONCLUDED THAT IT WOULD BE AN EQUITY INVESTMENT

25       BUT IT COULD BE RECORDED AS A LOAN.  BUT BECAUSE THE

1    BELGIAN AUTHORITIES HAD RECENTLY CHANGED THEIR LAWS,

2    IT SUGGESTED THAT PERHAPS THE BANKS WOULD BE BETTER

3    OFF GOING TO THE BELGIAN AUTHORITIES AND GETTING A

4    RULING AS TO WHETHER IT SHOULD BE TREATED AS AN EQUITY

5    INVESTMENT OR A LOAN.  SO IT WAS UNCERTAIN, IT SEEMS

6    TO ME, THE WAY I READ THE ARTHUR ANDERSON LETTERS, AS

7    TO WHAT IT WOULD BE TREATED UNDER BELGIAN LAW.

8  Q.  OKAY.  NOW, IF YOU LOOK AT 15 OF YOUR REPORT, THE

9    SECOND FULL PARAGRAPH THERE, THERE'S ALSO SOME

10    DISCUSSION ABOUT 10 PERCENT OF THE BANK'S EQUITY.

11    WOULD YOU JUST EXPLAIN HOW THAT AFFECTS THE CONCLUSION

12    IN BELGIUM?

13  A.  YES.  THIS RELATES TO WHAT APPEARS TO BE AN ISSUE

14    RELATING TO LENDING LIMITS.  JUST LIKE THE UNITED

15    STATES DISTINGUISHES BETWEEN INVESTMENTS IN FINANCIAL

16    COMPANIES AND INVESTMENTS IN NON-FINANCIAL COMPANIES,

17    IT SEEMS TO ME THAT WHAT ARTHUR ANDERSON LETTER IS

18    SAYING HERE IS THAT IF THIS -- IF CHEMTECH WAS TREATED

19    AS A FINANCIAL -- INVESTMENT IN A FINANCIAL COMPANY,

20    THEN THE -- ANY INVESTMENT IN EXCESS OF 10 PERCENT OF

21    THE BANK'S EQUITY WOULD HAVE TO BE DEDUCTED FROM THE

22    BANK'S CAPITAL FOR REGULATORY PURPOSES.  IN OTHER

23    WORDS, THE FIRST TEN PERCENT WOULD BE TREATED AS A

24    RISK WEIGHTING OF 100 PERCENT, AND ANYTHING IN EXCESS

25    OF 10 PERCENT OF THE BANK'S CAPITAL WOULD HAVE TO BE

1   TREATED AS A HIGHER RISK WEIGHTING AND HIGHER CAPITAL

2   CHARGE.  HOWEVER, IF IT WAS AN INVESTMENT IN A --

3   EXCUSE ME; LET ME REVERSE THAT.  IF IT WAS A -- YES,

4   IF IT WAS A FINANCIAL COMPANY, THEY'D INVEST MORE THAN

5   10 PERCENT, BUT ANYTHING ABOVE THE 10 PER CENT WOULD

6   HAVE TO BE DEDUCTED AND HAVE A HIGHER CAPITAL CHARGE.

7   IF IT WAS AN INVESTMENT IN A NON-FINANCIAL COMPANY,

8   THEN THE BANK WOULD BE LIMITED TO INVESTING NO MORE

9   THAN 10 PERCENT OF IT'S EQUITY.  SO IT'S A LENDING

10  LIMIT ISSUE; IT'S NOT A CAPITAL CHARGE ISSUE, THE WAY

11  I READ THE ARTHUR ANDERSON LETTER.  BUT IN ANY EVENT,

12  REGARDLESS OF WHETHER IT'S GOING TO BE TREATED AS A

13  EQUITY INVESTMENT OR AS A LOAN, EXCUSE ME, NO MATTER

14  WHAT THE AMOUNT IS, WHETHER IT'S GOING TO BE A NON-

15  FINANCIAL COMPANY INVESTMENT OR AN INVESTMENT IN A

16  FINANCIAL COMPANY, IT'S GOING TO BE RISK WEIGHTED AT

17  100 PERCENT.  SO IT SOUNDS LIKE IT'S REALLY NOT GOING

18  TO MAKE ANY DIFFERENCE UNDER BELGIAN LAW.

19  Q.   OKAY.  I THINK WE MADE IT THROUGH, MR. SCHWARTZ.

20  LET'S TURN BACK TO DEMONSTRATIVE EXHIBIT 19 AND WE CAN

21  WRAP UP HERE.  AGAIN, BACK TO NUMBER 2 THAT YOU LOOKED

22  AT EARLIER, JUST TO CONCLUDE, CAN YOU SUMMARIZE YOUR

23  CONCLUSION WITH RESPECT TO THE ARTHUR ANDERSON LETTERS

24  AND THEN ALSO THE FOREIGN BANK REGULATORY TREATMENT?

25  A.   YES.  BASED ON MY REVIEW OF THE ARTHUR ANDERSON

1      LETTERS AS WELL AS ALL OF THE OTHER INFORMATION THAT'S

2      LISTED IN MY REPORT, IT'S MY VIEW THAT IT'S COMPLETELY

3      INAPPROPRIATE TO COME TO SOME TYPE OF CONCLUSION UNDER

4      U.S. BANKING LAW AS TO WHETHER THE CHEMTECH INVESTMENT

5      WAS EQUITY OR AS A LOAN, BASED UPON HOW THE INVESTMENT

6      WAS TREATED UNDER FOREIGN BANK CAPITAL REQUIREMENTS.

7  Q.   OKAY.  AND WHAT ABOUT THE REGULATORY SUBMISSION; HOW

8      DOES THAT AFFECT YOUR OVERALL CONCLUSION?

9  A.   I THINK -- AGAIN, I THINK THE REGULATORY SUBMISSION IS

10     ABSOLUTELY CRITICAL TO TAKE INTO ACCOUNT BECAUSE IT

11     DESCRIBES TO A U.S. BANKING REGULATOR EXACTLY WHAT THE

12     INVESTORS BELIEVE THAT THE INVESTMENT IS;  THAT IS,

13     IT'S AN EQUITY INVESTMENT AND DISCUSSES THE

14     IMPLICATIONS OF MAKING THAT INVESTMENT AS OPPOSED TO

15     IT BEING TREATED AS A LOAN BY THE INVESTORS.  AND

16     THEREFORE, IT'S MY VIEW THAT BASED UPON THAT LETTER,

17     WHICH IS AN IMPORTANT PART OF THIS DOCUMENTATION, AS

18     WELL AS OTHER INFORMATION, THAT THE INVESTORS VIEWED

19     THE CHEMTECH TRANSACTION AS AN EQUITY INVESTMENT, NOT

20     AS A LOAN.

21  Q.   AND IS THAT PER U.S. BANKING LAW?

22  A.   FOR U.S. BANKING LAW PURPOSES, YES.

23         BY MR. MURPHY:

24            ALL RIGHT.  I HAVE NO FURTHER QUESTIONS FOR

25         YOU AT THIS TIME.

```
 1 ‖    BY THE COURT:
 2 ‖         THANK YOU, MR. MURPHY.
 3 ‖         MR. SAWYER, I THINK WHAT WE'LL DO IS WE'LL
 4 ‖    TAKE ONE LAST BREAK AT THIS TIME.  ONCE AGAIN,
 5 ‖    IT'LL BE A 15 MINUTE BREAK SO WE CAN TRY TO
 6 ‖    ACCOMMODATE YOU AND GET THESE TRANSCRIPTS OUT TO
 7 ‖    YOU AS SOON AS POSSIBLE.
 8 ‖         SO, MR. SCHWARTZ, AGAIN, WE'LL RETURN IN 15
 9 ‖    MINUTES.  YOU'LL THEN BE SUBJECT TO CROSS
10 ‖    EXAMINATION, AS YOU KNOW.
11 ‖         COURT IS IN RECESS.
12 ‖         (THEREFORE, AT THIS TIME, COURT IS IN
13 ‖         RECESS.)
14 ‖         (THEREFORE, AT THIS TIME, THE PROCEEDINGS
15 ‖         ARE RESUMED.)
16 ‖    BY THE COURT:
17 ‖         BE SEATED.
18 ‖         OKAY.  MR. SAWYER, YOU MAY PROCEED WITH
19 ‖    CROSS-EXAMINATION.
20 ‖    BY MR. SAWYER:
21 ‖         THANK YOU, YOUR HONOR.
22 ‖                   CROSS-EXAMINATION
23 ‖ BY MR. SAWYER:
24 ‖ Q.   GOOD AFTERNOON, MR. SCHWARTZ.
25 ‖ A.   GOOD AFTERNOON.
```

1    Q.    I'D LIKE TO TAKE YOU THROUGH THE LETTER THAT YOU CALL

2          A CRITICAL PIECE OF EVIDENCE IN THIS CASE, THE LETTER

3          TO THE FEDERAL RESERVE BOARD.

4    A.    THE FEDERAL RESERVE BANK.

5    Q.    I'M SORRY, FEDERAL RESERVE BANK OF NEW YORK.  AND

6          THAT'S JOINT EXHIBIT 119, BEGINNING AT THE THIRD PAGE

7          OF THAT EXHIBIT.  FIRST OF ALL, I THINK YOU MENTIONED

8          ON DIRECT, BUT THE LETTER IS WRITTEN BY KING AND

9          SPALDING, AND DO YOU KNOW WHAT KING AND SPALDING IS?

10   A.    KING AND SPALDING IS A LAW FIRM THAT WAS REPRESENTING

11         DOW CHEMICAL.

12   Q.    HOW DO YOU KNOW THEY WERE REPRESENTING DOW CHEMICAL?

13   A.    THERE WERE OTHER DOCUMENTATION THAT I HAD REVIEWED IN

14         CONNECTION WITH THIS TRANSACTION THAT INDICATED THAT

15         THEY WERE REPRESENTING DOW.

16   Q.    OKAY.  AND THE LETTER WAS WRITTEN TO ERNIE PATRIKIS AT

17         FEDERAL RESERVE BANK OF NEW YORK?

18   A.    THAT'S CORRECT.

19   Q.    AND THE "RE" LINE IN THAT LETTER, IT SAYS, "RE:

20         TRANSACTION DISCUSSION OF JULY 20, 1993."  IF YOU

21         COULD TURN BACK A PAGE IN THE EXHIBIT, YOU READ THE

22         "RE" LINE OF A MEMO WHICH IS A CHEMTECH ROYALTY

23         ASSOCIATES, LP, BUT THAT WAS A MEMO FROM HOWARD DARBY

24         AND LEVIN TO THE FOREIGN BANKS THAT PARTICIPATED IN

25         THE CHEMTECH TRANSACTION; CORRECT?

1  A.   YES.

2  Q.   THE ACTUAL LETTER WRITTEN TO THE GENERAL COUNSEL OF

3       THE FEDERAL RESERVE BANK OF NEW YORK DID NOT MENTION

4       CHEMTECH, DID IT?

5  A.   THAT'S CORRECT.

6  Q.   IT DIDN'T MENTION DOW CHEMICAL?

7  A.   IT DID NOT MENTION DOW CHEMICAL EITHER.

8  Q.   NOW IN YOUR REBUTTAL REPORT YOU STATE, "THE FEDERAL

9       RESERVE LETTER CLEARLY REFLECTS THAT THE BANKS

10      REGARDED THE CHEMTECH INVESTMENT AS AN EQUITY

11      INVESTMENT RATHER THAN A LOAN."  NOW, I WANT TO GO

12      THROUGH THE LETTER THAT WAS SENT TO THE FEDERAL

13      RESERVE BANK OF NEW YORK, AND WHEN WE GET TO THE PART

14      WHERE IT CLEARLY REFLECTS THE BANK REGARDED THE

15      CHEMTECH INVESTMENT AS EQUITY, PLEASE STOP ME AND

16      POINT THAT OUT, OKAY.

17           THE BEGINNING -- THE FIRST PARAGRAPH OF THAT

18      LETTER, DEAR MR. PATRIKIS, AND THE PARAGRAPH ENDS,

19      "THANK YOU FOR TAKING THE TIME TO SPEAK WITH US

20      EARLIER THIS AFTERNOON."  WOULD YOUR OPINION BE THAT A

21      REASONABLE READING OF THAT LINE WOULD BE THAT LIKELY A

22      TELEPHONE CALL WAS MADE TO MR. PATRIKIS?

23 A.   IT WAS EITHER A TELEPHONE CALL OR A FACE-TO-FACE

24      MEETING; IT'S NOT CLEAR WHICH.

25 Q.   IN YOUR OPINION, WHAT'S THE MOST LIKELY EVENT THAT

1     WOULD HAVE LED TO THAT, A PHONE CALL OR A MEETING?

2  A.   I'M NOT SURE IT MAKES ANY DIFFERENCE, DOES IT?

3  Q.   WELL, BECAUSE YOUR ---

4         BY THE COURT:

5              WAIT, WAIT, WAIT, WAIT.  MR. SCHWARTZ, YOU

6         KNOW THE RULES.  IT'S NOT YOUR ROLE TO ASK

7         QUESTIONS; IT'S YOUR ROLE TO ANSWER QUESTIONS,

8         OKAY?

9         BY THE WITNESS:

10             YES, SIR.

11  BY THE WITNESS:

12  A.   I HAVE NO OPINION AS TO WHETHER IT WAS A TELEPHONE

13      CALL OR A FACE-TO-FACE MEETING.  I CANNOT COME TO A

14      CONCLUSION ON THAT.

15  BY MR. SAWYER:

16  Q.   BUT YOUR REPORT INDICATES THAT THEY MET WITH THE

17      GENERAL COUNSEL AND THE STAFF.  SO IN YOUR REPORT WHEN

18      YOU SAY "MET," YOU HAD NO BASIS ON WHICH TO SAY OR TO

19      SUGGEST THAT "MET" MEANT A FACE-TO-FACE MEETING; IS

20      THAT CORRECT?

21  A.   "MET" IN MY REPORT MEANS TALKED WITH.  YOU HAVE

22      TELEPHONE CONFERENCE CALLS AND TELEPHONE MEETINGS; YOU

23      CAN HAVE A FACE-TO-FACE MEETING.  THAT IS A GENERIC

24      TERM THAT RELATES TO DISCUSSIONS.

25  Q.   OKAY.  IF THE DOW CHEMICAL COMPANY SUBMITTED PROPOSED

1  FINDINGS IN THIS CASE TO SUGGEST THAT A MEETING TOOK

2  PLACE, BASED ON YOUR REPORT, WHAT -- ALL THAT YOUR

3  REPORT OR ALL THAT YOUR TESTIMONY REALLY CAN SAY IS

4  THAT SOME TYPE OF CONVERSATION TOOK PLACE; CORRECT?

5  A.  THAT'S CORRECT, SIR.

6  Q.  NOW, THE SECOND PARAGRAPH BEGINS, "I COMPILED THE

7  FOLLOWING DESCRIPTION OF THE PROPOSED TRANSACTION

8  BASED ON THE NOTES I PREPARED FOR OUR EARLIER

9  CONVERSATION." NOW, AGAIN, A NATURAL READING TO ME TO

10  THAT IS THAT IT WAS PROBABLY A BRIEF CONVERSATION, HE

11  HAD NOTES READY TO MAKE A DISCUSS -- TO TALK TO MR.

12  PATRIKIS AND MR. PATRIKIS DIDN'T HAVE TIME, SO HE PUT

13  IT IN A LETTER AND MAILED IT TO HIM. AGAIN, WHAT IS

14  YOUR OPINION OF WHAT THAT PORTION OF THIS ---

15  A.  I WOULD COMPLETELY DISAGREE WITH THAT CONCLUSION. YOU

16  SAY IT'S A BRIEF CONVERSATION; I THINK THERE'S NO

17  EVIDENCE IN HERE THAT INDICATES IT WAS A BRIEF

18  CONVERSATION. I BELIEVE THAT THERE WERE NOTES THAT HE

19  HAD PREPARED FOR OUR EARLIER CONVERSATION, AND

20  APPARENTLY THOSE NOTES COULD HAVE BEEN EXTENSIVE; THEY

21  COULD NOT HAVE BEEN EXTENSIVE. I THINK THERE'S NO

22  BASIS FOR CONCLUDING WHETHER IT WAS A BRIEF

23  CONVERSATION WHATSOEVER.

24  Q.  OKAY.

25  A.  AND WHAT THE PURPOSE OF THIS WAS. MY EXPERIENCE,

1   HOWEVER, HAS BEEN THAT WHEN YOU HAVE A MEETING OR SOME

2   SORT OF DISCUSSION WITH THE FEDERAL RESERVE, YOU

3   OFTENTIMES WANT TO PUT DOWN ON PAPER EXACTLY WHAT THE

4   NATURE OF THE TRANSACTION IS SO THAT THE AGENCY IS

5   ABLE TO LOOK AT WHATEVER YOU HAVE DOWN AND COME TO A

6   CONCLUSION, RATHER THAN HAVING TO RELY UPON THEIR

7   NOTES AND THEIR MEMORY AS TO WHAT THE TRANSACTION WAS.

8   SO IT'S NOT UNHEARD OF FOR SOMEBODY, EVEN IF YOU HAVE

9   A LONG CONVERSATION WITH HIM, TO TRY TO SUMMARIZE AND

10  PRESENT THE NATURE OF THE TRANSACTION.

11  Q.  OKAY.  SO IT COULD HAVE BEEN A LONG CONVERSATION OR A

12      SHORT ONE, WE HAVE NO IDEA?

13  A.  THAT'S CORRECT.

14  Q.  THE LAST LINE OF THAT SENTENCE, "IT IS OUR HOPE THAT

15      AFTER YOU HAVE HAD A CHANCE TO STUDY THE DESCRIPTION

16      WE CAN CONTINUE THE DISCUSSION WHERE WE LEFT OFF."

17      THERE IS NO EVIDENCE ANYWHERE IN THE RECORD OF THIS

18      CASE THAT YOU'RE AWARE OF THAT ANY FURTHER DISCUSSIONS

19      EVER TOOK PLACE, CORRECT?

20  A.  THAT'S CORRECT.

21  Q.  NOR IS THERE ANYTHING THAT YOU'RE AWARE OF THAT EVER

22      SUGGESTS THAT THE FEDERAL RESERVE BANK OF NEW YORK

23      ACTUALLY APPROVED THIS TRANSACTION; IS THAT CORRECT?

24  A.  THAT'S CORRECT.  ALTHOUGH I MUST -- I THINK YOU HAVE

25      ALLUDED WRONG.  THE FEDERAL RESERVE BANK OF NEW YORK

1    DID NOT HAVE TO APPROVE THE TRANSACTION.  WHAT THIS

2    WAS WAS SEEKING GUIDANCE FROM THE FEDERAL RESERVE AS

3    TO WHETHER THEY HAD ANY OBJECTION TO THE BANKS RELYING

4    UPON THE EXCEPTION IN THE REGULATION FOR THIS TYPE OF

5    TRANSACTION.  THE FEDERAL RESERVE DID NOT HAVE TO

6    APPROVE ANYTHING.

7  Q.  OKAY.  THAT'S A GREAT POINT, THEN.  SO NEITHER PARTY

8    SHOULD SUBMIT A BRIEF TO THIS COURT SUGGESTING THAT

9    THE FEDERAL RESERVE BANK OF NEW YORK HAD APPROVED THIS

10    TRANSACTION; CORRECT?

11  A.  I BELIEVE THAT WOULD BE CORRECT.

12  Q.  THE NEXT PARAGRAPH BEGINS, "AS WE DESCRIBED, KING AND

13    SPALDING HAS BEEN WORKING WITH SEVERAL FORTUNE 100

14    WORLD CLASS U.S. CORPORATIONS, THE SPONSORS."  NOW, MY

15    -- AGAIN, MY READING OF THIS SUGGESTS THAT THIS LETTER

16    IS ABOUT MORE THAN ONE TRANSACTION; WOULD THAT BE A

17    FAIR GUESS?

18  A.  NOT BASED UPON -- NECESSARILY BASED UPON THAT

19    PARTICULAR SENTENCE, NO, I WOULD NOT AGREE WITH THAT.

20  Q.  SO THE FACT THAT THEY SAY THEY'VE BEEN WORKING WITH

21    SEVERAL FORTUNE 100 WORLD CLASS CORPORATIONS AND

22    DEFINING THEM AS "THE SPONSORS," PLURAL, DOESN'T

23    SUGGEST TO YOU THAT THERE WAS MORE THAN ONE

24    TRANSACTION THAT MIGHT BE AT ISSUE?

25      BY THE COURT:

1              IF YOU KNOW, SIR.

2  BY THE WITNESS:

3  A.   I DON'T -- I DON'T THINK IT'S APPROPRIATE TO COME TO A

4       CONCLUSION SAYING THAT MORE ONE TRANSACTION IS

5       DESCRIBED HERE BASED UPON THAT ONE SENTENCE.

6  BY MR. SAWYER:

7  Q.   OKAY.  IF THE GOVERNMENT'S CASE -- THE GOVERNMENT'S

8       POSITION IN THIS LITIGATION IS THAT THE GOLDMAN SACHS

9       AND COMPANY THAT'S PROMOTED WHAT WE ARE CONTENDING TO

10      BE AN ABUSE OF TAX SHELTER, AND THAT THEY PROMOTED IT

11      TO FIVE DIFFERENT COMPANIES.  THEY PROMOTED IT TO DOW,

12      MARION MERRELL DOW, THE MERK CORPORATION,

13      INTERNATIONAL PAPER, AND DUNN AND BRADSTREET.  I

14      BELIEVE THERE'S EVIDENCE IN THE RECORD TO SUPPORT

15      THAT.  NOW, WITH THAT IN THE RECORD OR WITH MY

16      REPRESENTATION OF THAT BEING THE RECORD IN THIS CASE,

17      WOULD YOU SAY THAT THE FIRST SENTENCE OF THAT LETTER

18      WOULD BE THAT KING AND SPALDING MIGHT BE REPRESENTING

19      ALL FIVE OF THESE U.S. TAXPAYERS WHO HAVE ENTERED INTO

20      THIS TRANSACTION?

21          BY THE COURT:

22              DON'T ANSWER YET.  IS THERE AN OBJECTION,

23          MR. MURPHY?

24          BY MR. MURPHY:

25              I THINK THERE'S A SIMPLE ONE, YOUR HONOR.  I

1          THINK HE'S ASKED THIS QUESTION A FEW TIMES NOW

2          AND THEN JUST WENT ON TO TESTIFY ABOUT WHAT THE

3          UNITED STATES BELIEVES ARE THE FACTS IN THIS CASE

4          THAT ARE NOT NECESSARILY STIPULATED TO,

5          PARTICULARLY WITH RESPECT TO THESE OTHER

6          TRANSACTIONS.  I THINK MR. SCHWARTZ HAS ANSWERED

7          THE QUESTION WITH RESPECT TO THIS LETTER, IN

8          PARTICULAR.

9          BY THE COURT:

10             OKAY.  I'LL -- I'M GOING TO LET YOU, MR.

11         SAWYER, ASK THE QUESTION ONE MORE TIME.  IF THE

12         WITNESS KNOWS THE ANSWER, HE CAN ANSWER.  IF HE

13         DOESN'T KNOW THE ANSWER, HE CAN ANSWER.  BUT I

14         AGREE WITH YOU, IT WAS MORE IN THE NATURE OF A

15         STATEMENT UNSTIPULATED TO.  BUT NONETHELESS, MR.

16         SAWYER, WHY DON'T YOU REPHRASE THE QUESTION AND

17         LET'S SEE IF THE WITNESS KNOWS THE ANSWER?

18 BY MR. SAWYER:

19 Q.   WOULD IT BE TRUE THAT A REASONABLE READING OF THIS

20      FIRST SENTENCE IN YOUR OPINION WOULD BE THAT KING AND

21      SPALDING MAY HAVE REPRESENTED MORE THAN ONE PARTIES

22      WHO HAVE ENTERED INTO A SIMILAR TRANSACTION?

23 A.   YES, THAT WOULD BE CORRECT.

24 Q.   AND THE SECOND SENTENCE, WOULD IT BE FAIR TO SAY THAT

25      HOWARD DARBY AND LEVIN MAY HAVE REPRESENTED MORE THAN

1    ONE FOREIGN BANK WHO WOULD HAVE BEEN ENTERING INTO

2    MORE THAN TRANSACTION?

3  A.  THAT'S POSSIBLE.

4  Q.  OKAY.  NOW, I'M GETTING READY TO TURN THE PAGE.  IS

5    THERE ANYTHING ON THIS FIRST PAGE THAT CLEARLY

6    REFLECTS THAT THE BANKS REGARDED THE CHEMTECH

7    TRANSACTION AS AN EQUITY INVESTMENT?

8  A.  NOT TO MY KNOWLEDGE.

9  Q.  ON PAGE 2 OF THE LETTER, THE FIRST FULL PARAGRAPH

10    BEGINS, "EACH TRANSACTION CONTEMPLATES A CONTRIBUTION

11    BY THE RELEVANT SPONSOR AND/OR IT'S AFFILIATE OF

12    SPECIFIC PERSONAL PROPERTY ASSETS TO A DELAWARE

13    LIMITED PARTNERSHIP."  AND THEN IT SAYS, "IN SEVERAL

14    CASES, THOSE ASSETS WILL CONSIST OF PATENTS, PATENTS

15    APPLICATIONS, SOFTWARE RIGHTS, OTHER INTANGIBLES,

16    TOGETHER WITH RELATED CONTRACTS."  AGAIN, THE

17    SUGGESTION IN THIS -- WELL, DID YOU READ THIS FIRST

18    SENTENCE OF THAT PARAGRAPH TO SUGGEST THAT MORE THAN

19    ONE TRANSACTION WAS AT ISSUE IN THIS PROCEEDING?

20  A.  YES, IT -- CERTAINLY.  WELL, AT LEAST CERTAINLY IT

21    DESCRIBES IN THE LETTER MORE THAN ONE TRANSACTION.

22  Q.  NOW, THE LAST PARAGRAPH OF PAGE 2, "IN EACH

23    PARTNERSHIP THE GENERAL PARTNER WILL BE A NON-U.S.

24    CORPORATION AFFILIATED WITH THE SPONSOR."

25  A.  I'M SORRY, COULD YOU -- WHERE IS THAT AGAIN?

1  Q.  I'M SORRY.  THE VERY LAST PARAGRAPH -- THE FIRST

2      SENTENCE OF THAT LAST PARAGRAPH.  "IN EACH PARTNERSHIP

3      THE GENERAL PARTNER" --

4  A.  YES, OKAY.

5  Q.  -- "THE GENERAL PARTNER WILL BE A NON-U.S. CORPORATION

6      AFFILIATED WITH THE SPONSOR."  AGAIN, BEGINNING "IN

7      EACH PARTNERSHIP" AGAIN SUGGESTING THAT MORE THAN ONE

8      TRANSACTION WAS AT ISSUE ---

9  A.  YES, I WOULD AGREE.

10 Q.  GETTING READY TO TURN THE PAGE, BUT AGAIN YOU

11     INDICATED THIS WAS A CRITICAL PIECE OF EVIDENCE IN

12     THIS CASE.  IS THERE ANYTHING ON PAGE 2 SUGGESTING

13     THAT THE FOREIGN BANKS CLEARLY -- THAT CLEARLY

14     REFLECTS THAT THE FOREIGN BANKS REGARDED THE CHEMTECH

15     INVESTMENT AS AN EQUITY INVESTMENT?

16 A.  THERE'S NO MENTION ON PAGE 2 WHATSOEVER ABOUT THE

17     BANKS.  SO I DON'T SEE ANYTHING IN THERE THAT SUGGESTS

18     AS TO WHAT THE BANKS' CONCLUSIONS WOULD BE.

19 Q.  NOW, LET'S TURN TO THE THIRD PAGE.  "THE PRINCIPAL

20     PLACE OF BUSINESS OF EACH" -- AND I'M AT THE FIRST

21     SENTENCE OF THE FIRST FULL PARAGRAPH -- "THE PRINCIPAL

22     PLACE OF BUSINESS OF EACH PARAGRAPH WILL BE OUTSIDE

23     THE UNITED STATES."  DO YOU HAVE ANY KNOWLEDGE AS TO

24     WHY EACH PRINCIPAL PLACE OF THESE PARTNERSHIPS HAD TO

25     BE OUTSIDE OF THE UNITED STATES?

1    BY THE COURT:

2        IS THERE AN OBJECTION?

3    BY MR. MURPHY:

4        WELL, I'M NOT QUITE SURE WHAT MR. SAWYER'S

5    DOING, BUT HE'S PURPORTING TO GO THROUGH THE

6    LETTER, SENTENCE BY SENTENCE, WHILE CONTINUING TO

7    SKIP OVER PIECES, WHILE ASKING ABOUT EQUITY AND

8    THEN ASKING ABOUT MULTIPLE PARTNERSHIPS.  BUT

9    WHAT HE'S DONE IS JUST SKIPPED RIGHT OVER THE TOP

10    OF THIS PAGE THAT TALKS ABOUT REGULATION K, WHICH

11    WAS THE ENTIRE POINT OF MR. SCHWARTZ'S DIRECT-

12    EXAMINATION.

13    BY THE COURT:

14        I UNDERSTAND THAT, MR. MURPHY.  YOU'LL HAVE

15    AN OPPORTUNITY ON REDIRECT TO BRING THAT OUT IF

16    YOU WISH.  BUT MR. SAWYER HAS THE RIGHT TO

17    QUESTION THE WITNESS ON ANY OR ALL PORTIONS OF

18    THE LETTER THAT YOU REFERENCED IN HIS DIRECT-

19    EXAMINATION.

20    BY MR. MURPHY:

21        OKAY.  THANK YOU, YOUR HONOR.

22  BY THE WITNESS:

23  A.  COULD YOU REPEAT THE QUESTION?

24  BY MR. SAWYER:

25  Q.  WELL, SURE.  IN FACT, LET ME REPEAT WHAT MY

1    UNDERSTANDING IS OF THE OPINION OF YOUR FIRST REPORT.

2    THE FIRST -- THE REPORT OPINION, AS I UNDERSTAND IT,

3    IS THAT THE FOREIGN BANKS REGARDED THEIR LIMITED

4    PARTNERSHIP INTEREST IN CHEMTECH AS AN EQUITY

5    INVESTMENT AND NOT AS A LOAN FOR PURPOSES OF U.S.

6    BANKING LAWS.  AND IN YOUR REPORT, AS I MENTIONED, YOU

7    INDICATE THAT IT'S THE FEDERAL RESERVE LETTER THAT

8    CLEARLY REFLECTS THAT THE BANKS REGARDED THE CHEMTECH

9    INVESTMENT AS AN EQUITY INVESTMENT RATHER THAN AS A

10    LOAN.  I MEAN, MR. MURPHY HAS A FAIR POINT, AND

11    INSTEAD OF -- AND I DO INTEND TO GO THROUGH THE REST

12    OF THIS LETTER -- BUT IF THERE'S SOME PORTION OF THIS

13    LETTER THAT CLEARLY REFLECTS THAT THE BANKS THOUGHT

14    THIS WAS AN EQUITY INVESTMENT, I WOULD LIKE YOU TO

15    POINT THAT OUT.

16  A.  WELL, I CAN POINT -- I CAN POINT OUT THE FACT THAT

17    WHEN YOU LOOK AT PAGE 3 OF THE LETTER, THAT'S THE LAST

18    PARAGRAPH WHICH I THINK IS THE SUMMARY -- SUMMATION --

19    EVERYTHING LEADS UP INTO THAT.  THEY WERE BUILDING A

20    CASE TO DEMONSTRATE THIS IS WHAT THE PARTNERSHIP DOES

21    AND THESE ARE THE FACTORS THAT HAVE TO BE TAKEN INTO

22    ACCOUNT IN ANY ANALYSIS UNDER U.S. BANKING LAW,

23    PARTICULARLY REGULATION K, AS TO WHAT THIS TRANSACTION

24    IS AND WHETHER IT FALLS WITHIN THE APPROPRIATE

25    EXCEPTION.  THE LAST PARAGRAPH CONCLUDES THAT, "ON

1    THESE FACTS, WE BELIEVE THAT THE PARTNERSHIP

2    CONSTITUTES A COMPANY THAT'S NOT ENGAGED DIRECTLY OR

3    INDIRECTLY IN ANY ACTIVITIES IN THE UNITED STATES,

4    OTHER THAN THOSE THAT ARE INCIDENTAL TO THE

5    INTERNATIONAL OR FOREIGN BUSINESS OF THE COMPANY." AND

6    THEN "AND THEREFORE THE ACQUISITION BY EACH BANK OF

7    IT'S LIMITED PARTNERSHIP INTEREST DOES NOT REQUIRE ANY

8    PRIOR NOTICE UNDER PRIOR APPROVAL BY VIRTUE OF THE

9    EXEMPTION AFFORDED IN SECTION 211.23F3."  AND THE

10    CONTEXT OF THAT IS THAT THE BANK HOLDING COMPANY ACT

11    DOES NOT PERMIT A FOREIGN BANK TO ENGAGE IN -- TO MAKE

12    AN INVESTMENT IN A COMPANY THAT'S ENGAGED IN

13    ACTIVITIES THAT ARE COMMERCIAL, IF THOSE ACTIVITIES

14    ARE BEING CONDUCTED INSIDE THE UNITED STATES, UNLESS

15    THOSE ACTIVITIES ARE INCIDENTAL TO THEIR FOREIGN

16    ACTIVITIES.

17  Q.  SO IS THAT WHAT YOU BELIEVE CLEARLY REELECTS THAT THE

18    BANKS THOUGHT THIS WAS AN EQUITY INVESTMENT; IS THERE

19    MORE?

20  A.  LET ME REVIEW THE LETTER AGAIN.  THE REST OF IT -- THE

21    REST OF THAT PARAGRAPH IS CRITICALLY IMPORTANT, AS

22    WELL.  "THE CONCLUSION IS PREDICATED IN LARGE MEASURE

23    ON THE DEFINITION OF ENGAGED IN ACTIVITIES THAT WOULD

24    BE ATTRIBUTED TO THE INVESTORS."  THOSE ACTIVITIES OF

25    THE FOREIGN ENTITY WOULD BE ATTRIBUTED TO THE

1     INVESTORS AS WELL.  "EACH PARTNERSHIP WILL HOLD 100

2     PERCENT OF THE VOTING SECURITIES OF THE SUBSIDIARY

3     CORPORATION."  THAT TALKS IN TERMS OF AN EQUITY

4     INVESTMENT MADE BY THE PARTNERSHIP ITSELF.  AND THEN

5     THE NEXT TO THE -- THE ULTIMATE PARAGRAPH ON PAGE 4

6     TALKS IN TERMS OF THE BANKS' DIRECT INVESTMENT IN THE

7     PARTNERSHIP AND SUCH BANKS INDIRECT INVESTMENT IN THE

8     PARTNERSHIP SUBSIDIARY IS PERMISSIBLE WITHOUT ANY

9     PRIOR NOTICE OR PRIOR APPROVAL UNDER THE BANK HOLDING

10     COMPANY ACT.  THE ONLY TIME PRIOR NOTICE OR PRIOR

11     APPROVAL IS REQUIRED FOR A TRANSACTION IS IF IT IS AN

12     INVESTMENT IN EQUITY AS OPPOSED TO MAKING A LOAN.

13     THERE'S NO PRIOR APPROVAL OR PRIOR NOTICE REQUIREMENTS

14     TO MAKE A LOAN UNDER THE BANK HOLDING COMPANY ACT OR

15     BOARD'S REGULATIONS.  SO I THINK YOU HAVE TO TAKE ALL

16     THOSE TOGETHER AND UNDERSTAND HOW BANKING LAW WORKS IN

17     ORDER TO COME TO THE CONCLUSION THAT THIS IS AN EQUITY

18     INVESTMENT AND THE BANKS REGARDED THIS AS AN EQUITY

19     INVESTMENT FOR PURPOSES OF BANKING LAW.

20  Q.  WELL, THAT DOESN'T SOUND TOO CLEAR.

21  A.  WELL, THIS IS NOT BEING WRITTEN BY A LAYMAN; THIS IS

22     BEING WRITTEN BY PRACTITIONERS WHO UNDERSTAND BANKING

23     LAW.  AND THESE ARE CRITICAL ASPECTS IN TALKING ABOUT

24     ACTIVITIES AND INVESTMENTS IN THE CHEMTECH TRANSACTION

25     OR TRANSACTIONS DESCRIBED AS VERY SIMILAR TO CHEMTECH.

1    Q.   AND IT'S BEING WRITTEN, AGAIN, BY KING AND SPALDING,

2         WHO REPRESENTS THE U.S. TAXPAYERS, NOT THE FOREIGN

3         BANKS.

4              BY THE COURT:

5                   IS THERE A QUESTION?

6    BY MR. SAWYER:

7    Q.   WELL, YOU MENTIONED THE ---

8              BY MR. SAWYER:

9                   I'M SORRY, YOUR HONOR.

10   BY MR. SAWYER:

11   Q.   YOU MENTIONED THAT THE LETTER WAS BEING WRITTEN BY

12        SOMEBODY WHO WAS, YOU KNOW, CONVERSANT IN U.S. BANKING

13        LAW, BUT THE AUTHOR OF THAT LETTER WAS NOT

14        REPRESENTING THE FOREIGN BANKS, WAS HE?

15   A.   WELL, BUT I WOULD POINT OUT THE FACT THAT THE SECOND

16        PARAGRAPH OF THE LETTER -- IN THE FIRST PARAGRAPH OF

17        THE LETTER IT TALKS ABOUT HOWARD DARBY AND LEVIN BEING

18        ON -- INVOLVED IN THE CONVERSATION WITH THE FEDERAL

19        RESERVE.  AND LAWYERS -- IN THE SECOND PARAGRAPH IT

20        TALKS IN TERMS OF LAWYERS WHO WERE THE BANKS' COUNSEL

21        BEING -- GIVING PERMISSION TO KING AND SPALDING TO

22        PROVIDE THE FOLLOWING DESCRIPTION.  SO THERE'S NO

23        QUESTION THAT BANK COUNSEL WAS INTIMATELY INVOLVED IN

24        THE PREPARATION -- IN THE SUBMISSION, CERTAINLY, AND

25        KNOWING FULL WELL THAT THIS WAS BEING SUBMITTED TO THE

1        FEDERAL RESERVE BANK.  SO I THINK TO SAY THAT KING AND

2        SPALDING DID IT ON THEIR OWN AS A REPRESENTATIVE OF

3        DOW IS INCORRECT.  THE BANK WAS CLEARLY INVOLVED.  AND

4        THAT'S THE WAY THESE TYPES OF TRANSACTIONS ARE BEING

5        INVOLVED.  THEY ARE IN THE BEST POSITION TO DESCRIBE

6        THE TRANSACTION BECAUSE THEY'RE THE TRANSACTION

7        COUNSEL.

8    Q.  WELL, AND THE TRANSACTION COUNSEL BEING PRIMARILY KING

9        AND SPALDING, I WOULD ---

10   A.  YES.

11   Q.  AND KING AND SPALDING IS REPRESENTING THE U.S.

12       TAXPAYERS IN THIS DEAL, NOT THE FOREIGN BANKS.  I

13       UNDERSTAND THAT ---

14            BY THE COURT:

15                IS THAT A QUESTION?

16   BY THE WITNESS:

17   A.  WHEN YOU SAY THEY'RE REPRESENTING THE U.S. TAXPAYERS,

18       I THINK THEY'RE REPRESENTING DOW.

19            BY THE COURT:

20                WAIT, WAIT, MR. SCHWARTZ.

21            BY THE WITNESS:

22                OH, I'M SORRY, YOUR HONOR; EXCUSE ME, YOUR

23       HONOR.

24            BY MR. SAWYER:

25                I'M SORRY, YOUR HONOR.

1          BY THE COURT:

2               MR. SAWYER, I'M NOT SURE WHEN YOU'RE ASKING

3          A QUESTION AND WHEN YOU'RE MAKING A STATEMENT,

4          SIR.  PLEASE MAKE SURE YOU COUCH STATEMENTS IN

5          THE FORM OF A QUESTION.

6          BY MR. SAWYER:

7               I APOLOGIZE.

8    BY MR. SAWYER:

9    Q.   AS FAR AS DOCUMENTS THAT YOU REVIEWED, YOU HAD

10        INDICATED THAT YOUR REPORT HAD A LIST OF DOCUMENTS

11        THAT YOU REVIEWED.  LET'S TALK ABOUT A FEW THAT YOU

12        HAVEN'T REVIEWED.  YOU DIDN'T REVIEW THE GOLDMAN SACHS

13        SLIPS PRESENTATION MADE TO THE DOW CHEMICAL COMPANY IN

14        APRIL 1992, DID YOU?

15   A.   THAT'S CORRECT.

16   Q.   YOU DIDN'T REVIEW THE GOLDMAN SACKS SLIPS PRESENTATION

17        MADE TO THE DOW CHEMICAL COMPANY IN JUNE OF 1992?

18   A.   WELL, LET ME CORRECT THAT.  I DID LOOK AT THOSE

19        DOCUMENTS, BUT I DID NOT TAKE THEM INTO ACCOUNT IN

20        CONNECTION WITH MY -- IN CONNECTION WITH MY REPORTS

21        BECAUSE I DID NOT BELIEVE THAT THEY HAD ANY IMPACT AT

22        ALL ON THE ANALYSIS OF U.S. BANKING LAW.  I DID LOOK

23        AT THEM, BUT I JUST DID NOT TAKE THEM INTO ACCOUNT.

24   Q.   I MENTIONED THE FIRST TWO WHICH WERE APRIL AND JUNE

25        PRESENTATIONS.  DID YOU LOOK AT THE GOLDMAN SACKS

1    SLIPS PRESENTATION MADE IN NOVEMBER OF 1992 TO DOW

2    CHEMICAL COMPANY?

3  A.    I DON'T RECALL.

4  Q.    DID YOU LOOK AT THE GOLDMAN SACKS SLIPS PRESENTATION

5    MADE TO THE FOREIGN BANKS IN THE SPRING OF 1993?

6        BY THE COURT;

7            OBJECTION.  DON'T ANSWER, MR. SCHWARTZ.

8        BY MR. MURPHY:

9            WELL, I DO HAVE AN OBJECTION, AND MAYBE MR.

10    SCHWARTZ COULD HANDLE THIS, BUT I'M LOOKING AT

11    THE EXHIBIT LIST, AND NUMBER 14 ON EXHIBIT B IS

12    THE EXHIBITS MARKED AT THE DEPOSITION OF PATRICK

13    MCGUIRE.  AND I'M PRETTY CERTAIN THAT AT THAT

14    DEPOSITION THE GOLDMAN PRESENTATION TO THE

15    FOREIGN BANKS WAS -- WAS MARKED AS AN EXHIBIT.

16        BY THE COURT:

17            ARE YOU SUGGESTING, MR. SAWYER, THAT IT WAS

18    NOT MARKED AS AN EXHIBIT?

19        BY MR. SAWYER:

20            NO.  AND IT PROBABLY WAS.  I DIDN'T -- I

21    APOLOGIZE.

22        BY THE COURT:

23            THAT'S OKAY.  WE'VE GOT A LOT OF DOCUMENTS

24    HERE TO GET THROUGH.  BUT LET'S JUST BE CLEAR.

25    HE SAID THAT THAT'S -- THANK YOU, MR. MURPHY.  I

1          THINK THAT MR. SAWYER WILL REPHRASE THE QUESTION.

2   BY MR. SAWYER:

3   Q.   SO YOU HAD ACCESS, PERHAPS, TO THE GOLDMAN SACKS

4        MATERIALS BUT YOU DIDN'T BELIEVE THEM RELEVANT TO YOUR

5        OPINION; IS THAT FAIR?

6   A.   I THINK THAT WHAT I WOULD SAY IS THERE WERE MANY, MANY

7        DOCUMENTS THAT I LOOKED AT IN CONNECTION WITH THIS

8        TRANSACTION AND PREPARATION OF MY REPORTS.  THE

9        DOCUMENTS THAT I THOUGHT MOST RELEVANT AND THE ONES

10       THAT I CONSIDERED IN CONNECTION WITH THE PREPARATION

11       OF THE REPORT ARE LISTED IN THE EXHIBITS.  I MAY VERY

12       WELL HAVE LOOKED AT THOSE AND NOT -- NOT NECESSARILY

13       HAVE TO RELY UPON THEM.

14  Q.   YOU INDICATED YOU REVIEWED THE REPORT OF PROFESSOR

15       HUBBARD, WHO'S AN EXPERT IN ECONOMICS.  AND YOU'RE

16       PURPORTING, I BELIEVE, TO REBUTT THIS EXPERT WITNESS

17       REPORT OF -- OF THE FORMER CHAIRMAN OF THE PRESIDENT'S

18       COUNSEL OF ECONOMIC ADVISORS.  BUT YOU HAVE NO

19       EXPERTISE, THEN, IN ECONOMICS, DO YOU?

20  A.   WHEN YOU SAY I HAVE NO EXPERTISE IN ECONOMICS, WHAT IS

21       -- I MEAN, I DO HAVE A MASTERS IN BUSINESS FROM

22       COLUMBIA UNIVERSITY, WHICH PROFESSOR HUBBARD, OF

23       COURSE, IS THE DEAN AT.  I WAS THERE MANY YEARS BEFORE

24       HE SHOWED UP ON THE SCENE.  BUT WHEN YOU SAY NOT AN

25       EXPERT IN ECONOMICS, I'M NOT SURE WHAT YOU MEAN.

1  Q.  YOU DON'T PURPORT TO BE AN EXPERT WITNESS IN THE FIELD

2      OF ECONOMICS?

3  A.  NO, I DO NOT.

4  Q.  YOU DON'T PURPORT TO BE AN EXPERT IN ACCOUNTING?

5  A.  THAT'S CORRECT.

6  Q.  AND YOU DON'T PURPORT TO BE AN EXPERT ON BELGIAN

7      BANKING LAW?

8  A.  THAT'S CORRECT.

9  Q.  AND YOU DON'T PURPORT TO BE AN EXPERT ON DUTCH BANKING

10     LAW?

11 A.  CORRECT.

12 Q.  YOU DON'T PURPORT TO BE AN EXPERT ON U.K. BANKING LAW?

13 A.  CORRECT.

14 Q.  AND YOU DON'T PURPORT TO BE AN EXPERT ON GERMAN

15     BANKING LAW?

16 A.  THAT'S CORRECT.

17 Q.  NOW, HAVE YOU EVER HEARD THE PHRASE IN REFERENCE TO A

18     TAX SHELTER CASE AS SOME DOCUMENT BEING MERE WINDOW

19     DRESSING?

20 A.  NO, I HAVEN'T.  I'M NOT AN EXPERT IN TAX, EITHER.

21 Q.  IS IT POSSIBLE ---

22          BY THE COURT:

23              JUST ANSWER THE QUESTION NOW, MR. SCHWARTZ.

24          BY THE WITNESS:

25              AGAIN, I ---

1          BY THE COURT:

2              JUST ANSWER THE QUESTION, OKAY?

3   BY MR. SAWYER:

4   Q.   IS IT POSSIBLE THAT THE DOCUMENT THAT YOU'RE PRIMARILY

5        RELYING ON, THIS LETTER FROM KING AND SPALDING TO THE

6        FEDERAL RESERVE BANK OF NEW YORK, WAS WRITTEN TO HELP

7        ESTABLISH LEGITIMACY FOR A TAX PRODUCT?

8          BY THE COURT:

9              IS THERE AN OBJECTION?

10         BY MR. MURPHY:

11             YES, THERE IS, YOUR HONOR.  I THINK HE'S

12        ALREADY TESTIFIED AS TO WHAT HIS EXACT OPINION IS

13        WITH RESPECT TO THE LETTER AND WHY IT WAS

14        WRITTEN, AND THEN HE HAS ALSO TESTIFIED THAT HE

15        IS NOT AN EXPERT IN TAX.  SO I DON'T KNOW ---

16         BY THE COURT:

17             I UNDERSTAND, MR. MURPHY, BUT I'LL ALLOW THE

18        QUESTION.  YOU'RE RIGHT, IT'S REPETITIVE, BUT

19        I'LL AT LEAST LET MR. SAWYER ASK THE QUESTION AND

20        LET'S SEE WHAT HAPPENS.

21         BY MR. MURPHY:

22             I JUST WANT TO MAKE SURE WE'RE NOT HAVING

23        ANY SPECULATION ON THAT.

24         BY THE COURT:

25             I UNDERSTAND.  LET'S JUST -- AGAIN, THE

1              OBJECTION IS OVERRULED.

2         BY MR. MURPHY:

3              THANK YOU, YOUR HONOR.

4         BY THE COURT:

5              AND WHY DON'T YOU ASK THE QUESTION AGAIN,

6         MR. SAWYER, IF YOU CAN REMEMBER IT.

7         BY MR. SAWYER:

8              I CAN'T REMEMBER, BUT I BELIEVE HE ANSWERED

9         HE HASN'T HEARD THE PHRASE WINDOW DRESSING.

10        BY THE COURT:

11             I THINK HE'S ANSWERED THAT QUESTION.

12   BY MR. SAWYER:

13   Q.   I WOULD LIKE TO CLARIFY ONE POINT.  IN YOUR DIRECT

14        EXAMINATION YOU INDICATED HAVING REVIEWED BANK

15        TRANSACTION DOCUMENTS, AND I'M NOT SURE IF I MIS-HEARD

16        YOU OR WHAT.  BUT COULD YOU EXPLAIN, DID YOU REVIEW

17        ANY BANK TRANSACTION DOCUMENTS IN THIS CASE?

18   A.   THE DOCUMENTS THAT I WAS REFERRING TO WERE THE

19        CONTRACTS AND THE VARIOUS PARTNERSHIP AGREEMENTS AND

20        EVIDENCE OF WHAT THE BANKS' INVESTMENTS WERE --

21        AMOUNTS, PERCENTAGES, AND VARIOUS TRANSACTION

22        DOCUMENTS RELATING TO THE TRANSACTIONS THEMSELVES --

23        THINGS THAT WERE SENT TO THE BANKS.

24   Q.   BUT ACTUAL DOCUMENTS FROM RABO BANK OR DRESDNER OR BBL

25        OR NATWEST OR KREDIET BANK, YOU DIDN'T REVIEW

1    DOCUMENTS FROM THOSE.

2  A.   THAT'S CORRECT, I BELIEVE.

3         BY MR. SAWYER:

4             THANK YOU.  I HAVE NO FURTHER QUESTIONS.

5         BY THE COURT:

6             OKAY.  THANK YOU, MR. SAWYER.

7             MR. MURPHY, IS THERE ANY REDIRECT?

8         BY MR. MURPHY:

9             I DO HAVE JUST A FEW THINGS, YOUR HONOR.

10                 REDIRECT-EXAMINATION

11 BY MR. MURPHY:

12 Q.   THANK YOU.  FIRST, MR. SCHWARTZ, YOU JUST TALKED ABOUT

13      MANY THINGS THAT YOU'RE NOT AN EXPERT IN, INCLUDING

14      FINANCE, EXCUSE ME, INCLUDING TAX.  WOULD YOU CONSIDER

15      YOURSELF AN EXPERT IN THE BASEL ACCORD AND IT'S

16      WORKINGS?

17 A.   OH, YES.  WE SPEND A LOT OF TIME IN OUR FIRM ANALYZING

18      BANK CAPITAL ADEQUACY ISSUES.

19 Q.   THANK YOU.  NOW, I JUST WANT TO GO BACK TO JOINT

20      EXHIBIT 119 THAT YOU SPENT SOME TIME WITH ON THE

21      CROSS-EXAMINATION.  IF YOU LOOK AT DOCUMENT, PAGE

22      NUMBER KBC/DOW 000304 --

23 A.   YES.

24 Q.   -- IT STATES, "THE ATTACHED LETTER WAS SENT TO THE

25      GENERAL COUNSEL OF THE FEDERAL RESERVE BANK OF NEW

1    YORK"; IS THAT CORRECT?

2  A.   THAT'S RIGHT.

3  Q.   AND CAN YOU JUST READ THE "RE" LINE OF THAT LETTER?

4  A.   CHEMTECH ROYALTY ASSOCIATES, LP, BANK HOLDING COMPANY

5    ACT."

6  Q.   SO EVEN IF THE KING AND SPALDING LETTER WAS DISCUSSING

7    GENERICALLY MORE THAN ONE TRANSACTION, IS IT YOUR

8    UNDERSTANDING THAT CHEMTECH WAS AT LEAST A

9    REPRESENTATIVE TRANSACTION IN THIS LETTER?

10  A.   YES.  THE WAY I READ THE COVER NOTE FROM HOWARD DARBY

11    AND LEVIN WAS THAT THE FACTS DESCRIBED IN THE KING AND

12    SPALDING LETTER WERE DESCRIBING THE CHEMTECH

13    TRANSACTION.  AT LEAST THAT'S WHAT SHE SAYS IN HER

14    COVER MEMORANDUM.

15  Q.   AND THE BANKS, I BELIEVE YOU TESTIFIED TO ON DIRECT.

16    YOU MENTIONED BANK BRUSSELS, LAMBERT, DRESDNER,

17    KREDIET BANK, NATWEST, AND RABO.  WERE THOSE THE BANKS

18    THAT INVESTED IN CHEMTECH?

19  A.   YES, THEY WERE.

20  Q.   ONE MORE THING, MR. SCHWARTZ.  YOU WERE ASKED ON CROSS

21    IF YOU WERE AWARE THAT THE FEDERAL RESERVE ACTUALLY

22    APPROVED THE TRANSACTION IN ANY WAY, AND I BELIEVE

23    YOUR RESPONSE WAS THAT YOU -- NO, YOU WERE NOT AWARE?

24  A.   THAT'S RIGHT.  I THINK I ALSO SAID THAT THERE WAS NO

25    NEED FOR FEDERAL RESERVE APPROVAL OF THE TRANSACTION,

1       AS WELL.

2   Q.  I JUST WANT TO CLARIFY THIS ON DIRECT, I ASKED YOU

3       WHAT WAS TYPICAL FOR THE FEDERAL RESERVE IN RESPONDING

4       TO A LETTER LIKE THIS.  DO YOU REMEMBER YOUR RESPONSE

5       TO THAT?

6   A.  THE FEDERAL RESERVE WOULD TYPICALLY NOT PROVIDE

7       ANYTHING IN WRITING IN CONNECTION WITH THIS TYPE OF -

8       -- THESE TYPES OF TRANSACTIONS -- TRANSACTIONS

9       GENERALLY.  THE GUIDANCE OF THE FEDERAL RESERVE, WHICH

10      WOULD TYPICALLY BE ORAL ADVICE.

11  Q.  AND WHAT ABOUT THE FACTS -- BECAUSE WE'RE HERE AND THE

12      BANKS OBVIOUSLY ENTERED INTO THIS TRANSACTION,

13      CHEMTECH, DOES THAT AFFECT YOUR OPINION ON WHAT THE

14      FEDERAL RESERVE THOUGHT ABOUT THIS LETTER?

15          BY MR. SAWYER:

16              OBJECTION, YOUR HONOR.  HE COULD HAVE NO

17          IDEA.

18          BY THE COURT:

19              WHY DON'T YOU LAY A FOUNDATION; IF THERE'S

20          A FOUNDATION OR A BASIS, I WILL PERMIT THE

21          QUESTION.  BUT IT SOUNDS PRETTY SPECULATIVE TO

22          ME.  I MEAN, I'M SATISFIED THAT THE FEDERAL

23          RESERVE IS NOT GOING TO ISSUE AN OPINION LETTER

24          IN MATTERS LIKE THIS.  IF I'M WRONG, YOU CAN

25          PRESENT TESTIMONY ABOUT THAT.  BUT THAT'S WHAT I

1    -- ONE OF THE THINGS THAT I'VE GLEANED FROM THIS

2    WITNESS' TESTIMONY.

3         AM I INCORRECT ABOUT THAT, MR. MURPHY?

4    BY MR. MURPHY:

5         NO, YOU'RE NOT, YOUR HONOR.  I THINK WE'VE

6    GOT THE POINT.

7    BY THE COURT:

8         ALL RIGHT.  VERY WELL.

9    BY MR. MURPHY:

10         ALL RIGHT.  I HAVE NO FURTHER QUESTIONS FOR

11    YOU, MR. SCHWARTZ.

12    BY THE WITNESS:

13         THANK YOU.

14    BY THE COURT:

15         MR. SCHWARTZ, THANK YOU FOR COMING IN TODAY.

16    YOU ARE EXCUSED, SIR.

17    BY THE WITNESS:

18         THANK YOU, YOUR HONOR.

19    BY THE COURT:

20         OKAY.  GENTLEMEN, IT IS NOW ALMOST 5:30.  I

21    BELIEVE YOU HAVE ONE MORE WITNESS, MR. MAGEE. THE

22    WITNESS WHO NOT HERE TODAY?

23    BY MR. MAGEE:

24         THE WITNESS IS NOT HERE TODAY, WILL BE HERE

25    TOMORROW.  WE WOULD VERY MUCH LIKE TO PROCEED,

1    YOUR HONOR.  TOMORROW YOU SAID WAS GOING TO BE A

2    SHORT DAY BECAUSE WE'RE CLOSING SHOP AT FOUR

3    O'CLOCK.  IF WE CAN START -- IF WE CAN CONTINUE

4    NOW WITH THEIR FIRST EXPERT WITNESS, WE HAVE FIVE

5    EXPERTS AND ONE VERY SHORT FACT WITNESS.

6    BY THE COURT:

7        WELL, I ---

8    BY MR. MAGEE:

9        SO WE MIGHT GET OUT OF HERE BY SATURDAY NOON

10    IF WE CAN ---

11    BY THE COURT:

12        I'M AS EAGER AS ANYONE ELSE TO GET THIS OVER

13    WITH, BUT I DON'T KNOW IF IT MAKES A WHOLE LOT OF

14    SENSE AT THIS STAGE TO GO FORWARD WITH JUST A

15    HALF HOUR OF TESTIMONY, YOU KNOW, AGAIN, GIVEN

16    THE LATENESS OF THE DAY.

17    BY MR. MAGEE:

18        I THOUGHT YOU WERE WILLING TO GO BEYOND 6:00

19    TODAY, BUT YOU ARE THE JUDGE.

20    BY THE COURT:

21        I INDEED AM, BUT SINCE WE HAVE TO -- AND I

22    ASSUME YOUR WITNESS WILL BE HERE FIRST THING

23    TOMORROW?

24    BY MR. MAGEE:

25        YES.

 1        BY THE COURT:

 2            OKAY.  SO SHE CAN BE OUR VERY FIRST WITNESS

 3        TOMORROW MORNING AT 8:30, CORRECT?

 4        BY MR. MAGEE:

 5            YES.  ASSUMING SHE MADE IT IN THIS STORM,

 6        YES.

 7        BY THE COURT:

 8            MR. WELSH, WHAT IS THE GOVERNMENT'S POSITION

 9        ON THAT?

10        BY MR. WELSH:

11            WE HAVE A COUPLE OF EXPERTS WHO ARE ON THE

12        WAY, BUT APPARENTLY, I UNDERSTAND FROM MY

13        COLLEAGUES, THAT THEIR PLANES -- THEY'RE FLYING

14        OUT OF NEW YORK.

15        BY THE COURT:

16            SO THEY'RE NOT EVEN PRESENT AT THIS TIME?

17        BY MR. WELSH:

18            NO, THEY'RE NOT.

19        BY THE COURT:

20            SO THAT WE CAN'T ---

21        BY MR. WELSH:

22            NO, I HAVEN'T EVEN GOTTEN AN E-MAIL FROM

23        THEM, SO THEY MUST BE UP IN THE AIR.

24        BY THE COURT:

25            WELL, SHAME ON MR. MAGEE FOR WANTING TO MOVE

1    FORWARD WITHOUT THE WITNESSES HERE.  I THOUGHT

2    MAYBE YOU'D HAVE TO PUT MR. GAUPP ON THE WITNESS

3    STAND.

4    BY MR. WELSH:

5        I THINK HE'D BE A GREAT EXPERT; I'D LIKE TO

6    SEE HIM UP THERE.

7    BY THE COURT:

8        I'D LOVE TO SEE MR. GAUPP ON THE WITNESS

9    STAND.  BUT LET'S JUST GO ON AND BREAK FOR THE

10   EVENING.  I THINK IT MAKES SENSE.  AND THAT WAY

11   WE'LL START FIRST THING TOMORROW MORNING,

12   ASSUMING YOUR WITNESS ---

13   BY MR. MAGEE:

14       YOU SUGGESTED EIGHT O'CLOCK YESTERDAY, YOUR

15   HONOR.

16   BY THE COURT:

17       I'M PREPARED FOR EIGHT O'CLOCK.  ARE YOU ALL

18   PREPARED TO ---

19   BY MR. WELSH:

20       THAT'S GOOD FOR US, YES.

21   BY THE COURT:

22       I HAVE A FEELING, MR. MAGEE, YOU'RE TRYING

23   TO GET OUT OF OUR CITY --

24   BY MR. MAGEE:

25       I'D LIKE TO GET HOME.

1    BY THE COURT:

2         -- AS QUICKLY AS YOU CAN.  SHAME ON YOU.

3    BY MR. MAGEE:

4         I LOVE YOUR CITY, BUT I DO HAVE A FAMILY.

5    BY MR. WELSH:

6         I DON'T THINK HE LIKES IT AS MUCH AS WE DO.

7    BY THE COURT:

8         SO LET'S DO THAT.  AND TOMORROW, AGAIN, WE

9    WILL BREAK AT 4:00.  AND ALSO, DEPENDING ON THE

10   PACE OF THINGS TOMORROW, I THINK WE'LL ALL BE IN

11   A BETTER POSITION TO TRY TO PLAN OUT THE REST OF

12   THE TRIAL TO DETERMINE IF, FOR INSTANCE, WE HAVE

13   TO COME IN ON SATURDAY OR IF IT'S WORTH IT TO

14   JUST PUSH THINGS BACK TO MONDAY OR TUESDAY OR

15   WHAT HAVE YOU.  AGAIN, I KNOW EVERYONE WANTS TO

16   GET ON HOME, BUT WE'LL TRY TO BE AS ACCOMMODATING

17   AS WE CAN.

18        SO AGAIN, WE WILL START PROMPTLY AT EIGHT

19   O'CLOCK TOMORROW.  I ASSUME EVERYONE CAN BE HERE

20   FOR EIGHT O'CLOCK; CORRECT?  OKAY.  VERY WELL.

21   COURT IS IN RECESS.

22        (THEREFORE, AT 5:40 P.M., THE COURT IS IN

23         RECESS FOR THE DAY.)

24

25

1              C E R T I F I C A T E

2

3         I CERTIFY THAT THE FOREGOING IS A CORRECT

4    TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE

5    ABOVE-ENTITLED NUMBERED MATTER.

6

*Clare Smith-Neely*

7

8         CLARE SMITH-NEELY, CCR

9         OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18